**UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE**

United States of America

   v.                                      Case No. 21-cr-41-1-JL

Ian Freeman

**ORDER OF DETENTION PENDING TRIAL**

Ian Freeman ("defendant") has been charged with Conspiracy to Operate Unlicensed Money Transmitting Business, in violation of 18 U.S.C. §§ 371, 1960(a), and (b)(1)(B); Operation of Unlicensed Money Transmitting Business, in violation of 18 U.S.C. §§ 1960(a), (b)(1)(B), and (C); Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349; Wire Fraud, in violation of 18 U.S.C. § 1343; Continuing Financial Crimes Enterprise, in violation of 18 U.S.C. § 225; and Money Laundering, in violation of 18 U.S.C. § 1956(a)(3)(B).  Doc. no. 1.  The defendant, along with his co-conspirators, allegedly operated an unlawful virtual currency exchange, misleading banks and other virtual currency exchanges by claiming that the incoming payments were donations to various churches.  By doing so, the defendants allegedly allowed individuals engaged in fraud and other unlawful activities to exchange U.S. currency for cryptocurrency without detection.

The government moved to detain the defendant on risk of flight and dangerousness grounds.  The defendant seeks release.  In accordance with 18 U.S.C. § 3142(f), a detention hearing was conducted by videoconference on March 19, 2021.[1]  For the reasons explained below, the government's motion for detention is granted.

## I.   Legal Standards

Section 3142(f) of the Bail Reform Act, 18 U.S.C. §§ 3141-3156, "does not authorize a detention hearing whenever the government thinks detention would be desirable, but rather limits such hearings" to the circumstances listed in 18 U.S.C. § 3142(f)(1) and (f)(2).  United States v. Ploof, 851 F.2d 7, 10 (1st Cir. 1988).  In this case, the government argued that a detention hearing was warranted under 18 U.S.C. § 3142(f)(1)(B), in light of the potential life sentence permitted by 18 U.S.C. §

---

[1] An in-person hearing was not possible on March 19, 2021 due to the health and safety precautions taken in response to the COVID-19 pandemic.  See Standing Order ADM-1, 20-25.  Defendant waived his right to an in-person hearing and consented to a video hearing.  Doc. no. 32.  The hearing was listed on the public docket on the court's website, and public access to the hearing was available by video in accordance with the court's Standing Order ADM-1, 20-7.  The court made written findings regarding the limitations on in-person public access, see Doc. no. 33, and incorporated those findings on the record.

2

225.[2]  Defense counsel challenged this ground for the detention hearing, arguing that it was unlikely that Mr. Freeman would be sentenced to life.  The government agreed that such a sentence was unlikely but argued that it was the maximum sentence authorized by the statute – not the likely sentence – that was determinative for purposes of § 3142(f)(1).  The provision at issue authorizes a detention hearing where the case involves "an offense for which the maximum sentence is life imprisonment or death."  18 U.S.C. § 3142(f)(1)(B) (emphasis added).  The plain meaning of this provision indicates that if a defendant's charge carries a statutory maximum of life imprisonment, a detention hearing is allowed.  See United States v. Martinez, 102 F. Supp. 2d 39, 41 (D. Mass. 2000) (finding that "[s]ection 3142(f)(1)(B) includes offenses for which a maximum term of life imprisonment is permitted" (emphasis added)).  Here, the defendant's charge under 18 U.S.C. § 225 carries such a maximum.  The court finds that a hearing was therefore authorized under 18 U.S.C. § 3142(f)(1)(B).

Pursuant to § 3142(f), the court must determine whether any condition or combination of conditions set forth in § 3142(c)

---

[2] At the detention hearing, the government did not indicate under which provision of 18 U.S.C. § 3142(f) it was seeking detention but did assert that Mr. Freeman was facing a maximum penalty of life in prison.  The government subsequently clarified that it was proceeding under § 3142(f)(1)(B).

will reasonably assure the appearance of the defendant ("risk of flight") and the safety of any other person and the community ("dangerousness").  See 18 U.S.C. § 3142(f); United States v. Patriarca, 948 F.2d 789, 791 (1st Cir. 1991).  In making this determination, the court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the accused, including family ties, past conduct, criminal history, financial resources, and employment; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release.  18 U.S.C. § 3142(g).

During a hearing conducted pursuant to 18 U.S.C. § 3142, the government has the burden of persuading the court that no condition or combination of conditions will reasonably assure (1) the defendant's presence at trial, see United States v. Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988); or (2) the safety of another or the community.  See Patriarca, 948 F.2d at 792.  The government is required to prove risk of flight by a preponderance of the evidence and to establish dangerousness by clear and convincing evidence.  See id. at 792-93.

## II.  Findings and Rulings

In this case, the government argued that the defendant's release posed a risk of flight and danger to the community.

After weighing the evidence and information before the court, including the Pretrial Services Report ("PSR") as well as the parties' proffers,[3] and balancing the factors laid out in 18 U.S.C. § 3142(g), the court finds that the government met its burden to prove risk of flight by a preponderance of the evidence and dangerousness by clear and convincing evidence.

A. Risk of Flight

The government argues that the defendant is a flight risk. The defendant has substantial financial resources.[4] In his interview with pretrial services, he indicated that he receives $23,000 in monthly income — $5,000 from advertisers and $18,000 from donations. PSR at 3-4. He also told probation that he has $60,000 in a checking account[5] and $500 in stocks. PSR at 4. In addition, while executing a search warrant on March 16, 2021,

---

[3] The court rejects the defendant's position that the government was required to make its case for detention based on dangerousness through witness testimony. "Courts have concluded that district courts have much discretion in determining whether a bail hearing shall be conducted by proffer or live testimony and have rejected the contention that either the constitution or § 3142(f) necessarily requires that live witnesses be produced at detention hearings." United States v. Pasciuti, 958 F.2d 361, 1992 WL 51482, at *5 (1st Cir. 1992) (per curiam, unpublished table decision) (citing cases).

[4] Mr. Freeman has access to the assets of the Shire Free Church, which he controls along with his business partner, Mark Edginton. See PSR at 4.

[5] The defendant proffered at the detention hearing that he intended to convert this money to cryptocurrency.

5

FBI agents seized approximately $178,000 from a safe in the defendant's bedroom. However, based on the information provided at the detention hearing, these amounts do not appear to capture the full extent of the defendant's substantial financial assets.

In its proffer, the government asserted that over $10 million passed through Mr. Freeman's accounts over two years, for which he charged an average of a 10% commission. The government also asserted that his business received hundreds of thousands of dollars every month, of which it took 5 to 15% in fees. Federal agents have identified approximately 28 Bitcoin — equivalent to about $1.6 million — that Mr. Freeman can access; the government indicated that these funds are almost impossible to trace and can be accessed from anywhere. Moreover, in 2018, an accountant provided a statement to a virtual currency exchange indicating that Mr. Freeman possessed $300,000 in deposit accounts and $2.4 million in liquid assets. The defendant proffered that he brought in between $30,000 and $100,000 through his businesses every month. The information set forth at the hearing by the defendant and the government is significantly different than the itemized income and assets Mr. Freeman initially reported to probation.[6]

---

[6] For the purposes of this order, the court considered only the representations regarding Mr. Freeman's income and assets. There is no dispute regarding the existence of the defendant's

6

The defendant's substantial assets support a finding that he is a flight risk. See United States v. Boustani, 356 F. Supp. 3d 246, 255 (E.D.N.Y. 2019) (considering, among other factors, the defendant's "access to substantial financial resources" in finding that he was a flight risk (citations omitted)), aff'd, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019); see also United States v. Hurley, 960 F.2d 143, 1992 WL 80316, at *2 (1st Cir. 1992) (per curiam, unpublished table decision) (considering the defendant's "likely . . . access to . . . financial resources" in affirming district court's holding that the government met its burden on risk of flight). Moreover, it appears that most of Mr. Freeman's assets are in the form of various cryptocurrencies, which would be difficult for the government to track and could be accessed from anywhere. See United States v. Weeks, No. 9:19-mj-08526-WM, 2019 WL 7044548, at *2 (S.D. Fla. Dec. 20, 2019) (considering, as part of the court's detention analysis, the government's assertion that the defendant "has extensive assets in cryptocurrency totaling millions of dollars which are unaccounted for and which could support him if he chose to flee"); United States v. Rhule,

---

accounts and other assets.  The court does not need to resolve the purported discrepancy between the assets disclosed during his pretrial services interview and those he allegedly failed to disclose and gives no weight to this issue.  Instead, it focuses on the nature of the assets themselves.

No. CR20-0105-JCC-2, 2020 WL 5984072, at *4 (W.D. Wash. Oct. 8, 2020) (considering, as part of the court's flight risk determination, the defendant's substantial financial means and use of cryptocurrency). The defendant's significant financial assets and the fact that much of his wealth is in the form of difficult-to-trace cryptocurrency weigh in favor of detention.

The court acknowledges that Mr. Freeman has lived in New Hampshire since 2006. PSR at 2. However, he lacks meaningful ties to the state and has traveled out of the country regularly in the last few years. His parents live in Florida and his sister lives in New York. Id. at 1-2. Mr. Freeman previously owned a residence in Keene, NH, but transferred it to the Shire Free Church — a religious organization with which he is affiliated — in 2012. Id. at 2. In 2015, he purchased a second property in the name of the Shire Free Church. Id. at 4. While he is employed by the Shire Free Church as a minister, his primary responsibility is hosting a radio show, which does not require his physical presence in Keene, New Hampshire. See id. at 3. The defendant traveled to Japan and Mexico in 2019, and to Mexico in 2018 and 2017.[7] Id. At the hearing, Mr. Freeman's counsel indicated that Mr. Freeman's business partner, Mark

---

[7] Mr. Freeman reported to pretrial services that each trip included broadcasting his radio show from these foreign locations. PSR at 3.

8

Edginton, is currently "out of the country," possibly in Mexico. The defendant's lack of meaningful ties to the area and his foreign connections are relevant factors in the risk of flight analysis. See United States v. Smiley, No. 3:19-CR-00752-RAM, 2019 WL 6529395, at *4 (D.P.R. Dec. 4, 2019) (considering the defendant's lack of ties to Puerto Rico in concluding he was a flight risk); Weeks, 2019 WL 7044548, at *4 (finding the defendant's foreign travel and lack of ties to the relevant jurisdictions contributed to his status as a flight risk); United States v. Smith, Crim. No. 16-464 WJ, 2016 WL 10538351, at *3 (D.N.M. Apr. 7, 2016) (explaining that the defendant's foreign travel supported a conclusion that he was a flight risk, despite finding that the travel was not extensive and that this factor was partially mitigated by the surrender of the defendant's passport).  When considered together, these facts weigh in favor of detention.

The length of the potential sentence is also significant. At least one of the charges carries a mandatory minimum of ten years and a maximum penalty of a life term.  See 18 U.S.C. § 225.  "[T]he potential sentence to be imposed . . . [is a] relevant factor[] in deciding whether the defendant poses a risk of flight."  United States v. Valerio, Crim. Action No. 07-10421-FDS, 2009 WL 2058851, at *2 (D. Mass. July 10, 2009)

(citing United States v. Castiello, 878 F.2d 554, 556 (1st Cir. 1989)).

Next, the court looks to the weight of the evidence against the defendant.  The court notes that "when evaluating the 'weight of the evidence,' the court does not make a determination of the defendant's guilt or innocence, but rather asks whether the evidence against the defendant, as proffered by the parties, is so strong that it could lead the defendant to flee."  United States v. Merrick, No. 20-cr-09-JD, 2020 WL 4483128, at *5 (D.N.H. Aug. 4, 2020) (citing 18 U.S.C. § 3142(j); United States v. Torres-Rosario, 600 F. Supp. 2d 327, 334 (D.P.R. 2009)).  Here, the weight of the evidence — including electronic records, financial analysis, and communications with banks and virtual currency exchanges, resulting from a nearly five-year federal investigation — "is strong and guides the court toward an inference that [Mr. Freeman]'s risk of flight and danger to the community is significant."  Id.  The lengthy potential sentence and strong evidence create an incentive to flee and weigh in favor of detention.  See Hurley, 1992 WL 80316, at *2 (finding that the combination of a potential sentence of more than 15 years and strong evidence established a "considerable incentive to flee").

The court notes the defendant's arguments concerning his mental health, physical health, and criminal record.  However,

10

these factors are at best neutral, and are outweighed by the factors favoring detention. Mr. Freeman's significant financial assets and their unique accessibility, lack of strong ties to New Hampshire, foreign travel, and potentially lengthy sentence, as well as the weight of the evidence against him, establish that he has both the means and the incentive to flee. For these reasons, the court finds that the government met its burden of establishing by a preponderance of the evidence that the defendant presents a serious risk of flight.

B. Dangerousness

The court also finds that the government has met its burden to show by clear and convincing evidence that Mr. Freeman poses a danger to the community. Dangerousness is not limited to physical acts of violence. United States v. Tortora, 922 F.2d 880, 884 (1st Cir. 1990) ("Danger, in this context, was not meant to refer only to the risk of physical violence." (citing S. Rep. No. 98-225, at 12, as reprinted in 1984 U.S.C.C.A.N. 3182, 3195)). Additionally, courts have found that economic harm may constitute a danger to the community for purposes of the Bail Reform Act. See United States v. Persaud, No. 05-cr-368, 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5, 2007) (agreeing with Magistrate Judge's finding that "economic harm qualifies as a danger within the contemplation of the Bail Reform Act");

11

United States v. Giordano, 370 F. Supp. 2d 1256, 1270 (S.D. Fla. 2005) ("There can be no question that an economic danger, like that posed by a serial defrauder, falls under the broad umbrella of 'dangerousness' as that term is used throughout the Bail Reform Act." (citation omitted)); see also United States v. DeSimone, CR No. 09-024S, 2009 WL 904688, at *2 (D.R.I. Apr. 1, 2009) (citing cases and finding that "the concept of 'danger' under 18 U.S.C. § 3142(g)(4) may, at least in certain cases, extend to pecuniary or economic harm").

Mr. Freeman allegedly built and oversaw a wide-ranging criminal enterprise that misled financial institutions, enabled fraud, and allowed those engaged in criminal activity to exchange their ill-gotten gains for virtual currency.  Mr. Freeman was aware of the investigation into his activities; however, he was undeterred by law enforcement's inquiries and, based on the timeline in the record, continued to engage in such activities and encourage others to do so.  According to the government, the defendant knew that his currency exchange was used by persons and/or entities engaged in criminal conduct and marketed his operation as an alternative to other exchanges by indicating that he would not ask about the source or destination of funds and charging much higher fees than legitimate exchanges.  Government agents have identified people across the country who stated they were manipulated by scammers into

12

sending money to the defendant, the Shire Free Church, or one of the alleged co-conspirators, often in the form of "church donations." As recently as March 16, 2021, the Postal Inspection Service intercepted a package addressed to the Shire Free Church, which contained $4,000 from "an 80-year-old victim of an apparent romance scam." This operation clearly poses a danger to the community by enabling fraud and economic harm.

For all of these reasons, the court finds that the government met its burden of proving by clear and convincing evidence that the defendant poses a danger to the community if released.

C. Proposed Conditions

The conditions offered by Mr. Freeman do not allay the court's concerns about risk of flight or dangerousness. The defendant has proposed surrendering his passport. While tendering his passport would reduce the risk of international travel, it does not prevent domestic travel outside of New Hampshire. See United States v. Zeaiter, No. 15-MJ-139-JSS, 2015 WL 3544666, at *2 (N.D. Iowa June 4, 2015) ("Moreover, a passport is not necessary for domestic travel, as the issue is not just one of flight from the country, but risk of any flight and non-appearance at future proceedings."). Additionally, while Mr. Freeman insisted at the hearing that his World

13

Government of World Citizens passport is a "worthless novelty document," probation reports that such passports "have reportedly been recognized at various times by officials in over 95% of all nations." PSR at 3 n.2. Moreover, anyone can purchase this document by applying and paying $125, see id., and even if he were to surrender the one currently in his possession, there is nothing to prevent the defendant from purchasing another.

The defendant also proposed installing a "tracking device" as a condition. However, location monitoring fails to meaningfully mitigate the court's concerns regarding risk of flight and dangerousness. The location monitoring technology used by probation does not have GPS functionality; it would merely alert probation of the defendant's comings and goings from a fixed location but would not otherwise track his movements. In other words, "[e]lectronic monitoring can alert the authorities to flight, but not prevent it." United States v. Angwang, No. 20-MJ-0837(RER), 2020 WL 5947187, at *5 (E.D.N.Y. Oct. 7, 2020) (citations omitted). Moreover, while location monitoring would alert probation if the defendant were to leave his home, "it provides little useful information about what [a defendant] is doing." United States v. Martin, 447 F. Supp. 3d 399, 403 (D. Md. 2020) (recognizing that cell phones and other technology "make it all too easy for [a defendant] to

14

resume his involvement . . . in [criminal conduct] without detection"). Because of the nature of the alleged crimes in this case and the fact that, according to the government's proffer, Mr. Freeman "organized, managed, and supervised at least three other people" to conduct his business, location monitoring would not reasonably assure the safety of the community by deterring the continued operation of the enterprise giving rise to the pending charges. In addition, electronic monitoring is "less effective in 'dangerousness' cases." United States v. Martinez-Torres, 181 F.3d 81, 1998 WL 1085669, at *2 (1st Cir. 1998) (per curiam, unpublished table decision). Here, both dangerousness and risk of flight are at issue, and location monitoring fails to assuage the court's concerns.

The defendant also suggested that he would be amenable to restrictions on his electronic access and access to his currency exchange business. However, he did not explain the form that such conditions would take or how they would reasonably assure that he would cease his activities. The court is not confident that monitoring or restricting Mr. Freeman's electronic access is a viable enforcement tool for probation given his demonstrated sophistication with computer technology and virtual currency. See United States v. Patel, Crim. No. 20-mj-14001 (ZNQ), 2020 WL 1698785, at *6-7 (D.N.J. Apr. 8, 2020) (finding, where the defendant faced charges of conspiracy to commit mail

15

fraud and identity theft, that "[t]he Court does not agree that internet restrictions and location monitoring will be effective in deterring Defendant" from resuming unlawful conduct); United States v. Ojo, Crim. No. SAG-20-0369, 2020 WL 7707341, at *2 (D. Md. Dec. 29, 2020) ("The conduct [the defendant] engaged in is the type of conduct that can be conducted in one's home, and conditions of release prohibiting computer or internet usage are notoriously difficult to enforce."). As to the defendant's involvement in his currency exchange business, for the reasons above, the court is not persuaded that restrictions on such conduct could be effectively fashioned. Moreover, Mr. Freeman's criminal history — specifically the charges of resisting arrest or detention and obstruction of government administration — does not demonstrate a willingness to comply with law enforcement or government orders.

Accordingly, Mr. Freeman's proposed release plan does not reasonably assure his appearance at future court proceedings or the safety of the community.

### III. Conclusion

For these reasons, the court finds that the government met its burden of establishing by a preponderance of the evidence that there are no conditions or combination of conditions of release that will reasonably assure the appearance of the

defendant and its burden of establishing by clear and convincing evidence that there are no conditions or combination of conditions of release that will reasonably assure the safety of any other person and the community.  Accordingly, it is **ORDERED** that the defendant be detained pending trial.

The defendant is committed to the custody of the Attorney General or his designated representative for confinement in a correctional facility, to be held separately, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the government, the person in charge of the correctional facility shall deliver the defendant to the United States Marshal for the purpose of appearing in connection with court proceedings.

SO ORDERED.

_____
Andrea K. Johnstone
United States Magistrate Judge

March 29, 2021

cc:   Mark L. Sisti, Esq.
      Georgiana MacDonald, Esq.
      Seth R. Aframe, Esq.
      U.S. Probation
      U.S. Marshal