UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.    )<br>)<br>IAN FREEMAN )<br>) | No. 1:21-cr-00041–01-JL |

## UNITED STATES' OBJECTION TO
## DEFENDANT'S MOTION TO REVOKE DETENTION ODER

United State Magistrate Judge Johnstone's 17-page order correctly held that there are no conditions or combination of conditions of release that will reasonably assure the appearance of the defendant and the safety of any other person and the community. *See* ECF No. 40. This Court should affirm the judge's detention order.

Ian Freeman is a sophisticated criminal. For years, Freeman ran an unlawful multi-million dollar business converting US dollars into cryptocurrency by making false and misleading statements to banks and virtual currency exchanges, and employing and instructing others to do so on his behalf. By obscuring the nature of his business, Freeman was able to operate without detection from the banks and avoid governmental registration requirements. The anonymity his business provided to his customers attracted hordes of cyber criminals that used his services to convert proceeds of romance scams, investment scams, and your-friend-is in jail scams, among others. In emails and recorded conversations in the government's possession, Freeman made no secret that he knew that fraudsters used his service for this purpose or that he needed to make misrepresentations to banks to conceal his scheme. Freeman's knowledge about the nefarious use that others made of his service is also demonstrated by the substantially higher fees that Freeman charged for bitcoin purchases compared to legitimate bitcoin exchanges,

which register with the government and follow anti-money laundering rules in an effort to avoid having scammers use their services to wash their fraud proceeds.

Freeman has profited mightily from this business and has assets which he failed to disclose to the probation office. In this regard, he claimed a total of $60,000 in a bank account, when the evidence shows that in excess of $10 million in bitcoin trades ran through his accounts for which he charged, on average, ten percent commissions. The disclosures that he made to probation about assets simply do not make sense. This, along with the substantial penalties he faces, including a ten-year mandatory minimum prison sentence and maximum of life, and his prior history of obstructing government activities make him a risk of nonappearance at court proceedings. In addition, were Freeman to be released and continue to engage in this business, his facilitation of exchanging virtual currency for fraudsters places many victims at risk of financial harm.

> **I.      Standard of Review – Appeal of Detention Order**

A district court reviewing a magistrate judge's order denying a motion to reconsider pretrial detention must "engage in de novo review of the contested order." *United States v. Tortora*, 922 F.2d 880, 884 n. 4 (1st Cir. 1990); *see also United States v. Perozzi*, No. 09-cr-117-16-SM, 2009 WL 2929292, at *2 (D.N.H. Sept. 9, 2009) (conducting de novo review of magistrate judge's detention order). The Bail Reform Act authorizes courts to detain a criminal defendant upon finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).  In making its bail determination, courts are required to consider information regarding: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and

seriousness of the danger to any other person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The government bears the burden of demonstrating dangerousness by clear and convincing evidence and must support a finding of risk of flight by a preponderance of the evidence. *United States v. Johnson*, 12-mj-01-01-LM, 2012 WL 40463, at *2 (D.N.H. Jan. 6, 2012). A finding of either risk of flight or danger is sufficient for detention. *See, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995).

> **II.     The defendant poses a risk of flight and danger to the community that cannot be mitigated with conditions.**

The defendant has been charged by indictment with money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B); wire fraud in violation of 18 U.S.C. § 1343; conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349; conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371, 1960(a), and (b)(1)(B); operation of an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960(a), (b)(1)(B), and (C); and operating a continuing financial crimes enterprise, in violation of 18 U.S.C. § 225. For operating a continuing financial crimes enterprise, the defendant faces a mandatory minimum sentence of ten years and a maximum penalty of life imprisonment. The advisory guideline range faced by the defendant is substantially above the mandatory 120-month sentence.

*Nature and Circumstances of the Offense*

The FBI began investigating Freeman because it received various reports of different scam proceeds being deposited into bank accounts in the name of Freeman and his affiliated churches. In fact, the FBI identified victims across the country, in most of the 50 states, who said that they were instructed by scammers to send money to Freeman, the Shire Free Church, or one of Freeman's co-conspirators or their churches. Many of them were instructed to write "church donation" as the reason for their deposit or wire into accounts. Indeed, Freeman himself provided

that instruction to many of his customers, including an undercover agent. When interviewed, witnesses told agents they were not donating to a church but merely following instructions.

To facilitate his business, Freeman opened accounts in the name of the Shire Free Church and had co-conspirators open accounts in the names of the Church of the Invisible Hand, the Reformed Satanic Church, and the Crypto Church of New Hampshire. In 2020, Freeman himself registered yet another church, the NH Peace Church and opened bank accounts in that church's name too.[1]  Because accounts were opened in the name of various churches, it appeared reasonable to banks that deposits in the accounts would be for "church donations," thus explaining Freeman's instruction to his customers to make this notation on deposits.

As recently as March 2021, the day that Freeman was arrested, the Postal Inspection Service seized a package destined for the Shire Free Church and Freeman that contained $4,000 sent by an 80-year-old victim of an apparent romance scam. *See* Exhibit 1. Her story was similar to the scores of stories that the FBI collected over the years of this investigation of scam victims sending money to Freeman for bitcoin under the guise that it was being given to a church.

The Government does not allege that Freeman conspired with these fraudsters to launder proceeds although Freeman has made clear that he knew fraudsters used his service to support their criminal activities. To avoid money laundering charges, Freeman emphasized to all of his bitcoin customers that he did not want them to tell him how they got their money or what they were going to do with their bitcoin. At the same time, he made sure to emphasize that he would not collect any information about them or report their transactions to the government. Instead of charging the two to three percent fee that legitimate cryptocurrency exchanges charge for their service, Freeman charged three to five times that amount. Thus, with the wink-and-nod, Freeman

---

[1] Freeman failed to report anything about this church to the probation department.

made sure that fraudsters knew that he was open to their business in exchange for their paying him premium rates.

Freeman's enterprise, moreover, was built on stealth and deception. According to admissions found in his own email accounts, Freeman knew that banks would not open or operate accounts for him if they knew the nature of his business and so he deliberately misled the institutions with various statements not limited to the previously discussed "church donation" lies. Sometimes, bitcoin purchases were described as "purchase of rare coins" all with the intent to mislead. Thus, banks (at least for a while) believed that Freeman was a legitimate church getting money from donations or other non-cryptocurrency activities. When the account activity, showing an incredible volume deposits, eventually caused the bank to question Freeman, he would try to obfuscate further before the bank would eventually shut his account. He would then move on to another bank or have a confederate open an account in their name that he controlled.

Freeman is also charged with money laundering. An undercover officer was introduced to Freeman. The undercover officer told Freeman he was engaged in drug dealing, and Freeman nevertheless allowed that officer to exchange cash for bitcoin at a virtual currency ATM he operated for which he had disabled the anti-money laundering controls that are set as defaults on such machines.

For his operation of this scheme, and his use of others to do this, Freeman is charged with operating a continuing financial crimes enterprise. He organized, managed, and supervised at least three other people in committing a series of wire fraud violations with gross receipts over five million dollars in a two-year period. The substantial penalty proscribed by this charge provides him an incentive to flee.

During a search warrant executed in March, agents seized approximately $178,000 from a safe in Freeman's bedroom. Freeman explained that he had recently collected money from his bitcoin ATMs (which he operated unlawfully) and had not yet been able to convert that cash to cryptocurrency. Notably, despite his recently emptying them, his ATMs, seized during execution of a warrant, contained almost $50,000 in additional cash deposits, underscoring again the enormous amount of cash Freeman's business regularly generated.

Freeman has the financial resources to flee. Bank records indicate that Freeman's business received deposits of hundreds of thousands of dollars monthly. Taking a 5-15 percent fee of this results in substantial profits to him. The government has identified approximately 28 bitcoin, the equivalent of about 1.6 million dollars, which Freeman can access. These funds are outside the reach of investigators, virtually untraceable and can be accessed from anywhere in the world. And it is quite likely that the government has not identified additional assets in cryptocurrency that Freeman could use to finance his flight if released.

*Weight of the Evidence*

This is a strong case that has been the subject of a joint FBI, IRS, USPIS investigation for almost five years. The government's case rests on comprehensive electronic records and extensive financial analysis. Search warrants for email accounts operated by Freeman, recordings of Freeman, and thousands of pages of bank records and correspondence with banks and virtual currency exchanges have been reviewed. Agents have interviewed numerous witnesses. This substantial evidence was presented to a federal grand jury, which resulted in the return of the instant indictment. In addition, more evidence was gathered at search warrants executed at Freeman's residence and forensic analysis of devices seized continues to produce additional proof.

The charges are not, as Freeman claims, novel or untested in court. *See United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019). The theory of the government's case is quite simple—a wire fraud conspiracy predicated on the defendant repeatedly lying to banks in order to induce them to keep his accounts open so he could continue operating his business. He employed others to do the same on his behalf. The money laundering charge is simple as well. He allowed an undercover officer posing as a drug dealer to use his cryptocurrency ATM to convert dollars to bitcoin. The defendant's contention that, because this case involves cryptocurrency, it is somehow different, is misleading. Cryptocurrency has been in widespread use for years and Courts have regularly considered similar cases in other districts. *See e.g.*, *United States v. Harmon*, 474 F. Supp. 3d 76 (D. D.C. 2020) (collecting authority). Perhaps, the charge of operating an unlicensed money services business is new to this district, but the issues have been litigated elsewhere in support of the government's position here. *Id.*

*History and Characteristics of this Defendant*

The defendant's history raises concerns about his willingness to abide by conditions of release. Although substantial time has passed, Freeman has convictions for obstructing government administration, resisting arrest, and criminal contempt.

Of more substantial concern are Freeman's material misrepresentations to the probation office while it was preparing his bail report. He continued to tell the probation department that he is paid by the church which is funded by donations. This is the same falsehood that Freeman used to perpetrate his crimes.

Most significantly, Freeman substantially underrepresented his financial holdings. He did not report the vast amounts of virtual currency he holds. Emails from Freeman's accounts indicate he held assets including gold and silver and virtual currency of different types including

ether dash, monero, and bitcoin. The government has not seized many of these assets, and he did not report them. In 2018, at Freeman's request, an accountant provided a statement to a virtual currency exchange indicating Freeman had $300,000 in US deposit accounts and $2.4 million in various liquid assets.

At the detention hearing, Freeman argued that he did not disclose these assets because he was not specifically asked about them. At best, this is game playing by Freeman and not the type of cooperation necessary to allow for the probation office to supervise him. At worst, it is a deliberate attempt to obscure his assets. *See United States v. Larry Dean Harmon*, N.D. Ohio No. 20-mj-1030, ECF No. 9-2 (Feb. 12, 2020) (holding that failing to report virtual currency amounted to a misrepresentation to probation). Freeman still has not disclosed these assets to the probation department. Additionally, since the probation interview, the government has become aware of at least one other bank account with a substantial balance that Freeman did not report. He does not dispute that he was asked about funds in bank accounts.

In addition, Freeman's computers and devices were encrypted. His emails indicate that he prefers to limit communication over what he called "open email" and instead to use encrypted applications. While using encryption is not unlawful, it is relevant to the Court's decision about whether the defendant is amenable to supervision. This is someone who was not fully candid with probation during the bail interview and who knows how to hide and obscure his activities.

*Danger to the Community*

Freeman also argues that he was aware of the FBI investigation and did not flee or alter his behavior. Of course, the defendant was not aware of the full extent of the investigation, including the introduction of the undercover officer and various other techniques. Regardless, his

awareness of the investigation and continued operation of his unlawful business bodes against his argument that he will abide by conditions if released.

In addition, Freeman wrote on one occasion that he welcomed the government attack he believed was coming, referring apparently to criminal charges he anticipated. Various of Freeman's associates have likewise characterized these charges in terms of a war or attack. Co-defendant Nobody stated in a recent recorded telephone call that, "somebody needs to start shooting pigs," and "it's time for the fuckin Boogaloo . . . that's how this thing ends. When we end this fucking government." This rhetoric raises substantial concerns about dangerousness.

In addition, Freeman's release poses a danger of additional financial harm being inflicted on new scam victims if he were to continue to operate his business. Substantial portions of this business occurred on encrypted platforms, using currency that is difficult to trace, making monitoring of these activities difficult. There are no conditions that could assure Freeman would be unable to continue to operate the business that, by his own admission, he continued to operate for years despite knowing he was under FBI investigation.

### III. Conclusion

For those reasons, the government respectfully requests that the Court order that the defendant be detained pending trial.

April 22, 2021

Respectfully submitted,
John J. Farley
Acting United States Attorney

/s/ Georgiana L. MacDonald
Assistant U.S. Attorney
Massachusetts Bar # 685375
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
georgiana.macdonald@usdoj.gov


/s/ Seth R. Aframe
Assistant U.S. Attorney
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552


/s/ John J. Kennedy
Assistant U.S. Attorney
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552