UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                   )<br>)<br>IAN FREEMAN                                  )<br>_____ ) | Docket no. 1:21-cr-41-JL |

UNITED STATES' OBJECTION TO
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

I.      INTRODUCTION.

A jury convicted Ian Freeman of several counts related to his operation of a business that traded bitcoin for fiat currency, namely (1) unlawful operation of an unlicensed money transmitting business; (2) conspiracy to operate an unlicensed money transmitting business; (3) money laundering; (4) conspiracy to launder money; and (5) tax evasion.  The defendant preserved motions for judgment of acquittal under Fed. R. Crim. P. 29.  This Court took the defendant's motion under advisement to permit the parties the opportunity to brief the issues raised.

For the reasons described below, there was sufficient evidence to support the jury's guilty verdict on each count.  Therefore, the Court should deny the motion for acquittal.

II.     STANDARD OF REVIEW.

In evaluating a Rule 29 motion, the Court's task is to decide whether, "after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006).  In making this judgment, all credibility disputes are to be resolved in the verdict's favor.  Id.  Moreover, is not necessary that a guilty verdict be the only verdict that could

sensibly be reached; it is enough that the guilty verdict finds support in a plausible rendition of the record. Id. The First Circuit Court of Appeals has described these standards as "daunting hurdles" for defendants who seek a reversal of a jury's verdict. Id.

III. THERE WAS SUFFICIENT EVIDENCE THAT THE DEFENDANT OPERATED AN UNLICENSED MONEY TRANSMITTING BUSINESS.

Freeman argues that the conviction for operating an unlicensed money transmitting business was infirm because he, in fact, was not running a business. He says that, because he was operating the bitcoin trading business under the auspices of his church, that meant that he was not required to register as a money transmitting business under 18 U.S.C. § 1960. That contention is flawed in multiple respects.

First, the jury instructions provide that a business under 18 U.S.C. § 1960, is an enterprise that is regularly carried on for financial gain and engages in money transmission more often than a single, isolated act. Docket Number 256. There is nothing in the instruction that excludes non-profits or religious organizations from the business definition. The only questions are whether the bitcoin trading was for financial gain and did the enterprise conduct more than isolated money transmission. The evidence presented at trial proved beyond a reasonable doubt that Freeman was operating a business as defined in the jury instruction. See United States v. Oliver, 19 F.4th 512, 517 (1st Cir. 2021) (unobjected to jury instructions become law of case for purposes of resolving Rule 29 motion). Even assuming that Freeman was operating legitimately as a church, the entity he operated and controlled was making financial gain. Freeman was charging his customers a fee far above what he paid to purchase the bitcoin from cryptocurrency exchanges or on localbitcoins.com. Thus, "the church" was making financial gain by selling bitcoin at a higher price than it was buying it. Moreover, Freeman conducted thousands of

transactions as part of his bitcoin trading enterprise as demonstrated by the LocalBitcoins records and the Telegram folder on Freeman's computer. Thus, Freeman's bitcoin operation engaged in more than isolated transactions and did so for financial gain. It was therefore a business as defined.

Freeman's argument seems to rest on the idea that a church does not make a profit because the money earned is put back into the church's mission. But the jury instruction does not talk about the status of the organization as a church or non-profit; it merely says that the money transmitting activity is done for financial gain. Here, the evidence was overwhelming that Freeman gained money through the bitcoin business. What he did with those gains after they were realized is beside the point for purposes of the § 1960 charge.

Second, even assuming incorrectly that a bona fide church engaged in money transmitting would not have to register under § 1960, there was plenty of evidence before the jury to conclude that Freeman was not operating a bona fide church. Chris Reitman, Colleen Fordham, and Melanie Neighbors, people close to Freeman, testified that they were not aware of any church services, activities, or the like. Neighbors testified that Freeman typically would invoke the church when he was seeking some sort of advantage from the government often related to avoiding taxes.

Moreover, Freeman operated multiple churches. There was no reason for Freeman to be opening the New Hampshire Peace Church other than to have another name in which he could open bank accounts. This certainly suggested that the church was merely a cover for obtaining bank accounts in which to operate the money transmitting business. This conclusion was reenforced by the way in which Freeman acted toward the other "churches." For example, Freeman told Renee Spinella at one point that they needed to get her "another church" and went

back and forth about her needing to get letterhead that looked different than his church. He also pretended to be Nobody when calling to discuss a banking matter with Bank of America involving the Church of the Invisible Hand, which was supposedly Nobody's church even though many documents relating to it were on Freeman's laptop. These shenanigans about the churches, plus the testimony about the Shire Free Church's lack of activity or membership, was sufficient for the jury to conclude that Freeman's "church" was nothing more than a front to conceal from banks Freeman's money transmitting business.

Third, there was evidence from which the jury could conclude that Freeman personally profited from the bitcoin exchange business. There were bank records introduced from the Colleen Fordham account used by Freeman for bitcoin trading showing hundreds of thousands of dollars in checks going to Freeman personally. In addition, there were multiple accounts that Freeman opened in his own name to operate the bitcoin trading operation. Thus, the jury reasonably could have concluded that the bitcoin trading operation was not actually being operated by the Shire Free Church but rather was Freeman's personal business.

The defendant's second argument was that there was no money transmitting because all the "transactions involved church-owned bitcoin." Money transmitting means transferring funds by any and all means to another person or location, and bitcoin is a type of funds. Docket Number 256 at 25. There were numerous examples presented where people sent Freeman fiat currency and Freeman sent bitcoin to a third party. In these situations, Freeman transferred bitcoin from his reserves to another person in exchange for dollars or went out and bought more bitcoin from an exchange to cover the transaction. It does not matter that Freeman may have had a store of bitcoin in hand when he accepted the fiat currency. He transferred that bitcoin to another person. That's money transmission.

Freeman has invented the idea that a money transmitter must be a pass through, i.e., Freeman would only be a transmitter if he was a go-between for the buyer and a cryptocurrency exchange. That contention has no basis in the jury instructions and Freeman has not cited a single case supporting that peculiar idea.

The defendant next argues that there was no transmission of funds because no blockchain evidence was introduced showing bitcoin being transmitted. According to Freeman, he was the only one who explained the dynamics of a bitcoin transaction and testified that there was no transmission. That is false. Ali Commoli, the government's first witness and former cryptocurrency analyst for the FBI, testified about the dynamics of a bitcoin transaction. She explained that bitcoin moves through the blockchain such that, after a transaction, the receiving wallet has a larger share of bitcoin and the sending wallet has a diminished quantity. Moreover, in numerous of Freeman's own LocalBitcoins chats he said that he had "sent" bitcoin. Sending and transmitting are synonyms. Thus, by Freeman's own description, he was transmitting bitcoin.

If Freeman's argument was correct, money transmitting could only exist when people pass physical currency. But, of course, that isn't how most modern financial transactions occur. As Commoli explained, in a pure fiat currency transaction performed through the banking system, the receiving account has more dollars and the sending account has fewer dollars. But no physical dollars actually change hands in that transaction; the banks adjust the electronic ledgers of the involved accounts to reflect the transaction. Thus, if the defendant's argument was correct, it would make § 1960 ineffectual in almost all cases for most money transmitting businesses operating through the normal financial system. That can't be right.

Finally, Freeman argues that, based on his lawyer's letter, he did not have the state of mind to knowingly operate a money transmitting business because he thought he was not operating as a business as defined in § 1960, since he believed he was operating as a church. That argument fails factually because, as already described, there was plenty of evidence for the jury to conclude that the defendant knew he was not operating his bitcoin enterprise under the auspices of a bona fide church. There was also evidence that the defendant knew his lawyer's letter, which focused only on one aspect of the defendant's business, was wrong. After receiving the lawyer letter, the defendant received the letter from FinCEN, telling him his business was required to register. He was told by a friend that the friend's lawyer determined that he had to register with FinCEN. He was also told the same thing by numerous financial institutions. Even if the lawyer letter were a defense, there was substantial evidence in the record that the defendant knew the letter was wrong.

This argument also fails because it misconceives knowingly when used in a criminal statute: "The knowledge requisite to a knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." Bryan v. United States, 524 U.S. 184, 192 (1998). Thus, all the government must show is that the defendant had knowledge of the facts that constitute the offense. Id.  Here, there is no dispute that the defendant understood what he was doing, i.e. trading bitcoin for dollars.  The numerous LocalBitcoins chats introduced at trial make that abundantly clear.  The defendant says only that he did not know that this conduct constituted a business.  But, whether the conduct constitutes a business is a legal determination about the meaning of "business" as used in § 1960.  And because § 1960 is a general intent crime, United States v. Talbnejad, 460 F.3d 563, 572 (4th Cir. 2006), the defendant's misunderstanding of the

law on what constitutes a business (even if it results from bad legal advice) is not defense, United States v. Smith, 7 F. Appx. 772 (9th Cir. 2001).

For the reasons stated, the defendant's motion for judgment of acquittal on the § 1960 count should be denied.

IV.  THERE WAS SUFFICIENT EVIDENCE THAT THE DEFENDANT ENGAGEDIN A CONSPIRACY TO OPERATE AN UNLICENSEND MONEY TRANSMITTING SCHEME.

The defendant contends that the government's proof on the conspiracy to operate an unlicensed money transmitting business was lacking because the defendant operated his business on an open and readily accessible site, localbitcoins.com, and the kiosks were open to the public. The defendant contends that this shows he did not join an agreement with a criminal intent.

This argument fails.  In 2018, the defendant received a letter from FinCEN telling him that he was running a money transmitting business based on his kiosks and that he should respond with his position if he disagreed with FinCEN's view.  Freeman's response to that letter was to, in his own words, "ignore" it. Freeman also said to banks that there was no fundamental difference between his kiosk business and his online business. Thus, the jury could conclude, based on Freeman's failure to respond to FinCEN's letter, that Freeman was going to keep operating his money transmitting business, even though he was on notice that doing so without a license was illegal.  There was substantial evidence in the record about steps Freeman took to lie to banks about the nature of his business (calling bitcoin sales purchases of rare coins, virtual goods, and church donations, for example), all of which could support a finding of criminal intent. Freeman apparently hoped that he would not get caught operating his unlicensed business because obviously the government's resources to prosecute are finite. That hope, of course, did

not materialize into reality. But a defendant's hope that law enforcement will not act is certainly not a defense to a crime when law enforcement does act.

V.     THERE WAS SUFFICIENT EVIDENCE OF MONEY LAUNDERING.

Freeman argues that the jury erroneously convicted him of money laundering based on the IRS undercover agent placing $20,000 into the defendant's kiosk at the Thirsty Owl after the undercover had told the defendant he was a drug dealer. Freeman contends that the jury's verdict was unsupported by the evidence because he was not involved in a financial transaction with the undercover when the undercover placed money in the Thirsty Owl kiosk. In this regard, the defendant says that he did not give the undercover permission to use the Thirsty Owl kiosk and therefore had no part in the undercover making the deposit.

The issue here is whether a reasonable jury could conclude that Freeman had given the undercover wink-and-nod permission to use the kiosk based on the totality of the circumstances. On the day of the transaction, when the undercover asked Freeman for permission to use the kiosk, Freeman responded, "I can't tell you, you can use it." That was hardly a definitive, "no." Previously, Freeman had told the undercover that the kiosks have no monitoring capability because Freeman had "disabled them" or turned them off. Thus, based on Freeman's earlier statements, the undercover and Freeman knew that, regardless of Freeman's comment that day, there would be no record of the undercover using the kiosk. The jury could reasonably conclude that by telling the undercover about the lack of identification procedures and recordkeeping on the machines, Freeman was inviting him to use it for criminal purposes. Freeman's comment about ways to send cash by mail to avoid search warrants also indicated that Freeman was aware of the defendant's unlawful business and still invited him to use the machines. The jury also heard evidence that Freeman controlled all aspects of his bitcoin business, including monitoring

cash going into the machines, ensuring that the machines had a store of bitcoin to sell, and collecting the profits from the sales.

Moreover, the defendant's comments to the undercover earlier in their relationship were telling. After the undercover told the defendant that he was a drug dealer, Freeman declined to do a bitcoin exchange through Telegram. In the text conversation about the proposed Telegram transaction, Freeman wrote:

> You got a little too loose lipped, so while I am not opposed to the sale of drugs, I do need to be careful
> Sadly, that means I cannot KNOWINGLY sell bitcoin to you.

The defendant's statement shows that the undercover's mistake was not in wanting to trade drug proceeds for bitcoin but for being too explicit about it. The defendant's concern was that he not "KNOWINGLY" sell bitcoin to the undercover. It was permissible for the jury to conclude that, while the defendant would not explicitly give the undercover permission to buy bitcoin from him after the undercover stated he was a drug dealer, Freeman was willing to do the transaction so long as he could claim later that he did not do so "KNOWINGLY." Based on the evidence described, the jury was justified in concluding that Freeman had given the wink and nod to the defendant to use his kiosk for a money-laundering transaction.

VI.   THERE WAS SUFFICIENT EVIDENCE OF MONEY LAUNDERING CONSPIRACY.

Freeman barely makes an argument about the money laundering conspiracy count. He says that there was no evidence that he entered into any agreement with an individual to launder money.

Freeman is wrong. While there may have been no explicit agreement, no such agreement was required. A money laundering conspiracy may be based on a willful blindness theory and

Freeman has offered no objection to the Court's giving of a willful blindness instruction.  <u>United States v. Adorno-Molina</u>, 774 F.3d 116, 122-125 (1st Cir. 2014); <u>United States v. Bivins</u>, 104 F. Appx. 892, 897 (4th Cir. 2004); <u>United States v. Wertz-Ruiz</u>, 228 F.3d 250 (3d Cir. 2000).  The government presented evidence that Freeman invited scammers to use his money transmitting business by promising that he would not ask any questions about why they wanted bitcoin.  The government also introduced statements in which Freeman made clear that he understood that romance scam victims were using his service.  The government introduced evidence of the astronomical fees Freeman charged compared to the fees charged by legitimate exchanges that complied with the Bank Secrecy Act. The fact that Freeman himself purchased his bitcoin through these exchanges at low fees is evidence of his understanding that his customers were scammers willing to pay his high fees in exchange for anonymity. And finally, the government introduced numerous examples of red flags that Freeman ignored, including the large cash transactions, the incongruity between the language used in the localbitcoin.com chats and the identity of the purported buyer, the willingness to do third-party trades with no verification, the demographic of his customer base, and the frequency and high-dollar value of many of the transactions.  This evidence, taken as a whole, was sufficient to prove that, under a willful blindness theory, Freeman was in an agreement to launder the proceeds obtained by individuals who were engaging in wire fraud.

There was also evidence that Freeman and Aria DiMezzo were engaged in a conspiracy to launder money.  The evidence showed that DiMezzo understood the willful blindness approach to Freeman's business; that she and Freeman shared numerous high-dollar value elderly customers; she communicated frequently about the transactions with Freeman; and she engaged in suspicious third-party trades with no verification (e.g.  Miller/Harold Jones).  This

evidence was sufficient for the jury to conclude that Freeman and DiMezzo were in business together to launder money. The jury's determination that Freeman was in a conspiracy to launder money was firmly supported in the evidence.

VI.     THERE WAS SUFFICIENT EVIDENCE OF TAX EVASION.

Pertaining to the tax evasion counts, the instructions state that tax evasion is, inter alia, an attempt to evade the assessment of taxes when there is a substantial tax due and owing. Despite this instruction, Freeman contends that the government's case was insufficient because the Internal Revenue Service never assessed the tax allegedly owed by Freeman. But the crime that Freeman committed was, in part, his conduct to conceal income under the guise of the churches so that the Internal Revenue Service would be unable to assess a tax. The tax evasion statute makes it a crime to evade the assessment of taxes. United States v. McGill, 964 F.2d 222, 230 (3d Cir. 1992). As long as tax is due and owing, no formal assessment is necessary. United States v. Stierhoff, 500 F. Supp. 2d 55, 61 (D.R.I. 2007). The tax due and owing was calculated by the revenue agent based on record evidence of Freeman's bitcoin sales. That was the appropriate way for the government to proceed. Id. at 67.

Freeman says that the government's case was deficient because there was no proof that the government ever asked him to appear for an interview or an audit. But, of course, there is no element to a tax evasion charge that requires the government to make such a showing. Freeman used the fact that there was no audit or interview to argue that his failure to pay tax was not willful. That was fair argument but there was plenty of evidence on other side including Freeman's own statements that he did not believe in paying taxes. The jury did not accept Freeman's argument, and there was ample evidence for them to do so. A defendant cannot

demonstrate a failure of proof merely by showing that the jury did not accept the defendant's construction of the evidence when the government presents a plausible, alternative conclusion.

Freeman also says that the revenue agent could not prove a tax deficiency because she relied on the standard deduction to determine the tax due and owing.  There is nothing wrong with that.  The tax code provides that an itemized deduction is not allowed unless elected by the taxpayer on his return.  26 U.S.C. §§ 3 & 63(e)(2).  Thus, a taxpayer is not entitled to itemize unless he files a return. Jahn v. IRS, 431 F. Appx. 210 (3d Cir. 2011); Maxwell v. United States, 80 F. Supp. 2d 1352, 1354 (N.D. Ga. 1999).   Because Freeman never filed a return, it was proper for the revenue agent to figure the tax due based on the standard deduction.

VII.    CONCLUSION.

For the reasons stated here and during oral argument at trial, the Court should deny Freeman's Rule 29 motion.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Dated: January 31, 2023

By: /s/ Seth R. Aframe
Seth R. Aframe
Assistant United States Attorney
53 Pleasant Street, 4th Floor
Concord, NH 03301
Seth.aframe@usdoj.gov