**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-30-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   21-cr-41-01-JL
            v.                      *   December 7, 2022
                                    *   1:50 p.m.
        IAN FREEMAN                 *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL - DAY TWO - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Government:     Seth R. Aframe, AUSA
                        Georgiana MacDonald, AUSA
                        John J. Kennedy, AUSA




For the Defendant:      Mark L. Sisti, Esq.
                        Sisti Law Offices




Court Reporter:         Susan M. Bateman, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

```
                        I N D E X
```

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ALI COMOLLI: | | | | |
| By Mr. Aframe | 4 | | 50, 60 | |
| By Mr. Sisti | | 27 | | 57 |
| THEODORE VLAHAKIS: | | | | |
| By Ms. MacDonald | 62 | | | |
| By Mr. Sisti | | 100 | | |

| EXHIBITS | FOR ID | IN EVD |
|---|---|---|
| Government's Exhibit Nos. 1228 and 1229. | | 25 |

```
1                      P R O C E E D I N G S

2              (IN COURT - NO JURY PRESENT)

3              MR. AFRAME:  We have decided to not read 1223 and

4    1227.  So we would ask that those not be exhibits.

5              And we've removed them from all of the books, and I

6    coordinated all of that with Mr. Sisti.

7              THE COURT:  All right.  I'll let the deputy clerk

8    know when she comes in.

9              MR. AFRAME:  Yes.  And she does know, but she

10   wanted me to say it on the record.

11             MR. SISTI:  But it might be okay to tell the jury

12   that, too, because they're going to see a gap in there.

13             THE COURT:  1223 and 1227 have been withdrawn?

14             MR. SISTI:  Yes.

15             THE COURT:  I'll take care of it.

16             (IN COURT - JURY PRESENT)

17             THE COURT:  Ladies and gentlemen of the jury,

18   welcome back from lunch.

19             Have any of you had any conversations with each

20   other or anyone else during the lunch break regarding the

21   case?

22             (Jurors respond "no")

23             All right.  A couple things.  First of all, two

24   exhibits have been withdrawn.  They're in your books still.

25             Are they still there?
```

1          MR. AFRAME:  No, just the tab.  The paper has been

2    removed.

3          THE COURT:  A couple of exhibits have been removed,

4    1223 and 1227.  1223 and 1227, they've been withdrawn.  Don't

5    worry about them.  There's nothing to think about.  Just don't

6    consider it one way or another, but they've been withdrawn.

7          Secondly, it's possible today during the afternoon

8    session that I may have to attend to another case very

9    briefly, like less than two or three minutes.  I'm monitoring

10   my screens, and if it happens we'll take a brief recess.  I'm

11   going to apologize in advance in case it happens.  Hopefully

12   it doesn't.

13          You can proceed.

14          MR. AFRAME:  Thank you, your Honor.

15          THE COURT:  The witness is still under oath.

16          CONTINUED DIRECT EXAMINATION OF ALI COMOLLI

17   BY MR. AFRAME:

18      Q.   Good afternoon, Ms. Comolli.

19      A.   Good afternoon.

20      Q.   And our reading shows we only have a little bit

21   more to go.

22          So let's turn to 1221, and this is April 22, 2020.

23   The user name is Greg_wayne for the buyer and FTL_Ian for the

24   seller.  And this is, as I said, April 22nd:

25          Hello.  BOA.

1          A.    Sorry for the delay.

2          Q.    And then the usual words?

3          A.    Yes.

4          Q.    Hello.  Am using my partner.  We are working

5     together but after deposit the money I'll do whatever you want

6     me to do.  My account was freeze from BTC before using my

7     partner.

8          A.    Is your partner the depositing agent who is

9     depositing your money on your behalf or is the partner the

10    buyer who is using you as their receiving agent for the

11    bitcoin?

12         Q.    My partners received the it, but I'll deposit it on

13    his ba half and do whatever you want me to do.  We have trade

14    before.  My user name is Kgreg89, but my account was hack so

15    am using my partner.

16         A.    So this is Karen on this account?

17         Q.    Yes.

18               And then there's a picture, if we could zoom in on

19    this woman, and what is her name?

20         A.    Karen Denise Grice.

21         Q.    In what state is her driver's license?

22         A.    South Carolina.

23         Q.    And what city in South Carolina does she live?

24         A.    Travelers Rest.

25         Q.    Okay.

1          MR. AFRAME:  And if we could go back out.

2     Q.   And her date of birth, I'm sorry, was what year?

3     A.   1971.

4     Q.   Okay.  That would be making her in her early 50s

5  now?

6     A.   Math isn't my strong suit, but yes.

7     Q.   Okay.

8          MR. AFRAME:  So back out.

9     Q.   Again, now we're on to -- we went from 422 to 423:

10         My account was hack sometimes ago using my partner.

11  We use to talk on Telegram but no more.

12    A.   So you are depositing and you are receiving?  So

13  the partner is not involved in this purchase?

14    Q.   Yes.

15    A.   Okay, for the record I will need you to redo the

16  verification photos, so I know for sure it is you.

17    Q.   Okay.  No problems but you can only text me you

18  can't called.  Please you can only text me on WhatsApp cause

19  my family don't know about this.  But I'll take a photo for

20  you and write something on it, okay?  Can you give me your

21  WhatsApp now?  I'll text you tomorrow?

22    A.   I don't use that program.  Only Telegram.  Sorry.

23    Q.   Yes.  Give me your Telegram.

24    A.   @FTL_Ian.  Make sure to type it exactly.  Send me a

25  message here to confirm you have me there as there is an

1    impostor there.

2         Q.   Okay.  That was 423, and going forward -- and it

3    looks from that that no transaction was completed that day,

4    right?

5         A.   It appears so.

6         Q.   And then going forward to 5-5, so this is 1221-A:

7              Hello.

8         A.   Hello.

9         Q.   And then the usual words and then:

10             Am using my partner LBT but I'll be the one to

11   deposit it.  It's me, Karen.  We have been trade before my

12   account was hack.  I'll do everything you want me to do.

13        A.   Thanks.  Still need the photos to prove it is you.

14   Thank you.

15        Q.   Okay.  No problems.  I'll do it okay.  Once I sent

16   you all the picture and deposit the money how long it's going

17   to take you to release the coins?  But why do you need my

18   phone number?  Do you want to call me?

19        A.   I release very fast, though I am traveling this

20   morning so I may have to pull over.  It's in case I need to

21   call to verify.  But if you are who you say you are, I

22   shouldn't need to.

23        Q.   Yes I am.  I'll do everything you ask me to do, but

24   I can't put my phone number.  My mom is going to be with my

25   don't want her to know am into bitcoin that's why.  But I'll

```
 1    write on a paper out today date and sign on it?
 2        A.   All right.  I reserve the right to refuse service
 3    if anything is suspect.  Go ahead.
 4        Q.   Trust me nothing is going to happen am the one that
 5    deposit it, okay?
 6             And then there's a photo of Karen Grice from South
 7    Carolina?
 8        A.   Yes.
 9        Q.   Hold on.  Let me write a note on a paper, okay?
10             Hello?
11             And more pictures of Karen Grice.
12             Hello.  You there?  On my way to the BOA now.
13    Please get me the information, okay?
14        A.   Bank name:  Bank of America.  Account name:  Church
15    of the Invisible Hand.  Account type:  Business checking.
16    Reason for deposit:  Church donation.
17        Q.   And was there any discussion in these previous
18    pages with Greg_wayne about church donation?
19        A.   No.
20        Q.   And was there any discussion about the difficulty
21    in congugating some of the verbs?
22        A.   No.
23        Q.   Okay friend.  What do you want me to write on the
24    receipt?  Do I need to write anything on the receipt?
25             Write across the receipt with a pen:  For bitcoin
```

1   purchase from FTL_Ian on localbitcoins.com.  No refunds.  Also

2   write the name of the teller and branch location, city, state

3   and street.

4            That's Mr. Freeman's instructions, right?

5       A.   Yeah.  That appears to be taken from the terms of

6   the trade or the advertisement.

7       Q.   Okay.  And you go next.

8       A.   Yes.

9       Q.   Okay friend.  I'll do that.  You there?  Should I

10  mark paid now?

11      A.   No.  You must upload a selfie with the receipt as

12  always.  Thank you.

13      Q.   With my ID.  Okay.  No problems?

14      A.   No ID needed.

15      Q.   Okay.  Am driving now.  Let me stop.

16           And then there's Ms. Grice with the receipt, right?

17      A.   Uh-huh.

18      Q.   That's it.  Can I mark paid now?  You there my

19  friend?

20           And this is all on 5-5.

21      A.   All set.  I'm leaving you positive feedback.  I

22  would appreciate you doing the same for me, thank you.  Please

23  spread the word of the peace and freedom that bitcoin can

24  bring the world.  Also you will not need to provide ID

25  initially in future trades, thank you.

1          Q.    Okay I'll -- thank you.  Can you give me your

2    Telegram?

3          A.    Yes, it's @FTL_Ian.  Type it exactly.  The other

4    guy is an imposter.  When you reach me, ask me to send you a

5    screenshot of this convo to prove it's really me.

6          Q.    Mine is Kgreg89.

7          A.    You can reach me here since you do not want to

8    direct trade.  Have a super day.

9          Q.    Okay.  No problem.  Next time what do I need to do?

10         A.    What do you mean?  It's the same process each time.

11   Open trade, I give you info, you deposit, post receipt photos.

12   I have now verified you on this account.

13         Q.    Good.

14               1222, 4-24-20, and the user name is UGOWIECHERS:

15               Hello, do you speak Spanish?

16         A.    Un poco.  Tienes Google translate?

17         Q.    I want to trade.  My bank is professional bank, and

18   I need 22,500 USD in bitcoins.  Could you help me?

19         A.    Yes.  I can help.  Have you read my terms?  Please

20   provide the required verification photos as described in the

21   terms.  Thank you.

22               Then there's an ID.

23               Hello.  Are you there?

24         A.    Yes, I'm still waiting on you to provide the photo

25   of you holding the note as I described in my terms.   Thank

1   you.

2        Q.    Okay.  Hold on.

3              And then the photo of the person, right?

4        A.    Yes, with the ID and the note.

5        Q.    Yeah.

6        A.    And this is coming from a U.S. bank account with

7   your name on it.

8        Q.    Yes.  Professional Bank in Coral Gables, Florida?

9              And then there's wiring info, and so if you could

10  do your usual?

11       A.    Bank name:  Bank of America.  Account name:  Church

12  of the Invisible Hand.  Account type:  Business checking.

13  Reason for deposit:  Church donation.

14       Q.    Okay.  Done.  I going to make the wire transfer.

15  Wait a minute.

16       A.    Are you sending in person at the bank, on the

17  phone, or online.

18       Q.    Why donation?  Could you send me your WhatsApp?

19  Hola?

20       A.    I do not use WhatsApp.  I cannot have you write

21  anything about bitcoin or they will close my account.  If you

22  don't want to write church donation, then please write

23  purchase of rare coins.

24       Q.    1224, Sweetcutebarbie on 4-30-20:

25              Hi.

```
1        A.    Hello.

2        Q.    There are the usual words:

3              Can I take pictures of my ID and note together

4   instead?  I can't take a selfie.

5        A.    Sorry, but I have to have a selfie.  Why can't you

6   take one.

7        Q.    I'm too old to take a selfie.  My hands are

8   trembling.

9        A.    I am so sorry, but my terms require it for

10  security.  It's easier if you have a mirror.  Turn on your

11  flash to ensure the photo is crisp, even with shaky hands.

12  Meaning, a mirror on a wall, like in your bathroom.  Please

13  cancel if you cannot move forward.  Thank you.

14       Q.    I can't hold something in one hand and take a photo

15  with my phone in the other hand.  My hands tremble too much?

16       A.    Some people hold the paper with their mouth.  Sorry

17  for the difficulty.

18             MR. AFRAME:  And then if we could just focus in on

19  the license?

20       Q.    This is in what state?

21       A.    Arizona.

22       Q.    And the man's name?

23       A.    For Mr. Stephen G. Revell.

24       Q.    He actually shares my birthday, but what is his

25  date of birth?
```

1      A.    His year of birth is 1949.

2      Q.    Thank you.

3            And going to -- the last line is:

4            Here's a picture of my ID.

5            And the next one, I'm sorry, is 1225?

6            Before we start reading it, I just want to point

7      something out that I'll come back to when we're done reading

8      it, but we've seen a change here in the user name, correct?

9      A.    Correct.

10     Q.    All the ones that we've read up to now, what was

11     the user name?

12     A.    FTL_Ian.

13     Q.    And what is it now?

14     A.    Bitcoinbombshell.

15     Q.    Okay.  And this is November 2, 2020.  November 2,

16     2020.  Go ahead.

17     A.    Hello.

18     Q.    And this is the usual introduction?

19     A.    Yes.

20     Q.    Okay.  And the user name for the buyer is

21     patrickbrown007, right?

22     A.    Yes.

23     Q.    Hello.  Sure providing you the necessary

24     documentation for verification will not at all be a problem.

25     Kindly let me know if I can buy for 45K and can you also

1    reduce the price a little for me.  I will be making a wire

2    transfer from my Wells Fargo Banks?

3         A.   I do offer a direct purchase option off of LBC, but

4    let's start with this amount today and then we can do the rest

5    later.

6              Did you read my terms fully, including the part

7    about where I may require you to restart the trade when the

8    wire comes through to get the updated price?

9         Q.   Friend, I am comparatively fresh on LBC, but I have

10   traded good.  Yea, I read it.  That's how your release time is

11   so less.  I completely understand that.  I can trade offline

12   with you.  I have been trading offline since long ago using

13   Coinbase Pro, but they have some technical issue going on as

14   they mentioned on my account my BTC are help in there.  If you

15   want, I can trade offline for say maybe around 12 BTC.  All

16   documentation will be provided and obviously if it is an

17   offline trade, you can call me up on my mobile number or as we

18   do, a zoom call is also okay for me.

19        A.   Do you want to trade here first or go direct

20   immediately?

21        Q.   We can go direct immediately if you say.

22        A.   Do you have the Telegram app?

23        Q.   No.  I don't have Telegram.

24        A.   It is an excellent messaging app.  Would you mind

25   downloading it?  Please add me as user name @FTL_Ian.

1    However, be careful not to add the imposter account that is

2    pretending to be me.  Send me a message there and ask for a

3    screenshot of this chat.  That way you will be 100 percent

4    sure you have reached me.

5         Q.   Okay.  Sure.  Let me do that.  Let me cancel this

6    trade.  Don't want to hold your BTC.

7         A.   Okay.  Thank you.

8         Q.   And 1225-A, which is the same November 2, 2020:

9              Hi friend.  Let's do first trade here in LBC so we

10   can both gain trust and next time we can move for a bigger

11   trade offline.  Let me send you the documents you asked me to

12   provide to you.

13        A.   Okay.

14        Q.   And then there's a photo of a man with gray and

15   white hair?

16        A.   Yes.

17        Q.   And do you see his passport there?

18        A.   I do.

19             MR. AFRAME:  And if we zoom in on that?

20        Q.   What's his place of birth?

21        A.   Oklahoma, USA.

22             MR. AFRAME:  Okay.  And zoom back out.

23        Q.   And the next one is his driver's license?

24        A.   Yes.

25             MR. AFRAME:  And if we could zoom in on that?

1     Q.    Same guy as in the passport, right?

2     A.    Yes.

3     Q.    And what's his name?

4     A.    Patrick Allen Brown.

5     Q.    And where does he live?

6     A.    Texas.

7     Q.    And what is his date of birth?

8     A.    It's 1953.

9     Q.    Okay.  And if you keep going, there's the driver's

10 license back and then a utility bill, right?

11    A.    Yes.

12    Q.    And then it says mobile phone number and he

13 provides a number and then an e-mail address as well?

14    A.    Yes.

15    Q.    Okay.  And then there's the usual words about what

16 to write on the paper from bitcoinbombshell, right?

17    A.    Yes.

18    Q.    Okay.  Let me do that real quick.  Give me a minute

19 to do that.

20          And there's Mr. Brown holding up the piece of

21 paper, and those are the words that he's supposed to write

22 based on what we just read?

23    A.    Yes.

24    Q.    Selfie note that you asked for is here.  Kindly

25 provide the wire details so I can move ahead?

1    A.    Thank you.  We are almost done, but due to the high

2    value of the trade I have a few more steps.  I looked up the

3    phone number you provided and it's registered to a Berkshire

4    Group.  Can you show me proof that you control this number,

5    such as a phone bill with your name on it?

6    Q.    That is whom I used to work for.  My son pays for

7    the bill.  Berkshire Group does not exist no longer.  They

8    have now become Berkshire Residential Investors.  You can call

9    me on this number to verify or can make a Zoom call to have a

10   word if you like at the same time.

11   A.    I just tried to call it.  Can we do Telegram to

12   verify?  It would be good to have you there even though we

13   will complete the trade here on LBC.

14   Q.    Can you call in and verify first?  It will take me

15   some time to know exactly what Telegram is.  I have used

16   WhatsApp before, but I did not like it that much.

17   A.    Just tried to call again.  Ended up at voicemail.

18   Left a message.

19   Q.    Calling you in now.

20         So who made the call?

21   A.    Patrickbrown007.

22   Q.    Okay.

23   A.    Thank you.  Will you be physically going to the

24   branch to send the wire so you can get a receipt?  The

25   Telegram app, it's available for phones and computers and is

1    very handy.

2         Q.   Yes, I will be going to the branch.  I already have

3    booked an appointment.

4         A.   Bank name:  Santander Bank.  Account type:

5    Business checking.  Account name:  NH Peace Church.  Reason

6    for wire:  Donation.

7         Q.   And we've done a lot of these now.  Is this the

8    first time we've seen the New Hampshire Peace Church?

9         A.   Yes.

10        Q.   And, again, this donation -- was there any

11   discussion with patrickbrown007 about a donation?

12        A.   No.

13        Q.   Okay.

14             Great.  Thank you.  I was able to book an

15   appointment in 45 minutes.  I will be making the transfer and

16   get back to you with an update and a wire receipt.

17             And then there's some words to write on the

18   receipt, right?

19        A.   Yes.

20        Q.   1225-B.  Again, still November 2, 2020:

21             Wire has been done.  Coming back home with a

22   receipt.  Okay the money has also been deducted.  Kindly check

23   and update if it has been reflected on your end.  In the

24   meantime I am working on sending you the note and the receipt.

25             And there's a photo of Mr. Brown with the note and

1    the receipt.

2              MR. AFRAME:  And if we could just zoom in on this

3    wire slip?

4         Q.   This is Patrick A. Brown who we've already talked

5    about.  How much was this particular wire for?

6         A.   $50,000.

7         Q.   And if you go down lower, who is that being sent

8    to?

9         A.   The New Hampshire Peace Church.

10        Q.   Okay.

11             MR. AFRAME:  And back out.  Go down a little bit

12   further.

13        Q.   Here's the back of the wire.  We've just redacted

14   the signature.  And then it says page 2?

15        A.   Sorry for the confusion, but I require the words to

16   be written on the receipt itself.  The first page, please.  I

17   will check my account.

18        Q.   Okay.  And then it's the same wire receipt and now

19   the words that are required are written there?

20        A.   Yes.

21        Q.   Okay.

22             Here you go buddy.

23        A.   Okay.  And please take a selfie with it per my

24   terms.  Then you can restart the trade and upload that final

25   photo there.  Thank you.  I have confirmed the wire is

1    received.

2         Q.    Okay I was having lunch.  Let me send it to you.

3         A.    Thank you.  My ads normally go down at 6 p.m.

4    Eastern, so if you need me to extend them so you have time to

5    restart, I can.  I also begin working by 7 p.m. Eastern, so

6    I'd like to wrap this up by then if possible, or my responses

7    will get much slower after 7 p.m.

8         Q.    Already working on it.

9               And then another picture of Mr. Brown holding the

10   receipt.

11              Here's the receipt with note and selfie, waiting

12   for the release.

13        A.    Okay.  Looks great.  Final step is to restart the

14   trade and then I will release the coins on the new trade.

15   Thank you, Patrick.  Next time, you can contact me directly on

16   Telegram for a discounted rate and then we won't have to worry

17   about any of the restart hassles.  You can click my user name

18   to see the advertisement.

19        Q.    Should I cancel this one?  The one that is there is

20   of lesser volume.

21        A.    Here's a link to the ad.  You'll just need to

22   cancel this one and reopen here.  Yes, the coins are currently

23   in escrow so a cancel and restart will take care of it.  Thank

24   you.

25        Q.    Okay.  And this is the last of the patrickbrown007,

1  still November 2nd:

2          Wire has been done.  Coming back home with the

3  receipt.  Okay buddy.  All set.

4      A.    Thank you.  Releasing based on the photos posted to

5  the original trades.  All set.  I'm leaving you positive

6  feedback.  I would appreciate you doing the same for me, thank

7  you.  Please spread the word of the peace and freedom that

8  bitcoin can bring the world.  Also you will not need to

9  provide ID initially in future trades, thank you.

10         Would you like to set up a chat with me on the

11  Telegram app for better service next time you're looking to

12  buy?

13     Q.    I would love to do the same.  Thank you for quick

14  release.  And, yes, I would be doing it for sure.  I will be

15  on Telegram in the next hour and I will send you my regards.

16     A.    Okay.  Please add me via my cell phone number which

17  you have from earlier or search for my user name there which

18  is @FTL_Ian.  Remember, there is an imposter there so make

19  sure to ask me to send you a photo of this chat to prove it's

20  really me.

21     Q.    Now it's the next day, 11-3-2020:

22         Hi.  Good morning.  Kindly confirm how % on top of

23  current price do you charge when trading offline.

24     A.    You send the wire.  I calculate the price when it

25  arrives based on the market rate from Kraken.  I then take my

 1    10% fee off the top and send the remaining amount to you at

 2    the market rate.  Simple.

 3         Q.    And we have one to go, 1226, which is an

 4    11-22-2020, and it's -- Joskayspace is the user name:

 5              Please drop details.  Hello.

 6         A.    Hello.

 7         Q.    Okay.  That we've seen before, and then there's a

 8    photo, right?

 9         A.    Yes.

10         Q.    And if we go to the next page we have, what do we

11    have there?

12         A.    We have a national driver's license from Nigeria.

13         Q.    And then Joskayspace says:

14              Sent.

15         A.    Did you read my full terms?  You agree that I will

16    require you to restart the trade once I receive the funds.

17    This guarantees we are not risking the price changes between

18    now and then, as international wires can take days.  Please

19    confirm you agree to restart the trade on my request before we

20    complete it.

21         Q.    Where am I wiring the funds to?  Do you have a

22    Nigerian account?

23         A.    My account can accept any funds.  It's in Nevis.

24         Q.    All I would ask you to do in the next one is just

25    read to us the name of the recipient bank.

```
 1          A.    Nevis International Bank and Trust.

 2          Q.    Who is the beneficiary on that account?

 3          A.    Ian B. Freeman.

 4          Q.    And what's the address?

 5          A.    73 Leverett Street, Keene, New Hampshire, 03431.

 6          Q.    And what was the reason being given for any wire

 7     sent on this?

 8          A.    Investment.

 9          Q.    Okay.  All right.  So those are the LocalBitcoin

10     chats that we have marked to read.

11                There's only one more thing that I want to do, and

12     it brings us back to patrickbrown007 and that date of November

13     2, 2020, and some other dates.

14                Let me ask you -- you told us you were an

15     investigator for the FBI now many hours ago.

16                Do you ever use IP addresses as a part of your

17     investigation?

18          A.    Yes.

19          Q.    And can you just briefly tell the jury what an IP

20     address is?

21          A.    Sure.  An IP address is just an identifier for a

22     device on a network or on the Internet.

23          Q.    So what information does it provide you as an

24     investigator -- can it provide?  What information -- by having

25     the IP address, what can that tell you about --
```

1        A.    Oh.  It can lead to subscriber information.

2        Q.    Okay.  And tell me again, just so I understand,

3    what is that address telling me as far as the location of the

4    item being logged on from?

5        A.    It tells you where it's being logged on from.

6        Q.    Okay.  So if it's the same IP address being used

7    for something, what does that mean?

8        A.    It's the same identifier so the same device.

9        Q.    Okay.

10       A.    The same identifier, yeah.

11       Q.    So if we looked way back at 1202, this was the very

12   I think first exhibit I showed you, and it was the user

13   account for FTL_Ian, real name Ian B. Freeman?

14       A.    Yes.

15       Q.    And what was the date last seen for that account?

16       A.    It was June 3, 2020.

17       Q.    And you told me then that that would be the last

18   date it was logged onto?

19       A.    Correct.

20       Q.    Okay.  If we go to 1228 --

21             MR. SISTI:  One second, your Honor.

22             (Attorney Aframe confers with Attorney Sisti)

23             MR. AFRAME:  Okay.  So we've agreed to 1228 and

24   1229, your Honor.

25             THE COURT:  Admitted, 1228 and 1229.

1              (Government's Exhibit Nos. 1228 and 1229 Admitted)

2       Q.    We were just talking about IP addresses and we were

3    talking about the date June 3, 2020.

4              MR. AFRAME:  So let's blow this up because I

5    certainly can't see that.

6       Q.    So on that date, right, we see -- first of all,

7    this data, where does this come from?  Who provided this?

8       A.    These records came from LocalBitcoins.

9       Q.    And did they provide a whole bunch of IP addresses?

10      A.    They did, yeah.

11      Q.    Okay.  And so this is the June 3, 2020, data, and

12   what's the user name for this particular IP address?

13      A.    This is the FTL_Ian account.

14      Q.    And then is there an IP address?

15      A.    Yes.

16      Q.    And we're going to just use the first five letters

17   as our identifier.

18              So what's the first numbers -- I'm sorry, the first

19   five numbers of the login IP address for FTL_Ian on June 30,

20   2020?

21      A.    64.223.

22      Q.    Okay.  And now let's turn to 1229, and this is the

23   same kind of information for the bitcoinbombshell.  And do you

24   remember for bitcoinbombshell, what name was that account

25   registered in?

```
 1           A.    I believe that was Renee Spinella.

 2           Q.    Okay.  And if we open this --

 3                 MR. AFRAME:  Could we blow up -- really we only

 4     care about the first three columns.  So that will make it

 5     easier for everyone to see.

 6           Q.    If we look at September 27, 2020, what do we see is

 7     the IP address as far as the first six numbers for

 8     bitcoinbombshell?

 9           A.    107.178.

10           Q.    And then there are logins on 9-30, right?

11           A.    Yes.

12           Q.    And that date will come up later, but for right now

13     all I want you to do is tell me as of 9-30-2020 for

14     bitcoinbombshell, what was the IP address login?

15           A.    64.223.

16           Q.    And if we went back to 1228, what would we see

17     about that login for FTL_Ian?  Do you remember?

18           A.    Was it 1228?

19           Q.    6-3.  I'm sorry.

20                 So we'll go back to Government's Exhibit 1228, and

21     on June 3, 2020, what was the login for FTL_Ian?

22           A.    64.223.

23           Q.    And then if we go back again to 1229, is the

24     same -- is the FTL_Ian login from 6-3 now being used for

25     bitcoinbombshell on 9-30?
```

```
1          A.   Yes.
2          Q.   And focusing now on 11-2, which was the
3   patrickbrown007 chat with bitcoinbombshell that we just read,
4   what was the IP address being used for that chat?
5          A.   64.223.
6          Q.   And that was the same one being used for FTL_Ian on
7   6-3-2020?
8          A.   Correct.
9          Q.   And then the last bitcoinbombshell, which is 3-10,
10  which I'll represent to you we've already admitted this.  The
11  account last seen for bitcoinbombshell was 3-13-2021.
12              This is 3-10-2021, and what was the login for that?
13         A.   64.223.
14         Q.   And is that the same FTL_Ian login from 6-30-2020?
15         A.   Yes.
16              MR. AFRAME:  No further questions.
17              THE COURT:  Cross-examination.
18              MR. SISTI:  Thank you, your Honor.  I get to take
19  my mask off.
20                        CROSS-EXAMINATION
21  BY MR. SISTI:
22         Q.   Good afternoon.
23         A.   Good afternoon, Mr. Sisti.
24         Q.   How are you?
25         A.   I'm doing just fine.  Thanks.  How are you?
```

1       Q.    They let you back in the court after they locked

2   you out there?

3       A.    Yeah.

4       Q.    You've got to be careful around here.

5       A.    Yeah.

6       Q.    I just want to discuss a few general things with

7   you.  I mean, we've gone over a lot of detail here, but

8   because you were involved with the FBI and because you were an

9   actual investigator on this material, I think that that would

10  probably come in handy for this jury.  Would you agree?

11      A.    Sure.

12      Q.    I mean, this is the kind of cases that you worked

13  on, right?

14      A.    Yeah.  I mean, I would clarify I was an analyst,

15  not an investigator.

16      Q.    No, but -- I mean, you've seen this?

17      A.    Yeah.

18      Q.    You've seen these cases from beginning to end, I

19  would take it, many times?

20      A.    Yes.

21      Q.    Okay.  You started out in your testimony giving a

22  brief description of bitcoin and cryptocurrency transactions

23  and that sort of thing, and I think one of the terms that you

24  used was something like pseudonymity or something like that?

25      A.    Yes.

1      Q.    Can you go back to that a second so we can come up

2   to speed on that again?  What's that all about?

3      A.    Sure.  Yeah, so it's basically the idea that you

4   can have an identifier but it's not tied directly to you.

5            And that long string of letters and numbers, that

6   public address, it's just that to the public, like a bank

7   account number.  Your bank account number -- you guys could

8   have my bank account number, but you don't know necessarily

9   that it's tied to me without that extra information.

10     Q.    All right.  And what's the advantage of that again?

11   Let's go through that again.

12     A.    The advantage of pseudonymity for the end user is

13   that they don't have to have their name tied to anything.

14     Q.    There's nothing illegal about that, right?

15     A.    Oh, no.

16     Q.    No.  I mean, people are doing probably thousands

17   and thousands of these transactions while we were sitting here

18   from this morning until now, right?

19     A.    Bitcoin itself is not illegal, no.

20     Q.    Right.  Bitcoin is not illegal.  Not having let's

21   say your full name and address on the transaction, that's not

22   illegal, right?

23     A.    No.

24     Q.    And when people are conducting business from one

25   individual to another, they don't have to ask why you're using

1   the money, do they?

2       A.   In what type of transaction?

3       Q.   I don't know.  I mean, you know, you're buying a

4   car just like Mr. Aframe was talking about.

5       A.   So in a private sale of a material good?

6       Q.   Yeah.

7       A.   No, not in a private sale of a material good

8   necessarily.

9       Q.   Right, a private sale of a material good.  You

10  know, we can go on and on.  Every day during transactions that

11  we make we don't have to explain why we are doing it, correct?

12      A.   Sure, but sometimes it's readily apparent.

13      Q.   Well, sometimes it is and sometimes it's not.  If I

14  went to a bank today and said I want $15,000, all right, it's

15  my money, I can take and do whatever I want with it, right?

16      A.   To a certain extent, yeah.

17      Q.   I know, but, I mean, are tellers at banks obligated

18  to say, what are doing with that, Mark?

19      A.   I can't say for sure.  I'm not an expert in that.

20      Q.   Okay.  Well, I mean, does the bank manager have to

21  come out and say, Mark, we don't want you taking $15,000, I

22  mean, we want to know what you're doing with it?

23      A.   Not for every transaction, but when certain

24  suspicious activity occurs, then they start to ask questions.

25      Q.   Sometimes they do and sometimes they don't, right?

1        A.    Sure.

2        Q.    I mean, we just saw examples while Mr. Aframe was

3   examining you of people that were going to banks, one of them

4   over a six-day period and took a lot of money out, right?

5        A.    Yes, it was a lot of money.

6        Q.    And it was from apparently a bank that she would

7   have known to go to, right?

8        A.    Yes.

9        Q.    And it doesn't sound like anybody from the bank was

10  stopping those transactions.

11       A.    I can't speak to that.

12       Q.    Well, we know they didn't stop them because they

13  kept going on, right?

14       A.    I can't speak to that either.

15       Q.    You can speak to it because you testified and in

16  fact you answered questions about it.

17       A.    Well, I can't speak to what the bank did.

18       Q.    Well, if they would have stopped the transactions

19  on day two, we never would have got to day six, right?

20       A.    That's fair.

21       Q.    Okay.  But they didn't, right?

22       A.    Apparently not.

23       Q.    Right.  And this bank would have been the bank that

24  would have provided the funds that would have been involved in

25  the eventual bitcoin purchase?

1        A.    Can you repeat the question?

2        Q.    Yeah.  The bank was providing money, right?

3        A.    Yes.  From the customer's account, yes.

4        Q.    Correct.  And the money was used to buy bitcoin,

5  right?

6        A.    Yes.

7        Q.    Okay.  We have no evidence whatsoever that anybody

8  interceded or stopped that event, right?

9        A.    Not at present.  Yeah, not at present.  I have not

10  seen it here in front of me at testimony.

11        Q.    Whether that be for bitcoin or whether that be for

12  buying a yacht, I mean, apparently nobody stopped the

13  transactions?

14        A.    The ones that we just read, no.

15        Q.    All right.  And there were a lot of those

16  transactions.  We went through a whole book of those

17  transactions, right?

18        A.    Yeah.

19        Q.    Is there any evidence that you saw while you were

20  looking at the books and while you were being questioned that

21  any bank stopped any proceeding that was going on?

22        A.    Stopped, no.  Questioned, yes.

23        Q.    Okay.  Well, I mean, Mr. Freeman was questioning,

24  too, wasn't he?

25        A.    Yes.

1      Q.    Yeah.  Okay.  So the banks were questioning a

2   little bit, Mr. Freeman was questioning a little bit, but, you

3   know what, the transactions were taking place, weren't they?

4      A.    Yes.

5      Q.    Okay.  But I want to go back to the beginning one

6   more time because the allegation here -- the general claim is

7   that Mr. Freeman is somehow linked hand-in-hand with scammers,

8   and we want to get to the bottom of that, okay?  All right?

9          Did you see any follow up in your review of the

10   material that directly linked Mr. Freeman to any known

11   scammer?

12      A.    You mean the review of the material from

13   LocalBitcoins?

14      Q.    Yeah.

15      A.    Other than his conversations?

16      Q.    Is there any linkage?

17      A.    No.

18      Q.    And when we're looking for linkage, a lot of times

19   you're going to see people that come up over and over again

20   and generally have the same goofy, I don't know, game they're

21   playing with somebody, all right, whether it's a romance scam,

22   whether it's my grandson's in jail scam, something like that,

23   right?

24      A.    Yeah.

25      Q.    Okay.  And they would come back over and over and

```
 1    over to the person they would be linked in with, right?
 2         A.    Yes.
 3         Q.    Yeah.  We didn't see that here.
 4         A.    We did see attempts for people to come back.  Yes,
 5    we saw attempts where individuals would come back.
 6         Q.    Attempts, right?
 7         A.    Yes.
 8         Q.    Then it got cut off, right?
 9         A.    Well, some of them went to Telegram, and I didn't
10    review Telegram so I don't know.
11         Q.    Well, it stopped, right?
12         A.    At least on LocalBitcoins, yeah.
13         Q.    Yeah.  And there was no reengagement after that,
14    right?
15         A.    There were multiple attempts.
16         Q.    Again, attempts.  And Mr. Freeman didn't take the
17    bait, right?
18         A.    I mean, I believe in some of those he did if I
19    recall.
20         Q.    Let's go through a couple because there's some that
21    are just absolutely I guess profoundly interesting.
22               And, again, I want to go back to the pseudonymity
23    thing.  If you're a scammer and you're working with somebody
24    hand-in-hand to rip off somebody, you want to stay
25    pseudonymous, right?
```

```
 1        A.    Yeah.
 2        Q.    I mean, you would be dumber than dumb to be giving
 3   away your identification, your cell number, your address.  I
 4   mean, I could go on and on.  That would be crazy if you're
 5   trying to actively rip somebody off, right?
 6        A.    If you were -- I guess I'm confused by the
 7   question.  I'm sorry.
 8        Q.    Generally in your investigations do you see active
 9   scammers giving their real name?
10        A.    Sometimes, yeah.
11        Q.    That's pretty dumb, right?
12        A.    Yeah, it's not smart, but we don't always catch the
13   smart ones.
14        Q.    Yeah.  That would be something, huh?
15              Do you see it, though?  Is that the course of
16   business when you're scamming that you give your full name?
17        A.    No.
18        Q.    Right.  That would be the unusual case, right?
19        A.    It depends on the case, but sometimes, yeah.
20        Q.    Yeah.  And in your usual cases -- if you're a
21   scammer and you're linked hand-in-hand with another scammer,
22   in the usual cases do you give your real cell phone number?
23        A.    Well, you may give a -- you give a spoofed one
24   usually.  Something like that.
25        Q.    You give a spoofed one?
```

1    A.    Yeah.

2    Q.    Let me ask you a question.  Maybe you don't know

3  the answer.  I mean, do you know that Ian Freeman goes by Ian

4  Freeman?

5    A.    Yes.

6    Q.    Okay.  Do you know he gave out his cell phone

7  number to a number of different individuals that were right in

8  these books?

9    A.    Yes, he did.

10    Q.    Okay.  Is there any evidence that he gave out a

11  spoofed cell phone number?

12    A.    No.

13    Q.    All right.  Do you know that Ian Freeman lives in

14  Keene, New Hampshire?

15    A.    Yes.

16    Q.    Do you know that on a number of communications in

17  this book Ian Freeman volunteered his address?

18    A.    Yes.

19    Q.    Okay.  Do you know if it's a fake address?

20    A.    No, I don't believe it's a fake address.

21    Q.    All right.  So what we can establish then is that

22  Ian Freeman was openly, without reservation, giving up the

23  name that he's known by, right?

24    A.    Yes.

25    Q.    The address where he lives, right?

1          A.    Yes.

2          Q.    The cell phone number that he could be reached at?

3          A.    Correct.

4          Q.    So that if anybody wanted to go after him, he gave

5    them an invitation to his address, his name, and his phone

6    number?

7          A.    Yes, he did list a lot of information.

8          Q.    He did list a lot of information.  He wasn't using

9    this particular platform and he wasn't communicating in an

10   attempt to be secretive.  He was actually advertising his

11   name, his whereabouts, and what he was doing, correct?

12         A.    Yes, he advertised.

13         Q.    Is that the normal course of business for scammers

14   in your background?

15         A.    For scammers?

16         Q.    Yeah.

17         A.    No.

18         Q.    Now, while the Assistant U.S. Attorney was

19   questioning you there was some -- there was always these

20   questions about where does that individual come from, like

21   what state does he come from and that sort of thing.  Is that

22   important?

23         A.    It can be.  Sometimes if you're dealing with

24   multiple -- or a certain individual is an agent and they're

25   dealing with people from all over the country, it should bring

1  up questions why, why are there people from so many different

2  places.

3        Q.    Well, people may be seeking him out, right?

4        A.    Yes, but there may be one individual that's seeking

5  him out on behalf of multiple others, and so the question is

6  why.  Given the volume of, as you said, scam activity, and

7  particularly with money mules, that is certainly a red flag.

8        Q.    Okay.  But, I mean, doing business with somebody

9  from Arizona is not illegal, right?

10       A.    No, not in and of itself.  Of course not.

11       Q.    No.  I mean, people in Arizona want bitcoins just

12  as much as people in Texas, right?

13       A.    Sure.

14       Q.    And people in Oklahoma.  I mean, we've seen all

15  this in that book, right?

16       A.    Yes.

17       Q.    People in Florida want bitcoin, right?

18       A.    Yes.

19       Q.    Now, you know, some of those people may have been

20  scammed, correct?

21       A.    Yes.  I believe so.

22       Q.    Right, right.  Some of those people may have been

23  taken advantage of, right?

24       A.    Yes.

25       Q.    Do you know who the people were that were engaged

1    with the people that were holding up their licenses?

2        A.   That wasn't my role in this investigation.

3        Q.   Okay.  And do you know from what you had seen in

4    any of that information whether or not Ian Freeman knew any of

5    those people that were in contact with any of the people

6    holding up notes and licenses?

7        A.   Again, this wasn't my role in the investigation.

8        Q.   All right.  But nothing you did could make that

9    linkage?

10       A.   No.  Nothing I did.

11       Q.   All right.  And the ages of people.  You're

12   starting to scare me with some of these ages because I was

13   older than some of them.  Why was that included?

14       A.   Well, one of the sort of indicators of fraud can

15   sometimes be a person's age.  Particularly with regard to --

16   when combined with bitcoin and some other types of -- some

17   other identifiers as well, red flags that pop up.  Generally

18   speaking, we found that given the volume of elder fraud

19   involved with cryptocurrency that that tends to be a red flag

20   when combined with other factors.

21       Q.   You showed -- I think there was some exhibit that

22   indicated the number of transactions that Freeman would have

23   been involved in?

24       A.   Yes.

25       Q.   There was a good number of them, right?

```
 1          A.    It was over 3,000, I believe.
 2          Q.    Over 3,000.  How many people did we talk about in
 3   this book?  Do you remember?
 4          A.    I don't recall, but it was significantly less than
 5   3,000, if that's what you're getting at.
 6          Q.    Yes.  I think it was less than 20, actually.
 7          A.    Okay.
 8          Q.    And I know your strong suit isn't math, but that's
 9   really infinitesimal, isn't it?
10          A.    It's certainly a difference, yes.
11          Q.    It's a huge difference?
12          A.    Yes.
13          Q.    When you're talking of a pool of well over 3,000
14   and you're picking 20 transactions, that's a very small
15   fragment of those transactions, right?
16          A.    Yes, but it's a selection from the overall records.
17          Q.    Yeah.  Did you select the records where Ian was
18   saying don't do business, it sounds like you're being scammed?
19          A.    I don't recall reading that.
20          Q.    No, but you didn't read everything, did you?
21          A.    I reviewed the records.
22          Q.    Did you read his profile?
23          A.    His profile?  Yes, of course I read his profile.
24          Q.    Did you read his reviews?
25          A.    His reviews?  Yes, I believe I read the reviews.
```

1      Q.    Can you tell the jury what the percentage of good

2   reviews were versus bad reviews?

3      A.    I don't recall the exact percentage, but he was

4   quite highly reviewed.

5      Q.    Highly reviewed means he was held out in that

6   community as being honest, right?

7      A.    People were very satisfied with their interaction

8   with him.

9      Q.    Right.  They weren't complaining about being

10   scammed or ripped off is what I guess I'm getting at.

11      A.    Correct.

12      Q.    There were actually identified individuals with I

13   think Nigerian national licenses that were being shown?

14      A.    Yes.  There was one individual with a Nigerian

15   driver's license and one with a Nigerian passport, correct.

16      Q.    And with regard to those individuals, do you know

17   if Ian Freeman ever met them?

18      A.    I do not, no.

19      Q.    Ever spoke with them in person?

20      A.    I don't know.

21      Q.    Was attempting to ever contact them?

22      A.    I mean, aside from these conversations through the

23   LocalBitcoins chats?  No, not that I'm aware of.

24      Q.    Do you know if the FBI or any other investigative

25   enforcement agency, whether it be out of the United States or

1  whether it be internationally, ever followed up on those

2  identities and human beings?

3      A.   I don't know.

4      Q.   Do you think that would be important?

5      A.   Potentially.  It depends.  There are lots of

6  scammers out there, and so prioritization of resources is --

7  it's outside of my purview.

8      Q.   Okay.  Do you have any knowledge whatsoever that

9  anybody pursued any investigation with regard to the people

10 that Ian insisted hold up their picture IDs from a government

11 document?

12     A.   Yeah, I have no knowledge of that.

13     Q.   Why would -- if you know, why would somebody want

14 to have somebody's identity on a government document before

15 transacting any kind of an activity with regard to

16 cryptocurrency?

17     A.   Well, one, to make sure they're not a robot,

18 potentially.  Two, to make sure that they're a real person and

19 can have the ability to dispute a transaction and the

20 aftermath with LocalBitcoins, for example.

21     Q.   Okay.  So it would be for Ian's protection to know

22 that he's dealing with a human?

23     A.   Yes.

24     Q.   And Ian's protection so that he could chase them

25 down potentially if Ian got ripped off?

1      A.    Correct.

2      Q.    And it's for the purpose of investigation

3   afterwards if this whole thing went down the toilet, for lack

4   of a better term?

5      A.    Sure.

6      Q.    Yeah.  And, you know, the people if they were

7   scammed during that transaction, would have had the

8   information of that person with the government document being

9   held up because Ian insisted on getting it, right?  The little

10  old lady that had a lot of money --

11     A.    You're talking about the agent transactions

12  particularly?

13     Q.    I am.

14     A.    Yes, if LocalBitcoins had those photos uploaded,

15  yes.

16     Q.    All right.  So what Ian was doing was protecting

17  himself, right?

18     A.    Yes.

19     Q.    And making a record of who was making the purchase

20  of the currency -- of the bitcoin?

21     A.    Yes, there's a record.

22     Q.    There's a record of that so that if, again, the

23  little old lady scam or the grandson scam or the romance scam

24  took off, Ian would have evidence that he would be able to

25  supply to the victim?

1       A.     Yes.

2       Q.     Yeah.  Do you know if the FBI prior to his arrest

3  ever went to him and said, can you help us because some little

4  old lady in California got ripped off or somebody thought that

5  their grandson was locked up, and can you help us out?

6       A.     I'm not aware of that.

7       Q.     But we know for sure that he kept all that

8  information, right?

9       A.     At a bare minimum on his LocalBitcoins profile,

10  yes.

11       Q.     And, again, the reason that you would be taking

12  pictures of individuals and the reason that Mr. Freeman would

13  have had them identify themselves was because he had a

14  protocol with regard to the purchase of bitcoin?

15       A.     Yes.  It was due to his protocol.

16       Q.     Okay.  And he stuck by that protocol?

17       A.     He certainly did.

18       Q.     Was there any evidence that you were able to obtain

19  that he tried to conceal any of the identities or any of the

20  transactions?

21       A.     From whom?

22       Q.     From the FBI.

23       A.     Conceal the identities of people?

24       Q.     Yeah.

25       A.     No, not the identities.  At least that I'm aware

1  of.

2       Q.   Okay.  Now, you know, before there was bitcoin and

3  before there was cryptocurrency there were scammers, right?

4       A.   Yes.

5       Q.   And they're still out there today.  I mean, you

6  mentioned something about using gift cards and that sort of

7  stuff.  That's going on as we speak, too, right?

8       A.   Yes.  Criminals are always early adopters of new

9  technology.

10      Q.   Right.  So as we're speaking, there's active

11 scamming going on.  It doesn't have to be with regard to any

12 kind of cryptocurrency.  That's for sure.

13      A.   No, it does not.

14      Q.   And just because you're engaging in some kind of

15 cryptocurrency activity that doesn't mean that you're doing

16 anything illegal?

17      A.   Not necessarily.

18      Q.   Right.  When he identified -- or there were

19 identifiers of the churches involved, I think there were a

20 number of them, they also left bank account information,

21 right?

22      A.   Correct.

23      Q.   So that would have been readily identifiable as

24 well, right?

25      A.   Yes.

1      Q.    There was nothing secret about where accounts were.

2  There would be a bank identified, a name, and there would be

3  an account number, right?

4      A.    Correct.

5      Q.    All right.  So nothing hidden there?

6      A.    No.

7      Q.    And, in fact, there were a number of different

8  banks.  He readily supplied the account numbers and the

9  identification needed to transact any kind of activity?

10     A.    Yeah, it was functionally important to the

11 transaction.

12     Q.    Do you know the history of bitcoin, by the way?

13     A.    The history?

14     Q.    Yeah.

15     A.    I mean, I'm familiar with it, yes.

16     Q.    And, you know, when did it start up?

17     A.    2009 is when a white paper by Satoshi Nakamoto was

18 produced.

19     Q.    Okay.  And with regard to the beginning of that,

20 was there actually physical bitcoin, like coins, like

21 quarters, or something like that?

22     A.    No, there's no physical bitcoin.

23     Q.    There's no physical bitcoin.  So there's no --

24 there's never been a trace of physical bitcoin?

25     A.    Physical bitcoin?  No.

1      Q.   It's always been computer generated; is that what

2   you're saying?

3      A.   Yes.  It's online.

4      Q.   And it's always been online?

5      A.   To my knowledge, yes.

6      Q.   Okay.  What was the original value of bitcoin?  Do

7   you know?

8      A.   The original value was zero because no one believed

9   in it, effectively.

10     Q.   All right.  And it started to become more and more

11  acceptable as the years went on, right?

12     A.   Yes.

13     Q.   Because more and more people were using it and they

14  appreciated the fact they didn't have to tell anybody what

15  they were doing with it, right?

16     A.   That may be one of the reasons why people enjoyed

17  it, yeah.

18     Q.   But you can still buy things and not tell people

19  what you're doing with it anyways, right?

20     A.   Yeah.  In fact, the first thing I believe someone

21  bought with bitcoin is a pair of alpaca socks, I believe.

22     Q.   That was a big purchase.  That's when bitcoin was

23  like 25 cents.

24     A.   Something like that.

25     Q.   And in today's market if you want to be anonymous,

1    I guess, all you've got to do is flash some cash, right?

2         A.    Yes.

3         Q.    So totally anonymous purchases can take place with

4    cash?

5         A.    Yes.

6         Q.    Attorney Aframe wanted to buy a $16,000 automobile

7    from you, remember, there was that trade?

8         A.    Yes.

9         Q.    But if I wanted to buy a $9,000 automobile with

10   cash from you, nobody knows, right?

11        A.    Correct.

12        Q.    Nothing illegal about that?

13        A.    Not that I'm aware of.

14        Q.    All right.  During the course of your review and

15   the course of your testimony and the reading of these chats

16   back and forth it appeared as though Mr. Freeman was concerned

17   about imposters.  Is this something that takes place during

18   the course of some of these transactions?

19        A.    Well, because you're known by a user name, and, in

20   particular, as you register accounts on these sites, someone

21   could register a user name that is very similar to your name

22   and people could get confused as to which person they were

23   talking to potentially.

24        Q.    All right.  So is it the responsible thing for

25   somebody to warn somebody that there's an imposter out there?

1      A.   Yes.

2      Q.   Okay.  So you would agree with me that what Ian was

3  doing when he was flagging that was to make sure that these

4  folks knew that they were dealing with him, the real Ian

5  Freeman?

6      A.   Yes.

7      Q.   Not the imposter, right?

8      A.   Yes.

9      Q.   Is that what scammers usually do?

10     A.   To warn them that you're dealing with them

11  specifically?  Not particularly.  But you want to direct

12  people to your business, which is effectively what was

13  happening there.  You want to make sure they have the correct

14  business.

15     Q.   The correct business but the correct name?

16     A.   Yes, and the correct name.  Of course, yes.

17     Q.   Correct address?

18     A.   Yes.

19     Q.   Correct phone number?

20     A.   Yes.

21     Q.   Scammers don't do that.

22     A.   I mean, not necessarily.

23     Q.   No.

24          MR. SISTI:  Could I have a moment, Judge?

25          THE COURT:  You may.

```
1                    MR. SISTI:  Thank you.

2                    (Attorney Sisti confers with the defendant)

3                    MR. SISTI:  Thank you for coming.  I have no

4      further questions.

5                          REDIRECT EXAMINATION

6      BY MR. AFRAME:

7           Q.    There was a lot of questions that suggested

8      scammers try to conceal themselves?

9           A.    Yes.

10          Q.    And the suggestion was made Mr. Freeman didn't try

11     to conceal himself, right?

12          A.    Yes.

13          Q.    Let me just be as clear as I possibly can be about

14     this.  Is the government's claim in this case that Mr. Freeman

15     is a scammer?

16          A.    No.

17          Q.    What is the government's claim in the case?

18          A.    That Mr. Freeman was an unlicensed money

19     transmitter and a money launderer.

20          Q.    And what was he doing through the unlicensed money

21     transmitting business as far as the government's allegation?

22          A.    Laundering money for scammers.

23          Q.    So there's a difference between the scammer and the

24     money launderer?

25          A.    Yes.
```

1      Q.    And we're not alleging he's the scammer, are we?

2      A.    Correct.

3      Q.    Let me go back to the question about banks as far

4  as whether they allow transactions or whatever the banks did,

5  and I want to make a point.

6            MR. AFRAME:  And if I can bring up 1201 and line 6?

7  If we could open the terms of trade, if you go down?

8      Q.    So what I understood Mr. Sisti to be asking you is,

9  you know, banks let these transactions go through, and if

10  these were bitcoin transactions from, you know, older people,

11  why are they allowing that?  That seems wrong.

12           Let's look here at the instructions from line 6,

13  "At the teller," it says, "you will need to go into the bank

14  and deposit with a human teller.  Find out the name of the

15  teller.  You will need to write that on the receipt.  Get a

16  receipt."  Then what's the next word in bold?

17     A.    Afterwards.

18     Q.    Afterwards.  After what?

19     A.    After interacting with the teller.

20     Q.    "Then write for bitcoin purchase from FTL_Ian on

21  localbitcoins.com.  No refunds."  Right?

22     A.    Correct.

23     Q.    So does the bank know it's a person born in 1945

24  buying $10,000 worth of bitcoin?

25     A.    No.

1    Q.   They just know what?

2    A.   It's a person born in 1945.

3    Q.   Is doing what with $10,000?

4    A.   They're sending a cash deposit to Mr. Freeman.

5    Q.   And does the bank know why?

6    A.   No.

7    Q.   Because that's not written till afterwards, is it?

8    A.   Correct.

9    Q.   And do you know one way or another whether banks

10   and credit unions filed suspicious activity reports of people

11   sending money to Mr. Freeman or any of these churches?

12   A.   I do not.

13   Q.   Mr. Sisti suggested that some of these transactions

14   didn't come to fruition that we read, and that's true, right?

15   A.   Correct.

16   Q.   Was there any example where Mr. Freeman asked

17   questions and said, oh, I don't want to do that transaction,

18   it seems suspicious to me?  Did we read any that said that?

19   A.   No.

20   Q.   Mr. Freeman very much wanted the photos?

21   A.   Yes.

22   Q.   Let me ask you a question about those photos.

23        MR. AFRAME:  Let me open up to Patrick Brown as an

24   example, because I suspect we will meet Patrick Brown, which

25   is 1225.

1      Q.    And somebody is using user name patrickbrown007,

2   correct?

3      A.    Yes.

4      Q.    And writing these words here, like, at 1630, or go

5   down a little further, like, here at 1637, "Friend, I am

6   comparatively fresh on LBC."

7            And then we have the photo, right?

8            MR. AFRAME:  If we go forward -- just go forward to

9   the first picture, 1225-A.

10     Q.    There's a photo, right?

11     A.    Yes.

12     Q.    Now, Patrick Brown, that man, right, there's

13   nothing that tells us whether he's the one who put that photo

14   in that LocalBitcoin chat.  In other words --

15           MR. SISTI:  Your Honor -- hold on.  I've been

16   hesitating with regard to objections, but we're leading now

17   and getting way down the path.

18           THE COURT:  Go a little more open-ended.

19           MR. AFRAME:  Okay.

20     Q.    Is there anything about what I see here that says

21   that Patrick Brown, that man I'm looking at, uploaded this

22   photograph to LocalBitcoins?

23     A.    No, not the man in the photograph.

24     Q.    Why not?

25     A.    Well, because he could have taken the picture

```
 1   himself, sent it to someone else, and had them upload it.
 2        Q.    What does the user name patrickbrown007 tell us?
 3        A.    Nothing.  It's just a user name.
 4        Q.    So she could call herself S. Aframe if she felt
 5   like it, right?
 6        A.    Yes.
 7        Q.    Would that make her me?
 8        A.    No.
 9        Q.    Mr. Freeman kept records of the photos on
10   LocalBitcoins and we saw some of them.  Did he also tell
11   people to go over to Telegram?
12        A.    Yes.
13        Q.    And were those photographs open and obvious to
14   people?  Have you seen them?
15        A.    These photos?
16        Q.    No, the ones on Telegram.
17        A.    Oh, I've not reviewed the Telegram information.
18        Q.    Where would those have been stored?
19        A.    Likely within the Telegram application itself.
20        Q.    And in all of the chats that we looked at did we
21   ever see Mr. Freeman ask anybody a question about the source
22   of funds?
23        A.    No.
24        Q.    Did we see transactions that were in the several
25   hundred thousand dollar range in cash?
```

1    A.    Yeah.  We saw people come to him asking for those

2    transactions, yes.

3         Q.    And did he talk about how to mail the money to him?

4         A.    Yes.

5         Q.    Did he ask any questions about where that much cash

6    came from?

7         A.    No.

8         Q.    Mr. Sisti suggested that, you know, why haven't you

9    found the scammers.  What is challenging in the situation we

10   have seen to find scammers when bitcoin is involved?

11        A.    Well, you've got to try and follow the money, for

12   one, which isn't always easy, and then not only that but

13   oftentimes the scammers are located in another country.

14        Q.    We talked about -- Mr. Sisti talked about Mr.

15   Freeman being highly reviewed?

16        A.    Yes.

17        Q.    When someone writes a review, does it matter who

18   they are and what their role in the transaction is?

19        A.    It just has to be the user that interacted.

20        Q.    Does it matter to what it means?

21        A.    Oh, what it means?  No.

22        Q.    So let me pull up 1225 again.

23              Hypothetically, 1225-A, if Patrick Brown, that man,

24   wrote a review saying Mr. Freeman is honest and terrific and

25   this was the best thing I've ever done, does that mean

 1   something different if it was written by patrickbrown007 and

 2   that happens to be a different person entirely?

 3        A.   Yes.

 4        Q.   In any of the photos or those chats that we saw --

 5   you were asked about large cash deposits.  We saw plenty of

 6   people in their 50s, 60s, and I think 70s, right?

 7        A.   Yes.

 8        Q.   Were any questions asked of those people by Mr.

 9   Freeman about why they're doing the transaction?

10        A.   No.

11        Q.   Did Mr. Freeman instead provide his own reason for

12   why people wanted to do the transaction?

13        A.   Yes.

14        Q.   Was there any evidence that he connected that

15   reason to anything in reality?

16        A.   No.

17        Q.   The church bank accounts -- again, the idea was

18   that those were open and obvious, right?

19        A.   Yes.

20        Q.   And Mr. Freeman's accounts were open and obvious?

21        A.   Yes.

22        Q.   Are the church entities the scammers?

23        A.   No.

24        Q.   Is Mr. Freeman the scammer?

25        A.   No.

1      Q.    What's the point of the bank accounts?

2      A.    To receive money from the other individual on the

3  other end of the trade.

4      Q.    Right.  And then the question is for what reason,

5  right?

6      A.    Yes.

7            MR. AFRAME:  Thank you.

8            MR. SISTI:  Just a little follow-up, if I could,

9  your Honor.

10           THE COURT:  Yes.  Please.

11           MR. SISTI:  Thank you.

12                      RECROSS-EXAMINATION

13 BY MR. SISTI:

14     Q.    We're going to let you go pretty soon, all right?

15     A.    Okay.

16     Q.    Just to reiterate, it's interesting that Mr.

17 Freeman may not have asked where the $100,000 came from,

18 right?

19     A.    Uh-huh.

20     Q.    But we know the banks probably didn't do that

21 either, right?

22     A.    I can't speak to that.

23     Q.    Is there any evidence they did?

24     A.    Not that I'm aware of, but also that wasn't my role

25 in the investigation.  I deal with virtual currency.

1      Q.   No, no.  I get that.  Is there any evidence that

2   you're aware of that the FBI, that any banking commission

3   followed up on any of this to see if they're highly regulated

4   institutions, all right, asked the questions that Mr. Aframe

5   wanted Mr. Freeman to ask?

6      A.   It wouldn't have been me that did that.  I can't

7   speak to it.

8      Q.   Who would do that?

9      A.   Another investigator, analyst.  I deal with virtual

10  currency.

11     Q.   Okay.  Another investigator, another analyst from

12  the federal government?

13     A.   Sure.

14     Q.   Do you know if they took the time to do that?

15     A.   I don't know.

16     Q.   Okay.  In the redirect examination the finger was

17  pointed at Mr. Freeman for not being a scammer, and that's

18  good because we've been saying all along he's not a scammer,

19  all right, but that he was a money launderer, right?

20     A.   Yeah.

21     Q.   Is it your experience that good old criminal money

22  launderers give their full name when they're transacting

23  business?

24     A.   Yeah, sometimes.

25     Q.   Yeah, sometimes.  Do smart ones do that?

```
 1          A.    Sometimes.

 2          Q.    Their address?

 3          A.    Say that again?

 4          Q.    Their address?

 5          A.    Sometimes, yeah.

 6          Q.    It's rare.  Come on.

 7          A.    I mean, I can't say exclusively that it doesn't

 8   happen.

 9          Q.    I didn't say it's possible or that it happens.  I'm

10   saying that's certainly not the norm, correct?

11          A.    It's not the norm, but it --

12          Q.    All right.  All right.

13          A.    But it certainly happens.

14          Q.    All right.  Now, come on.  Address, phone number,

15   cell phone, is that what money launderers do?

16          A.    I mean, yeah, some of them.  They're taking

17   business from anyone so they've got to be able to get in

18   contact with them.

19          Q.    Do you really want to stand on that testimony?

20          A.    Yeah.

21          Q.    All right.  So you're saying they're committing

22   crimes in plain sight?  Is that what you're saying?

23          A.    I mean, of course -- I think what you're alluding

24   to are things like shell companies and things like that.  Is

25   that what you're alluding to?
```

1      Q.    Yeah.

2      A.    Yeah, of course shell companies are used, but they

3   need to be able to get in contact with people and people need

4   to be able to get in contact with them.

5      Q.    I'm not talking about shell companies here because

6   we're talking like we discussed.  He's real.  He's flesh and

7   blood, right?

8      A.    Yes.

9      Q.    He has a house in Keene, a real one, right?

10      A.    Yeah.

11      Q.    Not a shell house, right?

12      A.    Right.

13      Q.    He has a real cell phone, right?

14      A.    Yes.

15      Q.    Not a shell phone, a cell phone, right?

16      A.    Yes.

17      Q.    Okay.  They don't do that.  They use what you said,

18   shell companies?

19      A.    Yes.  The best do, yes.

20      Q.    Thank you.

21                      FURTHER EXAMINATION

22   BY MR. AFRAME:

23      Q.    If I'm in a restaurant and I'm going to take money,

24   drug money, and launder it through my restaurant, do I have a

25   telephone number?

```
 1        A.   Yes.

 2        Q.   Am I serving food?

 3        A.   Yes.

 4        Q.   Do I have a business?

 5        A.   Yes.

 6        Q.   Can you come eat there?

 7        A.   Yes.

 8        Q.   Am I still laundering money?

 9        A.   Yes.

10        Q.   Thank you.

11             MR. SISTI:  Have a nice trip back.  Thank you.

12             THE COURT:  Thank you.

13             Please call your next witness.

14             MS. MACDONALD:  Your Honor, I think it's been 90

15   minutes.  Is this a good time for our break?

16             THE COURT:  It hasn't been 90 minutes.

17             MS. MACDONALD:  Okay.

18             The government calls Theodore Vlahakis

19             THE COURT:  Wait a minute.  Am I wrong, Kellie?

20             THE CLERK:  No.  That will be at --

21             THE COURT:  About twenty past?

22             THE CLERK:  At 3:25.

23                        THEODORE VLAHAKIS

24          having been duly sworn, testified as follows:

25             THE CLERK:  For the record, please state your name
```

1    and spell your last name.

2            THE WITNESS:  My name is Theodore Vlahakis.  Last

3    name is spelled V-L-A-H-A-K-I-S.

4                          DIRECT EXAMINATION

5    BY MS. MACDONALD:

6        Q.    Good afternoon, Mr. Vlahakis.

7        A.    Good afternoon.

8        Q.    Could you please tell us where you're employed?

9        A.    The U.S. Department of Treasury, Financial Crimes

10   Enforcement Network, commonly known as FinCEN.

11       Q.    And what's your position with FinCEN?

12       A.    I'm a senior compliance officer.

13       Q.    We'll get into more detail, but as an overview, can

14   you just generally tell us what FinCEN is and what its

15   responsibilities are in the government?

16       A.    FinCEN is a bureau of the U.S. Department of

17   Treasury tasked with protecting the financial system against

18   money laundering and similar types of financial crimes.

19       Q.    Okay.  And I would like to ask a little bit about

20   your background.  Could you just tell us about your

21   educational background?

22       A.    Yes.  I have a BA from Brandeis University and a

23   J.D. from George Mason University School of Law.

24       Q.    How long have you worked for FinCEN?

25       A.    Since March of 2009.

1    Q.   Have you held more than one position with FinCEN

2    since 2009?

3    A.   I have.

4    Q.   And I would like to ask you to sort of go

5    chronologically starting with 2009 up to the present, what was

6    your first position at FinCEN?

7    A.   I joined FinCEN in 2009 as a Bank Secrecy Act

8    resource center specialist.

9    Q.   What does that position entail?

10   A.   So that position entails answering inquiries from

11   financial institutions, regulators, law enforcement, and

12   sometimes individuals regarding how to comply with the Bank

13   Secrecy Act, which is the federal anti-money laundering

14   statute and also complying with our form requirements and

15   related processes.

16   Q.   Okay.  And, just basically, how were you

17   interacting with businesses and individuals that would call to

18   speak with FinCEN?

19   A.   They would leave a message on our regulatory

20   Helpline, a voicemail, and we would answer it within 24 hours,

21   and they would also sometimes leave e-mails.  So they could

22   choose between calling or e-mailing or both.

23   Q.   Okay.  And what was your next position with FinCEN?

24   A.   I was a team lead within the same group.

25   Q.   Did you change groups at some point?

1        A.    Yes.   After a team lead I became a section chief

2   within the same group, and then in 2017 I moved over to a

3   different division, the enforcement division, and became a

4   compliance and enforcement officer.

5        Q.    And tell me about what your responsibilities were

6   in the enforcement division.

7        A.    My responsibility chiefly was to help out with

8   enforcement actions against certain financial institutions

9   that were not complying with the Bank Secrecy Act and also to

10  advise them of their requirements.

11       Q.    And do you still work in that division but in a

12  different position?

13       A.    Yes.

14       Q.    And tell me about your current role.

15       A.    I'm currently a senior compliance officer within

16  that division.  And as part of that role, I again help ensure

17  that financial institutions comply with the Bank Secrecy Act

18  and they understand their reporting and compliance

19  obligations, and I also provide training to internal and

20  external stakeholders, and I testify as a custodian witness.

21       Q.    Okay.  You've mentioned the Bank Secrecy Act a bit,

22  so let's dive in and talk a bit about that.

23            Could you generally describe what the Bank Secrecy

24  Act is?

25       A.    Sure.  The Bank Secrecy Act is a federal anti-money

1    laundering statute and it requires financial institutions, for

2    example, banks, credit unions, and similar types of

3    institutions, to file certain reports of transactions, to keep

4    records of transactions, and also to keep and have what's

5    known as an anti-money laundering program.

6         Q.    Okay.  We'll talk about all those things in a bit

7    more detail, but let's start with who the Bank Secrecy Act

8    applies to.

9              You mentioned a couple of examples.  Can you give

10   me sort of a broader idea of that?

11        A.    Sure.  So the Bank Secrecy Act applies to financial

12   institutions, and commonly they're known as your depository

13   institution, so your banks and credit unions, but also it

14   applies to more non-traditional types of financial

15   institutions.  For example, casinos, money services

16   businesses, and we have a wide variety of investment, broker

17   dealers, hedge funds.  So all of those are considered

18   financial institutions and they have to comply with the Bank

19   Secrecy Act.

20        Q.    Okay.  What is a money services business?

21        A.    Sure.  FinCEN characterizes a money service

22   business based on the type of financial activity that they

23   conduct.  So again I mentioned -- we're all familiar with

24   banks, depository institutions.  A money service business

25   could be a business that cashes checks.  It could be a money

1    transmitting business.  It could be, for example, someone who

2    issues or sells traveler's checks or money orders.  It could

3    be the U.S. Postal Service.  It could be someone who provides

4    or sells prepaid access.

5         Q.   Okay.  And one of the examples you just listed is a

6    money transmitter.  So I would like to ask you what that is.

7         A.   Yes.  So a money transmitter is a person who

8    provides money transmission services.  And money transmission

9    services is defined by FinCEN as the acceptance of currency,

10   funds, or the equivalent of currency or funds, and the

11   transmission of currency, funds, or it's equivalent, to

12   another location or person by any means.

13        Q.   Okay.  And what about people that sell, exchange

14   bitcoin for U.S. dollars, is that a money transmitter?

15        A.   Yes.

16        Q.   And tell me why.

17        A.   Because FinCEN has guidance that explicitly states

18   that if you are exchanging virtual currency for real currency,

19   or what we call fiat currency, you are a virtual currency

20   exchanger which is a money transmitter which is a money

21   services business.

22        Q.   Okay.  Are there any exceptions to that?

23        A.   Generally, yes, there are a few exceptions.

24        Q.   Tell me about the exceptions.

25        A.   Okay.  So the main exception we would have is

1   someone who is not acting in a business capacity.  For

2   example, in the check cashing realm if you're not a check

3   cashing business but you happen to cash a friend's check and

4   it just happens once, it's a one-time occurrence, it's not

5   repeated.  And the same can be applied to the other categories

6   of MSBs, too, money services businesses.

7            So the same thing with the money transmission.  If

8   money transmission -- if it happens once and it's an isolated

9   incident, we wouldn't necessarily consider the entity to be a

10  money transmitter, but it's always based on facts and

11  circumstances.  So that's the main exception and there are

12  others as well.

13       Q.   So it's really a de minimus exception.  Is that how

14  you would describe it?

15       A.   Yes.

16       Q.   Let me just get into a little more detail there.

17  What sort of things would take you out of being a one-time or

18  infrequent money transmitter versus being one that is

19  regulated by FinCEN?

20       A.   If you're obviously transmitting money on a regular

21  basis, if it's repeated, if you are -- if it's let's say part

22  of your business or if it's just something that's done on a

23  regular basis so it's not isolated.

24            As I mentioned, it's always a matter of fact

25  circumstances, but if it's happening more than let's say once

1   or twice in a year, then we would consider the entity to be a

2   money transmitting business.

3       Q.   Okay.  And if somebody had questions about whether

4   they were a money transmitter, does FinCEN offer resources?

5       A.   Yes.

6       Q.   And tell me about those.

7       A.   FinCEN offers a money services business homepage on

8   our public website.  On that homepage we have information

9   about how to comply with our requirements relating to money

10  services businesses and money transmission requirements, FAQ

11  documents, administrative rulings, many, many different types

12  of examples.

13          And if someone views those materials and still has

14  questions, there are clear links to our regulatory Helpline,

15  which I just mentioned, the resource center, where they can

16  call or e-mail and receive a response within 24 hours.

17      Q.   And does FinCEN offer specific guidance about

18  virtual currency businesses?

19      A.   Yes.

20      Q.   Please tell me about that guidance.

21      A.   In 2013 we issued a guidance piece and it laid out

22  the compliance obligations for users of virtual currency,

23  exchanges of virtual currency, and administrators of virtual

24  currency.

25      Q.   Okay.  So let's talk about those three categories.

1    What's a user of virtual currency and how, if at all, does

2    FinCEN regulate?

3         A.    Sure.  A user of virtual currency is simply someone

4    who obtains virtual currency.  For example, maybe they mine

5    it, they have a mining operation, or they just have some

6    virtual currency, and they use it to purchase real or virtual

7    goods or services.

8         Q.    Okay.  And is that a money transmitter?

9         A.    No, it is not.

10        Q.    Okay.  And how about an exchanger?

11        A.    An exchanger of virtual currency, as we mentioned,

12   is someone who exchanges virtual currency for real currency

13   and/or vice versa.

14        Q.    And is somebody who exchanges virtual currency for

15   real currency, and/or vice versa, a money transmitter?

16        A.    Yes.

17        Q.    And is that stated in your 2013 guidance?

18        A.    Yes.

19        Q.    Has that guidance changed at all since 2013?

20        A.    No.

21        Q.    Has that been available since 2013 to the public?

22        A.    Yes.

23        Q.    Okay.  Now, when you're looking at a type of

24   business model -- I would like to sort of discuss -- we talked

25   about the de minimus exception, but, otherwise, does the size

1    of the business matter in determining whether something is a

2    money transmitter?

3         A.    No.

4         Q.    Does the number of employees matter?

5         A.    No.

6         Q.    Can a business run by only one person be a money

7    transmitter?

8         A.    Yes.

9         Q.    Does it matter what the name of the business is?

10        A.    No.

11        Q.    Does it matter whether the business describes

12   itself as a money transmitter?

13        A.    No.

14        Q.    Why not?

15        A.    Because FinCEN is concerned with the activity or

16   conduct of money transmission.  And once that activity occurs,

17   that triggers the requirement to register and report and have

18   an anti-money laundering program and all of the other

19   requirements under the Bank Secrecy Act that are associated

20   with financial institutions.

21        Q.    Okay.  And we've talked about FinCEN's guidance

22   about virtual currency businesses.

23              Does it have specific guidance on virtual currency

24   kiosks?

25        A.    Yes.  We have a few guidance pieces related to

1   kiosks.

2      Q.   Okay.  And, generally, could you describe what the

3   guidance is with respect to virtual currency kiosks?

4      A.   So those guidance pieces, which I think were in

5   about 2014, they came out in 2014, they do not change or

6   supersede the 2013 guidance.  They just clarify it.

7           And, again, it says that if someone is exchanging

8   virtual currency for real currency, and vice versa, they're

9   characterized as a money transmitter, and they would have to

10  register with us as such.

11     Q.   So does it matter in what manner they do that?

12     A.   Not at all.

13     Q.   Whether it's through a kiosk or otherwise?

14     A.   No.

15     Q.   Okay.  So I think we've talked about which

16  businesses are covered so I would like to transition to talk a

17  bit about what covered businesses like money transmitters are

18  required to do.

19          Are there registration requirements?

20     A.   Yes.

21     Q.   Please tell me about those.

22     A.   So all money services businesses, including money

23  transmitters, must register with FinCEN within 180 days after

24  their business is established by completing what's called an

25  RMSB, a registration of money services businesses.  It's also

1    called FinCEN Form 107.  That form basically just has fields

2    corresponding to information relating to the type of business,

3    the types of services it offers, you know, locations, address,

4    identifying information, bank account information, location of

5    supporting documentation, and that's, in a nutshell, what the

6    registration form is asking about.

7         Q.   Okay.

8              THE COURT:  Let's take the afternoon break.

9              Fifteen minutes.

10             (IN COURT - NO JURY PRESENT)

11             THE COURT:  Anything for the Court?

12             MR. SISTI:  I think we're good, Judge.

13             THE COURT:  All right.  See you in fifteen then.

14             (RECESS)

15             THE COURT:  All right.  The witness is still under

16   oath.

17             Ms. MacDonald, you may proceed.

18             MS. MACDONALD:  Thank you, your Honor.

19        Q.   Mr. Vlahakis, you can take your mask off when you

20   testify, and I will as well.

21        A.   Thank you.

22        Q.   I believe when we took the break we had just

23   started to talk about registration requirements, and you were

24   talking about money transmitters are required to register with

25   FinCEN; is that correct?

1  A. Correct.

2  Q. Okay.  And you had described the form that they are

3 required to fill out; is that correct?

4  A. Yes.

5  Q. Is there a fee for registering?

6  A. No.

7  Q. Okay.  Are you aware of some states that require

8 similar registration?

9  A. Each state requires -- has its own registration

10 requirements, and FinCEN is just concerned with its own

11 registration requirements.  So that's -- FinCEN is -- you can

12 think of that as the federal registration requirement.  So we

13 don't concern ourselves with state registration requirements

14 or any other requirements that a state may or may not have.

15  Q. Okay.  So if a money transmitting business is

16 required to register with FinCEN, it doesn't matter what state

17 they're in?

18  A. Correct.

19  Q. And it doesn't matter if they're in a state that

20 requires registration?

21  A. Correct.

22  Q. They still have to register?

23  A. Yes.

24  Q. Or a state that doesn't require registration, they

25 would still have to register?

1      A.   Correct.  As long as they're meeting our definition

2  of a money service business.

3      Q.   Okay.  And for companies or entities that do

4  register with FinCEN, are there additional requirements under

5  the Bank Secrecy Act?

6      A.   Yes.

7      Q.   I believe that when you gave an overview you talked

8  about an anti-money laundering program.  So I would like to

9  talk about that a bit.

10     A.   Correct.  Yes.

11     Q.   Could you describe what you meant by an anti-money

12  laundering program?

13     A.   Yes.  All financial institutions are required to

14  have an anti-money laundering program, and the purpose of an

15  anti-money laundering program is just so that an institution

16  is not laundering money either wittingly or unwittingly.  For

17  example, on behalf of the customer.  And so they're acting as

18  a first line of defense because they're in a position to

19  detect and deter certain types of suspicious activity going by

20  or through an institution.

21          So an anti-money laundering program has four

22  separate requirements.  First is policies, procedures, and

23  internal controls to assure compliance with all of our

24  requirements under the Bank Secrecy Act.

25          Second is a compliance officer who ensures the

1    financial institution is complying and generally is not

2    laundering money.

3         Third is education and training of the staff of the

4    financial institution.

5         And fourth would be an independent review.

6    Q.   Okay.  Let's talk first about the policies and

7    procedures.  What does that entail?

8    A.   So the institution must draft up policies and

9    procedures, which means that, for example, how to handle

10   certain types of transactions when it would believe that

11   certain transactions may be suspicious.  You know, they have

12   to know their customer.  That's considered policies and

13   procedures.

14        For banks that might be when to close an account,

15   for example, when to keep it open, and so -- policies and

16   procedures are internal, which means that, you know, FinCEN

17   doesn't dictate what they should be.  It's unique to each

18   institution, but they have to have that so they can consult

19   those policies and procedures for these transactions if they

20   may be suspicious or out of the ordinary and also so that

21   their employees know what to do when confronted with these

22   types of transactions.

23   Q.   Okay.  And you mentioned a term called know your

24   customer.

25   A.   That's correct.

1    Q.   Does that just mean understanding who uses your

2    business?

3    A.   Yes, and also -- understanding who uses the

4    business but understanding the type of transaction as well.

5    And so if the business, the institution, doesn't understand

6    fully what is going on with the transaction, there should be

7    policies and procedures in place where, for example, they

8    reach out to the customer to ask why they might be conducting

9    that transaction, what the purpose of it may be.

10   Q.   Okay.  And you discussed a compliance officer.  And

11   if we're talking about a small business, does that mean hiring

12   somebody?

13   A.   Not necessarily, no.

14   Q.   Okay.  So as long as one is -- does it just require

15   that somebody in the business be designated as a compliance

16   officer?

17   A.   Yes.  It could be the owner, yeah.

18   Q.   Okay.  And for companies that do register with

19   FinCEN, are there also reporting requirements?

20   A.   Yes.

21   Q.   And tell me about those, please.

22   A.   Financial institutions are required to report

23   transactions to FinCEN.  For example, all transactions in

24   currency, or cash, that are over $10,000 during the course of

25   any one business day, conducted by or on behalf of any person

1    during the course of a business day, so that's one, and they

2    file what's called a currency transaction report or CTR.

3              Another type of report is called --

4        Q.   If you don't mind, let me stop you to ask you a few

5    more questions about that before we move on.

6        A.   Not a problem.

7        Q.   Why does that requirement to file a report of cash

8    transactions over $10,000 exist?  What's the purpose of that?

9        A.   It's just a way for FinCEN and law enforcement to

10   track large cash transactions.

11       Q.   And why is it important for FinCEN and law

12   enforcement to track large cash transactions?

13       A.   Because it could possibly help them with their

14   investigations.  All the information that we request in the

15   report, for example, who's conducting the transaction, who the

16   transaction is on behalf of, the locations associated with the

17   transaction, is entered into a database that is searchable by

18   FinCEN and law enforcement officials, and that allows them to

19   conduct investigations.

20       Q.   And is there anything about the cash in particular

21   that makes this important?

22       A.   Yes.

23       Q.   What's that?

24       A.   Because we're asking for -- it's cash in and/or

25   cash out.  So commonly you think of that as deposits and/or

1    withdrawals.  And the reason we're interested in cash is

2    because it allows us to trace currency that possibly could be

3    from a criminal source.  It could possibly be related to human

4    smuggling, drug dealing, tax evasion.  But we have that

5    requirement for all currency transactions over $10,000 whether

6    they're suspicious or not.

7         Q.   Okay.  And, just to be clear, would a receipt of

8    $10,000 in cash to purchase bitcoin be something that would

9    require a CTR or a currency transaction report?

10        A.   It would have to be over $10,000, yes.

11        Q.   Thank you for the correction.  Over $10,000 to

12   purchase bitcoin would require a currency transaction report?

13        A.   Yes.

14        Q.   And let's talk about the second type of report.

15   What are those?

16        A.   They're called suspicious activity reports, or

17   SARs.

18        Q.   And please tell me what those are.

19        A.   Those are completed by financial institutions just

20   to let FinCEN know that they believe that possible suspicious

21   transactions have occurred.

22        Q.   Okay.  And what is -- can you give me some example

23   of suspicious transactions or things that would cause a SAR?

24        A.   Sure.  The most common one is called structuring.

25   For example, when someone may be trying to circumvent the CTR

1    reporting requirement.  Maybe they find out that the

2    institution would be filing the CTR for a transaction over

3    $10,000 so they decide to lower their transaction amount to,

4    you know, 9,000, let's say, or 9,900.  And it could be once.

5    It could be over repeated -- it could be a sequence of those

6    type of transactions.  Again, it's all a matter of facts and

7    circumstances.

8              So that's one type is structuring.

9         Q.   Okay.  And why is that called structuring?

10        A.   It's called structuring because they're structuring

11   transactions.  They're breaking them up to avoid a reporting

12   requirement.  They're trying to prevent the financial

13   institution from filing a currency transaction report.

14        Q.   Okay.  Could you give me some other examples of

15   things that would require a suspicious activity report?

16        A.   Sure.  Fraud is another one.

17        Q.   Okay.  And what are some sort of suspicious things

18   that might indicate fraud or red flags for fraud?

19        A.   Sure.  Transactions that may be out of the ordinary

20   for the particular customer.  Perhaps, you know, there's

21   someone, a lower income person who all of the sudden begins

22   sending or receiving millions of dollars to people or

23   jurisdictions.  It's just something that could be out of the

24   ordinary.

25             Elder financial exploitation is another type of

1      fraud that we see.

2              I mean, if you look on the suspicious activity

3      report, I believe there are over 40 different boxes an

4      institution could check that corresponds with different

5      suspicious activity characterizations or typologies.  And

6      assuming that a box doesn't correspond to the transaction that

7      they see, they can just write in other.  But in all events

8      they can explain in a few paragraphs in the narrative section

9      what they're seeing and why they're filing, and that's the

10     most important part of the SAR.

11          Q.    And is there sort of one category you see related

12     to unregistered MSBs, or money services businesses?

13          A.    Yes.

14          Q.    And tell me about that.

15          A.    Yes.  So financial institutions, for example banks,

16     can file suspicious activity reports on certain customers they

17     believe may be operating as money services businesses but are

18     not registered as such with FinCEN.

19          Q.    Okay.  And if a bank sees that, they might file a

20     SAR?

21          A.    Yes.

22          Q.    Okay.  And you described sort of a narrative that

23     can be included with these reports.  Can you tell us sort of

24     what types of information in your experience financial

25     institutions collect to inform that narrative?

1       A.    Yes.   The narrative is, as I mentioned, the most

2   critical part of this report.   Institutions are collecting

3   information relating to the type of transaction, the dates,

4   the subject, so who was involved in the transaction, the

5   possible victim.   In some cases the institution may not have

6   all this information, and they would have to specify why in

7   the narrative section.   Perhaps it's an ongoing pattern of

8   activity.   So in the narrative they would just say that this

9   is, you know, a continuing activity report.   We've been filing

10  every 90 days for the same activity.   It would provide contact

11  information for the institution, the office within the

12  institution who files it.

13       So the purpose of the narrative is for someone who

14  really is not familiar with what's going on, with the type of

15  activity at all, they should be able to read that and in a few

16  minutes understand everything about the transaction and who

17  may or may not be involved in it.

18       Q.    Okay.   And in your experience how do banks collect

19  that type of information -- or banks, financial institutions,

20  credit unions, money transmitters?

21       A.    Right.   I'm going to go back to the anti-money

22  laundering program that I mentioned.   When transactions are

23  running through financial institutions, the purpose of an

24  anti-money laundering program is so the institution can

25  properly detect and report all the activity.   So that's why

1    they have policies and procedures in place.  That's why they

2    have a compliance officer in training and an independent

3    review.  So if these types of suspicious transactions pop up

4    from time to time, they'll be able to recognize it and report

5    it.

6         Q.    And does FinCEN provide guidance on how to identify

7    suspicious activity?

8         A.    Yes.

9         Q.    And what types of guidance does FinCEN provide?

10        A.    We have on our public website many resources for

11   different types of financial institutions on how to identify

12   and report suspicious activity.  So, for example, depending

13   upon the type of activity, we have FAQ documents.  We have

14   documents relating to how to complete the SAR.  We have

15   webinars, many webinars, which are like short videos.  We have

16   what's called the SAR Activity Review, which is like a

17   magazine that we put out, and I believe we stopped putting

18   that magazine out back in 2011, but we continued to issue

19   related guidance.  It just provides examples of what law

20   enforcement would be working on, you know, investigations that

21   are aided by suspicious activity reports.

22             And, again, it's the same theme as I mentioned with

23   completing the registration form.  If an individual does not

24   understand something, they can contact the regulatory Helpline

25   via phone or e-mail and receive a response within 24 hours.

1      Q.    Okay.  And let's sort of take an example of one of

2  these FinCEN publications.  Are you familiar with some FinCEN

3  guidance on detecting elder fraud?

4      A.    Yes.

5      Q.    And can you tell me about some of the red flags

6  that are identified in that FinCEN guidance?

7      A.    Yes.  So, for example, that guidance lists I

8  believe over a dozen red flags associated with potential elder

9  exploitation, and that could be that the elderly individual

10 all of the sudden wants to close out their accounts, wants to

11 transfer large sums of money to someone that they may not be

12 related to.  They may not even know what the purpose of the

13 transaction is when they're asked by the financial

14 institution.  And, you know, the overarching theme of the red

15 flags is that you have an elderly person who is all of the

16 sudden conducting very large transactions at the direction or

17 control of someone else, they could be related, maybe not, and

18 the bank -- the institution believes that it's suspicious,

19 believes that there's some type of exploitation going on with

20 this person.

21     Q.    Okay.  And that guidance, is that available to the

22 public on FinCEN's website?

23     A.    Yes.

24     Q.    Tell me about the purpose of suspicious activity

25 reports and what they're used for.

1       A.   The purpose of suspicious activity reports is to

2   help law enforcement and FinCEN conduct investigations.  All

3   of the fields, all the information we're requesting, for

4   example the name of the filer, for example the bank or the

5   MSB, the institution filing, the subject or suspect

6   information, the ID, the addresses, the payment instruments

7   involved, everything, the possible victim information, all

8   that information goes into our database and it's searched by,

9   as I've mentioned, searched by law enforcement and FinCEN.

10          And when the investigations are conducted, the

11  information let's say from one SAR or set of SARs can be cross

12  referenced from SARs filed by other financial institutions and

13  other types of reports.  For example, currency transaction

14  reports or -- we have many other types of reports that are

15  filed as well.  And so that just can help paint a very broad

16  picture of the type of activity that would not be seen within

17  the narrow space or the vacuum of one financial institution

18  filing that one report.

19      Q.   Okay.  And so is it correct to say this helps law

20  enforcement find patterns across them?

21      A.   Yes, yes.

22      Q.   And so is it possible for a law enforcement officer

23  to search a name and find SARs filed by many different banks

24  or credit unions on that name?

25      A.   Yes.

1      Q.    Okay.  Are SARs public?  Is that public

2   information?

3      A.    No.

4      Q.    And tell me about FinCEN's policy on SAR

5   disclosure.

6      A.    So FinCEN has a policy on SAR nondisclosure or

7   confidentiality.  The terms are used interchangeably.  We

8   treat SARs as confidential law enforcement tips, which means

9   that, number one, the fact that a SAR has been filed or any

10  background information supporting the SAR cannot be disclosed

11  to the subject of the SAR.  They can only be viewed by those

12  officials with a need to know.  For example, FinCEN officials

13  conducting that investigation.  So it's very specific.

14         They can't be disclosed in open court, and they

15  generally cannot be disclosed to anyone without a need to know

16  who is not part of the investigation.

17     Q.    Okay.  So we can talk about SARs generally, but

18  typically we don't talk about the specifics of any one SAR; is

19  that correct?

20     A.    That's correct.

21     Q.    And what is, if you know, the purpose of that

22  policy?

23     A.    The main purpose is to encourage financial

24  institutions to file.  If we didn't have that policy, the

25  information contained in suspicious activity reports could

1    become public.  That information is extremely sensitive.  And

2    so for that reason we not only want financial institutions to

3    file these reports, but we want them to be very transparent

4    about what they see because, you know, what we're asking them

5    is to file on what they believe is suspicious.

6           We have what's called a safe harbor, too, which is

7    related to this, which simply means that there won't be any

8    liability against the financial institution if they file a

9    report and the activity ends up being legitimate or partially

10   legitimate.  That's why we don't want the reports to be

11   disclosed if there's no need.

12       Q.   Okay.  Now, switching gears a bit, does FinCEN

13   sometimes specifically reach out to businesses about the

14   requirement to register?

15       A.   Yes.

16       Q.   Okay.  And I'm going to show you Government's

17   Exhibit 201, which I believe is not objected to.

18           MS. MACDONALD:  Is that correct, Mr. Sisti?

19           MR. SISTI:  That is correct.

20           MS. MACDONALD:  Okay.  201.

21           THE CLERK:  Your Honor, do you want to admit that

22   exhibit?

23           THE COURT:  It's admitted.  Did I misunderstand?

24           MS. MACDONALD:  No.  That's correct.

25           THE CLERK:  I just wanted to make sure it was

1   correct.

2         Q.    Do you recognize this?

3         A.    Yes.

4         Q.    And is this -- what is this generally?

5         A.    This is an e-mail sent to an entity that basically

6   states we believe they're operating as a money services

7   business, specifically a money transmitter, and, therefore,

8   they would be required to register as such with FinCEN.

9         Q.    Okay.  And what date was this e-mail sent?

10        A.    This was sent Friday, July 13, 2018.

11        Q.    Okay.  And the subject of the e-mail?

12        A.    FinCEN MSB registration inquiry.

13        Q.    Okay.  And can you tell me what the attachment is

14   called?

15        A.    Shire CryptoCoin bitcoin kiosk letter 07-13-18.pdf.

16              MS. MACDONALD:  Okay.  And I think I'll ask, Ms.

17   Shedd, if you can go to the third page, which is the

18   attachment here.

19        Q.    And so is this a copy of the same letter that is

20   just attached to that e-mail?

21        A.    Yes.

22        Q.    Okay.  So let's take a look at this one.  This is

23   the same day, July 13th of 2018, correct?

24        A.    Yes.

25        Q.    And I'll ask if you don't mind reading the first

1   paragraph.

2        A.    Sure.   "Dear Shire CryptoCoin:   This letter is to

3   inform you that the United States Department of Treasury,

4   Financial Crimes Enforcement Network, FinCEN, believes that

5   your business is a money services business, MSB, as defined by

6   the Bank Secrecy Act, BSA.   As a result, you are required to

7   register with FinCEN as an MSB and comply with applicable

8   anti-money laundering, AML, program, recordkeeping, and

9   reporting regulations."

10       Q.    Okay.   And the anti-money laundering program and

11  recordkeeping requirements, are those what we've just

12  discussed?

13       A.    Yes.

14       Q.    And what are the reporting regulations?

15       A.    We also discuss those relating to currency

16  transaction reporting and suspicious activity reporting.

17       Q.    Okay.   And could you please read the second

18  paragraph?

19       A.    "FinCEN regulations define MSBs to include money

20  transmitters, further delineating that a money transmitter is

21  a person who provides money transmission services or any other

22  person engaged in the transfer of funds."

23       Q.    And, actually, I can just stop you there.

24             I see a footnote at the end of that paragraph.   Do

25  you see what is being cited to here?

1     A.   Yes.

2     Q.   And do you recognize that?

3     A.   Yes.

4     Q.   What's that?

5     A.   That is the regulation associated with money

6 transmission that defines a money transmitter.

7     Q.   Okay.  And you can keep reading.

8     A.   Okay.  "The term money transmission services means

9 the acceptance of currency, funds, or other value that

10 substitutes for currency from one person and the transmission

11 of currency, funds, or other value that substitutes for

12 currency from one person and the transmission of currency,

13 funds, or other --"

14         THE COURT:  When you're reading, you've got to read

15 slower.

16         THE WITNESS:  Yes, your Honor.

17     A.   "The term money transmission services means the

18 acceptance of currency, funds, or other value that substitutes

19 for currency from one person and the transmission of currency,

20 funds, or other value that substitutes for currency from one

21 person and the transmission of currency, funds, or other value

22 that substitutes for currency to another location or person by

23 any means."

24     Q.   Okay.  So I heard part of that twice.  Is that in

25 the regulation?

1        A.    No.  That's a typo.

2        Q.    Okay.  So despite -- so if we sort of took out that

3  repetitive clause, is the rest of it direct from the statute?

4        A.    Yes.

5        Q.    Okay.  And does FinCEN sort of have the power from

6  Congress to write regulations to require people to register?

7        A.    Yes.

8        Q.    And do you know what statute that power comes from?

9        A.    Yes.

10       Q.    What's that?

11       A.    It's 31 United States Code 5330.

12       Q.    Okay.  And that gives the power to create the types

13  of regulations that are cited here; is that correct?

14       A.    Yes.

15       Q.    Okay.  I'll have you read the next short paragraph,

16  please.

17       A.    "There is no minimum activity threshold for money

18  transmitters under FinCEN's regulation.  Consequently,

19  engaging in money transmission in any amount qualifies your

20  business as an MSB."

21       Q.    Okay.  So no dollar amount.  Is this, again, based

22  on the activity and not a specification threshold?

23       A.    Correct.  Yes.

24       Q.    The next paragraph, please.

25       A.    "On March 18, 2013, FinCEN published its guidance

 1    application of FinCEN's regulations to persons administering,

 2    exchanging, or using virtual currencies.  This guidance

 3    clarifies the scope of FinCEN's regulations with regard to

 4    certain virtual currency business models.  In doing so, it

 5    describes how most virtual currency administrators and

 6    exchangers engage in activities that make them money

 7    transmitters and thus MSBs."

 8         Q.   Okay.  And so the date of this referenced guidance

 9    is 2013?

10         A.   Yes.

11         Q.   And this letter was sent in 2018; is that right?

12         A.   Correct, yes.

13         Q.   And this is the guidance you said that hadn't

14    changed since 2013 to 2018?

15         A.   Has not changed, right.

16         Q.   Okay.  And what is linked at footnote 2 there?

17         A.   Footnote 2 is a link to that guidance piece

18    referenced.

19         Q.   Okay.  And I'll have you read the last paragraph on

20    this page.

21         A.   "As with other types of financial institutions,

22    MSBs, including money transmitters, must comply with the BSA.

23    Under the BSA, MSBs must register with FinCEN within their

24    first 180 days of doing business and subsequently renew said

25    registration every two years.  The BSA also requires financial

1    institutions to make and keep certain reports which enable law

2    enforcement to detect and deter financial crimes like money

3    laundering and terrorist activity.  Failure to comply with the

4    BSA may result in civil and criminal penalties."

5         Q.   Okay.  I'll have you read the next short paragraph

6    as well.

7         A.   "You must register your MSB with FinCEN through our

8    online BSA E-Filing System located at," and there's the link,

9    "There is no cost to register."

10        Q.   Okay.  What is that link to?

11        A.   That link is to the BSA E-Filing System, or

12   electronic filing system, where one may register their MSB.

13        Q.   Okay.  And please read the next paragraph.

14        A.   "If you believe that you do not qualify as an MSB,

15   and are not operating under the definition of a money

16   transmitter under the BSA, please contact us within two weeks

17   from the date of this letter/e-mail and state your explanation

18   in writing at frc@fincen.gov.  Please provide updated contact

19   information so that you may be reached by a FinCEN

20   representative to discuss your submission."

21        Q.   Okay.  And are you familiar with the process for

22   what would happen if somebody did contact that e-mail address?

23        A.   Yes.

24        Q.   Could you tell me about what would happen?

25        A.   Yes.  They would describe the circumstances

1  surrounding, you know, why they may or may not be an MSB.  In

2  this case, why they would not be an MSB or they believe

3  themselves to not be an MSB.  And then we would respond within

4  24 hours via phone or e-mail based upon the original form of

5  correspondence, and we would apply our publicly available

6  facts -- I'm sorry -- regulation, guidance, administrative

7  rulings to the facts stated in the voicemail message or in the

8  e-mail to determine whether or not the entity is or is not an

9  MSB?

10       Q.   Okay.  And I believe you previously testified that

11  your prior position was in sort of FinCEN's help center.  Is

12  that the place that would receive these type of calls?

13       A.   Yes.

14       Q.   Okay.  And, I'm sorry, what was the term that you

15  used for it?  Was it a resource center?

16       A.   Yes.  FinCEN Resource Center.

17       Q.   Okay.  And did you receive these types of phone

18  calls when you worked in the FinCEN Resource Center?

19       A.   Very often.

20       Q.   And who would typically call you?

21       A.   Generally people establishing a business wanting to

22  know if it qualified as a money service business.  That was

23  the core inquiry.

24       Q.   And if those businesses had attorneys representing

25  them, would you sometimes speak with those attorneys?

1      A.    Yes.

2      Q.    Okay.  Would you sometimes also speak with the

3  business owners themselves?

4      A.    Yes.

5      Q.    Okay.  I'll have you continue to read the next

6  paragraph that begins with "FinCEN is."

7      A.    "FinCEN is attempting to bring all unregistered

8  MSBs in this industry in compliance.  If another

9  cryptocurrency kiosk operator fails to accept or receive

10  receipt of this letter, they are not absolved of their

11  responsibilities as an MSB under the BSA.  Should you wish to

12  provide any information on those believed to be in

13  noncompliance, please e-mail the address above."

14      Q.    And what do you understand this paragraph to be

15  saying?

16      A.    This paragraph in summary is saying that the letter

17  is not targeting any one individual entity, and also it's

18  saying that if an entity is operating as an MSB and didn't

19  receive this letter, it does not absolve them of their

20  responsibilities under the BSA to register.  It's also saying

21  that anyone can provide information to us related to

22  noncompliance.

23      Q.    Okay.  And let me back you up to the first page of

24  this.  Who was this letter sent to?

25      A.    Shire Cryptocoin.

1        Q.    Could you read the e-mail addresses that it was

2    sent to?

3        A.    Yes, shirecryptocoin@gmail.com,

4    keenecrypto@gmail.com, shirebtcmanch@googlegroups.com.

5        Q.    And are you familiar with the circumstances that

6    led to this letter being sent to these entities?

7        A.    Yes.

8        Q.    And what are those?

9        A.    This was part of a general -- it's part of a

10   general program that we had at the time to identify possible

11   unregistered money transmitters and then to inform them of

12   their requirements via this letter.

13       Q.    Okay.  Let me take you back -- I'm sorry to make

14   you jump around, Caryn -- to the last paragraph again.

15       A.    Read the last paragraph?

16       Q.    I'm sorry.  The last paragraph of the -- it would

17   be page 2 or page 4.

18       A.    Oh, there it is.  "If you have outstanding

19   questions about your BSA requirements, please contact the

20   FinCEN Resource Center, FRC, BSA Helpline at 703-905-3591 or

21   toll free at 1-800-767-2825.  Additional resources may be

22   found at --"

23       Q.    And you don't need to read that, but what I see

24   here are two telephone numbers, an e-mail address a few

25   paragraphs up, and at least just on this page two different

1    links for more resources if anybody had any questions; is that

2    right?

3         A.   Yes.

4         Q.   Okay.  Are you aware of whether anybody ever

5    responded to this letter to that e-mail address?

6         A.   I'm not.

7         Q.   And I just want to make sure I understand your

8    answer.  Did anybody ever respond?

9         A.   No.

10        Q.   Nobody responded.  Okay.

11             Does FinCEN maintain records of businesses that

12   register?

13        A.   Yes.

14        Q.   Okay.  And are you able to search those records to

15   determine whether specific businesses have or have not

16   registered?

17        A.   Yes.

18        Q.   Okay.  And I'm going to show you Government's

19   Exhibit 202 which I believe is also not objected to so we can

20   just display that to the jury.

21             And do you recognize this document?

22        A.   Yes.

23        Q.   Okay.  And what is this?

24        A.   This is a cover sheet for a certified records

25   search.

1     Q.   Okay.  And was FinCEN requested to search various

2  individuals and entities to determine whether they had

3  registered?

4     A.   Yes.

5     Q.   Okay.  And let me take you to the next page of this

6  document.  What is this?

7     A.   So this is -- this is the result of the

8  certification of the search for FinCEN Form 107, a

9  registration of money services business.

10     Q.   Okay.  And what did that result find?

11     A.   And it's saying it's a negative result.  So FinCEN

12  was not able to locate this form after a diligent search

13  associated with the subject listed on here.

14     Q.   Okay.  So FinCEN searched this name, Ian B.

15  Freeman, the aliases listed here, Ian Bernard, and the dates

16  of birth and Social Security numbers, and found no

17  registration?

18     A.   That's correct.

19     Q.   Okay.  Are we going to look at a number of similar

20  forms in this document?

21     A.   Yes.

22     Q.   And do they all show that none of the entities

23  registered with FinCEN?

24     A.   Correct.

25     Q.   Okay.  So let's look at page 2.  I'm sorry.  I

1    guess it would be page 3, the next page.

2         A.    This is the same document.  It confirms the

3    negative search result for a subject known as Shire Free

4    Church, d/b/a Free Shire Church.

5         Q.    Okay.  And page 4, please, the next page.

6         A.    The same document for subject Shire Bitcoin, d/b/a

7    Shire Bitcoin Vending.

8         Q.    The next page, page 5.

9         A.    This is the same document for subject Shire

10   Cryptocoin.

11        Q.    Page 6.

12        A.    This is the same document for subject Shire BTC.

13        Q.    Page 7.

14        A.    Same document for subject Free Talk Live, d/b/a

15   FTL, d/b/a freetalklive.com.

16        Q.    Page 8.

17        A.    Same document.  Subject:  Church of the Invisible

18   Hand.

19        Q.    Page 9.

20        A.    Same document.  Subject:  Reformed Satanic Church,

21   d/b/a Reformed Satanic Church of Keene.

22        Q.    Page 10.

23        A.    Same document.  Subject:  NH Peace Church.

24        Q.    Page 11.

25        A.    Same document.  Subject:  Crypto Church of NH,

 1   d/b/a Crypto Church of New Hampshire.

 2       Q.    Page 12.

 3       A.    Same document.  Subject:  Aria DiMezzo, a/k/a James

 4   Baker, a/k/a James Brody Baker.

 5       Q.    Page 13.

 6       A.    Same document.  Subject:  Colleen Fordham.

 7       Q.    Page 14.

 8       A.    Same document.  Subject:  Renee Spinella, a/k/a

 9   Renee LeBlanc.

10       Q.    Page 15.

11       A.    Same document.  Subject:  Nobody, a/k/a Richard A.

12   Paul, a/k/a Richard G. Paul, and a/k/a Richard Goyan Paul.

13       Q.    Page 16.

14       A.    Same document.  Subject:  Andrew J. Spinella.

15       Q.    Almost there.  Page 17.

16       A.    Same document.  Subject:  Shire Free Church

17   Manchester.

18       Q.    Okay.  And page 18.

19       A.    Same document.  Subject:  Shire Free Church

20   Monadnock.

21       Q.    And these documents show that none of these

22   entities registered as of at least the date on the top, March

23   11th of 2021; is that correct?

24       A.    Correct.

25       Q.    Do you know whether any of these entities ever

1   filed currency transaction reports?

2         A.    That would not be possible.

3         Q.    And why is that?

4         A.    Because they're not registered as MSBs.  So they're

5   not financial institutions.

6         Q.    Okay.  And did any of them ever file suspicious

7   activity reports?

8         A.    Again, that would not be possible.

9         Q.    Okay.  No further questions.  Thank you.

10              THE COURT:  Cross-examination.

11              MR. SISTI:  Can we just leave that up for a second?

12                     CROSS-EXAMINATION

13   BY MR. SISTI:

14        Q.    I'm going to get into that with you in a second.

15              Good afternoon.

16        A.    Good afternoon.

17        Q.    I'm Mark Sisti.  We never met before, and there was

18   probably no reason for us to, okay?

19        A.    All right.

20        Q.    Let me go back to that FinCEN e-mail, okay, just

21   for a second.

22        A.    Okay.  Sure.

23        Q.    Your recollection on the FinCEN e-mail -- let me

24   just check it.  I want to make sure I'm not messing up here.

25              I've got the old-fashioned paper one in front of

1   me.  It says via electronic delivery, I believe, right?

2          A.    Correct.

3          Q.    All right.  And it's got some addresses on it, but

4   it doesn't have a name.  There's no human being it's directed

5   to, right?

6          A.    That's correct.

7          Q.    All right.  Nowhere in the body of this particular

8   e-mail is there anything directed to an Ian Freeman, correct?

9          A.    That's correct.

10         Q.    Okay.  And can you tell me when it starts out "Dear

11  Shire Cryptocoin," who runs Shire Cryptocoin?

12         A.    I'm not qualified to answer that.

13         Q.    Do you know if Ian has anything to do with Shire

14  Cryptocoin?

15         A.    I'm not qualified to answer that.

16         Q.    Okay.  Are you qualified to answer that in fact

17  this electronic transmission was ever even read by Ian

18  Freeman?

19         A.    No.  I can just state that we did not receive a

20  response to it.

21         Q.    Yeah.  You didn't get a response.  You didn't get a

22  confirmation of delivery, did you?

23         A.    Not to my knowledge.  I did not send this, but not

24  to my knowledge.

25         Q.    Yeah, I know.  That's the other thing I was going

1    to ask.  You actually weren't the creator of this, right?

2         A.   That's correct.

3         Q.   And you didn't put it on its path or select the

4    addresses on this particular letter or e-mail?

5         A.   I did not.

6         Q.   Okay.  All you're testifying to in essence is that

7    this is, in essence, kind of a typical transmission and it was

8    put out there and you recognize the document, right?

9         A.   Yes.

10        Q.   It's not that you created the document, that you

11   had anything to do with the substance of the document, or that

12   you selected or researched the addresses that were claimed to

13   have had it sent to, right?

14        A.   That's correct.

15        Q.   Okay.  And, again, just to go back to I think one

16   of the basic foundational questions.  You don't know if that

17   gentleman over there, and I'll tell you his name is Ian

18   Freeman, ever received this document?

19        A.   I do not.

20        Q.   Okay.  I'm going to go on to something else because

21   that last series of -- if we can go back to that, the last

22   series of when you were confirming that there weren't

23   registrations, and I want you to look at those very closely.

24        A.   Okay.

25        Q.   And I want you to compare, and take your time, look

 1    at each one.  And if we can just flip through them very, very

 2    slowly, because I want you to keep an eye on the addresses or

 3    the entities that you're supposed to be looking for, okay?

 4         A.    Uh-huh.

 5         Q.    All set?

 6         A.    Yes.

 7         Q.    Okay.  I'm looking at the FinCEN letter and I'm

 8    looking at your electronic delivery e-mail, and I'm going to

 9    ask you some questions, okay?

10         A.    Sure.

11         Q.    On any of the addresses on the e-mail or the FinCEN

12    letter that's attached do you see Ian Freeman?

13         A.    No.

14         Q.    Okay.  Do you see Shire Free Church?

15         A.    Shire -- no.

16         Q.    Do you see Shire Bitcoin?

17         A.    No.

18         Q.    Do you see Shire Cryptocoin?

19         A.    I think that was on there, yes.

20         Q.    Okay.  Now, that's important.

21         A.    Yeah.

22         Q.    Do you know who controls or owns Shire Cryptocoin?

23         A.    No.

24         Q.    Can you tell this jury whether or not Ian Freeman,

25    the guy on trial, has anything to do with Shire Cryptocoin?

```
 1        A.    I would have no knowledge.  I can't.

 2        Q.    I'm going to keep going.

 3              Shire BTC, do you see that on any of the headings

 4   that you directed your e-mail of Saturday, July 14, 2018?

 5        A.    No.  Shire -- well, no, I don't.

 6        Q.    How about Free Talk Live?

 7        A.    No.

 8        Q.    How about Church of the Invisible Hand?

 9        A.    No.

10        Q.    How about Reformed Satantic Church?

11        A.    No.

12        Q.    How about New Hampshire Peace Church?

13        A.    No.

14        Q.    How about Crypto Shire New Hampshire?

15        A.    No.

16        Q.    How about Aria DiMezzo?

17        A.    No.

18        Q.    How about Colleen Fordham?

19        A.    No.

20        Q.    How about Renee Spinella?

21        A.    No.

22        Q.    How about Nobody?

23        A.    No.

24        Q.    How about Andrew Spinella?

25        A.    No.
```

1      Q.   How about Shire Free Church, Manchester?

2      A.   No.

3      Q.   How about Shire Free Church, Monadnock?

4      A.   No.

5      Q.   Okay.  Let's kind of, like, figure this out a

6   second.

7           You sent an e-mail that you don't know was received

8   by Ian Freeman, right?

9      A.   Uh-huh.

10      Q.   You sent a FinCEN letter that you don't know if it

11   was ever reviewed by Ian Freeman, right?

12      A.   Uh-huh.

13      Q.   Okay.  You don't know who operates or controls

14   Shire Cryptocoin?

15      A.   That's correct.

16      Q.   The searches that you conducted for the United

17   States Attorney's Office -- as of March I think of this year,

18   right?

19      A.   Yes.

20      Q.   Had no addresses that were common to your notice

21   that was sent out Saturday, July 14, 2018, except for Shire

22   Cryptocoin, correct?

23      A.   Yes.

24      Q.   And as we sit here today in this courtroom, we

25   don't know if Shire Cryptocoin has anything to do with Ian

1   Freeman, right?

2        A.   That's correct.  I don't.

3        Q.   Okay.  Just a couple things.

4             You were commenting on the statute and the

5   guidance.  Guidance certainly isn't a statute, just to start

6   with, right?

7        A.   That's correct.

8        Q.   I mean, you went to law school.  You know what's

9   going on with that.  They're completely different things.

10        A.   Right, right.

11        Q.   But there is a statute, and it came into fruition

12   shortly after 9-11, right?

13        A.   Uh-huh.

14        Q.   I mean, the purpose really was to keep an eye out

15   for -- one of the main purposes was to take a look at and

16   control terrorist money exchanging, right?

17        A.   That's correct.

18        Q.   Okay.  And I think it came into effect in 2002?

19        A.   Around that time, yes.

20        Q.   Yeah.  And in 2002 there wasn't even

21   cryptocurrency, right?

22        A.   No.

23        Q.   Right.  And the purpose of the statute is to place

24   the public on notice as to what is legal and what's illegal,

25   right?

1      A.    Generally, yes.

2      Q.    I mean, that's why we have them?

3      A.    Yep.

4      Q.    And, in fact, there was no mention of

5  cryptocurrency, bitcoin, or the like in that particular

6  statute up until it was revised in January of 2021, correct?

7      A.    That is correct.  However, I mentioned the

8  definition of a money transmitter includes a virtual currency

9  exchanger.

10          The definitions and characterizations of MSBs were

11  put forth originally in 2001, and then in 2011 we redefined

12  the definition of MSBs, we had a final rule come out, and in

13  that final rule we made room for emerging technologies.  For

14  example, cryptocurrency.  And we redefined a money transmitter

15  by saying that it can be -- it can involve real currency or

16  any other type of currency that substitutes for it.  So when

17  we're looking at that 2013 guidance that discusses what's

18  required of a virtual currency exchanger or administrator,

19  that's based upon the 2011 redefinition of a money

20  transmitter.  So that's what we're looking at there.

21      Q.    Okay.  You're looking at the -- I hate getting in

22  the weeds like this, but you're looking at the 2013 reference

23  that you made during your direct examination, right?

24      A.    Uh-huh.  That's the guidance piece, but that refers

25  to the regulation that came out in 2011.

1        Q.    Right.  That doesn't say cryptocurrency either in

2   there, does it?

3        A.    It didn't have to say cryptocurrency.

4        Q.    Well, it doesn't, does it?

5        A.    It does not.  You're right.  It does not actually

6   say cryptocurrency.

7        Q.    All right.  I just wanted to make sure.

8              You were talking about suspicious activity reports?

9        A.    Yes.

10       Q.    And how secret it is and all that?

11       A.    Uh-huh.

12       Q.    So you wouldn't know if banks that were dealing

13   with individuals that we've heard about today in this

14   courtroom were doing their job and making out suspicious

15   activity reports?

16             MS. MACDONALD:  Your Honor, may we have a brief

17   sidebar on this issue?

18             THE COURT:  Sure.

19             (SIDEBAR)

20             MS. MACDONALD:  Your Honor, Mr. Vlahakis does know

21   the answer to the question, which is that there were SARs

22   filed on Mr. Freeman, but as his policy doesn't allow him to

23   discuss them -- he's willing to, but he would like the Court

24   to order him to discuss it if he's going to.

25             THE COURT:  So to answer your question, if he wants

1      a court order I'm happy to do that.

2                   You have no objection?

3                   MR. SISTI:  Well, first of all, the question has

4      nothing to do with Freeman.

5                   MS. MACDONALD:  You discussed entities that we have

6      discussed, and I think your wording was individuals we've

7      discussed.

8                   MR. SISTI:  They would have been the alleged

9      victims that you brought up that were exchanging large amounts

10     of money during transactions and were getting the large

11     amounts of money primarily, by the way, from the Bank of

12     America.

13                  THE COURT:  Right.

14                  MS. MACDONALD:  Well, that wasn't clear to me.  I

15     guess if you clarify that question, if that's your question --

16                  THE COURT:  There's two ways to approach it.  If

17     Mr. Sisti wants to clarify or narrow his question, he can, or

18     I can simply allow the witness to answer it as he understood

19     it.  I don't have any problem either way.

20                  MR. SISTI:  I'm limiting it to the Bank of America

21     disclosures.

22                  THE COURT:  You should probably -- then why don't

23     you re-ask it that way.

24                  (CONCLUSION OF SIDEBAR)

25                  THE COURT:  Okay.

1          MR. SISTI:  Thank you, Judge.

2          THE COURT:  By the way, I should say the

3  microphones at counsel table should be off.  Are they off?

4  There you go.  Go ahead, counsel.  Rephrase.

5          MR. SISTI:  Thank you.  I appreciate it, Judge.

6      Q.   Let me ask you this.  We had a number of

7  individuals that were declared as, well, subjects of scams for

8  at least part of the trial this morning.  They came from all

9  over the United States, okay?

10     A.   Okay.

11     Q.   Were you asked to go into suspicious activity

12  reports, for instance, with regard to Mary Hurd?

13     A.   No.

14     Q.   Let me just go through a list to make sure.  It

15  might be a partial list.

16          There was a Mary Hurd, and that's a no?

17     A.   That's correct.

18     Q.   An E. Swartz?

19     A.   Same.  No.

20     Q.   I think it's a last name of Welton?

21     A.   No.

22     Q.   An R. Miller?

23     A.   No.

24     Q.   A Gene Burns?

25     A.   No.

```
1        Q.   A D. Davis?

2        A.   No.

3        Q.   A James Rossell?

4        A.   No.

5        Q.   Natasha Hand?

6        A.   No.

7        Q.   Evan Perro?

8        A.   No.

9        Q.   Steven Williams?

10       A.   No.

11       Q.   You wouldn't know if their banks were doing what

12  they were supposed to do, right?

13       A.   I would not, no.

14       Q.   And you weren't asked to take a look at that?

15       A.   That's correct.

16            MR. SISTI:  I have nothing further.

17            THE COURT:  Redirect.

18            MS. MACDONALD:  Briefly, your Honor.

19            Given that line of questioning, I think I would

20  like to ask that question, if you could instruct the witness

21  to answer it, that we discussed at sidebar.

22            MR. SISTI:  That doesn't open up that line of

23  questioning.

24            THE COURT:  Well, I don't think it's a matter of

25  opening the door.  It's just a line of inquiry she wants to
```

1    undertake.

2         MR. SISTI:  Well, that's a whole new thing.  That's

3    going beyond my examination.  It's a whole new inquiry.

4         THE COURT:  That's true.

5         MR. SISTI:  That just doesn't cut it.  That's my

6    objection.  I kept my questions limited and narrow for a

7    reason.

8         THE COURT:  Is it your view that he opened the door

9    to this?  I don't think he did.  By rephrasing that very

10   question and by the rest of his examination, I don't think he

11   opened that door.

12        MS. MACDONALD:  Okay.

13        THE COURT:  If you have an argument that he did,

14   I'm listening.

15        MS. MACDONALD:  I mean, I won't say he chose to ask

16   that specific question, but he did, you know, ask that about

17   the other folks that we talked about, and, you know, the

18   defendant was on the other side of those transactions.

19        THE COURT:  I'm going to release the jury for the

20   day so we can work this issue out and you don't have to wait

21   for us to do that.

22        Ladies and gentlemen, we'll see you tomorrow at 9

23   o'clock.  Remember my usual admonitions.  No discussions with

24   each other or anybody else about this overnight and no

25   independent inquiry or research into the matter during the

1   recess.  Thank you.  We'll see you tomorrow morning.

2                 (IN COURT - NO JURY PRESENT)

3                 THE COURT:  Actually, to protect the jury -- the

4   reason to protect the jury -- you can remove your masks.  That

5   goes for everybody in the gallery.  Go ahead.

6                 All right.  So, look, the opening the door doctrine

7   requires that the question and answer created a misleading

8   impression.  So unless you can demonstrate to me that he

9   opened a misleading impression -- because he didn't go there

10  -- by restricting the question, he really didn't go there on

11  his cross.  So by the rules of evidence you're really not

12  supposed to get into this area unless he created a misleading

13  impression.

14                MS. MACDONALD:  I mean, my understanding, your

15  Honor, is that the question was:  Did you search for whether

16  suspicious activity reports were filed on these specific

17  victims?

18                THE COURT:  Yeah.

19                MS. MACDONALD:  The way that suspicious activity

20  reports work, they may have been filed on those transactions,

21  but while Mr. Vlahakis did not search those individuals he did

22  search Mr. Freeman, and all I would ask is are you aware of

23  suspicious activity -- you know, did you search whether

24  suspicious activity reports were filed on Mr. Freeman, and the

25  answer would be yes.

1          THE COURT:  Yeah, so you didn't do that on direct,

2     and nothing he did on cross opens that inquiry unless I'm

3     misunderstanding.  Because if he had just answered the

4     question, for example, as actually asked and maybe he looked

5     to me -- and I would have allowed that, actually.  I would

6     have given the instructions.  But then counsel I think by your

7     tacit agreement restricted the question.

8          So I can't say that he created a misleading

9     impression the way the question was asked a second time.  I

10    understand your point but --

11         MS. MACDONALD:  Okay.  That's fine.

12         THE COURT:  It opens -- yeah, and you clearly

13    didn't intend to go there on your direct because you didn't go

14    there.  So I can't allow it.

15         MS. MACDONALD:  That's okay, your Honor.

16         THE COURT:  It's a good faith effort, yeah.

17         All right.  Anything else for the Court?

18         MR. SISTI:  Nothing, Judge.

19         THE COURT:  I'm going to ask you to confer before

20    tomorrow's evidence -- I'm not going to make you come early or

21    anything, but confer about tomorrow's exhibits because I don't

22    want to waste too much time on foundational stuff unless

23    there's real disputes over the admissibility, okay?

24         All right everybody.

25         (Jury trial adjourned at 4:50 p.m.)

```
1                      C E R T I F I C A T E

2

3

4            I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted:  3-1-23     /s/   Susan M. Bateman _____
                            SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```