**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-30-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                   *
UNITED STATES OF AMERICA           *
                                   *   21-cr-41-01-JL
          v.                       *   December 9, 2022
                                   *   9:07 a.m.
      IAN FREEMAN                   *
                                   *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL - DAY FOUR - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Government:        Seth R. Aframe, AUSA
                           Georgiana MacDonald, AUSA
                           John J. Kennedy, AUSA
                           U.S. Attorney's Office




For the Defendant:         Mark L. Sisti, Esq.
                           Sisti Law Offices




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
                         I N D E X


WITNESSES:              Direct      Cross     Redirect     Recross


HOPE CHERRY


By Ms. MacDonald          4                    55, 64

By Mr. Sisti                          27                      59


BRUCE SWEET


By Ms. MacDonald         66

By Mr. Sisti                          71


PAVEL PRILOTSKY


By Mr. Aframe            75




EXHIBITS                                      FOR ID      IN EVD


Government's Exhibit No. 1005.                               47

Government's Exhibit No. 1006.                               47

Government's Exhibit No. 1102.                               70
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court has before it for
 3    consideration today criminal case number 21-cr-41-01-JL,
 4    United States of America versus Ian Freeman, for jury trial
 5    day five.
 6              THE COURT:  Day five?  Day four.
 7              THE CLERK:  Day four.  My apologies.
 8              THE COURT:  No problem.  We start out with a clean
 9    record.
10              Welcome back to court.  Has anybody had any
11    conversations with each other or anyone else about this trial
12    during the recess?
13              (All jurors answer "no")
14              Have any of you been exposed to any information or
15    conducted any sort of independent research or investigation
16    during the recess?
17              (All jurors answer "no")
18              THE COURT:  All right.  Let's proceed then.
19              MS. MACDONALD:  The United States calls Hope
20    Cherry.
21              THE COURT:  I think you all have headsets on your
22    chairs.  There's going to be an exhibit later that involves
23    audio that counsel thought you should have the headsets so you
24    can hear it better.  So that's what that's for.
25                            HOPE CHERRY
```

```
1              having been duly sworn, testified as follows:
2                   THE CLERK:  Would you please state your name for
3         the record and spell your last name?
4                   THE WITNESS:  First name Hope.  Last name Cherry,
5         C-H-E-R-R-Y.
6                   THE CLERK:  Thank you.  You may be seated.
7                            DIRECT EXAMINATION
8         BY MS. MACDONALD:
9              Q.   Good morning, Ms. Cherry.
10             A.   Good morning.
11             Q.   Ms. Cherry, where do you live?
12             A.   I live in Silver Spring, Maryland.
13             Q.   And where are you employed?
14             A.   Agriculture Federal Credit Union in Washington,
15        D.C.
16             Q.   How long have you been employed with Agriculture
17        Federal Credit Union?
18             A.   For about 27 years.
19             Q.   And what is your position there?
20             A.   I am the VP, or vice president, of risk and
21        security.
22             Q.   Okay.  Can you tell me what type of institution
23        Agriculture Federal Credit Union is?
24             A.   We are a federal credit union.
25             Q.   And are you affiliated with a certain federal
```

1    agency?

2        A.   USDA is our mainstay.

3        Q.   Okay.  And what does USDA stand for?

4        A.   United States Department of Agriculture.

5        Q.   Okay.  How many branches does AgFed Credit Union

6    have?

7        A.   Currently we have three.

8        Q.   Okay.  And where are those branches located?

9        A.   We have several in the state of Maryland and the

10   District of Columbia.

11       Q.   Okay.  And is most of your membership in the

12   Maryland, District of Columbia, Virginia area?

13       A.   Yes.

14       Q.   But is it limited to people in that area?

15       A.   No.  If you're affiliated with USDA and several

16   other select employee groups that we contract with, you can

17   become a member, and there's also a membership fee if you make

18   a donation to another affiliate.

19       Q.   Okay.  So it is open to other members of the

20   public?

21       A.   Right.  Certain criteria.

22       Q.   Okay.  And I just want to back up.  I know this is

23   a little basic, but just to make sure everybody is familiar

24   with it, what is a credit union?

25       A.   A credit union is a member-owned institution.

1    We're a nonprofit.

2         Q.    Okay.

3         A.    And we provide banking services.

4         Q.    Okay.  And how do credit unions differ from banks?

5         A.    Again, we're a nonprofit member-owned.  Our members

6    are basically the owners.

7         Q.    Okay.  And do credit unions tend to be smaller?

8         A.    There are a lot of larger credit unions, but my

9    particular credit union is smaller.

10        Q.    And are you familiar with the term shared

11   branching?

12        A.    Yes.

13        Q.    And what does that mean?

14        A.    Because credit unions don't have a large number --

15   or smaller credit unions don't have a large number of

16   locations, we participate in what we call a shared branching

17   network where our members can go to another credit union, and

18   as long as they're participating, they can make their deposits

19   or process their transactions.

20        Q.    Okay.  And are there members of the shared

21   branching network across the country?

22        A.    Yes, there are.

23        Q.    And how do sort of your typical customers use the

24   shared branching network?

25        A.    Primarily for just depositing and withdrawals.

1      Q.    Okay.  So if they're traveling, you know, far away

2   from their local branch, they could go into another branch to

3   use it for those sorts of things?

4      A.    If they're traveling or they live in that area.

5      Q.    And let's talk a little bit about your position

6   with the credit union.

7            What does it mean to be the VP of risk and

8   security?

9      A.    I primarily look at -- I'm the compliance officer

10  for the credit union.  We handle compliance matters, fraud.

11  We're more or less the internal auditors for the credit union.

12     Q.    Okay.  And do you have another title relevant to

13  the Bank Secrecy Act?

14     A.    I am actually the bank secrecy officer for the

15  credit union.

16     Q.    Okay.  And could you tell me what that is?

17     A.    I primarily look at our day-to-day operations and

18  make sure that we're actually in accordance with any bank

19  secrecy laws and regulations as well as the program -- or the

20  board-approved program for the credit union.

21     Q.    And are you familiar with FinCEN?

22     A.    Yes, I am.

23     Q.    And does the credit union have to register with

24  FinCEN?

25     A.    Yes, we do.

1      Q.    Okay.  Does the credit union have an anti-money

2   laundering policy?

3      A.    Yes, we do.

4      Q.    Could you tell me a bit about that?

5      A.    Basically, the government regulation requires there

6   are approximately five to six what they call pillars within

7   the bank secrecy program, and we have to address all of those

8   pillars, and that's looking at our customer identification

9   program, making sure we have internal controls, and even going

10  so far as training.

11     Q.    Okay.  And does the Bank Secrecy Act also have

12  reporting requirements?

13     A.    Yes.

14     Q.    And what sorts of things are you required to

15  report?

16     A.    We are required to report any currency transaction

17  in excess of $10,000.

18     Q.    Okay.  And is there another type of report you're

19  required to file?

20     A.    We also look at suspicious activities, and we file

21  what they call a suspicious activity report.  We call it a

22  SAR.

23     Q.    Okay.  And tell me a little bit more about what

24  types of activities cause you to file a SAR.

25     A.    There are a number of activities.  We're looking at

1    money laundering, structuring, deposits.  We look at fraud,

2    commercial, consumer, identity thefts, financial exploitation,

3    elder abuse.  That type of thing.

4        Q.    Okay.  And what type of information do you collect

5    just generally about your accounts that allows you to file

6    these SARs?

7        A.    We collect information for our membership when they

8    open a new account, a new member.  We have what they call a

9    customer identification program.  We're required to get

10   personal identifying information such as name, address, tax

11   identification number, and that type of thing, and then we

12   look at day-to-day transactions for that person.  So, in other

13   words, we have to do our customer due diligence.

14       Q.    Okay.  And does FinCEN give guidance on the sorts

15   of things that might require a suspicious activity report?

16       A.    Yes, they do.

17       Q.    How do you receive that type of guidance?

18       A.    Being a registered official with FinCEN for the

19   credit union, they send information directly to me.

20       Q.    Okay.  And do they provide guidance, for example,

21   on elder fraud and the sorts of things to look at?

22       A.    Yes, they do.

23       Q.    And what sorts of guidance do they provide on that?

24       A.    They're looking at the type of transactions that

25   person may be doing, whether or not they're making large

1    withdrawals or transfers, or even if they're coming into the

2    office with someone else that is doing most of the talking.

3        Q.    Okay.  Now let's talk about how someone opens an

4    account with AgFed Credit Union.

5              Do they need to come to a branch in person or is

6    there another way to do that?

7        A.    Actually, they can do it both ways.  They can come

8    in as well as an online membership application.

9        Q.    Okay.  And let's talk about the online membership

10   application.  What type of information does that require?

11       A.    We require your personal identifying information,

12   your name, your address, your tax identification number.  We

13   go so far as to ask employment, which is not necessarily

14   answered, and as well as what type of use you're going to use

15   the account for.

16       Q.    Okay.  And are you familiar with an account opened

17   by an Ian Freeman?

18       A.    Yes, I am.

19       Q.    And do you recall approximately when Ian Freeman

20   opened an account with your credit union?

21       A.    It was on or around November 19th of 2019.

22       Q.    Okay.  And how did he open his account?

23       A.    Online.

24       Q.    And what types of accounts can be opened online?

25       A.    The only type of account you can open is a

1    personal.

2         Q.   Okay.  So is that the type of account that he

3    applied for?

4         A.   Yes, it is.

5         Q.   And did you review his application around that

6    time?

7         A.   Yes, we did.

8         Q.   And do you recall what type of -- what he listed as

9    the purpose for his account?

10        A.   He was using it for household purposes.

11        Q.   Okay.  And do you recall -- what else do you recall

12   about the account application?

13        A.   We ask you the type of funds that you're going to

14   be putting in the account, how you're basically going to use

15   it, and what services you're going to be using, such as our

16   wire transfer services, as well as what type of -- the source

17   of funds.

18        Q.   Do you recall Mr. Freeman's answers?

19        A.   One of the things that stuck out was a $500,000

20   wire.  Approximately five transactions a month.  Wire

21   transfers totalling about 500,000.

22        Q.   And why did that stick out to you?

23        A.   That's not something you see every day with a

24   household account.

25        Q.   And do you recall where the application said Mr.

1    Freeman was located?

2         A.    New Hampshire.

3         Q.    And did that stick out to you as well?

4         A.    Yes.  That's one of the only accounts I've seen --

5    or applications I've seen coming out of New Hampshire.

6         Q.    Okay.  And when you open a household purposes

7    account, what sorts of activity do you expect to see in that

8    account?

9         A.    Regular household activity.  Your paycheck going

10   in, usually electronically, check deposits, but you're also

11   paying your utilities, your mortgage, your rent.  That type of

12   thing.

13        Q.    Okay.  And you told me that some things about Mr.

14   Freeman's application stuck out to you at that time.  Did you

15   nevertheless open the account?

16        A.    One of the things that stuck out was the multiple

17   inquiries from other FIs, other financial institutions.  There

18   were a number of them.  So at the time they were relatively in

19   the realm about the same time, and that's what we call a red

20   flag.  So we looked at that, and ultimately, we did decide to

21   actually open the account.

22        Q.    Okay.  So explain to me what you mean by multiple

23   inquiries from other FIs.

24        A.    If you have other financial institutions that

25   actually subscribe to what we call check systems where -- you

1    may be associated with a credit account, but this is a debit

2    file.  So the debit file shows what type of depositor you are

3    and it takes a look at the information that you actually

4    provided us, including when your Social Security number was

5    issued and just confirming that your name and your address,

6    your tax identification number is correct.  So we looked at

7    that as well as a number of institutions that inquire on you.

8    So that could mean fraud, identity theft, that type of thing.

9    So there were a number of financial institutions that had

10   inquired on him.

11         Q.   Okay.  And you said that you saw that as a red flag

12   but you nevertheless opened the account; is that correct?

13         A.   That doesn't necessarily mean that he's up to no

14   good, but at the time we elected to actually open the account

15   and then watch it.

16         Q.   Okay.  And were you part of that decision-making at

17   that time?

18         A.   Yes, I was.

19         Q.   Okay.  And so when you say watched the account,

20   generally what does that entail?  When you're monitoring or

21   watching an account, what are you looking for?

22         A.   We look at all transactions.  The type of

23   transactions that are going through the source of funds.  That

24   type of thing.

25         Q.   I'm going to show you Government's Exhibit, this

1    has been agreed to, 1001.  That will be on a screen in front

2    of you in just a moment.

3         A.    Okay.

4         Q.    Can you see that okay?

5         A.    Yes.

6         Q.    Okay.  And what is this that we're looking at?

7         A.    That is looking at his statement beginning in

8    December.

9         Q.    Okay.  And so can you -- let's read the name and

10   the address at the top.

11        A.    His name is Ian B. Freeman, 63 Emerald Street,

12   Apartment 610, Keene, New Hampshire.

13        Q.    Okay.  And is this -- can you tell from this

14   statement whether this is the first month that the account was

15   in business?

16        A.    No, this is actually the second because you can see

17   the previous balance was $5.

18        Q.    Okay.  And so tell me about -- does that $5 mean

19   something to you?

20        A.    That $5 is in his what we call a shared savings

21   account.  That's your membership account.  That's your stake

22   in the credit union.  You have to open for a minimum of $5.

23        Q.    Okay.  And so let's look at -- so I see on top

24   primary share account, that's a savings account, and then

25   underneath that sort of dotted line I see share draft

1    checking.  Is that a different account?

2         A.    That's his checking account.

3         Q.    Okay.  And there's $50 in that.  Does that number

4    mean anything to you?

5         A.    That was his balance that he opened with in the

6    previous month.

7         Q.    Okay.  And let's take a look -- I see this account

8    sort of starts getting deposits on 12-2.  Can you sort of

9    describe generally what we're looking at on this statement,

10   what each column is?

11        A.    The first column, the left column, is the date.

12   The ID number for the account is the 08.  And it gives a

13   description of where the transaction actually took place at.

14        Q.    Okay.  And I see here frequently it says deposit

15   shared branch.  What does that mean?

16        A.    That means that there was a deposit made at a

17   shared branch location, and the shared branch location usually

18   gives the name of the credit union as well as the address.

19        Q.    Okay.  And then I see some of these start with VER.

20   What does that mean?

21        A.    Oh.  Verification.  I'm sorry.

22        Q.    Okay.  Can you explain that?

23        A.    Every time you walk into a shared branch they're

24   going to verify that account number, and that account number

25   is usually on a deposit or a withdrawal ticket, and they

 1    verify that the name on the account, the account number, and

 2    what have you is correct.

 3        Q.   Okay.  And sometimes do we see verifications

 4    without deposits?

 5        A.   Yes.

 6        Q.   And do you know why that would typically happen?

 7        A.   For some reason that person is usually there

 8    inquiring on that account or the financial institution is

 9    inquiring on that account.

10        Q.   Okay.  But then if there's no deposit, then the

11    transaction --

12        A.   Then it's just a verification.

13        Q.   Okay.  And then let's go over to the next column.

14    I see the first -- I guess there's a zero above the dotted

15    line and then 1450 below it.  What does that column indicate?

16        A.   That's the actual amount of the deposit.

17        Q.   Okay.  And then the column next to that?

18        A.   That's the continual balance.

19        Q.   Okay.  So we have 1450 plus the initial 50 gets us

20    to 1500.  That's the account balance?

21        A.   Right.

22        Q.   Okay.  I'm going to direct you down to December

23    6th, which is the second page, and I'll ask that we can sort

24    of go one by one through the deposits into the account on

25    December 6th.

1          So we'll start with the first -- there's, like, a

2    line that appears to be cut off that says Elkhart, Indiana.

3    So we can start right below that.

4          Can you tell me the location of the branch and then

5    the amount of the deposit?

6          A.   The first verification was in -- APCU is the name

7    of the credit union, Floyd County branch, and it's 3040 Martha

8    Berry Highway in Rome, Georgia, and then you see a deposit for

9    $3,049.

10         Q.   Okay.  And let's go down to the next one.

11         A.   There's a verification from Osage Beach Parkway in

12   Osage Beach, Missouri, and that's for 2500.

13         Q.   Okay.  And what's next?

14         A.   There's a Panama City in Panama City, Florida, and

15   then there's a shared branch deposit, same location, for

16   3,000.

17         Q.   Okay.  And what's next?

18         A.   Followed by a verification from the Spirit of

19   Alaska in Fairbanks, Alaska, and there was a deposit for

20   3,000.

21         Q.   Okay.  And this next one appears just to have a

22   verification, correct?

23         A.   Just an inquiry, and that was out of Elkhart Avenue

24   in Elkhart, Indiana.

25         Q.   Okay.  So for whatever reason that transaction

1    never happened?

2         A.    No, there wasn't a deposit.

3         Q.    Okay.  And what's next?

4         A.    There's a verification of National City in

5    California, and that was followed by a deposit of 3,000.

6              Then a verification from Urbandale, Iowa, and then

7    that deposit was for $3,002.

8              And then there was a verification from Jones Road

9    in Houston, Texas, and that was the biggest deposit of

10   $12,530.

11        Q.    Okay.  And was there anything that happened that

12   day that caused you to have to file one of the reports that we

13   talked about?

14        A.    We take a look at transactions, and, like I said,

15   currency transaction reports are done based on the day that

16   you make the deposit.  And you can see there are 1, 2, 3, 4,

17   5, 6, 7 deposits, and, if I'm not mistaken, it totalled well

18   over 30,000.

19        Q.    Okay.  And so a currency transaction report was

20   filed for that day?

21        A.    Because we own the account, we're required to file

22   that report.

23        Q.    Okay.  And were you thinking about any other type

24   of report?

25        A.    Well, based on the amount of cash -- because you

1    can see at the end of that $12,530 there was over $67,000 in

2    the account, which is quite a difference from the opening

3    deposit of $50 just a few days earlier.  So we were looking at

4    that and looking at the type of transaction and very concerned

5    at that point.

6         Q.   Okay.  Did you receive any information from other

7    credit unions about these deposits?

8         A.   We received several communications, and we actually

9    put out communications to the other credit unions asking about

10   the transactions, including what type of -- the source of

11   funds that went in, and they're all currency.

12              We actually got copies of -- for the most part,

13   copies of the deposit tickets, and on those deposit tickets it

14   showed the individuals' names as well as identification of the

15   individuals making the deposits.

16              So we did reach out because, again, we were very

17   concerned, and because of the dollar amount that was going in

18   in such a fast time, that we were looking at a suspicious

19   activity report.

20        Q.   Okay.  And I'm going to direct you now --

21              MS. MACDONALD:  Caryn, if you could pull up Exhibit

22   1002.

23        Q.   And do you recognize these documents?

24        A.   Yes.

25        Q.   And what are these?

1          A.    This is a shared branch deposit ticket, and that

2    was Christian Financial.

3          Q.    And can you read the name on that deposit ticket?

4                MS. MACDONALD:  Maybe we can zoom in on that.

5    Thank you.

6          A.    Judith L. Moore, and it was in the account of Mr.

7    Ian B. Freeman.  His account number is listed on the top.

8          Q.    Okay.  And how much was this for?

9          A.    For $6700.

10         Q.    Okay.  And I'm just looking to see if we see where

11   Christian Financial Credit Union is, but it may not say it.  I

12   think it says it on the next page.

13               So let me ask you first about the photo that we see

14   here at the bottom.  What is that photo of?

15         A.    We requested a photo of the person that was

16   actually making the deposit.

17         Q.    Okay.  And let's go to the second page here.  I see

18   on the top, maybe to give us a hint about where this branch

19   was, you see Novi branch?

20         A.    I'm sorry.  Repeat that.

21         Q.    Novi branch right at the top there?

22         A.    Novi branch, yeah.

23         Q.    Okay.  And then at the bottom we have another photo

24   provided by the Christian Financial Credit Union?

25         A.    Yes.  That's the photo of the depositor and her

1    signature.

2           MS. MACDONALD:   If we could please pull up

3    Government's 1003?

4       Q.    Do you recognize this?

5       A.    That is a page out of the currency transaction

6    report.

7       Q.    And who filed that report?

8       A.    This is the financial institution on 12-6.   That

9    deposit for $12,530 was well over the limit.   So they are

10   required to file that CTR.   And the individual that was making

11   that deposit -- and you can see at the top it was a person

12   making the deposit that was not -- they didn't own the

13   account, but that was the person making the deposit, and it

14   was Martha.

15      Q.    Okay.   And when they say somebody else owned the

16   account, would that be referring to Ian Freeman?

17      A.    Yes.

18      Q.    Okay.   And so I'll just have you read a couple of

19   lines.   Could you just read the full name?

20      A.    The individual making this deposit was Martha A.

21   McManus.

22      Q.    Okay.   And the occupation or type of business?

23      A.    She is a retired school teacher.

24      Q.    Okay.   And her date of birth?

25      A.    That is 5-21-1959.

1    Q.    Okay.  And then we'll go to the next page.  What
2    are we looking at on the top here?
3    A.    We're looking at another form of a shared branching
4    deposit ticket.
5    Q.    Okay.  And that's her driver's license?
6    A.    Driver's license, right.
7    Q.    Okay.  And that would have been required by the
8    other financial institution?
9    A.    They received that at the time when she made the
10   deposit.
11   Q.    Okay.  And then I will direct you to Government's
12   Exhibit 1004.  What are we looking at here?
13   A.    This is another shared branch deposit ticket.
14   Q.    Okay.  And could you just read the member name?
15   A.    The member name is Ian B. Freeman.  And the person
16   making I believe the deposit was Nancy, and I can't really
17   tell the last name.
18   Q.    Okay.
19         MS. MACDONALD:  Can you try to zoom in a little
20   bit, Caryn, to see if we can read that last name?
21   A.    It looks like Nestram (sic).
22   Q.    Thank you.  And so are these just examples of the
23   documentation that you were provided by other credit unions
24   where these deposits were being made?
25   A.    Yes.

1      Q.   Okay.

2           MS. MACDONALD:   And let's go back, if we can, to

3   the second page of Government's Exhibit 1001.

4      Q.   So I see that these deposits come in very quickly,

5   but then they seem to stop after 12-6; is that correct?

6      A.   That's correct.

7      Q.   And why did those deposits stop after 12-6, if you

8   know?

9      A.   Well, after a short period of time and $64,000 in

10  cash deposits we elected to restrict the account.

11     Q.   And why did you do that?

12     A.   We had some very serious concerns where these funds

13  were coming from.

14     Q.   Okay.

15     A.   So we were initially looking at possible money

16  laundering.

17     Q.   Okay.  And I see an outgoing wire as the last

18  transaction for $55,000.  Tell me about that.

19     A.   That was a wire transfer that was actually sent

20  through our member services.

21     Q.   Okay.  And after you restricted the account and

22  this wire sort of request happened, did this lead you to have

23  any communication with Mr. Freeman?

24     A.   Any wire transfer that goes out in a sizable amount

25  for the credit union is approved by senior management, two

1   signatures required, and because of the activity we felt it

2   was time to talk to Mr. Freeman.

3        Q.   Okay.  And please tell me about that conversation.

4        A.   Well, we talked to Mr. Freeman about where the

5   money was coming from and why he was getting a certain amount

6   of money.

7             MR. SISTI:  Judge, I want to make sure it's not

8   hearsay, the "we talked to him."  Was it her?  If it's

9   somebody else, I would like to ask that person.

10            THE WITNESS:  No, it was me.

11            THE COURT:  Thank you.

12            MR. SISTI:  Thank you.

13       Q.   And you can continue.

14       A.   Because of the dollar amount we actually required

15  the two signatures, and I placed the phone call to Mr. Freeman

16  expressing concern about the amount of money that was going

17  into the account.

18       Q.   Okay.  And how did Mr. Freeman respond?

19       A.   He basically said that he was dealing in rare coin

20  and that these individuals were purchasing rare coins from

21  him.  It turned out to be virtual currency and crypto.

22       Q.   Okay.  And tell me how you learned that it was

23  virtual currency and crypto and not rare coins.

24       A.   Well, we actually take a look at -- we're required

25  by law to verify all the information on the wire.  And when we

1   drilled down on where the wire was going, we do see that that

2   financial institution that actually was the one ultimately

3   receiving it dealt with virtual currency and crypto.

4       Q.   Okay.  And so when Mr. Freeman told you rare coins

5   but you later found out that meant cryptocurrency, how did you

6   characterize his statement?

7       A.   That was another red flag for me.  I was a little

8   concerned.

9       Q.   Okay.  And did you find rare coins to be truthful?

10          MR. SISTI:  I'm going to object.

11          THE COURT:  Yeah.

12          MS. MACDONALD:  That's fine.

13          THE COURT:  You can approach it a different way but

14  not that way.

15      Q.   During that conversation did Mr. Freeman tell you,

16  if you recall, the name of his business?

17      A.   No.  Well, he initially said something about a

18  minister for Free Shire Church.

19      Q.   Okay.  And after you learned that name did you

20  search any databases for that?

21      A.   Like I said previously, we are required to do our

22  due diligence on anyone that opens an account with us.  So we

23  did a certain amount of due diligence on Mr. Freeman prior to

24  that, and we did see some affiliation with that church.

25      Q.   Okay.  And once you learned based on searching the

1    location that the wire was going what type of business you

2    thought Mr. Freeman was in, did you make any conclusions about

3    the type of that business?

4         A.    Not necessarily.  Not necessarily.

5         Q.    Okay.

6         A.    We just felt it was -- from what the traditional

7    church that we might be used to, that it was a little

8    different.

9         Q.    And we've previously talked about FinCEN.  Do you

10   have access to a FinCEN database that you searched?

11        A.    We have access to what we believe could be a money

12   service business.  And dealing in what he indicated that he

13   was doing, we felt that we were dealing with a money service

14   business and that was not registered.

15        Q.    Okay.

16        A.    And money service businesses are required to be

17   registered with FinCEN.

18        Q.    Okay.  And you searched the FinCEN database to

19   determine that he was not registered?

20        A.    He was not registered.

21        Q.    Okay.  Shortly after that conversation did AgFed

22   close Mr. Freeman's account?

23        A.    We suggested he close it or we would close it for

24   him.

25        Q.    Okay.

 1          MS. MACDONALD:  Your Honor, if I could just have

 2   one moment?

 3          THE COURT:  You can.

 4          MS. MACDONALD:  No further questions.  Thank you.

 5          THE COURT:  Cross-examination.

 6          MR. SISTI:  If I could have just one moment, Judge?

 7          THE COURT:  Yes.

 8          (Attorney Sisti confers)

 9                    CROSS-EXAMINATION

10   BY MR. SISTI:

11       Q.   I'm sorry, Ms. Cherry.  We just had to get some

12   technical stuff taken care of.  You know the deal, right?

13       A.   Right.

14       Q.   Okay.  So you've been employed in essence as the

15   fraud overseer compliance officer for quite a while?

16       A.   Yes.

17       Q.   Again, how long was that?  How long have you been

18   there?

19       A.   Approximately 24 years in that position.

20       Q.   Okay.  Mr. Freeman applied for an account in his

21   name, correct?

22       A.   Correct.

23       Q.   And did you determine that this was not some kind

24   of fake name or anything like that?

25       A.   We have to do our due diligence and, yes, we did

1    verify.

2        Q.    Okay.  So you verified that he actually opened the

3    account in his name, and he gave you an address, correct?

4        A.    Correct.

5        Q.    And you verified that that was a valid address?

6        A.    Correct.

7        Q.    Okay.  And as we move along, he opens the account

8    for the minimum amount, which most people do, right?

9        A.    Correct.

10       Q.    Okay.  And deposits start coming into the account

11   fairly quickly?

12       A.    Yes.

13       Q.    All right.  And they come in for a number of days,

14   and then a withdrawal of 55,000 comes out of it, right?

15       A.    Correct.

16       Q.    Okay.  Just asking generally, where did the 55,000

17   go from the best of your information?

18       A.    It went to an FI, and then it was forwarded to

19   another financial institution.

20       Q.    Do you know if it was being utilized to buy

21   additional bitcoin?

22       A.    Based on where it was ultimately ending up, we

23   determined that, yes.

24       Q.    Right.  So, in fact, he was making -- there were

25   deposits being made, right?

1        A.    Correct.

2        Q.    And then he openly withdrew $55,000 and directed it

3   to another institution, right?

4        A.    Correct.

5        Q.    All right.  And you could trace that pretty easily

6   and determine that it was for the purchase of bitcoin, that he

7   was purchasing bitcoin?

8        A.    We sent it to a financial institution that dealt

9   with that.  If you're asking me if he did something, I can

10  only tell you where it went.

11       Q.    Okay.  Do you know where it went?

12       A.    I have to look at the wire.

13       Q.    Oh.

14             MR. SISTI:  Is there a way you can pull that up

15  again?  That was --

16       Q.    Oh, the wire or the actual deposit withdrawal

17  activity?

18       A.    He withdrew the funds --

19       Q.    Right.

20       A.    -- in the form of a wire transfer.

21       Q.    Oh.  Okay.  All right.  We'll get into that again.

22  Don't worry about it.

23       A.    Okay.

24       Q.    I don't want to place that burden on you.  We'll

25  have an explanation for that later, okay?

1      A.   Okay.

2      Q.   All right.  But 55,000 came out, and that was

3 clearly showing up on his own statement, right?

4      A.   Correct.

5      Q.   Okay.  Let's talk about red flags and that sort of

6 stuff.

7      When you opened the account for Freeman, you said

8 that there was some red flag activity?

9      A.   There were a number of financial institutions that

10 inquired on him.

11     Q.   Okay.  But you continued to process his

12 application, right?

13     A.   We didn't have at that point a clear-cut reason to

14 say no.

15     Q.   Okay.  But you didn't have any real imperative to

16 open it.  I mean, you could say we need further time to

17 research it, right?

18     A.   We actually -- I believe we may have contacted Mr.

19 Freeman, received his driver's license, that type of thing.

20     Q.   Yeah, but that's normal.  You have to have that,

21 right?

22     A.   The online membership application doesn't

23 necessarily require that you give it to us at the time that

24 you open.

25     Q.   Right.

1     A.     We do require that you document it.

2     Q.     Okay.

3     A.     And we may contact you and request it.

4     Q.     All right.  So when you contacted him for his

5  driver's license, he didn't say, well, that's the end of this

6  thing, I don't want to have anything to do with these guys.

7  He actually forwarded a copy of his driver's license, right?

8     A.     Correct.

9     Q.     So he knew that you were doing due diligence and he

10 knew that you were checking up on him, obviously?

11     A.     You would have to --

12     Q.     Well, you followed up and --

13     A.     We followed up for his driver's license.  What he

14 felt, I don't know.

15            THE COURT:  Wait a minute.  You both can't talk at

16 once.  One at a time, please.

17     A.     We requested his driver's license.  Whether or not

18 he felt that we were checking up more on him, I can't tell

19 you.

20     Q.     Okay.  But he was compliant?  There wasn't any --

21     A.     We did ultimately get it.

22     Q.     He was compliant?  There wasn't any hesitation?

23     A.     Yes.

24            THE COURT:  Ma'am, you've got to let him finish the

25 question before you speak.  Do you follow me?

```
1                    THE WITNESS:  Gotcha.
2                    THE COURT:  I'm not trying to give you a hard time.
3       We're just trying to make a record.  That's all.
4                    THE WITNESS:  Okay.
5           Q.   Okay.  I think we got it.
6           A.   Okay.
7           Q.   Okay.  All right.  And the other -- as you were
8       going through, there were no negative balances or negatives on
9       the bank searches, right?
10          A.   No.
11          Q.   So all of his bank searches came back, they were
12      all positive, and you went forward with opening the account?
13          A.   There was no negative information that was coming
14      back from that source.
15          Q.   Okay.  And, again, the year of this would have been
16      when?
17          A.   2019.
18          Q.   All right.  In fact, it began, what, November 19,
19      2019?
20          A.   Around there.
21          Q.   Yeah.  Okay.  All right.  So then the deposits --
22                   THE COURT:  Time-out.
23                   Sir, you've got to put a mask on, in the back row.
24      You didn't know that?  You didn't know that?
25                   (Person indicates "no")
```

1          THE COURT:  Okay.  Thank you.

2          Go ahead.

3      Q.    So the deposits start coming in and you notice that

4  they're coming in in cash deposits?

5      A.    Yes.

6      Q.    And when did you find that out?

7      A.    We actually have a report that tells us they were

8  coming in as cash.

9      Q.    Okay.  And you didn't immediately stop that?  I

10 mean, the cash deposits were coming in for a few days,

11 obviously.

12     A.    No, we didn't immediately stop it.

13     Q.    The government flashed up the transaction with

14 regard to Judith Moore, $6700?

15     A.    Correct.

16     Q.    There was a picture and a signature of Judith

17 Moore?

18     A.    Correct.

19     Q.    And, again, where did that come from?  Where did

20 that information come from?

21     A.    The shared branch.

22     Q.    All right.  So the shared branch did business with

23 Judith Moore in the amount of $6700, and that would have been

24 cash?

25     A.    Yes, it was.

```
1          Q.    Okay.  Did the shared branch share with you that
2    they had a red flag or they had hesitated or done anything to
3    stop Judith Moore from transacting business?
4          A.    They spoke to Ms. Moore, and there were some
5    concerns.  This is an older person putting money in an account
6    that she didn't own.
7          Q.    Did Judith Moore insist on putting money in the
8    account?
9          A.    I'm sorry?
10         Q.    Did Judith Moore insist on putting money in that
11   account?
12         A.    Yes, she did.
13         Q.    And your shared branch allowed that to happen,
14   correct?
15         A.    Yes, they did.
16         Q.    After they did their inquiry, correct?
17         A.    They spoke to her and they elected to take the
18   deposit.
19         Q.    All right.  So they allowed -- now, how old is this
20   woman?  We're not talking about somebody that's 85 years old
21   or anything, are we?  I believe she was born, and this is off
22   the top of my head, in 1959?
23         A.    I don't necessarily believe that that one was '59.
24   It was another.
25         Q.    Okay.  Well, how old is this woman?
```

```
1          A.    She looks like she could be in her 60s.
2          Q.    Do you have any information that can help us here?
3          A.    Not off the top of my head.  We did some research
4     on her, but I can't necessarily tell you how old she is.
5          Q.    Okay.  Even after that transaction she had a
6     substantial amount of money in her balance though, didn't she?
7          A.    In her balance?
8          Q.    Yeah.
9          A.    I don't know what her balance is.
10         Q.    All right.  But the credit union that she did
11    business with didn't hesitate to do business with her?
12         A.    She's making the deposit into Mr. Freeman's
13    account.  That's our account.
14         Q.    I understand.
15         A.    If she had an account with them, I can't tell you
16    what her balance is with them.
17         Q.    All right.  But the teller at the institution that
18    accepted the $6700, all right, took the $6700?
19         A.    Correct.
20         Q.    From the same woman that the jury is looking at,
21    Ms. Moore?
22         A.    Right.
23         Q.    Okay.  And then you also had -- the government put
24    up Exhibit 1003, a Martha McManus?
25         A.    Correct.
```

1    Q.   And Martha McManus we find out I think showed a

2    driver's license as well.  Texas.  Yeah, there we go.

3         Now, this one for sure she says she was born

4    5-21-59?

5    A.   Correct.

6    Q.   All right.  So we're not talking about anybody in

7    their, you know, late 80s or anything like that, or even 70s?

8    A.   This particular person was born in 1959.

9    Q.   Right.  So she's in her mid/early 60s?

10   A.   Okay.

11   Q.   All right?

12   A.   All right.

13   Q.   And it indicates that she's a retired school

14   teacher, right?

15   A.   Correct.

16   Q.   Okay.  And that particular transaction took place.

17   Was there any problem with that when she was depositing money?

18   A.   That deposit was well over $12,000.

19   Q.   It was.

20   A.   Right.

21   Q.   And what happened there?  Because it was over

22   12,000, tell the jury what you have to do.

23   A.   Financial institutions have to file a currency

24   transaction report.

25   Q.   And was there a currency transaction report filed?

1       A.    You're actually looking at a page of it, yes.

2       Q.    That is correct.  So everything went by the numbers

3  with regard to Martha McManus, right?

4       A.    They took the deposit.  They were required to file,

5  yes.

6       Q.    Yeah.  I mean, they didn't hesitate to take that

7  money, right?

8       A.    Correct.

9       Q.    Okay.  And that was over $12,000.

10            Did they get a complaint from Martha McManus?  Do

11  you know?

12       A.    Not that I'm aware of.

13       Q.    So that transaction went through free and clear,

14  and then there was an Exhibit 1004, and this is the one with

15  the Nancy -- I think it's Triestram.  Something like that,

16  right?

17       A.    Right.

18       Q.    And what was the transaction that took place?

19       A.    That was a $4,000 deposit.

20       Q.    Okay.  And was there any hesitation that you could

21  see from any of the invoices or records that you came upon

22  where the teller or the institution had any hesitation

23  whatsoever to do business with her?

24       A.    Not that I know of.

25       Q.    Was there any complaint rendered by Nancy?

1       A.   Not that I'm aware of.

2       Q.   All right.  So that money all went in.

3            Now, there is something I wanted to go over with

4  you.

5            You had a telephone conversation with Mr. Freeman?

6       A.   Correct.

7       Q.   And you told him you were going to put a hold on

8  that account or you were going to stop the account?

9       A.   We actually restricted the account prior to my

10  conversation with Mr. Freeman.

11      Q.   All right.  So you restricted the account, you gave

12  him a phone call, and you had a conversation with him?

13      A.   We restricted the account.  He initiated a wire

14  transfer.  We had a conversation.

15      Q.   All right.  Did he call you or did you call him?

16      A.   I contacted him.

17      Q.   All right.  And you contacted him at the number

18  that he had given you?

19      A.   I believe so, yes.

20      Q.   Right.  So he gave you accurate information as to

21  how to contact him, right?

22      A.   And he actually put that information on the wire

23  transfer.

24      Q.   Right.

25            MR. SISTI:  And there's another exhibit, it's

1   Government's 1005.  It's the Government's 1005.  If I could

2   hold for a second, I would move at this time to have the

3   identification stricken.

4            MS. MACDONALD:  We object, your Honor.  It's

5   hearsay.  It's a letter written by the defendant.  We did not

6   introduce it.

7            THE COURT:  Oh, you're saying -- well, what's the

8   purpose for which you're offering it, Mr. Sisti?

9            MR. SISTI:  This is an actual reference to the

10  communication with Ms. Cherry.  This is going to flesh out

11  what that communication was and what the result and response

12  would be.  This is not hearsay.  In fact, it's a complete

13  reference.  It's in order to make it a complete communication.

14           We've heard with her on the stand, you know, what

15  her end of it was.  And this whole communication in fact

16  entails two e-mails, or two communications, one from Ian to

17  her and one that she responds back to him with.

18           THE COURT:  These are instructions from Ian to her?

19           MR. SISTI:  Yes.

20           THE COURT:  Yeah, because if they're instructions,

21  they're not hearsay.  There may be assertions of fact in

22  there, too, that I need to examine.

23           MS. MACDONALD:  Yeah, we might take a look at it.

24  I'm not sure that there are instructions.

25           MR. SISTI:  Well, I think they're clarifications,

1  and there's also clarifications made by her to him as to why

2  this is going on.

3          THE COURT:  I think they're probably coming in

4  under the rule of completeness anyway, but I should look at

5  them.

6          MR. SISTI:  I can stand here, Judge, if you have

7  questions.  I know what they are.

8          THE COURT:  Yeah.

9          (The Court reviews Government's Exhibit 1005).

10          For the record, I'm looking at Government's Exhibit

11  1005.

12          MR. SISTI:  Your Honor, in order to make this

13  complete so you don't have to look at it twice, I'll be asking

14  for 1006 to be coming in, too.

15          THE COURT:  You premarked this?

16          MR. SISTI:  They premarked it.

17          MR. AFRAME:  We did not admit it.

18          THE COURT:  You didn't admit it, but, I mean, you

19  listed it as one of your exhibits.

20          MR. SISTI:  Yes.

21          THE COURT:  And now you're saying it's

22  inadmissible.  Why would you have listed it as an exhibit?  I

23  understand you haven't introduced it yet, but you did include

24  it on your exhibit list.  So was there a purpose for which you

25  were going to offer it?

1          MS. MACDONALD:  Well, your Honor, it's a statement

2    of the defendant.  We can offer that, but he would have to

3    testify to it.

4          THE COURT:  Understood.  Okay.

5          Is there another one?

6          (The Court reviews Government's Exhibit 1006)

7          All right.  Here's my thought on this.  Given the

8    testimony about his statements on direct, I think these come

9    in generally under the rule of completeness.  They fill up the

10   whole communication.

11         However, I do think there are passages in these

12   letters, in both, that probably should be redacted because

13   there are certain facts -- in terms of the defendant, they are

14   hearsay.  This will take a minute to work out, at least for

15   me.  So I think what I want to do --

16         Do you want to proceed with this right now, Mr.

17   Sisti?

18         MR. SISTI:  I do, Judge.

19         THE COURT:  What I'm going to do is I'm going to

20   take a little break, give the jury a break, and I'm going to

21   probably look at this with an eye towards making some

22   redactions.

23         MR. SISTI:  All right, Judge.

24         THE COURT:  And we can probably try to work it out

25   together.

1              (IN COURT - NO JURY PRESENT)

2              THE COURT:  There's a few ways to approach this as

3    I'm reading these letters now.  One is with a sort of general

4    limiting instruction, which is that these are offered to --

5    these are offered to complete the evidence on the

6    communications between the witness and the defendant on this

7    issue with an instruction that these are not offered for their

8    truth because they couldn't be, that it would be hearsay.

9              There's a lot of information here, though.  But

10   there's many assertions here that really shouldn't be offered

11   for their truth, but they should be offered I think as an

12   explanation for the defendant's position on these issues or at

13   least statements that he made, true or not.  That's sort of

14   the essence of the hearsay rule.  That's one way of doing it,

15   admit them with an instruction that these two exhibits, 1005

16   and 1006, cannot be considered for their truth, and you could

17   close on that and remind them.

18             The other way is to try to redact because I'm not

19   sure exactly what you're focused on, Mr. Sisti, in these two

20   exhibits.  There might be things you really wanted and other

21   things you don't care about.

22             MR. SISTI:  I mean, I'll be clear.  I want the

23   completeness aspect of this.

24             THE COURT:  Yeah.

25             MR. SISTI:  I mean, we're sitting here listening to

1   really a partial of what was going on between the two of them,

2   and I want a complete record of what went on between the two

3   of them, and your instruction would be acceptable.

4         THE COURT:  The question is whether it's acceptable

5   to the objecting party, though.  What do you think?

6         MS. MACDONALD:  I mean, my -- I maintain my

7   objection in that it's not -- I mean, she made the decision to

8   close the account.  Period.  Later he sent a letter that she

9   responded to.  That's the order that these came in.  So I

10  don't see how this is related in the rule of completeness to

11  -- AgFed closed the account and then he sends a letter.  I'm

12  not sure that that, you know, is --

13        THE COURT:  It's his position on their interaction

14  if he's saying I think you did the wrong thing for these

15  reasons.

16        MS. MACDONALD:  Which is hearsay.

17        THE COURT:  Well, it's hearsay if it's offered for

18  its truth.  It's not hearsay if it's offered for his position

19  on why she was incorrect in closing the account.

20        You can't pick and choose this way.  Especially if

21  you're going to put these on your exhibit list.  I mean,

22  that's really cherry-picking.

23        MR. SISTI:  I was just told this morning they

24  weren't going to introduce them.

25        THE COURT:  That's fair, and they didn't.  They

1    didn't introduce them.  That is their choice to make, but I

2    mean -- well, explain this to me then.  For what purpose were

3    they included on your exhibit list?  There had to be some

4    purpose for which you contemplated their admission.

5              MR. AFRAME:  Sure.  And you can read that, right,

6    and you can see there are things we would like and you can see

7    there are things we don't like, and that's a strategy.

8              MR. SISTI:  Excuse me, Judge.

9              I don't know what the rule is in your courtroom,

10   but where I come from generally the person who is arguing is

11   -- I know there's three attorneys over there but --

12             THE COURT:  I generally don't enforce that in my

13   courtroom.

14             MR. SISTI:  Okay.

15             THE COURT:  I asked a question, though, about -- I

16   guess I'm asking a question about -- look, I think I

17   understand the answer anyway.  The answer is there are things

18   about the exhibits you would like the jury to know and there

19   are things you didn't.  You made the choice not to introduce

20   them.

21             Look, I think I made this clear in my pretrial

22   rulings already, though.  I'm not a believer in excluding

23   evidence from a jury that sort of sets forth the interaction

24   between the important parties and witnesses in the case.

25             I understand that the defendant normally has to

1    testify to make assertions of truth, but this is just -- you

2    know, there's a series of interactions between this witness

3    and the defendant about a topic.  This completes them.  I know

4    it's self-serving and after the fact, but I think a limiting

5    instruction can solve it.

6           I don't think it's a difficult argument to make for

7    you to explain to the jury the fact that the defendant wrote

8    these things doesn't make them true.

9           Do you want to look up the rule?

10          I'm happy to have you argue.  I'm going to allow

11   everybody to argue.

12          I don't enforce that rule, Mr. Sisti.  I generally

13   allow the trial teams to make arguments.

14          Rule of completeness basically says if something is

15   admitted -- I don't know if you want me to focus on that or

16   the hearsay rules.

17              MR. AFRAME:  No, I understand the hearsay rules.

18              THE COURT:  The rule of completeness says that if

19   part of a statement or writing is admitted, the remainder of

20   it should be admitted if in fairness it should be considered

21   as part of the complete -- as part of the complete -- I think

22   of it as interaction.  It's really more focused on a single

23   document or a single maybe statement.

24              MR. AFRAME:  I mean, I guess that was my question.

25              THE COURT:  Yeah, and it's not an unreasonable

1  argument.  My view is that the limiting instruction covers the

2  problem so I'm going to allow it.

3            MR. SISTI:  Thank you.

4            THE COURT:  I'll let you introduce them first when

5  you're, you know, and I'm going to give the limiting

6  instruction right away, all right, because this is fairly

7  radioactive stuff, all right?

8            MR. SISTI:  Thank you.

9            THE COURT:  All right.  Okay.

10            (IN COURT - JURY PRESENT)

11            THE COURT:  You may proceed.

12            MR. SISTI:  Thank you, your Honor.

13            I think we left off where I was offering

14  Government's Exhibit 1005 and 1006.

15            Why don't I approach the witness and just make sure

16  that we have this squared away and she can recognize these

17  documents first.

18            THE COURT:  Sure.

19            MR. SISTI:  Thank you.

20      Q.    Let me show you Government's Exhibit 1005 first,

21  and let me ask you if you can recognize that?

22      A.    Yes.

23      Q.    And just for the record, is that a document that

24  you, yourself, received and had reviewed?

25      A.    Yes, it is.

1              MR. SISTI:  I would move to strike 1005 now and

2     enter it as a full exhibit.

3              THE COURT:  It's admitted subject to the objection

4     offered by the prosecution.

5              MR. SISTI:  Thank you.

6              (Government's Exhibit No. 1005 Admitted)

7         Q.   Let me show you Government's Exhibit 1006 and ask

8     you if you recognize that?

9         A.   Yes, I do.

10        Q.   Is that in fact a document that you prepared

11    yourself?

12        A.   Yes, it is.

13             MR. SISTI:  And now at this time I would ask to

14    strike the ID and enter it as a full exhibit.

15             THE COURT:  It's admitted over the objection of the

16    prosecutor.

17             MR. SISTI:  Thank you.

18             (Government's Exhibit No. 1006 Admitted)

19             MR. SISTI:  Your Honor, I am going to be asking to

20    publish this over the screen.  I believe the Court wanted to

21    give the jury an instruction.

22             THE COURT:  I can do that now.

23             Any objection to me doing it now?

24             MS. MACDONALD:  No, your Honor.

25             THE COURT:  Listen, these two exhibits, 1005 and

1    1006, these are admitted for a special purpose.  Sometimes

2    evidence is admitted for a limited purpose, you can consider

3    it for certain things but not other things, all right?  This

4    is an example.

5           These letters are letters -- actually e-mails

6    written by the defendant.  You cannot consider them for their

7    truth.  They're not offered for you to consider that the

8    statements contained in the two e-mails are true statements.

9    They are offered to you so you'll -- for two reasons,

10   basically.  To understand the defendant's position with

11   respect to this interaction with the witness, the back and

12   forth, to understand his point of view, but not because that

13   point of view is true.  You can't consider it for its truth.

14   It's not admissible for that purpose.

15           The other reason is to round out and complete the

16   conversation.  They had an interaction.  This is another part

17   of it.  It's called the rule of completeness, and it's just so

18   you can have the whole picture.

19           You may proceed.

20           MR. SISTI:  Thank you, Judge.

21           So if we could show Government's Exhibit 1005.

22           And if everybody can see that, what we'll do in

23   order to make it clear is I'll read it into the record.

24           This is Government's Exhibit 1005.  There's in the

25   upper right-hand corner an address, Shire Free Church

1    Monadnock, 73 and 75 Leverett Street, Keene, the Shire.  And

2    it's entitled Regarding Money Services Business and Direct

3    Sale of Cryptocurrency.  Dated 2019-12-12.

4            To:  Hope Cherry.  Greetings.  I understand AgFed

5    currently believes I am involved in a "money services

6    business."

7            I am a founding minister of the Shire Free Church,

8    and my activities are part of our church mission to foster

9    peace.  One way we do that is by helping connect people with

10   cryptocurrency like bitcoin.  We also broadcast our message of

11   peace and cryptocurrency to two continents via satellite and

12   over 200 radio stations in the United States.

13           I understand many banks are uncertain of

14   cryptocurrency and can understand why you wouldn't want to be

15   involved with accounts who are money services businesses.  I

16   wouldn't want that designation either, and from what I can

17   tell it does not apply to what I am doing.  Selling

18   cryptocurrency is not "money transmission" or any of the other

19   things on the list of activities that would qualify a business

20   as a money "money services business" from my attorney.  In it

21   he analyzed both state and federal statutes defining "money

22   services businesses" and money transmission.

23           We have been charitably operating cryptocurrency

24   vending machines here in New Hampshire since 2014 with no

25   issues from the government.  We were the first such operation,

1    and the New Hampshire regulators are well aware of us.  Also

2    as part of my church mission, I sell bitcoin online to

3    individuals.  There's no fundamental difference between

4    running a cryptocurrency vending machine and selling person to

5    person.  In both cases I am selling product from my inventory

6    to a willing buyer.  This is nothing more than the simple sale

7    of a product, albeit a digital one.  It's a rare coin, like

8    gold, but digital.

9            In fact, the New Hampshire Banking Commission has

10   said specifically "we don't regulate that," speaking of the

11   crypto vending machines that I operate on behalf of the Shire

12   Free Church here in New Hampshire.

13           Here is a clip from the New Hampshire Commission to

14   Study Cryptocurrency at the Concord State House featuring the

15   hearings examiner for the New Hampshire Banking Commission,

16   Maryam Torben-Desfosses, stating clearly and specifically

17   about the church's machines as we were the only group

18   operating machines publicly at the time this hearing was

19   recorded:  "I don't want to call it an ATM.  It's not an ATM.

20   The bitcoin machine owns its own bitcoin.  We don't regulate

21   that.  Enjoy, have fun.  That's no different than me going to

22   a vending machine and buying a Kit Kat or a bottle of water.

23   It's a product at that point."

24           Here's a link directly to the relevant portion of

25   her lengthy testimony to the Commission.

1          And there's a YouTube address.

2          You need only watch from 16:40 to 19:00.

3          Additionally, I am attaching the two-page letter

4    from the New Hampshire Commission to a national crypto vending

5    company confirming that cryptocurrency is not regulated in the

6    state of New Hampshire.  The letter was written in response to

7    the business owner who had asked the commission what hoops he

8    needed to jump through in order to run a crypto vending

9    machine in New Hampshire.  He gave me permission to share it

10   as long as his identifying information was redacted.

11          The only difference between our cryptocurrency

12   vending machines and vending it to people online is the online

13   buyers must pass ID verification and receipt verification

14   procedures to protect against fraud as fraudsters are rampant

15   on the online platforms I mentioned to you, localbitcoins.com

16   and paxful.com.  Our procedures verify the identity of the

17   buyer before they are given any account information, verifies

18   the buyer knows they are buying bitcoin which stops

19   man-in-the-middle attacks and finally confirms with receipt

20   verification that the same person who initiated the trade is

21   the same person who made the purchase.  This also protects

22   against man-in-the middle attacks and confirms that the sale

23   is ordered and paid for by the same individual, meaning this

24   is a direct sale and no transmission of value to a third

25   party.

1      For every deposit made to AgFed I have the ID of

2  the depositor, a photo showing them with a note verifying they

3  are knowingly buying bitcoin, a photo of the receipt with

4  specific words written on it indicating they are buying

5  bitcoin and there are no refunds, and finally a photo of the

6  buyer holding the same receipt in a selfie.  Therefore, if you

7  can identify for me which buyer or buyers were not being

8  honest about buying coins, I can show proof they were lying to

9  you without my knowledge or consent.  I would be happy to show

10  you the photos they sent me and where they were instructed to

11  be honest.  Honesty is very important to me.

12      Thank you for your time and consideration.

13      Signed Ian Freeman, Minister Shire Free Church,

14  Monadnock, host of Free Talk Live.

15      Is that an accurate reading of that communication

16  that you would have received, Ms. Cherry?

17      A.   Yes, it is.

18      THE COURT:  I think I need to instruct the jury a

19  little bit further on this.

20      Just this.  Again, that letter is offered to you to

21  complete the interaction, the evidence about the interaction

22  between the witness and the defendant, and it's not offered

23  for its truth or for the truth of any of the statements

24  contained in the letter.

25      I need to add something.  There's a lot of

1    information in the letter about New Hampshire state law.  In

2    this case the defendant is not charged with violating New

3    Hampshire state law.  He's charged with violating federal law.

4            You may proceed.

5            MR. SISTI:  Thank you, Judge.

6        Q.    There was some reference to some attached letters

7    and so forth, I didn't go into that, but you received those as

8    well from Mr. Freeman?

9        A.    I received one letter, yes.

10       Q.    And can you tell -- do you recall what the letter

11   was or where it was from?

12       A.    It was an opinion from someone within the state of

13   New Hampshire.

14       Q.    It was a lawyer or something, wasn't it?

15       A.    Can you go back to the New Hampshire Banking

16   Commission?

17       Q.    Okay.  There was a letter from the Banking

18   Commission?

19       A.    I believe so.

20       Q.    Okay.  All right.  And after you absorbed that you

21   responded to Ian through an e-mail, correct?

22       A.    Correct.

23       Q.    And that would be Government Exhibit, and it's now

24   a full exhibit, 1006, and let me go through that and you

25   correct me if I'm misstating anything.

1              It was actually created by you, Hope Cherry?

2         A.    Correct.

3         Q.    On Friday, January 3, 2020, at 6:32 p.m., and it

4    was sent to Ian at freetalklive.com and the specific subject

5    was sale of cryptocurrency and membership.  Let me go through

6    it:

7              "Mr. Freeman, I apologize for not getting back to

8    you sooner.  Yes, your documents were forwarded to me and I

9    did finally have a chance to review them.

10             Although your argument the Shire Free Church does

11   not fit the definition of money transmitter or a money service

12   business is compelling, the membership is not in the name of

13   the church.  The membership was opened using your identifying

14   information regardless of where the statements are being sent

15   to or your position of a minister of the church.

16             Furthermore, recent regulatory advisories,

17   including an October 2019 joint statement from the leaders of

18   U.S. Commodity Futures Trading Commission, the Financial

19   Crimes Enforcement Network, and the U.S. Securities and

20   Exchange Commission notes otherwise.  In addition, your

21   activities could best be described as an unregistered P2P

22   exchanger, that and the number of tales the employees of the

23   shared branches received from your depositors on why they are

24   depositing large funds of cash through membership has led the

25   credit union to suspend your convenience services and revoke

1    your membership.  Upon receipt of this communication, please

2    contact the CU at 202-479-2270 to make arrangements to close

3    the accounts and transfer the remaining funds."  And then

4    sincerely signed by you.

5              Is that in essence what was the communication?

6         A.   Yes, it is.

7         Q.   But what happened though is that the account was

8    closed, right?

9         A.   Yes.  He closed it.

10        Q.   And you didn't hesitate on sending him his

11   remaining balance?

12        A.   They sent -- yes, member services sent him a check.

13        Q.   So your credit union didn't question the validity

14   or the legality of the deposits that were made in that

15   account?

16        A.   We did not question the cash going in.

17             MR. SISTI:  Thank you.

18             THE COURT:  Redirect.

19             MS. MACDONALD:  I want to just follow-up briefly on

20   that.  If you could pull up Government's I think it's 1002.

21                       REDIRECT EXAMINATION

22   BY MS. MACDONALD:

23        Q.   Did you ever speak to Judith Moore?

24        A.   We contacted her.

25        Q.   And without telling me what she told you, after

1    that conversation what did you conclude about the validity of

2    that transaction?

3                MR. SISTI:  Well, I have to object.

4                THE COURT:  Overruled.

5        A.    I'm sorry.  Repeat that.

6        Q.    Without telling me what she told you, what did you

7    conclude about the validity of that transaction into the

8    account?

9        A.    I felt that there was something -- she could

10   possibly be scammed.

11       Q.    Okay.  And let's go look at your letter,

12   Government's 1006.

13             And I would like to focus on this second paragraph

14   here.  You write:  Although your argument that the Shire Free

15   Church does not fit the definition of a money transmitter or a

16   money services business is compelling --

17             I have a question for you.  Did you really think --

18   what were your thoughts?  Did you think that this was

19   compelling?

20       A.    I think I was being polite at this point.

21       Q.    Okay.  And when you received the letter from Mr.

22   Freeman and the attached documents, did you consider them and

23   review them with the leadership of your credit union?

24       A.    Yes, I did.

25       Q.    And did anything in all of this and the attachments

1   and the letter, did that do anything to affect your decision

2   about closing Mr. Freeman's account?

3       A.    Looking at the amount of deposits going in in a

4   short time, being concerned of course about money laundering,

5   we elected to actually restrict his convenience services and

6   close the account or suggested he close the account.

7       Q.    And this didn't change your decision about that at

8   all?

9       A.    No, it didn't.

10      Q.    Let's read through the second --

11            MS. MACDONALD:  I'm sorry.  I would like to pull

12  that up again, if you don't mind, Ms. Shedd.

13      Q.    I would like to focus on the large paragraph:

14            Furthermore, recent regulatory advisories, including an

15  October 2019 joint statement from the leaders of the U.S.

16  Commodity Futures Trading Commission, the Financial Crimes

17  Enforcement Network --

18            Is that FinCEN that we've been talking about?

19      A.    Yes, it is.

20      Q.    -- and the U.S. Securities and Exchange Commission

21  notes otherwise.

22            And when you say notes otherwise, that means

23  doesn't agree with his opinion about being a money servicing

24  business?

25      A.    Yes, it is.

1    Q.   Okay:  In addition, your activities could best be

2    described as an unregistered P2P exchanger.

3         What do you mean by that?

4    A.   That is actually exchanging currency for another

5    type of currency.

6    Q.   Okay.  And would that make him a money services

7    business?

8    A.   Yes.

9    Q.   Okay:  That and the number of tales the employees

10   of the shared branches received -- and should there be a --

11   does that mean by your depositors -- on why they are

12   depositing large funds of cash to your membership has led the

13   credit union to suspend your convenience services and revoke

14   your membership.

15        Did I read that correctly?

16   A.   Yes, you did.

17   Q.   Okay.  Now, you mentioned that you did some

18   diligence on Mr. Freeman and the name of the church; is that

19   right?

20   A.   Right.

21   Q.   Other than an Internet search and Freeman's own

22   statement about the church, do you know anything about that

23   organization, including its really a church or whether he is

24   really a minister?

25   A.   We never received any documentation, and I really

1     couldn't tell you what the church actually stood for.

2          Q.     Okay.  And, finally --

3                 MS. MACDONALD:  I would like to just pull up 1005,

4     the second page, just that last paragraph before the

5     signature, please.

6          Q.     Mr. Freeman says:  Honesty is very important to me.

7                 Is that correct?

8          A.     Correct.

9          Q.     When he opened the account for household purposes

10    and then used it for his business, does that strike you as

11    being honest?

12                MR. SISTI:  Again, it's a conclusion that can't be

13    reached.  It's an objection, Judge.

14                THE COURT:  Give me a moment.

15                MS. MACDONALD:  I can rephrase the question.

16                THE COURT:  Hold on a second.

17                No.  She can answer that.  The question was:  When

18    he opened the account for household purposes and then used it

19    for his business, does that strike you as being honest?

20                I think you can easily cover that on recross, Mr.

21    Sisti, if you need to.

22                MR. SISTI:  Thank you.

23         A.     No, I don't believe he was being honest.

24                MS. MACDONALD:  Okay.  Thank you.

25                          RECROSS-EXAMINATION

1    BY MR. SISTI:
2        Q.   Okay.  Let me go back a little bit.  These other
3    branches, we're talking about tales coming from the
4    individuals that were making the deposits, right?
5        A.   Correct.
6        Q.   Well, Mr. Freeman wasn't a party to those
7    conversations, was he?
8        A.   No.  He wasn't there.
9        Q.   No.  He wasn't there.
10            Mr. Freeman wouldn't be the one that would be able
11   to stop the transaction or somehow be able to note what they
12   were saying, right?
13       A.   He wasn't there.
14       Q.   Right.  It would be up to the highly regulated
15   credit union branches to stop the transaction if they thought
16   the "tales" were raising red flags, correct?
17            THE WITNESS:  Can I add something to that?
18            THE COURT:  Can you add something?
19            THE WITNESS:  Rather than a yes or a no?
20            THE COURT:  Right.  You should answer yes or no,
21   but you can always explain your answer.
22       A.   Repeat that, please.
23       Q.   It would be up to the individual credit union
24   branches, the tellers, the people that are hearing the
25   conversations, to clarify and stop or allow the transaction,

1    correct?

2         A.   I don't believe that's as clear-cut as you're

3    making it out to be.

4         Q.   I'm not trying to be clear-cut about it.  I'm just

5    saying, look, if they're thinking suspicious things are going

6    on, do they just grab the money anyway?

7         A.   Grab the money?

8         Q.   Yeah, take the deposit.

9         A.   They take the deposit.

10        Q.   They don't try to stop let's say Mrs. Moore?  They

11   don't try to say, whoa, you shouldn't be giving me this money?

12   I mean, he can't do it, can he?

13        A.   He can't.

14        Q.   He wasn't there.

15        A.   Correct.  He wasn't there and they elected to take

16   the deposit.

17        Q.   Right.  They elected to take the deposit.  They

18   took the deposit from those individuals, right?

19        A.   Correct.

20        Q.   The pictures that you saw and that were shown to

21   the jury by the government, the credit union branch

22   individuals that were in control of taking or refusing the

23   deposit from Judith Moore, they took it, right?

24        A.   Correct.

25        Q.   They had control over that transaction?

```
 1        A.    They took the money as she instructed them to do.

 2        Q.    Yeah.  Ian couldn't stop them, right?

 3        A.    He wasn't there.

 4        Q.    I know.  Martha McManus, the credit union branch

 5   that took her money, the jury saw that?

 6        A.    Correct.

 7        Q.    They didn't stop her?

 8        A.    Correct.

 9        Q.    Mr. Freeman wasn't there.

10        A.    Correct.

11        Q.    He couldn't stop her.

12        A.    Correct.

13        Q.    There's no evidence that he heard any tales from

14   Ms. McManus, right?

15        A.    Correct.

16        Q.    Nancy Triestram.  The credit union branch took her

17   money, right?

18        A.    Correct.

19        Q.    Mr. Freeman wasn't there for that transaction, was

20   he?

21        A.    Correct.

22        Q.    So if there were red flags and tales, Mr. Freeman

23   wouldn't have seen the red flags and he wouldn't have heard

24   the tales, right?

25        A.    Correct.
```

1      Q.    Your credit union branches were there and they took

2   the money?

3      A.    Correct.

4      Q.    All right.  But it goes on because after the

5   exchange of information between you and Mr. Freeman in the

6   telephone conversation and then in the letter from Freeman to

7   you and the e-mail response from you to him, the end of this

8   whole saga is that you returned the balance of his account to

9   him, right?

10     A.    Correct.

11     Q.    Is it generally your policy at your credit union to

12   return funds to an illegal money transmitter?

13     A.    He was an unregistered money transmitter.  What

14   were we supposed to do with those funds?

15     Q.    I'm not -- you're the guy in control.  You're the

16   one that was talking about FinCEN.  You're the one that

17   rattled off a whole number of different federal agencies.

18   What were you supposed to do?

19     A.    We returned the money.  We gave him the ability to

20   close his account.

21     Q.    Did you call FinCEN?

22     A.    We did a suspicious activity report.

23     Q.    Did you report to them directly?

24     A.    We did a suspicious activity report as required.

25     Q.    Did you call them?

```
1          A.   No, we did not.

2          Q.   Did you ever sit down with anybody from FinCEN?

3          A.   No, we did not.

4          Q.   How about any other government entity?

5          A.   We are required to file a report, which we did.

6          Q.   That's it, right?

7          A.   Yes, we did.

8          Q.   And what year was that?

9          A.   That was in 2020.

10              MR. SISTI:  Thank you.

11              THE COURT:  I'll give you one more round.

12              MS. MACDONALD:  Thank you.

13                        FURTHER EXAMINATION

14   BY MS. MACDONALD:

15         Q.   First question.  Do you know anything about the

16   conversations that led these people -- between Mr. Freeman and

17   these people leading them to make deposits into his account?

18         A.   No, I don't know anything about that.

19         Q.   Okay.  And does the BSA require you to collect

20   suspicious activity reports and file them?

21         A.   We are required if we feel it's something

22   suspicious.

23         Q.   And does it require you to collect information

24   about the deposits?

25         A.   To a point, yes.
```

1          Q.    And to ask questions?

2          A.    We try to ask as much questions as we can to

3     explain our position and why we felt it was suspicious.

4          Q.    And does that information you collect sometimes

5     lead you to see patterns?

6          A.    Yes, it does.

7          Q.    And so over your monitoring of the account over six

8     days you saw a pattern of activity?

9          A.    Correct.

10         Q.    Okay.  And that pattern may not have been visible

11    to every other credit union?

12         A.    No.

13         Q.    But because you saw the pattern --

14               MR. SISTI:  Your Honor, again leading.

15               THE COURT:  A little bit.

16         Q.    What did that pattern allow you to do?

17         A.    We continued to watch it and filed this suspicious

18    activity report.

19         Q.    Okay.  Would any of the other credit unions have

20    understood that pattern of activity in Mr. Freeman's account?

21         A.    Not unless they looked, no.

22               MS. MACDONALD:  Okay.  Thank you.

23               MR. SISTI:  I have no further questions.

24               Thank you, Ms. Cherry.

25               THE COURT:  You're excused, ma'am.  Thank you.

1              Who's your next witness?

2              MS. MACDONALD:  The United States calls Bruce

3     Sweet.

4              THE COURT:  Well, before you call him --

5              MS. MACDONALD:  Oh, it's quick.

6              THE COURT:  It's, like, a really quick one?

7              MS. MACDONALD:  Yes.

8              THE COURT:  Let's do that witness then before we

9     take the break.

10                          BRUCE SWEET

11          having been duly sworn, testified as follows:

12              THE CLERK:  Please state your name for the record

13    and spell your last name.

14              THE WITNESS:  Sure.  It's Bruce Sweet, S-W-E-E-T.

15              THE CLERK:  Thank you.  Please be seated.

16              THE WITNESS:  Good morning, sir.

17                        DIRECT EXAMINATION

18    BY MS. MACDONALD:

19         Q.    Good morning, Inspector Sweet.

20               Where are you employed?

21         A.    I'm employed as a United States postal inspector

22    with the U.S. Postal Inspection Service.

23         Q.    And what do you do as an inspector with the U.S.

24    Postal Inspection Service?

25         A.    I am a federal agent that investigates crimes

1    pertaining to the U.S. mail.

2         Q.    Okay.  And can you tell me a little bit about what

3    those crimes are and what you typically investigate?

4         A.    Sure.  Postal inspectors investigate crimes like --

5    I guess a large swath of crimes.  So it would be mail theft,

6    mail fraud, child exploitation.  We do narcotics through the

7    mail, hazardous mailings, and sometimes money laundering as

8    well.

9         Q.    Okay.  And do you sometimes work with other

10   agencies on investigations?

11        A.    Yes.  Very frequently.

12        Q.    And in those investigations do your

13   responsibilities generally relate to things involving the

14   mail?

15        A.    Yes.

16        Q.    Okay.  Were you involved in an investigation of Ian

17   Freeman?

18        A.    I was.

19        Q.    And I'm going to direct you to March 16th of 2021.

20              What happened in that investigation that day?

21        A.    There were search warrants in the city of Keene.

22        Q.    Okay.  And during the investigation of Mr. Freeman

23   had you identified a post office box affiliated with him?

24        A.    Not necessarily a post office box but a private

25   mailing box, yes.

1      Q.    Okay.  And so can you please -- I'll have you

2   explain what a private mailing box is.

3      A.    You have, like, UPS stores or private shipping

4   companies that also have -- they can receive U.S. mail and

5   other mailings.  So they call it a private mailbox.

6      Q.    Okay.  And do you recall the address of the one

7   affiliated with Mr. Freeman?

8      A.    Yes.

9      Q.    What was that?

10     A.    63 Emerald Street, Keene, New Hampshire, 03431.

11     Q.    Okay.  And with respect to Mr. Freeman's box, what

12  did you do on March 16th of 2021?

13     A.    There was a -- we went to the -- Shipping Shack was

14  the name of it.  We obtained the box that was there -- or

15  looked for the documents pertaining to that box, which was

16  Unit 610, and we obtained or found out that there was a box

17  there, meaning an incoming mailing box.  So we looked at that

18  box and took custody of it.

19     Q.    Okay.  And did you contact the sender of that box?

20     A.    Yes, we did.

21     Q.    And based on statements from the sender, did you

22  decide to open the parcel?

23     A.    We did.

24     Q.    Okay.  And I'm going to show -- where did you open

25  the parcel?

1    A.    At my office in Manchester, New Hampshire.

2    Q.    Okay.  And I'm going to show you Government's

3  Exhibit 1101.

4         MS. MACDONALD:  Mr. Sisti, I'm not sure if you have

5  any objection.

6         (Attorney MacDonald confers with Attorney Sisti)

7         MS. MACDONALD:  There's no objection.  May I show

8  this to the witness, your Honor?

9         THE COURT:  You may.

10   Q.    Do you recognize this?

11   A.    Yes.

12   Q.    And what is that?

13   A.    That is the box that on March 16th we obtained from

14  the Shipping Shack.

15   Q.    Okay.  I'll have you take it out of the packaging,

16  if you don't mind, and who is this box addressed to?

17   A.    It is addressed to the Shire Free Church, Unit 610,

18  63 Emerald Street, Keene, New Hampshire.

19   Q.    Okay.  And if I could have you just hold up kind of

20  the return so the jury can see the return sender, what's

21  depicted there?

22   A.    It's just a stamp with cats on it.

23   Q.    And does that have a return address on it?

24   A.    Yes, it does.

25   Q.    And who is it from?

1          A.    Judith Moore of 24717 Apple Crest Drive, Novi,

2    Michigan.

3          Q.    Okay.  And if you can open the package and pull out

4    what was inside, could you show us what that is?

5          A.    Sure.  It's a Samsung Galaxy 5 cardboard box.

6          Q.    And was there a Samsung Galaxy S5 inside that box?

7          A.    There was not.

8          Q.    And what was inside that box?

9          A.    There were four candy Life Savers along with a

10   withdrawal envelope -- or a bank withdrawal envelope filled

11   with cash, U.S. currency.

12         Q.    Okay.  And are the Life Savers still in there, if

13   you could show the jury?

14         A.    They are.

15         Q.    Okay.  And what else is in there?

16         A.    The banking envelope for the cash.

17         Q.    Okay.  Thank you.

18         MS. MACDONALD:  And I'll have you, Ms. Shedd, pull

19   up 1102, please.

20         Mr. Sisti, am I correct that's a full exhibit?

21         MR. SISTI:  We're okay with 1102.

22         THE COURT:  1102 is admitted.

23         (Government's Exhibit No. 1102 Admitted)

24         Q.    And what are we looking at here?

25         A.    That is the contents or the U.S. currency that was

1    taken out of that PNC Bank cash envelope.

2         Q.    Okay.  And do you recall approximately how much

3    currency?

4         A.    It was $4,000.

5               MS. MACDONALD:  Thank you.

6               Oh, I'm sorry.  If I could have one moment?

7               THE COURT:  You may.

8               (Pause.)

9               MS. MACDONALD:  Actually, could we just briefly

10   pull up Government's 1002, and page 2, please?

11        Q.    I would just ask you to read the signature on that.

12        A.    It appears to be Judith Moore.

13        Q.    Okay.  And what does the top line say?

14        A.    Novi branch.

15              MS. MACDONALD:  Thank you.

16              THE COURT:  Cross?

17              MR. SISTI:  Thank you, Judge.

18                           CROSS-EXAMINATION

19   BY MR. SISTI:

20        Q.    Judith Moore.  Did she make any complaint to you

21   about anything?

22        A.    Not that I'm aware of.

23        Q.    Right.  I mean, have you heard that Judith Moore

24   made a complaint about Ian Freeman or the Shire Free Church?

25        A.    Not that I'm aware of.

1      Q.    Right.  In fact, Judith Moore sent a box to

2   essentially Ian Freeman, right, Shire Free Church?

3      A.    Yes.

4      Q.    All right.  And in it was cash, right?

5      A.    Correct.

6      Q.    Do you know what the cash was for?

7      A.    Based on the conversation, it sounded like for

8   bitcoin.

9      Q.    All right.  So it was cash for a product, correct?

10      A.    Yes.

11      Q.    To an individual that actually was able to get the

12   product -- you may not know that, but it was for a purpose,

13   right?

14      A.    I don't know that.

15      Q.    I mean, it wasn't for drugs or anything, right?

16      A.    I'm not aware of that, but I don't know that.

17      Q.    Okay.  It was for the purchase of a legal product.

18   That's what your information is?

19      A.    Based on my conversation, yes.

20      Q.    Okay.  And not only did she send the money, but she

21   was kind enough to send candy along with it to Mr. Freeman,

22   right?

23      A.    That was in the contents, yes.

24           MR. SISTI:  Thank you.

25           MS. MACDONALD:  Nothing further, your Honor.

1          THE COURT:  Inspector, you're excused.

2          THE WITNESS:  Thank you.

3          THE COURT:  Jadean, we'll take the morning recess.

4   Fifteen minutes.

5          (IN COURT - NO JURY PRESENT)

6          THE COURT:  Just a couple of things.  I want to

7   have a clear record.

8          Those two exhibits, 2005 and 2006.

9          MR. SISTI:  1005 and 1006.

10         THE COURT:  Thank you.  1005 and 1006.  I admitted

11  1005 over the government's objection, but as I watched the

12  examination of 1006 -- you know, 1006 obviously is not hearsay

13  because it was not offered for its truth.  Mr. Sisti was not

14  offering that witness's letter for its truth.  He obviously

15  disagrees with it.

16         And I said it was over your objection.  I don't

17  even know if you objected to 1006 because there wouldn't be a

18  hearsay objection anyway.  I just wanted to make that clear

19  for the record.

20         The other thing is --

21         MR. SISTI:  I think they did object to it, Judge.

22         THE COURT:  Did you?  So what's the objection to

23  1006?

24         MS. MACDONALD:  Well, no.  We weren't going to

25  introduce it if we weren't introducing 1005.

1          THE COURT:  Yeah, interestingly 1006 kind of

2     becomes a rule of completeness for 1005, I get it, but it's

3     not hearsay.

4          MR. SISTI:  That's right.

5          THE COURT:  All right.  So there's that.

6          The gentleman with the mask -- listen, I didn't

7     want to give you a hard time about the mask.  If you don't

8     want to wear the mask -- yeah, I'm talking to you, the guy in

9     the back who didn't have the mask on when he came in.

10          OBSERVER:  Oh, I think he didn't know, sir.

11          THE COURT:  You know he didn't know?  Okay.

12          OBSERVER:  This was his first day coming here.

13          THE COURT:  I just wanted you to know we have an

14     extra courtroom if you don't want to wear one.

15          THE PERSON:  No, no.  Actually, just to clarify, I

16     actually did know.  I just forgot when I came in.  I went to

17     the bathroom real quick and when I came in, I forgot about

18     that.

19          THE COURT:  Thank you.

20          All right.  Fifteen.

21          (RECESS)

22          MR. AFRAME:  The United States calls Pavel

23     Prilotsky.

24                    PAVEL PRILOTSKY

25        having been duly sworn, testified as follows:

1           THE CLERK:  Please state your name for the record

2    and spell your last name.

3           THE WITNESS:  Pavel Prilotsky, P-R-I-L-O-T-S-K-Y.

4                        DIRECT EXAMINATION

5    BY MR. AFRAME:

6       Q.   Before we start, let's pull the microphone to you

7    and you to the microphone.

8            Good morning.

9       A.   Good morning.

10      Q.   Could you state where you're employed?

11      A.   U.S. Treasury Department, IRS Criminal

12   Investigations.

13      Q.   And what is your job with IRS Criminal

14   Investigations?

15      A.   I'm a special agent.

16      Q.   And how long have you been a special agent?

17      A.   For over 14 years.

18      Q.   And what kind of cases do you investigate as an IRS

19   Special Agent?

20      A.   We investigate potential violations of Internal

21   Revenue Code, money laundering, and various Bank Secrecy Act

22   violations.

23      Q.   And where are you presently stationed?

24      A.   Charlotte Field Office.

25      Q.   How long have you been in Charlotte?

1        A.    For several years now.

2        Q.    And where were you before Charlotte?

3        A.    In the New York Field Office.

4        Q.    And did you have some involvement in the

5   investigation into Mr. Freeman?

6        A.    Yes.

7        Q.    And what was that?

8        A.    I was working in my undercover capacity with Mr.

9   Freeman doing various transactions.

10       Q.    And have you been an undercover in other cases as

11  well?

12       A.    Yes.

13       Q.    And what was your -- tell us a little bit about

14  being an undercover.  How do you do that?  Do you use -- what

15  identity do you use?

16       A.    We use various identities.  It depends on the role

17  we play.  You know, it depends on what the case is about.

18       Q.    And what was your role in this case as the

19  undercover investigator?

20       A.    To conduct bitcoin transactions with Mr. Freeman.

21       Q.    Okay.  And did you do that?

22       A.    Yes.

23       Q.    And did that happen in a short period of time or a

24  relatively long period of time?

25       A.    I would say a long period of time.

1        Q.    Was the interaction with him over a year long?

2        A.    Yes.

3        Q.    Okay.  And we're going to go through that today and

4   go through those interactions that you had with him.

5              Was much of it in writing?

6        A.    Yes.

7        Q.    Okay.  And so we will be going through that in some

8   detail.

9              So let me ask you this.  How did you first connect

10  with Mr. Freeman about the idea of buying bitcoin?

11       A.    Through localbitcoins.com.

12       Q.    Okay.  Was that your idea or did other agents tell

13  you that's how to do it?

14       A.    Yes, I was told where to start.

15       Q.    Okay.  And let me show you what's been marked as

16  Government's Exhibit 601, it's been admitted, and let's go to

17  the end of it and then we'll go back up to the beginning.

18  We'll read it back to front.

19             And I'm going to move because it will be easier for

20  me if I can see a screen.

21             MR. AFRAME:  Down lower, please.  Down.

22       Q.    Can you see that?

23       A.    Yes.

24       Q.    And so the name at the very bottom -- so, first of

25  all, what date did this transaction happen?

```
1          A.    September 11th.

2          Q.    Of what year?

3          A.    2019.

4          Q.    And was this the first transaction with Mr.

5   Freeman?

6          A.    Yes.

7          Q.    And in bold it says Mordovian, and I'll tell you

8   the jury is already familiar with user accounts on

9   LocalBitcoin.

10              What was Mordovian?

11         A.    That was my user name on LocalBitcoin.

12         Q.    Why did you select Mordovian?

13         A.    That's something I selected based on a region of in

14  the world I'm familiar with.

15         Q.    Okay.  And you speak with some accent.  Are you

16  from that region of the world?

17         A.    Not exactly from there but close enough.

18         Q.    Okay.  And what does it say?  What did you say to

19  start the conversation?

20         A.    Please let me know account info.  I'm at TD.

21  Thanks.

22         Q.    And to avoid some reading, the jury read many

23  LocalBitcoin chats, and this little paragraph here will look

24  very familiar to them.  So I will not read it, but I will just

25  say that the requirements were, one, a close-up of your
```

1    government ID, two, one including your face and holding a

2    piece of paper with these words on it:  I certificate that I

3    am buying bitcoins from the Shire Free Church.

4             Did I read that right?

5    A.    Yes.

6    Q.    And going forward, now at 7:33 p.m., FTL_Ian, which

7    we've already talked a lot about says:

8             Don't forget to get the teller's name and branch

9    phone number and do mark complete when you are done.

10            And then it says TD Bank, right?

11   A.    Yes.

12   Q.    And the account name is Colleen M. Fordham?

13   A.    Yes.

14   Q.    Did you know Colleen M. Fordham?

15   A.    No.

16   Q.    And it's a personal checking account, right?

17   A.    Yes.

18   Q.    And then what do you say just right above that?

19   A.    Okay.

20   Q.    And then the next communication is -- well, you say

21   something else here at 7:52, right, going up?

22   A.    Yes.

23   Q.    What do you say?

24   A.    Where are we?

25   Q.    7:52.

 1        A.    Oh.  I'm sorry.

 2              Sent.

 3        Q.    All set.  I'm leaving you positive feedback.  I

 4   would appreciate you doing the same for me.  Thank you.

 5   Please spread the word of the peace and freedom that bitcoin

 6   can bring the world.  Also you will not need to provide ID

 7   initially in future trades, thank you.

 8              So that was pretty straightforward, right?

 9        A.    Yes.

10        Q.    Okay.  And was the ad that you were responding to

11   on LocalBitcoins the one printed up here at the top?

12        A.    Yes.

13              MR. AFRAME:  And can we just blow up the

14   disclaimer?

15        Q.    Disclaimer:  What you do with your bitcoin is your

16   business.  Don't tell me what your plans are.

17              Did I read that right?

18        A.    Yes.

19        Q.    Okay.

20              MR. SISTI:  Could we have that read?  That wasn't

21   entirely read.

22              MR. AFRAME:  I'm not sure what you're asking me.

23              MR. SISTI:  The disclaimer.

24              MR. AFRAME:  You want me to read more of the

25   disclaimer?  Sure.

1          MR. SISTI:  I want the disclaimer read.

2          THE COURT:  Well, you don't have to do it.  It's up

3    to you.  He can do it if he wants to.

4      Q.    What you do with your bitcoin is your business.

5    Don't tell me what your plans are.  If you do, meaning tell

6    me, I reserve the right to refuse the sale.

7          Did I read everything we can see there?

8      A.    Yes.

9          MR. SISTI:  Thank you.

10     Q.    And if we go to 602, this is a receipt.  Who's

11   handwriting is that, sir?

12     A.    Mine.

13     Q.    And there's a dollar amount.  How much?

14     A.    $502.

15     Q.    And was that the amount you did this first

16   transaction for?

17     A.    Yes.

18     Q.    And so -- and the date, do you see the date?

19     A.    Yes.

20     Q.    What is it?

21     A.    September 11, 2019.

22     Q.    And is this the receipt from that first

23   transaction?

24     A.    Yes.

25     Q.    Okay.  And about a month later did you do a second

1    transaction on LocalBitcoins with FTL_Ian?

2         A.   Yes.

3              MR. AFRAME:  And, again, if we could look at 603.

4    If you go to the end, starting from the bottom, a little bit

5    up.

6         Q.   Again, we see -- this is on November 13, 2019, and

7    we see what I'll refer to the jury now as standard

8    instructions, and the bank name is First Technology Federal

9    Credit Union, and now who's the account?

10        A.   Ian B. Freeman.

11        Q.   It's a personal checking account, and it says:

12             Your reason for deposit, if asked:  Purchase of

13   rare coins/investment.

14             Did I read that right?

15        A.   Yes.

16        Q.   Do you have any side conversations with Mr. Freeman

17   besides these?

18        A.   No.

19        Q.   Did you give him any information about your desire

20   to purchase rare coins?

21        A.   No.

22        Q.   Did you tell him you were investing?

23        A.   No.

24        Q.   Whose idea was that?

25        A.   Mr. Freeman's.

1          Q.    Okay.  And then if we go up, it says -- at 5:36,
2     what does it say?
3          A.    Doing it now.
4          Q.    And if we go up further up above the documents.
5                FTL_Ian:  I am grateful for the opportunity to
6     serve you again.  Thank you.
7                And then you say?
8          A.    Thanks.
9          Q.    And then you say?
10         A.    I would like to buy more tomorrow or Friday.  Can
11    we do it off LocalBitcoins?
12         Q.    And why did you want to go off LocalBitcoins?
13         A.    It just would be easier to communicate directly.
14         Q.    And was it part of your role as an undercover?
15         A.    Yes.
16         Q.    And the response was:  Certainly.  Please reach out
17    to me directly via my Telegram user name at FTL_Ian.
18               And what was your response?
19         A.    Okay.  I will.
20         Q.    And did you in fact do that?
21         A.    Yes.
22         Q.    Before we do that, let's just look briefly at 6:04.
23    That last -- according to Mr. Freeman's instructions, that
24    last transaction was supposed to happen at the First -- the
25    deposit was supposed to be made to the First Tech Credit

```
 1   Union.
 2            Was this a deposit you made?
 3        A.   Yes.
 4        Q.   And was it on November 13, 2019?
 5        A.   Yes.
 6        Q.   And whose handwriting is at the top?
 7        A.   Mine.
 8        Q.   And where did you get those words that you wrote
 9   there?
10        A.   Per instruction from Mr. Freeman.
11        Q.   And is this the receipt for that transaction?
12        A.   Yes.
13        Q.   And if we go down, how much was this transaction?
14        A.   $502.
15        Q.   And whose signature is there with the P?
16        A.   Mine.
17        Q.   Okay.  And, again, was that a relatively
18   straightforward transaction?
19        A.   Yes.
20        Q.   After that did you communicate with Mr. Freeman on
21   Telegram?
22        A.   Yes.
23        Q.   And tell me how long did that -- not in an exact
24   number of days, but how long did that sort of conversation
25   with him go on?
```

```
 1          A.    Over a year.

 2          Q.    And did you keep a record of that conversation?

 3          A.    Yes.

 4          Q.    How did you -- where does the Telegram

 5    communication show up first?

 6          A.    On an application on the cell phone.

 7          Q.    Okay.  And then did you make a video sort of just

 8    capturing all of that communication?

 9          A.    Yes.

10          Q.    And did you provide that to my office?

11          A.    Yes, I did.

12          Q.    Okay.  And so I want to go through that as it

13    appeared between you and Mr. Freeman.

14                MR. AFRAME:  So let's pull up Government's Exhibit

15    605.

16          Q.    Do you recognize this?

17          A.    Yes.

18          Q.    What is this?

19          A.    This is the communication I had with Mr. Freeman on

20    Telegram.

21          Q.    Okay.  And whose name is at the top?

22          A.    Ian Freeman.

23                MR. AFRAME:  Are you able to zoom in on that little

24    photo?

25          Q.    And who is that a photo of putting up the V sign?
```

```
1        A.    Mr. Freeman.

2        Q.    And did you eventually meet Mr. Freeman?

3        A.    Yes.

4        Q.    And do you see Mr. Freeman in the courtroom?

5        A.    Yes.

6        Q.    And what color shirt is he wearing?

7        A.    Light blue.

8              MR. AFRAME:   Judge, can the record reflect that the

9    witness identified the defendant?

10             MR. SISTI:   We agree.

11             THE COURT:   He has identified him.

12       Q.    All right.   So is this a Telegram communication?

13       A.    Yes.

14       Q.    Just so we can follow, because we're going to read

15   it, who is speaking in the white?

16       A.    Mr. Freeman.

17       Q.    And who is speaking in the green?

18       A.    Myself.

19       Q.    Okay.   And what is the date that this began?

20       A.    November 13, 2019.

21       Q.    And what was the date of the last LocalBitcoins

22   transaction that we looked at?   And if you don't remember, I

23   can show you.

24       A.    It was around the same time.

25       Q.    In fact, if we went back to 604, do you see the
```

1    date on the receipt?

2         A.    Yes.  November 13, '19.

3         Q.    Okay.  So same day?

4         A.    Same day.

5         Q.    Okay.  All right.  So let's just start going.

6               I will be Mr. Freeman and you will be yourself.

7         A.    Okay.

8         Q.    Hello.

9         A.    Thanks again for quick BTC trx today on LBC.

10        Q.    And is that the transaction we were just talking

11   about?

12        A.    Yes.

13        Q.    Okay.

14              The trades work similar here, but since we don't

15   have LocalBitcoins in the way, I calculate the amount of BTC I

16   send based on the coinmarketcap.com price at the time your

17   deposit is made and the receipt photos provided.

18              My rate is the same, 12 percent for cash deposit.

19        A.    Is $500 your minimum?

20        Q.    Yes.  Please.  If you need less, I can recommend my

21   friend.  We work together.

22        A.    That would be great.  I can use your friend for 100

23   to $300 range.

24        Q.    He may have a $200 low end, but you'll have to ask

25   him.

1          MR. AFRAME:  And if we could just scroll to the

2     next -- all the way up so that the last bubble is off the

3     screen, if we can.  All right.  We'll do it from there.  Oh, I

4     guess that won't work.  Back down.  So scroll up as we just

5     did, and right there is fine.  All right.

6          Q.   So he may have a $200 low end, but you'll have to

7     ask him.  His user name is @Pope_Nobody.

8               And let me ask you.  Later on in this story do you

9     end up meeting the man named Nobody?

10         A.   Yes.

11         Q.   Okay.

12              Tell him I sent you.  He lives next-door to me.

13         A.   Great.  Thanks.

14         Q.   And that was November 13th.  So now we'll move

15    forward two days to November 15th.  Go ahead.

16         A.   Hey, Ian, can I purchase BTC today?

17         Q.   Yes, but I'm traveling and won't be able to send

18    the coins until later this afternoon.

19         A.   That's fine.

20         Q.   After sending the required receipt photo with the

21    words written on it as described in my terms, please take a

22    photo of your face with you holding the receipt next to it and

23    send me that as well, thank you.

24              And the bank:  First Technology Federal Credit

25    Union.  Ian B. Freeman.  Personal checking.  Your reason if

1    asked:  Purchase of rare coins/investment.

2              Did you have any conversations with Mr. Freeman

3    outside of what we're looking at here in the Telegram chat?

4         A.   No.

5         Q.   Did you talk to him about a desire for rare coins?

6         A.   No.

7         Q.   Did you talk to him about investing?

8         A.   No.

9         Q.   Okay.  Go ahead.

10        A.   I went to a different credit union and they're

11   having internal problem sending to this account, said to try

12   depositing to different account.  Do you have another account

13   to deposit to?

14        Q.   I just want to make sure the jury sort of gets

15   this.  You're an undercover, right?

16        A.   Yes.

17        Q.   So is everything you say to Mr. Freeman exactly

18   what's happening?

19        A.   No.

20        Q.   Was there actually a problem with the bank?

21        A.   No.

22        Q.   Why did you tell Mr. Freeman that?

23        A.   To see if I can get a different account number.

24        Q.   Okay.

25              Strange.  There are two other accounts associated

1    with that one.

2         A.    I'll try to back to the same bank from the other

3    day.  Went through now.

4         Q.    Okay.  And if we blow up that, so that's a receipt

5    from November 15, 2019?

6         A.    Yes.

7         Q.    And how much -- can you see how much that

8    transaction was for?

9         A.    $501.

10        Q.    Okay.  So similar to the other ones?

11        A.    Yes.

12        Q.    Okay.  Go ahead, sir.

13        A.    You will deposit BTC to my LocalBitcoins account?

14        Q.    I'll send it to whatever address you provide me.

15   Am still on the road, will be home by 6 p.m. Eastern, and will

16   calculate your BTC and send it then.

17        A.    Okay.  Let me know when you'll be ready to send.

18        Q.    Please send your preferred address.

19              MR. AFRAME:  Can you just stop?

20        Q.    We saw -- do you know what a QR code is?

21        A.    Yes.

22        Q.    Did we just see one?

23        A.    Yes.

24        Q.    What is that?

25        A.    It's the code.  It's the bitcoin wallet address.

1      Q.    Yeah, and below the QR code is a whole long string

2    of letters and numbers.  Do you see that?

3      A.    Yes.

4      Q.    What is that?

5      A.    That represents the QR code, the bitcoin wallet

6    address.

7      Q.    Okay.  Thank you.  And it starts 1CKQ, right?

8      A.    Yes.

9      Q.    Okay.  Carrying on:

10           Just got home.  Need two things.  One, a selfie

11   with you and the receipt.  I always need that, please.  Also,

12   please paste the address for me.  I can't use a screenshot.

13           And then did you follow that instruction?

14      A.    Yes.

15      Q.    I'm not going to make you read that, but is it the

16   same 1CKQ that was in the QR code?

17      A.    Yes.

18      Q.    Okay.  Go ahead.

19      A.    I'll send you a selfie with receipt in a few hours.

20   Just left the house.

21      Q.    No worries.  I'll be around.  Sorry for the delay

22   today.  Usually I am not traveling.

23      A.    Sorry.  I first thought you needed selfie if issue

24   with funds.

25      Q.    No, just to make sure you are the depositor.  Many

1   scams out there, and I've learned the hard way.

2        A.    Understand.

3        Q.    Who's that?

4        A.    Myself.

5        Q.    And what are you doing?

6        A.    Per Ian's instruction, sending a selfie with the

7   receipt.

8        Q.    Sent.  .0518 BTC.  Thanks for your patience.

9        A.    Got it, thanks bro.

10        Q.    And this was still in November, right?

11        A.    Yes.

12        Q.    And now we've jumped ahead a little bit of time?

13        A.    Yes.

14        Q.    It's Christmas 2019?

15        A.    Yes.

16        Q.    Go ahead.

17        A.    Merry Christmas and Happy New Year.

18        Q.    Thank you for your patronage and same to you.  You

19   didn't do anything on Christmas, right, as far as a

20   transaction?

21        A.    No.

22        Q.    Why did you reach out to him on Christmas?

23        A.    Wishing him a happy merry Christmas to keep the

24   conversation going.

25        Q.    Okay.  And then we jump forward from December 25,

```
1   2019, to March 17, 2020, and just to -- I don't know if
2   they'll need orientation, but something important in the world
3   happens between those two dates, right?
4        A.   Yes.
5        Q.   What happens between December 25, 2019, and March
6   17, 2020?
7        A.   It was the pandemic.
8        Q.   Okay.  And so are we going to see some discussion
9   related to the pandemic?
10       A.   Yes.
11       Q.   All right.  Go ahead.
12       A.   Hey, amigo, you still selling BTC?
13       Q.   Yes.  Have Chase for cash deposit.  Also can do
14  wire, cash by mail.
15       A.   Nice.  I may hit you up in next few days.  What's
16  max you can do per day?  How you doing in this pandemic
17  nonsense?
18       Q.   Sales are brisk.  I can handle a lot per day.  What
19  do you need?  I have plenty of coin on hand.
20       A.   I can imagine.  I may need anywhere from 5K to 20K.
21       Q.   No problem.  Cash deposit?  Wire?  Cash by mail?
22       A.   I may do each method to spread out if you know what
23  I mean.  I can start out with cash deposit and wire first.
24       Q.   Sounds like three times the work, but whatever
25  makes you feel good.
```

1      A.    Different account numbers this time?

2      Q.    Yes, the last credit union froze my account.

3            And then it's Chase Bank.  Church of the Invisible

4    Hand.  Account location:  Michigan.  Church location:  New

5    Hampshire.  Reason for deposit:  Church donation.

6            Did I read all that right?

7      A.    Yes.

8      Q.    So earlier you had been told to write -- what were

9    the reasons you were told to write for the reasons for the

10   deposit before?  Do you remember?

11     A.    Purchase of rare coins/investment.

12     Q.    And what are you being asked now?

13     A.    Church donation.

14     Q.    Are there any kind of side conversations going on

15   about you wanting to donate to the Church of the Invisible

16   Hand?

17     A.    No.

18     Q.    Who's providing that idea to you?

19     A.    Mr. Freeman.

20     Q.    Do you have any idea why?

21     A.    No.

22     Q.    Okay.

23     A.    Send me the info.  I'll see maybe this week

24   sometime.  That sucks.  I had that before.  Awesome.  Why they

25   freeze you for?

1    Q.   All banks and CUs will close cash deposit accounts

2    eventually.  I've lost dozens of accounts over four years.

3    They don't like cash deposits coming in from all over.  It's

4    not illegal, but they can get in hot water with the regulators

5    over it.

6    A.   I see, that's why BTC way to go.  You do lots of

7    transactions.  Maybe that's why.  Gotta be careful with the

8    banking system.  I prefer meet in person to avoid the system.

9    Q.   And was that part of your undercover strategy when

10   you say I prefer meet in person to avoid the system?

11   A.   Yes.

12   Q.   What were you trying to do?

13   A.   To do a transaction in person.

14   Q.   I've seen them take down accounts with limited

15   transactions.  It doesn't seem to matter.  They hate cash.

16   A.   Yup.  What you think of this corona stuff?

17   Q.   Insane reactions.  Total police state coming on.

18   It's crazy.

19   A.   Agree.  Is NH safe?  Still thinking of checking

20   that out.  Keep hearing positive things.

21   Q.   There's a ton of people who are armed here.  Common

22   criminals will get wiped out if they try some shit.  But the

23   problem is the state cracking down on freedom.

24   A.   Sweet.  Easy to own a weapon there?

25   Q.   If you're not a felon, yes.

1     A.    You probably got a AK-47?  LOL.  Probably less

2  crime if everyone armed.

3     Q.    I had one, sold it to someone.  Don't have to fill

4  out paperwork either if it's a private sale to someone you

5  know.  People have been lining up and selling New Hampshire

6  gun stores out of ammo.

7     A.    I have 380 Bodyguard here.  Small and convenient I

8  bet.

9     Q.    NH is very different from NY.  NY is number 50 on

10  the freedom in the 50 states study.

11     A.    You open carry in New Hampshire?  Yeah NY is

12  getting worse.

13     Q.    I have, yes.

14     A.    Thanks, bud, I'll keep you posted.

15     Q.    And we just went forward, that was March 17th, and

16  now we're at April 7th, correct?

17     A.    Yes.

18     Q.    Go ahead.

19     A.    Hey Ian, I'm ready to buy BTC, can do tomorrow

20  possibly.  Account info still same?

21     Q.    Chase, yes.

22     A.    Didn't get a chance to go to Chase today.  We have

23  one branch and drive-through was packed each time I got there.

24  We'll try again tomorrow.  Want to do 3K.

25     Q.    Okay.  No problem.

```
1          A.    Can you do through credit union again?

2          Q.    I have no credit union for cash at this time.

3    Sorry.  Can take wire transfer if that's easier.

4          A.    Okay.  I may do that.  I have KeyBank account.

5          Q.    Let me know if you want wiring info.

6          A.    Sure.  I think that will be quicker.

7          Q.    It's okay to send online or over the phone.

8          A.    Online is fine here.

9          Q.    And again he provides banking information now at

10   the JP Morgan Chase Bank.  Church of the Invisible Hand church

11   donation with a church address of 73 Leverett Street, Keene,

12   New Hampshire.

13         A.    Thanks.

14         Q.    If you can print a receipt online, that's cool.  If

15   not, just write this note on a blank piece of paper:  Write on

16   wire confirmation receipt filling in the blanks, I, blank,

17   authorized and completed a wire transfer in the amount of

18   blank USD for the purchase of bitcoin from FTL_Ian on

19   Telegram.  I understand that this transaction is

20   non-refundable.  Then photo it and yourself holding it.

21         A.    Will do.  If I get to Chase Bank, I can still

22   deposit cash into that account, correct?  I try to avoid wire

23   fees.

24         Q.    Yes.  And this is now April 9th two days or a day

25   later.  Who's in that photo?
```

```
1        A.    Myself.

2        Q.    You?

3        A.    Me.

4              MR. AFRAME:  And could we just open it up, blow it

5   up?

6        Q.    Does it say:  I, Pavel -- can you read the words at

7   the top of the -- are those the words that you were asked to

8   write on the receipt?

9        A.    Yes.

10       Q.    And going down, yeah, are those the words?

11       A.    That's my handwriting, yes, per Ian's instruction.

12       Q.    And I just read some words out loud from the chat.

13  Did you then write those words as instructed?

14       A.    Yes.

15       Q.    And how much was this transaction?

16       A.    $3,000.

17       Q.    Okay.  And this bitcoin address starts 18YT, right?

18       A.    Yes.

19       Q.    Okay.  We don't need to read all of that.

20             Keep going from the next bubble.

21       A.    Let me know when you send it.

22       Q.    What did you deposit?

23       A.    $3,000.

24       Q.    That is not in cash.

25       A.    They wouldn't take cash.  Made me get money orders.
```

1    Q.    Did that actually happen?

2    A.    Yes.

3    Q.    Hmm, strange.  It's a business account so it should

4    take cash.  Maybe the branch you were at did not realize that.

5    A.    Who knows.

6    Q.    Unfortunately we will have to wait until tomorrow

7    morning when they should clear.

8    A.    Ah, okay, let me know.  I thought money order is

9    like cash.

10   Q.    No.  Sorry.  Usually they clear next day.  Was it

11   just one MO or more than one?

12   A.    No prob.  Will wait till it clears.  Three total 1K

13   each.  Keep me posted.

14   Q.    Please ping me in the morning to remind me to check

15   on it.  Thank you.

16   A.    K.

17   Q.    So at this point you've made a series of cash

18   transactions dating back to September of 2019, right?

19   A.    Yes.

20   Q.    And has Mr. Freeman provided you the reasons you

21   should put for those deposits?

22   A.    Yes.

23   Q.    And you testified -- well, did he ever ask you for

24   any information about exactly why you're making all these cash

25   deposits to buy bitcoin?

```
 1        A.    No.

 2        Q.    Has he asked you any reason at all?

 3        A.    No.

 4        Q.    Has he asked you anything about the source of

 5   funds?

 6        A.    No.

 7        Q.    Going to April 10, 2020.

 8        A.    Cheers.

 9        Q.    It looks like it cleared.  You still want it sent

10   to --

11              And then that same bitcoin address appears again,

12   right?

13        A.    Yes.

14        Q.    And your response?

15        A.    Yes.

16        Q.    Sent.

17              And then there's a long number, which is the amount

18   of bitcoin, that starts .38 that was sent.

19              Thank you.

20        A.    Thanks bro.  Hate dealing with banks these days.  I

21   may need to do another 5 to $6,000 in the next week or two.

22        Q.    Okay.  No problem.

23        A.    Would bank check work for you if I mailed it?  I

24   mainly deal with cash, but mailing hard cash may be risky,

25   idk.  I don't know.
```

1    Q.   So you just told him you deal mostly with hard

2    cash?

3    A.   Yes.

4    Q.   And his response is:

5         I do accept cash by mail, also cashier's check is

6    fine.  You just have to wait until it clears.

7    A.   I'll let you know.  How about meet in person if

8    anything?

9    Q.   Where are you located?

10   A.   Outside of Albany, but often have work in Boston

11   area.  Also would love to swing by Keene someday.  I'm also in

12   Vermont often.  Maybe we can meet sometime once this corona

13   stuff settles down.

14   Q.   I don't usually do sales in person, but I do

15   operate two crypto vending machines here in Keene.  We do have

16   meet-ups every six days here.  If you find yourself over this

17   way and need some coins, Thirsty Owl is open 7 days a week.

18   A.   Oh, nice.  I would love to do meet-up as well.  Do

19   you still do meet-ups these days in this environment?

20   Q.   Sure.  I don't believe the government and don't

21   care anyway.  I would rather have freedom with risk than

22   authoritarian "safety."

23   A.   Right on.

24   Q.   The local libertarians here are having a nightcap

25   event tonight in Keene where we've been openly drinking for

1  the last two weeks in Central Square with at times over ten

2  people, and we've been thankfully ignored by police.

3          Oh, and, yes, you can spend crypto at Thirsty Owl,

4  so if you need some take-out you can pay with BTC, Dash, BCH

5  or BSV.

6      A.   Sweet.

7      Q.   11:59 p? on Friday nights.

8      A.   Yeah, such gatherings don't fly here in New York

9  where I'm at.  I would def come out tonight.  Only I have to

10 travel the opposite direction this weekend.

11     Q.   And that was April 10th, and now we just went

12 forward two weeks to April 24th, correct?

13     A.   Yes.

14          Hey Ian, happy Friday, I would like to do another

15 transaction.  Want to get more BTC before next month.  Do you

16 think value of BTC will go up in the future?

17     Q.   Okay.  I don't make predictions on its price.  But

18 Chase closed my account.  Do you want to try BOA?

19     A.   I'm just trying to get rid of cash, LOL.  I guess

20 whatever works.  Do you have a new BOA?  Not sure if you gave

21 it to me before.

22     Q.   Yes.  Bank of America.  Church of the Invisible

23 Hand.  Church location:  New Hampshire.  Reason for deposit:

24 Church donation.

25     A.   Sure.  Send it over then maybe next time can do by

1    mail if you send address.

2         Q.   Ian Freeman, 63 Emerald Street, No. 610, Keene, New

3    Hampshire, 03431.

4         A.   Do you have a KeyBank account any chance?

5         Q.   I did in the past, but they closed it.

6         A.   Got it.  That's what I have now.  BOA gave me

7    issues in the past.  Most likely I will do transaction next

8    week as I'm traveling today.  Let me know your preferred

9    method.  I want to exchange 5K.

10        Q.   It's up to you.  Whatever is most convenient.  You

11   are the buyer.

12        A.   I guess I meant mail preference.  Wasn't sure if

13   you wanted regular mail, UPS, et cetera.  Some prefer one

14   service over another for tracking.

15        Q.   All right.  So you were going to send him how much

16   money?

17        A.   $5,000.

18        Q.   And you were going to do that through some kind of

19   mail service?

20        A.   Yes.

21        Q.   And what did you tell him about what kind of money

22   you have, cash, or what had you told him already?

23        A.   I previously told him I had cash.

24        Q.   Okay.  And you asked him here about different kinds

25   of mail, UPS, et cetera?

1          A.     Yes.

2          Q.     And you say some prefer one service over another

3     for tracking purposes, right?

4          A.     Correct.

5          Q.     And so we've seen everything in writing so far,

6     like a text exchange, but does Telegram have other features?

7          A.     Yes, such as voice communications.

8          Q.     So like a voice memo?

9          A.     Yes.

10         Q.     And so do you know by looking at your Telegram

11    chat -- there's a blue circle with an arrow.  Do you know what

12    that is?

13         A.     Yes.  It's a voice recording I received.

14                MR. AFRAME:  All right.  Can we play that now?  I

15    think you're okay for this one.  So that's 606, which is just

16    this audio but just pulled out so we can play it.

17                (Audio played)

18                MR. AFRAME:  I thought it would be louder.  Why

19    don't you use the headphones.

20                THE CLERK:  Just pull the headsets apart and then

21    they will come on, and the volume is in the front.

22                (Audio continues to be played)

23         Q.     Did you express anything about concern about a

24    warrant?

25         A.     No.

1       Q.   Who brought that up?

2       A.   Mr. Freeman.

3       Q.   Okay.

4            MR. AFRAME:   Let's turn back to the chat.   I think

5   we skipped -- yeah.

6       Q.   Go ahead.

7       A.   Good stuff.   I may still try to get official bank

8   check if that works for you too.

9       Q.   That's fine, just have to wait until it clears.

10      A.   Okay, will let you know next week.

11      Q.   And so that says April 24th, and now we're going to

12  move ahead to May 4.

13      A.   Hey Ian, I had issues with bank last week, couldn't

14  take out my cash.   It's crazy.   I hate dealing with banks

15  these days, hope to take care of it this week and send you

16  check.   Is it same mailing address for you?

17      Q.   It says in blue:   Forwarded from Ian Freeman.   And

18  then in black:   Ian Freeman, 63 Emerald Street, No. 610, Keene

19  New Hampshire, 03431.

20      A.   Thanks.   When's your next meet-up?

21      Q.   Saturday 5:00 p.m. in Central Square.   Technically

22  starting at Fritz, a restaurant there on the Square, and then

23  there's sort of an advertisement for it, and it says meet-up,

24  there's a link, and then it says:   Keene crypto meet-up at

25  Fritz on Central Square, Saturday May 9, 2020, 5:00 p.m.

1              Turns out they weren't open past 4:00 on Sundays.

2    So let's do this on Saturday when they are actually open.  One

3    of our attendees a couple years ago told us the guy that --

4              And then it cuts off.

5              MR. AFRAME:  If you could stop it right there and

6    blow up the picture?

7         Q.   In the middle of the photo there's a man with a

8    heavy beard.  Do you see that person?

9         A.   Yes.

10        Q.   Based on subsequent interactions, do you know who

11   that person is?

12        A.   Yes.

13        Q.   Who is that?

14        A.   Nobody.

15        Q.   And you mean -- you actually mean somebody, right?

16   Somebody named Nobody?

17        A.   Yes.

18        Q.   And earlier when we were going through your chat

19   there was some discussion about Pope_Nobody.  Do you remember

20   that?

21        A.   Yes.

22        Q.   How did Mr. Freeman describe Pope_Nobody in the

23   chat?  Do you remember what his role was?

24        A.   Someone who can do a transaction with me for

25   bitcoin.

1          Q.    Okay.  And what did he say about their relationship

2     when it came to that?

3          A.    I believe that it was his friend.

4          Q.    Okay.  And there's a man in the back.  If you

5     looked quickly, you would think -- with a shirt on.  If you

6     looked quickly, you would think it's a Bruins symbol, but what

7     is it really?

8          A.    It's a symbol for bitcoin.

9          Q.    Okay.  And in the foreground similarly on the man's

10    winter hat?

11         A.    Bitcoin symbol as well.

12         Q.    Okay.  All right.  So after the photo of Mr. Nobody

13    you continue on.

14         A.    Restaurants open there?

15         Q.    Only for take-out.

16         A.    I see.  Nice pic.  Can't wait to meet you guys.

17    Where can I get some of that crypto apparel?

18         Q.    What are you referring to there?

19         A.    The clothing.  The hats and the shirts.

20         Q.    Okay.

21               I looked up bitcoin knit cap or something a couple

22    years ago, came from the UK.  I think the shirt in the

23    background is from 6 dollar shirts website.

24         A.    Sweet.  Thanks for info, bro.  I'll def come down

25    hopefully soon when things open up and hang out with you guys

 1    and maybe do another trx then too.  Goodnight, bro.

 2         Q.    And when you say trx, what did you mean by that?

 3         A.    Transaction.

 4         Q.    Okay.  And then there's a picture of Alf with a

 5    disco outfit.  Who's that from?

 6         A.    Mr. Freeman.

 7         Q.    May 6, 2020.

 8         A.    Hey, Ian, I mailed check for 5K.  Let me know when

 9    you get it.

10         Q.    Okay.

11               And now May 11, 2020.

12         A.    Happy having.  Did you receive my check yet?

13         Q.    No, was just at the mailbox today.

14         A.    Thanks for checking, should be any day now, wasn't

15    expecting to take so long.  Maybe will just meet in person

16    next time, will be much quicker.

17         Q.    And then you provided tracking information?

18         A.    Yes.

19         Q.    Going to the mailbox today.

20               MR. AFRAME:  Oh, I think we skipped.

21               Up a little bit.

22         Q.    Okay.  Whose is the thumbs up?

23         A.    Mine.

24         Q.    $5,000 cashier's check received.  Check deposited.

25    Should clear tomorrow.

1        A.    Okay.

2        Q.    Bad news.  My account access has been locked and my

3   bank is sending me a letter regarding what is happening.  The

4   fraud department says it may be because the account is newer.

5   We are going to have to wait as it's not clear which

6   transactions they are taking issue with.  As of now your check

7   has not cleared yet.  Not sure how many more days it will

8   take.

9        I am very sorry, but this shit always happens

10  eventually with bank accounts.

11        It definitely would have been faster had you just

12  come buy it with cash from a vending machine here.  Sorry,

13  Pavel.  I will follow up on this with the bank diligently.

14        A.    Thanks for letting me know.  I want to 10K plus

15  next time so will def come in person, hopefully soon after

16  this clears.  That's why I hate banks too, but sometimes

17  there's just no way around.

18        Q.    Still no letter from Citizens Bank, FYI, still

19  locked out.

20        A.    Okay.

21        Q.    Now we're at May 18th.  So we're having this issue

22  with the bank.

23        Spoke with them by phone today.  They say account

24  is under review and I will need to wait on the letter to find

25  out more.  So far the account available balance has not

1  reflected the deposit from last week.

2      A.   Got it.

3      Q.   Had you deposited 5,000 the last week?

4      A.   Yes.

5           Hey Ian, I was just wondering which bank giving you

6  problems, so hopefully I avoid them in future.  KeyBank gave

7  me issues before, too.

8      Q.   They are the all the same, but it's Citizens Bank.

9      A.   They're bad too.

10     Q.   The hold has been removed from your check.  My

11 account is still locked, but I am able to check the balance by

12 phone.  To what address shall I send the BTC, and is there a

13 long bitcoin address there?

14     A.   Yes.

15     Q.   BC1Q, and this is May 20th.

16          I am going to lower my rate for the extra hassle to

17 10 percent permanent reduction.

18          And then there's a long number starting with .4,

19 and that's BTC, right?

20     A.   Yes.

21     Q.   Go ahead.

22     A.   Appreciate it, thanks.

23     Q.   Thank you for your patience.  We'll be doing

24 bitcoin pizza day here in Keene on Friday at 4:00 p.m. at

25 Little Zoe's.  Should be a good group.

1       A.      Thanks, man.

2       Q.      May 29th.

3       A.      Hey, Ian, was wondering when your next meet-up will

4   be.

5       Q.      Crypto or otherwise?  Well, they are all the same

6   because it's the same people attending, but the crypto meet-up

7   can sometimes attract a newbie.  So most if not all of the

8   people at tonight's nightcap at Keene at 11:59 p.m. week 10

9   are crypto users.

10      A.      I'll be in the area in a few weeks, 19th or 20th,

11  was hoping to meet up to buy BTC and meet you guys.  I'm

12  planning to make a good deal that weekend and wouldn't mind

13  stopping by, don't want to deal with these banks anymore.

14  They're getting worse each time as you already know.

15      Q.      I am sadly not selling at this time due to losing

16  two bank accounts.

17      A.      That's too bad.  Would you possibly do cash deal if

18  we met in person to avoid bank?

19      Q.      Normally I would say yes, but at this time I

20  cannot.  Sorry about that.

21      A.      I understand.  Let me know when you will again.

22  It's hard to find someone to trust these days.

23      Q.      Will do.

24      A.      I still wouldn't mind stopping by for meet-up that

25  weekend if you will have it.

1          Q.    We have a libertarian meet-up every Sunday at 6:00

2     p.m. which is basically the same people that come to the

3     crypto meet-ups which are every six days here.

4          A.    Nice.  Most likely I'll be there this time.  Really

5     looking forward.  Really thinking this time about relocating

6     too.  How long are meet-ups usually?

7          Q.    An hour.  Sometimes longer.  It's just people

8     together.  There's no structure.  Tonight's nightcap can

9     easily go a couple hours.

10          A.    Cool.  Also do you have anyone you recommend to buy

11     BTC?  I want to do 10 to 15K next time.

12          Q.    At this time, I don't, sorry.

13          A.    No prob.  How long you think you won't be selling?

14          Q.    For as short a time as possible, but what that

15     means for banks, I don't know.

16          A.    I see, keep me posted.  When's your next nightcap

17     in Keene?

18          Q.    Tonight 11:59.

19          A.    Sorry.  I meant after tonight's.

20          Q.    Every Friday, same time.

21          A.    Thanks Ian.

22          Q.    And now it's June 6th.

23          A.    Hey Ian, is it bad protest in Keene or not violent?

24     I'm still really want to come in next week or two so hopefully

25     it will be safe.

1   Q.   Peaceful.

2   A.   Thanks.

3   Q.   And now June 10th.

4        Hi, Pavel.  My partner, Aria, is now able to accept

5   wires and money orders.  If you would like to trade with her,

6   please let me know and I will introduce you.  She is trusted

7   and is my neighbor in real life.

8   A.   Hey Ian, thanks, that would be great.  Would she be

9   around next weekend?  If all goes well, I plan on stopping by

10  for the nightcap.  I'll try to deposit some cash for money

11  orders beforehand if all works out and would like to do a deal

12  otherwise maybe in person since I'll be there anyway.

13  Q.   She and I are always at the nightcap.

14       And then there's a thumbs up, and that's from who?

15  A.   Myself.

16  Q.   All right.  Now we're at June 15th, 2020.

17  A.   Hey Ian, nightcap is held at town square?

18  Q.   Yes, it's called Central Square.

19  A.   Sounds good.  Looking forward to exploring Keene

20  this Friday.  Maybe we can meet up earlier before midnight if

21  you'll be around.  Do you guys gather at midnight or earlier?

22  Q.   11:59 p.m. Fridays.

23       Thumbs up, who's that from?

24  A.   Myself.

25  Q.   Police finally targeted us this weekend.

1        And then there's an article with the title Keene

2   Police Prove it's Business as Usual by Targeting Peaceful

3   Nightcap Event which appeared in the freekeene.com.

4        And then if we could go forward.

5        A.    That sucks.  They got nothing better to do.  Still

6   on for this Friday?  Come on, parking ticket?  It's not like

7   the cars are unattended.  They're not in anyone's way.

8        Q.    Yes, still on.

9        FYI, I will be on a campground between June 22nd

10  and July 5th.  I will be able to receive mail at the

11  campground.  Do not send any mail to arrive to my Keene, New

12  Hampshire, address during this time frame, thank you.  If you

13  would like to send me a shipment at the campground, just let

14  me know and I'll give you the address.  There will be a bunch

15  of libertarian crypto people there.

16       And then it's a website called porcfest.party.

17       A.    Nice.  I'll try to make it.  Are you around

18  tomorrow evening?

19       Q.    Yes, on the radio after 7.

20       A.    I see.  Maybe we can meet up before or after the

21  show.  I plan to be in Keene around 6.  Is radio show public?

22       Q.    Yes.

23       And then there's a Free Talk Live link with -- it

24  just says Free Talk Live with a description.  Go ahead.

25       A.    I guess I meant whether I can come in and observe

1    or participate, LOL.

2         Q.   I don't think we'll have an open seat, but you're

3    welcome to come sit in.  Come on by 73 Leverett Street for

4    that.

5         A.   Nice, I would love to.  Will def stop by.  I can be

6    there before 7.  How long is it last usually?

7         Q.   Three hours.  You're welcome to stay as long as

8    you're entertained.  Then afterwards we do an Internet-only

9    show called Nobody Tells the Truth.  Then go to the square for

10   the nightcap?

11        A.   Sounds good.  I hope to buy some crypto too if it

12   works out.

13        Q.   June 19th.

14        A.   Hey Ian, was wondering if you would be able to meet

15   before your radio program starts.  I was hoping to convert

16   cash to BTC, explore Keene, then catch up with you after the

17   show.

18        Q.   I'm on hold with Chase.  No way to know how long

19   that will take.  There's a slick new vending machine at

20   Thirsty Owl, and you can buy food with crypto there too if you

21   want.

22             Just stop for one second.  I'll show you

23   Government's 607.  Do you know that?

24        A.   Yes.

25        Q.   What's that?

1        A.    Thirsty Owl.

2        Q.    Is that where you were going at that time?

3        A.    Yes.

4        Q.    Okay.

5              MR. AFRAME:  Go back.  All right.  So right there.

6        Q.    There's a slick new vending machine at the Thirsty

7   Owl and you can buy food with crypto there too if you want.

8   Let me know if you're going there and I'll drop the rate for

9   you.  Have it up last couple of weeks due to bank exchange

10  issues.

11             And was there a deal you had reached earlier or a

12  discount Mr. Freeman had provided to you?

13       A.    Yes.

14       Q.    And what percent with the discount was he going to

15  provide?

16       A.    10 percent.

17       Q.    Okay.  And that's a photo sent by Mr. Freeman to

18  you?

19       A.    Yes.

20       Q.    Okay.

21       A.    Ah, I have 11K to get rid of.  Don't want it to be

22  too suspicious with that much cash.  I should be there around

23  6:15 to 6:30.  Want to hang around town without the cash if

24  you know what I mean.

25       Q.    We've had old ladies go there and drop 40K in that

1  location.  But, yeah, I can help you in person later.  Thought

2  you might already have been here and looking to buy

3  immediately.

4      A.   LOL.  I will try myself but if you can be there

5  6:30 for assistance, that would be great.  I've never used

6  this kind before.  First time here.  Later is fine, whatever

7  time works for you I would appreciate it.

8           MR. AFRAME:  Wait.  I lost just where it went.

9      Q.   It's a slick machine.  I recommend it.  No ID or

10  phone required to use it since it's a private sale of BTC?

11      A.   Can deposit to any crypto wallet?  Do I need to

12  have account?

13      Q.   No, your BTC wallet is where it sends to.  You can

14  scan it at the machine, then enter cash.

15      A.   Okay.  I will give it a try, just don't want any

16  forms filed on me if you know what I mean.

17      Q.   Oh, no way.  We have disabled all that nonsense.

18      A.   What percentage fee will it be?

19      Q.   I'll drop it to our usual 10 percent.  It's at 14

20  percent right now.  Just message me when you're there, 141

21  Winchester Street.

22      A.   Okay.  Sounds good.  I'll let you know when I'm

23  there.  If you can swing by, even better.  LOL.  Will be there

24  soon.

25      Q.   Okay, dropped rate to 10 percent.

1     A.     Just want to make sure your machine doesn't have

2     facial rec tech.

3     Q.     All ID factors are turned off.  It is a private

4     wallet-to-wallet sale, not money transmission, not money

5     transmission like most machines do.

6     A.     Awesome.

7     Q.     And then there's a photo and then it says:

8            Security says it's out of service.

9     A.     That's what I said, yes.

10           Security told me it was out of service.

11    Q.     Sorry.

12           That's false.  Calling the owner.

13    A.     It's limit 5K.  Do I need new wallet address to do

14    more?  I have 6,000 more.  Sorry, I know your radio show will

15    start soon.  I can do later in person 6K if you want.

16    Q.     Start another purchase.

17    A.     Okay.

18    Q.     There is no limit on the number you can do.

19    A.     All set.  I did two more transactions, 5K and 1K,

20    waiting for it to hit my wallet.  Awesome machine.  Thanks

21    man.  Let me know when you're free if before nightcap.

22    Listened to your show from last night.  Interesting things

23    from Belarusian guy, good stuff.  That's where I'm from.

24    Keene is such a cool town.

25    Q.     Like I said, feel free to swing by the studio.  I

```
 1    won't really have much time before nightcap, as we're on the
 2    air pretty much until then.
 3         A.   Got it.  I'll see you at nightcap then.
 4         Q.   Hey, we're here.
 5         A.   Will be there shortly.
 6         Q.   Now, if you could just stop there.
 7              You just told him you did an $11,000 cash
 8    transaction at the kiosk in the Thirsty Owl?
 9         A.   Yes.
10         Q.   And you did do that?
11         A.   Yes.
12         Q.   And did Mr. Freeman ask you any questions about why
13    you were having that much cash?
14         A.   No.
15         Q.   You've been watching now from September 11th of
16    2019, to June 20th of 2020, not quite a year but a good amount
17    of time.  Has he asked you a single question about why you
18    keep telling him you have all this cash?
19         A.   No.
20         Q.   On the night of June -- so at around midnight
21    between the 19th and the 20th, where did you go?
22         A.   I'm sorry.  Can you --
23         Q.   So there's been a lot of discussion about the
24    meet-up?
25         A.   Right.
```

1      Q.    We were at June 19th.  You did the transaction in

2  the machine.  You're in Keene.  Did you go and meet up with

3  Mr. Freeman and friends?

4      A.    Yes.

5      Q.    And where did you do that?

6      A.    At the town square in Keene.

7      Q.    And did you have a conversation with Mr. Freeman?

8      A.    Yes.

9      Q.    Was Nobody there?

10      A.    Yes.

11      Q.    Was Aria there?

12      A.    Yes.

13      Q.    Did you talk in more detail about what you do?

14      A.    Yes.

15      Q.    Did you disclose to Mr. Freeman that night at least

16  in your undercover story way what the source of all of that --

17  or that cash was?

18      A.    Yes.  I explained that I sell drugs.

19      Q.    And we'll get back to that in a second.

20            Now, that night did you wear a recording device?

21      A.    Yes.

22      Q.    Have you listened to the whole recording?

23      A.    Yes.

24      Q.    Overall, how would you describe the quality of the

25  recording?

1      A.    It wasn't too clear.

2      Q.    Clear in spots and not in others?

3      A.    There were too many people there so it was not

4  clear enough.

5      Q.    Okay.  And did you listen to the recording?  Could

6  you actually find the part where you talked about the drugs?

7      A.    No.

8      Q.    But does that actually come up later in this chat

9  in writing with Mr. Freeman?

10     A.    Yes.

11           MR. AFRAME:  Okay.  So we'll get to that, but there

12  is one part that we would like to play, and I would ask the

13  jury to pick up their binders because there's a transcript of

14  it as well.

15           The transcript -- well, actually, before you open

16  it -- I'll direct you to the right page in a second.

17     Q.    Have you listened to the full recording?

18     A.    Yes.

19     Q.    And we have a very short clip taken from that,

20  right?

21     A.    Yes.

22     Q.    Did you compare that clip to the full recording?

23     A.    Yes.

24     Q.    Does the clip accurately reflect what's on the full

25  recording?

1     A.    Yes.

2     Q.    Was a transcript prepared of this small section?

3     A.    Yes.

4     Q.    And did you compare the transcript words to the

5  clip?

6     A.    Yes.

7     Q.    To the best of your ability was it accurate to

8  what's on the recording?

9     A.    Yes.

10          MR. AFRAME:  Okay.  So I would ask the jury to open

11  the book to 1 to 609-B, and for this I would ask you to put on

12  the headphones.  And I would say this, just to give you a

13  warning.  There's going to be a little bit of static in the

14  middle of it.  So just be prepared.  I think that will be

15  uncomfortable for about a second and a half, and then you'll

16  hear the rest, okay?  This is only 30 seconds.

17          (Audio played)

18     Q.    Do you know whose voice that was in that recording?

19     A.    Yes.

20     Q.    Who was that?

21     A.    Mr. Freeman's.

22     Q.    Okay.  And was that a conversation between you and

23  him?

24     A.    Yes.

25     Q.    Was this with a lot of friends around?

1      A.    Yes.

2      Q.    Was he comfortable in the surroundings?

3      A.    Yes.

4            MR. AFRAME:  Back to the chat.

5            Okay.  All right.  So this happened on the term

6   from June 19th to June 20th, what we just heard.  So we looked

7   at this before, and then it's going to switch to June 20th.

8            Okay.  Stop.  Down a little.

9      Q.    All right.  So if we look, right, at 12-19 it says:

10           We'll be there shortly.

11           12:03 a.m., right?

12     A.    Yes.

13     Q.    So where were you going at 12:03 a.m. then?

14     A.    To the Friday night meet-up at town square.

15     Q.    Okay.  And then now we're further on into -- we're

16   into June 20th, and it says:

17           Please press the button from the robot in the

18   Monadnock decentralized currency room or it will boot you

19   after several hours.

20           And then you say?

21     A.    Thanks, bro.

22     Q.    Do you know what this is in reference to?

23     A.    It's one of the group chats from Keene from the

24   group of people.  So I guess if you don't use it for a while,

25   you have to login so it doesn't boot you.

1          Q.    Okay.  Just so the jury understands that, can you

2    explain to me what these group chats that you were just

3    referring to are?

4          A.    Mr. Freeman invited me to several group chats.

5    They're like -- the Telegram chat is one-on-one that I've had

6    with him.  The other group chat there's a lot of people in

7    there.  So you could get invited and chat with more than one

8    person.

9          Q.    And so did Mr. Freeman invite you?

10         A.    Yes.

11         Q.    And were you a participant or more just an observer

12   of the chats?

13         A.    Just an observer.

14         Q.    And what did you do with the information you

15   collected from those chats?

16         A.    Provided it to your office.

17         Q.    Okay.

18               MR. AFRAME:  Judge, can we approach for a second?

19               THE COURT:  You may.

20               The jury will take off the headphones now.

21               (SIDEBAR)

22               MR. AFRAME:  The witness will testify that this is

23   a -- he just described a bunch of group chats he was a part

24   of.  This document was part of the chats.  And I would seek to

25   introduce that now on the same tax evasion idea that we

1    offered the --

2              THE COURT:  Whisper.

3              MR. AFRAME:  -- stop paying taxes stop sign from

4    yesterday.

5              THE COURT:  Go ahead, Mr. Sisti.

6              MR. SISTI:  Thank you.

7              Yeah, it's not part of that stop taxes thing.  It's

8    separate and apart.  So there's no continuity with regard to

9    that, first of all.

10             Second, that's like a tiniest snippet of any kind

11   of group chat.

12             Third, there is a free speech aspect to this.

13             Fourth, many people have espoused that feeling.  In

14   fact, we have an ex-president that said he was smart because

15   he avoided paying taxes.

16             THE COURT:  That's true.

17             MR. SISTI:  Right.  So I don't know what that's all

18   about.  Maybe people do think suckers pay taxes and maybe a

19   lot of corporations think that, too.

20             THE COURT:  Yeah.  Objection overruled.  That's

21   clearly admissible evidence.  And in the context of this case

22   where there's four counts of tax evasion, that's clearly not

23   more prejudicial but probative.  It's admissible.

24                 (CONCLUSION OF SIDEBAR)

25        Q.   I'm just showing you what --

1           THE CLERK:  Wait a minute.  Wait.

2     Q.    I'm showing you what's been marked as Government's

3  612.

4     A.    Okay.

5     Q.    Did you provide this as part of the chat

6  conversations that you were observing?

7     A.    Yes.

8           MR. AFRAME:  I would ask to bring up 612.

9     Q.    Does that say Ian Freeman in blue?

10    A.    Yes.

11    Q.    And are the letters IF to the side in red?

12    A.    Yes.

13    Q.    In a big circle, yeah.  All right.  Let me read

14 this and tell me if I read it correctly:

15          Only suckers pay tax on crypto.  Also, how was the

16 obligation to pay taxes created in the first place?  I would

17 like to see where I opted in, cause I didn't, unless it was

18 under duress.

19          Did I read that correctly?

20    A.    Yes.

21    Q.    Showing you what's been marked as Government's 613,

22 was this also a document from the chats you were observing

23 that you provided?

24    A.    Yes.

25    Q.    Thank you.

1          MR. AFRAME:  If you could bring up Government's

2    613.

3        Q.    Tell me if I have read this correctly.  Do we see

4    Ian Freeman in blue?

5        A.    Yes.

6        Q.    And the big red circle with IF?

7        A.    Yes.

8        Q.    They sent a threatening letter to all the CVM

9    operators more than a year ago.  We all ignored it.

10          Did I read that right?

11       A.    Yes.

12       Q.    And then there's another person we're not

13    interested in, and then it says Ian Freeman again, right?

14       A.    Yes.

15       Q.    I'm not saying they won't try charging people.

16          Did I read that right?

17       A.    Yes.

18       Q.    Okay.  We'll return to the chat.  It's now July

19    30th of 2020.  Go ahead.

20       A.    Hey, Ian, thinking of coming to Keene again,

21    hopefully meet with you again --

22          THE COURT:  Slow it down when you read.

23          THE WITNESS:  Okay.

24       A.    Hey, Ian, thinking of coming to Keene again,

25    hopefully meet with you again and do another transaction.  Let

1  me know if you want to grab lunch in next week or two.  I also

2  wanted to get 20K BTC.

3      Q.    Thank you.  I enjoyed meeting you and don't want to

4  be rude, but unfortunately I can't sell you bitcoin because

5  you told me too much about what you do.  As you probably know,

6  I'm not opposed to your line of work, but I can't knowingly

7  help you with financial matters.  I hope you can understand.

8  You're certainly still welcome here in Keene, of course.

9      A.    Bummer.  I thought I had the perfect connection,

10 LOL.  Wish I didn't say anything now but I think I understand

11 your concerns.  I thought I only told you about cars, which is

12 my main thing.  I just had another bank account shut down the

13 other day.  Can't even use your ATM?  I told a few of my

14 buddies.  They all got excited.  Now don't even know what to

15 respond to them.

16     Q.    My answer to the question is, I can't KNOWINGLY

17 assist you with financial matters.

18          Before we go on, how is knowingly written in the

19 chat?

20     A.    In capital letters.

21     Q.    At least from your experience when you write

22 knowingly in a text message, what do you mean when you do

23 that?

24     A.    When I try to emphasize something.

25          THE COURT:  Wait a minute.  Are you asking when he

1    uses the word knowingly or when he uses capital letters?

2              MR. AFRAME:  Capital letters.

3              THE COURT:  I just wanted it to be clear.

4              MR. AFRAME:  Sorry if I asked that wrong.

5         Q.   When you use capital letters in a text exchange,

6    what do you mean?  What is the purpose of using all capital

7    letters?

8         A.   To exclaim or emphasize something.

9         Q.   Okay.  Go ahead.

10        A.   I guess I don't fully understand what is it that

11   you know that you can't sell BTC to me.  I've dealt with many

12   people before and you seem most reasonable and understanding

13   with similar thinking as me.  If there's any way you can

14   assist, I would greatly appreciate it as I have lots of

15   respect for what you do.  I will try to purchase BTC elsewhere

16   if I can and I still want to come to Keene.

17        Q.   You told me you sell drugs.  Therefore, to assist

18   you with buying bitcoin would be considered money laundering.

19   Money laundering requires knowledge of the illegal activity.

20             I don't think you are an undercover agent, but you

21   got a little too loose lipped.  So while I am not opposed to

22   the sale of drugs, I do need to be careful.  Sadly that means

23   I cannot KNOWINGLY sell bitcoin to you.

24             And just so the record is clear, how is knowingly

25   written by Mr. Freeman here again?

1          A.    In all caps.

2          Q.    Nearly every bitcoin seller the feds have taken

3   down have sold to an undercover stating they did something

4   illegal to get the money.  It's just not worth the risk to me.

5          A.    Those appear to be serious accusations.  I mean

6   money laundering words, I'm not well knowledgeable with these

7   as you are, but I can see where you're coming from.  I just

8   thought no big deal about selling some drugs to let you know

9   that since you're open-minded about that stuff.  I myself

10  always have to watch out for feds too.

11         Q.    I am very open minded.  I am an advocate for ending

12  the war on drugs and advocate of the responsible use of

13  various substances.

14         A.    Bravo brother.  If you're a responsible user of

15  those substances, there's no reason for government to tell you

16  what kind of substances you can put in your body.

17         Q.    You're preaching to the choir for sure.

18         A.    Maybe I'll try to do transaction in Portsmouth,

19  then drive to Keene and grab a drink or food next time you

20  guys will get together.  That would be great if you have

21  anything during lunch or dinner hour because that night drive

22  back was horrible.

23         Q.    And then there's a keenebitcoin.com Monadnock

24  Decentralized Currency Network.

25               So he just told you, right, he could not knowingly

1    work with you?

2         A.    Yes.

3         Q.    And then what's he doing here?

4         A.    Having a meet-up.

5         Q.    And did he send you the invitation?

6         A.    Yes.

7         Q.    And is he in that photo?

8         A.    Yes.

9         Q.    And is he showing the V sign?

10        A.    Yes.

11        Q.    In the back of the table?

12        A.    Yes.

13        Q.    Okay.

14              Our regular meet-ups are all daytime.

15        A.    Awesome.   This weekend I have some reservations but

16   next time for sure.

17        Q.    Recommend joining that group.   Location changes

18   every time.

19        A.    Got it, thanks.

20        Q.    Just to orient us in time, that was July 30th, and

21   now we've gone forward to August 24th.   So just under a month.

22              Go ahead.

23        A.    Hey Ian, I'm looking at some houses near Keene this

24   week.   Maybe will stop by the meet-up.

25        Q.    Sounds good.

 1              And then we'll stop there.

 2              And so did you come back to Keene the next day,

 3    August 25th?

 4         A.   Yes.

 5         Q.   And did you attend a meet-up?

 6         A.   Yes.

 7         Q.   And did you record that meet-up?

 8         A.   Yes.

 9         Q.   And did you use -- what recording methods did you

10    use that time?

11         A.   Video and audio.

12         Q.   And have you reviewed the full video meet-up?

13         A.   Yes.

14         Q.   And did we make a small clip?

15         A.   Yes.

16         Q.   And did you compare the clip of the meet-up to the

17    full video of the meet-up?

18         A.   Yes.

19         Q.   And was the clip accurate?

20         A.   Yes.

21         Q.   Okay.  And so this is 610-A which you will see on

22    the screen.

23              (Video played)

24         Q.   It's a little hard to hear, but you were there.

25    What did you ask in that part?

1       A.    I asked if I can do a transaction I believe at the

2   Thirsty Owl.

3       Q.    And what did he say about the machine?

4       A.    He said the machine is still there.

5             MR. AFRAME:  Okay.  And then we'll play it to the

6   end.

7             (Video continues to be played)

8             Take it back a little bit because the way it was

9   stopped we couldn't hear it.  We'll play it again just

10  through.

11            (Video continues to be played)

12      Q.    So he said it was still there, and then what did

13  you say?

14      A.    I said -- I asked if I can use it.

15      Q.    And what did he say?

16      A.    I can't tell you that you can use it.

17      Q.    Okay.  And you had been in a long, we've watched

18  it, a long relationship here with Mr. Freeman through the

19  Telegram.

20            Based on everything, what did you understand was

21  going on at that point?  What was your understanding of the

22  relationship at this point based on all the knowledge you had

23  accumulated?

24      A.    Based on my understanding and previous

25  communications with Mr. Freeman, I understood that, you know,

```
1    as a wink and a nod almost, you can use the machine.
2              MR. SISTI:  I'm going to object.
3              THE COURT:  Yeah, it's called speculation.
4         Q.   Okay.  What did you do next?
5         A.   I went to the Thirsty Owl.
6         Q.   Okay.  And what did you do once you got there?
7         A.   And I purchased approximately $20,000 in bitcoin
8    from the ATM machine.
9         Q.   And how did you do that?
10        A.   By physically going into the Thirsty Owl, putting
11   the cash into the machine, there were no identification
12   required just like the previous time, and got the bitcoin that
13   way.
14        Q.   Okay.  And if we look at 611, what are those?
15        A.   Those are the receipts I received from the bitcoin
16   machine.
17        Q.   And the first three are for how much?
18        A.   $5,000.
19        Q.   And the second one was for how much?
20        A.   $5,000.
21        Q.   And the third one?
22        A.   5,000.
23        Q.   And the fourth one?
24        A.   4900.
25        Q.   And that is just under $20,000, right?
```

1        A.    Yes.

2        Q.    And what was the fee that this machine charged on

3   each of those transactions?

4        A.    14 percent.

5        Q.    So that was August 25th?

6        A.    Yes.

7        Q.    And after that did you initiate any further

8   communication with Mr. Freeman?

9        A.    No.

10        Q.    Did he initiate communication with you?

11        A.    Yes.

12        Q.    And when was that?

13        A.    December 28, 2020.

14        Q.    December 27, 2020?

15        A.    I'm sorry.  27th, 2020, of December.

16        Q.    And I'll just read it and we'll finish:

17              Got any plans for New Year's Eve?

18        A.    Going to Miami.  You?

19        Q.    Secret party in Keene area.  Wanted to invite you.

20   Have a good trip.

21        A.    Awesome.  Wish I was there.  Thanks for the invite

22   and have fun.

23        Q.    Okay.  And is that the end of your communication

24   with Mr. Freeman?

25        A.    Yes.

1       Q.    And have you had any further communication outside

2    of the evidence we've looked at today?

3       A.    No.

4             MR. AFRAME:  Okay.  I don't have anymore questions.

5             THE COURT:  All right.  We have a few minutes.  Go

6    ahead.

7             MR. SISTI:  I didn't know if you wanted to take

8    care of that other matter.

9             THE COURT:  Oh, yes.  I forgot about that.  Let's

10   take the lunch break.

11            Ladies and gentlemen, I'm going to tell you to come

12   back at -- or ask you to come back at 1:40, please.  1:40.

13   I've got a little business to take care of with counsel here

14   that will delay it.  Go ahead.

15            (IN COURT - NO JURY PRESENT)

16            THE COURT:  Attorney Rothstein, welcome.

17            MR. ROTHSTEIN:  Good afternoon.

18            THE COURT:  You're representing -- yeah, please

19   approach.

20            You're representing Ms. Spinella?

21            MR. ROTHSTEIN:  That's correct, your Honor.

22            THE COURT:  All right.  My understanding is the

23   United States Attorney's Office has -- they have submitted to

24   me, I'll tell you, the appropriate paperwork for a grant of

25   immunity.

1          Would it be her intention to assert her rights

2    under the Fifth Amendment?

3          MR. ROTHSTEIN:  It would -- without the grant of

4    immunity, it would be her intention to assert her rights under

5    the Fifth Amendment.

6          THE COURT:  All right.

7          Have I granted that motion yet?

8          THE CLERK:  Yes, you did.

9          THE COURT:  I did.  Okay.  So she has been granted

10   immunity.  I assume you've explained that to her?

11         MR. ROTHSTEIN:  I have explained that to her, your

12   Honor.

13         THE COURT:  All right.  Are there any questions

14   that you or she has for me regarding the grant of immunity?

15         MR. ROTHSTEIN:  There is one issue, your Honor.

16         In speaking to Ms. Spinella, and I think the

17   parties are aware of this, she has voiced a possible intention

18   to pursue withdrawing her plea.

19         THE COURT:  Understood.

20         MR. ROTHSTEIN:  And I just wanted to raise with the

21   Court that sort of different -- without that I think that

22   there would be no question.  I would like to posit whether the

23   withdrawal of her plea and potential withdrawal of her plea is

24   an event that bears on the grant of immunity or whether the

25   two things are interdependent.  In other words --

 1              THE COURT:  I understand, yeah.

 2              MR. ROTHSTEIN:  So if she ends up pursuing

 3     withdrawing her plea, she would obviously be concerned that

 4     whatever she ended up saying in this proceeding could somehow

 5     come back and bite her in that event.  And if she withdrew her

 6     plea, the parties would be back to square one, and the

 7     government may proceed with charges that are very different

 8     than these charges.  So under all those circumstances, that

 9     would be her concern.

10              Obviously I'm in no position -- as the Court knows,

11     I was assigned yesterday.  I'm in no position to advise her on

12     the issue of withdrawing her plea despite the fact that this

13     trial is going to go on for some time.  There's no way I could

14     possibly investigate that and put a motion before this Court

15     in that period of time.

16              THE COURT:  Sure.

17              MR. ROTHSTEIN:  So the concern that she expressed

18     to me, which I think is a valid concern, is that under those

19     circumstances would she be protected on these contingent

20     future events.

21              THE COURT:  Understood.

22              Well, we'll take up the issue of her withdrawal in

23     a minute -- as it pertains to you in a minute.

24              My view -- and I haven't researched this, but my

25     view is that the grant of immunity and her intention with

1    respect to her plea and disposition of her case are unrelated.

2           My view is that the grant of immunity would extend

3    to the same charges.  In other words, if she testifies here,

4    her testimony cannot be used as direct evidence against her or

5    as indirect evidence to obtain new evidence against her in

6    that case.

7           Of course the testimony probably could be used for

8    impeachment purposes if she contradicted it, but not as direct

9    evidence against her.

10          Does the prosecution disagree with that conclusion?

11          MR. AFRAME:  No, your Honor.

12          THE COURT:  So she is protected.  That's my

13   conclusion.

14          MR. ROTHSTEIN:  I guess one -- you may have said

15   this, your Honor, but one concern might be -- and this is all

16   just positing hypotheticals.  If she moves to withdraw the

17   plea, she's successful in doing that, and the government

18   decides to bring a count of -- instead of just wire fraud they

19   charge bank fraud or something like that, a different charge.

20          I guess her concern is whether -- if that happens,

21   whether what she says here today under a grant of immunity

22   would cover that circumstance, and in the event --

23          THE COURT:  My view is that it would.  It would.

24   Her immunity would protect her even under that circumstance.

25          Do you have any disagreement with that, Mr. Aframe?

1           MR. AFRAME:  No, your Honor.

2           THE COURT:  No.  So you have that assurance as

3 well.

4           MR. ROTHSTEIN:  Okay.  I wanted to put that on the

5 record, your Honor.

6           THE COURT:  I appreciate that.  This has been a

7 limited appointment for you.  Let me ask your client.

8           Ms. Spinella, are you comfortable with Attorney

9 Rothstein acting as your counsel with respect to your decision

10 about your plea?

11          MS. SPINELLA:  Yes.

12          THE COURT:  All right.  It's a very wise choice.

13 He's very good counsel.

14          I'm going to continue your -- after today I'm going

15 to continue -- or after her testimony I'm going to continue

16 your appointment so you can explore that together, all right?

17          MR. ROTHSTEIN:  Okay.

18          THE COURT:  Are you willing to do that, Mr.

19 Rothstein?

20          MR. ROTHSTEIN:  I am willing to do that, your

21 Honor.

22          All right then.  I just wanted to put your mind at

23 ease about that.

24          So, look, there's an immunity order.  That means

25 the testimony you provide cannot be used against you in any

criminal case, including the case that you've already pled to
and been convicted of.

Should you be allowed to withdraw your guilty plea,
I can't express an opinion on that yet.  That's a matter for
down the road, and you have good counsel to advise you about
that.  Do you understand?

MS. SPINELLA:  Yes.

THE COURT:  All right.  So when do you plan to call
the witness?

MR. AFRAME:  Next.

THE COURT:  Okay.  It will be this afternoon.

Ms. Spinella, you should stay around the courthouse
today, okay?  Do you understand?

MS. SPINELLA:  Yes.

THE COURT:  All right.

Anything else, counsel?

MR. AFRAME:  No, your Honor.

MR. SISTI:  Is the court in recess until --

THE COURT:  Lunch recess until 1:40.

MR. SISTI:  Thank you.

THE COURT:  And it looks like we're going to have a
little more time with this witness.  So you don't have to be
right back at 1:40.

MR. SISTI:  Thank you.

THE COURT:  Thanks everybody.

1           (RECESS)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

143

1                    C E R T I F I C A T E

2

3

4           I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted:   3-1-23        /s/   Susan M. Bateman _____
                                SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25