UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                         \*
UNITED STATES OF AMERICA          \*
                           \*   21-cr-41-01-JL
          v.            \*   December 12, 2022
                           \*   1:15 p.m.
      IAN FREEMAN            \*
                                           \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF JURY TRIAL - DAY FIVE - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Government:      Seth R. Aframe, AUSA
                           Georgiana MacDonald, AUSA
                           John J. Kennedy, AUSA
                           U.S. Attorney's Office




For the Defendant:       Mark L. Sisti, Esq.
                           Sisti Law Offices




Court Reporter:          Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
                          I N D E X


WITNESSES:              Direct     Cross    Redirect        Recross


HAROLD JONES


By Mr. Sisti                         3                         13

By Mr. Aframe                                 11


MELANIE NEIGHBOURS


By Mr. Aframe          15                     75

By Mr. Sisti                        59                         77


KARLA CINO


By Mr. Aframe          78

By Mr. Sisti                        99


KENDALL MCBREARTY


By Mr. Aframe          113


EXHIBITS                                    FOR ID      IN EVD


Government's Exhibit Nos. 901-908-B                       27

Government's Exhibit Nos. 1553 and 1554.                  27

Government's Exhibit Nos. 2802 thru 2820.                 88

Government's Exhibit Nos. 1501 thru 1579 and 1914.        113
```

1                        P R O C E E D I N G S

2                 THE COURT:  Sir, you are still under oath.

3                 Mr. Sisti, you may begin your cross.

4                 MR. SISTI:  Thank you, your Honor.

5                    CROSS-EXAMINATION OF HAROLD JONES

6    BY MR. SISTI:

7         Q.    Mr. Jones, good afternoon.

8         A.    Good afternoon.

9         Q.    My name is Mark Sisti.  I know we've never met.

10             And the guy sitting over there that I represent,

11   he's Ian Freeman.  Have you ever met him?

12        A.    No, I have not.

13        Q.    Have you ever spoken to him?

14        A.    No.

15        Q.    Okay.  What's the total amount of money that -- the

16   total amount that you calculate you were scammed out of?

17        A.    I am not 100 percent sure, but from what I could

18   tell probably about $800,000.

19        Q.    About 800,000.  And this all had to do with this

20   fellow that held himself out at least as Raymond Miller?

21        A.    Correct.

22        Q.    And you did speak to somebody that claimed to be

23   Raymond Miller, right?

24        A.    I'm sorry?

25        Q.    You spoke with somebody who claimed to be Raymond

```
1    Miller?

2         A.    Correct.  Through the Internet.

3         Q.    Yeah, I mean actual telephone calls?

4         A.    No.

5         Q.    None?

6         A.    None.

7         Q.    Just something -- texting and Telegram and that

8    stuff?

9         A.    Correct.

10        Q.    Did you ever have actual physical contact with

11   Natasha?

12        A.    No.

13        Q.    So you had no physical contact with Natasha and no

14   physical contact with Raymond Miller.

15              Did either one of them ever send you a photo or

16   anything to verify they were human beings?

17        A.    I got pictures from Natasha.

18        Q.    You did?  Okay.  And Natasha claimed to be what

19   again, just for the jury?

20        A.    She was an heir to an inheritance.

21        Q.    Okay.  She claimed to be an heir to an inheritance

22   in some other country, right?

23        A.    Yes.

24        Q.    All right.  Did you ever get any kind of physical

25   evidence of that, that she was an heir?
```

1      A.   I got some information from a company called

2  Greenfield I think that researched.

3      Q.   All right.  And was this money supposed to be for I

4  think you said something like taxes and attorney's fees or

5  something?

6      A.   Correct.

7      Q.   Did you ever have any contact with an attorney?

8      A.   Well, I understood Raymond Miller was.

9      Q.   Okay.  Okay.  We're starting to flesh it out a

10  little bit.  So Raymond Miller's claim to fame was that he was

11  the lawyer?

12      A.   Correct.

13      Q.   A lawyer for this Natasha, right?

14      A.   Correct.

15      Q.   Okay.  I don't want to pry too much, but, you know,

16  these scams come in all flavors.

17          Was Natasha also like a romantic interest or a

18  human interest as well?

19      A.   That was a component laid out to me.

20      Q.   Yeah.  And the money aspect kind of flew from that,

21  kind of derived itself from that?

22      A.   Somewhat.

23      Q.   Okay.  And this situation went on for how long?

24      A.   About six months or so.

25      Q.   Six months?  Okay.  Do you remember when it

1    started?

2         A.   I think it was in March.

3         Q.   Okay.

4         A.   Of 2020.

5         Q.   Okay.  So it was before the first transaction that

6    was noted on that chart which was on the 3rd of May, I

7    believe?

8         A.   I think it was -- I'm not sure of the exact timing,

9    but it was around that level, yeah.  March, April.

10             Actually, it had to be April because I broke up

11   with my wife around the end of May -- or, I mean, of March.

12        Q.   Okay.  So it started up in April then?

13        A.   I believe it was there.  Possibly May.

14        Q.   Okay.  And then out of nowhere the money thing

15   starts coming?

16        A.   It somewhat did, yes.

17        Q.   Okay.  And the first -- what was the first

18   transaction, the one that was on this chart there, or did

19   something happen before that?

20        A.   That I don't remember.

21        Q.   So other things could have been happening before

22   March 3rd?

23        A.   I don't think March was -- it was too early.

24        Q.   I'm sorry.  May.  I'm sorry.  May 3rd.

25        A.   I don't remember.

1          Q.    You don't remember.  Okay.  All right.

2                In any of these particular exchanges with this

3     Raymond Miller was the name Ian Freeman used?

4          A.    It must have been on the paperwork.  I don't

5     remember for sure, but I guess so, yeah.

6          Q.    Well, I know that there was some kind of money

7     thing sent to him, but did he say who Ian Freeman was or what

8     any of this was about?

9          A.    No.

10         Q.    Nothing, right?

11         A.    No.

12         Q.    Okay.  Was there any indication that this Miller

13    guy was working with Ian Freeman in any way, shape, or form?

14         A.    Yes, from what I was told.

15         Q.    That's what Miller said, right?

16         A.    Yes.

17         Q.    Did you confirm that in any way, shape, or form

18    with Ian Freeman?

19         A.    I wasn't able to contact him.

20         Q.    Did you attempt to contact him?

21         A.    I had no way to do it.

22         Q.    All right.  Did you ask Miller, let's say, for

23    contact information for Freeman?

24         A.    Yes, I did, and he told me it was -- that this is a

25    conduit for bitcoin.

1     Q.    All right.  So that's basically all that he said

2  about Ian Freeman?

3     A.    Essentially.

4     Q.    Yeah, that that's how he would be able to get the

5  bitcoin?

6     A.    Yes.

7     Q.    All right.  These banks that you worked with were

8  Wells Fargo, Chase, and Ally?

9     A.    Those were some of the banks where money was sent

10  to I think.

11     Q.    And the vast amount of your money was coming out of

12  what account?

13     A.    It was out of basically personal accounts.

14     Q.    And there were two major banks?

15     A.    Yes.

16     Q.    And one of them told you to knock it off, that they

17  thought it was a scam, right?

18     A.    Yes.

19     Q.    I mean, honestly, was there any particular reason

20  why you didn't stop at that point?

21     A.    I had already sent enough money, and it was very

22  possible a deal was going to happen.  I was convinced it was

23  going to happen.

24     Q.    Did they tell you why they thought it was a fraud?

25     A.    No.

1      Q.   But they just said they weren't going to work with

2   you anymore, right?

3      A.   Correct.

4      Q.   All right.  So then you switched banks to Bank of

5   America?

6      A.   Correct.

7      Q.   And you did transactions with them for several -- I

8   guess several hundred thousand dollars, right?

9      A.   Correct.

10     Q.   When did they finally shut you off?

11     A.   I don't recall the exact date.

12     Q.   But multiple transactions were going through that

13   bank just as multiple transactions went through your first

14   bank, right?

15     A.   Correct.

16     Q.   Before anybody approached you and said maybe this

17   isn't a good idea?

18     A.   Correct.

19     Q.   How much went through the first one before you were

20   told it was --

21     A.   I don't know the number.

22     Q.   Okay.  Which bank do you think moved more money for

23   you?

24     A.   Bank of America.

25     Q.   All right.  How long did it take for Bank of

1    America to say this is a bad idea?

2        A.   That I don't know.  I don't remember.

3        Q.   All right.  Did they ever ask you what this was

4    for?

5        A.   They did, and I told them the answer that Miller

6    told me to tell them.

7        Q.   Okay.  So this is where I wanted to go.

8             Somebody was basically scripting you, and that was

9    Mr. Miller, right?

10       A.   Correct.

11       Q.   And what Mr. Miller would do is he would set up

12   hypotheticals, right, like if they ask you this, tell them

13   that?

14       A.   I don't recall that.  The direction was very

15   specific who the recipients were and what the donations were

16   for.

17       Q.   All right.  So Miller is the one that was telling

18   you what to tell banks?

19       A.   Yes.

20       Q.   All right.  Why don't you give the jury an example

21   of what Miller was telling you.

22       A.   Well, it was on the pages that were presented

23   earlier.  That it was a donation mostly to a church.

24       Q.   All right.  Did you have actual conversations with

25   the banks concerning that?

1        A.    They asked, yes.

2        Q.    All right.  And then you would say what Miller told

3   you to say?

4        A.    Correct.

5        Q.    Okay.  So you were working with Miller in order to

6   keep the bank accounts going?

7        A.    Correct.

8        Q.    This guy over here, Freeman, wasn't telling you

9   what to say, right?

10       A.    No.

11       Q.    And never did?

12       A.    No.

13             MR. SISTI:  Okay.  I have nothing further.

14             THE COURT:  Redirect.

15             MR. AFRAME:  Could we just pull up 2705?

16             So if we just blow up the reason above all the fine

17   print there, Caryn?

18                       REDIRECT EXAMINATION

19   BY MR. AFRAME:

20       Q.    What's the reason on this wire that was given to

21   the bank?  Do you see the reason, the additional reference

22   information?

23       A.    It was given to me by Miller.

24       Q.    And what does that say?

25       A.    In order to buy bitcoin via Telegram, I, Harold

1   Jones, authorize the bitcoin to be delivered to --

2        Q.   No, no, no.  I'm sorry.  We're looking at the wrong

3   thing.  See where it says on the left additional reference

4   information?

5        A.   Oh, okay.  Church donation.

6        Q.   Yeah.  So where did that come from to you?

7        A.   Miller.

8        Q.   Do you know where Miller got it from?

9        A.   Well, it would appear that I got it from Raymond

10  Miller.

11       Q.   That's where you got it from?

12       A.   Yeah.

13       Q.   Do you know where Raymond Miller got it from?

14       A.   I don't know.

15       Q.   Okay.  And when you went -- I think we covered

16  this.  I just want it to be clear.

17            When you were dealing with the bank, did they know

18  that you were buying bitcoin with these transactions?

19       A.   No.

20       Q.   What did they think you were doing?

21       A.   Sending a donation.

22       Q.   And you're a wealthy person?

23       A.   Yes.

24       Q.   Do you give to charity?

25       A.   Yes.

1      Q.   And that's what this says, right?

2      A.   That's correct.

3      Q.   And you didn't really tell the bank what you were

4   doing?

5      A.   Correct.

6      Q.   And why didn't you do that?

7      A.   Because it wasn't necessary.  It wasn't required.

8      Q.   So did the bank know you were buying bitcoin?

9      A.   No.  They did not know that bitcoin was involved.

10          MR. AFRAME:  Nothing further.

11          MR. SISTI:  The Exhibit 2705, can we see that on

12   the screen again?  Can that be blown up a little bit?

13                          RECROSS-EXAMINATION

14   BY MR. SISTI:

15     Q.   We'll get it up there.  Be patient with us, Mr.

16   Jones.  It's coming up.

17          MR. SISTI:  If we can just blow that up a bit,

18   please?

19     Q.   This is a document and it has to do with the

20   bitcoin purchase purported to be going through Miller, right?

21     A.   Correct.

22     Q.   And I'm just trying to see what we're looking at

23   here.  This is coming from your Camelot, Brittany Limited

24   account?

25     A.   Correct.  I think, yeah.

1      Q.    All right.  And in this particular transaction did

2  that have anything to do with Ian Freeman?

3      A.    I had no idea.

4      Q.    Did it have something to do with the Reformed

5  Satanic Church?

6      A.    That's what the recipient was that was given to me

7  and told to put on there.

8      Q.    Okay.  And do you know who the individual was, a

9  DiMezzo?  Do you know an Aria DiMezzo?  Have you heard that

10  name?

11      A.    No.

12      Q.    Do you know who would have been the person that

13  somehow was running the Reformed Satanic Church?

14      A.    No.

15      Q.    Okay.  Thank you.

16          MR. AFRAME:  That's all.

17          THE COURT:  Sir, you're excused.  Thank you.

18          THE WITNESS:  You're welcome.

19          MR. AFRAME:  The United States calls Melanie

20  Neighbours.

21                    MELANIE NEIGHBOURS

22        having been duly sworn, testified as follows:

23          THE CLERK:  For the record, please state your name

24  and spell your last name.

25          THE WITNESS:  Melanie Neighbours,

```
 1   N-E-I-G-H-B-O-U-R-S.

 2                        DIRECT EXAMINATION

 3   BY MR. AFRAME:

 4        Q.   Good afternoon, Ms. Neighbours.

 5             How old are you?

 6        A.   36.

 7        Q.   And where do you presently live?

 8        A.   Manchester.

 9        Q.   And how long have you lived in Manchester?

10        A.   About four or five years.

11        Q.   And where did you live before Manchester?

12        A.   Keene, New Hampshire.

13        Q.   And I'll ask you about you living in Keene in a

14   second.

15             Let me just ask you a little about your background.

16             Did you grow up in New Hampshire?

17        A.   No.

18        Q.   Where do you grow up?

19        A.   Louisiana mostly.

20        Q.   And tell us a little about your education.

21        A.   I have an undergrad in accounting from Southern

22   Louisiana University and a J.D. from Louisiana State

23   University.

24        Q.   And what year did you get your J.D.?

25        A.   2013.
```

1    Q.   J.D., is that the law degree?

2    A.   Yes.

3    Q.   And did you ever take the bar to become a

4    practicing lawyer?

5    A.   I passed the bar, but I failed the character and

6    fitness.  They wanted me to go to a -- they wanted me to go to

7    their $30,000 rehab to get approved, and I opted not to do

8    that.

9    Q.   Okay.  That fine.  I just want to make sure it's

10   clear.

11        So what was the cause of that?  What happened?

12   A.   I got a DWI in between graduating law school and

13   passing the bar.

14   Q.   Got it.  And is that your only conviction?

15   A.   Technically in Louisiana traffic speeding and

16   traffic tickets and stuff like that are misdemeanors, but

17   other than that, yes.

18   Q.   Okay.  And let me ask you about just your

19   professional background in Louisiana.

20        What year did you graduate from law school?

21   A.   2013.

22   Q.   And what year did you come to New Hampshire?

23   A.   2015.

24   Q.   So did you do any work from 2013 to '15?

25   A.   Yes.  I worked at my father's -- he had at the time

1   a bail office for a little while, and I ended up getting a job

2   at an accounting firm as a financial analyst.

3        Q.   Okay.  And just so we understand the terms under

4   which you're testifying today -- so have we met before?

5        A.   Yes.

6        Q.   A few times?

7        A.   Five times maybe.  Something like that.

8        Q.   Okay.  And do you have an agreement from my office

9   that you won't be prosecuted based on your testimony today?

10       A.   Yes.

11       Q.   And was that by way of a letter?

12       A.   Yes.  The proffer letter and the immunity letter.

13       Q.   Okay.  Now, does that cover your testimony if you

14  were to perjure yourself or otherwise make false statements?

15       A.   No.

16       Q.   So let me ask you about what brought you to New

17  Hampshire.

18            So before we figure that out, why don't you tell

19  the jury just a little bit about your political beliefs.

20       A.   I'm an anarchist.

21       Q.   Okay.  And tell the jury what it means to you at

22  least to say you're an anarchist?

23       A.   We believe in something called a nonaggression

24  principle, which means it is immoral to initiate force, fraud,

25  or threats of force or fraud, and that the state, a/k/a

1    government, inherently does that.

2        Q.   Okay.  And did you have those beliefs when you were

3    living in Louisiana?

4        A.   I mean, not the whole time, but at some point, yes.

5        Q.   Okay.  And did you -- how did that mesh with your

6    life in Louisiana, those beliefs?

7        A.   If I had to broadly define them, I would say they

8    were Republican.

9             THE COURT:  Stop.

10            Sir, do you want to put a mask on, please?  There

11   are rules.  You look around and you see everybody else wearing

12   a mask.

13            OBSERVER:  He hasn't been here.  He didn't know.

14            PERSON:  I'm sorry.  I don't have one with me.

15            THE COURT:  There's an overflow room across the

16   hall, you can watch the trial there, or we can give you a

17   mask.  Whatever you like.

18            PERSON:  Okay.  I'll take one.

19            THE COURT:  Thank you.

20            Sir, can you remove your hat, please?

21            Thanks.  Thanks very much.

22            You may proceed.

23       Q.   So I was asking you -- you told us about your

24   anarchist beliefs, and I was just asking sort of -- and you

25   said you developed those while you were living in Louisiana,

```
 1   and I was trying to inquire about whether those beliefs had
 2   any impact on your decision to leave Louisiana.
 3       A.    Yeah.  I met I think two total, and they were both
 4   in college not staying there permanently as far as I know.
 5   Most of the anarchists and libertarians for that matter are in
 6   New Hampshire.
 7       Q.    Okay.  And how did you figure that out, that New
 8   Hampshire was a place where you could find like-minded folks?
 9       A.    From the Internet, various websites.
10       Q.    Okay.  And tell me about your process that you went
11   through to relocate yourself from Louisiana?
12       A.    I was working in the accounting job, and I had
13   saved some money.  At first I was going to pay to take the
14   bar, but I decided this would be a better life, basically.
15       Q.    Okay.  And where did you decide to move to?
16       A.    Keene.
17       Q.    And how did you pick Keene?
18       A.    There's kind of a divide as to who is living in
19   which area.  The more politically motivated -- I guess you
20   could say the more in-system people are in Manchester, and the
21   more activists, civ. dis., outside the system people are in
22   Keene.
23       Q.    I heard you say activists.  What was the second
24   thing you said?
25       A.    Oh, civil disobedience.
```

1      Q.    Okay.  Oh, civ. dis., is that what you said?

2      A.    Yes.

3      Q.    Civil disobedience.  Okay.  And which of those

4  appealed more to you?

5      A.    The second one.

6      Q.    Okay.  And how did you explore -- so you're coming

7  from far away Louisiana.  How did you explore that community

8  that was over in Keene?

9      A.    I had visited a few times, and I ended up getting

10  added to chat rooms.  I found out about the Shire Society

11  website, and I was added to a few -- at least one chat room

12  and Telegram.

13      Q.    Okay.  And did you through that process encounter

14  Mr. Freeman?

15      A.    Yes.

16      Q.    And you talked about something called the Shire

17  forum.  What did you call it?

18      A.    Well, the Shire Society website has a forum on it.

19  So that forum.

20      Q.    Okay.  And what kinds of things would you talk

21  about there?

22      A.    Philosophy, events, stuff like that.

23      Q.    Okay.  How did you find a place to live in New

24  Hampshire?

25      A.    I posted on I think it was called the Keene Chat,

1    or it was something like that, that I was looking for a place,

2    and Ian responded that I could rent a spot in his duplex.

3         Q.   Okay.  And did you do that?

4         A.   Yes.

5         Q.   And when did you move in there?

6         A.   November 5, 2015.

7         Q.   And we've already learned, because this trial is

8    now over a week old, that that duplex -- it's a duplex so it

9    has two sides.  We've learned that there's 73 and 75.

10             Which side did you live on?

11        A.   It was the side without the studio.

12        Q.   Okay.  And who did you -- so was that the side

13   where Mr. Freeman lived or the other side?

14        A.   The other side.

15        Q.   And who lived with you on the other side?

16        A.   Rich Paul, a/k/a Nobody, lived there.

17        Q.   Okay.  And at that time was his name Rich Paul or

18   was it Nobody?

19        A.   It was Rich Paul.

20        Q.   Okay.  And did anyone else there live with you?

21        A.   There was a guy named Terry who was there for a

22   while, and I think before Terry this guy moved out.  I don't

23   remember his name.  It was a while ago.

24        Q.   Okay.  And who lived on the side with Mr. Freeman?

25        A.   Renee lived, like, with him with him.  They shared

1    a room.  They were together.

2          Q.    And this was what year again, 2015?

3          A.    2015.

4          Q.    Okay.  And did anyone else live there?

5          A.    Yeah, there was -- he had various roommates at

6    various times.

7          Q.    Okay.  And as far as you could tell when you were

8    living in the same duplex with Mr. Freeman, what was he doing

9    for work or activity?

10         A.    I knew that he ran the radio show, and I kind of

11   assumed he made most of his money from that.

12               I know that he also rented out rooms, obviously.

13         Q.    Okay.  And did you pay rent to Mr. Freeman?

14         A.    Yes.

15         Q.    And how did you pay him?

16         A.    Sometimes it was cash and sometimes -- I'm not sure

17   if I ever paid him anything else.  I know it was sometimes I

18   paid him in cash.

19         Q.    And at that time what were you doing for work?

20         A.    I was doing bookkeeping and taxes, which taxes is

21   obviously seasonal, and I had a part-time job for some of it

22   collecting invoices for a local newspaper.

23         Q.    Okay.  And did you enjoy living in Keene?

24         A.    Yes.

25         Q.    Did you find a politically-minded community?

```
1         A.    Yes.

2         Q.    Like-minded community, I should say.

3         A.    Yes.

4         Q.    And you talked about I think briefly Mr. Freeman's

5    radio show?

6         A.    I'm sorry.  What?

7         Q.    You talked briefly about Mr. Freeman's radio show?

8         A.    Yes.

9         Q.    What was that called again?

10        A.    Free Talk Live.

11        Q.    And did you become involved in that?

12        A.    Yes.  I became a co-host, kind of a fill-in, and

13   then eventually a -- I guess not permanent but long-term,

14   like, regularly scheduled.

15        Q.    Okay.  So when you're a co-host, are you paid for

16   that or is that volunteering or for fun?

17        A.    At first it was for fun.  We eventually got paid

18   $20 a night.

19        Q.    Okay.  And can you tell me just -- we've heard the

20   radio show mentioned, but I don't think anyone has ever talked

21   about what it was like or what it did.  Can you just describe

22   that for us?

23        A.    It was loosely a libertarian -- not all co-hosts

24   were libertarians, but it was pretty much a libertarian radio

25   show.  We talked about -- philosophy was the main thing and
```

1    current events and then whatever people called in about.

2         Q.    And how often is it on?

3         A.    Seven nights a week.

4         Q.    And for how long?

5         A.    Three hours minus commercials.

6         Q.    And is Mr. Freeman a permanent host?

7         A.    Yes.

8         Q.    And are there other permanent hosts?

9         A.    Yes.  Mark Edge, Aria DiMezzo, Renee.

10        Q.    And what did you know Renee's last name to be, if

11   you knew it?

12        A.    Well, I knew that Kate was her middle name.  She

13   went by Renee Kate at the time.  She wasn't married yet.

14        Q.    Okay.  Do you know what her name is?

15        A.    Spinella.

16        Q.    Okay.  All right.  So Mark Edge, Mr. Freeman, Aria,

17   what did you say, DiMezzo?

18        A.    Yes.

19        Q.    And they were all on the radio show?

20        A.    Aria came later, but, yeah, when she came, she was

21   pretty permanent.

22        Q.    You were on the show.  Anybody else?

23        A.    There is a bunch of other people.  Some stayed

24   longer than others.  Rich Paul was on the show.

25        Q.    Okay.  And Rich Paul -- again, what's his legal

1    name?

2         A.    Nobody.

3         Q.    Okay.  And did you ever -- in addition to being a

4    sometimes co-host, did you ever develop any other job with the

5    radio station -- with the radio show?  Excuse me.

6         A.    After Daryl Perry was fired I started doing the

7    mostly admin work for them.  I would schedule the ads.

8              I did pay the co-hosts from a bitcoin wallet, and

9    eventually I started sending out the invoices for the

10   advertisers.

11        Q.    Okay.  And did you do that from an office or was

12   that remote work?  What kind of work was it?

13        A.    It was remote.

14        Q.    And at some point did you leave Keene, move from

15   Keene?

16        A.    Yes.  When I met my -- I mean, not when I met him,

17   but after I met my now husband we moved to Manchester because

18   that's where regular W-2 jobs tend to be.

19        Q.    Okay.  And when did you go to Manchester?

20        A.    September of 2016.

21        Q.    And did you try to do any other kind of work when

22   you were living in New Hampshire -- living in Manchester?

23   Excuse me.

24        A.    I eventually took a job at an accounting firm, and

25   eventually I worked at a warehouse for a little while.

1      Q.    Okay.

2      A.    At some point I started working for Mark.

3      Q.    For Mark?

4      A.    Yes.

5      Q.    Okay.  And that's Mark Edge?

6      A.    Yes.

7      Q.    When you were -- you described Mr. Freeman.  You

8    participated in his radio show.  He was your landlord, right?

9      A.    For a while.  I mean, I moved eventually, but he

10   was at one point.

11     Q.    Would you have described him as a friend?

12     A.    He was a friendly acquaintance.

13     Q.    Okay.  And along the way did you ever help Mr.

14   Freeman out in your capacity as a bookkeeper?

15     A.    Yes.

16     Q.    How would you communicate with Mr. Freeman?  What

17   was your method of communication?

18     A.    Usually Telegram or in person.

19     Q.    Okay.  And did you ever -- did you save your

20   Telegram chats with Mr. Freeman?

21     A.    They save themselves.

22     Q.    Okay.  And did you receive a subpoena in this case

23   for records that you had related to Mr. Freeman?

24     A.    Yes.

25     Q.    And did you provide them pursuant to the subpoena

1    that you received?

2            A.   Yes.

3                 MR. AFRAME:  Your Honor, the parties agree to

4    Exhibits 901 through 908-B inclusive.

5                 THE COURT:  901 through 908-B inclusive are

6    admitted.

7                 MR. AFRAME:  As well as 1553 and 1554.

8                 THE COURT:  1553 and 1554 admitted.

9        (Government's Exhibit Nos. 901 through 908-B Admitted)

10       (Government's Exhibit Nos. 1553 and 1554 Admitted)

11           Q.   Ms. Neighbours, you're going to see come up on the

12   screen right now Exhibit 901.  Does that look familiar to you?

13           A.   Yes.  That is a chat between me and Ian.

14           Q.   Okay.  And it says -- and so the date of this is

15   the 27th of February of 2018?

16           A.   Yes.

17           Q.   And the top speaker where it says IF, that's Mr.

18   Freeman?

19           A.   Yes.

20           Q.   It says:  I need to hire an accountant to write a

21   letter certifying me with enough net assets to be considered

22   an accredited or sophisticated investor.

23                Did I read that right?

24           A.   Yes.

25           Q.   And then there's a website there for something

1    called Kraken.  Do you see that?

2        A.    Yes.

3        Q.    Do you know what Kraken is?

4        A.    Kraken is a crypto exchange where you can -- it's

5    like a stock exchange except instead of stock they do crypto.

6        Q.    Okay.  So you can buy and sell crypto there?

7        A.    Yes.

8        Q.    And it says after that:

9            They can accept for proof of source of funds:  Tax

10   return from 2015 or more recent, and then letter from

11   bank/accountant stating assets, bank statement and/or equities

12   statement, pay stub showing previous two years income, an

13   accountant's letter stating a client's real estate holdings,

14   and inheritance suffice for net worth.

15            Did I read that right?

16       A.    Yes.

17       Q.    And then it says:  I don't have any tax returns or

18   pay stubs and only about 300K across my bank accounts in the

19   most recent statements.  So accountant's letter is the only

20   other option.  As a minister, I'm in the unusual position of

21   not legally owning things but having the ability to control

22   well over 2.5M in various assets, both real estate and

23   cryptocurrency.

24            Did I read that right?

25       A.    Yes.

1       Q.    And Mr. Freeman referred to himself as a minister.

2             Did you have an understanding of what he was

3    referencing there?

4       A.    He had this thing called the Shire Free Church, and

5    he would say that he was a minister of that entity loosely

6    speaking.

7       Q.    And did he say that back when you lived with him in

8    2015?

9       A.    Yes.

10      Q.    And you lived at 75 Leverett Street?

11      A.    If that's the one without the studio, then yes.

12      Q.    You lived -- okay.  Well, yeah.

13            Hold on for just one second.

14            Were you -- when you lived at that address, did you

15   see any church activities happening?

16      A.    No.

17      Q.    Were there services held at that location?

18      A.    No.

19      Q.    Did you see literally anything at all involving

20   church activities?

21      A.    No.

22      Q.    When would you see Mr. Freeman discuss the church

23   based on your experience?

24      A.    When he needed it as a legal entity for some legal

25   reason.

1       Q.    So can you give us some examples of times that you

2   saw that?

3       A.    When he fought the property tax on the building, he

4   said it belonged to a church.  When it was useful to be a

5   minister at a church for whatever legal reason.

6       Q.    Okay.  And here he says he doesn't have any tax

7   returns, right?

8       A.    Right.

9       Q.    That seems to attach to the very next paragraph.

10  He connects that to being a minister?

11      A.    Oh, he connects not having assets allegedly to

12  being a minister.

13      Q.    Okay.  And it says he doesn't have tax returns or

14  pay stubs?

15      A.    Right.

16      Q.    Okay.  And you had some -- you were doing

17  bookkeeping, right?

18      A.    Yes.

19      Q.    Now, were you a certified public accountant?

20      A.    I was not.

21      Q.    Okay.  Mr. Freeman asked you to do this letter.

22  Did you end up doing the letter?

23      A.    I did.

24      Q.    If we go on here, it says, you:

25            I'm sure I can do that.  Let me just double check

```
 1    to see if there's anything I need to do on my end first.
 2         A.   Yes.
 3         Q.   And then Mr. Freeman says:
 4              300K in bank statements for January and authorized
 5    agents for two real estate properties and crypto assets.
 6         A.   Yes.
 7         Q.   And then, if you keep going, it just says:
 8              Any thoughts?
 9         A.   And I said:
10              Can I call you in like ten minutes?
11              He says sure.
12         Q.   There's a break then, right, to March 2nd, if we
13    keep going?
14         A.   Yes.  So then after the phone call it's March 2nd.
15         Q.   And it says -- do you remember the phone call?
16         A.   Not really.
17         Q.   Okay.  And then if we keep going on March 2, 2018,
18    it says:
19              How much is in crypto?  And you don't have any
20    debt, right?
21              And then he says:
22              I have no debt and an excellent credit rating.
23    They only need to know about 2.5M.
24              Did I read all of that right?
25         A.   Yes.
```

1      Q.    And you say:

2            Okay.

3            And that's sort of the end of the substance of the

4      conversation, correct?

5      A.    Yes.

6      Q.    Did you end up writing this letter for Mr. Freeman?

7      A.    I did.

8      Q.    And did he pay you to do that?

9      A.    Yes.

10     Q.    How much?

11     A.    I want to say $35.  I'm not exactly sure.

12     Q.    Okay.  Not a lot of money?

13     A.    No.  I charge 35 an hour for things except tax

14     forms.  So something like that.

15     Q.    Okay.  And let me show you 902.  Is this the

16     resulting letter you wrote for Mr. Freeman?

17     A.    Yes.

18     Q.    And it says Melanie's Bookkeeping and Taxes.

19     That's your business?

20     A.    It was.

21     Q.    And it says:

22            Our client Ian Freeman's assets include the

23     following.  And then it says $300,000 in U.S. deposit accounts

24     and $2.4 million in various liquid assets?

25     A.    Yes.

1      Q.    And there's no reference in 902 to a church, is

2  there?

3      A.    No.

4      Q.    Are you writing this for the church or for Mr.

5  Freeman?

6      A.    For Ian Freeman.

7      Q.    So did this letter eventually lead to a falling-out

8  between you and Mr. Freeman?

9      A.    It did.

10     Q.    And this letter is way back in 2018.  When did the

11  fall-out between you happen?

12     A.    During his bail hearings that were live streamed.

13     Q.    And what got you upset with Mr. Freeman at that

14  time?

15     A.    He insisted on -- well, he told the judge several

16  times on the live stream during the court hearing that he was

17  broke, had no money, had no assets, et cetera, things of that

18  nature.

19     Q.    And why did that upset you?

20     A.    Because he had me write this which was true and

21  said the opposite.

22     Q.    Did that eventually lead to a confrontation between

23  you and Mr. Freeman?

24     A.    It did.

25     Q.    And when did that happen?

1      A.     That was recently.  It was -- because he wasn't

2   allowed to contact me for a while so it was, I don't know,

3   maybe a few months ago.

4      Q.     And did you explain what you were upset about?

5      A.     Yes.

6      Q.     And did Mr. Freeman try to give you an explanation?

7      A.     He told me that the assets belonged to the church

8   and that the letter should have said the church and that was

9   an oversight on his part, and that both the letter was true

10  but also he would make sure to basically correct it with you

11  all that I wrote an accurate letter.

12     Q.     Okay.  And did you take to the Internet with any

13  negative statements about Mr. Freeman?

14     A.     I did prior to him calling me.  Not after.

15     Q.     Okay.  And since that exchange about the letter and

16  then the statements that Mr. Freeman made about not having

17  money, have you communicated since that?

18     A.     He called me a second time that night or afternoon,

19  whatever it was, but not since that day.

20     Q.     Okay.  And do you still remain angry over that?

21     A.     Yes.

22     Q.     Okay.  Let me show you 903.  This is now -- if you

23  look at the top of this, it's an e-mail from Mr. Freeman.  Do

24  you see that?

25     A.     Yes.

```
 1        Q.    And it's to you, right?  Are you

 2   melanie@freetalklive.com, at least at that time?

 3        A.    Yes, yes.

 4        Q.    Okay.  And this letter says -- this e-mail says:

 5   This international bank needs a reference letter from an

 6   accountant on letterhead.  They've attached instructions on

 7   what it should contain.  How much to write this one up for me,

 8   please?

 9             Did I read that right?

10        A.    Yes.

11        Q.    And did you write him up a reference letter?

12        A.    I did.

13        Q.    Exhibit 904, is that the reference letter you wrote

14   for Mr. Freeman?

15        A.    It is.

16        Q.    And it says you consider him to be a responsible

17   person who takes care of his obligations.

18             Where did you get the language for this letter

19   from?

20        A.    There was an attachment, I think it was an

21   attachment, but it was in the letter that he forwarded me.

22        Q.    Okay.  And did you provide him with what that

23   letter said to write?

24        A.    Yes.

25        Q.    Okay.  And was that true for you at that time?
```

1    A.    At that time that's what I believed.

2    Q.    Okay.  Tell me who Aria -- well, actually, tell me

3    what you know about Mr. Freeman and his bitcoin business.

4    A.    Well, at the time I knew that he had multiple

5    bitcoin ATMs which are basically kiosks placed in a public

6    location just like a vending machine would be and -- I think

7    they actually call them bitcoin vending machines, and you can

8    go up and if you download a bitcoin wallet, you can buy

9    bitcoin from them.

10          And I know that at some point -- well, I don't know

11   if it was later on, but I found out later on that he was at

12   least selling, if not buying and selling, from people on -- it

13   was either localbitcoin.com or localbitcoins.com.

14   Q.    Okay.  And the letter that you wrote to him where

15   you said he had these deposit accounts, do you know, like,

16   what the -- and you said it was related to Kraken, but did you

17   know what this was related to as far as his business?

18   A.    He told me that he needed to get a higher account

19   limit on Kraken.

20   Q.    Okay.  And did he tell you why he needed to do

21   that?

22   A.    I don't think he specifically said.  I assumed it

23   was to be able to buy and sell --

24          MR. SISTI:  Objection.

25   Q.    That's okay.  Don't assume.

 1          THE COURT:  Right.

 2     Q.   If you don't know, you don't know.

 3          THE COURT:  Only if you know.

 4     Q.   But Kraken I think you did say is a place you buy

 5 and sell bitcoin?

 6     A.   Yes.

 7     Q.   And tell me who Aria DiMezzo is.

 8     A.   She was -- she moved after me.  She became a

 9 co-host when she did on Free Talk Live.  She started something

10 that she called the Reformed Satanic Church which did

11 various -- well, it did various homeless outreach and

12 educational outreach and --

13     Q.   And how about bitcoin things?  Did Aria DiMezzo do

14 bitcoin things under the purview of the Reformed Satanic

15 Church?

16     A.   Yes.  She would hand out bitcoin to I think

17 sometimes just people, maybe in lower amounts, but I know that

18 she used bitcoin and crypto to give to homeless people and

19 stuff like that.

20     Q.   And how about the selling of bitcoin?  Do you know

21 if she did that?

22     A.   I know that Aria sold bitcoin.

23     Q.   Okay.  Aria herself as distinct from this entity

24 that she was running?

25     A.   Yes.

1      Q.    Okay.  Who's James Baker?

2      A.    That is -- I don't know if it's still her legal

3  name, but it was originally Aria's legal name.

4      Q.    Okay.  And at some point did Aria ask you to write

5  a letter for her that was similar to the one -- or for the

6  Reformed Satanic Church similar to the one that you did for

7  Mr. Freeman?

8      A.    The asset verification one, yes.

9      Q.    Yes.  Okay.  And let me show you Government's 908.

10  Do you recognize this?

11      A.    Yes.

12      Q.    So one name is you, Melanie Neighbours.  The other

13  one says deleted account.

14          Did you provide this as part of your subpoena

15  return?

16      A.    I did.

17      Q.    And do you know who the person was based on the

18  content that was the deleted account?

19      A.    It was Aria DiMezzo.

20      Q.    Okay.  And it says -- April 17, 2020, it says from

21  deleted account, which is Aria DiMezzo?

22      A.    Yes.

23      Q.    Kraken will accept a letter from an accountant

24  stating assets.  If you're willing to, I'm glad to pay.

25          Did I read that right?

```
1        A.    Yes.

2        Q.    We've already talked about Kraken, right?

3        A.    Yes.

4        Q.    Just remind us one more time.

5        A.    It's a crypto exchange you can go on and buy and

6   sell crypto like you could on a stock exchange.

7        Q.    Okay.  And you say:

8              What's the asset minimum they want and what do you

9   have?

10             Right?

11        A.    Right.

12        Q.    And then she says:

13             They have not mentioned an asset minimum.  At

14   present and on hand the RFS --

15             Did you understand what the RFS was?

16        A.    The Reformed Satanic Church.  I assumed that that

17   was a -- I believe that was a typo.

18        Q.    -- has $100.

19             Is that right?

20        A.    Yes.

21        Q.    43 -- what's BCH?

22        A.    Bitcoin cash.  It's another cryptocurrency.

23        Q.    2.5 BTC?

24        A.    That's bitcoin.

25        Q.    And 6 XMR.  Do you know XMR?
```

 1          A.    It's a crypto.  I would have to look up which one

 2     it is.

 3          Q.    It's just a different kind of crypto?

 4          A.    Yes.

 5          Q.    I may or may not add USD to it though because I

 6     don't think that would look good for the amounts of money that

 7     will be going through the account.

 8                Did I read that right?

 9          A.    Yes.

10          Q.    And the top of 908-A just repeats what we just saw

11     I think.  It's just the way it printed.  Do you agree with

12     that?

13          A.    Yes.

14          Q.    Then it's you again:  I've done one of these

15     before.

16                So when you're talking about one of these before,

17     what are you talking about?

18          A.    An asset verification letter that I believed was

19     going to Kraken.

20          Q.    Who did you do that for?

21          A.    Ian Freeman.

22          Q.    And there were tiers for different amounts you were

23     allowed to trade corresponding to different asset amounts.

24     That may have changed since then so I would look to see what

25     account you have/are applying for.

```
 1              Did I read that right?
 2      A.    Yes.
 3      Q.    Also I assume the church has no debt?
 4      A.    Yes.
 5      Q.    And which church are we talking about there?
 6      A.    The Reformed Satanic Church.
 7      Q.    And then Aria says:  The account for which I am
 8 applying is a pro account without limits, but they have not
 9 suggested a limit based on available assets.
10              This is the Reformed Satanic Church, right?
11      A.    Yes.
12      Q.    Also has 5 ounces of gold.  Did I read that right?
13              .5 ounces.  Sorry.
14      A.    .5 ounces.
15      Q.    .5 ounces of gold.  Did I read that right?
16      A.    Yes.
17      Q.    And it says no debt, correct?
18      A.    Yes.
19      Q.    And then there's a text exchange which is kind of
20 hard to see there, right?
21      A.    Right.
22      Q.    But if we go to 905, is this the same text?
23      A.    Yes.
24      Q.    And if you look at the top, whose name is there?
25      A.    Ian Freeman.
```

1      Q.    And are you familiar with that picture?

2      A.    That was his usual profile picture.

3      Q.    Okay.  And so in this whose words are in white?

4      A.    Ian's.

5      Q.    And whose are in pink?

6      A.    Aria's.

7      Q.    And how did you get a copy of this?

8      A.    Aria sent it to me.

9      Q.    Okay.  So Mr. Freeman says:  That is the legal

10   formation document.

11           Correct?

12     A.    Yes.

13     Q.    And then Aria says:  I sent them literally

14   everything I had.  I'll e-mail and ask about that then.

15     A.    Yes.

16     Q.    Send it to him again and tell him this is what you

17   received from the state of New Hampshire.

18     A.    Yes.

19     Q.    Tell him you have that and the certificate of good

20   standing and ask what else he could mean besides these things.

21           Okay.  Does that have anything to do with the

22   letter that we're talking about?

23     A.    Not directly.

24     Q.    Okay.

25     A.    It sounds like they're trying to discuss --

1      Q.    That's okay.  If it doesn't have to do with the

2   letter, I don't want you to guess what they're talking about.

3            Let's go on though:  I'm hesitant to say that the

4   RFS only has $100 in USD at present, but it isn't like they

5   would immediately be auditing the account for large

6   transactions, right?

7            Did I read that correctly?

8      A.    Yes.

9      Q.    Does that seem to relate to the letter based on

10   your conversation with Aria?

11      A.    Yes.

12      Q.    Mr. Freeman:  If you want, you can have her certify

13   that you have access to significant, over $1 million in church

14   donations and cryptocurrency assets.  Just leave off which

15   church's donations and assets they are.

16            Did I read that right?

17      A.    Yes.

18      Q.    And if we went back to 908-A, you received that

19   text that we just read in just bigger font, you received that

20   as part of your instructions, correct?

21      A.    Yes.

22      Q.    And it says at the bottom:

23            Thoughts?

24            Right, the very bottom under the text?

25      A.    Yes.

1          Q.     And what was your response?

2          A.     I can do that.

3          Q.     And if we go to 908-B.  Again, just the way it

4     printed it's there again, but then you say:  I can do that.  I

5     just tried to look up their limits, and they don't have them

6     published.  I am convinced this corresponds to a reg, but if

7     you have 1 million worth, I imagine that's good enough.

8                 And she says?

9          A.     Perfect.  Thank you.

10         Q.     And if we look at 906, is this the letter that

11    ultimately came of that?

12         A.     Yes.

13         Q.     And on 4-17-2020, and I'll just read it:  The

14    Reformed Satanic Church has no debts.  James Baker, also known

15    as Aria DiMezzo, in her capacity as high priestess of the

16    church has access to church assets in excess of $1 million in

17    the form of United States currency, Bitcoin Cash, Bitcoin

18    Core, privacy coins, and gold.

19                Correct?

20         A.     Yes.

21         Q.     Based on the text, where did you understand the

22    million dollars was coming from?

23         A.     Some type of loan from Ian.

24         Q.     And what was Ian's instruction as to how the letter

25    should read?

 1    A.    That the assets were belonging to a church and to

 2  not specify which church.

 3    Q.    And did you do that?

 4    A.    Yes.

 5    Q.    Does this church make clear whether that million

 6  dollars belongs to the Reformed Satanic Church or to something

 7  else?

 8    A.    No.

 9    Q.    Did you intentionally leave it ambiguous?

10    A.    Yes.

11    Q.    And at whose instruction was that?

12    A.    It was coming to me from Aria, but ultimately from

13  Ian.

14    Q.    Let me show you one other text that --

15          907, do you recognize this?

16    A.    Yes.

17    Q.    Did you provide this to the government as part of

18  the subpoena return?

19    A.    Yes.

20    Q.    And again we see in big bold blue Ian Freeman.

21          Do you see that?

22    A.    Yes.

23    Q.    And not the one at 14:00 but the communication at

24  15:39, there's a photo, right, in the middle between the two

25  words?

1      A.   Yes.

2      Q.   Can you see what the logo is on that photo?

3      A.   The IRS logo.  It's from the IRS.

4      Q.   And can you read to me what Mr. Freeman wrote above

5   and below that photo?

6      A.   Was it really necessary to use my home address for

7   whatever this is?  That's not a logo I enjoy seeing in my

8   mailbox.

9      Q.   Okay.  And let me just do one more thing.  If we

10  look at 1552 -- first of all, I'll ask you before -- well,

11  yeah, 1552.

12           MR. AFRAME:  Just before you bring it up, let me

13  just look at it.

14           MR. SISTI:  Could we approach, Judge?

15           THE COURT:  You may.

16           (SIDEBAR)

17           MR. AFRAME:  So we have a video -- this is a still

18  shot from a video, and we have some clips of Aria DiMezzo

19  doing a how-to on how to sell bitcoin which says:  Aria

20  DiMezzo, High Priestess, Reformed Satanic Church in

21  association with the Shire Free Church.

22           Our theory is that Aria and Mr. Freeman were in a

23  conspiracy to sell bitcoin in the way that we have suggested,

24  and these clips are pertinent to that.

25           I was going to just play it through this witness

1  because she knows Aria DiMezzo, but I think they're statements

2  of a co-conspirator.

3          THE COURT:  Okay.  Potentially.  But aren't you

4  going to call DiMezzo?

5          MR. AFRAME:  No.

6          THE COURT:  Okay.  Go ahead.

7          MR. SISTI:  You know, that's exactly the problem,

8  Judge.  I mean, if DiMezzo got on there, then maybe DiMezzo

9  can explain, you know, what the context and the contents of

10 this is.  It's not self-explanatory if it's just based on a

11 theory, all right, that the two of them are connected.  You

12 know, that's something I can ask DiMezzo.

13         THE COURT:  No.  I mean, I don't think DiMezzo has

14 to testify for these statements to be admissible.  I guess --

15 but what it may require is -- I mean, if you're representing

16 them as statements of a co-conspirator in further of the

17 conspiracy, they're admissible as non-hearsay so long as I can

18 rule later under Petrozziello that they're not -- that they

19 are relevant, that they are exactly what you represent them

20 for, but I think as you've represented them now, it seems to

21 be admissible as a statement of a co-conspirator.  That's

22 non-hearsay.

23         MR. SISTI:  Doesn't there have to be a foundation

24 first?  I think you have to make the ruling first in order to

25 be the gatekeeper on this.

1          THE COURT:  Sure, but I can make the upfront ruling

2    based on offers of proof.  So why don't you tell me.

3          MR. AFRAME:  We will eventually, relatively soon,

4    show both of what we just showed, that he was giving her a

5    million dollars.  We would like to show that.  Sorry.  I just

6    showed that.

7          We will eventually show Mr. Freeman's Telegram

8    folder that will have lots of photos and receipts from

9    customers of his Telegram business.  The same people we will

10   also show were on her phone.  There will be communications

11   between them in which they're talking about aspects of the

12   business.

13         THE COURT:  You're about to offer video clips.

14   Isn't that what we're talking about here?

15         MR. AFRAME:  I thought you were asking me for my

16   Petrozziello proffer.

17         THE COURT:  No.  It's Petrozziello.

18         MR. AFRAME:  Sorry.

19         THE COURT:  My question is what are the statements

20   you're about to offer.

21         MR. AFRAME:  Okay.  Sorry.  I can tell you that.

22         Statement one is how you need to avoid the banks,

23   and statement two is how you never sell to anyone who tells

24   you why they're going to tell you the reason they want the

25   bitcoin.

1          MR. SISTI:  But she said she didn't independently

2     know that.  Does she say Ian Freeman told me to tell you that?

3          THE COURT:  No, Freeman doesn't have to tell her to

4     say that.  They're alleged to be in a conspiracy together.

5     Look, I understand that you need to be able to cross-examine

6     her, but you can call her I guess.

7          MR. SISTI:  Why do I want to call her?

8          THE COURT:  I'm not saying you should.

9          MR. SISTI:  I think they have to call her.  I think

10     they have to call her.  They're basically tarring Freeman with

11     DiMezzo.  That's exactly what they're doing.

12          THE COURT:  I'm not aware of any authority for that

13     proposition that they have to call a co-conspirator as a

14     witness before they can present statements of the

15     co-conspirator.  I just don't think that's the law.

16          So I'm going to overrule the objection subject, by

17     the way, at your request -- at the back end if they are not

18     statements in furtherance of a conspiracy and not shown to be,

19     I have to strike them and tell the jury to disregard, but for

20     now based on what you've just described they're admissible.

21          MR. SISTI:  The question really is -- let's just

22     say as we're moving along we find out that she's operating

23     independently.  Let's just say, for instance, because we saw

24     the chart up there that was almost entirely, okay, the

25     Reformed Satanic Church business that was going through the

1    last witnesses, by the way, you know, an unbelievable scam

2    problem.  He was sending it to her.  He was sending it to her

3    entity.  It had nothing to do with Freeman.  There was no

4    cross reference.

5              THE COURT:  Yeah, I think that's true that if the

6    evidence -- you're right.  If the evidence will establish that

7    there's no such conspiracy and, therefore, that these

8    statements could not have been uttered in furtherance of a

9    conspiracy, they'll have to be stricken.

10             But I think there's enough now -- there's enough to

11   allow them to be presented.  That's just the way I'm

12   accustomed to approaching statements of a co-conspirator.  It

13   certainly is subject to a ruling and finding later that

14   there's no conspiracy and you haven't made the proper showing.

15   I've been listening to all the cross and all the evidence on

16   this, but right now she's alleged to be a co-conspirator and

17   the foundation is laid that she's involved in this and we're

18   going to see some statements by her right now that

19   themselves -- you're not supposed to consider the statements

20   themselves, I believe, on the Petrozziello, but I've heard

21   enough where I think they're admissible.

22             MR. SISTI:  What's the date on that?

23             THE COURT:  It looks like June 16, 2020.

24             MR. SISTI:  June 16, 2020.

25             Let me just check something before I go further.

```
 1                    THE COURT:  Okay.
 2                    Let's give the jury a little break.  This is going
 3      to take a minute.
 4                    (CONCLUSION OF SIDEBAR)
 5                    (IN COURT - NO JURY PRESENT)
 6                    THE COURT:  Okay.  Look, what's been proffered --
 7                    MR. SISTI:  I'm sorry, Judge.  Could we have the
 8      witness excused for this?
 9                    THE COURT:  Yes.
10                    MR. SISTI:  Thank you.
11                    THE COURT:  Don't go too far.  We're going to be
12      back shortly.
13                    (Melanie Neighbours leaves the courtroom)
14                    All right.  What has been proffered is a video
15      which depicts Aria DiMezzo basically presenting to a group, I
16      don't know if this is an Internet broadcast or a physical
17      seminar, about how to sell bitcoin, and it's dated during June
18      of 2020.
19                    Is that during the period of the conspiracy?
20                    MR. AFRAME:  Yes, your Honor.
21                    THE COURT:  Now, the objection -- I thought the
22      objection was hearsay.  Is it?
23                    MR. SISTI:  Well, it's two things.  One, it's
24      hearsay.
25                    Two, I believe that there has to be a foundation in
```

1   order to allow that in that of course Ian would have been part

2   and parcel to that particular communication if there's a

3   co-conspirator type exception that we're running with right

4   now.

5            I'll let them make the offer but --

6            THE COURT:  Well, is that different from hearsay?

7            MR. SISTI:  No.

8            THE COURT:  Okay.  Look, the rule is 801(b)(2).

9   It's considered an admission of a party opponent if it is made

10  by a party's co-conspirator during and in furtherance of the

11  conspiracy.

12           Now, if by part and parcel you mean that it must be

13  shown to be in furtherance of the conspiracy between Freeman

14  and -- is it DiMezzo?

15           MR. SISTI:  Yes.

16           THE COURT:  You're right.  But if part and parcel

17  means that he has to have approved it or been part of its

18  transmission, I don't think that's the law.  It must be a

19  statement by a co-conspirator in furtherance of the

20  conspiracy.

21           MR. SISTI:  Okay.  I can live with that.

22           THE COURT:  Okay.  So make your proffer.

23           MR. AFRAME:  So the video itself is on how to sell

24  bitcoin that was posted, which is -- well, what we've been

25  talking about.  It's in association with the Shire Free

1    Church.  Aria DiMezzo represents herself as the Reformed

2    Satanic Church.  We just saw Mr. Freeman provide a million

3    dollars to Ms. DiMezzo.

4            At Government's Exhibit 1218, which we've already

5    introduced, there's a LocalBitcoins chat in which some user

6    says:  Do you accept Zelle?  The answer is:  No, sorry, but

7    Aria Anarchist does.  We work together.

8            And then when I showed the user name that that

9    associates with, it's Aria DiMezzo.  Later -- or James Baker

10   who's Aria DiMezzo.

11           THE COURT:  Yes.

12           MR. AFRAME:  Later in the trial we intend to show

13   that same clients were shared between electronic devices of

14   the defendant and Ms. DiMezzo.  We intend to have some audio

15   chats in which Ms. DiMezzo and Freeman are talking about

16   banking issues.  We have an audio of Mr. Freeman talking to a

17   bank in which he's trying to get money back from a wire sent

18   by James Baker for $315,000.  So I think we've shown in a

19   bunch of ways that they were working together.

20           We've also shown over here for Mr. Jones that Jones

21   was sending at Raymond Miller's behest to both Freeman, Church

22   of the Invisible Hand, and the Reformed Satanic Church which

23   is associated with Aria DiMezzo.

24           The next witness, Karla Cino, will testify that she

25   sent to usually Mr. Freeman but that he instructed her to send

1    to DiMezzo when he was busy.

2              That's some of what we have.

3              THE COURT:  Yeah.  Right.

4              Go ahead, Mr. Sisti.

5              MR. SISTI:  Yeah, that last one, I don't know if

6    that's working together or just referring to somebody.

7              THE COURT:  Well, I mean, it's evidence that I as

8    making a preliminary finding or a jury could find is the basis

9    for a finding of a conspiracy.  It doesn't have to be proved

10   conclusively.  I mean, that's up to the jury.  For me it has

11   to be more likely than not.

12             MR. SISTI:  All right.  Well, let me start there.

13             THE COURT:  Go ahead.

14             MR. SISTI:  There's no evidence that $1 million was

15   provided.  There was discussion about it, all right?  So let's

16   start there.  So I disagree with the assertion that $1 million

17   was provided.

18             I can assert that -- it's my understanding that

19   DiMezzo made that particular instructional clip, that video,

20   on her own, that that was something that Freeman wasn't

21   involved in.  It wasn't funded by him.  He wasn't there during

22   the production of it.  It was her deal for her particular

23   situation and for her Reformed Satanic Church.

24             The offer with regard to Jones and the Miller

25   thing, well, the two entities that were just quoted by

1    Attorney Aframe were the Invisible Hand and the Reformed

2    Satanic Church, neither of which Freeman had been connected

3    during the course of the Jones testimony.

4            I don't know what's going on with what's going to

5    happen in the future here, all right, so I can't speak to

6    that.  I can only speak to what we're dealing with right now.

7    And as it sits right now, I would assert that maybe later on

8    in the trial they can hit that clip, but I don't think they

9    have it yet.

10           I mean, you know, if they're standing on he loaned

11   her a million dollars, show it to me.  It's just not there.

12   This accountant can't say it, either.

13           THE COURT:  I wouldn't say they're standing on it.

14   I mean, I don't think it's more complicated than -- well, let

15   me make sure I'm putting it in the proper context, Mr. Aframe.

16           With respect to which -- I guess this is the

17   conspiracy count on not the money laundering but the other

18   count, right?

19           MR. AFRAME:  I think we're saying she's a

20   conspirator in both.

21           THE COURT:  Go ahead, Mr. Sisti.  I'm listening.

22           MR. SISTI:  I mean, the money laundering thing --

23   there's just nothing there as far as a connection.  There's

24   nothing.  I mean, we heard it's a money laundering count.  I

25   don't think I heard her name mentioned once.  I don't think

1    there was even an allusion to DiMezzo during the course of

2    that entire testimony.  Certainly not on a wire.  Certainly

3    not during the course of his testimony.  Zero.

4              THE COURT:  I think I'm going to need a minute with

5    this indictment just to make sure before I issue a ruling.

6    Look, if you want to introduce this now with this witness, I'm

7    going to need to take a little break and spend a little time

8    with the indictment.  Because your proffer does make sense to

9    me, but I want to make sure it holds up under your actual

10   allegations in the indictment.  I'm not sure right now by my

11   memory that it does.  So I'm going to double check.

12             The other option is if you want to present this

13   later in the trial when you've got more so-called conspiracy

14   evidence in, it might change the analysis, but I'm happy to

15   take the break now and take a look at it now.  I just want to

16   know how you would like to proceed.

17             MR. AFRAME:  It really doesn't matter whether we do

18   it now or after, but, I mean, I guess we've come -- I mean, if

19   it will save the Court time, I'm happy to do it after we

20   present all the stuff about the phones and the crossover of

21   clients.

22             THE COURT:  Through this witness or through another

23   witness?

24             MR. AFRAME:  Through another witness.

25             THE COURT:  Who would that be?

1              MR. AFRAME:  The FBI agent who searched the phones

2    and the computers who will say here's the crossover.

3              THE COURT:  I'm going to take a little look at it

4    now anyway.

5              MR. AFRAME:  Okay.

6              THE COURT:  We are in recess.

7              (RECESS)

8              (IN COURT - JURY PRESENT)

9              THE COURT:  All right.  The defendant has made a

10   hearsay objection to the proffered evidence which is a

11   photographic image and some video evidence.  The Court has

12   reviewed the indictment and the evidence heard thus far.

13             The Court does find that these evidence are

14   statements of an alleged co-conspirator and are thus not

15   hearsay.  They're not hearsay subject to an exception.

16   They're non-hearsay under Rule 801(d)(2)(E) and are,

17   therefore, admissible subject to review on request by the

18   defendant at the end of evidence if necessary, but for now

19   they're admissible.

20             MR. AFRAME:  Thank you.

21             THE COURT:  Good afternoon, ma'am.  You're still

22   under oath.

23             THE WITNESS:  Okay.

24             MR. AFRAME:  I just have just a couple more

25   questions.

```
 1                   If we could just pull up 1552?

 2        Q.    Do you know that person?

 3        A.    Yes.

 4        Q.    Who is that?

 5        A.    Aria DiMezzo.

 6        Q.    And is that who we were just talking about as it

 7   related to that letter and the text exchange with Mr. Freeman?

 8        A.    Yes.

 9        Q.    And it says Aria DiMezzo, High Priestess, Reformed

10   Satanic Church; is that right?

11        A.    Yes.

12        Q.    And then it says:  In association with the Shire

13   Free -- and then it's cut off?

14        A.    Yes.

15        Q.    And then the top says:  Selling Bitcoin, The

16   Ultimate How-To?

17        A.    Yes.

18        Q.    Okay.  I'm just going to play two clips of this,

19   and after we play them I won't have any questions.

20              MR. AFRAME:  So 1553.

21              (Government's Exhibit No. 1553 played)

22              MR. AFRAME:  And 1554.

23              (Government's Exhibit No. 1554 played)

24              MR. AFRAME:  Thank you.  Nothing further.

25              THE COURT:  Cross-examination.
```

1           MR. SISTI:  Thank you, Judge.

2                    CROSS-EXAMINATION

3    BY MR. SISTI:

4        Q.   Good afternoon.

5        A.   Hi.

6        Q.   We haven't met, have we?

7        A.   Not in person.

8        Q.   No.  So let me just go through a little bit of what

9    the government's lawyer went through earlier.

10            You went to law school but you're not a lawyer,

11   correct?

12       A.   Right.

13       Q.   You're not a lawyer in Louisiana nor are you a

14   lawyer in New Hampshire, right?

15       A.   Right.

16       Q.   You do bookkeeping but you're not a CPA?

17       A.   I did, and I was never a CPA.

18       Q.   You were never a CPA.  Okay.

19            And just -- you know, I'll jump from there to the

20   end, that last little clip.  That's Aria DiMezzo, right?

21       A.   Yes.

22       Q.   I mean, that's not Ian Freeman, right?

23       A.   Right.

24       Q.   Okay.  And I saw that the title on her little video

25   was something like how I choose a bank, right?

1      A.    Something like that.

2      Q.    Yeah.  It didn't say how Ian chooses a bank, right?

3      A.    Right.

4      Q.    And then she went on to give a couple little

5  interesting pieces of advice about don't get into

6  conversations with people even if it's innocuous, right?

7      A.    Right.

8      Q.    Even if it's as innocent and, you know, small as

9  buying a burger someplace, it's not your business, right?

10     A.    Right.

11     Q.    That's exactly what she said, right?

12     A.    Right.

13     Q.    Okay.  And to just knock it off at that point.  You

14  don't need to know anybody else's business whether they're

15  buying a burger, a Cadillac, or anything else, right?

16     A.    That's what she said.

17     Q.    Yeah.  Okay.  That's what she said.  That was a

18  video about what she says, right?

19     A.    Right.

20     Q.    Okay.  Now, I hate getting into political stuff and

21  I hate getting into religion in a federal courthouse.  I mean,

22  to me it's one of those things, but we're going to have to get

23  into a little bit of it, okay?  Mr. Aframe got into a little.

24  I want to get into a little as well, okay?  Fair enough?

25     A.    Yeah.

1      Q.    All right.  You're an anarchist and I take it

2    you're an atheist?

3      A.    I was excluding that one conversation since the

4    last time I talked to Ian.

5      Q.    Well, I mean, I don't know, are you an atheist?

6      A.    No.

7      Q.    Were you an atheist in 2018?

8      A.    Yes.

9      Q.    Were you an atheist in 2015?

10     A.    Yes.

11     Q.    Were you an atheist in 2019?

12     A.    Yes.

13     Q.    When did you become a non-atheist?

14     A.    Sometime in 2021, around.

15     Q.    Okay.  And is this when you had this, like,

16   discussion with Ian about the letter you wrote for him?

17     A.    No.

18     Q.    Is this the discussion that you referred back to a

19   bail hearing on?

20     A.    I'm sorry.  Can you --

21     Q.    Was there a discussion that triggered something in

22   your life or did something trigger in your life before let's

23   say April of 2021?

24     A.    To trigger what?  I'm not sure what you're --

25     Q.    Okay.  Let's back up a second, okay?  I don't want

1   to confuse you here either.

2          When did you become a non-atheist?

3      A.    Towards the end of 2021.

4      Q.    Why?

5      A.    My -- one of my daughters had -- my husband was

6   always a Christian, or at least always since I knew him, and

7   one of my daughters had died.  We found that out in June of

8   2021.  She died before she was born.

9          My husband had never really pushed the issue

10  before, but he was, like, well, I think you should pray.  And

11  at first I was really kind of hesitant to do that, and I was,

12  like, okay, I'll try it.

13         I decided basically to kind of -- basically to shut

14  him up I was, like, okay, well, I'll try this one time.  I

15  was, like, I don't even know what I'm going to ask for.  I

16  thought about it.  I was, like, okay, so I will ask God

17  basically, like, okay, if you exist, I'm going to go open that

18  Bible and, like, if you're real, like, make it open to

19  something that means something.  And I even said -- I was,

20  like, okay, no cheating and going through the New Testament.

21  Like, I figure I'm going to, like, open to some -- at the time

22  I figured I would open to some random OT genocide, which a lot

23  of those could be translated better, have better footnotes,

24  but that's -- and it opened to Psalm 91 which -- two things

25  about that.  At the end it says something to the effect -- I

 1    have it in my pocket.

 2        Q.    No, I mean, you got inspired.  I mean, I don't know

 3    what your deal is right now.  I mean, what's your situation

 4    right now?

 5        A.    As far as --

 6        Q.    Religion.

 7        A.    I'm a Christian.

 8        Q.    Okay.  So end of 2021 is when you kind of throw

 9    away the atheist thing and you become a Christian?

10        A.    Yes.

11        Q.    Okay.  I guess that's what I was asking for, okay?

12        A.    Okay.

13        Q.    All right.  You wrote a letter for Ian with regard

14    to a verification letter as an accountant, correct, a Kraken

15    letter?

16        A.    I think the -- what is it called?

17              The signature block says bookkeeper.

18        Q.    Yeah, bookkeeper.  So you didn't hold yourself out

19    as an accountant?

20        A.    Right.

21        Q.    You didn't hold yourself out as a lawyer?

22        A.    Right.

23        Q.    You held yourself out as a bookkeeper, right?

24        A.    Yes.

25        Q.    But the fact of the matter is you really didn't do

1    the every day books for Ian, correct?

2          A.   I did not.

3          Q.   Right.  The fact of the matter is that you were

4    actually bookkeeping for Mark Edge, right?

5          A.   I was.

6          Q.   Okay.  And can you tell the jury who Mark Edge is?

7          A.   Mark Edge is one of the founders of Free Talk Live

8    and -- yeah, one of the founders of Free Talk Live.

9          Q.   Who is a minister at the church, too, right?

10         A.   He would probably tell you that.

11         Q.   Well, he told you that, too, didn't he?

12         A.   Probably at some point.

13         Q.   Well, probably because he probably married you to

14   your husband, right, as a minister?  Right?

15         A.   He told me he had a Quaker church at that time.

16         Q.   Did he tell you, okay, that he was a minister and

17   that he would marry you?

18         A.   Yes.

19         Q.   Okay.  And when was that?

20         A.   2018.

21         Q.   2018.  And in 2018 what were you bookkeeping for

22   him?

23         A.   Mark Edge Media.

24         Q.   Okay.  And that would be the radio station?

25         A.   At the time he told me that he wanted to kind of

1    split away from that and have his own thing that was basically

2    more legal, to paraphrase it.

3            And so they were supposed to split up advertisers

4    and Mark would bring in his own advertisers and be a separate

5    entity, and Ian I never asked because I wasn't doing his.

6         Q.    Right.  You weren't doing his stuff.  But you knew

7    Mark as being involved with the church, too, right?

8         A.    He was involved in Free Talk Live.

9         Q.    Yeah.  What else?  Are you having a hard time

10   remembering?

11        A.    I mean, that was the entity he was involved in.

12        Q.    All right.  Was he involved in any of the

13   charitable giving in the Keene area?

14        A.    Oh, yes.  Mark gave to a few charities that I know

15   of.

16        Q.    Okay.  And did he give through the church?  You did

17   his books.

18        A.    I did the books for Mark Edge Media.  I didn't do

19   the books for any of the churches.

20        Q.    So you don't know if he did?

21        A.    No.

22        Q.    All right.  There were a number of charities that

23   were being taken care of by Mr. Freeman and the church in

24   Keene.  You're aware of that, right?

25        A.    I knew that Ian went to some charities.  I knew

1    that FTL donated to some charities.

2        Q.    Right.  And what would those have been?

3        A.    FTL very publicly donated to and solicited for the

4    Uganda orphanage, and Ian gave to the Hundred Nights.

5        Q.    What's that?

6        A.    A homeless shelter.

7        Q.    It's a homeless shelter.

8              What else were they doing in town?

9        A.    That's all of the charity work that I know of.

10       Q.    Well, you know they were giving bitcoin away to the

11   homeless, right?

12       A.    Aria was.

13       Q.    All right.  Do you know if Ian was, too?

14       A.    Not that I know of.

15       Q.    Okay.  You don't know one way or the other though,

16   right?

17       A.    Right.

18       Q.    Okay.  But that was something that those church

19   people were doing in Keene.  I mean, Aria was doing it, the

20   woman that we just saw in that film clip, right?

21       A.    I know that Aria was doing it.

22       Q.    Yeah.  No question about it.  And it had to do with

23   bitcoin and it had to do with the homeless, right?

24       A.    Yes.

25       Q.    And the Hundred Nights thing, that's quite an

```
1    outfit.  That's a pretty big outfit in Keene, isn't it?
2         A.   I've never been there.  I know they have a ball.
3         Q.   Yeah.  I mean, it's an important place for homeless
4    folks, right?
5         A.   I can't speak on that.
6         Q.   Right.  But, I mean, it openly operates.  It's not
7    some, you know, behind the scenes situation, right?
8         A.   Yeah, they advertise and have a public-facing
9    existence.
10        Q.   Okay.  All right.  You had mentioned something
11   about -- you were upset about Ian's representation during a
12   bail hearing that he didn't have any money, right?
13        A.   Yes.
14        Q.   And what date was that?
15        A.   I don't know exactly.  There were multiple
16   hearings.  There were at least two hearings where he said
17   that, but he had a bunch of bail hearings.
18        Q.   Can I tell you it was in April of 2021?
19        A.   That sounds about right for at least one of them.
20        Q.   You weren't doing any bookkeeping for Mr. Freeman
21   in April of 2021, were you?
22        A.   No.
23        Q.   You didn't see what his financial situation was in
24   2021, correct?
25        A.   Right.
```

1    Q.   You don't know what was going on with bitcoin or

2  Dash in 2021, correct?

3    A.   Well, the crypto themselves are public and so are

4  their wallets.

5    Q.   Did you know?

6    A.   Did I -- can you rephrase that?

7    Q.   Did you know that Dash -- Dash is a kind of

8  cryptocurrency, right?

9    A.   Yes.

10    Q.   I hate to sound kind of, you know, flip, but Dash

11  crashed.  Did you know that?

12    A.   I didn't follow that one closely, but I vaguely

13  knew that.

14    Q.   Yeah.  You don't know what Mr. Freeman or his

15  church was worth in April of 2021, right?

16    A.   Right.

17    Q.   You don't know if they were above the water or

18  below the water at that time, correct?

19    A.   Right.

20    Q.   You don't know who was controlling any asset at

21  that time because Mr. Freeman certainly wasn't.  It was a bail

22  hearing.  You knew he was incarcerated at the time, right?

23    A.   Well, your assets don't disappear just because

24  you're --

25    Q.   I'm just asking whether or not you knew if he was

1   in control of anything in April of 2021.

2         A.    He was not physically in control of any of it

3   because he was in jail.

4         Q.    Right.  You don't know what ministers were

5   controlling any assets if anything was available in April of

6   2021, correct?

7         A.    No.

8         Q.    Okay.  Mr. Aframe discussed, you know, you've been

9   in that house and you've not seen a shrine or you've not seen

10  a gathering room.  Is that something that you have to have in

11  order to have a church in this state?

12        A.    New Hampshire state law, as I understand it, is

13  very vague or lenient on what constitutes a church.

14        Q.    Right.  So there isn't any kind of mandatory

15  shrine, correct?

16        A.    I would be really surprised to hear it.

17        Q.    All right.  And you would be surprised if there was

18  some kind of symbol that had to be in the particular area or

19  in any area in order to define an entity as a church, correct?

20        A.    I would.

21        Q.    And you are knowledgeable of the fact that he has

22  registered with the Secretary of State as a church?

23        A.    I recently looked that up, but he claimed he didn't

24  pretty consistently.

25        Q.    Did he send the $50 like he's required and put in

1    the information on the form.  Do you know that?

2        A.    I've since looked it up, and presumably he did.

3        Q.    Yes, he did.

4              So the last time that you had any affiliation

5    whatsoever with Mr. Freeman or the church would have been

6    years ago, right?

7        A.    I still was on the show and knew him up until the

8    time he got arrested, I believe.

9        Q.    When's the last time he paid you for any service?

10       A.    That would have been a while ago.

11       Q.    A long time ago, right?

12       A.    Years at least.

13       Q.    All right.

14             MR. SISTI:  If I could just have a moment, Judge?

15             THE COURT:  You may.

16       Q.    When you got on the stand, one of the first things

17   that Mr. Aframe asked you was whether or not you were

18   testifying via a grant of immunity.  Do you remember that?

19       A.    Yes.

20       Q.    Why are you testifying under a grant of immunity?

21       A.    That was something my lawyer got, I guess.

22       Q.    Yeah, I guess, but were you told you were going to

23   be indicted?

24       A.    No.

25       Q.    I mean, did you do something illegal that I'm

1    supposed to know and they're giving you a break on?

2         A.   I never had any deal with the government other than

3    the immunity and proffer letter.

4         Q.   Yeah, but, I mean, everybody that takes the stand

5    is supposed to testify truthfully.  You know that, right?

6         A.   Yes.

7         Q.   Whether you're immunized by the United States

8    government or not, right?

9         A.   Well, if I'm immunized, I don't have to worry about

10   saying what is true.

11        Q.   What are you worried about saying?

12        A.   I mean, a lot of this is from five, six, four,

13   whatever it is, years ago.  I don't keep detailed notes and

14   records of every conversation, every phone conversation, every

15   text conversation to be able to defend against it years later.

16        Q.   I get that, but should the jury know that you're

17   under some pressure to testify?  That if you don't testify,

18   that you'll be charged?  I mean, what's going on here?

19        A.   They never came to me with anything like that.  I

20   think he said at one point he wasn't planning on prosecuting

21   me for anything.

22        Q.   So they weren't planning on prosecuting you for

23   anything but gave you immunity?  Is that your understanding?

24        A.   I mean, they might know who I am and that I don't

25   necessarily trust them a whole lot.

1      Q.    That you don't trust the government?

2      A.    I mean, I don't know why they make those decisions

3  or not.

4      Q.    So you got it for nothing, basically?  Is that

5  what's going on here?

6      A.    Oh, I talked to them.

7      Q.    Yeah, a lot of people talk to them.

8      A.    Well, we tend to advise against that unless you

9  have something like this.  I mean, I had to -- legally I had

10 to comply with the subpoena, but I didn't have to go sit down

11 and talk to them like --

12     Q.    Look, let me put it as flat-out as I possibly can.

13           THE COURT:  Counsel, sidebar.

14           MR. SISTI:  Thank you.

15           (SIDEBAR)

16           THE COURT:  Look, can somebody please explain this?

17 I don't like the jury being confused about things like this.

18           Why is she getting immunity?

19           MR. AFRAME:  Because the letter that she wrote

20 where she wrote vagaries for Ian Freeman --

21           THE COURT:  She had exposure.

22           MR. AFRAME:  She wrote a letter at the behest of

23 Aria and Ian Freeman.  Amy Spencer suggested that could

24 possibly be a problem, and so I agreed to not prosecute her

25 for that.

```
1            THE COURT:  Sure.
2            MR. AFRAME:  That's what happened.
3            THE COURT:  I'm not suggesting anything happened
4    that's untoward.  I don't know why you don't develop this
5    stuff on direct.  Like, for a million reasons I don't know why
6    you don't develop it on direct.  Somebody clean it up.  I
7    don't want the jury wondering these things.
8            MR. SISTI:  I don't know why.
9            THE COURT:  You don't know why, but she won't tell
10   you.  You could clean it up, too.
11           MR. AFRAME:  Clearly she doesn't remember why.
12   Because Amy Spencer wanted it.  I don't know that she would
13   even be able to answer.
14           THE COURT:  Yeah, but, I mean, I guess my question
15   is -- you've been kind of through the ringer before, but why
16   is she getting immunity?
17           MR. AFRAME:  I just told you.
18           THE COURT:  I know, but what would she be charged
19   with?  I guess she could be charged as a part of this whole
20   case.
21           MR. AFRAME:  She could be a conspirator.  I mean,
22   if you're taking an aggressive position and saying I'm
23   concerned about my client, then this is what you do.
24           And what she said when I said we had no intention
25   to prosecute her, that's absolutely true.  We met with her
```

1    multiple times.  There was no immunity the last time we went

2    through that letter, and Amy had concerns because --

3              THE COURT:  Amy over lawyered it a bit, okay, but

4    she was looking out for her client.  I just want to find a way

5    to get the jury --

6              MR. SISTI:  I'm going to ask her about those

7    letters.

8              MR. AFRAME:  Or I will.  I was going to.  Clearly

9    she doesn't really understand why her lawyer got it for her.

10   That's the problem.

11             THE COURT:  You both can develop it however you

12   want as long as somebody explains it.  Because when I'm

13   confused, I don't like the jury being confused.

14             MR. SISTI:  I was trying.

15             THE COURT:  I know.  She's tough, yeah.

16             (CONCLUSION OF SIDEBAR)

17             THE COURT:  You may proceed.

18             MR. SISTI:  Thank you.

19        Q.   Let's try to clean this up, okay?

20        A.   Okay.

21        Q.   Were you granted immunity because of something you

22   did?

23        A.   I'm not sure.

24        Q.   Were you granted immunity because of those two

25   letters that were referred to, the DiMezzo letter and the Ian

1    Freeman letter?  I mean, were those the reasons?

2        A.    I didn't get immunity until well after those two

3    letters were handed over.

4        Q.    So you don't know?

5        A.    It doesn't make sense to me that it would be for

6    those two letters because that was roughly a year prior to the

7    immunity.

8        Q.    Okay, so -- look, you don't know why, right?

9        A.    That's fair.

10            MR. SISTI:  I have nothing further.

11            THE COURT:  You may proceed.

12                         REDIRECT EXAMINATION

13   BY MR. AFRAME:

14       Q.    We've met multiple times, correct?

15       A.    Yes.

16       Q.    And in the -- every time from the very first

17   meeting did you sign a letter that said that nothing you said

18   in the meetings with us could be used against you if there

19   were ever to be any other proceeding against you, a proffer

20   letter?

21       A.    Yes.

22       Q.    And we met multiple times and it was always subject

23   to that letter, right?

24       A.    Yes.

25       Q.    Do you recall that at the very last meeting your

 1    lawyer for the first time requested that you get a letter from

 2    my office saying we wouldn't prosecute you for truthful

 3    testimony that you provided today?

 4         A.   Yes.

 5         Q.   And at that meeting for the first time did we go

 6    into detail about the Reformed Satanic Church letter?

 7         A.   Oh, yes.

 8         Q.   And did we go over for the very first time the text

 9    message that was imbedded in the chat?

10         A.   Yes.

11         Q.   Was there a concern that you and your lawyer had

12    based on the letter that you wrote for Ms. DiMezzo and the

13    Reformed Satanic Church based on the text from Mr. Freeman?

14         A.   There was.

15         Q.   And what was the concern?

16         A.   That it looked -- once you see everything together,

17    that it looked like the letter was kind of led, the one for

18    Aria.

19         Q.   And not completely accurate, truthful, in the sense

20    that it concealed which church was doing what?

21         A.   Yes.

22         Q.   Is that when your lawyer had the concerns?

23         A.   I believe so.  You all talked about that outside.

24         Q.   Right.  So you didn't hear when I talked to your

25    lawyer?

1          A.     Right.

2          Q.     But the letter that gave you the immunity if you

3     testified truthfully here today, did it come after your lawyer

4     and I had a conversation after we had the discussion about

5     what that text and letter were?

6          A.     Yes.

7          Q.     Thank you.

8                 MR. AFRAME:  Nothing further.

9                 THE COURT:  If you want.

10                          RECROSS-EXAMINATION

11    BY MR. SISTI:

12         Q.     Just one simple question.  What were they going to

13    charge you with?

14         A.     I never worked in federal court, and I never worked

15    with white collar crimes.  I mean, I would imagine something

16    like bank fraud because it ended up going to a bank and not

17    the exchange it was supposed to.

18         Q.     I don't know.  Did they ever tell you?  I'm not

19    asking you to imagine.

20         A.     He never told me -- the state never told me

21    anything like that.

22                MR. SISTI:  I have nothing further.

23                THE COURT:  Okay.  You're excused.  Thank you.

24                MR. AFRAME:  The United States calls Karla Cino.

25                          KARLA CINO

```
 1              having been duly sworn, testified as follows:
 2                   THE CLERK:  For the record, please state your name
 3       and spell your last name.
 4                   THE WITNESS:  Karla Cino, C-I-N-O.
 5                             DIRECT EXAMINATION
 6       BY MR. AFRAME:
 7           Q.   Good afternoon, Ms. Cino.
 8           A.   Good afternoon.
 9           Q.   And how old are you?
10           A.   How old am I?  I'm 74 years old.
11           Q.   And what state do you live in?
12           A.   New Jersey.
13           Q.   And how long have you lived in New Jersey?
14           A.   Since 1975.
15           Q.   And what do you do in New Jersey?
16           A.   I'm a real estate broker.
17           Q.   Are you still a real estate broker today?
18           A.   Yes.
19           Q.   And tell me, are you married?
20           A.   No.
21           Q.   Do you have children?
22           A.   Yes.
23           Q.   How many?
24           A.   I have three daughters.  One in Australia, one in
25       New York, and one in Georgia.
```

1     Q.    And were you married?

2     A.    Yes, I was.

3     Q.    And how did that marriage end?

4     A.    Divorce.

5     Q.    And when did you get divorced?

6     A.    I'm not really sure, I would have to look at the

7  documents, but I think it was 2002 or 2003.

8     Q.    Okay.  At some point did you meet a man online?

9     A.    Yes.

10    Q.    And roughly when do you think that was?

11    A.    2016.

12    Q.    And what did you know that man's name -- understand

13  that man's name to be?

14    A.    Frederick Dreher.

15    Q.    Say it again.

16    A.    Frederick Dreher.

17    Q.    Frederick Dreher.  Okay.

18          How did you meet Frederick Dreher?

19    A.    Online.  A stupid romance scam it turns out to be,

20  but all those years ago I didn't realize it.

21    Q.    And what computer app did you meet him on?

22    A.    Facebook.

23    Q.    And tell me about that relationship with Frederick.

24  How did it start and what happened?

25    A.    We spoke, you know, back and forth in text

1    messages.  Then he called me, and we had several conversations

2    by phone.  He sent me flowers.  He sent me stuffed animals.

3              You know, it seemed to be going okay.  He kept

4    saying he was going to be coming back, you know, to the United

5    States.  He wasn't in the United States at that time from what

6    I understand.

7        Q.   Where did you understand him to be?

8        A.   In Germany.

9        Q.   And how long did that period when -- you know, it

10   all seemed to be going well and he was sending you gifts and

11   you were communicating, how long do you think that was?

12       A.   That time period probably -- I never really thought

13   about it before.  It was probably about eight months or so I

14   guess.

15       Q.   And how often during that time would you be

16   communicating with him?

17       A.   Frequently.  Frequently.

18       Q.   Multiple times a week?

19       A.   Probably.  Again, 2016.  It's hard to remember.

20       Q.   Yeah.  And at some point did matters turn towards

21   money?

22       A.   Yes.  He said that he had an oil -- he told me he

23   worked for Exxon Corporation as an oceanographic specialist I

24   think, and that he had a ship coming into Texas full of oil

25   and it was stuck because there were so many stacked up trying

1   to come into port and he had to pay a lot of money every day,

2   you know, for fines for not bringing their tanker into the

3   port.

4        Q.   And what did he ask you to do?

5        A.   He asked me to send him money to help pay the

6   fines, if I recall properly, and I did.

7        Q.   Were there other things he asked you to do that

8   required you to send him money?

9        A.   He asked me to send him a telephone one time

10   because his phone was broken.  So I sent it to his friend.

11        He said the Coast Guard wanted a $5,000 fine for

12   his ship.  I sent that.  At that point, that was in 2016,

13   maybe 2017.  I don't remember.

14        Q.   And how much money of your own do you estimate that

15   you sent to Frederick?

16        A.   Over time I sent him at least $100,000, but it

17   caused me to lose a lot of money from my business because I

18   was taking time to do these things for him.

19        Q.   And did he -- when you were giving him this money,

20   did he tell you he would pay you back?

21        A.   Yes.  He said when he returned home he had two

22   homes, two houses that he could sell or take an equity line of

23   credit on and repay me for the money I had sent to him.

24        Q.   At first did you believe him?

25        A.   Yes.  Yeah.

1     Q.   And did you continue to believe him?

2     A.   I did for, you know, quite some time, and then --

3 we didn't really talk for quite a while, you know, chat or

4 whatever, and then he said that he had an opportunity to, I

5 think he put it, broker bitcoin for other people.  And if I

6 could help him with that, he would be able to pay me back more

7 quickly.

8     Q.   So by that time when he broached the idea of

9 brokering bitcoin for him, what was the status of your

10 relationship as far as you thinking he would come back and be

11 with you?

12     A.   I thought maybe there was a chance, but I really

13 needed to get the funds I sent to him back.  That was really

14 important.

15     I have two daughters that both have an autoimmune

16 disease and I was helping them, you know, with their

17 medications and everything, and I really needed to get my

18 money back.

19     Q.   And did you -- tell me about what he wanted you to

20 do as far as helping him with the bitcoin, making money

21 through bitcoin.  What did he tell you that was going to

22 involve?

23     A.   Well, he said that people would send wire transfers

24 into my account, my personal account, and I should forward

25 these funds to someone named Ian Freeman and that Frederick

1    would send me a wallet ID, I guess that's like a bank account

2    number with bitcoin, and that Ian Freeman would send the

3    bitcoin proceeds to him at that wallet number.

4        Q.    And did Frederick put you in contact with Mr.

5    Freeman?

6        A.    Yes, yes.

7        Q.    And how did that happen?

8        A.    I think, and I can't be 110 percent sure, but

9    either by a text message or an e-mail.

10       Q.    Okay.  And did you end up having multiple

11   communications with Mr. Freeman?

12       A.    Yes.  After the initial contact Mr. Freeman said

13   the best way to contact him would be through Telegram, which

14   is an app.

15       Q.    And what kind of information would you get from Mr.

16   Freeman?

17       A.    He would tell me the bank account number to send

18   the funds to and he would tell me how to send the funds, like,

19   send a copy of the wire transfer I was making with a statement

20   at the bottom saying that the funds were only for the sale of

21   bitcoin and there would be no refunds.

22       Q.    And how about reasons to give the bank?  Would he

23   provide any of those?

24       A.    Yeah, I think initially it was for purchase of rare

25   coins, and I asked him why and he said banks don't like to see

1   bitcoin transactions.

2           At that time it was not new, but I guess newer.

3   Now PayPal has bitcoin, but back then it was very rare you

4   would see anybody sending bitcoin.

5       Q.   And how much did you know about bitcoin at that

6   time?

7       A.   Only what I read on the Internet.  That it was a

8   different type of currency that could be traded, and that was

9   really about all.

10      Q.   And did you have any of your own bitcoin?

11      A.   No, no.  I didn't have any money.

12      Q.   Okay.  And did Mr. Freeman in addition to providing

13  you -- did he always have you send the wires to him or did he

14  tell you to send them to other people?

15      A.   He had -- generally, I sent to him.  Not always to

16  the same bank though.  He had a lot of different banks, and I

17  asked him about that and he said that he traveled a lot so he

18  had banks in many places.

19           Other times he would have me send them to Aria

20  DiMezzo who I understood to be a neighbor of his and a James

21  Baker or a James Barker.  I don't remember his name.  I

22  thought they were husband and wife, Aria and James.  I'm not

23  sure if they really were.

24      Q.   And anyone else?

25      A.   Yeah.  His girlfriend, Renee -- it starts with an

1  S.

2      Q.   Did you ever speak to Aria or Renee?

3      A.   I don't think so.  I think I just -- they had

4  Telegram communication as well, the app, so that's how we

5  communicated.

6      Q.   Okay.  And were you getting -- these wires into

7  your account, where were they coming from?

8      A.   All different people and places.  And Frederick

9  would say -- you know, he would send me -- occasionally he

10  would send me a copy of the wire transfer that would be going

11  into my account.  I didn't really scrutinize them that much.

12  I would just make sure that, you know, whatever that transfer

13  document said was the amount that went into the account.

14      Q.   And did Frederick pay you anything for what you

15  were doing?

16      A.   Not really.  He paid for the transfer fee.  That

17  would vary anywhere from $25 to $35, and he would pay me a

18  couple of dollars for gas.  That's about it.

19      Q.   And we'll have later in the trial the exact number

20  of wires that you did to Ian, Aria, and Renee, or their

21  associated entities, but do you have a sense of how many times

22  you did this roughly?

23      A.   I don't recall the number of times, but it was a

24  lot of money over time.

25      Q.   And how long did you go on getting wires from other

1   people and then sending it to Freeman or his --

2      A.   I think that started -- and, again, I don't

3   recall -- around 2019 and finished in 2020 sometime.

4      Q.   And at any point did Mr. Freeman ask you why you

5   were buying so much bitcoin from him?

6      A.   No.  He didn't ever ask me, and I don't think he

7   really cared.

8      Q.   How about Aria?  Did she ever ask you?

9      A.   No one ever asked me why I was buying bitcoin.

10      Q.   Okay.  How about as you dealt with banks?  As you

11   were sending all these wires, did that ever become a problem

12   for you?

13      A.   Yeah.  At first I didn't realize, but they would

14   close my account.  But then looking back, you know, when you

15   put money in an account and then you're wiring it out the next

16   day, I guess their compliance officers would say, hey, you

17   know, this doesn't look good, but they would just send me a

18   letter in the mail saying they were closing my account and

19   they didn't need to give me a reason.

20      Q.   Did that happen multiple times?

21      A.   It happened a few times, yeah.

22      Q.   Why does this eventually stop?

23      A.   I had an account at a bank called ConnectOne, and I

24   had a really good relationship with the manager there.  I had

25   my business accounts there also.

1      Q.    Okay.  And did the bank -- let me just ask it this

2  way.  Did the bank advise you to stop?

3      A.    Actually, I got a letter from the bank.  And I went

4  in to the bank to close out my business accounts, I had to

5  move them also, and the manager, having been a good

6  relationship, gave me a copy of an article from New Hampshire

7  stating that Ian Freeman had been arrested.

8      Q.    And did you then --

9      A.    Of course I totally flipped out on Frederick and

10  discontinued contacting Ian.

11      Q.    And when's the last time you talked to Frederick?

12      A.    Pardon?

13      Q.    Have you spoken to Frederick?

14      A.    I haven't spoken to him.  He's been trying to

15  contact me even recently trying to get me into some scheme

16  about financial advisor or something, but I'm just basically

17  saying stay away from me, leave me alone.

18      Q.    Okay.  And did you ever get your $100,000 back?

19      A.    No. I didn't get any of my money back.

20      Q.    So let me show you --

21          MR. AFRAME:  We agree to admit 2802 to 2820.

22          MR. SISTI:  That's without objection.

23          THE COURT:  2802 to 2820 inclusive?

24          MR. AFRAME:  Yes.

25          THE COURT:  Admitted.

```
 1                    (Government's Exhibit Nos. 2802 thru 2820 Admitted)
 2          Q.    And we're going to show you now a series of photos
 3     with you holding receipts.
 4                Who were you -- when you would take these selfie
 5     pictures, who would you send them to?
 6          A.    To Ian or one of the other people that was going to
 7     be receiving a wire.
 8          Q.    And how would you do that?
 9          A.    How would I take the picture?
10          Q.    How would you send the selfie?
11          A.    Oh.  Through Telegram.
12          Q.    And when you were going to do a transaction to send
13     money to Mr. Freeman or one of the other people, would you
14     contact them ahead and let them know it was coming?
15          A.    I would send a message to the person and just say
16     will you be able to receive this amount of money and which
17     bank should I send it to and which person.
18          Q.    And what would you get back?
19          A.    I would get the name of the bank, the account
20     number, the routing number, and who to send it to.
21          Q.    Okay.  So let's look at 2803.
22          A.    Is there going to be something coming on the
23     screen?
24          Q.    Yeah, on that screen.
25          A.    There's nothing here.  Okay.
```

1     Q.    Is that you?

2     A.    Yeah.

3     Q.    And is that -- that's signed January 28, 2020?

4  Sorry.  We're blowing up the bottom now.

5     A.    Oh, that's better.  Yeah.

6     Q.    And does that say:  I, Karla Cino, authorize --

7     A.    Would you like me to read it?

8     Q.    Go ahead.

9     A.    I, Karla K. Cino, authorize --

10          THE COURT:  Read it slowly, please.

11    A.    Oh, sorry.

12          THE COURT:  Not a problem.

13    A.    I, Karla K. Cino, authorize and -- I can't read the

14  next word -- a wire transfer in the amount of $29,445.50 --

15  oh, no, it's USD -- for the purchase of bitcoin from FTL_Ian

16  on Telegram.  I understand this transaction is nonrefundable.

17          I signed it with my name, Karla K. Cino, printed my

18  name below it, and dated it 1-28-20.

19    Q.    And that's your handwriting?

20    A.    Yes.

21    Q.    Okay.  And let me show you 2804.  Does that say

22  the -- you can read that one as well?

23    A.    Yeah.  It's essentially the same:

24          I, Karla K. Cino, authorized and completed a wire

25  transfer in the amount of $41,565 USD for the purchase of

1    bitcoin from FTL_Ian on Telegram.  I understand this

2    transaction is non-refundable.

3             My signature, Karla K. Cino, the date 1-28-20, and

4    my printed name below, Karla K. Cino.

5        Q.   Okay.  And how did you put that on your shirt like

6    that?

7        A.   Scotch taped.  It was too hard to hold it up and

8    take a picture with my other hand.  So he told me to do it in

9    the mirror.

10       Q.   Who told you?

11       A.   Ian.

12       Q.   Do what in the mirror?

13       A.   Take the picture with me facing the mirror.

14       Q.   Is that -- why did that come up?

15       A.   I told him it's really hard to hold the paper and

16   take a picture at the same time with an iPhone.

17       Q.   2805.  We don't need to read all the words.  I'll

18   just point out if there are differences, but this one was for

19   $15,000?

20       A.   Yes.

21       Q.   And on 2-5-2020?

22       A.   Yes.

23       Q.   And you taped it to your jacket?

24       A.   I taped it to my jacket because I couldn't hold it,

25   right.

```
 1          Q.   And 2806?

 2          A.   I taped it to my chin I think, and this one says --

 3          Q.   This is for 2,265?

 4          A.   Yes, yes.

 5          Q.   And, again, to FTL_Ian?

 6          A.   Exactly the same language, and it was on February

 7     6, 2020.

 8          Q.   And 2807?

 9          A.   Okay.  I can't read that, but at the bottom it has

10     the same language to Ian and, let's see, for 4,500 or 4,600.

11     I can't read it clearly.

12          Q.   Yeah.  And that's your signature?

13          A.   Yes.  I'm just going to roll my chair over.  I've

14     got a really sore neck.

15               MR. AFRAME:  And if we just blow up what bank

16     account it was sent to?

17          Q.   Who is the beneficiary you sent it to?

18          A.   Ian Freeman.

19          Q.   And what's the address?

20          A.   73 Leverett Street in Keene, New Hampshire.

21          Q.   Okay.  And is that your bathroom?

22          A.   Pardon?

23          Q.   Is this in your bathroom at your home?

24          A.   Yes.  That's where the mirror was.

25          Q.   So is that what you're doing here, you're taking
```

1    the picture in the mirror?

2        A.   Yeah.  I taped it to my jacket and took a picture

3    in the mirror.

4        Q.   And 2808.  Here you've taped it to your --

5        A.   To my lip or my chin and --

6             MR. AFRAME:  And can we just open up who this one

7    was sent to towards the top, the beneficiary?

8        A.   That's kind of blurry.

9        Q.   Yeah.

10            MR. AFRAME:  You can blow it back out.  That's too

11   blurry to see.

12       Q.   Can you see how much money this one was for that

13   you handwrote on the side?

14       A.   Yeah, 14700.  14,700.

15       Q.   Okay.  And when was that?

16       A.   The 12th of March 2020.

17       Q.   Okay.  And 2809?

18            And, again, one we saw Bank of New Jersey.  This is

19   now Valley Bank, right?

20       A.   This is Valley Bank, but that used to be Oritani.

21   All these banks sell their companies.  So Bank of New Jersey

22   sold to ConnectOne.

23       Q.   Okay.  And is this a different bank, Valley?

24       A.   Valley used to be Oritani.  So, yeah.

25            That one you're showing now is Bank of New Jersey

1   which became ConnectOne, and that was for 11,500 USD.

2          Q.    And that was on what date?

3          A.    On the 17th of March 2020.

4          Q.    And, again, you're in your bathroom it looks like?

5          A.    Yeah, yeah.  You're just not seeing my shower in

6   the background.  You're seeing my medicine cabinet.

7          Q.    Are you in front of the mirror?

8          A.    Yeah, and it's taped to my cheek.

9          Q.    Got it.  2810?

10         A.    Okay.  That's to Ian Freeman at 73 Leverett Street,

11  and it's for $106,000.  It's the same language as the other.

12         Q.    And this one has at the top the purpose of the wire

13  on the first --

14         A.    Purchase of rare coins is what he told me to put on

15  there, yeah.

16         Q.    Okay.  Next, 2811?

17         A.    That is March 20, 2020, for $11,500, and let's see

18  if I can see the purpose there.  I don't see it.

19         Q.    So we just went through -- there were transactions

20  on -- this is -- what date is this, Ms. Cino?

21         A.    March 20, 2020.

22         Q.    Okay.  So we just went through 3-6, 3-12, 3-17,

23  3-19, 3-20.

24               Is Mr. Freeman discussing any of the particulars or

25  Frederick or why you're doing this?

1    A.    No.  He never asked me why I was doing it.  He just

2    told me the language to put at the bottom of these.  He wanted

3    me to send a picture of the wire transfer separate and then

4    send him the one with the language at the bottom.  I wrote

5    that after.  That wasn't on there at the time I, you know, did

6    the transfer in the bank.

7        Q.    And based on anything you and he discussed, would

8    he have known whether this was your money or someone else's

9    money?

10       A.    He never asked me if it was my money.  I just knew

11   he had this relationship and that's where the money was going.

12       Q.    2812?

13       A.    Purchase of rare coins at the top.  It looks like

14   $5,480.

15       Q.    And who did it go to?

16       A.    Ian B. Freeman, 73 Leverett Street, Keene, New

17   Hampshire.

18       Q.    Okay.  And this was $5,480?

19       A.    Yeah.

20       Q.    And this was on April 1?

21       A.    Yes.

22       Q.    And then 2813?

23       A.    Okay.  This must be one -- yeah, I sent this to

24   Aria DiMezzo who I understood was his neighbor.

25       Q.    And who did you understand that from?

1          A.     Who what?

2          Q.     How did you know that?  Who told you that?

3          A.     Ian told me to utilize her because he was going to

4     be traveling, if I recall correctly.  $19,700 it looks like.

5          Q.     And this says:  I am Karla K. Cino buying bitcoin

6     from Aria DiMezzo via Telegram?

7          A.     Yeah.  A wire transfer in the amount of 19,700.  I

8     understand it cannot be refunded or reversed, and she insisted

9     on a copy of my daughter's driver's license.

10         Q.     Okay.

11         A.     On the 17th of August of 2020.

12         Q.     And 2814?

13         A.     Okay.  This one --

14         Q.     Again, you're holding your driver's license?

15         A.     Yeah.  This went to Aria DiMezzo also I think.

16    Yes.

17         Q.     And over here the reference is construction

18    payment?

19         A.     Right.

20         Q.     Do you remember how that came about?

21         A.     I asked her -- I said, you know, why is that, and

22    she says, well, I took an equity line out on my house so the

23    bank won't have a problem accepting these funds coming in as a

24    construction payment.

25         Q.     Okay.  And, again, how are you communicating with

1   DiMezzo?

2        A.    On Telegram.

3        Q.    And the date of this transaction was what?

4        A.    Is that the one that's up now?

5        Q.    Yeah.

6        A.    It looks like 10-28-2020.  Yes, 10-28-2020.

7        Q.    And 2815?

8              MR. AFRAME:  Could we zoom in on I think the top of

9   this one?

10       A.    This one is to Ian Freeman.  I can't really -- oh,

11  this says to his Peace Church.  And I asked him about that,

12  and he goes, well, sometimes we just put it in the donation

13  and then send the bitcoin out afterwards, the purchase of

14  bitcoin through the church and send it out.

15       Q.    Okay.  Did he tell you anything else about the

16  church?

17       A.    That he was a pastor in the church and that Aria

18  DiMezzo, I think was her name, was a member of the church or

19  functioned in the church.

20       Q.    Okay.  And that was on what date?

21       A.    November 13, 2020, for -- where is the amount?  Let

22  me see now.

23       Q.    That's okay.  2816.

24       A.    Okay.  This is for -- this is Aria DiMezzo.

25       Q.    Aria DiMezzo, yeah.

 1        A.    And I think this is for construction of something.

 2    Something to do with the construction on her home also.

 3        Q.    But did it really have to do with construction on

 4    her home?

 5        A.    Pardon?

 6        Q.    Did it really have to do with construction on her

 7    home?

 8        A.    I don't know how they were handling it.  I really

 9    had no idea.

10        Q.    Okay.

11              MR. AFRAME:  Move down on the --

12        A.    I asked her -- I said, why, and she said, well, you

13    know, it's my account.  Usually you send money to Ian for

14    bitcoin.  And of course on the bottom it says for purchase of

15    bitcoin from Aria DiMezzo.  No refunds allowed.

16        Q.    Okay.  And it was for how much at the top?  Do you

17    see that?

18        A.    If I can find it.  I can't see it there.  Oh, I

19    see.  4,767.

20        Q.    Thanks.  I just have a couple more.

21        A.    Okay.

22        Q.    2817, who is this one to?

23        A.    Renee Spinella.  I think she was Ian's girlfriend,

24    if that's correct.  That's what I was told.

25        Q.    Okay.

1      A.   She also lived in New Hampshire.  This was for

2   $1500.

3      Q.   Okay.  And just a couple more.  2818?

4      A.   All right.  This is December 7th --

5      Q.   No, no.  That's okay.  What's the date on this one?

6      A.   This one is January 20, 2021.

7      Q.   And what bank did you send this one to?

8      A.   Let's see.

9      Q.   Do you see under beneficiary the name?

10      A.   Yeah.  Ian Freeman.  I was looking for the name of

11   the bank, but I can't see it.

12      Q.   And 2819?

13      A.   This one is to Ian Freeman, and it was on January

14   20, 2021, and it was for -- I can't see the amount.

15      Q.   That's okay.

16           And the last one is 2820.  This is 2819.  Excuse

17   me.

18      A.   This one is February 4, 2021, for 9,752 to Ian

19   Freeman.

20      Q.   And the last one?

21      A.   March 9, 2021, to Ian Freeman.

22      Q.   And how much?

23      A.   $9,650.

24      Q.   Now, when you sent these -- you know, all of these

25   had the handwriting that it was for bitcoin.  Would you put

```
 1   that on the wire receipt before or after you would make the
 2   transaction at the bank?
 3        A.   No.  Afterwards.  Before I sent him the photo.
 4        Q.   So did the banks understand that all these
 5   transactions were for bitcoin or they didn't --
 6        A.   No.
 7             MR. SISTI:  I would have to object and move to
 8   strike.
 9             THE COURT:  Yeah, that's sustained.
10             MR. SISTI:  Thank you.
11             THE COURT:  There's definitely a way of getting it,
12   but not that way.
13        Q.   What you submitted to the bank is the wire slips
14   that didn't have the words on them, right?
15        A.   Correct.  I put that on there after.
16        Q.   We just went through a whole bunch of them.  Did
17   any of them say anything without the writing you put
18   afterwards about bitcoin?
19        A.   No.
20             MR. AFRAME:  Okay.  Thank you.
21             THE COURT:  Cross.
22             MR. SISTI:  Thank you.
23                      CROSS-EXAMINATION
24   BY MR. SISTI:
25        Q.   Good afternoon.
```

1    A.    Hello.

2    Q.    You're still in business in New Jersey?

3    A.    Yes.  I'm trying to stay alive in this climate.

4    Q.    Is it commercial or is it --

5    A.    I do commercial and residential real estate in New

6    York and New Jersey.

7    Q.    All right.  So you're still active, you're still in

8    the business, and you're still out there?

9    A.    Still trying to make a living, yeah.

10   Q.    All right. Okay.

11   A.    I'm trying to recover from Frederick Dreher.

12   Q.    Yeah, we're going to talk about Frederick.

13         When did this relationship with Frederick start?

14   A.    In 2016.  I think it was in June.

15   Q.    Okay.  So this has been going on a long time?

16   A.    Yeah.

17   Q.    Well before Ian Freeman entered into your sphere?

18   A.    Yeah.  Ian Freeman's transactions entered in once I

19   was requested to try to help Frederick with his bitcoin

20   business.

21   Q.    Frederick's so-called bitcoin business, right?

22   A.    Yes.  Exactly.

23   Q.    You don't know who this guy is?

24   A.    No.  I've never met him.  I've only seen

25   photographs.  I don't even know if those photographs are him.

1      Q.   Okay.

2      A.   And, again, I feel really stupid, ignorant, used,

3  but it is what it is, and, you know, it's in the past.

4      Q.   Right.  But, I mean, a good deal of it I guess up

5  until, what, 2019, had nothing to do with Ian, right?

6      A.   Nothing to do with bitcoin.  Nothing to do with

7  Ian.  Uh-huh.

8      Q.   And you were just sending money over for this oil

9  rig guy?

10     A.   That was -- yeah, you know, that -- I would have to

11  look way back, but I think that was really mostly in 2016,

12  '17.

13     Q.   Right.

14     A.   After that I didn't send him any money that I can

15  recall.

16     Q.   Okay.  2016-2017 he's making believe he's some kind

17  of oil guy and the Coast Guard is fining him and he needs

18  money and this and that, right?

19     A.   Yeah.

20     Q.   Right.  And then all of the sudden you guys don't

21  have anymore conversation for a while?

22     A.   No, there were occasional text messages I guess.

23  Maybe e-mail.  I don't even recall at this point.  But, you

24  know, I just kept asking him, when are you going to be able to

25  repay me the money that I've given you and when are you going

1  to be coming back to the U.S.?  Can't you mortgage the houses

2  that you own, you know, to try and help me get out of the

3  hole, because I was very -- I owed money on my taxes and --

4  you know, I was in financial disaster really.  Working hard

5  but, you know, the money --

6         Q.    He was taking advantage of you.

7         A.    Exactly.  Exactly.

8         Q.    Right.  And that had absolutely nothing to do with

9  this bitcoin business?

10        A.    No.  The bitcoin I think started in '19 or '20.  I

11  don't recall.  You could look at the receipts.  You could

12  figure that out.

13        Q.    All right.  But at some point in time this bitcoin

14  thing gets going, and what's the deal there?  You get involved

15  with that in order to get your money back or something like

16  that?

17        A.    No. I received the transfer fee and a little bit of

18  money for transportation.  I didn't take money, you know, for

19  myself from any of those transactions other than --

20        Q.    Okay.  Why did you continue with this relationship

21  then?

22        A.    I was -- well, number one, I thought his bitcoin

23  thing was legitimate and that at some point he would, you

24  know, be able to pay me back.

25              And as far as a relationship, at that point I was

1   praying that one day he would pay me my money back.

2        Q.   Did he ever say that he was in business with Ian

3   Freeman?

4        A.   He didn't say I'm in business with Ian Freeman.  He

5   did not use those words.  I just had a phone number to contact

6   Ian, and then a Telegram address to contact Ian, and that was

7   the only mention.

8        Q.   That was it.  It wasn't as though they were

9   business partners or they were in this together or anything

10  like that, right?

11       A.   No, not to my knowledge.

12       Q.   Okay.  And he never said that he was in business or

13  business partners with Renee Spinella, for instance?

14       A.   With any of those other people, no.

15       Q.   Aria DiMezzo?

16       A.   Yeah.

17       Q.   Nothing, right?

18       A.   Nope.

19       Q.   Are you aware that actually Ian does deal in

20  bitcoin?

21       A.   Well, I assumed that he did since he was sending

22  the -- Frederick would send the -- sorry.  My neck is really

23  sore.

24       Q.   No, I'm sorry, too.

25       A.   Frederick would send the wallet number that Ian had

1    to send the bitcoin funds to.

2         Q.    Right.

3         A.    So I guess technically they were in business

4    together.

5         Q.    Well, he was sending the bitcoin to where it was

6    supposed to go?

7         A.    Uh-huh.

8         Q.    You don't know if they ever even met each other

9    ever?

10        A.    Oh, I have no clue.  I have no idea about their

11   personal relationship.

12        Q.    Right, yeah, or ever communicated with each other?

13        A.    I have no idea.

14        Q.    Or if there is such a guy as this Frederick?

15        A.    It could be Joe Schmoe for all I know at this

16   point, yeah.

17        Q.    Yeah.  That whole story could just be absolutely

18   totally fabricated?

19        A.    Of course.  It's not unusual in this day and age of

20   the Internet, unfortunately.

21        Q.    Now, a lot of these banks that you were running

22   this money through before the bitcoin thing -- how many

23   different banks?

24        A.    Before bitcoin?

25        Q.    Yeah.

1      A.    One or two, I guess.

2            Before bitcoin I had no reason to change banks.

3      Q.    Right.

4      A.    I had never had a bank account closed on me without

5   being notified prior to bitcoin.

6      Q.    Okay.  So you were sending these checks and they

7   were going to Frederick and everything?

8      A.    They weren't checks.

9      Q.    Money orders or transfers?

10     A.    I don't even remember if I wire transferred it or

11  used a MoneyGram or something like that.

12     Q.    None of your banks said you've got to watch out

13  here, something is goofy?

14     A.    None of what?

15     Q.    None of your banks warned you of anything?

16     A.    No, no.  I didn't send him money regularly.  It was

17  occasionally.  So I didn't suspect anything, and I'm sure the

18  bank didn't have a clue, you know.

19            And I think also that I might have sent -- if I go

20  back in my mind, I may have sent Frederick, or whoever he is,

21  money through MoneyGram or RIA, which is a money transfer

22  service, but I can't recall specifically.

23     Q.    Okay.  So there were all different ways you were

24  working to get money to Frederick, right?

25     A.    Well, he would tell me, you know, who to send it

1      to.  I never actually sent Frederick Dreher using that name

2      any money.

3           Q.    You didn't?

4           A.    No.

5           Q.    What names did you send money to?  Do you remember?

6      Do you remember who you sent money to?

7           A.    At this point, no.  It's years ago.  '16, '17, '18,

8      '19, '20, '21, six years ago.  I really don't remember.

9           Q.    Do you know if any of those people are being -- do

10     you know if Frederick is being investigated now?

11          A.    Not that I know of.  I do have information.  If the

12     FBI wants it, I'll give it to them.

13          Q.    I mean, how many times have you talked with the FBI

14     about Frederick?

15          A.    Just at my interview at Dunkin Donuts when they

16     came to meet me prior to these proceedings.  A few weeks ago,

17     I guess.

18          Q.    And did you say you would give them any information

19     they wanted?  I mean, you want your money back, right?

20          A.    Yeah.  They didn't ask me for information about

21     Frederick particularly.  I offered to give them some

22     information if they wanted it, and they said that's an

23     entirely different scenario.  That this is about Ian and the

24     bitcoin.

25          Q.    The FBI didn't want to know?

1    A.    I don't know if they didn't want to know, but at

2    that time they didn't appear to want any information that I

3    had.

4    Q.    They didn't want to know about any information

5    concerning Frederick?

6    A.    At that time.

7    Q.    Yeah.  Was there any other time they wanted to know

8    about Frederick?

9    A.    No, because that's the only time I spoke to them.

10   I met with a couple of agents and a recording secretary I

11   think.

12   Q.    When you were in contact with Ian, he did give you

13   an address and his name, the city?

14   A.    I needed that for the wire transfers.

15   Q.    Right.  That was right there on the wire transfers.

16   Of course the banks would have known about that because it's

17   right there, right?

18   A.    Uh-huh.  Of course.

19   Q.    Yeah.  I mean, there was nothing surreptitious

20   about that.  It's Ian Freeman.  He gave you an address in

21   Keene, New Hampshire, right?

22   A.    He gave me his name, his address, his account

23   number, and his wire routing number, and the name of the bank.

24   Q.    Right.  He didn't say you got to keep my name a

25   secret or my address, anything like that, right?

1      A.      How can you send a wire transfer and keep someone's

2  name a secret?  No, he didn't say that.

3      Q.      Well, I guess you could.  You could send it to a

4  fake guy and a fake house with a post office box if you wanted

5  to, right?

6      A.      Well, if he had a bank account, his name is on it I

7  would presume.

8      Q.      Yeah.  So, I mean, everything was right there for

9  you, right?  His identification was open to you?

10      A.      Yeah, if that's who he really is.  Like I said, I

11  never met him.  I saw a picture of him wearing a hat on his

12  Telegram page.  Other than that, I don't know the man.

13      Q.      Okay.  Did you ever tell him why you were

14  purchasing bitcoin?

15      A.      I don't think so.  He never asked me.

16      Q.      Did you ever tell him that you were a reseller of

17  bitcoin?

18      A.      No.

19      Q.      Did you ever tell him you were in the trade of

20  utilizing bitcoin or reselling bitcoin?

21      A.      No.

22      Q.      Nothing came up with regard to the use of the

23  bitcoin?

24      A.      No.  Not that I recall, no.  I didn't chat with him

25  a lot.  It was what bank, the account number, the routing

1    number, the person, and the name and address.  That was it.

2    And the amount and what to put on the transfer.  That was it.

3         Q.   All right.  So he wouldn't know what in the world

4    you were doing with that bitcoin?

5         A.   I have no idea whether he would or wouldn't know.

6    Obviously, he was in business doing this apparently with a lot

7    of other people so --

8         Q.   Right.

9         A.   But with me he never asked me what I was doing with

10   it.

11        Q.   He never asked you.  You never told him, right?

12        A.   I wasn't doing anything with it.  I gave him the

13   wallet number that Frederick Dreher gave me, and that's where

14   Ian sent the bitcoin.

15        Q.   Okay.  But let me ask you this.  Did you tell him

16   Frederick Dreher told me to get in touch with you?

17        A.   I don't recall.  It's a long time ago.  I think

18   maybe 2019 or something.

19        Q.   Right.

20        A.   And if I had said that, it would have been in the

21   Telegram conversations I think, but there's no history on

22   those.  I think that's probably why he liked to use it because

23   you can't save any of the conversation unless you take a

24   picture of it.

25        Q.   Well, we've seen it.

1        A.     Okay.  Good.

2        Q.     The thing, though, is -- I guess I'm coming back to

3    an old subject.  This Frederick guy has been in contact with

4    you after 2021?

5        A.     And?

6        Q.     When's the last time you had a conversation with

7    him?

8        A.     Oh, probably last week.  He's trying to get me

9    involved in some kind of financial advisor scheme.  He told me

10   he's gotten his credentials for financial advisor and that if

11   I could get someone here to take money from one of you, that

12   he would invest it.  You know, I basically played along with

13   him after this all came to light that he was -- that Ian was

14   being arrested for all of this.

15            I let Frederick contact me only on occasion.  He

16   kept asking me to send him money.  I told him I didn't have

17   any.  And then he tried to involve me in some other scheme,

18   and I told him I'm not interested.

19            The only reason I kept any open conversation was

20   possibly to help the FBI grab him at some point.

21       Q.     Right, right.

22       A.     But I benefit nothing from it.

23       Q.     Right.

24       A.     I sat out in that room for four hours today waiting

25   to come in here with my coat on because I was cold, but I'm

1    trying to do the right thing here.

2         Q.    You are doing the right thing.  And my question for

3    you is, has the FBI been doing the right thing for you?

4              MR. AFRAME:  Objection.

5         A.    I think so.  They treated me with respect.  I mean,

6    I had to take five days away from my business, but I'm willing

7    to be a good citizen and do the best I can to make this right.

8         Q.    Good.  Did they tell you --

9         A.    They --

10        Q.    I'm sorry, ma'am.

11             THE COURT:  Let her finish.

12        Q.    Go on if you've got more to say.

13        A.    I can't hear you.

14        Q.    If you have more to say, go on.

15        A.    One more time.

16        Q.    If you have more to say, I don't want to cut you

17   off.

18             THE COURT:  Finish your answer.

19        A.    Okay.  What were you asking me now, have they

20   treated me right?

21        Q.    I think, yeah, we were talking about that.

22        A.    Yes.

23        Q.    Did they tell you they're going to go after

24   Frederick?

25        A.    They said that that would not occur at this time.

1    I don't know if they will in the future.  I'm not privy to

2    that at this time.

3         Q.    Did you tell them that you've been talking with

4    Frederick as recently --

5         A.    I told them I have information, and they said that

6    they would follow up on that.  That's as far as it went.

7         Q.    That was it?

8         A.    Yes.

9         Q.    Thank you.

10        A.    You're welcome.

11              MR. AFRAME:  Nothing further.

12              THE COURT:  You're excused.

13              THE WITNESS:  Okay.  Thank you.

14              I'm going to grab a bottle of water because I

15   haven't had anything.

16              THE COURT:  Take a couple if you want.  You earned

17   it.

18              How long have we been going, Kellie?  I know we

19   took a break there when I was doing the research, but what

20   else?

21              THE CLERK:  We have fifteen more minutes.

22              THE COURT:  Let's take a ten minute break now, and

23   then we'll go right till 5:00 o'clock.

24              (RECESS)

25              MR. AFRAME:  Your Honor, the United States calls

1    Special Agent Kendall McBrearty.

2             THE COURT:  This witness is going to be lengthy,

3    right?

4             MR. AFRAME:  Yes.

5                          KENDALL MCBREARTY

6         having been duly sworn, testified as follows:

7             THE CLERK:  For the record, please state your name

8    and spell your last name.

9             THE WITNESS:  Kendall McBrearty, M-C-B-R-E-A-R-T-Y.

10            MR. AFRAME:  Your Honor, before we begin, the

11   United States moves to admit Exhibits 1501 to 1581 inclusive,

12   as well as Government's Exhibit 1914.

13            MR. SISTI:  One second, please.

14            (Attorney Sisti confers with Attorney Aframe)

15            THE COURT:  Are you going to change that?

16            MR. AFRAME:  I'm going to make a slight amendment.

17            For now we will not do -- 1580 and 1581 we'll

18   reserve until tomorrow.

19            THE COURT:  So 1501 to 1579, and then that one

20   other one.

21            MR. AFRAME:  1914.

22            THE COURT:  Those are admitted, Kellie.

23            MR. AFRAME:  Thank you, your Honor.

24      (Government's Exhibit Nos. 1501 thru 1579 and 1914 Admitted)

25                         DIRECT EXAMINATION

BY MR. AFRAME:

Q.    Good afternoon, Special Agent McBrearty.

A.    Good afternoon.

Q.    Could you tell the jury how you're employed?

A.    I am a Special Agent with the Federal Bureau of Investigation.

Q.    And how long have you been with the FBI?

A.    Just under eight years.

Q.    And where did you go to -- tell us about your educational background.

A.    I got my undergraduate degree at the University of Virginia and my Master's at Boston University.

Q.    And prior to coming to the FBI did you have law enforcement experience?

A.    I did.  I was a police officer for the City of Charlottesville.

Q.    And tell us about where you've been with the FBI. Where was your first station?

A.    I first started out in our Los Angeles division in our Long Beach resident agency.  Then after that -- I spent four years there, and then I went to D.C. to the Attorney General's detail.

Q.    Just briefly, what does that mean, you were on the Attorney General's detail?

A.    The Bureau provides 24/7 protection for the

```
 1    Attorney General and for the Director of the FBI.  So I was on
 2    the Attorney General side.
 3         Q.   And which Attorney Generals did you help protect?
 4         A.   I started with Attorney General Barr and finished
 5    with Attorney General Garland.
 6         Q.   And after doing that work where did your travels
 7    take you next?
 8         A.   New Hampshire.
 9         Q.   And how long have you been in New Hampshire?
10         A.   Just over a year.  I got here October of 2021.
11         Q.   Okay.  And what's your present assignment?
12         A.   Presently I'm with our national security.
13         Q.   Before that in New Hampshire when you first got
14    here, did you have a different assignment?
15         A.   I did.
16         Q.   And what was that?
17         A.   I was working white collar crimes.
18         Q.   And was this -- this case, was this in the white
19    collar crime section?
20         A.   Yes.
21         Q.   And what's your present role?
22         A.   I am the case agent of this case.
23         Q.   And that happened well into the investigation,
24    correct?
25         A.   It did.
```

1      Q.    And so what was your -- I mean, you came after the

2  arrests and the search warrants and all that, right?

3      A.    Correct.

4      Q.    So what was your primary role in the case?

5      A.    I came in -- when I came in, interviews had just

6  been started with people, a lot of people, and then evidence

7  was being reviewed.  Those were kind of my two main functions

8  was to conduct interviews and review evidence.

9      Q.    And we -- it doesn't seem like today, but it was

10  today that we heard testimony about some computers being

11  imaged.  Did you have -- what was your role as it relates to

12  Mr. Freeman's computer that we saw pictures of earlier today?

13      A.    I reviewed his computer.

14      Q.    And what else -- what other items did you review?

15      A.    Three other cell phones.

16      Q.    And who did they belong to?

17      A.    One was Renee Spinella, another was Andrew

18  Spinella, and the third was Aria DiMezzo.

19      Q.    Okay.  And is that going to be primarily what you

20  testify about today?

21      A.    It is.

22      Q.    All right.  Let me -- before we get to that, let me

23  start with Government's Exhibit 1914.

24            Do you recognize these records?

25      A.    Yes.

1        Q.    And what are they?

2        A.    These are records we received from Kraken regarding

3   Ian Freeman's account there.

4        Q.    And what is Kraken, if you know?

5        A.    It is a cryptocurrency exchange.

6        Q.    If you just hold on one second as we put it up, I'm

7   going to be asking you some questions about what we're seeing

8   here.  Just one second.

9              Okay.  So looking -- are you familiar with these

10  records?

11       A.    Yes.

12       Q.    So looking at the first column, do you know what

13  txid stands for?

14       A.    Transaction ID.

15       Q.    And the second column just says refid.  Do you know

16  what that is?

17       A.    Reference ID.

18       Q.    And then the third column is even more

19  self-explanatory.  It says time?

20       A.    Yes.

21       Q.    And what's the fourth column?

22       A.    Type.

23       Q.    And there's deposit and then there's trade.

24             Do you know what trade means?

25       A.    Yes.

1        Q.    What does that mean?

2        A.    When money was exchanged.

3        Q.    Okay.  So this company -- and I think the jury

4    knows this already, but just to be clear, what does this

5    company do?

6        A.    They exchange fiat currency for cryptocurrency and

7    vice versa.

8        Q.    Okay.  So that's what a trade would be?

9        A.    Yeah, or imagine you can do cryptocurrency to

10   cryptocurrency.

11       Q.    Okay.  And moving over to asset -- the A class

12   column seems to always say currency so I'll skip over that

13   one.

14              The asset class, the asset column, if we start at

15   the very top, we see a ZUSD.  Do you know what the Z means?

16       A.    Yeah, they put a Z in front of the fiat currencies.

17       Q.    And then USD would stand for?

18       A.    U.S. dollar.

19       Q.    And so if this weren't dollars but euros, what

20   would this look like?

21       A.    If I'm remembering correctly, something like Z

22   euro, ZUR, or something like that.

23       Q.    Okay.  And then other ones have a XX, like the

24   third one down?

25       A.    Yes.

1    Q.    What's that mean?

2    A.    They put that in front of the cryptocurrencies.

3    Q.    And what does BT mean?

4    A.    Bitcoin.

5    Q.    And then the next column would be amount, right?

6    A.    Yes.

7    Q.    And then fee, right?

8    A.    Yes.

9    Q.    And I wouldn't worry about balance.

10         So if we look at the refid column, right?

11   A.    Yes.

12   Q.    Do they appear to you to come in pairs, that is,

13   they're matched -- there are two lines and they're identical?

14   A.    Yes.

15   Q.    And if we went over to -- starting going down the

16   trade, the time column, do we also seem to have pairs?

17   A.    Yes.  They correspond with the same two numbers or

18   the same two times.

19   Q.    Okay.  And if we -- let's look at an example

20   further in.

21         MR. AFRAME:  Let's go to page 353 as an example,

22   and can we look at 11-21-20 -- 1-21-20.

23   A.    Okay.

24         MR. AFRAME:  And can you pull out the one that's at

25   1927, the pair, the couple that's at 1927?

1      A.    Yes.

2            MR. AFRAME:  Caryn, can you blow those up for us?

3      Q.    Okay.  So do you see that?

4      A.    Yes.

5      Q.    So do these go together?

6      A.    Yes.

7      Q.    And on the currency line, the 280,556, that line

8  was in the column marked amount, right?

9      A.    Yes.

10     Q.    And then the next column was fee, right?

11     A.    Yes.

12     Q.    And this related column is the 32.5285.

13           So what do we learn about this about how much

14  bitcoin was purchased?

15     A.    That amount was put in, and they received 32.5285

16  bitcoin.

17     Q.    And how much did that cost in U.S. dollars to get

18  32.5285?

19     A.    $448.91 approximately.

20     Q.    I asked that badly.  How much did you have to --

21  not the fee charge, but how much did it cost to get 32.5285 in

22  bitcoins, fees aside?

23     A.    $28,566.71 approximately.

24     Q.    Look at that again.

25     A.    To get the 32 bitcoin?

1     Q.    Yes.  What does that number say?

2     A.    I'm sorry.  Ask the question again.

3     Q.    How many bitcoin were purchased in this

4  transaction?

5     A.    32.5285.

6     Q.    Putting the fee out of it for a second, how much

7  did that cost in dollars?  What is the number above the

8  32.5285?

9     A.    280,566.7079.

10    Q.    All right.  So roughly $280,566?

11    A.    Yes.  Sorry.

12    Q.    And what was the fee that was charged by Kraken to

13  get that much bitcoin?

14    A.    $448.91.

15         MR. AFRAME:  Okay.  We'll just do one more example.

16         We'll just do page 271, and we'll look at a pair at

17  10-11-19 at 18:27.

18    A.    Okay.

19         MR. AFRAME:  I just want the jury to be familiar if

20  they want to look at these records later.  So we'll just do

21  one more example.

22    Q.    Does this look the same?

23    A.    Yes.

24    Q.    So how much bitcoin was purchased here?

25    A.    .166755.

1     Q.    And fees aside, how much did that cost?

2     A.    $1,390.07.

3     Q.    And how much of a fee had to be paid to Kraken for

4  that transaction?

5     A.    $2.22.

6     Q.    Okay.  Thank you.

7           And were there many, many similar examples

8  throughout this that looked like that?

9     A.    Yes.

10     Q.    Okay.

11           All right.  So let's start talking about Mr.

12  Freeman's computer that we heard discussed earlier this

13  morning.  We heard about the encryption and that they were

14  able to get the password.  Were you involved in any of that

15  part of it?

16     A.    No.

17     Q.    What was the first thing that you -- what did you

18  get after that whole process was over?

19     A.    I got a copy of everything that was done.

20     Q.    Okay.  And what did you do with that?

21     A.    I reviewed it.

22     Q.    Okay.  So let's go through what you were able to

23  figure out.

24           MR. AFRAME:  Can I see 1305 which has already been

25  admitted?

1    Q.   Do you know what this is?

2    A.   Yes.

3    Q.   And was this part of your review of the computer?

4    A.   Yes.

5    Q.   And what was this?

6    A.   This was the desktop's documents, downloads,

7    pictures.  That was what was pulled off of Mr. Freeman's

8    computer and provided to us for review.

9    Q.   And did you go through all of these various

10   folders?

11   A.   I did.

12   Q.   Okay.  So let's start with documents, and let's

13   look at 1501.

14        So what we saw just a minute ago -- there was a

15   bunch of folders, and one of them was documents, right?

16   A.   Yes.

17   Q.   And if we looked up at the very top, right, that

18   last thing we looked at was Home Files Only?  Was that the

19   name of it?

20   A.   Correct.

21   Q.   And now we're in documents?

22   A.   Correct.

23   Q.   And so what are we looking at here?

24   A.   This is a screenshot of the file path to get to the

25   documents folder.

1    Q.    Okay.  And let's look -- looking down at the

2    various folders, do you see one called Church?

3    A.    Yes.

4    Q.    Okay.  And so let's -- where is that, just so --

5          MR. AFRAME:  Caryn, can you just pull up Church?

6    A.    It's about six down.

7    Q.    Okay.  And 1502 would be the next document.  Again,

8    this is another screenshot, right?

9    A.    Yes.

10   Q.    So we can follow it by watching the top; is that

11   correct?

12   A.    Correct.

13   Q.    So we started at Home files, right?

14   A.    Yes.

15   Q.    Then we opened documents, right?

16   A.    Yes.

17   Q.    And then now we've opened Church; is that right?

18   A.    Correct.

19   Q.    And there are a whole bunch of folders, right?

20   A.    Yes.

21   Q.    And then there are some Word documents and PDFs at

22   the bottom?

23   A.    Yes.

24   Q.    Okay.  So the first one that I want to look at is

25   something called Church Research.

1      A.    Okay.

2      Q.    And that would be 1503.  So now we -- and I won't

3  keep doing this because I think the jury will get the hang of

4  it.  We'll do it one more time.  We start at Home files?

5      A.    Yes.

6      Q.    We opened at documents?

7      A.    Correct.

8      Q.    We open to Church?

9      A.    Yes.

10     Q.    And now we open to Research?

11     A.    Correct.

12     Q.    And in the Research there's something called Church

13  Definitions, IRS References?

14     A.    Yes.

15     Q.    Forming a Church?

16     A.    Yes.

17     Q.    Et cetera.  Okay.  And so in 1504 -- do you know

18  what 1504 is?

19     A.    Yes.

20     Q.    What is that?

21     A.    That was the PDF titled Church Definitions.

22     Q.    Where did it say that this came from?

23     A.    IRS.

24     Q.    And can you just -- just looking at the items that

25  it says at the top that talks about Church for Tax Purposes?

1      A.    Okay.

2      Q.    Do you see the various bullets?

3      A.    Yes.

4      Q.    What's the first one?

5      A.    A distinct legal existence and religious history.

6      Q.    What's the second one?

7      A.    A recognized creed, form of worship, and literature

8   of its own.

9      Q.    What's the third one?

10      A.    Definite and distinct -- oh, gosh -- ecclesiastical

11   government, including a formal code of doctrine and

12   discipline.

13      Q.    How about the fourth one?

14      A.    An organization of ordained ministers selected

15   after completing prescribed courses of study.

16      Q.    And the last one?

17      A.    Established places of worship with regular

18   congregations, religious services, and/or religious

19   instruction for members.

20           MR. AFRAME:  Okay.  Turning to the next page of

21   that -- so this is -- can I go over to Withhold Income Tax for

22   Ministers?  Next page.

23      Q.    What is this talking about?

24      A.    Income tax and what the church is required to

25   withhold.

1     Q.    Okay.  And does it say -- what does it say a church

2  is allowed to do when it comes to a minister?

3     A.    A church is not required to withhold income tax

4  from the compensation that it pays to its duly ordained,

5  commissioned, or licensed ministers for performing services in

6  the --

7          THE COURT:  I need you to read slower and read

8  louder.

9          THE WITNESS:  Okay.

10    A.    -- or licensed ministers for performing services in

11 the exercise of their ministry.

12    Q.    Okay.

13         MR. AFRAME:  And if we went to the last part of

14 this?  Back out to the last page.  Is there material -- the

15 last page of this document.

16    Q.    In this last section -- what does this section

17 generally relate to?

18    A.    Charitable donation information and what's

19 deductible.

20    Q.    Okay.  And so this was all in the folder called

21 Research?

22    A.    Yes.

23    Q.    Okay.  Let's now look at 1505.

24         Again, we're in documents, Church, and now what

25 folder are we in?

```
1          A.    Crypto Church.

2          Q.    Okay.  And is there a whole series of documents

3   here related -- in the Crypto Church folder?

4          A.    Yes.

5          Q.    Okay.  And what does the very first one say, the

6   very first folder?

7          A.    ItBit.

8          Q.    And do you know what itBit is?

9          A.    Yes.

10         Q.    And what is itBit?

11         A.    Cryptocurrency exchange.

12         Q.    Okay.

13               MR. AFRAME:  And if we turn to 1506?

14         Q.    In the itBit folder I see a -- do you see a

15   passport?

16         A.    A passport photo, uh-huh.

17         Q.    A passport photo?

18         A.    Yes.

19         Q.    Who is that passport of?

20         A.    Renee LeBlanc.

21         Q.    And whose computer is this?

22         A.    Ian Freeman's.

23         Q.    And what church is this?

24         A.    Crypto Church.

25         Q.    Folder?
```

1      A.   Yes.

2      Q.   And 1507 I think was actually shown to Ms. Spinella

3  earlier, but I'll show it to you again now.

4           This was a -- what does this appear to be?

5      A.   It's institutional documentation, nonprofit

6  organizations for itBit.  It's account opening.

7           MR. AFRAME:  And if we go to section 1?  Next page.

8      Q.   What church is this for?

9      A.   I think it said Crypto Church of New Hampshire.

10          MR. AFRAME:  Did your screen go off?

11          THE COURT:  Yeah.

12          MR. AFRAME:  Okay.

13     A.   Yes, the Crypto Church of New Hampshire.

14     Q.   And what address is given for the mailing address

15  for that entity?

16     A.   The mailing address is 73 Leverett Street, Keene,

17  New Hampshire, 03431.

18     Q.   And what city is the physical address?

19     A.   City is Derry, New Hampshire.

20     Q.   And the telephone number?

21     A.   603-209-7122.

22     Q.   And if we went to section 2, who's listed there as

23  the name?

24     A.   Renee LeBlanc.

25     Q.   And what does it say her position is?

1      A.    Minister.

2      Q.    And if we went to section 3, who's identified as

3  the person with management control?

4      A.    Renee LeBlanc.

5      Q.    And how much of an ownership does she purportedly

6  have?

7      A.    100 percent.

8      Q.    And what's her title?

9      A.    Minister.

10     Q.    And section 4 we've read already the brief

11  description.  What was the source of funds for this church

12  going to be, No. 2?

13     A.    Donations.

14     Q.    And what is the purpose of this account, No. 5?

15     A.    Our church is investing in bitcoin.

16     Q.    And then it says at No. 8 -- do you see No. 8?

17     A.    Yes.

18     Q.    Please describe your donor-involved volunteer base.

19            What does it say to that?

20     A.    They are all based in New Hampshire.

21     Q.    And how much did the Crypto Church say it was going

22  to be trading monthly?

23     A.    $250,000.

24     Q.    And who signed this document that was on Mr.

25  Freeman's computer?

1      A.     Renee LeBlanc.

2      Q.     And if we go to 1508, was this document, too, in

3  Mr. Freeman's Crypto Church folder?

4      A.     Yes.

5      Q.     And what was its purpose?  What's the title of the

6  document?

7      A.     Statement of Dissolution.

8      Q.     And it says at number -- it says in No. 1:  The

9  purpose is dissolve the Crypto Church of New Hampshire to make

10  it available for Pat Edgington to Reform as a New Hampshire

11  trade name?

12     A.     Yes.

13     Q.     And then it says:  We are attaching the resignation

14  of three of the original five board members originally

15  submitted to us in October 2017.  This is why the document has

16  only two signatures but is still a unanimous decision.

17            Is that right?

18     A.     Yes.

19     Q.     And then who signed it?  Who were the two people

20  who signed it?

21     A.     Chris Rietmann and Renee LeBlanc.

22     Q.     And if we went over to the back to the other three

23  names, what are those?

24     A.     The first one is Matthew Roach, the second Robert

25  Call, and the third Johnathan Dunker.

1      Q.    And whose computer did you find this on?

2      A.    Ian Freeman's.

3      Q.    Is Ian Freeman's name on any of that piece of

4  paper?

5      A.    No.

6      Q.    And turning to 1509 -- you're the case agent so

7  you've been able to sit in, right?

8      A.    Yes.

9      Q.    Do you recall Ms. Spinella's testimony about her

10  reticence or reluctance to draft letterhead?

11      A.    Yes.

12      Q.    And do you remember a discussion about Mr. Freeman

13  needing letterhead because he needed a community service

14  letter?

15      A.    Yes.

16      Q.    And did you find this document in Mr. Freeman's

17  Crypto Church folder?

18      A.    Yes.

19      Q.    And does it have letterhead?

20      A.    It does.

21      Q.    And what's the letterhead for?

22      A.    Crypto Church of New Hampshire.

23      Q.    And what's the date?

24      A.    April 30, 2018.

25      Q.    And does it say:  To whom it may concern, this

 1   letter is to certify that Ian Freeman has conducted more than

 2   12 hours of service for our organization recently.  Our church

 3   is newly formed, and he donated many hours of his time and

 4   even drove across the state to help us consult on legal

 5   filings, opening accounts, along with building our website.

 6            Did I read that right?

 7       A.   Yes.

 8       Q.   On behalf of my church, I'm grateful for Mr.

 9   Freeman's time and experience?

10       A.   Expertise, yes.

11       Q.   I'm sorry.  Expertise.

12            Did I read that right?

13       A.   Yes.

14       Q.   And is that signed by -- well, it's not signed.  Is

15   there a blank that leaves it unsigned?

16       A.   Yes.

17       Q.   Does it say underneath:  Renee LeBlanc, Minister of

18   Crypto Church of New Hampshire?

19       A.   Yes.

20       Q.   And 1510, does this say Secretary of State document

21   for the Crypto Church of New Hampshire?

22       A.   Yes.

23       Q.   Does it say that the Crypto Church of New Hampshire

24   is registered to transact business in New Hampshire?

25       A.   Yes.

1     Q.    And, again, where did you find this?

2     A.    Ian Freeman's computer.

3           THE COURT:  Are you done with that exhibit?

4           MR. AFRAME:  Yes.

5           THE COURT:  All right.  We'll stop for the day.

6           All right.  Ladies and gentlemen of the jury,

7     please listen carefully because there's a little bit of a

8     curve ball for tomorrow.

9           Tomorrow is going to be a different schedule

10    because I have a commitment that I have to focus on in the

11    morning.  We're going to start tomorrow at 11:30 with no

12    lunch.  So get something to eat before you come, and we're

13    just going to go from 11:30 to 5:00, and the usual 90 minutes,

14    15 break, 90 minutes, 15 break.  All right?  I just wanted you

15    to be aware.

16          So you have a free morning tomorrow to do with what

17    you want, and maybe you can catch up on something you haven't

18    been able to get to, but 11:30 we'll start.

19          Just keep in mind we're not going to have lunch as

20    a court.

21          Remember my admonition.  No discussions with each

22    other or anybody else regarding the trial, and no access to

23    any information mistakenly or on purpose.  If something

24    happens inadvertently, please notify us immediately, all

25    right?

1          You are released for the night.  We'll see you

2   tomorrow at 11:30.

3          (Jury trial adjourned at 5:00 p.m.)

1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate transcription of

6     the within proceedings to the best of my knowledge, skill,

7     ability and belief.

8

9
      Submitted:   3-1-23      /s/   Susan M. Bateman _____
10                             SUSAN M. BATEMAN, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25