**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-30-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   21-cr-41-01-JL
          v.                      *   December 14, 2022
                                  *   9:15 a.m.
     IAN FREEMAN                  *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL - DAY SEVEN - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Government:        Seth R. Aframe, AUSA
                           Georgiana MacDonald, AUSA
                           John J. Kennedy, AUSA
                           U.S. Attorney's Office




For the Defendant:         Mark L. Sisti, Esq.
                           Sisti Law Offices




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
                         I N D E X


WITNESSES:              Direct      Cross      Redirect        Recross


KENDALL MCBREARTY


By Mr. Sisti                          3                         47,54

By Mr. Aframe                                    30, 53


REBECCA AULT


By Mr. Kennedy          55

By Mr. Sisti                          73


KATE EYERMAN


By Ms. MacDonald        78                         116

By Mr. Sisti                          100


NANCY TRIESTRAM


By Ms. MacDonald        118



EXHIBITS                                         FOR ID       IN EVD


Defendant's Exhibit K.                                         109
```

1              P R O C E E D I N G S

2              THE CLERK:  The Court is now in session and has

3    before it for consideration day seven jury trial in

4    21-cr-41-01-JL, United States versus Ian Freeman.

5              THE COURT:  Good morning everybody.  Welcome back

6    to court.

7              Have any of you had any conversations with each

8    other or anybody else regarding the trial during the recess?

9              (Jurors answer "no")

10             Have any of you been exposed to any sort of

11   information about the trial during the recess?

12             (Jurors indicate "no")

13             All right then.  We'll proceed then.

14             Defense counsel will undertake cross-examination of

15   the witness.

16             MR. SISTI:  Thank you, your Honor.

17             THE COURT:  Yep.  You're good to go.

18             THE CLERK:  Your Honor, is the witness still under

19   oath?

20             THE COURT:  The witness is still under oath.

21              CROSS-EXAMINATION OF KENDALL MCBREARTY

22   BY MR. SISTI:

23      Q.   Good morning.  I've been seeing you around here for

24   a while.

25      A.   Yes.

1    Q.   Let me just start out slowly.  I don't want to go

2  through all these transactions.  I mean, the fact of the

3  matter is you went through about, from what we could tally,

4  about 1 percent of all of the transactions that Mr. Freeman

5  would have been engaged in.  Is that pretty fair?

6    A.   I don't know.

7    Q.   Well, do you know what the total number of

8  transactions over the many years has been?

9    A.   No.

10    Q.   I mean, you came up with this analysis with regard

11  to median age of transaction, but that was only based on that

12  very limited number that you were showing the jury, right?

13    A.   That was based on the Telegram folder.

14    Q.   But it wasn't based on the LocalBitcoins folder,

15  right?

16    A.   No.

17    Q.   Well, why not?

18    A.   It was just a folder that we focused on for that

19  number.

20    Q.   So it was just up to you to focus on a specific

21  folder so that you can come up with a specific number?

22    A.   Sure.

23    Q.   Well, does that make sense when you're trying to

24  communicate with the jury the average or median age of the

25  people that were transacting business in cryptocurrency?

1      A.   Yes, when dealing with the Telegram transactions.

2      Q.   Which is that file?

3      A.   Yes.

4      Q.   So it would be fair then to include all of the

5  people in that file, right?

6      A.   Yes.

7      Q.   Is there any reason why you guys left out a number

8  of people when you were going through the file?

9      A.   In terms of ages?  I didn't leave anybody out.

10      Q.   Well, you did.  You left out Robarge.  You left out

11  Young.  You left out Garcia.  You left out Green.  You left

12  out Ferrero.  You skipped right over them.

13      A.   For the ages?

14      Q.   For your testimony.

15      A.   Yes, I'm sorry.  For the ages that I've tallied or

16  for what we looked at yesterday?

17      Q.   Well, the ones I just rattled off were very young

18  people.  Are you aware of that?

19      A.   I would have to review it again, but I know that

20  -- I don't think Green had a license or a passport off the top

21  of my head.  I would have to see some of the other ones.

22      Q.   I understand, but you didn't go through and testify

23  to the jury about all of them.  I mean, you went through a

24  list.  I mean, I saw the list.  The jury heard about the list.

25  It was going on and on and on.  But for some reason you

1    skipped over some, and I guess my question is why.

2         A.    I don't know.

3         Q.    I don't either.  Maybe that can be cleared up on

4    redirect.

5              THE COURT:  Take it easy.  Don't testify.

6              MR. SISTI:  All right.

7         Q.    So with the very limited sample that you looked at,

8    very limited sample, you were able to say that there was an

9    investigation, an active investigation going on with regard to

10   a Nigerian national, correct?

11        A.    It's something we're following up on, yes.

12        Q.    Well, by following up, what are you doing?  Why

13   don't you tell the jury.

14        A.    I don't know if I can comment on an ongoing

15   investigation, but based on the information we received from a

16   scammed victim and the information that we've recovered on the

17   computer, we're able to follow through with similar leads.  So

18   we will be following up with various investigative techniques

19   to include subpoenas, interviews, kind of the regular course

20   of action for following up on an investigation.

21        Q.    Right.  And the information you got in order to

22   follow up on an investigation came from Ian's computer, right,

23   his records?

24        A.    Yes, and the information provided from a witness.

25        Q.    Yeah, but the identification -- the actual Nigerian

1    passport came from Ian?

2        A.    I believe so, yes.

3        Q.    Right.  And it's the Nigerian passport that may be

4    the nail on that guy's coffin because it's an actual

5    government passport with an actual ID and everything else on

6    it, right?

7        A.    Correct.

8        Q.    Right.  And that's something you wouldn't have had

9    but for the fact that Ian collected that during the course of

10   a transaction, correct?

11       A.    That's correct.

12       Q.    Okay.  So that's one individual that you're able to

13   follow up on.

14             And were you able to follow up on this fellow that

15   claimed to be in Germany, you know, and I guess he had some

16   problems and needed money and all this other stuff?  I'll go

17   through names if you want but -- how about -- let's start with

18   Jerry Harmon.  Did you follow up with Jerry Harmon at all?

19       A.    No.

20       Q.    Well, Jerry Harmon -- wasn't he somebody that was

21   concocting this story with Ms. Varel?

22       A.    Yes.  If my memory serves me correctly, he had a

23   hand in a number of different scam victims.

24       Q.    Now, do you know if it's a real human being even?

25       A.    At some point but -- I mean, no.  I don't know if

1    that person individually is the real name or who the person is

2    behind the name.

3         Q.    I mean, is there any information you have that this

4    Jerry Harmon ever met with, like, Ian Freeman for any reason?

5         A.    I don't.

6         Q.    How about we talk about Frederick Dreher.  This

7    would have been the Karla Cino problem, right?

8         A.    Yes.

9         Q.    This Frederick Dreher claimed to be involved in oil

10   or something like that, right?

11        A.    I believe so.

12        Q.    Yeah.  And this was a long-term kind of

13   communication with Karla and ended up in having her lose quite

14   a bit of money, right?

15        A.    Yes.

16        Q.    Do you know if Frederick Dreher is a living,

17   breathing human being?

18        A.    I don't.  I don't know who the person is behind the

19   name.

20        Q.    Do you know if there's a Frederick Dreher ever

21   having any communication directly with Ian Freeman?

22        A.    Not to my knowledge.

23        Q.    The interesting thing about Frederick Dreher is

24   apparently he's still pursuing Karla in some way, shape, or

25   form, right?

1      A.    Correct.

2      Q.    And you guys know about that?

3      A.    Yes, we do.

4      Q.    Were you with Karla when she told you in your

5    debriefing with her at Dunkin Donuts that the man was actually

6    phoning her or contacting her in some way, shape, or form?

7      A.    I don't remember the specifics exactly, but, yes, I

8    was with her at the Dunkin Donuts.

9      Q.    And were you the agent or was there some other

10   agent that told her that you didn't want to get into it at

11   that point in time?

12     A.    I don't believe that's exactly what I said, but we

13   are following up with the information that she has recently

14   provided us.

15     Q.    Well, I mean, her impression was that you didn't

16   want to talk about it.  That she was offering you information,

17   and that you weren't pursuing that because you were more

18   interested in dealing with Mr. Freeman right now.  That's what

19   she said.

20     A.    I don't know if that's exactly what she said.

21     Q.    Well, that was the tenor of what she said.  You

22   were sitting right here, right?

23     A.    Yes.

24     Q.    Okay.  And would that be proper for me to say that

25   was the tenor of what she said?

1     A.   In a manner of speaking.

2     Q.   Yeah.  So are you saying that her perception is

3 incorrect?

4     A.   I'm saying that with the information that she

5 recently provided we are going to follow up with her on that.

6     Q.   All right.  But that information and Frederick

7 Dreher and that scam would have been known to you for over a

8 year, and nothing was going on with your investigation, right?

9     A.   To say nothing was going on is inaccurate, but,

10 yes, it takes time to follow up on scam victim information and

11 ongoing investigations.

12     Q.   So are you actively pursuing this?

13     A.   We have the information.  Right now this is the

14 focus, and then we will follow up with her.

15     Q.   Okay.  But this Dreher is the guy that took all

16 this money from her, if there is a Dreher, right?  He's the

17 scammer?

18     A.   Yes.

19     Q.   Okay.  Ian Freeman is not the scammer?

20     A.   No.

21     Q.   Frederick Dreher is the scammer.  Okay.

22     And Harmon is a scammer and Chiedu is a scammer.

23     And there's a Williams that was involved in some

24 transactions.  Was he a scammer or was he just a name?

25     A.   Are you referring to Patrick Brown?

```
 1        Q.    Yeah.

 2        A.    He was the scammer.

 3        Q.    All right.  Are you pursuing a Mr. Williams now?

 4        A.    No.

 5        Q.    Wasn't there a Williams that was involved in your

 6   testimony yesterday that actually had a CDL license and a

 7   truck that was photographed?

 8        A.    No.  I think the truck was Raymond Miller.

 9        Q.    Miller.  I'm sorry.

10              In that particular photograph there was an actual

11   license, right?

12        A.    Correct.

13        Q.    Was Miller involved in any scam operation?

14        A.    Yes.  I mean, he was the victim.

15        Q.    All right.  And who was scamming him?

16        A.    I don't recall the name.

17        Q.    All right.  So what we have here is a number of

18   scams, and there's probably hundreds and hundreds and hundreds

19   of them going on every day, right?

20        A.    I can't speak to that.

21        Q.    Well, it happens with or without cryptocurrency,

22   correct?

23        A.    Yes.

24        Q.    And it's been going on for years, correct?

25        A.    Yes.
```

1    Q.   All right.  Now, none of the institutions that

2    we've talked about so far seem to have successfully cut off

3    the victims in this case from continuing their investment in

4    the scam.

5         In fact, some investments went to the point of

6    hundreds of thousands of dollars without bank or financial

7    institution intervention.

8         Varel is the best example of that, right?

9    A.   I'm sorry.  That was a long --

10   Q.   Yeah, it's a long question.

11   A.   I don't believe the beginning of that was totally

12   accurate.  I do think banks stopped individuals from

13   continuing on.

14   Q.   Yeah, some banks did.

15   A.   To say that they lost a lot of money, yeah, some of

16   them did.

17   Q.   Yeah, but some of these people that you were

18   talking about even yesterday did four transactions over a

19   period of about a week from the same bank, and they just let

20   it go.

21   A.   I can't speak to specifics, but, yeah.

22   Q.   And in Varel's case she did $240,000 on the 15th

23   and 210,000 on the 21st at Chase Bank, and nobody even

24   questioned that, right?

25   A.   I wasn't in for her testimony.

1          Q.     But you know the case?

2          A.     Yes, I do.  I've also interviewed a lot of people,

3    and there's a lot of numbers and a lot of banks.  I don't know

4    that I can speak to specifics with Varel without seeing

5    something.

6          Q.     Well, I mean, if you could just take it from me,

7    all right?

8          A.     Okay.

9          Q.     That she transacted business January 15th for

10   240,000 and January 21st for $210,000 out of her Chase Bank

11   trust account.

12         A.     Okay.

13         Q.     That nobody -- in fact her testimony was nobody

14   raised an issue with her taking that money out.

15                Is that the normal course of business that you're

16   aware of?

17         A.     For banks?

18         Q.     Yeah.

19         A.     I've seen various courses of action for different

20   banks.

21         Q.     Yeah, and then on the 21st she went to another bank

22   and took $305,000 out and sent that to this Jerry Harmon guy

23   somehow, and nobody questioned her on that either.

24                Are you aware of that?

25         A.     If that's what her testimony was, yes.

1    Q.   The only person that had any concern for her with

2   regard to spending or to taking that money was none other than

3   Ian Freeman.  Are you aware of that?

4    A.   Not specifically, no.

5    Q.   Are you aware that Varel said that it felt like

6   Freeman was concerned about her spending that much money?

7        Did you ever hear that?

8    A.   I can't recall.

9    Q.   So none of the banks had a concern or the

10  institutions, but Ian wanted to check to see whether or not

11  she honestly wanted to utilize those funds.  That was the

12  testimony here.

13       Are you aware of that?

14   A.   I did not sit in on her testimony.

15   Q.   Now, there were a couple of audio calls.  I'll give

16  you the exhibit numbers.  They were 1580 and 1581.

17       1580 would have been Freeman and Nobody on a call

18  to a I think Bank of America branch?

19   A.   Yes.

20   Q.   And 1581 would have been Freeman on the Bank of

21  America call, okay?  Got it?

22   A.   Yes.

23   Q.   All right.  That had to do with the subject matter

24  of approximately $350,000, the return thereof, correct?

25   A.   Yes.

1      Q.    Actually, the calls went in kind of like out of

2  order.  I don't know if you know that or noticed it, but the

3  way it would have worked is Freeman would have made the first

4  call.  So 1581 should have been the first call.

5      A.    Okay.  And that was with the $125,000 dispute?

6      Q.    No.  It would have been 350,000, all right?

7      A.    Okay.

8      Q.    And Nobody would have been the second call.  There

9  was an additional 40,000 that hadn't been returned.

10     A.    Okay.

11     Q.    Okay.  So do you know whether or not in 1581 with

12  Freeman, okay, actually stating he was Nobody, do you know

13  whether he was authorized by Nobody to do that call?

14     A.    I don't.

15     Q.    Have you had the opportunity to debrief Nobody in

16  this case?

17     A.    No.

18     Q.    Has anybody asked him about what the genesis of

19  that call was or why that call was made?

20     A.    Not to my knowledge.

21     Q.    So we can't come to the conclusion that Freeman was

22  doing this without the exact authority -- the conveyance of

23  authority to do so by Nobody, correct?

24     A.    Correct.  I don't know if Nobody talked to Mr.

25  Freeman.

1      Q.    Are you aware that Bank of America did return

2  $310,000 in that account?

3      A.    I am not aware.

4      Q.    You didn't do any follow up on that?

5      A.    I personally did not.

6      Q.    And then the second call had to do with the

7  remaining 40 that was still being held.

8            Are you aware of that?

9      A.    That's the call with Nobody and Mr. Freeman.

10     Q.    Right.  Okay.  So in that call there's no question

11  that they were pursuing the return of the additional $40,000,

12  right?

13     A.    Correct.

14     Q.    Okay.  And, again, I go back to one of my original

15  questions, and that was, is there any evidence at all that any

16  of the banking institutions lost even one cent in any of these

17  transactions?

18     A.    I do not know.

19     Q.    Well, certainly after this investigation that's

20  taken place over two, three years, and you're the, you know,

21  lead investigator on this thing, the case agent, one would

22  think you would know whether or not the banks lost money in

23  any of these deals.

24     A.    Yes, the finances were handled by a separate FBI

25  employee.

1      Q.    There's something else -- and you were in court for

2   this -- that I was asking.  I want to ask you about it.  It

3   had to do with that search in Keene on the 16th of March 2021

4   with the SWAT team.

5      A.    Okay.

6      Q.    You watched that film?

7      A.    That was the first time I had seen it in court.

8      Q.    Okay.  I just want to ask you something, okay?

9   These SWAT team guys, they had helmets on.  You saw that?

10     A.    I believe so, yes.

11     Q.    I mean, have you been involved in SWAT activity

12  before?

13     A.    Yes, I have.

14     Q.    Right.  And what happens is that there's special

15  gear that a lot of you folks use.  Some of it actually is gear

16  so that you can record the actual activity, correct?

17     A.    I believe we just started wearing body cams, and I

18  don't even think everybody is wearing them yet.

19     Q.    Well, I'm just asking because we'll get to take a

20  look.  Some of these cams are mounted on helmets, right?

21     A.    I don't know that personally.

22     Q.    You don't know that personally?

23     A.    No.

24     Q.    Where are they supposed to be located?

25     A.    I don't know.  From what I know, they just rolled

1    out the body cam policy.  It hasn't reached the general agent

2    yet.  I know some SWAT teams have started maybe to implement

3    it.  I don't know where they're supposed to wear them.

4         Q.   Well, let me ask you this.  Would it surprise you

5    that there was some equipment attached to the helmets of a

6    number of the members of the SWAT team that made the search on

7    the Keene residence?

8         A.   I know there is a number of equipment attached to a

9    helmet.  There's something -- it's for night vision that

10   people wear.  Other people wear lights on their helmets.  They

11   can wear a handful of different things.  So, no, it wouldn't

12   surprise me that there was equipment attached to some of their

13   helmets.

14        Q.   Is there some reason that a SWAT team would not

15   want to record what they were doing?

16        A.   No.

17        Q.   So the reasons would tend to favor recording what

18   you're doing so that you could back up what you were doing and

19   the legitimacy of what you were doing, right?

20        A.   Yes.

21        Q.   Are there any recordings from the government, from

22   the FBI, from the SWAT team that we can show this jury?

23        A.   Not to my knowledge.

24             MR. SISTI:  Okay.  If we could just roll

25   Defendant's G for the jury and start it right up?  And you can

```
 1  stop when I ask, if you would, please.

 2              (Defendant's G starts playing)

 3              Okay.  If you could stop there.

 4       Q.    What's that vehicle?

 5       A.    That's the BearCat.

 6       Q.    Okay.  That is one BearCat, correct?

 7       A.    Correct.

 8       Q.    Okay.

 9              MR. SISTI:  Keep going.

10              (Defendant's G continues playing)

11              You can stop there.

12       Q.    There's a vehicle making a right turn?

13       A.    Yes.

14       Q.    What's that?

15       A.    Based on my limited seeing of it, it looks like

16  another BearCat.

17       Q.    So now we are at two BearCats, right?

18       A.    Correct.

19              MR. SISTI:  Okay.  If you will keep rolling?

20              (Defendant's G continues playing)

21              It seems to be a number of vehicles and humans.

22              Stop.  Can you go back to 14:20?

23       Q.    And I'll ask you to concentrate on what's going on

24  from 14:20 to 14:30, please.  Okay.

25              What's that gentleman doing?
```

```
 1              MR. SISTI:  Stop.
 2        A.   The one at the back of the car?
 3        Q.   Yeah.
 4        A.   Appears to be throwing something.
 5        Q.   What do you think that is?
 6        A.   I can't say specifically because I don't see it,
 7   but in my experience it would be a flash bang.
 8        Q.   Okay.  Prior to throwing the flash bang grenade,
 9   did you see anybody attempt to vocally or physically warn the
10   people inside of that house?
11        A.   I can't speak to that.  I can't see them or hear.
12        Q.   In fact, they were avoiding contact with the house,
13   were they not?
14        A.   I can't speak to that.
15        Q.   Do you see anybody in that frame?
16        A.   Currently?  I can't really see much.
17        Q.   Did you see anybody near that house prior to that
18   frame?
19        A.   Just the people walking out from that car is what I
20   saw in that frame.
21        Q.   Did you see them hiding behind the car?
22        A.   I don't know that I would use the word hiding, but
23   I saw them behind the car.
24        Q.   They certainly weren't approaching the door, were
25   they?
```

```
 1          A.    Not in this frame, no.

 2          Q.    They weren't on the porch, right?

 3          A.    I don't believe so.

 4          Q.    Certainly there wasn't anything that you could

 5    identify as a megaphone being used to notify the residents of

 6    the home that there was a search about to take place, correct?

 7          A.    There's no audio and I can't see everybody, but no.

 8    From what I can see on this frame, no.

 9          Q.    Thank you.

10                MR. SISTI:  If you'll keep rolling, please?

11                (Defendant's Exhibit G continues playing)

12                Stop.

13          Q.    Does that support your idea that that was a flash

14    bang grenade?

15          A.    Yes.  Like I said, based on my experience that's

16    what I think it would be.  I can't say for certain.

17          Q.    In your experience isn't there supposed to be a

18    callout first?

19          A.    Before what?

20          Q.    Before entering.  Before throwing a flash bang

21    grenade.

22          A.    Entering and throwing a flash bang are very

23    different things, but, yes, prior to entering there should be

24    a knock and announce.

25          Q.    Thank you.
```

1                    MR. SISTI:  Keep rolling.

2                    (Defendant's Exhibit G continues playing)

3                    You can stop.

4         Q.    At the time that that flash bang grenade was just

5    clearing the air, what do you see on the left side?

6         A.    I see a BearCat with its lights on.

7         Q.    Do you see that BearCat with a battering ram?

8         A.    Yes.

9         Q.    Do you see the BearCat with a battering ram with a

10   window frame dangling from it?

11        A.    That's what it appears to be.

12        Q.    And that would be contemporaneous with throwing the

13   flash bang grenade, correct?

14        A.    It's two different angles.  So, yes, if that camera

15   also got -- if that was the same time and right next to the

16   other one, then I -- I can't say for certain.  It's two

17   different cameras.

18        Q.    All right.  But obviously the BearCat with the

19   device on front, the ram, entered the residence and ripped out

20   a window, correct?

21        A.    It appears to have a window on the end of it, yes.

22                   MR. SISTI:  Keep rolling, please.

23                   (Defendant's Exhibit G continues playing)

24                   Stop.

25        Q.    Do you see those things on the helmets?

1      A.   Yes.

2      Q.   What are they?

3      A.   It appears to be night vision goggles.

4      Q.   Well, there's goggles.  What else is there?

5      A.   Are you talking about the thing that's lit up?

6      Q.   I'm not talking about the thing that's lit up.  I'm

7  talking about the thing that's mounted on top of the helmet.

8      A.   Yes, I believe that's night vision goggles.

9      Q.   Do you see anybody there with any camera equipment

10  or any equipment at all that's capable of recording audio or

11  visually that particular event?

12      A.   I can't say for certain in this frame.  I don't

13  know that I could specifically say what's on each person.

14      Q.   As the case agent on this case, did you make

15  inquiry as to whether or not anybody had any audio or visual

16  equipment to record?

17      A.   I was not the case agent during this event.  I was

18  still stationed in Washington, D.C.

19           I came into this at the end of October, early

20  November of 2019.

21      Q.   Okay.  At the end of October, early November when

22  you took over the case --

23      A.   2021.  Sorry about that.

24      Q.   '21.  Did you make inquiry as to the means of entry

25  and that particular operation on the 16th of March?

1        A.    No.

2        Q.    Okay.

3              MR. SISTI:  Keep rolling, please.

4              (Defendant's Exhibit G continues playing)

5              Keep going.

6              Stop.

7        Q.    Something just lifted off from the white car in

8   front of the porch.  Do you know what that is?

9        A.    I'm sorry.  I was focused on the individuals.

10             Could you play it again, and I'll focus on the

11   white car?

12       Q.    Yeah.  Please.

13             MR. SISTI:  Okay.  Why don't we try again.  Roll.

14             (Defendant's Exhibit G continues playing)

15             Stop.

16       Q.    What is that?

17       A.    It's an aerial -- we don't call them drones.  I

18   just can't remember exactly what we call them, but drone-like.

19       Q.    It's a drone-like thing, and it's going to what?

20   What's the purpose of that?

21       A.    So that is used, from my understanding, to help us

22   clear spaces so that we don't have to put agents in harm's

23   way.  So that will kind of give us eyes into a space for

24   officer safety.

25       Q.    All right.  So it's for surveillance, right, and

1    it's for clearing spaces?

2         A.   Yes.  It's to give us an idea of what we would be

3    walking into, yes.

4         Q.   So somebody is monitoring what that drone-like

5    thing is seeing, correct?

6         A.   I can't say for certain here, but probably.

7         Q.   Well, I mean, it wouldn't be worth anything if

8    somebody wasn't monitoring it?

9         A.   No.

10        Q.   Right.  And if somebody was monitoring it, was it

11   being recorded that which they were seeing?

12        A.   I don't know.

13        Q.   Okay.

14             MR. SISTI:  Continue, please.

15             (Defendant's Exhibit G continues playing)

16        Q.   Who's that guy?

17        A.   Nobody.

18        Q.   All right.  And he was a tenant in that building?

19        A.   Yes.

20        Q.   Okay.  Thank you.

21             MR. SISTI:  Keep going.

22             (Defendant's Exhibit G continues playing)

23        Q.   And this fellow?

24        A.   I don't know for certain, but based on previous

25   testimony I believe it's Matthew Roach.

```
 1          Q.    Okay.  Thank you.
 2                I'm sorry.  Matthew Roach, was he ever arrested or
 3    charged with anything?
 4          A.    No.
 5          Q.    Thank you.
 6                MR. SISTI:  Keep going.
 7                (Defendant's Exhibit G continues playing)
 8          Q.    And of course that's Ian, right?
 9          A.    Yes.
10          Q.    Okay.  Did you get any information that anybody
11    resisted in this search at all?
12          A.    Not to my knowledge.
13          Q.    And who's that?
14          A.    I believe that's Bonnie.
15          Q.    And Bonnie is married to Ian?
16          A.    I believe so.
17          Q.    Was she charged or arrested for anything?
18          A.    No.
19                (Defendant's Exhibit G continues playing)
20                MR. SISTI:  Okay.  Stop.  Go back a couple, if you
21    could.
22          Q.    Okay.  What do we got here?  This is a SWAT member?
23          A.    Yes, it appears to be a SWAT operator.
24          Q.    All right.  And we're going to let it go for a few
25    seconds, and I'm going to stop it again.
```

1            MR. SISTI:  Go right ahead.

2            (Defendant's Exhibit G continues playing)

3            Keep going.  Stop, please.

4       Q.   What's going on there?

5       A.   He appears to be taking that camera down.

6       Q.   He's taking down a camera.  He doesn't want

7  somebody to see what they're doing?

8       A.   I believe it's for officer safety.

9       Q.   Yeah.  Well, do you have information -- did anybody

10 have information anybody was remotely monitoring anything from

11 that residence?

12      A.   No.

13      Q.   No.

14      A.   So they have to be cautious if somebody is.

15      Q.   Did you guys ever replace that for Ian?

16      A.   I can't speak to that.

17      Q.   I mean, that was intentionally being destroyed,

18 correct?

19      A.   Yes.

20           MR. SISTI:  Continue.

21           (Defendant's Exhibit G continues playing)

22      Q.   Okay.  What do we have here?

23      A.   It appears to be the end of the BearCat that we saw

24 earlier with the window.

25      Q.   Okay.  So that's got the window on it and it's

1    approaching something.  Do you know what it's approaching?

2         A.   The porch.

3         Q.   Okay.  Let's keep looking.

4              (Defendant's Exhibit G continues playing)

5         Q.   What's it doing now?

6         A.   I can't see.

7         Q.   Again, having taken over this particular case, did

8    you know how many agents were there at that scene?

9         A.   I don't.

10        Q.   All right.  Thank you.

11             So the only recordation that we know of that

12   particular event would have been something made available for

13   the jury by actually Ian because he recorded, correct?

14        A.   Yes, this video I believe was recorded by Mr.

15   Freeman.

16        Q.   Right.  Something you were getting into -- and

17   there was a lot of calculations, and I guess we're going to

18   get into some more as the day goes on.  There was quite a bit

19   of money that was coming into accounts dedicated to I think

20   Crypto Church, Peace Church, Ian Freeman, et cetera, et

21   cetera, hundreds of thousands of dollars, right?

22        A.   Yeah, I can't speak to each one, but, yes, money

23   went into different entities.

24        Q.   Right.  My question for you is money came in, but

25   money went out, too, right?  Money came into accounts?

1          A.    Okay.

2          Q.    And then money came out of accounts, right?

3          A.    Are we referring to the images that we saw

4     yesterday?

5          Q.    Yeah.  There was purchases made, right?  Are you

6     aware of how Mr. Freeman had bitcoin that he could actually

7     use in transactions?

8          A.    I know that he purchased bitcoin through exchanges.

9          Q.    Right.  So this isn't just bringing money in.  You

10    actually, like in any situation, especially in a situation

11    where you have to raise money, whether it be for a church or

12    anything, is you have to spend money too, right?

13         A.    Okay.

14         Q.    All right.  So you have to go back on an exchange

15    and you have to purchase as well, correct?

16         A.    Yes, I know he went onto exchanges and purchased.

17         Q.    Okay.  And this was an ongoing thing.  Money would

18    come in and money would go out because you've got to have your

19    supply of bitcoin, right?

20         A.    I don't know specifically how he operated that

21    aspect of it.

22         Q.    Are you aware that he purchased bitcoin for the

23    churches and that the churches owned the bitcoin that would

24    then be out there on the market?  Are you aware of that?

25         A.    Not specifically, no.  I believe some of the

1  exchanges were in his name and some in the church's name.

2      Q.   Okay.  But they would have been purchased and owned

3  by let's say either Ian or the churches?

4      A.   Correct.

5      Q.   It's their property, right?

6      A.   I'm sorry.  Yes.

7      Q.   All right.  And it was their property that they

8  were actually then out there utilizing during the transactions

9  with others that we've shown the jury?

10     A.   It was his property.

11     Q.   Right.

12     A.   Yes.

13          MR. SISTI:  If I could have a moment, Judge?

14          THE COURT:  You may.

15          MR. SISTI:  Thank you.

16          (Attorney Sisti confers)

17          MR. SISTI:  Thank you.  I appreciate it.

18          THE COURT:  Redirect.

19                    REDIRECT EXAMINATION

20  BY MR. AFRAME:

21     Q.   Let's just take the last point first.

22          Mr. Freeman used money that he obtained through all

23  the transactions we've looked at to buy virtual currency?

24     A.   I believe so, yes.

25     Q.   And then he sold the virtual currency?

1        A.    Yes.

2        Q.    And we've seen now probably we're getting close to

3   over hundreds of examples of him selling virtual currency,

4   right?

5        A.    Yes.   There were a lot.

6        Q.    And one of the -- when we pulled up the computer,

7   there was a list of exchanges, right?

8        A.    Correct.

9        Q.    And one of them was Kraken?

10       A.    Yes.

11       Q.    And did we show records from Kraken?

12       A.    We did.

13       Q.    And do you remember the example that we showed the

14   jury about when he bought $280,000 worth of bitcoin from

15   Kraken?

16       A.    I do.

17       Q.    Actually, that was right when Danella Varel was

18   giving him $700,000, right?

19       A.    Yes, I believe the time frame was the same.

20       Q.    So he bought $280,000 of bitcoin approximately.   Do

21   you remember approximately how much he paid for that?

22       A.    I think it was around $440.

23       Q.    Okay.   Is that well under 1 percent?

24       A.    Yes.

25       Q.    And have we seen from records in this case what Mr.

1    Freeman charged on Telegram?

2        A.    Yes.  I believe it was anywhere between 10 and 20

3    percent.

4        Q.    Just for discussion purposes we can use the lowest

5    number we see, which is 10 percent.

6        A.    Okay.

7        Q.    So Danella Varel sent Mr. Freeman how much money?

8        A.    700,000.

9        Q.    Roughly.  What's 10 percent of that?

10        A.    Oh, gosh.  70,000.

11        Q.    Okay.  So that's how much money Mr. Freeman got as

12    a fee?

13        A.    Correct.

14        Q.    And that's 10 percent, and he paid less than 1 to

15    buy it from the exchange?

16        A.    Correct.

17        Q.    And that was his business?

18        A.    Yes.

19        Q.    Thanks.  Just to make it clear, he's buying virtual

20    currency at a lower rate and selling it to people at a higher

21    rate?

22        A.    That's what it appears to be, yes.

23        Q.    Let me talk about the search for a minute.

24              You testified for many hours yesterday, right?

25        A.    I did.

1      Q.    And what did you testify about?

2      A.    Interviews that had been conducted, what we found

3   on three cell phones and a computer.

4      Q.    And most of the hours were spent on what?

5      A.    The three cell phones and the computer.

6      Q.    Three cell phones and the computer.  And amongst

7   those items which was the most time spent on?

8      A.    Mr. Freeman's computer.

9      Q.    Okay.  And where did you find that?

10      A.    It was found in Mr. Freeman's residence.

11      Q.    Okay.  And there's a lot of evidence that was

12   presented on the government's direct case through you about

13   that computer, right?

14      A.    Yes.

15      Q.    And were several witnesses from the government

16   called about how that computer was seized and processed and

17   how the evidence was gathered?

18      A.    Yes.

19      Q.    And you're the case agent so you've been in the

20   courtroom for the trial, correct?

21      A.    Correct.

22      Q.    Did you see that testimony?

23      A.    I did.

24      Q.    Did Mr. Sisti ask a single cross-examination

25   question of any of those witnesses?

1          A.    No, he did not.

2          Q.    He asked you a lot of questions about the search.

3    What were all of those questions related to?

4          A.    The SWAT operation that took place before the

5    search.

6          Q.    Did that have anything to do with the processing of

7    the computer which led to the evidence that was presented

8    through your direct testimony?

9          A.    No.

10         Q.    Can you -- it seems like you have some background

11   in SWAT tactics?

12         A.    I do.

13         Q.    Can you just explain what's the objective, what's

14   the purpose of using the kind of tactics we saw?

15         A.    To make sure that we are able to conduct a search

16   following and entering a callout safely without anybody

17   getting injured.

18         Q.    Are they used every time?

19         A.    No.

20         Q.    How is that decision made typically based on your

21   experience?

22         A.    There's a number of different factors that go into

23   that decision.  It has to do with what is known to be at the

24   residence, what's believed to be at the residence, any

25   challenges getting into the residence could have, maybe a

1    locked gate, bars on windows, but certainly weapons inside

2    would raise to the level of having a SWAT team perform the

3    initial entry.

4         Q.   And as far as SWAT tactics go, is the objective to

5    have -- how much force is -- what are you trying to do?  Why

6    do we see the force used?  What's the purpose?

7         A.   You want to have enough people and have just enough

8    force that you remain in control and are safe and have enough

9    to cover all the various things that could go wrong when

10   conducting that initial callout and entry.

11        Q.   And I saw a broken window and I saw a broken

12   camera.  Do you know, were any shots fired as a result of this

13   entry?

14        A.   No.

15        Q.   Was anyone hurt?

16        A.   Not to my knowledge.

17        Q.   From the SWAT perspective -- how would you classify

18   what happened that day if you were a SWAT member?  Were the

19   objectives obtained in the way that you would hope?

20        A.   Yes.  You know, it seemed to be by the book.

21        Q.   Let me show you 312.

22             MR. AFRAME:  A slight technical difficulty.  It

23   will take a second.

24        Q.   Special Agent, do you see that?

25        A.   It's a little hard to see, but yes.

1      Q.    Maybe if the jury can look at it, and I'll hand it
2  to you and you will probably see it better.  It's the light
3  that's hard to see.
4      A.    Yeah.
5      Q.    Now do you see it?
6      A.    Yes.
7      Q.    And what is it?
8      A.    It appears to be a number of high-powered weapons.
9  At least it looks like seven types of rifles loaded -- well,
10 magazines, and it looks like I'm seeing three pistols, a
11 ballistics helmet, and a vest with magazines in it, and some
12 other equipment that I can't necessarily make out.
13     Q.    Okay.  And do you know where that picture came
14 from?
15     A.    Yes, I do.
16     Q.    Where did it come from?
17     A.    I believe it came from Matthew Roach's room.
18     Q.    And where is that?  What building are we in?
19     A.    73 Leverett.
20     Q.    And is that where we saw the search entry video
21 that was presented?
22     A.    Yes.
23     Q.    And were those there on the day of that search
24 entry?
25     A.    Yes.

1      Q.   And as a SWAT -- with some SWAT background, does it

2  matter to you that they were in Mr. Freeman's bedroom, Mr.

3  Roach's bedroom?

4      A.   No.

5      Q.   Why not?

6      A.   They're in the residence.  It just is a matter of

7  -- if there are weapons in there, they can be used by anybody

8  in there.  Especially out -- these don't appear to be locked

9  up at all.

10      Q.   Okay.  Thank you.

11           Mr. Sisti asked you some questions about banks and

12  stopping transactions.  Do you recall that?

13      A.   Yes.

14      Q.   You've looked at many -- how many transactions in

15  the Freeman case as the case agent do you think you've looked

16  at?

17      A.   A lot.

18      Q.   And in any of them was the bank told that this is a

19  transaction to purchase bitcoin?

20      A.   Not by the victim witnesses.

21      Q.   Okay.  And have you looked at lots of

22  communications involving Mr. Freeman doing transactions that

23  led to the sale of bitcoin?

24      A.   Yes.

25      Q.   Would he provide instructions to the buyers about

1   what to tell the bank?

2       A.   Yes.

3       Q.   Were those instructions -- did he say to tell them

4   that the person is intending to buy bitcoin?

5       A.   No.

6       Q.   Did he provide some other reasons?

7       A.   Correct.

8       Q.   Was one of them church donation?

9       A.   Yes.

10      Q.   Was one of them buying rare coins?

11      A.   Purchase of rare coins, yes.

12      Q.   Was one of them investment?

13      A.   Yes.

14      Q.   But not bitcoin?

15      A.   No.

16      Q.   There was some discussion that Nobody told Mr.

17   Freeman -- not discussion.  Mr. Sisti represented to you that

18   Nobody told Mr. Freeman that he could call Bank of America on

19   Nobody's account.

20           Did Mr. Sisti say that to you?

21      A.   Yes.

22      Q.   Do you have any idea if that's true?

23      A.   I don't.

24      Q.   Whether that's true or not, did Bank of America

25   know that?

```
1          A.    No.
2          Q.    Did Mr. Freeman get on the phone and say I'm
3    calling on behalf of Nobody with his authorization?
4          A.    No.
5          Q.    What did he do?
6          A.    He represented himself as Nobody.
7          Q.    Did Bank of America know what was going on there?
8          A.    Not to my knowledge.
9          Q.    Based on what you heard?
10         A.    No.
11         Q.    Did you review a lot of documents filed by banks in
12   this case -- some documents?
13         A.    Yes.
14         Q.    Were there SARs?
15         A.    To my knowledge there were.
16         Q.    Did Mr. Freeman end up with many, many accounts
17   closed?
18         A.    Yes.
19         Q.    Did we go through yesterday his own notes about all
20   the accounts that banks had closed?
21         A.    Yes.
22         Q.    Were they for himself?
23         A.    Not all of them, no.
24         Q.    Some of them?
25         A.    Some of them were, yes.
```

1    Q.    Were some for the Shire Free Church?

2    A.    Yes.

3    Q.    Were some for Renee?

4    A.    Yes.

5    Q.    Were some for Colleen Fordham?

6    A.    Yes.

7    Q.    Did banks tell Mr. Freeman that he was a money

8    servicing business?

9    A.    Yes.

10   Q.    Did they tell him he needed to register?

11   A.    Yes.

12   Q.    Mr. Sisti suggested that the big break in the

13   Chiedu case was evidence from Mr. Freeman.

14         Did Mr. Freeman provide you with the Nigerian

15   passport for Mr. Chiedu?

16   A.    No.

17   Q.    How did you obtain it?

18   A.    Through a search warrant.

19   Q.    Did you find other examples where you actually had

20   the real ID of the person or was that a break?

21   A.    That was a break.

22   Q.    And as far as -- as you continued to investigate

23   Chiedu, did you have a second break?

24   A.    Yes.

25   Q.    And what was that?

1    A.    That he -- his follow-on communication with a

2    victim, one of his victims, he began conversing with her with

3    his real face and over FaceTime, and that victim was able to

4    take screenshots of those communications and provide them to

5    us.

6    Q.    We heard about the Harmon -- Mr. Harmon, who was

7    the person who was mentioned by Ms. Varel.

8    A.    Yes.

9    Q.    Did that name come up in other matters?

10   A.    Yes.

11   Q.    Did you collect information about Harmon from

12   another victim?

13   A.    I believe I collected a lot of information from a

14   woman named Karen Miller who was also scammed by Mr. Harmon.

15   Q.    Again, I think you testified to this, but I want to

16   make it clear.  What is the challenge in trying to investigate

17   the name Harmon, Dreher, these other names?

18   A.    Generally speaking, these scammers are -- they use

19   fake names, fake phone numbers, fake e-mail addresses.

20   Generally, they're located overseas and typically the money

21   ends up going overseas.

22   Q.    And was the money -- following the money in these

23   transactions particularly challenging?

24   A.    Yes.

25   Q.    Why was that?

1       A.      The anonymous nature of bitcoin wallets and

2   cryptocurrency makes it more difficult.

3       Q.      And I'll just use an example.  We'll just use Ms.

4   Varel.  Who was the one involved in turning that money from

5   fiat currency into bitcoin that makes it harder to find the

6   scammer?

7       A.      Mr. Freeman.

8       Q.      Mr. Sisti said Mr. Dreher got a lot of money from

9   Karla Cino, right?

10      A.      Yes.

11      Q.      Who else got money from Karla Cino's transactions?

12      A.      Aria DiMezzo and Mr. Freeman.  Maybe others.

13      Q.      So I don't want the jury to have any

14  misunderstandings.  Mr. Sisti suggested we did not show you

15  every single folder in the Telegram folder.  I want to make

16  sure that we do that.  So let's just do that now.

17      A.      Okay.

18              MR. AFRAME:  It will take a second while we get it

19  ready.  It will just take a second.

20              THE COURT:  Understood.

21              MR. AFRAME:  1532.

22              Mark, can you tell me the name of the people you

23  listed so we can do this quickly?  Green, Ferrero?

24              MR. SISTI:  Yes.  Robarge.

25              (Off the record)

1          MR. AFRAME:  So, first of all, let's just look down

2   and look at how many folders there are.  So, 1, 2, 3, 4, just

3   scroll down slowly.  So 1, 2, 3, keep going, 4, 5, 6, 7, 8, 9,

4   10, 11, 12, 13, 14.

5          Q.    All right.  So do you agree with me that 14 times 4

6   is 56, and then there's three more, so that would be 59

7   folders?

8          A.    Yes.

9          Q.    Would you also agree with me, and the jury saw this

10  yesterday, many of them contain multiple people?

11         A.    Yes.

12         Q.    So 59 does not tell us the number of people, it's

13  the number of folders, and then multiple people in some of the

14  folders?

15         A.    Correct.

16         Q.    And you did an age calculation that you testified

17  to yesterday which I think was just shy of 60.  Is that right?

18         A.    Yes, I believe the average was just over 59, I

19  think.

20         Q.    And did you count every person in every folder for

21  which you could obtain some kind of identification?

22         A.    Yes.

23         Q.    Okay.  And so the ones that Mr. Sisti talked about

24  on the direct -- so we did show Arriaga, right?

25         A.    Yes.

1       Q.    And that's not an older person?

2       A.    No.

3             MR. AFRAME:  Okay.  Garcia.  So we'll just open

4    Garcia.  There's Anna Garcia.  We showed Laureen Garcia, okay,

5    and if you just show me the picture of the woman holding the

6    sign up.  Okay.  Thank you.  And the receipt.

7       Q.    And that's $3,300, correct?

8       A.    Yes.

9       Q.    Scrolling down, and that's on 2-29-20?

10      A.    3-2-2020.

11      Q.    Sorry.  That was my error.  3-2-2020?

12      A.    Yes.

13      Q.    Okay.  Thank you.

14            MR. AFRAME:  And the slip at the bottom.

15      Q.    This is a $16,000 cash deposit?

16      A.    Yes.

17      Q.    And when was that?

18      A.    5-4-2020.

19      Q.    Okay.  So this woman put in about $20,000 in a

20   two-month time period?

21      A.    Yes.

22      Q.    Okay.

23            MR. AFRAME:  The next one.

24            MR. SISTI:  License, please.

25            MR. AFRAME:  You want to see the license?  Sure.

1      Q.    Her date of birth was?

2      A.    1975.

3      Q.    5-11-1975.  My birthday plus one year.

4            Green.  There's no license, correct?

5      A.    Correct.

6      Q.    And there's a $1,300 transaction.  Can you see

7   that?  I can open it.

8      A.    Yes.

9      Q.    Okay.  Not much in that one.

10           Ferrero.  That person's date of birth, year of

11  birth?

12     A.    1965.

13     Q.    So that makes the person, what, around 54?

14     A.    Yes.

15     Q.    And this is 2020.  So 55.

16           MR. AFRAME:  And the wire receipt.

17     Q.    And that's a $2,000 wire, correct?

18     A.    Yes.

19     Q.    And where was it being sent?  Who's the

20  beneficiary?

21     A.    Colleen Fordham.

22     Q.    And what was the reason that Mr. Ferrero put as the

23  originator, the beneficiary?

24     A.    Purchase for rare coins.

25     Q.    Okay.  Back to Robarge, and this guy's date of

1   birth is '77?

2        A.   Correct.

3        Q.   Okay.  And there's no receipt.  It's just a piece

4   of paper?

5        A.   Yes.

6        Q.   Okay.

7             MR. AFRAME:  And Young.  Sorry.  Before Young there

8   was one more that was given to me.  Serlet.

9        Q.   And this person is very young, right?

10       A.   Yes.

11       Q.   1996?

12       A.   Yes.

13       Q.   Okay.  And, again, no receipt, just a piece of

14  paper?

15       A.   Yes.

16       Q.   Okay.  And then the last one --

17            MR. AFRAME:  I don't see a Young.  Do you see a

18  Young?  Okay.  There's no Young.

19       Q.   So now have we shown every folder -- well, either

20  every folder I chose to show you or every folder Mr. Sisti

21  mentioned?

22       A.   Yes.

23       Q.   Okay.  Nothing further.

24            THE COURT:  Recross.

25            MR. SISTI:  Thank you, Judge.

```
 1                      RECROSS-EXAMINATION
 2    BY MR. SISTI:
 3         Q.    And the individuals that were just completed, the
 4    folder, were all under the age of 59, correct?
 5         A.    I believe so.
 6         Q.    Right.  And those were the ones that were left out
 7    yesterday, right?
 8         A.    Yes.  From the images.  Not from my calculation.
 9         Q.    From testimony to the jury so the jury would know
10    what their ages were, right?
11         A.    Yes.  From the -- yes.  From the images we showed.
12         Q.    Okay.  I just wanted to make sure we're complete,
13    okay?
14               Now, the first question that the prosecutor asked
15    you had to with the Kraken account?
16         A.    Yes.
17         Q.    A $280,000 purchase of currency?
18         A.    Yes.  I believe it was fiat to bitcoin.
19         Q.    Bitcoin.  And there was a fee attached to that?
20         A.    Yes.
21         Q.    So there's a sales fee on that, right?
22         A.    Yes.
23         Q.    All right.  So when you're buying something, all
24    right, on any market, you're trying to buy it at the lowest
25    price, right?
```

1      A.   Yes.

2      Q.   But you're also going to be charged for that

3 transaction as well?

4      A.   Yes.

5      Q.   There's nothing unusual about that transaction,

6 correct?

7      A.   No.

8      Q.   No.  There's nothing illegal about that

9 transaction, right?

10      A.   His purchase from Kraken?

11      Q.   Yeah.

12      A.   No.

13      Q.   No.  Okay.

14      Do you know where the excess money goes that is

15 made during these church transactions or Freeman transactions?

16 Do you know where any of that excess money goes?

17      A.   No.

18      Q.   Do you know that the mission of that church -- and

19 in fact you alluded to a mission -- a question was asked about

20 the mission of the church.  Do you know that the mission has

21 to do with charity?  Do you know that?

22      A.   He said I believe it had something to do with

23 fostering peace --

24      Q.   Right.  Fostering peace.

25      A.   -- through the spreading of bitcoin.

1      Q.    Right.  Do you also know they're involved in

2   charitable giving?

3      A.    Through testimony I think I've been made aware.

4   Something about homeless shelters maybe.

5      Q.    Homeless shelters.  Orphanages.  You heard that,

6   too, right?

7      A.    I only heard the orphanage through one of the

8   transactions.

9      Q.    All right.  Orphanage through a transaction.  Okay.

10          They actually give bitcoin to people on the street.

11   Do you know that?

12      A.    No, I do not.

13      Q.    All right.  And they contribute to food banks and

14   food pantries.  Do you know that?

15      A.    I think that's come up, yes.

16      Q.    That's just a few of the things, okay?

17      A.    Okay.

18      Q.    All right.  So, again, with regard to any excess

19   money that may flow, you don't know where that goes?

20      A.    Not entirely, no.

21      Q.    With regard to this March 16th SWAT search entry

22   situation, factors that go into things like bringing in two

23   BearCats, factors that go into bringing in a SWAT team that

24   consisted of at least eight fully armed individuals with

25   automatic weapons, factors that kind of go into figuring out

1    whether you're going to toss a flash bang grenade onto

2    somebody's porch prior to announcing you were there when it

3    was dark out, those factors include bars on the windows,

4    right?  You said that?

5        A.    Yes, I said that.

6        Q.    Okay.  They include a history of whether or not the

7    individuals within the confine of that particular residence

8    have a violent past history, correct?

9        A.    Yes, I believe that can be factored in.

10       Q.    Right.  Other things would be whether or not they

11   were known -- as in Mr. Freeman, for instance, known as being

12   somebody that advocated, like, the violent overthrow of a

13   country, correct?

14       A.    Yes.  I guess that can be a factor.

15       Q.    Yeah.  Espousing violence against governmental

16   authority, things like that?

17       A.    Sure.

18       Q.    Yeah.  Well, none of that's true with regard to

19   Freeman, right?

20       A.    I would like to be clear.  I did not participate in

21   the decision-making prior to this search.  I was not here.

22       Q.    Okay.  Do you know if anybody ever gave you, like,

23   a memo or anything like that as to why they had to come in

24   with two BearCats, with battering rams, fully outfitted with

25   automatic weapons, night vision gear, and a flash bang grenade

1   to enter the home of a New Hampshire Peace Church member that

2   was waving a peace flag on the porch?  Anybody?

3        A.   I have not received a memo.

4        Q.   And Mr. Aframe says nobody got hurt.  No one got

5   hurt he says, right?

6        A.   Correct.

7        Q.   Well, that's nice and that's good.  Do you think

8   people had the hell scared out of them that night?

9        A.   I can't speak to that.

10       Q.   You can't speak to that?

11       A.   I don't know.

12       Q.   That exhibit -- Mr. Roach's firearms he had in his

13  room, right?

14       A.   Yes.

15       Q.   Did anybody even know anything about that before

16  they had the two BearCats, the eight SWAT team members, the

17  whole deal, the whole flash bang thing, did anybody know

18  anything about Mr. Roach?

19       A.   I don't know.

20       Q.   Did Mr. Roach have any kind of a violent

21  background?

22       A.   I think I heard through testimony that he did not.

23       Q.   By the time you took that picture -- by the time

24  the folks took the picture of the weapons in Roach's room,

25  everybody had been out of the building, right?

1        A.    Yes.

2        Q.    We saw -- we just saw that film that was made

3   available by Ian that nobody left that particular home that

4   was carrying any kind of a weapon, right?

5        A.    No.

6        Q.    There was no resistance whatsoever with any

7   governmental authority, right?

8        A.    Not that I could speak to, no.

9        Q.    Mr. Aframe asked whether or not you knew whether or

10  not Nobody gave permission to Freeman to make that phone call

11  to the Bank of America, right?

12       A.    He did ask, yes.

13       Q.    You guys are the investigators.  Did you ask

14  Nobody?

15       A.    We did not.

16       Q.    And what is the difference to the Bank of America?

17  They didn't lose a dime, did they?

18       A.    I don't know.

19       Q.    Any report from them they lost anything with regard

20  to that transaction?

21       A.    I don't know.

22       Q.    With regard to the bank accounts that were referred

23  to by Mr. Aframe that were closed concerning Mr. Freeman or

24  the churches, those were closed but the amounts of the money

25  in the bank accounts are given back to Mr. Freeman or the

1    church, right?

2        A.   I can't speak to specifics.

3        Q.   Did you research or do anything to investigate

4    whether banks generally give back money to people that they

5    think are involved in criminal activity?

6        A.   No, I did not research that.

7             MR. SISTI:  I have nothing further.

8             MR. AFRAME:  Just one last question.

9             THE COURT:  I'll give you one more reach.

10                        FURTHER EXAMINATION

11   BY MR. AFRAME:

12       Q.   Mr. Sisti inquired about what happened to all the

13   money that we've seen flowing through Mr. Freeman's bitcoin

14   business?

15       A.   Yes.

16       Q.   Did you -- as part of your searching devices, did

17   you search Ms. Spinella's phone?

18       A.   Yes.

19       Q.   Are you familiar with the contents from that?

20       A.   Yes.

21            MR. AFRAME:  Can we just look at 808?

22       Q.   What does Ms. Spinella say in the very first line?

23       A.   You are rich.

24       Q.   And what does Mr. Freeman say?

25       A.   I also work nearly every day and saved money.  I

1  never spend to my income and never have even when I was not as

2  well off.

3      Q.   And from your review of the records did it appear

4  to you that Mr. Freeman worked pretty hard at this bitcoin

5  operation?

6      A.   Yes.

7                    FURTHER EXAMINATION

8  BY MR. SISTI:

9      Q.   What does Freeman drive?

10     A.   I don't know.

11     Q.   The jury saw his house, right?

12     A.   Yes.

13     Q.   Does he have any mansions anyplace?

14     A.   I don't believe so.

15     Q.   Does he have any exotic cars anywhere?

16     A.   I don't know.

17         MR. SISTI:  I have nothing further.

18         THE COURT:  Agent, you're excused.  You can step

19  down.

20         Call your next witness.

21         MR. KENNEDY:  The government calls Rebecca Ault.

22                    REBECCA AULT

23      having been duly sworn, testified as follows:

24         THE CLERK:  For the record, please state your name

25  and spell your last name, please.

```
 1              THE WITNESS:  Rebecca Ann Ault, A-U-L-T.
 2                          DIRECT EXAMINATION
 3    BY MR. KENNEDY:
 4         Q.   Good morning, Ms. Ault.  How are you?
 5         A.   I'm good.
 6         Q.   Could you just tell the jury where you currently
 7    live?
 8         A.   I live in Bowling Green, Kentucky.
 9         Q.   And how long have you lived in Bowling Green?
10         A.   Twenty years.
11         Q.   And how old are you?
12         A.   59.
13         Q.   Currently employed?
14         A.   Yes.
15         Q.   And how are you employed?
16         A.   I work for Warren County schools in Kentucky.
17         Q.   The county schools?
18         A.   Uh-huh.
19         Q.   And what do you do there?
20         A.   I'm a cafeteria manager.
21         Q.   And how long have you been doing that?
22         A.   Five years.
23         Q.   And what did you do prior to that?
24         A.   Walmart.  I was the manager at Walmart for 36
25    years.
```

1    Q.   Are you married?

2    A.   No.

3    Q.   Were you ever married?

4    A.   Yes.

5    Q.   Are you divorced?

6    A.   Divorced.  I was married 38 years.

7    Q.   Do you have any children?

8    A.   One.

9    Q.   And if you don't mind me asking, what brought about

10   your divorce?

11   A.   He was physically and mentally abusive.

12   Q.   And how long ago was that divorce?

13   A.   It was in 2019.

14   Q.   I'm going to direct your attention to August of

15   2020.  Did you join the dating website Match.com?

16   A.   Yes, I did.

17   Q.   Okay.  And did you meet somebody on that website

18   that you began communicating with?

19   A.   Yes.

20   Q.   And how did you come to know that person, by what

21   name?

22   A.   His name was Gary Eugene Flowers.

23   Q.   Okay.  And did Mr. Flowers reach out to you?  Did

24   you reach out to him?  How did that start?

25   A.   He reached out to me, and then I reached back out

```
 1    to him, yes.
 2         Q.   Okay.  And did you communicate with him through the
 3    Match.com website?
 4         A.   I did.
 5         Q.   At some point did you communicate with him outside
 6    of that website?
 7         A.   Yes.
 8         Q.   And can you tell the jury about that?
 9         A.   He asked me to join Telegram, and I did.  We talked
10    through Telegram for quite some time, and then --
11         Q.   So --
12         A.   I'm sorry.
13         Q.   No, no.  You're totally fine.  Sometimes it's
14    easier for the jury if we take it piece by piece.
15         A.   Yeah.  So it was through Telegram at first, yes.
16         Q.   Okay.  So, you know, in that summer of 2020 did you
17    know what Telegram was?
18         A.   No.
19         Q.   And what did you come to find out about it?  What
20    is it?
21         A.   It was a website where you could just communicate
22    with somebody through Telegram.
23         Q.   Okay.  And is that text messages, voice messages,
24    video?  What kind of communication is it?
25         A.   More like text messages.
```

1      Q.    Okay.  And did you begin communicating with Mr.
2  Flowers on that website -- on that application?
3      A.    Yes.
4      Q.    And how often were you communicating with him?
5      A.    Probably every other day.
6      Q.    And what kind of things were you talking about with
7  him?
8      A.    Just, you know, basic life things, what he did,
9  what I did, you know, kids and grandkids, and things like
10  that, and where he lived.
11      Q.    And what did he tell you about himself?
12      A.    He told me he lived in Mobile, Alabama, and was a
13  civil engineer and traveled a lot.
14      Q.    He traveled a lot?
15      A.    Uh-huh.
16      Q.    Okay.  What were you hoping to find with Mr.
17  Flowers?
18      A.    A companion.
19      Q.    Did you develop feelings for Mr. Flowers?
20      A.    I felt like, yes, I had feelings.
21      Q.    Okay.  At some point did something happen with Mr.
22  Flowers where he asked for your assistance?
23      A.    Yes.
24      Q.    Could you just tell the jury about that?
25      A.    He was going to Turkey.  He had a business deal

1    over there and he needed money for -- he got sick and he

2    needed money to see a doctor, and then it went on as I needed

3    money for work to feed the employees.

4         Q.   So why don't we start with that first one.

5              So you said he's in Turkey and he got sick; is that

6    right?

7         A.   Yes.

8         Q.   And he needed you to send him money?

9         A.   Yes, to see a doctor.

10        Q.   And did you send him money?

11        A.   Yes.

12        Q.   And tell the jury, you know, why you were inclined

13   to send him money.

14        A.   I felt sorry for him.  I guess I was -- vulnerable

15   is the word that I used.

16        Q.   Did you care about him at that time?

17        A.   I thought I did, yes.

18        Q.   Okay.  How did he ask you to get him the money?

19        A.   He asked me to go to my bank and wire the money.

20        Q.   Okay.  How did you know where to wire it?

21        A.   He would send me an address to send it to.

22        Q.   I think you started to tell us that it moved on

23   from there.  Can you just give the jury just a general idea of

24   how it developed from being sick in Turkey to needing more

25   money?

1          A.    He was -- he needed money for, like I said, for his

2    business.  And then he got sick and then he went in the

3    hospital, and I wouldn't talk to him as much.  He said he was

4    in the hospital.  I mean, I guess that's pretty much it.

5                And then I got -- I'm the one that got nervous.

6          Q.    So while he was in the hospital -- how long was he

7    in the hospital for?

8          A.    For weeks.

9          Q.    Okay.  And was he asking you for money during this

10   time that he was in the hospital?

11         A.    For medicine and for the doctors.

12         Q.    Okay.  You said at the end you were the one who got

13   nervous?

14         A.    I got nervous sending the money, yes.

15         Q.    Okay.  And what do you mean by that?

16         A.    It scared me.  I just -- I had never dealt or done

17   anything like that before in my life.

18         Q.    Okay.  Do you recall when he had you send those

19   wires if those were sent in his name, in the name Gary

20   Flowers?

21         A.    No.  They were sent to different people.

22         Q.    Okay.  Did you tell Mr. Flowers that you were

23   nervous about sending this money?

24         A.    I did.

25         Q.    And how did he respond to you?

1      A.   He wanted me to try doing it a different way.

2      Q.   And can you tell the jury about that?

3      A.   He wanted me to send it with a wallet in bitcoin.

4      Q.   Did you know what bitcoin was?

5      A.   I did not.

6      Q.   Did you own any bitcoin?

7      A.   No.

8      Q.   Had you ever used a bitcoin wallet?

9      A.   No.

10     Q.   Did you agree to help send him money through

11 bitcoin?

12     A.   Yes.

13     Q.   Okay.  And how did you know how to do that?

14     A.   He explained to me what to do.

15     Q.   And how was he explaining this to you?  How was he

16 communicating?

17     A.   Phone calls.

18     Q.   And is that sort of through your phone number or

19 through the Telegram?

20     A.   Through my phone.

21     Q.   How did you know who to send the money to to get

22 the bitcoin?

23     A.   Well, at the time he wanted me to send it to --

24 well, the first time it was to Mr. Freeman.

25     Q.   Okay.  And did that information come from Mr.

1  Flowers?

2       A.    Yes.

3       Q.    And did he explain to you who Mr. Freeman was?

4       A.    Just he did bitcoin.

5       Q.    As part of this process, did Mr. Flowers ask you to

6  take some photographs?

7       A.    Yes.

8       Q.    And did you take those photographs?

9       A.    Yes.

10       Q.    After you took those photographs, what would you do

11  with them?

12       A.    I would send them to Mr. Flowers.

13       Q.    Okay.  I am going to show you what we've agreed is

14  a full exhibit, Government's 2302.  It should pop up on your

15  screen at some point.

16            Can you see that?

17       A.    Yeah.

18       Q.    And if you need for any of these, we can blow this

19  up if you have trouble seeing it.

20            Do you recognize what this is?

21       A.    Yes.

22       Q.    Would you tell the jury?

23       A.    It is a picture of my driver's license.

24       Q.    Did you take this photograph?

25       A.    I did.

1          Q.    And did you send this photograph to Mr. Flowers?

2          A.    Yes.

3          Q.    I show you Government's 2303 which has been agreed

4    to as a full exhibit.  Is that you?

5          A.    Yes, it is.

6          Q.    Is that your driver's license again?

7          A.    Yes.

8          Q.    And is that your handwriting?

9          A.    Yes.

10         Q.    And it says:  I certify that I am buying bitcoin

11   via wire transfer from FTL_Ian on Telegram, and there's dates,

12   a signature and a phone number.

13               Is that your signature?

14         A.    Yes, it is.

15         Q.    Is that your phone number?

16         A.    Yes.

17         Q.    Did you know what FTL_Ian on Telegram was?

18         A.    No.

19         Q.    Okay.  How did you know what to write on that

20   sheet?

21         A.    Mr. Flowers.

22         Q.    And did you take this photograph as well?

23         A.    Yes, I did.

24         Q.    Did you send that to Mr. Flowers?

25         A.    Yes, I did.

1      Q.    I'm going to show you Government's 2304.  It's also

2  been agreed as a full exhibit.

3            Is that you?

4      A.    Yes.

5      Q.    Did you have a bank account at U.S. Bank?

6      A.    Yes.

7            MR. KENNEDY:  And if we can maybe just blow up the

8  picture of the receipt?

9      Q.    Are you able to see what the amount of that wire

10  is?

11     A.    20,000.

12     Q.    Okay.  Is that handwriting yours?

13           Oh, sorry.  We popped out.

14           MR. KENNEDY:  Let me just -- actually, can you blow

15  up the handwriting at the bottom?

16     Q.    Again, is this your handwriting?

17     A.    Yes, it is.

18     Q.    And it looks like it says:  I, Rebecca A. Ault,

19  authorized and completed a wire transfer in the amount of

20  $20,000 for the purchase of bitcoin from FTL_Ian on Telegram.

21  I understand that this transaction is non-refundable.

22           Is that language Mr. Flowers sent to you?

23     A.    Yes.

24     Q.    Did you take this picture and send it to Mr.

25  Flowers?

1    A.    Yes.  Well, I don't see a picture.

2    Q.    Sorry.  Yeah, we'll back that out.

3    A.    I took that picture, yes.

4          THE COURT:  Stop.  Let the witness finish.

5          MR. KENNEDY:  Got it.

6          THE COURT:  Please proceed.

7          MR. KENNEDY:  I'm going to have Caryn back it back

8    out all the way.

9    Q.    Did you take this picture?

10   A.    Yes, I did.

11   Q.    And did you send this to Mr. Flowers?

12   A.    Yes.

13   Q.    Okay.  I'm going to show you Government's 2305.

14   Also agreed as a full exhibit.

15         Is that also you?

16   A.    Yes.

17   Q.    Is that another U.S. Bank wire receipt?

18   A.    Yes, it is.

19   Q.    I think the actual text I'm not sure we'll be able

20   to zoom in but we'll look at something later related to that,

21   but I would like to focus on the words at the bottom.

22         Is that your handwriting again?

23   A.    Yes, it is.

24   Q.    And does it say:  I, Rebecca A. Ault, authorized

25   and completed a wire transfer in the amount of $5,000 for the

1    purchase of bitcoin from FTL_Ian on Telegram.  I understand

2    that this transaction is non-refundable?

3         A.    That's correct.

4         Q.    Okay.

5              MR. KENNEDY:  If we can just go back to 2304 for a

6    minute.  This is the first wire we looked at.  We'll see if

7    Caryn can blow it up at the top left.

8         Q.    Are you able to see what date this was sent on?  It

9    might be tough, but we'll see what we can do.  That very top

10   line.

11        A.    Yeah, it looks like October 28, 2020.

12        Q.    Okay.

13             MR. KENNEDY:  You can go back to 2305.

14        Q.    I'm not sure about the quality of this picture.  We

15   can try to zoom in on the date again.  Like I said, I will

16   show you another document related to this, but let's see if we

17   can zoom in on that.

18             Are you able to read the month?

19        A.    Is it September?

20        Q.    If you can't, that's okay.  I understand.

21        A.    I can't.  It's blurry.

22        Q.    Yeah.  And sometimes that happens with these when

23   we zoom in.

24             MR. KENNEDY:  You can come all of the way back out,

25   Caryn.

1    A.    That might be better.

2    Q.    This is a photograph that Mr. Flowers had you take?

3    A.    Yes, it is.

4    Q.    And did you send that to him?

5    A.    I did, yes.

6    Q.    Okay.  I'm going to show you 2306.  Also a full

7  exhibit.  Is that another U.S. Bank wire receipt?

8    A.    Yes.

9    Q.    And what's the date on this one?

10    A.    December 8, 2020.

11    Q.    And what's the wire amount?

12    A.    $20,000.

13    Q.    And can you tell me who the beneficiary information

14  is on this one?

15    A.    Renee Spinella.

16    Q.    And is that your handwriting?

17    A.    Yes.  That is my handwriting, yes.

18    Q.    Okay.  And it looks like it's the same language

19  we've been reading just with the amount changed to $20,000.

20          And is that a photograph Mr. Flowers had you take?

21    A.    Yes.

22    Q.    I'll show you 2307.  Is that that same wire receipt

23  just with you in the picture?

24    A.    Yes.

25    Q.    Did you send that to Mr. Flowers as well?

1    A.    Yes, I did.

2    Q.    While you were conducting these wire transfers,

3  were you communicating with Mr. Flowers?

4    A.    I was.

5    Q.    And was that through the Telegram app?

6    A.    Through Telegram and maybe texts.  I believe it was

7  more Telegram.

8    Q.    Okay.  And was he providing you updates on what to

9  do?

10    A.    Yes.

11    Q.    At some point did you -- at any point in this did

12  you speak with Mr. Freeman?

13    A.    Oh, one time.

14    Q.    Okay.  And how did that happen?

15    A.    He called and asked if I authorized the transfer,

16  and I said, yes, and that was it.

17    Q.    About how long was the phone call?

18    A.    Five seconds maybe.

19    Q.    Did he ask you if you knew anything about bitcoin?

20    A.    No.

21    Q.    Did he ask why you were buying bitcoin from him?

22    A.    No.

23    Q.    Did he ask you where you were getting the money

24  from?

25    A.    No.

1      Q.   I'm going to pull up for you what has already been

2  admitted, the jury has seen this, Government's 2008, which is

3  a bank record.

4           And if you could just read the name the subscriber

5  or the account name is in right under the Santander sign?

6      A.   The NH Peace Church.

7      Q.   Okay.  And where's that located?

8      A.   In Keene, New Hampshire.

9      Q.   Before today had you been to New Hampshire before?

10     A.   No.

11     Q.   And --

12          MR. KENNEDY:  Caryn, can you go into the statement

13  date just to the top right?  Blow that up.

14     Q.   And can you just orient the jury to what month

15  we're looking at here?

16     A.   10-2-2020 to 11-2-2020.

17     Q.   And I think that first wire we looked at you said

18  was October 28th; is that right?

19     A.   Yes.

20          MR. KENNEDY:  So, Caryn, if we could just scroll

21  down to an entry for October 28th?

22     Q.   About halfway down do you see entry on 10-28, wire

23  in from Rebecca A. Ault?

24          MR. KENNEDY:  I don't know if Caryn can highlight

25  that.

1        Q.    Do you see that?

2        A.    Yes.

3        Q.    And is that the $20,000 wire we looked at?

4        A.    Yes, it is.

5        Q.    It says REF artwork.  Do you know what that is?

6        A.    No.

7        Q.    Do you know why -- was that something you would

8   have put on the wire?

9        A.    That was something that Mr. Flowers told me to put

10  on the wire.

11       Q.    Okay.  Did he explain to you why you needed to put

12  artwork on the wire?

13       A.    No.

14       Q.    When you spoke with Mr. Freeman, did he ask you

15  anything about artwork?

16       A.    No.

17             MR. KENNEDY:  Caryn, if you can just go to --

18             THE COURT:  You have a little ways to go with this

19  witness, right?

20             MR. KENNEDY:  Yeah.  Maybe just five more minutes.

21             THE COURT:  Okay.  We'll take the morning break.

22             Fifteen minutes, Kellie.

23             We'll reconvene at 11:10.

24             (RECESS)

25             THE COURT:  You can continue.

1          MR. KENNEDY:  Thank you, your Honor.

2          THE COURT:  Just so you know, we'll break at 12:30

3   for lunch.

4          Go ahead, counsel.

5          MR. KENNEDY:  Thank you.

6     Q.    Ms. Ault, I believe when we left off we were

7   looking at a transaction at 10-28.

8          MR. KENNEDY:  I'm going to have Caryn go to the

9   next page, if we could?

10     Q.    I'm going to direct your attention to the top

11   right, and if you could just tell the jury what statement

12   period we're looking at here?

13     A.    11-3-2020 to 12-2-2020.

14     Q.    Okay.  So is this the next month in those

15   statements?

16     A.    Yes.

17     Q.    Okay.  I'm just going to direct your attention to

18   an entry on 11-9.

19          Is that your name, Rebecca A. Ault?

20     A.    Yes, it is.

21     Q.    Is that the $5,000 wire we looked at?

22     A.    Yes, it is.

23     Q.    I think that's the one we weren't able to see the

24   date.  Does that sound right?

25     A.    Yes.

```
1      Q.    So it looks like November 9th.

2            MR. KENNEDY:   If we can just come back out?

3      Q.    Just under that business checking sort of bold

4  stripe there's a couple names in bold.  Are you able to read

5  those?

6      A.    Ian B. Freeman, d/b/a NH Peace Church.

7      Q.    Do you know what the NH Peace Church is?

8      A.    No.

9      Q.    Did Mr. Flowers tell you anything about a church?

10     A.    No.

11     Q.    How did things end between you and Mr. Flowers?

12     A.    How did they end?

13     Q.    Are you still talking to Mr. Flowers?

14     A.    No.

15     Q.    So how did that sort of come to an end?

16     A.    I blocked him.

17     Q.    Okay.  And we looked at three wires here.  I think

18  there was two $20,000 wires and a $5,000 wire.  So $45,000.

19           Did you send more money than that to Mr. Flowers?

20     A.    Yes, I did.

21     Q.    How much in total did Mr. Flowers get you to send

22  him?

23     A.    Including this, it would be right around 200,000.

24     Q.    And where did that money come from?

25     A.    My retirement.
```

1        Q.    Did you ever get any of your money back?

2        A.    No.

3        Q.    How has this whole ordeal affected you?

4        A.    Traumatic, stress, depressed.  I mean, it turned my

5   life all around.

6              MR. KENNEDY:  I don't have anymore questions for

7   you, Ms. Ault.

8              THE COURT:  Cross-examination.

9              MR. SISTI:  Thank you, Judge.

10                       CROSS-EXAMINATION

11   BY MR. SISTI:

12        Q.    Good morning, Ms. Ault.

13        A.    Hello.

14        Q.    I know it's a trouble to be here, and I think we

15   all appreciate the fact that you made an effort to get here.

16   So thank you.

17        A.    Uh-huh.

18        Q.    Where in Kentucky are you from?

19        A.    Bowling Green, Kentucky.

20        Q.    Bowling Green, Kentucky?

21        A.    Yes.

22        Q.    Okay.  Let's go back to this Mr. Flowers.  I hate

23   bringing this stuff up over again, and I'm sorry this happened

24   to you.

25              Did you ever see Mr. Flowers?  Like, was there ever

1    like, a Skype thing or anything like that?

2         A.    We tried, but of course it didn't work.

3         Q.    Yeah.  It was probably part of his deal, too.  Of

4    course it didn't work, right?

5         A.    Yes.

6         Q.    Yeah.  But there were some telephone conversations?

7         A.    Yes.

8         Q.    All right.  And how long did this whole thing go

9    on?

10        A.    From August 2020 to -- it went into '21.  I can't

11   give you -- I can't recall an exact.

12        Q.    Kind of early '21, something like that?

13        A.    I think it went into '21, yes.

14        Q.    Okay.  All right.  So it was quite a while?

15        A.    Yes.

16        Q.    Not a long, long time, but quite a while?

17        A.    Quite a while, yes.

18        Q.    Okay.  Now, the bulk of the transactions obviously

19   would have been cash or wire transfers?

20        A.    Yes, sir.

21        Q.    Okay.  Let me go through that.  That had nothing to

22   do with Ian Freeman or the New Hampshire Peace Church or any

23   of that stuff, that was actually just transactions directly

24   with Mr. Flowers or some other designee, right?

25        A.    Yes.

1      Q.    Okay.  And would you go to your -- it was a U.S.

2  Bank?  Is that where you were banking?

3      A.    Yes.

4      Q.    Do you have, like, one branch there?  Do you work

5  with one branch or multiple branches?

6      A.    No.  There's probably five.

7      Q.    Five.  Were you working out of one?  I mean, did

8  you go to one branch or how did that work?

9      A.    It depended on where I was at.  In Bowling Green I

10  would just, you know, go to the closest one.

11      Q.    All right.  But, I mean, it is your bank?

12      A.    Yes.

13      Q.    How long has it been your bank?

14      A.    Probably 25 years.

15      Q.    All right.  So you've been a dedicated customer of

16  U.S. Bank in the Bowling Green, Kentucky, area for 25 years?

17      A.    Well, I've lived in Bowling Green for 20.  I know

18  they've changed names a couple times, but I've always been

19  with them.

20      Q.    All right.  And about how many of those wire

21  transfers do you think you sent out from U.S. Bank in Bowling

22  Green?

23      A.    Maybe eight, ten.

24      Q.    Eight or ten?

25      A.    Uh-huh.

```
1          Q.    Okay.  Did any of the tellers there or any of the
2    bank personnel in any capacity ever say, are you authorizing
3    this kind of money going to Mr. Flowers?
4          A.    They did question, yes.
5          Q.    And when did they question that?
6          A.    On a couple of the bigger transactions.
7          Q.    All right.  And what would you tell them?
8          A.    That I did authorize it.
9          Q.    All right.  And after they asked you if you
10   authorized it -- because they wanted to be sure everything was
11   on the up and up, at least they were trying, right?
12         A.    Yes, yes.
13         Q.    Then you would go ahead and -- they would go ahead
14   and send the wire?
15         A.    Yes.
16         Q.    Okay.  And you actually had two transactions with
17   Ian Freeman, right?
18         A.    Yes.
19         Q.    And Ian actually called you up, right?
20         A.    Who did?
21         Q.    Ian Freeman.
22         A.    Yes.  Once, yes.
23         Q.    You didn't know Ian Freeman from anybody before
24   this, you know, this guy Flowers somehow made this connection,
25   right?
```

1          A.    Right.

2          Q.    Okay.  And obviously Ian didn't know you from

3     anybody either, right?

4          A.    Right.

5          Q.    Okay.  But on the transaction forms you left a

6     phone number.  Remember you hold up the note and it left your

7     phone number?

8          A.    Yes.

9          Q.    So Ian would have had to make an affirmative act

10    and call you at that phone number, right?

11         A.    He did, yes.

12         Q.    Yeah.  And he called you for the express purpose of

13    asking you whether or not you authorized the transaction,

14    right?

15         A.    Yes.

16         Q.    And he didn't do anything with that transaction

17    until you said you authorized it, right?

18         A.    I suppose so, yes.

19              MR. SISTI:  I have nothing further.  Thank you.

20              THE COURT:  Redirect.

21              MR. KENNEDY:  I'm okay, your Honor.  She can go.

22              THE COURT:  Ma'am, you're excused.  Thank you.

23              THE WITNESS:  Thank you, sir.

24              MS. MACDONALD:  The United States calls Kate

25    Eyerman.

1          KATE EYERMAN

2     having been duly sworn, testified as follows:

3          THE CLERK:  For the record please state your name

4  and spell your last name.

5          THE WITNESS:  My name is Kate Eyerman, and my last

6  name is spelled E-Y-E-R-M-A-N.

7                    DIRECT EXAMINATION

8  BY MS. MACDONALD:

9     Q.    Good morning, Ms. Eyerman.

10          Where are you employed?

11    A.    I'm employed at Paxos Trust Company.

12    Q.    And what's your position with Paxos Trust Company?

13    A.    I'm the BSA/AML officer.

14    Q.    Okay.  And we'll talk about that more in a bit, but

15  could you begin by telling us what kind of a company Paxos

16  Trust Company is?

17    A.    Paxos Trust Company is a regulated

18  infrastructure -- regulated blockchain infrastructure company,

19  and we also provide an exchange for cryptocurrency services.

20    Q.    And let's talk about that exchange.

21          Tell me what the exchange for cryptocurrency

22  services does.

23    A.    The exchange for cryptocurrency services enables

24  users to buy and sell cryptocurrency, exchanging their fiat

25  U.S. dollar currency for crypto assets.

1          Q.    And can you give us an example of some of the
2    crypto assets that can be purchased on the exchange?
3          A.    Examples of some assets include bitcoin, Ethereum,
4    BitcoinCash, LikeCoin, and some others.
5          Q.    Okay.  And is your exchange commonly known by any
6    name other than Paxos?
7          A.    We are also and were founded under the name of
8    itBit.
9          Q.    Okay.  Let's talk about how to use the exchange.
10               Is it open to the public?
11         A.    Yes.
12         Q.    And what types of customers generally utilize the
13   exchange?
14         A.    A variety of type of customers.
15         Q.    Can individuals use it?
16         A.    Yes.
17         Q.    Can businesses use it?
18         A.    Yes.
19         Q.    Does anyone -- do people need to have an account in
20   order to use it?
21         A.    Yes.
22         Q.    And when you've created an account, can you then
23   use the services and purchase cryptocurrency on the exchange?
24         A.    Yes.
25         Q.    Okay.  When an individual, for example, purchases

1   bitcoin or another type of cryptocurrency on the exchange,
2   does itBit charge a fee?
3        A.   Oh, when they purchase cryptocurrency?
4        Q.   Uh-huh.
5        A.   Yes.
6        Q.   And could you tell me about how the fee structure
7   works?
8        A.   There is a fee for exchanging cryptocurrency.
9   There's no fee when you actually deposit fiat currency into
10  the exchange.  There's a fee when you actually conduct that
11  exchange and you buy the bitcoin or the other crypto, and that
12  fee is dependent upon the amount that you would be exchanging.
13       Q.   Okay.  So when you purchase -- when you say there's
14  no fee to deposit fiat currency, that mean if you put, for
15  example, dollars into your exchange account to later use to
16  purchase, the putting the dollars in doesn't incur a fee?
17       A.   Correct.
18       Q.   But in order to use those dollars to purchase
19  cryptocurrency the exchange does charge a fee?
20       A.   Correct.
21       Q.   And you testified that that depends on the amount
22  that you're purchasing?
23       A.   Correct.
24       Q.   Do smaller or larger amounts have higher fees?
25       A.   I believe that larger amounts have lower fees.  I

1    would need to confirm details with the fee schedule.

2         Q.   Okay.  Are you familiar with the highest sort of

3    percentage charged under the fee schedule?

4         A.   Yes.

5         Q.   And what is that?

6         A.   The highest fee would be 35 BIPs, and a BIP is one

7    one-hundredth of a percent.

8         Q.   Okay.  And so, just to be very clear, what

9    percentage is that?

10        A.   It's .35 percent.

11        Q.   Okay.  So the highest fee that itBit would charge

12   to purchase bitcoin, for example, is .35 percent?

13        A.   Correct.

14        Q.   Okay.  Is Paxos a regulated entity?

15        A.   Yes.

16        Q.   And is it considered a money transmitting business?

17        A.   We are considered a money services business.

18        Q.   Okay.  And does this impose any federal

19   registration requirements?

20        A.   Yes.

21        Q.   Who does Paxos register with?

22        A.   We are registered as a money services business with

23   FinCEN.

24        Q.   Okay.  And are you familiar with the Bank Secrecy

25   Act?

1          A.    Yes.

2          Q.    And does that apply to the exchange?

3          A.    Yes.

4          Q.    And just very generally, and we'll get into sort of

5    more detail, what types of requirements does the Bank Secrecy

6    Act impose on the exchange?

7          A.    The Bank Secrecy Act generally imposes requirements

8    to have a program in place to identify, detect, and report

9    potentially suspicious activity.

10         Q.    You testified that your position is as a BSA/AML

11   officer.  Can you first tell us what those abbreviations stand

12   for?

13         A.    Yes.  BSA is Bank Secrecy Act and AML is anti-money

14   laundering.

15         Q.    Tell us then, how would you describe your position

16   with the company?

17         A.    My position is to oversee the program that is in

18   place at Paxos to ensure compliance with the Bank Secrecy Act

19   by overseeing the program to identify and detect potentially

20   suspicious activity and to report as appropriate per that

21   requirement.

22         Q.    Okay.  And let's talk about those reporting

23   requirements.  Are those imposed by the Bank Secrecy Act?

24         A.    Yes.

25         Q.    And what types of reports does the Bank Secrecy Act

1    require you to file?

2        A.    The requirement is to file reports of potentially

3    suspicious activity.

4        Q.    Okay.  Are those commonly known as suspicious

5    activity reports?

6        A.    Yes.

7        Q.    And in order to inform yourself of when you might

8    need to file a suspicious activity report, what types of

9    information do you collect about your customers and their

10   transactions?

11       A.    We collect information with regards to their

12   identity in line with our KYC, know your customer, or CIP

13   program and the nature of their business activity in the

14   normal course of business, and then if there is something that

15   we assess to be potentially suspicious, that may generate a

16   suspicious activity report.

17       Q.    Okay.  And could you give me some examples of the

18   type of activity that you would determine to be suspicious?

19       A.    Examples may include if a customer's activity is

20   outside what would have otherwise been expected based on their

21   business profile, such as a sudden increase in the volume of

22   transactions or the type of transactions that may otherwise

23   be, again, unusual based on what we expected from their

24   account profile.

25       Q.    Okay.  And you talked about KYC.  What does that

1  stand for?

2       A.   KYC stands for know your customer.

3       Q.   And do you collect various information about your

4  customers when they create an account?

5       A.   Yes.

6       Q.   Okay.  So let's talk about the process for creating

7  an account and the types of information that you collect at

8  that point.

9            Could you begin by giving us an overview of how you

10 create an account with Paxos?

11      A.   Sure.  In order to create an account a user would

12 need to log on to the Paxos website utilizing the Paxos

13 interface and provide personal information, legal

14 identification, and other requisite information in order to --

15 in order for us to understand their identity and validate

16 their identity.

17      Q.   Okay.  And are you familiar with the term risk

18 ratings?

19      A.   Yes.

20      Q.   And tell me what that means.

21      A.   Upon onboarding we provide a customer risk rating

22 or a risk rating to all customers based on a variety of

23 factors.  Risk ratings can be -- they're typically low,

24 medium, or high, and they're designed to help us understand

25 the risk associated with the customers that we onboard and

1    provide access to our platform.

2          Q.    And can you give me an example of what would be a

3    low risk customer?

4          A.    Sure.  Hypothetically, a low-risk customer would be

5    an individual who operated in what we would consider to be a

6    low-risk jurisdiction where there is a friendly, established

7    AML/CFT regime in place with a known -- when they're not

8    operating with any high-risk industry or they're not in a

9    high-risk occupation, for example.  Although there are

10   different circumstances in each case that affect the actual

11   risk rating of the customer.

12         Q.    Okay.  So let me just make sure that we understand

13   the acronyms you're using.

14               We've talked about AML already, but can you just

15   remind the jury again?

16         A.    Sure.  AML stands for anti-money laundering.

17         Q.    And CFT?

18         A.    The countering or financing of terrorism.

19         Q.    Okay.  And let's now talk about an example of what

20   might be a high-risk account.

21         A.    Sure.  Again, there are various circumstances and

22   factors that may contribute to a high-risk rating.  Some of

23   those may include working in a high-risk industry, high-risk

24   jurisdiction, high-risk business, high-risk occupation, as

25   examples.

1      Q.    Are money transmitting businesses high risk?

2      A.    Yes.

3      Q.    Why is that?

4      A.    We consider money transmitters to be high risk for

5  a variety of reasons.  I think per general industry standard

6  they're considered high risk, and at Paxos we consider them to

7  be high risk.

8      Q.    Does Paxos operate accounts for unregistered money

9  transmitting businesses?

10     A.    No.  We consider unregistered money services

11 businesses to be a prohibited entity type.

12     Q.    Okay.  In order to collect this information to

13 determine a risk rating, do you sometimes collect additional

14 information than what's on the initial application?

15     A.    Yes.

16     Q.    And what would cause you to do that?

17     A.    A variety of reasons.  We will reach out to the

18 customer or account applicant in order to -- with, you know,

19 supplemental questions in order to ensure that we have what we

20 would consider to be a thorough understanding of their

21 profile, the industry in which they are going to be working,

22 you know, their business type, and in certain instances

23 additional clarification is necessary.

24     Q.    Okay.  And we discussed sort of the account opening

25 process and questions that you might ask when an account is

1    opened.

2         Do you sometimes ask questions sort of during the

3    life of the account?

4         A.   Yes.

5         Q.   And tell me about how you monitor an account sort

6    of over its lifetime.

7         A.   Sure.  There are a few ways that we monitor the

8    account over the course of the lifetime.

9         Based on the risk rating itself, we conduct a

10   refresh process that is -- the frequency of the refresh is

11   determined by the risk rating.  So higher risk accounts are

12   refreshed at a more frequent basis, whereas lower risk

13   accounts are refreshed at a lower frequency, and upon refresh

14   we will contact the customer to ensure that their business

15   profile has not changed, their KYC/PIP information on file is

16   up to date, and ask any clarifying questions that may be

17   appropriate since the last time that we had communicated with

18   them.

19        Q.   And are sort of quantities of funds going through

20   an account something that comes into this calculus?

21        A.   Yes.  We maintain an ongoing risk rating process.

22   And so in the event that we identify via our ongoing

23   monitoring systems that there has been either an increase in

24   volume or an increase in velocity of transactions, we will

25   conduct an ad hoc outreach or, you know, a request for

1    information from the customer.

2         Q.    Okay.  And so when you say outreach or a request

3    for information, that's generally your response when you see

4    things that are out of the ordinary or concerning; is that

5    right?

6         A.    Correct.

7         Q.    Okay.  And when you reach out to the customer, you

8    know, is it the same script every single time you reach out to

9    a customer or do you ask different questions?

10        A.    So I am not specifically responsible for the

11   outreach at Paxos.  Typically, there is an initial standard

12   template that will start the conversation, but we may ask

13   tailored questions depending upon the nature of the customer,

14   the nature of the profile, and the nature of the concern that

15   we have.

16        Q.    Okay.  And why do you ask those tailored questions?

17        A.    In order to ensure that we have as complete an

18   understanding -- as complete a picture of the profile in order

19   to satisfy our own assessment with regard to the nature of

20   their profile and the risk of that business activity.

21        Q.    Okay.  And if during your monitoring of an account

22   you learned that one person is buying the bitcoin and sending

23   it to another person, would that be a cause for concern?

24        A.    It would be -- it would be a trigger for outreach.

25        Q.    Okay.  And is that allowed on your platform, third

1    party transfers?

2         A.    No.  We do not allow third party transfers.

3         Q.    And during your course of monitoring an account if

4    you determine that someone is too risky, what do you do?

5         A.    If we identify that a customer of ours is outside

6    of our risk appetite, we will typically close the account or

7    disable them from activity.

8         Q.    Okay.

9         MS. MACDONALD:  I would like to pull up what's been

10   admitted as Government's Exhibit 101.

11        Q.    And do you recognize the logo on the top of this

12   document?

13        A.    Yes.

14        Q.    And what logo is that?

15        A.    It says itBit.

16        Q.    Is that your exchange?

17        A.    Yes.

18        Q.    Could you read what it says below article 1?

19        A.    Below article 1 it says company information.

20        Q.    Okay.  And have you previously reviewed this

21   document?

22        A.    I have as part of preparation for this case.

23        Q.    And can you tell us generally what type of a

24   document this is?

25        A.    This appears to be part of an initial application

1       for an account.

2              Q.    Okay.  I'm going to have you just read a few

3       things.  Can you tell me what is listed as company name for

4       this account?

5              A.    It reads Shire Free Church, Monadnock.

6              Q.    Okay.  And the registered mailing address?

7              A.    Reads 63 Emerald Street, No. 610, Keene, New

8       Hampshire, 03431.

9              Q.    And the physical location?

10             A.    It reads 73 Leverett Street, Keene, New Hampshire,

11      03431.

12             Q.    Okay.  And I'll ask, if you don't mind, just

13      reading the sentence below that that starts with "I

14      understand."

15             A.    I understand that itBit will be relying on the

16      accuracy of the above certification, and I represent, warrant,

17      and covenant to itBit that the above statements are complete

18      and accurate.

19             Q.    Okay.  And who signed this document?

20             A.    It looks like it has been signed by Ian B. Freeman.

21             Q.    Okay.  And what's his title?

22             A.    Minister.

23             Q.    Okay.  And this is dated 2016?

24             A.    Correct.

25             Q.    And was your company the same size as it currently

1    is in 2016?

2         A.    I was not with the company in 2016, but it was

3    smaller, as I understand, in 2016.

4         Q.    Okay.  And were the requirements under the Bank

5    Secrecy Act generally the same or different in 2016?

6         A.    I think they've largely been the same.  The Bank

7    Secrecy Act is -- I would want to defer to a lawyer, but the

8    Bank Secrecy Act is --

9              MR. SISTI:  Well, I will object.  I will move to

10   strike that.  She has no personal knowledge or expertise.

11             THE COURT:  Well, hold it.

12             Yeah, sustained.

13             MR. SISTI:  Thank you.

14             THE COURT:  Unless she knows.  You can lay a

15   foundation for her knowledge, she can surely testify about it,

16   but you haven't done that yet.

17        Q.    In 2016 were you working in the same general field?

18        A.    In 2016 I was working for the U.S. Treasury

19   Department.

20        Q.    Okay.  And what was your position with the U.S.

21   Treasury Department?

22        A.    I would need to check the exact dates on my resume,

23   but I believe at that time I was working in the Office of

24   Terrorism and Financial Intelligence on AML/CFT related work.

25        Q.    Okay.  So in that position were you familiar with

1    the requirements of the Bank Secrecy Act?

2         A.   Generally.  Not intimately.

3         Q.   Okay.  So I'm going to ask a slightly different

4    question.

5              Do you know whether the requirements of the Bank

6    Secrecy Act change depending on the size of your business?

7              THE COURT:  Do you know about that?  Before you say

8    whether they were, do you know whether or not they changed?

9              THE WITNESS:  Do I know whether the BSA changed

10   based on the -- can you repeat the question?

11        Q.   Yes.  I apologize.

12             Whether it matters how large your business is,

13   whether it still needs to comply with the Bank Secrecy Act?

14        A.   It does not matter the size of your business.  You

15   are still required to comply with the Bank Secrecy Act.

16             MS. MACDONALD:  Okay.  Let's move on to page 4 of

17   this document, please.

18        Q.   And just to reorient us, you testified that this is

19   part of an account opening application; is that correct?

20        A.   Can you make it a little bigger?

21             Correct.  This appears to be part of the

22   institutional application.

23        Q.   Okay.  I'm going to read a couple of these

24   questions here.  The first, No. 1:  Provide us a brief

25   description of your business.  Indicate what your main

1    business products and services are as well as who your main

2    customer types are.

3              Did I read that correctly?

4         A.   Yes.

5         Q.   And could you read the response provided?

6         A.   We are not a business.  We are a church.  Our

7    customers are our church family and the general public.

8         Q.   Okay.  And 2:  Describe your source of funds.  If

9    your source of funding is from employment, please indicate the

10   company name and your official title/position.  If your source

11   of funds is something other than employment, then we will need

12   a detailed description of that funding.

13             Did I read that correctly?

14        A.   Yes.

15        Q.   And what was the response?

16        A.   Radio show/donations.

17        Q.   Okay.  I'm going to read No. 5:  Please state the

18   purpose of your account with us.

19             Did I read that correctly?

20        A.   Yes.

21        Q.   And what is the answer?

22        A.   To acquire bitcoin for our church outreach

23   projects.

24        Q.   Okay.  And, just generally, do you understand what

25   the purpose of these questions are?

```
1        A.    Yes.

2        Q.    What is that?

3        A.    To understand the nature and type of the business

4   and to understand what their customer profile would look like.

5        Q.    Okay.  And these are questions that -- strike that.

6              MS. MACDONALD:  Let's take a look at Exhibit 102,

7   please.  This has been agreed on as well.

8              And this is an e-mail, and I'm going to represent

9   that sort of the earlier in time one is at the bottom of this

10  page.  So if we could focus on that first, and then we'll look

11  at the response.

12       Q.    And do you recognize -- where it says itBit

13  support, do you recognize what that is?

14       A.    Yes.

15       Q.    What's that?

16       A.    It appears to be the e-mail address associated with

17  the support team at itBit or Paxos.

18       Q.    Okay.  And let's -- the date on this e-mail is

19  November 4th of 2016; is that correct?

20       A.    Yes.

21       Q.    And starting with "Hello, Ian," could you read the

22  first paragraph?

23       A.    From time to time, we will ask our clients

24  questions to ascertain the nature of their activity.  We do

25  this to ensure the safety and security of our trading
```

1    platform.  We would like some further information regarding

2    your activity.

3         Q.   Okay.  And let's start with the first one.

4              No. 1:  What is the source of funds for your

5    account?  If your source of funds is employment, please

6    provide the name and location of your employer and your

7    title/position.  If it's not employment, please provide in

8    detail how the source of funds is generated.

9              Did I read that correctly?

10        A.   Yes.

11        Q.   Okay.  And I would like to jump up to the other

12   e-mail.  What is the date here?

13        A.   It appears to be Friday, the 4th of November, in

14   2016.

15        Q.   Okay.  So the same day?

16        A.   Correct.

17        Q.   Okay.  And this one is -- who is this from?

18        A.   This is from Ian Freeman.

19        Q.   Okay.  And who is it to?

20        A.   Help@itbit.com.

21        Q.   Okay.  And so there is a No. 1 listed.  It's

22   corresponding to the No. 1 question.  I'll ask you to read the

23   response there.

24        A.   No. 1 reads:  The Shire Free Church at which I am a

25   minister.

1     Q.    Okay.  And let's jump down to the first e-mail,

2   just to go back and forth with the sort of questions and

3   answers, and I will ask you to read the second question

4   whenever Caryn has a moment.

5           Thank you so much.

6     A.    The second question is:  What is the purpose of

7   your itBit account?

8           MS. MACDONALD:  Okay.  And if we could jump up to

9   the first e-mail to see the response?

10    A.    No. 2 reads:  The purpose is to acquire bitcoin for

11  our various bitcoin outreach projects that I am in charge of.

12    Q.    Okay.  And who signed that e-mail?

13    A.    It's signed Ian Freeman.

14    Q.    And what is his title?

15    A.    Minister.

16    Q.    Okay.  And so back to the itBit e-mail.  We read

17  the first paragraph:  From time to time we ask our clients

18  questions to ascertain the nature of their activity.

19          Is that consistent with Paxos's general policy of

20  monitoring accounts?

21    A.    Yes.

22          MS. MACDONALD:  Okay.  I would like to pull up

23  Government's Exhibit 103 which has also been admitted.

24    Q.    And is this also a document maintained by your

25  company?

1          A.    Yes.

2          Q.    Okay.  And could you read the title of this

3   document?

4          A.    The title is:  Regarding modification of

5   daily/monthly limits for bitcoin and/or fiat withdrawals.

6          Q.    Okay.  And who is the name listed under full name

7   as on ID?

8          A.    Ian B. Freeman.

9          Q.    Okay.  And what is your understanding generally of

10  the purpose for this document?

11         A.    It appears to be a request to change the withdrawal

12  limit for the individual's account.

13         Q.    Okay.  And going down, who signed this document?

14         A.    It looks like it is signed by Ian Freeman.

15         Q.    And what is the date?

16         A.    April 17, 2017.

17         MS. MACDONALD:  Okay.  Let's jump to the third

18  page, please.

19         Q.    Okay.  And here I see a number of questions.  I'm

20  going to read just a few of them.

21         No. 1:  Provide us a brief description of your

22  business.  Indicate what your main business products and

23  services are as well as who your main customer types are.

24         Did I read that correctly?

25         A.    Yes.

1      Q.    And could you read the response?

2      A.    We are an interfaith church dedicated to fostering

3   peace.  Our "customers" are our church family and the general

4   public.  We believe bitcoin is a tool to help foster peace

5   around the globe.

6      Q.    Okay.  And No. 2 says:  Describe your source of

7   funds.

8            And could you tell me what the response to that

9   was?

10     A.    We have an internationally syndicated talk radio

11   program and also receive donations from our supporters around

12   the world.

13     Q.    Okay.  And, finally, No. 5:  Please state the

14   purpose of your account with us.

15           What was the response to that question?

16     A.    Can you just scroll down?

17     Q.    I apologize.

18     A.    ItBit is an easy way for us to acquire bitcoin for

19   our various church outreach projects.

20           MS. MACDONALD:  Okay.  Ms. Shedd, if you could

21   scroll all of the way down to the bottom of this page, please?

22     Q.    Ms. Eyerman, beginning with the asterisk, could you

23   read the rest of the page?

24     A.    If your company is considered a money service

25   business, MSB, and has not already provided itBit with the

1    following documents, please provide:  1.  FinCEN MSB

2    registration.  2.  State MSB registration.  3.  BSA/AML policy

3    for your MSB business.

4         Q.   Okay.  And what, if you know, is the purpose of

5    requesting these documents?

6         A.   In general, the purpose for requesting these

7    documents is to ensure that the entity is appropriately

8    registered with a legal entity such as FinCEN or state

9    authorities.

10              And with respect to the policy, to ensure that

11   there is a BSA/AML policy or program in place to oversee

12   compliance with the BSA and AML regulations.

13        Q.   And why does itBit care if one of their customers

14   is operating a money servicing business?

15        A.   It's prohibited to be a customer of Paxos if you

16   are an unregistered MSB business, and so this appears to be

17   validation to request the actual registration documents.

18              And we want to ensure that we understand our

19   customer profile and that they are also taking the appropriate

20   steps to mitigate against any potential AML or other financial

21   risk.

22              MS. MACDONALD:  Okay.  Thank you.

23              No further questions.

24              THE COURT:  Cross-examination.

25              MR. SISTI:  Thank you, Judge.

```
 1                        CROSS-EXAMINATION
 2   BY MR. SISTI:
 3        Q.    Good morning.
 4        A.    Good morning.
 5        Q.    We're going to get you out of here.
 6        A.    Thank you.
 7        Q.    You're in New York City, right?  Is that where you
 8   are?
 9        A.    Correct.
10        Q.    Okay.  Lexington, Avenue, is that where your office
11   is?
12        A.    Where I work?
13        Q.    Where you work.
14        A.    No.  I work from home.
15        Q.    Oh, you work from home.  Is the business address on
16   Lex, though?  Is it on Lexington?
17        A.    I believe that our official business address is
18   Lexington Avenue.
19        Q.    Okay.  It's funny in this day and age that you can
20   actually track how much money went through Paxos just today
21   within the last 24 hours.
22              Do you know how much went through Paxos in the last
23   24 hours?
24        A.    I do not.
25        Q.    If I told you that as of about fifteen minutes ago
```

1    you guys have traded $8 million, would that be a shock?

2         A.    I don't think it would be a shock, but I also don't

3    have any way to validate that.  I don't know that.

4         Q.    Is that kind of, like, in the realm of where you

5    guys are?  I mean, it's a fairly large operation, correct?

6         A.    I think it depends on how you define large.

7         Q.    Yeah, I know.  It's tough.

8               Where do you define yourself in this particular

9    industry?

10        A.    In the cryptocurrency?  I'm sorry.  Can you define

11   what industry?

12        Q.    Well, why don't you define what industry you're in,

13   and then I'll ask the question, okay?

14              What do you do, and do others do the same thing?

15        A.    So we are a regulated blockchain infrastructure

16   company.  We are an exchange.  There are exchanges of varying

17   sizes.  I think it's all relative.

18        Q.    Okay.  In that universe where would you place Paxos

19   or itBit?

20        A.    We're a growing but small company.

21        Q.    Okay.  And you're doing 8 million in the last 24

22   hours.  If I told you that, that wouldn't be a shocker for

23   you, right?

24        A.    I can't validate that.  I don't know what our

25   numbers are.  So I'm not comfortable committing to that

1    number.

2        Q.    Okay.  There are fees that are charged though

3    because that's what you do.  You charge fees, right?

4        A.    There is a fee structure in place, yes.

5        Q.    Right.  But your sales are immediate.  In other

6    words, you're not holding something and taking a risk.  When

7    you make that point of sale determination, it's quick and it's

8    over, right?

9        A.    This is not my area of expertise.

10        Q.    All right.  So you can't really explain what the

11    fee structure is all about there, why they set fees at certain

12    rates?

13        A.    The fee structure, this is not my area of

14    expertise.

15        Q.    All right.  Okay.

16              So that testimony about the fee is interesting, but

17    you don't know why it is what it is, right?

18        A.    I do not know the specifics that lead into the

19    development of the fee structure.

20        Q.    Okay.  And I appreciate the honesty in that answer.

21              With regard to the application on Exhibit 101,

22    there's a real name on the exhibit, there's a real address on

23    the exhibit, there's a real purpose on the exhibit.

24              Did anybody follow up on anything with regard to

25    Exhibit 101?

1          MR. SISTI:  Why don't we put it up on the screen

2   just so we have clarification.

3       Q.    That's the first one that you testified about.

4       A.    This predates my time at Paxos.

5       Q.    I know.

6       A.    So I don't know the details of the follow-up for

7   this particular piece of information.

8       Q.    What was the date?

9       A.    The date is May 18, 2016.

10      Q.    Okay.  May 18, 2016?

11      A.    Correct.

12      Q.    Okay.  Do you know if that account immediately

13  started to engage in transactions?

14      A.    I do not know the details of the immediacy of the

15  transactional activity.

16      Q.    Is there any other information you can give the

17  jury where itBit had a problem with that application, that

18  face sheet, the name, the address, the identifier, or anything

19  like that?

20      A.    I don't know additional information off the top of

21  my head.

22      Q.    Okay.  Then there was 102.  That was an e-mail

23  exchange.

24          MR. SISTI:  If you can call that up for a second?

25      Q.    Do you remember that?  You were asked questions

1     about that.

2          A.    Yes.

3          Q.    Okay.  And with regard to 102, general questions,

4     it was I think your follow-up, you were doing some kind of a

5     check-in on the account, not you, but your company, and you

6     needed some additional information on that one?

7          A.    I'm sorry.  What's the question?

8          Q.    Did you need additional information?  Did somebody

9     need some clarity?

10         A.    Sorry.  Did I need additional information on this?

11         Q.    Did the itBit people -- what was the purpose of

12    that?

13         A.    So based on my read of this e-mail, it appears that

14    there was outreach for additional information with regards to

15    the account activity.

16         Q.    Okay.  And it required some answers, right?

17         A.    Correct.

18         Q.    Okay.  And then there was Exhibit 103, a

19    modification of daily/monthly limits?

20         A.    Correct.

21         Q.    All right.  And what's the date on that?

22         A.    The date on this form is April 17, 2017.

23         Q.    Now, prior to coming here and preparing for your

24    testimony, did you examine the documents concerning Ian

25    Freeman and the Shire Church and that sort of stuff, or were

1    there just certain things you were asked to take a look at?

2        A.    I looked at these documents only in the context of

3    preparing for today's testimony.

4        Q.    Okay.  Then I'm not going to ask you what I was

5    planning on asking because it would be outside the realm of

6    what you know.  I mean, it's not like you went through the

7    whole file or anything like that, right?

8        A.    Correct.

9        Q.    All right.  And you wouldn't know whether or not

10   there was an explanatory letter sent to your firm by an

11   attorney in New Hampshire with regard to the definition of

12   what was going on in Ian's church?

13       A.    I believe that an explanatory letter came up in the

14   conversations that I had in preparation.

15       Q.    Did you see it?

16       A.    I believe, yes, but I am not -- I would want to

17   make sure that we're referring to the exact same letter.  The

18   term explanatory letter is broad.  So I just don't want to

19   inaccurately state anything.

20       Q.    No, no.  That's good.

21             Okay.  Do you recall a letter from the Law Offices

22   of Martin and Hipple, PLLC, being shown to you?  If you

23   didn't, that's okay, all right?

24       A.    I don't know if I recall the exact law office, to

25   be honest.

1      Q.    All right.  But do you remember something like

2    that?  I'm going to show you something, and if it's not, it's

3    not, okay?  Got it.

4            MR. SISTI:  Don't put it up on the screen.  I just

5    want to approach.

6            May I approach, Judge?

7            THE COURT:  You may throughout your examination.

8            MR. SISTI:  Thank you.

9      Q.    I'm going to show you a copy of the proposed

10   exhibit.

11           (Witness peruses document)

12     A.    I believe that I have seen this before in the

13   context of reviewing for this case.

14     Q.    Okay.  Good.  Thank you.

15           And I'm going to ask you some questions about it.

16           MR. SISTI:  Could I have Defendant's K entered as a

17   full exhibit at this time?

18           MS. MACDONALD:  Can we approach briefly, your

19   Honor?

20           THE COURT:  You may.

21           (SIDEBAR)

22           THE COURT:  So what do you want to ask her about

23   this?

24           MR. SISTI:  I want to offer that it's part of their

25   protocols and procedures that that letter would have been

1   consistent with their updated information and explanation as

2   to what the goings on are with regard to Ian Freeman and the

3   church "business," and that is the letter that does explain

4   it.

5          THE COURT:  I'm not sure I understood that.  I

6   don't think she's seen it, right?

7          MR. SISTI:  She did.  I showed it to her.  She said

8   that --

9          THE COURT:  Oh, yeah, I know, but not before today?

10         MR. SISTI:  Yes, she did.

11         THE COURT:  Okay.

12         MS. MACDONALD:  Yeah, she may have seen it.  It was

13  provided to their company.  I don't know that we went over it

14  with her, but --

15         MR. SISTI:  You can check the record.  I asked the

16  question.

17         THE COURT:  Oh, yeah.  I was sort of asking them.

18         Okay.  Go ahead.

19         So you're going to ask her what exactly again?

20         MR. SISTI:  Again, why would that come their way,

21  what's the body of it about, do they do follow-ups on status

22  like she said.  That's part of cross-examination.  She said

23  that's what they do.

24         THE COURT:  I guess, but, you know, you're going to

25  ask her if it's the type of information that they would

1    consider?

2                    MR. SISTI:  Yes.

3                    THE COURT:  Okay.

4                    What's your position?

5                    MS. MACDONALD:  Well, I request, your Honor, that

6    -- we thought there would be at least a limiting instruction

7    about specifically the state law like the instruction you had

8    previously given about the state law.

9                    THE COURT:  Okay.  I can give them that

10   instruction.

11                   It's a fair question though.

12                   MR. SISTI:  I don't know that they get that

13   limiting instruction right now.  That's like focusing on a

14   specific exhibit that's fully admitted.  I just don't think --

15   they can get that at the end.

16                   THE COURT:  I'll make a decision about -- well,

17   first of all, you can definitely do that in redirect.

18                   MR. SISTI:  If she knows.

19                   THE COURT:  If she knows, right.  But, you know,

20   it's pretty easy on redirect.

21                   I'll make the decision about when I hear this

22   testimony.  I just want to -- I want to just remind counsel,

23   though, that before we started the trial I said if you would

24   like me to make specific limiting instructions, you should

25   send me proposals so I can consider them.  I don't think I

1    need them, but I also want to respect your wishes.

2              MR. AFRAME:  We did submit them on this point.

3              THE COURT:  Oh, you did?

4              MR. AFRAME:  Yes.

5              THE COURT:  Did you file it on ECF?

6              MR. AFRAME:  Yes.

7              THE COURT:  I'll take a look.  Thank you.  It will

8    help me when I eventually do something, and I'll decide when

9    to do it once I hear the testimony.

10             MR. SISTI:  Thank you.

11             (CONCLUSION OF SIDEBAR)

12             MR. SISTI:  Are you all set, Judge?

13             THE COURT:  Yes.  Thank you.

14             Go ahead, counsel.  You may continue.

15             MR. SISTI:  Thank you.

16             I will move to strike ID from Defendant's Exhibit K

17   and offer it as a full exhibit at this time.

18             MS. MACDONALD:  Other than our request, no

19   objection, your Honor.

20             THE COURT:  It's admitted.

21             (Defendant's Exhibit K Admitted)

22             MR. SISTI:  Thank you.

23             If we could call Exhibit K up, please?

24        Q.   Now, I did ask you whether or not you did review or

25   at least see this particular document, correct?

1          A.    You did ask, correct.

2          Q.    Now, I'm not -- I don't know.  I don't want to

3    overreach.  You're not capable of actually giving a legal

4    opinion on something I take it, correct?

5          A.    Correct.

6          Q.    All right.  But this is a document that was offered

7    to your company.  It's addressed to itBit, 450 Lexington Ave.,

8    #3952, New York, New York.  It sounds like your address or

9    your business address?

10         A.    I believe so, but, again, that's not a working

11   location.  So I believe so.

12         Q.    Okay.  And it has to do with the Shire Free Church

13   and the subject matter is:  Shire Free Church is neither a

14   money services business nor a money transmitter.  That's the

15   subject matter, right?

16         A.    Correct.

17         Q.    I'm not asking you to give an opinion on it.  I'm

18   just asking you whether or not your firm, your company, your

19   industry received an explanation letter from a law office

20   located in Concord, New Hampshire, on behalf of the Shire Free

21   Church?

22         A.    That's what it looks like, yes.

23         Q.    And that would have been obtained on November 10th,

24   thereabouts, 2017, right?

25         A.    Correct.

1        Q.    Were you still operating and transacting different

2   transactions with Shire Free Church to the best of your

3   knowledge as of November 10, 2017?

4        A.    I wasn't with the company at that time.  I'm not

5   sure of the status of the account at that time.

6        Q.    All right.  Can you just very, very -- and I'm not

7   going to ask you to go in and talk about specifics, but just

8   take a look at page 1 generally.

9             Does it appear to you as though the individual

10   writing the letter is the attorney for the Shire Free Church,

11   line 1?

12        A.    Yes.  It says:  I represent Shire Free Church on

13   whose behalf I write this letter.

14        Q.    And paragraph 2, does it appear as though that

15   individual represents that the church is a nonprofit and does

16   not engage in businesses for profit?

17        A.    Yes.  That's the first sentence.

18        Q.    Okay.  And the question is whether or not there's a

19   requirement as a money transmitter, and can you look at the

20   last paragraph?

21        A.    Yes.

22        Q.    And in the last paragraph is this attorney stating:

23   As explained below, this does not transform the church from a

24   nonprofit to a money services business or a money transmitter.

25   The church has no legal requirement to register or be licensed

 1   as such.

 2            Correct?

 3       A.    Correct.

 4       Q.    The letter then breaks down into an explanation if

 5   you look at page 2 of 4.

 6            The attorney that is drafting this opinion letter

 7   for you and for your review, or your company's review, then

 8   goes into the federal law as interpreted by this attorney,

 9   correct?  And I'll give you a chance to take a look, and the

10   jury is going to get this so --

11       A.    Correct.  That's what this looks like.

12       Q.    All right.  In essence, this attorney is stating

13   that the church is not a dealer in foreign exchange, is not a

14   check casher, is not an issuer or seller of traveler's checks

15   or money orders, is not a provider of prepaid access and is

16   not a seller of prepaid access.  It also of course is not a

17   U.S. Postal Service.  That would be in paragraph 1, 2, 3, 4.

18       A.    Correct.

19       Q.    It leaves the question of whether the church is a

20   money transmitter, and this particular attorney posits that it

21   is not and then goes into certain CFRs, federal regulations,

22   correct?

23       A.    Correct.

24       Q.    Okay.  I'm not asking you to agree or disagree.

25   I'm just asking whether or not this is a document that

1    generally would have been requested because you guys probably

2    needed more information.

3         A.    It appears that this is a document that we would

4    have requested to obtain more information.

5         Q.    All right.  It goes on to explain why he comes to

6    this particular opinion on page 3, correct?

7         A.    Correct.

8         Q.    And he concludes at the end of the federal aspect

9    of his interpretation and his opinion that:  Therefore, the

10   church is not an MSB under federal law and need not be

11   registered or licensed as one.

12              Correct?

13        A.    Correct.

14        Q.    And he then goes into a state law interpretation

15   from the state of New Hampshire, and I'll direct you to the

16   last two paragraphs on page 3.

17        A.    Okay.

18        Q.    And the last two paragraphs on page 3, which will

19   go into page 4:  For good measure, I also note that the New

20   Hampshire Banking Department's own Maryam Torben-Desfosses

21   testified about bitcoin before the New Hampshire Legislature's

22   Commission to Study Cryptocurrency in 2016.  During her

23   testimony Ms. Torben-Desfosses clearly testified that

24   organizations such as a church are not money transmitters.

25   Said Torben-Desfosses, "We have machines in this state (New

1    Hampshire).  I know of at least one where it is what people

2    call the bitcoin vending machine.  I don't want to call it an

3    ATM because it's not akin to an ATM, but a bitcoin vending

4    machine.  We have a manufacturer in New Hampshire that creates

5    these bitcoin vending machines.  Not all of the bitcoin

6    vending machines have the same software program."

7                We're on page 4 now.

8                "So they can be programmed to do different things

9    and hold different things.  If the bitcoin vending machine

10   owns its own bitcoin, so it's actually loaded, the information

11   is loaded into this system, and it's only a limited number of

12   bitcoins on the system, what we've seen is someone comes in

13   with actual dollars and buys a bitcoin through the machine,

14   that's user-to-user.  Now, we don't regulate that.  The

15   bitcoin machine owns its own bitcoin.  We don't regulate that,

16   and we've told several companies "we don't regulate that,

17   enjoy, have fun."  That's no different than me going to a

18   vending machine and buying a Kit Kat or a bottle of water.

19   It's a product at that point."

20               Did I read that correctly?

21        A.   Yes.

22        Q.   There's additional testimony from Ms. Desfosses,

23   and I'll quote, "Now, if that bitcoin vending machine now

24   actually holds bitcoin owned by someone else, they're almost

25   acting just as if it's an exchange, so for example Coinbase.

1   They're basically doing the transmission for this other

2   entity.  They may not have the stored value piece and maybe

3   it's talking to a wallet somewhere else.  If it's talking to a

4   wallet somewhere else and I'm putting money into that machine

5   to get that bitcoin that's somewhere else, that machine

6   doesn't own that wallet.  It's not bitcoin.  It's owned by

7   someone else.  Then it's a money transmitter.  It is no

8   different than me going to Western Union saying, hey, take my

9   money, I want to send it over there."

10          And then it concludes, "As the church owns its own

11   bitcoin and does not use in bitcoin machines to sell the

12   bitcoins of third parties, it is clearly not a money

13   transmitter under New Hampshire law.  Given the above, it is

14   clear the church has no responsibility or obligation to be

15   licensed or registered as a money transmitter or a money

16   services business.  Please do not hesitate to contact me if

17   you have further questions.  Best regards, Seth J. Hipple,

18   Esquire, Shire Free Church, file number 17-083."

19          Do you know whether or not the folks at itBit

20   followed up and contacted Mr. Hipple?

21       A.   I do not know.

22          MR. SISTI:  Okay.  Thank you for your time this

23   morning and this afternoon.

24          I have no further questions.

25          THE COURT:  A couple instructions for the jury.

1          I'm deciding to do this now, for the record,

2    because basically the entire letter was read into the record

3    verbatim to the witness.

4          Two things.  Number one, this is not a case where

5    there is an advice of counsel defense.  Whether the defendant

6    received the advice of counsel even in good faith is not a

7    relevant matter for this case.

8          But the evidence was admissible with respect to the

9    issue that the witness testified about, whether that is

10   information that her office would consider in making its

11   evaluation.  That's number one.

12         Number two is just a reminder that Mr. Freeman, the

13   defendant, is charged with violations of federal law, not New

14   Hampshire state law.

15         You may do your redirect.

16         MS. MACDONALD:  Thank you, your Honor.

17                     REDIRECT EXAMINATION

18   BY MS. MACDONALD:

19   Q.    Ms. Eyerman, are you aware of what actions itBit

20   took with respect to Mr. Freeman's account after receiving

21   this letter?

22   A.    I believe that the account was closed.

23         MS. MACDONALD:  Okay.  And if we could pull up the

24   letter, Exhibit K, please, Ms. Shedd?  I think we need to

25   switch over.  Page 2, please.

1          Okay.  I'm going to direct -- if we could just

2     bring up that last paragraph, Ms. Shedd?

3          Q.   And this is the federal law section, Ms. Eyerman;

4     is that correct?

5          A.   Yes.

6          Q.   Okay.  I'm going to read sort of in the middle of

7     the paragraph:  Here the church does not accept currency from

8     one person and then transmit value to another person but

9     rather provides bitcoin to the same person as opposed to say

10    Western Union.

11          This letter even appears to suggest that somebody

12    who accepts currency from one person and then transmits value

13    to another person would be a money transmitter; is that

14    correct?

15         A.   Let me just read it again.  It's a little -- can

16    you ask your question one more time?

17         Q.   Yep.  Let me just read it:  The church does not

18    accept currency from one person and then transmit value to

19    another person.

20          This defendant's own letter seems to suggest that

21    doing that, accepting currency from one person and

22    transmitting to another person, would make him a money

23    transmitter.  Do you agree?

24         A.   Yes.

25         Q.   Thank you.

1          MR. SISTI:  I don't have anything further, Judge.

2          THE COURT:  You're excused.  Thank you.

3          THE WITNESS:  Thank you.

4          MS. MACDONALD:  The United States calls Nancy

5    Triestram.

6                        NANCY TRIESTRAM

7        having been duly sworn, testified as follows:

8          THE CLERK:  For the record, please state your name

9    and spell your last name.

10         THE WITNESS:  My first name is Nancy.  My last name

11   is Triestram, which is T-R-I-E-S-T-R-A-M.

12                      DIRECT EXAMINATION

13   BY MS. MACDONALD:

14    Q.    Good afternoon, Ms. Triestram.  How are you?

15    A.    Fine.

16    Q.    Ms. Triestram, where do you live?

17    A.    I live in Elkhart, Indiana.

18    Q.    And have you lived there your whole life?

19    A.    No, ma'am.

20    Q.    Where else have you lived?

21    A.    When I married my husband 30 some years ago, I

22   moved to Michigan.

23    Q.    Okay.  How old are you, Ms. Triestram?

24    A.    I am 70.

25    Q.    You mentioned your husband.  Are you currently

1    married?

2         A.   No.  I am now a widow.

3         Q.   When did you become a widow?

4         A.   Seven years ago in August.  It will be eight years

5    this August.

6         Q.   Okay.  Do you have children?

7         A.   I have four children of my own, and I have four

8    stepchildren.

9         Q.   How about grandchildren?

10        A.   I have seven of my own and 28 all together with my

11   husband's.

12        Q.   And great grandchildren?

13        A.   I have nine of my own, and there's 25 of them all

14   together.

15        Q.   Ms. Triestram, are you retired?

16        A.   I'm semi-retired.  I also work for Marriott Hotels

17   as a night audit.

18        Q.   And what profession are you retired from?

19        A.   I was a home caregiver.

20        Q.   And when did you start working for Marriott Hotels?

21        A.   I think it was three years in October.

22        Q.   Okay.  I'm going to direct you to 2017-2018.

23             Around that time frame did you begin a relationship

24   with someone you met online?

25        A.   Yes, I did.

1   Q.   And before we talk more about that, could you tell

2   the jury a bit about what your circumstances were at that

3   time?

4   A.   Well, I had become a widow.  I lived in the middle

5   of 90 acres by myself.  I had never lived by myself before.

6   I also got RSV, so I couldn't go out of my house

7   for, like, six weeks and didn't have nobody come to visit me

8   or anything.

9   And then a couple weeks after that I had to give my

10  home up because we had a life lease on some property, but I

11  did not realize the life lease was in my husband's name only.

12  So I had to give up my home also.  So pretty depressing.

13  Q.   And so it's around that time that you met somebody

14  online?

15  A.   Yes, it was.

16  Q.   And who was it that you met?

17  A.   I met a gentleman.  He called himself Anthony

18  Buitly-Grey.

19  Q.   And could you describe the nature of your

20  relationship with Mr. Grey?

21  A.   Just texts like friends.  We went on something

22  called Hangouts, and we would just text back and forth usually

23  once a day or --

24  Q.   And how long did that relationship last?

25  A.   Three or four years.

1    Q.    And you said daily communication?

2    A.    Yeah.

3    Q.    Did you ever meet him in person?

4    A.    No.

5    Q.    What did you understand his situation to be?

6    A.    He was in the Gulf of Mexico on an oil rig, and he

7    was supposedly some kind of a boss or something.

8    Q.    Did you have intentions to meet him in person?

9    A.    Yes.  He had a son that lived supposedly in Chicago

10   which he had sent me a picture of, and, yes, I was going to

11   meet him someday.

12   Q.    And did he give explanations for why he wasn't able

13   to meet you?

14   A.    He just kept putting it off.  Like, when I first

15   met him he was supposedly in New York City and he was supposed

16   to go out to this rig just for, like, a month or so, and then

17   something came up, and something else came up.  I've never met

18   the man.

19   Q.    Okay.  At some point did he ask you to send him

20   some money?

21   A.    Yeah.  After about six months or a year that we had

22   been talking.  He first asked for, like, a gift card for $50

23   to watch Netflix or something with.  He said he couldn't get

24   to his money because he was out in the ocean.  And then, I

25   don't know, a couple weeks later it was a hundred dollars for

1    something else, and then it would go back to 50 now and then,

2    and I would give it to him.

3         Q.   Over time approximately how much money of your own

4    money did you send to him?

5         A.   Probably around $16,000.

6         Q.   Okay.  At one point in time did he ask you to use

7    your bank account?

8         A.   Yes, he did.  He said he had some money coming in

9    and he -- when he first asked me about the banking account, he

10   asked me if I could just save it for him because he was

11   planning on coming home.  And then after he didn't come then

12   it was, well, can you wire this money or transfer it, and so I

13   would do that.

14        Q.   Okay.  And did he ask you to open a bank account

15   for him at some point?

16        A.   He may have, but he used my banking account because

17   -- I guess I'm just old.  One banking account is enough to

18   keep track of.

19        Q.   Okay.  I'm going to show you Exhibit 3101 which has

20   been admitted.

21             Do you recognize this?

22        A.   That's me.

23        Q.   And did you take this photo?

24        A.   Yep, I did.

25        Q.   And why did you take this photo?

1      A.    Well, he started having me send money to somebody
2   to buy bitcoins, and they needed proof of my identity.
3      Q.    Okay.  And when he asked you to do that, did you
4   know what bitcoins were?
5      A.    I have no idea what they're worth.
6      Q.    Okay.  Do you know anything about them?
7      A.    I don't know anything.
8      Q.    Okay.  And when he asked you to take this photo,
9   who did you send it to?
10     A.    I sent it to Anthony, and then he forwarded it to
11  Mr. Freeman I understand.
12           MS. MACDONALD:  Okay.  Let's look at Government's
13  3106, please.
14     Q.    And do you recognize this photo?
15     A.    Yes.  I was transferring money to Mr. Freeman.
16           MS. MACDONALD:  Okay.  Let's maybe pull up the
17  comments section.  It's sort of the handwritten section in the
18  middle.  Thank you.
19     Q.    I'm just going to read that, and you tell me if I
20  read it correctly:  I certificate that I am buying bitcoins
21  via wire transfer from FTL_Ian on Telegram on behalf of Connie
22  Creach, 2-14-2020.
23     A.    Yep.
24     Q.    Is that your signature?
25     A.    Yes, it is.

1      Q.    Okay.  And did you write those words?

2      A.    Yes, I did.

3      Q.    Why did you write those words?

4      A.    I was instructed that I had to write it that way.

5      Q.    Okay.  And who gave you those instructions?

6      A.    Mr. Anthony.

7      Q.    Okay.  Do you know what Telegram is?

8      A.    That was a transfer from my banking account.

9      Q.    So in the words you write:  From FTL_Ian on

10   Telegram.  Do you know what that means there?

11      A.    No.

12      Q.    Okay.  What is a Telegram?

13      A.    Well, a telegram is a wire transfer.

14      Q.    Okay.  And it also says on behalf of Connie Creach.

15   Do you know anybody named Connie Creach?

16      A.    No, I do not know her.

17      Q.    Okay.  And did Mr. Grey tell you anything about why

18   he was asking you to write that name?

19      A.    He said she was the accountholder and that she had

20   quit, but they still use her account.

21            MS. MACDONALD:  Okay.  Let's look at 3105, please.

22      Q.    Do you recognize this photo?

23      A.    Yep.

24      Q.    And where is this taken?

25      A.    I'm thinking it's still at my bank.

1        Q.   Okay.  And it appears there are words -- similar

2   words written here as well?

3        A.   Yes.

4             MS. MACDONALD:  Okay.  Exhibit 3103 -- actually, if

5   you could pull up 3103 and 3104 side by side?

6        Q.   Okay.  So it may be a little hard to tell, but it

7   looks like -- I see the date on these 2-11-2023.  It appears

8   to be the same date on both of these.  Do you see that?

9        A.   Uh-huh.

10        Q.   And one of them sort of seems a bit cut off whereas

11   the other one is the whole document.  Did I describe that

12   accurately?

13        A.   Yeah.

14        Q.   And do you know why you sent these two photos?

15        A.   I was informed that I had to take a picture from

16   corner to corner of the paper, and if I didn't take it corner

17   to corner, they would have me do it again.

18        Q.   Okay.  And did you get that sort of request to fix

19   the photo more than once?

20        A.   Yes, I did.

21        Q.   And did you understand where that was coming from,

22   where those instructions were coming from?

23        A.   Mr. Anthony was telling me that Mr. Freeman didn't

24   like the picture so I needed to do it again.

25        Q.   Okay.  And I'm going to show you one more photo of

```
1    the same day, 3102, and I'll just try to zoom in on the wire
2    amount which is on the bottom unless you can read that on the
3    screen.
4          A.   Not very clearly.
5          Q.   I see $42,000.  Is that correct?
6          A.   Yep.
7               MS. MACDONALD:  Okay.  Let's pull up, please --
8    actually, before that -- 3106, please.
9               I'm sorry.  We did that.
10              3107.
11         Q.   Is that you as well?
12         A.   Yep.
13         Q.   Ms. Triestram, do you know Ian Freeman?
14         A.   No.
15         Q.   You've never met him in person?
16         A.   No.
17         Q.   Did you ever speak to him on the telephone?
18         A.   I did one time.
19         Q.   And could you tell me about that conversation?
20              THE COURT:  Let's hold it up for now.  We need to
21   take the lunch break.
22              So we will go into recess for one hour and return
23   at 1:30 to continue.
24              Remember my admonition.  No conversations.  No
25   research.
```

```
 1                    (IN COURT - NO JURY PRESENT)
 2              THE COURT:  Anything for the Court?
 3              MR. SISTI:  I don't know.  The government might
 4   want to give you an update where they are so we can figure out
 5   our schedule.
 6              THE COURT:  All right.  We don't need to do that on
 7   the record though.
 8              We're in recess.
 9              (Off the record discussion)
10              (RECESS)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                       C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate transcription of

6     the within proceedings to the best of my knowledge, skill,

7     ability and belief.

8

9

10    Submitted:   3-1-23        /s/   Susan M. Bateman _____
                                 SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25