**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-30-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   21-cr-41-01-JL
          v.                      *   December 20, 2022
                                  *   9:15 a.m.
      IAN FREEMAN                 *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL - DAY NINE - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Government:      Seth R. Aframe, AUSA
                         Georgiana MacDonald, AUSA
                         John J. Kennedy, AUSA
                         U.S. Attorney's Office




For the Defendant:       Mark L. Sisti, Esq.
                         Sisti Law Offices




Court Reporter:          Susan M. Bateman, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| KEITH MURPHY | | | | |
| By Mr. Sisti | 4 | | 14 | |
| By Mr. Aframe | | 10 | | 15 |
| MAX SANTONASTASO | | | | |
| By Mr. Sisti | 16 | | | |
| By Ms. MacDonald | | 20 | | |
| EDWARD FORSTER | | | | |
| By Mr. Sisti | 22 | | 31 | |
| By Mr. Kennedy | | 28 | | |
| ADAM MOSHER | | | | |
| By Mr. Sisti | 32 | | 37 | |
| By Mr. Kennedy | | 35 | | 38 |
| DAEL CHAPMAN | | | | |
| By Mr. Sisti | 39 | | 46 | |
| By Mr. Aframe | | 44 | | 47 |
| CAROLYNN URBANSKI | | | | |
| By Mr. Sisti | 48 | | | |
| By Mr. Aframe | | 53 | | |
| MELINDA CAMBIAR | | | | |
| By Mr. Sisti | 56 | | 73,75 | |
| By John Kennedy | | 63 | | 75 |
| IAN FREEMAN | | | | |
| By Mr. Sisti | 78 | | | |

| EXHIBITS: | | FOR ID | IN EVD |
|---|---|---|---|
| Defendant's Exhibit M-2. | | | 59 |

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court is now in session and has
 3      before it for consideration day nine of the jury trial in
 4      criminal case 21-cr-41-01-JL, United States versus Ian
 5      Freeman.
 6              THE COURT:  All right.  Good morning everyone.
 7      Welcome back to court.
 8              Have any of you had any conversations with each
 9      other or anyone else about the trial during the recess?
10              (Jurors answer "no")
11              Have any of you been exposed to any information
12      regarding the trial either intentionally or inadvertently
13      during the recess?
14              (Jurors answer "no")
15              THE COURT:  Good.  We'll get started then.
16              As I instructed you yesterday and have been
17      throughout the trial, the defendant has no obligation to put
18      on any evidence because the entire burden of proof rests upon
19      the prosecution.
20              But, as you can see, Mr. Sisti is on his feet, and
21      he has informed me that he intends to present evidence to you
22      in the defendant's defense.  So he'll get started now.
23              Mr. Sisti, you can call your first witness.
24              MR. SISTI:  Thank you, your Honor.  I appreciate
25      it.
```

1          Our first witness will be Keith Murphy.

2                    KEITH MURPHY

3      having been duly sworn, testified as follows:

4          THE CLERK:  For the record, please state your name

5  and spell your last name.

6          THE WITNESS:  Keith Murphy, M-U-R-P-H-Y.

7                  DIRECT EXAMINATION

8  BY MR. SISTI:

9      Q.   Good morning, Mr. Murphy.

10      A.   Good morning.

11      Q.   Thanks for coming this morning.  I know you're

12  busy.

13          Can you just again state your name, tell the jury

14  where you live, and then we'll get into a few questions about

15  what you do for a living?

16      A.   My name is Keith Murphy.  I live in Manchester.

17      Q.   Okay.  And are you a business owner?

18      A.   I own restaurants.

19      Q.   Okay.  Why don't you tell the jury what restaurants

20  you own and where they are located?

21      A.   Murphy's Taproom in Manchester, 494 Elm Street.

22  Murphy's Diner next-door at 516 Elm Street.  Murphy's Taproom

23  and Carriage House in Bedford.

24      Q.   Now, how long have you been in business?  How long

25  have you been dealing with restaurants?

1          A.    I've been in the industry 30 years.  I've owned

2    Murphy's Taproom in Manchester since 2007, and that was the

3    first one.

4          Q.    And how about the other establishments?

5          A.    The Bedford location opened in 2017.  The diner

6    opened in 2012.

7                Prior to owning those restaurants I was in

8    management, I was a server, a bartender, et cetera.

9          Q.    Okay.  I want to ask you primarily I think about

10   the Elm Street location, and that would be Murphy's Taproom?

11         A.    Yes.

12         Q.    Okay.  Can you tell the jury physically just kind

13   of like what kind of a spot it is, where it's located in

14   Manchester, you know, the visuals basically?

15         A.    It's across the street from the Verizon Wireless --

16   excuse me, now it's the Southern New Hampshire University

17   arena, and a block south.

18                It's a casual Irish pub environment.  Probably 60

19   percent alcohol, 40 percent food, nachos, burgers.  Pretty

20   casual.

21         Q.    Okay.  What kind of crowds do you bring in over

22   there?

23         A.    It depends on what's going on across the street by

24   and large.  We have a college night on Thursdays.  It could be

25   a country show across the street one week, and the next week

1      it could be a rock show, and then the next week it's the

2      Boston Pops.  So the crowd is really dependent upon what's

3      going on at the arena.

4           Q.   Okay.  Now, as far as the visibility aspect of the

5      Taproom on Elm Street, is this a glassed-in kind of

6      establishment?  Can you see it from the outside to the inside?

7           A.   Yes.  The building is fronted with very large

8      showroom style windows.

9           Q.   All right.  And, again, it is a bar/restaurant

10     establishment.  Are you frequented or are you open to the

11     commissioner with regard to alcohol regulation?  Do they come

12     in and out of there?

13          A.   They do quite regularly.

14          Q.   And law enforcement as well?

15          A.   Yes.

16          Q.   All right.

17          A.   I mean, we never have fights or issues like that,

18     we run a very good place, but we certainly do see our share of

19     police officers that stop in.

20          Q.   Okay.  Now, I want to draw your attention to what

21     has been referred to as a bitcoin vending machine.

22               Did you ever have a bitcoin vending machine in your

23     establishment on Elm Street?

24          A.   Yes.  We began to take bitcoin in payment for

25     services I believe in 2012 or '13.  I was approached by

1   someone who wanted to have a weekly gathering of bitcoin

2   enthusiasts.  And after I began to take bitcoin as payment I

3   was approached by someone else who said that he could put a

4   bitcoin machine in the lobby of the restaurant to make it

5   easier for those people to buy and sell bitcoin.

6       Q.   Okay.  And can you tell the jury just who you were

7   having contact with?

8       A.   I believe the initial contact was with Mr. Freeman.

9       Q.   Okay.  And after you had the initial contact with

10  Mr. Freeman, did he explain just what this machine was all

11  about and the use and how to use it and that sort of stuff?

12      A.   The initial meeting was fairly brief.  In fact, the

13  only meeting was very brief.  I did not own bitcoin or dabble

14  in it.  At the time it was a very new concept for me as it was

15  for most people.  So what I cared about was that it made it

16  easier for my customers to do business with us.

17      Q.   Okay.  And what year, approximate, was that?

18      A.   I believe it was 2013, but it's almost a decade ago

19  so I'm a little rough.

20      Q.   All right.  And would it be fair to say that that

21  particular machine or a machine like it has been in your

22  establishment for nine years or so?

23      A.   That would be fair to say.  There was another

24  machine prior to the one that's there, the one that Mr.

25  Freeman put in.  So he wasn't even the first person to

1    approach me about a machine.

2         Q.   All right.

3         A.   But the first machine didn't last long.  I had a

4    lot of technical problems with it.

5         Q.   All right.  And with regard to the machine that Ian

6    Freeman put in, did it have any of those technical problems or

7    anything like that?

8         A.   No.  It was very reliable.

9         Q.   Okay.  Now, I have to do this because it's part of

10   the court procedures, but do you see Ian Freeman in the

11   courtroom?

12        A.   I do.

13        Q.   Okay.  And again, for the record, you have to

14   basically point him out or describe what he's wearing.

15        A.   It's the gentleman in the blue shirt, the navy blue

16   shirt sitting to my right.

17        Q.   Thank you.

18             MR. SISTI:  Your Honor, if the Court could maintain

19   that that identity has been confirmed?

20             THE COURT:  He has identified him.

21        Q.   Thank you.  Now, with regard to Ian, was he

22   involved with the servicing and the maintaining of that

23   machine as far as you know?

24        A.   After the initial meeting to discuss the machine

25   placement I did not physically see Mr. Freeman after that day.

1    There was the occasional communication via text or e-mail or

2    something of those natures, but we -- about once a month

3    someone would come by and empty the machine, but it was not

4    Mr. Freeman.

5        Q.    Okay.  And where was this particular machine

6    placed?  Was it in a spot where the public could easily access

7    it?

8        A.    Yes.  The restaurant has sort of a foyer area

9    that's some glass in front and on both sides, it's

10   approximately 6 by 10, and it was in that lobby.

11       Q.    Okay.  And is that lobby right off of Elm Street?

12       A.    It is.

13       Q.    And can you see that machine from Elm Street?

14       A.    You can.

15       Q.    Okay.  Now, is this a machine that was used

16   frequently by your patrons?

17       A.    Yes.

18       Q.    And did you ever experience any complaints by any

19   of your patrons with regard to the machine?

20       A.    No.

21       Q.    Were there ever any complaints, for instance, about

22   any fees that would have been charged or anything like that?

23       A.    No.

24       Q.    Did anybody complain to you in any way, shape, or

25   form that they weren't getting the bitcoin that they expected

1    for the dollar amount going in?

2         A.   No.

3         Q.   Okay.  Did any law enforcement official or anybody

4    from the Liquor Commission ever question the legitimacy or the

5    legality of that machine in your lobby?

6         A.   No.

7         Q.   And was that true through the entirety of its

8    presence there?

9         A.   Up until the day it was taken away.

10        Q.   Okay.

11             MR. SISTI:  I have no further questions of Mr.

12    Murphy.

13             Your witness.

14                       CROSS-EXAMINATION

15    BY MR. AFRAME:

16        Q.   Good morning, Mr. Murphy.

17        A.   Good morning.

18        Q.   My name is Seth Aframe.  I'm one of the assistant

19    U.S. attorneys working on the case.  I just have a couple

20    questions for you.

21             So what was the financial arrangement between you

22    and Mr. Freeman for the machine?

23        A.   When we had that initial meeting, Mr. Freeman

24    offered a percentage of the fees that went into the machine.

25    And, again, it was a long time ago so I do not recall the

1  exact amount, but it was basically to pay some sort of

2  compensation for the electricity, the WiFi access, the

3  Internet access, and basically rent for the space on the wall

4  that it took up.

5       Q.   And it sounds like you didn't have much -- the

6  machine was there, but you didn't have much to do with its

7  day-to-day operations?

8       A.   I never touched it.

9            MR. AFRAME:  Okay.  Can I just bring up Exhibit

10 301?

11      Q.   Is this what it looked like?

12      A.   Yes.

13      Q.   And do you see where the bitcoin symbol is?

14      A.   I do.

15      Q.   Do you know what that is next to it?

16      A.   I do not.

17      Q.   Okay.  You don't know what that does?

18      A.   No.  Again, I don't -- I never used the machine

19 myself.

20      Q.   Okay.  Do you know if Mr. Freeman put a sticker

21 over that at some point?

22      A.   I'm not aware of that, no.

23      Q.   Okay.  Do you know -- in your initial conversation

24 with Mr. Freeman did you discuss whether his bitcoin business

25 was registered with the United States Department of Treasury?

```
 1         A.    That was not discussed.

 2         Q.    Do you know if it was or it wasn't?

 3         A.    No, I do not know.

 4         Q.    Was there any way by looking at the machine to know

 5    whether it was or it wasn't?

 6         A.    I don't believe so.

 7         Q.    Would your customers have known if it was or

 8    wasn't?

 9         A.    I don't think that's possible, no.

10         Q.    Okay.  Do you know whether the machine required any

11    kind of personal identifying information such as a photo?

12         A.    I'm not aware of that, sir.

13         Q.    As in it didn't or as in you just don't know?

14         A.    As in I do not know.  I never used the machine.  I

15    walked by it every day for a number of years but never used it

16    myself.

17         Q.    Okay.

18         A.    I had customers that requested it.  That's why it

19    was there.

20         Q.    Say that again.  I'm sorry.

21         A.    I had customers that asked for a machine, and

22    that's why I had it there.

23         Q.    Okay.  But you have no idea how it operated?

24         A.    No, sir.

25         Q.    You have no idea if it was properly registered or
```

1    licensed?

2         A.   No, sir.

3         Q.   Okay.  Mr. Freeman you said came in for that

4    initial meeting and never came back?

5         A.   Not to the best of my recollection, correct.

6         Q.   He sent -- or other people came to pick up the

7    money?

8         A.   Yes, sir.

9         Q.   All right.  Was there a -- are you aware of a

10   police complaint in 2019 about the machine being used as part

11   of a fraud scam?

12        A.   No, sir.

13        Q.   Do you know -- have you ever heard the name

14   Marianna (ph.) Gregory?

15        A.   I have not.

16        Q.   Do you know a Michael Pantellis?

17        A.   No.

18        Q.   Was he not a manager at the Murphy's Taproom?

19        A.   I'm sorry.  Michael Patellis?  I'm sorry.  It

20   wasn't Pantellis.  Patellis.

21        Q.   Oh.  Okay.  The police report says Pantellis, but

22   Patellis.

23        A.   Mr. Patellis was a kitchen manager for my location.

24        Q.   Okay.  And in 2019 did he report to you that the

25   police came to talk to him about someone who had put $5,800 in

1    the machine and then said it was a scam?

2         A.    2019?  No.  But at that time I was very busy at my

3    Bedford location which had just opened a year or two prior.

4    So it's possible that it got missed, the communication, but he

5    did not tell me.

6         Q.    Okay.  So you've never heard of Marietta (ph.)

7    Gregory?

8         A.    No.

9         Q.    A Nathan Shaw?

10        A.    No.

11        Q.    And Mr. Patellis never told you that the police

12   came to interview him about that machine being used as part of

13   a scam?

14        A.    I wish he had, but no.

15              MR. AFRAME:  Okay.  Thank you.

16              Nothing further then.

17              THE COURT:  Redirect?

18              MR. SISTI:  Just very, very briefly.

19                         REDIRECT EXAMINATION

20   BY MR. SISTI:

21        Q.    So would I be accurate in saying that over the

22   several years that the machine was there you never were

23   approached by law enforcement with regard to the legitimacy of

24   that machine?

25        A.    That's correct.

1        Q.    That nobody from law enforcement, local law

2    enforcement, said anything about licensing or the lack of

3    licensing with regard to the machine?

4        A.    That's correct.

5        Q.    That nobody from the Liquor Commission, the state

6    Liquor Commission said anything about licensing or the lack

7    thereof of that machine?

8        A.    Correct.

9        Q.    And that nobody from the federal government came

10   into your establishment and questioned whether that was a

11   legitimate machine and whether it was properly licensed?

12       A.    Correct.  Not until it was taken away.

13            MR. SISTI:  Thank you.

14                          RECROSS-EXAMINATION

15   BY MR. AFRAME:

16       Q.    Did you need Liquor Commission permission to put

17   the bitcoin machine in?

18       A.    No.

19            MR. AFRAME:  Thank you.  Nothing further.

20            MR. SISTI:  Thank you.

21            THE COURT:  Mr. Murphy, thank you.  You're excused.

22            THE WITNESS:  Thank you, sir.

23                          MAX SANTONASTASO

24         having been duly sworn, testified as follows:

25            THE CLERK:  For the record, please state your name

 1   and spell your last name.

 2           THE WITNESS:  Max Santonastaso,

 3   S-A-N-T-O-N-A-S-T-A-S-O.

 4                       DIRECT EXAMINATION

 5   BY MR. SISTI:

 6       Q.   Good morning.  I can call you Max, right?

 7       A.   Yes, sir.

 8       Q.   All right.

 9           Max, thanks for showing up today.  I know you're

10   busy.

11           Could you tell the jury where you live, and I'll

12   ask you a little bit about yourself?

13       A.   Yes.  I live in Winchester, New Hampshire.

14       Q.   And how long have you been in New Hampshire?

15       A.   Six years.

16       Q.   Okay.  What about your background?  Where were you

17   educated?

18       A.   I grew up in Massachusetts, and I went to Monty

19   Tech Vocational School in Fitchburg.

20       Q.   Okay.  And were you employed in Mass. or have you

21   had any employment --

22       A.   I never worked in Mass.

23       Q.   Okay.  How about any employment or military

24   history?

25       A.   Yes.  I was in the Army for four years.  I joined

1    when I was in Massachusetts and went active duty, and then I

2    moved to New Hampshire when I ETSd or got out.

3        Q.   Okay.  And what was your military experience, if

4    you would?

5        A.   My stateside I was stationed at Fort Bliss.  And I

6    did communications with the military, and I did a deployment

7    for 11 months to Afghanistan.

8        Q.   Okay.  And when was that?

9        A.   2015.

10       Q.   I would like to get right to the heart of why

11   you're here today.

12            Have you had contact or do you know an individual

13   by the name of Ian Freeman?

14       A.   Yes, sir.

15       Q.   And how do you know Ian Freeman?

16       A.   Well, I heard Ian Freeman before I actually met

17   him.  I would listen to podcasts in the military.  On my

18   deployment, you know, there wasn't always Internet.  And one

19   of the podcasts I came across was Free Talk Live, and Ian runs

20   that radio show.

21            So I met Ian when I first moved to New Hampshire at

22   an event just in downtown Keene.

23       Q.   Okay.  And what kind of an event was that, if you

24   would?

25       A.   Nightcap.

1   Q.   And what was nightcap?

2   A.   Nightcap was just -- it's Friday night.  Ian and

3   his friends would go to downtown Keene and just hang out, and

4   that was -- I was just walking by getting some pizza with my

5   friend, and I met Ian.

6   Q.   Okay.  So since that initial meeting have you met

7   up with him on more occasions?

8   A.   Yes.

9   Q.   And what was the subject matter with regard to

10  those meet-ups?

11  A.   Just -- well, there was one time where I sold some

12  cryptocurrency to Ian, and there was another time where there

13  was just a New Year's party.

14  Q.   Okay.  Let's get into the cryptocurrency aspect.  I

15  mean, how experienced are you in the cryptocurrency field?

16  A.   Not very experienced.

17  Q.   Okay.  How did you become somewhat connected to

18  that particular currency?

19  A.   Some people gifted me some just to show me how it

20  worked, and I sold a PlayStation to somebody and they said

21  I'll give you more than you want for it if you take this, and

22  I wasn't sure.  I didn't really want it.  I just wanted to

23  offload it so I sold it to Ian.

24  Q.   Okay.  And since that have you had any more

25  experience with cryptocurrency or bitcoin?

1   A. Yes.

2   Q. And did that come through the contact that you had

3 with Ian?

4   A. No.

5   Q. Okay.  And that would be an investment that you

6 utilized on your own?

7   A. Yes.

8   Q. Okay.  With regard to Ian, has he ever given you

9 advice or any direction with regard to this type of

10 transaction?

11   A. No.

12   Q. Do you know if Ian is involved in church activities

13 in the Keene area?

14   A. Well, I believe he has his own church.  I don't

15 know what churches he might attend.

16   Q. All right.  And do you know what he does?  What

17 does he do from day to day?

18   A. Well, I know he puts a lot of work into his radio

19 show.  He goes to a lot of events, protests, and I know he

20 goes to PorcFest when -- well, he used to before he was

21 restrained.

22    And, yeah, those are the things I know he does.

23   Q. Okay.  How well do you know Ian?

24   A. Pretty well.  You know, I think I know his

25 personality a lot more just because of his media presence.

```
1              I know Ian -- like, I follow Ian just because I
2     believe he has a lot of integrity especially after finding God
3     and just seeing the difference between good and evil, and so I
4     kind of -- I guess I find myself attracted to people that
5     exude those qualities.  It's a lot more important to me now
6     from a divine level.
7         Q.    Okay.  What's his general reputation in the
8     community for honesty?
9         A.    Good.
10             MR. SISTI:  Thank you.
11             Your witness.
12                        CROSS-EXAMINATION
13    BY MS. MACDONALD:
14        Q.    Good morning, Mr. Santonastaso.
15        A.    Good morning.
16        Q.    My name is Georgie MacDonald.  I work for the U.S.
17    Attorney's Office.
18             First, I want to say thank you for your service.
19    And I just have a few questions for you.
20             When Mr. Sisti asked you about how many times you
21    met up with Ian, I believe you told him that you had met him
22    in person at a New Year's Eve party and during the crypto
23    sale; is that right?
24        A.    Yes, ma'am.
25        Q.    Okay.  And so you don't regularly socialize or
```

```
 1   spend time with him, correct?
 2        A.   Yeah, I've bumped into him at, you know,
 3   restaurants and things like that, but those aren't memorable
 4   events.
 5        Q.   Okay.  So the majority of sort of your knowledge of
 6   Mr. Freeman comes from his social media postings and his radio
 7   show, right?
 8        A.   Yes.
 9        Q.   Okay.  And not from your time spent personally with
10   him, correct?
11        A.   Both, but, yes, the majority would be probably not
12   in person.
13        Q.   Okay.  You said that you sold some crypto to Mr.
14   Freeman at one point, right?
15        A.   Yes.
16        Q.   Could you tell us, did you make a profit from that
17   sale?
18        A.   No.
19        Q.   You did not?
20        A.   No.
21        Q.   Okay.  That was a good deal for Mr. Freeman, I
22   would guess.
23        A.   Well, what I mean is what I sold it for, it was the
24   same value.  So whatever the dollar amount had been when I got
25   it as a gift or had got it as for a sale item wasn't like the
```

```
 1  price had gone up a lot, but the price that it was at was what
 2  I was given for it.
 3       Q.   Okay.  But you didn't add a 20 percent fee for
 4  that?
 5       A.   No.
 6       Q.   Okay.
 7            MS. MACDONALD:  No further questions.  Thank you.
 8            MR. SISTI:  Nothing further.  Thank you.
 9            THE COURT:  Sir, you're excused.
10            THE WITNESS:  Thank you.
11            THE COURT:  Thank you.
12                       EDWARD FORSTER
13       having been duly sworn, testified as follows:
14            THE CLERK:  For the record, please state your name
15  and spell your last name.
16            THE WITNESS:  My name is Edward Forster,
17  F-O-R-S-T-E-R.
18                     DIRECT EXAMINATION
19  BY MR. SISTI:
20       Q.   Good morning.
21       A.   Good morning.
22       Q.   Thanks for showing up here today.  I know you're
23  busy.
24            And where do you live, Mr. Forster?
25       A.   I live in Antrim.  Antrim, New Hampshire.
```

1      Q.    Okay.  And how long have you been in that area?

2      A.    On and off my entire life except for maybe a decade

3   in which I lived on the West Coast.

4      Q.    Okay.  We asked you to be here today because you've

5   had some contact with Ian Freeman?

6      A.    Uh-huh.  Yes, I have.

7      Q.    Okay.  And, for the record, can you point him out

8   in the courtroom?

9      A.    He's sitting right on over there next to the lovely

10   lady with a mask.

11          MR. SISTI:  Thank you very much.

12          THE COURT:  He has identified him.

13      Q.    Ed, can you tell the jury what you do for a living?

14      A.    I own with my family a pizza place in Keene, New

15   Hampshire.

16      Q.    And how long have you owned this pizza place?

17      A.    We opened up in 2011.

18      Q.    Okay.  And business is okay?  It's doing well?

19      A.    Business is fabulous.  We've grown every year we've

20   been in business, and so, what, 12, 13 years now.

21      Q.    And what's the name of the place?

22      A.    Little Zoey's Pizza.

23      Q.    Little Zoey's?

24      A.    Yeah.

25      Q.    And where's that located in Keene?

1    A.    We're right off of Gilbo Avenue.  It's that

2  building called the Center of Keene.  It used to be part of

3  the Colony Mill complex essentially back when shopping was a

4  thing.

5    Q.    Okay.  Before --

6    A.    Yeah, before the Internet.

7    Q.    Oh, yeah.  I remember that.

8    A.    Yeah.

9    Q.    How did you meet Ian?

10    A.    I don't remember the exact point where I met Ian.

11  We went to a festival called PorcFest up in Lancaster, New

12  Hampshire, and that was strictly because we were interested in

13  selling pizza.  We have a mobile kitchen that we utilize for

14  festivals and private functions and whatnot.  And when we were

15  there, we discovered and learned about -- or I had heard about

16  cryptocurrencies and specifically bitcoin.

17          There were a number of people that I met over that

18  week, and Ian was definitely one of them.  Found out that he

19  was from Keene and continued on --

20    Q.    Okay.

21    A.    -- interacting with him from time to time after

22  that.

23    Q.    What was the interaction like?

24    A.    Very business.  Very formal for the most part.  It

25  was related towards understanding cryptocurrencies and

1    bitcoin.  He was basically somebody who seemed extremely

2    knowledgeable about that.  He seemed to be extremely

3    knowledgeable about a lot of things when it came to the

4    system, the way it worked, the way blockchain worked, and how

5    one might incorporate that into their business.

6         Q.    All right.  So was he basically giving you advice

7    on this particular subject matter?

8         A.    Yeah, based off of questions that I would ask.  You

9    know, I was very interested.  You know, watching what was

10   happening with our Federal Reserve being inflated to the point

11   that it is where they're literally making money out of

12   nothing -- I mean, what is money but paper and cotton and wood

13   pulp, and we've all decided that it's valued at something, but

14   yet we have a system where they can print it as much as they

15   want and -- well, you can see what's happening right now with

16   the inflation that we're getting, and that seems to be

17   directly caused by our system, the people in charge.

18             So I'm always interested in things that were more

19   solid.  Like gold, for example.  There's a limited amount.

20   There can only be so much.  It's going to hold the value.

21             I like the idea of cryptocurrency.  It seems modern

22   and interesting and something to learn more about.

23        Q.    Okay.  So has your business actually embraced the

24   cryptocurrency?

25        A.    It has.  We utilize it to a certain extent.  We

```
 1    utilize all types of alternative forms of exchange, actually.
 2    You know, I've traded pizzas for a canoe, for example.  I've
 3    traded pizzas for a work chiller.  There're all different ways
 4    of exchanging value, and that's pretty much what I look at.
 5         Q.   With regard to Mr. Freeman, has he imparted all of
 6    this knowledge and this information free of charge?
 7         A.   He definitely never asked me for anything.  In
 8    fact, when there was an incident in which either I screwed
 9    something up or something happened with the programming
10    involving a cryptocurrency called Dash and I lost I think
11    about $200, he gave it to me because -- he gave me $200
12    because of the fact that I had lost $200, and he felt bad that
13    he had given me bad advice and he didn't want me to feel like
14    he had screwed me over or anything like that.  At least that
15    was the impression that I got.  He was -- it was mostly about
16    trying to impart knowledge about the way this worked and what
17    this was.
18         Q.   Okay.  Did you at any point in time over the years
19    that you've known him have any experience with him where it
20    seemed as though he was taking advantage of you or anybody
21    else with regard to this?
22         A.   No.  That's my point.  It's the absolute opposite.
23    I never felt like he was ever one to take advantage of
24    anybody.  He always seemed to be that kind of guy that really
25    wanted to make sure everybody knew he was on the up and up.
```

1           There's a lot of shady people out there, and I've

2    had plenty of experiences meeting them.  I never got the

3    impression that Ian was shady in any particular way.

4           Q.    And being a member of the community in Keene, what

5    is Ian's general reputation?

6           A.    Oh, from the social groups that I -- I mean, it's

7    either nobody knows who he is or they know of him as somebody

8    who is a libertarian who speaks towards personal freedoms and

9    personal rights, is against the idea that, you know, anyone

10   should be using violence against anyone else.

11          He's a nonaggression type person.  I've never -- I

12   don't know.  I've never heard anything negative about him

13   personally.  Maybe there are things that people don't agree

14   with him politically, but I've never -- nothing -- yeah,

15   nothing negative.

16          Q.    Okay.  How about his reputation for honesty and

17   trustworthiness?

18          A.    Again, I've never heard anybody say anything with

19   regard to him being a liar or saying that he ever lied about

20   anything.  In my personal experience I've always found him to

21   be extremely trustworthy and honest.  There's never been cause

22   that I've ever been given by him or anyone else to see him in

23   any particular light other than a decent human being.

24          MR. SISTI:  Okay.  Thanks for coming in.

25          Your witness.

```
 1                      CROSS-EXAMINATION
 2   BY MR. KENNEDY:
 3        Q.    Good morning, Mr. Forster.  How are you?
 4        A.    I'm doing very well.  And yourself?
 5        Q.    Not too bad.
 6              Just a few questions and we'll get you out of here.
 7        A.    Okay.
 8        Q.    You testified that you met Ian Freeman at PorcFest?
 9        A.    I think it was around PorcFest.  It was around that
10   time that I became aware of bitcoin and cryptocurrencies.
11        Q.    Okay.  And so you were there selling pizzas, right?
12        A.    Oh, yes.  Oh, yes.
13        Q.    And did he approach you about cryptocurrency?
14        A.    No, not at all.  Actually, it was a number of other
15   people that were all promoting cryptocurrencies, and they were
16   saying, you should be taking crypto, everyone else here is
17   taking crypto.  Take crypto.  Take crypto.
18              I spoke to another gentleman completely -- I don't
19   even remember his name -- who helped me get a little code for
20   my window and develop a wallet.
21              But really when it came to learning more about the
22   specifics of cryptocurrencies, I learned a lot more from Ian.
23        Q.    Okay.  So you would consider him a source of
24   information about cryptocurrency?
25        A.    Yes.
```

1      Q.   And I think you testified that it was a very

2  business formal relationship with him?

3      A.   Yes.  Absolutely.

4      Q.   And you sought advice from him on how to set up

5  cryptocurrency at your business?

6      A.   If I had issues.  You know, I did my own personal

7  investigations on that as well.  And when there were issues I

8  didn't understand or things I wanted to talk about and he was

9  present, I would ask him questions.

10          They would hold bitcoin meetings at our restaurant.

11  I think they held them once a month but not always at the same

12  place.  Just at places that would accept cryptocurrency.  And

13  when they would show up to have their meetings, I would go out

14  and ask questions of the group often.

15     Q.   Okay.  So Mr. Freeman also frequented your

16  restaurant?

17     A.   Oh, yes.  Absolutely.  Absolutely.  As well as lots

18  of people.  We're incredibly well-known in Keene.  Probably

19  the highest rated pizza restaurant in southern New Hampshire.

20     Q.   Okay.  So is it fair to say that your relationship

21  with Mr. Freeman is he's a customer and a source of

22  information about bitcoin?

23     A.   Yes.  A customer and a source of information about

24  bitcoin, yeah.

25     Q.   Okay.  And Mr. Freeman didn't tell you about the

1    businesses that he was running, correct?

2        A.    No.  I mean, not really, no.

3        Q.    Okay.  So he didn't tell you about his bitcoin

4    selling business?

5        A.    No.

6        Q.    Okay.  So you don't --

7        A.    The only bitcoin that I took in was the bitcoin

8    that customers, you know, exchanged for pizza.

9        Q.    Yeah.  So I just wanted to make sure I understood

10   that your impression of Mr. Freeman is just based on those

11   interactions you've had with him as a customer and as a source

12   of information?

13       A.    Now, when you say selling bitcoin, how does one

14   sell bitcoin?  Isn't it an exchange?  I mean, one value for

15   another value?

16       Q.    Well, that's not what I'm asking.  So I asked, did

17   he tell you anything about his bitcoin selling business, and I

18   think your answer was no; is that right?

19       A.    Yeah, but I'm just trying to make sure I understand

20   your question.  That's all.

21       Q.    I mean, that was my question.  Did he tell you

22   about his bitcoin selling business?

23       A.    Not specifically, no.  Maybe he mentioned things

24   based off of questions I might have asked, but it wasn't

25   anything he ever pushed on me.

1     Q.   Okay.  So, I mean, he wasn't sharing his customer

2  lists with you, right?

3     A.   I don't know what a customer list would be.

4     Q.   Okay.  So it sounds like the answer is no.

5     A.   Yeah.

6     Q.   Okay.  So, again, your interactions with him --

7     A.   I just don't know how one sells bitcoin.  I thought

8  it was just an exchange.

9     Q.   Okay.  I'll leave it to the jury and what they've

10 heard.

11          I just want to be clear.  You knew him as a

12 customer, correct?

13    A.   Yeah, he was a customer.

14    Q.   And he was somebody who gave you advice about

15 bitcoin?

16    A.   Yeah, he was someone that gave me advice about

17 bitcoin when I asked for it.

18    Q.   And that's really the extent of your relationship

19 with Mr. Freeman?

20    A.   Yeah.

21    Q.   Okay.  I don't have anything else for you.

22    A.   Okay.

23                     REDIRECT EXAMINATION

24 BY MR. SISTI:

25    Q.   Just really one quick follow-up.

1          And the advice he gave you was good advice?

2     A.    As far as I could tell.  I mean, I never felt like

3 I ever got bad advice from him.  He was someone who was more

4 concerned with people being successful rather than -- I always

5 got the impression that Ian was out for everyone's best

6 interests, not just for his own, you know, he was looking for

7 everyone to be successful, which in my opinion someone who

8 represents being a libertarian, for example, it's what they

9 do, you know.  I mean, to be honest with you, I'm shocked that

10 we're here.

11     Q.    All right.  Thank you.  I appreciate it.  Thanks.

12          MR. SISTI:  Nothing further.

13          THE COURT:  Wait a minute.

14          MR. KENNEDY:  I'm fine, your Honor.

15          THE COURT:  We're all set.

16                       ADAM MOSHER

17     having been duly sworn, testified as follows:

18          THE CLERK:  For the record, please state your name

19 and spell your last name.

20          THE WITNESS:  My name is Adam Mosher, M-O-S-H-E-R.

21                    DIRECT EXAMINATION

22 BY MR. SISTI:

23     Q.    Good morning, Adam.  How are you?

24     A.    I'm doing well.  Thank you.  Yourself?

25     Q.    I'll try to get you out of here so you can go back

1    to work, okay?

2         A.    Thank you.

3         Q.    Can you tell the jury a little bit about yourself,

4    where you live and what you do for a living?

5         A.    Sure.  I live in Newport, New Hampshire.

6               I own a small restaurant in Hillsboro, New

7    Hampshire, it's known as Taco Beyondo, and that's where I came

8    to know Ian Freeman.

9         Q.    And about when did you get to know Ian Freeman?

10        A.    I can't say with any accuracy.  I would say maybe

11   the last four years or so, three to four, maybe five years.

12        Q.    And how did that happen?

13        A.    He would come in with some of his colleagues and

14   friends, and they were always a really nice group of people

15   that would come in and, you know, super respectful, show a lot

16   of respect towards my staff, enjoyed food, and just kind of

17   did their thing.

18        Q.    Okay.  Did there come a time when you got involved

19   or at least had some curiosity with regard to cryptocurrency?

20        A.    Yeah, it's kind of a little bit above my pay grade.

21   My ex-wife was more interested in that than I was, but I did

22   follow the lead and we did start accepting cryptocurrency.

23   I'm still not sure exactly how it works, but we do accept

24   cryptocurrency.  It's been kind of an interesting thing.  I'm

25   trying to learn more about it.

1      Q.    Okay.  And when did you start utilizing that in

2  your business?

3      A.    I would say -- again, I can't be super accurate

4  with a date or anything, but possibly maybe 2018 or '19.

5      Q.    Okay.  And did that come to your attention through

6  Ian Freeman?

7      A.    It did.  Yes, sir.

8      Q.    Okay.  And how did it come to your attention?  I

9  mean, give us a little bit about what the dynamic was like.

10      A.    Again, my ex-wife did a lot of that stuff as far as

11  the crypto went.  I think I put the sticker on the door for

12  the establishment saying we now accept cryptocurrency.  We had

13  a tablet that was provided, and, you know, whatever

14  transactions came through in the form of cryptocurrency

15  transpired over the tablet, and then they went into I believe

16  they're called a digital wallet.

17      Q.    All right.  Okay.  If you ever had any problems or

18  questions, who would you go to?

19      A.    I would call Ian.  He was great.  He was right on

20  the money.  He would come in and take care of whatever issues

21  we had.  Like I said, I'm more of a food guy.  I'm not a tech

22  guy.  So when it came to anything tech-wise, I would call Ian

23  and he would come right in and help us out.

24      Q.    Just straight up, I mean, did Ian ever charge you

25  for anything?

1    A.    There was no charge for anything.  He was always,

2    like I said, pretty straightforward.  He seemed to be a very

3    honest guy.  He just helped us wherever we needed the help.

4    Never had a problem with him.  He's been coming into the

5    restaurant, like I said, for years at this point, and he just

6    seemed like a straight up kind of guy.

7    Q.    All right.  Did you ever hear any complaints about

8    him, anything like that from anybody in there?

9    A.    I've never heard a complaint about Ian.

10    MR. SISTI:  Your witness.

11    CROSS-EXAMINATION

12    BY MR. KENNEDY:

13    Q.    Good morning, Mr. Mosher.

14    A.    Good morning.

15    Q.    I will get you out of here quick.  I promise.

16    A.    Thank you.

17    Q.    You testified that bitcoin is above your pay grade,

18    right?

19    A.    I'm not sure -- yeah, I barely can log on to the

20    Interwebs.

21    Q.    I mean, would you say that it's kind of a

22    complicated concept?

23    A.    I mean, not so much.  I've learned a lot about it I

24    guess as far as -- I guess I have to think about it like I

25    would the stock market.

Case 1:21-cr-00041-JL   Document 273   Filed 03/01/23   Page 36 of 129

36

1        Q.    Okay.  So it wasn't intuitive to you, though?

2        A.    Not so much I would say, but, you know, like I

3  said, I've learned about it and I do think it's interesting.

4  I know it's in the news quite a bit these days and people are

5  accepting it all over.

6        Q.    And is your business pretty successful?

7        A.    It's done well, yeah.

8        Q.    You do banking at financial institutions as part of

9  your business?

10       A.    Yes.  Correct.

11       Q.    Multiple institutions or just one institution?

12       A.    No, just one institution we use.

13       Q.    Do you have multiple accounts with the institution?

14       A.    Well, personally, yes, but with the business I

15  believe there's just the one.

16       Q.    Okay.  Have you ever had any accounts shut down by

17  the banks?

18       A.    No, sir.

19       Q.    And just a couple more questions.  You said you met

20  Ian Freeman as a customer at your store?

21       A.    Yes, sir.

22       Q.    And he's been a customer for several years?

23       A.    Correct.

24       Q.    And in that interaction with him as a customer he

25  gave you some advice about bitcoin; is that right?

1     A.    More how to accept it I guess than anything, yeah.

2     Q.    Okay.  So fair to say your relationship with him is

3  kind of a professional -- you're a businessman and he's a

4  customer relationship?

5     A.    I would say that's accurate, yeah.  You know, we've

6  spoken outside of that, too, but --

7     Q.    Would you say the majority of your interactions

8  with him are as a customer?

9     A.    The majority, yeah.

10     Q.    Okay.  I don't have anymore questions for you.

11     A.    Thank you.

12                    REDIRECT EXAMINATION

13  BY MR. SISTI:

14     Q.    The interest you have in the bitcoin situation is

15  for moneymaking basically, right?

16     A.    Yeah, I guess the moneymaking, and it seemed like

17  an exciting and new opportunity to learn about a new currency,

18  I guess.

19     Q.    Right.  And Ian is the one that opened that door

20  for you?

21     A.    Yes, sir.

22     Q.    In fact, you mentioned this tablet that you

23  utilized during transactions with cryptocurrency?

24     A.    Correct.

25     Q.    Who gave you that?

```
 1          A.    That was Ian.

 2          Q.    Did he charge you a dime for that?

 3          A.    Not a dime.

 4          Q.    Did he teach you how to use it?

 5          A.    He taught my staff more than me, kind of the people

 6   that worked up front.  I'm in the kitchen.

 7          Q.    And that was free of charge, too?

 8          A.    It was.  Yes, sir.

 9          Q.    Thank you.

10          A.    Thank you.

11          MR. KENNEDY:  Very brief.

12                          RECROSS-EXAMINATION

13   BY MR. KENNEDY:

14          Q.    Does Mr. Freeman pay with cryptocurrency when he

15   comes into your store?

16          A.    He has in the past.  I believe so, yeah.

17          Q.    Is that regularly how he pays?

18          A.    I'm not honestly sure how he pays.  Like I said,

19   I'm behind the line in a kitchen.  It's an open kitchen, I

20   know when Ian comes in, but otherwise I can't say with

21   certainty how he's paying for food.

22          Q.    Mr. Freeman was interested in getting you set up

23   with cryptocurrency at your place?

24          A.    Yes, sir.

25          Q.    So he could pay you in cryptocurrency?
```

```
 1           A.      Correct.
 2                   MR. KENNEDY:  Okay.  Thank you.
 3                   MR. SISTI:  Thank you.
 4                   THE COURT:  Sir, you're excused.
 5                   THE WITNESS:  Thank you.
 6                             DAEL CHAPMAN
 7           having been duly sworn, testified as follows:
 8                   THE CLERK:  For the record, please state your name
 9   and spell your last name.
10                   THE WITNESS:  Dael Chapman, C-H-A-P-M-A-N.
11                           DIRECT EXAMINATION
12   BY MR. SISTI:
13           Q.      Good morning.  How are you doing, Dael?
14           A.      Fine.  Thank you.
15           Q.      Good.  Can you tell the jury a little bit about
16   yourself, where you live and what you did for a living?
17           A.      I live in Amherst, Massachusetts.  I am a retired
18   high school Spanish teacher.  I retired in 2007.
19           Q.      There's been some questions about people's ages in
20   this courtroom over the last couple of weeks.  I hate to delve
21   into such a thing, but how old are you?
22           A.      75.
23           Q.      Okay.  And do you know a fellow by the name of Ian
24   Freeman?
25           A.      I do.
```

1          Q.    And do you see him here today in the courtroom?

2          A.    Yes.

3          Q.    Okay.  Can you just point him out, please?

4          A.    Yeah, he put his hand up.

5                THE COURT:  He had his hand up, and she has

6    identified him.

7                MR. SISTI:  Thank you very much, Judge.

8          Q.    How did you get to know Ian?

9          A.    I learned about bitcoin in 2012, but I couldn't

10   figure out how to get it.  I didn't know a single person that

11   knew anything about it.

12               And so finally in around 2016 or '17 a friend said,

13   well, why don't you look for a meet-up group.  So I got online

14   and looked for a meet-up group, and I recognized the name of

15   someone I knew from the University of Massachusetts in

16   Amherst.  So I contacted him, and he said why don't you come

17   up to Keene and meet some of the people in the cryptocurrency

18   meet-up group.  So I did.

19         Q.    Okay.  So that was a few years back and you went to

20   the meet-up group?

21         A.    Uh-huh.

22         Q.    Would that be the opportunity that you had to first

23   meet Ian Freeman?

24         A.    Yes.

25         Q.    Okay.  And what was going on in the meet-up group?

1    I mean, what was the subject matter?  What was the interchange

2    there?

3         A.    Well, they met at a restaurant, and they were just

4    hanging out and chatting.  I had a ton of questions and people

5    answered my questions, and they just talked among themselves.

6    It was very informal, low-key, and every time I went different

7    people would come and go.  There were a few regulars, but

8    mainly people just sort of dropping in.

9         Q.    Okay.  And is that where you started to learn a

10   little bit more about what this cryptocurrency situation was?

11        A.    Yes.

12        Q.    Okay.  What were the questions you had and who

13   would be the person that you got the most advice from?

14        A.    Well, the biggest question is how do you get

15   bitcoin.

16        Q.    Right.

17        A.    And the person I asked was -- everybody who was

18   there answered my questions.  Various people answered in

19   various ways.

20        Q.    Okay.  Did you ever have any kind of a relationship

21   with Freeman wherein he aided you in getting any of that

22   currency?

23        A.    He had an ATM machine, and he taught me how I could

24   use it.

25        Q.    Okay.  And where would that machine have been

1    located, if you recall?

2        A.    There was one in the first restaurant that we met

3    at.  I can't remember the name of it.  It was very dark, and

4    we sat outside on the corner of -- I can't even remember the

5    street.  I don't really know Keene.  And then there was

6    another one near a convenience store in a place they call the

7    bitcoin emporium.

8        Q.    Okay.  And how many of these meet-ups do you recall

9    going to?

10       A.    Well, I've been going since, what, 1916 or -- I

11   mean 2016 or '17, I don't remember, and I would -- when the

12   weather is decent, I might go up every two months.  In the

13   winter I don't go up because of the snow.  So I would say

14   maybe five times a year perhaps.

15       Q.    And when you were in these meetings and exchanging

16   information, who was the one that seemed to have the most --

17   well, who had the most advice and had the most knowledge with

18   regard to this particular item, the bitcoin?

19       A.    Ian definitely had the most knowledge because when

20   I would ask other people, sometimes they would refer me to

21   him.  I wouldn't say he gave the most advice because he never

22   offered.  He was just very quiet.  And if I asked, he would

23   answer my questions.

24       Q.    All right.  So would it be fair to say he wasn't

25   pushing any of this stuff on you?

1      A.    No.  Absolutely not.  Quite to the contrary.

2      Q.    All right.  So when you would need something

3  resolved, you had some question, was he the go-to guy?

4      A.    Well, he's the guy I would want to go to, yes.

5      Q.    And why is that?

6      A.    Because he could always figure things out.  I have

7  a MacBook.  Most people in the group aren't familiar with

8  Apple products, nor was he, I believe, but he could always

9  figure things out.  He's extremely bright.

10     Q.    Okay.  Did he help you through some of your

11  questions and transactions that you wanted to make?

12     A.    Yes.  Because sometimes I managed to buy something,

13  like, on Coinbase or somewhere else and then I didn't know how

14  to get it off and move it around, and he would help me with

15  that when I asked.

16     Q.    Okay.  Did he ever charge you anything for any of

17  his services?

18     A.    No, no, which is interesting because other people

19  there did and offered to help me for $150 an hour, and I

20  always felt kind of guilty because when I asked him for help,

21  he never asked for anything.  I always hoped that he didn't

22  feel I was taking advantage of him.

23     Q.    Okay.  Well, I mean, he never expressed that to

24  you?

25     A.    What?

1    Q.    He never said that you were taking advantage of him

2  in any way?

3    A.    I'm just saying since everybody else was charging

4  and he wasn't, I wondered if I was being cheap, you know, by

5  not paying him was what I was saying.

6    Q.    And his advice, was it good advice as far as you're

7  concerned?

8    A.    Oh, it's always been good.

9          There are some things he hasn't been able to

10  resolve, but since this case started he hasn't been able to

11  help.  So I'm still stuck.  I still have lots of unanswered

12  questions.

13    Q.    Okay.  What's his basic reputation in the community

14  that you're aware of?

15    A.    Well, I'm not from Keene so I don't know the

16  community.

17    Q.    Right.

18    A.    But everyone that comes and goes and the store

19  owners and the people in the restaurants seem to respect him.

20  He seems to be a very noble person and very laid back and

21  respectful and very civil.

22    Q.    Thank you.

23          MR. SISTI:  Your witness.

24                    CROSS-EXAMINATION

25  BY MR. AFRAME:

1       Q.    Good morning.

2       A.    Good morning.

3       Q.    So you just said that you know Mr. Freeman to be

4    noble, laid back, and civil.  Did you ever deal with Mr.

5    Freeman on localbitcoins.com?

6       A.    No.

7       Q.    Do you know whether he's noble, civil there?

8       A.    I don't know.  I haven't used that platform.

9       Q.    Okay.  Do you know anything about buying bitcoin

10   from Mr. Freeman on Telegram?

11      A.    No.

12      Q.    Okay.  Do you know how he behaves there?

13      A.    No, I don't.

14            They did, I don't know if it was Ian or one of the

15   other guys, help me set up Telegram on my phone.

16      Q.    But you never bought bitcoin that way?

17      A.    No.  I'm in several groups, but I don't see any --

18   I don't really get on it very much to tell you the truth.

19      Q.    Okay.  And you bought bitcoin from an ATM machine

20   in a restaurant in Keene?

21      A.    Yes.

22      Q.    And that was at Mr. Freeman's advice?

23      A.    No.  I saw the machine.  I said, can someone please

24   show me how to use it, but then it stopped working.

25      Q.    Okay.  And did you pay a commission to buy that

1    bitcoin?

2         A.   I don't know.  It's included in whatever money I

3    put in the machine I would assume.

4         Q.   So you don't know if you paid a fee?

5         A.   No.  I have to confess that I'm not doing bitcoin

6    because I want to earn money.  I'm doing it because I wanted

7    to learn the technology because I feel that that's where the

8    country is headed, and I didn't want to be completely

9    clueless.

10        Q.   Were you able to find any bitcoin help in your home

11   friend group?

12        A.   I did find two men that work at Mount Holyoke

13   College, and they used to meet once a month and I went there

14   for a while, and then -- they weren't quite as informed as the

15   Keene group, but then when COVID hit they stopped meeting, and

16   I haven't heard from them since.

17        Q.   How about your women friend group in Amherst, are

18   any of them bitcoin experts?

19        A.   No.  They don't even know what it is.

20        Q.   Thank you.

21             MR. AFRAME:  No further questions.

22             MR. SISTI:  Just a couple, Judge.

23                        RECROSS-EXAMINATION

24   BY MR. SISTI:

25        Q.   You purchased bitcoins from the vending machines?

1        A.    Yes.

2        Q.    I think one was the -- you referenced it as like a

3    country store?

4        A.    Country store?  A little convenience store, yes.

5        Q.    A little convenience store?

6        A.    Yes.

7        Q.    And the other one was at a restaurant?

8        A.    Yeah.

9        Q.    The Thirsty Owl, is that the --

10       A.    I think -- is it on the corner of a street that

11   goes down to Emerald?

12       Q.    Yeah.

13       A.    Yes.

14       Q.    Okay.  Any complaints or problems with any of those

15   purchases at all?

16       A.    No.  Until the machines stopped working.

17       Q.    Okay.  Anybody complaining about excessive fees or

18   anything like that?

19       A.    No.  Never.

20            MR. SISTI:  Thank you.

21                      RECROSS-EXAMINATION

22   BY MR. AFRAME:

23       Q.    Do you know if that bitcoin vending machine or

24   bitcoin ATM was registered with the federal government?

25       A.    I don't know.  Nor do I know if that's required.

1    Q.   Okay.  Did you have to provide any identification

2  when you bought the bitcoin at the Thirsty Owl?  Did it take

3  your photo?

4    A.   No photo.  This was quite a while ago before --

5    Q.   Do you remember what you had to do?

6    A.   No, I don't remember.

7    Q.   Okay.  Thank you.

8         MR. SISTI:  Nothing further.  Thank you.

9         THE COURT:  Thank you, ma'am.  You're excused.

10        THE WITNESS:  Thank you.

11                     CAROLYNN URBANSKI

12        having been duly sworn, testified as follows:

13        THE CLERK:  For the record, please state your name

14  and spell your last name.

15        THE WITNESS:  Carolynn Urbanski, U-R-B-A-N-S-K-I.

16                    DIRECT EXAMINATION

17  BY MR. SISTI:

18    Q.   Carolynn, good morning.

19    A.   Good morning.

20    Q.   Can you tell the jury a little bit about yourself,

21  where you live and what you do?

22    A.   I live in Langdon, New Hampshire.  I'm retired.  I

23  was a software consultant for 16 years.  Actually, that's my

24  last job.

25         I also have a barbecue business over in Alstead,

1    Tennessee -- not Tennessee.  We're originally from Tennessee.

2    In Alstead, New Hampshire.  The restaurant portion was just

3    recently closed in fact Sunday, but the actual business is

4    open.  I'm going to be doing some catering and other work with

5    it.  So it's not a dead business.  It's just a too quiet

6    business for a while.

7         Q.   How long have you had that business?

8         A.   Six years.

9         Q.   Six years.  Okay.

10             I'm going to go into your relationship or how you

11   know Ian Freeman.  Do you know Ian Freeman?

12        A.   I know him socially.  I would not consider him --

13   we're not close friends or anything like that.  I know him

14   socially from being at different festivals that he was at.

15             He was a customer to our restaurant.  We have

16   friends in common, but obviously there's an age difference.

17   We're not social buddies, that type of thing.

18             He did -- he was integral to bringing some business

19   to my restaurant with no expectation of anything, but because

20   we did accept cryptocurrency, Goldback, that type of thing, a

21   lot of people would come to our restaurant.  He helped put me

22   on the map with that and get the contacts to get people to

23   know that we offered those services.

24        Q.   Okay.  This is a formality, but can you point Ian

25   out in the courtroom for me?

1      A.    Right over there.

2      Q.    Okay.

3            MR. SISTI:  If the Court would recognize that he's

4      been identified?

5            THE COURT:  He has been identified by her.

6            Thank you.

7            MR. SISTI:  Thank you.

8      Q.    Okay.  So let's talk about your relationship with

9      Ian.  It's not one of being a close friend but certainly one

10     where you've had some contact professionally and otherwise?

11     A.    Right.  I really consider it a professional

12     relationship in common organizations and common activities at

13     times.

14     Q.    Okay.  With regard to the cryptocurrency aspect, is

15     he somebody that you actually relied on for advice and some

16     direction with regard to that?

17     A.    Yes.  If I had questions, he was available both in

18     how to properly present it and how to have customers pay me.

19     That type of thing.

20     Q.    Okay.

21     A.    And that was not anything in how to pay me.  It's

22     just I was using a third party product that was not related to

23     either of us, and whenever we would have questions or issues

24     with it or when it wouldn't seem to work, Ian was the one that

25     I could always ask.

```
1          Q.    Okay.  So you would go to him for advice?
2          A.    Well, I wouldn't go to him.  It would be more of a
3    case where if he was at the restaurant and I had a question, I
4    could ask him about it.
5          Q.    Okay.  And he was there.  Did you find him to be
6    knowledgeable with regard to your concerns?
7          A.    Definitely.
8          Q.    Okay.
9          A.    And definitely passionate about the product.
10         Q.    Okay.  And by passionate about the product, what do
11   you mean by that?  Let the jury know.
12         A.    I mean knowledgeable about it, liking the benefits
13   of it.  Just the ease of use.
14         Q.    Was it easy to use?  I mean, were people using it
15   frequently at your place?
16         A.    No, it wasn't frequent.  I mean, again, it's not --
17   probably maybe ten percent of our customers came in, which is
18   a very small amount, we weren't a large business, that they
19   actually came in because they knew we took cryptocurrency,
20   that we took bitcoin.
21         Q.    Okay.  And he would help you with any of the
22   technical stuff?
23         A.    Correct.
24         Q.    And even though he was giving you advice with
25   regard to the technical aspects and trying to straighten out
```

1  anything that you had any questions with, did you know Ian to

2  ever charge you for anything?

3         A.    No, no.  There was never any charge or any

4  expectation of a charge or anything.  No favors.  If anything,

5  he was very generous because he would sometimes give a tip.

6         Q.    Okay.

7         A.    Okay.  That might sound backwards.  It wasn't a tip

8  to me for anything.  It would be somebody else in the

9  restaurant asking about it.  So tip is the wrong word.

10        Q.    So advice, is that what --

11        A.    He would give advice and maybe a small token to

12 somebody so they could be introduced to it.

13        Q.    So he would actually give away something?

14        A.    Small amounts, but just to help at being an

15 advocate of the process.

16        Q.    Okay.  And would he guide them as to how to use it

17 as well?

18        A.    I don't know.  If they would ask, certainly.

19        Q.    Okay.  Have you known him to be somebody that

20 others respect in the community as well?

21        A.    Yes.

22        Q.    And by that, what do you mean?

23        A.    I know him to be very charitable in the community

24 as far as several organizations.  I could not necessarily name

25 the organizations except for I think is it 101 Nights?  I know

1    he's been very active in supporting those.  He's been very

2    active in -- I know of people that he has helped in one way or

3    another in the sense of helping them move, helping them to get

4    established, find information.

5           Again, I don't have that close of a personal

6    relationship, but he's known to help others.  I mean, after my

7    husband died there was a case where I was told that if you

8    need anything, talk to Ian.  That he would be glad to support

9    me or help me.  I never needed to.  There was no expectation

10   of payback, but it was one -- I mean, after my husband passed

11   last year there were a lot of offers of I'm here for you which

12   was just surface.  In that case I knew it was one that if I

13   really needed something -- if I needed him, he would be there

14   for me.

15          Q.   Okay.

16          A.   And that's why I feel he's a very sincere, helpful

17   individual.

18          Q.   Thank you, and thanks for coming in this morning.

19          A.   That's it?

20               THE COURT:  Cross.

21               THE WITNESS:  Oh.  Sorry.

22                         CROSS-EXAMINATION

23   BY MR. AFRAME:

24          Q.   So you talked about your personal relationship with

25   Ian?

1      A.    Correct.

2      Q.    And do you know anything about what he did for

3  business?

4      A.    No.

5      Q.    Do you know anything about him --

6      A.    I'm sorry?

7      Q.    Do you know anything about what he did for

8  business?

9      A.    Not particularly, no, because I never -- it never

10  came up.  I knew he was active with bitcoin.  That was it.

11      Q.    What's the last thing you just said?

12      A.    I said I knew that he was, you know, promoting

13  bitcoin and active, but I never questioned it one way or the

14  other.

15      Q.    But it sounds like, at least from your perspective,

16  he had some resources, right?  He gave to charities?

17      A.    Correct.

18      Q.    He did some other, it sounds like, nice things in

19  the community from your perspective?

20      A.    Uh-huh.

21      Q.    But you don't know how he had any money?

22      A.    No.  I mean, nobody asked me where, you know, my

23  donations come from.  I don't ask anybody what their donations

24  or what they do comes from.  I didn't have that type of

25  relationship that I would be comfortable asking that.

```
 1        Q.    Okay.  Do you know anything about how he sold
 2   bitcoin on localbitcoins.com?
 3        A.    No, I was not aware of that.
 4        Q.    Do you know anything on how he sold bitcoin through
 5   his Telegram?
 6        A.    No.
 7        Q.    Do you know anything -- did you know anything about
 8   his bitcoin vending machines?
 9        A.    I knew the vending machines.  That was it.  I've
10   never used one.  Never had any need or want.
11        Q.    Okay.  How much time do you think Mr. Freeman spent
12   teaching, you know, help giving you some guidance about
13   bitcoin?
14        A.    Ten hours, five hours.
15        Q.    Okay.
16              MR. AFRAME:  Nothing further.
17              MR. SISTI:  No questions.
18              THE WITNESS:  That's it?
19              THE COURT:  You're excused.  Thank you.
20              THE WITNESS:  Thank you.
21              MR. SISTI:  May we approach for a second?
22              THE COURT:  Yes.
23              (SIDEBAR)
24              MR. SISTI:  I think I've got one testing right now.
25              THE COURT:  Let's take a break then.
```

```
1                    THE CLERK:  She's negative.
2                    THE COURT:  Is she outside?
3                    MR. SISTI:  Let me go see and check.
4                    THE COURT:  Sure.  Do you want to take the recess
5     then?
6                    MR. SISTI:  Yeah, let's take it.
7                    (CONCLUSION OF SIDEBAR)
8                    THE COURT:  We'll take the recess a little bit
9     early because our next witness is apparently testing for
10    COVID.  So we'll take the break now and we'll be ready when
11    that's over.
12                   (RECESS)
13                   (IN COURT - NO JURY PRESENT)
14                   (OFF THE RECORD)
15                   (IN COURT - JURY PRESENT)
16                   THE COURT:  Mr. Sisti, is your next witness ready?
17                   MR. SISTI:  We're all set.
18                   THE COURT:  Please proceed.
19                            MELINDA CAMBIAR
20         having been duly sworn, testified as follows:
21                   THE CLERK:  For the record, please state your name
22    and spell your last name.
23                   THE WITNESS:  Melinda Cambiar, C-A-M-B-I-A-R.
24                            DIRECT EXAMINATION
25    BY MR. SISTI:
```

 1          Q.    Good morning.  Thanks for coming over.  I know it's

 2    a busy time of year for you, and we'll explain that to the

 3    jury as why, but where do you live?

 4          A.    I live in Keene, New Hampshire.

 5          Q.    And how long have you been in that community?

 6          A.    Since I was 18 in 1976.

 7          Q.    All right.  That's a couple of years, huh?

 8          A.    Yep.

 9          Q.    All right.  Can you tell the jury, you know, what

10    you do?

11          A.    I am the executive director of Hundred Nights which

12    is the emergency homeless shelter in Keene.

13                Previous to that I ran the Community Kitchen for 24

14    years which is a soup kitchen and pantry program.

15          Q.    Okay.  And I take it this is the busiest week you

16    have of the year pretty much?

17          A.    It is, and it's for a variety of reasons, not just

18    that the numbers of people who are homeless are increasing

19    every day, but this is the week of the year that most people

20    want to make donations, which is wonderful but busy.

21          Q.    I know I'm taking you away from that, but we won't

22    be real long with you, okay?  All right.

23                Now, you've been running the -- what is the Hundred

24    Nights thing?  Why don't you explain that.

25          A.    So when it was founded at the end of 2009, the

1   founder, Don Primrose, actually set it up to be a cold weather

2   shelter.  So the name Hundred Nights was because at that point

3   in time it was literally open just for 100 nights, from

4   December 31st until March 31st each year.

5          Over the years -- I became executive director in

6   2013, and we started increasing the number of nights.  So the

7   name is no longer matching, but it's too hard to change.

8          Q.   Yeah.  So it's like 365 nights now?

9          A.   It's 365 nights, yeah.

10         Q.   Okay.  All right.

11              I'm going to ask you about your contact and

12  relationship with Ian Freeman.  Do you know Ian Freeman?

13         A.   I know Ian Freeman, yes.

14         Q.   Okay.  And can you point him out in the courtroom

15  for the jury?

16         A.   Yeah.  He's over there.

17         Q.   Okay.

18              THE COURT:  She's identified the defendant.

19              MR. SISTI:  Thank you, your Honor.

20         Q.   When did you come to first meet Ian, if you can

21  recall?

22         A.   So I started, like I said, in 2013, probably in

23  May, and I met him soon after that.

24              Ian has been a donor from the very start of Hundred

25  Nights.  So I had -- I didn't get very much help from people

1    when I first started at Hundred Nights.  So I sort of had to

2    do all my own research into all the paperwork and the files.

3            As it turned out, he had probably been one of the

4    original donors back in the beginning of 2010.

5        Q.   Okay.  There's a series of financials that I think

6    the government subpoenaed from you, and I want to show you

7    those.  They're marked as Defendant's Exhibit M-2 for ID right

8    now.  We can't show them up on the screen, but I want to walk

9    over there and show them to you and ask you whether these are

10   the ones.

11           MR. KENNEDY:  Your Honor, the government has no

12   objection.

13           THE COURT:  Admitted.

14           (Defendant's Exhibit M-2 Admitted)

15           MR. SISTI:  Thank you.

16       Q.   So these are a full exhibit.  They're up on the

17   screen so you can see them.

18           Just generally, what does that package represent?

19   What is that?

20       A.   So we have a database that's called Little Green

21   Light and we -- I think we've had it for probably five or six

22   years now.  We transferred all of our data from Excel into

23   this.  That went back as far as 2010.

24       Q.   Okay.

25       A.   And this is the front page of it, and at the bottom

1  or sort of middle of that page it shows that it is Ian

2  Freeman's Shire Free Church and Free Talk Live donation page.

3       Q.   Okay.  So what it does is it basically just keeps a

4  ledger of Ian Freeman's and the church's contributions?

5       A.   Yes.

6       Q.   And this would be a record that goes back for

7  years, correct?

8       A.   Yes.  Since -- well, since 2010.

9       Q.   Since 2010.  All right.  So there's been giving

10  from the Shire Free Church, Free Talk Live, Ian Freeman for

11  over a decade.  Is that fair to say?

12       A.   Yes.

13       Q.   Okay.  And, in fact, it kind of indicates that the

14  last -- I think the last contribution automatically was taken

15  out just a few days ago, like December 4th.  Is that accurate?

16       A.   Correct.

17       Q.   So is Ian, the Shire Free Church, on some kind of

18  automatic giving situation?  Is that what happens?

19       A.   It comes directly into our bank account every month

20  on the same date unless it was a more specialized donation.

21       Q.   Okay.  So, generally, you'll get a regular donation

22  and then the jury will be able to look at this exhibit at

23  their leisure when they're deliberating?

24       A.   Yes.

25       Q.   And they'll be able to see the history of the

1    giving that goes back for over a decade?

2        A.    Correct.

3        Q.    And that was always in the name of Ian Freeman,

4    Shire Free Church, Free Talk Live?

5        A.    Yes.

6        Q.    Okay.  Now, what are the services that you actually

7    render to the community because of the donations you receive,

8    including the ones you get from Ian?

9        A.    So we provide emergency shelter.  We have currently

10   36 beds.  We had 48 beds a night until COVID happened.  24 of

11   those beds were in two churches.  So the churches shut down.

12             In order to make up that missing 24 beds at the two

13   churches, we were given some CARES Act money and got some

14   hotel rooms, but we also bought a converted Coach bus that has

15   twelve bunks on it to make up the difference, which is

16   fortunate this year because we no longer have hotel rooms.

17             So in addition to providing shelter beds, we

18   provide a resource center that is open basically from 7:00

19   a.m. to 8:00 p.m.  We serve three meals a day.  We have

20   laundry facilities and showers that people can use.  We

21   provide transportation to doctor's appointments, and we have a

22   case manager who works one-on-one with folks to try to get

23   them back on their feet if that's possible.

24       Q.    Okay.  I mean, this is a big deal in Keene,

25   apparently?

 1      A.    It's a big deal all over the country right now,

 2 unfortunately.

 3      Q.    Yes.  And it's unfortunately growing in the Keene

 4 area?

 5      A.    Yes.

 6      Q.    Okay.  How well do you know Ian, by the way?

 7      A.    I don't know Ian very well.

 8      Q.    Okay.  You just know him as a contributor?

 9      A.    Yes.

10      Q.    And you know him through the Shire Free Church

11 contributions?

12      A.    I know nothing about the Shire Free Church except

13 for the name.

14      Q.    Except for the name and the contributions?

15      A.    Yes.

16      Q.    Okay.  That have historically for years been going

17 into your Hundred Nights?

18      A.    Yes.

19      Q.    And those are actual -- those are straight gifts,

20 right?  He gets nothing back from that?

21      A.    No.

22      Q.    No.

23      A.    They were outright contributions.

24      Q.    Okay.  Thank you.

25            MR. SISTI:  Your witness.

1          THE COURT:  Cross.

2                    CROSS-EXAMINATION

3    BY MR. KENNEDY:

4          Q.   Good morning, Ms. Cambiar.  My name is John

5    Kennedy.  I believe we've spoken before, correct?

6          A.   Yes.

7          Q.   I just want to ask you a couple questions and go

8    through the records a little bit.  I know you're busy, and

9    I'll try and get you out of here as quick as I can.

10              So you are the executive director for Hundred

11   Nights, correct?

12         A.   Yes.

13         Q.   And Hundred Nights is a 501c3 nonprofit?

14         A.   Yes.

15         Q.   And you're registered as a charitable trust with

16   the state of New Hampshire?

17         A.   Yes.

18         Q.   And there are specific nonprofit regulations at the

19   federal level you have to follow?

20         A.   Yes.

21         Q.   At the state level that you follow?

22         A.   Yes.

23         Q.   Are there any at the local level you have to

24   follow, too?

25         A.   Well, yes, but they're very different than the

1    state and the federal level.

2         Q.    And is part of your job as executive director

3    ensuring compliance with those regulations?

4         A.    To the best of my ability, yes.

5         Q.    And as a part of that your organization keeps

6    records, correct?

7         A.    Yes.

8         Q.    And it's important that you keep accurate records,

9    correct?

10        A.    Yes, it is.

11        Q.    And that includes records of the donations you

12   receive?

13        A.    Correct.

14        Q.    And we've seen some of those records, and I'll walk

15   through some of them.

16               Do you file a form with the IRS every year?

17        A.    A 990, yes.

18        Q.    Do you file a report with the Charitable Trusts

19   Unit through the state?

20        A.    Yes.

21        Q.    The jury has heard a lot in the case between the

22   time frame of about 2016 onward.  So I'm going to start there.

23               MR. KENNEDY:  And if we can bring up I think page

24   20, Caryn?  Do you have access?  Do I need to change it over?

25   Okay.  Page 20, if you can.  Sorry.

1              Sorry.  If we can go to January of 2016?  I guess I
2    was off.  Sorry.  Page 17.  Wherever 2016 starts.  I may be
3    off on my numbers.  Sorry.  If we can go up another one?
4         Q.   All right.  So can you see that?  I know it's a
5    little blurry.  Do you want to see if we can blow it up a
6    little?
7         A.   Yes.  That would be nice.
8         Q.   Okay.  All right.  So it looks like -- if we start
9    in January of 2014, it appears there is a $10 donation on
10   January 1st; is that right?
11        A.   Correct.
12        Q.   And that's monthly PayPal donor?  That's what it
13   says on the right?
14        A.   Yes.
15        Q.   And then above that is a thousand dollar donation
16   and it says in the note M ball sponsor?
17        A.   We held a masquerade ball every year in March at
18   the country club as a fundraiser.
19        Q.   Okay.  And so was this a donation as part of the
20   ball?
21        A.   Yes.  I don't remember if it was under Shire Free
22   Church or Free Talk Live, but they were a sponsor of the
23   masquerade ball along with probably eight or ten other
24   sponsors.
25        Q.   Okay.  And is that to defray the cost of putting on

1     the ball?

2          A.   Yes.

3          Q.   And I assume you fundraise at the ball?

4          A.   We do.  I think that we probably in our best year

5     bought in close to $20,000.

6          Q.   Okay.

7               MR. KENNEDY:  If we could just go up to the next

8     page?  These are reverse chronological.  So we'll just go up.

9          Q.   Let me ask you, have you reviewed these records

10    before coming here today?  I know you produced the records.

11         A.   I do the entries every month so --

12         Q.   Okay.

13              MR. KENNEDY:  If we can just zoom back out, Caryn,

14    and scroll down a little?  All right.

15         Q.   So if I'm seeing this, it looks like in February

16    there's a $10 monthly donation, is that correct, at the very

17    bottom?  Can you see?

18         A.   It's too small.

19         Q.   Yeah.

20              MR. KENNEDY:  Your Honor, do you mind if I approach

21    the witness?  I have a paper copy she can look at.

22              THE COURT:  You may.

23         Q.   This is two-sided.  We're down here.  If you start

24    from here, it's going kind of chronologically and --

25         A.   Oh, here.  Yep.

1      Q.   So if I could just direct your attention to
2 February of 2016 at the bottom there?  That's a $10 donation
3 in February; is that right?
4      A.   Yes.
5      Q.   And there's a $10 donation in March?
6      A.   Yes.
7      Q.   A $10 donation in April?
8      A.   Yes.
9      Q.   Another 10 in May?
10      A.   Yes.
11      Q.   Another 10 in June?
12      A.   Yes.
13      Q.   10 in July; is that correct?
14      A.   Yep.
15      Q.   10 in August?
16      A.   Yep.
17      Q.   10 in September?
18      A.   Yep.
19      Q.   $10 in October?
20      A.   Yes.
21      Q.   $10 in November?
22      A.   Now where am I?
23      Q.   I know.  It's reversed.
24      A.   Yes.
25      Q.   And then $10 in December for 2016; is that right?

```
 1        A.    Correct.

 2        Q.    So we looked at the thousand dollars for the ball,

 3  correct, back in '16?

 4        A.    Yes.

 5        Q.    And then we looked at twelve monthly $10

 6  transactions, correct?

 7        A.    Correct.

 8        Q.    So $1,120 for 2016, correct?

 9        A.    Yes.

10        Q.    Okay.  And then if we go to 2017, I'll go a little

11  quicker, but we have a $10 donation in January of 2017?

12        A.    Yes.

13        Q.    And February?

14        A.    Yep.

15        Q.    And March?

16        A.    Yep.

17        Q.    And April?

18        A.    Yes.

19        Q.    May?

20        A.    Yes.

21        Q.    June?

22        A.    Yes.

23        Q.    July?

24        A.    Yes.

25        Q.    August?
```

```
1          A.   Yes.

2          Q.   September?

3          A.   Yes.

4          Q.   October?

5          A.   Yes.

6          Q.   November?

7          A.   Yes.

8          Q.   And December?

9          A.   Yes.

10         Q.   So for 2017, twelve $10 donations; is that right?

11         A.   Yes.

12         Q.   So $120 in 2017, correct?

13         A.   Correct.

14         Q.   2018 in January, do you see that?

15         A.   $10, yes.

16         Q.   Yep.  $10 in February?

17         A.   Yes.

18         Q.   $10 in March?

19         A.   Yes.

20         Q.   $10 in April?

21         A.   Yes.

22         Q.   $10 in May?

23         A.   Yes.

24         Q.   $10 in June?

25         A.   Yes.
```

1      Q.   $10 in July?

2      A.   Yes.

3      Q.   $10 in August?

4      A.   Yes.

5      Q.   $10 in September?

6      A.   Yes.

7      Q.   $10 in October?

8      A.   Yes.

9      Q.   $10 in November?

10     A.   Yes.

11     Q.   $10 in December?

12     A.   Yes.

13     Q.   So another twelve $10 donations in 2018; is that

14   correct?

15     A.   Correct.

16     Q.   So $120 in 2018.

17          Look at 2019.  $10 in January?

18     A.   Yes.

19     Q.   $10 in February?

20     A.   Yes.

21     Q.   $10 in March?

22     A.   Yes.

23     Q.   $10 in April?

24     A.   Yes.

25     Q.   $10 in May?

```
1         A.    Yes.

2         Q.    $10 in June?

3         A.    Yes.

4         Q.    $10 in July?

5         A.    Yes.

6         Q.    $10 in August?

7         A.    Yes.

8         Q.    $10 in September?

9         A.    Yes.

10        Q.    $10 in October?

11        A.    Yes.

12        Q.    $10 in November?

13        A.    Yes.

14        Q.    $10 in December?

15        A.    Yes.

16        Q.    So another twelve at $10 each; is that right?

17        A.    That's correct.

18        Q.    So $120 in 2019; is that right?

19        A.    Yes.

20        Q.    So I'll have you look through 2020.  We've been

21   going through each of these.  I'll have you just review the

22   2020.

23              If you could tell me how many donations you see?

24        A.    It's been $10 a month.  So twelve a year.

25        Q.    Okay.  I would like to direct you to actually 2021,
```

1    if we could just go through that.

2              Do you see January 4, 2021?

3        A.    Yes.

4        Q.    So it's $10 in that January, correct?

5        A.    Yep.

6        Q.    And then we have February and March, another ten in

7    each?

8        A.    Yep.

9        Q.    On the next page we have April, May, June, $10

10   each?

11       A.    Yes.

12       Q.    July, August, October; is that right?

13       A.    Yes.

14       Q.    So no September donation that year?

15       A.    That's what it looks like.

16       Q.    Okay.  And then we have November and December; is

17   that correct?

18       A.    Yes.

19       Q.    So 2021 it's eleven donations, $110; is that right?

20       A.    Correct.

21       Q.    And then it looks like for 2022 we have monthly

22   donations up through December; is that correct?

23       A.    Yes.

24       Q.    So $120 in 2022; is that correct?

25       A.    Yes.

1          Q.    Okay.  And as part of your filings to the

2    Charitable Trusts, do you disclose how much you have received

3    in contributions?

4          A.    We're only required to disclose donors of over a

5    certain amount.  I believe it's $5,000 a year.

6          Q.    Okay.  Do you give them a total amount that you

7    received in contributions?

8          A.    I leave that up to the accountant, but probably.

9          Q.    Okay.  Do you know if you received over a million

10   dollars in donations in 2021?

11         A.    In 2021 we did just over a million dollars for the

12   first time, yes.

13         Q.    Okay.  And that was the year that Mr. Freeman

14   donated $110?

15         A.    Yes.

16               MR. KENNEDY:  I have no further questions.

17               Thank you.

18                         REDIRECT EXAMINATION

19   BY MR. SISTI:

20         Q.    We've just called up the first page of the

21   document.  Do you see that?

22         A.    For 2022?

23         Q.    No.  The very first page of Defendant's Exhibit

24   M-2.

25               MR. SISTI:  And if you will just scroll down to the

```
1   middle?
2        Q.    That was the document where you initially
3   identified Ian Freeman, Shire Free Church, and Free Talk Live?
4        A.    Yes.
5        Q.    And there's a total that is on that particular
6   page?
7        A.    Yes.
8        Q.    Is that accurate?  He's given through the church
9   128 gifts for a total of $6,400?
10        A.    Yes.  He's also -- Ian has also contributed some
11   things to our former holiday auction in December.
12        Q.    So what is that all about?  What kind of things?
13        A.    What kinds of things?
14        Q.    Yeah.  What did he give?
15        A.    I believe he donated part of a bitcoin two years in
16   a row.
17        Q.    Okay.  And he does that out of his own free will
18   for donations in and of itself?
19        A.    I would imagine so, yes.
20        Q.    Yeah.  I mean, he doesn't get anything for it.
21   He's just giving it to you.
22        A.    No, no.  It was a donation that brought money into
23   Hundred Nights.
24        Q.    All right.  So would it be fair to say that he's
25   been a very regular, consistent donor to Hundred Nights?
```

1      A.    He has.  I don't know if I'm allowed to elaborate

2  on that or not, but I don't turn down anybody who gives us

3  five dollars a year.  We need every penny.

4      Q.    All right.  It's clear that you appreciate what

5  he's doing?

6      A.    I appreciate all of our donors, yes.

7      Q.    Okay.  Thank you.  Thank you very much for coming

8  in.

9                         RECROSS-EXAMINATION

10  BY MR. KENNEDY:

11      Q.    Ma'am, I'm not denigrating anybody's, you know,

12  donations.  The jury has heard a lot about charity that was

13  given by Mr. Freeman's organization so I'm just asking --

14            MR. SISTI:  Your Honor, I object.  He needs to ask

15  a question.

16            MR. KENNEDY:  I'm going to ask the question.

17            THE COURT:  You can lead up.  It's okay.

18      Q.    Since 2010 Mr. Freeman has donated $6,400, correct?

19      A.    Yes.

20      Q.    Okay.  So that's twelve years $6,400, correct?

21      A.    Yes.

22            MR. KENNEDY:  Thank you.

23                         FURTHER EXAMINATION

24  BY MR. SISTI:

25      Q.    Okay.  That was the cash aspect, but there's a

1    bitcoin aspect, too, that he gave away?

2        A.    Yes.  I don't have that -- I don't recall that

3    number, though.  We haven't had an auction since 2019.

4        Q.    Yeah, things have been shut down.  All right.

5              Thank you very much.  Thanks again.

6              MR. KENNEDY:  Nothing.

7              THE COURT:  You're excused.  Thank you.

8              MR. SISTI:  At this time, your Honor, with the

9    Court's permission, the defendant, Ian Freeman, wishes to

10   testify.

11             THE COURT:  Please.

12             You know, this requires a colloquy.

13             MR. SISTI:  Yeah.

14             THE COURT:  I'm going to excuse the jury

15   momentarily.

16             You can take the stand, Mr. Freeman.

17             (IN COURT - NO JURY PRESENT)

18             THE COURT:  Mr. Freeman, I need to make sure you

19   understand the rights you have with respect to testifying in a

20   criminal trial.

21             THE DEFENDANT:  Sure.

22             THE COURT:  My guess is that you do, but we need to

23   make a record.

24             All right.  So, first of all, you understand just

25   as I've been telling the jury that you have no obligation to

```
 1   present any evidence whatsoever, you obviously have no
 2   obligation to testify in this case.  Do you understand that?
 3              THE DEFENDANT:  I follow that, yeah.
 4              THE COURT:  And no one can require you to testify.
 5   The Court cannot.  The prosecution cannot.  Even your lawyer
 6   cannot require you to testify.  Do you understand that?
 7              THE DEFENDANT:  That's right.  I'm here on my own
 8   volition.
 9              THE COURT:  The decision about to testify or not
10   testify is literally yours and yours alone, and no one else
11   can have any role in that whatsoever.  Do you understand that?
12              THE DEFENDANT:  That's correct.
13              THE COURT:  All right.
14              Tell me your understanding of your rights against
15   self-incrimination.
16              THE DEFENDANT:  I have the right to remain silent
17   if I so choose.
18              THE COURT:  Right.  So what you're about to do is
19   your decision?
20              THE DEFENDANT:  It absolutely is.
21              THE COURT:  All right.  And you make that --
22   without telling me what you said to each other, have you
23   consulted with your lawyer about this decision?
24              THE DEFENDANT:  I most certainly have consulted.
25              THE COURT:  And have you at least considered his
```

```
 1    advice?
 2              THE DEFENDANT:  I have considered his advice.
 3              THE COURT:  Fair enough.
 4              Are you satisfied with that, prosecution?
 5              MS. MACDONALD:  Yes, your Honor.
 6              THE COURT:  Mr. Sisti, anything else you want me to
 7    cover?
 8              MR. SISTI:  No.  Thank you.
 9              THE COURT:  All right.  Let's get the jury.
10              (IN COURT - JURY PRESENT)
11                             IAN FREEMAN
12         having been duly sworn, testified as follows:
13              THE CLERK:  For the record, please state your name
14    and spell your last name.
15              THE WITNESS:  I am Ian Freeman.  Last name
16    F-R-E-E-M-A-N.
17                          DIRECT EXAMINATION
18    BY MR. SISTI:
19         Q.   Ian, the jury has heard a lot about you, and I want
20    you to square a few things away for us, okay?
21         A.   Sure.
22         Q.   Why don't we start from the beginning.
23              Where were you born?  Where were you raised?
24         A.   I was born and raised in Sarasota, Florida.
25         Q.   Okay.  And how long did you live down there?
```

1          A.    26 years.

2          Q.    A little bit about your education?

3          A.    I went to mostly government school, including a

4    gifted school for my middle school and high school years, and

5    then went to do two years of college.

6          Q.    And where was that?

7          A.    The college was at Manatee Community College.

8          Q.    All right.  And that's the county that Sarasota is

9    in?

10         A.    Manatee County.  Yeah, it's the county north of

11   Sarasota.

12         Q.    And what year did you leave Florida and where did

13   you go?

14         A.    In 2006 I moved here to New Hampshire to Keene.

15         Q.    All right.  And when you got to Keene, were you

16   employed?  What were you doing?

17         A.    I have my own talk show.  It's called Free Talk

18   Live.  It's a nationally syndicated show heard on, well, back

19   then not as many radio stations, but today about 180 radio

20   stations.  So I was doing that show in Florida, and we moved

21   it to Keene.

22         Q.    All right.  And has that been a continuous

23   operation?

24         A.    Continuous since 2002 when we started it.

25         Q.    All right.  And do you get sponsors in order to,

1   you know, keep that show on the air?

2       A.    When we can.  I mean, it's -- radio isn't the most

3   glamourous profession so we don't have a whole lot of

4   sponsorship, but we've had some over the years and we're

5   grateful for them.

6       Q.    Okay.  What's the reason for Free Talk Live?  I

7   mean, what's the underpinning of that?

8       A.    Well, when I grew up -- when I was growing up

9   listening to talk radio with my father in Florida, one of the

10  things that kind of frustrated me about the talk shows that

11  were on the air was that the hosts seemed to be very

12  controlling as far as they didn't want to allow maybe contrary

13  opinions to be heard.  They didn't seem to like to be

14  challenged.  They wouldn't generally have what we would call

15  in the business open phones.  They would screen a lot of their

16  phone calls and they would screen out people who they didn't

17  want to talk to.

18          And, as a more freedom-minded person, that didn't

19  really rub me the right way.  So I wanted to have a show where

20  we could have open phones and anyone could call in, and so

21  that's why we called it Free Talk Live because people are free

22  to call in and bring up whatever they want.

23      Q.    Okay.  Even if they disagree with you or somebody

24  else on the show or anything else?

25      A.    It's usually better if they disagree because I

1    don't want to just talk to people I agree with all the time.

2    I don't think that's very interesting.

3         Q.   Okay.  Let me just go into some general areas.

4    We're going to get into some deep questioning in a bit.

5         A.   Okay.

6         Q.   The bitcoin thing, when did you get involved with

7    that?

8         A.   So my understanding, it's been a long time, but it

9    was I believe sometime in late 2010 when a gentleman called

10   into our show from Australia.  He had been a longtime listener

11   so we were aware of who he was.  He had called in previously.

12   And he brought up this Bitcoin concept which I don't think any

13   of us on the show had heard of it at that point.  It had just

14   started in 2009 so it was pretty new, and he called in to kind

15   of tell us about it.

16             Our initial reaction and my reaction was, you know,

17   pretty skeptical, all right?  I mean, it's this new

18   technology.  Who knows if it's going to go anywhere.  What's

19   it backed by, you know, that was one of the big questions, and

20   that call ended and that was kind of the end of that.

21             And then a little bit later on, I think it was

22   January of 2011, we had a meeting with Gavin Andresen who was

23   kind of, like, the second guy to Satoshi Nakamoto.  Satoshi,

24   by the way, is the founder of Bitcoin.  No one knows who that

25   is.  It's an anonymous individual or individuals.  Satoshi

1    disappeared from public view in 2011, and when he or she did

2    that Satoshi Nakamoto turned over kind of the keys of Bitcoin

3    if you will, to Gavin Andresen who happens to live in Amherst,

4    Massachusetts.  At the time we were in Keene, so he came up,

5    drove up from Amherst.  We went out to a Thai restaurant on

6    Main Street in Keene, and he really answered all of our

7    questions.  I mean, he's one of the key programmers or was at

8    that time, and so he was able to answer every question we had

9    about it.

10            So that was when I really started to kind of catch

11   the vision for what bitcoin could do for people.

12       Q.    Okay.  And, generally, I don't want to get too

13   crazy at this point, but, I mean, we're going to get there,

14   we're going to go deep, but what's the vision that you're

15   talking about?

16       A.    So for a very long time, and I'm going back to

17   other governments many hundreds of years ago, governments of

18   the world have been debasing their currencies.  So it goes all

19   the way back to coin clipping where -- you know, in the old

20   days before paper money they had gold and silver.  Well, the

21   governments would clip the edges off of the gold and silver,

22   and they would melt that down to make more coins.  Sort of

23   increasing the money supply.  And they do that today, of

24   course, without coin clipping through the Federal Reserve,

25   which is the central bank here in the United States that

1    creates the dollar.  Unfortunately, these days it's basically

2    being created out of thin air.

3              There was a time where the dollar was actually

4    backed by silver and gold, but that ended officially finally

5    in 1971, and ever since then they have been inflating as much

6    as they want.

7              And so Satoshi Nakamoto by creating Bitcoin, he or

8    she, they created this thing that allows the individual for

9    the first time in perhaps generations, if not ever, allows the

10   individuals to control their own finances without the

11   involvement of some centralized so-called authority, without

12   this central bank, without them being able to take the value

13   out of your pocket, which is what inflation is.

14             The news media reports inflation as though it's

15   just prices going up, but the reality is inflation is an

16   increase in the money supply.  So when they print more

17   dollars, or nowadays they usually just increment numbers in a

18   computer, but they still print.  But when they increment the

19   number of dollars that are in circulation, you have more

20   dollars chasing the same amount of goods and so prices tend to

21   go up as a result of that.

22             Many of us have noticed this happening, especially

23   in recent years, but it's been going on for a very long time

24   and Satoshi Nakamoto knew that.  And Satoshi put out Bitcoin

25   at a time right after the financial crisis of 2008.  That was

1    something that motivated Satoshi.

2        Q.   Okay.  What was the original cost of let's say

3    bitcoin?

4        A.   Zero.

5        Q.   Zero.  Okay.  Now, can you explain that?  I mean,

6    again, what's the valuation, how does it have a value, all

7    that sort of stuff?

8        A.   Yeah.  So when bitcoin came out -- it's a program.

9    Satoshi wrote code.  And so no one had any idea that this

10   thing was going to take off.  No one had any idea it would

11   ever be used once let alone how it is today.

12            At some point somebody purchased I think a couple

13   of pizzas from Papa Johns and they spent 10,000 bitcoin at the

14   time, and this might have been 2010 when this happened, and

15   that was, you know, worth $19 at that moment.  So it was the

16   first time that bitcoin had ever actually had a price because

17   somebody was willing to trade something, in this case two

18   pizzas, for this thing, this digital code, basically.

19            Did I answer your question?

20       Q.   Yeah.  I mean, what was it worth?  You said zero.

21       A.   Well, it was worth zero before somebody finally did

22   something with it, which was buy those two pizzas.  So at that

23   time 10,000 bitcoins was worth 19.99.

24       Q.   Okay.  When did you start, you know, getting into

25   it?  When did you start acquiring bitcoin?

1          A.    So my show already had an advertiser named Roger

2    Ver, and Roger was like a computer guy.  He had a business

3    called MemoryDealers.  So he was doing, like, wholesale

4    computer memory sales.  So he was already very successful,

5    probably a millionaire at that time, and he was what we would

6    call, like, an angel sponsor on Free Talk Live.  He was

7    somebody who probably never expected to actually sell any of

8    his wholesale computer memory to any of our listeners.  You

9    know, we just do, like, a general interest talk show.  So the

10   odds that somebody is listening to it that, you know, runs a

11   computer store would be pretty slim.  So he was advertising

12   with us just on the basis that he appreciated our message, our

13   libertarian message on Free Talk Live.

14          He was somebody who was listening.  He wasn't just

15   an advertiser.  He was also a regular listener.  And he heard

16   that conversation we had when the gentleman from Australia had

17   called into the show.

18          And I think that there was another call that was

19   made about bitcoin shortly after that, and he heard that

20   conversation as well.

21          I think it was the second call that he heard us

22   talking about bitcoin where I still hadn't, you know, gotten

23   into it.  I still was pretty skeptical about it.

24          Roger, he kind of caught the vision for kind of the

25   personal empowerment that bitcoin could mean for people, and

1   he went and he took some amount of his savings and he

2   purchased a large amount of bitcoin with that when it was well

3   under one dollar per bitcoin.

4        Q.   And when did you jump in?

5        A.   So because he was already an advertiser, we were

6   already taking dollars from him on a regular basis for his

7   advertisements, and he came to us eventually probably in early

8   2011 and he asked us, will you take bitcoin for my

9   advertising.

10             And at first I -- you know, I'm, like, well, we've

11   got bills to pay.  We've got to get dollars coming in.  We

12   can't pay bills in bitcoin.  And I said I would be willing to

13   take maybe 10 percent, 15 percent in bitcoin.  So that was the

14   beginning of it.

15        Q.   Okay.  And when you started to first acquire

16   bitcoin, what would the dollar value be of the bitcoin that

17   you were acquiring?

18        A.   I had to go back to the charts.  You can go online

19   and pull up, you know, historic charts to see what the price

20   of bitcoin was at any given time.

21             In the year 2012 it tended to be below $10 for the

22   super majority of the year.

23             In 2011 it would have been probably less than $5.

24        Q.   Okay.  Let's just jump ahead.  What is it worth

25   now?

1    A.   I think the last time I looked within the last few

2    days it was at around $16,500 apiece.

3    Q.   All right.  So that's quite an increase.

4    A.   Yeah.

5    Q.   All right.  And you got in early?

6    A.   I did, fortunately, yes.  It would have been better

7    if we had taken 100 percent in bitcoin at the time, but it

8    turned out 10, 15 percent worked pretty well.  And over time

9    we did end up getting to 100 percent.  Roger is still an

10   advertiser to this day.

11   Q.   Okay.  Now, when did the bitcoin situation kind of

12   meld up with the Shire Free Church?  How did that -- what's

13   the genesis of that, and what's the reason?

14   A.   Well, the Shire Free Church was founded in 2013

15   because we wanted to create a church that was a peace church,

16   which isn't unheard of.  There are some other peace churches

17   out there such as the Quakers and I think Jehovah's Witnesses.

18   A peace church being -- the primary mission of the church is

19   to foster peace.  So we wanted to do that considering that

20   Free Talk Live is a moral teaching platform.  We are on the

21   air seven nights a week doing a live radio show talking about

22   peace and liberty and individual freedom and morality, and so

23   we thought that would be a perfect thing to kind of roll

24   underneath the idea of the Shire Free Church which we had

25   already, you know, created.

1          And then eventually -- again, this whole time, you

2    know, the show was taking in bitcoin as revenue, and so that

3    was all donated to the Shire Free Church.

4          And then eventually in 2014 I had the vision for

5    being able to make bitcoin more available to the average

6    person because it was fairly complex at that time especially

7    to get bitcoin.  It would usually involve having to go online

8    through certain websites and jumping through all kinds of

9    hoops.  And so I wanted to launch a bitcoin vending machine

10   for that purpose.  To make it simple to where you would just

11   put cash in a machine and you get a bitcoin out.

12         That was kind of where that came from, and it is my

13   belief that bitcoin helps foster peace so it seemed to

14   dovetail perfectly with the church mission.

15   Q.    All right.  So the proceeds or the so-called profit

16   that you would get, where does it go?

17   A.    Well, you know, the term profit -- we're not a

18   profit-seeking entity as a nonprofit, but when you sell a

19   thing, this code, this bitcoin, there's money that is coming

20   in, there is revenue, and that is put right back into church

21   operations, church outreach programs, and purchasing more

22   bitcoin to, you know, have in our inventory and increasing

23   that over time as well.

24         Because basically we see the dollar as being

25   against God, you know?  It's used to go to war.  It's used to

1    kill innocent people all around the planet.  And so every

2    dollar that we can get out, and also euros or whatever other

3    government central bank money that we can get out from

4    people's hands and turn it into something valuable, not just

5    bitcoin but also gold or silver, is something that we can

6    disempower the warmongering state with, and hopefully that

7    will lead to more peace.

8         Q.   Okay.  I mean, is that the general mission of the

9    church?

10        A.   The church mission is to foster peace through

11   whatever means necessary.

12        Q.   Okay.

13        A.   Peaceful means, of course.

14        Q.   Right.  Okay.  I'm going to hit on some general

15   subjects, and then we're going to get specific, okay?

16        A.   Okay.

17        Q.   The bitcoin vending machine, when's the first time

18   that you engaged in purchasing one or operating one or, you

19   know, actually placing one in a building?

20        A.   Yeah.  So a friend of mine was running a thrift

21   store in Keene at the time on Route 101, which is a fairly

22   busy thoroughfare in Keene, and somehow I did the research at

23   the time looking into different bitcoin vending machine

24   operations that are actual physical machines.  There weren't

25   very many options.  And there was one that was relatively

1    affordable for a thousand dollars called a Skyhook.  It was a

2    tiny little thing maybe about as wide as this tissue box and

3    about that high.  And so I purchased one of those, and we put

4    it in this thrift store that was run by a friend of mine.

5         Q.   Okay.  And that would be where?

6         A.   Route 101 in Keene.  It's also known as Marlboro

7    Street.

8         Q.   All right.  And when you first put that machine in

9    there, how was it stocked?  I mean, how do you get these

10   bitcoin?  What's going on with that?

11        A.   Well, the church already had a significant amount

12   of bitcoin by this time.  We're talking about 2014.  So by

13   that time we were probably definitely taking 100 percent of

14   our advertising dollars from Roger in bitcoin.  I don't know

15   how many hundreds of bitcoin it would have been at the time,

16   but it would have been some probably number of hundreds if

17   not, you know, maybe thousands of bitcoins at that point.  So

18   we had plenty of inventory as is, but you would then purchase

19   more on bitcoin exchanges or from individuals who might be

20   willing to sell you some.

21        Q.   Okay.  So this is all the -- the bitcoin that is

22   being distributed from the machines, who owns that?

23        A.   In our case it's the Shire Free Church.  In the

24   case of other bitcoin vending machines or what some people

25   would call ATMs, and I don't think that's a good name for it,

1    but in other cases those machines don't have their own

2    inventory.  They are purchasing from an exchange and

3    delivering it instantly to the customer.

4           We didn't do it that way.  Ours sold from what you

5    would call a hot wallet, meaning the machine that we had

6    interfaced with what they call a full mode of bitcoin that we

7    were running, that the church was operating.

8        Q.    All right.  So when people buy out of that machine,

9    it's coming directly from the church inventory?

10       A.    That's correct.

11       Q.    And why is it that you do it that way?

12       A.    Well, because we had the inventory of bitcoin.  So

13   we didn't need to use anybody else.  We didn't have to go

14   outside of our own sphere to do that.  It kept things simple.

15       Q.    Okay.  When you first organized the church, when

16   was that, 2013?

17       A.    2013.

18       Q.    What was your financial status?  Why don't you tell

19   the jury, you know, how well-off you were or whatever?

20       A.    My finances were certainly getting better than they

21   had ever been in my life at that point because, you know, as I

22   said, we had been taking in bitcoin probably since, you know,

23   as early as 2011 when it was far less than $10 per bitcoin.

24   And by I think it was 2014 when we started the bitcoin vending

25   machine, bitcoin had gone up to maybe $350.  That was a fairly

 1    typical price to see in 2014.

 2              So if you presumed that we got in all of the

 3    bitcoin that we were selling at the bitcoin machine at, like,

 4    you know, less than $10 a bitcoin, that's at least a 35X

 5    increase.  So we were doing much better at that time.

 6         Q.   How about you personally?  What was your situation?

 7         A.   When we founded the church, I donated everything

 8    that I had to the church, including the home that I lived in,

 9    the $200,000 home that is a duplex in Keene.

10         Q.   That's the one that the jury saw?

11         A.   It's that one.

12         Q.   The raid?

13         A.   That's correct.

14         Q.   And, again, I want to go back to your financials

15    just so everybody has a clear picture.

16              I mean, do you own anything like exotic automobiles

17    or anything like that?

18         A.   No.  I've always owned used cars.

19         Q.   And what do you own right now?

20         A.   I don't own anything.  The car that I drive is

21    owned by the Shire Free Church.  The church sustains me.

22         Q.   And what is the car?

23         A.   It is a 2007 RAV4 with 187,000 miles.

24         Q.   Do you have any substantial foreign holdings or

25    yachts or anything like that?

1          A.    At one point, I think it was in the year 2020, I

2    did open an international bank account.  This was on the

3    recommendation of the blockchain.com bitcoin exchange because

4    it was getting difficult to find banks that were willing to do

5    banking with in the United States for the Shire Free Church.

6    So that's why I opened that account.

7          Q.    So there is an account, it was opened, and is that

8    the one that was brought to the jury's attention?  I think it

9    had a Nevis identifier on it?

10         A.    Yeah, Nevis in St. Kitts is where it was located.

11         Q.    And where did the money come from that went into

12   that account?

13         A.    One of my other accounts in the United States.

14         Q.    And was that a church account, as well?

15         A.    I don't recall whether it was a church account.

16   Basically every account that I had to me was a church account

17   whether it had the name Shire Free Church on it or not.  If it

18   was an account in my name, I was doing everything for the

19   church.

20         Q.    Yeah, let me ask you this.  Do you draw an income?

21         A.    No.  That's, I believe, the legal term.

22               The church sustains me.  I have a parsonage.  The

23   house that I live in is owned by the church.  And, obviously,

24   you know, I buy food and gas to put in the church car.

25         Q.    And what do you do?  I mean, you are a minister in

1    the church?

2         A.    That's correct.  I'm one of the founding ministers.

3         Q.    And what is your duty?  What do you do?

4         A.    Well, with the Shire Free Church it's a

5    decentralized organization, which is a little bit different

6    from your typical sort of organized religion.  There's nobody

7    to tell me what to do per se, but I do whatever it is that God

8    calls me to do to spread the message of peace.

9         Q.    And what would that include?

10        A.    We do various forms of outreach, including our

11   seven night a week radio show which is essentially our church

12   ministry.  I'm sure many people are familiar with television

13   or radio church ministries.  That's essentially what we're

14   doing with Free Talk Live.

15             I also do a lot of in-person outreach where I help

16   inform people of things like knowing your rights.  So, for

17   instance, knowing your rights in regards to interacting with

18   the police or knowing your rights in regards to being on a

19   jury.

20        Q.    Okay.  And how about contributions?  We heard a

21   little bit this morning, but what are the other outfits or

22   individuals that you contribute to?

23        A.    Unfortunately, we're not able to get Nfuna Johnson

24   in here from Uganda where the Shire Free Church did a

25   significant amount of fundraising and donations to contribute

1    to an orphanage in Jinja, Uganda.  We did put in the visa

2    application for Mr. Nfuna Johnson, the founder of that

3    orphanage, and unfortunately the State Department denied his

4    travel here.  Otherwise, we would have loved to have

5    introduced you to him as well, but that was one of them.

6            Of course the Hundred Nights locally.  The Keene

7    Community Kitchen, which was mentioned earlier, was also some

8    place I've donated.

9        Q.    All right.  Any other things that you're doing with

10   regard to community action?

11       A.    Well, like I said, we do a lot of outreach

12   projects.  One of the things that we did with some of the

13   revenue from the bitcoin vending machines and LocalBitcoins

14   was we rolled that into promotions of cryptocurrency and

15   helping local people in the Keene area understand what bitcoin

16   is.

17           So we did a long series of advertisements on a

18   local radio in Keene.  We also did not just radio ads but we

19   did some print ads.  There's, like, a newspaper called the

20   Monadnock Shopper in the Keene area that's, you know, kind of

21   like an advertorial newspaper where they talk about local

22   businesses and, you know, new businesses that open, that kind

23   of thing.  So we had some featured articles in there.

24           And in addition to the sort of educational aspect,

25   we also did giveaways on these platforms.  So the radio ads

1    would also include a giveaway option.  People could reach out

2    to me, and hundreds of people in the Cheshire County area have

3    done this, reached out to me.  If they were new to bitcoin, I

4    would give them $50 worth of cryptocurrency just for simply

5    entering our giveaway contest, and then at the end of each

6    month --

7                    (Court Reporter asks witness to slow down)

8         A.    Sorry.  It's a bit of an adrenalin rush sitting up

9    here.

10                   So at the end of each month we would give $500

11   worth of cryptocurrency to a randomly chosen winner who had

12   entered that contest previously, and we did that for some

13   number of years in Keene.  So various different types of

14   outreach from knowing your rights to educating on bitcoin and

15   donating to local charities.

16        Q.    Okay.  Did you also help out with the local court

17   system, the community service aspect?

18        A.    We have certified some people's community service

19   for the local courts on more than one occasion over the years.

20   As a nonprofit in New Hampshire, we can do that.

21        Q.    Now, other than the bitcoin vending machines, we've

22   heard testimony about other means in which this is transacted.

23   Can you give the jury an explanation of what that's all about?

24   I mean, we've all seen the pictures of the people with the

25   licenses and all this stuff.  What's that all about?

1          A.    You're referring to localbitcoins.com?

2          Q.    Yes, Ian.

3          A.    So a couple years after we started the bitcoin

4    vending machine in Keene, a friend of mine introduced me to

5    LocalBitcoins.  And given the mission I had of helping people

6    get ahold of bitcoins, I thought this again would dovetail

7    perfectly with what we were already doing and expand our reach

8    from beyond Cheshire County to, well, anywhere in the United

9    States in theory or potentially beyond that.

10         And so we signed up -- or I signed up for an

11   account at LocalBitcoins and began the process of offering

12   bitcoins for sale in that particular marketplace there with,

13   again, the intention of revenue being rolled right back into

14   the Shire Free Church and using the money that was coming in

15   from all over the country to help promote bitcoins more in New

16   Hampshire.

17         Q.    And was that working out okay?

18         A.    It was working great generally with the exception

19   of the, you know, occasional scam attempt.

20         Q.    Yeah, let's talk about that for a second.

21         What were you experiencing -- you were kind of like

22   new to that situation, right, when you entered the

23   LocalBitcoin?

24         A.    Yeah, when I signed up for LocalBitcoins, there's

25   not, like, a training seminar or anything like that.  They

1    just kind of, you know, dump you into the site, and then you

2    kind of have to figure it out.  You have a little bit of

3    information about the different types of -- you saw some of

4    the advertisements earlier in the trial.  So there were

5    different payment methods that you could elect to accept from

6    people who wanted to buy bitcoin.

7          They did have a ranking on the different payment

8    methods.  Some of them were what they would call high risk,

9    meaning that there was a high risk that the person who was

10   buying from you could have the transaction reversed.

11         And so, as we learned earlier, bitcoin is

12   irreversible.  So once you send the bitcoin to the purchaser,

13   you can't just claw that back, but some of these payment

14   methods using banking systems or cards or whatever, almost all

15   of them can be clawed back somehow.  So if you were to

16   encounter a scam artist, they could take the bitcoin from you

17   and then claw back their original payment.

18         So there was a high risk, there was a medium risk,

19   and there was a low risk.  Different forms of payment that had

20   sort of these different rankings.  So I went with the lowest

21   risk payment type which was cash deposits at a bank.

22    Q.   Okay.  And what was your experience with these

23   scammers out there?

24    A.   They were in the minority on the site, but they

25   were certainly there and they were always looking for an

1    opportunity to take advantage of you if you weren't paying

2    attention and if you didn't have the right steps in place to

3    prevent their scams.

4            So they started showing up first in the form of

5    just basically taking money out of the church bank accounts.

6    So the way you can do that with this old banking system is if

7    you have a routing number and you have an account number for

8    somebody, you can just put that information into just, like,

9    your credit card payment system or your car payment system,

10   and just pull money out of somebody's account.  And that's

11   what happened to our accounts.  I noticed that there were

12   people paying their credit card bills, and, I mean, it didn't

13   happen all the time, but every now and then I would log into

14   the bank account and, like, $2,000, where did that go?  Oh, it

15   went to somebody's car payment.  And obviously that wasn't

16   authorized.  So you would call the bank up, and they call the

17   other bank and they get the payment back.  So we got that

18   taken care of.  But it was things like that that happened

19   early on that made me realize, okay, I definitely need to

20   start putting more security into place.

21        Q.    And how did you actually put more security into

22   these transactions?

23        A.    So I added requirements for people to show

24   identification both before and after their purchase.  The

25   reason why you want to do it both before and after is because

1   you want to prevent what's called a man-in-the-middle attack.

2   At some point early on I did learn about this particular type

3   of scam, and so I built security requirements to try to

4   prevent that from happening.  The idea of the

5   man-in-the-middle attack is the scam artist will open the

6   trade with you, show their ID, and if they don't have to show

7   later on that they were the ones that made the purchase, well,

8   they might send a scam victim in to make the deposit.  Maybe

9   they'll tell the scam victim that they're going to sell them a

10  car or something like that, like, you know, an ad on

11  Craigslist.  So somebody walks into your bank, they put $5,000

12  in, they think they're going to get a car, and they don't get

13  anything from the scammer.  But if I don't check on the back

14  end to make sure that the scam artist has the exact receipt to

15  prove that, well, in this case hopefully not a scam artist but

16  the actual person who wants bitcoin is buying and making the

17  purchase, making the deposit at the bank, and showing the

18  receipt at the end next to their face to prove that they were

19  the actual individual, then I don't know who made that

20  deposit.

21          And having that particular system did catch at

22  least one scam in the process.  We were able to save an

23  elderly gentleman from losing $4,000 in that case.

24      Q.   All right.  So would you actually try to, you know,

25  figure out if people were being scammed?  I mean, did you have

1  a system for that?

2        A.    Absolutely.  The whole point of the system was to

3  make sure that the buyers were aware of what they were

4  purchasing because of, again, the man-in-the-middle scam, it's

5  not unheard of for these scammers to go on, like, Craigslist

6  and make an offer for a car.  Somebody comes in there and

7  says, I want to buy your car.  The scammer says, sure, just

8  drop it in this bank account, and meanwhile the scammer is

9  trying to fool me into thinking that they're the ones that are

10  making the deposits.

11            So having all these requirements in the way makes

12  it very, very difficult for those scam artists.  And, again,

13  it very rarely happened, but it did.

14            There was another scam that was particularly

15  brazen.  Some of them were particularly, like, surprisingly

16  brazen.  Even though I was requiring identification, at least

17  on I think two or three occasions we had somebody walk into a

18  bank, deposit cash into an account, my account, and then they

19  -- they had to show an ID, and then they walked out of the

20  bank.  They took the picture with their receipt.  And I have

21  them write words on the receipt like for bitcoin purchase, no

22  refunds, things like that.  They showed me the picture of the

23  receipt.  I verified the bank account had the money that was

24  put into it.  Everything looked good so I released the bitcoin

25  to the individual.  I think it's all over and done with --

1          THE COURT:  Again, you've got to slow down a little
2    bit.
3          THE WITNESS:  Sorry.
4          THE COURT:  Just try to breath a little bit.
5          THE WITNESS:  Yeah, no problem.
6      A.    So they would put the money into the account, I
7    would verify that the funds were there, and then I would
8    release the bitcoin to the person who had put money in.  They
9    showed their ID, they had their receipt, and then I would
10   learn later that the money disappeared from the account later
11   on in the day, maybe an hour or two later, and I would call up
12   the bank and say, what happened here, and they would tell me,
13   oh, so-and-so came back in and said he put the money in the
14   wrong account so we just gave it back to him.  And that's the
15   bank's error in that particular case, but that would be what
16   you would call -- what do they call that?  It's where --
17   social engineering I think is the term for that, meaning that
18   this person was so persuasive, you know, a con artist, they
19   were so persuasive they persuaded a bank teller to do
20   something they weren't supposed to do, which is take money out
21   of someone else's account, my account, or the church account,
22   and give it back to a stranger who deposited it.
23          So in some cases it didn't matter how much we did
24   to try to prevent scams.  Like something that brazen, you just
25   can't plan for that.

1    Q.   We heard a number of individuals come in and

2  explain their situations.  They ranged from all over the

3  place.  Social Security scam, the romance scam, the, you know,

4  I'm on an oil tanker or some other thing.

5         If you caught wind of any of those things during

6  any of the give and take on LocalBitcoins, what would you be

7  doing?

8    A.   Well, we would put a stop to it if we caught wind

9  of anything like that happening.  Unfortunately, as maybe you

10  guys learned from the testimony, which was -- you know, the

11  stories are really sad.  Many of them were completely under

12  the spell of those scam artists.

13         And so what they would do is they would lie to me

14  when I asked questions of them, and at that point in the --

15  we're fast forwarding here, right?

16    Q.   Right.

17    A.   So we started with cash deposits.  Eventually, I

18  started to take wire transfers, and so the numbers were going

19  up at the time because the wires tended to be a little bit

20  larger than the typical cash deposit.  And, eventually, I

21  implemented even more restrictions and more requirements which

22  included that they would have to give me their phone number.

23  I would verify the phone number.  I had a whitepages.com

24  account.  So I would check the phone number and make sure it

25  was actually their number, because what I didn't want to do

1   was call a scammer, right, because I knew that the scammers

2   would tell these people things and they would follow their

3   every direction.  So I wanted to make sure that I could talk

4   to the actual person to see if they were being scammed.  And

5   so I would verify the phone number to make sure that it was

6   owned by the person because if the scammer told some of these

7   people to put the scammer's phone number on the paperwork,

8   then the scammer would answer the phone and pretend to be this

9   person, right?  So I wanted to make sure I was talking to the

10  right person.

11          So once I was satisfied that this was actually this

12  individual's phone number from the phone records, I would give

13  them a call and there was a series of questions that I would

14  ask them.

15          And sometimes I was able to, you know, inform

16  people that, hey, you know, you're probably talking to a scam

17  artist, and other times they just straight-up lied to me to

18  get through the procedure.

19          And Patrick Brown was one of those cases,

20  unfortunately.  I had what I thought was at that point an

21  ironclad -- I thought I'm going to catch every scammer.  I've

22  got such a great system.  I've developed it.  Battle tested.

23  Learned the hard way over time.

24          And Patrick testified that I never called him,

25  which is definitely not true.  I had an extensive conversation

1  with Patrick, and he lied to me.  I asked him if he had -- if

2  there was a third party involved in this trade.  I asked him

3  if he was being coerced, and he absolutely was being coerced,

4  but I had no idea.

5      Q.    And had you reached out to a lot of people over the

6  years?

7      A.    Absolutely, yeah.

8      Q.    I mean, we did hear from an individual that said

9  that you actually wanted to know whether or not she actually

10  wanted to spend that money.

11      A.    That's correct.  And usually there were more

12  questions than what was represented on the stand.  Why they

13  don't recall those questions -- you know, it was years ago and

14  they are up in their years so perhaps they didn't recall them,

15  but I definitely had more questions than just one for them.

16          Usually I would ask them if they knew the other

17  person that was recommending them because there was usually

18  another person that had kind of brought them in, and they

19  would always say that they knew that person, that it was their

20  friend.

21          And when I was reading the discovery in this case

22  -- I didn't know until I read the discovery in most of these

23  cases that the things they were telling me were not true.

24          And, unfortunately, the banks didn't help because

25  they had this secrecy thing at the banks, and I think that had

1    I known earlier on that there were people that were victims of

2    scams, that I would have become more aware of it early on, but

3    a lot of the times when the banks would close our accounts

4    they would just send this generic letter that said, well,

5    we're using our terms of service to break up with you, and we

6    don't have to tell you why.  Here's your check.

7            And so they never told me what was actually going

8    on.  Had they actually asked me some questions or informed me

9    -- as did happen with the Patrick Brown situation thanks to a

10   phone call from a detective.  The banks never told me

11   anything.

12       Q.    And who was the detective that got in touch with

13   you?

14       A.    Detective Alan Snoddy, if I recall, S-N-O-D-D-Y,

15   was his name.  He reached out to me in regards to Patrick

16   Brown.  Because what happened in that case was the bank that I

17   was dealing with had frozen my account because there was a

18   dispute.  So sometimes the people who were being scammed it

19   turned out would finally realize it.  And so in the case of

20   Patrick I guess at some point he did realize that, and he went

21   into his bank and he said, I was taken advantage of, I want my

22   money back.  So they called my bank and said we want to send

23   that wire back to this gentleman.  And at that point I was

24   made aware, right, because I had no idea.  My understanding of

25   Mr. Brown was that he was an older gentleman who had some

1   money to invest in bitcoin and he was doing it for investment

2   purposes.  That's what he told me on the phone.

3       Q.   Did you end up working with the detective in Texas

4   to try to --

5       A.   Yeah, I spent at least a half an hour on the phone

6   with the detective speaking to him, learning from him about

7   what happened.  He did me the favor of actually informing me

8   about what had transpired with the whole federal agent or

9   whoever, fake federal agent calling Mr. Brown and taking him

10  through all of this.  So I didn't know anything about that at

11  that time, and I provided every bit of evidence that I could

12  possibly provide to this detective in regards to assist him

13  with that.

14      Q.   When was that?

15      A.   I believe that was sometime in 2020 when that

16  happened, if I recall correctly.

17      Q.   So he would ask you for documents, and you would

18  make sure that he got them?

19      A.   Yes.  And that wasn't the only time that we

20  assisted law enforcement with investigations.

21      Q.   Why don't you explain to the jury on other

22  occasions what took place.

23      A.   Well, I already referenced an earlier case which

24  was a doctor, it turned out, in Alabama who had deposited

25  $4,000 into my account.  And this was one of those

1   man-in-the-middle scams, and we detected this one in the

2   process.  So unlike Patrick Brown, who unfortunately completed

3   the scam, this gentleman we stopped the scam midstream so to

4   speak.

5           So what had happened was -- and it's a little

6   complicated so I'll try to take it slow here.

7           I received a trade on I believe LocalBitcoins,

8   because that's where 90 plus percent of our trades were done.

9   I received a trade, and of course we put the buyer through the

10  know your customer process.  We want to get a picture of the

11  buyer.  We want to get their government ID.

12          It was a young woman in New York City or New

13  Jersey, I think in that area, and she wanted to buy, you know,

14  roughly $4,000 worth of bitcoin.  She jumped through the

15  hoops, she wrote the required notes, and everything looked

16  fine.  So, okay, now you can go to the bank, here's my banking

17  info, and a deposit was made.

18          And then, of course, I require a receipt and I

19  require the receipt have for bitcoins, no refunds, certain

20  words written on it, and I require the person take a picture

21  of the receipt and a picture of themselves holding the

22  receipt.

23          And when I got the picture of them holding the

24  receipt, I noticed something was off and I zoomed in on it,

25  and it seemed pretty clear to me that this picture that they

1    had, the receipt quote-unquote was a scan of the receipt.  It

2    was a scanned printed version of that receipt.  So it was not

3    the original receipt.  And I could tell based on some

4    graphical differences between what the receipt should have

5    looked like, you know, what the close-up -- so I got two

6    pictures, right, the close-up of the receipt and then the one

7    with the young woman holding the receipt.

8            The one she was holding wasn't the original so I

9    froze the trade.  I said, look, I can't release this bitcoin

10   to you until you give me the actual -- you know, an image of

11   you holding this actual receipt, and they got really upset,

12   and usually that's a sign that you might be dealing with a

13   scam artist at that point, like, oh, release my bitcoin, you

14   know, yelling at me through text, but I would not do that.

15           We contacted the credit union in this case.  We

16   wanted to do everything we could to find out who the actual

17   depositor was.  The police ended up getting involved in

18   Alabama and in Gardner, Massachusetts, where the credit union

19   was on our end.  So there was a credit union in Alabama, I

20   think it was Tuscaloosa at the time, and a credit union in the

21   Keene area, which was GFA from Gardner, Mass.  And between

22   them and the police and the attorneys, we were able to get the

23   older gentleman his money back because of our security

24   procedures.

25       Q.    I mean, how many other kinds of situations have you

1    had to become involved in in order to take care of some of

2    these people?

3        A.    There was another one in Daly City, California,

4    with, unfortunately, an older gentleman who lost a large chunk

5    of his mother's inheritance to an online scammer.  In his case

6    it was a romance scam.

7              I spoke with Detective Yip, I believe, in Daly

8    City, and once again provided all the evidence to show that we

9    were just simply the people from which bitcoin was purchased

10   by this gentleman.  That we weren't actually involved in the

11   scam.  That he knew he was buying bitcoin, and, you know,

12   here's all the evidence.  So we would provide whatever sort of

13   assistance that we could.

14       Q.    Okay.  Now, I'm going to hit on a couple other

15   subjects here.  Then I'm going to get into specifics with you.

16             There's been a lot of testimony about banks and

17   bank accounts and the names of the accounts, who was on the

18   accounts, why their name was on the account.

19             Why don't you explain to the jury, you know, like,

20   why Spinella's name was on the account, or Aria's name was on

21   the account, or the different churches' names were on the

22   account.

23       A.    Sure.  So in the case of Renee, she was an old

24   friend who needed assistance, she needed to earn some money,

25   and so I was willing to help her as a contractor with the

1    church.  Renee did a large amount of transactions on

2    LocalBitcoins.  I think her profile was flashed up at one

3    point with over a thousand trades just under her account.  And

4    so, you know, I trained her on what to look out for, how to

5    detect, you know, potential scams that were going on.  She was

6    supposed to come directly to me if there was anything funny

7    that she noticed about any transactions, and we would deal

8    with that as they came up.  So she had her own bank accounts,

9    you know, for that purpose.

10           Aria is Aria DiMezzo, and she is the founder of the

11   Reformed Satanic Church, which is her church in her case.

12           And then the Shire Free Church has our own accounts

13   which are separate from Aria's accounts.

14           And Aria was also doing her own thing, and the

15   Shire Free Church lent her some of the church funds in order

16   to do that.

17           Did I answer your question?

18      Q.   Yeah.  I think we're getting there.

19      A.   Okay.

20      Q.   So in Aria's case then her base was a donation from

21   your church?

22      A.   That's correct.  She had not been into bitcoin for

23   as long, and so, therefore, she did not have as many funds at

24   her resources.

25      Q.   And with regard to Renee, that situation was once

1   again her actually going out and making her own deals, I

2   guess?  I mean, she was operating her own situation?

3       A.   For the most part.  At times she would prefer to

4   not be doing the work, and so I would take over underneath her

5   account, with her permission of course, and then she would

6   just simply get paid a commission.

7       Q.   All right.  I'm going to ask you another question

8   kind of on that same kind of subject.

9            There was some kind of a dispute with a bank.  I

10  think it was Bank of America?

11      A.   Yeah.

12      Q.   And I think you stepped in for Nobody and tried to

13  claw back money that had not been returned.  Why don't you

14  explain that whole situation.

15      A.   Yeah.  Normally when a bank would freeze one of our

16  accounts, it would be -- well, usually they wouldn't tell us

17  why, right?  We would just be able to identify the transaction

18  and then we would try to go and figure out what was going on.

19  We would provide whatever sort of information we could to the

20  banks about how we were legitimate, we were legitimately, you

21  know, making a bitcoin sale to this person, and 98 percent of

22  the time we would be vindicated in those particular freezing

23  of accounts.  They would close our account anyway because they

24  didn't want us dealing with anything with bitcoin or they

25  thought the account was too high risk because as it would turn

1    out, sometimes it was a scam that was going on which of course

2    they would never end up telling us.

3            They would close these accounts, but they would

4    always cut us a check.  So we would always win the dispute for

5    -- because we had all the evidence, right?  We had the

6    evidence to prove that this person knowingly was purchasing

7    bitcoin so there was no scam on our side, and so they would

8    always cut us a check.

9            In the case of the $40,000 from Bank of America,

10   that was a woman who was buying bitcoin who I've spoken with

11   on the phone.  Her name was Cynthia Wimmer.  She had purchased

12   bitcoin on more than one occasion.  As it turned out -- she

13   had not told me this until we finally started digging into

14   this frozen transaction.  She then revealed that she was

15   actually buying at the behest of some overseas gentleman who

16   had been sending her money.  And so it was the money that she

17   had been sent.  She had previously represented as though she

18   was a successful businesswoman and that the money was coming

19   from her, but when she revealed the truth, she revealed that

20   it was coming from this other gentleman.

21           And so apparently the $40,000 had come into her

22   account at Bank of America, and then she had sent it to the

23   Church of the Invisible Hand, which is Nobody's church, and

24   that was what was frozen, clawed back by Bank of America, and

25   then clawed further back.  So it was like a two-step process.

1    It didn't get clawed back into Cynthia's account because it

2    wasn't hers.  It went back to the original person from whom it

3    had come into Cynthia's account.

4            So it was so far removed at that point.  Even

5    though we had all the proof that Cynthia was a legitimate

6    buyer from our perspective, she was the one who was involved

7    unwittingly in a scam situation.

8            So we weren't able to win that one, but that was

9    the only one that we weren't successfully vindicated on.

10       Q.   About how many of these transactions took place

11   that you can actually, you know, go back and verify?  I mean,

12   actual total number of, you know, LocalBitcoin transactions,

13   Telegram transactions, everything combined?  I mean, how many

14   of these things?

15       A.   I mean, just on local LocalBitcoins under my

16   account alone there were 3,900 transactions by the time the

17   account was closed, you had about a thousand at least with

18   Renee, and probably several hundred each with Aria and Nobody.

19           You're looking at at least 6,000 transactions

20   probably just on LocalBitcoins amongst thousands of individual

21   buyers.

22           Some buyers would come back regularly and purchase.

23   So the number of buyers is lower than the total number of

24   trades, but it was a large number of people.

25           And that doesn't include the bitcoin vending

1    machines which would also be some unknown number of hundreds

2    if not thousands of purchases over the bulk of a decade that

3    we ran them.

4        Q.    And with these numbers that are up there pretty

5    high, what's the number of complaints that came directly to

6    you, if you can recall?

7        A.    Very few.  As I said, we usually didn't even -- if

8    there were scams that were going on, they were very hard to

9    detect even with the most invasive questions that we could

10   possibly ask.  The scam artists -- as one woman put in her FBI

11   report that I learned about in discovery, her name was Karen

12   Miller, I think you saw her name earlier, she told the --

13              MS. MACDONALD:  Your Honor, it's hearsay.

14              THE COURT:  It's intended for what's offered?

15              MR. SISTI:  Yeah, it's offered for an example of

16   what actually he was experiencing.  He can't really testify to

17   the truth of the statement.  Only what he knows was expressed

18   to him.

19              THE COURT:  Yeah, but your question for him was

20   what's the number of complaints that came directly to him?

21              MR. SISTI:  Yeah.

22              THE COURT:  It's definitely not responsive to that.

23       Q.    Well, what were the number of complaints that came

24   directly to you?

25       A.    Very few.  I mean, less than a percentage of a

1    percent.  I mean, the bulk of my transactions were on the up

2    and up.  We have tremendous feedback from this, and there were

3    very few.  Even the prosecution offered they only found 50 to

4    75 supposed victims in this case.

5         Q.   And this is out of the thousands and thousands that

6    you have dealt with?

7         A.   That's correct.

8         Q.   That's not even including the bitcoin machines, is

9    it?

10        A.   Correct.  Yeah, it was several thousand on

11   LocalBitcoins alone.  With the bitcoin machines it was very

12   rare.  Every now and then we would hear something from a store

13   owner that there might have been someone coming in who was

14   possibly involved in being scammed, and we had warnings up

15   about those scams.  And, again, it was one of those things

16   where, you know, even if you have a conversation with a

17   person, if they believe that they're in love with someone and

18   they want to purchase that person bitcoin -- I've even said to

19   people over the phone before, I've said -- who might have

20   said, like, oh, this is for my husband, or something like

21   that, and I would say something like, listen, ma'am, you know,

22   it's none of my business, but I have to ask.  Have you ever

23   met your husband?  And sometimes they would say yes, and I

24   don't know if they were telling me the truth.

25        Q.   I want to go to one specific situation.  And we

1    heard from this IRS agent, remember that?

2         A.    Oh, yes.  I remember Pavel very well.

3         Q.    Yeah, I want to talk about that for a second.

4    That's one of the money laundering charges that's out there

5    for the jury to consider.

6         A.    Right.

7         Q.    And we heard him testify.  And, actually, we heard

8    a wire intercept, because he was wired, and an exchange there.

9    But I want the jury to understand this thing fully.

10         How did you ever even get to know this guy or meet

11   this guy?

12         A.    The first time Pavel reached out was through

13   LocalBitcoins.  He opened a trade I believe that was shown to

14   you guys for I think roughly $500, which was my minimum trade

15   amount, successfully completed the trade, he showed his ID, he

16   showed the receipt, all the hoops were jumped through by him,

17   and so, okay, great, thank you.

18         And then he came back and did it again and did it

19   some other number of times.  The number of times I don't

20   recall.  Probably a handful.

21         Q.    Okay.  Now, that was not --

22         THE COURT:  Counsel, let me suggest this.  Because

23   his testimony is very fast.  Maybe try to get, you know,

24   smaller bites with the Q and A.

25         THE WITNESS:  Sorry.  Just give me a down move and

1    I'll remember to slow it down or something.

2              THE COURT:  You're probably not as focused on it as

3    I am because I'm watching the reporter, and I've got to worry

4    about the record, but just answer the questions.

5              THE WITNESS:  Sure.  Thank you.

6         Q.   We'll plow through this.

7         A.   Okay.

8         Q.   I really want to talk about this guy.

9         A.   Yeah.  Me, too.

10        Q.   All right.  And I want the jury to hear it all, all

11   right?  So it is a good idea to take it slow.

12        A.   Sure.  Thank you.

13             I don't know if I finished the -- do you want to

14   reask the question?

15        Q.   I'll help you out here.

16        A.   Okay.

17        Q.   All right.  So you did a number of transactions

18   that had nothing to do with a bitcoin vending machine, right?

19        A.   That's correct.  He was primarily an online

20   purchaser.  He represented himself as living in the Albany,

21   New York, area.

22        Q.   Okay.  Now, you didn't know this guy, did you?

23        A.   I didn't know him from any other customer.

24        Q.   All right.  So after a couple of transactions with

25   him online, what takes place?

1          A.    At some point he represented that he was interested

2     in coming out to visit Keene and coming to one of our

3     cryptocurrency meet-ups.  It seemed as though he was aware

4     that there was, you know, kind of a movement of cryptocurrency

5     advocates here in New Hampshire, libertarians, for instance,

6     that were interested in bitcoin, and he represented himself as

7     being interested in joining that movement and potentially

8     maybe even moving here.

9          Q.    Okay.

10         A.    And so that was sort of his basis or his excuse for

11    coming out.

12         Q.    So did he in fact come out, and did you in fact

13    meet with this guy who represented himself as Pavel?

14         A.    Yes.  I met Pavel on more than one occasion in real

15    life at our bitcoin and libertarian meet-ups that we had.

16         Q.    And what was the general conversation and interplay

17    with him while you had actual meet-ups?

18         A.    He did a very good job of making himself appear as

19    though he was someone who believed in personal liberty and

20    someone who was very into bitcoin, a critic of big banks.  So

21    he, you know, fit right in it seemed.

22         Q.    All right.  Now at some point in time did he

23    inquire about a bitcoin vending machine or did you make it

24    known to him that such things existed?

25         A.    I don't recall at what point the vending machine

1    would have come up.  I'm sure it was something that was a

2    point of conversation at the meetings that we had.  A variety

3    of topics would have been covered at those meet-ups.

4         Q.    Up until that point in time had he indicated to you

5    that he was a heroin dealer or dealing in anything illegal in

6    any way, shape, or form?

7         A.    No.  It wasn't until the summer of 2020 when he

8    came to one of our nightcap meet-ups and revealed that

9    information.

10        Q.    Okay.  Now, these nightcap meet-ups, what are they

11   all about?  We heard a little bit this morning about it, but

12   what are they?

13        A.    They're libertarians that would come to the park in

14   downtown Keene and socialize.

15        Q.    All right.  And while there he appeared, I take it?

16        A.    He did.

17        Q.    All right.  And did he introduce himself to you?

18   How did that go about?

19        A.    It's a relatively small group.  There might have

20   been less than ten people there.  So he introduced himself to

21   pretty much everyone that was in the park and had

22   conversations that involved multiple people.

23        Q.    Okay.  Up until that point in time did you know

24   anything about his background other than what he told you?

25        A.    Nothing.  He represented himself as a used car

1    salesman or a car dealer in Albany.

2        Q.   Okay.  Now, at some point in time -- he doesn't

3    just infer.  Does he tell you that he's actually involved in

4    the drug trade?

5        A.   It was a strange conversation because I wasn't

6    really having the conversation with him.  By my recollection,

7    I was standing very close to him so I was well able to hear

8    what he was saying.  I think he was speaking with another

9    friend of mine about cars or something like that, and I heard

10   him say that he sold heroin in that conversation.  It was

11   quite clear.

12       Q.   And once you heard that he was selling heroin, what

13   takes place?

14       A.   Well, in my mind it was like red alert.  My thought

15   was this person is either an undercover cop or he's a moron.

16       Q.   So he's spouting off about selling heroin at least

17   in your presence?

18       A.   Yes.

19       Q.   What does that mean to you?

20       A.   It means, okay, this is probably an undercover

21   agent who is attempting to set me up.  Because I was well

22   aware that the federal government's agencies do these

23   undercover operations against people who sell bitcoin, and I

24   was also well aware at that point that I was being

25   investigated by the FBI because they had come and spoken to

1    Renee and Andy as far back as 2018.  And then in 2019 they

2    spoke to one of my LocalBitcoins buyers who tipped me off that

3    they were investigating me, and so I was well aware.  I knew

4    at some point they were going to try this because they always

5    try this.  This is what they do.

6         Q.    All right.  So what happens?  Let's go through the

7    progression.  You hear that.  You now have this belief that

8    he's either an undercover or a heroin dealer, correct?

9         A.    I was more likely believing that he was an

10   undercover.  Even though I told him in our chat that you

11   probably read on Telegram where I told him I didn't think he

12   was necessarily an undercover, and the reason I said that to

13   him was you keep your enemies close.  I wanted to see what he

14   was going to do next.

15        Q.    All right.  So what takes place?

16        A.    Well, he reached out to me and asked if he could

17   purchase some more bitcoin, and I told him that I would not be

18   able to do that because he told me that he did something

19   illegal for a living.

20        Q.    And that's something that the jury actually was

21   able to read off the screen?

22        A.    That's correct.  That was on a Telegram chat, and I

23   think that was July.  I think it was in late July when he did

24   that.  It was after the nighttime meet-up that he came back

25   with that.

1    Q.   All right.  So he wants to buy, and you say no way?

2    A.   That's correct.

3    Q.   All right.

4    A.   And I told him that I could not knowingly sell him

5    bitcoin because I know the language of the money laundering

6    statute.  I am well aware of the money laundering laws because

7    I've seen so many other cases where this same federal

8    government has prosecuted bitcoin sellers online, and every

9    single time they run the same thing.

10        One of the kind of interesting differences in this

11   case was he was never able to meet me alone, and, I mean, you

12   saw him sitting here.  He's kind of an intimidating looking

13   character.  I can't imagine what would have happened if I was

14   in, like, a car alone with this guy, as other bitcoin sellers

15   have been, and then he is wanting to buy bitcoin and then he

16   says he's a heroin dealer and works for the Russian Mafia.  I

17   mean, that would be a really intimidating experience, and I

18   suspect some people would have sold it to him just out of

19   fear.

20   Q.   Right.

21   A.   Luckily, I met with a group of people and I didn't

22   have that situation so it was much easier to turn him down,

23   which is what I did.

24   Q.   All right.  So he doesn't give up there, though?

25   A.   No.

1     Q.    Apparently he wants to take another crack at you.

2  When does that happen?

3     A.    It happened about a month later.  He showed up at

4  another one of our meet-ups.  This one was at Taco Beyondo in

5  Hillsborough, and after about an hour of the usual meet-up we

6  were wrapping up the meet-up and I was getting ready to go,

7  and he said something.  And there's audio of this, it's kind

8  of hard to hear it, but he says something about, hey, I want

9  to take my friend to see your vending machine.  Is it still at

10  the Thirsty Owl?  And I told him, yeah, it's still at the

11  Thirsty Owl.  And he says, can I use that?  And I said, I

12  can't tell you that you can use that.

13     Q.    What did he say after that?

14     A.    He said, all right, okay.

15     Q.    So you weren't even in Keene --

16     A.    That's correct.

17     Q.    -- when that conversation took place, correct?

18     A.    Yeah, we were at least 30 minutes away from Keene.

19     Q.    All right.  And he brings up the Thirsty Owl,

20  right?

21     A.    That's correct.

22     Q.    Does he bring up that he's going to actually make

23  that transaction that night?

24     A.    No.  He never said that.

25     Q.    I mean, did you know if he ever made that

1    transaction prior to us getting into court and listening to

2    this guy?

3          A.   I had no idea who was purchasing at the machines

4    and when they were purchasing at the machines.

5          Q.   Did you give him permission to use your machines

6    over at the Thirsty Owl?

7          A.   No.  I explicitly told him I cannot give him

8    permission to use them.  I told him I can't tell you you can

9    use that.

10         Q.   And, again, that was when you were in Hillsborough,

11   New Hampshire?

12         A.   And I believed that he was an undercover agent

13   specifically.  I had no belief that he was a heroin dealer.

14         Q.   And you didn't even know where he went afterwards?

15         A.   No clue.  He did not call me.  If you recall

16   previously when he was at Thirsty Owl before he revealed that

17   he was a heroin dealer, he called me, and because he was a

18   good buyer I accessed the machine administrator back-end and I

19   lowered the price on the machine for him, and then I raised it

20   as soon as he left.  So he got a special price in that case

21   prior to revealing he was a heroin dealer.  He certainly did

22   not call me this time.

23         Q.   That's right.  He didn't call you for that deal,

24   did he?

25         A.   No, because he knew I wouldn't give it to him, and

1    I would tell him again you're not allowed to use my machine if

2    he had called.

3         Q.    So would it be fair to say he went to the machine

4    without your knowledge?

5         A.    Correct.

6         Q.    And pumped in an amount of money that you had no

7    knowledge of the amount that would have been pumped in?

8         A.    The machine gives reports when purchases happen.

9    Sometimes I see them.  Sometimes I don't.  You know, they

10   would come in via e-mail, that sort of thing, but I would have

11   no idea who was putting money into the machine and I wouldn't

12   necessarily know when.

13        Q.    Right.  He didn't say I'm taking 20 grand and I'm

14   going to pump it in your machine at the Thirsty Owl?

15        A.    He did not.

16        Q.    All right.  And you never got contact from him that

17   he did such a thing?

18        A.    Not until I was arrested.

19        Q.    Right.  And you never sent anybody over there to

20   monitor the machine to see if he was going to do it, correct?

21        A.    No.  And what would they have been able to do,

22   tackle a police officer?

23        Q.    Well, I'm just saying nobody was there on your

24   behalf?

25        A.    No.  Certainly not.

1          Q.    And you didn't have a remote camera to see if he

2     was there, right?

3          A.    No, I did not.

4                THE COURT:  All right.  Let's take the lunch break.

5                One hour.  Let's resume at 1:30.

6                (IN COURT - NO JURY PRESENT)

7                THE COURT:  First of all, does anybody have

8     anything for the Court before we break?  No?

9                One thing I wanted to raise -- I distributed to you

10    the updated draft of the jury instructions.  The only point

11    of -- I wouldn't even call it a point of contention but point

12    of more serious discussion that we had where I made a

13    modification was in the instruction on tax evasion.

14               What I did was Mr. Sisti recommended a number of

15    factors to consider on the willfulness issue.  I didn't use

16    them all.  I used a few.  I used a few of what I thought were

17    prosecution examples, the stop sign and one other thing.  I

18    think it was a statement about -- statements.  I just said

19    statements.

20               Anyway, here's what I'm going to do with that.

21    Frankly, I don't think either side is entitled to any sort of

22    laundry list or itemized list of factors to consider, but what

23    I tried to do was strike a balance by putting in suggestions

24    from both sides.  But if we can't agree on what that's going

25    to say, I'm not going to give any sort of itemized list

1    because I don't think either side is entitled to it.

2         So look it over and let me know your thoughts.  You

3    don't have to do it now.  I just wanted to direct your

4    attention to that because I don't think there's anything else

5    in that jury charge that's going to even warrant anymore

6    discussion until you read it.

7         MR. SISTI:  I did suggest I think in our first

8    conference, it may have been when we were remote, that I had

9    requested, I don't know what's in here, I haven't read it, a

10   more expansive Maine style First Circuit instruction.  I don't

11   know if you can --

12        THE COURT:  Maine style First Circuit instruction

13   on which issue?

14        MR. SISTI:  On the tax evasion issue.

15        THE COURT:  Oh.  Well, we did add more to it.  Take

16   a look at it.  I'll certainly hear you out when it's time to

17   talk about it.

18        Thank you.

19        MR. SISTI:  Thank you.

20        (RECESS)

21

22

23

24

25

1           C E R T I F I C A T E

2

3

4        I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted:   3-1-23       /s/   Susan M. Bateman _____
                               SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25