*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 8, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * * *
                                 *
UNITED STATES OF AMERICA         *
                                 *   1:21-cr-41-JL
              v.                 *   December 6, 2022
                                 *   2:10 p.m.
IAN FREEMAN                      *
                                 *
* * * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF JURY TRIAL
DAY 1 - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


<u>Appearances</u>:


<u>For the Government</u>:          Georgiana L. MacDonald, AUSA
                              Seth R. Aframe, AUSA
                              John J. Kennedy, AUSA
                              United States Attorney's Office



<u>For the Defendant</u>:          Mark L. Sisti, Esq.
                              Sisti Law Offices



<u>Court Reporter</u>:            Liza W. Dubois, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              55 Pleasant Street
                              Concord, New Hampshire 03301
                              (603)225-1442

I N D E X

                                                          PAGE

PRELIMINARY INSTRUCTIONS                                    7

OPENING STATEMENTS

By Ms. MacDonald                                           25

By Mr. Sisti                                               45

```
1                    P R O C E E D I N G S
2              THE CLERK:  In the matter of 21-cr-41-01-JL, United
3   States vs. Ian Freeman, the government has premarked exhibits
4   100 series through 3100 series to which objection has been made
5   and shall remain marked for identification at this time.
6              Defendants have premarked Exhibits A through L-2 to
7   which the objection has been made and shall remain marked for
8   identification at this time are as follows:  A-1 through A-4,
9   C-1 through C-4, D-1 through D-7, E-1 through E-3, F, G, H-1
10  through H-2, I, J-1 through J-10, K, L-1 and L-2.
11             Is everybody in agreement with that?
12             MS. MACDONALD:  Yes.
13             MR. SISTI:  Yes.
14             MR. AFRAME:  Not the D ones.
15             THE COURT:  You only got rid of -- you only got rid
16  of 2, 3, 4, 5 and 6.  You still have 7.
17             MR. AFRAME:  You just said D1 and D7?  Okay.
18             THE CLERK:  Yeah, I just wrote it on the exhibit
19  list here.
20             MR. AFRAME:  Okay.
21             THE CLERK:  Okay.  We're all set.
22             Court is now in session and has before it for
23  consideration jury trial in criminal case 21-cr-41-01-JL,
24  United States vs. Ian Freeman.
25             THE COURT:  Good afternoon.
```

1          First things first.  Mr. Freeman's wife was denied

2     admission because she didn't have an ID.  The court rules

3     require an ID, but I'm going to -- I ordered them to let her in

4     today.

5               MR. SISTI:  Okay.  I can vouch for her today.

6               THE COURT:  She can come in today.  She's your wife

7     and you're on trial.  But she's going to have to have an ID

8     from now on.

9               THE DEFENDANT:  She forgot it.

10              THE COURT:  Understood.  That's why I said it's

11    probably a good idea -- she ought to be here in this trial.

12              Gentleman in the back, you don't have a mask on.

13    Yup.  We have a requirement to wear masks during the trial.

14    Sir, right up front.

15              UNIDENTIFIED INDIVIDUAL:  No one gave me a mask.

16              THE COURT:  We can give you one.  Didn't somebody

17    tell you you couldn't come into court without a mask?

18              UNIDENTIFIED INDIVIDUAL:  I walked in.  No one

19    approached me.

20              THE COURT:  Okay.  No problem.  There you go.

21              UNIDENTIFIED INDIVIDUAL:  Thank you.

22              THE COURT:  You're welcome.

23              For those of you who don't want to wear masks, we've

24    set up an overflow courtroom across the hall, Courtroom Number

25    1, where the trial will be broadcast.  So if you don't want to

1   wear a mask, you're welcome to watch it over there without a

2   mask because there'll be very few people there and you can

3   space out according to courtroom policy.

4           Now, Counsel, we had the conversation before we

5   started regarding whether the trial would be conducted with

6   masks.  Witnesses, of course, will testify without a mask.

7   They'll be tested in the morning.  Counsel examining witnesses

8   and opening and closing can proceed without a mask.

9           The jury.  I'm going to give the jury a little

10  instruction about this because they're -- there was a small

11  minority who preferred masking, but I'm going to let them know

12  if any of them change their mind during the proceeding, they

13  can let Kellie know on a break and if we get to a point where

14  the entire jury is comfortable proceeding maskless, we will.

15          But until -- while we have a jury that's not --

16  while we have jurors who would prefer to proceed with a masked

17  trial, we're going to honor that because that's consistent with

18  court policy at the moment.  All right?  So that's where we are

19  on that.  Just as an update for you.

20          Anything for the Court before we open?

21          MS. MACDONALD:  No, your Honor.

22          THE COURT:  Actually, I need to instruct before we

23  open, and I will.

24          All right.  Thanks to everybody in the gallery

25  for -- for honoring the rules.  It's very helpful.  And, again,

1    if you decide you don't want to wear that mask, just go across

2    the hall.  We'll have a nice, big, open courtroom for you to

3    watch the trial.  All right?

4              Let's get the jury.

5              We're using Courtroom 3, where we selected the jury,

6    as a jury deliberation room and jury break room during the

7    trial to give them plenty of room to space, should they want

8    it.  It takes it -- so it takes an extra minute to get them

9    from the room over to the jury box here.

10              THE CLERK:  All rise for the jury.

11                    (With the jury present.)

12              THE COURT:  Please be seated.

13              We have a juror without a mask.  Did you forget?

14              Let's talk about masking for a minute.  We'll get

15    started now.

16              You probably noticed that at the beginning of the

17    proceeding -- before you even entered jury selection, we sort

18    of conducted an informal pole of each of you individually.  You

19    probably remember Tracy asked you about your preference.  If at

20    any time -- because right now we're obviously conducting a

21    masked proceeding.  Everyone in the courtroom is wearing a

22    mask.

23              The only exceptions to that will be three,

24    basically:  It'll be witnesses on the witness stand, so you can

25    see their face; lawyers asking questions, just for ease of

1    communication; and the defendant, who has a medical waiver.

2    His doctor has provided a request to the Court that he not be

3    masked because of a medical issue.

4              Now, if any of you change your mind about this

5    proceeding, all right, just let Kellie know.  I want to make --

6    what I mean by that is this.  If you told -- if you told us

7    when you first started jury selection you would prefer if the

8    trial was masked but you've changed your mind, you prefer it to

9    be unmasked, let us know.  If you don't -- if you told Tracy

10   that you'd prefer to be unmasked but you'd rather wear a mask,

11   let us know.

12             What we're trying to do is honor your preference.

13   All right?  And if we get to a point when the entire jury would

14   prefer not to, we'll honor that.  But for now that's not what

15   we have, so we're going to proceed with masks.  That's where we

16   are now.

17             Now, we're about to start the trial and it's time

18   for me to tell you what'll be happening for the next couple of

19   weeks here.  I want to describe how the trial will be conducted

20   with this microphone and explain what we'll be doing.  You, the

21   lawyers for both sides, the prosecution and defense, and

22   myself, the Court.  At the end of the trial, I will give you

23   more detailed guidance in writing on how you are to go about

24   reaching your decision, but now I just want to explain simply

25   how the trial will proceed.

1          When you get instructions on the law at the end of

2    trial, you're each going to have your own copy that you can

3    read and refer to and take notes on and do whatever you want.

4    But for these preliminary instructions, they're a short version

5    just to give you a little bit of a preview.

6          Now, this criminal case has been brought by the

7    United States Government.  I'll sometimes refer to the

8    government as the prosecution.  The U.S. Government is

9    represented at this trial by three prosecutors, Assistant

10   United States Attorneys, Georgiana MacDonald, Seth Aframe, and

11   John Kennedy.  The defendant, Mr. Ian Freeman, is represented

12   by his attorney, Mark Sisti.

13         The defendant has been charged by the United States

14   Attorney with violations of federal law.  He's charged with

15   one count of operating an unlicensed -- unlicensed money

16   transmitting business, one count of -- one count of money

17   laundering, and four counts of income tax evasion.

18         He's also charged with two conspiracies, a

19   conspiracy to operate an unlicensed money transmitting business

20   and a money laundering conspiracy.

21         The charges against Mr. Freeman are contained in the

22   indictment.  The indictment is simply a description of the

23   charges made by the United States Attorney against Mr. Freeman.

24   It is not evidence of anything.  The defendant pleaded not

25   guilty to the charges against him and he denies committing

1    these crimes.

2         The defendant is presumed innocent and must be

3    found -- must not be found guilty by you unless all of you

4    unanimously find that the U.S. Attorney has proven the

5    defendant's guilt beyond a reasonable doubt on each of the

6    separate counts.  You'll consider each offense separately.

7         The first step in the trial will be opening

8    statements.  Just as the indictment is not evidence, neither

9    are the opening statements.  Their purpose is only to help you

10   understand what the evidence will be and what the U.S. Attorney

11   will try to prove.

12        After the U.S. Attorney opens, the defense attorney

13   may make an opening statement.  He doesn't have to make any

14   statement.  Sometimes criminal defendants don't make any

15   statements or offer any evidence.  That'll be up to Mr. Sisti.

16        At that point in the trial, even if Mr. Sisti gives

17   an opening, no evidence will have been offered by either side.

18        Next the U.S. Attorney will offer evidence that it

19   says will support the charges against Mr. Freeman.  The

20   evidence in this case will consist of the testimony of the

21   witnesses as well as the documents and exhibits.

22        Now, some of you have probably heard the terms

23   circumstantial evidence and direct evidence.  Don't be

24   concerned with these terms.  You're to consider all the

25   evidence given in trial, both circumstantial and direct.  It

1  doesn't matter whether evidence is circumstantial or direct.

2  It matters how credible you find it.  You will decide if the

3  case has been proven.

4          After the U.S. Attorney presents evidence, the

5  defendant's lawyer may present evidence on the defendant's

6  behalf, but he's not required to do so.  I remind you that the

7  defendant is presumed innocent and the United States Attorney

8  must -- must prove his guilt beyond a reasonable doubt.  The

9  defendant does not have to prove his innocence.

10          After you've heard all the evidence on both sides,

11  the U.S. Attorney and the defendant will be given time for what

12  we call final arguments or closing arguments.

13          After that, the final part of the trial will occur

14  when I instruct you on the rules of law which you are to use in

15  reaching your verdict.  I'll give each of you a written copy of

16  my instructions and I will read them to you out loud, just like

17  I'm doing now.  After hearing my instructions, you will leave

18  the courtroom together to make your decision together.  Your

19  deliberations will be secret.  You will never have to explain

20  your verdict to anyone.

21          Now that I have described the trial, let me explain

22  the jobs that you and I are to perform during the trial.

23          I will decide which rules of law to apply in this

24  case.  You will decide whether the United States Attorney has

25  proved beyond a reasonable doubt that the defendant has

1    committed the crimes of operating an unlicensed money

2    transmitting business, money laundering, income tax evasion, or

3    conspiracies to operate an unlicensed money transmitting

4    business or a money laundering conspiracy.  You must base that

5    decision only on the evidence in the case and my instructions

6    about the law.

7            I will now give you a brief overview of that law,

8    the law that's applicable to this case.  Please understand that

9    I will give you more detailed instructions on the law at the

10   end of the case which you will be able to take with you into

11   the jury room and refer to during your deliberations.  Those

12   final instructions are the ones that will govern your

13   deliberations.

14           Many of these counts have subelements or defined

15   terms that I'll explain to you in more detail when I provide

16   the final instructions at the end of the case.  But for now I

17   want to give you a general sense of these elements.  Elements

18   are just the things that the prosecutors have to prove.

19           The charge of operating an unlicensed money

20   transmitting business, he's been charged with that, operating

21   an unlicensed money transmitting -- an unlicensed money

22   transmitting business.  In order to sustain its burden of

23   proof, in other words, prove its case, the U.S. Attorney must

24   prove each of the following elements beyond a reasonable doubt:

25   One, that there was a business engaged in money transmitting;

1   two, that the defendant knowingly controlled, conducted,

2   managed, supervised, directed, or owned that business; third,

3   that the business affected interstate or foreign commerce,

4   interstate trade or commerce; and, fourth, that the business

5   was unlicensed.

6          Money laundering, Mr. Freeman's also charged with a

7   count of money laundering.  In order to prove its case, the

8   United States must prove each of the following elements beyond

9   a reasonable doubt:

10         One, that Mr. Freeman conducted or attempted to

11  conduct a financial transaction; two, that the financial

12  transaction involved property that law enforcement represented

13  to be the proceeds of a specified unlawful activity.  In this

14  case, the trafficking of controlled substances.  That means

15  illegal drugs.

16         Third, that Mr. Freeman believed that the financial

17  transaction involved the proceeds of the specified unlawful

18  activity; and, fourth, that Mr. Freeman conducted the final

19  transaction with the intent to conceal or disguise the nature,

20  location, source, ownership, or control of the proceeds of the

21  specified unlawful activity.

22         Tax evasion.  Mr. Freeman's also charged with four

23  counts of willfully attempting to evade or defeat income tax

24  each year from 2016 to 2019.  Each count refers to a different

25  year, 2016, '17, '18, and 2019.  In order to sustain its burden

1    of proof, in other words, in order to prove the case for this

2    crime, the U.S. Attorney must prove each of the following

3    elements beyond a reasonable doubt.  There are three.

4              One, that Mr. Freeman owned substantially -- strike

5    that.

6              That Mr. Freeman owed substantially more federal

7    income tax for the year in question than was indicated on his

8    federal income tax return; two, that Mr. Freeman willfully

9    attempted to evade or defeat the assessment or payment of the

10   tax; third, that Mr. Freeman committed an affirmative act in

11   furtherance of this intent, he did something in furtherance of

12   the intent.

13             Now, two other charges are conspiracy charges.

14   Conspiracies are agreements to commit a crime.

15             He's charged with a conspiracy to commit the crime

16   of operating an unlicensed money transmitting business.  It is

17   against federal law to conspire with someone to commit this

18   crime.  A conspiracy is an agreement, spoken or unspoken.  It

19   does not need to be a formal agreement or plan in which

20   everyone involved sat down together and worked out all of the

21   details.

22             In order to sustain its burden of proof to prove its

23   case of that crime, the United States Attorney must prove each

24   of the following elements beyond a reasonable doubt:

25             One, that an agreement existed between at least two

1    people to operate an unlicensed money transmitting business;

2    two, that Mr. Freeman willfully joined that agreement; three,

3    that at least one of the conspirators committed an overt act

4    during the period of the conspiracy alleged by the indictment

5    in an effort to further the conspiracy, an overt act.

6           The last offense, money laundering conspiracy.  He's

7    charged with a money laundering conspiracy.  In order to

8    sustain the burden of proof and prove that case, the U.S.

9    Attorney must prove each of the following three elements beyond

10   a reasonable doubt:

11          One, that two or more persons entered into an

12   agreement or mutual understanding to launder money; two, that

13   Mr. Freeman knowingly, willfully, and intentionally agreed with

14   one or more persons to enter into the agreement to launder

15   money; third, that Mr. Freeman entered the agreement with the

16   intent to further its unlawful purpose.

17          Now, this conspiracy charge involves the crime of

18   money laundering and I listed out those elements of money

19   laundering just a minute ago.  As I mentioned, in the money

20   laundering charge, the government alleges that Mr. Freeman

21   conducted or attempted to conduct a financial transaction

22   involving proceeds that were represented by law enforcement to

23   be from the trafficking of illegal substances.

24          In the money laundering conspiracy charge, the

25   government alleges that the money laundering consisted of a

1    financial transaction involving proceeds from a crime called

2    wire fraud.

3            All right.  Now, that was a lot, I know.  Five

4    different charges, lots of different elements.  Remember --

5    remember that you don't have to remember all of those elements

6    yet.  At the end of the case, you'll get it in writing.  So

7    when you're working through the evidence together, you'll be

8    able to refer to that in writing and you won't have any -- you

9    won't have to wonder what the elements are.

10           Now, if you find the defendant guilty, it will then

11   be my job to decide what punishment should be imposed.  In

12   considering the evidence and arguments that will be given

13   during the trial, you should not guess or even think about

14   punishment.  It should not enter into your consideration or

15   your discussions or deliberations at any time.

16           During the course of the trial, you should not talk

17   with any witness or with the defendant or with any of the

18   lawyers in the case.  Please don't talk with them about any

19   subject at all.  In addition, during the course of the trial,

20   you should not talk about the trial with anyone else, not your

21   family, not your friends, not the people you work with and,

22   maybe surprisingly, not even your fellow jurors during the

23   trial.  After the evidence portion of the trial, that's

24   different.  But during the trial, no discussions about the

25   evidence in the case.  You should not discuss this case amongst

1    yourselves until I have instructed you on the law and you have

2    gone to the jury room to make your decision at the end of the

3    trial.

4            It's important that you wait until all the evidence

5    is received and you have heard my instructions on rules of law

6    before you deliberate among yourselves.

7            Further, you should not communicate with anyone else

8    or the outside world about this case during any part of the

9    trial.  The prohibition applies to both receiving information

10   and giving information.  Do not email about it, text, tweet,

11   instant message or share information about it on any blog,

12   website, or social media platform like Facebook, Google,

13   LinkedIn -- there's a long list -- Snapchat, Instagram,

14   YouTube, Twitter, TikTok, Reddit, WhatsApp, Twitch, Parler,

15   Clubhouse, Slack, Telegram, Matrix, or Mastodon.  And I'm sure

16   there are many more.

17           This is not meant to be an all-inclusive list.  You

18   must not use any similar technology or social medium, even if I

19   have not specifically mentioned it here.  To disseminate any

20   information about the trial during the trial whether to your

21   family or coworker or to the world at large would violate both

22   my instructions and this Court's rules.

23           We don't live tweet from here.  We don't record.  We

24   don't disseminate information during the trial.

25           One other word about an even newer challenge for

1  trials such as this one.  Persons, entities and even foreign

2  governments may seek to manipulate your opinions or your

3  impartiality during deliberations using the communications I've

4  already discussed or using fake social media accounts.  But

5  these misinformation efforts might also be undertaken through

6  targeted advertising online or in social media.  Many of the

7  tools you use to access email, social media, and the Internet

8  display third-party notifications, pop-ups, or ads while you

9  are using them.  These communications may be intended to

10  persuade you or your community on an issue and could influence

11  you in your service as a juror in this case.

12        For example, while accessing your email, social

13  media or the Internet, through no fault of your own you might

14  see pop-ups containing information about this case or the

15  matters, legal principles, individuals, or other entities

16  involved in the case.  Please be aware of this possibility and

17  ignore any pop-ups or ads that might be relevant to what we are

18  doing here and certainly do not click through to learn more if

19  these notifications or ads appear.  If this happens, you must

20  let me know.

21        During the course of the trial, you'll receive all

22  the evidence you properly may consider to decide the case.

23  Because of this, you should not attempt to gather any

24  information on your own which you think might be helpful.

25  Don't do any independent research.  That's the key here.  All

1   the evidence that you'll deliberate about has to come from this

2   space right here, that witness stand, those exhibits.

3           Because of this, again, don't attempt to gather any

4   information on your own which you think might be helpful.

5   Don't engage in any outside reading on the case, the matters of

6   the case, or the individuals involved in this case, not on your

7   smartphones or tablets, not on the Internet, not at the library

8   and not in your own home.

9           Do not attempt to visit any places mentioned in the

10  case and do not in any other way try to learn about the case

11  outside the courtroom and you must ignore any information about

12  the case that you might see, even accidentally, while browsing

13  the Internet or on your social media feeds.

14          Now that the trial has begun, you must not read

15  about it in the newspaper or watch or listen to television or

16  radio reports or read Internet news or social media reports,

17  blogs, chat rooms, or anything else about what's happening

18  here.

19          The reason for all these rules, as I'm sure you can

20  understand, is that your decision in this case must be made

21  solely on the evidence presented at trial.  I expect that you

22  will inform me as soon as you become aware of your or another

23  juror's violation of these instructions.

24          At times during the trial a lawyer may make an

25  objection to a question asked by another lawyer or to an answer

1    by a witness.  A lawyer might stand up and say "objection."

2    Don't draw any conclusions from these objections or from my

3    rulings on the objections.

4              They only relate to the legal questions that I must

5    determine as the Court and should not influence your thinking

6    at all.  If I say sustained, that means I agree with the

7    objection and the evidence cannot be -- cannot come in, cannot

8    be spoken or must be disregarded.  Don't attempt to guess what

9    answer might have been given if I had allowed the question to

10   be answered.  And, similarly, if I tell you not to consider a

11   particular statement, if I say, Mr. Jones just testified to X,

12   disregard it, you must disregard it.  You can't let it enter

13   into your mind or deliberate about it.

14             Now, during the course of the trial I might ask a

15   question of the witness, me, the judge.  If I do, that does not

16   indicate that I have any opinion about the facts in this case.

17   I do not take a side in this case.  Sometimes I might ask a

18   question, though.  That either means I'm confused because I

19   don't understand something or I might be -- I might be

20   concerned that something's not clear and I want to make sure

21   it's clear for you.  So sometimes I'll ask a question, not very

22   often.

23             One thing to remember.  My questions are not more

24   important than their questions, the lawyers', just because the

25   judge is asking.  Don't think there's something special going

1    on.  It's often as simple as I didn't hear what just was said

2    or asked.

3           Let me clarify something you may wonder about later.

4    During the course of the trial I may have to interrupt the

5    proceedings to confer with the attorneys, to talk to the

6    lawyers, about some rules of law or rules of evidence.

7    Sometimes we talk up here at the bench, over at that little

8    area.  It's called sidebar.  Sometimes we'll do it using those

9    same headphones we used for jury selection.  That's what we've

10   been doing during COVID so we're not all crawling into the same

11   space.  We'll do it one way or the other.

12          But sometimes they take a few minutes.  Sometimes

13   they take 15 seconds.  But sometimes they get bogged down.  If

14   they get bogged down, what I'm going to do is give you a break.

15   I'm going to let you go back to the Courtroom 3 and be

16   comfortable and -- so that you can talk to each other and move

17   around rather than sitting there silently waiting for us to

18   resolve the issue.  I don't do it very often, but sometimes I

19   do.

20          Trust me on this.  When that happens, it makes the

21   trial move faster, not slower.  It feels like a delay because

22   nothing's happening for a couple minutes, but what we're doing

23   is working something out so it's not going to continue to keep

24   coming up and causing a dispute.  So believe it or not, even

25   though it feels frustrating sometimes, we'll take a break and

1     you're out there 20 minutes sometimes, it almost always makes

2     the trial move more quickly.

3          One thing we're always trying to do here is honor

4     and be grateful for the contribution you're making.  So we try

5     to conduct the trial as quickly as we can, but getting all the

6     evidence out to you so you can make an informed, fair, and

7     impartial decision and render a just verdict.

8          Now, last topic.  Note-taking.  You have permission

9     to take notes.  We've probably already given you notepads,

10    right?  Do you have them?  Good.

11         Now, the fact that you've been given permission to

12    take notes doesn't mean you have to take notes.  You are not

13    required to take notes.  You're just allowed to.  If you decide

14    to take notes, and that's up to you, you must observe some

15    limitations.

16         First of all take notes sparingly.  Don't try to

17    transcribe what's going on.  Only -- only the court reporter

18    can actually do that.  It's difficult.  And if you get -- if

19    you try too hard to transcribe and write everything down,

20    believe me, you're going to lose track of the evidence.  You're

21    going to be writing instead of listening.  Your job is to

22    listen and to watch those witnesses.

23         But sometimes it's -- it is helpful to sparingly

24    take notes to help you remember a name or a date or an

25    identity, a relationship, just some detail.  Nothing wrong with

1    taking notes for that and you should do it, if you want to.

2            Secondly, when you're taking notes, don't be

3    distracted from the ongoing trial.  Overindulgence in

4    note-taking is unreasonable and unnecessarily distracting.

5    It's your duty as a juror -- the most important thing you'll be

6    doing is assessing the credibility of the witnesses that appear

7    in the witness stand.

8            In order to assess each witness's credibility, you

9    must observe the demeanor and the appearance of each witness.

10   That's why they're not going to be wearing masks.  Note-taking

11   must not distract you from that task.  If you wish to take a

12   note, don't sacrifice your ability and opportunity to make

13   important observations about the witness first.  You can make

14   your note after you make your observations.

15           Keep in mind that when you ultimately make a

16   decision in this case, you will be relying primarily on your

17   eyes and your ears and your mind, your ability to reason

18   together, and not on your fingers, not your notes.

19           Third, finally, don't use your notes as authority to

20   persuade other jurors.  Your notes are not official transcripts

21   and your notes should be used only as aids to your own memory

22   and not as authority to persuade other jurors what the evidence

23   was.  You could have made a mistake in what you wrote.  You

24   could have misunderstood the evidence or didn't hear it

25   correctly.  In the end, you each must rely on your own

1    recollection or impression as to what the evidence was.  Your

2    notes are not official transcripts.  So with those limitations,

3    though, you are given permission to take notes.

4            At the end of each day, during any breaks in the

5    day, please place your notes in that envelope which was

6    provided.  The envelope will be taken and secured each night,

7    locked up.  The envelope will be returned to you at the

8    beginning of each day.  At the conclusion of the case, after

9    you have used your notes to deliberate together, they will be

10   collected and they will be destroyed.  Nobody will see your

11   notes.  No one will violate the secrecy of your deliberations.

12           If you choose not to take notes, by the way,

13   remember that it's your own individual duty and responsibility

14   to listen carefully to the evidence.  You can't give this

15   responsibility to someone who takes great notes.  You might be

16   sitting close to somebody who's a great notetaker.  That

17   doesn't mean you free-ride and check out mentally.  Everybody

18   has a responsibility to observe, watch, hear, and recall the

19   evidence as best they can.

20           We depend on your judgment as individuals and then

21   collectively as a group to remember what you can about the

22   evidence in the case.

23           That's it.  Thanks for paying such close attention.

24   We're going to get started now with the trial.

25           Any -- anything from counsel about the instructions

1  first?

2           MS. MACDONALD:  No, your Honor.  Thank you.

3           MR. SISTI:  Thank you, Judge.

4           THE COURT:  All right.  Now, in court, the first

5  part of the trial after we select the jury is opening

6  statements.  Just a reminder, these are not evidence.  The

7  things the lawyers say are not evidence.  The evidence in the

8  case is testimony and exhibits and sometimes what we call a

9  stipulation, an agreement.  But that's it.  Opening statements

10 are not evidence, but they are a preview of the evidence that

11 the lawyers intend to present to you.  So we do that first.

12          Under our rules of procedure, the prosecution, with

13 the burden of proof, gives the first opening.  Who's opening

14 for the United States?

15          MS. MACDONALD:  I am, your Honor.

16          THE COURT:  AUSA MacDonald will open.

17          You may proceed.

18          MS. MACDONALD:  Thank you.

19          THE CLERK:  Your Honor, may I administer the oath?

20          THE COURT:  Let's swear the jury in.  That's sort of

21 important.  Yeah.  Let's do that.

22          THE CLERK:  Will the jury please stand and raise

23 your right hand.

24              (Jury sworn by the deputy clerk.)

25          THE COURT:  Thank you, Kellie.  I appreciate that.

1                    THE CLERK:  You're welcome.

2                    THE COURT:  AUSA MacDonald, you may proceed.

3                    MS. MACDONALD:  Thank you, your Honor.

4                    Ian Freeman ran a money transmitting business, a

5      business that exchanged U.S. dollars for bitcoin.  That

6      business was a money laundering business and you'll learn that

7      Ian Freeman had one golden rule for the criminals that he

8      served:  What you do with your bitcoin is your business.  Don't

9      tell me what your plans are.

10                    This was his golden rule and it's how he invited

11     criminals to use his business to launder their money.  This was

12     his way of saying, if you produce the cash, I'll produce the

13     bitcoin, and I'll never ask too many questions about where that

14     money came from.

15                    Mr. Freeman's business served romance scammers,

16     investment scammers, scammers preying on the elderly, scammers

17     from Nigeria, scammers lying and telling their victims that

18     they were stuck on oil rigs.  All these scammers swindled their

19     victims into providing them U.S. dollars and they instructed

20     their victims to send that money to Ian Freeman in Keene,

21     New Hampshire.

22                    Ian Freeman received those dollars from the victims

23     and he sent anonymous bitcoin to the scammers.  Why?  To help

24     them hide their tracks.  And in exchange for this service,

25     Mr. Freeman charged a fee, a substantial fee, a fee well in

1    excess of what you would pay if anonymity and hiding your

2    tracks were not your primary concern.

3              Ian Freeman is charged with money laundering.  He

4    designed his bitcoin business to serve these scammers so they

5    could hide their ill-gotten gains in anonymous bitcoin.  That's

6    what money laundering is.

7              What you do with your bitcoin is your business.

8    Don't tell me what your plans are.

9              This, you will learn, was his invitation to

10   criminals and his golden rule was also a way for him to close

11   his eyes and pretend he wasn't aware that his bitcoin customers

12   were scammers defrauding people of their life's savings.

13             Now, I'd like to talk a little bit more about

14   bitcoin, as it may be new to some of you.  And you won't need

15   any expertise to understand the evidence that you'll hear in

16   this trial.  But if it is new to you, you'll learn that bitcoin

17   is a type of virtual currency.  It's not something physical

18   that you can hold in your hand like a U.S. dollar or a quarter.

19   It exists only on a computer.

20             But, like dollars, it holds value.  It can be used

21   to buy things like a pizza or paper services, like getting a

22   car detailed, and it can also be used as an investment.

23             Now, I want to be clear from the outset that this

24   case is not -- that selling bitcoin itself is not illegal.

25   This case is not about the fact that Ian Freeman used bitcoin.

1  Rather, this case is about how Ian Freeman sold and exchanged

2  bitcoin in illegal ways and how he used it to launder money.

3          And I expect that you'll hear testimony about two

4  properties of bitcoin that are significant.  The first is that

5  it's pseudoanonymous, and that's a long word that means that

6  when you transact with bitcoin, when you send it, when you

7  receive it, you don't use your name or any account information

8  that identifies you like you do if you use a credit card or if

9  you make a deposit into a bank account.  All you need is a long

10  string of letters and numbers to send and receive it and nobody

11  knows that that's -- that string of letters and numbers, called

12  an address, nobody knows that's yours unless you choose to tell

13  them.

14          And the other property is that bitcoin transactions

15  are permanent and irreversible.  So when I send bitcoin, I

16  can't recall it.  Once it's sent, it's gone.  So the bottom

17  line is bitcoin is just a type of currency, but it has some

18  properties that make it unique and those unique properties

19  happen to be enticing to scammers.  It's harder to identify who

20  owns it, and it can't be recalled once it's sent.

21          During this trial, you'll meet a number of witnesses

22  in their 50s, 60s and 70s who've traveled here from all across

23  the country.  Many of them have no idea what bitcoin is or how

24  it works.  What they have in common is that they were victims

25  of scams, many of them romance scams.

1    They met someone online who professed to love them

2  and eventually convinced them to send money; I need to pay the

3  taxes on my inheritance, once I do that, you know, I'll pay you

4  back when I come to live with you in the United States.

5    That's what I mean by a romance scam.  You'll learn

6  that these scammers would tell their victims to send regular

7  dollars to Ian Freeman.  They put cash deposits into banks,

8  they wired funds from their retirement accounts, and sometimes

9  they sent stacks of cash in the mail.  They did that because

10  they trusted their scammers who professed to love them.

11    And you'll hear that Ian Freeman received these

12  dollars and he took a cut, sometimes 10 percent, sometimes more

13  than 20 percent, and then he sent the remaining value in

14  bitcoin to the scammers.

15    And remember what I told you about bitcoin.  It

16  helps the scammers remain anonymous.  And once the bitcoin is

17  sent, there's no way to get it back, even when a victim

18  realizes that they've been scammed.  This is how Freeman

19  laundered the scammed money.

20    During this trial you'll learn about ways that the

21  United States financial system is regulated by laws designed to

22  stop money laundering, just the type of activity that you'll

23  see Mr. Freeman engaged in.  And you'll hear from a

24  representative from the Financial Crimes Enforcement Network or

25  FinCEN, which is a part of the Treasury Department that

1    enforces the Bank Secrecy Act.

2              And the Bank Secrecy Act is a law that governs

3    financial institutions and businesses and it applies to banks,

4    it applies to credit unions, and it applies to money

5    transmitting businesses or money services businesses.  These

6    are businesses that exchange or transmit funds.  And funds

7    means dollars and funds also means bitcoin.

8              So bitcoin exchanges, or people who run a business

9    exchanging bitcoin for dollars, are governed by the Bank

10   Secrecy Act.  It applies to those businesses.  And you'll learn

11   that those businesses must do certain things.  They must

12   register with FinCEN.  They have to have an anti-money

13   laundering policy in place to prevent their business from being

14   used for money laundering, and they must file certain reports

15   with the government.  Some of those reports are called currency

16   transaction reports and they have to be filed for any cash

17   transaction over $10,000.  They also have to file what's called

18   suspicious activity reports and those are reports when they --

19   the company sees something that is a red flag for fraud or

20   crime.

21             So you'll learn that these businesses have an

22   obligation to understand the transactions because they have an

23   obligation to flag things if they think there's fraud or crime

24   going on.

25             These reports documenting the suspicious things, the

1　red flags, well, they often lead to police investigations.

2　It's not good for criminals like romance scammers.

3　　　　　And so Ian Freeman is charged with operating an

4　unlicensed money transmitting business, meaning that he didn't

5　register that business with FinCEN.  And FinCEN's records will

6　show it.  And you'll also hear Freeman's own words that he

7　chose not to register.

8　　　　　But you'll learn that he also didn't do the other

9　things that are required of those businesses.  He did not file

10　currency transaction reports, he did not file suspicious

11　activity reports.  In fact, quite the contrary.  He told his

12　scammer clients that he wouldn't file forms on them.  On an

13　advertisement for his bitcoin business he said, your personal

14　information will not be shared with anyone.  And he boasted, we

15　respect your privacy.  In other words, no forms, no questions.

16　The price for these criminals' anonymity was Freeman's fee.

17　　　　　And I'd like to preview for you now the way that his

18　business worked.  There were sort of three prongs to it.  The

19　first was through bitcoin kiosks, the second through a website

20　called localbitcoins.com and the third over a messaging

21　application called Telegram.  These are all arms of the same

22　business and all structured in a way to be appealing to

23　criminals who are willing to pay his fee to launder their money

24　so long as there were no questions asked about the reason for

25　the transaction.

1          What you do with your bitcoin is your business.

2    Don't tell me what your plans are.

3          So let's talk first about the kiosk business.

4    Bitcoin kiosks look a lot like traditional ATMs.  You can go up

5    to them and put in cash and get bitcoin in return.  And

6    Mr. Freeman operated kiosks at a few places throughout

7    New Hampshire; in Keene at the Thirsty Owl and at Route 101

8    Goods, in Manchester at Murphy's Taproom, and in Nashua at the

9    Red Arrow Diner.

10          And selling bitcoin through a machine, it's not

11   unlawful.  You'd never know by looking at it that there was

12   something nefarious going on.  But let's talk about what made

13   Freeman's kiosks criminal.

14          First, they weren't registered, and, second, they

15   allowed people to buy bitcoin completely anonymously.  And I

16   mean completely.  You could go up to the machine, you wouldn't

17   need an ID, no name, no telephone, no nothing.  You put in cash

18   and you gave the machine just that number-letter bitcoin

19   address and exchanged cash for bitcoin, no questions asked.

20          And for this, Freeman charged a premium.  In an

21   email that you'll see, he wrote, you can get crypto online in

22   various ways.  The cheaper methods require you to give up

23   personal identifying information, like your bank account, while

24   the vending machines at Route 101 Local Goods and Thirsty Owl

25   are basically anonymous, but you'll pay more for that

1  convenience.  Freeman's kiosks, his words, he charges a high

2  fee so you can get your bitcoin but remain anonymous.

3         And because Freeman allowed it, people came and

4  people deposited large amounts of cash completely anonymously.

5  And you'll hear evidence that he monitored those kiosks closely

6  and he'd make comments to his team of staff who emptied the

7  cash from them and say things like big spender or major whale

8  on site.  In talking about his machine at the Thirsty Owl, a

9  bar in Keene, he said, we've had old ladies go there and drop

10  40K, $40,000.

11         But despite monitoring all the money going in and

12  collecting a handsome fee, Freeman didn't file one currency

13  transaction report or one suspicious activity report and he

14  didn't collect a shred of information about the depositors like

15  he was required to do under the law.

16         Quite to the contrary.  He posted signs on his

17  bitcoin kiosks saying, do not tell our staff why you want the

18  coins.  What you do with your bitcoin is your business.  That

19  was his golden rule.

20         Now, this completely anonymous business was

21  lucrative, but it's limited in scope because these old ladies

22  that Mr. Freeman referenced had to be in New Hampshire to use

23  the bitcoin kiosks.  And so to expand his business out of the

24  state and out of the country, he had to go online.  And so

25  that's where localbitcoins.com comes in.

1    This is a website that can be compared to like a

2    Craigslist for bitcoin in that it matches people who want to

3    buy it with people who want to sell it.  And you'll see that

4    Freeman placed advertisements on that platform offering bitcoin

5    for sale.  And, of course, on those advertisements he lists his

6    golden rule:  What you do with your bitcoin is your business.

7    Don't tell me what your plans are.

8    Now, this business allowed him to reach a much

9    larger clientele because despite the local in the name, he was

10   able to reach clients, customers, all across the country on

11   localbitcoins.com, anyone on the Internet.  But, of course,

12   this model is more complicated because people in Florida can't

13   just come and put money into an ATM in New Hampshire and so for

14   this part of his business to work, he had to use banks so that

15   people could go and deposit money into a local branch of a bank

16   or a credit union or wire something from an account in another

17   state to Mr. Freeman's accounts.

18   Now, banks and credit unions, they're regulated by

19   the Bank Secrecy Act.  They file suspicious activity reports.

20   They file currency transaction reports and they have anti-money

21   laundering programs.

22   And so you'll hear evidence in this case that banks

23   and credit unions often wouldn't operate accounts for

24   Mr. Freeman's unregistered business.  They were frequently

25   closing his accounts.  And you'll see that another complicating

1  part of operating that business through the banks was that

2  banks often have the ability to recall wire transfers.  So if

3  somebody went into the bank and said, I was scammed, the bank

4  might be able to claw that money back.

5        And sometimes when a transaction looked suspicious,

6  this happened to Mr. Freeman.  And when it did happen, it was a

7  big, expensive problem because, remember, if Mr. Freeman had

8  already sent the bitcoin, that bitcoin can't be clawed back.

9  That's already sent.  So if a bank takes the money from

10  Freeman's account and gives it back to a scam victim, he can't

11  call back that bitcoin.  He's out the bitcoin.

12        And so as a result, Freeman often found himself in

13  disputes with banks.  And in these situations, he told the

14  banks about what he called his "know your customer" procedures

15  and one of the first witnesses you'll meet will walk you

16  through the localbitcoins.com records and you'll see a number

17  of examples of these advertisements and some examples of his

18  "know your customer" procedure, but it's a bit complicated, so

19  I'm going to preview it for you now.

20        If you wanted to buy bitcoin from Ian Freeman on

21  localbitcoins.com, he'd require that you send him a photo of

22  your driver's license and he'd give you specific instructions

23  if you were going to send him a wire transfer to go to the bank

24  and to write specific -- to tell the bank specific things about

25  why you were sending the wire.

1        He'd tell you to describe it as a church donation,

2   and we'll get to that in a minute; he'd sometimes tell you to

3   write purchase of virtual goods; sometimes purchase of rare

4   coins.  He never told them to write bitcoin purchase, the true

5   reason for the wire.

6        But once you'd get the receipt from the bank, you'd

7   be required to write a note on it, a different note for

8   Mr. Freeman.  And that note would say something like for

9   purchase of bitcoin from Ian Freeman on December 6, 2022, this

10  transaction is nonrefundable.  And then he'd require you to

11  take a selfie, a picture of yourself, holding up that receipt

12  with one, you know, description written to the bank and the

13  other handwritten note that you've added for Mr. Freeman and

14  send that to him before he sent the bitcoin.

15        And you'll see that sometimes he'd ask for your

16  phone number to give you a quick call and make sure that you

17  were really sending him money, but consistent with his golden

18  rule, he would never ask where the money came from or why you

19  were buying bitcoin like he was obligated to do under the Bank

20  Secrecy Act if he thought something was suspicious.  Why not?

21        What you do with your bitcoin is your business.

22  Don't tell me what your plans are.

23        And you'll notice that Mr. Freeman is very strict

24  about these photos and the notes that he instructs people to

25  write on them and he kept them in a folder on his computer

1    labeled KYC for "know your customer."  But he didn't use this

2    information to report suspicious activity like he was obligated

3    to do.  He only used this information when banks questioned his

4    activities and he used it to portray himself as a victim

5    instead of a money launderer.  And during this trial you will

6    see a lot of those photos.

7              And that brings us to the third arm of Mr. Freeman's

8    business, the Telegram business, the clients that he served

9    over the messaging application Telegram.

10             Telegram is an app that lets you send messages and

11   chat.  And you'll see that sometimes Mr. Freeman encouraged his

12   LocalBitcoins customers to contact him on Telegram, on that

13   app.  And you'll see that he kept a folder on his computer

14   called Telegram.  And in it he kept those selfies that I just

15   described.

16             Now, the average age of the people supposedly buying

17   bitcoin in Mr. Freeman's Telegram folder is over 55.  That's

18   the average.  And during this trial you'll hear directly from

19   some of the people whose photos are in that Telegram folder.

20   They'll tell you that they never communicated with Mr. Freeman

21   on Telegram.  They'll tell you that they were victims of scams.

22   And you'll learn that often the scammers would pretend to be

23   their victims when they communicated with Freeman.

24             And many of these victims whose pictures are in the

25   Telegram folder on Mr. Freeman's computer were widows or

1    widowers, victims of romance scams.  They were older, they had

2    retirement savings, and many of them sent tens or even hundreds

3    of thousands of dollars to Ian Freeman, sometimes within a

4    matter of days.

5              You'll see that Freeman knew this, that he had their

6    receipts, he had the photos, but he never once filed a

7    suspicious activity report or a currency transaction report and

8    he never asked too many questions.

9              As long as somebody got that selfie with the

10   magic words on the deposit slip, he'd take his cut from the

11   victims -- from what the victims sent, he'd send the bitcoin to

12   the scammers.  No problem.

13             You'll hear from 76-year-old Danella Varel.  And

14   you'll learn that over six days in January of 2020 she sent

15   three transfers totaling $755,000 to Mr. Freeman.  She was a

16   victim of a romance scam and her scammer asked her for the

17   money.  She never talked to Mr. Freeman on Telegram, but at her

18   scammer's request, she sent him the money and she took the

19   photos and she wrote the note.

20             You'll see her photos in Mr. Freeman's computer and

21   you will see the receipts from the Danella Varel Revocable

22   Trust account and from the TD Ameritrade account.  And you'll

23   see the photos that document her sending away her life's

24   savings in just under a week.

25             And in that time, at a 10 percent fee, Mr. Freeman

1   would have made $75,000 for a few minutes of work.  That's

2   Mr. Freeman's Telegram business.

3           And so the three ways that he sold bitcoin are, one,

4   the anonymous kiosks; two, the don't tell me why you want the

5   bitcoin localbitcoins.com business; and, three, the average age

6   over 55 Telegram business.  Those are the three ways he sold

7   bitcoin, all as part of a single money laundering business.

8           And you'll learn this business was substantial, to

9   the tune of tens of millions of dollars.  And you'll also

10  learn, as I mentioned previously, that one of the biggest

11  challenges he had to keep that lucrative business going was

12  keeping bank accounts open.  And so he enlisted others to help

13  him do that.

14          You'll learn that he hired people to open bank

15  accounts for him to use for his bitcoin business and you'll

16  hear from some of them directly.  You'll see the contracts that

17  he had each of them sign, laying out the percentage of the

18  profits that they'd get.

19          Renee Spinella, Colleen Fordham, Chris Reitmann,

20  Aria DiMezzo, and a person who legally changed his name to

21  Nobody, they all opened bank accounts that Ian Freeman used to

22  sell bitcoin.

23          And they didn't just do that in their own names.

24  Sometimes they opened bank accounts in the names of businesses

25  and other times they did so in the names of churches.

1          Let's start with Nobody.  He started the Church of

2     the Invisible Hand and Mr. Freeman used that church to open

3     bank accounts for his bitcoin business.

4          Next, Renee Spinella.  She started the Crypto Church

5     of New Hampshire and Mr. Freeman used that church to open bank

6     accounts for his bitcoin business.

7          Aria DiMezzo, she started the Reformed Satanic

8     Church and Freeman used this church as part of his business.

9          And, finally, Mr. Freeman, he himself had two

10    churches, the Shire Free Church and the New Hampshire Peace

11    Church.  And, of course, he opened bank accounts in the names

12    of both of those churches and he used those bank accounts for

13    his bitcoin business.

14          And you'll learn that these churches were little

15    more than letterhead.

16          You'll see from bank records that when Mr. Freeman

17    opened these accounts, he never told the banks that he was

18    using them for bitcoin.  To explain movements of money, he

19    would tell the banks that he was conducting church outreach; he

20    said the accounts would be used for his international ministry.

21    And when people were sending him wires into his accounts, he'd

22    instruct them to write the reason for the wire was a church

23    donation.  You will learn that pretending to be a church

24    getting donations was Mr. Freeman's deceitful way of getting

25    banks to open accounts for him.

1          And he also decided that he didn't have to pay taxes

2     on any of the income that he made from this bitcoin business.

3     He'd invoke the church here as well.  In some of his

4     bitcoin-related contracts he wrote "As a nonprofit outreach

5     project of the church, we do not collect or pay taxes to any

6     state agency regarding these operations."

7          But you'll see evidence that the real reason is that

8     just doesn't like to pay taxes and that, by the way, is another

9     crime that he is charged with.  So let's talk about those

10    charges.

11         He's charged with, one, operating an unlicensed

12    money transmitting business.  He sold bitcoin for U.S. dollars;

13    he didn't register that business with FinCEN.

14         He's charged with operating a conspiracy to operate

15    an unlicensed money transmitting business, meaning that he

16    agreed with others to do that, he had people open bank accounts

17    for him, start up the churches.  They worked together to do

18    that business.

19         He's charged with four counts of tax evasion from

20    2016 to 2019.  He willfully evaded the assessment and payment

21    of taxes.

22         And he's charged with money laundering, a conspiracy

23    to launder money, agreeing with others to launder the proceeds

24    of wire frauds and in this case that's the scams like the

25    online scams like romance scams.

1        And you'll learn that he worked with the scammers to

2   do this and that he also worked with Aria DiMezzo.  They shared

3   some of those same 55-plus clients in the Telegram folder.

4   They were in business together to launder money.

5        And, finally, he's charged with one count of money

6   laundering based on his sale of bitcoin to an undercover

7   officer who was pretending to be a drug dealer.  And that's

8   another type of money laundering, because it's illegal to

9   exchange bitcoin for funds that you believe to be proceeds of

10  drug trafficking, even if a drug deal never happened.

11       So while the other money laundering charge

12  encompasses his whole business, that one is just focused on an

13  interaction and a sale to an undercover officer.  And I haven't

14  talked much about that, so I'll preview that now before I

15  conclude.

16       You will meet an officer named Pavel.  And he went

17  undercover and bought bitcoin from Mr. Freeman.  And Pavel's

18  interactions with Freeman are key to understanding his business

19  and the steps that he took to insulate himself.  Pavel began

20  purchasing bitcoin from Freeman on localbitcoins.com and he

21  made two purchases there and he paid 9 percent and 12 percent

22  and got his bitcoin in return and he took the pictures that

23  Freeman requested.

24       And then they moved their conversation off of

25  localbitcoins.com into Telegram, that messaging app.  And

1  you'll see that Pavel got his picture in the Telegram folder on

2  Freeman's computer.  And it's then that Pavel began to drop

3  hints that he was a criminal trying to launder his money.  He

4  told Freeman things like "I'm just trying to get rid of cash,

5  LOL."

6          That's a red flag.  And you'll see that Freeman told

7  him the best way to send cash in the mail so that it's harder

8  for investigators to open the package.  That red flag was not

9  lost on from Freeman.

10          You'll also learn that when Pavel talked to Freeman

11  about driving from upstate New York to New Hampshire to put

12  money in the bitcoin kiosk, he said, I have 11K to get rid of,

13  don't want it to be too suspicious with that much cash, red

14  flag, since as we talked about, the government is required to

15  file reports for cash transactions over $10,000.

16          But Freeman reassured Pavel; no ID or phone required

17  to use it, meaning the machine.  And that's also when he told

18  him, we've had old ladies go there and drop 40K in that

19  location.

20          Pavel responded:  Okay, I'll give it a try, just

21  don't want any forms filed on me, if you know what I mean, red

22  flag, since Pavel was saying he was worried about those forms.

23          Freeman responded:  Oh, no way.  We have disabled

24  all that nonsense.

25          Freeman gets it.  No ID, no forms, no questions.

1    His business was set up to let criminals sidestep the rules

2    about reporting suspicious financial activity.

3              But then, instead of just dropping hints, Pavel

4    pushed it and he violated Ian Freeman's golden rule:  What you

5    do with your bitcoin is your business.  Don't tell me what your

6    plans are.

7              Pavel will tell you that he met Mr. Freeman in

8    person at a late night meet-up in Keene and during a long

9    conversation, he told Mr. Freeman that he was a drug dealer.

10   And he didn't say anything that night, but the next time that

11   Pavel wanted to purchase bitcoin, Freeman told him in a text,

12   and I'm going to read it, "you told me you sell drugs.

13   Therefore, to assist you with buying bitcoin would be

14   considered money laundering.  Money laundering requires

15   knowledge of the illegal activity.  I don't think you're an

16   undercover agent, but you got a little too loose-lipped.

17   Sadly, that means I cannot knowingly sell bitcoin to you."

18             You will see this conversation and you'll notice

19   that Freeman put "knowingly" in all capital letters.

20             And let me pause here, because Freeman is correct

21   that knowingly selling bitcoin to a criminal is unlawful.  But

22   it's also unlawful for him to look the other way, to put his

23   head in the sand, to ignore all the red flags so he can plow

24   ahead with the sale.

25             Freeman also told Pavel, "The undercover nearly

1    every bitcoin seller the feds have taken down have sold to an
2    undercover stating they did something illegal to get the money.
3    It's just not worth the risk to me."
4         Pavel broke the golden rule.  And yet you'll hear
5    evidence that a few weeks later Pavel put almost $20,000 in
6    Freeman's bitcoin kiosk and Freeman charged a 14 percent fee
7    and made about $2,700.  No ID, no forms, no questions.
8         During this trial we'll present evidence that
9    Mr. Freeman operated a business, an unlicensed business, and
10   that he designed it in such a way that it facilitated money
11   laundering.  He profited from that business, he repeatedly lied
12   to keep it going, and below the radar.
13        And you'll hear and see that he did some of these
14   things quite openly and that makes sense to some extent because
15   to some degree, he is a media personality.  He even once had a
16   scam victim on his radio show.  But when you tell people, don't
17   tell me what you do with your bitcoin and you publicly
18   advertise that you won't share their information with anyone
19   and that you don't file forms, you create a business for
20   scammers and other criminals.
21        And despite sending out that invitation quite
22   publicly, what Mr. Freeman didn't share were his emails, his
23   text messages, his conversations with his bitcoin customers
24   and, most importantly, that Telegram folder on his encrypted
25   computer.  You will see those things.  And it's the evidence

1    that will show you what Freeman, only Freeman, knew and Freeman

2    saw, all the red flags.

3              He knew that his business made him rich by taking a

4    portion of vulnerable people's money and sending the rest in

5    bitcoin to scammers.  That is the reason that people were

6    willing to pay his fees.  They were using him to launder their

7    money.

8              What you do with your bitcoin is your business.

9    Don't tell me what your plans are.

10             That was Mr. Freeman's way of telling the scammers

11   that as long as they were willing to pay, he was willing to

12   look the other way.

13             THE COURT:  Mr. Sisti, do you plan to open?

14             MR. SISTI:  I do, your Honor, with the Court's

15   permission.

16             THE COURT:  Please proceed.

17             MR. SISTI:  Thank you.

18             Good afternoon.  Once again, my name's Mark Sisti,

19   and seated right next to me is Ian Freeman.  And, I got to tell

20   you, we've got a lot to say here, too.  I'll try to keep it as

21   condensed and straightforward as I can.

22             I don't want to get too deep into the weeds with you

23   right away, but I must, I must, address some of the things that

24   the government has laid out before you because some of it,

25   quite frankly, is absolute nonsense.  Nonsense.

1          You heard this morning that, you know, we're a

2    country of, you know, laws.  We're a country where people are

3    supposed to follow laws.  That's perfectly fine.  But you can't

4    sit around and speculate that somebody broke laws and you can't

5    make up things and you can't omit things that a jury should

6    know about, whether it be on an opening, whether it be during

7    the course of the trial, or whether it be on closing.

8          You're going to determine what the facts are in this

9    case.  And let me tell you, it's not what the government just

10   told you.  All right?  Just because it's the federal government

11   and just because it's an Assistant U.S. Attorney, it doesn't

12   make it true.  Just because it's an FBI investigation, it

13   doesn't make it credible.  Just because it's an IRS

14   investigation, it doesn't make it unlawful.

15         And we're going to go through some of these things

16   and you're going to hear a lot as we go through this.  When

17   they put a witness on the stand, let me assure you, they will

18   be cross-examined.  And just because they say something on

19   direct, it doesn't mean it's true.  The crucible of truth, the

20   way you determine whether something is true, whether something

21   should be believed, is through the test of cross-examination.

22         And in this country, thank God, we are given that

23   opportunity.  Whether it's with the lowest and poorest of

24   people or the richest and the most famous of people, those

25   charged with crimes have the right to push back.  And that's

1    what we're going to do for the next two to three weeks.  We

2    will push back on the assumptions and the speculation and the

3    made-up stories that will be placed before you.

4            I want to go through this with you a little bit at a

5    time because it's not so easy as to what you just heard.

6            Freeman's not a scammer.  Interesting.  Over the

7    next two and a half weeks, if they are laying the entire

8    foundation of their case on him being a scammer, him locking

9    arms with scammers to hurt little old ladies, to steal their

10   inheritance, bring one on.  Place that scammer on the stand and

11   have him or her point that finger at Ian Freeman and say, I

12   locked arms with that man sitting right next to Mark Sisti.

13   And we agreed, together, to pull off a Nigerian prince scam;

14   and we agreed, together, to pull off an I need to get back to

15   the country scam or your grandson is in trouble scam.  Show us

16   one.  Show us one.  Bring him in.  You won't see one, by the

17   way.  He's locked so tight with these scammers they can't find

18   one of them.

19           They've been investigating Ian Freeman for years.

20   It's almost like he walked around with a target on the back of

21   his head.  And we'll get to that.

22           They made him out to be a bad man on opening.  He's

23   probably the most nonviolent human being in this courtroom.

24   He's helped his community and the businesses in his community

25   and little old ladies that appreciate what he did for them, not

1    just in Keene; Vermont, New Hampshire, he helped get money back
2    from a professor's mother, he helped an investigation in Texas
3    on a scam.  I'll go through a long list of just how bad Ian
4    Freeman is and what a scammer he is.
5            The church is real.  The church does real things.
6    You didn't hear from the prosecutor that the church is involved
7    in aiding the homeless in Keene, like churches do, like getting
8    food for those that need it, for actually working with courts
9    to help with community service.  You didn't hear that.
10           You didn't hear how the church, his church, set up
11   an orphanage in Uganda.  You didn't hear that.  You didn't hear
12   a lot of things.  He helps.  He doesn't hurt.
13           There's some misconceptions that have been flying
14   around and, you know, we have really been looking forward to
15   this day.  Those masks that you have on your face have delayed
16   a lot of things.  It's set back trial calendars, it's left open
17   open allegations of crime for people for a long time, longer
18   than usual in this country.  And it's time.  It's time to clear
19   the air.  And that's just what we're going to do.
20           If setting up food pantries, helping the homeless,
21   feeding the poor aren't church things, we'll figure a few out
22   yourself.  Setting up a mosque for a Muslim community in
23   western New Hampshire because they needed a place to worship,
24   that's Ian Freeman.  That's the church, helping the community.
25           He helps local businesses, businesses, some of which

1    come to him and say how can we get involved in utilizing

2    bitcoin so that somebody can buy a pizza at my store, tacos at

3    my store, how can you help us do that?  How can you help us

4    make money, Ian?

5            And what does he do?  He gives them advice and he

6    shows them how to do it, ladies and gentlemen, for free.  For

7    free.  He doesn't ask anything of them.  And they appreciate

8    it.  The prosecution knows that.  You didn't hear that, though.

9            Many, many people and many businesses have utilized

10   his services.  And he operates openly.  He operates not behind

11   a curtain, I'll tell you that much.  He's not secretive.  You

12   know the photographs that were just discussed?  My God, they

13   have his -- they have his name on them.  And he keeps them, not

14   just when the transaction is being activated, but he keeps them

15   as a record of those transactions.

16           He warns people about scams.  But you didn't hear

17   that either.  You wonder why.  Or do they want to make him out

18   to be a bad man?

19           He refuses to engage in activity.  He rejects deals.

20   He turns people away.

21           He works with law enforcement.  He's worked with law

22   enforcement on more than one occasion.  And the prosecution

23   knows that.

24           Money transmission is an interesting definition.

25   You'll hear some of the history of what went on with regard to

1    this money transmission business and the laws and the

2    regulations that were designed with regard to it.  You'll hear

3    that money transmission came into effect essentially in 2002,

4    post 9/11 situation.

5           You'll hear that cryptocurrency didn't exist in 2002

6    and that our Congress never anticipated anything like

7    cryptocurrency.  And you'll hear that the allegations that are

8    leveled against Ian Freeman right here in this courtroom were

9    based on a statute that didn't even mention the word

10   cryptocurrency.

11          We are a nation of laws.  We are a nation of giving

12   notice to people.  And the statute -- one of the statutes he's

13   being prosecuted on doesn't even mention that nasty word,

14   cryptocurrency.  They corrected it after he was arrested.  It

15   went into effect in January of 2021.  They had a brilliant idea

16   to put in that word.

17          Money transmission has to do with businesses.

18   Freeman's not in a business.  In fact, the question is whether

19   he's even transmitting anything.  And you've got a short little

20   primmer on bitcoin and cryptocurrency.  We're going to get into

21   it a lot deeper, folks.  The stuff doesn't move.  There's no

22   transmission.  In fact, it stays in one place.  But we'll get

23   there as we move along.  I told you earlier we're all going to

24   get a little bit better educated by the end of this thing.

25          But the money transmission aspect of this -- of

1   these allegations, they don't -- they're not for him.  That's

2   not what was going on with him.  And Freeman relied on a few

3   things because of that.  You didn't hear that in November of

4   2017, November of 2017, well before the time he was arrested,

5   Ian Freeman sought counsel from a licensed attorney in the

6   state of New Hampshire and an opinion letter was written and

7   sent to New York City on Ian's behalf.

8            And the opinion letter, which Ian had full knowledge

9   of and relied upon, indicated a few things.  One, Freeman's not

10  operating a business as defined.  He's operating a church.

11           Two, the material, the bitcoin itself, isn't

12  involved in an exchange.  And we'll get into these terms

13  because they mean things and words mean things in this case.

14  The bitcoin that is under his control or the church's control

15  is owned by the church.  In other words, he's not setting up

16  deals moving money from one guy to another guy to another guy.

17  That's not what's going on.  Everything that moves from the

18  church is owned by the church, which doesn't fit the

19  transmission statute.  It's theirs.  And that's in the letter,

20  by the way, that Freeman relied upon.

21           But the letter gets better and better, and he relies

22  on it because it's coming from an attorney.  He doesn't have

23  any criminal intent whatsoever and, in fact, in addition to the

24  letter from the attorney.  Our own banking system in the state

25  of New Hampshire testified, in state -- I'll give it, it's in

1    state -- but it's in the same time period that Freeman's

2    vending machines are not to be considered part of a money

3    transmission system.  They are to be considered vending

4    machines, basically like a Coca-Cola machine.  If they own the

5    material that is the subject of the machine, then it doesn't

6    fit the definition and they need not apply for a license.

7         You didn't hear that.  Things aren't so simple.

8         A nefarious operation, ladies and gentlemen, does

9    not include picture-taking, licenses of individuals that you're

10   scamming.  Why would you hold on to something like that if

11   you're scamming?  You'd ditch that junk as quick as you could.

12   I mean, it doesn't even make sense.  Photos, selfies, all

13   preserved.  Why do we know it's preserved?  The government has

14   them.  They're on his computer.  And they're years old.  And he

15   makes no secret of it.

16        You know, you bring up highly regulated business,

17   you bring up the fact that he should have noticed red flags,

18   and you heard the prosecutor tell you that a little old lady

19   dumps $750,000 over six transactions in six days.  You wonder,

20   what bank did she go to that was so highly regulated; what bank

21   wouldn't have seen those red flags, since they're so highly

22   regulated, where a local customer of theirs who's over 70 years

23   old is pulling down $750,000 in six days.  Show me that bank

24   president because that guy should be sitting next to me.

25        Those transactions weren't Ian Freeman hand-in-hand

1   with some scammer, by the way.  And there are instances, and

2   the government knows it, where Ian actually warned people;

3   there are scammers out there, be careful.  He's told them to

4   be careful.  And they go ahead and they go through with the

5   transaction anyways, I guess just like they would in front of a

6   bank teller at Bank of America.

7          The FBI agent, undercover, is a sorry excuse for a

8   desperate attempt to hang a money laundering charge on Freeman.

9   It's almost jokeworthy.  Freeman, once he heard that this guy

10  was entering or trying to enter into a transaction, essentially

11  to launder money because he said he was a heroin addict or a

12  heroin dealer, said no.  No.

13         Now, I don't know.  The government can't have it

14  both ways.  They told you he said no before this clown went in

15  to a vending machine without Freeman's permission, by the way,

16  and dumped $20,000 into it.  That was just to make it look like

17  Freeman said go get 'em, tiger.  Freeman told him no.  Even

18  their undercover guy, okay, blew it.

19         But you can't have it both ways.  If he told him no,

20  then why did he force himself in?  Why did he go in and buy the

21  20?  Does he say, oh, Freeman had a change of heart?  It's a

22  forced buy.  Can't wait till we see him.

23         By the way, it's on a wire.  Did you know that?  You

24  didn't hear that.  We're going to try to give you an

25  opportunity to listen to that wire because when he informed

1    Freeman -- after Freeman had told him no -- when he informed

2    Freeman of his heroin business and when the FBI agent said, I

3    want to go use your vending machine, Freeman told him, I cannot

4    tell you you can use that.

5              Doesn't sound like a hand-in-hand, arm-in-arm

6    agreement to launder money there, does it?  What's he supposed

7    to do, put an armed guard in front of his vending machine?  He

8    did what he did.  He said what he said.  And their little

9    undercover guy went and bought anyway without his permission.

10             These vending machines that were discussed, by the

11   way, were operated openly for years.  For years.  With the

12   signs.  The Taproom in Manchester is a very busy place.  It's

13   open to the public.  It's open to the public.  It's open to

14   police officers.  It's open to the Liquor Commission.  It's

15   open to anybody who wants to walk by.  The machine in that

16   operation operated without any problems for years.  The owner

17   had no problems there, no complaints there, no trouble there.

18   Zero.  Zero.  You could walk by outside of that place and see

19   it inside.  Nobody's hiding anything.

20             When you take a look at this case, there are two

21   sides to this particular coin and you're going to have to try

22   to figure this out.  But the most important thing about

23   criminal jury trials in the United States of America is

24   something that Judge Laplante told you early on today and that

25   he told you at 6:45 this morning; this is a rule of law nation.

1    This isn't some place where they just point a finger at you and

2    it's good enough to convict you.  You play by the rules here.

3          When I had the chance to ask you just a couple hours

4    ago whether or not you all agreed with the jury system and the

5    criminal justice system in this country, all of you nodded yes.

6    Not one of you hesitated on saying you'd come along and you'd

7    deal with this problem together with us in this courtroom.  And

8    you all agreed to follow the rules.  And I guess that's all I'm

9    going to ask you to do.

10          I really need you, and Ian needs you, to follow the

11   rules.  We need you to keep an open mind.  We need you to watch

12   the direct and the cross-examination and we need you to hold

13   your fire on coming to an opinion until we can deliver

14   everything to you.

15          We need you to honestly believe throughout the

16   course of this trial that the burden of proof is on them.  And

17   it's a heavy burden.  It's not a kind of guilty, it's not a

18   probably guilty.  It's not even like a clear and convincing

19   guilty.  In this country, it's proof beyond a reasonable doubt,

20   the highest standard in the world.

21          And if you're taking that to heart, I'll be coming

22   back in a couple of weeks and I'm going to ask you to do the

23   right thing.  I'm going to ask you to be a nation of laws.  And

24   I'm going to ask you to say not guilty, they failed.  And we'll

25   talk about it.  And you'll be proud of your decision.

```
 1                    Thank you very much.
 2              THE COURT:  All right, Counsel.
 3              I'm just going to let the jury -- I'm going to let
 4    the room clear out.
 5              We'd normally go on 90-minute blocks and then we
 6    give the court reporter a little break because it's tough to
 7    keep up with the witnesses.
 8              So it's been over 90 minutes.  I'm going to take a
 9    little break now.  I might be discharging you for the day
10    because it's been a long day with the jury selection.  Most
11    days we're going to go 9:00 to 5:00, but I'm going to talk to
12    the lawyers before I make that decision.
13              So we're going to take a little break.  I'm going to
14    ask Kellie to put you into the deliberation room for a brief
15    recess.
16              THE CLERK:  Please rise for the jury.
17                        (Jury excused.)
18              THE COURT:  We can go off the record.
19                   (Off-the-record discussion.)
20                    (With the jury present.)
21              THE COURT:  All right.  Ladies and gentlemen of the
22    jury, I'm going to discharge you for the day.
23              A reminder.  Don't talk to the -- talk with anyone
24    about the case during the recess, the overnight recess.  Don't
25    conduct any independent research or investigation into any
```

1    matter involved in this case or anything involved in the case.

2    I'll be asking you about that every morning.  It's very

3    important.

4            I'll be checking with you in case you were exposed

5    to some information that you shouldn't be considering in your

6    deliberations.  It doesn't mean that the case is over or that

7    you're kicked out or anything like that, but if somebody is

8    exposed to information, we have ways to deal with it and I'll

9    ask you about it every morning.  Okay?

10           Normally our courtroom days are 9:00 to 5:00.  There

11   are certain days where we have to end a little early, maybe we

12   start a little late depending on something going on at the

13   courthouse that I have to attend to or something, but generally

14   it'll be 9:00 to 5:00.

15           So tomorrow we'll start at 9:00.  Just get here a

16   little bit before 9:00 and we'll go to 5:00.

17           Does that work for everybody?

18           Okay.  If it turns out there's some kind of family

19   emergency or something that requires something, just let Kellie

20   know and she'll let me know and we'll figure it out.

21           All right?  But, importantly, no discussion about

22   the case, no independent research or investigation into any

23   matter involved in this case during the overnight recess.

24           And we'll start tomorrow with the Government's first

25   witness.

```
 1                    Any questions for the Court?

 2                    All right.  Yes, sir?

 3                    THE JUROR:  I actually do have one, just a simple

 4     notification to our employer that we're -- we did get selected,

 5     that okay?

 6                    THE COURT:  Yeah.

 7                    THE JUROR:  Just no details.

 8                    THE COURT:  Oh, yeah, you can talk to -- you can

 9     tell the world you're on a jury.

10                    THE JUROR:  Okay.

11                    THE COURT:  You just can't talk about the evidence.

12                    THE JUROR:  Okay.

13                    THE COURT:  All right.  Very good.

14                    All right.  Have a nice night.

15                    THE CLERK:  All rise for the jury.

16                               (Jury excused.)

17                    THE COURT:  All right.  Anything I can do for any of

18     you?

19                    See you in the morning.

20                    MR. SISTI:  Thank you.

21                    MS. MACDONALD:  Thank you, Judge.

22                    (Proceedings adjourned at 4:18 p.m.)

23

24

25
```

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 3/10/23          */s/   Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR