*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 8, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
                                  *
UNITED STATES OF AMERICA          *
                                  *   1:21-cr-41-JL
             v.                   *   December 8, 2022
                                  *   9:11 a.m.
                                  *
IAN FREEMAN                       *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY 3 - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:


For the Government:         Georgiana L. MacDonald, AUSA
                            Seth R. Aframe, AUSA
                            John J. Kennedy, AUSA
                            United States Attorney's Office



For the Defendant:          Mark L. Sisti, Esq.
                            Sisti Law Offices



Court Reporter:             Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603)225-1442

I N D E X

                                                        PAGE

HEARING RE: RENEE LEBLANC                                 3

WITNESS:                    Direct   Cross   Redirect   Recross

THEODORE VLAHAKIS
  By Ms. MacDonald                               9
  By Mr. Sisti                                             10

KATHRYN THIBAULT
  By Mr. Aframe             11                 81
  By Mr. Sisti                       47                    92

KEVIN MCCUSKER
  By Ms. MacDonald          96
  By Mr. Sisti                      101

DEREK FEATHER
  By Ms. MacDonald                            106

EXHIBITS:                            FOR ID              IN EVD.

Government's Exhibit 311                                   89

Government's Exhibit 312                                   89

<pre>
                      P R O C E E D I N G S

          THE CLERK:  Court is now in session and has before

it for consideration a motion hearing in criminal case

21-cr-41-01-JL, United States vs. Ian Freeman.

          THE COURT:  All right.  Good morning, everyone.

We're in a -- we're in Courtroom 4 during the Freeman trial.  I

was informed that Ms. Spinella, who was once a codefendant --

is a codefendant in the case but has been convicted and

sentenced, has been subpoenaed to be here today.

          So, Ms. Spinella, you're -- you've been subpoenaed?

          MS. SPINELLA:  Yes.

          THE COURT:  All right.  Let me just ask you, is it

your intention today to -- to testify in the trial or is it

your intention to assert your rights under the Fifth Amendment?

          MS. SPINELLA:  I would like to assert my Fifth

Amendment rights.

          THE COURT:  All right.  I think I'd like to appoint

you a lawyer then, if that's okay with you --

          MS. SPINELLA:  That would be good, yes.

          THE COURT:  -- just to advise you and help you

navigate the process.  All right?  So we're going to do that.

          Is there anything -- and without talking about any

of the facts in the case or anything like that, is there

anything else you want me to know about your situation?

          MS. SPINELLA:  I am curious to know what type of
</pre>

1   immunity that I was supposedly granted.

2            THE COURT:  I'm going to let your lawyer explain

3   that to you.  But, generally, it's -- it's use immunity,

4   correct?

5            MR. AFRAME:  (Nods head.)

6            THE COURT:  Yeah.  So there's a federal law that

7   says if the Attorney General believes that you would -- that

8   your testimony would be useful or important in a criminal

9   trial, but that -- but that you would -- it's your intention

10  not to testify and to assert your rights under the Fifth

11  Amendment, that the Attorney General has the power to ask the

12  Court to give you immunity.

13           And that would mean that nothing -- that would mean

14  that your testimony in the case could not be used against you

15  in any case against you and also that nothing derived from that

16  testimony, in other words, if you said something -- if you

17  provided some new information that wasn't already known to the

18  prosecutors and the agents, if you provided new information

19  that led to other information, that couldn't be used against

20  you either.

21           That's sort of the basics.  In other words, you

22  couldn't be prosecuted using information that you provided in

23  the trial or information that they learned as a result of --

24  learned as a result of you providing that information.  That's

25  the basic.  But a lawyer can tell you in real detail.  Do you

1    understand?

2            MS. SPINELLA:  Yes.  Would I be able to have a

3    couple days with my lawyer to discuss this or --

4            THE COURT:  A couple days meaning probably today and

5    tomorrow, yeah.

6            MS. SPINELLA:  (Nods head.)

7            THE COURT:  But we're going to work hard to get

8    you a lawyer as fast as we can.  In fact, if you want, if you

9    want -- now, well, if you want to stay in the courthouse for a

10   little while, we can probably try to get somebody down here for

11   you like today.

12           If you have other things to do and you can't be

13   here, we would just be in touch with you.  We'd have to make

14   sure we have your cell phone number, a way to reach you, to put

15   you together with your lawyer, help you out.  Understand.

16           MS. SPINELLA:  Yes.

17           THE COURT:  Now, here's the thing, though.  Because

18   you're a witness in the case, you can't watch the case.  You

19   can't listen to the others' testimony.  It's a rule called

20   sequestration and it just means that witnesses can't listen to

21   the other witnesses.  So -- because we want your testimony to

22   be from your memory, your experiences, your observations, not

23   on your observations of the trial.  Do you understand what I'm

24   saying?

25           MS. SPINELLA:  Yes.

1          THE COURT:  Okay.  Anything else you want to ask me?

2          MS. SPINELLA:  I just need to retrieve my stuff out

3    of that room, if that's okay.

4          THE COURT:  Oh, yeah.  We'll give you time.  So

5    we'll start that process now.

6          Will you be leaving or maybe spending a little time

7    here today?

8          MS. SPINELLA:  I at least need to go pay for my

9    parking.

10          THE COURT:  Yeah.  Here's what we're going to do.

11    We're going to start the process downstairs of getting you a

12    lawyer.  So after you go pay for your parking, come on back, go

13    to the clerk's office.  It's on the first floor.  You walk in

14    the courthouse, take a right, and you will be at the clerk's

15    office.  And they're probably going to help you -- they're

16    going to at least tell you who your lawyer is, they'll be

17    working on it while you're gone, and whether or not that lawyer

18    can come down and meet with you here today.  That would be the

19    best.

20          But if not, if either you're not available or the

21    lawyer's not available like the next few hours, at least you'll

22    be in touch with each other and you can make arrangements to

23    meet sometime today.  All right?

24          MS. SPINELLA:  Yes.

25          THE COURT:  And I understand the government, you'd

1   like her back here tomorrow to testify?

2            MR. AFRAME:  If that ends up being feasible based on

3   what happens.  If not, obviously we can do it next week.  We're

4   willing to take her out of order.

5            THE COURT:  The lawyers here on both sides may also

6   be in touch with your lawyer because they may be curious about

7   what's going on between you and your lawyer.  But this will

8   be -- this will be your lawyer.  Your conversations will be

9   private and privileged between you and your lawyer, just like

10  it was before.  Understand?

11           MS. SPINELLA:  Yes.

12           THE COURT:  All right.  All right.  So we'll get

13  that process underway now.  So go pay for your parking, get

14  that straightened out.  Come back to the clerk's office and

15  explain who you are.  They'll already know you're coming.  All

16  right?

17           MS. SPINELLA:  (Nods head.)

18           THE COURT:  All right.  Kellie, you know what to do.

19           THE CLERK:  Yes, your Honor.  I'm going to get her

20  phone number and let Kathy downstairs know --

21           THE COURT:  Yeah.  We're going to get your

22  information so we can be in touch with you.

23           All right.

24           MR. AFRAME:  Thank you.

25           MS. MACDONALD:  Thanks.

1          MR. SISTI:  Thank you.

2          (Recess taken from 9:17 a.m. until 9:20 a.m.)

3          THE CLERK:  Court is now in session, has before it

4    for consideration day three of the jury trial in criminal case

5    21-cr-41-01-JL, United States vs. Ian Freeman.

6          All rise for the jury.

7               (With the jury present.)

8          THE CLERK:  Please be seated.

9          THE COURT:  All right, ladies and gentlemen of the

10   jury.  Welcome back to court.  A little bit of a late start

11   this morning because we had a little procedural issue arise.

12   We took care of it, though, so we'll get underway now.

13         Have any of you had any conversations with each

14   other or anybody else regarding this trial during the recess?

15         No.

16         Have any of you had any independent exposure to

17   information, research, investigation, anything at all,

18   regarding the trial during the recess?

19         There being no affirmative answers, we're going to

20   proceed now.  We have a new witness.  We're about to call a new

21   witness, right?

22         MS. MACDONALD:  Your Honor, we would request a brief

23   redirect of Mr. Vlahakis.  Just a few questions.

24         THE COURT:  You may proceed.

25         MS. MACDONALD:  Thank you.

```
 1                THE COURT:  Mr. Vlahakis is still under oath.

 2                THE WITNESS:  Thank you, your Honor.

 3                THE COURT:  Thank you.

 4                      REDIRECT EXAMINATION

 5     BY MS. MACDONALD:

 6        Q.    Good morning, Mr. Vlahakis.

 7        A.    Good morning.

 8        Q.    I just have a few more questions for you.

 9              Ms. Shedd, if you could please pull up Government's

10     Exhibit 201.

11              Mr. Vlahakis, I would ask you to read the title of

12     the attachment, please.

13        A.    Sure.  Shire Cryptocoin Bitcoin Kiosk Letter

14     071318.pdf.

15        Q.    Okay.  And is it your understanding that this letter

16     we read yesterday was directed specifically at the Bitcoin

17     kiosk operation?

18        A.    Yes.

19        Q.    Okay.  And does FinCEN -- is FinCEN required to

20     notify businesses of their obligations to register and comply

21     with the Bank Secrecy Act?

22        A.    No.

23        Q.    Is it typical practice to send letters to all

24     businesses like this?

25        A.    No.
```

1    Q.    And why specifically was this letter sent, if you're

2    aware?

3    A.    This was just part of a -- a general campaign that

4    the enforcement division and FinCEN undertook to identify or to

5    try to identify virtual currency exchangers that may not be in

6    compliance, in this case, may not be registered as a money

7    transmitter, which are a form -- they're a form of MSB, money

8    services business.

9    Q.    Okay.

10   A.    If -- even if we did not send a letter like that, if

11   a money services business engages in qualifying activity, the

12   registration requirements and all other requirements attach as

13   a financial institution, whether they're notified or not.

14   Q.    Okay.  And you don't typically notify businesses?

15   A.    That's correct.

16   Q.    And they're still required to comply with the law?

17   A.    Yes.

18            MS. MACDONALD:  Okay.  Thank you.

19            THE WITNESS:  Thank you.

20            THE COURT:  You're good?

21            MR. SISTI:  Thanks, Judge.

22            THE COURT:  Yup.

23                         RECROSS-EXAMINATION

24   BY MR. SISTI:

25            Q.    So this jury shouldn't assume in any way, shape, or

1  form that Ian Freeman or any entity that he may have been

2  connected with was placed on any notice by the federal

3  government, correct?

4       A.   Correct.

5            MR. SISTI:  I have nothing further.

6            THE COURT:  Sir, you're excused.

7            THE WITNESS:  Thank you, your Honor.

8                     (Witness excused.)

9            THE COURT:  Please call your next witness.

10           MR. AFRAME:  The United States calls Special Agent

11  Katie Thibault.

12           THE CLERK:  Please raise your right hand.

13           **KATHRYN THIBAULT**, having been first duly sworn,

14  testified as follows:

15           THE CLERK:  Please be seated.

16           For the record, please state your full name and

17  spell your last name.

18           THE WITNESS:  Kathryn Thibault, T-h-i-b-a-u-l-t.

19                  DIRECT EXAMINATION

20  BY MR. AFRAME:

21       Q.   Good morning, Ms. Thibault.  How are you?

22       A.   Good morning.

23       Q.   Could you tell the jury how you're employed?

24       A.   I am an agent with the FBI.

25       Q.   And how long have you been employed with the FBI?

1      A.    24 years.

2      Q.    And prior to your 24 years with the FBI, did you

3  have previous law enforcement experience?

4      A.    I did.  I was a state trooper in Maryland.

5      Q.    And what is your present assignment with the FBI?

6      A.    I am a supervisor over the polygraph program for the

7  east region.

8      Q.    And where are you presently stationed?

9      A.    Knoxville, Tennessee.

10      Q.    Can you just pull the microphone maybe a little

11  closer?

12      A.    Yes.  Sorry.  Is that better?

13      Q.    Yup.  And can you -- so you said you've been in

14  Tennessee doing polygraph work?

15      A.    Yes, sir.

16      Q.    And how long have you been doing that?

17      A.    Approximately two months.

18      Q.    And prior to your assignment to Knoxville,

19  Tennessee, where were you stationed?

20      A.    Here in Bedford, New Hampshire.

21      Q.    And how long were you assigned to Bedford,

22  New Hampshire?

23      A.    Seven years.

24      Q.    What kind of cases did you work on when you were in

25  Bedford, New Hampshire?

1   A.   I worked child exploitation and white-collar crime

2   investigations.

3   Q.   Okay.  I want to focus on white-collar crime

4   investigations.

5        What kinds of cases fall under the heading of

6   white-collar crime?

7   A.   Bank fraud, money laundering, different types of

8   embezzlement, public corruption, romance scams.

9   Q.   So let's focus for a minute on the last thing you

10  just said, which is romance scams.  Can you just provide -- so

11  how many of those do you think you've investigated while you

12  were in New Hampshire, rough number?

13  A.   Several.

14  Q.   That's fine.

15  A.   Okay.

16  Q.   Can you just tell the jury from a sort of a

17  bird's-eye view what that term means, romance scam?

18  A.   It's a situation where an individual will make

19  contact with someone from a social media platform.  For

20  example, they'll go on a dating website like Match.com, Our

21  Time, it could be through Instagram, it could be through

22  Facebook.  Sometimes it's even a random text on their cell

23  phone.

24       They start to engage with another person.  I'm going

25  to refer to that person as a scammer.  And that person will

1    develop a friendship relationship with them that they become

2    pretty involved with.  It's communication that happens

3    throughout the day every day at which time the scammer will

4    then ask that person that they're involved with to provide them

5    money; they provide some type of elaborate story where they're

6    in desperate need of funds.  And the intentions are that they

7    will then deplete that person of any financial assets that they

8    have over a period of time.

9        Q.    And understanding that all cases are different,

10   based on your experience, was there sort of a typical

11   demographic of the victim in those cases?

12       A.    Yes, sir.  Typically elderly senior citizens and a

13   widow.

14       Q.    And what -- you talked about the -- that the victim

15   would move money to the scammer at the scammer's request.  How,

16   in your experience -- what are the different kinds of ways

17   you've seen money move in your romance scam investigations?

18       A.    There are a lot of different ways.  Some will

19   require people to purchase gift cards through Amazon or they'll

20   send them to Walmart or various stores like CVS and Walgreens

21   and have them buy monetary gift cards kind of like the

22   MasterCards and Visas that you can buy.  And they'll send those

23   through -- however their means of communication is on the cell

24   phone with three -- with a picture.

25            Some will do cash transactions and deposit into

1    different accounts.  Some will buy virtual currency.  Some will

2    wire money.  A lot of different ways, personal checks, you name

3    it.

4         Q.    And in your investigation, are you familiar with the

5    term money mule?

6         A.    Yes, sir.

7         Q.    And what does that term mean in the way -- in your

8    investigations?

9         A.    A money mule is a person who is moving assets from

10   other parties that they don't know into different bank accounts

11   and making wire transfers and so forth, cash deposits from

12   people they don't know, per an instruction from another person.

13        Q.    So in these romance scam cases, how have you

14   typically seen the money mule figure into what you're

15   investigating?

16        A.    The scammer, once they've depleted the funds from

17   the person who's deemed the victim, they will then try to

18   recruit them and groom them into becoming the mule.  So they

19   will then instruct them to create bank accounts and they will

20   then have money deposited into those accounts from people that

21   they don't know and they'll move that money for the scammer.

22        Q.    And in your experience, have these romance scam

23   cases been easy or difficult to resolve?

24        A.    They're very difficult.

25        Q.    What has been, in your investigations, the biggest

1   hurdle that you've run into as you've tried to resolve them?

2       A.   A lot of the financial transactions are eventually

3   sent overseas as well as the actual scammers being overseas.

4   So it's very difficult to identify, locate, and find where

5   everything is ending up.

6       Q.   Okay.  So let me turn from that sort of general

7   discussion, just so we're -- we understand all the terms that

8   we're talking about, to your participation in this case.

9           So were you part of the Ian -- investigation into

10  Ian Freeman?

11      A.   Yes, sir.

12      Q.   And when did you start your -- when did that

13  investigation start, or at least your participation?

14      A.   2017.

15      Q.   And what was your role in 2017?

16      A.   I was the lead case agent.

17      Q.   And how long did you hold that role?

18      A.   Till approximately 2020 when my job changed.

19      Q.   Okay.  And as part of that case, did you do -- end

20  up doing a lot of interviews?

21      A.   Yes, sir.

22      Q.   Now, I'll represent to you yesterday we looked at a

23  lot of records from localbitcoins.com, including a whole series

24  of chats.  Were those available to you when you were sort of

25  working on this investigation?

1       A.    No, sir.

2       Q.    And we saw photos and driver's licenses.  Did you

3  have those?

4       A.    No, sir.

5       Q.    We also -- I'll represent to you later in the trial

6  we will see Mr. Freeman's computer that will have more driver's

7  licenses and photographs.  Did you have access to that?

8       A.    No, sir.

9       Q.    So how -- given that you didn't have that

10  information, what kind of people did you interview?

11      A.    They were individuals who were doing monetary

12  transactions and wire transfers for Mr. Freeman.

13      Q.    And how did you figure out who was sending money to

14  Mr. Freeman if you didn't have any of those tools that I just

15  suggested?

16      A.    I utilized what's called a suspicious activity

17  report, which is called a SAR.

18      Q.    And how would you yourself get access or who would

19  give those to you?

20      A.    The -- I had a financial analyst that was working

21  with me on the investigation as well as some other support

22  staff that would be able to access those and provide them to

23  me.

24      Q.    And as you -- did you read them?

25      A.    Yes.

1  Q.   And what did they have in them?  What's in them?

2  A.   It would provide the banking institution, the name

3  of the person who was doing the financial transaction, the

4  amount, and where it was being sent to, dates and times and so

5  forth.

6  Q.   And about -- if you were to estimate in your

7  investigation of this case, about how many SARs do you think

8  you reviewed?

9  A.   A tremendous amount.

10  Q.   More or less than a hundred, do you think?

11  A.   More than a hundred.

12  Q.   And were you able to interview all hundred people?

13  A.   No, sir.

14  Q.   How did you go about then taking those SARs and

15  figuring out who to interview?

16  A.   Well, because I work in New Hampshire, we looked to

17  see if there was anyone within the local area; for one, for

18  identification, but each person that I could physically see a

19  name, any type of identification, we would try to figure out

20  who they were, at which point then we would find them and try

21  to -- and I would call them and interview them with my

22  coworkers.

23  Q.   How many were in New Hampshire ultimately?

24  A.   There was a few, but a very small handful.

25  Q.   And did you then, using the SAR information, try to

1    make contact with people who had sent money to Mr. Freeman?

2        A.    Yes, sir.

3        Q.    And did you end up conducting a whole bunch of

4    interviews?

5        A.    I did.

6        Q.    And as you spoke to people, did you find another

7    source of information?

8        A.    Yes, sir.

9        Q.    And what was that?

10       A.    When I would speak with some of these individuals,

11   they would explain that they had reported --

12            MR. SISTI:  I'm going to have to object with regard

13   to that with hearsay, Judge, any statements attributed to

14   anybody else.

15            THE COURT:  Depends what they're offered for, so --

16            MR. AFRAME:  Yeah.  I guess I'm just asking for the

17   kind of information she had.  I'm not going to ask for anyone's

18   statements.

19            MR. SISTI:  Well --

20            THE COURT:  But if it's relied from hearsay -- well,

21   yeah, look, it's -- I'm going to allow it to explain the basis

22   for her proceeding, but you can't assume anything she heard was

23   true.  You're only getting it to explain why she proceeded with

24   an investigation.

25            You may proceed.

1        Q.    Did you get information from local police

2    departments around the country?

3        A.    Yes, I did.

4        Q.    Did you find out whether other offices of the FBI

5    had any open cases relating to any of the people you

6    interviewed?

7        A.    Yes, I did.

8        Q.    And you're familiar with the witness list here,

9    right?

10       A.    Yes, sir.

11       Q.    Were there some FBI reports or interviews related to

12   people that are going to testify later in the trial?

13       A.    Yes, there were two.

14       Q.    Okay.  And are they from New Hampshire?

15       A.    No, sir.  Kansas City and Knoxville.

16       Q.    Okay.  So as you went out and did your interviews of

17   all these people, without telling me anything that they said,

18   where were they located?

19       A.    All over the country.

20       Q.    And just as a demographic description, what was --

21   how would you describe the demographic of the people that you

22   were generally interviewing?

23       A.    Over the age of 65, retired, and widowed.

24       Q.    Now, let me -- so was that a large share of what you

25   did on the -- on the investigation?

1    A.    Yes.

2    Q.    And did that relate to the sending of money to

3 banks -- from banks -- through the banking system to

4 Mr. Freeman?

5    A.    Yes.

6    Q.    Was there another part of the case that you

7 investigated as well?

8    A.    Yes, sir.

9    Q.    And what was that?

10    A.    The Bitcoin kiosks that were being run by

11 Mr. Freeman here.

12    Q.    And how did -- how did you -- what action did you

13 take to investigate them?  What thing did you do?

14    A.    We looked up to see if there were any devices in the

15 area that were owned by him through just open source search

16 coin ATM radar.  You can Google -- there's a lot of different

17 options out there.  It'll identify by city and state where ATMs

18 or the kiosks are available and then I would verify with our

19 anti-money laundering unit in Washington DC with the FBI if

20 they were, in fact, his devices.

21    Q.    And there'll be more evidence about that later in

22 the trial, but did that have you identify some that at least

23 you believed were operated by Mr. Freeman?

24    A.    Yes, sir.

25    Q.    And then what did you do?

1    A.    Then I personally went and made buys at those

2  devices.

3    Q.    And when you say buys, what does the -- what does

4  that mean?

5    A.    Made a purchase of Bitcoin from the device.

6    Q.    And were you using your own money?

7    A.    No, sir, the government's.

8    Q.    And what was the purpose of doing that?

9    A.    Two reasons, really.  One, to see how the device

10 operated, what the stages were to actually make a purchase; and

11 then, two, to understand where the Bitcoin that I was

12 purchasing was coming from, meaning the wallet.

13    Q.    Okay.  And, again, there'll be more about that later

14 in the trial.

15           So let me focus more on the first thing you said

16 which is sort of what you did and how they worked.

17           So I'm going to show you now what's been marked and

18 agreed to as Government's Exhibit 301.

19           That should be on everyone's screen.  A little nod

20 to say everything's working?  Okay.

21           Could you -- and, actually, for some it's not

22 centered on the screen.  There we go.

23           Special Agent Thibault, do you recognize that?

24    A.    Yes, sir.  That's one of the devices Mr. Freeman

25 owned.

1      Q.   And, tell me, and I'm not sure if I asked you this.

2   If I did, I'll ask it again.  Where did you make your purchases

3   as your -- as you were doing this investigation?

4      A.   One was at Murphy's Taproom, which is located in

5   Manchester, New Hampshire.  Another one was Route 101 Local

6   Goods which was in Keene, New Hampshire.

7      Q.   Okay.  Looking -- did you take this picture?

8      A.   Yes, sir.

9      Q.   And just walk us through how you do a Bitcoin

10   transaction on a machine like this.

11      A.   So the machine is actually on.  You just have to do

12   a touchscreen to activate it, at which time you can request

13   what you'd like to purchase, what type of currency.  This one,

14   I purchased Bitcoin.  And then you identify how much you'd like

15   to, meaning how much U.S. currency I'm going to put into the

16   device.

17           At that point you scan -- in the top left corner

18   you'll see where there's a hand with a QR code.  Your cell

19   phone is used because that's going to offer the barcode to scan

20   for your Bitcoin wallet.  A QR code is like if you think about

21   with the pandemic when you would go to a restaurant to eat, we

22   would scan their menus and that's the link to the menu.  So

23   it's the same thing.  It would be -- the QR code on my phone

24   would be the link to my Bitcoin wallet.

25           I would then enter the U.S. currency in the top

1    right corner, just feed the -- the bills in and it would tally

2    an amount and then it would -- I would allow for a purchase to

3    be made.  And the larger screen, you just simply push the

4    button and it would transfer the money -- or, I'm sorry, it

5    would transfer the Bitcoin to the wallet.

6         Q.    And how long did that whole process take?

7         A.    Not very long.  It's just how much money you're

8    going to put into the device.  It's just physically feeding the

9    bills in.

10        Q.    So did you -- in doing this transaction, did you

11   have to provide your name?

12        A.    No, sir.

13        Q.    Did you have to provide your driver's license?

14        A.    No, sir.

15        Q.    Did it have any functionality to take your photo?

16        A.    No, sir.

17        Q.    Did you provide your phone number?

18        A.    No, sir.

19        Q.    Did you have to speak to any employee of either

20   Murphy's Taproom or Route 101 Local Goods?

21        A.    No, sir.

22        Q.    Did you have to do anything at all to identify

23   yourself as making this transaction?

24        A.    No, sir.

25        Q.    And as a point of contrast, did you ever try to buy

1  Bitcoin on a machine that you did not believe was -- or learned

2  to be owned by Mr. Freeman?

3       A.   Yes.

4       Q.   And can you just tell us what the difference in the

5  experience was.

6       A.   Very different.  It would require an ID be presented

7  and shown for scanning purposes.  And it wasn't a -- it would

8  be a state ID, for example, your driver's license.  I couldn't

9  show a Sam's Club, you know, membership card that had my

10 picture.

11            It required a phone number with a legitimate phone

12 service, not something that was a prepay, and then there would

13 be my name would have to be identified and there would be a

14 communication with the -- device's owner or operator to verify

15 about my purchases.

16      Q.   Okay.  And if I look at this machine, do you see

17 the -- the Bitcoin symbol down in -- the white and yellow

18 Bitcoin symbol?

19      A.   Yes, sir.

20      Q.   There's something next to that.  Do you know what

21 that is?

22      A.   That's a finger scan.

23      Q.   And to operate the machines when you purchased from

24 Mr. Freeman, was that finger scan required?

25      A.   No, sir.

```
 1          Q.   Was it operational?

 2          A.   Not to my knowledge.

 3               MR. AFRAME:  Okay.  So let's look at 302.  These are

 4     admitted.

 5          Q.   Are you familiar with this, Special Agent?

 6          A.   Yes, sir.

 7          Q.   And I'll just read the very top:  Cryptocurrency

 8     vending machine rules, updated August 2018.

 9               Where did this photo come from?

10          A.   One of Mr. Freeman's devices.

11          Q.   Did you take it?

12          A.   Yes, sir.

13          Q.   Was this stationed near one of the machines?

14          A.   Yes, sir.

15          Q.   So number 1 says:  You must use a QR code from a

16     wallet you control.

17               And you just already described that to us, right,

18     when you showed us the photo of 301 a second ago?

19          A.   Yes.

20          Q.   Number 2 says:  Your cryptocurrency is your

21     responsibility to keep safe and spend safely.

22               Right?

23          A.   Yes, sir.

24          Q.   And 3:  All sales are final.

25          A.   Yes, sir.
```

1     Q.    And then number 4 is one I really want to focus on

2    which says:  Do not tell our staff why you want to buy

3    cryptocurrency.

4          Did I read that right?

5     A.    Yes, sir.

6     Q.    And is that how it worked out?  Did you have to tell

7    anyone why you were buying cryptocurrency?

8     A.    No, sir.

9     Q.    Did anyone ask?

10    A.    No.

11    Q.    Looking down now, at the bottom there's some more

12   directions, but I think you sort of already described that.  I

13   want to focus on the bottom.

14          And it says:  If you believe something went wrong,

15   please contact customer service ASAP at keenecrypto@gmail.com

16   or call 603-513-2449.

17          Did I read that right?

18    A.    Yes, sir.

19    Q.    And let's look briefly back at Government's

20   Exhibit 201.

21          I'll represent to you that this is the letter,

22   email, that we just spent some time talking about from a

23   representative of FinCEN.  The jury's familiar with this email

24   and letter, but can I just ask you to look below where it says

25   via electronic delivery.  Do you see that?

```
1           A.   Yes, sir.

2           Q.   And there's a series of emails?

3           A.   Yes, sir.

4           Q.   Can you read the second email?

5           A.   keenecrypto@gmail.com.

6           Q.   And going back to 302, is that the same email we see

7     there?

8           A.   Yes, sir, keenecrypto@gmail.com.

9           Q.   And let's go forward to Government's Exhibit 303

10    that has been agreed to.  Do you see an email?

11          A.   I do.

12          Q.   And what is the date of the email?

13          A.   December 30th of 2018.

14          Q.   And according to the "from," who is it from?

15          A.   It's from Ian Freeman.

16          Q.   And I just want to ask you, were search warrants to

17    get email done in this case?

18          A.   Yes, sir.

19          Q.   Were you part of that process?

20          A.   Yes, sir.

21          Q.   Is this where these emails came from?

22          A.   Yes, sir.

23          Q.   And who signed -- so it's from Ian Freeman.  Who

24    signed the email?

25          A.   Ian.
```

1    Q.    And it's to someone named K. Quinlan, right?

2    A.    Yes, sir.

3    Q.    Which is not really important for our purposes.

4          So what is important is for you to read to me the

5    first sentence of that email.

6    A.    I've sent you two emails from another email address,

7    keenecrypto@gmail.com, but haven't heard back from you.

8    Q.    That --

9    A.    Oh, sorry.

10    Q.    And that's an emailed signed by Mr. Freeman, right?

11    A.    Yes.

12    Q.    And if we go back to 302, that's the same -- is that

13    the same email that's on the vending machine -- the kiosk rules

14    or vending machine rules?

15    A.    Yes, sir.

16    Q.    And is that the same email that's on the letter from

17    FinCEN?

18    A.    Yes, sir.

19    Q.    Thank you.

20          And, again, looking at 302 now, there's a phone

21    number, too, right?

22    A.    Yes, sir.

23    Q.    And that phone number is 603-513-2449?

24    A.    That's correct.

25    Q.    And yesterday we spent a long time looking at

1    records from localbitcoins.com.  And I'm going to ask to turn

2    to Government's Exhibit 1202.  This was represented yesterday

3    to be information about user accounts on localbitcoins.com that

4    pertained to that site and that's already been admitted and

5    explained to the jury.  But can you just tell me the user name

6    for this account?

7        A.    ftl_Ian.

8        Q.    And the real name?

9        A.    Ian B. Freeman.

10       Q.    And if you go down to old phone numbers, what is the

11   first old phone number listed on this document?

12       A.    Area code 603, 513-2449.

13       Q.    And if we go back to 302, do we see that telephone

14   number here?

15       A.    Yes, sir.

16       Q.    Thank you.

17             So what -- how did this investigation eventually

18   come to a conclusion?

19       A.    I obtained a search warrant for Mr. Freeman's

20   residence.

21       Q.    And when was that search conducted?

22       A.    March 16th of 2021.

23       Q.    And where was that search conducted?

24       A.    The residence of 73-75 Leverett Street in Keene,

25   New Hampshire.

1       Q.      And what was your role in conducting that search?

2       A.      I was the on-scene case agent.

3       Q.      And I'd like to show you what's been marked as

4   Government's Exhibit 304.  It's been agreed to already.

5               Do you recognize that photo?

6       A.      Yes, sir.  That's Mr. Freeman's residence.

7       Q.      And you described it as a duplex, right?

8       A.      Yes.

9       Q.      So -- and you said 73-75?

10      A.      Yes, sir.

11      Q.      So looking at the photo, which side is 73?

12      A.      It is not -- the right-hand side of the photograph.

13      Q.      Is it the side with the stairs?

14      A.      Yes.

15      Q.      And who lived on the 73 side of the building?

16      A.      On 73, Mr. Freeman.

17      Q.      And the other side is 75?

18      A.      An individual by the name of Nobody.

19      Q.      Okay.  And can you just describe for me the outer

20   part of the house, what we see there?

21      A.      It's a white structure.  It was a duplex, a wooden

22   front porch, green in color, and then it had two entrances.

23              The right-hand side, if you go up the stairs, the

24   doorway was right there and then on the left side it was on the

25   other side.

1          MR. AFRAME:  Okay.  And before I talk about what's

2     inside the house, there's an exhibit that I know there's an

3     objection to, your Honor, so I -- I think we need to deal with

4     that.

5          THE COURT:  All right.  Does it require a sidebar or

6     something I can rule from the bench?

7          MR. AFRAME:  Probably a sidebar, I guess.

8          THE COURT:  Okay.  Please approach.  We'll use the

9     sidebar.

10                         AT SIDEBAR

11          MR. AFRAME:  There's a video that was found on the

12     Internet that shows Mr. Freeman being interviewed on the porch

13     of the house and as part of the video, there's a sign -- a stop

14     sign with a sticker on it that says stop paying taxes.  And we

15     want to introduce that.  So it just shows Mr. Freeman -- from

16     Freeman and the stop sign, we stripped out the audio because

17     the audio was from someone else, the person doing the

18     interview.  I thought that was hearsay.  But we just want to

19     show the presence of the sign and Mr. Freeman and it goes to

20     our tax evasion charge.

21          THE COURT:  What's the -- I mean, what's the --

22     what's the nexus between him and the sticker on the stop sign?

23          MR. AFRAME:  It's on his porch at his house.

24          THE COURT:  Oh, it's not a real stop sign.

25          MR. AFRAME:  It was taken and then put a sticker on

```
 1    it.  So it's a --
 2              THE COURT:  So on his porch there's a stop sign.
 3              MR. AFRAME:  Yes.
 4              THE COURT:  Okay.  And it has a sticker on it that
 5    says paying taxes.
 6              MR. AFRAME:  It says stop.
 7              THE COURT:  I get it.
 8              MR. AFRAME:  I'm sorry.
 9              THE COURT:  It's on his porch.
10              Okay.  Go ahead, Mr. Sisti.
11              MR. SISTI:  Yeah.  We don't know who put the
12    so-called sticker on there.  It's more prejudicial than
13    probative.  It doesn't really go to what we're talking about
14    here.  I mean, it's speculative.  I mean, a lot of this is
15    speculative.  Let's stop paying taxes.  I mean, that porch was
16    used, and they know it, by a myriad of people.  Tons of people
17    were on that porch.
18              THE COURT:  Sure.
19              MR. SISTI:  And, you know, who put it there, who
20    slapped the sticker on it, they don't know.  They don't know if
21    Freeman did anything with regard to that.  And to assert that
22    it -- it was a directly connected item that somehow drove his
23    mentality to avoid taxes, I mean, that -- I don't know.  I
24    mean, people say don't pay taxes every day, they don't want to
25    pay taxes.  I mean, do you want to pay taxes?
```

```
 1                THE COURT:  No, I don't, but this is -- look, okay.

 2                MR. SISTI:  We have --

 3                THE COURT:  I understand your arguments.  It is

 4      relevant.  It is -- it makes a fact of consequence more likely

 5      than it would be without the evidence, so it fits the

 6      definition.  I don't think it's more prejudicial than

 7      probative.  It's on a piece of residential property that he

 8      owns and controls.  All the points you just made in opposition

 9      to the exhibit can be made on cross-examination to great

10      effect, but I think it's -- I think it's permissible.  I'm

11      going to allow it.

12                MR. SISTI:  I don't know what the -- I'm sorry.

13      Just one more thing.

14                I don't know what the time nexus is, though.  I

15      don't know when this so-called --

16                THE COURT:  That's a good point.

17                MR. AFRAME:  I'll get a little bit of evidence on

18      that.

19                MR. SISTI:  No, I --

20                MR. AFRAME:  I'll elicit some evidence which will be

21      that she watched the whole video and from the audio and the

22      things Mr. Freeman said, it is obvious because of what he's

23      talking about that it came after the search of the house on

24      March 16, 2021.

25                MR. SISTI:  It came after the search of the house?
```

1          MR. AFRAME:  After.

2          MR. SISTI:  Well, you know -- well, I think it makes

3    it even more ridiculous.  I mean, it would be prior to when the

4    active charges came into effect if it doesn't have anything to

5    do with the present charges.

6          THE COURT:  The question for me, is it within like a

7    year or so of the conduct involved in the case, and it is.

8    It's just -- it just shows a prohibit -- it shows activity and

9    I think it's permissible.  But your objection is noted.

10          MR. AFRAME:  Thank you.

11                    CONCLUSION OF SIDEBAR

12     Q.    Special Agent Thibault, were you able to identify a

13    video that was -- a video that's relevant to this picture I'm

14    showing you, a video from the Internet?

15     A.    Yes.

16          MR. SISTI:  Object.

17          THE WITNESS:  I'm waiting on the picture.

18          MR. AFRAME:  Sorry.  Do you -- oh, sorry.  304, I'm

19    sorry.  304.

20          THE CLERK:  Counsel, is the jury supposed to see

21    this part yet?

22          MR. AFRAME:  This is something we've already shown

23    right now.

24          THE COURT:  Yeah.

25          MR. AFRAME:  This is okay.

```
 1              THE CLERK:  Okay.
 2         Q.    This is 304, right?
 3         A.    Okay.  Yes.  Yes.
 4         Q.    Did you find a video related to this, what we're --
 5    this front porch?
 6         A.    Yes, I did.
 7         Q.    And who was in the video?
 8         A.    Ian Freeman.
 9         Q.    And where did you find the video?
10         A.    On odyssey.com.
11         Q.    And was it an interview?
12         A.    It was.
13         Q.    And did you listen to the whole interview?
14         A.    Yes.
15         Q.    And who -- based on what was said, without telling
16    me really what was said, could you identify in time using the
17    time of the search of this house when the interview occurred?
18         A.    After.
19         Q.    Okay.  And based on you having been at this location
20    and watching the video, were you able to identify where the --
21    where the interview took place?
22         A.    It was on the front porch of that residence.
23         Q.    Okay.  And there was -- we made a clip, a very, very
24    short clip, of that video, right?
25         A.    Yes.
```

1     Q.    And did you -- and you watched the whole video?

2     A.    Yes.

3     Q.    And you watched the clip?

4     A.    Yes.

5     Q.    Was -- is the clip an accurate depiction of what's

6  in the full video?

7     A.    Yes.

8     Q.    And when you watched the full video -- and was there

9  audio?

10     A.    The full video had audio.  It did.

11     Q.    And did we remove the audio from the clip?

12     A.    Yes.

13     Q.    And in the audio part of the clip, was it

14  Mr. Freeman speaking or someone else?

15     A.    In the audio it was Mr. Freeman and there was

16  another person as well.

17     Q.    Okay.  So let me show you now what -- the clip,

18  which is Government's Exhibit 305, 305A.  This is just the

19  clip.  It's very, very short.

20                    (Video recording played.)

21             MR. AFRAME:  And if we just stop there.

22             So in the background of that, do you see the

23  railing?

24     A.    I do.

25     Q.    And what color are the spindles below the railing?

```
 1        A.   Green.

 2        Q.   And in front of the railing, what do you see?

 3        A.   It's a stop sign.

 4        Q.   And what do you see under the stop sign?

 5        A.   There's a sticker and a lighter.

 6        Q.   And what does it say?

 7        A.   Paying taxes.

 8        Q.   So if you read all the words, what would it say?

 9        A.   Stop paying taxes.

10             MR. AFRAME:  And if you just play the video to the

11   end.

12                      (Video recording played.)

13             MR. AFRAME:  Stop there.

14        Q.   Again, based on your experience, do you know where

15   this is?

16        A.   That is the front porch of Mr. Freeman's residence.

17        Q.   Is that the same place we just looked at in 304?

18        A.   It is.

19             MR. AFRAME:  And if you could just play the video to

20   the end.

21                      (Video recording played.)

22        Q.   And who is that?

23        A.   That is Mr. Freeman.

24        Q.   Thank you.

25             All right.  Let's talk a little bit about -- now
```

1  let's move off the porch and let's go inside the house.

2       A.    Okay.

3       Q.    So let's talk about 75, the 75 side.  That's

4  where -- who lived there again?

5       A.    A gentleman by the name of Nobody.

6       Q.    And tell me what you -- what -- how that was set up?

7  What was on the 75 side of the building?

8       A.    You entered the home and there was a living room

9  area, a kitchen area.  There were bedrooms upstairs.

10       Q.    And as far as that side of the building, did you see

11  anything that at least appeared to you to be a shrine?

12       A.    No.

13       Q.    How about a chapel?

14       A.    No.

15       Q.    How about even a meeting room for some kind of small

16  congregation?

17       A.    No.

18       Q.    And let me focus now on 73 Leverett.  That's where

19  Mr. Freeman lived?

20       A.    Yes, sir.

21       Q.    Were other people living there, too?

22       A.    There were.

23       Q.    Okay.  And tell me about that side of the house.

24       A.    It was basically a mirror image of the number 75.

25  And the living room was not a traditional living room.  It was

1   a radio station that he owns.

2       Q.    Okay.  And let me ask you the same brief series of

3   questions.

4             Did anything in that side of the house appear to be

5   a shrine?

6       A.    No.

7       Q.    A chapel?

8       A.    No.

9       Q.    A meeting room other than this room for a radio

10  show?

11      A.    No.

12      Q.    So let's now look at that radio station room, and

13  I'd ask to show you what's been marked as Government's

14  Exhibit 306.  306 is agreed to.

15      A.    This is Mr. Freeman's radio room.

16      Q.    And just, again, looking to the -- to the left for a

17  second, what do you see in the sort of left-hand side of the

18  picture?

19      A.    A lot of radio equipment.  You move over and there's

20  a desk with a chair and a lot of -- just different equipment

21  and documents and folders.

22      Q.    And in the foreground, it looks like there's a black

23  and red chair?

24      A.    Yes, sir.

25      Q.    And what's behind that?

1      A.    Behind it is the desk.

2      Q.    Yup.  Okay.  And let's now -- and did you go in this

3  room?

4      A.    I did.

5      Q.    And is this what it looked like --

6      A.    Yes, sir.

7      Q.    -- on the day of the search?

8      A.    Yes, sir.

9      Q.    And, tell me, before we go any further, just sort of

10  a little bit on how this search of this room took place.  What

11  was the procedure?

12      A.    Standard procedure that when we execute a search

13  warrant, we photograph the property before we actually enter to

14  make sure we can document the state of the residence or

15  building, whatever we're entering.

16          At that point then we have teams that go in.

17  They're assigned to different areas of whatever property,

18  specifically with this house, each room and they are briefed on

19  what they're looking for.  They have to read the warrant, they

20  read the attachments, they understand the case.  I would

21  explain it to them and what I'm looking for or we as a team.

22          And once everything is photographed, the search

23  starts.  And if they find something that is of value that we

24  are looking for, they will mark it and then that's photographed

25  again.

1      Q.   Okay.  And what was your -- how did people -- so

2  when you do a search like this, are there a lot of people

3  involved?

4      A.   A lot of people.

5      Q.   And are they all sort of -- you told us you're the

6  case agent and you -- sounds like you spent from 2017 to 2020

7  pretty deeply enmeshed in all of this?

8      A.   Yes, sir.

9      Q.   Are all these other agents like that or are they --

10     A.   No.  I had a team that worked with me, but for the

11 most part everyone had volunteered to come and help.  So we

12 briefed them on specifics.  If they have a question, then they

13 can ask me or other parties that were on my team.

14     Q.   And do those -- some of those people make the first

15 identification of what might be relevant?

16     A.   Yes, sir.

17     Q.   And as the lead person on the scene, what's your

18 role?

19     A.   If they have a question, I come and look at the --

20 the documentation or the device that they've found, verify

21 whether or not we do need to take it.  But I'm there just to

22 oversee and make sure everything runs smoothly.

23     Q.   Okay.  And so let's look at Government's

24 Exhibit 307.

25          This has been agreed to.

1      A.    That's a picture of the desk, the same desk that we

2  just saw, but this is how we would mark it during the search.

3      Q.    Okay.  So the chair -- the red chair's not in the

4  picture anymore?

5      A.    That's correct.

6      Q.    Okay.  And, obviously, if we went back to that

7  picture we wouldn't see those yellow -- I'll call them tents,

8  but the yellow markers with numbers.

9      A.    Correct.

10      Q.    So who put those there?

11      A.    The search team.

12      Q.    And what do they indicate?

13      A.    They identify pieces of documentation that we would

14  collect as evidence.

15      Q.    Okay.  And so there's two I want to really zoom in

16  on and the first one is Government's Exhibit 308, which has

17  been agreed to.

18            And what's that?

19      A.    It's a stack of manila folders.

20      Q.    Ad if we went back to Exhibit 307 for a second, just

21  to make sure we see where that is on the desk, where is that on

22  the desk?

23      A.    Top left corner.

24            MR. AFRAME:  Okay.  And if we could just zoom in on

25  the folders -- can we go in further?

1            No, I'm sorry, the next -- the next exhibit.  Can we

2    zoom in on the folders?

3        Q.    So can you just read to me the -- three of the

4    folder titles are visible, right?

5        A.    Yes, sir.

6        Q.    Can you read me the one in the near ground?

7        A.    Bar Harbor, then you have FBI Crypto --

8        Q.    And then what's the one in the back?

9        A.    IRS Bullshit.

10        Q.    Okay.  Thank you.

11            And now if we go back to 307, do you see the tent

12    with the 30 on it?

13        A.    Yes, sir.

14        Q.    In that photo, what's the condition of that folder?

15        A.    It is closed.  It's a manila folder.

16        Q.    Okay.  And if we turn to Government Exhibit 309, are

17    we still looking at the same desk?

18        A.    Yes, but now the folder's open with the documents.

19        Q.    Okay.  And if we could just zoom in on the documents

20    a little bit, a little closer, the document that's most readily

21    visible, what does that say at the top?  It says State of

22    New Hampshire and then under that?

23        A.    Application for Registration of Trade Name.

24        Q.    And what's the business name?

25        A.    Crypto Church of New Hampshire.

1      Q.    And there's an address?

2      A.    Yes, sir.  63 Emerald Street, number 506, in Keene,

3  New Hampshire.

4      Q.    And what's the brief description of that business?

5      A.    Religious.

6      MR. AFRAME:  Okay.  And if we could zoom back out.

7      Q.    And the names that are -- do you -- actually, if we

8  look now, can we focus in on the -- on the page that we only

9  see half of?  If we -- yup.

10      So I -- what do you see at the top, where it's -- do

11  you see filer information?

12      A.    Yes, sir.  It has the name Ian B. Freeman.

13      Q.    And then there's a payment of -- yup.

14      And then there's a payment of how much?  If you

15  could zoom back in where we just were.

16      A.    $50.

17      Q.    And what is the reference information there?

18      A.    Crypto Church of New Hampshire.

19      MR. AFRAME:  Okay.  Thank you.

20      And then there's one more exhibit, Judge, but we

21  need to show it to you briefly.

22                        AT SIDEBAR

23      THE COURT:  I've been shown Exhibit Number 310 for

24  identification.  It looks like a safe or a refrigerator.  I'm

25  not sure --

```
 1                MR. AFRAME:  Safe.

 2                THE COURT:  It's a safe.  It's open with some wads

 3    of cash inside and you're offering this to show what?

 4                MR. AFRAME:  We use -- sorry.  It's some evidence of

 5    tax evasion.  My experience is people hide -- when they don't

 6    want to pay taxes, they hide money in their bedroom, in their

 7    closet, and that's what this is.

 8                THE COURT:  All right.

 9                MR. SISTI:  I don't know what your experience is,

10    but my experience is that legitimate cash can be kept in your

11    own house in a safe and it just -- all that does is point to a

12    negative inference without any supporting evidence.  Why is

13    that -- why is that illegal?

14                THE COURT:  It's not.  It -- it perhaps shows the

15    existence of income with respect to which the defendant may

16    have evaded taxes, but, I mean, are you going to make any kind

17    of showing that this is connected up with --

18                MR. AFRAME:  He never paid taxes and he's -- he's

19    already showed evidence that he has a stop paying taxes and an

20    IRS Bullshit folder.  So I think they all linked together.  And

21    then he hides $179,000 in his bedroom.  That's our position.

22                THE COURT:  The years he didn't pay taxes allegedly

23    were what?

24                MR. AFRAME:  The years?

25                THE COURT:  Yeah.
```

1          MR. AFRAME:  Through 2019.  So I --

2          THE COURT:  2016 through 2019.

3          MR. AFRAME:  And that would be after that.

4          THE COURT:  I think that's more prejudicial than

5   probative.

6          MR. AFRAME:  Okay.  That's fine.

7          MR. SISTI:  Thank you.

8                    CONCLUSION OF SIDEBAR

9          THE COURT:  Sustained.

10          MR. SISTI:  Thank you.

11          MR. AFRAME:  Well, I messed up my binder, but other

12   than that, I'm done.

13          THE COURT:  Okay.  All right then.

14          Cross-examination.

15          MR. AFRAME:  I'm going to get in trouble for this.

16          MR. SISTI:  If I could have just a moment, Judge.

17          THE COURT:  You may.

18          MR. SISTI:  Thank you, Judge.

19          THE COURT:  Thank you.

20          MR. SISTI:  It's a whole new era with the IT stuff.

21                    CROSS-EXAMINATION

22   BY MR. SISTI:

23     Q.   Good morning.

24     A.   Good morning.

25     Q.   How do you like your new position?

1       A.    I enjoy it.

2       Q.    Yeah.  I mean, you were in Bedford a long time.

3       A.    A long time.

4       Q.    Yeah.  Let me go back to a few things that were

5  mentioned.

6             There were a few people in New Hampshire you

7  interviewed with regard to SAR reports?

8       A.    Yes, sir.

9       Q.    And do you recall who those people were?

10      A.    I do.

11      Q.    Could you just tell the jury.

12      A.    One individual was by the name of Andrew Spinella

13  and another was Renee LeBlanc.

14      Q.    Okay.  So that's two people?

15      A.    Yes.

16      Q.    Right?  Okay.  And then -- let's see.  There were

17  people from other parts of the country?

18      A.    Yes, sir.

19      Q.    Okay.  During the course of your investigation, were

20  you able to specifically link a scammer, a scammer, with Ian

21  Freeman?

22      A.    No.

23      Q.    And the reason I ask that is that a lot of times

24  what happens is that these scammers team up with somebody in

25  order to perpetuate their business, correct?

1       A.    Well, I never caught one in this case, so I couldn't

2  exactly state a truthful answer for that.

3       Q.    All right.  But certainly nothing like that showed

4  its face during your examination with regard to Freeman?

5       A.    With the finances going to locations we couldn't

6  identify, I was never able to identify someone.

7       Q.    Right.  Well, I mean, you are aware that some people

8  actually -- Freeman actually made some of these people that

9  were making these deals show actual national identification

10  cards.  Do you know that?

11       A.    No, sir.

12       Q.    All right.  Nobody ever told you that, huh?

13       A.    No, sir.

14       Q.    Right up till the time of the raid.

15       A.    No, sir.

16       Q.    Okay.  And let me ask you a little bit about these

17  buys you made at these machines.

18            How many -- just so the jury understands how many of

19  these vending machines there are, how many are there in just

20  New Hampshire?

21       A.    In New Hampshire alone?  Oh, I couldn't tell you.

22       Q.    Well, I mean, you did --

23       A.    There are a lot of devices throughout the state.

24  They're everywhere.

25       Q.    Like over a hundred?

1      A.   I wouldn't be able to tell you unless I looked

2   online.

3      Q.   Oh, well, I mean, I thought you did say that you

4   were actually scoping out those machines.

5      A.   Back in 2018, 2017 time frame, yes.  But as for

6   today, I looked specifically for Keene, New Hampshire, and then

7   seeked assistance through Washington, our anti-money laundering

8   unit, to identify which ones were his.

9      Q.   Right.  So you looked at --

10      A.   But I wouldn't be able to say how many devices from

11   the state.

12      Q.   Yeah.  Well, you'd agree with me they pop up all

13   over the place, right?

14      A.   Well, they are everywhere, yes, sir.

15      Q.   Yeah.  Do they all have requirements that you have

16   to put your driver's license in or your phone number or

17   anything like that?

18      A.   I couldn't answer if all of them do, but they're

19   supposed to.  I've used several that do require that.

20      Q.   There are several that do; there are several that

21   don't?

22      A.   Well, the only ones I encountered were

23   Mr. Freeman's.  That was my focus since this was my

24   investigation.

25      Q.   Well, then, I guess I don't understand why you just

1    said what you said.

2              Let's say there's a hundred of these machines out

3    there.

4         A.   Uh-huh.

5         Q.   And I know that's lowballing it.  How many have you

6    literally looked at?

7         A.   I only focused on Mr. Freeman's devices and then I

8    sought out another one to see how they actually operated if he

9    didn't own it.

10        Q.   So you looked at Freeman's devices.  How many did

11   you look at?

12        A.   I think there were six at one point in time.

13        Q.   So you look at six devices and then you randomly

14   look at one other?

15        A.   Yes.

16        Q.   And you make a comparison between Freeman's six and

17   one other, right?

18        A.   Well, that and the use of YouTube.  For example, if

19   you Google how to buy Bitcoin, it will give you instructions

20   and I used that as well.

21        Q.   Well, I'm not --

22        A.   That's as a standard procedure.

23        Q.   I have to say something, Agent.  YouTube isn't,

24   like, you know, the go-to for an FBI investigation, is it?

25        A.   It was instruction advice on how to buy Bitcoin

1    because it was pretty new back in 2017.

2         Q.    Well, I'm asking -- you're making a generalization

3    that Freeman's operation was different in kind than the

4    hundreds of other kiosks that were out there.  You kind of said

5    that to the jury, right?

6         A.    No, I can't -- I can't state to the hundreds of

7    other kiosks.  I didn't use them.

8         Q.    All right.  So that when Mr. Aframe said, oh, you

9    don't have to put your finger on the fingerprint identification

10   thing, right --

11        A.    Uh-huh.

12        Q.    -- yeah, well, that may be true with 200 of those

13   kiosks in this state, right?

14        A.    I don't know.

15        Q.    Right.  You don't know.

16        A.    I don't know.

17        Q.    Or you don't have to put in your telephone number;

18   that may be true for 200 of those kiosks in this state.

19        A.    I couldn't state that.

20        Q.    I know.  So we should never, ever come to the

21   conclusion, ever, that Mr. Freeman's operation is different

22   in kind than the majority of the operations in the state of

23   New Hampshire, right?

24        A.    His device did not ask for the information.

25        Q.    That's not my question.

```
1         A.    I can't attest -- I didn't buy from the other

2    kiosks, so I can't attest to that.

3         Q.    Right.  So this jury shouldn't take a negative

4    inference from that, should they?

5               MR. AFRAME:  Objection.

6         Q.    That was what it was offered for.

7         A.    I'm just stating what the device requirements were

8    in order to purchase Bitcoin.

9         Q.    Okay.

10        A.    And they did not ask for any information.

11        Q.    And I understand that testimony --

12        A.    Uh-huh.

13        Q.    -- but you can't say that that's rare or unusual,

14   correct?

15        A.    It was not, in my experience, what I experienced

16   from the other device that I purchased from.

17        Q.    The one other device.

18        A.    Correct.

19        Q.    So we shouldn't draw a generalization from that,

20   should we?

21        A.    Well, I think that's an individual's choice.  I'm

22   just stating the facts.

23        Q.    You're stating a fact --

24        A.    Uh-huh.

25        Q.    -- that one other device was different than
```

1   Mr. Freeman's.  That's the fact, right?

2        A.    From the one device that I did purchase from,

3   correct.

4        Q.    All right.  We'll keep that in mind.

5              Now, with regard to Murphy's Taproom, do you know

6   how long that kiosk was in existence in Murphy's Taproom?

7        A.    No, sir.

8        Q.    Do you know if any complaints were ever made by

9   anybody that operated, utilized, that particular machine at

10  Murphy's Taproom?

11       A.    No, sir.

12       Q.    Do you know if the owner and operator of Murphy's

13  Taproom had any complaints about Mr. Freeman with regard to how

14  he operated that kiosk?

15       A.    I'm not aware.

16       Q.    Do you know if the Liquor Commission that oversees

17  Murphy's Taproom and the operation that goes on in Murphy's

18  Taproom ever filed a complaint against Mr. Freeman with regard

19  to that kiosk?

20       A.    I'm not aware.

21       Q.    Okay.  Did you check into any of that?

22       A.    No, sir.

23       Q.    Why not?

24       A.    It wasn't relevant to what I was looking for.

25       Q.    Well, what if somebody at Murphy's Taproom said I

1   used Freeman's machine and I got screwed a hundred times; that

2   would be relevant, right?

3        A.   The only way I think that would come out it is if

4   they emailed that address provided on the device.

5        Q.   Or if they complained to the owner of the bar?

6        A.   Potentially, I guess.

7        Q.   Did you -- did you make any inquiry of the owner of

8   the bar?

9        A.   No, sir.

10       Q.   Did you make any inquiry of any of the staff at the

11  bar?

12       A.   No, sir.

13       Q.   The sign that's placed that was shown to you and

14  placed near the Bitcoin machine --

15       A.   Yes, sir.

16       Q.   -- all right, it said don't talk to the staff about

17  why you are purchasing Bitcoin.

18       A.   Correct.

19       Q.   All right.  And have you seen any signs like that

20  before?

21       A.   No.

22       Q.   But you only looked at one other machine, right?

23       A.   Correct.

24       Q.   The Route 101 Goods machine --

25       A.   Yes, sir.

1    Q.    -- you went there.  Did you operate that machine as

2    well?

3    A.    Yes, sir.

4    Q.    Did we see a picture of that?

5    A.    Today, no.

6    Q.    Okay.  Can you explain what that one looked like to

7    the jury?

8    A.    It looked more like a traditional ATM.  It was a

9    stand-alone device.  It wasn't mounted to the wall.  Pretty

10   large in scale.

11   Q.    Okay.  During the course of your investigation, did

12   you hear from the owner of Route 101 Goods?

13   A.    During the investigation?

14   Q.    Yeah.

15   A.    No, sir.

16   Q.    Was it ever voiced to you from anybody that may have

17   done business at the kiosk at Route 101 Goods that they were

18   scammed or screwed or in any way taken advantage of with regard

19   to that kiosk?

20   A.    No, sir.

21   Q.    With regard to your purchase at Murphy's Taproom,

22   part of the process is to agree to the terms of service, right?

23   A.    To -- to -- for using that Bitcoin machine?

24   Q.    Yeah.

25   A.    Yes.  You simply turn it on.  There really wasn't

57

1    any agreement.  It was just the request to purchase the

2    Bitcoin.

3         Q.    Right.  And with regard to that, there was the sign,

4    right?

5         A.    Yes.

6         Q.    Okay.  And that if you had any complaints, you could

7    call a phone number or email something, right?

8         A.    Yes.

9         Q.    Okay.  There was some comparison, some

10   back-and-forth, with documents like a FinCEN letter and an

11   email and that sort of thing that you were asked to take a look

12   at --

13        A.    Yes, sir.

14        Q.    -- and compare -- compare email address with a --

15   I guess an email address and a phone number, right?

16        A.    Yes, sir.

17        Q.    Okay.  We heard from the representative from the

18   FinCEN yesterday and a little bit today, okay, just so you

19   know.  He was unable to verify that that letter ever got to

20   that email address.  Are you able to verify that that letter

21   ever got to the email address?

22        A.    Honestly, I cannot recall specifically.  With all

23   the email returns, I'm not able to answer that.

24        Q.    Okay.  So this jury wouldn't know if Mr. Freeman

25   ever got that FinCEN letter?

58

1          A.     Well, as of sitting here right now, I wouldn't be
2     able to answer it, but I'm sure I could do some research and
3     see.
4          Q.     Well, I mean, today's the day of the trial, you
5     know.
6          A.     Uh-huh.
7          Q.     Okay.  You talked about the search in Keene and that
8     you -- you were the on-site agent?
9          A.     Yes, sir.
10         Q.     And, again, what does that mean?  Did you coordinate
11    this particular search?
12         A.     Yes, sir.
13         Q.     Would you say it was done in a very gentle, knowing,
14    nonviolent fashion?
15                MR. AFRAME:  Objection, relevance.
16                THE COURT:  Overruled.
17                MR. SISTI:  Thank you.
18         A.     It was conducted as it needed to be in regards to
19    officer safety and what we were facing.
20         Q.     Well, were you facing somebody that was known to be
21    violent and armed?
22         A.     No.
23         Q.     You knew that before you started that search, right?
24         A.     Based on observations, there were significant
25    officer safety issues, which is why I utilized assistance in

1   regards to approaching the residence.

2       Q.   Well, let me tell you this.  With regard to Freeman,

3   okay, does he espouse like any kind of violent overthrow of the

4   nation or anything like that?

5       A.   I didn't utilize that.  I was referencing video and

6   surveillance that we had of the residence where people were

7   displaying weapons and I was concerned for the agents and FBI

8   employees for the search of the house.  We wanted to make sure

9   it was secure.

10      Q.   Actually, you observed -- you had him under

11  observation, that house under observation.  Why don't you tell

12  the jury, for how long.

13      A.   A significant amount of time.

14      Q.   Significant.

15      A.   Uh-huh.

16      Q.   That's -- that's like a real wide range.  If I said

17  significant, I don't want you to look at my house for more than

18  24 hours, that -- is that significant?

19      A.   It was definitely more than 24 hours.

20      Q.   I know.

21      A.   It was a very difficult location to surveil and so

22  we had concern because there were a lot of occupants going in

23  and out of the residence that had weapons.

24      Q.   There were a lot of people that had no weapons, too,

25  right?

1       A.    There were people there, but I couldn't tell you.  I
2  could only see the ones that were displayed openly.

3       Q.    Openly displayed?

4       A.    Uh-huh.

5       Q.    Did you know if they were even there the day of the
6  search?

7       A.    There were weapons there.

8       Q.    I didn't ask whether there were weapons there.  Were
9  there people there that were displaying weapons?

10      A.    No, sir.

11      Q.    All right.  And how many days did you have that
12  residence under observation?

13      A.    Specific number of days, I couldn't tell you, but it
14  was several months.

15      Q.    Several months --

16      A.    Yes, sir.

17      Q.    -- that you had cameras fixed on his home, right?

18      A.    Yes, sir.

19      Q.    You saw everybody that came and everybody that left,
20  right?

21      A.    Yes, sir.

22      Q.    All right.  You saw him walk his dog in the morning,
23  all right?  Right?

24      A.    I didn't, but --

25      Q.    Well, you observed --

```
 1          A.      -- it was surveilled, yes.
 2          Q.      It was surveilled, right.  You saw every -- you saw
 3     his wife now going in and out of the house, right?
 4          A.      Not at the time.  I don't believe she was there
 5     then.
 6          Q.      She wasn't there.
 7          A.      I don't know.  I don't know.  We had a difficult
 8     time identifying a lot of people.  That's what the point of
 9     the -- of watching, was to see who was in the residence.
10          Q.      Perfectly innocent people that had nothing to do
11     with anything you were checking in on, right?
12          A.      We were watching the residence, yes.
13          Q.      You were watching the residences, you were capturing
14     license plates and running them through New York and
15     Pennsylvania, right?
16          A.      I couldn't recall which states but, yes, we were
17     checking vehicle tags.
18          Q.      So, I mean, if I -- if I drove up to say hi to Ian
19     Freeman and, you know, offer him a birthday gift, you would
20     have checked my license plate?
21          A.      If we were surveilling that day, yes, sir.
22          Q.      And that day was several months?
23          A.      Yes, sir.
24          Q.      And after several months of observation, you decided
25     that there was a specific day that you were going to execute a
```

1   search warrant?

2        A.   Yes, sir.

3        Q.   Why that specific day?

4        A.   It was just a lot of coordination with a tremendous

5   amount of people.  So that worked best after having the search

6   warrant signed.

7        Q.   Well, when you finally got into the house -- and we

8   saw a couple of things -- you were asked whether there was a

9   shrine or a chapel or a meeting room.  Does that -- does that

10  mean that if there isn't a shrine or a chapel or a meeting room

11  that a building cannot be used as a church?

12       A.   Well, it wasn't what I recognized to be a church,

13  so ...

14       Q.   Well --

15       A.   I -- I didn't recognize -- I didn't see any of those

16  things and he kept saying that that was a church, so I'm just

17  answering the questions.

18       Q.   I know, but do you need like some kind of symbol in

19  order for you to come to a conclusion that it's a church?

20       A.   Me personally?

21       Q.   Yeah.

22       A.   I -- I don't believe so.

23       Q.   Right.  And you know people that run churches

24  sometimes have parsonages, too, right, there's no meeting rooms

25  in those, no shrines?

1       A.   I couldn't answer that.

2       Q.   And then there was a shot of the radio station area

3   and the question came up again, was there any kind of shrine in

4   that area or chapel or anything.  You've heard of like radio

5   ministries, right?

6       A.   Yes, sir.

7       Q.   Nothing uncommon about that, is there?

8       A.   I've heard of them.  I don't know how common they

9   are.

10      Q.   And the jury got to see a Secretary of State

11  application, right?

12      A.   Yes, sir.

13      Q.   A $50 fee by Ian Freeman, right?

14      A.   Yes, sir.

15      Q.   To utilize that space for religious purposes.

16      A.   I believe it had a different address on there.  It

17  was a -- the P.O. box that he was using on that application.

18      Q.   All right.  It may have been a P.O. box --

19      A.   Uh-huh.

20      Q.   -- but, I mean, there was a purpose, right?

21      A.   He filed the form.

22      Q.   Right.  The purpose was for religious purposes,

23  right?

24      A.   That's what it stated, yes.

25      Q.   Okay.  And that was -- that was -- was that a

1    legitimate -- I mean, was that a real Secretary of State State

2    of New Hampshire application and fee that was taken?

3         A.    I believe it was a legitimate application.  I

4    couldn't verify if the fee was actually taken.

5         Q.    Okay.  Now, how long did the whole search take

6    place?

7         A.    How long?

8         Q.    Yeah.

9         A.    We were there for the majority of the day.

10        Q.    For a full day.  Can you describe in your words how

11   you searched that place.  How did you enter that place?

12        A.    I utilized what we call our SWAT team.  Based on the

13   intelligence that we'd collected regarding the weapons that

14   we'd seen displayed outside the residence, they -- it's a

15   tactical team.  So I can't speak to specifics, but they go and

16   they give the occupants of the building an opportunity to exit

17   on their own, at which time they didn't.  So they did breach

18   the property with what we call a BearCat, which is a type of

19   law enforcement armored vehicle.

20             THE COURT:  I need you to speak up a little bit.  I

21   want to make sure the jury hears you.

22             THE WITNESS:  Okay.  We -- I utilized SWAT, which is

23   a tactical team based on the intelligence I'd collected for

24   officer safety because there was significant high-powered

25   weapons observed outside the residence during the surveillance.

1              SWAT gave an opportunity for the occupants to exit.

2    They do what we call -- refer to -- I guess you would say it

3    was a call-out.  And they didn't exit the building or the

4    house, so they used what's -- an armored vehicle that we call

5    BearCat.  And it actually will open the residence like through

6    a window, for example, in order to see if anyone is inside for

7    our safety because we're obviously not going to enter the

8    residence, especially with what we had observed.  At that point

9    the occupants did, after a period of time, come outside.

10             The residence was then cleared by this tactical team

11   and that's when we deemed the scene to be safe and we entered

12   into the property to start the search.

13        Q.   Well, what do you mean by a call-out?

14        A.   They physically ask the occupants to exit the

15   property safely.

16        Q.   What time of day did this take place?

17        A.   6:00 a.m.

18        Q.   6:00 a.m.?

19        A.   Yes, sir.

20        Q.   Was it dark out?

21        A.   It was, I believe, yes.

22        Q.   Are people generally sleeping at that time?

23        A.   I think some are.

24             MR. SISTI:  Yeah.

25             Your Honor, I just need one second.  I've just got

1    to check on something here.

2              THE COURT:  Yes.

3              MR. SISTI:  Thank you.

4              Thank you, Judge.

5        Q.    Before you began your search, in doing your due

6    diligence in order to make sure that there was officer safety

7    and having -- and knowing who was coming and going and staying

8    at that residence, did you run criminal record checks with

9    regard to the residents of that home?

10       A.    We didn't actually know everyone that was inside

11   that residence.  We had an idea of possible occupants, but we

12   didn't because the property was owned by Mr. Freeman.  There

13   weren't other occupants listed.  So I really couldn't say who

14   we thought was inside, but we did do some checks on people to

15   make sure we knew who, if we did encounter, that we could

16   identify them when they did exit.

17       Q.    Okay.  I'm kind of zeroing in on something that I

18   think maybe we're crossing on.

19       A.    Okay.

20       Q.    Officer safety is something you were discussing with

21   the jury, right?

22       A.    Yes.

23       Q.    So if there's nonviolent people inside a home that

24   legitimately have no record and legitimately have the right to

25   carry a firearm, all right, got it?

```
1          A.    Yes, sir.

2          Q.    You would want to know that, right?

3          A.    Certainly.

4          Q.    Okay.  So who did you know was regularly in that

5     house?

6          A.    Mr. Freeman.

7          Q.    Okay.  Stop there.  Now, does he have any kind of

8     felony record?

9          A.    No, sir.

10         Q.    Okay.  Did you know him to have a firearm?

11         A.    No, sir.

12         Q.    Okay.  Go on down the list.  Who else?

13         A.    A gentleman by the name of Matt Roach.

14         Q.    Okay.  Matt Roach.  Does he have a felony record?

15         A.    No, sir.  I don't believe so.

16         Q.    Okay.  Any record of being a violent felon or a

17    violent person?

18         A.    No, sir.

19         Q.    Okay.  Who else?

20         A.    I believe the other gentleman who lived in 75,

21    Mr. Nobody.

22         Q.    Okay.  Mr. Nobody, any record of him having any

23    violent record?

24         A.    He did have a criminal record, but I couldn't speak

25    to it specifically.
```

1      Q.    All right.

2      A.    I do recall a record, though.

3      Q.    Do you know if he purchased, carried, displayed a

4  firearm?

5      A.    That day, no.

6      Q.    No.  Okay.  So that's three that we know of.  Who

7  else, anybody else?

8      A.    To my knowledge, I believe that was -- those were

9  the only individuals that we actually knew would be inside the

10 residence.  But there were always a lot of people frequenting

11 the area.

12     Q.    Yeah.  Well, right before you went in to do the

13 search, I'm sure you guys were more than -- more than on top of

14 who was coming and going in that house, right?

15     A.    Well, there's only so much we can do.

16     Q.    Yeah, but you had --

17     A.    It's all observation.

18     Q.    I know.  You have 24-hour observation, right?

19     A.    Not at that point, no, sir.  No, we did not.  No.

20 That was only the beginning of the case.

21     Q.    So that was only for several months?

22     A.    Yes, sir.

23           MR. SISTI:  All right.  I'm going to ask the Court's

24 permission -- this is marked for ID now, so we will need a

25 sidebar for a moment.

1           MR. AFRAME:  Mark, we don't object.

2           MR. SISTI:  You don't object?

3           MR. AFRAME:  Based on everything that's already

4    happened.

5           MR. SISTI:  All right.

6       Q.   You described the search, you described the reasons,

7    and you talked about a call-out.  Do you know if Mr. Freeman's

8    home had the ability to record what went on that night?

9       A.   No, sir.  I believe there were cameras, but I don't

10   recall.

11      Q.   You believe there were cameras that, in fact, your

12   agents tried to destroy?

13      A.   I couldn't answer that.

14      Q.   Well, you were there, weren't you?

15      A.   I was there, yes.

16          MR. SISTI:  I'm going to ask that Defendant's G at

17   this time be played for the jury.  It has been stipulated to as

18   a full exhibit.

19          THE COURT:  Defendant's G?

20          MR. SISTI:  Thank you.

21               (Video recording played.)

22          MR. SISTI:  Okay.  Can we stop it right there?

23      Q.   What's pulling up there?  What's going on?

24      A.   I believe that's one of our vehicles, a tactical

25   vehicle, but that's really all I can tell you.

1          MR. SISTI:  All right.  Well, keep running.

2          Let's stop there.

3      Q.    What is that thing?

4      A.    That is the vehicle I was discussing.  That's what

5  we refer to as the BearCat.

6      Q.    That's a BearCat.  Why don't we hold it for a

7  second.

8          Describe -- describe for the jury what a BearCat is.

9      A.    It's an armored vehicle that law enforcement uses

10  for tactical purposes.

11      Q.    An armored vehicle that law enforcement uses for

12  tactical purposes.

13          I just want to make sure.  This is the 16th of March

14  2021?

15      A.    Yes, sir.

16      Q.    Is there any snow on the ground?

17      A.    I can't recall.  I don't know if that is snow from

18  the -- I've never seen this video before.

19      Q.    No?  How about do you know if --

20      A.    I can't recall.  It was cold that morning.  I

21  remember that.

22      Q.    It was very cold, right?

23      A.    Uh-huh.  Yes, sir.

24          MR. SISTI:  Okay.  Why don't we keep running.

25      Q.    Who are all these vehicles?  Who's that?

1    A.    This is all part of the SWAT team.

2          MR. SISTI:  Okay.  Why don't we stop right there.

3    Q.    How many people from the SWAT team were asked to be

4    there on the 16th of March 2021, for this search?

5    A.    I don't know how many were there.  I am not part of

6    the team.  The commander is in charge of that, who runs that

7    operation.  So they deem whatever amount of people are

8    necessary.

9          MR. SISTI:  Okay.  Keep running it, please.

10   Q.    What would that activity be?

11         If you'll stop for a second.

12   A.    I don't know.  I wasn't at the scene because we had

13   to stay away for officer safety until they secured the

14   residence for us.

15   Q.    Seems like there's a disturbance going on, though,

16   right?

17   A.    I don't know.

18   Q.    Okay.  We'll keep going.

19         Hold on one second, though.  Is there anything that

20   indicates anybody did a, quote, call-out?

21   A.    I wouldn't be able to tell you that.

22   Q.    What is a -- again, how would you do a call-out at I

23   think it would be 5:14 in the morning on the 21st of March?

24   A.    They physically -- the way I understand it,

25   because I couldn't hear it because we're not near the --

1    we're around -- away from the scene for protection, is that

2    they asked the occupants to come out of the residence.

3         Q.   That's what you were told happened, right?

4         A.   That's the way it was understood that it occurred --

5    that I understood it to have occurred.

6         Q.   Yeah, but you don't know if it occurred that way, do

7    you?

8         A.   Well, eventually the occupants did come out because

9    once it was secured, I was asked to come up to the scene.

10        Q.   Eventually they came out?

11        A.   Uh-huh.

12        Q.   That's after they used a battering ram, but we'll go

13   through.

14             Continue, please.

15             Okay.  What's that all about?  Why don't we stop

16   right there.

17        A.   That's part of our tactical team.

18        Q.   Can you describe what your tactical team uses to be

19   so tactical?  I mean, it seems to be they're fairly

20   well-equipped.

21        A.   Yes.

22        Q.   What are they equipped with for this search of Ian

23   Freeman's home?

24        A.   It appears to be a shield and their assigned

25   firearms.

1      Q.    Seems like a shield, that's just two people, and an

2   automatic weapon, right?

3      A.    Yes.

4      Q.    Okay.  Do you see any of them calling out anything?

5      A.    I wouldn't be able to tell from the video.  There's

6   no audio.

7            MR. SISTI:  Why don't we keep going.

8      Q.    Wow.  How many have we got here?

9            Hold on.  Can we back that up a bit?  Okay.  Stop.

10           What have you got in the frame right now?  Can you

11  count them?

12     A.    One, two, three, four, maybe five or six agents.

13     Q.    Okay.  All with firearms?

14     A.    Yes.

15           MR. SISTI:  Why don't we continue.

16           Wait a minute.  Why don't we stop there.

17     Q.    Do you see what that agent just did?

18     A.    Removed the flag.

19     Q.    What flag was that?  What did he rip down from the

20  porch?

21     A.    That's definitely done for visual officer safety

22  purposes.

23     Q.    What flag did he rip down?

24     A.    I don't know what it was.

25           MR. SISTI:  Why don't we continue.

1            Can you stop for a second?

2       Q.    Does it look like anybody's making an effort to call

3  out or knock on a door or anything?

4       A.    I wouldn't be able to say.  I don't know what they

5  were specifically doing.

6       Q.    Right.

7       A.    And there's no audio, so I couldn't answer that.

8            MR. SISTI:  All right.  Why don't we continue.

9            Can we stop for a second?

10      Q.    Was there any indication by any of the members of

11 that team that there was any verbal resistance coming from the

12 house at that time?

13      A.    I was not on their line of communication during this

14 part.

15      Q.    You got to talk to these guys afterwards, didn't

16 you?

17      A.    No.  After the SWAT team, after we -- once we

18 started the search, I did not speak with them, no.

19      Q.    Was there ever a report that there were threats

20 coming from within the home or anything like that?

21      A.    Not -- I -- I've never read anything like that.  Not

22 to my knowledge.  I didn't focus on that.  Once the entry is

23 made, that -- their team is totally separate.

24      Q.    I understand.

25      A.    Uh-huh.

1      Q.    I'm just asking so the jury understands what we're

2   watching.

3            Was anybody threatening those fully armed agents?

4      A.    I don't know.  I wasn't there.

5            MR. SISTI:  Okay.  Why don't we continue.

6            Here we go.  Can we stop?

7      Q.    Who is that?

8      A.    That's the gentleman Mr. Nobody.

9      Q.    Can you tell the jury if you see him with any

10  firearms, weapons, anything of the sort?

11     A.    It doesn't appear in that frame.

12            MR. SISTI:  Why don't we continue.

13            And if we can stop.

14     Q.    Do you know who that is?

15     A.    I didn't see his face.

16            MR. SISTI:  Okay.  Why don't we back up a second.

17            Okay.  Why don't we go again.

18     Q.    Do you know who that gentleman is?

19     A.    I don't.

20     Q.    Okay.  What's his attire?

21     A.    A T-shirt and like sweatpants.

22     Q.    Any shoes?

23     A.    No, sir.

24     Q.    Did he come out with any weapons that you saw?

25     A.    Doesn't appear to be any in his hands.

1      Q.    Does it appear as though he's resisting any way,

2   shape, or form?

3      A.    No.

4            MR. SISTI:  Why don't we continue.

5            Okay.  Why don't we stop.

6      Q.    Do you recognize that individual?

7      A.    That's Mr. Freeman.

8      Q.    And how is he attired?

9      A.    I think it's a robe.

10     Q.    Is there any indication from you that he was

11  resisting any kind of arrest or contact with your agents?

12     A.    Not at this point, no.

13     Q.    And who's he got with him?

14     A.    A dog.

15           MR. SISTI:  Yeah.  Why don't we continue.

16           Okay.  Why don't we stop there.

17     Q.    Who would that be?

18     A.    I believe that's Bonnie.

19     Q.    The one that you weren't sure was there?

20     A.    Correct.

21     Q.    That is definitely her, right?

22     A.    I believe it is.  I didn't know who she was before

23  the day of the arrest.

24     Q.    How is she attired?

25     A.    It looks like a robe.

1          Q.    Do you know if she's got anything on her feet?

2          A.    I can't see in this frame.

3                MR. SISTI:  Why don't we keep going.

4          Q.    As we've seen these so far, is there any indication

5    of any resistance at all?

6          A.    No, sir.

7          Q.    Okay.  Now, your members of your SWAT team are now

8    entering the home, correct?

9          A.    Yes.

10                      (Video recording played.)

11         Q.    What's going on there?

12                Can we stop?  Can we stop?  Can you back that up a

13   second, please?

14                Okay.  What's this man doing?

15         A.    He's obviously disabling that camera.

16         Q.    Is that standard operating procedure to you?

17         A.    I don't know.  I'm not on the SWAT team, so I don't

18   know.

19         Q.    I mean, is it general SWAT team or FBI policy to

20   destroy other people's property?

21         A.    I wouldn't be able -- I wouldn't call it destroying.

22   I think it's for officer safety purposes that they remove or

23   disable the cameras.  But I'm not on the SWAT team, so I

24   couldn't tell you.

25         Q.    Yeah.  So you're just guessing why he destroyed

1    that?

2         A.    Well, from my viewpoint, it would be to make sure

3    that that's not being, you know, monitored from across the

4    street or a remote access where it would possibly cause us

5    harm.

6              MR. SISTI:  Just keep going, please.

7         Q.    Might be -- can we stop?

8              Might be they don't want people to see what they're

9    doing, too, right?

10        A.    For safety purposes, yes.

11        Q.    Might be they don't want people like a jury seeing

12   what they're doing, too, right?

13        A.    No --

14             MR. AFRAME:  Objection.

15             THE COURT:  Is there a -- you can answer.

16             THE WITNESS:  I would disagree.  I think it's for

17   tactical purposes so, you know, these types of recordings

18   aren't put out on some platform of social media that would

19   cause us harm in future arrest.

20        Q.    I think you're speculating.  Okay?

21             How do you know that --

22             THE COURT:  Well -- well, don't testify.

23             MR. SISTI:  I'm sorry.

24        Q.    How do you know it wasn't for some just vindictive,

25   nasty, destructive reason?

1     A.    I don't work with people like that.  We're very

2   professional.  We're extremely professional.

3                    (Laughter in audience.)

4              MR. SISTI:  Let's continue, please.

5              THE COURT:  Excuse me.

6              MR. SISTI:  I'm sorry, Judge.

7              THE COURT:  No outbursts.  This isn't for your

8   entertainment.  This man's in here accused of a crime and his

9   lawyer's defending him.  Any more outbursts, it'll be the last

10  one.

11             Please proceed.

12             MR. SISTI:  Thank you, Judge.  I appreciate that.

13             Please continue.

14                    (Video recording played.)

15    Q.    What is that?

16    A.    That looks like the arm of the BearCat with the

17  windowpane.

18    Q.    Well, weren't your officers already in the house?

19    A.    That I couldn't tell you.

20    Q.    Hold it.  I mean, we're -- this has time stamps on

21  it.

22    A.    I -- again, I wasn't there, so I can't tell you each

23  specific stage of what took place.

24    Q.    We already saw individuals walking out of that house

25  with their hands up, barefoot, in the snow, going out through

1  the porch, right?

2      A.    Yes, but I've never seen this video before and I --

3  I wouldn't be able to attest that this was the sequence or if

4  it was manipulated or cut or anything.

5          MR. SISTI:  All right.  Why don't we just continue.

6      Q.    So that's actually going through a window?

7      A.    It went through a window, obviously.

8      Q.    And yanking it out?

9      A.    Yes.

10     Q.    Okay.  What else?

11         Keep going.  Thank you.

12         You remember that day, right?

13     A.    Yes, sir.

14         MR. SISTI:  I have no further questions.

15         THE COURT:  It's time for the morning break, so

16  we'll continue with redirect after the break.  15 minutes.

17         THE CLERK:  All rise.

18                   (Jury excused.)

19         THE COURT:  Please be seated.

20         The agent, you never saw this tape before --

21         THE WITNESS:  No, sir.

22         THE COURT:  -- today?  All right.

23         Anything for the Court?  No?  All right.

24         MR. SISTI:  Can we approach for one second?

25         THE COURT:  Sure.

1          MR. SISTI:  Something just came --

2          THE COURT:  Do you need a record?

3          MR. SISTI:  No.  Actually --

4          THE COURT:  Okay.  We're off the record.

5                 (Off-the-record discussion.)

6       (Recess taken from 10:54 a.m. until 11:12 p.m.)

7          THE CLERK:  All rise for the jury.

8          Please be seated.

9          THE COURT:  All right.  The agent is still under

10   oath.

11                   REDIRECT EXAMINATION

12   BY MR. AFRAME:

13       Q.   Since it was most of the subject of the cross-exam,

14   I'll just focus for a couple minutes on the search.  Okay?

15       A.   Okay.

16       Q.   All right.  So on that day, was this the only search

17   conducted relevant to the Freeman case?

18       A.   No, sir.

19       Q.   Where were the other searches conducted?

20       A.   There were several other sites located throughout

21   the area in the state.

22       Q.   And at any of any of those other sites was the SWAT

23   used?

24       A.   Yes, sir.  No, I stand corrected.  No.  It was just

25   this location.

1      Q.    And why -- why was SWAT decided to be used at this

2  location?

3      A.    Based on what we had observed from surveillance of

4  the property, there were individuals that would be in front of

5  the residence with very high-powered rifles.

6      Q.    And that wasn't Mr. Freeman, right?  I don't want to

7  overstate this --

8      A.    No.

9      Q.    -- that was not Mr. Freeman, right?

10      A.    No, it was not.

11      Q.    And when you're doing a search, is that the concern,

12  Mr. Freeman and Mr. Freeman alone?

13      A.    No.

14      Q.    Why not?  What -- when you're thinking about a

15  search, what -- what are the considerations that are going

16  into -- into the -- your -- your thinking?

17      A.    Well, the actual search is just the organization and

18  making sure that we take only what's needed for the execution

19  of the search warrant.  But to enter the property is a serious

20  concern for officer safety.

21           Based on the type of weaponry that we had seen, I

22  had even observed another individual on the front porch of his

23  residence that had a full-size umbrella.  He unscrewed the base

24  of the umbrella and pulled out a full-size sword.

25           So there were indications to where it would be --

1  you know, I want to make sure we stay safe.  I don't want

2  anybody being hurt.

3          Four weeks prior to the execution of the search

4  warrant, there were two FBI agents murdered --

5          MR. SISTI:  I'm going to object.

6          THE COURT:  Yup.  Yeah.  Was what -- was the event

7  you're about to describe connected with this case in any way?

8          THE WITNESS:  No, sir.

9          THE COURT:  Why don't you stop there.

10          MR. SISTI:  Thank you.

11          THE COURT:  Go ahead.

12  Q.    Let me ask you maybe what I think is the most --

13          THE COURT:  It's okay to say that there had been

14  events -- you know, there had been events in the country that

15  raised your awareness.  That's fine.  But let's not get into

16  specifics.

17  A.    Okay.  There were --

18  Q.    Which, I guess, I mean, that's the point.

19  Everyone's heard that point.  We don't need to make it again.

20  A.    Okay.

21          THE COURT:  Well, if it's the case.

22          MR. AFRAME:  Yeah.

23          THE COURT:  I'm not testifying.

24          MR. AFRAME:  No.

25  Q.    I mean, is that the case?

1      A.    It is the case.  There were some events that had

2  occurred.

3            THE COURT:  That's fine.

4      Q.    But the most important thing to me is was anyone

5  hurt in this event?

6      A.    No.

7      Q.    Okay.  Let me ask you about -- Mr. Sisti kept

8  talking about the call-out and said, well, where was the

9  call-out, where was the call-out.

10           You've been an FBI agent for 24 years, right?

11     A.    Yes, sir.

12     Q.    You're familiar with the search warrant in this

13  particular case, right?

14     A.    Yes, sir.

15     Q.    Did it require knock-and-announce?

16     A.    No.  Well, it did in the sense that, yes, we notify

17  them to come out.  It just wasn't -- they didn't cooperate.

18     Q.    Right.  But the law required you to do that?

19     A.    Yes.

20     Q.    And people did come out?

21     A.    They did.

22     Q.    I saw them.

23     A.    They did.

24     Q.    And the video itself had a 5:00-something time stamp

25  on it.  Did you see that as you watched it, that it was --

```
1         A.   You saw that there was -- yeah, it was marked with
2    time.
3         Q.   And this is not from the government, this video,
4    right?
5         A.   No.
6         Q.   You hadn't seen this video till today?
7         A.   No, sir.
8         Q.   What was the time on which the search could
9    commence, according to the search warrant?
10        A.   6:00 a.m.
11        Q.   And did you follow that?
12        A.   Yes.
13             MR. AFRAME:  Okay.  Let me -- well, let's approach
14   for a second.
15                          AT SIDEBAR
16             THE COURT:  Okay.  I've been handed two exhibits
17   marked for identification, 311 and 312.  They appear to depict
18   the interior, looks like a bedroom.
19             Go ahead.
20             MR. AFRAME:  And I'm focusing on the various guns
21   that are in that photo.
22             THE COURT:  Sure.  And you want to introduce these?
23             MR. AFRAME:  Yes.  In light of Mr. Sisti's everyone
24   is peaceful, nonviolent, there was no risk here -- in light of
25   the argument -- the questioning which suggests that everything
```

1   was peaceful and nonviolent and there was no risk here and this

2   was an FBI overreaction, the fact that a bedroom in the house

3   was filled with these weapons is now relevant.

4                MR. SISTI:  Okay.  Let me address that because, one,

5   it's not Freeman's room.  In fact, it's the room of an

6   individual with the last name Roach that they knew lived there.

7   He has got no record whatsoever.  They did a complete

8   background on him.  There was no reason for them not to.  It's

9   separate and apart from Freeman's room.  There have been no

10  threats against any agents or federal authorities.  Period.

11               Those firearms are all legal.  Those firearms were

12  known and not used in any way, shape, or form for threats or

13  anything else.  It's an overamplification of things outside of

14  the realm of Ian Freeman.  He can't even walk in that room.

15               THE COURT:  Why not?

16               MR. SISTI:  Because it's leased separately by

17  Mr. Roach.  It is not his.

18               THE COURT:  All right.  And you're saying that was

19  known to the investigators --

20               MR. SISTI:  Roach --

21               THE COURT:  -- that he had a lessee?

22               MR. SISTI:  Oh, yeah.  They know Roach.  They said

23  that's who he was.  She testified to it.

24               THE COURT:  Okay.

25               MR. AFRAME:  Can I say something further?

1                THE COURT:  Of course.

2                MR. AFRAME:  This isn't a question of whether

3    Mr. Freeman's guilty or innocent.  It's strictly a question of

4    safety.  Whoever's these guns were, they're in the house, they

5    could be accessed, and the FBI is coming.  That there's a

6    lessee relationship seems to have nothing to do with what we're

7    talking about.  This is -- Mr. Sisti has made a huge point

8    about peacefulness, nonviolence, no weapons, and that suggests

9    that is not so and I think I have every right to try to present

10   that now.

11               MR. SISTI:  I'm going to tell you, I mean, I've

12   lived in this state now since 1976.  I -- I would say that more

13   than 50 percent of the individuals that live in this state have

14   a firearm or more in their house.  And if that was a

15   rationalization to be doing what they did, they'd be doing it

16   in every search.

17               THE COURT:  I'm just trying to get a better look at

18   these -- at these firearms.

19               MR. SISTI:  They were examined even afterwards, by

20   the way.

21               THE COURT:  Yeah.

22               MR. SISTI:  There's nothing.  Nothing.

23               THE COURT:  What's the story on Roach?

24               MR. SISTI:  He's clean.

25               MR. AFRAME:  He lives -- I don't know.  I don't -- I

 1    don't believe he has a criminal record, but he lives there with

 2    Freeman.  He's part of Freeman's group of people.

 3              THE COURT:  That's what I'm asking, is he known to

 4    be an associate for any of these antigovernment --

 5              MR. AFRAME:  Yes.  Right?  Yes.  He's signed on some

 6    of those documents.  He's one of the names that we read off as

 7    do people know him, because he signed on these church

 8    documents.  He's part of the crew.

 9              THE COURT:  Okay.

10              MR. SISTI:  He's also got no record whatsoever of

11    violence, no record of handling unlawful firearms, no reckless

12    conduct in his background.  The guy sells pet insurance for a

13    living.

14              THE COURT:  Sure.  Okay.

15              MR. SISTI:  I needed him the other day.

16              THE COURT:  Here's the thing.  Okay?  Look.  I do

17    think in light of the cross-examination it's just -- it's

18    admissible evidence to demonstrate that there are threats to

19    any investigating officer in someone's prior residence.  Even

20    in a pro-gun state like New Hampshire where a lot of people

21    have guns at home, I think it's permissible on redirect and I'm

22    sure you'll explore it on recross.

23              Yeah, I'm going to allow it.  I don't think -- and I

24    certainly don't think the prejudice outweighs the probativity

25    in light of the cross.  I didn't think there was anything wrong

 1    with the cross.  I think the cross was completely permissible

 2    and acceptable.  But it -- I think it makes this -- it makes

 3    this worth considering.

 4                 MR. SISTI:  Can I see that one more time?

 5                 THE COURT:  Okay.  Overruled.

 6                     CONCLUSION OF SIDEBAR

 7          (Government's Exhibits 311 and 312 were admitted.)

 8                 THE COURT:  Folks, understand I'm addressing you

 9    right now.  That's so she can hear when we're at sidebar.  Do

10    you understand?  Thanks.

11        Q.    Okay.  Only one last point on the -- the search.

12              So when you ultimately -- so let me ask this

13    question.

14              Once we watched that part that we watched, the

15    video, does the -- once the residence is secured and it's

16    determined that all people are out of the house, what happens

17    to the SWAT team?

18        A.    They depart the area.

19        Q.    Okay.  And then -- then what happens?

20        A.    Then my team will move in and we start the search --

21        Q.    Okay.

22        A.    -- of the actual residence.

23        Q.    And I imagine -- how are you dressed?

24        A.    I had on cargo pants and stuff that we could work,

25    you know, a traditional shirt.  Not a suit.

1    Q.    Okay.  And did you search all the rooms of the

2  house?

3    A.    My teams did, yes.

4    Q.    Yes.  And was there -- in the 73 Leverett side, was

5  there more than one bedroom?

6    A.    Yes, sir.

7    Q.    And were you able to identify who was in which

8  bedroom based on what you found in them?

9    A.    Yes, sir.

10    Q.    And where was Mr. Freeman's bedroom?

11    A.    It was on the second floor in the rear of the

12  residence.

13    Q.    And was there another bedroom?

14    A.    Yes, sir.

15    Q.    And did you figure out, based on what was in there,

16  whose bedroom was that?

17    A.    A gentleman by the name of Matt Roach.

18    Q.    And were you familiar with Mr. Roach, just based on

19  the surveillance that had been done leading up to the --

20    A.    Yes, sir.

21    Q.    -- search?

22          And did you know him to associate with Mr. Freeman?

23    A.    Yes.

24    Q.    And how far was Mr. Roach's bedroom from

25  Mr. Freeman's bedroom?

1      A.   Not very far.  It was pretty much across the hall

2  with a stairwell in between.  I would say no further than here

3  to the second table in the courtroom.

4      Q.   Okay.  And did you search Mr. Roach's room?

5      A.   My team did.

6      Q.   Okay.  Are you familiar with what was found in

7  there?

8      A.   I'm sorry.  What?

9      Q.   Are you familiar with what was found in there?

10      A.   Yes, sir.

11      Q.   Okay.  So let me show you now what's been marked

12  for -- as Government's Exhibit 311 first.

13           THE CLERK:  Is this for ID or no?

14           MR. AFRAME:  No, the objection's been --

15           THE COURT:  It's been admitted, 311 and 312.

16      Q.   This is Government's Exhibit 311.  It's slightly

17  blurry, but are you familiar with this?

18      A.   Yes, sir.

19      Q.   And whose bedroom was this?

20      A.   Mr. Roach's.

21      Q.   And that's the one down the hall from Mr. Freeman's?

22      A.   Yes, across the hall.

23      Q.   And is there a fireplace on sort of the side wall

24  here, some -- there's a -- there's a white wall with blue

25  circles?

```
 1          A.    Yes.  I don't recall it -- I don't remember if it

 2    was a fireplace.  It's hard to see.

 3          Q.    That's fine.

 4          A.    I do remember what is located there specifically.

 5          Q.    Okay.  So what's leaning against that wall?

 6          A.    Weapons.

 7          Q.    Okay.

 8          A.    Firearms.

 9          Q.    And I'll see if 312 can show it just a little closer

10    up.

11                And do you see a whole bunch of different types of

12    weapons there?

13          A.    Yes, sir.

14          Q.    And those were there the day of the search?

15          A.    Yes, sir.

16          Q.    And no one got hurt in the search, right?

17          A.    No, sir.

18                MR. AFRAME:  No further questions.

19                            RECROSS-EXAMINATION

20    BY MR. SISTI:

21          Q.    Let's talk about Mr. Roach for a second.  Okay?

22          A.    Okay.

23          Q.    Because you knew about Matt Roach well before there

24    was any kind of a search that was executed, correct?

25          A.    I did know of him before the search warrant, yes,
```

 1    sir.

 2         Q.    And, again, I'm going to go back to the beginning.

 3    For officer safety, certainly you would have checked his

 4    background?

 5         A.    Yes, sir.

 6         Q.    And for officer safety, you knew he had no violent

 7    criminal record, right?

 8         A.    That's correct.

 9         Q.    That he was not a convicted felon, right?

10         A.    That's correct.

11         Q.    That he had the right to procure, own, and secure

12    weapons, correct?

13         A.    Yes, sir.

14         Q.    All right.  There was no restrictions with regard to

15    Mr. Roach having those weapons, right?

16         A.    No, sir.

17         Q.    That room was separate and apart from Ian Freeman's

18    room, right?

19         A.    Yes, sir.

20         Q.    No question about that?

21         A.    No question.

22         Q.    Roach never threatened any of your officers at the

23    scene?

24         A.    Not that I'm aware of.

25         Q.    Right.  Well, you would know that, wouldn't you?

94

1      A.   I would know that, yes, if --

2      Q.   Yeah.

3      A.   It did not happen in my presence.  I'm not aware of

4  any.

5      Q.   Well, a lot of things didn't happen in your

6  presence; because it was referred to again by the U.S.

7  Attorney's Office that there was this call-out thing, that

8  there was this knock-before-you-enter situation, right?

9      A.   Yes, sir.

10     Q.   This call-out, right?

11     A.   Yes, sir.

12          MR. SISTI:  Okay.  If you could start G again,

13  please.

14                    (Video recording played.)

15     Q.   Do you know what that is?

16     A.   No, sir.

17          MR. SISTI:  Can you stop for a second?

18     Q.   Why is all that disturbing?  Why is that dust or

19  flakes or snow or whatever happening, do you know?

20     A.   No, sir.

21          MR. SISTI:  Why don't you continue.

22          Stop.  You can stop.

23     Q.   Do you know what that is?

24     A.   No, sir.

25     Q.   Did you ever hear in your 24 years of experience a

1    call-out called a flash bang grenade?

2         A.   I've heard of a flash bang, yes.

3         Q.   Do you know what that is?

4         A.   I really couldn't define it.  I just know that it's

5    used by the SWAT team.

6         Q.   Do you think it was used in the early morning

7    hours --

8         A.   I don't know.

9         Q.   -- of the 16th of March?

10        A.   I don't know.

11        Q.   What are you watching?  What are you seeing?

12        A.   It's a video with some debris in front of the

13   camera.  I couldn't tell you specifically.

14        Q.   Does it -- have you seen a flash bang before?

15        A.   I have in a training purpose.

16        Q.   Yeah.  You may have just seen one for real.

17             Thank you.

18             MR. AFRAME:  Nothing further.

19             THE COURT:  Thank you.  You're excused.

20             THE WITNESS:  Thank you.

21                     (Witness excused.)

22             THE COURT:  Please call your next witness.

23             MS. MACDONALD:  Kevin McCusker.

24             THE CLERK:  Please remain standing and raise your

25   right hand.

1    **KEVIN MCCUSKER,** having been first duly sworn,

2   testified as follows:

3        THE CLERK:  Please be seated.

4        For the record, please state your name and spell

5   your last name.

6        THE WITNESS:  My name is Kevin McCusker,

7   M-c-C-u-s-k-e-r.

8                    DIRECT EXAMINATION

9   BY MS. MACDONALD:

10    Q.   Good morning, Agent McCusker.  Could you please tell

11   us where you work.

12    A.   I am a special agent for the Federal Bureau of

13   Investigation currently assigned to the Portland resident

14   agency office in Portland, Maine.

15    Q.   And did -- how long have you worked in the Portland

16   office?

17    A.   I've been in the Portland office for just over two

18   years.

19    Q.   And where were you previous to that?

20    A.   Prior to that I worked in our headquarter city, so

21   our Boston field office, for a white-collar crime squad, an

22   economic crimes squad.

23    Q.   Okay.  And could you just briefly describe what your

24   duties and responsibilities are as an FBI special agent?

25    A.   So I am -- my typical day-to-day duties are to

1  gather evidence and information and speak to witnesses about

2  allegations or information that would be indicative of

3  violations of federal law.  I try to develop an investigation

4  in a case and present to a -- the appropriate prosecuting

5  office.

6      Q.   Okay.  And sometimes do you serve as the main case

7  agent on those cases?

8      A.   Most times I do, yes.

9      Q.   But do you otherwise help in other people's

10 investigations?

11     A.   Yes, I do.

12     Q.   And let me direct you to March 16th of 2021.  Did

13 you participate in a search that day?

14     A.   I did.  A search warrant, yes.

15     Q.   And was this a case that was your investigation or

16 someone else's that you were helping on?

17     A.   This was another -- another agent, another team of

18 agents' investigation --

19     Q.   Okay.

20     A.   -- out of the -- out of the New Hampshire resident

21 agency offices.

22     Q.   And how did it become to -- come to be that you

23 participated in the search that day?

24     A.   I believe it was a canvass to our office, the

25 entirety of the office, for availability.  It sounded like they

1   needed -- they needed manpower for the search and I volunteered

2   for that.

3        Q.   Okay.  And prior to helping out in the search, were

4   you given any sort of background or briefing about the case?

5        A.   I was.  I had been briefed that it had to do

6   with cryptocurrency.  I had been given materials about

7   cryptocurrency, what to -- what would be -- what to look for,

8   what it -- what it seems like, what it -- what it looks like,

9   and as well as a brief about the nature of the case the morning

10  of the search and then -- so yes.

11       Q.   Okay.  And are you informed that a search warrant

12  has been received?

13       A.   Yes.

14       Q.   And are you instructed on specific things that that

15  search warrant authorizes you to search for?

16       A.   Yes.  During the brief it would have -- it would

17  have been briefed.

18       Q.   Okay.  And on the morning of March 16th, 2021, I'll

19  represent we've heard some testimony that there was a SWAT team

20  that made an initial entry.  Were you a member of that SWAT

21  team?

22       A.   Not at the time, no.

23       Q.   Okay.  And so you weren't a part of that initial

24  entry?

25       A.   No, I was not.

1     Q.    Okay.  What was your role that day?

2     A.    I assisted during the searching of the residence.

3     Q.    Okay.  And I'm going to pull up what has been

4  admitted as Exhibit 401.

5           Do you recognize this photo?

6     A.    I -- I recognize the room in the photo, yes.

7     Q.    Okay.  And where is this room?

8     A.    This room is in the residence or the structure at

9  Leverett Street in Keene, New Hampshire.  It was on the first

10  floor, one of the -- the room that I mostly spent time in doing

11  the search.

12     Q.    Okay.  And is this -- is there something -- do you

13  see sort of -- well, actually, let me just take you to

14  Government's Exhibit 402.

15           Do you recognize this?

16     A.    Yes.  So that's the -- a file cabinet that's

17  underneath a printer that's located in that same room.  You can

18  see --

19     Q.    Okay.

20     A.    In the prior picture you can see it off in the

21  corner.

22     Q.    And let's do that.  Let's go back to 401 and I'll

23  have you describe where in that room that file cabinet is.

24     A.    So you can see it kind of to the middle of the

25  picture in the back.  You see the printer and then underneath

1    the printer is that cabinet.

2         Q.    Okay.  And is that a location that you searched?

3         A.    Yes.

4         Q.    Okay.  And did you find something that you believed

5    to be responsive to the search warrant?

6         A.    Yes.

7         Q.    Okay.  And let me direct you to Government's

8    Exhibit 403.

9               What are we looking at here?

10        A.    So that's a manila folder that was in that file

11   cabinet containing the documents.

12        Q.    Okay.  And what is that manila folder titled?

13        A.    It has the word crypto written at the top.

14        Q.    Okay.  And you determined that to be responsive to

15   the search warrant?

16        A.    Yes.

17        Q.    Okay.  And after you found that, what did you do

18   with it?

19        A.    I had -- well, we had arranged it the way it looked

20   in the photo so that it could be photographed and assigned a

21   number.  And then it -- I don't remember if it was I who

22   packaged it, but it was identified and photographed for

23   packaging and seizure.

24        Q.    Okay.  And after participating in a search that day,

25   did you have any further investigation -- participation in this

1    case?

2         A.    No.

3              MS. MACDONALD:  Okay.  Thank you.

4              THE COURT:  Cross.

5              MR. SISTI:  Thank you, Judge.

6                        CROSS-EXAMINATION

7    BY MR. SISTI:

8         Q.    Good morning.

9         A.    Good morning, sir.

10        Q.    I won't keep you long, Agent, but how long were you

11   at that particular residence?

12        A.    Probably a couple hours.

13        Q.    And can you tell the jury when you arrived?

14        A.    Probably -- probably arrived at the -- in the

15   residence approximately seven o'clock maybe.

16        Q.    Okay.  So that would have been well after the

17   initial entry?

18        A.    Correct.

19        Q.    And well after the individuals inside had been

20   cleared?

21        A.    Correct.  I mean, we were in the general vicinity of

22   the residence, but not at the scene.

23        Q.    Were you able to observe the scene?

24        A.    No.

25        Q.    Okay.  So you wouldn't have been able to see what,

1   in fact, took place with regard to the SWAT team?

2       A.   I wouldn't have seen it.

3       Q.   Did you hear anything?

4       A.   I don't have a memory of hearing anything.  I know

5   that there was a tactical team involved in the -- in the -- in

6   the initial approach of the house.

7       Q.   Okay.  I mean, I just want to make sure because I

8   don't want to miss anything.

9           Did you hear a call-out, something like, hey,

10  Freeman, you know, it's the FBI, it's time to come out,

11  anything like that?

12      A.   I don't remember.

13      Q.   Did you hear a flash bang grenade?

14      A.   I don't remember.

15      Q.   You don't remember?

16      A.   No.

17      Q.   How far away from this residence were you?

18      A.   It might have been -- I don't remember it.  It might

19  have been a block and a half, two blocks.

20      Q.   You don't remember.  Okay.  But you don't remember

21  anything; you don't remember any hearing, right?

22      A.   I -- no, I don't.

23      Q.   And you don't remember seeing anything?

24      A.   I don't -- I don't remember seeing the entry of the

25  house, no.

1    Q.    All right.  How many agents were there?  When you

2    first came on the scene.

3    A.    There were a number of agents.  In that particular

4    room, when I first went into that room, there weren't that

5    many -- I probably was the -- one of the agents out of -- I

6    probably was the one agent in there for a little while until

7    the search -- until more agents came in.

8    Q.    Okay.  Let me make my question a little bit more

9    clear, okay, because maybe we're misunderstanding each other.

10    How many total agents were at that scene?

11    A.    I don't -- I don't know.  15 or 20.

12    Q.    15 or 20 agents at that one residence, right?

13    A.    I -- I don't have the exact number, sir.  I'm sorry.

14    Q.    But that excludes the SWAT team, right?

15    A.    Correct.

16    Q.    So there's 15 or 20 agents, plus the six or seven

17    SWAT members, right?

18    A.    The -- I don't believe the SWAT members were there

19    when I was there.

20    Q.    No.  They were there before you, right?

21    A.    Correct.

22    Q.    And you've worked on a SWAT team before, haven't

23    you?

24    A.    I have.

25    Q.    Can you tell the jury whether there's a certain

1  number of you folks that would be put together for something

2  like this operation?

3       A.    I mean, that's a decision that's made by the

4  leadership of the team.

5       Q.    Okay.  All right.  But if I said there were six or

6  seven SWAT agents at the scene, that would not be unusual,

7  right?

8       A.    No.

9       Q.    And there would be a BearCat there, too, so there'd

10  be an operator for the BearCat, right?

11      A.    There -- if they used a BearCat, there would be an

12  operator for the BearCat.

13      Q.    Okay.  So maybe we're up to seven or eight SWAT team

14  and 15 to 20 regular special agents?

15      A.    Agents or other personnel involved in the search.

16      Q.    Any other person --

17      A.    Again, that would have been -- one would have come

18  after the other.

19      Q.    All right.  There were a lot of people there, right?

20  Right?

21      A.    There's an amount that's determined to be

22  appropriate based on the needs of the search.

23      Q.    Okay.  I just -- you were in the -- what I guess was

24  like the radio station office kind of area?

25      A.    Yes, sir.

1    Q.   And you pointed out in Exhibit 401 a filing cabinet,

2    right?

3    A.   Yes, sir.

4    Q.   But you were in the vicinity of that room and I

5    think the picture's going to show -- could we put up 401,

6    please?

7         There's a window to the right?

8    A.   Yes, sir.

9    Q.   Can you tell the jury what that window looks like?

10   A.   I mean, it's -- I believe that's the window that was

11   broken.

12   Q.   Yeah.  It's -- it's been broken, right?

13   A.   Yes.

14   Q.   Do you know how that window was broken?

15   A.   No, I don't.

16   Q.   Okay.  Did anybody explain while you're sitting in a

17   radio station room in a house why that window is smashed?

18   A.   No, not specifically.

19        MR. SISTI:  I have no further questions.

20        THE COURT:  Redirect?

21        MS. MACDONALD:  No, your Honor.  Thank you.

22        THE COURT:  Thank you.  You're excused.

23        THE WITNESS:  Thank you, sir.

24             (Witness excused.)

25        MS. MACDONALD:  Manchester Police Detective Derek

1    Feather.

2            THE CLERK:  Please remain standing and raise your

3    right hand.

4            **DEREK FEATHER**, having been first duly sworn,

5    testified as follows:

6            THE CLERK:  Please be seated.

7            For the record, please state your name and spell

8    your last name.

9            THE WITNESS:  Derek Feather, F-e-a-t-h-e-r.

10                   DIRECT EXAMINATION

11   BY MS. MACDONALD:

12       Q.   Good morning, Sergeant Feather.  Where are you

13   currently employed?

14       A.   City of Manchester Police Department.

15       Q.   And what is your current assignment?

16       A.   Patrol supervisor, sergeant.

17       Q.   Okay.  And in March of 2021, did you have a

18   different assignment?

19       A.   Yes, I was.  I was part of the task force for the

20   FBI.

21       Q.   Tell me what task force you're referring to.

22       A.   With the Safe Streets Task Force.

23       Q.   And what is the Safe Streets Task Force?

24       A.   We focused on drug offenders and violent crime.

25       Q.   Okay.  And what does it mean to be a task force

1    officer with the FBI?

2         A.    I basically have the same access, arrest powers, and

3    everything that an agent would have.

4         Q.    Okay.  Now, you testified that you were on a task

5    force that dealt with drugs and violent crime.  Did you

6    sometimes help other groups in your office?

7         A.    Yes, we did.

8         Q.    And on March 16th of 2021, were you helping out a

9    different part of your office?

10        A.    Yes.

11        Q.    Okay.  And who was -- who were you helping out that

12   day?

13        A.    Katie.

14        Q.    Okay.  Is Katie another agent in your office?

15        A.    Yeah, I'm sorry.  Her last name is striking me at

16   the moment, but yeah.

17        Q.    Okay.  And what were you asked to help out with that

18   day?

19        A.    There was several search warrants that were about to

20   take place and we were -- we were assigned to one specifically.

21        Q.    Okay.  And where was that search warrant that you

22   participated in?

23        A.    142 Chester Road in Derry.

24        Q.    Okay.  In Derry, New Hampshire?

25        A.    Derry, New Hampshire.

1    Q.    And, generally, who were the targets of Katie's

2  investigation, if you know?

3    A.    I was just familiar with the one, Ian Freeman.

4    Q.    Okay.  And were you involved in the investigation

5  prior to participating in the search that day?

6    A.    No.

7    Q.    Okay.  Now, prior to participating in the search at

8  142 Chester Street in Derry, were you briefed on the case?

9    A.    I wouldn't call it a -- we call it a brief, but --

10  we meet the morning of, but there's minimal information given.

11    Q.    Are you given information about what you are

12  supposed to search for?

13    A.    The contents of the search warrant, absolutely, yes.

14    Q.    Okay.  And did that happen that day?

15    A.    Yes.

16    Q.    Okay.  Let me show you Government's Exhibit 1801.

17  This has been admitted.

18          Do you recognize this photo?

19    A.    That's the address 142 Chester Road --

20    Q.    Okay.

21    A.    -- Derry.

22    Q.    Is that where you participated in the search warrant

23  on March 16th of 2021?

24    A.    Yes.

25    Q.    And did that search involve the SWAT team?

1        A.    No.

2        Q.    Okay.  Just a team of agents to search the

3  residence?

4        A.    Correct.

5        Q.    Okay.  And let me direct you to Government's

6  Exhibit 1802.

7              Do you recognize this photo?

8        A.    Yes.

9        Q.    And what's depicted in this photo?

10       A.    That's the living room.  That slider to your left

11  actually faces the front of the road.

12       Q.    Okay.  And 1803.

13       A.    Same thing.  The stairs to the left go up to the

14  upstairs, obviously, and that door that's open to your

15  right-hand side, that's your main entrance.

16       Q.    And do you see things in this photo that you

17  determined were responsive to the search warrant?

18       A.    Yeah.  We were -- we were specifically looking for

19  electronic devices.

20       Q.    Okay.  And what does electronic devices include?

21       A.    Cell phone, laptop, tablet, like anything in that

22  era.

23       Q.    Okay.  And can -- and in this photo were there

24  certain electronic devices that you identified?

25       A.    I did.  There's a -- next to that blue pillow on the

1   right-hand side of the couch there's a phone face down.

2       Q.   Okay.  And, actually, let's look at 1804.

3       A.   Face up.  Sorry.

4       Q.   Okay.  And is this the --

5       A.   Yeah, that's the -- yeah.

6       Q.   Is this the phone?

7       A.   Yeah.

8       Q.   Okay.  And let's back up again to 1803.

9       Is there something else depicted in this photo that

10  you identified?

11      A.   On the left-hand side by the stairs, there's another

12  phone by that remote.

13      Q.   Okay.  And let's go to 1805.

14      What is this a picture of?

15      A.   That's a cell phone.

16      Q.   Okay.  And you were the person to identify these two

17  cell phones?

18      A.   Yes.

19      Q.   Okay.  And we see a little yellow tents next to

20  them.  What are those there for?

21      A.   Those are numbered just to keep track of the

22  evidence.  And it's the way they just -- the way the FBI tracks

23  their evidence.

24      Q.   Okay.  And after participating in the search at

25  142 Chester Street in Derry, did you have any further

1    involvement in this case?

2          A.   I did not.

3                MS. MACDONALD:  Okay.  Thank you.

4                THE COURT:  Cross?

5                MR. SISTI:  I have no questions.

6                THE COURT:  No questions.

7                You're excused.  Thank you.

8                       (Witness excused.)

9                MS. MACDONALD:  Next we call FBI Special Agent Scott

10   O'Donnell.

11               THE CLERK:  Please remain standing and raise your

12   right hand.

13               **SCOTT O'DONNELL**, having been first duly sworn,

14   testified as follows:

15               THE CLERK:  Please be seated.

16               For the record, please state your full name and

17   spell your last name.

18               THE WITNESS:  William Scott O'Donnell,

19   O-D-o-n-n-e-l-l.

20                      DIRECT EXAMINATION

21   BY MS. MACDONALD:

22         Q.   Agent O'Donnell, where are you employed?

23         A.   At the FBI.

24         Q.   And what is your position with the FBI?

25         A.   I'm a special agent.

1      Q.    What office are you assigned to?

2      A.    I'm assigned to the Bedford residential agency.

3      Q.    Okay.  And what are your primary duties in the

4   Bedford resident agency?

5      A.    Criminal investigation informant development.

6      Q.    And how long have you been with the FBI?

7      A.    Excuse me?  I'm sorry.

8      Q.    I'm sorry.  How long have you been with the FBI?

9      A.    Approximately 27 years.

10      Q.    Okay.  And I'm going to direct you to March 16th of

11   2021.  Were you involved in a search warrant executed that day?

12      A.    Yes.

13      Q.    And was your participation in that case as a sort of

14   member of the case team or as somebody helping out that day

15   with the search?

16      A.    Helping out that day of the search.

17      Q.    Okay.  And had you had any significant prior

18   involvement in the case prior to that day?

19      A.    No.

20      Q.    Prior to participating in a search like that, are

21   you given some background about the case and the search

22   warrant?

23      A.    Yeah, a general overview.

24      Q.    Okay.  And do you get a briefing about the things

25   that you are authorized to search for and seize in the warrant?

1      A.    Yes, correct.

2      Q.    And did you receive that that day on March 16th?

3      A.    The day before, yes.

4      Q.    Okay.  And what location were you involved in

5   searching that day?

6      A.    659 Marlborough Street in Keene.

7      Q.    Okay.  And let me show you what's been marked and

8   admitted as Government's 1701.

9            Do you recognize this photo?

10     A.    Yes.  That's the residence.

11     Q.    Okay.  And do you know who lived at this residence?

12     A.    Aria DiMezzo.

13     Q.    And let me direct you to Government Exhibit 1702.

14           What are we looking at here?

15     A.    We are looking at Aria DiMezzo's bedroom.

16     Q.    Okay.  And did you determine it was her bedroom

17   based on things found in the room that day?

18     A.    Yes.

19     Q.    And did you identify something responsive to the

20   search warrant in that room?

21     A.    Yes.

22     Q.    Okay.  Let me show you Government's Exhibit 1703.

23           And can you tell us what's depicted here?

24     A.    That's a cellular telephone.

25     Q.    Okay.  And where in this photo is the cellular

1    telephone?

2         A.    On the bed.

3         Q.    Okay.  And what's next to it?

4         A.    A charger.

5         Q.    I'm talking -- did you add anything to that, did you

6    put something there?

7         A.    Oh, I'm sorry.  So in conducting a search we put tag

8    number 1, it's a yellow marker, so that we could document the

9    evidence appropriately.

10        Q.    Okay.  And so you placed that next to the cellular

11   telephone?

12        A.    The photographer did.

13        Q.    Okay.  But you were the one to locate it?

14        A.    Yes.

15        Q.    Okay.  After participating in the search that day,

16   did you have any further involvement in this case?

17        A.    I interviewed Aria DiMezzo --

18        Q.    Okay.

19        A.    -- briefly.

20        Q.    But other than that, after that day --

21        A.    No.

22        Q.    -- did you have any other involvement?

23        A.    No.

24              MS. MACDONALD:  Okay.  No further questions.  Thank

25   you.

1          MR. SISTI:  No questions.

2          THE COURT:  You're excused, Agent.  Thank you.

3                      (Witness excused.)

4          THE COURT:  What was?  I didn't follow that.  What's

5     going on?

6          MS. MACDONALD:  I'm sorry.  I think maybe he went to

7     the men's room or is back in our office and is coming over.

8          THE COURT:  If he's back in your office, we should

9     take a recess.

10         MS. MACDONALD:  She said one minute, so I'm not

11    sure --

12         THE COURT:  She might have said that as a figure of

13    speech.

14         MS. MACDONALD:  Do you want me to find out?

15         THE COURT:  Yeah.

16         MR. AFRAME:  We'll find out.

17         MS. MACDONALD:  Apologies, your Honor.  He was in

18    our office.  So he's running over, so --

19         THE COURT:  Let's let the jury take a little break

20    in the break room.

21         THE CLERK:  All rise.

22                      (Jury excused.)

23         THE COURT:  Okay.  Anything for the Court?

24         MR. SISTI:  All set.

25         THE COURT:  We'll resume again when the witness

1    arrives.  Thanks.

2              MS. MACDONALD:  Your Honor, he just arrived.

3              MR. KENNEDY:  Judge --

4              THE CLERK:  Hold on.

5          (Recess taken from 11:55 a.m. until 12:00 p.m.)

6              THE CLERK:  All rise for the jury.

7              Please be seated.

8              MS. MACDONALD:  Detective Yu Kajita.

9              THE CLERK:  Please remain standing and raise your

10   right hand.

11             **YU KAJITA**, having been first duly sworn, testified

12   as follows:

13             THE CLERK:  Please be seated.

14             THE WITNESS:  Thank you.

15             THE CLERK:  For the record, please state your name

16   and spell your last name.

17             THE WITNESS:  Sure.  My name is Yu Kajita, last name

18   spelled K-a-j-i-t-a.

19                       DIRECT EXAMINATION

20   BY MS. MACDONALD:

21        Q.   Detective Kajita, where are you employed?

22        A.   I'm employed by the Brookline Police Department in

23   Massachusetts.

24        Q.   And for how long have you been employed by the

25   Brookline Police Department?

```
 1          A.    Approximately 16 years.

 2          Q.    And for how long have you been in the position of

 3     detective?

 4          A.    Since 2015.

 5          Q.    And what did you do before becoming a detective?

 6          A.    I was a patrol officer.

 7          Q.    Okay.  Now, in your past nine years as a detective,

 8     have you developed any special skills?

 9          A.    I have.

10          Q.    Tell me about that.

11          A.    I am certified as a forensic examiner through the

12     FBI's New England Regional Computer Forensics Laboratory.

13          Q.    Okay.  And are you currently -- do you currently

14     have a special assignment?

15          A.    I do.

16          Q.    What's that?

17          A.    I'm currently assigned to that FBI's New England

18     Regional Computer Forensics Laboratory, also known as NERCFL.

19          Q.    Okay.  And prior to your assignment with the FBI,

20     did you educate yourself about digital forensics?

21          A.    I did.

22          Q.    And tell me about what -- whether you did work with

23     digital forensics while with the Brookline Police Department.

24          A.    As my role with the detective in the Brookline

25     Police Department, I specialize in cell phone forensics
```

1    analysis as well as call data record analysis.

2        Q.   Okay.  And let's talk about the training that you

3    received once joining the FBI.

4        A.   Yes.

5        Q.   Do you get any sort of special training or

6    certifications?

7        A.   Yes.  I've attended approximately a twelve-week

8    course hosted by the FBI that specialized in advanced forensic

9    analysis and acquisition methods.  I am certified through their

10   curriculum and as well as outside the FBI I'm certified through

11   private vendors who specialize in digital forensics.

12       Q.   Okay.  And let's take those one by one.

13            What about -- what sort of things do you learn in

14   the twelve-week FBI certification?

15       A.   It's broken up to two-week programs spread out all

16   throughout the year and they specialize in different types of

17   acquisition of digital forensics such as how to -- how to

18   acquire digital data from a cell phone, to a laptop, a desktop,

19   as well as how to process them to be able to understand and

20   read those data.

21       Q.   Okay.  And after receiving your initial

22   certification with the FBI, do you have to do any sort of

23   continuing education?

24       A.   I do.

25       Q.   And tell me about that, please.

1    A.    So with the FBI, I have to maintain my certification

2    level by completing examination of digital data as well as

3    taking an annual competency test to make sure that I'm still

4    qualified under the FBI's guideline.

5    Q.    Okay.  And are you so qualified?

6    A.    I am.

7    Q.    And tell me about the certifications that you

8    referenced with respect to specific tools.

9    A.    I'm certified through Cellebrite CCPA, CCO,

10   certified cell phone operator and certified Cellebrite --

11   excuse me, Certified Cellebrite Operator and Certified

12   Cellebrite Physical Analyst.

13   Q.    Okay.

14   A.    As well as XRY basic and advanced forensic analysis

15   and magnet's -- Magnet -- AXIOM's magnet certified forensic

16   examiner's certification.

17   Q.    Okay.  And tell me about what sort of your

18   day-to-day responsibilities are.

19   A.    It's -- my role as a task force officer with the

20   FBI is to provide technical assistance, from doing a -- the

21   forensics extracting, analyzing, preserving as well as provide

22   technical support on the field and at the lab.

23   Q.    Okay.  And when you say on the field, what does that

24   mean?

25   A.    Assist on search -- search warrants.

1    Q.    Okay.  And what kind of assistance do you provide on

2    search warrants?

3    A.    To identify any digital media devices.  Depending on

4    the search warrant, if it's -- the search warrant is requesting

5    to locate any digital devices, my role is to identify,

6    preserve, and take appropriate, necessary actions to be able to

7    do a future analysis.

8    Q.    Okay.  And what about the work that you do in the

9    lab?

10   A.    The same role.  Any device that comes into our lab,

11   we go through a whole procedure of taking necessary measures to

12   preserve that data and then analyze and make it available for

13   the case agent or the local detectives to review for their

14   investigation.

15   Q.    And are there -- is there any type of digital device

16   that you specialize in?

17   A.    Not specifically, but just pretty much I specialize

18   in general forensics, general digital forensics.  So not just

19   cell phones, but also, like I stated, laptops, desktops, as

20   well as DVR units, infotainment systems in vehicles.

21   Q.    And these days, what is the most common type of

22   device that you're analyzing?

23   A.    Most common device would be cell phone.

24   Q.    Okay.  How many cell phones would you say you have

25   analyzed in your career?

1    A.    I would say, ballpark, close to or over a thousand

2  phones.

3    Q.    Okay.  And what is -- you mentioned you have a

4  certification in Cellebrite.

5    A.    Yes.

6    Q.    Is that a tool that is used with cell phones?

7    A.    Yes.

8    Q.    And could you tell us a bit about that tool and how

9  it works?

10   A.    So the tool is an acquisition tool as well as a

11 processing tool.  What I mean is when we get a cell phone, we

12 connect the phone to the Cellebrite program to pull the

13 necessary data to keep the integrity of that data.

14       Once I acquire that data, I will have to use their

15 tool again to process that data to make it human-readable and

16 it spits -- it spits that data out in a categorized manner.  So

17 every -- all the data that's coming back is categorized into

18 tables such as media, pictures, videos, call logs, web history,

19 et cetera.

20   Q.    Okay.  So let's break that down a little bit.

21       You described a -- one type of tool that sort of

22 makes the copy.  Is that an accurate --

23   A.    Correct.

24   Q.    -- description?  Okay.  And then once you made that

25 copy, sort of what does that copy look like?

1    A.   It's in a digital format.  It could come as a zip

2    file, a compressed file, because, again, a cell phone is like a

3    mini computer.  It's large in data nature.

4         So that tool will compress it to make it more, in a

5    sense, portable and then process that and open all that data up

6    to make it more understand -- human-readable format.

7    Q.   Okay.  So is it the second tool that makes that

8    human-readable?

9    A.   Correct.

10   Q.   Okay.  And you're certified in both of these

11   Cellebrite tools?

12   A.   Yes.

13   Q.   Okay.  Were you involved in an investigation

14   involving Ian Freeman?

15   A.   I was.

16   Q.   And what was your role in that investigation?

17   A.   I was requested to review -- extract, review --

18   extract, process, review, and examine I believe it was four

19   cell phones and a laptop.

20   Q.   Okay.  And we're going to talk about three cell

21   phones today.

22        Your Honor, if I may approach the witness with

23   the --

24        THE COURT:  You may.

25        MS. MACDONALD:  -- exhibit?  Thank you.

1    Q.   I'm showing you what's been marked as Government's

2  Exhibit 1401 and I'll actually let you take out what's inside

3  there.

4    A.   It is a portable hard drive.

5    Q.   And do you recognize this hard drive?

6    A.   Yes.

7    Q.   And did you review it prior to your testimony today?

8    A.   I did.

9    Q.   And what is contained on this hard drive?

10   A.   It contains three Cellebrite reports that I

11  generated, evidence -- the three phones are item as evidence

12  1B15, 1B16 and 1B61.

13   Q.   Okay.  Thank you.  You can put that back.  Thank

14  you.

15        Did you analyze all three of the devices you just

16  listed, 1B15, 1B16 and 1B61?

17   A.   I did.

18   Q.   Okay.  And was the process for analyzing each of

19  those three devices similar?

20   A.   Yes.

21   Q.   So let's talk about that.  And if there's any

22  differences between them, please feel free --

23   A.   Sure.

24   Q.   -- to stop me, but to save time we'll discuss the

25  process for all three together.

```
1          A.    Sure.

2          Q.    Okay?  All right.

3                What is the first step that you take when you

4    analyze -- I should back up.

5                Are these three -- what types of devices are these

6    three?

7          A.    They're -- all three are a Samsung Galaxy S9.  Two

8    of them are S9+ and one of them was S9.

9          Q.    Okay.  And those are all cellular telephones?

10         A.    Yes.

11         Q.    Okay.  So what's the first step that you take when

12   conducting an analysis of a cellular telephone?

13         A.    I first do a physical examination on the device,

14   take a photograph and assign a unique identifier to identify

15   that phone within our lab.

16         Q.    And that brings up a good question I should have

17   asked you.  Where did you conduct the analysis of these three

18   phones?

19         A.    Back in Chelsea, Massachusetts, at the forensics

20   laboratory.

21         Q.    Okay.  And so you were provided the three physical

22   phones in your laboratory in Chelsea, Massachusetts?

23         A.    Yes.

24         Q.    Okay.  So what -- what do you do after you conduct

25   that first step of labeling and photographing?
```

1    A.    Then I make sure that the device is in a forensics

2    manner, meaning making sure that the phone is not connected to

3    the network.

4          In order to do this, I have to place the phone in

5    airplane mode.  If not, I have to take the SIM card out to

6    disconnect from the network.

7    Q.    Why is it important to disconnect a cell phone from

8    the network?

9    A.    It's important because it's constantly connecting to

10   the network and communicating with the cell phone provider.

11   And so if -- if we maintain the phone in a network capacity and

12   we forget to remove from the network, it can remotely wipe from

13   the user.

14   Q.    Okay.  And so once you've made sure that the device

15   is not connected to the network, what do you do next?

16   A.    Then I go through the whole process of taking notes

17   of the device and then use the appropriate tool to extract the

18   data from each device.

19   Q.    Okay.  And what tool did you use in this case?

20   A.    In this case, I used a tool called Cellebrite

21   Premium.

22   Q.    Okay.  And so this is sort of the first of the two

23   Cellebrite tools we've previously discussed?

24   A.    Yes.

25   Q.    Okay.  And for all three of these devices, did you

1    use Cellebrite Premium to make a copy?

2        A.    I did.

3        Q.    Okay.  And tell me about how you determine that

4    you've made an accurate copy of the devices.

5        A.    So what I do is I calculate the hash.  A hash is a

6    process using a mathematical algorithm against that data file

7    and then create a -- an alphanumeric value that represents that

8    data.  So in short term, it's another way to say it's a digital

9    fingerprint to that data that I just extracted.

10       Q.    Okay.  So let's break that down a little bit.

11             What is the -- what do you mean by a digital

12   fingerprint?  What does that actually look like?

13       A.    It's alphanumeric.  It can range from 15 characters

14   to, gee, I don't know exactly how big the span can be, but I

15   know it can start from 15.

16       Q.    Okay.  So a long string of numbers and letters?

17       A.    Yes.

18       Q.    And the -- the Cellebrite device that you -- or

19   program that you use assigns that to the specific cell phone?

20       A.    Correct.

21       Q.    Okay.  And how do you use that long string of

22   numbers and letters to know that you've made an accurate copy?

23       A.    I verify that hash number by checking that

24   extraction hash that was presented and then I manually just

25   make sure that those matches -- those values are a complete

1    match because it's important to keep the integrity of that data

2    as how it was pulled.

3         Q.    Okay.  And what if, you know, you made a copy of --

4    you had a copy of the device and, like, one new text message

5    came in on the copy or on the original device.  What would the

6    hash values show?

7         A.    It would not match.  It'll be a complete different

8    value.  Therefore, the initial extraction hash value and the

9    new extraction value will be completely different, meaning it's

10   been -- the data has been altered since the first time.

11        Q.    Okay.  And even any tiny change, can that alter the

12   hash value?

13        A.    Correct.

14        Q.    Okay.  In this -- in this case, with respect to all

15   three of the telephones we've discussed, did you confirm that

16   your copy had the same hash value assigned to the original?

17        A.    All three, yes.

18        Q.    Okay.  Once you've made that copy and confirmed with

19   the hash value that it's the same, what do you do next?

20        A.    Then I process that data to make it human-readable

21   with a program called Cellebrite Physical Analyzing.

22        Q.    Okay.  And you did touch on this a bit before, but

23   when you say human-readable, what exactly does that mean?  What

24   does the final product look like?

25        A.    So when I first extract the data, everything is in

1    digital format, meaning ones and zeros to the human eye.  We

2    don't understand what ones and zeros mean besides just random

3    numbers, so the tool will translate those ones and zeros into

4    more human-readable, in this case, an English format so a -- it

5    would -- like I stated earlier, it categorizes all that data

6    into specific categories such as pictures, videos, web

7    artifacts, and et cetera.

8         Q.   Okay.  And is that sort of the only thing that then

9    can be substantively searched?

10        A.   Yes.

11        Q.   Okay.  And when I look at that, does that look like

12   what I look at when I'm looking at my cell phone or is it a bit

13   different?

14        A.   It's a little different.

15        Q.   And how is it different?

16        A.   Well, because -- we can't re-create what you see on

17   your phone because it's just, again, the program that -- that

18   translates makes it into more a universal way of reading it.

19   So it's not going to be your exact how you see on your phone.

20        Q.   Okay.  I'm going to show you now what's been agreed

21   to be admitted as Government's Exhibit 1402.

22             Do you recognize what this is?

23        A.   Yes.

24        Q.   And what is that?

25        A.   It is the Cellebrite preliminary device report.

1     Q.    Okay.  And is this for one of the three devices that

2  we've been discussing?

3     A.    Yes.

4     Q.    Okay.  And can you tell by looking at this what type

5  of device this was?

6     A.    It is -- so the device model, SM-G965U, and I

7  believe one, two, three, four -- five lines below it says

8  Galaxy S9+.

9     Q.    Okay.  And is this sort of a part of the sort of

10  human-readable product that you've been talking about?

11     A.    Yes.

12     Q.    Okay.  Let me direct you down a couple lines further

13  under current SIM phone number.  What is listed there?

14     A.    It's going to be 1-603-209-7122.

15     Q.    And what is that?

16     A.    That would be the phone number assigned to that

17  phone.

18           MS. MACDONALD:  Okay.  And I will direct you,

19  Ms. Shedd, to page 2, please.

20     Q.    What are we looking at here?

21     A.    Any user account that is identified through the

22  phone --

23     Q.    Okay.

24     A.    -- such as email accounts, any social media

25  accounts.

1      Q.    Okay.  Anything that has been accessed or kept by

2  the phone?

3      A.    Yes.

4      Q.    Okay.  So let's just look right at the top here.  It

5  doesn't say source, but what's the user name?

6      A.    Reneeleblanc727@gmail.com.

7      Q.    Okay.  And I'm going to go to -- ask you to go down

8  to line 6.

9      A.    Renespinella727@gmail.com.

10     Q.    And down to line 9.

11     A.    Bitcoinbombshell727@gmail.com.

12     Q.    Okay.  And does it list a number of accounts of --

13  in various different things here?

14     A.    Yes.

15     Q.    Okay.  Let me go down to page 5, the bottom of page

16  5.  I see Google Photos, Google Docs, Google Drive at the

17  bottom.  And I will have you read the name listed on the top at

18  one -- let's start with 117.

19     A.    Renee Freeman.

20     Q.    And 118?

21     A.    Renee Kate.

22     Q.    Okay.  And I won't go through all of these, but I

23  did -- yup, just want to go to page 7, right in the middle at

24  131.  Is there a Telegram account?

25     A.    131, Renee Kate.

1    Q.    Okay.  Thank you.

2          Let's now go to Government's Exhibit 1403.

3          What are we looking at here?

4    A.    It's going to be the second phone, device model

5    SM-G965U.

6    Q.    Okay.  And is this -- what type of phone is this?

7    A.    It's going to be a Samsung Galaxy S9+.

8    Q.    Okay.  And what's listed under current SIM phone

9    number?

10   A.    It's going to be 603-557-1779.

11   Q.    Okay.  And let's go to the second page that lists

12   accounts.  And I don't see sort of names until we get to the

13   bottom here, so we can start at 33 with Uber, Dropbox, Google

14   Photos.  What names do you see listed here?

15   A.    Andrew Spinella.

16   Q.    Okay.  And then just on page 3, number 45, who's the

17   Telegram account holder?

18   A.    Andy Spinella.

19         MS. MACDONALD:  Okay.  And, finally, let's pull up

20   Government's Exhibit 1404.

21   Q.    And what are we looking at here?

22   A.    This will be the third device, device model SM-G960U

23   and that is to a Samsung Galaxy S9.

24   Q.    Okay.  And is there a phone number associated with

25   this?

1      A.    Yes.  It's going to be 603-803-2428.

2      Q.    Okay.  And let's go to page 2, please.  And I will

3  have you just look at these near the top of the page, the --

4  the Gmail accounts.

5            Could you read the three -- the four Gmail accounts

6  listed here?

7      A.    The first one's going to be bbaker.bits@gmail.com;

8  the second one is Aria.DiMezzo86@gmail.com; third one,

9  jbaker1251@gmail.com; and the fourth one,

10  arianachrist@gmail.com.

11     Q.    I'm sorry.  I'll have you read just one more right

12  below that.

13     A.    Aria@reformmedsatan-I-C-C-H-U-R-C-H.com.

14     Q.    Is that Reformed Satanic Church?

15     A.    Satanic Church, sorry.

16     Q.    Yup.  And let me just take you down to the bottom of

17  page 5, line 59.  Who does that Telegram account belong to?

18     A.    Belongs to an Aria DiMezzo.

19     Q.    Okay.  And after you conduct the extractions, do you

20  or somebody else do sort of the in-depth analysis of the things

21  on the telephone?

22     A.    On this case, it was sent over to the requesting

23  case agent.

24     Q.    Okay.  And what is it that you provide to the case

25  agent?

1          A.     I create a Cellebrite reader report.

2          Q.     Okay.  And are those the three reports that were on

3     Government's Exhibit 1401?

4          A.     Yes.

5          Q.     Okay.  And in this case, did you provide those to

6     the case agent?

7          A.     I did.

8          Q.     Okay.  When you do an extraction of a cell phone, do

9     you sometimes get everything that's ever been on the phone or

10    how -- how do you -- that's not a great question, but do you

11    always get everything on the phone?  How do you know what --

12    what you're getting and does that vary?

13         A.     It varies based on the extraction type.  In this

14    case, what -- well, let me just correct.

15               We don't know if we always get everything that's on

16    the phone until we actually do a comparison test to the device

17    itself as well as the extraction report.  In this case, I was

18    able to do three -- three extractions of a physical extraction

19    which is a bit-for-bit copy from the phone -- from the phone.

20         Q.     And do you sometimes -- are you able to get

21    deleted -- things that have been deleted off of a phone?

22         A.     It depends, depending on where this data's coming

23    from.  If it's a third-party application and the setting is set

24    where all the data's held actually not from the device but from

25    the Cloud, it can delete that data.  Therefore, I may have

1    remnants of that data, but not entirely such as chat

2    conversations that may have been on the phone.  But we do not

3    see the chat, but we may have the remnants such as an

4    attachment file.

5         Q.   Okay.  So sometimes, but not always?

6         A.   Correct.

7         Q.   Okay.  In your experience conducting analyses of

8    forensic devices, have you come across UTC time or the

9    Universal Time Code?

10        A.   Yes.

11        Q.   What is that?

12        A.   It's also known as Coordinated Universal Time.  It

13   is a default time zone set located in England, I believe.  So

14   we all live in different time zones and it is all based off of

15   that UTC.  So we're -- eastern is -- Eastern Daylight Savings

16   is minus five hours from UTC.

17        Q.   Okay.  After you gave the copies, the readable

18   copies, of these devices to the case agent, did you have any

19   other substantive involvement in this case?

20        A.   No, I have not.

21             MS. MACDONALD:  Okay.  Thank you.

22             THE COURT:  Cross?

23             MR. SISTI:  No cross.  Thank you.

24             THE COURT:  Sir, you're excused.

25             THE WITNESS:  Thank you very much.

1                    (Witness excused.)

2          THE COURT:  How long is the next witness, roughly?

3          MS. MACDONALD:  40 minutes for me.

4          THE COURT:  Let's take the lunch break then.

5    15 minutes -- sorry.  An hour.  We will resume at 1:30.

6          THE CLERK:  All rise.

7                    (Jury excused.)

8          THE COURT:  Off the record.

9              (Off-the-record discussion.)

10            (Lunch recess taken at 12:31 p.m.)

C E R T I F I C A T E


         I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 3/10/23            /s/  Liza W. Dubois
                             LIZA W. DUBOIS, RMR, CRR