*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 8, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
                                    *
UNITED STATES OF AMERICA            *
                                    *  1:21-cr-41-JL
            v.                      *  December 9, 2022
                                    *  12:47 p.m.
                                    *
IAN FREEMAN                         *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY 4 - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:


For the Government:          Georgiana L. MacDonald, AUSA
                             Seth R. Aframe, AUSA
                             John J. Kennedy, AUSA
                             United States Attorney's Office



For the Defendant:           Mark L. Sisti, Esq.
                             Sisti Law Offices



Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

```
 1                           I N D E X

 2

 3     WITNESS:              Direct   Cross   Redirect   Recross

 4
       PAVEL PRILOTSKY
 5       By Mr. Sisti                    4                    28
         By Mr. Aframe                        21, 36
 6

 7     RENEE SPINELLA
         By Mr. Aframe        37
 8

 9
       EXHIBITS:                      FOR ID            IN EVD.
10
       Government's Exhibit 104                           78
11
       Government's Exhibit 105                           80
12
       Government's Exhibit 826                           88
13
       Government's Exhibit 827                           88
14
       Government's Exhibit 829                           88
15
       Government's Exhibit 830                           88
16
       Government's Exhibit 831                           88
17
       Government's Exhibit 832                           88
18
       Government's Exhibit 833                           88
19
       Government's Exhibit 834                           88
20
       Government's Exhibit 835                           88
21
       Government's Exhibit 836                           88
22
       Government's Exhibit 837                           88
23
       Government's Exhibit 838                           88
24
       Government's Exhibit 839                           88
25
       Government's Exhibit 840                           88
```

| | EXHIBITS:<br>(Continued) | FOR ID | IN EVD. |
|---|---|---|---|
| 1 | | | |
| 2 | Government's Exhibit 841 | | 88 |
| 3 | Government's Exhibit 842 | | 88 |
| 4 | Government's Exhibit 843 | | 88 |
| 5 | Government's Exhibit 844 | | 88 |
| 6 | Government's Exhibit 845 | | 87 |
| 7 | Government's Exhibit 601 | | 121 |
| 8 | Government's Exhibit 602 | | 121 |
| 9 | Government's Exhibit 603 | | 121 |
| 10 | Government's Exhibit 604 | | 121 |
| 11 | Government's Exhibit 605 | | 121 |
| 12 | Government's Exhibit 606 | | 121 |
| 13 | Government's Exhibit 607 | | 121 |
| 14 | Government's Exhibit 608 | | 121 |
| 15 | Government's Exhibit 609A | | 121 |
| 16 | Government's Exhibit 609B | | 121 |
| 17 | Government's Exhibit 610A | | 121 |
| 18 | Government's Exhibit 611 | | 121 |
| 19 | Government's Exhibit 612 | | 121 |
| 20 | Government's Exhibit 613 | | 121 |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
1                    P R O C E E D I N G S
2              THE COURT:  Ladies and gentlemen of the jury, did
3     you have any conversations with each other or anyone else
4     regarding the subject matter in the trial during the recess?
5              All right then.  We'll resume.
6              The witness is still under oath.  You may cross.
7              MR. SISTI:  Thank you, your Honor.
8                        CROSS-EXAMINATION
9     BY MR. SISTI:
10         Q.   Okay.  Again, just for the record, you work for U.S.
11    Treasury IRS?
12         A.   Yes.
13         Q.   Okay.  And how long have you been there?
14         A.   Approximately 14 years.
15         Q.   All right.  And how many times have you been
16    involved in undercover work?
17         A.   Numerous times.
18         Q.   Numerous is a good answer.  How many do you think it
19    is?
20         A.   Maybe a hundred, maybe more.
21         Q.   A hundred or more.  And the job, when you're working
22    undercover, basically is to get incriminating evidence on an
23    individual so that you can pursue a prosecution, right?
24         A.   I work in my undercover capacity, correct.
25         Q.   No, no.  Did you hear my question?
```

1          A.    Can you repeat, please?

2          Q.    I certainly will.

3                The purpose of you going undercover is to obtain

4   incriminating evidence against an individual so that you can

5   pursue a prosecution.

6          A.    Yes.

7          Q.    Okay.  I mean, that is your goal, correct?

8          A.    Yes.

9          Q.    Your goal, in essence, is to gain the trust, many

10  times through deception --

11         A.    Yes.

12         Q.    -- to gain the trust of an individual so that they

13  will tell you something that renders them in a position where

14  they did something illegal, right?

15         A.    Yes.

16         Q.    Okay.  And sometimes that works, and sometimes it

17  doesn't work, right?

18         A.    Correct.

19         Q.    Okay.  In this particular case, you tried to gain

20  the trust of Ian Freeman, the guy sitting right over there,

21  right?

22         A.    Yes.

23         Q.    And you did it by posing as -- at least initially as

24  a legitimate bitcoin purchaser, correct?

25         A.    Yes.

1        Q.    A guy that's doing everything by the book, nothing

2    weird about it, you just wanted to buy some bitcoin, right?

3        A.    Yes.

4        Q.    Okay.  And, in fact, the jury was shown your first

5    transaction.  I think it was on 9/11/2019?

6        A.    Yes.

7        Q.    And the first transaction basically goes fairly

8    flawless; you introduce yourself, he introduces himself, you

9    show IDs, you write notes, there's money that is transferred,

10   and bitcoin goes to your wallet, right?

11       A.    Yes.

12       Q.    No big problems there --

13       A.    No.

14       Q.    -- and nothing illegal about that transaction,

15   correct?

16       A.    Correct.

17       Q.    Right.  All right.  And you want to be a regular

18   customer with Ian and there doesn't seem to be any friction

19   there, so you come back to him and you do another transaction,

20   right?

21       A.    Yes.

22       Q.    And the second transaction, once again, it's on the

23   up and up; you're not saying you're a drug dealer, you're not

24   saying that you're trying to launder money, you're not saying

25   anything like that, right?

1    A.    Correct.

2    Q.    Okay.  And, again, you're engendering trust and the

3    transaction goes down without a flaw and, in fact, there's

4    absolutely nothing illegal about that transaction, right?

5    Correct?

6    A.    Yes.

7    Q.    Okay.  You have Telegram exchange and your purpose

8    for that is to buy offline, right?

9    A.    Yes.

10   Q.    Okay.  You want to buy offline because it's easier

11   to buy offline and, again, you're engendering this trust

12   relationship with Ian and you want to start loosening things up

13   and do more transactions, right?

14   A.    Correct.

15   Q.    Okay.  And the first Telegram transaction that you

16   go through, it goes through pretty slick and it's the same old

17   thing; it's basically money for product, bitcoin, right?

18   A.    Yes.

19   Q.    There's no -- nothing illegal about that

20   transaction?

21   A.    Except that it wasn't an investment or purchase in a

22   rare coin.

23   Q.    Yeah, did you say, hey, what you mean by that?

24   A.    No.

25   Q.    You didn't ask -- you know, that's the thing.  I was

1    going to ask you about that.

2              Because the prosecutor kept asking you, did you put

3    that on the receipt, did you put that on the document.  Do you

4    remember that?

5         A.    Yes.

6         Q.    He said who put that on that document, right?

7         A.    Right.

8         Q.    Right.  And you said Ian Freeman, right?

9         A.    Yes.

10        Q.    And here's the question I'm going to ask.  Why

11   didn't you disagree with him?

12        A.    I went per his instructions.

13        Q.    I understand that.  But you're an undercover guy.

14   Don't you want to catch him doing something illegal?

15        A.    I wasn't ready to ask that question --

16        Q.    You weren't ready?

17        A.    -- at that time.

18        Q.    Well, you didn't ask it, right?

19        A.    Correct.

20        Q.    But even in a legal transaction, if you saw

21   something like that, if you were just an absolute regular buyer

22   of bitcoin and somebody put something on a piece of paper that

23   you disagreed with, wouldn't you ask why?

24        A.    I was in my undercover capacity.

25        Q.    I understand -- I understand.  Why didn't you ask

1    the question?

2        A.    I didn't ask it, the question, at the time, because

3    I had a strategy to, you know, move forward --

4        Q.    No, that's --

5        A.    -- and meet in person.

6        Q.    Do you think if you asked why I have to put that on

7    a piece of paper that would have ended the whole thing?

8        A.    I can't answer to that.  I don't know.

9        Q.    We have to wonder about that, right?  Right?

10       A.    I did not ask the question, so ...

11       Q.    I know you didn't ask the question, but I'm asking

12   the question now.  I'm asking why, why you didn't make inquiry.

13       A.    Because it wasn't an appropriate time.

14       Q.    It wasn't an appropriate time in your head to ask,

15   right?

16       A.    I can't speak for others.

17       Q.    Did you want -- did you want to just be willfully

18   ignorant; is that what you wanted to be?

19       A.    No.

20       Q.    You just wanted it to lay out there so that people

21   could speculate?

22       A.    I -- I wanted to buy bitcoin and in order to buy

23   bitcoin, I had to follow the instructions --

24       Q.    Okay.

25       A.    -- of Mr. Freeman.

1    Q.   But he didn't say you couldn't ask questions, did

2    he?

3    A.   No.

4    Q.   He didn't say, I want you to lie, did he?

5    A.   No.

6    Q.   All right.  We'll get back to that.  No, I want to

7    stay with it a second.

8         How do you know that those words on those documents

9    didn't have something to do with Ian's intent to buy more

10   bitcoin, for instance, to invest, for instance, or to donate a

11   partial part of that transaction to his church?  Do you know

12   any of those answers?

13   A.   No.

14   Q.   Did you ever ask him why?

15   A.   No.

16   Q.   All right.  Well, part of this whole undercover

17   thing had to do with long conversations and talks about going

18   to meet-ups in Keene, right?

19   A.   Yes.

20   Q.   The meet-ups in Keene, as they were portrayed to

21   you, were not meet-ups to do anything illegal, were they?

22   A.   No.

23   Q.   They were meet-ups to discuss cryptocurrency,

24   libertarian theory or, you know, libertarian basis and

25   political theories and so forth, right?

1      A.   Yes.

2      Q.   You know, kindred spirits hanging out together,

3  chatting about, you know, their beliefs, right?

4      A.   I understood it to be a libertarian crypto meet-up.

5      Q.   Right.  And that's -- and that's how you wanted to

6  get in there.  You made yourself out to being a libertarian

7  crypto guy, right?

8      A.   Yes.

9      Q.   Okay.  And, again, there's nothing illegal about

10  being a libertarian crypto guy?

11      A.   No.

12      Q.   Right.  And, in fact, you could travel throughout

13  the United States meeting up with like people that were

14  libertarian crypto guys and that's not illegal, right?

15      A.   Right.

16      Q.   Okay.  Whether it's in Keene or whether it's in

17  New York or Albany or wherever, okay, it's okay to do, right?

18      A.   Yes.

19      Q.   Okay.  So you wanted to get involved with this to

20  further the trust aspect that you were engendering with Ian,

21  right?

22      A.   Correct.

23      Q.   Okay.  Because your goal -- and let's cut right to

24  the chase -- your goal was to get Ian to do something illegal,

25  right?  Correct?

1       A.   To see if it would happen, correct.

2       Q.   Yeah.  You were encouraging him to get loose and to

3  stop thinking and drop his guard and to go along with you and

4  do something illegal, right?

5       A.   I wasn't encouraging.  I was just, you know, based

6  on my conversations with him.

7       Q.   You were bringing him along, right?  You were saying

8  I'm just like you, Ian, we're the same guy.

9       A.   Building trust, correct.

10       Q.   Yeah.  And, you know, and the reason that you're the

11  same guy, at least you think you're the same guy as Ian, is

12  that you want him to slip and fall; you want him to do

13  something illegal, right?

14       A.   It would depend on how the circumstances go based on

15  how, you know, the transactions go and the questions are

16  answered, so ...

17       Q.   All right.  But so far all the transactions, every

18  transaction you had with Ian Freeman, was absolutely

19  legitimate, it was legal, right?

20       A.   I was buying bitcoin --

21       Q.   Right.

22       A.   -- for cash, you know.

23       Q.   It's legal, right?  Correct?

24       A.   Except it wasn't for the purpose that it was stated

25  for.

1    Q.   Well, you --

2    A.   Yeah.

3    Q.   You didn't state anything.

4    A.   Correct.

5    Q.   You didn't correct anything, right?

6    A.   Right.

7    Q.   And you didn't ask questions about anything?

8    A.   Right.

9    Q.   And you don't know what his purpose was at all,

10   right?  Correct?

11   A.   Based on, you know, the chat groups I was part of

12   and stuff, I understood what it was about.

13   Q.   You don't understand what it was about with him,

14   right?

15   A.   It's all in the chat --

16   Q.   It's all --

17   A.   -- my communications.

18   Q.   It is.  And did he ever say, I want you to be

19   deceptive, I want you to lie so that we can make this

20   transaction happen?

21   A.   He told me if I'm asked what this is for, I want you

22   to tell them for this reason, it's for investment or donation.

23   Q.   Is it for that reason?

24   A.   No.

25   Q.   Did you ask Ian if it --

1        A.    Well, I don't know.

2        Q.    You don't know, right?

3              Now, really, when we get to the nuts and bolts of

4    this thing, what you really wanted to do was that you wanted

5    him to knowingly -- and that's an underlying question -- you

6    wanted him to knowingly engage in an illegal activity and the

7    way you wanted him to do that was you wanted him to know you

8    were a, quote, heroin dealer or a drug dealer, right?

9        A.    Yes.

10       Q.    Okay.  And you were going to get him to know that by

11   going to one of these meet-ups or at least exchanging that

12   information somehow to him so that he would knowingly have

13   information that you were making money illegally, right?

14       A.    Yes.

15       Q.    And that you were going to take that money and you

16   were going to run it through one of his machines, right?

17       A.    Yes.

18       Q.    Early on in your legal transactions with Ian, Ian

19   agreed to drop his percentage rate at the machines from

20   14 percent to 10 percent, correct?

21       A.    Yes.

22       Q.    And he did that because probably he wanted you to be

23   a customer, right?

24       A.    Yes.

25       Q.    He wanted to give you favorable treatment because he

1   wanted you, when you were doing legal transactions, all right,

2   to continue doing them, right?

3       A.   Yes.

4       Q.   Yeah.  That's an encouragement to continue, you

5   know, the transactions.  A lot of people will give people a

6   break if they'll continue to do transactions, right?

7       A.   Correct.

8       Q.   And if they like you as a customer and want you as a

9   customer, they will continue to give you that break, right?

10      A.   That's a fair statement.

11      Q.   Yeah.  Fair.  And if they don't want -- want you to

12  be a customer and they don't like what you're doing, they won't

13  give you a break, will they?

14      A.   It's -- depends on, you know, whatever they have set

15  up.

16      Q.   Yeah.  Well, it's clear to say that when you were

17  doing legal transactions, when he knew you were doing legal

18  transactions, when there was no mention of drugs, that he gave

19  you the 10 percent rate.

20      A.   Yes.

21      Q.   Okay.  But at some point in time you had a

22  conversation with him and as soon as he knew, as soon as he

23  knew, that you were involved in drug activity, he shut you off,

24  right?

25      A.   Yes.

1        Q.    So once he had knowledge that you were a drug

2   dealer, he didn't want to do business with you, right?

3        A.    I -- I guess not.

4        Q.    Yeah.  And he told you that, right?

5        A.    He told me he knowingly did not want to do business

6   with me.

7        Q.    Yes.  And, in fact, you wouldn't let it go; you came

8   back to him and you met up, you intentionally went to Keene,

9   you intentionally sought Freeman out, right?  And it was on

10  August 25th.

11       A.    Yes.

12       Q.    And you intentionally sought him out and you

13  intentionally wore a wire, right?

14       A.    Yes.

15       Q.    And you intentionally did that so you'd give it one

16  more shot, right?

17       A.    Yes.  I previously told him I had $20,000 I needed

18  to get rid of in cash.

19       Q.    Yeah.  And he didn't want anything to do with that,

20  right?

21       A.    Knowingly, he did not want to deal with me.  He

22  emphasized that, so ...

23       Q.    He did not want to deal with you.  And you came back

24  to him on the 25th and you engaged in a brief conversation --

25  and the jury heard it, but I'll tell you what the words were

1    that I heard and you correct me if I'm wrong.  When you said

2    you were going to go in and do business in that machine in that

3    building that was shown to the jury, he said, I can't tell you

4    you can do that.  Isn't that what he said?

5         A.   Yes.  Something -- yes.

6         Q.   I -- he did not give you permission to use his

7    machine, right?

8         A.   I asked him where the machine was.  He said it's

9    still there.  But for me it meant the same thing as he

10   emphasized knowingly in the previous conversations.  He didn't

11   want me -- to tell me, you know, as is.  So I can't tell you --

12        Q.   Well, you asked him -- you asked him specifically --

13   you asked him specifically -- you said you were going to go in

14   and use that machine.  And when you told him you were going to

15   use that machine, again, tell the jury what he told you.

16        A.   Yes.  He told me, I can't tell you that you can use

17   it.

18        Q.   Period.

19        A.   And based on my previous conversations with him,

20   knowingly -- you know, I asked him before if I can clean

21   $20,000.  He said, knowingly I can't tell you.  He never told

22   me anything specifically.

23        Q.   He said he can't deal with you anymore.  He told you

24   that.

25        A.   He emphasized knowingly he can't deal with me.  I

 1    mentioned a lot of times if he knows what I mean, what I was

 2    saying, and I have understood that to be that he understands

 3    what I do.

 4         Q.    Wow, there's a lot of speculation.  You know what an

 5    easy way to do and ask a question is?  You ask the question and

 6    you listen for the answer.  Right?

 7              MR. AFRAME:  Objection.

 8              THE COURT:  He finished it with, right, so I've got

 9    to allow it.

10              MR. SISTI:  Thank you.

11         Q.    You ask the question and you get the answer, right?

12         A.    I understand that, but I --

13         Q.    And you did ask the question and you did get the

14    answer.  Right?

15         A.    I understand what you're saying, yes.

16         Q.    Yes.  And then you went into that building.  Where

17    was Ian?

18         A.    I don't know.

19         Q.    Ian wasn't even near you, right?

20         A.    He was not near me, correct.

21         Q.    You went in there on your own and you pumped money

22    in the machine, right?

23         A.    Yes.

24         Q.    Okay.  You pumped money in the machine and out came

25    the receipts, correct?

1      A.   Yes.

2      Q.   I think they're 611 -- could we call those up?

3   There are four receipts there and they total just under

4   $20,000 --

5      A.   Yes.

6      Q.   -- right?

7      A.   Correct.

8      Q.   And they came from one of Ian's machines, right?

9      A.   Yes.

10      Q.   One of the machines that Ian in the past when you

11   were doing legal transactions when -- when he wanted you as a

12   customer ran a percentage rate of 10 percent, right?

13      A.   Yes.

14      Q.   Why don't you tell the jury what the percentage rate

15   was on those transactions for -- after he told you he couldn't

16   do business with you?

17      A.   14 percent.

18      Q.   14 percent.

19      A.   Yes.

20      Q.   And you went in there and he told you you couldn't

21   use the machines and you pumped money in, right?

22      A.   I told him I had $20,000 in cash to get rid of, so

23   that's what I did, yes.

24      Q.   You went in.  You did it on your own, right?

25      A.   After asking if the machine is still there.

1    Q.    Did you ask Ian for a break that day; I got 20,000,

2    are you going to cut me down to 10 percent?

3    A.    No.

4    Q.    No.  You went -- you know, and this is the guy that

5    gave you a break when he knew you were doing something legal,

6    right?

7    A.    Based on the circumstances that day, there was no

8    time to ask, so ...

9    Q.    It takes a second to ask.  Come on.  Hey, Ian, can

10   you drop it down to 10 percent.

11         You just went in there and pumped the 20, came out

12   with the receipts, and now it's a make-believe game that he

13   gave you permission, right?

14   A.    I'm not making anything up here.

15   Q.    Good.  And if -- I'm sorry.  We're not either.

16   A.    I understand.

17   Q.    Okay?  I mean, everything I've asked you, everything

18   I asked you, okay, you either didn't know because you didn't

19   ask, which leads things to speculation, right?

20   A.    Yes.

21   Q.    Right?  Or you're saying, well, I kind of think he

22   really meant this when he actually said that I couldn't do

23   business with him, right?

24   A.    I just went on previous communications and

25   understandings of how we were working, you know.  I've said I

1   know -- if you know what I mean, he never asked me as well what

2   I mean, but he knew what I mean based on, you know, our

3   communications in the past.  So, I mean, I -- I told him I'm

4   coming to the area to do a deal and get rid of cash.  I

5   understand that's speculation.

6              MR. SISTI:  It is speculation, correct.  Exactly.

7   Thank you.

8                        REDIRECT EXAMINATION

9   BY MR. AFRAME:

10       Q.    Let's look at 601.

11             Do you remember this, Agent?

12       A.    Yes.  Yes.

13       Q.    Can you read the disclaimer?

14       A.    What you do with your bitcoin is your business.

15   Don't tell me what your plans are.

16       Q.    Okay.  So you broke that rule, didn't you?  Did you

17   tell him you were into drugs?

18       A.    Yes.

19       Q.    And it says, if you do, I reserve the right to

20   refuse?

21       A.    Yes.

22       Q.    So he did that, right?

23       A.    Correct.

24       Q.    Now, up until that point, you had been telling him

25   about cash transactions, right?

1    A.   Yes.

2    Q.   And you sent him a check in the mail for $5,000?

3    A.   Yes.

4    Q.   And when you sent that, you asked about it, like how

5  should I mail it.  What was his response about?  Do you

6  remember that?  I can play it for you if you don't.

7    A.   He played the -- he sent me an audio recording of

8  what -- how I should deal with it.

9    Q.   And what did he understand your concern to be?  I'll

10  play it for you again if you don't remember.

11    A.   Let's play it.

12         MR. AFRAME:  606A.  Or is it 606?

13              (Audio recording played.)

14    Q.   Based on your communications up to that point, had

15  you said explicitly that you were doing something illegal?

16    A.   No.

17    Q.   Then this recording happened, right?

18    A.   Yes.

19    Q.   Based on what you had said so far, what did he,

20  Mr. Freeman, understand to be a concern you would have?

21         MR. SISTI:  I'm going to object.

22         THE COURT:  What's the objection?

23         MR. SISTI:  The objection is it's speculative.  He

24  doesn't know what Ian Freeman's thinking.

25    Q.   What did he --

1          THE COURT:  Yeah, sustained -- as to that way,

2    sustained.

3          MR. SISTI:  Thank you.

4          Q.    I'm not sure that's what I asked, but what did he

5    say?

6          A.    He said, based on his experience, the mail can be --

7    you need a search warrant to go through mail at USPS compared

8    to other methods.

9          Q.    In your experience as an undercover, when people

10   talk about search warrants, are they talking about legal

11   activity?

12         A.    No.

13         Q.    So -- and Mr. Freeman went through with the money

14   you sent after the discussion about the search warrants, right?

15         A.    Yes.

16         Q.    Uh-huh.  Mr. Sisti talked a lot about gaining trust

17   and that's true; that is part of what you were trying to

18   achieve, right?

19         A.    Yes.

20         Q.    And we saw conversations where you talked about

21   libertarian ideas and things I assume you thought would bring

22   you in common with Mr. Freeman.

23         A.    Correct.

24         Q.    Did that get you invited to the meet-up?

25         A.    Yes.

1     Q.    Did you try to be friendly?

2     A.    Yes.

3     Q.    Did you try to engage in conversation?

4     A.    Yes.

5     Q.    Was Mr. Freeman at that point engaging in recorded

6   communications, at least in his mind?  Did he know -- he didn't

7   know you were recording, right?

8     A.    No.

9     Q.    He's in the park with friends, right?

10    A.    Yes.

11    Q.    Are we drinking?

12    A.    There was drinking going on.

13    Q.    Okay.  It's a social occasion?

14    A.    Correct.

15    Q.    He thinks you're a like-minded libertarian based on

16   the conversation we read earlier.

17    A.    Yes.

18    Q.    And there are other friends around?

19    A.    Yes.

20        MR. AFRAME:  Can we pull up 608.  Sorry.  Wrong

21   number.  60 -- 609B, excuse me.

22    Q.    This was the transcript from a recording you made

23   when you were all hanging outside, right?

24    A.    Yes.

25    Q.    This is a -- this is a comfortable, unguarded

```
 1   environment?
 2        A.    Yes.
 3        Q.    This is what Mr. Freeman said to you in that
 4   scenario, right, that situation --
 5        A.    Correct.
 6        Q.    -- when he thinks he's talking to friends?
 7        A.    Yes.
 8        Q.    "They've been warned of the potential scams that are
 9   out there and if you fall in love with a guy from Africa, I
10   can't talk you out of it, you know.  Uh, so it is what it is."
11              Did I read that right?
12        A.    Yes.
13        Q.    And you just say "so," right?
14        A.    Yes.
15        Q.    "And then he describes the vending machine is a way
16   for them to take their -- the money that they have and send it
17   to the person that they've fallen -- they've fallen in love
18   with.  I'm guessing, right?  Like I don't know."
19              Right?  That's what he says, right?
20        A.    Yes.
21              MR. AFRAME:  You can take that down.
22        Q.    And the vending machine requires no identification.
23        A.    Correct.
24        Q.    No phone number.
25        A.    Right.
```

```
 1         Q.   Nobody talks to you.

 2         A.   No.

 3         Q.   No facial recognition.

 4         A.   No.

 5         Q.   No forms filed.

 6         A.   No.

 7         Q.   You walk up, you put money in.

 8         A.   Yes.

 9         Q.   When Mr. Freeman described that -- if we could go

10   back to the chat, which might take a second, but if we could go

11   back to the chat in -- in May, in the May time period.

12              Just a little further down.  We're going to -- keep

13   going.  Keep going.  A little further.  Just a little below

14   this.

15              First of all, stop right there because Mr. Sisti was

16   talking about why you got the reduced rate because you were

17   such a good customer.  What -- why did he -- why did he reduce

18   the rate, do you remember, looking at this, right above the

19   picture?

20         A.   Yeah, I believe because the issues I had with the --

21   let's see, due to, you know, banking exchange issues.

22         Q.   You had sent money to him and then he couldn't do

23   the transaction because --

24         A.   It took a little while with the bank to clear.

25         Q.   And there was a problem with the bank?
```

1    A.    Yes.

2    Q.    Like they -- did they freeze his account?

3    A.    Something like that happened, yes.

4          MR. AFRAME:  Okay.  Keep going.

5    Q.    We're talking about here the $11,000 in cash, right?

6    A.    Yes.

7    Q.    And Mr. Freeman, in discussing your -- your concern

8  about the cash, what does he say right below at 4:43 p.m.?

9    A.    We've had old ladies go there and drop $40,000 in

10  that location.

11         MR. AFRAME:  Okay.  And just keep going.  I want to

12  get back to the -- how this machine worked.

13   Q.    So right here, right?  You scan it in the machine

14  and then enter cash.

15         And you asked -- you say:  I don't want any forms

16  filed on me.

17         And what is his response?

18   A.    Oh, no way.  We have disabled all that nonsense.

19   Q.    So when something is disabled, does that mean it

20  could also be enabled?

21   A.    Yes.

22   Q.    But here there was nothing, right?

23   A.    (Shakes head.)

24   Q.    No identification, no forms, no nothing.  Right?

25   A.    No.  Correct.

```
 1              MR. AFRAME:  Keep going.
 2        Q.   You keep talking about that:  All ID factors are
 3   turned off.
 4              Do you see that?
 5        A.   Yes.
 6        Q.   I guess that means they could be turned on, huh?
 7        A.   Yes.
 8        Q.   Okay.  That's Mr. Freeman telling you, right?
 9        A.   Correct.
10        Q.   So he understood everything about that machine,
11   clearly?
12        A.   Yes.
13        Q.   And he knew you had postured as a drug dealer?
14        A.   Yes.
15        Q.   He said words to you, we heard them, but did he also
16   know that there would be absolutely no record that you used
17   that machine?
18        A.   Yes.
19              MR. AFRAME:  Thank you.  Nothing further.
20              THE COURT:  Recross.
21                        RECROSS-EXAMINATION
22   BY MR. SISTI:
23        Q.   I just want to clear a couple more things up with
24   you after that.
25              You did break the golden rule, right?  You said you
```

1    were going to do something illegal.

2        A.   Can you clarify, please?

3        Q.   No.  I mean, you know, Mr. Aframe said you broke the

4    golden rule; you said what you were going to use that machine

5    for.

6        A.   Yes.

7        Q.   Yeah.  Well, that's -- that is the golden rule.  If

8    you walk into a bank and you say, here's $5,000 from my drug

9    trade, are they going to do a deal with you?

10       A.   I wasn't walking into a bank.

11       Q.   I'm just asking you.

12       A.   Probably not.

13       Q.   Definitely not, right?

14       A.   Yes.

15       Q.   Okay.  And with regard to money in the U.S. Mail,

16   let's talk about that for a second.

17            U.S. Mail is different than UPS, isn't it?

18       A.   Yes.

19       Q.   I mean, UPS isn't regulated by the government the

20   same as the U.S. Mail, right?

21       A.   It's a private contractor, yes.

22       Q.   So the answer is they're different, right?

23       A.   Yes.

24       Q.   In many ways, U.S. Mail is the safer, more secure

25   way to send things, correct?

```
1          A.    That depends --

2          Q.    Well --

3          A.    -- who you ask.

4          Q.    -- you have government employees under government

5    regulations in government buildings being supervised by people

6    in authority from the government, right?

7          A.    So is private mail is secure as well.

8          Q.    Hold it.

9          A.    Okay.  Yes.

10         Q.    The answer is yes to what I said, right?

11               MR. AFRAME:  Object.

12               THE COURT:  Overruled.

13         Q.    Isn't it?  Thank you.  But at FedEx you don't know

14   who the heck is touching your stuff, do you?  Do you?

15         A.    There's people working there --

16         Q.    Yeah.

17         A.    -- FedEx.

18         Q.    People working there that could have criminal

19   records, right?  Right?

20         A.    Anything can be possible.

21         Q.    People working there that have a history of

22   stealing, right?

23         A.    I can't tell who's working there.  I'm sure

24   everybody has their own criteria for selecting.

25         Q.    But what do you think of the post office in the
```

1    United States?  Do you think they go hiring people that have

2    records of theft?

3         A.    I can't speak to the post office.

4         Q.    Yeah.  Well, one of the reasons that somebody may

5    have suggested to their customer to send money through the mail

6    through the U.S. Postal Service is because it is safer.  Did

7    you ever think about that?

8         A.    No.

9         Q.    Okay.  One of the reasons may be that, yes, in fact,

10   there are more regulations and there is more oversight through

11   the U.S. Postal Service than at some field office of Federal

12   Express, right?

13        A.    I'm aware of the government using UPS as well,

14   so ...

15        Q.    You just don't want to answer the question.  I

16   didn't ask you whether or not the government used UPS.

17        A.    Everyone has their safeguards.

18        Q.    Some are better than others, right?

19        A.    Maybe.

20        Q.    Maybe.  And it's not illegal to send cash through

21   the mail, is it?

22        A.    Probably not.

23        Q.    Well, I mean --

24        A.    I'm not sure I can speak for the post office.

25        Q.    You work for the U.S. Treasury?

1        A.    Yes.

2        Q.    IRS?

3        A.    Yes.

4        Q.    Can you tell the jury whether it's illegal to send

5    money through the mail?

6        A.    You can send whatever you want.

7        Q.    Did you ever ask Freeman why he said -- he suggested

8    U.S. Mail versus FedEx specifically?

9        A.    Can you repeat, please?

10        Q.    Did you ever ask Freeman why he suggested U.S. Mail

11    versus FedEx specifically?

12        A.    He answered the question in a voice recording he

13    sent me.

14        Q.    Right.  That, in fact, there were regulations and,

15    in fact, if they were going to go into a package, there would

16    have to be a search warrant, right?

17        A.    Yes.

18        Q.    Okay.  Instead of some guy just ripping it open at

19    UPS.

20        A.    Yes.  He said the search warrant is required for

21    USPS.

22        Q.    Right.  And in his belief, it's not required for

23    UPS, right?

24        A.    Right.

25        Q.    That means they could go into your package without

1   government authority and take your property, right?

2       A.   Yes.

3       Q.   Even though it's legal, right?  Even though the

4   property is legal, right?

5       A.   I don't -- I don't think mail can just be opened and

6   taken, legal or illegal.

7       Q.   So you're saying that mail controlled by the U.S.

8   Post Office can just be ripped open and taken?

9       A.   Well, based on Mr. Freeman's experience, he told me

10  you need a search warrant to open USPS.

11      Q.   I know.  But in order to get a search warrant, you

12  have to at least have some basis to believe the material inside

13  is illegal, right?

14      A.   Yes.

15      Q.   Okay.  At UPS, you can just rip the package open,

16  right?

17      A.   That's what I was told --

18      Q.   Yeah.

19      A.   -- by Mr. Freeman.

20      Q.   All right.  So you can send legal money through the

21  mail, through UPS, and there shouldn't be any problem with it,

22  right?

23      A.   You can send money through the mail --

24      Q.   Yeah.

25      A.   -- I guess.

34

1      Q.    Okay.  We were shown just a couple of those quick

2  conversations that were just bubbled up and you'll agree with

3  me that, in fact, one of them started with Ian saying that

4  people have been warned about scams.

5           I think it was 609.

6      A.    Yes.

7      Q.    Okay.  And that was during that small transcript,

8  that one-page transcript, that starts out with people have been

9  warned about scams, right?

10     A.    Okay.

11     Q.    Yeah.  And he goes through and he tells -- he just

12 does a very short thing about how -- how people come in, how

13 old ladies come in and drop 40,000 or something like that?

14     A.    Yes.

15     Q.    Okay.  He can't stop what people are using their

16 money for, right?

17     A.    He told me he had control over his ATM -- bitcoin

18 ATM machine.

19     Q.    Yeah.  Well, I mean, let's put it this way.  If the

20 old lady came in and said, I'm being scammed or if he sensed it

21 was going to be a scam, did he say I just let that baby go

22 through?

23     A.    He told me when I was at the machine that the -- the

24 identifying information was turned off on that machine for my

25 transaction.

1      Q.    That has nothing to do with my question.

2            Did he tell you, I actually sit there actively and

3   I've seen people scammed and I just let it go?

4      A.    I don't recall.

5      Q.    Yeah.  And, in fact, the 14 percent drop to

6   10 percent for you was a permanent drop; that's what he

7   communicated to you, right?

8      A.    Probably, if that's what it says.

9      Q.    Yeah.  It was a permanent drop until you said you

10  were doing something illegal.  He didn't cut you a break after

11  that, did he?

12     A.    The last transaction was 14 percent.

13     Q.    And when you told him you were going to go inside

14  that building and use that machine, he said, you can't do that,

15  right?

16     A.    He said, I can't -- I can tell you can't do that,

17  something in that regards.

18     Q.    He said -- he communicated to you he didn't want you

19  to do that.

20     A.    He didn't knowingly tell me, knowingly -- like I

21  said before, based on my previous conversations with him, I

22  understood, you know, that it was okay.  Because knowingly

23  he's -- he didn't want to hear what I was going to do next.

24     Q.    He specifically told you before that date -- he

25  specifically told you he didn't want to do business with you.

1          A.    Yes.

2          Q.    Okay.  And, in fact, the last communications you had

3    with Ian Freeman was he told you that he can't say you can do

4    that, correct?

5          A.    Something in that regards, yes, correct.

6          Q.    Well, we're going to bring it up one more time and

7    you can listen to it and I'll ask you the question again.

8          A.    Sure.

9                     (Video recording played.)

10         Q.    You told him you were going to go in the Owl and use

11   the machine, right?

12         A.    I asked him if the machine was there and he said

13   it's there, yes.

14         Q.    And he said, I can't say you can do that, right?

15         A.    I can't tell you if you can use it, correct.

16         Q.    And that's the last time you ever talked to Ian

17   Freeman, right?

18         A.    In person, correct.

19               MR. SISTI:  Thank you.

20                    CONTINUED REDIRECT EXAMINATION

21   BY MR. AFRAME:

22         Q.    And he set that machine up so he couldn't stop you,

23   right?

24         A.    Yes.

25               MR. AFRAME:  Thank you.

1          MR. SISTI:  I have nothing further, Judge.

2          THE COURT:  You're excused.

3          THE WITNESS:  Thank you, sir.

4                  (Witness excused.)

5          MR. AFRAME:  The United States calls Renee Spinella.

6          THE CLERK:  Ms. Spinella, if you could step this way

7    and step between the table and then I'll have you step into the

8    witness box.

9          Step into the box and then please remain standing.

10          Please raise your right hand.

11          **RENEE SPINELLA,** having been first duly sworn,

12    testified as follows:

13          THE CLERK:  Please be seated.

14          Could you state your name for the record and spell

15    your last name.

16          THE WITNESS:  Renee Spinella, S-p-i-n-e-l-l-a.

17          THE CLERK:  You may want to lean -- pull your chair

18    forward for the microphone.  Thank you.

19                      <u>DIRECT EXAMINATION</u>

20    BY MR. AFRAME:

21          Q.  Good afternoon, Ms. Spinella.

22          A.  Good afternoon.

23          Q.  My name is Seth Aframe.  We've never spoken before,

24    right?  Or we've spoken only -- we've never spoken about the

25    case back and forth.  I once presented information to you,

1   right?

2        A.   Yes.

3        Q.   But we didn't actually have a conversation, did we?

4        A.   No.

5        Q.   Okay.  And you're testifying today here pursuant to

6   a subpoena, right?

7        A.   Yes.

8        Q.   Okay.  And how old are you?

9        A.   25.

10        Q.   And are you married?

11        A.   Yes.

12        Q.   And who are you married to?

13        A.   Andrew Spinella.

14        Q.   And what town do you live in?

15        A.   Manchester, New Hampshire.

16        Q.   And can you tell the jury your educational

17   background?

18        A.   Completed high school.

19        Q.   And what year did you complete high school?

20        A.   2014.

21        Q.   And can you tell me what your employment history --

22   other than it relates to this case, separate from that, what

23   have you been doing since you graduated high school?

24        A.   Pretty much waitressing.

25        Q.   Okay.  And how long have you known Mr. Freeman?

1      A.   A decade, I think.

2      Q.   A decade.  So this is 2022, so since about 2012?

3      A.   Yeah.

4      Q.   How did you first meet him?

5      A.   I don't remember.

6      Q.   Okay.  What was your relationship with him?

7  Describe your relationship with him.

8      A.   We dated for a while.

9      Q.   And when did you start to date?

10     A.   2014.

11     Q.   Okay.  And you graduated high school, again, in

12  2014?

13     A.   Uh-huh.

14     Q.   And were you living with him at 73 Leverett Street?

15     A.   Yes.

16     Q.   And what years were you living at 73 Leverett

17  Street?

18     A.   I think from 2014 until 2017.

19     Q.   And was that the period when you were dating?

20     A.   Yes.

21     Q.   And you broke up in 2017?

22     A.   Yes.

23     Q.   And did you continue to have a professional

24  relationship with Mr. Freeman after the -- that breakup?

25     A.   Yes.

1    Q.   And I'm going to show you Government's 801.  Do you
2  see that document?
3    A.   Yes.
4    Q.   And if we go to the bottom, I think it's consistent
5  with what you said, which is it was signed on 8/14/17.
6    A.   I'm sorry.  What was the question?
7    Q.   Was it signed on August 14, 2017?
8    A.   August 4th.
9    Q.   I'm sorry, August 4th, 2017.
10       And that's your signature under Renee LeBlanc?
11   A.   Yes.
12   Q.   And Ian Freeman is signing that document as well?
13   A.   Yes.
14   Q.   And Spinella is your married name and your maiden
15 name is LeBlanc?
16   A.   Yes.
17   Q.   Okay.  And we don't need to read this whole
18 document, but is it -- can you just summarize what its purpose
19 was?
20   A.   I really don't remember --
21   Q.   Well, you can read it and tell me.
22   A.   Right.  That's what I'm trying to do.
23   Q.   Go ahead.
24   A.   Okay.
25   Q.   Okay.  So, just generally, what was the purpose of

1    this agreement?

2          A.    Well, it seems like when we were breaking up, he was

3    still willing to help me out and, like, just generally help me

4    move on.

5          Q.    Right.  Okay.  And did some of these things in here

6    happen?

7          A.    I think so, yeah.

8          Q.    Okay.  And I'm really interested in the last

9    paragraph as it relates to the case most directly.

10               And it says:  This agreement is separate from the

11   work contract the two, and I take it that's you and

12   Mr. Freeman, are involved in with the Shire Free Church.

13               And that's the sentence.  Right?  So you had a

14   separate employment situation with the Shire Free Church?

15         A.    I think so, yes.

16         Q.    And what was that relationship, really?  What did

17   you do for the Shire Free Church?

18         A.    I was selling bitcoin.

19         Q.    Okay.  And did you have -- it suggests that you may

20   have had a separate contract related to that.

21         A.    Yes.

22         Q.    And I'll show you what's been marked as Government's

23   Exhibit 802, but before I do that, just so that the jury

24   understands, so were you -- were you charged in this case?

25         A.    Yes.

1        Q.   And did you plead guilty to the charge, one of the

2   charges?

3        A.   I pled guilty, yes.

4        Q.   And you don't have any agreement today with the

5   government, do you?

6        A.   Like --

7        Q.   Like any sort of leniency or anything.  You're just

8   testifying pursuant to the subpoena?

9        A.   Yes.

10            MR. SISTI:  May we approach, your Honor?

11            THE COURT:  Yeah.  Do you want to finish that up?

12            MR. AFRAME:  I'm not --

13       Q.   Your testimony is immunized in the sense it can't be

14   used against you correctly -- correct, today?

15       A.   Yes.

16       Q.   But we had no prior -- there's no written agreement

17   between you and I; in fact, we've never spoken before today

18   substantively about the case?

19       A.   I'm here because I've been compelled to testify.

20       Q.   Yes.  Okay.

21            MR. SISTI:  Your Honor, could I have a --

22            THE COURT:  Do you want me to give an instruction?

23            MR. SISTI:  I do.

24            THE COURT:  This witness is testifying under what's

25   called a grant of immunity.  All right?  She does not have a

1   cooperation agreement with the United States Attorney's Office,

2   but the U.S. Attorney, the Department of Justice, has granted

3   her immunity, which means that nothing she says in this -- in

4   this trial, none of this testimony, can be used against her in

5   any -- in any criminal charge, for any trial for any offense.

6   That's the nature of -- that's the nature of her -- the sort of

7   special nature of her testimony today that might make it

8   different than other testimony you hear.

9             So no cooperation agreement, but the testimony is

10  given under immunity and it cannot -- it cannot be used against

11  her in a criminal trial against her.

12            Satisfied with that, Counsel?

13            MR. SISTI:  Thank you very much.

14            MR. AFRAME:  Thank you.

15            THE COURT:  Go ahead.

16       Q.   Okay.  So back to where we were, which is the work

17  you were doing with the Shire -- the Shire Free Church selling

18  bitcoin.

19            And if we go to 802 --

20            THE COURT:  Hold on a second.  I meant to tell

21  counsel the jury asked me to remove my mask when I was giving

22  them instructions, which I didn't just do.

23            So let me ask, does anybody on the jury want to hear

24  that instruction again?  If you want to hear it again, I'm

25  happy to do it.  You good?  Okay.  But I'll remember next time.

1    Sorry about that.

2              Please proceed.

3              MR. AFRAME:  Thank you.

4        Q.    All right.  So looking at 802 and just going to the

5    end before we look at the actual terms, again, you signed this

6    as the contractor?

7        A.    Yes.

8        Q.    And Mr. Freeman signed it and he says administrator,

9    Shire bitcoin.

10       A.    Yes.

11       Q.    And the agreement date was June 28th, 2017?  Yes?

12       A.    Yes.

13       Q.    And is that -- that was a -- was that a couple

14   months before your breakup agreement?

15             I can go back and show you if you want.

16       A.    Yeah.

17       Q.    801.

18       A.    8/4 -- yeah, yeah.  I think so, yeah.

19       Q.    That's August?

20       A.    Yeah.

21       Q.    Okay.  All right.  And it says you're going to

22   work -- going to the second page, no -- six days a week?

23       A.    Yes.

24       Q.    Okay.  And the first page:  The agreement lays out

25   the responsibilities of Renee LeBlanc as she assists the Shire

1    Free Church's nonprofit bitcoin outreach operations.  Renee

2    will be referred to herein as contractor.  Ian Freeman is the

3    administrator of the church's outreach program.

4            Did I read that correctly?

5        A.   Yes.

6        Q.   Security required.  These operations require high

7    security due to the movement of significant church funds.

8    Contractor will follow all security-related instructions of

9    administrator and if contractor does not understand the reasons

10   for the instructions, contractor will inquire for an

11   explanation.

12           Mission.  Contractor will use church funds to spread

13   bitcoin on localbitcoins.com as a method of fostering peace,

14   the church mission.

15           Professional.  The Shire bitcoin assistant's

16   position is a profession, not a hobby.  Contractor agrees to

17   spend at least four days per week attending to responsibility

18   as long as funding and bitcoins are available.  Contractor may

19   set working hours, but must begin the working day no later than

20   2:00 p.m. Eastern time.  Contractor must be willing to work up

21   to six hours per day or until available inventory is sold.

22           When it says inventory, does that mean inventory of

23   bitcoin?

24       A.   Yes.

25       Q.   Contractor may work from anywhere, but must be able

1    to transmit funds daily to administrator via either check or

2    Square Cash.

3              And administrator is Mr. Freeman, right?

4        A.    Yes.  Or the church, something.  I really don't --

5        Q.    Well, if you look up at the top right, it says Ian

6    Freeman is the administrator.

7        A.    Then yes.

8        Q.    Okay.

9              In return for the dedicated service, the church will

10   supply a working capital loan of 4,000 per day of commitment.

11             And that's -- is that your commitment?

12       A.    To be honest, this was a really long time ago and I

13   don't remember it and I don't want to screw up on answers.

14       Q.    So I'll ask you at the end.

15             At the four-day minimum, contractor will have 16,000

16   with which to purchase bitcoin inventory.

17             And you're a contractor, right?

18       A.    Yes.

19       Q.    Should contractor wish to commit five or six days

20   per week, that will increase the total available to 20 to

21   24,000 respectively.

22             The terms of the loan are the church collects one

23   percent on every sale.  Should contractor wish to reduce this

24   rate, contractor may show interest in taking on extra

25   responsibilities, specifically, repurchasing and moving bitcoin

1    and logging those purchases.

2              If contractor opts for a vacation or has reason for

3    extended absence from contractor's responsibility, the working

4    capital loan must be repaid prior to the absence.  This allows

5    the church to use those funds for outreach while contractor is

6    away.  The funds can be reloaned on contractor's return.

7              Have I read all that correctly?

8         A.   Yes.

9         Q.   And you -- when you went into selling bitcoin, what

10   was your personal financial situation?

11        A.   I think I had -- I was in between jobs.

12        Q.   So you didn't have a lot of money?

13        A.   No.  I never have.

14        Q.   So the money you got from this to do this work came

15   from the church?

16        A.   Yes.

17        Q.   Contractor understands that risk is involved in this

18   profession.  Though contractor is using loaned money,

19   contractor assumes responsibility for all losses incurred

20   through scams on LocalBitcoins as well as losses due to market

21   price fluctuations.  Contractor is willing to accept these

22   risks and pay back any lost funds to the church.

23             Contractor is to stay sober while on the job so as

24   to minimize risk of loss through mistakes.

25             Until contractor opts for greater responsibility,

1    church administrator will assist in repurchasing bitcoin as

2    well as logging and calculating payouts to contractor.

3    Administrator will also assist contractor with saving payouts,

4    if requested.

5              Then there's a modifications provision, termination

6    provision, and a jurisdiction provision, right?

7    A.    Yes.

8    Q.    And so did you assume this job?

9    A.    Yes.

10   Q.    And did you -- how long do you think you did it for?

11   A.    From 2017 until 2021, I think.

12   Q.    Okay.  And we'll ask more about that in a second.

13             And there's one other contract -- and if we go to

14   803.

15             Let me ask you one other question before we talk

16   about 803.

17             802, did you write that contract?

18   A.    No.

19   Q.    Do you know who did?

20   A.    Someone from the church.  I don't know if it was Ian

21   specifically.  I don't know.

22   Q.    Okay.  803 says Shire Free Church, 73 and 75

23   Leverett Street, right --

24   A.    Yes.

25   Q.    -- Keene, comma, the shire.

```
1          A.    Yes.

2          Q.    Am I reading that right?

3          A.    Yes.

4          Q.    And there's a logo, free people of the shire?

5          A.    Yes.

6          Q.    And 73 Leverett Street is where Mr. Freeman lived?

7          A.    Yes.

8          Q.    And when you were there, were other people living in

9   75 Leverett Street?

10         A.    Yes.

11         Q.    Was Nobody living in 75 Leverett Street?

12         A.    I don't remember --

13         Q.    Okay.

14         A.    -- at the time.

15         Q.    This agreement is called the Crypto Vending Machine

16  Courier Agreement.

17               Did I read that right?

18         A.    Yes.

19         Q.    If we go to the back of this one, you signed this as

20  contractor on the left-hand side?

21         A.    Yes.

22         Q.    Okay.  And at least where Mr. Freeman's signature

23  line is, does it say 2020?

24         A.    Yes.

25         Q.    Okay.  And it says:  This agreement between the
```

1    Shire Free Church and Andy Spinella and Renee LeBlanc, herein

2    referred to as contractors, governs the collecting and

3    depositing of funds from the Shire Free Church's crypto vending

4    machine in Manchester, New Hampshire.

5            Ian Freeman is the administrator of this --

6    administrator of this church program.  The mission of the

7    church is to foster peace.  The spreading of bitcoin into the

8    community assists this goal, as given by God.

9            Responsibilities.  Contractors will monitor the

10   CVM --

11           And so the CVM is the vending machines, right?

12       A.   Yes.

13       Q.   Okay.  So contractors will monitor the CVM admin

14   system for cashbox's fullness status and shall collect the cash

15   as often as they like.  But if the box becomes over 50 percent

16   full and hasn't yet been collected, contractors must plan a

17   collection run to happen in less than 24 hours at the next safe

18   and available opportunity.

19           And it goes on to say -- to give some other rules.

20           At the bottom it says:  Upon collecting the cash,

21   contractors shall at the earliest opportunity deliver the cash

22   to the bank account specified by the church administrator.

23   This account may change over time as needed.  Contractors shall

24   remove one percent of the cash from the collection prior to

25   depositing, rounding up to the nearest $20.  Upon successful

1    deposit, contractors shall provide a photo of the bank deposit

2    receipt to the church's administrator over Telegram.

3             So did I read that right?

4         A.   Yes.

5         Q.   And is that something you ended up doing, picking up

6    cash from the -- Mr. Freeman's various vending machines?

7         A.   Yes.

8         Q.   Okay.  And we'll talk more about that in a while.

9             So you obviously had both a business and a personal

10   relationship with Mr. Freeman.

11        A.   Yes.

12        Q.   In what manner would you communicate with him?  Did

13   you text?

14        A.   Yeah.

15        Q.   Did you use Telegram?

16        A.   Yes.

17        Q.   Did you use Signal at some point?

18        A.   Yes.

19        Q.   And what's Signal?

20        A.   It's an encrypted messaging app.

21        Q.   And what's Telegram?

22        A.   An encrypted messaging app.

23        Q.   Okay.  And I'm going to show you now a whole long

24   series of communications between you and Mr. Freeman and what

25   I'm going to do is instead of making you read them,

1    Ms. MacDonald and I will read them.  I will read the Ian

2    Freeman portion and you -- and you -- and she will read the

3    portion that's you.

4            All I'll ask you after each one is did we read it

5    correctly and if I have any follow-up questions on it, I will

6    ask them of you.  Okay?

7        A.   Okay.

8        Q.   Okay.  So the first one is 804.  And all of these

9    have been admitted by agreement, which will take us from 804 to

10   825.  And the other documents that we've admitted so far, 801

11   to 803, were also admitted by agreement.

12           THE COURT:  Yeah, we're -- okay.

13           MR. AFRAME:  Okay?

14           THE COURT:  Yup.

15       Q.   All right.  So 804, are you familiar with -- do you

16   see where it says from Ian?

17       A.   Yes.

18       Q.   And, Ms. Spinella, what's your middle name?

19       A.   Catherine.

20       Q.   So do you go by Renee Kate sometimes?

21       A.   Yes.

22       Q.   Okay.  And so this is you and Ian speaking to each

23   other through Telegram?

24       A.   Yes.

25       Q.   Okay.  And so this is way back on July 12, 2017,

1    which would only be, based on what we've looked at already, a

2    couple weeks after you signed the agreement to start selling

3    bitcoin with localbitcoins.com, right?

4         A.   Yes.

5              MR. AFRAME:  Okay.  So we'll read the first one.

6         (Text messages as read by Attorneys Aframe and MacDonald.)

7              MR. AFRAME:  "Dealing with banks is part of your

8    job."

9              MS. MACDONALD:  "Okay.  I can deal with them

10   Friday."

11        Q.   And so by this point you are -- you are working for

12   Mr. Freeman in his bitcoin business, correct?

13        A.   Yes.

14             MR. AFRAME:  805.  This is July 14, 2017.

15             "You hadn't seen my messages here.

16             Yes, we are working together.  It's important to

17   communicate."

18             MS. MACDONALD:  "Oh, I didn't, y, realize you called

19   me."

20             MR. AFRAME:  "I expect to hear from you at 2:00 p.m.

21   six days a week.

22             Please."

23        Q.   So did you perceive Mr. Freeman in this -- in this

24   employment relationship to be the boss?

25        A.   Yeah, but, I mean -- yeah.

1    Q.   I mean, you didn't --

2    A.   And I was shirking, probably, my responsibilities.

3    Q.   No, I'm not blaming you.  I'm just asking.  I mean,

4  he was asking you instructions on what you were supposed to do,

5  right?

6    A.   Yes.

7    Q.   Like a boss would do, right?

8    A.   Yes.

9         MR. AFRAME:  806.

10        "But your assignment for today --

11        I'm sorry.  This is July 17, 2017.

12        But your assignment for today is to contact Wells

13  Fargo about turning on wiring."

14        MS. MACDONALD:  "K."

15        MR. AFRAME:  "Once we can get you wiring access, you

16  won't have to share my exchange account.

17        And we can move the money faster."

18    Q.   So this was just at the very beginning of your

19  starting to work for Mr. Freeman, right?

20    A.   Yes.

21    Q.   And were you -- at that point, were you sharing an

22  account with him to do some of this work?

23    A.   It sounds like it.

24    Q.   Okay.  And before I read, Wells Fargo, what is that?

25  Is that a bank?

```
1        A.    Yes.

2              MR. AFRAME:  So July 17, 2017.

3              "Wells Fargo time?  Got to get that wiring turned on

4    if possible."

5              MS. MACDONALD:  "And why do I need wiring again?  As

6    in what vague shit do I tell them?

7              And tomorrow at 2:00 p.m. we have another showing.

8    No word back from the other place yet."

9        Q.    So that one, is that related to your business or was

10   that just talking about looking for a house?

11       A.    What, the second one or the first one?

12       Q.    Yeah, the second one.

13       A.    The second one, a house, yeah.

14             MR. AFRAME:  Okay.

15             "So you need to send domestic wires for investment

16   purposes.

17             You do day trading.

18             They will presume that means you trade stocks or

19   commodities."

20             MS. MACDONALD:  "Okay.

21             Sigh.

22             I hate phone calls haha."

23       Q.    Ms. Spinella, were you doing -- were you trading

24   stocks or commodities?

25       A.    I believe that bitcoin is a commodity, yeah.
```

```
 1                    MR. AFRAME:  Okay.  808.

 2         Q.    Were you trading stocks?

 3         A.    Not in the traditional sense.  I don't --

 4         Q.    Okay.  When you said "vague shit," what did that

 5    mean?

 6         A.    I'm not good at making phone calls or, like, talking

 7    to authority figures.  I get very nervous, in case that wasn't

 8    apparent.

 9               And so, yeah, like, I was asking for like what do I

10    say to get wired, because I don't know how.

11         Q.    Right.  I get that part, but -- I understand -- I --

12    but the vague part, why did you need to be vague?

13         A.    No -- no reason.  I just didn't know what to say.  I

14    wasn't trying to highlight, like, anything by that.

15         Q.    Okay.  But that doesn't say I don't know what to

16    say.  That says, I want to tell them vague shit.

17         A.    I don't know what to say to that.

18         Q.    Okay.

19         A.    There was no ...

20               MR. AFRAME:  I forgot to tell the jury.  These are

21    in your binder, if that helps you follow along with this.  So

22    some of you clearly have figured that out.

23               And we are only at the beginning, so we're at -- 807

24    is what we're talking about right now.

25         Q.    So your answer to that question is you just don't
```

1  know why you put that?  Okay.  You've got to say it out loud.

2       A.   Yes.

3            MR. AFRAME:  And we're going to look at 808.

4            MS. MACDONALD:  "You are rich.

5            Something that meant a lot to me.

6            I wish I could undo."

7            MR. AFRAME:  "I also work nearly every day and save

8  money.  I never spend to my income and never have, even when I

9  was not as well off.

10           Vacations should be reserved for when you have

11  enough savings to easily afford it."

12      Q.   Had Mr. Freeman been rich from since you knew him?

13      A.   Not that I -- not that I know of.

14      Q.   Well, here you say he's rich.

15      A.   Right.  I don't know why.

16      Q.   You don't know why you said he's rich?

17      A.   Yeah.  I mean, isn't that subjective?

18      Q.   Right.  But it's your subjectiveness, so I guess I'm

19  asking why -- why did you think he was rich.

20      A.   I've always been pretty broke, so people making

21  normal salaries are kind of rich to me, honestly.

22      Q.   Okay.  Okay.  And was Mr. Freeman a hard worker?

23      A.   Yes.

24      Q.   Did he work hard at this bitcoin business?

25      A.   Yes.

1      Q.    Did he spend a lot of time on it?

2      A.    I guess so, yes.

3      Q.    And he had income, right?

4      A.    Yes.

5            MR. AFRAME:  809.

6            MS. MACDONALD:  "Sigh."

7            MR. AFRAME:  "Can you follow up with them?

8      Now itBit is asking if the church is operating ATMs.

9      Fuck."

10           Ian then -- Ian Freeman:

11           "Ian, we wanted to follow up on some additional

12     information regarding your account.  Do you currently operate

13     bitcoin ATMs or equivalent?  If so, you may be acting as a

14     money service business.  As a MSB, we will need the following

15     information:  A copy of your MSB money transmitter or

16     equivalent registration with the state of New Hampshire; your

17     FinCEN registration as an MSB, a copy of your BSA/AML policy

18     and procedure for your business.  Your response much

19     appreciated.  Thank you.  ItBit."

20     Q.    Do you know why Mr. Freeman was upset about itBit

21     asking that?

22     A.    No.

23           MR. AFRAME:  Okay.  810.

24           MS. MACDONALD:  "You're rich.  You can afford to

25     dick around with large amounts of money.  I can't."

1           MR. AFRAME:  "We need to modify our agreement,

2    because you just told me you are quitting.  I have another

3    option for you."

4        Q.    And, by the way, this is August 29th, 2017, so a

5    couple months into the relationship -- the business

6    relationship?

7        A.    Uh-huh.

8           MS. MACDONALD:  "And we need to figure out what to

9    do with me soon.  Or else I need to go get another job."

10          MR. AFRAME:  "You can do like Chris at 101 --

11   Route 101 is doing."

12          MS. MACDONALD:  "No, I didn't."

13          MR. AFRAME:  "This job involves risk.

14          It's in your contract.

15          If you can't handle risk, quote, right now, unquote,

16   that's saying you quit, quote, right now, unquote."

17          MS. MACDONALD:  "Dot, dot, dot, Ian, you know what I

18   mean."

19          MR. AFRAME:  "We can change to where you just let me

20   use your account to sell and all you have to do is banking

21   tasks and I'll pay you 20 percent.

22          You'd literally get paid to just handle any account

23   issues that need to be handled with the bank."

24          MS. MACDONALD:  "Selling is always risky, but some

25   times are obviously more risky than others.

1            20 percent of what?"

2            MR. AFRAME:  "Of what comes into the account."

3            MS. MACDONALD:  "Is that more than what I make now?"

4            MR. AFRAME:  "You're not working now, so you make

5  nothing now.

6            But it's not as much, no."

7            MS. MACDONALD:  "Ian, why do you always give me

8  smart-ass answers when I'm asking you serious questions?  So

9  frustrating."

10           MR. AFRAME:  "Before the church took 1 percent, so

11  previously you'd make more, but that's because you did the work

12  necessary to make more."

13           MS. MACDONALD:  "Okay.  Dot, dot, so then nada.

14           I need to make the maximum amount of money

15  possible."

16           MR. AFRAME:  "Just to be clear, you'd get paid

17  20 percent of the daily net once a week."

18           MS. MACDONALD:  "I guess I'm not getting it."

19           MR. AFRAME:  "That statement doesn't jibe with not

20  taking risk.  You don't make the maximum without taking risk."

21           MS. MACDONALD:  "How much would that be?"

22           MR. AFRAME:  "I'll give you numbers from Chris.

23           Stand by."

24           MS. MACDONALD:  "Estimate.

25           Okay."

1           MR. AFRAME:  "Before my accounts got closed, a

2   recent full week netted him $254.

3           Prior to that, $210.

4           Obviously, if I'm doing the work, I'd be taking on

5   any risk of scams.

6           However, if something does happen, you may need to

7   talk to the bank.  So, again, that's what you'd be getting paid

8   to do.

9           So there was a big scam that happened where Chris --

10  Chris's account got hit for a $4,500 car payment to some

11  stranger.

12          He went to TD and they took care of it.  The account

13  got credited.

14          My point is you'd still have to do a little work to

15  maintain the accounts at my direction, but most of the time

16  you'd do nothing at all and get paid.

17          It dramatically lowers your risk and will still get

18  you paid which frees you up to do that other job so you can

19  make more money that way."

20          MS. MACDONALD:  "I will entertain this idea.

21          But what about what we were talking about last

22  week?"

23          MR. AFRAME:  "You want me to write up an agreement?

24  I pretty much just need to load up the one I have with Chris

25  and make a few tweaks."

1              MS. MACDONALD:  "Absolutely not yet.

2              This is something we'd have to talk a lot more

3    about."

4              MR. AFRAME:  "Either way, we gotta do your banking

5    stuff.

6              So you wanted to go Thursday?"

7              MS. MACDONALD:  "Exactly."

8              MR. AFRAME:  "We gotta go to WF and get you another

9    account somewhere else that has wiring like Chase.

10             So if you wanna go, you're gonna need to be up in

11   the morning.  This is an all-day affair.

12             Meaning you either -- you need to either do a

13   sleepover here or somehow get out of bed and get over here in

14   the a.m."

15             MS. MACDONALD:  "I would consider coming Wednesday

16   night.

17             What of the church starting talk?"

18             MR. AFRAME:  "Well, that's something worth

19   discussing."

20             MS. MACDONALD:  "I agree."

21        Q.   So we've already -- do you know who Chris is in this

22   conversation?

23        A.   I believe Chris Reitmann.

24        Q.   Okay.  And he's already testified at this trial

25   about how he opened bank accounts to allow Mr. Freeman to use

1    in the bitcoin business.

2              Did you ever do that?  Did you open bank accounts

3    that you allowed Mr. Freeman to use in the -- in his bitcoin

4    business?

5         A.    I opened bank accounts for church purposes, yeah.

6         Q.    So were they used --

7         A.    Selling bitcoin.

8         Q.    Selling bitcoin.  Okay.  And when you opened those

9    particular accounts, were you the one who was doing the

10   activity in it or was Mr. Freeman doing the activity in those

11   accounts?

12        A.    I know I -- I know I was.  I don't remember the

13   extent of Ian's involvement.

14        Q.    Okay.  And it said Mr. Reitmann was making, it

15   looked like here, a couple hundred dollars a week.  Was that --

16   to you, did that seem like a lot or a little bit of money?

17        A.    It seemed like a bit, yeah.

18        Q.    Okay.  At the very end you say "what of the church

19   starting talk?"

20              So you've already been talking about this Shire Free

21   Church, which I guess was already -- I mean, that's what was

22   signing the contracts, right?

23        A.    Yes.

24        Q.    Do you know what I'm saying?  In the beginning, we

25   looked at contracts.

1      A.   Right, yes.

2      Q.   And Mr. Freeman was the administrator of the Shire

3  Free Church.

4      A.   Yes.

5      Q.   And now we're in August of 2017 and it says "what of

6  the church starting talk?"

7           So it can't be talking about the Shire Free Church,

8  because that's already started, because we saw contracts.

9  What's this?

10     A.   Probably the beginning of the Crypto Church of

11  New Hampshire, if I had to guess.

12           MR. AFRAME:  Okay.  All right.  811.

13           MS. MACDONALD:  "Okay.  You wanna just fucking do

14  this and get it the fuck over with?"

15           MR. AFRAME:  "Yes.

16           Log into your WF on your laptop.

17           And pull up your account number or the debit card.

18           As you have the info they'll ask for.

19           Then I'll call you and you can conference me and

20  I'll Telegram you answers you get stuck on like before.

21           No coinbase, but you can't lie here.

22           You're not investing for others.

23           Just personal."

24     Q.   So was this you and Mr. Freeman getting on a call

25  together with some financial institution?

1    A.    Sounds like it.

2          MR. AFRAME:  Okay.  812.

3          "I have two more signers for the Crypto Church."

4          MS. MACDONALD:  "Thanks.  I thought I had.  Oh,

5    well.

6          Really?"

7          MR. AFRAME:  "Should be able to get two more at

8    breakfast tomorrow."

9          MS. MACDONALD:  "Nice."

10         MR. AFRAME:  "Chris Reitmann and Matt Roach."

11         MS. MACDONALD:  "Bitchin."

12         MR. AFRAME:  "Matt has already presigned his

13   resignation."

14    Q.    And so this was a chance to get this Crypto Church

15   up and running?

16    A.    Sounds like it.

17         MR. AFRAME:  813.

18         "You wake up at 2:00 p.m., get ready for work, and

19   be logged in by 3:00 p.m. and selling Monday through Thursday.

20   Consider this a modification of our agreement.  I want you on

21   time from now on, like a real responsibility, please, thank

22   you.

23         You are to message me by 3:00 p.m. daily to alert me

24   that you are on, please."

25         MS. MACDONALD:  "Yes, Dad."

```
 1                   MR. AFRAME:  "Not your dad.
 2                   I'm your supervisor.  And you have agreed to become
 3       professional so you can start now that you've finally been up
 4       front about when you can start working.
 5                   Now then, happy sales."
 6                   Does time -- I'm going to do a letter.  It's about
 7       the time --
 8                   THE COURT:  You can keep going.
 9                   MR. AFRAME:  Okay.  Sure.
10                   So 814.
11           Q.    So this is a letter addressed to you, right?
12           A.    Yes.
13           Q.    And it has your address as 73 Leverett Street,
14       Keene, New Hampshire, right?
15           A.    Yes.
16           Q.    And based on what we know from the contract, you
17       weren't living there anymore then -- by then, right?
18           A.    Yes, but I'm not good at updating my information.
19           Q.    Yeah, no, that's fine.  Yup.  I understand.
20                   Okay.  So it's made out to you, though, right, dear
21       Renee C. LeBlanc?
22           A.    Yes.
23           Q.    And it says -- and I'm not going to read all of
24       this, just the -- really just the first sentence:
25                   We are writing to let you know that during a recent
```

 1    review of your account or during your account application, it

 2    appeared that your account may be used to conduct money service

 3    business activity.  Money service business activity includes

 4    check cashing, foreign exchange, issuance of sales or

 5    redemption of traveler's checks and/or money orders, money

 6    transmission, and seller or provider of prepaid access.

 7            And it -- it gives a bunch of things you'll need to

 8    do based on this question about being a money servicing

 9    business.

10            And if we go to the end, we'll see it's signed by

11    someone named Jose Valdovinos who works for Wells Fargo.

12            Did I read that all correctly?

13        A.    Yes.

14        Q.    815 -- so that letter was October the 10th, 2017,

15    and 815 is back to the text messages.  And this is the next

16    day, October 11th, 2017, and the first from Ian is

17    jose.r.valdovinos@wellsfargo.com.

18            And it just says incoming call, but there's no

19    information there.

20            Then it says "this is an argument to keep wire

21    transfers separated from the cash account.

22            But if you can actually convince him to leave you

23    alone ...

24            I've never liked the screen printing story.  It's

25    easy to ask someone for some kind of proof of that."

1          Did I read all that correctly?

2     A.    Yes.

3          MR. AFRAME:  "The financial dominatrix story is much

4    better, IMO.  You can't really prove that without violating the

5    guys who are being dominated's privacy.  It's the kind of topic

6    that will be uncomfortable for the bank agent to have.

7          Will says art is subjective.

8          Maybe you're doing other art now."

9          MS. MACDONALD:  "Then financial dom story it is."

10          MR. AFRAME:  "That is also art."

11          MS. MACDONALD:  "Are there laws, though?"

12          MR. AFRAME:  "There are always laws.

13          But for extracting money from desperate, lonely

14    guys, no lawyers that I know of.

15          Your art story may have been a cover for the

16    financial dominatrix business, which is the real art of taking

17    money from guys."

18          Then there's some -- there's a hang-up and a -- and

19    an attachment that is not here.

20          And then it's -- at 10/12/27 (sic) "how about hello

21    Jose, oh my, no, I'm certainly not involved in those things.

22    My boyfriends from around the country pay me for my services

23    that I provide to them over the Internet and I don't provide

24    them with any of the services you describe.  What was it that

25    caused the confusion?  Renee LeBlanc.

```
 1              Or make the last line, is there anything else I can
 2   do to help you?"
 3              MS. MACDONALD:  "Both?  Idk.
 4              Maybe put in that I'm a financial dom.
 5              He's gonna ask what services."
 6              MR. AFRAME:  "You want me to send it?"
 7              MS. MACDONALD:  "Go for it.  You know what you're
 8   doing.
 9              Just make sure he doesn't think I'm a prostitute.
10              Like for real."
11        Q.    And then if we go to 816, this is an email that at
12   least looks to be from you to this Jose Valdovinos at
13   wellsfargo.com, and it's the -- I'll read it:
14              Oh my, no, I'm certainly not involved in those
15   things.  My boyfriends from around the country pay me for my
16   services -- for my services that I provide to them over the
17   Internet and I don't provide them with any of the services you
18   describe.  Just curious, what was it that caused the confusion?
19   Is there anything else I can do to help you, Renee LeBlanc.
20              And if we went back to 815 for a second, on the --
21   going down, right there, that -- the text in the blue box from
22   Mr. Freeman looks almost exactly the same as that email.
23              So did you send that email, do you remember?
24        A.    I don't remember.
25        Q.    Okay.  Did Mr. Freeman have access to that email
```

1    address?

2         A.   I don't know.

3         Q.   Okay.  But you agree with me except for the last

4    sentence, it's the same language that was in that text?

5         A.   Yeah.

6         Q.   Okay.  And just below, this relates to

7    Mr. Valdovino's question about whether your activity was a

8    money servicing business?

9         A.   Sorry.  What was the question?

10        Q.   See the bottom part of that email?  That's just the

11   letter from Mr. Valdovinos that asks whether your business was

12   a money servicing business?

13        A.   Yes.

14             MR. AFRAME:  Okay.  817.

15             THE COURT:  New exhibit?

16             MR. AFRAME:  Yup.

17             THE COURT:  We'll take the afternoon break.

18             Jadean.

19             THE CLERK:  Please stand for the jury.

20                       (Jury excused.)

21             THE COURT:  Anything for the Court, counsel?

22             MR. AFRAME:  No, your Honor.

23             MR. SISTI:  All set.

24             THE COURT:  15.

25             (Recess taken from 3:20 p.m. until 3:40 p.m.)

1          THE COURT:  Ms. Spinella, you're still under oath.

2          MR. AFRAME:  So just 816 for one second.

3          So just to remind us where we were, we were talking

4    about an email sent from the bitcoinbombshell2727 Gmail account

5    to an email account at Wells Fargo belonging to Jose R.

6    Valdovinos.  And next -- and that was on 10/12.

7          The next exhibit is 817, which is the next day,

8    10/13/27.

9          "No reply from the WF guy yet."

10          MS. MACDONALD:  "Gay.

11          I think I'm going to sell tomorrow, by the way."

12          MR. AFRAME:  "No news could be good news, but in

13    this case, doubtful.

14          Yes, you should continue selling.

15          The account is not locked yet."

16          MS. MACDONALD:  "We had plans today and I'm not sure

17    if I'll be able to.

18          But yeah, idk, you never said financial dom.

19          I feel like he's going to assume I'm a prostitute?"

20          MR. AFRAME:  "I was vague on purpose.

21          Not possible.

22          You can fuck two people in two places at once?

23          I said you have boyfriends who pay you for Internet

24    services."

25          MS. MACDONALD:  "Well, if you think it'll work.  I

1  tryst you.

2          Trust."

3          MR. AFRAME:  "Renee, I have no idea if it'll work.

4  I fully expect the account to be closed."

5      Q.   Ms. Spinella, were you actually acting as a

6  financial dominatrix to men online?

7      A.   It was a joke in poor taste.  No.

8      Q.   But it was a joke in poor taste that although that

9  term wasn't used, the substance of it went to Wells Fargo Bank,

10  right?

11     A.   Looks like it.

12          MR. AFRAME:  Okay.  818.

13          MS. MACDONALD:  "Hey.

14          What would you say if I said that Andy said that

15  when we run out of bank accounts that we could start using his

16  like you do with Chris."

17     Q.   And is that Chris, again, Chris Reitmann?

18     A.   Probably.

19          MS. MACDONALD:  "Could that be a thing that happens?

20          Like he would make new accounts for us at BOA or WF,

21  DCU, Citibank, whatever."

22          MR. AFRAME:  "That's possible."

23          819, which is on August -- I'm sorry, October 18,

24  2017.

25          MS. MACDONALD:  "But idk about this guy.

1                    Probably ripping someone off.

2                    Or just dumb."

3             MR. AFRAME:  "I'll take a look.

4             Heh, how many Brendas say bro?"

5             MS. MACDONALD:  "Good point lol."

6        Q.    So was this referring to a localbitcoins.com

7   transaction you were doing?

8        A.    Probably.  It sounds like Ian stopped someone from

9   scamming me.

10       Q.    Right.  And you brought it to Ian's attention,

11  right?  You said this looks like probably ripping someone off,

12  right?

13       A.    Looks like it.

14       Q.    And that was -- and you brought that to Ian's

15  attention.

16             And it says:  How many Brendas say bro.

17             Did Ian -- would Ian, when you asked him to, review

18  a LocalBitcoins chat if you were concerned?

19       A.    Would he ask to review -- what was the question?

20  Sorry.

21       Q.    Would he review -- if you were concerned about a

22  LocalBitcoins chat that you were involved in, would you

23  sometimes ask Ian to review it?

24       A.    Yes, I would ask him to do it.

25       Q.    And here he made a comment, how many Brendas say

1    bro, right?

2         A.    Yes.

3         Q.    Do you think that was in relation to a LocalBitcoins

4    chat?

5         A.    Yeah.

6               MR. AFRAME:  Okay.  And 820.

7               "Let's go ahead and call Citibank with me on the

8    line."

9               MS. MACDONALD:  "Pretty sure I threw away the

10   number.

11              Do you still have it?  O."

12              MR. AFRAME:  "Yes."

13              MS. MACDONALD:  "On the other page?"

14              MR. AFRAME:  Okay.

15              MS. MACDONALD:  "Okay."

16              MR. AFRAME:  And there's a phone number.  Oh, sorry.

17   Okay.

18              And then there's a phone number.

19              MS. MACDONALD:  "Address was 63 emerald, right?"

20              MR. AFRAME:  "No, 73 Leverett."

21              MS. MACDONALD:  "Okay.  Account number."

22              MR. AFRAME:  And then there's an account number and

23   there's a card number and there's an expiration date and

24   there's a CVV number.  And then a PIN number.

25              Then it says, "background to tell operator.  You

1  received a letter on 12/1 refusing a check deposit because the

2  account has been closed.  However, besides this one letter,

3  you'd never been sent any other notice that your account was

4  being closed.

5          You've since called multiple times and each time you

6  have never been told when you will have check cut to you for

7  the balance in the account.  You need that money for your

8  business and they have an fiduciary duty to give it to you.

9  You'd like to know when you'll get your money and if they don't

10  want to speak -- if they don't want you to speak -- if they --

11  if they know -- wait -- and if they don't know, you want to

12  speak to a manager about this."

13          MS. MACDONALD:  "Okay."

14          MR. AFRAME:  "You haven't gone to social media yet

15  about this crappy customer service, but you will if they don't

16  resolve this."

17          MS. MACDONALD:  "Quote, fraud prevention

18  department."

19          MR. AFRAME:  "What did you pick, five?"

20          MS. MACDONALD:  "Yup."

21          MR. AFRAME:  "The account should have over $12,000

22  in it.

23          FYI."

24          MS. MACDONALD:  "Okay."

25          MR. AFRAME:  "You need access to that money to pay

1    your rent and bills.  This is really hurting you."

2         MS. MACDONALD:  "Yeah, they didn't care last time."

3         MR. AFRAME:  "Are you going to be -- are you going

4    to be financial dominatrix?"

5         Q.   So is this -- was Mr. Freeman providing you to give

6    information on the telephone call you were going to do?

7         A.   I don't remember, but it sounds like it.

8         MR. AFRAME:  821.

9         "So can you please explain this shit with the church

10   state business" --

11        MS. MACDONALD:  That's me.

12        MR. AFRAME:  Sorry.

13        MS. MACDONALD:  "So can you please explain the shit

14   with the church state business account stuff again?"

15        MR. AFRAME:  "The possible issue is it's at the same

16   address as I am.  But who knows if that'll set off any red

17   flags.

18        If you can open an account for the Crypto Church at

19   Service CU, you might be able to use that to get an exchange

20   account open."

21        Q.   So were you using -- trying to use the Crypto Church

22   to open bank accounts.

23        A.   At this time, I don't know.

24        Q.   Did you do that at any time?

25        A.   Later on I know at least.

1      Q.   Do you know, is the Crypto Church registered to be

2   at 73 Leverett Street?

3      A.   I don't know that.

4           MR. AFRAME:  So if I just brought up Government

5   Exhibit 309, if we just zoom in on the back, second page, the

6   middle page of that, the middle of the photo.

7      Q.   So it says the filer is Ian L Freeman at Emerald

8   Street and then it's Crypto Church of New Hampshire; is that

9   right?

10     A.   Yes.

11     Q.   And back at 821, did you ever try to use the Crypto

12  Church as a way to open up an exchange account?  You'll see it

13  says that at the -- it's this January 8, 2018, the last line

14  says you might be able to use that to get an exchange account

15  open.

16     A.   Yes.

17     Q.   Do you remember if you ever used the Crypto Church

18  in an effort to open a crypto exchange account?

19     A.   I don't remember, but probably.

20          MR. AFRAME:  Okay.  And so let me show you what

21  we've marked previously -- actually, I haven't shown you this,

22  Mark.  So it's an itBit application which is a crypto exchange.

23          We've agreed to admit Government's Exhibit 104, your

24  Honor.

25          THE COURT:  104?

1           MR. SISTI:  104.

2               (Government's Exhibit 104 admitted.)

3      Q.    So if we could pull up 104, do you know if itBit is

4  a crypto exchange?

5      A.    Yes.

6      Q.    And it is, right?

7      A.    Yes.

8      Q.    Okay.  And going to the second page, this is an

9  application.  And it says, company name, Crypto Church of

10  New Hampshire, right?

11     A.    Yes.

12     Q.    And it's -- provides a mailing address 73 -- a

13  registered mailing address 73 Leverett Street, Keene.  That's

14  Mr. Freeman's address?

15     A.    Yes.

16     Q.    And it provides a physical address, that's 142

17  Chester Road, Derry?

18     A.    Yes.

19     Q.    And the second page says, name, Renee LeBlanc, and

20  then it gives you the title of minister.

21           What were you the minister of?

22     A.    The Crypto Church of New Hampshire.

23     Q.    Did you provide -- tell us what your -- your

24  educational background was for that position?

25     A.    Educational background?  I mean, I had been watching

1    the Shire Free Church for a long time and agreed with the

2    position held and the position held by the Crypto Church as

3    well, so I didn't mind.

4         Q.   You didn't mind?

5         A.   No.

6         Q.   Okay.  Are you -- are you ordained by any

7    organization?

8         A.   No.  I don't think you have to be.

9         Q.   I'm just asking.  Okay.

10             And if we went to section 4, that's your name there,

11   right?

12        A.   Yes.

13        Q.   And so you have a hundred percent ownership interest

14   in the -- as minister of the Crypto Church?

15        A.   Yes.

16        Q.   Okay.  And section 4 says:  Provide us a brief

17   description of your business.  Indicate what your main business

18   products and services are, as well as who your main customer

19   types are.

20             And it says:  To further the church's mission of

21   spreading peace in accordance with our great prophet's vision,

22   which was inspired by God.  Our actions in furtherance of this

23   divine mission are for charitable, educational, and religious

24   purposes.  We don't have products and services or customers.

25             So let me just start with the first sentence.  Who

1    is your great prophet?

2         A.   Satoshi Nakamoto.

3         Q.   Okay.  And he's the person who wrote the whitepaper

4    about bitcoin?

5         A.   Yes, founded bitcoin.  Yeah.

6         Q.   Okay.  And it says the purpose of your account, your

7    church, is investing in bitcoin?

8         A.   Yes.

9         Q.   And you were going to trade $250,000 a month?

10        A.   Yes.

11        Q.   And if we turn to the next page, you signed this

12   as -- under the title minister sometime, I guess it looks like

13   2017?

14        A.   I thought it was a little later, but ...

15        Q.   Yeah.  Okay.

16        A.   I can't really read it well.

17             MR. AFRAME:  And it may have been -- that may have

18   been a mistake, because if we look at the next email, which is

19   2018, on 10 -- this is 105.  This is an email with her and

20   the -- and itBit.

21             105, the parties agree.

22             THE COURT:  105's admitted.

23             MR. AFRAME:  Yeah.

24                 (Government's Exhibit 105 admitted.)

25             MR. AFRAME:  And so 105, if we go to sort of the end

1    of this email, up a little bit.  I'll come back to that part.

2    But up to the text, so above -- above the first -- the first

3    February 26, '20 -- yeah, we can start there.

4         Q.    March 1, 2018 -- this is from itBit support:  Could

5    you please provide us with a funded bank account in the

6    church's name or proof that you are in the process of funding

7    the account.

8              And then it says:  Renee, yes, how much funding

9    would you like to see in the account?

10             Have I read that right?

11        A.    Yes.

12        Q.    And then it says:  On your application you stated

13   that your estimated monthly trading volume is $250,000 USD, so

14   we will need to see proof of funds that would substantiate that

15   amount.

16             And then your response to the -- James from itBit

17   was:  Oh, I had put that number down as a goal.  Initially our

18   trading probably will not reach that level.  What is the

19   minimum I can show you to get started as an institutional

20   account at itBit?  Our donors are generous, but I can't ask for

21   $250,000 in initial funding.

22             That prior page.

23             The prior page:  Yeah, that's fine.  There's not a

24   specific amount we need to -- we need to see, we just need a

25   document that will show us how you will fund the account, with

1    what funds.  The bank account you sent was empty, so we just

2    need to see some source of funds and what you will be using to

3    fund your account.

4            And then they follow up:  Just wanted to send a

5    reminder about the above request.

6            And then on March 20th, it says:  Sending a final

7    reminder about the above request.

8            And then on March 27, 2018, you write back:  Hi,

9    sorry for the delay.  We did some fund-raising and did get 20K

10   into the account.  I have attached a screenshot, but the

11   account is only a few days away from being -- but the account

12   statement is only a few days away from being generated for this

13   month if you need that instead.  Is there anything else I can

14   help you with?

15           And then if we go to the attachment -- and do you

16   see there that this document that you attached showed a -- if

17   we look at the bottom, right, there's a $20,000 donation --

18   commercial account deposit on March 12, 2018?

19      A.    Yes.

20      Q.    Who made that donation?

21      A.    I don't remember.

22      Q.    Okay.  If we went to Government's Exhibit 506, do

23   you recognize the signature on the bottom right of this

24   document?

25      A.    Yes.

1    Q.    Whose is that?

2    A.    Ian's.

3    Q.    And if we go to the next page -- well, we should

4    just stop here.

5         This shows a $20,000 deposit into the Crypto Church

6    of New Hampshire at 73 Leverett Street, Keene, New Hampshire,

7    right?

8    A.    Yes.

9    Q.    And if we went to the next page, and the jury's

10   already seen this exhibit, this is a $20,000 check to your

11   church sent from 101 Goods from a TD Bank account, right?

12   A.    Yes.

13   Q.    And it says church donation?

14   A.    Yes.

15   Q.    And that's the day of the deposit that you sent

16   along to itBit, right?

17   A.    I think so.

18   Q.    Do you want me to show you?

19   A.    Yeah.

20        MR. AFRAME:  Okay.  Go back to the -- to the prior

21   exhibit, which is 102, and then to the last page of that.  The

22   last page.

23   Q.    And this is showing a $20,000 deposit on 3/12/2018

24   and you submitted this to the itBit on behalf of the Crypto

25   Church, right?

1    A.   Yes.

2         MR. AFRAME:  822.  8 -- we're back into the binder

3    at 822.

4         "Okay.  I have the signed authorization from Chris.

5         I'll be in Concord tomorrow, do you want to meet up

6    at a Service Credit Union to open your account?"

7         MS. MACDONALD:  "Sure."

8         MR. AFRAME:  "You have to wake up earlier than

9    normal, though."

10   Q.   And Chris Reitmann, was he one of the directors of

11   your Crypto Church?

12   A.   At the time, I -- I don't remember.  I don't know.

13   Q.   You were the minister, right?

14   A.   Yes.  At this -- it was January, right?

15   Q.   This is January of 2018.

16   A.   So then yes.

17        MR. AFRAME:  Okay.  Okay.  823.

18        "Good answer."

19        MS. MACDONALD:  "Ayyy, guess what I found?

20        And what was a good answer?"

21        MR. AFRAME:  "When you told her you were a -- when

22   you told her you were a minister was the good answer."

23        824.

24        "Say that he can't get into his account.

25        And the site said he needs to call."

1          MS. MACDONALD:  "And when they say where is your

2    money coming from?

3               I'm gonna fucking lose it.

4               This better not be happening."

5          MR. AFRAME:  "Online sales."

6          MS. MACDONALD:  "They will ask for more and you know

7    it.

8               This is his first time dealing with them."

9          MR. AFRAME:  "Wells says:  You don't have any

10   accounts eligible to send money using this service.  Please

11   contact your banker or Wells Fargo advisor to assist you.

12               So he can try to call WF to see if wiring is even

13   available.

14               But first thing is to call BOA."

15          MS. MACDONALD:  "He doesn't know what to do, Ian.

16   We call, yes, but what happens when they grill him.

17   Seriously."

18          MR. AFRAME:  "I don't know.  Come up with

19   something."

20          MS. MACDONALD:  "Ian, are you fucking serious.

21               Come on."

22          MR. AFRAME:  "All we've done is send the wires,

23   correct?  Out of that account?

24          MS. MACDONALD:  I think --

25          MR. AFRAME:  Sorry, that was you.

1          MS. MACDONALD:  "All we've done is send the wires,

2    correct?  Out of that account?

3          I just don't understand why they would freeze it."

4          MR. AFRAME:  "All wires.

5          And checks.

6          No cash."

7          MS. MACDONALD:  "Wtf.

8          So then.

9          We can say we were wiring money for personal

10   investments."

11         MR. AFRAME:  "Certainly.

12         But what if they ask where it's coming from.

13         It's obvious he's writing checks from his WF

14   account."

15         MS. MACDONALD:  "That, with a D, what I'm asking

16   you."

17         MR. AFRAME:  "That's why you should cook up a

18   story."

19         MS. MACDONALD:  "Dot, dot, dot."

20    Q.    And when it says that -- you know, when it says this

21   is his first time dealing with them, was this referring to your

22   husband, Andrew?

23    A.    I believe so.

24    Q.    Okay.  And did he -- there was some we already read

25   where he -- you talk about the idea that he would open up bank

1   accounts that Mr. Freeman could use.

2         Did that, in fact, happen?

3     A.   I believe that I used it.

4     Q.   Okay.  But it was open to use for the bitcoin --

5     A.   For bitcoin, yes.

6     Q.   -- business.  Okay.

7         MR. AFRAME:  825.

8         "Oh, I thought you meant Andy didn't get a reply

9   from itBit regarding the KYC."

10         MS. MACDONALD:  "KYC?"

11         MR. AFRAME:  "Know your customer.

12         Required by government.

13         That's what those questions are they send out.

14         They have to comply with -- with govt."

15         MS. MACDONALD:  "Ahh."

16         MR. AFRAME:  "If the answers are satisfactory, they

17   usually don't say, okay, you're good, they just let you keep

18   going with the account.

19         If they aren't satisfactory, they usually hit you

20   back with more questions."

21     Q.   Okay.  So the formatting has changed now and this

22   next series are chats from Signal, which you already also told

23   me you used with Mr. Freeman, correct?

24     A.   Yes.

25     Q.   Okay.

1        A.    It's my default messaging app.

2              MR. AFRAME:  Yes.  And these go from 826 to 845 and

3    they've been agreed to.

4              THE COURT:  826 through 845 inclusive, admitted?

5              MR. AFRAME:  Except for 828 and 828A that we're not

6    going to admit.

7              THE COURT:  Okay.  Say 828 and 828A, they're not

8    admitted.

9              MR. AFRAME:  Thank you.

10             (Government's Exhibits 826, 827, 829, 830, 831, 832,

11   833, 834, 835, 836, 837, 838, 839, 840, 841, 842, 843, 844, 845

12   admitted.)

13             MR. AFRAME:  And so we'll continue -- we'll continue

14   on here using the same format and these start on April 3rd,

15   2018.  And it starts with you, Ms. Spinella, so Ms. MacDonald

16   will read it.

17             MS. MACDONALD:  Do you want me to read --

18             MR. AFRAME:  You can read what's happening over

19   there.

20             MS. MACDONALD:  It says "Andrew Spinella, subject

21   itBit withdrawal, April 3rd, 2018, 5:53 a.m. UTC.

22             ItBit support replied:  Hi, Andrew, we understand

23   that there has been irregularity in your IP address on 2

24   April 2018, Netherlands and U.S.  To safeguard your interests

25   and for security purposes, we have held your withdrawal.

1          Please kindly clarify the above and confirm that it

2     is valid by replying with the below information.

3          The withdrawal amount, the last four characters of

4     the withdrawal address.

5          Thank you, itBit team.

6          This message was sent to chaosdragoon77@ yahoo.com

7     in reference" --

8          THE COURT:  Slow down, please.

9          MS. MACDONALD:  Apologies.

10         "In reference to case number 93996.

11         I doubt he'll be okay with it."

12         MR. AFRAME:  "I can get -- I can get you that info."

13         MS. MACDONALD:  "I was just wondering if this was

14    you."

15         MR. AFRAME:  "Yes.

16         He can tell them he appreciates their concern and

17    the hold, but those are merely VPN accesses from the

18    Netherlands.  He can provide them with the last four of the

19    withdrawal address and the amount was 2.0289 BTC.

20         Make sure to get the capitalization right on the

21    last four of the withdrawal addresses."

22    Q.    Did we read that right?

23    A.    Yes.

24         MR. AFRAME:  827.  And this is April 3rd, 2018.

25         MS. MACDONALD:  "I am going to make this deposit in

1   May and nothing is going to stop me.  I will be taking at least

2   $1,000 to the venue, hopefully closer to 2,500."

3              MR. AFRAME:  "Set aside 200 per week.

4              Or $300.

5              I guess May is pretty soon."

6              MS. MACDONALD:  "A few weeks ago.  He's coming out

7   in August.  He needs to approve the engagement, and then the

8   engagement needs to happen and then he can give me money."

9              MR. AFRAME:  "Okay.  Get crakin."

10             MS. MACDONALD:  "Yeah, it is.  I was sort of

11  counting on that thousand, as you said it was coming to the

12  Crypto Church, equals moi.

13        Q.   So you are the Crypto Church?

14        A.   At this point in time.

15             MR. AFRAME:  We're going to skip to 829.

16             This is April 5th, 2018.

17             MS. MACDONALD:  "Letterhead?  I don't know the first

18  thing about any of this.

19             That's fine."

20             MR. AFRAME:  "I need a certification of community

21  service from you.

22             If your church is going to certify community

23  service, you'll need to make some letterhead.  You can use

24  LibreOffice to do it.  There's probably a template, but you

25  should tweak it to make it yours.

```
 1                 O.O" -- I'm sorry.  That was you.
 2                 MS. MACDONALD:  "Ian, I don't know the first fucking
 3      thing about writing a legal document.
 4                 Also, how do I know this is a good idea?  You seem
 5      to have a lot of bad ideas, lol."
 6                 MR. AFRAME:  "It's just a letter.  I can suggest
 7      wording, but you should have some official church letterhead
 8      first."
 9                 830.
10                 "Hey, can you make up some letterhead for your
11      church?"
12                 831.
13                 "Today:  Open DCU account, deposit $7,923.29 check
14      from Wells Fargo into account.  Call Wells Fargo to ask about
15      closing account.
16                 Don't close Wells Fargo account until check clears
17      into DCU."
18                 MS. MACDONALD:  "Got it."
19                 MR. AFRAME:  "Wednesday, get cashier's check from
20      BOA for $11,793, deposit into DCU.  Find a local bank with
21      online wiring.
22                 Don't close BOA until check clears into DCU.
23                 Or we can get out the last -- or we can wire out the
24      last money from BOA tomorrow to Andy's itBit so you can have
25      11K of work to tide you over until you get DCU rolling.
```

1          Then you can close BOA without having to wait for a

2     check to clear.

3          Whether or not you want to do one last wire, Andy

4     needs to apply -- reply to itBit's email to unlock withdrawals

5     from the account, per the suggested reply I sent him a few days

6     ago.

7          He should do that do, puhleeze."

8     Q.    So were these instructions about what you should be

9     doing as part of the work?

10    A.    It looks like it.

11    Q.    And those came from Mr. Freeman?

12    A.    Yes.

13         MR. AFRAME:  832.  April 9th.  Go ahead.

14         MS. MACDONALD:  "Also, haha, read this,

15    www.FBI.gov/investigate/whitecollarcrime."

16         MR. AFRAME:  "I just checked on those bills.  Not

17    yet, it seems.

18         That's a long page to read.  Is there something

19    specific I should be looking at?"

20         MS. MACDONALD:  "The money laundering section."

21         MR. AFRAME:  833.  April 18th.

22         "Damn, I didn't think about the letterhead last

23    night.

24         Did you work on that?

25         I really need to get that done this month."

1              MS. MACDONALD:  "Dude, write a damn letterhead.

2    I'll sign it or whatever.

3              Where did we say we should send it?  Probably

4    local."

5              MR. AFRAME:  "You want to cash it out, right?

6              You can use your church account to do that on local.

7    We just need to set you up with a new ad.

8              I wanted you to put a feminine touch on the

9    letterhead."

10             MS. MACDONALD:  "I don't want it to look too much

11   like my church."

12             MR. AFRAME:  "It'll take you a few minutes.

13             Please."

14             MS. MACDONALD:  "Feminine touch, wtf are you talking

15   about.

16             I'm fine with it, I just don't know wtf you're

17   asking me to do."

18             MR. AFRAME:  "You have LibreOffice, right?"

19             MS. MACDONALD:  "No."

20             MR. AFRAME:  834.  This is April 22nd.

21             "Can you do the Crypto Church letterhead by the end

22   of the week, please -- by the end of the weekend, please?"

23        Q.   And then there's an audio Signal -- does Signal

24   allow the sending of voicemails?

25        A.   Yes.

1          MR. AFRAME:  Okay.  Could you play the voice memo

2     that's embedded here?  It's the next -- it's 834A.

3                    (Audio recording played.)

4          Q.    That was you?

5          A.    Yes, very drunk.

6          Q.    And that was you talking about a letter for your

7     church of which you're the minister?

8          A.    Sounds like it.

9                    MR. AFRAME:  835.  April 30th, 2018.

10                   "Don't forget bank deposit."

11                   MS. MACDONALD:  "We're going.  Now, when they ask

12    what it's for, as they always do, is donations a correct

13    answer?"

14                   MR. AFRAME:  Also, since you --

15                   MS. MACDONALD:  That's mine.

16                   "Also, since you have that folder, can I have the

17    account number, please?

18                   We are here."

19                   MR. AFRAME:  And then there's a number and says

20    "they shouldn't ask, but yes."

21                   836.

22                   "Also, letterhead."

23                   MS. MACDONALD:  "Will you just write the damn

24    thing?"

25                   MR. AFRAME:  "Yes, but you still need to make it

95

1  your own."

2          MS. MACDONALD:  "I told you I'll sign it.  I'm not

3  seeing why I am being given a damn writing assignment.

4          Why?"

5          MR. AFRAME:  "So it looks like a woman's

6  letterhead."

7          837.

8          "It just -- itBit just sent me an account closure

9  notice.

10          We regret to inform you that we cannot maintain your

11  account at this time.  As a financial institution, itBit is

12  required to periodically review customers and their

13  transactional activity.  Your account may have been closed for

14  a variety of reasons after review of account activity."

15          MS. MACDONALD:  "You, or me?"

16          MR. AFRAME:  "Me."

17          "Just checked your email.  You're still okay."

18          MS. MACDONALD:  "Okay.  Well, shit.  That sucks."

19          MR. AFRAME:  "Yes.  Luckily I have Kraken."

20      Q.    So did Mr. Freeman have access to your accounts and

21  your email?

22      A.    I'm not sure which ones.

23      Q.    But he had access to some?

24      A.    I think so.

25          MR. AFRAME:  638.

```
 1                MS. MACDONALD:  "Sigh.  So my options are, one,
 2     limited work but not getting flagged or, two, going balls to
 3     the wall, making money, but having attention drawn to myself.
 4     Hmm.  Haha.  Fuck."
 5                MR. AFRAME:  "ItBit told me to clear the account by
 6     5/25 so we have until then."
 7                MS. MACDONALD:  "What do you propose?  I'd like to
 8     make as much money as possible with the least amount of risk."
 9                MR. AFRAME:  "It's up to you."
10                MS. MACDONALD:  "I need a recommendation.  I'm
11     extremely broke but I'm not trying to get flagged or arrested."
12                MR. AFRAME:  839.
13                "How much do you want?"
14                MS. MACDONALD:  Idk.  Whichever which make me as
15     much money as possible without getting my account closed in one
16     day?  Idk.
17                I'm scared to limit myself because I know you're not
18     going to wait and I am in serious money trouble, haha.
19                Plays jeopardy theme."
20                MR. AFRAME:  "Well, that's the thing, we really
21     don't know.
22                We've seen accounts shuttered in days of limited
23     transactions (CITI).
24                We've seen it take months.
25                Limiting amounts to under 3k per tx may help."
```

1          MS. MACDONALD:  "Well, then, give me what you think

2     is appropriate.

3          That's what I was thinking.  But if you're going to

4     throw caution to the wind, I need to not miss out."

5          MR. AFRAME:  "I've had permission from Chris to burn

6     his TD since last year.

7          And they haven't shut it down, amazingly.

8          Now, it had a history of usage for other things

9     prior to being flipped to crypto sales only.

10          So maybe that is helping.  Or?

11          Just sent you 5 BTC."

12          MS. MACDONALD:  "Or the feds are watching you.  Or

13     quite the opposite.  Dude, idk.  All I know is I woke up early

14     and there's still nothing in my local.  Instacart wants me to

15     be in early, this is going to suck, but I need money.  Please

16     just get the hell on with it, lol."

17          MR. AFRAME:  "Reminder to keep me in the loop,

18     'cause I'm going to rebuy these as you sell as normal.  This

19     isn't a clearance."

20          And then the next one's 5/18, Exhibit 840.

21          "You don't appear to have your ads up."

22          MS. MACDONALD:  "Fixed."

23          MR. AFRAME:  "You could always open a Chase bank

24     account for the church.  You can't do personal, they won't take

25     case deposits on personals."

```
 1                     Again, 518, 841.

 2               MS. MACDONALD:  "Ick."

 3               MR. AFRAME:  "Whatever you decide, you know its days

 4     are numbered.  So if you're going to keep doing BTC stuff, you

 5     need to open another church account somewhere or at least add

 6     it as a d/b/a at Cheshire Credit Union 'cause when Service

 7     Credit Union closes the account, they will cut the final check

 8     in the name of Crypto Church of NH.

 9               And you'll need to deposit -- you'll need somewhere

10     to deposit that.

11               THE COURT:  Did you mean 838, not 638?  Which did

12     you mean?

13               MR. AFRAME:  What did I say?

14               THE COURT:  You said 638.

15               MR. SISTI:  It should be 838.

16               MS. MACDONALD:  I'm not sure where that is.

17               MR. AFRAME:  I don't know where we see that.

18               THE COURT:  This is on this big run you're on right

19     now.

20               MR. AFRAME:  Can you show me where --

21               MR. SISTI:  It's 838.

22               MR. AFRAME:  Did I say 6?

23               THE COURT:  Yes.

24               MR. AFRAME:  Oh, they're all 8.  So if I said --

25     sorry.
```

1          They're all -- the second two numbers are right and

2     the first number should have been an 8.

3          THE COURT:  Yup.  Thank you.

4          MR. AFRAME:  "Whatever you decide, you know its days

5     your numbered.  So if you're going to keep doing BTC stuff, you

6     need to open another church account somewhere or at least add

7     it as a d/b/a at Cheshire Credit Union because when Service

8     Credit Union closes the account, they will cut the final check

9     in the name of Crypto Church of NH.

10         And you'll need somewhere to deposit that.

11         Adding a d/b/a is super easy.

12         Whether or not you're going to keep being active,

13    you should probably do that at Cheshire just to make sure you

14    can deposit the account closure check when it happens."

15         MS. MACDONALD:  "We should probably just keep it

16    empty."

17         MR. AFRAME:  842.

18         "Your total earned for 5/17 and 18 $563.

19         So that's what you can spend from the church account

20    via the debit card."

21         MS. MACDONALD:  "Okay."

22    Q.   And 843 is a bank statement from Service Credit

23    Union.  Do you see that it says Crypto Church of NH at the top?

24    A.   Yes.

25    Q.   And it says 73 Leverett Street?

1    A.   Yes.

2    Q.   And the prior conversation where Mr. Freeman said

3    that there was $563 for you in that account, that was on

4    May 22nd, 2018?

5    A.   Yes.

6    Q.   And if we look at this bank statement, it shows two

7    ATM withdrawals on 5/22/18 and 5/29/18 and the first one was

8    for $300.  Do you see that?

9    A.   Yes.

10   Q.   And the second one was for $260?

11   A.   Yes.

12   Q.   And that was $3 short of the amount that Mr. Freeman

13   said you could -- you could spend?

14   A.   Yes.

15        MR. AFRAME:  Okay.  844.

16        "Well, guess you don't have to call Service CU.

17        Just got a certified letter."

18        MS. MACDONALD:  "No.

19        Fuck."

20        MR. AFRAME:  And are we able to blow up the letter?

21   Q.   And so the -- Ms. -- Ms. Spinella, the first line

22   says:  Please be advised that Service Credit Union will no

23   longer service the Crypto Church of New Hampshire business

24   accounts due to irregular shared branching -- branch accounting

25   activity.

1          Do you see that?

2     A.    Yes.

3     Q.    "There have been numerous shared banking deposits

4  made throughout the United States into your business checking

5  account"?

6     A.    Yes.

7          MR. AFRAME:  Okay.  And after -- go ahead.

8          MS. MACDONALD:  "Fucking damn it."

9          MR. AFRAME:  All right.  So now we're on to

10 Government's Exhibit 845, and this is July 17th, 2018.

11          "How much to hire you to go open a church bank

12 account for sending wires?"

13          And then there's a -- next to your name there's an

14 audio link and that audio link appears at 845A.

15          If we could play that now.

16               (Audio recording played.)

17     Q.    And that was you?

18     A.    Yes.

19          MR. AFRAME:  "Okay.  If you don't want to do it,

20 I'll just have you sign some paperwork authorizing Chris to do

21 it.

22          Figured I'd offer you first.

23          Or you can sign a paper resigning as a board

24 member."

25          MS. MACDONALD:  "I should probably do that, yes.

1   Have him do it.

2            I'm really not interested in going to jail.  I have

3   a lot to lose now.  I'm getting married.  I have a life ahead

4   of me.

5            The FBI is watching you.  You probably shouldn't be

6   doing anything stupid either."

7            MR. AFRAME:  "Thanks for the advice.  I don't think

8   it's stupid to sell bitcoin, but that doesn't mean they won't

9   arrest me for it.

10            This week some of the crypto vending machine

11   operators received an emailed threat from FinCEN."

12            MS. MACDONALD:  "Uh, that's bad."

13            MR. AFRAME:  "Nah."

14            MS. MACDONALD:  "I'm not saying it's stupid to be

15   selling it, but I am saying that you have a house and money and

16   our dog.  Do you have something to lose.  Jazzy isn't getting

17   any younger.  What if you go to prison and she fucking dies

18   while you're in there?  Is this all really worth it?"

19            MR. AFRAME:  And then there's an audio, 845B.

20                  (Audio recording played.)

21            MR. AFRAME:  Are you going to read the -- there's a

22   little --

23            MS. MACDONALD:  I was just waiting for Caryn to pull

24   it up.

25            MR. AFRAME:  Oh, yeah.

```
 1                    MS. MACDONALD:  "Christ.

 2                    In your opinion?  Or like, legally, because it turns

 3      out there is a difference."

 4                    MR. AFRAME:  "All law is opinion."

 5                    MS. MACDONALD:  "Sure, but in actual reality, it's

 6      not."

 7                    MR. AFRAME:  And then there's a whole series of

 8      audio back and forth which we've, for ease, just put together

 9      in one exhibit which is 845C.

10                    We'll play that for you now.

11                         (Audio recording played.)

12      Q.    And if we turn to 846, that was you and Mr. Freeman?

13      A.    Yup.  And I sound like a worried mom.

14                    MR. AFRAME:  846.

15                    "We had a whale come in.

16                    Murphy's is at 72 percent full."

17                    MS. MACDONALD:  "Yes.  My body has developed

18      somewhat of a tolerance and has adjusted to making that my new

19      normal.  That is what's making this twice as worse.  My body

20      has forgotten the old normal, so my hormones are at the will of

21      chemicals that aren't in me.

22                    Oh, boy, swell."

23                    MR. AFRAME:  "Over 28K waiting for you."

24                    MS. MACDONALD:  "I'll let Andy know."

25      Q.    So was this related to picking up the money from the
```

1   vending machines?

2       A.   Yes.

3       Q.   And so did Mr. Freeman -- it looks like Mr. Freeman

4   had a way where he could be aware of how much money was in the

5   machine, because he knew it was 72 percent full?

6       A.   Yeah.

7       Q.   And he knew that a whale had come in.  Do you see

8   that?

9       A.   Yeah.

10      Q.   I take it -- what's a whale?

11      A.   Someone who wanted to buy a good amount of bitcoin.

12           THE COURT:  Hold on a second, please.

13           Thank you.  Go ahead.

14           MR. AFRAME:  847.  This is September 30th, 2020.

15           "Dude, I just logged in to your localbitcoins.com --

16   sorry.  Dude, I just logged into your old localbitcoins.com

17   bitcoinbombshell account."

18      Q.   Did I read that correctly?

19      A.   Yes.

20      Q.   Okay.  And did you allow Mr. Freeman to have access

21   to your old localbitcoins.com bitcoinbombshell account?

22      A.   Yeah.

23           MR. AFRAME:  "Apparently it has sold over 500 BTC in

24   its history.  Wow."

25           MS. MACDONALD:  "Lol.  Now I see these.

1          The answer is yes to local, btw.  I still have to

2     think about what level, but I didn't want to explicitly say yes

3     over the nonencrypted phone call."

4          MR. AFRAME:  This is 10/9/2020, Exhibit 848.

5          "I'm going to do my best to be up in the morning.

6     Gonna put up an ad on your LBC and if we're lucky, I'll make

7     you some money while you sleep."

8          Q.   And just for clarification, was your LBC the

9     bitcoin -- the bitcoinbombshell account?

10          A.   Yes.

11          MS. MACDONALD:  "I'm telling you this because I'm

12     scared I'm going to die, dude.

13          That's great and all so thanks."

14          MR. AFRAME:  849.

15          MS. MACDONALD:  "Sigh.  Well, then, now what.  Can't

16     just lie and say we're together?"

17          MR. AFRAME:  "I'm gonna give them a few days before

18     I reply."

19          MS. MACDONALD:  "It's not unheard of to share a

20     freaking computer."

21          MR. AFRAME:  The other account from the Thirsty Owl

22     is also under similar investigation."

23          And then there's a copied email from Kraken from

24     October 14th, 2020.

25          "Hello.  Thank you for your email with the photo and

1    information that we requested.

2             During our review of your account, our system has

3    indicated that your Kraken account has been accessed from a

4    device which has also been used to access other Kraken

5    accounts.  So we can better understand the activity we have

6    observed, please answer the following questions in a reply to

7    this email.

8             Have you at any time, either now or in the past,

9    assisted anyone else in opening or operating a Kraken account?

10   If so, provide the names of those users.

11            Were you given assistance -- were you given

12   assistance with your own Kraken account by any other

13   individual?  If so, provide the name of the person that

14   assisted you.

15            Have you ever shared a device with any other Kraken

16   users?  If so, list their name -- names.

17            Thank you for your assistance.  We look forward to

18   your reply.

19            My draft responses:  I think my now husband had an

20   account with Kraken at one time, but I don't recall.

21            No, I was not, aside from your support department.

22            If I used a shared device, how would I know how

23   other people were using it unless I was looking over their

24   shoulder?  Also, how would I know the names of anyone sharing a

25   device?"

1          MS. MACDONALD:  "But you don't want to keep them

2     waiting."

3          MR. AFRAME:  "Lol, yeah, but since I did, I got to

4     make it look like you.

5          Kraken closed the account before I could even reply

6     to them.  They say they are returning the wire."

7          MS. MACDONALD:  850.

8          MR. AFRAME:  Sorry.  That was 850.

9          "Kraken closed the account before I could even reply

10    to them.

11          They say they are returning the wire."

12          MS. MACDONALD:  "So we couldn't even send one damn

13    wire?  Are you kidding me?

14          What are these services even for?  Literally, why do

15    these places even exist if they don't want people screwing

16    around with BTC.  I don't get it."

17          MR. AFRAME:  "They're all afraid of the government,

18    so they do ridiculous KYC things."

19          MS. MACDONALD:  "Make it make sense."

20          MR. AFRAME:  "The fact that your account existed

21    since 2016 didn't help.  They figured out the two accounts were

22    coming from the same computer and they didn't like that.  I

23    wasn't as careful as I should have been."

24          851.  This is proposed -- this is from Ian.  It's a

25    proposed reply sent to you.

1          "Wow, I told you I don't check this email often.  I

2     didn't even have time to reply to your last email so you must

3     really want me gone, huh?

4          So is it the case that people who use a public

5     library computer are not allowed to use Kraken because it's the

6     same computer as someone else?  What does it matter whether or

7     not I know the person?

8          I heard you guys became a bank recently.  It

9     definitely feels like you're acting like a bank.  What a shame.

10    Renee."

11         Q.   Now, that -- that's your name, but you didn't write

12    that, right?

13         A.   Looks like it.

14         Q.   Well, it's in a box from Mr. Freeman marked

15    "proposed reply to Kraken support."

16         So is this an email you're supposed to send?

17         A.   I honestly don't know.

18         MR. AFRAME:  Okay.

19         MS. MACDONALD:  "Go right ahead.  Fuck 'em.  I'd

20    even mouth off more if it was me, so go off lol."

21         Q.   Does that clarify it for you?

22         A.   I guess so.

23         MR. AFRAME:  852.

24         "I have ad -- I have set up ads for international

25    wires.

1        Those are for Nigerian Naira."

2        852.  I'm sorry.

3        "Those are for Nigerian Naira.

4        Only one did the verification."

5        MS. MACDONALD:  "Lmfao.  I almost asked if they were

6   from a Nigerian prince, but I thought better of it."

7        MR. AFRAME:  "So we'll see if he sends funds

8   tomorrow.

9        I've ordered the transfer account approval from

10  Citizens Bank."

11        MS. MACDONALD:  "Lawd, please let me be the first to

12  receive a payment from the OG Nigerian prince via bitcoin."

13        Q.    You're talking about a Nigerian prince here a couple

14  times.  What's that in reference to?

15        A.    Some meme on the Internet from 2005 or something,

16  like even earlier than that.

17        Q.    And is it related to Internet scams?

18        A.    Yeah.

19        Q.    Okay.

20        A.    Once again, like, it's a joke.

21        Q.    Yeah, I understand.

22        And 853 is an audio clip.

23        853.

24        (Audio recording played.)

25        Q.    And who were the two -- was that -- what was that

1    from?  Are you familiar with that?

2        A.    It sounds like Free Talk Live.

3        Q.    Okay.  And who are the two people talking?

4        A.    Mark and Ian.

5        Q.    Mark and Ian?

6        A.    Yes.

7        Q.    And what's Mark's last name?

8        A.    Edge.

9        Q.    Edge.  Mark Edge --

10       A.    Edgington.

11             MR. AFRAME:  Okay.  This is from 11/24/2020 on 854,

12   at Government's 854.

13             "The LBC buyer turned out to be a scam victim.

14             Now I get to lose my bank account likely and maybe

15   the money.  On hold with the bank now.

16             "Won't affect you.  I paid you regardless.  Just

17   means the buyer won't be coming back and I'll probably shit out

18   of an account."

19             MS. MACDONALD:  "What?  Dude."

20       Q.    Do you know if around this time Mr. Freeman was

21   making transactions using the bitcoinbombshell account?

22       A.    I don't.

23       Q.    You don't know?

24       A.    I don't know.

25             MR. AFRAME:  Okay.  855, Government's 855, 12/21/20.

1          "I've got another hundred K coming in to your

2     account today from Karla.

3          We need to get this money moving."

4     Q.    Do you know who Karla is?

5     A.    No.

6     Q.    And then if we went to the next page, it says:

7     Looks like she sent the wire to you.

8          If you look at 855A, do you see this wire form?

9     A.    Yes.

10    Q.    What does it say by name of originator?

11    A.    Karla.

12    Q.    Karla what?

13    A.    K. Cino.

14    Q.    Karla K. Cino.

15         And the date of this -- do you see at the very top

16    it says transfer date 21 December 2020?

17    A.    Yes.

18    Q.    And who's the beneficiary?

19    A.    Me.

20    Q.    And that's your address?

21    A.    Yes.

22    Q.    And can you tell me the wire amount?  It's at the

23    top.

24         Caryn, can you highlight it to help us out?

25    A.    Sorry.

1        Q.   Can you blow it up?

2        A.   100 -- yeah.  $104,960.

3        Q.   So was that just a little over the hundred thousand

4   dollars that was talked about there?

5        A.   Yes.

6        Q.   Okay.  And it says at the bottom:  For purchase of

7   bitcoin on Telegram, no returns or reversals, from FTL_Ian, by

8   Karla K. Cino?

9        A.   Yes.

10            MR. AFRAME:  Okay.  856, 1/23/20.

11            "In case they ask you for a recent transaction to

12   verify, you're the real Renee.

13            You submitted this wire on Thursday, 12/17.

14            If they ask what it's for, I'd say investments.  If

15   they press, I'd say rare coins.  But you can say what you

16   like."

17            MS. MACDONALD:  "I forget how three way calls work."

18            MR. AFRAME:  "Call me first."

19            1/8/21.

20            MS. MACDONALD:  "I mean for work.  If I don't have

21   this bank account, I don't have any income."

22            MR. AFRAME:  "Then if you want to work while you're

23   being patient, you'll need another account.

24            Maybe we need to get you a church.

25            Then get a church account."

1          MS. MACDONALD:  "Oh, Lord, this again?"

2          MR. AFRAME:  Well, DCU said the activity wasn't

3     appropriate to a personal account.

4          So if you have -- if you intend to have similar

5     activity in the future, you'll probably need a business

6     account."

7          MR. AFRAME:  So --

8          MS. MACDONALD:  I think we missed the exhibit number

9     on that.

10          MR. AFRAME:  Huh?

11          MS. MACDONALD:  The exhibit number on that last one.

12          MR. AFRAME:  So we're now on Exhibit 858.  Did I not

13     do the last one?  The last exhibit was 857.

14          We're now looking at 858 and this conversation

15     actually has three participants.  The first one just has

16     Mr. Freeman and Mr. Spinella.  So if you could just read

17     Mr. Spinella.

18          Q.   Do you recognize what this is?  Was there a chat

19     that comprised Mr. Spinella, Mr. Freeman, you, and someone

20     named Michael Y?

21          A.   I actually don't recognize it.

22          Q.   Okay.  It says Ian Freeman created the group

23     Manch CVM Service.

24          Do you see that?

25          A.   Uh-huh.

1     Q.    And were you part of picking up money from the
2  vending machines in and around Manchester?
3     A.    Yes.
4          MR. AFRAME:  Okay.  Could you start with Andy at the
5  bottom there?
6          MS. MACDONALD:  "Heyooooo."
7          MR. SISTI:  I'm sorry.  I just have to object.  If
8  she has no recollection, she has no recollection.  If this
9  helps refresh it, that's fine.
10          THE COURT:  Sure.  You can refresh or you can
11  impeach somehow, but --
12     Q.    Do you recall having chats about -- with a bunch
13  of -- with Mr. Freeman and your husband about picking up money
14  at ATMs that you did through Telegram?
15     A.    Yes.  I didn't remember a group chat, though.
16     Q.    Well, now that you've seen this, do you remember
17  that you had chats about picking up money at the ATM -- at the
18  vending machines?
19     A.    Yes.
20     Q.    Is that what this is?
21     A.    Yes.  I also got confused by the format at first.
22     Q.    I understand.  So the format, right, of course, just
23  to be clear, this Cellebrite, that wasn't part of what you
24  would have ever seen, right?
25     A.    Right.  I got confused at first.

1          MR. AFRAME:  I understand.

2          Okay.  Go ahead.

3          MS. MACDONALD:  "Heyooooo."

4          MR. AFRAME:  "Hey -- hey there.  Here's the bank

5    deposit info I sent over Signal, just so it's handy here.  Bank

6    name, Service Credit Union, there's an account number, Ian

7    Freeman, personal checking, New Hampshire.

8          If you deposit over 10K, they may ask my occupation,

9    which is minister.  They may also ask what the funds are from.

10   You can say vending or if they push, vending machines.  They

11   have never asked what I vend, but if they do, you can say rare

12   coins.

13         Also, I made y'all a login for the CVM back end so

14   you can see the current status of the machine."

15         And then there's some password information.

16         MS. MACDONALD:  "Sweet."

17         MR. AFRAME:  "When you get moment, I can walk you

18   through the important parts of the admin for your purposes.

19   Let me know the next time the two of you will have five minutes

20   together and I can call you to go over it."

21         And that was on 12/18.  This is the next day, 12/19.

22         "Hi guys, had a couple whales at the CVM today.

23         Box is 60 percent full.  Y'all need to make a

24   journey as soon as you get up.

25         Tomorrow, 12/19.

```
 1                  $32,000 in there right now, so payout to you for

 2   this run is gonna be at least 320."

 3                  MS. MACDONALD:  "Holy shit."

 4                  MR. AFRAME:  "You at work tonight?"

 5                  MS. MACDONALD:  "Yup, on break now."

 6                  MR. AFRAME:  "Okay.  Ping me when you all wake up

 7   and I'll give you a quick walkthrough and the CVM admin so you

 8   can see the machine status and such."

 9                  MS. MACDONALD:  "Okay."

10        Q.    And, Ms. Spinella, this is 12/19/2019.  Do you see

11   that, that's the date of this chat?

12        A.    Yes.

13                  MR. AFRAME:  I'm going to show you now a video that

14   came from the Service Credit Union which is 858A.

15                       (Video recording played.)

16        Q.    Do you recognize this bank?

17        A.    I don't recognize the bank, but I recognize me.

18        Q.    Okay.  And if you -- if you stop it, at the bottom

19   the surveillance video said 12/19 on it, doesn't it?

20        A.    Yes.

21        Q.    2019?

22        A.    To -- yes.

23        Q.    At the very bottom --

24        A.    Yes.

25        Q.    -- do you see that?
```

1       A.    Yes.

2       Q.    Right.  And that's the same day that they were

3  talking about there being a whole bunch of money at one of the

4  ATMs, right?

5       A.    Yes.

6             MR. AFRAME:  Okay.  Okay.  859.

7             This is 3/1/20.

8             "Also please check the menu and verify that Monero

9  is now an option to buy.  Thank you.

10            Big spender in tonight.

11            17K in, 40 (sic) percent full, definitely needs a

12  visit when y'all make up Monday, please."

13      Q.    So did Mr. Freeman often tell you when there was,

14  you know, big spenders in or that you had to go pick up because

15  he knew there was a lot of money in the machine?

16      A.    Well, yeah.  It fills it up so that more people

17  can't buy it.

18      Q.    Right.  And so he would just go out and tell you to

19  go out and do the job that you agreed to do, right?

20      A.    Yes.

21            MR. AFRAME:  Okay.

22            MS. MACDONALD:  "We're on it first thing tomorrow."

23            MR. AFRAME:  860, which is 3/19/20.

24            "Man, this is gonna suck.

25            Email from Service Credit Union:  In accordance with

1    CDC guidelines, amid the coronavirus, COVID-19, outbreak, we

2    have made the decision to close all in-store branch locations

3    and stand-alone branch lobbies.  Drive-thru and ATM services

4    will be available at a number of branch locations.

5                Boy, I can't wait to have to send that stupid vacuum

6    case back and forth with stacks of cash and hold up the

7    drive-thru line."

8                MS. MACDONALD:  "Hooray, sounds like a massive pain

9    in the ass.

10               It just dawned on me.  With everything going on, is

11   the bar even going to be open to be able to do a collection?"

12               MR. AFRAME:  861.

13               "Guys, Michael has decided to retire from CVM

14   administration.  A recent arrest of a guy in California spooked

15   him."

16               And then this is Renee Kate.

17               MS. MACDONALD:  "Oh, weak sauce.  What happened?"

18               MR. AFRAME:  And then Andrew.

19               MS. MACDONALD:  "What did said guy get arrested for?

20               Also, we shall pick up tomorrow.

21               And happy birthday, big boy."

22               MR. AFRAME:  "Superman29 pleads guilty to laundering

23   millions using bitcoin ATMs.  Thank you."

24               MS. MACDONALD:  "But how is that laundering?

25               And that's Cali being retarded like usual."

1           MR. AFRAME:  That's just an attachment.

2           MS. MACDONALD:  "So he's the idiot.  Lol, gotcha.

3    Not worried then.

4           Sounds about right.  Good thing it's legal in

5    New Hampshire and we don't sell to people we know are doing

6    legal -- illegal things.

7           So then why did that scare Michael?  We're not

8    registered.  On their radar, sure, but --"

9           MR. AFRAME:  And then there's an audio.  Would you

10   play the audio, 861A.

11          THE COURT:  How long is the audio?

12          MR. AFRAME:  861A.

13          THE COURT:  How long is the audio?

14          MR. AFRAME:  Oh, just a short --

15          THE COURT:  Like?

16          MR. AFRAME:  Under a minute.

17          THE COURT:  Go ahead.

18               (Audio recording played.)

19          MR. AFRAME:  That's it.

20          THE COURT:  All right.  Ladies and gentlemen of the

21   jury, it's five o'clock on a Friday.  It's time to discharge

22   you for the weekend.

23          I hope you have a good weekend.  It's been a -- it's

24   been a long week and you've been very attentive.  We appreciate

25   your attention and we'll see you Monday morning at the usual

 1    time.

 2              Remember my admonition.  No discussion with each

 3    other or anybody else regarding this trial during the recess

 4    and no independent research or investigation on any issue

 5    involved in the trial during the recess.

 6              Thank you.

 7              THE CLERK:  Please stand for the jury.

 8                        (Jury excused.)

 9              THE COURT:  Ms. Spinella, I'm going to excuse you

10    for the weekend.

11              Attorney Rothstein, I assume you'll explain to your

12    client she's to have no contact with counsel for either side

13    over the weekend.

14              MR. ROTHSTEIN:  Yes.

15              THE COURT:  Or any witnesses.  Thank you.

16              All right, counsel.  Oh, just let me just take care

17    of this.

18              There's a number of 600 series exhibits that were

19    not actually entered, so I'm going to read these into the

20    record as my understanding is these have been admitted.

21              601, 602, 603, 604, 605, 606, 607, 608, 609A and

22    609B, 610A, 611, 612, and 613.

23              MR. SISTI:  We're good with that, Judge.

24              MR. AFRAME:  Yes.

25              THE COURT:  Those are admitted.

1           MR. AFRAME:  Thank you.

2           (Government's Exhibits 601, 602, 603, 604, 605, 606,

3    607, 608, 609A, 609B, 610A, 611, 612, and 613 admitted.)

4           THE COURT:  Anything else for the Court?

5           MR. AFRAME:  No, your Honor.

6           MR. SISTI:  No, your Honor.

7           THE COURT:  I'll see you Monday.

8           THE CLERK:  All rise.

9           (Proceedings adjourned at 5:02 p.m.)

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 3/10/23         */s/  Liza W. Dubois*
                            LIZA W. DUBOIS, RMR, CRR