*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 8, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                 *
UNITED STATES OF AMERICA         *
                                 *  1:21-cr-41-JL
             v.                  *  December 14, 2022
                                 *  1:40 p.m.
IAN FREEMAN                      *
                                 *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY 7 - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

<u>Appearances</u>:


<u>For the Government</u>:          Georgiana L. MacDonald, AUSA
                               Seth R. Aframe, AUSA
                               John J. Kennedy, AUSA
                               United States Attorney's Office




<u>For the Defendant</u>:          Mark L. Sisti, Esq.
                               Sisti Law Offices




<u>Court Reporter</u>:            Liza W. Dubois, RMR, CRR
                               Official Court Reporter
                               United States District Court
                               55 Pleasant Street
                               Concord, New Hampshire 03301
                               (603)225-1442

```
 1                    I N D E X

 2

 3   WITNESS:              Direct   Cross   Redirect   Recross

 4
     NANCY TRIESTRAM
 5     By Ms. MacDonald       3
       By Mr. Sisti                    8
 6

 7   DIANE CACACE
       By Mr. Kennedy        15               55
 8     By Mr. Sisti                  53

 9

10   THOMAS CONNOLLY
       By Mr. Aframe        56
       By Mr. Sisti                  62
11

12   COLLEEN RANAHAN
       By Mr. Kennedy        64               90
13     By Mr. Sisti                  85

14

15
     EXHIBITS:                  FOR ID            IN EVD.
16
     Government's Exhibit 2601                       71
17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE COURT:  We don't need a record yet.
 3                   (Off-the-record discussion.)
 4              THE CLERK:  All rise for the jury.
 5                   (With the jury present.)
 6              THE COURT:  Please be seated.
 7              Ladies and gentlemen, any conversations between each
 8  other or anyone else regarding the trial during the break?
 9              THE JURY:  No.
10              THE COURT:  Anybody exposed to any sort of outside
11  information about the trial during the break?
12              Let's proceed then.  Go ahead, AUSA MacDonald.
13              MS. MACDONALD:  Thank you, your Honor.
14                   CONTINUED DIRECT EXAMINATION
15  BY MS. MACDONALD:
16         Q.   Ms. Triestram, before we went on the lunch break, I
17  believe we had just started talking about whether you knew
18  Mr. Freeman and I asked you whether Mr. -- you ever spoke to
19  Mr. Freeman on the telephone.  Is that correct?
20         A.   Yes.
21         Q.   And I believe you had said that one time you did?
22         A.   Yes.
23         Q.   Could you please tell us about that conversation.
24         A.   I was in the car and he called and he asked if -- if
25  I was Nancy Triestram.  And I said yes.  And he told me his
```

1   name was Iran (sic) Freeman and he asked me if I was buying

2   bitcoins for Connie Creach.  And I said yes, that I was on my

3   way then to either pick up or buy, I don't know.

4         Anyways, then he said, okay, I just wanted to make

5   sure and that's the last I --

6   Q.   Okay.  And that's --

7   A.   That's all I remember being said.

8   Q.   Okay.  And did he ask you if you knew Connie Creach

9   personally?

10  A.   I don't remember him asking me that.

11  Q.   Did he ask why you were sending --

12  A.   No.

13  Q.   -- money?  Okay.  Did he ask you if you knew

14  anything about bitcoin?

15  A.   No.

16  Q.   Did he ask you where the money was coming from?

17  A.   I had -- that's all he asked me is if I was buying

18  some.

19        MS. MACDONALD:  Okay.  If we could please pull up

20  Government's Exhibit 3109.

21  Q.   Is this you, Ms. Triestram?

22  A.   Yup.

23  Q.   And did you send this photo to Mr. Gray?

24  A.   Yup.

25  Q.   Okay.  And I see you're wearing a mask.  What -- and

1    the date on this is April 15th of 2020.  Was this sort of the

2    beginning of the pandemic?

3         A.    I do believe it was.

4         Q.    Okay.  And I'm just going to read the note:

5               I, Nancy Triestram, wire transfer for $4,050 for the

6    purchase of bitcoin from FTL_Ian for Connie Creach.  I

7    understand this is nonrefundable.

8               Did I read that correctly?

9         A.    Yes, you did.

10              MS. MACDONALD:  Okay.  And could we please pull up

11   3110.

12        Q.    Is this you in this photo?

13        A.    Yup.

14        Q.    Did you take this one as well?

15        A.    Yup.

16        Q.    And where is this one taken?

17        A.    My kitchen.

18        Q.    Okay.  And I'm going to read this note which is a

19   bit different.

20              This says:  I, Nancy Triestram, am buying bitcoin

21   from Aria DiMezzo on Telegram via my trusted agent, Connie

22   Creach.  And I can't read that word, but wire transfer in the

23   amount of 5,000 USD.  I understand this is nonrefundable.

24              Is that right?

25        A.    Yup.

1          Q.    And it's dated 6/2/20?

2          A.    Yup.

3          Q.    This is the first that we've seen Aria DiMezzo.  Why

4    did you write her name on this piece of paper?

5          A.    I was just told that Mr. Freeman was having trouble

6    with his banking account and that -- they asked me to send it

7    to this person.

8          Q.    Okay.  And who told you that?

9          A.    Mr. Anthony.

10               MS. MACDONALD:  Okay.  And finally, 3 -- 3111.

11         Q.    Is this you again?

12         A.    Yup.

13         Q.    Okay.

14         A.    In my kitchen.

15         Q.    In your kitchen.

16               And I'll read this one:  I, Nancy Triestram,

17   authorize and complete any wire transfer in the amount of

18   $5,000 for the purchase of bitcoin from Aria DiMezzo on

19   Telegram.  I authorize delivery to my trusted agent, Connie

20   Creach.  I understand this is nonrefundable.

21               And it's dated 6/4/20.  Is that correct?

22         A.    Yes, ma'am.

23         Q.    And that's just two days after the other one that we

24   looked at?

25         A.    Yes.

1      Q.    Okay.  And could we please pull up Government's

2   Exhibit 1565A.

3            And what we're -- I can represent to you this is

4   a -- this has already been shown to the jury and this is a

5   picture of a folder on a computer.

6            Do you see sort of various small images of yourself

7   in there?

8      A.    Oh, yes.

9      Q.    Okay.  And these all represent different transfers

10  to Mr. Freeman?

11     A.    Uh-huh.

12     Q.    Okay.  And I see -- if we could pull up at sort of

13  the top left, there's a file that says Stogner.

14            Can you see that man's face?

15     A.    Yes, I can.

16     Q.    Do you know that person?

17     A.    No, I do not.

18     Q.    Do you know anybody named Jared Stogner?

19     A.    No.

20            MS. MACDONALD:  Okay.  If we could back out.

21            There's another woman here about one, two, three --

22  four rows down, the second photo in.  Just focus on that.

23     Q.    Do you recognize this person?

24     A.    No, I don't.

25     Q.    Do you know anybody named Shirley Jimeno?

1          A.    No, I don't.

2          Q.    Okay.  At some point did you stop sending money to

3     Mr. Gray?

4          A.    Yes.

5          Q.    And why did you stop?

6          A.    Excuse my French, but I got tired of the bullshit.

7          Q.    And what do you mean by that?

8          A.    Well, always promising to come home all the time and

9     coming to meet me and if I didn't write a document out right

10    the first time, they'd make me do it again.  And I would get

11    frustrated and mad.  And I think finally I come out of my

12    depression and just figured out what I was doing was just

13    not -- not cultured.  I -- I just couldn't do it no more.

14         Q.    Okay.  Did you ever get paid for any of this?

15         A.    No.

16         Q.    Did you ever receive any bitcoin?

17         A.    No.

18         Q.    No?

19         A.    I don't even know what they are.

20              MS. MACDONALD:  Okay.  No further questions.  Thank

21    you.

22              THE COURT:  Cross?

23              MR. SISTI:  Thank you, Judge.

24                        CROSS-EXAMINATION

25    BY MR. SISTI:

1    Q.    Good afternoon.

2    A.    Good afternoon.

3    Q.    I'll have you out of here real quick.  Okay?  I know

4  you don't want to stick around here.  There's going to be a

5  snowstorm in a couple days anyway.

6    A.    I'm probably getting it now at home.

7    Q.    Actually, you're getting hit now, right?  Yeah.

8  Okay.  Well, stick around for a while.

9          You -- you dealt with this Anthony guy for how long,

10  do you recall?

11    A.    I would say probably -- my husband died in 2'15, so

12  I'd say it was 2'16 when I first started talking to him.

13    Q.    So how many years?

14    A.    Four or five.

15    Q.    All right.  That's quite a long time.

16    A.    Yeah.

17    Q.    You never actually met him, right?

18    A.    No.

19    Q.    Did you ever actually see a photograph of him or

20  anything?

21    A.    I had photographs of him on my phone.  He'd send

22  me -- I think he sent me three pictures of him.

23    Q.    Of course --

24    A.    He also sent me a picture of his son and his

25  granddaughter.

1      Q.   Of course, you don't know if it was really a picture

2   of him.

3      A.   No.

4      Q.   And you don't know if he even has a son, right?

5      A.   Well, he looked awful much like the guy that he sent

6   the picture of.  So I don't know.

7      Q.   It might be that guy's son --

8      A.   Yeah.

9      Q.   -- right?  You just don't know what's going on here?

10     A.   No, I don't.

11     Q.   This whole thing is just an absolute disaster,

12  right?

13     A.   I agree.

14     Q.   All right.  Let me ask you just a couple things.

15  Okay?

16          There were quite a few transactions during that

17  four-year period, four or five-year period.  And how much

18  money -- can you tell the jury how much money -- how much did

19  you lose?

20     A.   I lost $16,000.  I don't know how much I

21  transferred to Mr. Freeman because he would have money sent to

22  my account -- my personal account and then I would forward it

23  to Mr. Freeman.

24     Q.   Right.

25     A.   I don't know how much.

1          Q.   But the question -- but the answer is you never got

2     any bitcoin, right?

3          A.   No.

4          Q.   Right.  So you never got anything for your money,

5     right?

6          A.   No.

7          Q.   What's the total amount you lost?

8          A.   I lost about $16,000 personally.

9          Q.   What's the total amount of the transactions, do you

10    think?

11         A.   I don't -- I don't have any idea.

12         Q.   Quite a few, though, right?

13         A.   I would say probably.

14         Q.   Yeah.  I mean, thousands and thousands of dollars,

15    right?

16         A.   I would say probably close to 20,000 or more.

17         Q.   More, yeah.

18              These transactions, they took place at the same

19    bank, didn't they?

20         A.   Most of them did.  There was one from the St. Joe

21    Michigan Bank --

22         Q.   Right.

23         A.   -- credit union, and that's where my car loan was

24    and my personal savings account.  And I think that's the only

25    places, besides a wire transfer from Walmarts.  I may have sent

1  a couple.

2      Q.   There were a lot -- we saw that there were a lot of

3  Chase receipts, Chase Bank.

4      A.   Those were -- that's my personal bank.

5      Q.   That's your personal bank.  There were quite a

6  few --

7      A.   Well, it was.

8      Q.   Yeah, it was.  There were quite a few transfers from

9  Chase --

10     A.   Yes.

11     Q.   -- from what we could see.

12          And that was your personal bank --

13     A.   Yes.

14     Q.   -- they knew you there?

15     A.   Do what?

16     Q.   You were a customer there?

17     A.   Yes.

18     Q.   They knew you, right?

19     A.   Oh, yeah, they knew me then.

20     Q.   Yeah.  Did anybody from Chase come up and say you

21  should watch out, you know, what are you doing with that money,

22  or --

23     A.   No, they didn't really say anything.  They knew I

24  just lost my husband recently and stuff.  We'd been at that

25  bank probably 25, 30 years.  And -- but one day they just sent

1    me a letter and said they didn't want me to be a customer

2    anymore because they didn't like my business transactions and

3    they shut my accounts down.

4         Q.   All right.  And that all happened at once without

5    them asking questions or anything?

6         A.   Yup.  That's it.

7         Q.   And this is after you had wired thousands of dollars

8    out of this bank?

9         A.   Yes.

10        Q.   All right.  The one thing we do know, though, is

11   that when you would hold up some of those receipts, at least

12   initially, you had to leave your phone number on it?

13        A.   Usually it was from my phone --

14        Q.   Yeah.

15        A.   -- and it probably was on there --

16        Q.   Right.

17        A.   -- on the bank transaction.

18        Q.   And we do know that Ian Freeman called you.

19        A.   One time --

20        Q.   Right.

21        A.   -- I talked to the gentleman.  He said he was

22   Mr. Freeman.

23        Q.   Yeah.

24        A.   I couldn't guarantee that.

25        Q.   Okay.  I mean, that's fair enough.  I mean -- I

```
 1    mean, you don't know the guy sitting over there, right?
 2         A.    I don't know anybody in this courtroom.
 3         Q.    Well, that's good.
 4               Okay.  But you don't know Ian?
 5         A.    Nope.
 6         Q.    But somebody that said he was Ian called you up,
 7    right?
 8         A.    He said his name was Mr. Freeman --
 9         Q.    Right.
10         A.    -- and asked me if I was who I am.
11         Q.    Right.  And he wanted to confirm that you wanted to
12    be sending, you know, cash to Connie Creach?
13         A.    He asked me if I went -- if I was sending money for
14    bitcoms (sic) for Connie Creach.
15         Q.    Okay.  All right.  But he just wanted to confirm
16    that, right?
17         A.    Yup.
18         Q.    Okay.  He's the only one that ever asked you a
19    question about what you were doing --
20         A.    Yup, he's the only one.
21         Q.    -- and he's the only one that wanted to confirm what
22    you were doing?
23         A.    He's the only one that asked if I was me.
24               MR. SISTI:  Okay.  Thank you.  I have nothing
25    further.
```

1          MS. MACDONALD:  Nothing, your Honor.  Thank you very

2   much.

3          THE COURT:  Ma'am, you are excused.

4          THE WITNESS:  Thank you.

5          THE COURT:  Thank you.

6                    (Witness excused.)

7          MR. KENNEDY:  Government calls Darlene Cacace.

8   Please remain standing and raise your right hand.

9          **DARLENE CACACE**, having been first duly sworn,

10  testified as follows:

11          Please be seated.

12          And for the record, please state your name and spell

13  your last name.

14          THE WITNESS:  Darlene Cacace, C-a-c-a-c-e.

15                    <u>DIRECT EXAMINATION</u>

16  <u>BY MR. KENNEDY:</u>

17      Q.   Good afternoon, Ms. Cacace.

18      A.   Good afternoon.

19      Q.   Can you tell the jury how you're currently employed?

20      A.   Yes.  I'm currently employed as the supervisory

21  forensic accountant for the Boston Division of the Federal

22  Bureau of Investigations.

23      Q.   And how long have you been in that position?

24      A.   I've been in this position for a little over a year.

25      Q.   How long have you been with the FBI?

1    A.    I've been with the FBI for a little over 30 years.

2    Q.    All right.  So what did you do prior to holding this

3    position?

4    A.    Prior to this position I was a forensic accountant

5    for a little over 29 years.

6    Q.    Okay.  And what is a forensic accountant?

7    A.    As a forensic accountant, I reviewed, analyzed, and

8    summarized various financial records.

9    Q.    And how do you go about doing that?

10   A.    Sure.  When assigned a particular investigation, I

11   work closely with the case agent and the Assistant

12   United States Attorney to identify accounts pertinent to that

13   investigation.  Once the accounts are identified, I serve legal

14   process to obtain the records associated with those accounts.

15        I then analyze the data on those records with

16   various computer programs such as Bank-Scan, Microsoft Excel,

17   i2 Analyst's Notebook, and then I produce reports that

18   summarize the activity that occurred in these documents.  And

19   this cycle continues over and over again as new information is

20   identified throughout my analysis.

21   Q.    All right.  We'll turn to this -- the reason you're

22   here in one second, but do you just mind giving the jury a

23   quick background on your education?

24   A.    Yes.  I have a bachelor's degree in economics and

25   accounting from Holy Cross College, a master in business

1  administration from Babson College, and I am a certified public

2  accountant in the state of Massachusetts.

3      Q.   And outside of the case that we're talking about

4  here today, have you been involved in financial analysis in

5  other cases?

6      A.   Yes, I have.

7      Q.   And, just ballpark, how many cases have you worked

8  in your career?

9      A.   Numerous cases.  A conservative estimate would be

10  around 200 cases.

11      Q.   Okay.  And were you involved in the investigation

12  involving Ian Freeman?

13      A.   Yes.

14      Q.   Okay.  What was your role in the investigation?

15      A.   My role in the investigation was to review the

16  financial records.  I reviewed thousands of pages of financial

17  records and produced summary reports that I referenced earlier.

18      Q.   Okay.  And just to remind the jury, how did you

19  obtain those financial documents?

20      A.   Those financial documents were obtained through

21  legal process.

22      Q.   Okay.  You said thousands.  Do you have any

23  approximation of how many pages you've reviewed in this case,

24  that is, sort of close as you can get?

25      A.   It was pretty voluminous, thousands of pages,

 1    include bank statements, the backup documents to the bank

 2    statements, so that would include deposit tickets, the items

 3    that go with the deposit tickets, canceled checks, and also

 4    wire transfer information.

 5        Q.    Okay.  Approximately, do you know how many cases --

 6    how many accounts you reviewed in this case?

 7        A.    Approximately 50 accounts, a little over 50.

 8        Q.    Okay.  And can you just remind the jury how you go

 9    about sort of identifying accounts in order to seek records

10    for?

11        A.    Sure.  Typically I work with the case agent and the

12    United States Attorney to identify those accounts.  And I also

13    do research in various government databases.

14        Q.    Okay.  In this case, did you review bank accounts in

15    the name of Ian Freeman?

16        A.    I did.

17        Q.    Did you review accounts in names other than Ian

18    Freeman?

19        A.    Yes, I did.

20        Q.    Okay.  Do you know any off the top of your head that

21    you can tell the jury?

22        A.    I do.  Church of the Invisible Hand, Shire Free

23    Church, accounts in the name of James Baker, accounts in the

24    name of Nobody.

25        Q.    Did you review both personal accounts and business

1   accounts?

2       A.   Yes, I did.

3       Q.   Okay.  And we're going to look at some in a minute,

4   but can you just describe to the jury what this summary is that

5   you create?

6       A.   The summary is -- is meant to summarize all of the

7   activity that occurred in the account, so all the documents

8   that I mentioned that I reviewed, the bank statements, the

9   checks, the deposited items, the wires, are summarized into

10  these reports just to give a high-level overview of the

11  activity that occurred in the account.

12      Q.   All right.  We're going to go through some of those.

13           I'm going to move up here so I can see a little

14  better.

15           Did you keep track of all the accounts for which you

16  reviewed?

17      A.   I did.

18      Q.   And did you put that into a spreadsheet?

19      A.   I did.

20      Q.   I'm going to show you what's been marked as

21  Government's Exhibit 2501, I believe, which has been agreed to

22  as a full exhibit.

23           Do you recognize this document?

24      A.   I do.

25      Q.   Did you make this?

1        A.    Yes, I did.

2        Q.    Okay.  And what -- what are we looking at here?

3        A.    We're looking at the accounts that I analyzed that I

4    created summary reports for.  There were a total of 50

5    accounts.

6              And if we look at the columns, the first column is

7    just a counter to keep track of the number of accounts; the

8    second column is the account identifier, the last four digits,

9    which would have been issued by the bank; the next column is

10   the financial institution that held the account; the next

11   column is the holder on the account; the next column is the

12   time period that I reviewed; the next column is the approximate

13   total credits into the account according to the bank

14   statements; and the last column will be the approximate total

15   debits out of the account, according to the bank statements.

16       Q.    Okay.  And so with respect to the total credits, if

17   we take that first account, the AgFed CU, the $67,406, is that

18   all of the money that came into the account throughout the time

19   period that's listed here?

20       A.    Yes.

21       Q.    Okay.  And then am I correct that the debits would

22   be all of the money that left the account?

23       A.    Correct.

24       Q.    Okay.  And so for these accounts, are these the

25   accounts that you created those summaries for?

1      A.    Yes.

2      Q.    Okay.  I'm going to show you some -- we'll go

3 through some of those summaries.  I'm going to show you what

4 has been marked as a full exhibit, 2502.

5            Is this one of those summaries that you created?

6      A.    Yes, it is.

7      Q.    Okay.  And we'll -- I think for this first one I'd

8 like to just kind of explain to the jury what we're looking at.

9 We're going to look at several of these.  We don't have to go

10 through every column on all of them, but on this first one, if

11 you could just walk us through what we're looking at.

12           So what is the -- the top chart that we're looking

13 at?

14     A.    So the top chart is a summary of the deposit sources

15 into Ally Bank checking account ending in 8059 in the name of

16 Ian B. Freeman for the time period October 2016 through

17 May 2017.

18     Q.    And do you know, is this a personal account or a

19 business account?

20     A.    This is a personal account.

21     Q.    Okay.  And that first column says deposit source.

22 What do each of those rows represent?

23     A.    So the first column labeled Deposit Source lists all

24 the deposit sources that contributed to this account; the next

25 column labeled Count lists how many times that deposit source

1   deposited money into the account; the third column, Total

2   Deposited, is the total deposited amount received from each

3   deposit source; and the last column, Percentage of Total

4   represents the percentage of the total amount deposited into

5   the account attributable to each deposit source.

6        Q.   Okay.  So, for example, if we go three down and it

7   says Ian B. Freeman d/b/a Free Talk Live, count six, what does

8   that mean with count six?

9        A.   So six deposits were received into this account from

10  Ian B. Freeman doing business as Free Talk Live.  The six

11  deposits totaled $71,500 and that accounted for roughly

12  4.87 percent of the total deposited amount into this account.

13       Q.   If we come down a little bit, there's one below

14  Interest that says "item missing."  Can you just tell the jury

15  what that means?

16       A.   Yes.  There were 12 items that were not supplied by

17  the bank with the legal process return, so I classified those

18  as missing.

19       Q.   So just so a -- I get an idea, are those -- are you

20  able to see that there are deposits in those amounts coming in?

21       A.   Correct.  They'll be listed on the bank statement,

22  but the backup to that deposit that was listed on the bank

23  statement was not provided by the bank.

24       Q.   Okay.  And what do you mean by backup again?

25       A.   So the backup would be the identification of the

1   deposit source.

2       Q.    And what's an example of that?  What's an example of

3   a backup document?

4       A.    So an example of a backup document would be a check

5   or it would be a deposit slip where the word cash is circled to

6   indicate a cash deposit or it could be a wire that came into

7   the account.

8       Q.    Okay.  I just want to come down a little bit.

9            We've got a series of deposit sources from Renee C.

10  LeBlanc and then Renee LeBlanc.  Is there a reason that there

11  are different entries for that name, Renee LeBlanc?

12      A.    That would have just been the name, her name, the

13  way her name was recorded on the deposited item.

14      Q.    Okay.  So if there was a deposit that came in in the

15  name of Renee C. LeBlanc and then a different deposit in the

16  name of Renee LeBlanc, that would have generated sort of two

17  separate deposit sources?

18      A.    Correct.

19      Q.    Okay.  And if we just come down to the Shire Free

20  Church Monadnock, count 81, does that mean that there were 81

21  deposits from that source?

22      A.    That is correct.

23      Q.    Okay.  And so that 984,900 represents 67 percent of

24  all the money that came into that account; is that right?

25      A.    Correct.

1        Q.    Okay.  And so if we can see -- and so the total

2   deposited down here, is that just adding up everything that

3   came into this account?

4        A.    Yes.

5        Q.    Okay.  We'll move down to the second box.  Like I

6   said, we won't go through every one this in-depth, but I would

7   like to just explain to the jury what's going on here.

8              And so what is this second box that we're looking

9   at?

10       A.    So the second box is a summary of the payees that

11  were paid from this account.  The first column lists the payee

12  name; the second column labeled Count is how many times that

13  particular payee received payments from this account; the third

14  column, Total Paid, represents the total amount paid to that

15  particular payee from this account; and the last column,

16  Percentage of Total, represents the percentage of the total

17  amount paid out from this account attributed to each payee.

18       Q.    Okay.  So, for example, in this account, itBit Trust

19  Company, we see 58 going out and a total of about 1.38 million,

20  which is 94 percent.  And do you know what -- is that right?

21       A.    That's correct.

22       Q.    All right.  And do you know what itBit Trust Company

23  LLC, is?

24       A.    I know that to be a cryptocurrency exchange.

25       Q.    Okay.  Move on to the next one.  We'll try and go

1  through these a little -- in not as detailed as we just did,

2  but, again, look at some.

3          So we have 2503, which is agreed to as a full

4  exhibit.

5          THE COURT:  2503?

6          MR. KENNEDY:  2503.

7          THE COURT:  It's already admitted?

8          MR. KENNEDY:  Already admitted.

9          THE COURT:  Okay.

10     Q.    And what account is this?

11     A.    This is a summary of the deposit sources and payees

12  from Axos Bank, platinum checking account ending in 8079, in

13  the name of Ian B. Freeman for the time period May 2017 through

14  June 2019.

15     Q.    Was this a personal or a business account?

16     A.    This was a personal account.

17     Q.    Okay.  We don't have to go through all of these, but

18  do you know the name Colleen Fordham?

19     A.    I do.

20     Q.    And we'll look at some later.  Did you review

21  accounts in the name of Colleen Fordham?

22     A.    I did.

23     Q.    Can you tell the jury where 43.95 percent of

24  deposits into this account came from?

25     A.    Ian B. Freeman, doing business as Free Talk Live.

```
 1        Q.    And how about 45.65 percent of the deposits?

 2        A.    Shire Free Church Monadnock.

 3        Q.    And so a total of 1.7 million into that account; is

 4   that right?

 5        A.    Correct.

 6        Q.    Okay.  If we go down to the payees, there's a --

 7   about six of them there.  Do you know, if we look at that

 8   second one, BitStamp Limited, do you know what that is?

 9        A.    I know that to be a cryptocurrency exchange.

10        Q.    How about Bittrex, Inc.?

11        A.    Bittrex, Inc. is also a cryptocurrency exchange.

12        Q.    Do you know what Gemini Trust Company is?

13        A.    Gemini Trust is also a cryptocurrency exchange.

14        Q.    And then that -- that item missing, again, is that

15   you don't have backup for that?

16        A.    Correct.

17        Q.    Okay.  And how about Payward, Inc.?

18        A.    Payward, Inc. is --

19        Q.    Do you know what that is?

20        A.    -- also a cryptocurrency exchange.

21        Q.    Okay.  We can look at Government's 2504, agreed to

22   as a full exhibit.

23              It looks like this is First Tech Federal Credit

24   Union and in parentheses you wrote "closed."

25              What does that mean?
```

1       A.      The account is closed.

2       Q.      Okay.  And so by the time, you know, when you

3   reviewed this, the account had been closed at this point.  Is

4   that what you mean?

5       A.      Correct.

6       Q.      Okay.  Just in that first row, how much money was

7   deposited in cash into this account?

8       A.      The total amount of cash deposits was 2,202,188.03.

9       Q.      Let me ask you.  In addition to bank records in this

10  case, were you asked to review any other sources of information

11  as part of your putting these charts together?

12      A.      Yes.

13      Q.      And what information did you review?

14      A.      I also reviewed Telegram folders and LocalBitcoin

15  folders.

16      Q.      And what were in those folders?

17      A.      Those folders contained photos and identities of

18  different people that made deposits into accounts that I

19  reviewed.

20      Q.      Okay.  So if we come to that second deposit source,

21  Karla K. Cino, are you familiar with that name?

22      A.      I am.

23      Q.      And how are you familiar with that?

24      A.      From the Telegram folders.

25      Q.      How about a little further down, Elizabeth D.

1    Corley?

2        A.    I am familiar with that name from the Telegram

3    folders.

4        Q.    Okay.  If we come down a little further, how much

5    money did Colleen Fordham put into this account?

6        A.    Colleen Fordham contributed $664,762, and also

7    above, $9,950.

8        Q.    And right below that it says "returned" in

9    parentheses.  What does that designation mean?

10       A.    That would have been a deposit that was returned.

11   It did not clear.

12       Q.    Okay.  Just about three-quarters of the way down, do

13   you see the name Karen Miller?

14       A.    Yes.

15       Q.    Were you familiar with that name?

16       A.    Yes.

17       Q.    And where did you see that?

18       A.    Karen Miller is from a Telegram folder.

19       Q.    Okay.  And how about the Dale and Deanna Allen

20   Trust?

21       A.    I am familiar with those names from Telegram folder.

22       Q.    And so the total deposits in this account was

23   6.16 million; is that right?

24       A.    That's correct.

25       Q.    Okay.  If we could go to 2505, agreed to as a full

1    exhibit, are these the payees of that same account we just

2    looked for -- looked at?

3          A.    Yes.

4          Q.    Okay.  And so if we could do some of the percentages

5    here, I think the largest is 40 percent.  Where did that money

6    go?

7          A.    That money went to Payward Ventures, Inc.

8          Q.    And, again, what is Payward Ventures?

9          A.    A cryptocurrency exchange.

10         Q.    Okay.  And how about this REW7012 for 2.3 million,

11   what is that?

12         A.    That is a rewards account associated with this

13   account.

14         Q.    Okay.  If we go to Government's 2506, it's a full

15   exhibit.  Is this that 7012 account we just talked about?

16         A.    Yes, it is.

17         Q.    Okay.  And how much cash was put into this account?

18         A.    $688,800.

19         Q.    Okay.  And then we see that 2.3 million from -- that

20   8014 from the other account, correct?

21         A.    Correct.

22         Q.    Okay.  And, again, if we look at payees, it looks

23   like the vast majority of this went to Payward Ventures; is

24   that right?

25         A.    That's correct.

1    Q.   Okay.  And, again, are you familiar with -- what do

2  you know Payward Ventures to be?

3    A.   I know Payward Ventures to be a cryptocurrency

4  exchange.

5    Q.   Do you know if it's known by any other names?

6    A.   It's also known as Kraken.

7    Q.   Okay.  I'm going to pull up 2507, full exhibit.  And

8  what account is this?

9    A.   This is the deposit -- summary of deposits for

10  Service Credit Union classic checking account ending in 62 and

11  in the name of Ian B. Freeman for the time period June 2019

12  through September 2020.

13    Q.   Okay.  How much cash was deposited into this

14  account?

15    A.   $2,250,055.

16    Q.   Are you familiar with the Church of the Invisible

17  Hand?

18    A.   I am.

19    Q.   And what do you know that to be?

20    A.   I know that to be a business associated with Nobody.

21    Q.   And by Nobody, do you mean a person named Nobody?

22    A.   Correct.

23    Q.   Okay.  And how much did Nobody or the Church of the

24  Invisible Hand deposit into this account?

25    A.   $1,475,566.

1    Q.    Okay.  I think we see -- we talked about Karla Cino.

2          How much did Colleen Fordham deposit into this

3    account?

4    A.    Colleen Fordham deposited a total of $342,292.

5    Q.    Okay. Come down.  Donald Huffman.  Are you familiar

6    with the name Donald Huffman?

7    A.    I am.

8    Q.    And how do you know that name?

9    A.    I know that name from the Telegram folders.

10   Q.    Do you see Karen Miller again?  How much did

11   Ms. Miller deposit into this account?

12   A.    Karen Miller deposited a total of $359,000.

13   Q.    This actually goes on to two pages.  If we could go

14   to the next page.

15         Do you know what Route 101 Goods LLC is?

16   A.    Yes.

17   Q.    And what is that?

18   A.    I know that to be a business associated with Colleen

19   Fordham and Christopher Reitmann.

20   Q.    And how much money was deposited from Route 101

21   Goods into this account?

22   A.    $670,393.

23   Q.    Are you familiar with the name Nancy Triestram?

24   A.    I am.

25   Q.    And how do you know that?

1        A.    From the Telegram folders.

2        Q.    And in the bottom, how about the name Danella Varel,

3   do you know that name?

4        A.    I know that name from the Telegram folders.

5        Q.    Okay.  So it looks like from June 2019 to

6   September 2020 there was about $7.3 million that went into that

7   account; is that right?

8        A.    Correct.

9              MR. KENNEDY:   Okay.  Can we go to Government's 2508,

10  also a full exhibit.

11       Q.    Is this that same account we were looking at?

12       A.    Yes, it is.

13       Q.    And are these the payees?

14       A.    Yes.

15       Q.    If we come down a little bit, we see 20 payees and

16  about $3 million to BC Exchange.  Do you know what that is?

17       A.    I know that is a cryptocurrency exchange.

18       Q.    Okay.  Come about three-quarters of the way down, we

19  see Payward Ventures again; is that right?  How much went to

20  Payward Ventures?

21       A.    Yes, a total of $2,672,000 was paid to Payward

22  Ventures.

23       Q.    All right.  Can you see how much the Reformed

24  Satanic Church paid into this account?

25       A.    Yes.  A total of $230,000 was paid to the reform --

1    Reformed Satanic Church.

2        Q.    And how much did the Shire Free Church pay into this

3    account or get paid out of this account?  I apologize.

4        A.    Shire Free Church was paid $100,000 from this

5    account.

6            MR. KENNEDY:  Move to Government's 2509.  That's

7    also a full exhibit.

8        Q.    Whose name is this account in?

9        A.    This is an account at Bank of America, a checking

10   account ending in 8465 in the name of Ian B. Freeman for the

11   time period October 2019 through January 2020.

12       Q.    All right.  So the -- just a couple of months; is

13   that right?

14       A.    Yes.

15       Q.    Okay.  If we start at the top, do you know the name

16   Mark Allison?

17       A.    I know the name Mark Allison from the Telegram

18   folders.

19       Q.    How about Gail Buffamondi?

20       A.    I know the name Gail Buffamondi from the Telegram

21   folders.

22       Q.    Okay.  We talked about Danella Varel.

23            We see deposit.  What does that mean?

24       A.    A deposit is the -- a deposit was indicated on the

25   bank statement, but we did not have the backup for those

34

1    deposits.

2         Q.    Okay.  So we just know that a deposit was made; we

3    just don't know what type of deposit.

4         A.    Correct.

5         Q.    Okay.  We see Donald Huffman again.  How much did

6    Mr. Huffman deposit?

7         A.    Mr. Huffman deposited $160,000 into this account.

8         Q.    A little further down, Karen Miller again.  How much

9    did Ms. Miller deposit?

10        A.    Karen Miller deposited $75,000 into this account.

11        Q.    Sorry.  Just above that, See Lee Lim, do you see

12   that?

13        A.    Yes.

14        Q.    How much did Ms. Lim deposit?

15        A.    See Lee Lim deposited $129,400 into this account.

16        Q.    Come down to the RJ Burns Family Trust of 2014.  Do

17   you see that?

18        A.    I do.

19        Q.    How much did that family trust deposit?

20        A.    $184,000.

21        Q.    Okay.  And we already talked about Dale and Deanna

22   Allen Trust.  You're familiar with that?

23        A.    Yes.  I'm familiar with that from the Telegram

24   folders.

25        Q.    And Nancy Triestram, again, you're familiar with

1   her?

2      A.    I am familiar with the name Nancy Triestram from the

3   Telegram folders.

4      Q.    Okay. So it looks like from October of 2019 until

5   January of 2020 there was just under $2 million deposited into

6   this account; is that correct?

7      A.    Correct.

8      Q.    Okay. And if we look at the bottom, where did about

9   91 percent of that money go?

10      A.    About 91 percent of this money was transferred to

11   Payward Ventures, Inc., the total amount was $1,768,100.

12      Q.    And what is Payward Ventures again?

13      A.    Payward Ventures, Inc., also known as Kraken, is a

14   cryptocurrency exchange.

15      MR. KENNEDY:  Okay. Government's 2510, full

16   exhibit.

17      Q.    Whose account is this?

18      A.    This is a Santander Bank account, a checking

19   account, ending in 9819 in the name of Ian B. Freeman for the

20   time period August 2020 through February 2021.

21      Q.    Okay. How much did Ms. Cino deposit into this

22   account?

23      A.    Karla Cino deposited $28,995 into this account.

24      Q.    How about Karen Miller, how much did she deposit?

25      A.    Karen Miller deposited $447,144 into this account.

1      Q.   How about Nobody Nobody?

2      A.   Nobody Nobody deposited $310,704 into this account.

3      Q.   Do you know if this is a personal account or a

4  business account?

5      A.   This is a personal account.

6      Q.   Okay.  What's this last entry here, transfer

7  checking 2523?

8      A.   This was a transfer into another Santander Bank

9  account ending in 2523.  The holder of the account is Ian B.

10 Freeman, doing business as New Hampshire Peace Church.

11     Q.   Okay.  So that -- am I right that a New Hampshire

12 Peace Church account made four deposits in the amount of

13 $471,000 into this account?

14     A.   Correct.

15     Q.   Okay.  Come down, where did 85 percent of this money

16 go?

17     A.   85 percent of the funds from this account were paid

18 to BC Exchange.

19          MR. KENNEDY:  Okay.  2511, full exhibit.

20     Q.   What account is this?

21     A.   This is an account in the name of Ian B. Freeman

22 doing business as New Hampshire Peace Church, Santander Bank

23 checking account ending in 2523 for the time period

24 October 2nd, 2020, through December 2nd, 2020.

25     Q.   Okay.  So that first entry, Diane L. Aucott.  Are

```
1    you familiar with that name?
2         A.   I am.
3         Q.   From where?
4         A.   The Telegram folders.
5         Q.   How about the name Rebecca A. Ault?
6         A.   I am familiar with that name from the Telegram
7    folders.
8         Q.   How much money did Ms. Cino deposit into this
9    account?
10        A.   $110,250 was received from Karla K. Cino.
11        Q.   Okay.  At the bottom, what's that last deposit
12   source?
13        A.   Renee C. Spinella deposited $58,000 into this
14   account.
15        Q.   Okay.  And then it looks like our summary of payees,
16   I think we just talked about 471,000 that was transferred from
17   the New Hampshire Peace Church; is that what that is?
18        A.   That's correct.
19        Q.   Okay.  So now we're going to move to Government's
20   2512.  It's a full exhibit.
21             Whose account is this?
22        A.   This is an account at Digital Credit Union in the
23   name of Colleen Fordham, checking account ending in 4760, for
24   the time period December 2018 through January 2020.
25        Q.   Okay.  And I think you testified you knew the name
```

1    Mark Allison?

2        A.    I know the name Mark Allison from the Telegram

3    folders.

4        Q.    Okay.  How about Gail Buffamondi again?

5        A.    I know the name Gail Buffamondi from the Telegram

6    folders.

7        Q.    How about Karla Cino?  How much did she deposit?

8        A.    Karla K. Cino deposited $32,800 into this account.

9        Q.    Come down, we see the RJ Burns Family Trust of 2014

10   again.  How much did that account deposit?

11       A.    $63,000.

12       Q.    And how about Nancy Triestram?

13       A.    Nancy Triestram deposited $31,200 into this account.

14       Q.    Okay.  And where did 99.98 percent of the money from

15   Colleen Fordham's DCU account go?

16       A.    To Ian Freeman.

17            MR. KENNEDY:  Okay.  Going to bring up what is

18   Government's 2513A, which is agreed to as a full exhibit.

19       Q.    What account is this?  This looks like Colleen

20   Fordham again.  Is this a different account?

21       A.    Yes, this is an account in the name of Colleen M.

22   Fordham, a TD Bank, a checking account ending in 2980 and

23   activity from September 2018 through October 2019.

24       Q.    Okay.  And how much cash was deposited in that

25   account?

1        A.    A total of $1,956,858.27 in cash was deposited into

2   this account.

3        Q.    Okay.  And so for the life of this account, it looks

4   like there was about -- it looks like -- I see the grand total

5   of 2.3 million and then less returned checks deposit item, what

6   does that mean?

7        A.    So a returned deposited item would be a deposited

8   item that didn't clear.  A returned check would be a check that

9   didn't clear the account.  So I subtracted those out of the

10  totals.

11       Q.    Okay.  And if we go down to summary of payees, about

12  78 percent -- well, let's go over the first one with 37 payees.

13  Who's that?

14       A.    Ian Freeman received a total of $1,799,936 from this

15  account.

16       Q.    And the returned -- what does that represent there?

17       A.    That would have been a returned item that did not

18  clear the account.

19       Q.    Okay.  So was that made up of that 107,000?

20       A.    It is -- correct, yes.

21       Q.    Okay.  And then Ms. Fordham made an additional three

22  payments to Ian Freeman; is that correct?

23             Below that, am I reading that right?  So there's the

24  37, we had the returned, and then below that, $242,627?

25       A.    I'm sorry.

```
1         Q.    Do you not see where I'm -- okay.  So, excuse me.

2               So we first looked at the payee for Ian Freeman --

3         A.    Correct.

4         Q.    -- account 37, 1.799 million, correct?

5         A.    Right.  And there's a line below.  Ian B. Freeman

6    was paid $242,627.

7               MR. KENNEDY:  Yeah.  Okay.  We are going to go to

8    2515A, full exhibit.

9         Q.    Whose account is this?

10        A.    This is a Bank of America checking account ending in

11   9633 in the name of Church of the Invisible Hand.  And the

12   signer on the account is Nobody Nobody.

13        Q.    Okay.  And it looks like the largest deposit source

14   is backup missing; is that right?

15        A.    Correct.

16        Q.    And, again, does that just mean you don't have the

17   backup documents to confirm what kind of deposit it was?

18        A.    That's correct.

19        Q.    And so you can't tell whether that's cash or check

20   or money order?

21        A.    That's correct.

22        Q.    Okay.  Come about halfway down.  Do you see the name

23   Mary Hurd?

24        A.    Yes, I do.

25        Q.    Are you familiar with that name?
```

1      A.     I am familiar with that name from the Telegram

2    folders.

3      Q.     Okay.  How about Pleasant Valley Oaks; do you know

4    what that is?

5      A.     I know Pleasant Valley Oaks to be associated with

6    Harold Jones.

7      Q.     And how much money was deposited from Pleasant

8    Valley Oaks?

9      A.     $101,754.

10      Q.     And how about from the Reformed Satanic Church?

11      A.     The Reformed Satanic Church deposited $125,000 into

12    this account.

13      Q.     Okay.  And so the total deposits in this account

14    from March 2020 to June 2020 were $1.2 million; is that right?

15      A.     That's correct.

16      Q.     Okay.  And then if we look at the payees, it looks

17    like about 42 percent was paid to Ian Freeman; is that correct?

18      A.     That's correct.

19      Q.     Okay.  And then these transfer -- what do these

20    transfer checks mean?

21      A.     So these would have been transfers to other checking

22    accounts at Bank of America, transfer to checking 4893, which

23    is the name of -- which is in the name of Reformed Satanic

24    Church and transfer to checking 6064.

25          MR. KENNEDY:  Okay.  2515B, full exhibit.

1      Q.    And whose account is this?

2      A.    This is an account in the name of Church of the

3  Invisible Hand at JPMorgan Chase, a checking account ending in

4  9038 and the signer was FNU Nobody.

5      Q.    And what's the time period again, sorry?

6      A.    January 2020 through April 2020.

7      Q.    All right.  So four months?

8      A.    Correct.

9      Q.    And how much cash was deposited in the account?

10     A.    $732,763.91.

11     Q.    And what was the total amount deposited in the

12  account?

13     A.    $976,501.84.

14     Q.    And if we look at those last two payees, where did

15  the large majority of this money in the Church of the Invisible

16  Hand account get sent to?

17     A.    $920,080 was sent to Ian Freeman; $821,553 was sent

18  to Ian B. Freeman.

19          MR. KENNEDY:  We'll look at 2516 now.  It's a full

20  exhibit.

21     Q.    Whose account is this?

22     A.    This is a Wells Fargo checking account ending in

23  3193.  The holder on the account was Renee C. LeBlanc and the

24  time period analyzed was January 2017 through November 2017.

25     Q.    How much cash was put in this account?

1    A.    $378,102.34 in cash was deposited into this account.

2    Q.    All right.  And we've got 58 percent of the money

3    went to itBit Trust Company.  Are you familiar with itBit

4    Trust?

5    A.    I am familiar with that to be a cryptocurrency

6    exchange.

7    Q.    Okay.  And then am I correct that 31 percent, about

8    122,000 went to Ian Freeman; is that correct?

9    A.    That's correct.

10    MR. KENNEDY:  To Government's 2517.

11    Q.    This one looks a little different, doesn't it?

12    A.    Yes, it does.

13    Q.    Can you just tell us what this summary is?

14    A.    This is a summary of transactions in the Crypto

15   Church of New Hampshire.  The signer was Renee C. LeBlanc.  The

16   account was held at Service Credit Union ending in 9598.  The

17   period analyzed was January 2018 through June 2018.

18    Q.    Okay.  And it looks like we don't have the sort

19   of -- the same sort of boxes we had before.  What are we

20   looking at here?

21    A.    Correct.  Since the activity in the account was able

22   to be viewed on one page, I didn't do a summary report like you

23   have seen in the previous accounts.

24    Q.    Okay.  So if we look in the middle of this from

25   about -- from 5/17 through 5/18, so those two days, and

1   highlight that, what are we looking at here?

2        A.   So we were looking at cash deposits made into this

3   account.   The last column is the location that the cash

4   deposits were made.

5             So, for example, on 5/17/2018, 1,050.25 was

6   deposited in Huntsville, Alabama.   On that same date, $1,000

7   was deposited in Houghton Lake, Michigan.   The same date again,

8   $2,000 in cash was deposited in Waco, Texas.   On that same date

9   again, $1,780 was deposited in Princeton, Minnesota.

10       Q.   Okay.   Sorry.   I -- we could read through, the jury

11  can see these --

12       A.   Sure.

13       Q.   -- but is -- essentially deposit -- cash deposits

14  being made from states all around the country?

15       A.   Correct.

16            MR. KENNEDY:   Okay.   Go to 2518.

17       Q.   Whose account is this?

18       A.   This is an account in the name of Renee Catherine

19  Spinella, Digital Credit Union, a checking account ending in

20  0897.   The time period analyzed was November 2020 through

21  January 2021.

22       Q.   So just a couple of months?

23       A.   Correct.

24       Q.   And we see names we've talked about.   Rebecca A.

25  Ault, are you familiar with her?

1    A.    Yes, I am familiar with Rebecca A. Ault from the

2    Telegram folders.

3    Q.    And Karla Cino, are you familiar with her?

4    A.    I am, from the Telegram folders.

5    Q.    Okay.  And how much cash was deposited?

6    A.    The total amount of cash deposits into this account

7    was $67,545.

8    Q.    Okay.  And payees looks like about 88 percent,

9    $247,000, went to Ian Freeman; is that correct?

10    A.    That's correct.

11    MR. KENNEDY:  Okay.  Let's do Government's 2529A,

12    also a full exhibit.

13    Q.    Whose account is this?

14    A.    This is an account in the name of Reformed Satanic

15    Church of Keene, checking account at Citizens Bank ending in

16    4521.  The signer was James Brodie Baker and the time period

17    was June 2020 through July 2020.

18    Q.    So is that just two months?

19    A.    Correct.

20    Q.    And how much total was deposited in that account in

21    those two months?

22    A.    $905,416.86.

23    Q.    Okay.  And are you familiar with Camelot Brittany

24    Limited Partnership?

25    A.    I am.

1     Q.   And how do you know that?

2     A.   I know this to be associated with Harold Jones.

3     Q.   Okay.  I think we've talked about Mr. Jones.

4          How much cash was deposited in this account?

5     A.   $541,970.

6     Q.   Okay.  Are you familiar with the name Thomas

7  Easterday?

8     A.   I am.  I'm familiar with that name from the Telegram

9  folders.

10    Q.   And which Telegram -- what was the Telegram folder

11 again that you reviewed?  What was it?

12    A.   The Telegram folders?

13    Q.   Yeah.  What was in it?

14    A.   It -- it was photographs and various payments that

15 were made into these bank accounts.

16    Q.   And do you know where that Telegram folder came

17 from?

18    A.   I know that it came from documents responsive to a

19 search warrant.

20    Q.   Do you know the name Donald F. Huffman?

21    A.   I do.

22    Q.   Was that in the Telegram folder as well?

23    A.   Yes.

24    Q.   How about Donald Zofrea?

25    A.   I know the name Donald Zofrea from the Telegram

1   folders.

2   Q.   Okay.  And on the next page, what's Paxos Trust

3   Company?

4   A.   Paxos Trust Company is a cryptocurrency exchange.

5   Q.   Okay.  Just a couple more.  I know we've done a lot

6   here.

7   To Government's 2520, full exhibit.

8   And whose account is this?

9   A.   This is a Wells Fargo checking account ending in

10  5556 in the name of James Baker, Reformed Satanic Church.  The

11  time period analyzed was June 2020 through December 2020.

12  Q.   Okay.  And did we -- you testified that Camelot

13  Brittany Limited Partnership is associated with Harold Jones;

14  is that correct?

15  A.   That's correct.

16  Q.   And he deposited $464,000 into this account?

17  A.   Yes.

18  Q.   How much cash was put in this account?

19  A.   A total of $174,200 in cash was deposited into this

20  account.

21  Q.   Go down to payee.  You see a $204,450 payment.  Who

22  is that to?

23  A.   That was payable to Miguel Angel Arnaiz Mancebe del

24  Castillo.

25  MR. KENNEDY:  If I could just pull up Government's

1      1216 for a minute.

2              Can you just scroll to the next page.  If we could

3      zoom in on the passport.

4          Q.    What's the name on this passport, Ms. Cacace?

5          A.    Miguel Angel Arnaiz Mancebo del Castillo.

6          Q.    Does that appear to be the same name that was in the

7      Reformed Satanic Church summary of payees that we just looked

8      at?

9          A.    Correct.

10         Q.    Okay.  I think I'm done showing those.  Just a

11     couple more exhibits to show you.

12             I'm sure the jury's happy to hear that.

13             Could you pull up Government's -- well, let me ask

14     you this first.

15             In addition to compiling all of these summaries,

16     were you asked to look at transactions involving specific

17     individuals?

18         A.    I was.

19         Q.    And were those names provided to you by the

20     government?

21         A.    Yes, they were.

22         Q.    And did you create sort of a chart involving just

23     certain individuals?

24         A.    Yes.

25         Q.    Okay.  And how did you compile that information?

1    What did you use?

2         A.   I compiled that information by reviewing the

3    Telegram folders and verifying that information through all the

4    bank accounts that I analyzed.

5         Q.   Okay.  I'm going to show you Government's 2523.

6    Maybe.  I can put it on the ELMO.

7              Do you recognize this document?

8         A.   I do.

9         Q.   Is that that summary of the individuals?

10        A.   It is.

11        Q.   Okay.  And the jury I think is familiar with some of

12   these individuals.  And, again, were all of these individuals

13   in the Telegram folder?

14        A.   Yes, they were.

15        Q.   Okay.

16        A.   Patrick Brown was in the LocalBitcoin.

17        Q.   Okay.  Okay.  So did you also look at some

18   LocalBitcoins folders?

19        A.   Yes.

20        Q.   And how many transactions did Karla Cino make?

21        A.   Karla Cino made 38 transactions totaling $858,650.

22        Q.   How about Harold Jones --

23        A.   Harold Jones --

24        Q.   -- how many transactions?

25        A.   -- had 42 transactions totaling $811,624.

1      Q.    Okay.  Let me ask you this.  Did the individuals

2  that you were provided -- did you make several versions of this

3  chart?

4      A.    Yes.

5      Q.    Okay.  So these are just the individuals that you

6  were most recently provided with?

7      A.    Correct.

8      Q.    Okay.  Did you make individual charts of those

9  individuals, of each of these individuals?

10      A.    I did.

11      Q.    That listed out each of the transactions that made

12  up that total --

13      A.    Yes.

14      Q.    -- is that correct?  Okay.

15            And I'll just show you a couple of them.  If we

16  could go to 2526.

17            This is a summary of deposits for Karla Cino?

18      A.    Yes.

19      Q.    Okay.  And can you just tell the jury, what does the

20  color-coding mean?

21      A.    The color-coding will represent unique accounts that

22  the deposits were made into.

23      Q.    So each color is a different account that it was

24  made into; is that correct?

25      A.    Correct.

1        Q.    Okay.  And how many different names -- named

2   accounts are there here?  I mean -- so if you count Ian

3   Freeman, Ian B. Freeman, as, you know, one account holder.

4        A.    Uh-huh.  So there are eight different colors on

5   here, so there are eight different accounts.

6        Q.    Okay.  But you see -- so Ian Freeman is one of the

7   account holders; is that correct?

8        A.    Correct.

9        Q.    Colleen Fordham, another account holder?

10       A.    New Hampshire Peace Church, Ian Freeman doing

11  business as New Hampshire Peace Church, Aria C. DiMezzo, and

12  Renee Spinella.

13       Q.    I'll show you Government's 2528.  And whose summary

14  of deposits is this?

15       A.    These are the summary of the 42 deposits made by

16  Harold Jones totaling $811,624.

17       Q.    And how many different accounts were deposited into?

18       A.    There are five different accounts on here.

19       Q.    Okay.  So it looks like we start with Church of the

20  Invisible Hand; is that correct?

21       A.    Correct.

22       Q.    And then move to Ian B. Freeman?

23       A.    Yes.

24       Q.    And then Church of the Invisible Hand again; is that

25  right?

1        A.    Correct.

2        Q.    And then I think all the remaining ones go to two

3   accounts involving the Reformed Satanic Church; is that

4   correct?

5        A.    That's correct.

6        Q.    Okay.  And what's the date of the first deposit into

7   the Reformed Satanic Church?

8        A.    6/15/2020.

9        Q.    Okay.  Last one, if we could look at Government's

10  2530.  And whose summary is this?

11       A.    This is a summary of the deposits received from

12  Nancy Triestram totaling $239,818.

13       Q.    And how many different accounts are there?

14       A.    There are six.

15       Q.    Maybe seven?

16       A.    Seven.

17       Q.    The white and the gray are a little -- and so

18  they're accounts in the name of Ian Freeman?

19       A.    Yes, accounts in the name of Ian Freeman, Colleen

20  Fordham, Church of the Invisible Hand, and James Baker,

21  Reformed Satanic Church.

22       Q.    Okay.  Did you provide -- did you have any other

23  involvement in this case outside of financial -- the financial

24  analysis?

25       A.    I did several phone interviews with the agents.

1     Q.   And interviews of who?

2     A.   They were interviews of some of the people that we

3 spoke about today.

4          MR. KENNEDY:  Okay.  I don't have any more questions

5 for you right now.  I'm sure Mr. Sisti has some for you.

6          THE WITNESS:  Thank you.

7                    CROSS-EXAMINATION

8 BY MR. SISTI:

9     Q.   Good afternoon.

10     A.   Good afternoon.

11     Q.   I won't be long with you.  Okay?  I mean, I can't go

12 through those again.  Okay?

13          I want to talk in some broad generalities with you,

14 though, if I could.  All right?

15          I mean, you did a pretty detailed analysis there.

16 It seems to me that there are a number of different bank

17 accounts and if I can summarize this pretty quick and to the

18 point, a lot of money went to churches and Ian Freeman, right?

19 I mean, is that fair to say?

20     A.   Yes.

21     Q.   Okay.  I think the percentages were running -- if

22 you take a look at these accounts, if you add the church's and

23 Freeman together, it almost hits at like 80 to 95 percent on

24 every one of those accounts from what I can see.  Fair enough?

25     A.   Fair enough for the ones we went through.

1    Q.   Right.  Okay.  And then the -- then the money that

2    goes out of those accounts seems to be going to exchanges, you

3    named a couple of them --

4    A.   Correct.

5    Q.   -- to purchase cryptocurrency, correct?

6    A.   Correct.  I didn't -- I didn't analyze any of the

7    statements from those exchanges, so I can't say exactly what

8    was done once --

9    Q.   Right.  But, I mean, the label was -- you know,

10   money was going to exchanges --

11   A.   Correct.

12   Q.   -- and then you would have a bottom line.

13   A.   Correct.

14   Q.   Right.  And it appeared as though it was about the

15   same percentage.  The money coming in, money going out, seemed

16   to be a great deal of it, if not a huge percentage, was going

17   to those cryptocurrency exchanges.  And if I said it was for

18   purchasing cryptocurrency, that would be consistent, correct?

19   A.   They went to the exchanges.

20   Q.   Right.  Okay.  I mean, I just want to make it clear

21   for the jury.  After your forensic analysis in great detail,

22   you weren't picking up money going to like real estate

23   purchases in Europe or something like that, correct?

24   A.   I did not see any purchases in Europe real estate.

25   Q.   Right.  No, like, exotic automobiles or yachts or

1    anything like that, right?

2         A.   No.

3         Q.   All right.  In fact, I think maybe the only -- the

4    only out-of-country inkling would have been the opening of a

5    Nevis account.  I don't know if you picked up on that, but I

6    think it was for about a hundred thousand dollars.

7         A.   I don't remember the exact amount, but I am familiar

8    with that account.

9         Q.   Okay.  And that account exists.  In fact, you know

10   it actually exists today.  Did you know that?

11        A.   I -- I do not know much about that account other

12   than I know that it exists.

13             MR. SISTI:  Okay.  All right.  Okay.  I really have

14   nothing further.  Thank you.

15             THE COURT:  Redirect?

16             MR. KENNEDY:  Just very quick.

17                      REDIRECT EXAMINATION

18   BY MR. KENNEDY:

19        Q.   Ms. Cacace, we looked at a lot of records that

20   showed that bitcoin went into -- or that money went into

21   different exchanges; is that correct?

22        A.   Yes.

23        Q.   I think you said you knew those to be bitcoin

24   exchanges.

25        A.   Correct.

1          Q.   Do you know where the bitcoin went after it got to

2     the exchange?

3          A.   I do not, no.

4               MR. KENNEDY:  Okay.  Nothing further.

5               MR. SISTI:  I have nothing further.

6               THE COURT:  You're excused.  Thank you.

7               THE WITNESS:  Thank you.

8                         (Witness excused.)

9               THE COURT:  Your next witness.

10              MR. AFRAME:  United States calls Thomas Connolly.

11              THE CLERK:  Please remain standing and raise your

12    right hand.

13              **THOMAS CONNOLLY**, having been first duly sworn,

14    testified as follows:

15              THE CLERK:  Please be seated.

16              For the record, please state your name and spell

17    your last name.

18              THE WITNESS:  My name is Thomas Connolly, spelled

19    C-o-n-n-o-l-l-y.

20                        DIRECT EXAMINATION

21    BY MR. AFRAME:

22         Q.   Good afternoon, Mr. Connolly.  How are you employed?

23         A.   I serve as an Assistant Secretary of State in the

24    New Hampshire Secretary of State's Office.

25         Q.   Can you tell the jury what the -- I know it does

1    many things, but what does the Secretary of State's office do?

2         A.    In my capacity, I'm the director of corporations.

3    We're responsible for registration of all businesses and

4    not-for-profit organizations in the state.  If they wish to

5    form business entities like LLCs or corporations --

6              THE COURT REPORTER:  I'm sorry.

7              THE COURT:  You've got to really slow down.

8              THE WITNESS:  I'm sorry.  I'm sorry.

9              We are responsible for business registrations,

10   including not-for-profits and trademarks and filing of liens

11   with the -- that relate to businesses within the state.

12        Q.    Okay.  Do you keep records of all those things?

13        A.    Yes.

14        Q.    And tell me about the process.  If I wanted to start

15   a nonprofit in the New Hampshire, what do I have to do as far

16   as filings, et cetera?

17        A.    Well, there are two different approaches.  One is if

18   they want to form a not-for-profit organization, the law that

19   governs that is New Hampshire RSA 292.  They file what are

20   called Articles of Agreement --

21             THE COURT:  You've got to slow down.

22             THE WITNESS:  I'm sorry.

23             The requirement is to file Articles of Agreement,

24   similar to when you form a corporation.  We would require you

25   to state the name of the entity, its purposes, who its members

1   will be --

2            THE COURT:  Wait.  She can't keep up with you.

3            THE WITNESS:  I'm very sorry.

4            THE COURT:  It's okay.  Just take -- just like make

5   an effort to just speak slowly and pronounce every word right

6   to the last letter.

7            THE WITNESS:  Okay.

8       Q.   All right.  We'll start again.  Ready?

9            So, tell me, if I want to start a nonprofit

10  organization, what kind of filing would I have to do?

11      A.   You would file Articles of Agreement.  That's a

12  document that would require you to state the name of the

13  entity, its purpose, as well as its -- the conditions for

14  membership and where it's located.  And it has to be signed by

15  a minimum of five individuals who will serve as the

16  incorporators of that, the nonprofit.

17      Q.   Okay.  And as the process -- so do I pay a fee to

18  the state?

19      A.   Yes.  The filing fee is $25.

20      Q.   And what does that entitle me to?  What do I get for

21  that?

22      A.   Once the document is reviewed and if it's approved,

23  that creates a -- a not-for-profit corporation.  That entity

24  exists under the laws of the state until such time it's

25  required that that entity has to renew its charter.

1      Q.   And tell me a little about -- you said if the

2   document's approved.  What's the approval process?

3      A.   To determine if the document's acceptable for

4   filing, we would review it to determine that the name that they

5   wish to use is available and it -- and conformed to the

6   requirements of the law --

7      Q.   That --

8      A.   -- that its purposes are specifically permitted

9   under that -- under the law, for example, in the case of a

10   nonprofit, if it states it's for charitable or religious

11   purposes, that the document's complete, that it's been signed

12   by those five individuals.

13      Q.   And is that -- is that review done sort of within

14   the four corners of the document?

15      A.   Correct.

16      Q.   Is there any sort of -- does your office conduct any

17   sort of investigation into the organizations?

18      A.   No, not at all.

19      Q.   Okay.  What other kinds of documents might -- might

20   I file with my nonprofit, you know, after I file the initial

21   paperwork over time?

22      A.   Once the nonprofit is formed under New Hampshire

23   law, there's a requirement that once in a five-year cycle that

24   they have to file we call it a nonprofit report, a statement of

25   the list of officers, directors, and all members of the

1   governing board of that nonprofit.  The law says they file in

2   years that end in 0 or in 5.  So, for example, if you

3   incorporated in 2022, the first year you would file your

4   nonprofit report to renew your charter would be --

5            THE COURT:  Slow down.  Slow down.

6            THE WITNESS:  -- 2025.

7       Q.   All right.  Let's look at 1510.

8            THE COURT:  Do you mind a little bit of leading on

9   this kind of witness?

10            MR. SISTI:  I want him -- I want him led, your

11   Honor.

12            THE COURT:  Yeah.  Why don't you -- she's

13   struggling.

14            Why don't you lead and seek some one- or two- or

15   three-word answers.

16       Q.   All right.  So this looks to me to be a certificate

17   of -- of good standing for the Crypto Church of New Hampshire.

18   Do you agree with that?

19       A.   Yes.

20       Q.   And is this a certificate that's issued by your

21   office?

22       A.   Yes.

23       Q.   And if we go down to the bottom, it's signed by

24   William Gardner.  Was he the Secretary of State?

25       A.   Yes.  At the time the certificate is dated, yes, he

1    was.

2       Q.   Okay.  So what -- what -- what -- I guess I don't

3    know the answer to ask this leading, but what generates the

4    Secretary of State to issue a certificate of good standing?

5       A.   It must be requested by an entity.  They can do that

6    online, on our website, or in person --

7       Q.   Okay.

8       A.   -- for a fee of $5.

9       Q.   And do you review the documents on file to determine

10   whether it's appropriate to issue this?

11      A.   The status that we maintain, yes, indicates whether

12   they're in good standing or not and if they filed all the

13   reports.  That's checked before they're issued that

14   certificate.

15      Q.   Okay.  And does that involve any kind of

16   investigation beyond your files to determine what the entity is

17   actually doing?

18      A.   No.

19           MR. AFRAME:  1512.

20      Q.   And this looks to be a Certificate of Registered

21   Trade Name of Church of the Invisible Hand.  Did I read that

22   right?

23      A.   Yes, that's correct.

24      Q.   And, again, this is a document that your office

25   would produce?

1          A.   Yes, it is.

2          Q.   And, just briefly, what does it mean that I've --

3     that I've received this document?

4          A.   Well, in this particular case, it appears that the

5     not-for-profits can also operate as unincorporated entities and

6     if they do so and they wish to register just their name, they

7     would register the certificate of trade name that we see here.

8          Q.   Okay.  And does this, again, just require the

9     appropriate filings?

10         A.   Yes.  It's an -- as I say, it's a single-page filing

11    with a $50 fee.

12         Q.   Okay.  And, again, is there any investigation done

13    into the actual activities of the entity?

14         A.   None, no.

15              MR. AFRAME:  That's all I have, your Honor.

16              THE COURT:  Cross.

17              MR. SISTI:  Real quick.  Okay?  I'm going to go

18    slow, too.  All right?

19              THE WITNESS:  No problem.  I apologize.

20              THE COURT:  That's all right.  That's all right.

21                        CROSS-EXAMINATION

22    BY MR. SISTI:

23         Q.   Both of those entities went right out there to the

24    state and registered for a fee, right?

25         A.   Correct.

1       Q.    The Crypto Church wasn't hiding from the State of

2  New Hampshire.  They got a business number and they paid their

3  fee and they got their certificate, right?

4       A.    That's correct.

5       Q.    The Church of the Invisible Hand wasn't hiding from

6  the State of New Hampshire, they paid their fee, they got their

7  business identification number, and they got their certificate,

8  right?

9       A.    That's correct.

10      Q.    Everything the way they're supposed to do it, right?

11      A.    Correct.

12            MR. SISTI:  Thank you.

13            MR. AFRAME:  Nothing.

14            THE COURT:  Thank you, sir.  You're excused.  We

15  appreciate it.

16                        (Witness excused.)

17            MR. AFRAME:  So the next witness is, you know, more

18  than a couple minutes.  So we can start it --

19            THE COURT:  Yeah.  Oh, you're saying for the

20  afternoon break?

21            MR. AFRAME:  We're about at the -- we're -- you

22  know, we're close.

23            THE COURT:  What do you estimate for the length of

24  the witness?

25            MR. AFRAME:  30 to 45 minutes.

1          THE COURT:  And that's your last witness of the day?

2     I believe you --

3          MR. AFRAME:  I imagine so.

4          THE COURT:  Yeah.  You know what, I -- what time did

5     we start, Kel?

6          THE CLERK:  3:15 will be the 90 minutes.

7          THE COURT:  3:15?  Oh, yeah.  Let's call the

8     witness.

9          MR. AFRAME:  Okay.

10         MR. KENNEDY:  United States calls Colleen Ranahan.

11         THE CLERK:  Please remain standing and raise your

12    right hand.

13         **COLLEEN RANAHAN**, having been first duly sworn,

14    testified as follows:

15         THE CLERK:  Please be seated.  For the record,

16    please state your name and spell your last name.

17         THE WITNESS:  Colleen Ranahan, R-a-n-a-h-a-n.

18                      DIRECT EXAMINATION

19    BY MR. KENNEDY:

20    Q.    Good afternoon, Ms. Ranahan.

21    A.    Good afternoon.

22    Q.    Can you tell the jury where you work?

23    A.    I work for the Internal Revenue Service.

24    Q.    The jury's just heard a whole bunch of bank

25    statements, so now we're going to talk about taxes.  I'm sure

1      they're thrilled.

2                  Can you tell the jury what you do at the IRS?

3          A.    I am a revenue agent in the Special Enforcement

4      Program.

5          Q.    And what's a revenue agent?

6          A.    A revenue agent audits and examines taxpayers'

7      individual or corporate returns in order to determine if a

8      taxpayer is compliant with the tax laws.

9          Q.    Okay.  How long have you been a revenue agent?

10         A.    16 years.

11         Q.    Okay.  And you said you were a revenue agent with

12     the Special Enforcement Program?

13         A.    Yes.

14         Q.    Can you tell the jury what that is?

15         A.    The Special Enforcement Program, as a revenue agent

16     I assist IRS's criminal investigation and the U.S. Attorney's

17     Office and the Department of Justice Tax Division with criminal

18     tax cases.

19         Q.    How long have you been in the Special Enforcement

20     Program?

21         A.    Eight years.

22         Q.    What's your educational background?

23         A.    I have a bachelor's in accounting and I have a

24     master's in business administration with a graduate certificate

25     in forensic accounting and fraud examination.

1    Q.    You said you were in the Special Enforcement Unit

2    program for eight years.  What did you do before that?

3    A.    I was a revenue agent in general program, in small

4    business self-employed.  I was also a coordinator in our

5    projects and special planning division.

6    Q.    Okay.  Have you ever been involved in audits of

7    taxpayers?

8    A.    Yes.

9    Q.    Throughout your career, approximately how many

10   audits have you been involved in?

11   A.    Hundreds.

12   Q.    Okay.  Have you ever been involved in determining

13   whether tax was due and owing for persons who did not file tax

14   returns?

15   A.    Yes.

16   Q.    In the course of your career, approximately how many

17   of those cases?

18   A.    Probably around a hundred to 150.

19   Q.    Okay.  In your experience being an Internal Revenue

20   agent for 16 years, are you familiar with the Internal Revenue

21   Code?

22   A.    Yes.

23   Q.    As part of your testimony today, were you asked

24   to determine whether there was a tax due and owing for an

25   individual named Ian Freeman for certain tax years?

1      A.    Yes.

2      Q.    And what tax years were those?

3      A.    2016, 2017, 2018, and 2019.

4      Q.    And as part of that, did you research whether

5  Mr. Freeman had filed tax returns for those years?

6      A.    I did.

7      Q.    And what did you determine?

8      A.    That there were no tax returns filed for Ian Freeman

9  in those four years.

10     Q.    Okay.  As part of your testimony, did you review

11 records in this case in order to come to that determination as

12 to whether or not there was a tax due and owing?

13     A.    I did.

14     Q.    And what kind of records did you review in this

15 case?

16     A.    I reviewed two records from localbitcoin.com (sic).

17 One was an advertisement spreadsheet and one was a trade

18 spreadsheet.

19         MR. KENNEDY:  If we could pull up I think it's 1201,

20 Caryn.

21     Q.    I'll represent that what we're going to put up here

22 the jury has seen already and they -- they saw a chart of

23 various advertisements and we'll get that up there in one

24 second.

25         Are you familiar with the information that's on this

1    chart?

2         A.    Yes.

3         Q.    And what information is on this chart?

4         A.    There is information from the advertisement

5    spreadsheet that I reviewed from localbitcoin.com.

6         Q.    Okay.  And as part of your review, was there any

7    information on this chart that was specifically applicable to

8    what you were doing?

9         A.    Yes.  I used the advertisement ID, the price

10   equation, and the advertiser.

11        Q.    Okay.  And what is the price equation?  The jury has

12   heard this, but what's your understanding of the price

13   equation?

14        A.    The price equation is what the cost of the bitcoin

15   plus a commission was.

16        Q.    Okay.  So is it the premium charged on the

17   localbitcoin.com ad?

18        A.    Yes.

19        Q.    And you talked about the advertisements.  What other

20   information did you review?

21        A.    The advertiser, the advertisement ID, and the

22   payment method for --

23        Q.    Okay.  So beyond the -- this is the advertisements

24   the jury has looked at.

25        A.    Correct.

1      Q.    Was there another set of information you looked at

2  in this case?

3      A.    There was; the trades from localbitcoin.com for the

4  advertiser FTL_Ian.

5      Q.    Okay.  And, just generally, what kind of information

6  was in that -- the trades?

7      A.    The trade ID, the buyer user name, the seller user

8  name, the amount purchased, the date.

9      Q.    Okay.  And do you know what account, again, you were

10  looking at?

11      A.    I was looking at the account for advertiser FTL_Ian.

12      Q.    Okay.  And if I could -- the jury has already seen

13  this, but if we could just pull up 1202, Exhibit 1202.

14           Are you familiar with this document?

15      A.    Yes.

16      Q.    Have you seen this document before?

17      A.    Yes.

18      Q.    Is this the -- the account information for the

19  account holder from LocalBitcoins?

20      A.    Yes.

21      Q.    And what's the account user name?

22      A.    FTL_Ian.

23      Q.    And what's the real name of FTL_Ian?

24      A.    Ian B. Freeman.

25      Q.    And is this the account for the data that you

1    reviewed?

2        A.    Yes.

3        Q.    And so you said you used information from the

4    advertisements and from the trades.  And what did you do with

5    that data?

6        A.    I created a spreadsheet that detailed out the

7    individual trades and I matched them with a -- whatever

8    advertisement number they came under.  So I was able to figure

9    out what the commission rate was for each trade.

10       Q.    Okay.  And using that commission rate for each

11   trade, did you also know from the data how much was paid by the

12   customer?

13       A.    Yes.

14       Q.    Okay.  And using those pieces of information, what

15   did you do?

16       A.    I took what the commission -- the cost to Ian

17   Freeman for the bitcoin was and I subtracted that from the

18   amount that was paid by the customer to determine what the

19   profit for that individual trade was.

20       Q.    Okay.  So I just want to make sure I understand you.

21             Did you calculate the commission that Mr. Freeman

22   earned on each trade?

23       A.    Yes.

24       Q.    Okay.  And what -- once you calculated that

25   information, what did you do with it?

1      A.   I separated it -- the trades out by year and

2  determined on a yearly basis from 2016 to 2019 how much

3  commission was earned in each year.

4      Q.   Okay.  And are those the years that you had data

5  from LocalBitcoins?

6      A.   It is.

7      Q.   Okay.  And did you use that information to create a

8  schedule of taxes?

9      A.   I did.

10      Q.   I'm going to show you what has been marked as

11  Government's 2601.

12           I think there was no objection to this, Mark?  Mark?

13  Sorry.

14           MR. SISTI:  I'm going to look right now.

15           MR. KENNEDY:  Yeah.

16           MR. SISTI:  Just one second.

17           MR. KENNEDY:  Yup.

18           MR. SISTI:  Actually, I have no objection at all to

19  that.

20           THE COURT:  Admitted.

21             (Government's Exhibit 2601 admitted.)

22           MR. KENNEDY:  Okay.  If we could just pull up 2601.

23      Q.   And can you just tell the jury what we are looking

24  at here?

25      A.   This is my schedule of tax due and owing for tax

1   years 2016 through 2019.

2       Q.    And, just broadly, what does this represent?

3       A.    This represents the income that I determined on a

4   yearly basis from the localbitcoin.com trades and it also

5   indicates what allowable deductions that I provided to

6   Mr. Freeman based on tax law.

7       Q.    Okay.  So I'd like to go through some of these rows,

8   but I see the first row there is unreported income; is that

9   correct?

10      A.    Yes.

11      Q.    And is that the number that you used the

12  LocalBitcoins data to determine?

13      A.    Yes.

14      Q.    Okay.  So I'd like to just turn to page 5 of this

15  exhibit, if we could.  Do you recognize this?

16      A.    I do.

17      Q.    And what is this?

18      A.    This is the first page of tax year 2016 individual

19  trades.

20      Q.    Okay.  And are these all the trades that

21  LocalBitcoins provided records for?

22      A.    Yes.

23      Q.    Okay.  And I think you had testified about some of

24  this information.  Do we see the trade ID?

25      A.    Yes.

1       Q.    And the time stamp for the trade?

2       A.    Yes.

3       Q.    And it includes a user name for a buyer; is that

4  correct?

5       A.    Yes.

6       Q.    And then advertisement ID; is that correct?

7       A.    Yes.

8       Q.    And what did you do with that advertisement ID?

9       A.    I matched it up to the data from localbitcoin.com

10  that was provided for the advertisement.  So I would know how

11  much for that particular advertisement the commission rate was.

12      Q.    Okay.  And so if we look over a little bit to the

13  column that says commission rate, is that what we saw in 1201

14  that we looked at before, which was that advertiser chart?

15      A.    Yes.  It had a name in front of it and then a plus

16  1.6 or 1.1.

17      Q.    Was it a star symbol?

18      A.    A star, yeah.

19      Q.    And so that was the commission for each specific

20  trade?

21      A.    Correct.

22      Q.    And so did you go through every trade that you were

23  provided records for?

24      A.    I did.

25      Q.    And you match up the advertisement ID to the

1  commission on each trade?

2       A.   I did.

3       Q.   And do you recall approximately how many trades

4  there were?

5       A.   In 2016 or total?

6       Q.   Total.

7       A.   I want to say approximately 4,000 -- 3,500 to 4,000.

8       Q.   Okay.  I am certainly not going to make you go

9  through all of those here, but if we could just look at --

10 maybe just that first one at the very top there, the 4364179.

11      A.   Uh-huh.

12           MR. KENNEDY:  Maybe Caryn can blow that out.  I

13 don't know if that'll come up.

14      Q.   Can you see that?

15      A.   Yes.

16      Q.   Okay.  Can the jury see that?

17           Okay.  So if we go over to the amount paid by the

18 customer, in this one it seems like a pretty --

19      A.   That's cut off a little bit.  The titles are a

20 little cut off.

21           MR. KENNEDY:  Oh, I'm sorry.  Maybe we can -- we can

22 recut it so that we have the title and that top line.

23      Q.   And so in this one we have the paid by customer and

24 the U.S. currency.  And how much is that one?

25      A.   $1.

1      Q.    Okay.  And so that's the amount that's paid by the

2  customer?

3      A.    Yes.

4      Q.    Okay.  And what was the commission rate?

5      A.    1.16.

6      Q.    Okay.  And can you just tell the jury how you came

7  up with the commission that ultimately was received on each

8  trade, just generally?

9      A.    The amount -- can you repeat that?

10     Q.    Can you tell the jury how you -- I won't do this for

11  every trade, just look at this first trade, how you came up

12  with that -- the commission that was paid to Mr. Freeman on

13  each trade?

14     A.    Yes.  So I took what -- the amount of U.S. currency

15  that was paid by the customer and divided it by the commission

16  rate to determine what the cost to Ian Freeman was.

17          Then I also went back and took the amount paid by

18  the customer in U.S. dollars, subtracted the cost to Ian

19  Freeman to determine what his commission or profit was.

20     Q.    So if I -- if I look at this first line here, if we

21  took -- what we have here is the cost of the bitcoin, the cost

22  to Freeman, and multiply the commission rate, which I think is

23  how we saw it in those advertisements, correct?

24     A.    Yes.

25     Q.    So if we took that cost and multiplied by the 1.16,

1    that would give us the total that the customer had to pay?

2        A.    Yes.

3        Q.    Okay.  And so then, again, how did you figure out

4    what the -- so with that information, how did you get that 14

5    cents at the end?

6        A.    I took what was paid by the customer and subtracted

7    the cost of the bitcoin to Ian Freeman and that's how I got the

8    14 cents.

9        Q.    Okay.

10       A.    So it was a dollar less 86 cents.

11       Q.    So that transaction, that 14 cents, is it -- does

12   that represent a 16 percent commission on the trade?

13       A.    Yes.

14       Q.    Okay.  And did you make that calculation for all

15   4,000 trades?

16       A.    I did.

17       Q.    Okay.  And we won't go through any more, if that's

18   okay.

19       A.    That's fine.

20       Q.    And so I think you said you separated these out by

21   year; is that correct?

22       A.    I did.

23       Q.    Okay.  And so if we can go back to page 1, let's

24   look at 2016.  It says -- what does that $69,568.06 represent?

25       A.    That is the total of all of the trades in 2016, what

1    was made by Ian Freeman on commission.

2         Q.    Okay.  So I understand, that's not the total amount

3    that every customer paid for the whole transaction, correct?

4         A.    Correct.

5         Q.    Okay.  That just represents the commission on each

6    trade?

7         A.    Correct.

8         Q.    Okay.  And did you do that for each of the four tax

9    years?

10        A.    I did.

11        Q.    And is that what's represented in that row

12   unreported income?

13        A.    Yes.

14        Q.    Okay.  So below that I see -- we'll go through what

15   some of these mean, but I see some red numbers in parentheses.

16   What does that mean?

17        A.    The red numbers are any deductions that are

18   allowable by tax law to any individual.

19        Q.    Okay.  I can -- I can keep going.  I don't know if

20   this is a good time to stop.

21             THE COURT:  You've got a little ways to go, right?

22             MR. KENNEDY:  Oh, yeah.

23             THE COURT:  Yeah.

24             MR. KENNEDY:  Well, hopefully not forever, but a

25   little ways.

 1                    THE COURT:  That's perfect.  Let's take the

 2       afternoon break.

 3                    THE CLERK:  All rise.

 4                             (Jury excused.)

 5                    THE COURT:  Anything for the record now?

 6                    MR. SISTI:  No.

 7                    THE COURT:  I'll see counsel briefly.

 8              (Recess taken from 3:17 p.m. until 3:35 p.m.)

 9                    THE COURT:  The witness is still under oath.

10              Mr. Kennedy, you may proceed.

11                    MR. KENNEDY:  Thank you, your Honor.

12              Q.    Right before the break we were talking about the red

13       numbers in parentheses.  Can you just explain that again, just

14       to refresh us what we were talking about?

15              A.    Sure.  The red numbers depict what is available by

16       tax law to every individual taxpayer as a deduction.

17              Q.    Okay.  And so in figuring out what Mr. Freeman may

18       owe for taxes, you gave him the benefit of deductions; is that

19       correct?

20              A.    Yes, I gave him what was allowed by law.

21              Q.    Okay.  So in this second row, we see self-employment

22       tax adjustment.  Can you just tell us what that means?

23              A.    So if a taxpayer pays any self-employment tax, if

24       they file that they have a business, they are responsible for

25       both the employee and employer portion of what we refer to as

1  FICA or social security and Medicare tax.  So we allow them to

2  deduct from their taxable income the 50 percent of what they

3  pay in self-employment tax.

4      Q.  Okay.  And if we turn to page 2 of this exhibit, are

5  these the calculations you did for self-employment tax?

6      A.  Yes.

7      Q.  Okay.  And we won't go through all of these, but if

8  we just look at the first one, line 1 is self-employment income

9  per return.  Is that 0 for every year?

10      A.  Yes.

11      Q.  And why is that?

12      A.  Because there was not a return filed.

13      Q.  Okay.  And then we have that -- at least for the

14  first one, the 69,568 number, is that the unreported income

15  that you calculated?

16      A.  It is.

17      Q.  Okay.  And then we come down to line 4 and we're

18  multiplying by some percent.  Where does that number come from?

19      A.  That's just a calculation.  It's the 69,568.05 times

20  92.35 percent.  It's a statutory calculation.

21      Q.  Okay.  So that comes from the revenue code?

22      A.  Yes.

23      Q.  And then what does it mean for maximum earnings

24  subject to tax?

25      A.  So every year there is an amount that is published

1     by the Internal Revenue Service that once you hit that amount,

2     you are no longer subject to social security tax, but you are

3     still subject to Medicare tax.

4          Q.   And does that number change every year?

5          A.   It does.

6          Q.   Okay.  And so then, see, we come down to line 7, 8

7     and 9, and it looks like we're doing some more math.

8          A.   Correct.

9          Q.   And where do those numbers come from?

10         A.   The Internal Revenue Code.

11         Q.   Okay.  And so you calculate the total

12    self-employment tax that would have been owed?

13         A.   Correct.

14         Q.   Okay.  And then I think you testified the deduction

15    is 50 percent?

16         A.   Correct.

17         Q.   And so does that number at the bottom, the tax

18    adjustment, represent 50 percent of the total tax?

19         A.   Of the total self-employment tax, yes.

20         Q.   Self-employment tax.  Okay.

21              And if we go back to page 1.

22              And so those are the numbers that are in row 2 for

23    the self-employment tax adjustment; is that correct?

24         A.   Yes.

25         Q.   Okay.  And that's deducted from what Mr. Freeman

1   would owe taxes on; is that correct?

2       A.   Yes.

3       Q.   Okay.  What is a standard deduction?

4       A.   A standard deduction is a deduction that is given to

5   every individual taxpayer.  If they don't itemize their

6   deductions, everyone gets a standard deduction.

7       Q.   Okay.  And I guess we can talk about it together

8   with exemptions.  I see exemptions for two of these years, but

9   not for 2018 and 2019.  Can you just explain what's going on

10  there?

11      A.   So there was a Tax Act of 2017 where the law

12  changed, where we no longer, starting in 2018, have an

13  exemption deduction.  But in reality they -- the item -- the

14  standard deduction was basically doubled, a little more than

15  doubled.  So we got rid of exemptions and doubled the standard

16  deduction.

17      Q.   Okay.  And were those deductions applied to the

18  unreported income?

19      A.   Yes.  It would decrease the taxable income.

20      Q.   Okay.  And then this last line up top here says

21  qualified business income deduction.  Just, in general, what is

22  that?

23      A.   That was also part of the Tax Act of 2017.  It's

24  just a new tax statute that allows small businesses to get an

25  up-to-20 percent deduction off of their self-employment profit.

1      Q.    Okay.  And I see it for 2018 but not for 2019.  Is

2  there a reason for that?

3      A.    It is.  There is an income phase-out that goes along

4  with the specific statute.  So once you hit a certain income,

5  you no longer are allowed the deduction.

6            MR. KENNEDY:  Okay.  And if we go to page 3.

7      Q.    Is this where you calculated the qualified business

8  income deduction?

9      A.    It is.

10     Q.    Okay.  And this, to me, looks like, you know, when

11 I've done my taxes, you get to certain sections and there's

12 like a worksheet and you fill in numbers and you sort of do the

13 math.  Is that similar to what you're doing here?

14     A.    It is.  This is taken exactly off of the qualified

15 business income deduction worksheet.

16     Q.    Okay.  And so was there a deduction applied in 2018?

17     A.    Yes.  It was $24,248.92.

18     Q.    Okay.  If we go back to page 1, what does total

19 adjustments represent?

20     A.    That represents all of the line items above, which

21 is any unreported income and all deductions that were allowed

22 off of that.

23     Q.    Okay.  And then we have the corrected taxable

24 income.  Is that the amount on which a tax would be assessed?

25     A.    Yes.

1      Q.    Okay.  And did you calculate that for years 2016

2  through 2019?

3      A.    I did.

4      Q.    Okay.  And then we see income tax.  How did you

5  calculate the income tax due?

6      A.    The income tax is a statutory rate that is provided

7  by the IRS every year.  So it's either a percentage of a tax

8  table or it's a bit of a calculation, a little equation,

9  depending on how high the taxable income is.

10      Q.    Okay.  And then we have self-employment tax.  Is

11  that the number that we calculated in Schedule B?

12      A.    It is.

13      Q.    Okay.  And so did you just add those numbers

14  together?  Is that correct?

15      A.    Yes.  In 2016, '17 and '18.

16      Q.    Okay.  All right.  And then if we look in 2019, I

17  see an additional number here under additional Medicare tax.

18  If you could just explain what that means.

19      A.    So if -- at some -- if an individual's income,

20  taxable income, is over 200,000 any year, there's a subcharge

21  for Medicare tax.  And it happened to be in this year.

22      Q.    Okay.  And did you calculate that in a different

23  schedule, if I go to page 4?

24      A.    Yes.

25      Q.    And is this the worksheet to calculate the

1    additional Medicare tax?

2         A.    It is.

3         Q.    Okay.  And that's back on page 1 in 2019, correct?

4         A.    Yes.

5               MR. KENNEDY:  If we can go back to page 1.

6         Q.    Okay.  And so then what is corrected tax liability?

7         A.    That is the tax that is due for that particular

8    year.

9         Q.    And then what is -- what would -- what would go in

10   tax per return?

11        A.    If there was a filed return, we would give credit

12   for any tax already assessed.

13        Q.    Okay.  And so did you calculate the additional tax

14   due and owing for each of those tax years?

15        A.    I did.

16        Q.    And for the year 2016, what was the additional tax

17   due and owing you calculated?

18        A.    $19,182.65.

19        Q.    How about for 2017?

20        A.    $66,033.55.

21        Q.    2018?

22        A.    $56,174.21.

23        Q.    In 2019?

24        A.    $140,198.28.

25        Q.    And you testified at the beginning that this was

1    based on LocalBitcoins data; is that correct?

2         A.    Yes.

3         Q.    Did you calculate any additional unreported income

4    from any other sources?

5         A.    I did not.

6         Q.    Okay.  So if, for example, there were trades that

7    happened outside of LocalBitcoins, did you capture any of that

8    on these worksheets?

9         A.    I did not.

10        Q.    Okay.  And if there was evidence that there were

11   additional trades outside of LocalBitcoins, how would that

12   affect the additional tax due and owing?

13        A.    It would increase it.

14             MR. KENNEDY:  Okay.  If I could just have one

15   second, your Honor.

16             THE COURT:  You may.

17             MR. KENNEDY:  I have nothing further.

18             THE COURT:  Cross.

19             MR. SISTI:  Thank you, Judge.

20                          CROSS-EXAMINATION

21   BY MR. SISTI:

22        Q.    Afternoon.

23        A.    Good afternoon.

24        Q.    Let me just ask a couple very simple,

25   straightforward questions.

1          You've been doing this for a while, right?

2     A.    Yes.

3     Q.    You've audited hundreds of cases?

4     A.    Approximately, yes.

5     Q.    Can you tell the jury how you go about doing an

6  audit, generally?  Let's say somebody owes something.  Do you

7  send them a letter or something, say, come on in?

8     A.    So we don't start off with somebody owing anything.

9     Q.    Right.

10    A.    We don't know that at the onset of an audit.

11          So a letter is sent out to a taxpayer, basically

12 saying, we're going to review your 2021 return, can you

13 schedule a time to meet with us so we can ask you some

14 questions about it, and provide some documentation.

15    Q.    Right.  So what you do it generally doesn't start

16 out in federal district court in front of a jury.  Generally,

17 if somebody owes taxes or you think somebody owes taxes or if

18 you want to check something out, you have the -- the ability --

19 in fact, you generally send out a letter and say let's get

20 together and talk about your taxes, right?

21    A.    For civil purposes, yes.

22    Q.    Well, let's -- let's cut right to the chase.

23          In 2016, the IRS didn't send a letter, did not send

24 a letter, to Ian Freeman or any of the church entities he

25 identifies with, correct?

1      A.    Yes, not to my knowledge.

2      Q.    Right.  You didn't say we'd like to talk to you,

3  come on in with your legal counsel, come on in with your

4  documents, come on in so we can straighten out, you know, what

5  you owe or what we think you owe, right?

6      A.    Correct.

7      Q.    All right.  That -- that -- that's generally what

8  you do, right?

9      A.    In general program, yes, that's what would be done.

10     Q.    In 2017, the same holds true.  You didn't send out a

11 letter to Ian Freeman or any of the church entities so that he

12 can come in and defend himself before you with legal

13 representation or his own accountant and go through the numbers

14 with you and determine whether or not he owed taxes, right?

15     A.    Correct.

16     Q.    In 2018, the same holds true; no letter went out.

17 You know where Ian Freeman lives, right?

18     A.    I don't personally know where Ian Freeman lives.

19     Q.    Well, I mean, the IRS does, don't they?

20     A.    I can't answer for the entire IRS.

21     Q.    Are you aware that the IRS actually sent him a

22 letter in 2014 just to verify his address?  Of course, they

23 sent it to him in the Spanish language, but they sent it to him

24 to his address.  Are you aware of that?

25     A.    I do not believe I have seen that.

1      Q.   All right.  But you didn't do any kind of background

2  thing on this -- on Ian Freeman before you came in?

3      A.   I checked to see if there were any tax returns filed

4  by him in these years.

5      Q.   And that's it, right?

6      A.   And I -- well, I looked at the records that were

7  provided to me from LocalBitcoin and determined what a taxable

8  income would be.

9      Q.   Okay.  But you knew his social security number?

10     A.   Yes.

11     Q.   You knew his address?

12     A.   I'm sure at one point I probably saw it, but I don't

13  know his address, no.

14     Q.   2018, the IRS did not send out a letter inviting him

15  in to clarify any discrepancies or problems with any of his

16  so-called income tax that would be due to the United States

17  Government, correct?

18     A.   Not to my knowledge.

19     Q.   In 2019, the IRS didn't have the wherewithal or

20  didn't have the -- I guess the need or want to reach out to Ian

21  to straighten out any taxes that you claim he would have owed?

22     A.   Not to my knowledge.

23     Q.   In fact, you never even told him that he owed taxes

24  in 2020?

25     A.   Not to my knowledge.

1      Q.    You didn't tell him that he owed taxes in 2021?

2      A.    Not to my knowledge.

3      Q.    No letters have been sent out so that he could come

4  in, sit down, and explain what his situation was, what entities

5  he was connected with, the itemization that would have gone

6  into a proper tax return, correct?

7      A.    Correct.

8      Q.    And you said that to the jury.  All you did is you

9  went through it pretty systematically and you came up with

10  numbers from sales that you claim would have been profits, but

11  you didn't -- you didn't include things like overhead; you

12  didn't include things like property tax; you didn't include

13  things like charitable giving, stuff like that; right?

14      A.    On the individual, no, I -- we gave the standard

15  deduction.

16      Q.    Right.  And the standard deduction generally could

17  be much less than what he's actually due, correct?

18      A.    It could be.

19      Q.    Right.  In fact, if he went through an itemization,

20  detailed, and you sat down with him, quite frankly, he may owe

21  nothing, right?

22      A.    Correct.

23          MR. SISTI:  I have nothing further.

24                    REDIRECT EXAMINATION

25  BY MR. KENNEDY:

1      Q.    In order to receive an itemized deduction, does a

2  taxpayer have to elect the itemized deduction?

3      A.    They do.

4      Q.    Do they have to fill out a schedule of itemized

5  deductions?

6      A.    They do.

7      Q.    Did that happen in this case?

8      A.    It did not.

9            MR. KENNEDY:  Thank you.

10           MR. SISTI:  Thanks for giving him the chance.

11           MR. KENNEDY:  Objection, your Honor.

12           THE COURT:  The jury will disregard the expression

13  of gratitude.

14           MR. SISTI:  Thank you.

15           THE COURT:  Again.  Okay.  You're excused.

16           THE WITNESS:  Thank you.

17                     (Witness excused.)

18           THE COURT:  All right.  We've reached the end of the

19  day and I think the end of the witnesses that are available to

20  testify today.  And, in fact, this is a little bit of an

21  unusual situation, so I need to fill you in here.

22           It's a -- it's the end of the witnesses for the week

23  because the -- the only remaining witness is Renee Spinella,

24  who is not medically cleared to be in the same courtroom as all

25  of us.  She's -- and she also is ill.

1           So you're going to have tomorrow off, which is

2    not -- it's not very common to suspend a trial in the middle

3    of evidence.  It doesn't happen very often.  But it's also not

4    unheard of.  It happens sometimes.  It's a little inconvenient

5    and I apologize for it, because, let's face it, it's going to

6    extend the trial a little bit here.

7           But I'm still doing my very best to keep this on

8    track and get this all wrapped up before the holiday.  All

9    right?  Hopefully well before the holiday.  But it's not going

10   to be tomorrow.  All right?  So tomorrow you're off.

11          Now, likely you're off Friday, too, because the way

12   the -- the way the COVID policy works in a federal building

13   like this, it's usually a matter of five days after testing

14   positive.  However, if there's a negative test on Friday, I'm

15   going to be striving to have you back on Friday.  But we're

16   going to have to play it by ear.  The usual way we communicate

17   with you, we'll just keep doing -- how are we doing it, Kellie?

18          THE CLERK:  They can contact me or Jadean.

19          THE COURT:  All right.  There's a number to call to

20   check in about whether they're supposed to be here?

21          THE CLERK:  Yes.

22          THE COURT:  Yeah.  All right.  So that's what you're

23   going to do is you'll get a call.

24          But it's not tomorrow.  Don't worry about tomorrow.

25   You have tomorrow off.  If you come in Friday, it's probably

1   going to be a tiny bit later than 9:00, like 10:00, to give us

2   time to test, if it happens at all.  But you'll get information

3   either way.

4              Now, here's the thing.  It doesn't change the rules.

5   You still can't talk to anybody about the trial, not your

6   family, not your friends, not coworkers, nothing like that.

7   You can't talk to each other about it.  And, of course, you

8   can't look into it on any issue involved in the case.

9              Now, here's something that's a little unusual.  The

10  U.S. Department of Justice has made -- has issued an indictment

11  from a court against a purported ex-billionaire involved in

12  crypto.  And some of you might have seen this in the news the

13  last couple days.  A few of you are nodding.  And you're going

14  to be exposed to it if you pay attention to the news in any

15  sort of forum like newspapers, television, radio, Internet.

16  You're probably going to come across it.

17             Very important to remember that case has absolutely

18  nothing to do with this case.  There's no allegation that

19  there's any connection whatsoever.  You might read that -- you

20  might read that article and form an opinion about it, that the

21  person you're reading about is probably guilty or looks like

22  has some real legal problems.  That not any way, shape, or form

23  makes it any more likely that Ian Freeman is guilty of these

24  offenses.  They are completely unrelated.  You understand that,

25  I hope.

1          All right.  Are you satisfied with that instruction,

2    Counsel?

3          MR. SISTI:  We are.  I appreciate it, your Honor.

4          THE COURT:  Government?

5          MR. AFRAME:  Yes.

6          THE COURT:  So, look, have a good day off tomorrow.

7    You've definitely earned it.  Again, this is unusual, but not

8    unheard of, and we really appreciate your patience and

9    cooperation.  This is an issue outside of our control.

10                    (Jury excused.)

11         THE COURT:  Counsel have anything for the record

12   they need to do?

13         MR. SISTI:  I think we're okay, Judge.

14         THE COURT:  All right.  Well, so far so good,

15   Counsel.  I appreciate everyone's efforts to keep it on track.

16   It shows respect for the jury's time and it's important.  Well

17   done.

18         So you -- we already talked about things we're going

19   to do the next couple days and let's do our best to keep it on

20   track.

21         We are in recess.

22         THE CLERK:  All rise.

23         (Proceedings adjourned at 3:56 p.m.)

24

25

C E R T I F I C A T E


       I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 3/10/23         */s/  Liza W. Dubois*
                                 LIZA W. DUBOIS, RMR, CRR