*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 8, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   1:21-cr-41-JL
              v.                  *   December 19, 2022
                                  *   9:48 a.m.
IAN FREEMAN                       *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY 8 - MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:


For the Government:        Georgiana L. MacDonald, AUSA
                           Seth R. Aframe, AUSA
                           John J. Kennedy, AUSA
                           United States Attorney's Office



For the Defendant:         Mark L. Sisti, Esq.
                           Sisti Law Offices



Court Reporter:            Liza W. Dubois, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, New Hampshire 03301
                           (603)225-1442

```
 1                      I N D E X

 2

 3   WITNESS:               Direct   Cross   Redirect   Recross

 4   RENEE SPINELLA        (Cont)

 5     By Mr. Aframe           4

 6

 7

     EXHIBITS:                      FOR ID            IN EVD.
 8
     (None marked.)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Off-the-record chambers conference held.)
 3              THE CLERK:  Court is now in session and has before
 4    it for consideration jury trial day eight in United States of
 5    America vs. Ian Freeman, 21-cr-41-01-JL.
 6              THE COURT:  Good morning, everyone.  Welcome back to
 7    court.  Sort of a long break.
 8              Have any of you had any conversations with each
 9    other or anyone else regarding the trial during the recess?
10              Have any of you been exposed to any information
11    about the trial or any issues involved in the trial through
12    independent research or inquiry or even inadvertently during
13    the recess?
14              All negative answers, for the record.
15              We'll proceed then.
16              So we've been off for a few days because one of our
17    witnesses was indisposed, but she's back.
18              We're very glad you're back and well.  Thank you for
19    being here this morning.
20              We're going to continue with her direct examination
21    and then her cross-examination.
22              The witness is still under oath.
23              And you understand that, right?
24              THE WITNESS:  Yes.
25              THE COURT:  Good.  All right then.
```

```
1              Mr. Aframe, you may continue with your direct
2    examination.
3                   CONTINUED DIRECT EXAMINATION
4    BY MR. AFRAME:
5        Q.   Good morning, Ms. Spinella.
6        A.   Good morning.
7        Q.   And I, too, am glad you're feeling better.
8              So I only have about maybe five minutes left on my
9    direct examination.
10             So we were -- just to pull up 858, just to do a
11   little bit of reorienting itself, since a few days have gone
12   by.
13             We were looking at communications from this chat
14   which was between you, Mr. Freeman, Andy, and -- Andy Spinella,
15   your husband -- can we just go back to the, yeah -- and a guy
16   named Michael.
17             And these chats were a group called Manch CVM
18   Service.  Do you see that in the first blue bubble down there?
19       A.   Yes.
20       Q.   And does CVM refer to the vending machines?
21       A.   Yes.
22       Q.   Okay.  And one of your jobs for Mr. Freeman was to
23   pick up money from the vending machines?
24       A.   Yes.
25       Q.   So we were looking at 861.  We had actually gone
```

1    through it, but I never really got to ask you any questions, so

2    I just want to go back through it again so I can ask you a

3    question about it.

4           So we'll do what we did.  And these are in your

5    binder, so if you want to see them, they're at 861, if you want

6    to read along.

7           We'll do the same thing.  I will read the

8    Mr. Freeman parts and Ms. MacDonald will read the other parts.

9           "FYI guys, Michael has decided to retire from CVM

10   administration.  A recent arrest of a guy in California spooked

11   him."

12          MS. MACDONALD:  "Oh, weak sauce.  What happened?

13          What did said guy get arrested for?

14          Also, we shall pick up tomorrow," smiley face, "and

15   happy birthday big boy."

16          MR. AFRAME:  And then there's the headline from a

17   newspaper and then it says -- a newspaper article or an

18   Internet article, I guess.

19          Then it says "thank you."

20          MS. MACDONALD:  "But how is that laundering.

21          And that's Cali being retarded like usual."

22          MR. AFRAME:  And then there's an attachment which

23   isn't there and then --

24          MS. MACDONALD:  "So he's the idiot.  LOL, gotcha.

25   Not worried then.

1          Sounds about right.  Good thing it's legal in

2   New Hampshire and we don't sell to people we know are doing

3   illegal things.

4          So then why did that scare Michael?  We're not

5   registered.  On their radar, sure but ..."

6          MR. AFRAME:  And then this ends with a recording.

7   We'll just play the recording, which is 861A.

8                  (Audio recording played.)

9          MR. AFRAME:  So if we could go back to 861, the last

10  page of that.

11     Q.    So above -- do you see where it says "attachments"

12  at the bottom?

13     A.    Yes.

14     Q.    And so above that, that's -- that's -- you're Renee

15  Kate, right?

16     A.    Yes.

17     Q.    And it says:  So then why did that scare Michael?

18  We're not registered.

19          Do you see that?

20     A.    Yes.

21     Q.    So when you say "we're not registered," are you

22  referring to the bitcoin operation you were assisting

23  Mr. Freeman with?

24     A.    Yes.

25     Q.    And you understood by not registered, based on the

 1    recording you just heard, that meant not registered with

 2    FinCEN?

 3          A.    I guess, yeah.

 4          Q.    Okay.  And you were helping Mr. Freeman, right,

 5    because you were picking up money from the CVMs, right?

 6          A.    Yes.

 7          Q.    And you had opened bank accounts for him?

 8          A.    Yes.

 9          Q.    And you had helped by selling bitcoin on

10    localbitcoins.com?

11          A.    Yes.

12          Q.    And you let him use your bitcoinbombshell account at

13    some point?

14          A.    Yes.

15                MR. AFRAME:  Okay.  So we'll press ahead and we just

16    had a couple more brief chats to go through.

17                So we'll look at 862.

18                "Also, whale's back at Murphy's, been pumping bills

19    in since 3:30.

20                Hey guys, I need you to get there soonish.

21                40 percent full.

22                Murphy's."

23                MS. MACDONALD:  "Most likely picking up today."

24          Q.    So is Murphy's -- do you know what that refers to,

25    where Murphy's -- what's Murphy's?

```
1          A.    Yes.

2          Q.    What is it?

3          A.    It's a bar.

4          Q.    Okay.  And was there a CVM there?

5          A.    Yes.

6          Q.    And Mr. Freeman, did he have the ability to monitor

7    the money that was going into the machines?

8          A.    Yes.

9          Q.    And when it says "been pumping bills in since 3:30,"

10   was Mr. Freeman able to do that from Keene to watch what was

11   happening in the machines?

12         A.    Yes.

13               MR. AFRAME:  Okay.  And 863.  This is on

14   February 5th, 2021.

15               "35,000 into Murphy's in the last hour, major whale

16   on site?"

17               MS. MACDONALD:  "Christ."

18         Q.    And what does "major whale" mean?

19         A.    It means that someone was filling the machine.

20         Q.    Okay.  With money?

21         A.    Yes.

22               MR. AFRAME:  And just two more.  864.

23               "Added flyers in a holder and a sticker over the

24   fingerprint scanner.

25               Verified, thank you.  All settled.
```

1          26 percent over 12K."

2     Q.   So was Mr. Freeman able to know the percentage of

3  the machine's capacity that was filled up with money?

4     A.   I think so.

5          MR. AFRAME:  And the last one is 865, which was on

6  March 1st of 2021.

7          MS. MACDONALD:  "I also filled that flyer slot."

8          MR. AFRAME:  "I've now been able to reautomate the

9  repurchasing of the cryptos, so I've lowered the rate on the

10  machines.  This may result in higher volumes as people start to

11  notice.

12          Renee, are you wanting to assist with cash deposits

13  in the future or only collections?

14          24,530 received, thank you.

15          65 -- $16,520 Murphy's and 17,870 received."

16     Q.   So at this time, were you just doing CVM collections

17  for Mr. Freeman?

18     A.   I think so.

19          MR. AFRAME:  Okay.  I have no other questions.

20                    CROSS-EXAMINATION

21  BY MR. SISTI:

22     Q.   How're you doing?

23     A.   Good.  How are you?

24     Q.   I'm okay.  Good seeing you back.  It's been a while.

25     A.   Thanks.

1    Q.   Let me start where Mr. Aframe left off, if I can.

2         This Murphy's, this is the Murphy's bar on Elm

3    Street in Manchester?

4    A.   Yes.

5    Q.   Can you tell the jury where the machine is located

6    and to the best of your knowledge how long it was located

7    there?

8    A.   It was inside the front door and I think it was

9    there for a year, I think.

10   Q.   By the time you were working, it was already there

11   for a year?

12   A.   I don't quite remember, but I think so.

13   Q.   Okay.  And then how long were -- how long were you

14   going to Murphy's to pick up the cash out of the machine?

15   A.   I think from at least summer 20 -- I don't remember

16   precisely.

17   Q.   It was more than just a couple times, though, right?

18   A.   Yeah, yeah, yeah.

19   Q.   Was it basically a weekly thing, couple times a

20   week, something like that?

21   A.   Yes.

22   Q.   Okay.  And obviously you're aware that there was --

23   it was there for the public's use?

24   A.   Yes.

25   Q.   I mean, anybody could come in and it would be

1    staring you right in the face?

2         A.    Yes.

3         Q.    Can you describe to the jury just how big it was

4    and --

5         A.    It was at least like this big --

6         Q.    Like you're saying maybe like --

7         A.    -- and yellow.

8         Q.    Yellow?

9         A.    Yeah.

10        Q.    About a foot and a half by two feet, something like

11   that?

12        A.    Yes.

13        Q.    Was it hanging on the wall?

14        A.    Yes.

15        Q.    And you were saying it was right on the front door,

16   like you walk in the bar and there it is, right?

17        A.    Yes.

18        Q.    Okay.  So anybody that walks into that place would

19   be exposed to it, right?

20        A.    Yes.  There was a sticker on the door that said, you

21   know, bitcoin for sale.

22        Q.    Right.  Where was the sticker?

23        A.    Also on the front door.

24        Q.    Right on the front door?

25        A.    Yes.

1      Q.   For everybody in the world to see walking down -- up

2  and down Elm Street, which is the biggest street in Manchester,

3  right?

4      A.   Yes.

5      Q.   Right across from the arena pretty much?

6      A.   Yes.

7      Q.   Okay.  And the owner, of course, would have known it

8  was there, right?

9      A.   Yes.

10      Q.   Okay.  Did you deal with the owner much?

11      A.   No.

12      Q.   No.  Did you ever, ever, hear of any complaints

13  whatsoever from the owner, the Liquor Commission, or law

14  enforcement about that machine?

15      A.   No.

16      Q.   Nothing at all, correct?

17      A.   No.

18      Q.   Okay.  And when you go there to pick up the cash, I

19  mean, you weren't doing this in some kind of a secretive

20  fashion, were you?

21      A.   No.

22      Q.   Can you tell -- tell the jury just what the typical

23  way in which you would collect cash out of the machine would

24  be.

25      A.   So we would go there with the keys and unlock it,

1    take the cash out, and I mean -- I -- some -- a little bit of,

2    put it in a bag and then walk out.

3         Q.   Okay.  And did you do that during the day?

4         A.   Yes.

5         Q.   Okay.  And would people see you going in and doing

6    that?

7         A.   Yes.

8         Q.   Okay.  Anybody comment how like that was illegal or

9    that was not appropriate or anything like that?

10        A.   No.

11        Q.   Okay.  How many times do you think you went in and

12   out of that particular place just for that particular machine?

13        A.   I'm honestly not sure, but probably like a hundred,

14   if I had to guess.

15        Q.   All right.  So, I mean, this was something that was

16   constantly going on, right?

17        A.   Yeah.

18        Q.   Okay.  And, again, you could actually see that

19   machine from Elm Street itself because it was -- right through

20   the window, right?

21        A.   Pretty much, yeah.

22        Q.   Any police officer walking up and down could see it?

23        A.   I don't think so.  Or would be able to see it?

24        Q.   Yeah.

25        A.   Yes.  Yeah.

1      Q.    Yeah.  I mean, anybody -- it was just open, out

2   there, sticking out there, right?

3      A.    Yes.

4      Q.    Okay.  Let me go back to something.

5            When you were -- let me ask you something straight

6   up.  Okay?

7      A.    Uh-huh.

8      Q.    Because the jury heard the last time you were here,

9   last week, about a deal that you had made.  And, you know, can

10   you explain that to the jury, just what your understanding of

11   this deal is.

12      A.    Are you referring to the deal of when I was moving

13   out of --

14      Q.    No, the plea -- the plea deal.

15      A.    Oh, the plea deal.  Yeah.

16            I was given the option of potentially spending eight

17   to ten years in jail if we took our cases to trial, so the

18   logical seem -- logical thing to do seemed to be to take a plea

19   deal, which has made me a felon, and my husband as well.  And,

20   yeah.  No jail time, but that's -- that was the deal.

21      Q.    So, I mean, let's get this straight.  Okay?  Because

22   I don't want to -- I don't want to cut corners, I don't want to

23   say anything that wasn't part of this thing, and I want the

24   jury to hear the truth.  Okay?

25      A.    (Nods head.)

1    Q.    Who -- who told you you would be doing eight to

2    ten years in jail?

3    A.    It was part of the proffer given by the prosecution

4    that is sitting in front of you.

5    Q.    And they told you you would do eight to ten years?

6    A.    Yes.

7    Q.    Let me ask you something that goes right to the

8    heart of this thing.  Do you think you did anything illegal?

9    A.    I don't think I did anything illegal or wrong.

10    Q.    All right.  So would it be fair to say you pled

11    guilty because you were scared?

12    A.    Yes.

13    Q.    And that you pled guilty because you were afraid to

14    go to trial?

15    A.    Yes.

16    Q.    Would it be fair to say that you never conspired or

17    agreed with Ian to do anything illegal?

18    A.    Yes.

19    Q.    And that when you were dealing with Ian, in fact,

20    would it be fair to say that Ian warned you that you should be

21    careful and watch out for scammers?

22    A.    Yes, multiple times.

23    Q.    Did he discuss with you that you're not in the

24    business to take advantage of people, you're -- this was not a

25    business, this is a church-related thing?

1        A.    Yes.  That was never the intention.

2        Q.    All right.  I mean, this wasn't to be making

3   millions of dollars, was it?

4        A.    No.

5        Q.    And what was Ian doing, if you know, with any of the

6   proceeds that were coming out of those machines?

7        A.    Going straight back into bitcoin.

8        Q.    So it would be a repurchase --

9        A.    (Nods head.)

10       Q.    -- back into bitcoin?

11       A.    Yes.

12       Q.    For further sales?

13       A.    Yes.

14       Q.    And what was the reason to buy and sell bitcoin?  I

15   mean, what was the -- what was the mission here?

16       A.    Well, I believe the mission is to keep as much money

17   as possible out of the government's hands because when they

18   have enough of it, I believe they do evil things with it.

19       Q.    Uh-huh.  And was this a church foundation type of a

20   mission?

21       A.    Yes.

22       Q.    And it was -- is this a -- is it free and clear and

23   obvious to the folks that were involved in this that it was for

24   the purpose of furthering that mission and that purpose?

25       A.    Yes.

1    Q.   And, I mean, was there any evil aspect assigned to

2  this at all?

3    A.   No.

4    Q.   Did you run into situations where people, it

5  appeared, were getting scammed?

6    A.   No.

7    Q.   You were able to at least keep an eye on things and

8  monitor things properly?

9    A.   Yes.

10   Q.   Okay.  If you were tipped off or if there would have

11  been a problem with identifying a scammer, what was the -- what

12  was your instruction from Ian Freeman?

13   A.   We would not sell to them.

14   Q.   Are you at this point in time attempting to withdraw

15  your guilty plea?

16   A.   It's a consideration at this time.

17   Q.   Did you at any point in time conspire with Ian

18  Freeman to engage in money laundering?

19   A.   No.

20   Q.   Did you at any point in time discuss and attempt to

21  purposely and knowingly engage in any situation that you knew

22  was unlawful with regard to money transmission?

23   A.   No.

24   Q.   What was your idea or your understanding of the

25  money transmission aspect of this case?

1        A.    Honestly, my knowledge on that is probably pretty

2    insufficient.

3        Q.    Right.

4        A.    But, yeah, my understanding is that churches, like,

5    didn't need that kind of like paperwork.

6        Q.    Right.  That it wasn't a business?

7        A.    Right.  Yeah.

8        Q.    Did Ian try -- did Ian force you to do any of this

9    stuff?

10        A.    No.

11        Q.    Everything you did was of your own free will?

12        A.    Absolutely.

13        Q.    And the same from what you understand would have

14    been with your husband?

15        A.    Yes.

16        Q.    So there would have been no pressure applied to you

17    to engage in any of this?

18        A.    No.

19        Q.    And you could either -- you could either stay and

20    remain with Ian, you know, collecting the money from the

21    machines and doing whatever or not?

22        A.    Yes.

23        Q.    It was all entirely up to you, correct?

24        A.    Yes.

25        Q.    Okay.  I want to ask you a little bit -- there was

1    an individual from the IRS that came in last week and I just

2    want to ask you a few questions about Ian.  I mean, you do know

3    the guy.

4         A.   Yes.

5         Q.   All right.  Can you tell the jury about his

6    lifestyle?  I mean, does he live like the rich and famous or, I

7    mean, what's going on here?

8         A.   Absolutely not.  Ian's an extremely nice guy and

9    lives pretty modestly.  His house is so old that there's

10   horsehair in the walls.  Like it's -- he's not out there

11   living, you know, the life of the luxurious.  Yeah.

12        Q.   So the house -- his house is a pretty simple house?

13        A.   Yeah.

14        Q.   I mean, I think the jury saw, you know, at least a

15   good bit of it.

16        A.   Yeah.

17        Q.   Okay.  Why don't you tell the jury what he drives

18   for a car.

19        A.   Last I knew, it was a RAV4.  But I haven't been able

20   to talk to Ian in almost two years --

21        Q.   All right.

22        A.   -- so ...

23        Q.   Was it a new RAV4?

24        A.   No.  No.  He picked it up from some used dealership.

25   It already had a bunch of miles on it when he got it.

1      Q.   All right.  So it's an older used RAV4?

2      A.   Yeah.

3      Q.   Any -- is he into jewelry or anything like that?

4      A.   No.  This is a guy that I had to beg to go to

5  JCPenney to go get some new slacks after like a decade of

6  wearing the same khaki pants.

7      Q.   All right.  So we -- we can't really assign to Ian

8  any knowledge on your behalf that he's, quote, rich?

9      A.   No.

10      Q.   You may have called him rich before because he makes

11  money and doesn't have to beg and scrape like you have had to

12  in the past?

13      A.   Yes.

14      Q.   Okay.  And would be your idea of rich?

15      A.   Pretty much.

16      Q.   Do you know what -- what the church is engaged in

17  with regard to charities or any other outreach?

18      A.   Yes.  I know that donations have been made to

19  schools.  We also used to contribute to the Hundred Nights

20  Shelter ball, which is a homeless shelter that's open the

21  hundred coldest days of the year.  Yeah, that was an annual

22  thing.

23      Q.   Okay.

24      A.   Yeah.

25      Q.   Are there other outreach that you're aware of?

1      A.    Off the top of my head -- definitely, but those are

2  just off the top of my head.

3      Q.    Do you know whether or not he gives away his

4  services in advising people how to use cryptocurrency and

5  business and that sort of thing?

6      A.    Yes.

7      Q.    Why don't you give the jury some examples of that.

8      A.    Ian preaching about bitcoin is a -- you know, every

9  time I introduce him to someone new, he's trying to show them

10  how to use whatever wallet.  And, yeah, can't -- can't exactly

11  shut him up about it.

12      Q.    Are there a number of businesses in Keene, in the

13  Keene area, that are now utilizing that particular type?

14      A.    Yes.

15      Q.    And is it because of Ian making that connection and

16  that liaison?

17      A.    Yes.

18      Q.    Does he charge for his services in advising them or

19  setting it up?

20      A.    No.

21            MR. SISTI:  Okay.  If I could have a moment, your

22  Honor?

23            THE COURT:  You may.

24            MR. SISTI:  Thank you, Renee.  Thanks for coming in.

25            THE COURT:  Redirect.

1        REDIRECT EXAMINATION

2 BY MR. AFRAME:

3        Q.   Just a couple more questions.

4             So let me just -- Mr. Sisti just tried to talk to

5 you about your plea in this case, right?

6        A.   Yes.

7        Q.   So you've been in this courtroom before, right?

8        A.   Yes.

9        Q.   And that was the day you pled guilty, right?

10       A.   Yes.

11       Q.   And you were under oath that day, right?

12       A.   Yes.

13       Q.   And Judge Laplante asked you a lot of questions,

14 right?

15       A.   Yes.

16       Q.   And was one of those questions -- and we read a

17 statement of facts, right; the government read a statement of

18 facts that day, correct?

19       A.   Yes.

20       Q.   And did you admit that day that you lied to banks?

21       A.   There -- there -- there was a long list of what the

22 government presented as facts.

23       Q.   And did you admit that they were true?

24       A.   In order to take a plea deal, yes.

25       Q.   Did you admit that they were true?

```
 1          A.    Yes.

 2          Q.    Did Judge Laplante ask you if you were pleading

 3    guilty because you were guilty?

 4          A.    Yes.

 5          Q.    Did you answer that question truthfully?

 6          A.    May I have a moment with my lawyer, please?

 7                THE COURT:  We'll take a brief recess.

 8                THE CLERK:  All rise.

 9                        (Jury excused.)

10                THE COURT:  Frankly, I really just wanted to be

11    careful because I know that Ms. -- I know that Ms. Spinella's

12    counsel is present here today by remote because he's still

13    COVID-positive.  So I'm -- my -- I just want to make sure with

14    Kellie.

15                Mr. Rothstein has access, he's listening?

16                THE CLERK:  Yes, he does, your Honor.

17                THE COURT:  All right.  I just don't know if he's

18    been trying to communicate with us during this at all and if I

19    would be able to hear him if he was.

20                So Mr. Rothstein -- I mean, how does --

21                THE CLERK:  I have to go back to -- I have to go see

22    him.  He's remote in a different area.

23                THE COURT:  Right.  Okay.

24                THE CLERK:  He can hear you, but you're not going to

25    be able to hear him.
```

1          THE COURT:  Well, he's on Zoom, so why can't I hear

2     him?  What --

3          THE CLERK:  He's not on Zoom, your Honor.

4          THE COURT:  Oh, he's just monitoring.

5          THE CLERK:  Yes.

6          THE COURT:  All right.  We need to be able to

7     communicate with him.  It needs to be as if he's in the

8     courtroom.  So --

9          THE CLERK:  Let me check with Tracy --

10         THE COURT:  Yup.

11         THE CLERK:  -- because I did receive a message

12    saying that he was tested again.  So I just want to follow up

13    with her.  Can I just go out back and check with her?

14         THE COURT:  Yup.

15         All right.  You're on your feet, Mr. Sisti.

16    Anything you want to say?

17         MR. SISTI:  No.

18         THE COURT:  Okay.

19         MR. SISTI:  Just up just in case.

20         THE COURT:  Just in case.  All right.  It's not --

21    it -- look, having her consult with her counsel during the

22    testimony is not normally the procedure, but sometimes when

23    counsel's in the courtroom, counsel might object or intervene

24    and I just didn't want to foreclose that possibility for

25    Mr. Rothstein.  That's all.

1          MR. SISTI:  It's -- I hate to interrupt the request

2   from a witness to discuss something with her lawyer.  However,

3   all right --

4          THE COURT:  Right.

5          MR. SISTI:  It is additional fodder now and

6   everybody better know.  I think it goes -- it goes to the

7   addition with regard to cross-examination.  That interruption

8   for the purpose of discussing something with her lawyer after a

9   specific question may or may not become substantive and I may

10  actually utilize that if Mr. Aframe doesn't ask the questions

11  that I would probably be asking.

12          THE COURT:  Right.  I -- I don't plan to allow a

13  consultation during the testimony.  I'm going to instruct

14  the jury that there was none.  But -- but my -- my taking a

15  recess was really to ensure that Mr. -- that Mr. -- that if

16  Mr. Rothstein is trying to be heard, he can be heard.  Nothing

17  more than that.

18          MR. SISTI:  I understand.  Again I would object to

19  consultation.  I think we're both on the same playing field

20  here.

21          THE COURT:  Oh, no, there can't be consultation and

22  I'm not going to permit consultation.

23          MR. SISTI:  Right.

24          THE COURT:  Yeah.

25          MR. SISTI:  So I don't know what Mr. Rothstein's

1   purpose would be and I don't know where this puts Spinella at

2   this point because you tacitly agreed, I think, on the record,

3   to allow her to speak with her lawyer.

4            THE COURT:  Right.  That's why I think -- that's why

5   I think an instruction is necessary that no such speaking to

6   counsel took place.

7            MR. SISTI:  So I don't know where we go from here,

8   but that's the instruction I would want and that's exactly what

9   I would be on my feet for.

10            THE COURT:  Understood.

11            MR. SISTI:  All right.

12            THE CLERK:  Your Honor, I have Tracy here.

13            THE COURT:  So is he still positive?

14            DEPUTY CLERK UHRIN:  Yes.

15            THE COURT:  All right.

16            THE CLERK:  We can do it via telephone.

17            DEPUTY CLERK UHRIN:  We could call him?

18            THE COURT:  Yeah.  Does he have his phone?

19            THE CLERK:  Yup.

20            THE COURT:  All right.

21            DEPUTY CLERK UHRIN:  I need to get his --

22            THE COURT:  I have his number.

23            DEPUTY CLERK UHRIN:  Oh, you do?

24            THE COURT:  Oh, yeah.

25            DEPUTY CLERK UHRIN:  All right.  Do you want me

```
 1   to --
 2              MR. SISTI:  I'd probably ask that the witness be
 3   excused --
 4              THE COURT:  Yeah, the witness should be excused for
 5   a -- well, all I'm going to ask him is if he's trying to be
 6   heard.
 7              We can excuse the witness if you like, but --
 8              MR. SISTI:  Yeah.  I just don't know where it's
 9   going to go.  That's all.
10              THE COURT:  Yeah.  All right.
11              There is a -- let me ask the -- the witness
12   coordinator, is there an empty conference room out there she
13   can stay in?
14              MS. EPHRAIMSON:  There's one right here.
15              THE COURT:  All right.
16              MS. EPHRAIMSON:  She can stay in one if that --
17              THE COURT:  Ms. Spinella, I'm just going to ask you
18   to remove yourself into a conference room, just for a moment,
19   if you don't mind.
20              MS. EPHRAIMSON:  Just put your mask on.
21              THE COURT:  All right.
22                         (Witness excused.)
23        (Connected via telephone with Attorney Rothstein.)
24              THE COURT:  All right.  Attorney Rothstein, can you
25   hear me?
```

1              MR. ROTHSTEIN:  Hello?

2              THE COURT:  Hello, Attorney Rothstein.  This is

3    Judge Laplante.  Can you hear me?

4              MR. ROTHSTEIN:  Yeah.  Not very well.  Let me --

5              THE COURT:  Let me try this.  Is that better?

6              MR. ROTHSTEIN:  No.  I -- am I speaking into my

7    phone or into the computer?

8              THE COURT:  Phone.

9              MR. ROTHSTEIN:  Phone?

10             THE COURT:  Yeah.

11             MR. ROTHSTEIN:  Oh, okay.  Here I am.  All right.

12   Yeah.  I'm sorry.  My computer -- my computer did something

13   funny.

14             So, yes, I can hear you fine, Judge.

15             THE COURT:  All right.  Look.  During her redirect

16   examination --

17             MR. ROTHSTEIN:  Yes.

18             THE COURT:  Well, you heard that.  You heard what's

19   transpired, correct?

20             MR. ROTHSTEIN:  I did.

21             THE COURT:  Okay.  Now, it's not the Court's plan to

22   permit her to consult with you --

23             MR. ROTHSTEIN:  Okay.

24             THE COURT:  -- during her testimony, of course.  But

25   what dawned on me was I was assuming that your remote access to

1    this proceeding was basically the same as you being in the

2    courtroom.  And if you were trying to be -- if you were trying

3    to be heard for some reason, I wanted to make sure you had the

4    ability to do that.  All right?

5            I don't -- I don't imagine that you were, but I just

6    wanted to be sure.

7            MR. ROTHSTEIN:  Well, I heard -- obviously I was

8    here and, you know, I would -- I mean, just for my client's

9    benefit, I heard my client say she would like the opportunity

10   to consult with me.  So I have a client who says she wants to

11   consult with me; of course, you know, I would want to consult

12   with her.  Obviously that's up to the -- that's up to the

13   Court.

14           So I -- I guess I'd like to make it clear on the

15   record that where my client asked to be able to consult with me

16   during the line of questioning that I would have wanted to --

17   to be able to -- to talk to her to address what her -- what her

18   concern is.

19           So, I mean, I would say that.  Beyond that, you

20   know, I don't -- I don't really know what I can say.

21           THE COURT:  Understood.  I -- what I want you to do

22   is this.  My only concern was that I wanted you to have

23   basically the same access to the courtroom that you would have

24   had you been sitting here.

25           MR. ROTHSTEIN:  Yeah.

1          THE COURT:  And I -- while I certainly understand a

2    subjective desire to respond to a client's desire to talk to

3    you --

4          MR. ROTHSTEIN:  Yes.

5          THE COURT:  -- that's not the same as you in some

6    way asserting yourself or objecting during the proceeding and I

7    don't see how there would have been any grounds to, to be

8    honest.  But sometimes -- sometimes I want to be careful and

9    that's -- that is -- that was my reason for taking the recess.

10         So look --

11         MR. ROTHSTEIN:  Right.

12         THE COURT:  -- what I'm going to do, I'm going to

13   allow -- I'm going to allow the examination to continue.  I'm

14   going to instruct the jury that there's been no consultation

15   between the client and counsel.

16         MR. ROTHSTEIN:  Okay.

17         THE COURT:  But I just want you to be aware if

18   you're trying to be heard in this proceeding, I'm going to keep

19   this cell phone on the bench.

20         MR. ROTHSTEIN:  Okay.

21         THE COURT:  And if you want to contact me for any

22   reason to assert anything on behalf of your client to do it

23   that way.  All right?

24         MR. ROTHSTEIN:  Okay.  That's --

25         THE COURT:  All right.

1           MR. ROTHSTEIN:  That's fine.  Okay.

2           THE COURT:  Thank you, Counsel.

3           MR. ROTHSTEIN:  Yes.  Thank you.

4           THE COURT:  Before I hang up with you, Counsel,

5   on -- parties' counsel have anything to add here?

6           MR. AFRAME:  No, your Honor.

7           MR. SISTI:  Nothing, Judge.

8           THE COURT:  All right.  I'm hanging up the phone,

9   Attorney Rothstein.  Thank you.

10          MR. ROTHSTEIN:  Okay.  Yup.

11              (Telephone call disconnected.)

12          THE COURT:  All right.  So my plan is -- my plan is

13   to resume -- have the witness resume the witness stand, bring

14   the jury back in, explain to the jury that witnesses are not

15   allowed to consult with counsel during their examination and

16   none took place here; that I -- it was -- it was the Court's

17   caution that caused the recess, but nothing's transpired in the

18   meantime, and allow it to continue.

19          MR. SISTI:  We'll see where it goes.  Thank you.

20          THE COURT:  All right.  Will that instruction be

21   satisfactory, at least at this point is what I'm asking.

22          MR. SISTI:  At this point.

23          THE COURT:  Yeah.

24          MR. AFRAME:  Yes.

25          THE COURT:  All right.  Let me -- I should ask

1    defense counsel.  So I'm -- maybe I want to make sure I'm not

2    failing to anticipate something.

3            I understand that based on events that transpire

4    going forward, you may or may not have objections to make or

5    motions to make.  My question is based on what's transpired

6    now, is there anything different you'd like me to do in

7    addressing the jury.

8            MR. SISTI:  I know what you're saying, Judge.  Right

9    now, no.

10           THE COURT:  Okay.  That's my question.

11           MR. SISTI:  All right.

12           THE COURT:  Let's get the jury.

13           My assumption, the reason for that recess is no more

14   and no less for me to make sure the witness's counsel had

15   access to the courtroom.  I assumed he did.

16           Turns out he was monitoring it through our remote,

17   not on Zoom, which means he could see us, but we couldn't

18   necessarily hear him.  We are addressing that now so it can

19   happen.  But that's the entire -- and the reason he didn't have

20   Zoom up till now was he declined it.  I thought, you know --

21   our discussions were that he would be connected by Zoom, but I

22   guess when he was told he could monitor it without a Zoom, he

23   accepted that.  So we will -- we're arranging for that now.

24           I'm going to tell the jury there's been no

25   consultation.  I'm going to tell them exactly what I just told

1    you.

2              Let's get the witness back on the stand, please.

3                        BEFORE THE JURY

4              THE COURT:  Ladies and gentlemen of the jury, thank

5    you for your patience during that recess.  Let me explain to

6    you the situation.

7              The witness asked during her testimony if she could

8    consult with her lawyer.  The answer to that question is no.  I

9    have to tell the witness now, you can't consult with counsel

10   during your testimony.  It's not permitted.

11             The reason I took the break, though, was because she

12   did have counsel present with her the last time she testified

13   and that lawyer is here in the courtroom -- courthouse today.

14   However, he's still COVID-positive, so we couldn't have him in

15   the courtroom with all of you and everybody else.  He's in a

16   conference room nearby, monitoring on a computer.

17             The reason for my recess was just to make sure -- I

18   wanted to make sure the attorney could hear and see what was

19   going on in the courtroom because I -- I don't have a Zoom

20   screen or something where I can see him.  Nothing more than

21   that.

22             The answer to the question is, no, the witness may

23   not consult with counsel during her testimony.  She has not

24   consulted with counsel.  It's not permitted.

25             And that's the answer to you as well, Ms. Spinella.

34

1    You must answer the questions.

2              And now I have ensured -- I have satisfied myself

3    that the attorney can hear and see us and vice versa, nothing

4    more than that.  I just had to address that technological

5    issue.  Everybody understand?  Good.

6              You can -- so the question's pending.  Why don't you

7    ask it again.

8         Q.    So I think the question I asked you was when you

9    told Judge Laplante that you were guilty at the change of plea

10   hearing when you were under oath, was that a truthful answer to

11   him?

12        A.    Yes.

13        Q.    You've discussed -- you talked about some of the

14   thinking that went into your decision to plead guilty and you

15   told Mr. Sisti about eight to ten years.  I want to make sure

16   that it's clear what happened.

17             So did we have a meeting at my office?

18        A.    Yes.

19        Q.    Were you present alone or with a lawyer?

20        A.    With a lawyer.

21        Q.    Was I present?

22        A.    Yes.

23        Q.    Was Ms. MacDonald present?

24        A.    Yes.

25        Q.    Was your lawyer and you shown a PowerPoint

1    presentation?

2         A.    Yes.

3         Q.    Did it show evidence in the case?

4         A.    It showed what you were going to present, yes.

5         Q.    Okay.  Did we discuss with your lawyer the

6    sentencing guidelines?

7         A.    Yes.

8         Q.    Were you required at that meeting to say anything?

9         A.    No.

10        Q.    In fact, was I speaking and Ms. MacDonald speaking

11   to your lawyer?

12        A.    You were addressing all of us, yes.

13        Q.    And did you make any decision that day?

14        A.    I did not make my decision that day, no.

15        Q.    Were you allowed to consult with your lawyer?

16        A.    Yes.

17        Q.    Was there any limitation on you consulting with your

18   lawyer?

19        A.    No.

20        Q.    And whatever that consultation was, after all of

21   that, is that when you decided that you wanted to plead guilty?

22        A.    Yes.  Again, it was eight to ten years in jail that

23   I was facing, so, yes, I decided to plead guilty.

24        Q.    And that was based on the sentencing guidelines,

25   right?

36

1      A.   Yes.

2      Q.   Okay.  And who ultimately decides what your sentence

3  is?

4      A.   I do.  Or wait.  The judge.

5      Q.   The judge.  Okay.  And that happened, right?

6      A.   Yes.

7      Q.   So Mr. Sisti asked you if you ever conspired with

8  Mr. Freeman.  So you -- you had an agreement with Mr. Freeman

9  to help him in his bitcoin business, right?

10     A.   Yes.

11     Q.   You agreed to open bank accounts for him?

12     A.   Yes.

13     Q.   You agreed to sell bitcoin online with and for him?

14     A.   Yes, and also for myself.

15     Q.   Uh-huh.  You collected money from the CVM machines?

16     A.   Kept the money?

17     Q.   Collected.

18     A.   Collected, yes.

19     Q.   And you understood that Mr. Freeman's business was

20  unregistered?

21     A.   Yes.

22     Q.   Did you say you were doing this bitcoin business

23  because you were attempting to fund church outreach, that was

24  your objective?  Did I understand that right?

25     A.   Can you repeat that, please?

1        Q.    Your objective in doing this work was to help fund

2   church outreach programs, that was your goal?

3        A.    Yes.

4              MR. AFRAME:  Okay.  Can we tell you to show

5   something on the document camera?  Can I do that?

6              THE CLERK:  Yes, you can.

7        Q.    Did you see that, Ms. Spinella?

8        A.    Not really.

9              THE CLERK:  Counsel --

10             THE COURT:  Hold it.

11             THE CLERK:  Counsel, it may be very small up there,

12  so you may -- you can give the paper exhibits.

13             MR. AFRAME:  Okay.

14             838.

15             THE COURT:  838, full exhibit.

16             MR. AFRAME:  It's already been admitted as a full

17  exhibit.

18       Q.    This is 838.  I'll just ask you to read it and then

19  I'll --

20             THE COURT:  How do we make it so the jury can see

21  it?  Is the Zoom causing a problem with that?

22             THE CLERK:  No.  Are you guys able to see it over

23  there?

24             THE COURT:  No, they -- it's tiny on the screens.

25  What I'm asking is how do we get it so the jury can see it.

1          THE CLERK:  That's the only problem with the -- with

2    the Zoom, your Honor.

3          THE COURT:  So it is the Zoom.

4          THE CLERK:  Yes.

5          THE COURT:  Okay.

6          MR. AFRAME:  It's very short.

7          MR. SISTI:  Your Honor, I think it's in the book.

8          MR. AFRAME:  No, it's -- is 838?

9          THE COURT:  838's in your book.

10          MR. AFRAME:  838.

11     Q.    Have you read it?

12     A.    (Nods head.)

13     Q.    So this was May 16th, 2028 (sic) and it was a Signal

14    conversation between you and Mr. Freeman.

15          And I'll just start -- well, I'll start from the

16    top.

17          And it says, "So my options are limited work but not

18    getting flagged or, two, going balls to the wall, making money,

19    but having attention drawn to myself."

20          I'll leave out the expletive.

21          Then Mr. Freeman said, "itBit told me to clear the

22    account by 5/25, so we have until then."

23          Then you say, "What do you propose?  I'd like to

24    make as much money as possible with the least amount of risk."

25          Mr. Freeman says, "It's up to you."

39

```
1            And you say, "I need a recommendation.  I'm
2   extremely broke, but I'm not trying to get flagged or
3   arrested."
4            And that was part of the church outreach?
5       A.   Both things are true.
6       Q.   Okay.  Do you know Melanie Neighbours?
7       A.   Yes.
8       Q.   And do you know she does some bookkeeping?
9       A.   I guess so, yes.
10      Q.   You said Mr. Freeman doesn't have -- doesn't live a
11  lavish lifestyle.  Do you remember telling Mr. Sisti that?
12      A.   Yes.
13      Q.   Do you know that she wrote a letter on his behalf
14  saying that he had $300,000 in deposits in accounts and
15  $2.4 million in various liquid assets?
16      A.   I don't really trust Melanie, so I don't -- I don't
17  know.  No, I don't know.
18      Q.   Okay.  And you yourself said to Mr. Freeman he is
19  rich, right?
20      A.   I have probably said that, yeah.
21      Q.   Do you remember it was in the exhibits?
22      A.   Uh-huh.
23      Q.   And you wrote everything in those exhibits that I
24  read that was under your name, right?
25      A.   Yes, years ago.
```

1           MR. AFRAME:  Okay.  Thank you.

2           THE COURT:  Recross.

3           MR. SISTI:  Thank you, Judge.

4                     RECROSS-EXAMINATION

5    BY MR. SISTI:

6         Q.   Let's go back to this wealth situation again.  That

7    was the last question.  I just want to make sure we're all on

8    the same page here.

9              You don't consider him a wealthy man, that's Ian

10   Freeman over there.

11        A.   No.

12        Q.   In fact, not at all, correct?

13        A.   No.

14        Q.   All right.  And, you know, when -- when the

15   prosecutor says and you said that you said once or something

16   that he was rich, that's relative to you being, let's get real

17   here, really poor, right?

18        A.   Yes.

19        Q.   Okay.  Anybody with a 2006 RAV4 living in the house

20   that he's living in, you considered he was doing okay, right?

21        A.   Right.  And, I mean, when you take a bunch of text

22   messages out of context and -- you know, I could have been

23   joking.

24        Q.   Right.  Okay.  So let's -- let's just make sure we

25   clear the air there.

1          The other thing is that, look, I'm going to

2     painfully go back.  And I hate to put you on the spot, but

3     you're not lying here to the jury today, are you?

4          A.    No.

5          Q.    All right.  This guilty plea you took, let's get

6     right back down to it for a second.  Okay?

7               Was this a very pressured-packed situation for a

8     young woman like you?

9          A.    Yes.

10         Q.    Did you fully recognize what in the heck you were

11    doing when you entered that guilty plea?

12         A.    It's very hard to understand legal proceedings.

13         Q.    In fact, have you switched lawyers since then?

14         A.    Yes.

15         Q.    And what was the reason for that?

16         A.    I am hoping to potentially appeal my plea.  And,

17    yes, I need a new lawyer to do that.  And that's also why I'm

18    afraid to be, you know, like answering questions, because I

19    don't think that they want me to do that.

20               MR. AFRAME:  Objection.

21               MR. SISTI:  I'm sorry?

22               MR. AFRAME:  Objection.  Speculation on what we want

23    her to do.

24               THE COURT:  Sustained.

25               The jury should disregard the statement, her

1   statement about what they want.  Nobody knows what someone else
2   wants.  We -- we testify based on what we see and what we hear.
3           Go ahead, Counsel.
4       Q.   Yeah.  What were you referring to?  Were you
5   referring to the U.S. Attorney's Office or your lawyers?
6       A.   I was referring to the prosecution.
7       Q.   All right.  Now, with regard to --
8           THE COURT:  So, again, sustained.  Disregard her
9   thoughts about the prosecution's wishes.
10          Go ahead.
11          MR. SISTI:  Thank you, Judge.
12      Q.   And your intent now is to withdraw the plea?
13      A.   Yes, it is.  It's a consideration.  I would like to
14  if I can --
15      Q.   All right.
16      A.   -- but I don't know.
17      Q.   All right.  And that's why you have new counsel now?
18      A.   Yes.
19      Q.   All right.  Did you -- did you at any point in time
20  during your connection with Ian conspire to do anything
21  illegal?
22      A.   No.
23      Q.   Did you at any point in time during your connection
24  with Ian intentionally do anything illegal?
25      A.   No.

```
1        Q.   Did you take certain pains and concentrate on doing

2   things that were not illegal?

3        A.   Yes.  Yes.

4        Q.   And was that upon the instruction of Ian?

5        A.   Yes.

6             MR. SISTI:  Thank you.

7             THE COURT:  Last round.

8                    CONTINUED REDIRECT EXAMINATION

9   BY MR. AFRAME:

10       Q.   Were you actually a financial dominatrix?

11       A.   No.

12       Q.   That was sent to the bank, right, that concept that

13   you were earning money from men on the Internet?

14       A.   No.

15       Q.   That wasn't sent to the bank?

16       A.   It -- yes.

17       Q.   And that's not true, right?

18       A.   No.

19       Q.   You were making money by selling bitcoin, right?

20       A.   Yes.

21       Q.   Mr. Freeman came up with the idea of a financial

22   dominatrix, right?

23       A.   I don't remember who came up with it.

24       Q.   Do you want me to show you?

25       A.   I -- like I still don't know who came up with it.
```

1       Q.    Okay.  It was sent to the bank, right?

2       A.    Yes.

3       Q.    And it wasn't true, right?

4       A.    Yes.

5                     RECROSS-EXAMINATION

6   BY MR. SISTI:

7       Q.    Let me cut to the chase here.

8             Did any bank lose one cent because of anything you

9   or Ian Freeman did?

10      A.    No.

11            MR. SISTI:  Thank you.

12                CONTINUED REDIRECT EXAMINATION

13  BY MR. AFRAME:

14      Q.    How do you know that?

15            THE COURT:  Wait, wait, wait.  Okay.  This really is

16  the last round.

17            MR. AFRAME:  Okay.

18      Q.    How do you know that?

19      A.    How do I know that?  Because there was never any

20  like restitution that we were asked for.  They were just

21  shutting down our accounts with no notice of what was going on.

22  We were never told that we were doing anything illegal.

23      Q.    Okay.  So you needed to be told it was illegal to

24  lie?

25      A.    Yeah.  And, in fact, we were told by an FBI agent

1   that it is completely legal to sell bitcoin.

2            MR. AFRAME:  I agree with that.  Okay.  Nothing

3   further.

4                    CONTINUED RECROSS-EXAMINATION

5   BY MR. SISTI:

6        Q.   There was no restitution to the banks, right?

7        A.   No.

8        Q.   They sent money back to you, in fact, when the

9   accounts --

10       A.   Yes.

11       Q.   -- closed?  They didn't hold money and say, you guys

12   screwed us and you owe us money?

13       A.   No.

14       Q.   All right.  And, in fact, you went through your

15   plea, you discussed the plea, we unfortunately had to resurrect

16   that moment for you.

17       A.   Yes.

18       Q.   Did the government ask you for any restitution as

19   part of that?

20       A.   No, just a fine paid to the state.

21       Q.   That was it, right?

22       A.   Yes.

23       Q.   No restitution?

24       A.   No.

25       Q.   Nothing, right?

```
 1        A.    No.

 2              MR. SISTI:  Okay.

 3              THE COURT:  You're excused.  Hope you feel better.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  All right.

 6                      (Witness excused.)

 7              THE COURT:  Counsel, let's confer here in the dock

 8   for a second.

 9              It'll be off the record.  It doesn't need to be on

10   the record.

11                      (Off-the-record discussion.)

12              THE COURT:  All right.  Where are you in your case?

13              MR. AFRAME:  United States rests.

14              THE COURT:  All right.  So the prosecution has

15   rested its case, ladies and gentlemen of the jury.  I want to

16   remind you that the burden of proof in a criminal trial rests

17   entirely on the prosecution.  It is the prosecution's burden to

18   prove the elements of each offense beyond a reasonable doubt in

19   order for you to return a conviction.

20              The defense has no obligation to put on a defense

21   and we are going to suspend the trial for the rest of the day.

22   Tomorrow, the -- the defense may begin to put on its case.

23              It'll be a 9:00 a.m. start like usual, same rules

24   apply.

25              I want to thank you.  I know this has been a little
```

1    bit of a -- more than a little bit of an inconvenient trial

2    because of the holiday season and the curveball we've been

3    thrown by the COVID virus.  But we want to make sure you're

4    safe, so it's been a little spotty and it's going to continue

5    to be spotty.  Hopefully today will be the end of the spotty.

6              Tomorrow we'll start at 9:00 and hopefully proceed

7    right through the rest of this with, if the defense puts on a

8    case, their evidence, then closing arguments, and then my jury

9    instructions, and your deliberations.

10             Thank you, and I will see you tomorrow at 9:00 a.m.

11             But remember my admonition, right?  No conversations

12   with each other or anybody else regarding the trial and no

13   independent research or investigation.

14             Thank you for your very deep and broad patience with

15   our trial.

16             THE CLERK:  All rise.

17                  (Jury excused.)

18             THE COURT:  The prosecution's rested its case.

19   The -- the defense counsel has communicated that it -- that the

20   defense does intend to put on a defense, but, of course, I'm

21   not going to instruct the jury on that or even mention it to

22   them yet, just in case you change your mind overnight.  I don't

23   want to create the impression, of course, that the defense has

24   a burden or an obligation.

25             So, Mr. Sisti, do you want to make a motion?

1          MR. SISTI:  I would like to make a motion, Judge.

2          And generally speaking, one, it would have to do --

3     I want to go specifically -- let's go specific first.

4          With regard to the money laundering charge and,

5     specifically speaking, the money laundering charge attributed

6     to the so-called heroin dealer/government agent/IRS agent, I

7     would ask right now that that case be dismissed.  Forget

8     willful blindness.

9          This is an intentional rejection of an invitation to

10    engage in criminal activity that the IRS agent rather clumsily

11    pursued after being told that Mr. Freeman could not do any

12    transaction with him after it was exposed to Freeman that this

13    individual was engaged in illegal activity.

14         But he wouldn't take no for an answer the first

15    time, so he came back wired the second time and a couple things

16    happened there.  One, Freeman again said he could not agree for

17    him to utilize those machines.  "I can't tell you you can do

18    that" is the specific that -- that you can use them.  And those

19    are the specifics with regard to that.  He did not accompany

20    him into the facility, he did not aid him in putting money into

21    the machines, he did not encourage him in any way, shape, or

22    form to do so.

23         And, you know, what's actually tantalizingly

24    interesting is that the agent at that point in time didn't get

25    the discount rate.  And that was brought up on direct by the

1    prosecution.  The rate of his purchase at the vending machine

2    on the date after being informed by Freeman that he no longer

3    wanted to do business with him was 14 percent.  14.  1-4.  And

4    prior to that, before knowing that this individual was engaged

5    in illegal activity, Freeman had extended a 10 percent

6    permanent rate.  And that is in the record.  That rate no

7    longer existed after Freeman knew that this individual was

8    engaged in criminal activity.

9            And I say that's not only a circumstance, that's

10   direct evidence that he no longer wanted to do business with

11   this individual in any way, shape, or form.  He had no control

12   over who was using that machine, he had no control how much

13   money was going into the machine, and there's nobody that could

14   testify that could even say that Freeman knew that he was using

15   that machine that day, pumping money into it.  He heard about

16   his intent and he told him no.

17           With that -- with that particular count -- I'd just

18   like to lay that one out for a second so I can do them one at a

19   time.

20           THE COURT:  Of course.

21           MR. SISTI:  But I think that count just speaks for

22   itself.  That's screaming for a dismissal at this point in

23   time, Judge.

24           THE COURT:  So you want -- do you want -- are you

25   saying you want to hear his objection first?

1           MR. SISTI:  I would.

2           THE COURT:  We can do it that way if you like.  I

3   don't mind.

4           MR. AFRAME:  In the government's view, the -- the

5   evidence in response to what Mr. Sisti said is sufficient --

6           THE COURT:  Hold on one moment, Mr. Aframe.

7           MR. AFRAME:  -- sorry, is sufficient to create a

8   jury question, in our view.  The conversations between

9   Mr. Freeman and the undercover prior to --

10          THE COURT:  The jury's gone.  We can remove our

11  masks.  That goes for everybody in the courtroom.

12          MR. AFRAME:  Prior to the transaction, back when he

13  told the -- the undercover you are too loose-lipped, I

14  knowingly, in all capitals, can't sell you bitcoin does not

15  indicate that he is refusing under all circumstances not to

16  sell him bitcoin.  It is that it has to be under the radar, it

17  has to be in a way that we're operating through a wink and a

18  nod and not explicitly.

19          They discussed the ATMs, the kiosks; they discussed

20  that they had no recognition, facial recognition, pictures,

21  forms, identification of any type in the video.  The undercover

22  says is the machine still at the Thirsty Owl; Mr. Freeman's

23  response is it's still there.  Then he says, can I use it?  He

24  says, I can't tell you you can use that.

25          That's not the same as you told me you're a drug

1    dealer and you're unknowingly using me to launder money, go

2    away, stay away.  It was in the case you are too loose-lipped,

3    wink and nod, same thing as everything else in this case.  I

4    think it's a jury question over whether that was a wink and a

5    nod or what Mr. Sisti wants to portray it as some kind of

6    refusal.

7              So in my view, the evidence on that point is

8    sufficient to get past the Rule 29 standard.  If the jury took

9    the inferences I just presented in the light most favorable to

10   the evidence, they could conclude that Mr. Freeman had

11   permitted that transaction, that transaction took place, that

12   transaction was a bitcoin transaction for $20,000.

13             We also know from other evidence that Mr. Freeman

14   follows the money that goes into those machines.

15             THE COURT:  That's what I -- let me ask you about

16   that.  Because on the points you were just making, I think

17   there's probably enough of a -- of a willful blindness-type

18   mens rea and intent to allow that to go to the jury.  I think

19   I agree with you, even though it's a -- even though it's a

20   good -- a good defense argument --

21             MR. AFRAME:  Uh-huh.

22             THE COURT:  -- but, you know, like Ms. Spinella

23   said, you asked her that question, you know, can he monitor

24   from Keene what's happening with the machines or like who's

25   putting money into it.  I mean, what's the evidence that he

1  knew that the transaction even took place?

2        I mean -- and she said yes, and then there was no --

3  you didn't ask her how -- how Ian Freeman knew that or how it

4  works.  I don't understand that right now.

5        MR. AFRAME:  So in the --

6        THE COURT:  How does -- what's the evidence that Ian

7  Freeman knows that the undercover bought bitcoin from a vending

8  machine?

9        MR. AFRAME:  So on that -- so what I can say -- I

10 can't say -- what I can say is that what the texts that led to

11 that question were generally is he's watching.  There's a

12 whale, they're putting -- they're pumping bills into the

13 machine.  I can't -- we don't have a text that says that day,

14 at that time --

15       THE COURT:  Yeah.

16       MR. AFRAME:  -- he's watching.  What I can say is he

17 had a -- around the same time in 2020, 2021, he is watching

18 generally.  But I can't say, other than he told the -- the

19 undercover said, I'm going there, he said the machine's still

20 there, and then the response -- and then, you know, it's what

21 Mr. Sisti said; I can't tell you you can use it.  But he just

22 said -- he just told him it was there.

23       THE COURT:  Yeah.

24       MR. AFRAME:  And then we know generally he's

25 watching the machines for when people are putting in large sums

1   of money because he's telling his minion that it's time to go

2   collect the money.

3              THE COURT:  Yeah.  It seems to me that -- yeah, I --

4   I understand the evidence to be that he has a way of

5   understanding when the machines are being activated and

6   receiving cash, right?

7              MR. AFRAME:  Correct, yes.

8              THE COURT:  I get that.  That's not the same as

9   being aware the undercover was pumping cash in.  I mean, what

10  he's asking is is -- is the money laundering charge an attempt

11  charge.  No.

12             MR. AFRAME:  No, it's not.

13             THE COURT:  So I guess what I'm saying, you know, is

14  if -- suppose he said, you know -- he said all those things,

15  but it was you have to come to my office or my house and give

16  me the money and he didn't show up.  So where's the money

17  laundering because -- where's the evidence he knew the

18  undercover showed up with the money and actually did anything

19  with it?

20             MR. AFRAME:  I guess it's the inference that he told

21  him he was going to do it.

22             THE COURT:  Right.

23             MR. AFRAME:  And then that he's watching generally.

24             THE COURT:  Okay.

25             MR. AFRAME:  That's the evidence.

1           THE COURT:  Straight answer.  Thank you.

2           Anything else you want to say about this?  I focused

3  on a different issue than you did.

4           MR. SISTI:  No.  Actually, I think we were on the

5  same track because he said he wasn't there and he didn't

6  witness any transaction.  I mean Freeman didn't.  Freeman --

7  Freeman didn't witness any -- any actual transaction.

8           And you're absolutely correct; there's no evidence

9  he was monitoring that machine to see if any amount of cash

10  went in, no matter if it was from an IRS agent or anybody else.

11  He wasn't expecting $20,000 to go into the machine and there's

12  no -- and there's no evidence that he moved toward it at all.

13          There wasn't an announcement by the agent that he

14  was going to actually go in and actually pump the machine.

15  There's no affirmative response.  All right?  I mean,

16  there's -- you can't -- you can't say that he's willfully blind

17  when he's not getting that --

18          THE COURT:  Yeah.

19          MR. SISTI:  -- that level.

20          THE COURT:  See, the -- I think the evidence of

21  willful blindness is definitely sufficient on source of funds.

22  I think -- but now I'm coming back to the prosecution now.  I

23  think maybe I understand your argument better now in a way I

24  didn't before, prosecution, which is the knowingly.

25          When he said "I can't," all caps, knowingly accept

1    your money, frankly, I had been thinking about that as

2    knowingly -- the knowingly culpable mental state going to the

3    source of funds.  You're saying it also goes to the acceptance

4    of the money, the actual laundering, the act of laundering.

5    Okay.

6              MR. AFRAME:  And I'll just add, I mean -- and that's

7    right.  And so what rounds that out, to me, is the discussions

8    they had of the ATMs and how they operated and all the concerns

9    that the undercover was expressing that Freeman said, don't

10   worry about it, it's all turned off, it's all disabled, it's

11   all there for you, basically, it's all there for you to use.

12             THE COURT:  Yeah.  No, yeah, I get it.

13             MR. AFRAME:  So that -- yes, you understand

14   correctly.

15             THE COURT:  I get it.  I just -- you know, I'm just

16   not sure if that gets you over the hump in a -- in a criminal

17   statute, but I have to think about it.

18             MR. SISTI:  Yeah.  I mean, it's all there for you to

19   use until you told me you were dealing heroin and now I'm

20   telling you I can't do business with you.

21             THE COURT:  Knowingly.

22             MR. SISTI:  Well --

23             THE COURT:  I know.

24             MR. SISTI:  Where are we?  You know, you're right.

25   This is where we are.

1          THE COURT:  Okay.  Under advisement.

2          MR. SISTI:  Okay.  Thank you.

3          THE COURT:  On the other counts?

4          MR. SISTI:  The tax evasion counts, the last

5    question I think I asked, and you can call it up, is whether or

6    not he actually owes the government taxes.

7          And the -- the sparse, scarce examination that they

8    did with standard deductions is almost jokeworthy.  And the

9    fact that he -- he wasn't requested once to go in and go

10   through itemization or -- or send over documents or anything

11   else, there was absolutely zero exploration into Freeman's

12   funds and whether or not he made a profit or didn't make a

13   profit, whether he had income or loss.

14         There's -- there's very simple accounting here that

15   never even took place.  It was all speculation.  It's all

16   speculative.  And she looked at the jury and basically said

17   that.  Does he owe taxes?  Could he actually, frankly, be owed

18   taxes?

19         This is not a situation where he was falsifying

20   documents or dummying up a return.  There are no returns.  We

21   all know that.  He didn't -- he didn't intentionally or

22   otherwise communicate to the IRS -- IRS in any way, shape, or

23   form what his income was or was not or his source of funds.

24         I mean, it was like -- that was very interesting,

25   but standard deductions, assuming that there was a profit off

1    of transactions from LocalBitcoin or anybody else is nothing

2    but speculation.  She doesn't know what overhead is, she

3    doesn't know what the take is, she doesn't know where the

4    donations were, she doesn't know where the charitable

5    deductions are, she doesn't know anything about -- with regard

6    to taking -- property taxes, employees, if there are any, if

7    you want to call them that, nothing.

8            We're making his case that he's a nonprofit, that

9    he's a church.  There's no invitation to even clarify anything.

10   It's like I'm assuming what your income -- this is assuming

11   everything that we subtract from the sale is somehow profit,

12   which is like a myth, and assuming that you take all this money

13   as income, I'm going to use standard deductions to calculate

14   what the taxes should be?

15           I mean, that's almost close to bizarre.  I mean,

16   I -- I couldn't believe what I was hearing.  I thought we were

17   going to get into much more of an exploration of, you know,

18   accounts here and accounts there and how it couldn't be just,

19   you know, the difference between the sale and resale of the

20   bitcoin, that where's this other money.  There -- there's --

21   nobody's even said there is other money.

22           I mean, it's a guesswork game and all it is is it's

23   interesting, but they can't make it out in 2016, 2017, 2018, or

24   2019 as to whether he owes the government taxes.  And that's

25   kind of like the fundamental, you know, question that you have

1    to -- have to answer here.  Evading taxation is one thing.  If

2    you don't owe it, you're not evading it.  He may be cheating

3    himself.  So that's where those are.

4              THE COURT:  Understood.

5              MR. SISTI:  Thanks.

6              MR. KENNEDY:  So --

7              THE COURT:  Mr. Kennedy.

8              MR. KENNEDY:  So with respect to the testimony on

9    the taxes due and owing, there was testimony from the agent

10   that she looked at LocalBitcoins records which included the

11   commission that is charged on top -- this is the commission

12   that you would charge in a sale for the profit and that's how

13   she calculated for each trade.  And she went every single trade

14   and added that up and so that's the amount of money that was

15   over and above the standard cost.  And that's what she used.

16             She also testified that she only looked at the

17   LocalBitcoins records.  There was a lot of evidence in this

18   case with respect to the Telegram and --

19             THE COURT:  Slow down a little bit.

20             MR. KENNEDY:  And that a lot of these sales took

21   place through the private app, the Telegram, and she said that

22   had she looked at those, if there was a commission on those

23   sales, that would have increased the amount of tax due and

24   owing.

25             THE COURT:  Right.

1          MR. KENNEDY:  We had chats from the LocalBitcoins

2     where Mr. Freeman was discussing how he uses the Telegram and

3     he charges -- I think in one example he said a ten --

4          THE COURT:  I think you've proved beyond a

5     reasonable doubt that income was generated.  There's no

6     question about that.  But his argument is based on the

7     availability of deductions and what -- and what effect that may

8     or may not have had, right, on tax due and owing, whether

9     there's an evasion of any obligation to pay taxes.  It wasn't

10    about the revenue.  That's proven.  What about his argument?

11         MR. KENNEDY:  So the testimony was that these

12    itemized deductions have to be affirmatively claimed by the

13    taxpayer.

14         THE COURT:  Yeah.

15         MR. KENNEDY:  And the further testimony was this

16    taxpayer did not file any tax returns.

17         THE COURT:  But is the law -- is the law that you

18    don't -- I mean, is the law that you don't owe taxes or you --

19    that you're only entitled to deductions when claimed?  Do you

20    follow what I'm saying?

21         Your colleague is nodding his head, but do you know

22    any authority -- I mean, there probably is authority for that.

23    I just don't know.  What is the law?  I mean, is it you owe

24    taxes -- there's an obligation to pay taxes if you haven't

25    taken the deduction?

1          MR. KENNEDY:  If you haven't claimed the deduction.

2     There's thousands of deductions in the Tax Code and we don't

3     just sort of assume that nobody owes taxes because they might

4     apply.

5          THE COURT:  Yeah.

6          MR. KENNEDY:  People -- you know, paying your taxes

7     is an affirmative duty under the law and we apply the standard

8     deduction unless you have more deductions and you want to claim

9     those under your taxes.  That was the testimony.  And --

10         THE COURT:  Yeah.

11         MR. KENNEDY:  -- and it was figured out and the

12    numbers presented were based on the revenue and then applying

13    those deductions.  I mean, Mr. Freeman didn't claim any

14    additional deductions.  I mean, again, the law, I think,

15    requires substantial tax due and owing.  It doesn't require a

16    specific amount.  I think the amounts that were proven

17    certainly enough to meet the substantial tax due and owing and

18    I think it's more than enough to get to the jury on this

19    question.

20         THE COURT:  What about the last question, though?

21    You know, the last question defense counsel asked the IRS

22    witness -- I'm trying to remember exactly how it was asked.  I

23    remember how it was answered.  The answer was yes.  But the

24    question was something like it may be that Ian Freeman doesn't

25    owe any income taxes, isn't that right.

1              MR. KENNEDY:  My --

2              THE COURT:  Do you --

3              MR. KENNEDY:  Sorry.

4              THE COURT:  She said yes.  I don't know if it was

5    maybe, or it's possible, something like that.

6              And at first I thought -- I'll admit at first I

7    thought, those claims are gone.  I thought more about it and

8    realized, well, the fact that it's possible that he wouldn't

9    owe income tax doesn't mean it's a reasonable doubt that he

10   owes income tax because a lot of things are possible that

11   aren't reasonable.  That's still a very, very odd way to end,

12   you know, the testimony without a lot more explanation, but,

13   still, what do you say about that?  Is it what I just said?

14   What do you say about that --

15             MR. KENNEDY:  So --

16             THE COURT:  -- end of your testimony?

17             MR. KENNEDY:  So my recollection of the testimony

18   was Mr. Sisti sort of offered the hypothetical of if he had all

19   of this overhead --

20             THE COURT:  Yeah.

21             MR. KENNEDY:  -- and he had rent and he had all

22   these other things that he could claim deductions for, is it

23   possible that he would owe no taxes.  And I think she said it's

24   possible but, again, he didn't claim those deductions.

25             THE COURT:  You're hearing it as that he would owe

1    no tax because as you've just told me before one isn't entitled

2    to these deductions, whether it's the standard or itemized,

3    until one claims them, right?

4              MR. KENNEDY:  And that was the testimony on

5    redirect.  I mean, I --

6              THE COURT:  Yeah, I'm going to need better than

7    testimony.  I'm going to need law on that.

8              MR. KENNEDY:  Yup.

9              THE COURT:  So we've got some time.  I need you to

10   dig that up.  Because it's a -- frankly, I think I understand

11   it, but it's not something we focused on in our jury

12   instructions at all or even in this motion and I think it's an

13   important point.

14             I think you're probably right about it, by the way.

15   It's that, you know, it's -- it's not that -- it's not that

16   like I don't have an obligation to pay taxes if I might

17   hypothetically take deductions.  You're probably right about

18   that.  I just want something a little more concrete than what I

19   have.  All right.

20             MR. KENNEDY:  Happy to brief it.

21             THE COURT:  Mr. Sisti, go ahead.  What else you got?

22             MR. SISTI:  I'll encourage you to take a look at

23   that actual exchange because I think her answer came with the

24   question:  So Mr. Freeman may not owe any taxes at all, and I

25   believe her answer was in the affirmative, Judge.

1          THE COURT:  May not owe any taxes?

2          MR. SISTI:  May not owe any taxes at all.

3          THE COURT:  I'll pull it up.  I'm not sure if that's

4   dispositive, but it's certainly important evidence.  Yup.

5          MR. KENNEDY:  Just, I mean, the question was, you

6   know, based on a different set of facts that you don't have

7   here before you, is it possible that Mr. Freeman doesn't owe

8   taxes.

9          THE COURT:  Yeah, I see -- I think you're -- you're

10  viewing it as a hypothetical line of questioning and defense

11  counsel isn't.  I'm not sure what the -- I'm not sure if it

12  makes much difference because even if it's possible he doesn't

13  owe any taxes at all, it doesn't mean it's a reasonable doubt

14  that he owes taxes at all.  I don't know.  But at least I want

15  to have a good understanding of the law on this issue before I

16  decide.

17          Go ahead, Mr. Sisti.

18          MR. SISTI:  Yeah, just on that, just one other

19  point.

20          THE COURT:  Yeah.

21          MR. SISTI:  There would have to be willful -- a

22  willful --

23          THE COURT:  Yeah.

24          MR. SISTI:  -- act, a voluntarily and intentionally

25  willful act, on Freeman and I think --

1          THE COURT:  See, I don't really struggle -- I don't

2     really struggle with the willfulness of Mr. Freeman because --

3     you may disagree.  Tell me what you think about this.

4          MR. SISTI:  Uh-huh.

5          THE COURT:  He -- the evidence to me, as I see it,

6     is that Mr. Freeman -- one thing he certainly was about

7     everything he did was very willful.  He was careful, he was

8     intentional, he -- he tried to create transactions that were at

9     least, in his view, either lawful or apparently -- appeared to

10    be lawful.  And he was being very careful based on an

11    understanding of the law and his obligations thereunder.  It

12    wasn't as if he was sort of aloof and unaware.  Do you follow

13    what I'm saying?

14          I think that carries a -- a strong indication of

15    willfulness.  Do you follow what I'm saying?

16          MR. SISTI:  I do, only if you conclude from the

17    beginning that he's guilty.  But if you -- if you start from

18    scratch and say, this is a guy that's trying not, okay, to owe

19    the government taxes, there's nothing wrong with that.  All

20    right.

21          THE COURT:  Uh-huh.

22          MR. SISTI:  If you take a look at the other side and

23    say, this is a guy that is intentionally, carefully inspecting

24    his own moves here and there and everywhere and being a church

25    and being a nonprofit and actually not profiting and not buying

1    the brand-new Lamborghini, then I think you have to look at the

2    other side of the coin.

3            This is a guy that, okay, they didn't -- they

4    didn't -- there was no itemization.  This is a guy that went

5    for four years during these -- these tax evasion years where I

6    believe you'll also look at the testimony and she will agree

7    that generally they send out letters to people like Freeman.

8    He had an address.  He had an address.  He wasn't hiding from

9    anybody.  He registered with the state of New Hampshire.  He's

10   got an actual address.  He's got phone numbers.  He's got

11   everything else.  They generally send letters out and make

12   inquiry with these types of individuals.

13           Not in this case, though.  That was the exception,

14   that there was no request for him to come in at any time to

15   explain what he does, what his church, which is out there --

16           THE COURT:  Yeah.

17           MR. SISTI:  -- you know, it's -- it's about -- it's

18   out there, like notoriously out there, especially in the Keene

19   area.  Bring him in.  Ask him.  Instead of running around in

20   the weeds trying to catch him on something -- it's like a

21   gotcha game.  Just bring him in.  If you wanted to bring him in

22   in 2016, bring him in.  '17, bring him in.  '18, '19, '20,

23   doesn't even know if the -- she doesn't even know if he owes

24   money in 2020.  There's no letter for 2020 either or 2021.

25           I mean, what's the deal here?  I mean, we're going

1   to just keep -- keep dropping line and hook out to you forever

2   so that we can just aggregate it or allow you to go along with

3   it because maybe, you are right, you didn't file in '16,

4   nothing happened to you; '17, nothing happened to you.  You're

5   right out there.  Everybody sees you.

6               '18, nothing happened to you, '19, nothing happened

7   to you, '20, nothing happened to you, '21.  Why can't he assume

8   that he's doing everything right, I guess is what I'm saying.

9               So, I mean, I guess that's it from me on the tax

10  thing, but you've got to look at it from both sides of the

11  coin.

12              THE COURT:  Yeah, let me ask the prosecution this

13  question.

14              It's related to that argument Mr. Sisti just made,

15  but not exactly on point.

16              His point is that, you know, as years go by, right,

17  without contact from the IRS about a failure to file, that's

18  almost a -- you know, like -- it's like an estoppel-type

19  argument, right, or laches or something, which really has no

20  application in criminal law.  But you know what I mean.

21              MR. KENNEDY:  Yeah.

22              THE COURT:  Okay.  I'm not really focused on that as

23  much.

24              MR. KENNEDY:  I can address --

25              THE COURT:  I think it's a great jury argument, but

```
 1    I'm not focused on it.  What I am focused on is this.
 2              Based on my experience doing -- presiding over cases
 3    and prosecuting cases for years before that, it does seem
 4    unusual -- it does seem unusual -- an evasion charge seems
 5    unusual without any sort of prior contact from the IRS.
 6              You know, generally these things, you know, there's
 7    usually a big question in the tax division over whether there's
 8    going to be a criminal or a civil charge and how it should be
 9    properly handled and it's just sort of a long, deliberative
10    process.  It's not something that usually appears out of
11    nowhere as a criminal charge.
12              You understand what I'm asking?
13              MR. KENNEDY:  I do.
14              THE COURT:  So this seems unique.  And I'm not sure
15    if it makes any difference, but I'm wondering about it.
16              MR. KENNEDY:  Yeah, I'm not sure it does make any
17    difference.  I mean, I can't speak to sort of stand-alone
18    tax --
19              THE COURT:  Yeah.
20              MR. KENNEDY:  -- investigations.  This was a case,
21    you know, that we heard testimony has been investigated for
22    several years for many aspects of it.  I think there was a lot
23    of evidence in this case and the fact that it's supported a
24    finding of a tax due and owing and a willful failure -- and a
25    willfulness to evade, I think, you know, makes this a little
```

1    different from just somebody who, you know, maybe hasn't filed.

2            I think, you know, with respect to not filing for

3    several years and whether there's any, you know, estoppel to

4    that --

5            THE COURT:  Yeah.

6            MR. KENNEDY:  -- the First Circuit here has cited

7    that as evidence of willfulness, repeated failure to file

8    that's referenced in the --

9            THE COURT:  Yeah.

10           MR. KENNEDY:  -- *Stierhoff* case of the

11   First Circuit.  It's one of the factors they look at, along

12   with employment of aliases and nominee entities.

13           You know, regularly conducting business in cash

14   where checks would suffice, earning substantial income during

15   years in which you don't report any of it, these are all what

16   the First Circuit has recognized as evidence of willfulness and

17   I think all of that has been at least presented here for a jury

18   to make that inference.

19           THE COURT:  It has.

20           MR. KENNEDY:  And then I suppose on top of it, your

21   Honor, we heard, you know, the evidence.  We saw the stop sign

22   with the stop paying taxes; we saw the video --

23           THE COURT:  Yup.

24           MR. KENNEDY:  -- where Mr. Freeman talked about the

25   ATMs are a way that you can have value and it can't be taxed

1    unless you tell them about it.

2            And then we saw the chat from the Telegram,

3    Mr. Freeman's statement only suckers pay tax on crypto.

4            So I think there's more than enough evidence to get

5    to a jury question on whether there's willfulness here.

6            THE COURT:  Yeah.

7            MR. SISTI:  It's just an interesting coincidence,

8    Judge, and we were just discussing this, that that those tax

9    evasion charges were not originally in the indictment.  It they

10   came as a superseding allegation after Mr. Freeman made it very

11   clear he was not going to be entering guilty pleas.  But I'll

12   move on.

13           THE COURT:  I get it.  There's a lot of evidence in

14   this case like that, though.  For example, there is circuit

15   authority that repeated failures to file can be evidence of

16   willfulness, but it's like a lot of evidence in this case.

17   One, including the sort of careful instructions to bitcoin

18   buyers about what to say and how to say it.  On one hand, that

19   can look like willfulness, it certainly can look like

20   willfulness, and a jury could find it as evidence of

21   willfulness.

22           On the other hand -- and I'm not saying this amounts

23   to reasonable doubt.  I'm just acknowledging that it exists.

24           You can also view the very same evidence -- one

25   could maybe, not sure if reasonably, but one could view it as a

1    careful attempt to either run -- run a business lawfully or at

2    least in a way that doesn't expose one to criminal prosecution;

3    or, on the other hand, to commit crimes in a way that makes it

4    more difficult to prove crimes.

5              It's unique evidence, this case.

6              All right.  Understood.  Any other counts you want

7    to move on?

8              MR. SISTI:  Yeah, the money transmission generally,

9    Judge --

10             THE COURT:  Yeah.

11             MR. SISTI:  -- there's really no evidence of

12   transmission.  I thought that we had somebody that was going to

13   be able to discuss blockchain and movement wallet, dynamics

14   within the realm of cryptocurrency, some basic understanding of

15   just what that is, if it is determined to be a currency in and

16   of itself and how it can move, if it moves, does it really

17   transfer, is this an item that appears and reappears through

18   algorithms and --

19             THE COURT:  Wait a minute.  Wait a minute.  I was

20   with you until --

21             MR. SISTI:  Right.

22             THE COURT:  -- does it really transfer.

23             MR. SISTI:  Does it transfer.

24             THE COURT:  I can understand the argument we're not

25   in the money transfer business.

```
1              MR. SISTI:  Right.

2              THE COURT:  What do you mean by does it transfer?

3              MR. SISTI:  Is there actually a transfer.  Bitcoin

4    is nothing but mathematics.  It's nothing but a bunch of

5    numbers and stuff.  Okay?

6              THE COURT:  Right.

7              MR. SISTI:  It actually -- my understanding, of

8    course, we didn't get anybody on the stand to explain it, is

9    that it actually disappears and reappears.  All right?  It's

10   not as though I'm handing you my bottle of water and then

11   you're taking it and giving it to somebody else.  It's a

12   disintegration of this and it's a reapplication through

13   mathematics.  All right?

14             THE COURT:  Ceases to exist until someone --

15             MR. SISTI:  Yes.  Basically, it's gone.  All right?

16   It has no worth unless and until it re -- it revitalizes itself

17   through a transaction.

18             But --

19             THE COURT:  We need David Hume to work this out for

20   us.

21             MR. SISTI:  Well, we needed somebody.

22             THE COURT:  Yeah.  Okay.

23             MR. SISTI:  Guess what?  You got 12 people over

24   there that are going to be saying the same thing.

25             So with regard to the transmission or transfer
```

1    evidence, it's devoid of being in the record.  Making believe

2    it goes from one so-called wallet in some kind of a form to

3    another wallet is -- is a myth.  And I hope that we're not

4    leaving this stuff up to the imagination of the jury because

5    that's a very essential and critical point, I think, that the

6    government has to prove beyond a reasonable doubt.  And they

7    have failed to do that in this case.

8              Second --

9              THE COURT:  A couple of witnesses just walked in.  I

10   don't think sequestration orders apply to this argument, do

11   you?  Can we have -- there's witness in the courtroom.  Anybody

12   have any objection to that?

13             MR. SISTI:  I don't know who's here.

14             THE COURT:  It looks like Ms. Spinella and --

15             MR. SISTI:  Oh, I don't care.  I take it that

16   they're discharged.

17             MS. MACDONALD:  Yeah, they've already testified.

18   That's fine.

19             THE COURT:  Go ahead.

20             MR. SISTI:  Thank you.

21             With regard to the aspect of the transmission or

22   transfer cases, the money transmitter cases, I have to say,

23   one, the argument is that, one, they're not in that business

24   and that we believe that takes them outside of the definition

25   and that the very foundation of this particular charge has to

1    do with a business.

2         They don't claim to be a business and there's been

3    no evidence to the contrary with regard to what -- just what

4    that business is other than the last witness that took the

5    stand and said that it was for church donations and

6    church-related activities and the mission of the church.

7         So I think we've got a problem there.  But, you

8    know, more interestingly, the transfer or transmission itself

9    is in question.  I --

10        THE COURT:  Okay.

11        MR. SISTI:  I mean, I -- I had expected, and I think

12   the Court expected, that we would hear something a little bit

13   more than guesswork that went on during the course of this

14   trial, that you would have somebody on the stand that would be

15   able to testify to just what that means in the context of this

16   particular item, bitcoin, and we didn't hear it.

17        Somebody could take the stand and explain how a

18   dollar goes through a bank to another bank and another bank.

19   That -- that can be explained.  But we didn't hear anything

20   about this bitcoin business.  Nothing.  And it's -- they're all

21   sitting over here worrying about what a wallet is, for God's

22   sake.

23        THE COURT:  Huh.

24        MR. SISTI:  You know, that hasn't even been defined.

25        So, you know, we're at the end of this case, they've

74

1   rested, but there's a lot of flesh that has to go on the

2   skeleton, yet, you know.  I mean, it's -- it's -- if we're just

3   going to leave it to the imagination of the jury, I think

4   that's pretty dangerous and that's why I'm making this motion

5   on --

6           THE COURT:  And the argument boils down to -- and I

7   don't mean to oversimplify, I just need to clarify.

8           You're basically saying that if they're going to --

9   to prove that it's a money transmitting business --

10          MR. SISTI:  Uh-huh.

11          THE COURT:  -- they must prove that money was

12  transmitted.

13          MR. SISTI:  Yes.

14          THE COURT:  And -- and you're saying that's the

15  deficit there, right?

16          MR. SISTI:  Yes.

17          THE COURT:  They haven't proven that.

18          MR. SISTI:  Yes.

19          THE COURT:  All right.

20          MR. SISTI:  The other charge, the other money

21  laundering aspect, I think we've covered enough in the argument

22  with regard to the agent, but it generally carries the same

23  basic argument and that is that this is an individual trying

24  over the top not to be involved in money laundering.  In fact,

25  he's taking a counterstep to money laundering and maybe that

1     will be more fruitful at the end of our testimony and when we

2     put on our witnesses, but --

3                    THE COURT:  Okay.

4                    MR. SISTI:  -- when there's scam detection, he

5     actually works and aids in trying to find out what's going on.

6     So ...

7                    THE COURT:  Got it.

8                    MR. SISTI:  Okay.

9                    MS. MACDONALD:  I guess it's my turn, Judge.

10                   With respect to the money transmission, we did hear

11    that testimony.  The first witness, Ali Comolli, testified

12    about how bitcoin works, how the transactions are recorded on

13    the blockchain, how they're verified by computers all over the

14    world.  She testified about that.  She testified about what

15    wallets were and how they worked.

16                   The FinCEN witness testified that FinCEN

17    specifically has determined that transmission of cryptocurrency

18    is money transmission --

19                   THE COURT:  Yup.

20                   MS. MACDONALD:  -- and that also is evidence that

21    the sending of bitcoin from one wallet to another qualifies as

22    money transmission.  And we heard lots of evidence that those

23    transactions happened in this case.

24                   You know, the defendant's own words in an email

25    he -- to a bank, somebody who worked for a bank.  We have clear

1   evidence of a sale of a digital product and that product was

2   delivered to the buyer.  We have the receipts from the

3   undercover showing that he received the bitcoin in his wallet

4   after paying Mr. Freeman.

5            So I think there's plenty of evidence that the

6   transmissions occurred.  The fact that -- the argument that

7   this was --

8            THE COURT:  What was the thing you just said about

9   we have a receipt -- because we definitely got evidence about

10  wallets and how bitcoin works.  We did.  But what we didn't

11  get, which I was expecting to get after our hearing on the

12  witness that was never called, what evidence do we have tying

13  Freeman's bitcoin wallet to any evidence in this case?

14           MS. MACDONALD:  We have evidence that people gave

15  him money and received bitcoin.  So I don't think we needed to

16  show on the blockchain that it was coming from his wallet.  I

17  think that that was --

18           THE COURT:  You don't?

19           MS. MACDONALD:  I think that it was clearly shown

20  that various people were giving him money and getting bitcoin

21  in return.

22           THE COURT:  Yeah.

23           MS. MACDONALD:  That's how, you know, you -- you

24  know, and that he -- yeah, that he was buying millions of

25  dollars in exchanges.

1           So he was -- we had evidence that he had exchange

2   accounts, that he had bank accounts that were sending money to

3   various exchanges, frequently large amounts of money, and that

4   he was --

5           THE COURT:  But remember at the hearing you said --

6   because we had an argument about whether your witness should be

7   allowed to say that is Ian Freeman's bitcoin wallet.  You said,

8   we're not going to do that.  We're just going to give the

9   jury -- we're going to give the jury -- I think it was, what do

10  they call it, you know, the wallet number, the --

11          MS. MACDONALD:  The address.

12          THE COURT:  Yeah, okay.  But you said they're going

13  to have information that they can tie to Ian Freeman's bitcoin

14  wallet without being told by a person it's Ian Freeman's

15  bitcoin wallet because the defense objected to that based on

16  that witness.  You said we don't need to do that, we're not

17  going to do it.  But you said the jury will be able to connect

18  his wallet to the evidence in this case.  I don't see that.  I

19  didn't see that in this case.

20          MS. MACDONALD:  So, I mean, frankly, your Honor, the

21  reason that we thought that her testimony would be helpful was

22  that it did connect all the businesses.

23          THE COURT:  Yeah.

24          MS. MACDONALD:  Right?  And so it connected -- it

25  showed that various exchange accounts in Mr. Freeman's name and

1    in the coconspirators' names were all depositing into this

2    wallet and that the wallet was then going to fund ATMs and the

3    undercover purchases.

4              That turned out not to be really in dispute and so

5    that's why we made the decision not to -- not to call her.  So,

6    you know, we've had plenty of evidence --

7              THE COURT:  What do you mean not in dispute?

8    Everything is in dispute.

9              MS. MACDONALD:  Our thought was that we had proven

10   that in other ways.

11             THE COURT:  Okay.

12             MS. MACDONALD:  That Mr. Freeman had control over

13   all the ATMs through his text messages.  You know --

14             THE COURT:  I get it.

15             MS. MACDONALD:  -- we knew he was controlling them,

16   through his conversations with the undercover.  That was sort

17   of the feeling, that we didn't need that extra testimony to

18   show that he was controlling all aspects of this business.  You

19   could clearly see from his bank account records that the bank

20   accounts in his name were funding the exchanges.  We have the

21   applications for the exchange accounts that came in with the

22   witness from itBit.

23             And so the feeling was that there -- we had proven

24   that in various other ways and it wasn't necessary to kind of

25   do that on the blockchain.

1          THE COURT:  Okay.  Truth is I was very focused on

2    that because of the pretrial hearing, so I was sort of looking

3    for it.  But I -- I'm not sure you needed to prove it, to be

4    honest.  You know, what needed to be proved, what the burden

5    is, is that Ian Freeman, right, had to own, control, et cetera,

6    et cetera, the money transmitting business.  And we do -- I

7    think we do have evidence that this business engaged in bitcoin

8    transmissions.  That seems to be proven.

9          I think I was looking for that only because the way

10   we left it at that hearing and you're basically telling me you

11   made a decision that -- not to do that.

12         MS. MACDONALD:  Correct.

13         THE COURT:  Which doesn't necessarily -- I'm not

14   saying that's fatal.  I'm just trying to understand.

15         MS. MACDONALD:  Uh-huh.

16         THE COURT:  Okay.  I interrupted you.  Sorry.

17         MS. MACDONALD:  I was also going to talk about the

18   claim that this was not a business.

19             There was evidence --

20         THE COURT:  Yeah.

21         MS. MACDONALD:  -- about his rates and about the

22   profits he was making and the fact that he had Ms. Spinella

23   working for him.  His contracts are employment contracts.

24   There was substantial evidence that he was operating this as a

25   business and making substantial profits.

1          THE COURT:  Yup.  All right.  Thank you.

2          You're getting up, Mr. Sisti.  Go ahead.

3          MR. SISTI:  Yeah, because of that last exchange with

4   regard to transmission again.

5          What they proved was that there were -- I'm going to

6   get this straight -- transactions, not transmission.  And --

7   and that therein lies the problem.  Okay?  Therein lies the

8   problem.  And, yes, you do have --

9          THE COURT:  Why isn't that just semantics,

10  transactions not transmission?

11         MR. SISTI:  Well, you know, because the -- it's the

12  actual transmission that -- that is the question.

13         THE COURT:  Because of your idea that bitcoin

14  doesn't exist as a thing; it's more of a --

15         MR. SISTI:  I mean --

16         THE COURT:  It's more of a -- I don't know, a way of

17  understanding and accessing money at different points, but it's

18  not physically moving is your point.

19         MR. SISTI:  It certainly isn't physically moving.

20  We know that.

21         THE COURT:  Yeah.

22         MR. SISTI:  But -- but we don't know what it does

23  because nobody testified to it.  All they saw was somebody

24  bought X for Y.  That's -- that's a transaction.  That's not a

25  transmission.

1          THE COURT:  Okay.  All right.  You don't have to sit

2    down.  If there's something else you want to say, you can --

3          MR. SISTI:  No, that's fine.

4          THE COURT:  All right.  That -- that motion under

5    Rule 29 is under advisement.  I'm not going to take the case

6    away from the jury yet or at all maybe.  I'm still thinking

7    about it.  There's some good arguments that have been made

8    here, but the government's had responses to them and I've got

9    to think about it.

10         So if you're going to put on a defense, we're going

11   to allow you to proceed tomorrow morning at 9:00.

12         I'll circulate the latest draft, which isn't much of

13   a change from the jury instructions, but we've made the changes

14   we discussed together at our charge -- at our charge conference

15   earlier.

16         Anything else anybody wants to say?

17         MR. SISTI:  Nothing.  Thank you, Judge.

18         MS. MACDONALD:  No, your Honor.  Thank you.

19         THE COURT:  All right.  I appreciate your patience

20   with all this during sort of a difficult, unusual procedural

21   posture with the COVID-infected witnesses and counsel.

22         I will see you tomorrow morning at 9:00.

23         THE CLERK:  All rise.

24         THE COURT:  Let's make sure, Mr. Sisti, those

25   witnesses get here early for testing.

1               MR. SISTI:  We're going to try to get them here at

2     8:15 --

3               THE COURT:  Good.

4               MR. SISTI:  -- as quick as we can get them here.

5               THE COURT:  See you tomorrow.

6               At our charge conference -- just -- just remember

7     where we left it.  I just wanted to remind you, you were going

8     to send me some tax evasion factors you wanted me to instruct

9     the jury about.

10              MR. SISTI:  Yeah, I will get those to you.

11              THE COURT:  Okay.  Just a reminder.

12              (Proceedings adjourned at 11:42 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 3/10/23            /s/  Liza W. Dubois
                             LIZA W. DUBOIS, RMR, CRR