*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 8, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:21-cr-41-JL
              v.                    *   November 15, 2022
                                    *   10:16 a.m.
IAN FREEMAN                         *
                                    *
* * * * * * * * * * * * * * * * * * *


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Government:          Georgiana L. MacDonald, AUSA
                             Seth R. Aframe, AUSA
                             John J. Kennedy, AUSA
                             United States Attorney's Office


For the Defendant:           Mark L. Sisti, Esq.
                             Sisti Law Offices


Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603) 225-1442

```
                          I N D E X
```

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Erin Montgomery | | | | |
| By Ms. MacDonald | 15 | | 37 | |
| By Mr. Sisti | | 25 | | 42 |

| EXHIBITS: | FOR ID | IN EVD. |
|---|---|---|
| (None marked.) | | |

1                    P R O C E E D I N G S

2            THE CLERK:  Court is now in session and has before

3    it for consideration evidentiary hearing in 21-cr-41-01-JL,

4    United States vs. Ian Freeman.

5            THE COURT:  All right.  We've got a few motions on

6    for today, but I assume since one of them has a witness, that's

7    the one you want to do first to allow the witness to get on

8    with whatever -- whatever she's doing.  So I think we should

9    probably do the expert issue first.  Does that make sense?

10            MS. MACDONALD:  Sure.

11            THE COURT:  All right.  How do you want to proceed?

12   Do you want to just call the witness or do you want to make any

13   sort of argument in advance?

14            MS. MACDONALD:  Whatever's helpful for the Court.

15   I'm happy to sort of give a summary of what I see that issue to

16   be before I call her, if that would be helpful.

17            THE COURT:  It might be worthwhile because there's a

18   little bit of dissonance into what the actual argument is.

19            MS. MACDONALD:  Yes.

20            THE COURT:  In some sense I read your objection

21   as objecting to more -- in an effort to be complete,

22   comprehensive -- than what the defense is seeking to exclude.

23   So it would probably help me a little bit.

24            Let me try this, Mr. Sisti.  It may or may not help,

25   but in terms -- in terms of what -- let me just get on the

```
1    microphone so the record can pick up what I'm saying.
2              There's some times I think your motion is primarily
3    directed at the software involved here; sometimes I think it's
4    more directed at the qualifications of the expert.  Is it all
5    of the above?  If you had to tell me exactly what --
6    laser-focused what you're seeking to exclude or if it's the
7    entire testimony, what about it doesn't meet the standard of,
8    you know, the 700 rules, Daubert.
9              MR. SISTI:  Right.
10             THE COURT:  What would you say -- how would you
11   summarize it for me?
12             MR. SISTI:  Well, the first thing I would say is if
13   the witness is in the courtroom, if she could be excused.
14             THE COURT:  That's absolutely.
15             MR. SISTI:  Thank you.
16             THE COURT:  Please excuse yourself.
17             For the record, the witness has been excused from
18   the courtroom.
19             Okay.  Thank you.
20             MR. SISTI:  Thank you, Judge.
21             THE COURT:  Yup.
22             MR. SISTI:  I think it's pretty much all of those
23   things, although you should know that we did have the
24   opportunity to do a prehearing interview, I think it was last
25   month.  It's not recorded or anything, but the government was
```

```
 1    kind enough to allow me access to the witness.

 2              THE COURT:  All right.

 3              MR. SISTI:  And you will find out during the course

 4    of this hearing that she's never been qualified in any court in

 5    the world as an expert witness with regard to this matter.

 6              So you should start with that as one of the building

 7    blocks of what our argument is.

 8              THE COURT:  So her qualifications.

 9              MR. SISTI:  Qualifications.

10              Is it a scientific process, I think you should

11    concentrate on that as well.  I mean, what is the -- what are

12    the principles, what's the -- what's the process, and can it be

13    duplicated, is there peer review, is there certification, that

14    type of a -- an approach.

15              With regard to the software, it seems that the

16    software's becoming less and less of a -- you can correct me if

17    you would --

18              THE COURT:  Less and less of a component of their

19    presentation; is that true?

20              MS. MACDONALD:  It's not a component of the

21    presentation.

22              MR. SISTI:  Right.

23              THE COURT:  Oh, okay.  It certainly has been --

24    okay.

25              MR. SISTI:  There we go.  That makes it pretty easy.
```

```
1              THE COURT:  Yup.
2              MR. SISTI:  All right?  So I would say that I think
3   we have to deal with whether or not we are applying principles
4   and methods in this case that are basically reviewable, that
5   are accepted in the community, are there even -- is this even a
6   community of experts.  I mean, what are we really dabbling in
7   here?
8              THE COURT:  Okay.
9              MR. SISTI:  She's been --
10             THE COURT:  So when you're talking about
11  principles --
12             MR. SISTI:  Uh-huh.
13             THE COURT:  -- we're not talking about principles
14  related to the software.  We're talking about principles
15  related to blockchain analysis --
16             MR. SISTI:  Yes.
17             THE COURT:  -- itself.
18             MR. SISTI:  Yes.
19             THE COURT:  Okay.
20             MR. SISTI:  And the exhibits that you'll be seeing
21  seem to be concentrated on that as well.
22             THE COURT:  Is the cospend -- is the -- is the
23  cospend heuristic front and center for you still or not?
24             MR. SISTI:  I don't know if it's front and center,
25  but it's still there.
```

1           THE COURT:  Okay.

2           Go ahead.

3           MS. MACDONALD:  So if I may, your Honor.

4           THE COURT:  Thank you, Counsel.

5           MS. MACDONALD:  I guess what I am not clear on is if

6    not the cospend heuristic, what is the objection.  Because, of

7    course, taking her qualifications as a separate issue -- I

8    understand that's kind of a separate issue we can talk about.

9           THE COURT:  Yeah.

10          MS. MACDONALD:  But with respect to the methods

11   used, everything is publicly available on the blockchain.

12   Really, the -- you know, I'm struggling in sort of even, you

13   know, describing this as expert testimony because it really is

14   more sort of like a bank analysis following-the-money type of

15   testimony.

16          I don't think we're -- we are -- that the defense is

17   challenging that bitcoin transactions are viewed on a public

18   blockchain, anyone can look at them, they are, you know -- they

19   are what they are.  They always will be the same.

20          The sort of one kind of -- it seems to me that the

21   one sort of narrow thing that she's going to talk about that is

22   based on her specialized knowledge, arguably, is cospend; is I

23   analyzed the blockchain --

24          THE COURT:  Uh-huh.

25          MS. MACDONALD:  -- to come to the conclusion that

1   360 addresses were all controlled by what she called the

2   holding wallet.

3           So I -- I think that the -- my understanding is

4   that that's really the -- kind of the only basis for what we're

5   challenging about Ms. Montgomery's testimony.  We're not

6   relying on chain analysis or any of the proprietary tools.  We

7   are only relying on her use of essentially what's like a Google

8   for the blockchain, a public website that allows you to sort of

9   search the blockchain, and her own analysis connecting those

10  360 wallets into the holding wallet.

11          Her opinion is these addresses are controlled by the

12  same person or entity, based on cospend analysis.

13          THE COURT:  Yup.

14          MS. MACDONALD:  So I'm -- my -- I think, based on my

15  understanding, that's -- that's the thing that's at issue and

16  I'm not clear exactly why Mr. Sisti says that's not kind of

17  central to his objection.  I'm not sure what else he's

18  objecting to.

19          THE COURT:  Well, the -- I thought she was -- was

20  she deposed or just questioned?

21          MR. SISTI:  Just questioned.

22          THE COURT:  Okay.  Wasn't your focus, though, on her

23  qualifications mostly during that questioning, less on the --

24          MR. SISTI:  It was mostly -- this is why this is

25  interesting.

```
 1                 THE COURT:  Yup.
 2                 MR. SISTI:  It's not so much the cospending, it's
 3      the aura of being an expert testifying to that.
 4                 THE COURT:  Okay.
 5                 MR. SISTI:  And we just heard that this is publicly
 6      available, that anybody can take a look at this sort of stuff.
 7                 Now, if she testifies in front of a jury as an
 8      expert, that's one -- that's one problem.  My -- my problem
 9      isn't with somebody going up there, saying, this is what I did,
10      these are my results.
11                 THE COURT:  Okay.
12                 MR. SISTI:  But as an expert, giving an expert
13      opinion on that, all right, with publicly available material,
14      I think causes a problem.  It gives her an aura of more
15      credibility, an aura of more authority.
16                 If she testifies and is not qualified as an expert,
17      and she hasn't been, then I have less of a problem and I may
18      even actually withdraw the request.
19                 THE COURT:  Yeah.  If it helps anybody --
20                 MR. SISTI:  Right.
21                 THE COURT:  -- because, you know, you want to seize
22      on that and say, fine with us, Judge, I'm talking to the
23      prosecutor.  But that doesn't solve it altogether because I --
24      you know, you just mentioned it a little bit and you mention it
25      in your papers.  We're not sure this is even expert testimony.
```

1     I don't know.  I -- I mean, when a forensic accountant

2     testifies in a jury trial, they generally are qualified as an

3     expert, if you want to call it that, or qualified to give an

4     opinion.

5           I don't plan on labeling -- I'm going to ask the

6     prosecution not to offer her as an expert.  Offer -- just to

7     simply call the witness.  And based on what I've read, I

8     probably -- and it's subject to these arguments today -- but

9     I'd probably be --  I would probably be inclined to allow her

10    to testify in the form of an opinion.

11          I wouldn't label them expert opinions.  I would ask

12    the prosecution not to do it.  I'm not going to say it.  But

13    I'm going to allow her to offer opinions and for her to

14    cross-examine her, as of now.  You may undermine that today

15    based on your cross.  I don't know.

16          But that's -- but, like, the aura, that won't come

17    from the Court.  I can tell you that.  And I would ask that,

18    since the Court's not going to use that term, it's not my habit

19    to use it, but if -- if you either offered her to offer an

20    opinion or you objected to her offering an opinion, I would

21    probably at this point say she may testify in the form of an

22    opinion under Rule 702.  I don't think that affords her any

23    sort of aura at all.  I don't think there's any -- any danger

24    or prejudice.

25          So be aware of that.  The word expert is not going

1    to be coming out of the Court's mouth and I'd like it not to

2    come out of the prosecution's mouth, if you can live with that.

3    That kind of -- I think that goes a long way toward addressing

4    the aura problem, because I think the aura problem -- maybe

5    especially in this case --

6            MR. SISTI:  Uh-huh.

7            THE COURT:  -- but in every case, it's probably not

8    that helpful.  It just affords too much -- it affords too much

9    credibility.

10           MR. SISTI:  Correct.

11           THE COURT:  The jury should figure out the

12   credibility based on the content of the testimony and the

13   qualifications but -- so that's that.

14           Okay.  So -- so, Mr. Sisti, you're actually -- your

15   clarifications today have helped me a little bit understand

16   your motion because I took from your papers basically exactly

17   what you said today.  It's less the cospend heuristic and other

18   principles.  It's this idea that someone has expertise in it

19   that elevates them beyond the average.

20           MR. SISTI:  Correct.

21           THE COURT:  I think that's highly -- highly

22   achievable in the courtroom and I actually agree with you.

23           Okay.  Now, that said, it doesn't mean you don't

24   want to present the witness today or do whatever you want to

25   do.

1          Let me ask this question.  Does knowing that

2  alleviate your problem or is there more you'd like to explore?

3          MR. SISTI:  Well, again, if -- if we're at that

4  particular -- if we are now in that position, the only real

5  issue would be qualifications and certification and so forth.

6  But that can be addressed today or could be addressed --

7          THE COURT:  Let's do it today.

8          MR. SISTI:  -- in voir dire.

9          THE COURT:  I mean, we're here.

10         MR. SISTI:  Yeah.

11         THE COURT:  The witness is here.  And I guess let me

12  just pull out the rule.  The rule is I think 702, right?

13         MR. SISTI:  Correct.

14         THE COURT:  I know the rule, but I may as well quote

15  it as written.  We all know the rule.  It's knowledge --

16  knowledge, experience, skill, training, and experience.

17         Okay.  Rule 702, this is the standard the Court will

18  apply today.

19         A witness who is qualified as an expert -- I won't

20  be using the word expert -- who is qualified by knowledge,

21  skill, experience, training, or education may testify in the --

22  in the form of an opinion or otherwise if, and there are four

23  listed criteria, A, B, C, and D.

24         A, that that expertise will help the trier of fact;

25  B, that the testimony is based on sufficient facts or data; C,

1    the testimony is the product of reliable principles; and, D,

2    the expert has reliably applied the principles and methods.

3           So that's the -- that's -- the question is

4    whether -- it sounds like we're focusing mostly on Rule

5    702(a) -- whether that expert's qualifications in the form of

6    knowledge, skill, experience, training, or education renders

7    her -- renders her qualified to offer an opinion under 702.

8    And you can explore that today on direct and on cross.  I'm

9    prepared to do that if you are.

10          MS. MACDONALD:  Just to clarify then, your Honor.

11   Should I focus my questioning just on her qualifications

12   instead of going through what her trial testimony would be and

13   the work that she did to do the cospend analysis?  If that's

14   not --

15          THE COURT:  It sounds to me, and I really do want

16   defense counsel to correct me if I'm wrong because I don't want

17   to short-shrift this, if it sounds like we're going to focus on

18   qualifications, it should be what the prosecutor just stated to

19   the exclusion of other issues, really.

20          MR. SISTI:  If I could just have one second.

21          THE COURT:  Take your time.

22          MR. SISTI:  I agree, Judge.

23          THE COURT:  Okay.  So law of the case, the Court's

24   perspective on this now, is that this challenge is not to the

25   principles, for example, the -- you know, the cospend heuristic

1  and similar principles of blockchain and bitcoin analysis are

2  not the issue.  The issue is the witness's qualifications to

3  offer this opinion testimony.  That's what we'll focus on

4  today.

5           All right.  I appreciate everybody's work on that

6  because it helps narrow the issues and now we can focus on

7  what's really in dispute.

8           Let's proceed.

9           MS. MACDONALD:  The government calls Erin

10 Montgomery.

11          THE COURT:  She's being retrieved.  She's outside

12 the courtroom.

13          MS. MACDONALD:  Your Honor, would you mind if I just

14 fill Ms. Montgomery in on the change of plans before we begin?

15          THE COURT:  Sure.  If that's okay with you.

16          MR. SISTI:  Certainly.

17          THE CLERK:  Please remain standing and raise your

18 right hand.

19          **ERIN MONTGOMERY**, having been first duly sworn,

20 testified as follows:

21          THE CLERK:  Please be seated.  There is a water for

22 you as well.

23          Could you please state your name and spell your last

24 name.

25          THE WITNESS:  Erin Montgomery, M-o-n-t-g-o-m-e-r-y.

DIRECT EXAMINATION

1

2 BY MS. MACDONALD:

3      Q.   Good morning, Ms. Montgomery.

4           Just to fill you in, while you were out of the

5 courtroom, the parties narrowed the issue in dispute and so

6 instead of going over your cospend and clustering work, we're

7 just going to talk about your qualifications this morning.

8      A.   All right.

9      Q.   Okay.  Could you begin by telling the Court where

10 you're employed.

11      A.   I'm employed at the FBI, Federal Bureau of

12 Investigations.

13      Q.   And what is your position with the FBI?

14      A.   I'm a supervisory intelligence analyst.

15      Q.   And do you work in a specific unit?

16      A.   Yes, I'm in the Threat Finance and Economic Crimes

17 Intelligence Unit which sits embedded in the Virtual Assets

18 Unit.

19      Q.   And just -- we'll get into more detail about what

20 you do in the Virtual Assets Unit, but could you briefly

21 describe what the unit in general does?

22      A.   Yeah.  So the Virtual Assets Unit is a headquarters

23 component out of our Criminal Investigative Division that

24 provides expert support to our field offices for virtual

25 asset-related investigations.

1      So that includes explaining the technology, offering

2   tactical and strategic support, and also seizure support.

3      Q.   Okay.  And when you say virtual assets, what do you

4   mean?

5      A.   Yeah.  So we use that as an umbrella term because it

6   encompasses a couple different buckets of technology primarily

7   that includes cryptocurrency, so decentralized virtual assets.

8      Q.   Okay.  So the Virtual Assets Unit, is it fair to

9   say, is the FBI's unit that specializes in cryptocurrency?

10      A.   Yes.

11      Q.   Okay.  Let's talk a little bit about how you got

12   here.  Tell us about your education, please.

13      A.   Yeah.  So I have a bachelor's degree from Texas A&M

14   University in liberal arts history with a minor in English

15   literature and then I joined the FBI right out of college.

16      Q.   Okay.  And for how many years have you worked for

17   the FBI?

18      A.   So in May it'll be 15 years.

19      Q.   15 years.  Okay.  And tell me about your assignment

20   when you first began at the FBI.

21      A.   Yeah.  So I was initially placed as a -- I was hired

22   as an intelligence analyst and placed in our headquarter's

23   cyber division.  So first I went to an 11-week analyst

24   instructor training class at Quantico to learn how to be an FBI

25   intelligence analyst and then was placed in the FBI cyber

1   division.

2      Q.   Okay.  And tell me about your role in FBI cyber.

3   How did that lead you to get involved in cryptocurrency issues?

4      A.   Yeah.  So I was put in an analytical unit focused on

5   financially motivated cybercrime.  So our team was doing

6   strategic work, looking at our cases across field offices, to

7   understand how financially motivated cybercriminals were

8   operating in what we call the underground economy, so where

9   they were buying and selling illegal goods and services and

10   ultimately how they were paying for those.

11          So that was when I first started working on what we

12   would call centralized virtual assets which was -- these were

13   companies that created a way to pay for things online, so like

14   anonymously you'd just register an account with your email

15   address and so you could obtain a virtual currency and then pay

16   for stolen credit cards, for instance.  So that's when I first

17   encountered the idea how you might want to anonymously pay for

18   things online.  And then around 2010, bitcoin came into my

19   realm through that work.

20      Q.   Okay.  And just for context, when was bitcoin

21   introduced to the world?

22      A.   So in a whitepaper in 2008, and then it was launched

23   in 2009.

24      Q.   Okay.  And so by 2010, you were working on bitcoin

25   related issues?

1      A.    Yes.

2      Q.    Okay.  And tell us about how you educated yourself

3  about bitcoin at that time.

4      A.    Yeah.  At that time it was new enough that there

5  were minimal books or things.  I spent a lot of time in the

6  same places that everyone was learning.  So online forums,

7  websites, experimenting with the software itself.

8            After a couple years, books started being written by

9  folks, so I read anything I could get my hands on.  And then

10  also just while encountering it in an investigation, you had

11  to -- you had to figure it out.

12      Q.    Okay.  Now, around 2010 were there other people at

13  the FBI looking at this?

14      A.    So we had some folks on my team -- as we started to

15  do our first big push project to understand it into 2011, there

16  were a couple people I was working with, but I was the primary

17  individual in cyber division and then I partnered with another

18  analyst in at that time our criminal investigative division.

19  But we were the two people at headquarters who were taking

20  ownership of it.

21      Q.    Okay.  So beginning in 2010 when you and another

22  analyst were sort of the two people at FBI looking at bitcoin,

23  did you sort of continue on that career path over the past

24  12 years?

25      A.    Yeah.  Yeah.  So it became my primary -- while I was

1    an analyst in cyber division, my primary program as I continued

2    to work the cyber underground, it was around payments and so

3    becoming someone who could answer people's questions around how

4    criminals were exploiting this technology.

5            And then in 2016 I transferred to the criminal

6    investigative division where it became my full-time focus,

7    looking at it from a money laundering perspective.

8        Q.    And at some point did the FBI set up a unit focused

9    specifically on virtual currency or virtual assets?

10       A.    Yeah.  So the team I was a part of in CID or the

11   Criminal Investigative Division, had ownership over the virtual

12   currency program in -- as a part of a broader money laundering

13   unit.  And within that team we built out a strategy and a push

14   to get a dedicated unit created so that we would have the

15   resources we needed to better equip the field.  So that's where

16   the Virtual Assets Unit was built out of is the work we did in

17   CID so that it is now a stand-alone, dedicated unit.

18       Q.    Okay.  And so you were part of developing that unit

19   for the FBI?

20       A.    Correct.

21       Q.    And I assume you joined that unit once it was

22   created?

23       A.    Yes.

24       Q.    Okay.  Tell me about -- I guess through your

25   experience at the FBI, have you supported investigations

1  involving virtual currency?

2       A.    Yeah.

3            THE COURT:  I'll ask both of you to just slow down a

4  little bit for the court reporter.

5            MS. MACDONALD:  I apologize, your Honor.

6            THE WITNESS:  Yes.

7            Yes.  So beginning -- rewinding back to my days in

8  the cyber division, early on it would have been consultations,

9  right, questions from our field offices, I've encountered

10 something that I don't understand, I don't know what it is, so

11 starting by explaining what it was that they were looking at

12 and helping to outline what opportunities they had to use that

13 to move a case forward.

14           So -- and then from there as the specialty of

15 actually doing what we call blockchain analysis or tracing, you

16 can think of it as following the money in a cryptocurrency

17 transaction, I started getting a lot of hands-on experience in

18 doing that for specific cases.  Not everyone had the tools that

19 you would need to do that in a robust way and so there was a

20 limited number of us.

21           And so from that point sometimes I would plug in and

22 be a key component of the investigation itself through

23 following the money for the case and sometimes it would be a

24 large part of that case and sometimes it would be more of a

25 consultation and helping them understand what their options

1    were or doing an initial triage, I would say, of what the --

2    the transactions were telling them.

3        Q.    Okay.  And, now, back in 2010, I assume there

4    weren't a lot of people doing blockchain tracing.

5        A.    Correct.

6        Q.    How did you educate yourself about it?

7        A.    It was -- it was practice, it was encountering

8    bitcoin addresses in a case or having an agent reach out to me,

9    and it was testing out using open source blockchain explorers

10   to see what was possible, what that data could tell us.

11             And then by 2015 or so, the FBI had acquired a

12   limited number of commercial tracing licenses so then it was

13   applying that knowledge I had learned to how various commercial

14   tools let you interact with that open source blockchain data.

15       Q.    And have you received training on those commercial

16   tools?

17       A.    Yes, I have.

18       Q.    Can you tell us a bit about the trainings and

19   certifications with respect to use of those?

20       A.    Yeah.  So the primary tool I've used is called

21   Chainalysis Reactor.  I've got two certifications in terms of

22   how to understand and use the tool, the Chainalysis Reactor

23   certification, and then an Investigative Reactor Specialist

24   certification around making sure you can use the tool in a

25   useful way.

1        Q.    Okay.  And backing up a little bit, we were talking

2   about what role you would take in investigations.  And am I

3   correct in saying that you often would trace money, trace --

4        A.    Correct.

5        Q.    -- trace -- do blockchain analytics in

6   investigations?

7        A.    Yes.

8        Q.    Could you estimate how many investigations you have

9   done blockchain analytics in?

10       A.    Yeah.  I'd say at this point it's in the hundreds,

11  at least doing some sort of tracing for those cases.

12       Q.    Okay.  And have -- has your blockchain analysis been

13  used to form the basis of search warrants?

14       A.    Yes.

15       Q.    And to form the basis of prosecutions?

16       A.    Yes.

17       Q.    Okay.  And let's talk a little bit about the --

18  you've testified that you're a supervisor of a unit now.  Can

19  you tell us about that unit?

20       A.    Yeah.  So as the Virtual Assets Unit was created --

21  the intelligence analysts are managed under a different

22  structure within the FBI and so I sit in a specific

23  intelligence unit where I've got a subteam of analysts and --

24  strategic analysts and a tactical analyst.

25              So we are under different management structure, but

1    we sit embedded with that broader Virtual Assets Unit where we

2    are conducting strategic analysis across our cases to

3    understand trends, the evolution of technology and how it might

4    be exploited, as well as offering -- so I'm training them up to

5    be able to do the same sort of things I was able to do.  So

6    that was a key piece, as we built the Virtual Assets Unit, to

7    equip more and more of our people to be able to do what I did.

8         Q.   And let's talk a little bit more about that

9    training.  Does the FBI now have a formal training program?

10        A.   Yes, we do.

11        Q.   And tell us about who developed that and how it was

12   developed.

13        A.   Yeah.  So I was one of the core team members who

14   built out our curriculum.

15             So over the years of supporting these cases, you

16   start to understand what types of questions people have when

17   they first encounter the technology.  So we started there to

18   say what's a baseline core curriculum that people would need to

19   know to be able to recognize this technology in their cases,

20   what is the skills they would need to conduct blockchain

21   analysis or follow the money, what are the skills they would

22   need to conduct seizure and forfeiture of virtual assets.

23             So I was a key part of building the curriculum and

24   then writing the curriculum itself.

25        Q.   Okay.  And can you estimate -- have you provided

1    that training to people?

2         A.    Yes.

3         Q.    Can you estimate how many people you have trained on

4    blockchain analytics?

5         A.    It would be in the thousands at this point.

6         Q.    Okay.  And what types of people are you training?

7         A.    Yeah.  So we are training all job roles,

8    realistically.  So that would include special agents, forensic

9    accountants, computer scientists.  Our intelligence analysts

10   and job role tactical specialists would be the primary

11   recipients of that training.

12        Q.    Okay.  And just backing up to talk about your unit,

13   how many people do you supervise in your unit?

14        A.    So right now I have four active employees.  We have

15   a couple open slots.

16        Q.    Okay.  And so you're the supervisor, a direct

17   supervisor, of the FBI's unit focused on blockchain analysis?

18        A.    Correct.

19              MS. MACDONALD:  Okay.  No further questions.  Thank

20   you.

21              MR. SISTI:  Thank you.

22              THE COURT:  The four employees under you, I mean,

23   how many of them are -- how many of them are special agents?

24              THE WITNESS:  None.  They're all intelligence

25   analysts or tactical specialists.

1              THE COURT:  Are any of them just pure clerical, like

2    a --

3              THE WITNESS:  (Shakes head.)

4              THE COURT:  Okay.  Go ahead.

5              MR. SISTI:  Thank you, Judge.

6                       CROSS-EXAMINATION

7    BY MR. SISTI:

8        Q.   Good morning.

9        A.   Good morning.

10       Q.   Believe it or not, we spoke before, but it was

11   during that interview a month ago or so.

12              Just a few questions for clarification.  We have

13   narrowed the issue here a little bit, but I want to go back on

14   your qualifications.

15              You graduated in what year?

16       A.   December of 2007.

17       Q.   And that was from where?

18       A.   Texas A&M.

19       Q.   So at A&M there wasn't a course on this sort of

20   stuff, right?

21       A.   Correct.

22       Q.   So your college education really isn't a basis for

23   your expertise?

24       A.   Agreed.

25       Q.   Okay.  And as we move along, when you were hired by

1    the FBI, naturally this bitcoin or cryptocurrency issue wasn't

2    even in play, correct?

3         A.    Correct.  It wasn't invented yet.

4         Q.    Right.  Now, as you moved along in the FBI, there

5    wouldn't have been anybody there that would have been

6    experienced in it, correct?

7         A.    Correct.

8         Q.    All right.  Let me just ask you.  As we stand here

9    today -- I mean, this is the first time you're in a courtroom,

10   you're sitting here and there's a judge presiding.  Have you

11   testified as an expert in any courtroom in the United States or

12   any other jurisdiction?

13        A.    No.

14        Q.    And as we move along in your career, can you tell

15   the judge whether or not you have any special certifications to

16   be claiming an expertise in this particular area?

17        A.    Yeah.  The two certifications I have are related to

18   the Chainalysis Reactor tools, so using a specific piece of

19   software.  So it's just a certified -- a reactor user and a

20   certified investigative specialist for that tool.

21        Q.    I mean, who hands out that certificate?

22        A.    The company who creates and sells the tool.

23        Q.    And is that the tool that you used in this case?

24        A.    It was a tool I used as supporting this case, yes.

25        Q.    So was all of your information or your analysis done

1   by the type -- let me back up for a second.

2          This tool that you used, is that readily available

3   to everybody?  Could I use that tool?

4      A.   I can't totally speak to how the company sells it

5   and who they allow to purchase it, but it's -- I believe they

6   have -- they sell it to businesses, not individuals, if that

7   makes sense.

8      Q.   Well, no, actually.  I mean, for our purposes today,

9   I want to know whether or not this is publicly available.  Is

10  this something that I can -- I can basically utilize to check

11  your work?

12     A.   I'm not sure I know the answer to how they provide

13  the tool to the public.

14     Q.   All right.

15         MS. MACDONALD:  Your Honor, if I could just clarify

16  something for the Court.

17         THE COURT:  Well, it's up to you.  Do you want her

18  to clarify something?

19         MR. SISTI:  I'm clear so far.  I mean, we --

20         MS. MACDONALD:  Fine.

21         MR. SISTI:  We just started.

22     Q.   So all of your --

23         THE COURT:  You'll have redirect.

24     Q.   Yeah.  I'm just -- I'm just asking generally.  Your

25  certifications are certifications that are given by a private

1    company?

2         A.    So I have taken two classes that result in a

3    certification to -- to prove that I understand how to use their

4    specific tool.

5         Q.    All right.

6         A.    But it -- I use a lot of different things when I do

7    blockchain analysis to include open source tools and open

8    blockchain explorers.

9         Q.    Okay.  But this is not an open source tool, correct?

10        A.    Correct.

11        Q.    But was this tool utilized during the course of your

12   analysis so that you could give an opinion to the government?

13        A.    So I started that way and then the prosecutors asked

14   me to rebuild my analysis using only open source tools, which I

15   was able to do.

16        Q.    Why did they ask you to do that?

17        A.    Because nothing that the tool that I used offered me

18   was proprietary.  It made it easier to visualize the

19   information, but it wasn't essential to analyzing the

20   information.

21        Q.    Okay.  So your certificate or your certification by

22   this private entity really doesn't enter into your conclusion

23   in this case, correct?

24        A.    Correct.

25        Q.    Do you have any other certifications that enter into

1    the conclusion in this case?

2         A.    No.

3         Q.    With regard to certifications, the lawyers in this

4    room all have to go through standardized training and

5    continuing legal education.  Do you have anything like that in

6    your field?

7         A.    So as an intelligence analyst, I'm required by the

8    bureau to have a certain number of training hours per year that

9    are either related to the -- the focus area I work on or

10   related to intelligence analysis, so things related to critical

11   thinking, writing, public speaking.  But that is not a

12   requirement for me as an analyst to -- I don't know if I

13   answered your question.

14        Q.    No, actually, you're going on that path.

15              So there is no specific training that you have to

16   take periodically in order to work in your field?

17        A.    Correct.

18        Q.    And certainly there's no specific training that you

19   have to take periodically to work in the specific field of

20   blockchain analysis?

21        A.    Correct.

22        Q.    Now, let's talk about blockchain analysis for a

23   second.

24              The program that has been developed at the FBI is

25   one that was developed in-house, correct?

1      A.    Correct.

2      Q.    No outside peers, in other words, no other analysts

3  from outside the FBI, are there generally to check your work,

4  correct?

5      A.    So not, I guess, in the development of the

6  curriculum.  Over the years as I've presented and taught, I've

7  taught with components of the DEA or the IRS, other law

8  enforcement entities.  But in terms of building, I guess, our

9  specific curriculum, yes, it was built in-house by the FBI.

10     Q.    Right.  So it's an in-house program used essentially

11  by your agency --

12     A.    Correct.

13     Q.    -- for your purposes?

14     A.    Yes.

15     Q.    And it's not observed or certified or peer-reviewed

16  by any outside agency?

17     A.    No, not in the way I think you're using the term

18  peer-reviewed.  It is available for law enforcement partners to

19  consume as training.

20     Q.    All right.  And with regard to peer review, I guess

21  I'm saying, you know, in the -- in the field of science, you

22  know, whether you're a government entity or whether you're a

23  private entity, things can be peer-reviewed like analysis of

24  drugs, for instance, right?

25     A.    Correct.

1      Q.    DNA samples, right?

2      A.    Correct.

3      Q.    You don't have to be with the federal government

4  in order to peer review a federal government scientific

5  conclusion, right?

6      A.    Correct.

7      Q.    Right?

8            This is a different thing altogether, isn't it, your

9  analysis; it's basically all in-house?

10      A.    Yes.  I mean, I work with other experts in the field

11  out of the Virtual Assets Unit where we will help each other

12  and check each other's work.  But, no, we don't send it off to

13  an outside entity to check.

14      Q.    Right.  Has any of your work since you began this

15  analysis been peer-reviewed by any outside entity?

16      A.    No.

17      Q.    Specifically, that would include the work you did

18  for this case, correct?

19      A.    Correct.

20      Q.    Did you even in-housewise have any specific review

21  of your work?

22      A.    Yes.

23      Q.    And did they go through each and every analysis that

24  you went through and did they come to their own opinion or a

25  different opinion?

1      A.   I -- I don't want to swear to every piece of work

2 has been specifically double-checked, but I've worked with

3 other people in our team to build out the tracing for the case.

4      Q.   So this work isn't entirely your work alone?

5      A.   Well, I had someone looking at it.

6      Q.   Did somebody else do some of the analysis on this

7 case?

8      A.   For the pieces that I was asked to rebuild, no.  I

9 did the analysis and then I had people look at it.

10      Q.   Did they create a report on it as well?

11      A.   No.

12      Q.   And is there a reason for that?

13      A.   It wasn't necessary.

14      Q.   Well, would the prosecution be able to see that

15 report to see whether or not your analysis matched up with

16 somebody else's analysis?

17      A.   I did not have someone independently re-create the

18 analysis.  I had them look over the work that I had done as

19 a -- a double-check, as a sanity check, if you will.

20      Q.   Well, as a double-check, then, that was not

21 memorialized in any type of report; that's what you're saying?

22      A.   Correct.

23      Q.   So I couldn't go to that person and say, was

24 Erin Montgomery's work accurate or not?

25      A.   Correct.

1            THE COURT:  Why not?  Are you saying one of your

2    colleagues reviewed your work and told you it was accurate?

3            THE WITNESS:  Oh, I'm sorry.

4            THE COURT:  He just said could I go to that person.

5            THE WITNESS:  Oh, but there's not a report that they

6    memorialized --

7            THE COURT:  Not even an email that said I checked it

8    over, looks good?

9            THE WITNESS:  No.  Well, I could double-check, but I

10   don't think so.  I think I was talking --

11           THE COURT:  I don't mean to admonish you here, but

12   you're under oath.

13           THE WITNESS:  Yeah.  Yes, sir.

14           THE COURT:  I mean, there either is or there isn't.

15   You might not remember.

16           THE WITNESS:  Yeah.

17           THE COURT:  The other thing you've got to remember

18   is his question to you was, you know, if he were inclined to,

19   could he go and ask this person.

20           So does -- is there a person out there with

21   knowledge that they checked your work and it was either

22   accurate or not?

23           THE WITNESS:  Yes.  So I -- there's kind of two

24   components of the work I did.  There's a lot of initial work

25   for the investigation that I wasn't asked to fully rebuild and

1    there are memorialized reports of that work that another

2    analyst and I wrote together.  So that was kind of -- I'm

3    sorry.  I wasn't really thinking of that bucket of work.

4              But that laid the foundation of then the report I

5    was asked by the prosecutors to rebuild totally apart from any

6    reference to that commercial tool.  And I have a recollection

7    of asking coworkers to take a look at my kind of slide deck and

8    I walked them through it as a sanity check.

9              So there wasn't, I don't believe, any written kind

10   of communications about that.  It was, hey, does this make

11   sense, is my reasoning sound.  But it was all based off of work

12   I had done already with another coworker who -- there are

13   memorialized reports for that.

14        Q.   There's memorialized reports with another coworker?

15        A.   Correct.

16        Q.   Who was that?

17        A.   Ali Comolli or Alexandra Comolli.

18        Q.   And so, I mean, is it clear then that we have some

19   kind of a team thing going on here?

20        A.   Yeah.  Originally it made sense for two people to be

21   looking at the analysis that we did.  It was just a smart way

22   to do it.

23        Q.   Yeah.  And would I be able to give that material to

24   an expert so they could check your work?

25        A.   I believe so.

1      Q.   Was all of it documented and memorialized so they

2 could look at it?

3      A.   Yes, sir.

4      Q.   Everything.

5           With regard to your coworker, what qualifications

6 does your coworker have?

7      A.   She was a tactical -- we called them staff

8 operations specialists or tactical specialists at the FBI.  So

9 they are primarily providing more direct operational support to

10 investigations.  She spent many years working and assisting on

11 darknet marketplace investigations and so had a lot of hands-on

12 experience doing follow-the-money for online purchases of

13 drugs.

14          And so she and I had -- she was working out of

15 headquarters in a unit focused on darknet marketplace

16 exploitation and then ultimately joined the operational unit

17 that we were the sister unit with and so we did a lot of work

18 together, kind of checking each other's work or working

19 directly together on things.

20     Q.   When you were checking each other's work, did you

21 come up with errors and corrections and modifications as you

22 were moving along?

23     A.   Well, certainly sometimes you would make a mistake,

24 yes.

25     Q.   Are those memorialized for us to take a look at?

1      A.    I believe -- I don't want to misspeak.  There's

2  probably an instance of a correction that we filed.  A lot of

3  times you would catch those mistakes before you filed the

4  official report, so it would be in more of a -- a peer-review

5  process of reading over someone's work.

6      Q.    And was that particular documentation sent to the

7  government so that they would know where that mistake or

8  correction was?

9      A.    Yeah, they have everything that I did for this case.

10 I'm just not certain if there's an example of that or not in

11 this instance.

12          MR. SISTI:  All right.  I have nothing further at

13 this time.  Thank you.

14          THE COURT:  I want to understand this last question

15 and answer.

16          The answer (sic) is:  Was that particular

17 documentation -- which I understood to mean documentation of

18 mistakes you might have corrected or errors -- was that

19 particular documentation sent to the government so that they

20 would know where that mistake or correction was.

21          You said yeah.

22          THE WITNESS:  So I -- I'm sorry.  I -- my -- my --

23 I'm not remembering if for this case if --

24          THE COURT:  Yeah, you've got to be -- let me just

25 caution you.  I think that's going on a lot in your testimony.

1    You've got to make the distinction between whether you're

2    talking about in general or this case.

3              THE WITNESS:  Yeah.

4              THE COURT:  So right now the impression is that you

5    sent to the prosecutors information about when you consulted

6    with colleagues about mistakes in your work.  And I'm not sure

7    if you even remember, to be honest, but one could read the

8    record now to assume that you've sent the prosecutors

9    information about this work-checking, which seems like normal

10   work flow process to me.

11             But, still, is that what you meant to say?

12             THE WITNESS:  No.  So I'm -- I'm not sure if for

13   this case, if we had had a correction to one of our documents

14   related to blockchain analysis.  I -- I just cannot remember.

15   But if we did, it was serialized to the case file and the

16   prosecutors would have access to that.  But I don't remember

17   one way or the other if there was an example of that for this

18   tracing.

19             THE COURT:  That's clarification.  Thank you.

20             THE WITNESS:  Okay.

21             THE COURT:  I don't mean to muddy up your record.

22   I'm just trying to understand.

23             MS. MACDONALD:  Yup.

24                       REDIRECT EXAMINATION

25   BY MS. MACDONALD:

1          Q.    And just again to clarify, you're not thinking of

2    any particular mistake; you're just talking about your general

3    process if you were to have made a mistake?

4          A.    Correct.

5          Q.    Okay.  And when you talk about -- you know, I think

6    you testified earlier, oh, I'm sure we made some corrections as

7    we were going along, can you tell me sort of what types of

8    corrections you're referring to and if you remember any in

9    particular?

10              MR. SISTI:  I have to object now.  Now it's

11    speculation.  I mean, if there's a clear memory of any

12    correction, I'd like to hear it, of course, in this case, but I

13    don't want to hear about generalized corrections in other

14    matters.  That means nothing with regard to this.

15              THE COURT:  Well, it might mean something to the

16    Court and some of the answers to your questions I think,

17    although I think you were questioning about this case, I felt

18    like some of the answers might have been referring to the more

19    general -- the more generalized process over time.  So I became

20    unclear about it.  I think she's trying to make it clear now

21    and I'm going to let her proceed.  I just want to know the

22    answers.

23          Q.    So would you like me to ask the question again?

24          A.    Yes, please.

25          Q.    I think my question is are you remembering any

1    specific corrections or mistakes in this case?

2         A.    I'm not.

3         Q.    Was your previous testimony referring to your

4    process if you had made mistakes and corrections and where

5    those would be recorded?

6         A.    Yes.

7         Q.    Okay.  And I wanted to just clarify that before when

8    you talked about, oh, I'm sure I made mistakes in this case,

9    there weren't any in particular that you're thinking of?

10        A.    Correct.

11        Q.    You were just trying to ensure you were -- you know,

12   included any -- were there -- were there any that you couldn't

13   remember at this time?

14        A.    Correct.

15        Q.    Okay.  And what did -- what was your understanding

16   of what sort of a mistake or correction would be?

17        A.    Yeah.  It's very easy to mistype bitcoin addresses,

18   to mistype amounts, they go to eight decimal places, to be

19   inconsistent in how you're rounding.  And so to go back over

20   your work and double-check the way you've written addresses,

21   the amounts that you're recording, the transaction hashes.  And

22   so there are often things like that that you catch before you

23   file the official report.

24        Q.    And are those sorts of equivalent to typos when

25   you're writing up a report?

1          A.    Correct.

2          Q.    And when you were referring to mistakes you're sure

3    that were made, were any of those -- you know, were you

4    referring to things that would have sort of gone to the heart

5    of the issue or your final opinion?

6          A.    No.

7          Q.    Okay.  Just sort of clerical mistakes?

8          A.    Correct.

9          Q.    Okay.  I want to talk about -- go back to sort of

10   the peer review issue that you were asked about.  And I didn't

11   ask you much about your specific testimony -- your sort of work

12   in this case.  I just want to ask a few questions about that.

13         How did you -- how did you originally come to

14   identify the holding wallet?  Did you use a tool to do that?

15         A.    Yes.  So looking at withdrawals from specific

16   exchange accounts to an address, a tool showed me that that

17   address was clustered with many other addresses.

18         Q.    Okay.  And I believe you testified that at the

19   request of this office you then re-created what the tool told

20   you using your own analysis?

21         A.    Correct.

22         Q.    Okay.  And just very kind of overview broadly, how

23   did you do that?

24         A.    I used a technique called -- we call it cospend

25   analysis or common spend analysis.  The way that bitcoin

1    transactions are built is that you can use multiple addresses

2    as inputs to a transaction.  And when you do that, the private

3    key for those addresses must be present in the wallet software

4    you're using to sign the transaction, thereby demonstrating you

5    control each input address.  So --

6         Q.   And just sort of backing up, you know, what were

7    you -- did you just use the public blockchain to do that?

8         A.   Correct, yes.

9         Q.   Okay.  And did -- when you did that, did you come up

10   with the same sort of answer that the tool had given you?

11        A.   Yes.

12        Q.   And so was your work a way of checking the tool?

13        A.   Yes, it was.

14        Q.   And did they give you the same result?

15        A.   Yes.

16        Q.   Okay.  Now, can anybody re-create what you did on

17   the public blockchain?

18        A.   Yes.

19        Q.   Could Mr. Sisti go type in the same things you did

20   and get the same result?

21        A.   Yes.

22        Q.   And are you confident that that result would be the

23   same?

24        A.   I am.

25             MS. MACDONALD:  Okay.  Nothing further.

1          THE COURT:  Recross.

2          MR. SISTI:  Thank you, Judge.

3                    RECROSS-EXAMINATION

4     BY MR. SISTI:

5          Q.   Just what were the open source tools that you were

6     relying on?

7          A.   In this instance a tool called blockchain.com, just

8     a way to visualize the underlying blockchain.

9          Q.   And this is -- this is the open source tool that you

10    used to come to your final conclusion?

11         A.   Yes.

12         Q.   Although you had used another tool prior to that?

13         A.   Yes.

14         Q.   And with regard to the open source tool that you

15    used that anybody can use to come to the same conclusion,

16    including me, then what makes you special with regard to this

17    material?

18         A.   I don't -- I don't know.  I did the work.

19         MR. SISTI:  Thank you.

20         MS. MACDONALD:  I have nothing further.

21         THE COURT:  You're excused.  Thank you.

22                    (Witness excused.)

23         MS. MACDONALD:  Can Ms. Montgomery stay in the

24    courtroom, your Honor?

25         THE COURT:  Sure.

1          MR. SISTI:  I'd ask that she not stay in the

2     courtroom if she's going to be an anticipated witness.

3          THE COURT:  Oh, are we going to hear -- well, wait a

4     minute.  Depends on what.  Are we going to hear argument now?

5     She probably shouldn't be listening to the argument, if you

6     don't want her to.  Usually nobody objects, but if there's

7     going to be argument about her qualifications, she probably

8     should be excused and it looks like she's leaving anyway.

9          All right.  So are we going to stick with this issue

10    or are we going to move on to the other motion?  Do you want to

11    argue about this?

12          MS. MACDONALD:  Sure.

13          THE COURT:  Please proceed.

14          MS. MACDONALD:  Your Honor, Ms. Montgomery is the

15    person at the FBI who created the training on blockchain

16    analysis.  She started the unit.  She was the first at the FBI

17    to become involved in bitcoin.  She was studying bitcoin two

18    years after its inception which is, you know, really right at

19    the beginning of when people were studying this issue.

20          She has spent her whole career with the FBI

21    supporting cases, creating trainings, studying trends, and now

22    she supervises the FBI unit on blockchain analysis.  She has

23    used it in hundreds of cases.  She has trained thousands of

24    people on these issues.  She is clearly qualified to testify

25    about her work in this case, which is a really sort of basic

1    kind of tenet of blockchain analysis.

2              She, you know, as we've discussed, is borderline of

3    expert testimony and we have no objection to, you know, not

4    bolstering her as an expert, simply we want to introduce her

5    testimony about what she did to --

6              THE COURT:  You're basically saying she's

7    qualified -- she's qualified to testify, competent to testify,

8    based on her firsthand knowledge under like 602; she did the

9    work, she can talk about it.

10             MS. MACDONALD:  That's correct.

11             THE COURT:  That's true, I agree, but there's a

12   component of it that probably requires that she understand it.

13   I'm not saying you haven't met that standard, but --

14             MS. MACDONALD:  And I don't know if that's a failure

15   of sort of my -- of our -- of my limiting my questioning of her

16   to her qualifications.  I'm certainly happy to kind of go into

17   more depth with her about, you know, how she applied it, what

18   she knows about it, and how she understands it.  I'm happy to

19   do that.

20             But, frankly, your Honor, if she's, you know --

21             THE COURT:  You cabined it based on our discussion

22   before and I understand your point.  That's probably why it's a

23   good idea, though -- that's probably why it was a good idea to

24   excuse her right now, because I might want to hear more from

25   her.  But I'll make that decision shortly.

1          What do you want to say?  What do you want to say?

2          MR. SISTI:  Well, I mean, it's -- to buttress an

3   individual's expertise qualifications by saying that's the

4   individual that created the program may sound impressive.  It's

5   also the worst reason to qualify somebody as an expert in the

6   field because there are lots of experts years and years ago

7   that thought the, you know, Earth was flat, too, after

8   developing their theories.

9          I guess what I'm saying is that there's nothing --

10  there's nothing that's been offered to the Court.  I mean,

11  if a DNA agent or a DNA expert came off the stand and said,

12  Mr. Sisti, you can do exactly what I can do, all you got to do

13  is, you know, take a look at a couple training films, that

14  would be shocking.  If a toxicologist said the same thing, that

15  would be shocking.

16         I don't think you've ever qualified anybody in this

17  courtroom under 702 that would look a defense attorney in the

18  eye and say you can do exactly the same as me; you have

19  absolutely no training whatsoever in it, but you can come up

20  with the same conclusions by hitting, you know, some kind of a

21  Google bar.

22         I think the bottom line here is that we don't

23  have -- we don't have a field, Judge, first of all, I don't

24  think we have a field that has been sufficiently tested where

25  you can 702 anybody and I think she's actually showing you

1    that.  Peer group review, where is it?  Where is the learned

2    treatises on bitcoin analysis by outside agencies, you know,

3    something other than the FBI with an ingrown program.

4              And, you know, it's like -- it's -- it's something

5    that really, really is a lot different than what we generally

6    deal with in -- when we're trying to qualify an expert.

7              THE COURT:  I do understand your point.  But in

8    fairness, all right, before she testified -- see, saying that

9    she's not qualified and saying that this field is not

10   sufficiently recognized or understood are really two different

11   things and she restricted her direct examination of the witness

12   to her qualifications.

13             I know it's related because you're basically saying

14   how can one be qualified in some -- in a field that's not

15   sufficiently understood or developed.  I know.  I'm not saying

16   you bait-and-switched them.  It's just that it goes a little

17   bit beyond her qualifications when you're talking about the

18   field.  You know what I'm saying?

19             MR. SISTI:  I know.  But, I mean, all I'm saying is

20   that we haven't heard of any -- any type of legitimate

21   certification or licensing or testing that gives her that

22   qualification.

23             I mean, her being an expert at the FBI's wonderful.

24   Her being an expert in this courtroom is a different thing.

25   They may recognize her as being the person at the FBI.  She may

1    not be the person in what she testifies to in this courtroom

2    because she hasn't experienced what we generally see in experts

3    and that is testing and certification.

4              THE COURT:  Sure, but I'm not going to qualify her

5    as an expert.

6              Let me ask it this way.

7              MR. SISTI:  Yeah.

8              THE COURT:  I -- I have the same problem with the

9    other motion regarding the jury nullification-type evidence.  I

10   don't know what people are proffering.  I don't know what

11   people are offering and objecting to.

12             For example, if she describes her work, it might be

13   hard to know in advance, but I don't know what you would seek

14   to exclude.  If she describes her work, I'm not sure what a --

15   I guess the opinion she's going to offer eventually, right, is

16   that the wallet can be traced to Ian Freeman.  No?

17             MS. MACDONALD:  Not even, your Honor.  I mean, I

18   think the jury can draw that conclusion on their own.  She will

19   say her opinion --

20             THE COURT:  Yeah.

21             MS. MACDONALD:  -- that she offers is this is the

22   wallet; I identified all these addresses, they're controlled by

23   one person.  And then she will introduce evidence that there

24   were subpoena -- she reviewed subpoenas that showed that

25   accounts in his name sent into the wallet and that money went

1   out to the wallet to the people he was selling bitcoin to, but

2   she's not going to specifically testify Ian Freeman controlled

3   the wallet.  I'm not asking that of her.

4           THE COURT:  You just said --

5           MS. MACDONALD:  I'm just asking --

6           THE COURT:  -- they're controlled by one person.

7   Does that mean one IP address or does that mean one person?

8           MS. MACDONALD:  It means an entity.  It means that

9   all of these addresses are owned by the same entity.  And she's

10  called that the holding wallet.

11          THE COURT:  What's an entity?

12          MS. MACDONALD:  So it's a cluster of bitcoin

13  addresses on the blockchain.  So that's how -- so, for example,

14  the way that bitcoin works is that you can -- you will have --

15  if you have a wallet, because the way that the transactions

16  work, money is often split up and you'll be working with

17  multiple addresses.

18          If you're sending, for example, five bitcoin to

19  someone and in your wallet you have an address with two and an

20  address with three, the wallet sends them together --

21          THE COURT:  I get it.

22          MS. MACDONALD:  -- and that can prove that the same

23  person controlled those two addresses.

24          THE COURT:  Why can't -- why can't more than one

25  person control the addresses or the wallet?  Why can't five or

49

1   ten people control the wallet?

2              MS. MACDONALD:  The same way that someone else could

3   log in to your bank account and make a wire if they logged in

4   to your bank account.  That's absolutely true.

5              THE COURT:  Or the -- or the bank account could

6   be -- yeah.  Anyone who's got the access code, right?

7              MS. MACDONALD:  And that's -- and that's not what

8   I'm arguing.  I'm not arguing that she can testify that

9   Ian Freeman had the access code.  I'm arguing that --

10              THE COURT:  Yup.

11              MS. MACDONALD:  -- they all required the same access

12   code; that all of these accounts -- that the 360 wallets were

13   all controlled by the same access code.

14              THE COURT:  Okay.

15              MS. MACDONALD:  That is what she is saying.

16              THE COURT:  Okay.  That's as far as it goes.

17              MS. MACDONALD:  That's as far as it goes in terms of

18   her opinion.  The rest will be sort of I -- you know, I -- the

19   evidence that will allow the jury to conclude that it was Ian

20   Freeman who had the access code, but she's not going to testify

21   to that.

22              THE COURT:  To that.  Yeah.  I get it.

23              And that in a sense -- look.  That -- that, in a

24   sense, is something that probably anybody of reasonable

25   intelligence could ascertain, but what allowed her to ascertain

1    it, frankly, is her education, knowledge, skill, experience,

2    and training, and that's not that of the average person.  It's

3    not really opinion testimony either and it would help the trier

4    of fact for sure sort through this.  I'm not even sure if it's

5    an opinion.  It's somewhere between opinion and observation.

6            Okay.  Do I -- there's another side issue, but I'll

7    circle back to it.

8            Go ahead, Mr. Sisti.  You heard me thinking out loud

9    there.  What are you --

10           MR. SISTI:  I think your last point is well taken.

11   It's more of an observation than an opinion.

12           THE COURT:  Then why can't they offer it?

13           MR. SISTI:  Because I think it also adds to

14   speculation, especially if they're focusing in on one

15   particular human being.  I mean, that's what this whole diagram

16   has, you know, depicted, that I see in front of me.

17           THE COURT:  Well, she's not going to -- she said

18   she's not going to --

19           MR. SISTI:  If she's just going to say it's an

20   access code and that the person with a key can access the

21   access code, then any person with the key can access --

22           THE COURT:  Yeah, that's true.

23           MR. SISTI:  -- the access code.

24           THE COURT:  I assume that's going to be your cross.

25           MR. SISTI:  I mean, it's absolutely true.  I mean,

1  so how does that help the trier of fact zero in --

2          THE COURT:  Well, it's the same way that, you know,

3  we have this problem -- we have this problem -- I have a couple

4  cases on appeal right now on -- on, you know, child

5  exploitation image cases, right --

6          MR. SISTI:  Right.

7          THE COURT:  -- who had the password to the laptop.

8          MR. SISTI:  Oh, I --

9          THE COURT:  And the guy says, yeah, I left it around

10 the firehouse station all the time and --

11         MR. SISTI:  Uh-huh.

12         THE COURT:  -- you know, maybe Joe over there was on

13 there.  Those aren't my images.

14         And it's just something that you have to explore.

15 It's evidence.  I -- I don't think the opinion that a single

16 access code is what allowed bitcoin to be deposited into the

17 wallet is particularly problematic or -- or opinionlike.

18 Anyway --

19         MR. SISTI:  I think if it's just the mechanics of

20 what she did --

21         THE COURT:  Yeah.

22         MR. SISTI:  -- what she observed, then she's just a

23 witness like anybody else.

24         THE COURT:  Me, too.  That's what they're saying, by

25 the way.  That is what they're saying.

1          MR. SISTI:  But I'm just saying -- no, the problem

2     is -- the problem is it's also dragging along something else

3     with it.

4          THE COURT:  It does.

5          MR. SISTI:  And that dragging along is the problem.

6          I mean, if you're just going to say, she's just a

7     regular witness, ladies and gentlemen, and we leave it at that,

8     that's pretty inane, especially when anybody could have access

9     to the key.

10         THE COURT:  Inane, perhaps.  I think inane is

11    strong, but I know your point.  But when you say the problem --

12         MR. SISTI:  Uh-huh.

13         THE COURT:  -- the -- it is the problem, that it

14    has -- it has some inculpatory power, but it also has

15    exculpatory power, as you've just demonstrated today in your

16    examination and your argument right now.

17         I don't think it's an admissibility problem, though.

18    I think it's a proof problem and it's a proof -- it's a proof

19    problem for both sides and you're going to do with it what you

20    will.

21         If -- look, if I'm not being asked to either qualify

22    someone as an expert, and the prosecution has disavowed that,

23    or to -- or to permit someone to testify in the form of an

24    opinion, and it's not even clear to me yet that I'm being asked

25    to do that, I'm hard-pressed to exclude this at this point.

1           I'm considering, frankly, appointing somebody myself

2     under 706 to get a -- but I'm not sure it's necessary, based on

3     the way this played out today.  Anyway, I think I've heard

4     enough to make my decision.

5           Anything else anybody wants to say?  I don't want to

6     leave anybody hanging on a point they haven't been able to

7     make.  I've got one more thing to say about the expert before

8     we leave.

9           Okay.  This.  I do not want an Imran Alrai situation

10    in this case.  Everything in her file, everything in her file,

11    if it hasn't already been produced, maybe it has, must be

12    produced to the defense.  I know you're looking at me like of

13    course we did and I take your word for it.  However, she was up

14    there describing perhaps that maybe -- what did she call it,

15    that -- she had a word to describe it, like information in a

16    file that might reflect her consultation with colleagues to

17    double-check the work.

18          If anything exists, please -- because I know you

19    have no objection to producing it.  I'm just reminding you.

20    Sometimes bureau witnesses make assumptions about what is

21    disclosable based on their own standard operating procedures

22    and we just need to be clear that -- that the investigating

23    agency's assumptions are not the Court's assumptions.  I just

24    don't want the headache.

25          So let's make sure every scrap of paper, every piece

1    of digital information that was created in the investigation

2    that's not privileged is produced.

3              MR. SISTI:  And, Judge, to that, I mean, I'm not

4    complaining about the government's production.

5              THE COURT:  I know.

6              MR. SISTI:  In fact, I'm complaining there's too

7    much of it.  But if -- if there is something like that, if the

8    government could refer that specific document to me so I don't

9    have to go through the 14,000 pages --

10             THE COURT:  Oh, yeah.  They're going to -- if it

11   exists, and I'm not saying it does, they're going to disclose

12   it in a way that that's identifiable to you so that you're not

13   looking for a needle in a haystack.

14             MR. SISTI:  Thank you.

15             THE COURT:  Okay.  Thank you.

16             I need a five-minute recess and then we'll get on to

17   the other motion.

18             THE CLERK:  All rise.

19          (Recess taken from 11:20 a.m. until 11:32 a.m.)

20             THE COURT:  All right.  The second motion on for

21   today is a prosecution motion to exclude certain defense

22   evidence which they say is either irrelevant or offered tacitly

23   in support of a jury nullification verdict.

24             I think to help us frame it I'm going to ask for the

25   defense to give me a proffer here.

```
 1              MR. SISTI:  Judge, there's a couple areas I can
 2    proffer.
 3              THE COURT:  Sure.
 4              MR. SISTI:  I mean, I think the documents that are
 5    in front of you we probably should just talk about.
 6              THE COURT:  Yeah, there's the letter from Attorney
 7    Hipple.
 8              MR. SISTI:  Well, yeah.  I mean, I'll tell you,
 9    Judge, in all honesty, it's a letter that was -- that was
10    drafted and sent by Attorney Hipple, who at the time --
11              THE COURT:  Yeah.  Just for the record, it's
12    document number 217-1.
13              Go ahead.
14              MR. SISTI:  That --
15              THE COURT:  First question, do you intend to offer
16    it?
17              MR. SISTI:  Yes.
18              THE COURT:  Okay.
19              MR. SISTI:  And not only offer the letter but offer
20    Hipple himself at trial.
21              THE COURT:  So Hipple's going to testify?
22              MR. SISTI:  Correct.
23              THE COURT:  And will presumably authenticate the
24    letter?
25              MR. SISTI:  That is -- authenticate the letter and
```

1    make it clear that that was -- the contents of the letter was

2    communicated to Mr. Freeman.

3              THE COURT:  That he told Freeman?

4              MR. SISTI:  (Nods head.)

5              THE COURT:  Okay.  What about -- so that's -- that's

6    one thing.

7              Second, the statements that are attributed to the

8    New Hampshire Banking Department official.

9              MR. SISTI:  We intend on calling her.

10             THE COURT:  You intend on -- that's Maryam

11   Torben-Desfosses?

12             MR. SISTI:  Correct.

13             THE COURT:  So she's going to testify.

14             MR. SISTI:  Yes.  I can speak to the FinCEN letter

15   as well.

16             THE COURT:  Talk to me about the FinCEN letter.

17             MR. SISTI:  July 13th, 2018.  It's even -- it's, in

18   essence, directed to Shire Cryptocoin which, by the way, is not

19   Ian Freeman.

20             It's an interesting document and I -- I believe that

21   the prosecution is positing or somehow relying on that document

22   to establish the foundation that he was placed on notice that

23   he couldn't engage in the business or the transactions that he

24   was engaged in.

25             THE COURT:  Well, so let me just take the

1    preliminary step.  Do you intend to introduce the FinCEN

2    letter?

3                    MR. AFRAME:  Yes.

4                    THE COURT:  Okay.  Go ahead.

5                    MR. SISTI:  I can also say that it wasn't a letter

6    that was delivered to Ian and I will proffer that for purposes

7    of this hearing as well.

8                    THE COURT:  Got it.

9                    MR. SISTI:  It was electronically delivered,

10   so-called electronically delivered letter.  There's no

11   certified mail.  There's nothing like that in existence.

12                   THE COURT:  Okay.  You're also going to make --

13   you're going to, I assume, present evidence that the -- that

14   the -- the vending machines were open and notorious.

15                   MR. SISTI:  The vending machines were in various

16   locations.  They were open and notorious for years in some

17   locations.  They are -- in fact, the one that -- this is the

18   most open and notoriously operated is in a -- at Murphy's

19   Taproom.  It's a regulated area by the folks from the State of

20   New Hampshire who deal with alcohol and regulating bars and

21   their services.  And it was out there for everybody to utilize,

22   including police officers and government officials.

23                   THE COURT:  Is the defendant himself going to

24   testify about his, I guess, understanding of his own compliance

25   with state law?  Is that something you plan on?

58

1          MR. SISTI:  Well, if he were to testify, of course

2   he would testify consistently with the fact that it was his

3   understanding that there wasn't anything wrong with what he was

4   doing.

5          THE COURT:  Okay.  Okay.  So at least now we know

6   the universe of the evidence, which is pretty much what we

7   thought it was.

8          I've read your papers.  I can't say that they don't

9   make sense to me.  They do.  Is there anything you want to add

10  to it?

11         MR. AFRAME:  No.  So, I mean, our proffer is, by the

12  way, on the FinCEN letter, we will prove that he received the

13  FinCEN letter.  That's a matter of fact for the trial.  So I

14  don't think we're here today to resolve that, but I promise you

15  we will have that evidence.

16         THE COURT:  Yeah.

17         MR. AFRAME:  On the issue that I think we're

18  dealing with, it's what is relevant to a prosecution under

19  1960(b)(1)(B).  I think that's what we're really talking about

20  because the crime requires you to knowingly operate an

21  unlicensed money transmitting business.  And as I understand

22  the case law, knowingly goes to you understood you were doing

23  certain things, certain conduct, and there is no defense on --

24         THE COURT:  It's not willfulness and it's not

25  scienter.

1          MR. AFRAME:  It's general intent crime.  He doesn't

2    need to know the registration.

3          So to me -- let me focus on the state law.  I think,

4    to me, that's the clearest.  So there's a separate crime; you

5    didn't register under state law.  And 1960(b)(1)(A) is you

6    didn't register under state law for which there's a crime.

7          And obviously a letter that said the state doesn't

8    require you to register or testimony that the State doesn't

9    require you to register would be highly relevant to that

10   charge.  He's not charged with that.  He's charged with not

11   registering under federal law.

12         What a state banking commissioner has to say about

13   state law has, in my view, literally nothing to do with

14   whatever he -- even if he did have to have an understanding,

15   which he doesn't, it has nothing to do with what his

16   understanding is under federal law.  And so, to me, that kind

17   of evidence would be very confusing to a jury and be

18   irrelevant.  So that was the basis for my argument.

19         THE COURT:  I understand.  Mr. Sisti, go ahead.  If

20   you want to say anything else about it, I'm listening.

21         MR. SISTI:  No.  I mean, you see the letter itself

22   before you, Judge, and if you look at page 2 of the Hipple

23   letter, he draws attention to, quote, federal law at the very

24   top left-hand section of that particular page.  He's addressing

25   that concern that was just given to you by the prosecution.  In

1    fact, he labels it as a subsection of his opinion letter,

2    federal law.  That's what he says.  He's not -- he's addressing

3    state and federal law.

4              But this particular section on page 2 of a four-page

5    letter directs at least in his letter that was given to

6    Mr. Freeman federal law and his interpretation and he went

7    forth based on that.

8              And then I guess, you know, the FinCEN letter I

9    already -- I already spoke about, so ...

10             THE COURT:  Yeah.

11             MR. SISTI:  I mean, I'm just dealing with the

12   universe of information that Freeman had at the time.  It would

13   be, in his head, selling a can of Coca-Cola out of a vending

14   machine.

15             THE COURT:  Yeah.

16             MR. SISTI:  It would be, in his head, selling things

17   that he already owned; that it isn't transmitting anything.

18             THE COURT:  Yup.  Okay.  What do you say about this

19   idea that the letter makes reference to federal law?

20             MR. AFRAME:  So let me just try to keep lines

21   straight just so that -- the Hipple letter does talk about

22   federal law and state law in separate sections.

23             THE COURT:  That's the lawyer letter.

24             MR. AFRAME:  We could talk separately about whether

25   there is a -- basically what I hear to be an advice of counsel

1    defense to I didn't register under federal law.  But let's put

2    that aside for one second.  What I was talking about was the

3    banking commissioner testimony.

4              THE COURT:  Yeah.

5              MR. AFRAME:  A state official is -- the proposal is

6    a state official will come into this courtroom and talk about

7    what is or is not required under state law.  And my point is --

8              THE COURT:  That's not relevant?

9              MR. AFRAME:  -- what does that have to do with this

10   1960(b)(1)(B) charge.  That's what I was talking about.

11             MR. SISTI:  What it has to do with is that the two

12   are linked, all right, in Freeman's head; that not only would

13   he be operating in a clean and legal fashion federally as

14   labeled, but a clean and legal fashion and actually testified

15   to before the legislature from a banking official.

16             Now, that gives him the feeling and the impression

17   that he's covered every base he can possibly cover, that he's

18   doing nothing illegal, that his activity is -- is just squeaky,

19   squeaky, at least that's what his attorney is telling him at

20   the time.

21             I mean, you know, it's the universe.  I don't think

22   you can take some out.  I mean, that's the -- that's the total

23   impression he's getting.

24             THE COURT:  I think I probably could, but I'm not

25   going to because I -- look, I do think that the prosecution's

1   arguments that these have either no relevance or minimal

2   relevance is probably correct.  But, see, I think the FinCEN

3   letter is a good example of why I think the jury needs to hear

4   this evidence subject to some very -- subject to some very

5   strong limiting instructions and with some good latitude for

6   the prosecution on cross.

7          But, you know, the FinCEN letter is a good example.

8   Like in presenting cases, the prosecution frequently puts in

9   evidence that isn't sort of laser-focused on an element of

10  proving an element.  It's for background or it's for context;

11  it's for explaining the conduct of witnesses and investigators

12  and it's -- it's just evidence to help a jury understand what

13  happened, the story.

14         And I think this is the same kind of evidence.  I

15  realize that under the law it only has minimal relevance, but I

16  don't think there's -- I don't think there's much danger of

17  prejudice because of the latitude I'm going to allow the

18  prosecution on cross and because of the limiting instructions I

19  am prepared to give.

20         The FinCEN letter is that type of evidence.  It

21  really is.  It's -- it's evidence that sets the stage and I

22  think -- and I don't want to be overly simplistic, but it's

23  sort of a what's good for the goose is good for the gander type

24  of analysis.

25              (Excerpt filed under separate cover.)

1          THE COURT:  Getting back to this other evidence

2     of -- is it Agent Montgomery or Analyst Montgomery?

3          MS. MACDONALD:  Analyst.

4          THE COURT:  Analyst?  I think the best way to

5     approach it is this.

6          It sounds like we're not going to hear an opinion

7     that -- that the wallet, the bitcoin wallet, involved was under

8     the control of Ian Freeman.  It sounds like evidence is going

9     to be presented that could lead to that inference and the

10    jury's going to be asked to make that inference, I'm sure,

11    quite directly, but there will not be an opinion offered in

12    that regard.

13         So, look.  We've limited ourselves to the

14    qualifications -- that's the motion now, is Analyst Montgomery

15    qualified to give the testimony.  For most of what I heard,

16    the only qualifications a person would need to provide this

17    testimony are Rule 602 competency qualifications, has -- does

18    the witness have firsthand knowledge.  And to most of it she

19    does because she did the work involved.

20         We learned today that she consulted with colleagues,

21    but not in any sort of unusual or prejudicial way and if

22    there's evidence manifesting that, it either already has been

23    produced or it will be produced.

24         But it sounds to me like the best way to handle

25    Analyst Montgomery is not to exclude her from testifying; it's

1    to permit her to testify as a law enforcement official, agent,

2    that worked on the case and if there are objections to her

3    competence to testify based on her personal knowledge or based

4    on -- based on -- that's under Rule 602 -- or if there are

5    objections based on whether her knowledge based on experience,

6    skill, knowledge, education, and the like render her testimony

7    excludable under Rule 702.

8            If it's not offered in the -- if it's not offered in

9    the form of an opinion, I don't see how I'm going to have a

10   basis to exclude it because the challenge isn't to -- the

11   challenge isn't to this sort of field of blockchain analysis,

12   for lack of a better way of describing it; it's based on

13   Montgomery's qualifications to testify about it.  If she's

14   limiting herself to the work she did, it is either admissible,

15   in my opinion, and your challenges to it, and there are some,

16   go to the weight, not the admissibility.

17           And as Attorney Sisti demonstrated today, there'll

18   be questions he'll raise about that and he'll be permitted to

19   raise them, but the Court's not prepared to exclude the

20   testimony based on her qualifications.  So that's the ruling.

21           Are there any other motions I didn't rule on?

22           MR. AFRAME:  (Shakes head.)

23           MS. MACDONALD:  (Shakes head.)

24           MR. KENNEDY:  (Shakes head.)

25           THE COURT:  Anything else you need from me?

1          MR. SISTI:  I think we're up to speed.  We're set

2    for a final pretrial next week, right?

3          THE COURT:  Yeah.  We should do it, right?  There's

4    things you probably want to talk about just to stay organized.

5          MR. SISTI:  I think so, yeah.  We're going to have a

6    jury list by then and hopefully we can cull out some of the

7    jurors.

8          THE COURT:  Yes.  We're doing a preliminary

9    questionnaire, right, Kel?

10         THE CLERK:  Yes.

11         THE COURT:  Let's get off the record so we're not

12   abusing your joints.

13                 (Off-the-record discussion.)

14            (Proceedings concluded at 11:55 a.m.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


          I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 3/10/23          /s/  Liza W. Dubois
                            LIZA W. DUBOIS, RMR, CRR