UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *
                                *  No. 1:21-cr-00041-JL-01
            v.                  *  December 8, 2022
                                *  1:40 p.m.
                                *
IAN FREEMAN,                    *
                                *
                Defendant.      *
                                *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF DAY THREE OF JURY TRIAL - AFTERNOON SESSION

BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Government:      Seth R. Aframe, AUSA
                        Georgiana MacDonald, AUSA
                        John J. Kennedy, AUSA
                        United States Attorney's Office


For the Defendant:      Mark L. Sisti, Esq.
                        Sisti Law Offices



Court Reporter:         Brenda K. Hancock, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1454

I  N  D  E  X

WITNESSES:              DIRECT    CROSS    REDIRECT    RECROSS

CHRISTOPHER RIETMANN

By Mr. Aframe           3                   68,74
By Mr. Sisti                      51                        73

COLLEEN FORDHAM

By Mr. Aframe           75                  121
By Mr. Sisti                      97                        119

E  X  H  I  B  I  T  S

(None marked this session)

1                    P R O C E E D I N G S

2           THE CLERK:  Please rise for the jury.

3                 (The jury entered the courtroom)

4           THE CLERK:  Please be seated.

5           THE COURT:  All right.  Let's resume.

6           MR. AFRAME:  The United States calls Christopher

7    Rietmann.

8           THE COURT:  Ladies and gentlemen of the jury, did you

9    have any conversations with each other or with anyone else

10   regarding the subject matter of the trial during the recess?

11   All negative.

12          **CHRISTOPHER E. RIETMANN**, having been duly sworn by the

13   Clerk, was examined and testified as follows:

14          THE CLERK:  Please be seated.  For the record, please

15   state your name and spell your last name.

16          Christopher E. Rietmann, R-i-e-t-m-a-n-n.

17                      DIRECT EXAMINATION

18   BY MR. AFRAME:

19   Q.   Good afternoon, Mr. Rietmann.

20   A.   Good afternoon.

21   Q.   And how old are you?

22   A.   I am 58.

23   Q.   And are you married?

24   A.   I am.

25   Q.   And who are you married to?

1    A.    My wife is Colleen Fordham.

2    Q.    And how long have you been married to Colleen Fordham?

3    A.    About a year or two.  I'm sorry.  I can't remember the

4    date.

5    Q.    That's okay.  And how long have you been with Ms. Fordham?

6    A.    Approximately 20 years.

7    Q.    And what town do you presently live in?

8    A.    In Alstead, New Hampshire.

9    Q.    And when did you move to New Hampshire?

10   A.    In 2013 we purchased our home, and we moved in 2014.

11   Q.    And where did you move from?

12   A.    Pennsylvania.

13   Q.    And did you have a career in Pennsylvania before moving to

14   New Hampshire?

15   A.    I did.

16   Q.    And what kind of career was it?

17   A.    I've been in the IT field for a number of years.

18   Q.    And so, what made you decide to leave Pennsylvania and

19   move to New Hampshire?

20   A.    Just directions that Pennsylvania was going.  It was

21   becoming more expensive to live.  The government was becoming

22   more intrusive.  It was difficult to see my rights expanding in

23   Pennsylvania.

24   Q.    Okay.  And what made you select New Hampshire?

25   A.    When I realized that I probably didn't want to be in

1    Pennsylvania long term I started to look around the country at

2    different places and to debate -- both of our children were

3    close to becoming 18 years old -- and where we would want to

4    settle, and we came across New Hampshire.

5    Q.   And what was appealing about New Hampshire?

6    A.   New Hampshire is the "Live Free or Die" state, and it's

7    not so much -- there was the Free State Project, which I did

8    look into, but there was a natural libertarianism to the people

9    of New Hampshire that I liked.  It seemed like a good fit for

10   us.

11   Q.   And would you describe your personal political philosophy

12   as libertarian?

13   A.   A small l libertarian.  So, I've never belonged to a

14   libertarian party or anything like that.  I'm not a member of

15   the Free State Project, but I was aware of them.

16   Q.   And can you just give the jury a couple of sentences,

17   maybe a paragraph on small l libertarian as you understand

18   that?

19   A.   So, how I would describe it, I believe that the person is

20   the smallest unit of our government, and a person's rights need

21   to be respected.  I don't really like the idea of me deciding

22   what you should do, and, as long as you're not infringing on

23   someone else's rights, then you should be free to do what you

24   wish.  That's kind of my idea.

25   Q.   Okay.  Thank you.  And you've already said that New

1   Hampshire's "Live Free or Die" motto represented something that

2   was appealing to you, correct?

3   A.   Yes.

4   Q.   And so, what made you select -- so Alstead is in the

5   southwest part of New Hampshire?

6   A.   Yes.

7   Q.   What made you select that part of the state as opposed to

8   any other part?

9   A.   We made a couple of trips up to New Hampshire, and we

10  looked around the entire state.  We looked at the Seacoast, we

11  looked at the cities, we looked up at the north, and they all

12  had something -- we needed high-speed internet access for the

13  work that I was doing at that time, and we wanted to be not so

14  far out in the boonies that we couldn't get to good shopping

15  and things like that, and we needed to find a house that was

16  affordable enough that we could afford to move up here.

17  Southwest New Hampshire seemed to fit the bill more than the

18  other regions of the state.

19  Q.   And as part of your transition from Pennsylvania to New

20  Hampshire to live, did you meet Ian Freeman somehow?

21  A.   I did.

22  Q.   And how did you do that?

23  A.   When we were up on one of our trips someone who was in the

24  Facebook group that I was in suggested a meet-up if we were

25  going to be in the Keene area.  We were, like, Well, we could

1  meet you at Five Guys Burgers, and so we made arrangements for

2  that, and Colleen and I showed up.  We expected to see, you

3  know, one or two people at Five Guys, and I think there were 15

4  or 20 people.  It was pretty amazing to see that many people

5  show up just for, you know, two people, random people from out

6  of state.  So, I did meet Ian that day.

7  Q.   And did you become friends with that group of people?

8  A.   I became friends with various people in that group of

9  people.

10 Q.   And was Ian Freeman one of your friends?

11 A.   Ian began as an acquaintance, and I would say a friendship

12 developed over time.

13 Q.   And would you say that he's a friend today?

14 A.   I would.

15 Q.   And let me turn and ask you about your relationship with

16 me and the government here and what brings you into court

17 today.  So, we've met a few times, right?

18 A.   Yes, we have.

19 Q.   Either three or four; is that right?  Three times?  Three

20 prior times?  Do you agree with that?

21 A.   What was the question again?

22 Q.   Have we meet, like, three prior times?

23 A.   At least.

24 Q.   Okay.  And you're testifying today pursuant to an

25 agreement with the government, right?

1     A.    Yes.

2     Q.    And what's your understanding of the agreement that you've

3     entered into with the government?

4     A.    In exchange for not having charges brought against me,

5     that I would testify truthfully and receive 40 bucks.

6     Q.    Well, the 40 bucks is the witness fee that all witnesses

7     get, correct?

8     A.    I guess.

9     Q.    Okay.

10    A.    That was a surprise to me today.

11    Q.    Okay.  But the essence of the agreement before the $40 was

12    you will not be charged, correct?

13    A.    I will not be charged.

14    Q.    And you've agreed to testify truthfully?

15    A.    I have agreed to testify honestly and truthfully.

16    Q.    Okay.  And one other thing that I learned when we met, and

17    I think the first time, according to my notes, we met was back

18    in March 2022.  You indicated that you at that time had had a

19    series of small strokes; is that right?

20    A.    Yes.  Well, on a -- I had been having troubles with my

21    memory and inability to pull up quickly the word I was looking

22    for.  My neurologist recommended an MRI, and numerous shadows

23    were seen on the MRI that could be indicative of a stroke.  We

24    don't know exactly for sure what those are or what they

25    indicate, but they seem to have happened over the last year or

1    two.

2    Q.   And that affects, you said, your word recall a little bit?

3    A.   Word recall.  It can affect my memory.  It can -- I can

4    just sometimes not pull up what I want to say, and I can lose

5    that completely.  Now, some of that is undoubtedly age, but I

6    don't know how much of it is due to the --

7    Q.   Would you say you generally continue to have a memory of

8    past events?

9    A.   Yes.

10   Q.   Okay.  All right.  So, let's focus on now what you've been

11   doing in New Hampshire since you came here sort of

12   professionally.  So, what was the first thing -- when you first

13   came here what kind of work were you doing?

14   A.   Initially I was just basically doing computer work for

15   small businesses and things like that.  I did a little bit of

16   that.  I had continued a business that I had started in

17   Pennsylvania modifying routers to avoid government surveillance

18   and things like that.  I gradually got the impression that

19   Colleen and I might want to consider forming our own business.

20   Q.   Okay.  So, after a while here in New Hampshire did you

21   become a small business owner in New Hampshire?

22   A.   I did.

23   Q.   And what was the first business that you came to own?

24   A.   It was Route 101 Goods, LLC.

25   Q.   Route 101 Goods, LLC.  And where was that located?

1    A.    At 661 Marlboro Street in Keene, New Hampshire.

2    Q.    Can you tell me what Route 101 Goods did?  What was its

3    business?

4    A.    Its business was consignment, so we would identify local

5    vendors of things that they made themselves, and we would offer

6    them for sale in our store.  The vendor, if an item sold, would

7    receive 55 percent of whatever the price was, and we would

8    receive 45 percent.

9    Q.    And who -- the building you described at 661 Marlboro

10   Street in Keene, did you own that building?

11   A.    We did not.

12   Q.    Did you rent that building?

13   A.    We did.

14   Q.    And who did you rent it from?

15   A.    I think the name on the property record is Shire Free

16   Church Holdings LLC, but I'm not certain of that.

17   Q.    Okay.  And let me ask you, as far as who you dealt with as

18   it related to landlord-tenant matters, who were you dealing

19   with as far as a human person?

20   A.    Ian Freeman.

21   Q.    Okay.  And are you a member of the Shire Free Church?

22   A.    No.

23   Q.    Have you ever attended any Shire Free Church services?

24   A.    No.

25   Q.    Do you know other people involved in the Shire Free

1    Church?

2    A.    Ian says he is involved in it, but other than that no one

3    has ever told me they are members of the Shire Free Church.

4    Q.    Okay.  And how would you pay your rent at Route 101 Goods?

5    What was the method of payment?

6    A.    We would pay by check.  When we started out, I think Ian

7    realized that we were a small business starting out and money

8    was not going to flow in as fast as we possibly could pay it

9    out.  We started off with a graduated plan where we would pay

10   initially nothing, and then -- I believe it was initially

11   nothing, and then it was 25 percent of the agreed-upon rent of,

12   like, $950 or somewhere around that.  After another three

13   months we would move it up to 750 or something like that, and

14   then at a year we would pay full rent.  So, it allowed us to

15   kind of ramp up our business.

16   Q.    Okay.  And since we talked a little bit about churches,

17   before we move on to a different topic let me show you what's

18   been agreed to as Government's Exhibit 507, and you'll see it

19   right there on the screen.

20   A.    Okay.

21   Q.    Do you recognize this document?

22   A.    I do.

23   Q.    And what's the name of the church written above in all

24   capital letters?

25   A.    CRYPTO CHURCH OF NEW HAMPSHIRE.

1    Q.   And if we go down to the signature part, do you see your

2    signature there?

3    A.   I do.

4    Q.   And you signed as a director or trustee?

5    A.   Yes.

6    Q.   And the other name there is Renee LeBlanc.  Do you see

7    that signature?

8    A.   I do.

9    Q.   And do you know Renee LeBlanc?

10   A.   I assume this is the Renee that I do know.

11            MR. AFRAME:  Okay.  And just turning to the back just

12   for a second, the top, please.

13   A.   I can't read the writing.

14            MR. AFRAME:  We want to see the top of the document.

15   Q.   Can you just read me the name on the top?  Just read me

16   the name, if you can.

17   A.   I assume that's Matthew D. Roach.

18   Q.   Yeah.  Do you know him?

19   A.   Yes, I know Matt.

20   Q.   And how do you know him?

21   A.   Just a friend.

22   Q.   Is he a friend of yours and Mr. Freeman's or just --

23   A.   I assume both of us.

24   Q.   Okay.  All right.  So, this identifies you as a director

25   or trustee of the CRYPTO CHURCH OF NEW HAMPSHIRE.  How did you

1   come to that position?

2   A.   I believe I was asked if I would sign formation documents

3   for the CRYPTO CHURCH OF NEW HAMPSHIRE.

4   Q.   And who asked you to do that?

5   A.   I couldn't tell you for certain.  It may have been Ian

6   Freeman, but it may have been someone else.

7   Q.   Okay.  And did you do anything other than -- you said you

8   signed formation documents?

9   A.   Yes.

10   Q.   Did you have any other participation in the ongoings of

11   the CRYPTO CHURCH OF NEW HAMPSHIRE?

12   A.   No.

13   Q.   So, you were not a minister of that organization?

14   A.   No.

15   Q.   Do you know what its religious principles are?

16   A.   I do not.

17   Q.   Did you ever go to a service?

18   A.   No.

19   Q.   And do you know if it has a chapel or some similar kind of

20   space?

21   A.   I do not, no.

22   Q.   So, let's turn back to Route 101 Goods.  When you opened

23   -- well, let me ask this.  Let's just get all the preliminaries

24   out of the way.  Did it stay Route 101 Goods until today?

25   A.   No.

1    Q.   Did you close that business at some point?

2    A.   At some point.

3    Q.   And why did you do that?

4    A.   Believe it or not, people don't often need to purchase

5    gifts.  So, it operated for about five years, I believe, and at

6    that point, while we were still kind of making money, we

7    decided to pivot.  I suggested that we discuss changing it from

8    a gift shop to a convenience store with my wife.

9    Q.   And have you done that?

10   A.   Yes.

11   Q.   And when did that change be completed?

12   A.   It began in 2019, and we opened for business late in 2019.

13   Q.   And what is the name of the convenience store that you're

14   now operating?

15   A.   Mighty Moose Mart.

16   Q.   And Mighty Moose Mart, is that still operating in the same

17   661 Marlboro?

18   A.   Yes.

19   Q.   And has the rent, sort of the lease arrangement with

20   Mr. Freeman changed at all?

21   A.   Not really, but Ian invested in the new LLC and agreed

22   that we would not have to pay rent as long as we maintained

23   certain space for the Embassy.

24   Q.   Okay.  And just briefly, the Embassy, just so we know what

25   we're talking about, what is that, really briefly?

1  A.  The Embassy was an educational venture to teach people

2  about cryptocurrency and bitcoin and things like that, not so

3  much of why you should but at least how it works so people

4  could gain a better understanding of it.

5  Q.  And that's just part of the 661 Marlboro property?

6  A.  Yes.

7  Q.  Okay.  So, let's talk back to the Route 101 Goods days.

8  Was there a bitcoin vending machine in that space when you

9  opened Route 101 Goods?

10  A.  Yes, there was.

11  Q.  And was there a prior business that had been operating in

12  there?

13  A.  Yes.

14  Q.  And that bitcoin vending machine, who did that belong to?

15  A.  I don't know.  I know that Ian Freeman took care of it.

16  Q.  Okay.  Were all your conversations about its operation

17  with Ian Freeman?

18  A.  Yes.

19  Q.  And were you willing to have that machine carry on in your

20  business when you started Route 101 Goods?

21  A.  Certainly.

22  Q.  And are you interested in bitcoin?

23  A.  I am.

24  Q.  Why?

25  A.  When bitcoin came about in 2009 with the whitepaper it

1    represented something that kind of spoke to me, was that we

2    could have financial sovereignty; we didn't have to use the

3    currency that the Federal Government said we had to use.  This

4    was something that was scaleable and something that could be

5    used for everyday transactions that was not subject to the

6    whims of bankers and politicians.

7            I was very concerned with the fact that our currency

8    had been devalued 98 percent in the last hundred years.  That's

9    troubling to me, and bitcoin seemed to be much more resistant

10   to those sorts of whims of the government and of Wall Street

11   banks.

12   Q.   So, did it align with your small l libertarian ideas?

13   A.   Certainly.

14   Q.   And did you understand its pseudoanonymous sort of

15   qualities?

16   A.   I did.

17   Q.   And, just briefly, what does that mean to you?

18   A.   Well, pseudoanonymity means that bitcoin doesn't have a --

19   by default bitcoin, if I own bitcoin, there's nothing on that

20   bitcoin saying, This is Chris Rietmann's bitcoin, and if I give

21   it to somebody else, well, now the government can trace Chris

22   Rietmann sent this bitcoin over here.  It's based on

23   mathematical equations and based on math, so it just works.  It

24   just is.

25           There's a saying in the crypto community that, you

1    know, you can write whatever laws you like, but bitcoin doesn't

2    care.  It's simply algorithms and numbers and math.  It doesn't

3    really have or need any other oversight.

4    Q.    So, those -- the machine that was in Route 101 Goods, did

5    you have keys to that machine?

6    A.    No, I did not.  Originally, no.

7    Q.    And were you able to access the fiat currency that was put

8    into that machine?

9    A.    I was never able to.

10   Q.    Okay.  Do you know how that machine works?

11   A.    In general.

12   Q.    Okay.  And, in fact, did you make a video using one of the

13   machines in your store and make a demonstration of how to

14   purchase cryptocurrency?

15   A.    No.

16   Q.    Was a video made of that?

17   A.    Yes.

18   Q.    Are you in the video?

19   A.    I am in the video.

20   Q.    Okay.  And you've seen that video --

21   A.    Yes.

22   Q.    -- before?

23        MR. AFRAME:  Okay.  So, I'm going to ask that we show

24   the video

25                       (Video recording played)

1      MR. AFRAME:  Can we stop it right there?  Can we just

2   blow up the terms and conditions for a second?

3   Q.   Mr. Rietmann, I'm going to just read to you what's marked

4   as Rule Number 4.  Do you see that?

5   A.   Okay.

6   Q.   "Our staff love crypto and are happy to discuss them, but

7   they don't need to know why you want them.  Keep that to

8   yourself," exclamation point.

9   A.   Sure.

10  Q.   Did I read that correctly?

11  A.   Yes.

12  Q.   Okay.  Thank you.

13      MR. AFRAME:  You can continue the video.

14                    (Video recording played)

15  Q.   So, that video is about Dash, right?

16  A.   Yes.

17  Q.   Would it work equivalently for bitcoin?

18  A.   Yes.

19  Q.   And in that transaction there was a QR code.  What did

20  that provide when the person put the QR code up to the machine?

21  A.   The QR code was to the user's digital wallet.

22  Q.   Okay.  And we've talked about that earlier in the trial,

23  so the jury understands what that means.  Did that person have

24  to provide any personal identifying information to make that

25  transaction?

1    A.    No.

2    Q.    And is that how the machine worked; it didn't require any

3    personal identifying information?

4    A.    No.

5    Q.    As in, no, it did not?

6    A.    No, it did not.

7    Q.    Okay.  So, you told us already you're running a

8    consignment store, Route 101 Goods, right?

9    A.    Yes.

10   Q.    This machine is there, correct?

11   A.    Yes.

12   Q.    And you don't have -- you don't remember if you have the

13   keys, but you certainly, you said, you did not have access to

14   the money in it?

15   A.    On the original machine I did not have access to -- I

16   can't even say that for certain.  So, with these vending

17   machines there were generally -- and I'm kind of remembering

18   poorly the first one we had.  The second one definitely had two

19   different sets of keys.

20   Q.    Okay.

21   A.    One set of keys allowed you into the machine.

22   Q.    And, first of all, when did these machines change?

23   A.    I believe in 2017, 2018, but my memory is not clear on

24   that.

25   Q.    Did both sets of machines have the same you didn't need to

1    provide personal identifying information feature?

2    A.    No.

3    Q.    Neither one required it?

4    A.    Neither one had that --

5    Q.    Okay.

6    A.    -- had that enabled.

7    Q.    It was not enabled on either one?

8    A.    Correct.

9    Q.    Okay.  And what was your role as it relates to these

10   machines, then?

11   A.    I would help people who had questions or were having

12   trouble with purchasing bitcoin or other cryptocurrencies.  I

13   would answer their questions.  Occasionally the hardware would

14   have some minor hiccup or our internet service at the store

15   would go out, and it might be necessary to reboot the machine

16   or something like that, but never anything complicated.

17   Q.    Did you get any compensation for that kind of support?

18   A.    I can't remember exactly, but from time to time I believe

19   we did receive something from use of the vending machine.  Our

20   primary motivation was the vending machine did draw people into

21   our store, which was never a bad thing.

22   Q.    Okay.  And we read Rule Number 4 a second ago that said

23   your staff loved crypto coin but they don't need to know why

24   you're buying the coin.  Remember we read that a second ago?

25   A.    Correct.

1   Q.   And did you follow that rule as a general practice in the

2   store?

3   A.   I would say I follow that in the general practice in my

4   life.  It's none of my business what you do with the 20 bucks

5   that's in your wallet, and the idea that we would be interested

6   in a $20 transaction doesn't make any sense to me.

7   Q.   So, that was a $20 transaction?

8   A.   Right.

9   Q.   But there were all different kinds of transactions done at

10  that machine, right?

11  A.   The bulk of the transactions were, I would say, less than

12  500.  A large percentage of those were probably less than 100.

13  We had a lot of people show up who would want to buy $50 worth

14  of bitcoin because they were interested in what it might do.

15  Some people did probably go all the way up to the maximum that

16  the machine would allow, which was $5,000, which is a

17  considerable amount of money, but does that cross some limit

18  that --

19  Q.   I'm not suggesting it did.  My only question was did you

20  talk to people about putting money into the machine?  That was

21  my only question.

22  A.   Okay.  Yes.

23  Q.   You did not?

24  A.   I did talk to people about putting money into the machine.

25  Q.   And for what purpose?

1    A.    To purchase bitcoin.

2    Q.    And what was your goal in talking to them, to help them

3    purchase the bitcoin?

4    A.    If they were having trouble, yes.

5    Q.    Right.  And my question to you was -- I asked you about

6    Rule Number 4.

7    A.    Rule Number 4.

8    Q.    Which was talking about -- talking to people about why

9    they wanted the bitcoin.

10   A.    Right.

11   Q.    And I guess what I'm asking you is did you not talk to

12   people about that subject?

13   A.    I did not want to know why people would want bitcoin.  If

14   they were looking for an investment, I'm not one who can give

15   investment advice, and if they were, God forbid, doing

16   something illegal, I did not need to know that.

17   Q.    Okay.  And did there ever come a time on occasion when --

18   so let me ask you this before I ask that question:  You said

19   people would put -- you could put up to $5,000 into the

20   machine?

21   A.    Yes.

22   Q.    Could you do serial, if you wanted to, $5,000

23   transactions?

24   A.    I suppose you could, but I don't know that we ever noticed

25   someone doing that.

1    Q.   Did you ever -- did people ever talk to you about why they

2    were buying bitcoin from the machine even if you did not ask

3    them?

4    A.   Generally, no, but some people would offer some

5    information about why they were doing this, why they were

6    purchasing bitcoin, and if it were something innocuous we

7    would, just again, remind them that, We don't really need to

8    know why you're buying bitcoin.  But some of the things that

9    came up were troubling, and we would ask them to leave; we

10   would not want to have them as a customer.

11   Q.   And what were some of those non-innocuous incidents that

12   happened along the way that you recall?

13   A.   So, there were a few.  The first one -- the most -- one of

14   the most distinctive ones I remember was a gentleman who said

15   he owned a small business.  He said, I'm a business owner, and

16   I've got to buy bitcoin right away.  I'm, like, Hold on.

17   What's going on here?  He's, like, I just got a call from my

18   electric company, and they said they are going to turn off the

19   power in my plant if I don't pay them in bitcoin right away, so

20   I've got to do this quick, and I've got to get this transaction

21   done.

22        And I just said, You're getting scammed, sir.  There

23   is no electric company in New Hampshire that accepts bitcoin,

24   and they're certainly not really threatening to turn off your

25   power.  In my opinion, this is a scam.

1    Q.    Okay.  That's an example.

2    A.    And we kind of talked him off the ledge.

3    Q.    Any other examples?  Did you ever see a lady with a large

4    envelope of cash?

5    A.    Yes.

6    Q.    And what was that?

7    A.    She came in with a large envelope full of cash and said,

8    you know, she was very excited, I'm here to buy bitcoin and you

9    guys are here and we're glad, and she began to tell me what was

10   going on.  So, the arrangement was that she had answered a

11   help-wanted ad, and all she had to do was receive large

12   envelopes of cash at home.  These envelopes of cash came from

13   people from all over the country that were buying Toyota auto

14   parts, Toyota auto parts that are not available for purchase in

15   the United States.  And what they would do is they would pay

16   for these auto parts by sending her address money, and she was

17   then told to use this money to purchase bitcoin to send it out

18   of -- send it to the people that were providing the auto parts,

19   and they would take care of shipping it, shipping the auto

20   parts to the people.

21           In reality, what was happening was the only address

22   that these scammers actually published was her home address.

23   They would send money to her home address, and she would send

24   bitcoin I'm going to guess overseas, and then, when the whole

25   thing fell apart, she had been laundering money and providing

1    nothing of value to these people who thought they were getting

2    Toyota auto parts from Japan.

3    Q.   And just so I understand, these are stories or scenarios

4    that people were presenting to you because you weren't seeking

5    them out, but they just ended up telling you?

6    A.   Or during the course of -- I'm a personable guy.  I mean,

7    I talk to people, and these things -- sometimes people would

8    let things slip, and if we suspected a scam was going on, we

9    would quickly and decisively shut it down.

10   Q.   And did you see older people use the machine at times?

11   A.   So, I wouldn't say she was older.

12   Q.   In general, though.  I mean, in general did you see older

13   people use the machine?

14   A.   We saw people of all ages, I mean, from high school kids

15   that were interested in buying bitcoin for the first time up to

16   people that were elderly.

17   Q.   And did you ever see any older people saying they needed

18   to send bitcoin to family members or romantic partners?

19   A.   Occasionally we had the family member, and that was a

20   tough one, because she says, I need to send my daughter

21   bitcoin, and that I really can't -- I didn't feel strongly

22   enough to say no.

23        But we did have one lady who came in and -- I wasn't

24   in the store, my wife was -- she was describing how she had met

25   the love of her life online, and if she could just continue to

1    send him bitcoin he could then -- you know, they could be

2    together in America and once he had finished college and things

3    like this, which was obviously a romance scam.

4    Q.   And, as you encountered these various scenarios, would you

5    talk to Mr. Freeman about them?

6    A.   I generally did, yes.

7    Q.   Did Mr. Freeman -- were there ever any changes made to

8    either machine to require any kind of identification to make

9    the transactions?

10   A.   No.

11   Q.   Did you make a step at some point because of your concerns

12   about some of the activity you saw at the machine as far as a

13   sign?

14   A.   Yes, I did make a sign with some common scams, warning

15   people not to.

16           MR. AFRAME:  And this has already been --

17           THE COURT:  Admitted?

18           MR. AFRAME:  -- admitted as a defense exhibit.

19   Q.   And is that the machine in your store?

20   A.   Yes.

21   Q.   And is that the sign that you put up?

22   A.   Yes.

23   Q.   And I can't read all the words, but it says at the top,

24   Bitcoin Scam Alerts?

25   A.   Yes.

1    Q.   And there's a lot of words we can't see there, but did you

2    write them?

3    A.   Yes.

4    Q.   Did you show it to Mr. Freeman?

5    A.   Yes.  Actually, I think I just posted it on the machine,

6    knowing that he would be in and he'd see it, and if he had any

7    comments he would let me know.

8    Q.   Did you have any further conversation about it?

9    A.   Other than I think he said, Looks good, and left it at

10   that.

11   Q.   That was about it?  Okay.  But there was no changing in

12   the functionality of the machine, was there, how it worked?

13   A.   No.

14   Q.   So, you said you had some interest in bitcoin, right?

15   A.   Yes.

16   Q.   And did you come up with your own idea for bitcoin related

17   to bitcoin kiosks?

18   A.   I did.

19   Q.   And can you describe what your idea was?

20   A.   So, I believe in 2017-2018 I had always thought that

21   bitcoin vending machines would do very well in airports.

22   People were traveling, they would have access to ATMs, they

23   could get money and purchase cryptocurrency while they were

24   traveling.  So, my idea was to put bitcoin vending machines in

25   airports.

1    Q.   And what were you going to call your business?

2    A.   The working title was Flyby Coins.

3    Q.   And did you get far enough in this process to get a

4    business plan going?

5    A.   I did.

6    Q.   And did you consider -- so you were going to have maybe

7    not these exact kiosks but ones that were similar?

8    A.   Similar to them.

9    Q.   And had you decided whether your machines would have

10   identification requirements?

11   A.   Yes.

12   Q.   And what did you decide about that?

13   A.   I decided that they would have whatever the minimum level

14   of Know Your Customer law devices enabled and something like

15   that.

16   Q.   And did you decide whether, if you went ahead with this

17   business, you would license it as a money transmitter with

18   FinCEN?

19   A.   Yes, I did.

20   Q.   And what did you decide about that?

21   A.   I decided I would.

22   Q.   Okay.  Did you show that business plan to Mr. Freeman?

23   A.   Mr. Freeman and numerous others.

24   Q.   Did you hope Mr. Freeman would participate in it with you?

25   A.   I don't know -- at that point, when I showed it to

1    Mr. Freeman, it was pretty much an idea to get feedback on the

2    business plan itself.  I never thought that Ian would be

3    seriously interested in pursuing investment.

4    Q.   And what was his comments when he reviewed your business

5    plan?

6    A.   I think he said or something to the effect of, It looks

7    good but not for me.

8    Q.   Okay.

9    A.   It's not right for me, or something like that.

10   Q.   Was there any further conversation about that?

11   A.   No.  I mean, there were further conversations.  I was

12   hoping he could put me in touch with other potential investors.

13   Q.   And did that ever get off the ground beyond the business

14   plan?

15   A.   Did not.

16   Q.   Okay.  So, did you at some point become aware that in

17   addition to the kiosks, the kiosk in your store -- first of

18   all, were you aware that Mr. Freeman was operating other kiosks

19   besides the one in your store?

20   A.   Yes.

21   Q.   And do you know where they were?

22   A.   I believe.

23   Q.   Where?

24   A.   One was at Campus Convenience in Keene, New Hampshire.

25   One was at Murphy's Tap Room in Manchester, New Hampshire.

1    They escape me.  There may have been another one somewhere.

2    Q.   Okay.  In addition to the kiosk aspect of the business did

3    you at some point become aware that Mr. Freeman had another

4    method for trading bitcoin?

5    A.   He was selling bitcoin, yes.

6    Q.   Selling bitcoin.  And what did you -- how did that aspect

7    of Mr. Freeman's business work?

8    A.   I really did not know any of the details, but my

9    understanding was he was selling them online through

10   localbitcoins.com, which was a website.

11   Q.   And at some point did Mr. Freeman ask you for some help

12   with that aspect of the business?

13   A.   He -- I had reached a point in my business where I was

14   really tired of TD Bank.  Over very -- just through timing we

15   had -- I had something deducted, and it cost our account to go

16   negative, and they hit us with an onerous fee and $35 extra and

17   stuff like that.  So, I was, like, I really don't want to work

18   with you, so I began to look for another bank in the Keene

19   area.

20   Q.   Okay.  So, you didn't like TD Bank.  I understand that.

21   How does that connect to something Mr. Freeman asked you to do

22   for his business?

23   A.   So, after I got my account set up with Savings Bank of

24   Walpole, then I had this account that wasn't going to do

25   anything.  I had told Ian that I was going to shut down TD

1    Bank, and he said, Well, if you're not going to use TD Bank, I

2    may have a use for it.

3    Q.   Okay.  And did you come to some agreement about that?

4    A.   Yes.

5    Q.   And what were the basic understand -- terms of that?

6    A.   If I would allow him to have access to that bank account

7    for him to, I guess, sell bitcoin online, then we would have

8    some remuneration for the use of our bank account.

9    Q.   And did you actually end up signing a written agreement on

10   that topic?

11   A.   We did.

12   Q.   So, I'll show you now Government's Exhibit 503.  And can

13   you read just the top, the title of the document?

14   A.   Agreement to Assist Shire Bitcoin's Outreach Operations

15   with Banking Support.

16   Q.   And if we just went to the very end for a second, before

17   we look at the meat of it, the last page, the end of -- it's a

18   two-page document.  Yeah.  That's your signature, correct?

19   A.   Yes, it is.

20   Q.   And it talks about the --

21        MR. AFRAME:  If you go up a little bit, Caryn.

22   Q.   It talks about the TD Bank account that you just

23   mentioned?

24   A.   Yes.

25   Q.   And there was a Route 101 Goods account?

1    A.    Yes.

2    Q.    And that account number is there?  The account number is

3    there?

4    A.    I assume that's the correct account number.

5    Q.    Yeah.  And the agreement was back in July of 2017?

6    A.    Yes, that sounds about right.

7    Q.    And while Mr. Freeman's signature is not on this version,

8    was there performance under this agreement; that is, did Mr.

9    Freeman participate in the agreement by paying you from time to

10   time?

11   A.    Yes.

12   Q.    Okay.  So, let me go back to the beginning so we can just

13   see what this agreement's all about.  So, it says, This

14   agreement lays out the responsibilities of the banking

15   assistant, Route 101 Goods, regarding the Shire Free Church's

16   nonprofit bitcoin outreach operations, Shire Bitcoin.  Route

17   101 Local Goods will herein be referred to as Assistant, and

18   Ian Freeman will be referred to as administrator of the

19   operation.

20         Did I read that right?

21   A.    Yes.

22   Q.    And the next says, Risk.  Well, let me ask before I keep

23   going.  Did you write all this, or did someone else write it?

24   A.    Someone else did.

25   Q.    Do you know who wrote it?

1    A.    No.

2    Q.    While the activity of connecting people with bitcoins or

3    other cryptocurrency is not illegal, many banks do not

4    appreciate cash deposits being made at multiple locations daily

5    for some reason.  Assistant understands that any bank accounts

6    dedicated to the bitcoin outreach operation will exist for a

7    limited period of time, determined by the bank in question.

8    Therefore, the bank account may not be used for any other

9    purpose besides assisting the church.  This keeps accounting

10   simpler and won't inconvenience other banking operations of

11   assistant's main business when the bank inevitably shuts down

12   the account, which sometimes can happen with a very short

13   notice.

14         Did I read that right?

15   A.    Yes.

16   Q.    And did you follow that in the sense of, once you turn

17   over the Route 101 Goods account to Mr. Freeman, you stopped

18   making any Route 101 Goods deposits or withdrawals from the

19   account?

20   A.    Yes.  We did not commingle.

21   Q.    As a nonprofit outreach project run by a church, we do not

22   collect or pay taxes to any state agency regarding these

23   operations.  If assistant determines it needs to pay taxes on

24   its compensation under this agreement, that is up to the

25   assistant.

1          Did you pay taxes on monies you made pursuant to the

2     agreement?

3     A.    I don't believe so.

4     Q.    Assistant understands that in the cryptocurrency world

5     risks are highly involved, including risk of government attack.

6     While we in the church believe this is a God-given mission to

7     spread bitcoin and thereby foster peace, that does not mean the

8     evil state will not target us.  We are ready to stand for the

9     peace that bitcoin can bring to the world by depriving the

10    state of its ability to control the money supply and,

11    therefore, its ability to go to war.  Assistant understands

12    that state aggression is a risk it is willing to accept.

13          Did I read that correctly?

14    A.    Yes.

15    Q.    Reward:  In return for allowing administrator access to

16    assistant(s) bank account, and then there's an (s),

17    administrator will pay assistant 20 percent of daily net, paid

18    weekly on Thursdays.

19          Were you paid?

20    A.    Yes.

21    Q.    And roughly how much would you make from doing this?

22    A.    In those days, I mean, that was -- I cannot remember exact

23    numbers, but I'm going to guess a couple of hundred up to a

24    thousand or $1,500, maybe.  I don't know.  I'd have to look at

25    records.

1    Q.    And who would do the accounting?

2    A.    Mr. Freeman, Ian.

3    Q.    And how would you be paid?

4    A.    Either by a -- I think it was his personal check or -- I'm

5    not even sure.  We would get either a check that we would

6    deposit in our business's checking account or occasionally

7    through Cash App or something similar.

8    Q.    It talks about the Shire Free Church, and it says, While

9    we, plural, in the church believe this is a God-given mission,

10   etcetera, did you deal with anyone else related to this

11   agreement other than Mr. Freeman?

12   A.    No.

13   Q.    So, looking at responsibilities:  Assistant will need to

14   write checks to administrator or to Shire Free Church, whenever

15   requested, in order to facilitate efficient operations.

16         Did you sign TD Bank checks and then hand them blank

17   to Mr. Freeman?

18   A.    Yes.

19   Q.    Assistant will on occasion have to interface with bank

20   staff to assist with approving outgoing wire transfers ordered

21   by administrator or deal with any account issues that arise.

22         So, did you have to deal with account issues from time

23   to time that would arise?

24   A.    Yes.

25   Q.    And can you describe that to us a little bit?

1   A.   A bank would -- it was usually when my account was being

2   scammed or something was going on related to a deposit.  If it

3   was a cash deposit we would have -- people were going to say

4   they were going to deposit cash, and then they would come back

5   five minutes later and say, I can't believe that I deposited it

6   in the wrong account, could I possibly get the cash I just gave

7   you back so I could deposit it at the correct bank, or whatever

8   it was, and banks would frequently give them that money right

9   back.

10   Q.   How did you know all that?  Did you ever deal with any of

11   Mr. Freeman's bitcoin customers?

12   A.   Never.

13   Q.   So, what was your source of information to knowing what

14   you just told us?

15   A.   Generally Ian would mention that there is a problem with a

16   particular bank or particular area, a particular branch of a

17   bank, and I would contact them or something to talk to a teller

18   or talk to a bank manager or something.

19   Q.   But you really had no relationship -- I mean, you didn't

20   really know what was going on other than what Mr. Freeman told

21   you, correct?

22   A.   Correct.

23   Q.   So, why didn't Mr. Freeman contact the bank?

24   A.   Because he was not the account holder.  Though, in some

25   circumstances, sometimes he did get involved, but it was

1    generally me.

2    Q.   Okay.  And did you at any time ever talk to any customer

3    buying bitcoin from Mr. Freeman's business?

4    A.   No.

5    Q.   Upon the bank closing the account bank will cut assistant

6    a check for the remaining balance, which needs to be deposited

7    in assistant's other bank account, then a check cut to

8    administrator for the closed accounts ending balance minus the

9    initial amount of assistant starting balance.

10        Is that just a summary of what would happen if the

11   relationship ended?

12   A.   Yes.

13   Q.   Option:  Assistant may opt to provide administrator with

14   access to a bitcoin exchange account.  Normally, administrator

15   will use church exchange accounts to purchase bitcoin, but

16   having access to an account held by assistant can increase our

17   daily limits for operations, increasing reward to assistant.

18        So, you're familiar with bitcoin.  What's an example

19   of a bitcoin exchange?

20   A.   A business like Coinbase that buys and sells bitcoin, or

21   itBit or -- there's a million of them --

22   Q.   Okay.

23   A.   -- places you can go to online and purchase bitcoin.

24   Q.   And did you take Mr. Freeman up on the option of opening

25   up a bitcoin exchange account for him to use?

1    A.   I believe we tried with Genesis and one other, but it was

2    a nightmare of paperwork that we didn't feel was worth our

3    time.

4    Q.   Okay.  And if we go to the next page, up at the top,

5    Administrator Responsibilities:  Administrator will sell the

6    church's bitcoin through localbitcoins.com utilizing

7    assistant's bank account for cash deposits from buyers.  Is

8    that what happened, just people would be depositing money into

9    these accounts that were in your name but it was the bitcoin

10   business money?

11   A.   They would deposit money into an account owned by Route

12   101 Goods, LLC, and then I think they were purchasing through

13   an ad that would have said Ian Freeman or something like that.

14   Q.   Okay.  And did you ever have conversations with

15   Mr. Freeman about any of the ongoing transactions and local

16   bitcoins he may have been managing?

17   A.   Never really had any conversations about it.  The only

18   time we ever would have conversations would be is if an issue

19   came up that we needed to be involved in.  Other than that, it

20   was pretty much hands off.

21   Q.   And when you say an issue you needed to be involved in, is

22   that because you had to interface with the bank?

23   A.   With the bank, yes.

24   Q.   Okay.  And I think we can -- I think those are the

25   material terms.  There's a modification term.

1          The jurisdiction term says, The agreement is not

2     governed by any governmental law, only by the terms of this

3     agreement.  If there is a dispute the parties will find a

4     mutually agreeable arbitrator or, failing that, utilize the

5     American Arbitration Association.  Both parties agree to abide

6     by the arbitrator's decision.

7          Did you ever have to use that provision?

8     A.    No.

9     Q.    Okay.  And so, this agreement talks about a TD Bank

10    checking account that was in the name of Route 101 Goods.  Did

11    you open a second account in the name of Route 101 Goods that

12    Mr. Freeman was allowed to use?

13    A.    We opened a Bank of America account.

14    Q.    Okay.  And was that ever really used for Route 101 Goods

15    business?

16    A.    No.

17    Q.    When you opened that, even at the time of the opening you

18    told Bank of America it was for Route 101 Goods, right?

19    A.    Yes.

20    Q.    What was the intention at the time you opened it, though?

21    A.    That we would make this account available, just like we

22    did the TD Bank account.

23    Q.    Okay.  And when you say that, does that mean for use by

24    Mr. Freeman and his bitcoin business?

25    A.    Yes.

1    Q.    And so, did Mr. Freeman end up using that account?

2    A.    Yes.

3    Q.    And did you sign checks in the same way you did for TD

4    Bank, in blank, that Mr. Freeman could then use?

5    A.    Yes.

6    Q.    And I'm going to just take us through just one month of

7    accounts -- of the bank statements for Bank of America.  This

8    would be December 1, 2019 to December 31, 2019, and it's

9    Government's Exhibit 504.  And if we look up at the top do we

10   see in the -- we see Bank of America, right?

11   A.    Yes.

12   Q.    And then we see the name of your company, right?

13   A.    Yes.

14   Q.    Route 101 Goods, LLC in Alstead, New Hampshire.  Is that

15   your home address?

16   A.    Yes, it is.

17   Q.    Okay.  And going down, the account starts with a summary,

18   correct?

19   A.    Yes.

20   Q.    So, for the relevant period how much money was deposited

21   into this Bank of America account being used by the bitcoin

22   business?

23   A.    $787,300.63.

24   Q.    And how much was withdrawn?

25   A.    $562,743.

1  Q.   And how much was spent in checks?

2  A.   Checks were $257,565.

3  Q.   Okay.  And I just want to look at some of the transactions

4  as we go through this one month.  So, does "counter credit"

5  just mean cash?

6  A.   I guess.

7  Q.   And you don't know what the source of any of this money

8  is, right --

9  A.   No.

10  Q.   -- other than Mr. Freeman had control of your account?

11       Okay.  So we can see many, many counter credits of

12  various amounts?

13  A.   Yes.

14       MR. AFRAME:  Let's go to the next page.

15  Q.   At the top there there's a whole series of $9,000

16  transactions and some $8,000 transactions.  Do you see that?

17  A.   Yes.

18  Q.   And on 12/11 there was a $12,000 transaction?

19  A.   Yes.

20  Q.   And a $15,000 transaction on 12/16?

21  A.   Yes.

22  Q.   And then on -- if you just stop right there for a second.

23  On 12/17 there's a $22,000 transaction.  Do you see that?

24  A.   Yes.

25  Q.   And that looks different than the others, right?

1   A.   Yes.

2   Q.   So, what kind of transaction was that?

3   A.   It says, Wire type.  Wire in.  I just assume that's a wire

4   transfer.

5   Q.   That's right, a wire transfer of $22,000.  And who is the

6   originator of that wire transfer?

7   A.   If "Orig" means originator, Donald F. Huffman.

8   Q.   And the sending bank is what?

9   A.   If that is sending bank, Navy Federal Credit Union.

10  Q.   Okay.  And going further, and stopping there, do you see a

11  12/18 wire?

12  A.   Yes.

13  Q.   And is the Orig Loren E. Zavala Mendoza?

14  A.   Yes.

15  Q.   And that was for $12,000?

16  A.   Yes.

17  Q.   And 12/19 -- so we just saw Mr. Huffman on 12/12, right?

18  If you don't remember, I can show you.

19  A.   I can't recall.

20       MR. AFRAME:  Can you go back up so we can see when the

21  first Mr. Huffman was.

22  A.   12/17.

23  Q.   Sorry.  12/17.  My mistake.  12/17.  And that was $22,000,

24  right?

25  A.   Yes.

1          MR. AFRAME:  And can you go forward now?

2     Q.   And now this is Mr. Huffman on 12/19, right?

3     A.   Yes.

4     Q.   And same bank?

5     A.   Yes.

6     Q.   And $29,000, correct?

7     A.   Yes.

8     Q.   And on 12/20 is there a $65,000 wire?

9     A.   Yes.

10    Q.   And who is that from?

11    A.   A Jeffrey A. Schmidt.

12    Q.   And does it list First Midwest Bank?

13    A.   Yes.

14    Q.   And carrying on, and just a couple of days later here, on

15    12/23, do we see Mr. Schmidt again?

16    A.   Yes.

17    Q.   And that's $65,000 again?

18    A.   Yes.

19    Q.   And that's the First Midwest Bank?

20    A.   Yes.

21    Q.   And the reason for that was listed as, or it says DET.  It

22    says, For orphanage?

23    A.   I assume he told this bank that this was for an orphanage.

24    Q.   Did you ever end up at least writing a letter related to

25    the Mr. Schmidt transactions?

1    A.    I did.

2    Q.    And who actually wrote the letter?

3    A.    I have no idea.

4    Q.    Did you actually write the letter?

5    A.    I did not write the letter.

6    Q.    And was it related to a dispute that ended up involving

7    these wires?

8    A.    Yes.

9    Q.    And did you go as far as signing the letter?

10   A.    I don't think I signed it.  I might have.  I can't recall.

11   I do know I didn't send it.

12   Q.    Okay.  And why didn't you send it?

13   A.    I had concerns with some of the language used in the

14   letter.

15   Q.    Okay.  Which you did not write?

16   A.    Which I did not write.

17   Q.    And were you working with anyone else in this business

18   other than Mr. Freeman?

19   A.    No.

20   Q.    Okay.  And 12/24.  So, we saw 12/17 and I think 12/19 for

21   Mr. Huffman.  Do we see Mr. Huffman again here on 12/24?

22   A.    Yes.

23   Q.    And this is the Navy Federal Credit Union?

24   A.    That's correct.

25   Q.    And how much was this wire?

1    A.    $70,000.

2    Q.    Okay.  And so, that brings us to the $787,000 at the

3    bottom --

4    A.    Yes.

5    Q.    -- figure?  Okay.

6          And if we look at the money that went out on 12/18, it

7    looks like $136,959 was wired to BNF, which I suggest is

8    Beneficiary, Ian Freeman.  Do you see that?

9    A.    I see that.

10   Q.    And it's at the Service Credit Union?

11   A.    Yes.

12   Q.    And then two days later $93,317 to Ian Freeman?

13   A.    Yes.

14   Q.    And that doesn't say Shire Free Church, does it?

15   A.    No, it does not.

16   Q.    And the next one is $145,698, three days later, to Ian

17   Freeman?

18   A.    Yes.

19   Q.    And the next one is $94,452 to Ian Freeman?

20   A.    Yes.

21   Q.    And $92,317 to Ian Freeman?

22   A.    Yes.

23   Q.    Okay.  So, that's what accounted for the withdrawals,

24   right?

25   A.    Apparently.

1    Q.   Yup.  And then there's a series of checks, and they're

2    listed there, but down below we can see pictures of them.

3    These are just the fees.

4         MR. AFRAME:  But if you could just keep going.  And if

5    we could zoom in on the check -- yeah, that's fine.

6    Q.   So, Colleen Fordham is your wife, right?

7    A.   Yes.

8    Q.   And she was part of Route 101 Local Goods?

9    A.   She was.

10   Q.   And so, she signed some of these checks for the company?

11   A.   She did.

12   Q.   And the first check is made out to Ian Freeman --

13   A.   Yes.

14   Q.   -- for just over 76,000?

15   A.   Yes.

16   Q.   And the second check is made out to Ian Freeman --

17   A.   Yes.

18   Q.   -- over 36,000?

19   A.   Yes.

20   Q.   Neither of those is made out to the Shire Free Church,

21   right?

22   A.   That's correct.

23        MR. AFRAME:  And the second checks, going down.  We

24   did those two.  No.  Sorry.  Up.

25   Q.   So, right there, check 1602, that's made out to Ian

1    Freeman for just over $38,000?

2    A.    Yes.

3    Q.    And 1603 is just over $61,000 to Ian Freeman?

4    A.    Yes.

5    Q.    And a 12/13/19 check is made out to Ian Freeman for just

6    over 30,000?

7    A.    Yes.

8    Q.    And then there's one made out to your company, right, for

9    a much smaller amount?

10   A.    Yes.

11   Q.    Okay.  And, again, smaller checks.  One to your company?

12   A.    Yes.

13   Q.    And do you know who Jonathan Groves is?

14   A.    Jonathan Graves is a guy who snowplows for us, and I

15   assume that was incorrectly written out of the wrong account.

16   Q.    Because you weren't supposed to commingle, correct?

17   A.    No.

18   Q.    Okay.  And generally you would adhere to that?

19   A.    Yes.

20   Q.    And were these checks payments for the services you were

21   providing Mr. Freeman, do you know, that were made out to your

22   company?

23   A.    I would assume.

24   Q.    Okay.  Did you at some point decide that you wanted to

25   stop doing this bank activity?

1    A.   I did.

2    Q.   And why was that?

3    A.   When we began there were many times when I had to get

4    involved.  It seemed like the banks were getting very concerned

5    with any accounts that were getting cash deposits.  So, the

6    time necessary for me to straighten out or deal with banks was

7    increasing constantly.

8    Q.   Okay.  And did that -- and so why did it make you want to

9    stop?

10   A.   It was a drain on my time.

11   Q.   Okay.  And so, did you and Mr. Freeman come up with an

12   agreement to just stop -- for you to stop doing that work?

13   A.   Yes.

14   Q.   And that would be Government's Exhibit 505.  And is this

15   the termination agreement?

16   A.   Yes.

17   Q.   And if you go down to the bottom for a second.  And that's

18   signed by Mr. Freeman, I think it's electronically done, and it

19   says -- under the signature does it say February 11, 2020?

20   A.   Yes.

21   Q.   And you and Colleen both signed this one on the next day?

22   A.   If this is an electronic document, it appears so.

23   Q.   Yeah, yeah.  And you received a severance of $6,000?

24   A.   Yes.

25   Q.   And it says:  You may continue to negotiate with Bank of

1    America to regain lost funds wrongfully held by the bank.  Who

2    wrote this?  Did you write this document?

3    A.    I did not.

4    Q.    And did you continue to try to deal with Bank of America?

5    A.    I did make another phone call or two, but we were not able

6    to recover any of the money.

7    Q.    And it also says that this will be considered your

8    resignation from the Crypto Church.  Do you see that at the

9    bottom?

10   A.    Yes.

11   Q.    And other than signing the formation document of the

12   Crypto Church did you have any interim involvement with the

13   Crypto Church in any way?

14   A.    No.

15   Q.    And I just have one last document to show you, which is

16   505 -- I'm sorry -- 506.  The second page of this appears to be

17   a Route 101 Goods TD Bank check.  Do you see that?

18   A.    Yes.

19   Q.    And is this one that you signed to Mr. Freeman in blank?

20   A.    It has my signature and it looks like, yes, it would have

21   been a blank check I would have signed.

22   Q.    In other words, you didn't write CRYPTO CHURCH OF NEW

23   HAMPSHIRE or the $20,000?

24   A.    That's correct.

25   Q.    And did you make a church donation to the Crypto Church?

1   A.   No.

2   Q.   And if we go back a page of this exhibit do you see

3   Mr. Freeman's signature on the bottom right?

4   A.   Yes, I see a signature on the bottom right.

5   Q.   Do you recognize that as Mr. Freeman's?

6   A.   I wouldn't know what Ian's signature looked like.

7   Q.   Well, if we looked at Government's Exhibit 505, did

8   Mr. Freeman apparently sign this agreement?

9   A.   Apparently, but it's an e-signature, so -- yeah, I'm just

10  saying that I don't know if I've ever witnessed Ian's actual

11  signature.

12  Q.   Okay.  Fair enough.  But this is a $20,000 deposit to the

13  CRYPTO CHURCH OF NEW HAMPSHIRE with the address of 73 Leverett

14  Street, Keene, New Hampshire, correct?

15  A.   This is a severance agreement.

16  Q.   I'm sorry.  506.  So, we see Service Credit Union?

17  A.   Yes.

18  Q.   A signature on the bottom right?

19  A.   Yes.

20  Q.   We see this is for the CRYPTO CHURCH OF NEW HAMPSHIRE at

21  73 Leverett Street, Keene, New Hampshire?

22  A.   Yes.

23  Q.   It's a $20,000 deposit --

24  A.   Yes.

25  Q.   -- by way of check?

1   A.   Correct.

2   Q.   And the check is 31218, correct, looking at the top?

3   A.   The release date, yes.

4   Q.   And the date of the check that, looking at the next page

5   at the top, is also March 12, 2018?

6   A.   Yes.

7   Q.   And there's also a stamp put on the check that has the

8   same date, correct?

9   A.   Yes.

10          MR. AFRAME:  Okay.  Nothing further.

11          THE COURT:  Cross-examination.

12          MR. SISTI:  Thank you, Judge.

13                      CROSS-EXAMINATION

14   BY MR. SISTI:

15   Q.   Afternoon.

16   A.   Good afternoon.

17   Q.   Do you want me to address you as Chris or Mr. Rietmann?

18   What do you prefer?

19   A.   Whatever you prefer.  Chris is fine.

20   Q.   Okay.  That makes it simple.  You were involved in the IT

21   field for quite a while?

22   A.   Yes.

23   Q.   Okay.  Understanding computers and understanding, like,

24   that bitcoin vending machine and that sort of stuff, that's

25   almost second nature to you, right?

1   A.    I don't know about second nature.  It's complex, but I

2   kind of gravitated towards it, towards bitcoin.

3   Q.    All right.  And, again, why did you gravitate toward it?

4   I just want to get this down.

5   A.    It really seemed like the first opportunity we had had to

6   have money that was not controlled by banks and governments,

7   and that was a real appeal to me, so I had been following it I

8   think since 2010, didn't really get involved till 2012, 2013.

9   Q.    Okay.  Now, the arrangements that you had with Ian

10  Freeman, the church, these were generally very good

11  arrangements for you, weren't they?

12  A.    They were.

13  Q.    And why don't you tell the jury why they were.

14  A.    They were an opportunity.  Route 101 Goods did not make a

15  lot of money.  It was not something we were going to retire off

16  of, and it was a good way for us to supplement the income that

17  we were receiving from Route 101 Goods.

18  Q.    Okay.  Did you find Ian Freeman somebody that was

19  trustworthy, good to deal with?

20  A.    Yes.

21  Q.    Okay.  He was the go-to guy for you, and he kept his end

22  of the promises up?

23  A.    Always.

24  Q.    This case has a lot to do with the government basically

25  saying that Ian was helping scammers, you know, through money

1   laundering.  Did Ian ever express it to you in any way, shape

2   or form, any way, shape or form that he encouraged scamming?

3   A.    Never.

4   Q.    And how long have you known him?

5   A.    Since 2013.

6   Q.    Did he ever express to you in any way, shape or form that

7   he encouraged money laundering --

8   A.    No.

9   Q.    -- or intentionally looking the other way just for profit?

10  A.    No.

11  Q.    On the other hand, what did he express to you with regard

12  to those particular items of interest?

13  A.    I think on a couple of examples, like, for example, the

14  example of Mr. Schmidt, I think at some point he did express

15  gratitude that somebody was using bitcoin for good.  There is a

16  guy who is actually depositing money to build an orphanage, and

17  that's a positive thing, it's a good thing for the world.  I

18  don't know if he ever mentioned Mr. Schmidt's name, but there

19  was a conversation about someone purchasing bitcoin to build an

20  orphanage overseas.

21  Q.    Overseas?

22  A.    I believe so.

23  Q.    All right.  Did he ever encourage you to prey on old

24  ladies or anything like that at these vending machines?

25  A.    No.

1    Q.   Did he ever expect you to keep an eye out and make sure

2    people weren't getting scammed, if you could help him avoid it?

3    A.   No.

4    Q.   Did he ever say, Okay, all we're going to do here is just

5    try to make money?

6    A.   No.

7    Q.   You know, you put up a sign at your store and what, in

8    essence -- it was really blurry and nobody could read that

9    thing.

10   A.   Right.

11   Q.   Let's put it up for a second.  That was I think A5.  There

12   we go.  It's a sign over a machine.  I mean, he can't read it,

13   but that sign has something to do with scam warnings, right?

14   A.   Yes.

15   Q.   Okay.  What do you recall it basically saying?

16   A.   So, it was titled Bitcoin Scam Alerts, and I believe it

17   has five different scams that I had described, some of which

18   were like, you know, the utility company that must be paid

19   immediately in bitcoin, that's probably a scam, romance scams,

20   help wanted scams and things like that.  I wanted to put a sign

21   up to warn people using the machine, that I was just hoping

22   that, if somebody is getting scammed, they happen to glance up

23   and they might not get scammed.

24   Q.   It's not like you could be at that machine 24 hours a day,

25   right?

1    A.    Absolutely not.

2    Q.    Right.  That machine was for people to freely access and

3    do what they wanted to do with it, right?

4    A.    It was in a public space, and if people had problems we

5    would assist them, if asked.

6    Q.    Okay.

7    A.    If people didn't need assistance, we wouldn't bother.

8    Q.    All right.  And you call it a "vending machine."  Why do

9    you call it a "vending machine"?  I know it's not just a term

10   of art; it's part of an actual reason that you call it that.

11   A.    So, the term "bitcoin vending machine" I had never really

12   heard until I came to New Hampshire, but it was a very accurate

13   thing.  A lot of people would say, Well, you've got a bitcoin

14   ATM.  It's, like, it cannot be an ATM.  It's not connected to a

15   bank.  It's not dispensing bitcoins or anything like that, you

16   know.  They're virtual.  You can't make deposits at it.  And a

17   vending machine is a place where you can go and you can offer

18   some money, and you can receive something from a vending

19   machine.  I can receive a soda, I could receive a candy bar, I

20   could receive bitcoin.  It doesn't matter what it is; it's just

21   I'm offering something of value, my cash, and you're going to

22   return something of value to me.

23   Q.    All right.  And who actually would have owned the bitcoin

24   in the machine in your store from what you knew?

25   A.    I believe Ian Freeman or the Shire Free Church.

1    Q.   All right.  So, this wasn't some machine that was hooked

2    up so it could grab from other wallets out in the ether?

3    A.   No.

4    Q.   No.  Okay.  And I want to make this clear:  So, the

5    product that was being sold from that machine would have been

6    the product that was solely owned by Ian Freeman or this Shire

7    Free Church, correct?

8    A.   Yes.

9    Q.   It wasn't being accessed from another source and then

10   moved, transmitted to some other place?

11   A.   Right.  So, some machines are set up so that when you do

12   make a bitcoin purchase it will instantly go out and buy

13   bitcoin on the open market from an exchange and then give it to

14   the person.  In this case the bitcoin was actually owned by

15   either Ian Freeman or the Shire Free Church or whatever, and

16   just sold like you would sell anything else.

17   Q.   All right.  So, it wasn't out there fishing around,

18   servicing and moving things; it was selling its own product to

19   a specific individual?

20   A.   Not as I understand it was working, yeah.

21   Q.   Hey, what was the first rule on the terms, if you recall?

22   Not on the scam alert, but there were terms that would come up.

23   I think it was 501.  It's the video.  Can we hear that again?

24                      (Video recording played)

25   Q.   Okay.  These are the terms.  Can you see, or does it have

1    to be blown up?

2    A.    Yes.

3    Q.    You can see them?

4    A.    Yes.

5    Q.    Okay.  What are the terms?

6    A.    You must use a QR code from a wallet that you control.

7    Q.    That you control?

8    A.    Yes.

9    Q.    Okay.  Why is that Rule 1?

10   A.    I would assume, and I did not come up with the rules, but

11   I would assume that you didn't want to have third parties

12   involved in a transaction.

13   Q.    He wanted a single transmission or transaction from that

14   machine to the one person controlling the wallet?

15   A.    Yes.

16   Q.    Okay.  All right.  Why don't we keep going, then.

17   A.    Your cryptocurrency is your responsibility to keep safe

18   and spend safely.

19   Q.    Okay.

20   A.    All sales are final.

21   Q.    All right.

22   A.    Our staff love cryptocurrency and are happy to discuss

23   them, but they don't need to know why you want them.  Keep that

24   to yourself.

25   Q.    All right.  Now, you already explained that to the jury a

1    bit, and, again, just for clarification, did you ever in your

2    course of your business at Route 101 Goods ever have people

3    explain why they're buying anything from you?

4    A.   No.  Occasionally you would say, I'm buying this candle

5    for a gift.  Okay.  But I didn't ask where they got their

6    money.

7    Q.   Or what purpose the product was going to be used for or

8    anything of that sort?

9    A.   No.

10   Q.   Right?

11   A.   No.

12   Q.   So, as far as you're concerned, this is just another

13   product in your store that is being sold, correct?

14   A.   Yes.

15   Q.   Okay.  Keep going.

16   A.   This is a cryptocurrency vending machine, not an ATM.

17   Cash goes in, cryptocurrency comes out of our wallet into your

18   wallet.  Notice the machine has a $20 minimum purchase.  It

19   accepts 10, 20, 50 and 100-dollar bills.

20        MR. SISTI:  Okay.  We can take that down.

21   Q.   Let me ask, you were asked on many occasions the

22   demographics of who was utilizing the machine at the store.

23   You'd agree with me that it was all different ages, right?

24   A.   Yes.

25   Q.   Okay.  Kids coming in, dropping $20 in there, right?

1  A.   Yes.

2  Q.   Middle-aged people coming in, spending $100?

3  A.   Yes.

4  Q.   Older people $20, $1,000?

5  A.   Yes.

6  Q.   It was all over the place, right?

7  A.   Yes.

8  Q.   Okay.  It wasn't some hangout for any particular

9  demographic, was it?

10  A.   No.  It was all over the board.

11  Q.   It was all over the place, right?

12  A.   Yes.

13  Q.   Okay.  It wasn't some kind of a magnet to bring in people

14  that were being scammed from what you could see?

15  A.   No.

16  Q.   And when you would see something like that, you would try

17  to intercede, right?

18  A.   Yes.

19  Q.   And did Freeman ever say, Well, just let them buy the

20  stuff; we're going to make money off of this?

21  A.   No.  I don't think he had any opinion whatsoever on -- he

22  didn't look for me to be the morality police.

23  Q.   Right.

24  A.   But, yeah, he just didn't want to -- his viewpoint was we

25  shouldn't care what people are doing with their money.  It's

1    their money --

2    Q.   Right.

3    A.   -- not ours.

4    Q.   Okay.  Did you ever think that he was in this thing for

5    any nefarious reason?

6    A.   No.

7    Q.   The fees that would have been charged, did you ever have

8    any discussion with the government about the fees that were

9    being charged?

10   A.   Yes.

11   Q.   What was the discussion you had with them?

12   A.   It seemed like they were implying that the fees were

13   onerous, that anybody could go online and purchase bitcoin at a

14   much lower rate than Ian Freeman was selling bitcoin at.

15   Q.   And what was your opinion of the fees that Freeman was

16   setting for the sale of bitcoin?

17   A.   I thought the fees through the machine, which are what I

18   pretty much knew, were exactly in line with the market.  In our

19   area, in New Hampshire there was a vast discrepancy between

20   what our machine was selling bitcoin for and other machines

21   were selling bitcoin for.  In some cases we were lower; in some

22   cases we were slightly higher.

23   Q.   Okay.

24   A.   It was kind of right in line.

25   Q.   So, he wasn't trying to take advantage of anybody with the

1    fees?

2    A.    I don't think so.

3    Q.    No.  So, let's put it to you this way:  So, if the

4    government was saying Freeman operated these machines, he

5    didn't have --

6          MR. AFRAME:  Objection.  Can I approach?

7          THE COURT:  It's time for the break, so we'll do it on

8    the break.

9          Go ahead, Kellie.

10         THE CLERK:  All rise.

11              (The jury exited the courtroom)

12         THE COURT:  Sir, you can step down.  You can take a

13   break.  Go ahead.

14         MR. AFRAME:  I didn't ask a single question about

15   fees.  He's asking questions to say the government's position

16   is -- I mean, I may have asked him to question to try to figure

17   it out, but to say that it's the government's position, I

18   didn't ask a single question --

19         THE COURT:  It wasn't the first time he did it,

20   though, and you hadn't objected at all.  The whole case is

21   about X, what you think, he comments about it, you don't

22   object.  I'm sort of surprised.  In other words, he's

23   characterizing your case.  You know, there's limits to that,

24   and I guess what I'm about to say is it's not an objection I

25   could sustain, but I'll give you plenty of latitude to clean it

1    up on redirect.  Put it that way.

2         MR. AFRAME:  It's not the question about the fees.  He

3    can ask him what the fees are.  He can say the fees consisted

4    in his opinion --

5         THE COURT:  It's the question that he's characterizing

6    the fees as --

7         MR. AFRAME:  My opinion.

8         THE COURT:  -- part of your case.

9         MR. AFRAME:  My view, which I did not hear until that.

10        THE COURT:  I understand.

11        MR. SISTI:  Judge, I'll just throw it out there.  I

12   know you're not asking me to say anything, but let's clear the

13   air.  I think it's implicated by the Know Your Customers

14   absences that have been dealt with.

15        THE COURT:  Sure, that's true, but like the amount of

16   the fees, that's not something that they base their case on.

17   I'm not saying you can't inquire, by the way.  You certainly

18   can.  It's the prefatory remark.  You know what I'm saying?

19        MR. SISTI:  I understand.

20        THE COURT:  And I think I've got to sustain that

21   objection.  Yeah.

22        MR. AFRAME:  And I'm not saying fees are irrelevant.

23   They are relevant.  I agree with that.

24        MR. SISTI:  And I can rephrase the question.  We can

25   fix that.

1              THE COURT:  Yeah.  There was one time --

2              MR. SISTI:  Don't tell war stories.

3              THE COURT:  It's a war story from this case.  It's

4    just a battle story from five minutes ago.  This whole case is

5    about X and what do you think of X?  And I thought nobody is

6    standing up over here.  You don't have to accept anything like

7    that.  I think there's some latitude I'll allow in cross, but

8    all I'm saying is this:  Nobody should be testifying in their

9    questions, and if people object to it I'll rule.

10             All right.  15.

11             MR. SISTI:  Thank you.

12             THE CLERK:  All rise.

13              (Recess taken from 3:15 p.m. to 3:34 p.m.)

14             THE CLERK:  All rise for the jury.

15                     (The jury entered the courtroom)

16             THE CLERK:  Please be seated.

17             THE COURT:  You may resume your cross-examination.

18             And you're still under oath.

19             THE WITNESS:  I'm sorry?

20             THE COURT:  You're under oath.  You are still under

21    oath.

22             THE WITNESS:  Yes.  Thank you.

23             MR. SISTI:  Thank you, Judge.

24    Q.   Let me ask you this.  Let me get back to those kiosks,

25    okay?

1    A.    Okay.

2    Q.    Let's go back to those kiosks.  The lack of having to show

3    ID or put your finger on something, you are in agreement with

4    that, I take it?

5    A.    Yes.

6    Q.    And did anybody ever discuss that with you that was coming

7    in and purchasing bitcoin?

8    A.    Some people expressed that they came to those machines, in

9    particular, because they didn't feel that they should have to

10   show ID for a $20 purchase.

11   Q.    Okay.  It was the people that were coming in talking about

12   the $20 purchases that were saying, This is pretty good.  I'm

13   not getting nickelled and dimed by having to put my thumb on

14   something or show an ID?

15   A.    Regardless of how much people were purchasing -- I

16   couldn't say it was just $20 purchases.  It was generally all

17   people felt that they didn't need to provide a government

18   record for making a purchase with their money of something

19   someone else owned.

20   Q.    Okay.  That's simple?

21   A.    Excuse me?

22   Q.    I said that's very simple?

23   A.    Yes.

24   Q.    I can take this off.

25   A.    Please.

1    Q.   Thank you.

2    A.   Thank you.

3    Q.   All right.  So, let's go through that again.  The fees

4    that were actually charged, again what percentage was that?

5    A.   I couldn't say for certain.  I believe the fees were

6    variable, and I often asked Ian how much the machine was

7    charging, meaning what percentage was the cost of bitcoin

8    raised above kind of the average cost of bitcoin, if you were

9    to go online.  And people using the machine -- and I expected

10   that price to be higher, because I understood the costs that

11   are involved in these transactions.

12   Q.   Okay.  So, you didn't see anything out of whack from what

13   you knew?

14   A.   No.  They were in line with what all other machines in our

15   immediate area were charging.

16   Q.   Okay.  Let's move on to the checks in the accounts and so

17   forth.  Actually, you kept an account open and, I guess, opened

18   another account for the church, right?

19   A.   That is correct.

20   Q.   All right.  And you kept the 101 Goods account open.  You

21   were going to shut it down, but you kept it open.  That was the

22   one at TD?

23   A.   TD Bank, yes.

24   Q.   Okay, good.  And actually that account enured to your

25   benefit; that actually was making Route 101 Goods money?

1  A.   Yes.

2  Q.   So, the Route 101 Goods account at TD Bank was actually an

3  income-producing account for your business?

4  A.   Yes.

5  Q.   And about how much money would you make out of that

6  account that you decided to keep open at TD Bank per week, per

7  month, however you want to cut it, if you can recall?

8  A.   Like, would I leave money in the TD Bank account just for

9  the heck of it?

10  Q.   No.  I mean, what was it generating?  What was the

11  agreement generating for you?

12  A.   It would generate some amount of money, fees for use of

13  the bank account.  I can't remember.  But, I mean, we never

14  retired, so it seems to me like it was a thousand or maybe

15  $2,000 a month, and that's just guessing.

16  Q.   Okay.  But as long as it was profitable you would keep it

17  open?

18  A.   Yes.

19  Q.   All right.  And if it wasn't profitable you would shut it

20  down, and Ian would understand that, I take it, right?

21  A.   Yes.

22  Q.   Okay.  So, if it was -- the account was operating and it

23  was enuring to your benefit, then you would keep it open?

24  A.   Yes.

25  Q.   Okay.  And the same held true with the other account that

1   you opened, correct?

2   A.    Yes.

3   Q.    Bank of America; is that what it was?

4   A.    Yes, Bank of America.

5   Q.    And that was opened up in your business as well?

6   A.    That's correct.

7   Q.    And it was making money for your business?

8   A.    Yes.

9   Q.    Okay.  So, both accounts opened up in your business were

10  making money for your business?

11  A.    Yes.

12  Q.    No question about that?

13  A.    It was keeping our business alive.

14  Q.    All right.  So, by Ian entering into that agreement with

15  you, you were able to keep your business alive?

16  A.    Yes.

17  Q.    In fact, Ian was kind of -- he was a pretty good landlord

18  for you, wasn't he?

19  A.    Yes.

20  Q.    What was the deal on being a good landlord?  What was his

21  response when you were in money jams and so forth?

22  A.    If we were falling upon hard times, which was more often

23  than I'd care to admit, Ian was always willing to work with us

24  to delay a payment if we owed money for rent based on the

25  schedule.  He would rewrite the terms of an agreement we had.

1    He would always come up with a way that we could continue to

2    operate while we got our foot in and continued to operate.

3    Q.   So, would it be fair to say he was a good landlord?

4    A.   Yes.

5    Q.   Would it be fair to say he was a good guy to be in

6    business with?

7    A.   Yes.

8    Q.   And would it be fair to say that he was a good friend to

9    you?

10   A.   Yes.

11   Q.   Still is?

12   A.   Yes.

13        MR. SISTI:   Thank you.   I have nothing further.

14                    REDIRECT EXAMINATION

15   BY MR. AFRAME:

16   Q.   You opened up that Bank of America account in the name of

17   Route 101 Local Goods?

18   A.   That's correct.

19   Q.   The intention at the time you opened it was to allow it to

20   be used for Ian Freeman, slash, Shire Bitcoin business?

21   A.   Yes.

22   Q.   You made money doing that?

23   A.   Yes.

24   Q.   You didn't tell the bank the real intentions of the

25   account, right?

1   A.    They never asked.

2   Q.    Did you tell the bank that it really wasn't for Route 101

3   Local Goods' consignment business?

4   A.    No.

5   Q.    And when you say they didn't ask, should they have guessed

6   that it was a bitcoin business?

7   A.    When I open up bank accounts occasionally the banks would

8   ask, and this is the question I got almost every time:  So,

9   what does Route 101 sell?  What does Route 101 do?  What is

10  your business?  And I would explain that we are a consignment

11  shop, and I would describe the different products we sell.

12  Q.    Okay.  And you signed up at Bank of America as a business

13  account for Route 101 Goods?

14  A.    That's correct.

15  Q.    And when you started -- changed what your TD Bank account

16  was being used for you didn't tell the bank that either, right,

17  that it started to be used by Mr. Freeman's bitcoin business?

18  A.    I never talked to them about any changes to my account

19  that was existing since day one.

20  Q.    Mr. Sisti said you couldn't stand by the machine 24 hours

21  a day, right?  Do you remember him asking you that?

22  A.    Correct.

23  Q.    And I think you said it wasn't open 24 hours a day.

24  A.    Right.

25  Q.    But whenever it was open the machine could have taken

1    identification, right, whether you're standing there or not?

2    It could have done that?

3    A.    The machine had no capability of accepting identification.

4    Q.    Right.  And that's because I think you said those features

5    had been disabled.

6    A.    No.

7    Q.    Or they were not enabled?

8    A.    Correct.  They were not enabled.

9    Q.    They were not enabled.  So, they were possible, but they

10   were not enabled?

11   A.    Correct.

12   Q.    You described -- we talked about your Flyby Coins

13   business?

14   A.    Yes.

15   Q.    And you told me that was a vending machine, going to be a

16   vending machine, if you went through with it?

17   A.    Yes.  Yes, that would be a vending machine.

18   Q.    In the same sense you talked about with Mr. Sisti, that

19   you were going to buy the bitcoin and then sell it out of the

20   machine?

21   A.    Yes.

22   Q.    And you also told me you were going to register that with

23   FinCEN?

24   A.    Yes.

25   Q.    You seem like an intelligent person.  Did you try to

1    figure out whether you should do that?

2    A.    I knew that if I were going to get to the level that I

3    would there was not a chance that it would not be a

4    money-transmitting business.

5    Q.    Because you would be providing bitcoin and getting fiat

6    currency in the machine?

7    A.    Well, there were a number of reasons.  It would involve

8    multiple bank accounts.  It would involve accounts with

9    exchanges to allow two-way instant fulfillment of

10   cryptocurrency orders.  It would have to necessitate working

11   with a lot of other FinCEN-type businesses.  So, for all those

12   reasons you would have to be FinCEN -- it wouldn't have been

13   possible without it.

14   Q.    Again, it was a vending machine, as you conceived of it?

15   A.    Right.  And the vending machine that I would describe for

16   that business, in contrast to the vending machine we had in our

17   store, which was not tied into any exchanges or anything like

18   that.  That was something that was taking actual bitcoin that

19   somebody actually owned and selling it; where the proposal in

20   my machine for Flyby Coins was that, when you put in money, it

21   would initiate an actual transaction to a crypto exchange, who

22   would then send the money to the machine.  The machine would

23   then send the cryptocurrency to the customer.  So, it would

24   have been involving a lot of interactions with FinCEN-regulated

25   companies and entities.

1    Q.    Like banks?

2    A.    Like banks.

3    Q.    Like exchanges?

4    A.    And exchanges.

5    Q.    Okay.  And Mr. Sisti asked you what the fees were, but you

6    never really answered it.  So, what did you understand the fees

7    to be on the vending machine?

8    A.    On the vending machine side it varied over time.  It may

9    have been something like five percent, and it may have gone up

10   to ten at some point in time based on a lot of different

11   factors, but there always had to be some fee.

12   Q.    Okay.  And how much do you think you made in total doing

13   this work for Mr. Freeman with the bank accounts?

14   A.    I have no idea.  I mean, we got --

15   Q.    Well, you made it sound like it was essential to the

16   sustaining of your existence.

17   A.    Right.  But you're asking for an exact -- for what I'm

18   perceiving as an exact number.  I know that the $6,000 we

19   received as severance I think was the most -- the biggest check

20   we ever received.

21   Q.    So, I guess what I'm not following is you said to

22   Mr. Sisti it was critical to sort of sustaining the ongoing

23   concern that was your business.

24   A.    At points it certainly was.

25   Q.    And then you said to me you terminated it because it was

1    just too much of a hassle.

2    A.    Eventually the pros -- or the cons outweighed the pros.

3    Q.    Okay.  So, it was that much of a hassle?

4    A.    It became that much of a hassle.

5            MR. AFRAME:  Thank you.

6                    RECROSS-EXAMINATION

7    BY MR. SISTI:

8    Q.    Just a couple more.  Even though it was a hassle, you got

9    a $6,000 check, though, right?

10   A.    Say again.

11   Q.    You got a $6,000 check?

12   A.    Yes.

13   Q.    Yeah.  And let's go back to the showing ID thing.  This is

14   a recurring question thing, but let's say your Toyota person

15   with the parts and the money that you kind of sensed was part

16   of a scam came in and flashed her driver's license.  Would that

17   have stopped that scam?

18   A.    If she would have told me about it and flashed me her

19   driver's license it wouldn't have made any difference to me.  I

20   would have still told her she was getting scammed.

21   Q.    Right.  Now, if she went to a machine and didn't see a

22   human being and didn't say anything and flashed her driver's

23   license into the machine --

24   A.    Right.

25   Q.    -- she would continue to be scammed?

1    A.    It would not have stopped that scam.

2    Q.    So, the mere fact of having an ID or going through an ID

3    process would never stop a scam, would it?

4    A.    Generally, no.

5    Q.    And the fact that if -- let's just say this:  The fact

6    that somebody walks in and flashes a license into a machine

7    isn't going to stop any kind of an illegal transaction, is it?

8    A.    I don't think so.

9                    FURTHER REDIRECT EXAMINATION

10   BY MR. AFRAME:

11   Q.    If I were a drug dealer and I had $50,000 and I wanted to

12   put it in the machine, might I not be dissuaded by having to

13   put my ID into the machine?

14   A.    Well, you couldn't deposit 50,000.

15   Q.    You told me I could just do a series of transactions.  I'm

16   going to do ten $5,000 transactions.

17   A.    I guess, but I think we would have noticed.  I would have

18   certainly noticed if somebody were there to deposit ten

19   transactions in a row.

20   Q.    What would you have done, since you don't ask any

21   questions?

22   A.    I probably would have said, You're allowed to do a $5,000

23   transaction.  How did you do this?  I mean, at some point I

24   think the machine would have filled up and stopped working,

25   because it can't accept unlimited amounts of money.

1    Q.   Okay.  Do you agree that putting an ID could be a

2    dissuader to certain kinds of transactions?

3    A.   Certainly to certain types.

4    Q.   Okay.  Thank you.

5    A.   It could be.

6                MR. SISTI:  I have nothing further.  Thank you, Judge.

7                THE COURT:  You're excused.

8                THE WITNESS:  Thank you.

9                THE COURT:  Thank you.

10                     (Witness stepped down)

11                MR. AFRAME:  The United States calls Colleen Fordham.

12                THE CLERK:  Please remain standing and raise your

13    right hand.

14                **COLLEEN FORDHAM**, having been duly sworn by the Clerk,

15    was examined and testified as follows:

16                THE CLERK:  Please be seated.

17                THE WITNESS:  Thank you.

18                THE CLERK:  And for the record, could you please state

19    your name and spell your last name.

20                THE WITNESS:  Colleen Fordham, F-o-r-d-h-a-m.

21                          DIRECT EXAMINATION

22    BY MR. AFRAME:

23    Q.   Good afternoon, Ms. Fordham.  How are you?

24    A.   Good, thank you.

25    Q.   And how old are you?

1   A.   61.

2   Q.   And when you walked in did you pass your husband going

3   out?

4   A.   Yes, I did.

5   Q.   Okay.  So, you were introduced by him, so that will allow

6   us to sort of move through some of the preliminaries pretty

7   quickly.  What do you do?

8   A.   Run a convenience store.

9   Q.   What's the name of that?

10   A.   Mighty Moose Mart.

11   Q.   And where is that?

12   A.   Keene.

13   Q.   And who owns the building where it operates?

14   A.   Ian Freeman.

15   Q.   And we already learned, but when did you move to New

16   Hampshire?

17   A.   Approximately eight years ago.

18   Q.   And where did you move from?

19   A.   Pennsylvania.

20   Q.   And what kind of work did you do in Pennsylvania before

21   you moved here?

22   A.   Worked for Delta Dental Insurance Company.

23   Q.   Your husband described himself as a small l libertarian.

24   Do you share the same views?

25   A.   Yes, but maybe not as strongly.

1   Q.   And were you initially charged in this case?

2   A.   Yes, I was.

3   Q.   And what was the essence of what you were charged with

4   doing?  Do you remember, like, what the basics were?

5   A.   Wire fraud, money laundering.

6   Q.   And ultimately were the charges dismissed against you?

7   A.   Yes.

8   Q.   And do you have an agreement with the government?

9   A.   To testify.

10  Q.   Okay.  And so, you're fulfilling that agreement today.

11  And, in addition to testifying, what kind of testimony does the

12  agreement provide?

13  A.   The testimony doesn't --

14  Q.   What kind of testimony?  I mean, you took an oath, right?

15  A.   Yes.  Honesty.

16  Q.   Yes.  And if you didn't testify truthfully, what would be

17  the possible consequences?

18  A.   I could have the charges reversed.

19  Q.   Okay.  And you moved here in 2013.  Tell me about how

20  Route 101 Local Goods got started.

21  A.   I worked -- I started working there as a cashier for

22  somebody that was running a thrift store at the time, and then

23  he decided he didn't want to run the thrift store anymore

24  because it wasn't really panning out, so Chris and I came up

25  with this brainy idea to take over that space and bring in

1    local artisans to show their crafts, sell their crafts and what

2    not for them.

3    Q.   And did that end up being a successful business?

4    A.   Not really.

5    Q.   What was the problem with it?

6    A.   It just -- it wasn't busy enough, and it comes down to how

7    often do you go out and buy someone a gift type thing?

8    Q.   And in that store was there a bitcoin vending machine?

9    A.   Yes, there was.

10   Q.   And who owned that machine?

11   A.   Ian Freeman.

12   Q.   And are you familiar with the name Shire Free Church?

13   A.   I've heard of it, yes.

14   Q.   Who do you associate with the Shire Free Church?

15   A.   Ian Freeman.

16   Q.   Do you associate anyone else with it?

17   A.   Not that I'm aware.  I mean, there may be others.

18   Q.   But that you know of.

19   A.   No.

20   Q.   Did you go to any meetings of it?

21   A.   No.

22   Q.   Did you go to any services?

23   A.   No.

24   Q.   Do you have any understanding of its religious tenets?

25   A.   No, I do not.

1    Q.   Do you know anything else about it other than it's on your

2    lease and that it had some affiliation with the ATM?

3    A.   Yes.

4    Q.   Is that all you know?

5    A.   Yes.

6    Q.   So, tell me about the machines and how they sort of

7    operated in the store as -- like, what was Mr. Freeman's

8    responsibilities as it came to the machine?

9    A.   Just to come in and remove the cash.

10   Q.   And how often would he do that?

11   A.   It could be maybe every two, three weeks.

12   Q.   And what were you told to do as it pertains to the

13   machine?  Would you have any responsibilities?

14   A.   No.

15   Q.   Did you talk to the people that were using the machine?

16   A.   No.  We tried to avoid that.  We let them go do their own

17   business, but some would offer information.

18   Q.   And did you see sometimes older people using the machine?

19   A.   On occasion, yes.

20   Q.   And would they sometimes tell you what they were doing?

21   A.   A couple had, yes.

22   Q.   And what would they tell you?

23   A.   Sending their honey bitcoin abroad so they can come back

24   to the United States.

25   Q.   And did that trouble you?

1    A.    It bothered me.

2    Q.    Why?

3    A.    Because I didn't believe it.

4    Q.    And what would you do?

5    A.    Nothing.

6    Q.    Why not?

7    A.    It's their business.  We had a sign up that said, Please

8    don't tell us why you're buying bitcoin.

9    Q.    And you followed that?

10   A.    Yes, I tried to.

11   Q.    And whose sign was that?

12   A.    I'm sorry?

13   Q.    Whose sign was that, as in who --

14   A.    I can't remember if Chris printed that up or if Ian

15   printed it up.

16   Q.    What other observations did you make of the people using

17   the machine?

18   A.    There were just a wide variety of ages, types of people

19   and regulars and --

20   Q.    And did the machine require anyone to provide any sort of

21   identification?

22   A.    No.

23   Q.    Now, in addition to the vending machines did you at some

24   point come to learn that Mr. Freeman had another aspect to his

25   bitcoin business?  Did it involve banks?

1   A.   Online?

2   Q.   Yes, online selling.

3   A.   Selling.

4   Q.   And how did you come to be aware of that?

5   A.   I don't know if that information was told to me by him or

6   Chris.

7   Q.   Okay.  And did Mr. Freeman ever ask you to take on some

8   role in that business?

9   A.   On the online, no.

10  Q.   Did you ever do anything to help Mr. Freeman with that

11  business?

12  A.   I did, yes.

13  Q.   And what did you do?

14  A.   I opened the bank accounts.

15  Q.   And were you doing that in exchange for being paid?

16  A.   A slight fee, yes.

17  Q.   And were you paid the slight fee?

18  A.   I'm sure we were.  Chris handled all the finances.

19  Q.   Okay.  And if we look at Government's Exhibit 701 -- you

20  lucked out because we read this with Chris, so we won't read it

21  again with you -- but the top of the document says:  Agreement

22  to Assist Shire Bitcoin's Outreach Operations With Banking

23  Support.  Correct?

24  A.   Mm-hmm.  Yes.

25  Q.   And in the first paragraph there is a reference to Shire

1    Free Church and Shire Bitcoin, correct?

2    A.    Yes.

3    Q.    And then Route 101 Goods was there originally, and it's

4    crossed out, and Colleen is written in there, right?

5    A.    Yes.

6    Q.    And that's you?

7    A.    Yes.

8    Q.    Okay.  And the jury is familiar with this agreement, so we

9    can just go to the end of it.  And it refers to a bank account

10   at TD Bank?

11   A.    Yes.

12   Q.    And your name and an account number.  And this one was

13   signed in October of 2018, right?

14   A.    Yes.

15   Q.    And signed by you and signed by Mr. Freeman?

16   A.    Yes.

17   Q.    And this refers to this bank account at TD Bank.  How many

18   accounts did you end up opening for Mr. Freeman in total?

19   A.    I think it was a total of three.

20   Q.    Okay.  And do you remember where else they were?

21   A.    Credit Service Union and GFA.

22   Q.    Okay.  And did you ever go on a -- travel with Mr. Freeman

23   to open one of these accounts?

24   A.    I think he gave me a ride at one point to go and open one.

25   I think it was the GFA.

1    Q.    And where was that?

2    A.    I can't remember what town that was in.

3    Q.    Was it -- how far from Keene was it?

4    A.    40 minutes, 45 minutes.

5    Q.    Okay.  And when you went on that occasion to open the

6    account did you go in alone, or did Mr. Freeman come in with

7    you?

8    A.    I went in by myself.

9    Q.    And each of those accounts that you opened, when you

10   opened them what was your intention for the use of those

11   accounts?

12   A.    For Mr. Freeman to use.

13   Q.    Okay.  And if we went back in this agreement to the prior

14   page it would talk about -- if we look at responsibilities --

15   do you see that?

16   A.    Yes.

17   Q.    Assistant will need to write checks to administrator or to

18   Shire Free Church whenever requested in order to facilitate

19   efficient operations.

20         Did you sign checks over to Mr. Freeman for him to use

21   as he wanted?

22   A.    Blank TD checks, yes.

23   Q.    Okay.  And if we look at that agreement, in addition to

24   signing over checks it talks about having to have interchanges

25   with the banks or exchanges with the banks.  Do you see that in

1  the responsibilities part?

2  A.  Okay.

3  Q.  The second sentence:  You will on occasion have to

4  interface with bank staff to assist with approving outgoing

5  wire transfers.

6  A.  Yes.

7  Q.  And it also says, Or deal with any account issues that

8  arise?

9  A.  I would get phone calls, yes.

10 Q.  So, what kind of account issues would arise?

11 A.  Questioning a deposit, this cash deposit made to my

12 account.

13 Q.  And did that happen often?

14 A.  Not particularly, no, but when they did they were very

15 stressful for me to deal with --

16 Q.  Okay.

17 A.  -- because I didn't really run the accounts.

18 Q.  Did you ever deal with any of Mr. Freeman's bitcoin

19 customers?

20 A.  Absolutely no.  Just maybe the ones -- the ones that came

21 in the store.

22 Q.  No.  I'm referring now only to the online business.

23 A.  No, I did not.

24 Q.  Did you deal with anyone related to the online business

25 except for Mr. Freeman?

1    A.    No, I did not deal with anybody else.

2    Q.    Okay.  So, let me just show you an example at Government

3    705 of what we're talking about.  This is -- do you see Service

4    Credit Union?

5    A.    Yes.

6    Q.    I'm looking now at the bottom email.

7    A.    Yes.

8    Q.    If we go to the bottom --

9    A.    Mm-hmm.

10   Q.    -- sorry, of this page.  And this is from an investigator

11   at Service Credit Union?

12   A.    Yes.

13   Q.    And this is one of the accounts that you opened for

14   Mr. Freeman's online business?

15   A.    Yes.

16   Q.    And it says, Per our conversation, please forward any

17   correspondence between you and the other individuals, including

18   any instructions you were given in regards to your account,

19   funds they were sending to you or information they were

20   requesting from you.  Please forward this correspondence.  And

21   it provides an email, correct?

22   A.    Yes.

23   Q.    Was this the kind of communication that you would get that

24   you found stressful?

25   A.    Yes.

1    Q.   Okay.  And why did you find it stressful?

2    A.   Because I wasn't quite sure how to handle it.  I didn't

3    want to handle it.

4    Q.   Okay.  And if we look up at the top it says -- there's a

5    response.  So, the bottom email is at November 9th, 2018 at

6    3:33 in the afternoon, and the response is about an hour and 16

7    minutes later, and it says:

8         Hi, Amanda.  I'm sorry for any miscommunication, but

9    my customers don't give me instructions.  I'm the one who gives

10   them instructions, for instance, how to deposit their cash.  I

11   sell rare coins, like gold and silver, and these are my buyers.

12   To assist you with your investigation, I'm attaching IDs for

13   the three clients that have deposited into my account so far.

14   There is no fraud.

15        Mr. Bennets is a repeat customer, and Mr. Harris and

16   Ms. Powell are new.  I always ID my clients before selling to

17   them, and, as you know, the receiving institution always

18   requires ID at the time of the deposit.  I also take credit

19   cards, but many customers prefer to avoid the fee by using cash

20   deposit.

21        And then there are three names, Gunner Harris, Lynda

22   Powell, Thomas Bennets, a dollar amount ranging from $3,050 to

23   $16,700 and three dates in November, correct?

24   A.   Yes.

25   Q.   I hope that helps.  Please let me know if there's anything

1    else I can help you with.  Colleen Fordham.

2            Now, you told me a minute ago you never had any

3    communication whatsoever with any clients of Mr. Freeman.

4    A.    That's correct.

5    Q.    Were you selling rare coins like gold and silver?

6    A.    I had mentioned that to the bank at one point.

7    Q.    But I'm saying it says here, an email from Colleen

8    Fordham, I sell rare coins like gold and silver.  Did you sell

9    these three people rare coins like gold and silver?

10   A.    No.

11   Q.    Did you write this email?

12   A.    No.

13   Q.    Who wrote that email?

14   A.    I think Mr. Freeman wrote the email, because I did not

15   respond.

16   Q.    Did you give him access to your email address to do that?

17   A.    Yes.

18   Q.    Did that happen from time to time?

19   A.    I would say maybe a couple of times.

20   Q.    Okay.  And there are some photos attached, some drivers'

21   licenses attached to the email --

22   A.    Yes.

23   Q.    -- if we go down?  And those are the emails for Bennets

24   and Powell and Harris, Gunner Harris, Lynda Powell and Thomas

25   Bennets?

1   A.   Yes.

2   Q.   Did you have those emails?

3   A.   No.

4   Q.   Where did those emails come from?

5   A.   From Mr. Freeman.

6   Q.   And, if we go to 706 -- so the emails we were just looking

7   at were November 9th, 2018 with the Service Credit Union, and

8   now this is four days later, and if we went to the next page of

9   that email we would see that the email just prior to the one

10  written by Nathan Glines that I will show you in a second was

11  the one we just went over, right, the November 9th email?

12  A.   Yes.

13  Q.   And so this would be a response to that.  It's just the

14  next email in the chain, and it's to you, right?

15  A.   Yes, it is.

16  Q.   And it is some response from the bank, correct?

17  A.   Yes.

18  Q.   What did you do with that?

19  A.   To this email?

20  Q.   What did you do with it?  Based on the top, if we go right

21  up to the top, right, what happened to that email?  Where did

22  it go?

23  A.   I forwarded it.

24  Q.   To who?

25  A.   To Ian.

1    Q.    Why?

2    A.    For him to respond.

3    Q.    Okay.  And you said that you had a TD Bank account?

4    A.    Mm-hmm.  Yes.

5    Q.    And if we go to 707, were there issues in that account as

6    well sometimes?  This appears to be an email from Mr. Freeman.

7    Do you see that?

8    A.    Correct, and I was copied on it.

9    Q.    And you were copied, and it's to Ms. Beshey at TD Bank,

10   right?

11   A.    Yes.

12   Q.    And it says, Kathleen, if you go to the second paragraph,

13   as we discussed, Colleen is a contracted payment processor who

14   assists me as part of my church mission in selling bitcoin

15   online to buyers around the country.

16         Were you a contracted payment processor?

17   A.    If that's what you want to call it.

18   Q.    Well, what were you doing?

19   A.    I just opened bank accounts.

20   Q.    Okay.  And there's a discussion here about a transaction

21   involving somebody named Bruce Blamire and Jessica Lee Alewine.

22   Did you have anything to do with that transaction?

23   A.    No, I did not.

24   Q.    So, if I go to the next paragraph:  The account on

25   localbitcoins.com that opened a trade with Colleen and I is

1    named classicpaul.  Do you see that?

2    A.    Yes.

3    Q.    Were you opening any trades with people on

4    localbitcoins.com?

5    A.    No, I was not.

6    Q.    And it goes on to describe in some detail a scam situation

7    involving these people, right, if you just read that paragraph?

8    I don't want to take the time to read all of those words, but

9    is that what's being described there?

10   A.    Yes.

11   Q.    And does it talk about Mr. Freeman's procedure, what he

12   calls his KYC hoops, which includes showing ID and holding a

13   note dated and signed?

14   A.    Yes.

15   Q.    And he says that that, the next-to-last sentence, that

16   that procedure, if the person shows the up-front note and the

17   receipt with the required words it's a pretty sure thing they

18   are not a victim of a scam.

19           Did I read that right?

20   A.    I don't know -- oh.

21   Q.    Next-to-last sentence of that paragraph.  The next-to-last

22   paragraph on the page.

23   A.    Yes, that's correct.

24   Q.    And this was a $16,000 transaction?

25   A.    Yes.

1    Q.   And the next paragraph says Mr. Freeman did something

2    called a "reverse lookup," where he could verify a phone

3    number.  Is that right?

4    A.   Yes.

5    Q.   Were you involved in any of that activity?

6    A.   No.

7    Q.   And there's some discussion on the next page about what

8    that conversation that Mr. Freeman's reporting was, but if you

9    go to the next paragraph below that it says -- and, again, this

10   is, if you look at the very bottom of this email, this is Mr.

11   Freeman writing, right?  It's signed by Mr. Freeman at the very

12   bottom?

13   A.   I don't see the bottom.

14   Q.   You will in a second.

15   A.   Okay.

16   Q.   Is that signed by Mr. Freeman?

17   A.   Yes.

18   Q.   Okay.  So, if we go back up it says, So we have clear

19   evidence of a legitimate $16,100 sale of digital product, and

20   that product was delivered to the buyer with the account name

21   classicpaul.  At the time they had provided all the required

22   photos, and everything seemed to being completely normal.  It

23   was a little unusual for the account to be in one name and then

24   another person being the one showing ID, but it's not unheard

25   of.  As long as they jump all the hoops it's almost always

1    totally fine.

2         Did I read that right?

3    A.   Yes, you did.

4    Q.   If Ms. Alewine would like her $16,100 back, we would need

5    back the 1.499 BTC that she and Bruce purchased.  However, I

6    suspect she doesn't have the BTC, as she said she had sent it

7    to the supposed military guy overseas.  So, I'm sure she would

8    like the $16,100 back and that she's trying to scam the other

9    institution and subsequently TD Bank in order to get it.  If

10   the money is taken from Colleen's account, she and I will be

11   the victims of this scam, and Ms. Alewine would end up with the

12   money and the BTC she ordered with it.

13        So, Colleen, did you perceive yourself as a victim of

14   some kind of scam?

15   A.   No.

16   Q.   And then Mr. Freeman goes on to talk about his 3,000

17   transactions and positive feedback, right, at the bottom?

18   A.   Yes.

19   Q.   Okay.  And the photo of the person Mr. Freeman attached,

20   and we'll show you that, do you know this man?

21   A.   No.

22   Q.   If we go to the next page, do you know anything about this

23   person at all?

24   A.   No.

25   Q.   The last thing that I want to do is to show you a couple

1    of the bank statements from the accounts that you opened.  So,

2    in that very contract that we showed you it was a TD Bank

3    account.  And let me bring up Government's Exhibit 702, and

4    we'll go through just a couple of months of this bank account.

5              So, this is October 22nd, 2018 to November 21st, 2018,

6    so one month in the fall of 2018.  Was this a personal account

7    in your name?

8    A.   It's in my name, yes.

9    Q.   And it shows deposits of how much?

10   A.   Total?

11   Q.   Yeah, for that month.

12   A.   Beginning balance --

13   Q.   The second line --

14   A.   Three hundred and seventy-eight thousand, four hundred and

15   seventy-six thousand (ph).

16   Q.   Did Route 101 Local Goods make that in a year?

17   A.   No.

18   Q.   So, if we look down we see all sorts of deposits, right?

19   A.   Yes.

20   Q.   And it's all just cash deposits?

21   A.   Yes.

22   Q.   And when we get past that we'll come to the checks.  You

23   signed these checks?

24   A.   Yes, I did.

25   Q.   Did you write the words that are not the signature?

1    A.    I only signed the checks.

2    Q.    And what did you do once you signed them?

3    A.    I gave them to Mr. Freeman.

4    Q.    And so, the first check says, Pay to the order of Ian

5    Freeman, and it's over $34,000, right?

6    A.    Correct.

7    Q.    And going just across.  I'm sorry.  Going down.  Yup,

8    right there.  The second check, 11/6, that's also to Ian

9    Freeman, right?

10   A.    Yes.

11   Q.    $46,813?

12   A.    Yes.

13   Q.    And then 11/13/18 to Ian Freeman?

14   A.    Yes.

15   Q.    $74,506.

16   A.    Yes.

17   Q.    And then the next one, 11/19/18, Ian Freeman, $89,925,

18   correct?

19   A.    Yes.

20   Q.    11/1, $46,166?

21   A.    Yes.

22   Q.    $11,882, Ian Freeman on 11/7?

23   A.    Yes.

24   Q.    11/14, $28,236 to Ian Freeman?

25   A.    Yes.

1    Q.   And just to make sure I understand, all you did was put

2    the signature?

3    A.   Yes.

4    Q.   So, you didn't decide to write "Ian Freeman"?

5    A.   No, I did not.

6    Q.   And you gave the unsigned checks to Ian Freeman?

7    A.   I gave the signed checks to Ian Freeman.

8    Q.   Sorry.  You gave the signed checks to Ian Freeman?

9    A.   Yes.

10   Q.   Now, we'll just do this for one more month.  It doesn't

11   look too different from the prior month, but this is just the

12   next month, right?

13   A.   Yes.

14   Q.   The end of the fall of 2018.  And how much came in in that

15   month?

16   A.   312,333.

17   Q.   And if we just went through the daily account activity

18   again, will we see that that 300-and-some-odd thousand came all

19   in in cash?

20   A.   Yes.

21   Q.   And if we looked at 11/30 for a second there's a $25,527

22   cash deposit?

23   A.   Yes.

24   Q.   And they are all in various amounts, right, most in at

25   least four figures?

1    A.    Yes.

2    Q.    And if we go to the checks, again, was the process the

3    same where you were the person who signed these checks?

4    A.    Yes.

5    Q.    And did you give them to Mr. Freeman?

6    A.    Yes.

7    Q.    And we have an $80,000 check to Mr. Freeman?

8    A.    Yes.

9    Q.    And then we have a $20,651 check to Shire Free Church,

10   right?

11   A.    Yes.

12   Q.    And that's the only check we've seen to Shire Free Church?

13   A.    From what you've shown me, yes.

14   Q.    And the next one is $28,527 to Ian Freeman?

15   A.    Yes.

16   Q.    And $60,391 to Ian Freeman?

17   A.    Yes.

18   Q.    And then the next column $49,707 to Ian Freeman?

19   A.    Yes.

20   Q.    And the next one 53,366 to Ian Freeman?

21   A.    Yes.

22   Q.    And the next on $31,679 to Ian Freeman?

23   A.    Yes.

24   Q.    And then there's a $55 check to you.

25   A.    Yes.

1    Q.   You signed that check.  Did you also write the "Pay to the

2    Order of" and the $55?

3    A.   Yes.

4    Q.   No further questions.

5            THE COURT:  Cross-examination.

6            MR. SISTI:  Thank you, Judge.

7                        CROSS-EXAMINATION

8    BY MR. SISTI:

9    Q.   Afternoon.

10   A.   Good afternoon.

11   Q.   It's a family reunion here today, I guess.  Let me ask you

12   something, okay?

13   A.   Sure.

14   Q.   You made a deal with the government.  It was basically you

15   don't get charged with anything, right?

16   A.   Correct.

17   Q.   What were they saying they were going to charge you with?

18   A.   Five different felonies.

19   Q.   Why don't you tell the jury.

20   A.   I really can't remember all five.  I think two counts of

21   wire fraud, money laundering and -- oh, their terminology.  I

22   don't know the exact.  But I know there were five.

23   Q.   Let me ask you something.  I'm going to bear down on just

24   the money laundering for a second, okay?  Did you ever consider

25   yourself somebody that was involved in money laundering?

1   A.   No, absolutely not.

2   Q.   I mean, did you ever consider yourself some kind of

3   co-conspirator with Ian Freeman --

4   A.   No.

5   Q.   -- as a money launderer?

6   A.   No.  Absolutely not.

7   Q.   Was that ever any kind of an intent expressed in any way,

8   shape or form by Freeman to you?

9   A.   No.

10  Q.   Did you ever have an agreement with Freeman in any way,

11  shape or form to launder money?

12  A.   Absolutely not, no.

13  Q.   So, I mean, I guess let me just go down a little bit

14  deeper on this.  I mean, Freeman owns the building, I guess the

15  church, or Freeman is the representative of the church, owns

16  the building that you do business out of?

17  A.   That's correct.

18  Q.   Okay.  And he's a good landlord?

19  A.   Yes, he is.

20  Q.   He's always been honest and up front with you?

21  A.   Yes.

22  Q.   You trust him?

23  A.   Yes.

24  Q.   Is he somebody that you sense -- how many years have you

25  known him?

1    A.    Eight.

2    Q.    Eight years?  Is he somebody that you sense is out to take

3    advantage of other people?

4    A.    Absolutely not.

5    Q.    And why do you say that?

6    A.    Just knowing his personality, he's not capable, I don't

7    think -- I feel he's not capable of doing those sorts of things

8    to people.

9    Q.    Did you ever see him express any or encourage any kind of

10   a scam situation?

11   A.    No.

12   Q.    Did he ever express disinterest in scams?

13   A.    No, never discussed.

14   Q.    It was not discussed?

15   A.    No.  It wasn't something we discussed.

16   Q.    All right.  Did he manage -- he didn't oversee the machine

17   in your business, right?

18   A.    Chris and I pretty much took care of it.  He'd just come

19   in every two, three weeks, maybe, and just take the cash out.

20   Q.    Okay.  So, the people that would do business at your

21   business in the machine were basically under your observation?

22   A.    Correct.

23   Q.    And Freeman would have nothing to do with who came and who

24   went and who did business there?  All he did was take the money

25   out of the machine, replenish bitcoin, right?

1   A.   That's correct.

2   Q.   So, how you operated that machine was really something

3   that was up to you guys?

4   A.   Yes.

5   Q.   And you saw all kinds of people coming and going, right?

6   A.   Yes.

7   Q.   And can you describe, like, the age groups that would be

8   involved in bitcoin purchasing?

9   A.   From young 20s to 70s.

10   Q.   Okay.

11   A.   All types in between.

12   Q.   All types in between?

13   A.   Mm-hmm.

14   Q.   All right.  There wasn't any specific demographic,

15   anything like that?

16   A.   No.  Not that I'm aware of, no.

17   Q.   No?  All right.  And, in fact, I mean, Freeman wouldn't

18   have known what age groups were going in and out of there,

19   right?

20   A.   That's correct.

21   Q.   He wouldn't have known your regulars in the store?

22   A.   No.

23   Q.   He wouldn't have known if something looked shady or not

24   shady?

25   A.   That's correct.  Yes, he would not.

1   Q.   Basically, he was just a guy with a key that would take

2   money out of a machine?

3   A.   Yes.

4   Q.   Did anybody at your store complain to you about that

5   machine?

6   A.   No.

7   Q.   Did any law enforcement over the years that that machine

8   was operating openly out there in the public ever come up to

9   you and say, There's something goofy going on here, or,

10  Something's wrong; you shouldn't be doing this?

11  A.   No.

12  Q.   Do you have people like police officers and stuff come

13  into that store?

14  A.   They'll stop in for lunch once in a while.

15  Q.   And that machine is just sitting right there, right?

16  A.   You couldn't miss it.

17  Q.   And how long has it been there?

18  A.   Well, we've been in the building seven years.

19  Q.   Okay.

20  A.   There has been -- there was a smaller machine when we

21  first took over the store, and then there was another machine,

22  bigger machine that showed up maybe three, four years ago.

23  Q.   All right.

24  A.   So, it's been there the whole time we've been there.

25  Q.   And before?

1    A.   Yes.

2    Q.   All right.  So, it's been there a long, long time.  It's

3    always been a fixture in that building, right?

4    A.   Yes.

5    Q.   Okay.  Now, you did open up some accounts, right?

6    A.   Yes, I did.

7    Q.   But the accounts were opened up so you could profit as

8    well, right?

9    A.   A small percentage, yes.

10   Q.   Yeah.  It was like 20 percent of the net or something like

11   that?

12   A.   I don't know the exact figure, because that was between

13   Chris and Ian.

14   Q.   Oh, okay.  All right.  But if I told you that those

15   documents that you were reviewing, those agreements, indicated

16   20 percent of the net, would you disagree with that?

17   A.   I really can't answer that question.  I don't know.

18   Q.   That's fair.  Okay.  But you were getting something out of

19   it, right?

20   A.   Supposedly we were getting a little something, yes.

21   Q.   And let me tell you something else.  Let me ask you

22   something.  Did Freeman at any point in time say, I want you,

23   Colleen, to lie to the banks?

24   A.   Oh, he discouraged it majorly.  No, he did not.

25             MR. SISTI:  Could I have 707 pulled up for a second,

1   please?

2          Can you folks see that okay?  That's a little rough.

3   Maybe we can get a better screen on it.  We're going to try to

4   amplify it a little bit.

5   Q.   Can you see that okay?

6   A.   I think so.

7          MR. SISTI:  All right.  Can you guys see that all

8   right?  Okay.

9   Q.   This is that note, that letter, the email that was sent by

10  Ian to Kathleen.  Do you see that?

11  A.   Yes.

12  Q.   And Kathleen would have been the person that was

13  investigating and kind of sent you an email?

14  A.   I believe so, yes.

15  Q.   Right.  It wasn't read in its entirety, and I want to make

16  sure that the jury understands where we're going here, okay?

17  A.   Okay.

18  Q.   All right.  This is directed to Kathleen, who had reached

19  out to you, right?

20  A.   Yes.

21  Q.   Okay.  And Ian is writing it, there's no question that

22  he's writing it, and you're not writing it, right?

23  A.   That's correct.

24  Q.   All right.  So, he's answering the bank himself?

25  A.   Yes.

1    Q.    He's not hiding that he has an interest or some kind of a

2    duty to respond, right?

3    A.    Correct.

4    Q.    Okay.  And it says:  Thank you for the time today.  Sorry

5    I couldn't send this before your day ended, but I just got back

6    to the office.  As we discussed, Colleen Fordham is a

7    contracted payment processor who assists me -- and you said you

8    could say that -- as part of my church mission in selling

9    bitcoin online to buyers around the country.

10          And you understand that's what he does?

11   A.    Yes.

12   Q.    You can see that her account has had very few issues over

13   the last year, and that is because we are very careful about

14   identifying customers and putting them through security and ID

15   verification procedures that prevent various types of fraud,

16   including the man-in-the-middle attack.  However, very rarely

17   somebody cooks up a scam we've never seen before.  I suspect

18   this situation with Bruce Blamire and Jessica Lee Alewine is

19   just that.

20          Okay.  And those were the people that were in question

21   that was brought to your attention, right?

22   A.    Yes.

23   Q.    All right.  So, Ian's taking it upon himself to explain

24   what's going on here, right?

25   A.    Yes.

1    Q.   Okay.  The account on localbitcoins.com that opened a

2    trade with Colleen and I is named classicpaul.  You can see it

3    here.  And he laid it out.

4    A.   Yes.

5    Q.   The LocalBitcoins site shows me a little more information

6    about the account, since we had an open trade together.

7              Now, he's saying quite clearly that it's him that was

8    involved in that trade, right?

9    A.   Yes.

10   Q.   I'm attaching a screenshot of that, and there was an

11   attached screenshot.  The contact attachment X photos are the

12   photos sent to me during the trade by whoever was operating the

13   account.  As you can see from the localbitcoins.com classicpaul

14   screenshot, the name registered on the account is Jessica Lee

15   Alewine.

16             Now, all that is open, that's out there, you can see

17   that, right?

18   A.   Yes.

19   Q.   Okay.  If you care to see it, I can show you the

20   interactions I had with the account during the trade, but the

21   summary is this, and he goes on to explain what took place,

22   because he, Ian, is saying he, Ian, is the guy that made the

23   trade, right?

24   A.   Yes.

25   Q.   Okay.  They open the trade, and, as a new customer to me,

1    I had them jump through my KYC hoops, including showing ID,

2    holding a note dated and signed that shows clearly the

3    individual is aware they are purchasing bitcoin.

4           So, let me just stop right there.  He's not hiding the

5    fact that he's selling bitcoin.

6    A.    No, he is not.

7    Q.    He is not hiding the fact that he is selling bitcoin to a

8    bank investigator, right?

9    A.    Correct.

10   Q.    This avoids the man-in-the-middle scam, where a victim is

11   told by the scammer they are buying a car or something and then

12   gets nothing.  After the deposit was made you can see the

13   photos of Bruce holding the TD receipt, which has been written

14   on explaining that there are no refunds and that the purchase

15   was for bitcoin, right?

16   A.    Yes.

17   Q.    If the person shows the up-front note and the receipt with

18   the required words, it's a pretty sure thing they are not the

19   victim of a scam.  Bruce was clearly aware he was buying a

20   large amount of bitcoin.

21          Okay.  Now, that's Ian's opinion, and he's describing

22   everything that's in the photos, right?

23   A.    Yes.

24   Q.    Once I was aware of the $16,100 being frozen by TD, I did

25   a reverse phone lookup for Ms. Alewine and called her Thursday

1    at 4:58 p.m. at the first number I found for her on

2    whitepages.com to which I am a paid subscriber, so I can get

3    people's cell phone numbers in the rare case I need to dig up

4    information on suspicious trade.  Ms. Alewine's number is

5    603-261-4045.

6              Okay.  So, that's the end of page 1.  He's giving a

7    lot of information to the bank representative, he is talking

8    about bitcoin, he is explaining the trade, correct?

9    A.    Yes, he is.

10   Q.    All right.  He's not dumping it on you, is he?

11   A.    No.

12   Q.    All right.  What's the next page?  Page 2.  She answered

13   the phone sounding kind of out of it.  I told her I was

14   investigating the $16,100 deposit that Bruce made that week and

15   that I had heard that she had raised some kind of issue with

16   the deposit.  (This is what Colleen's understanding of the

17   situation was on Thursday after she first spoke with you).

18             And that was the conversation, right?

19   A.    Mm-hmm.  Yes.

20   Q.    And then you relayed that to Ian?

21   A.    Yes.

22   Q.    Ms. Alewine denied having any kind of issue with the

23   transactions, saying they were buying bitcoin for someone they

24   know overseas in the military.  I have no idea if the military

25   story of hers is true, but regardless she admitted that she was

1  buying bitcoin and said she had Bruce conduct the transaction

2  because she did not have her ID.  She claims she went to the

3  hospital the next day after the transaction and that she was

4  still there and did hear some beeping in the background -- I'm

5  sorry -- I did hear some beeping in the background.  She then

6  asked me how much time she would be going to jail for.  I'm not

7  sure why she asked me that.  Perhaps because I told her I was

8  investigating the incident or perhaps that in whatever state of

9  mind she was -- let me get to where we are.  Okay.  She claims

10  she went to the hospital the next day after the transaction,

11  that she was still there, and I did hear some beeping in the

12  background.  She then asked me how much time she would be going

13  to jail for.  I'm not sure why she asked me that.  Perhaps

14  because I told her I was investigating the incident, or perhaps

15  that in whatever state of mind she was in at the time she knew

16  that she had been caught in an attempt at fraud.  I told her

17  she's not in trouble at this time and thanked her for

18  confirming she was indeed aware she was buying bitcoin.  She

19  said that she was present with Bruce at the TD branch when he

20  made the deposit.

21          So, he's giving all this information to the

22  investigator?

23  A.    Yes.

24  Q.    You wouldn't have known any of this?

25  A.    No.

1    Q.   So we have clear evidence of a legitimate $16,100 sale of

2    a digital product, and that product was delivered to the buyer,

3    the account name classicpaul.  At the time they had provided

4    all the required photos, and everything seemed to be completely

5    normal.  It was a little unusual for the account to be in one

6    name and then another person be the one showing the ID, but

7    it's not unheard of.  As long as they jump all the hoops, it's

8    almost always totally fine.  If Ms. Alewine would like her

9    $16,100 back we would need back the 1.499 BTC that she and

10   Bruce purchased.  However, I suspect she doesn't have the BTC,

11   as she said she sent it to the supposed military guy overseas,

12   so I'm sure she would like the $16,100 back, and that she's

13   trying to scam the other institution and subsequently TD Bank

14   in order to get it.  If this money is taken from Colleen's

15   account -- and he does say your account?

16   A.   Yes.

17   Q.   -- she and I will become the victims of this scam.  And

18   the "she and I" would mean that your account, of course, would

19   be charged, and you would lose some of the money that you were

20   supposed to be contracted to get, right?

21   A.   Yes.

22   Q.   And Ms. Alewine would end up with both the money and the

23   BTC she ordered with it.  I would be happy to answer any

24   questions you have about this matter and have cc'd Colleen on

25   this email, so please do Reply All when you write back.  You

1    had mentioned the other financial institution only called you

2    and had not actually sent anything in writing.  I'm --

3              THE COURT:  Counsel, slow down a little bit.

4              MR. SISTI:  I'm sorry, Judge.

5    Q.   I'm curious as to what they are claiming was told to them,

6    because we should have all the evidence we need to prove our

7    involvement was as honest sellers of bitcoin.  My seller's

8    account has over 3,000 transactions in three years with 100

9    percent feedback and has traded with nearly 2,000 different

10   people.  You can see my reputation on the LocalBitcoins site

11   here, and he leaves the site number.

12             Thank you for your time and attention to this matter.

13   Please let me know if I can better help you understand what has

14   happened.

15             Now, that all came from Ian, right?

16   A.   Yes.

17   Q.   Ian was answering this investigator's inquiries, because,

18   quite frankly, you didn't know anything about those

19   transactions, right?

20   A.   No, I did not.

21   Q.   And he didn't say in any of his responses that you had any

22   indication or any interest or any knowledge of what took place

23   during that particular transaction, right?

24   A.   That's correct.

25   Q.   He took it upon himself to say it was a bitcoin

1   transaction; he took it upon himself to lay out the specifics

2   as he knew them; he gave them phone numbers and descriptions

3   and photographs, right?

4   A.   Yes.

5   Q.   Was there anything that you recall him holding back -- I

6   mean, is there anything that he held back that you are aware

7   of?

8   A.   Not that I'm aware of.

9   Q.   Now, you're still in that building?

10  A.   Yes.

11  Q.   And you're still doing business as a convenience store

12  now, right?

13  A.   We're doing it as a convenience store now, yes.

14  Q.   Okay.  And the building is still owned and operated by the

15  church?

16  A.   As far as I know, yes.

17  Q.   And Ian is still, in essence, the landlord?

18  A.   Yes.

19  Q.   And he's still treating you fairly?

20  A.   Yes.

21  Q.   Thank you.

22          THE COURT:  Redirect.

23                      (Pause)

24          THE COURT:  You may proceed.

25          MR. AFRAME:  Could we not show the jury for a second?

1    Mr. Sisti --

2            THE COURT:  Has Mr. Sisti seen this yet, this

3    document?

4            MR. AFRAME:  It's the indictment.  I'm sorry.

5            THE COURT:  I'm not exactly sure what's going on here.

6            MR. SISTI:  I don't either.

7            MR. AFRAME:  It will be very exciting once it happens.

8            MR. SISTI:  I'm okay.

9            THE COURT:  You may proceed.

10                        REDIRECT EXAMINATION

11    BY MR. AFRAME:

12    Q.   So, Mr. Sisti asked you a bunch of questions.

13            THE COURT:  Do you have any objection to the jury

14    seeing this document?

15            MR. SISTI:  I think that we don't even have to do

16    that.

17            THE COURT:  Okay.  Whatever.

18            MR. AFRAME:  It's not important to me either.

19            THE COURT:  You can proceed.

20    Q.   Mr. Sisti asked you some questions on the premise that you

21    were charged with money laundering in this case.

22    A.   I thought I had been.

23    Q.   Okay.  If I showed you the indictment, which I will on the

24    screen --

25    A.   Okay.

1    Q.   This is the indictment, right, and you're named in the

2    caption?

3    A.   Yes.

4         MR. AFRAME:  And if you just go to the end, Caryn, if

5    you could just go to --

6         MS. MACDONALD:  I think it's being displayed to the

7    jury.  I don't know.

8         THE COURT:  It sounds like nobody cares.  Go ahead.

9         MR. SISTI:  It's okay.

10         THE COURT:  Trying to get to the end, right?

11         MR. AFRAME:  Yeah, trying to get to the end.  All

12    right.  Back up one.

13         THE COURT:  There you go.

14    Q.   Count 20 is money laundering.  Do you see that?

15    A.   No.  Where?

16    Q.   Right there.

17    A.   It's kind of blurry.

18         THE COURT:  Your screen is blurry?

19         THE WITNESS:  A little bit, or it's my glasses.

20         THE COURT:  Yeah.

21    A.   Where am I looking, Seth?

22    Q.   Do you see in paragraph 26, do you see Count Twenty in

23    bold print above that, about where your finger is?

24    A.   Oh, yes, yes.

25    Q.   And that says "money laundering" right?

1    A.   Yes, yes, yes, yes.

2    Q.   And your name is not in that count, is it?

3    A.   No, it's not.

4    Q.   Okay.  That's fine.  Right?  So, you weren't charged with

5    money laundering?

6    A.   I guess not, but there were a total of five.  That much I

7    do remember.

8            MR. AFRAME:  Okay.  And can we pull up Exhibit 705.

9    Q.   You told Mr. Sisti that Mr. Freeman said, Never lie to the

10   banks, right?

11   A.   Yes.

12   Q.   And this is -- this document we looked at when you

13   testified, and you said Mr. Freeman wrote this, correct?

14   A.   Yes.

15   Q.   And he wrote this under your name, correct?

16   A.   Yes.

17   Q.   Do you consider that honest?

18   A.   At that point I didn't care.  I wanted this responded to.

19   Q.   And it says, I sell rare coins like gold and silver.  Were

20   you aware of Mr. Freeman selling gold and silver?

21   A.   No.  I had said that to a bank rep during a phone call.

22   Q.   Right.  That's not what I'm asking you.  You didn't write

23   this email, right?

24   A.   No.

25   Q.   Mr. Freeman wrote it, right?

1   A.   Yes.

2   Q.   And it says, I sell rare coins like gold and silver.  Were

3   you in a business with Mr. Freeman to sell gold and silver?

4   A.   No.

5   Q.   So, that's not true, right?

6   A.   That's not true.

7   Q.   Okay.  And if we just go to 707 for a second.  Before I

8   show you 707, Mr. Freeman had you -- we looked at two months of

9   bank statements, right?

10  A.   Yes.

11  Q.   That was $600,000 in two months' business?

12  A.   Yes.

13  Q.   What did you know about it?  What did Mr. Freeman tell you

14  about this, what looks like in a very short time to be a

15  multimillion-dollar business you were involved in?

16  A.   Just that he was selling bitcoins online.

17  Q.   Okay.

18  A.   I stayed out of the --

19  Q.   And if we look at page 2 of this, in the second full

20  paragraph at the end it says, As long as they jump all the

21  hoops it's almost always totally fine.

22        Do you have any idea if that's true or not?

23  A.   I don't know for sure, no.

24  Q.   Okay.  Thank you.

25        THE COURT:  Recross?

1          MR. SISTI:  Yeah, just real quick.  It's getting late

2     here.

3                        RECROSS EXAMINATION

4     BY MR. SISTI:

5     Q.    Bitcoins is coins, right?  In your head are they rare, or

6     are they common?

7     A.    Rare.

8     Q.    Mr. Aframe was talking about a total number of

9     transactions that add up to $600,000.

10    A.    Yes.

11    Q.    You don't know what the take is on $600,000, do you?

12    A.    No.

13    Q.    You don't know if you made money or you lost money with

14    $600,000?

15    A.    No.

16    Q.    Thank you.

17              MR. AFRAME:  Nothing further.

18              THE COURT:  Ma'am, you're excused.

19              THE WITNESS:  Thank you.

20              THE COURT:  Thank you.

21                        (Witness stepped down)

22              THE COURT:  Your next witness, is it long or short?

23              MS. MACDONALD:  It's about 45 minutes.

24              THE COURT:  About 45.  I think these people have been

25    here long enough.  I'm going to send you home.

1          All right.  Ladies and gentlemen of the jury, my usual

2     admonition:  Don't talk to each other or anybody else about the

3     evidence in this case during the recess, and no independent

4     research or investigation on any matter involving this case

5     during the recess.  I look forward to seeing you tomorrow

6     morning at 9:00.

7          THE CLERK:  All rise.

8                    (The jury exited the courtroom)

9          THE COURT:  You can be seated.  You can take your

10    masks off, if you want.  Anything for the Court?

11         MR. SISTI:  Yeah, one thing.  These individuals who

12    testified today have been released, I take it?

13         THE COURT:  Yeah.

14         MR. SISTI:  Now they're not witnesses in this case.

15    Could Ian, as their landlord, finally start talking to them?

16         THE COURT:  As their landlord?

17         MR. SISTI:  It's tough for him to deal with that --

18         THE COURT:  Yeah.

19         MR. SISTI:  -- building without getting involved.

20         THE COURT:  I understand.  Well, is there any chance

21    you're going to recall these folks?  Bottom line is can the

22    sequestration order be relaxed for people after they've

23    testified?

24         MR. AFRAME:  Yes.  Mark's agreed to that for us, so we

25    agree to that for him.

1          THE COURT:  So ordered.

2          MR. SISTI:  Thank you.

3          THE COURT:  Anything else?

4          MR. SISTI:  No.

5          THE COURT:  All right.  See you tomorrow.

6          THE CLERK:  All rise.

7       (WHEREUPON, the proceedings adjourned at 4:53 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    knowledge, skill, ability and belief, a true and accurate

8    transcription of the within proceedings.

9

10

11

12

13   Date: ____3/10/23_____        /s/ *Brenda K. Hancock*
                                     Brenda K. Hancock, RMR, CRR
14                                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25