UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*
                                        \* No. 1:21-cr-00041-JL-01
            v.                          \* December 12, 2022
                                        \* 9:25 a.m.
                                        \*
IAN FREEMAN,                            \*
                                        \*
                Defendant.              \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


<u>TRANSCRIPT OF DAY FIVE OF JURY TRIAL - MORNING SESSION</u>

<u>BEFORE THE HONORABLE JOSEPH N. LAPLANTE</u>


<u>APPEARANCES</u>:


<u>For the Government</u>:        Seth R. Aframe, AUSA
                            Georgiana MacDonald, AUSA
                            John J. Kennedy, AUSA
                            United States Attorney's Office


<u>For the Defendant</u>:         Mark L. Sisti, Esq.
                            Sisti Law Offices



<u>Court Reporter</u>:           Brenda K. Hancock, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, NH 03301
                            (603) 225-1454

1                      I   N   D   E   X

2    WITNESSES:              DIRECT    CROSS    REDIRECT    RECROSS

3    DUSTIN WONG
     By Mr. Kennedy          5
4

5    NICHOLAS NATHANS
     By Mr. Kennedy          16
6

7    JAMES ROSSELL
     By Mr. Kennedy          27
8    By Mr. Sisti                     44

9
     PATRICK BROWN
10   By Mr. Kennedy          52                82
     By Mr. Sisti                     72                85
11

12   HAROLD JONES
     By Mr. Aframe           86
13

14
                      E   X   H   I   B   I   T   S
15
                      Govt's        For ID.    In Evd.
16
               2701 thru 2711                  106
17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  All rise for the jury.

3                  (The jury entered the courtroom)

4          THE CLERK:  All rise for the Honorable Court.

5          THE COURT:  Please be seated.  Good morning.

6          MR. SISTI:  Good morning.

7          THE CLERK:  Court is now in session and has before it

8     for consideration Jury Trial, Day Five, in criminal matter

9     21-cr-41-JL, United States v. Ian Freeman.

10          THE COURT:  Ladies and gentlemen of the jury, welcome

11     back to court for Day Five, week two of the trial.  I have a

12     couple of things to go over with you before we get started.

13          First, I need to ask you if any of you have had any

14     conversations with each other or anybody else during the recess

15     during this trial?

16                  (The jurors answered in the negative)

17          THE COURT:  Have any of you had any exposure to any

18     information at all, either intentionally or unintentionally,

19     during the recess regarding the trial?

20                  (The jurors answered in the negative)

21          THE COURT:  Good.  We'll proceed, then.  A couple of

22     things.

23          First of all, just for planning today, I have a

24     12-noon commitment in the Court that I have to take care of at

25     noon.  So, lunch will be a little bit early, it will be right

1    at noon today, and I'm going to give you a little bit of extra

2    time today, noon to 1:15 just today because of some things we

3    have going on here.

4            Secondly, I need to tell you that when we adjourned on

5    Friday the witness on the witness stand was Renee Spinella.

6    You might remember she was testifying under the grant of

7    immunity.  She has contracted COVID, and she sent the Court a

8    positive test yesterday.  Under court policy, it will be a few

9    days before she can testify here safely again, depending on

10   whether she tests negative and our usual rules and protocols,

11   so we'll be monitoring that.  But she was in her direct

12   examination.  That direct examination needs to be completed,

13   and she'll be subject to cross-examination when it's completed.

14           So, we're going to have a different witness this

15   morning; it will not be Renee Spinella.  If this was a much

16   shorter trial, it would be a bigger problem, but we're hoping,

17   we're pretty confident that she'll be able to resume the stand

18   once she gets cleared.  So, a different face this morning, just

19   so you understand what's going on.

20           Sometimes this happens in trials, we need to take

21   witnesses in a different order.  It doesn't change your job.

22   You are just to evaluate the evidence and the testimony as you

23   normally would.  All right?

24           Let's proceed.

25           MR. KENNEDY:  The government calls Dustin Wong.

1          THE COURT:  I don't know if I explained this to you

2   before.  All of our witnesses that testify here without a mask

3   on, they've all tested negative here at the courthouse.

4          THE CLERK:  Please remain standing and raise your

5   right hand.

6          **DUSTIN WONG**, having been duly sworn by the Clerk, was

7   examined and testified as follows:

8          THE CLERK:  Please be seated and, for the record,

9   please state your name and spell your last name.

10          THE WITNESS:  Yes.  My name is Dustin Wong, W-o-n-g.

11                    <u>DIRECT EXAMINATION</u>

12   <u>BY MR. KENNEDY</u>:

13   Q.   Good morning, Mr. Wong.

14   A.   Good morning.

15          THE WITNESS:  Good morning, your Honor.

16   Q.   Could you tell the jury how you're currently employed?

17   A.   Yes.  I'm currently employed by the Federal Bureau of

18   Investigation.  My job title is Information Technology

19   Specialist, Digital Forensic Examiner.

20   Q.   And how long have you had that job?

21   A.   Approximately six to seven years.

22   Q.   And what is a digital forensic examiner?

23   A.   Digital forensics is analyzing digital evidence such as

24   cell phones, laptops, computers that in a way that accurately

25   depicts the contents of the evidence item without altering the

1    item.

2    Q.    Just give the jury just a quick background on your

3    education.

4    A.    Yes.  I received my bachelor's degree at St. John's

5    University in 2017.  My degree was Cyber Security Systems,

6    concentrated in Digital Forensics, and I'm currently in my last

7    semester at Boston College for my master's degree in Cyber

8    Security, Government and Policy.

9    Q.    Did you get any specialized training to become a digital

10   forensics examiner?

11   A.    I did, yes.

12   Q.    Could you tell the jury about that?

13   A.    Yes.  So, as part of our digital forensics curriculum at

14   the FBI we go through an approximately 12-week course that

15   specializes in different functions, such as computers, Apple

16   products and more devices.  After the end of each course we

17   have to taken a written and proficiency test, and we have to

18   pass in order to move on to the next course.

19   Q.    Do you need to pass all those courses in order to become a

20   digital forensic examiner?

21   A.    Yes, we do.

22   Q.    And did you pass all those tests?

23   A.    Yes, I did.

24   Q.    Do you have any other certifications related to digital

25   forensic examination?

1    A.    Yes, I do.

2    Q.    Can you tell the jury about that, please?

3    A.    Yes.  So, as part of our curriculum we also have ongoing

4    continuing education.  We take industry-standard certifications

5    from popular vendors, such as SANS Institute, and SANS

6    Institute has a variety of digital forensics courses as well,

7    and they have a test, too, at the end of each course.

8    Q.    And in addition to your specialized training you had to do

9    to become a digital forensic examiner, do you have to take any

10   continuing education courses?

11   A.    Yes, I did.

12   Q.    And can you tell the jury about what you have to do with

13   that?

14   A.    Yes.  So, those were the SANS Institute that I just

15   mentioned.  These are digital forensics courses, and then at

16   the end you take an exam to pass.

17   Q.    Okay.  And I think you testified that digital forensic

18   examination involves digital devices; is that right?

19   A.    Correct.

20   Q.    And in your six to seven years as a digital forensic

21   examiner, about how many devices have you examined?

22   A.    Approximately over 200 devices, including computers and

23   cell phones.

24   Q.    Okay.  And if you could just briefly give the jury just an

25   idea of what your day-to-day is as a digital forensic examiner.

1    A.    Yeah.  So, I work at the New England Regional Computer

2    Forensics Laboratory.  We receive requests from case agents

3    wanting us to analyze their digital devices.  So, once a

4    request comes in we take the original evidence from the

5    evidence control facility, and we analyze it and forensically

6    process the original evidence item.

7    Q.    And after you forensically process it, what do you do with

8    that evidence?

9    A.    Yes.  So, then, after we forensically image the item, we

10   make it available for investigative review.

11   Q.    Were you involved in the investigation involving Ian

12   Freeman?

13   A.    Yes, I was.

14   Q.    And what was your role in this case?

15   A.    My first involvement was the day of the search warrant

16   back in March of last year at 73 to 75 Leverett Street, Keene,

17   New Hampshire.

18   Q.    And what was your role with respect to the search?

19   A.    My role was, as a digital forensic examiner, assisting the

20   investigative team to look for any digital devices at the

21   occupancy.

22   Q.    So, were you, yourself, looking for devices?

23   A.    Yes, I was.

24   Q.    And then what do you mean "assisting others"?

25   A.    So, when the investigative team finds a device at the

1    location, they would call me and ask me to see if -- to take a

2    look at the device.

3    Q.    And for what purpose?

4    A.    To see if we should seize it for investigative review.

5    Q.    During your assignment at the search did you identify any

6    digital devices in this case?

7    A.    Yes, I did.

8    Q.    I'm going to show you what has been agreed to as a full

9    exhibit Government's 1302.  Do you recognize this photo?

10            THE COURT:  Is this admitted already?

11            MR. KENNEDY:  Yes.

12            THE COURT:  1302.

13   A.    Yes, I do.

14   Q.    And can you tell the jury what we're looking at?

15   A.    This was at the place of the location for the search

16   warrant, and this was the recording studio within that house.

17   Q.    Okay.  And were there any digital devices that you seized

18   in this photograph?

19   A.    Yes, there were.

20   Q.    And can you just direct the jury to where that is?

21   A.    On the corner of the desk, the black Thinkpad laptop.

22   Q.    I show you what has been agreed for admission as a full

23   exhibit, Government's 1303.  Can you tell the jury what we're

24   looking at?

25   A.    It's a zoomed picture of that Thinkpad laptop.

1    Q.    And what's the yellow thing with "51" on it?

2    A.    The 51, those tents are numbers that we give to items that

3    we want to seize.

4    Q.    And I'm going to show you Government's 1304, which is

5    agreed as a full exhibit.  And what are we looking at here?

6    A.    That's the cover of that same Thinkpad laptop.

7    Q.    So, that's the same laptop in all three pictures?

8    A.    Correct.  Yes.

9    Q.    Did you do anything with the computer while you were on

10   scene?

11   A.    I did not.  We looked at it, and then we -- I told the

12   case agent to take it back for investigative review.

13   Q.    And how was it taken back for investigative review?

14   A.    We collected -- it's called "bag and tag."  We put it in

15   an evidence bag, and we seal it with evidence tape.

16   Q.    Okay.  At some point did you work with this computer again

17   later?

18   A.    I did, yes.

19   Q.    And what was your assignment with respect to this

20   computer?

21   A.    Yes.  So, back at the laboratory I received a request to

22   forensically image and process the laptop for investigative

23   review.

24   Q.    Okay.  Can you tell the jury what you mean when you say

25   "forensically image"?

1   A.    Forensically image is to create a bit-for-bit copy of the
2   hard drive in the laptop.
3   Q.    And I guess just to drill down, what's a bit-for-bit copy?
4   A.    Bit-for-bit means everything on the hard drive.  So, from
5   point A to the end of the hard drive we're making a forensic
6   image of that whole hard drive, so that would include also the
7   deleted space of that hard drive.
8   Q.    Can you just explain just physically how you went about
9   making that forensic image?
10  A.    Yes.  So, first we have to, in order to remove the hard
11  drive, I took the back casing of that laptop out to get to that
12  hard drive.
13  Q.    And so, what did you do once you got access to the hard
14  drive?
15  A.    Once we removed -- once I removed the hard drive, then I
16  connected the hard drive into a forensically approved device.
17  We call it a TX1.  It's a portable imaging device.
18  Q.    And how does the portable imaging device work, just
19  briefly?
20  A.    So, there's two main functions of the portable imaging
21  device.  One, it's called a write blocker; and, two, we get to
22  image the hard drive within the portable imaging device.
23  Q.    Can you explain what you mean by the term "write blocker"?
24  A.    Sure.  So, "write blocker" is to prevent any data from
25  going onto the original evidence.  We use a write blocker so

1  that no data from our side can get into the hard drive.  So,

2  essentially it's a one-way street.  We get to get the data from

3  the hard drive, but no data from our side is going onto the

4  hard drive.

5  Q.   Okay.  And you said that this tool did two things.  There

6  was the write blocker.  What was the second thing this tool

7  does?

8  A.   Yeah.  So, it forensically images as well.

9  Q.   Okay.  And that's the bit-for-bit copy you talked about?

10  A.   Correct.  Yes.

11  Q.   Okay.  And did you do that in this case?

12  A.   I did, yes.

13  Q.   Okay.  Once you had the forensic image, what did you do

14  with that?

15  A.   So, once I -- so I received a notification of the forensic

16  image that it was encrypted with the Linux encryption.

17  Q.   Let me ask you two questions.  Let's start with Linux.

18  What does that word mean?

19  A.   Linux is just a different type of operating system.  So,

20  operating systems such as windows or your Apple laptops,

21  they're all operating systems.  Linux is just a different

22  operating system that one person could use.

23  Q.   And what does -- could you just explain to the jury what

24  it means to be encrypted?

25  A.   Yes.  So, "encryption" means to prevent any unauthorized

1    person to access your data, so only the person who has the

2    decryption key or a password, they can, only them, they can see

3    the data.

4    Q.   So, what would the data look like if you didn't have the

5    encryption key?

6    A.   Sorry.  What was that?

7    Q.   What would the data look like if you didn't have the

8    encryption key?

9    A.   So, the data would, once we make the image, it would be

10   scrambled; we wouldn't be able to see the contents of the hard

11   drive from the laptop.

12   Q.   Okay.  And does the fact that the data is encrypted affect

13   your ability to make a forensic image?

14   A.   No, it does not affect our ability.

15   Q.   Okay.  And the forensic image you make, is that image

16   itself also encrypted?

17   A.   The forensic image, yes, it's encrypted, because we're

18   making a bit-for-bit copy of the hard drive.

19   Q.   How do you confirm that the forensic image you have is an

20   accurate copy of the hard drive that you took out of the

21   computer?

22   A.   Right.  So, the portable imaging device also has hashing

23   functions.

24   Q.   Okay.  The jury heard a little bit about hashing with

25   respect to the cell phones, but if you could just explain what

1    "hashing" means with respect to the forensic copy of the hard

2    drive.

3    A.    Yeah.  So, hashing is a mathematical algorithm that

4    verifies a forensic image or drive.

5    Q.    What do you mean "verifies"?

6    A.    "Verifies" means that it computes a long string of numbers

7    and letters in order to ensure that the image that we created,

8    generated is authentic and verifiable to the original hard

9    drive itself.

10   Q.    So, does it authenticate that it is, in fact, a

11   bit-for-bit copy?

12   A.    Correct.  Yes.

13   Q.    If you were to, during the copying process, if you changed

14   like, say, one letter in an email would that change the hash

15   value?

16   A.    Yes, that would.

17   Q.    And in this case were you able to authenticate the hash on

18   the original and the forensic copy?

19   A.    Yes, I was.

20   Q.    After you made the forensic copy, what did you do with the

21   original computer, the hard drive?

22   A.    So, the original hard drive, I placed it back into the

23   laptop, and then I sealed the laptop back with evidence tape to

24   be returned to the evidence control facility.

25   Q.    Did you do any more work on that original hard drive?

1    A.   I did not.

2    Q.   What did you do with the forensic image in this case?

3    A.   The forensic image was generated up on our network share.

4    Yes.

5    Q.   And so, what does that mean, "network share"?

6    A.   So, the network shares are how we, as forensic examiners,

7    use to do our work on the forensic image, to process it as

8    well.

9    Q.   Okay.  And what did you do after you put it on the

10   network?

11   A.   Once I put it up on the network, since I saw that there

12   was Linux encryption, I contacted one of our computer

13   scientists, Nicholas Nathans.

14   Q.   And why did you do that?

15   A.   He has more expertise in the Linux operating system and

16   with their encryption.

17   Q.   Did you have any further involvement in this case?

18   A.   I did not, no.

19           MR. KENNEDY:  I have no further questions, your Honor.

20           THE COURT:  Cross-examination?

21           MR. SISTI:  I have none.  Thank you.

22           THE WITNESS:  Thank you.

23           THE COURT:  You're excused.  Thank you.

24                  (Witness stepped down)

25           MR. KENNEDY:  The government next calls Nicholas

1   Nathans.

2          THE CLERK:  Please remain standing and raise your

3   right hand.

4          **NICHOLAS NATHANS**, having been duly sworn by the Clerk,

5   was examined and testified as follows:

6          THE CLERK:  Please be seated, and, for the record,

7   please state your name and spell your last name.

8          THE WITNESS:  Nicholas Nathans, N-a-t-h-a-n-s.

9                       DIRECT EXAMINATION

10  BY MR. KENNEDY:

11  Q.   Good morning, Mr. Nathans.  Can you tell the jury how

12  you're currently employed?

13  A.   Yes.  I am currently employed as a cyber security engineer

14  for the Mitre Corporation, a not-for-profit company based out

15  of Bedford, Massachusetts.

16  Q.   And how long have you been employed with the Mitre

17  Corporation?

18  A.   For about 17 months.

19  Q.   And prior to working for the Mitre Corporation, how were

20  you employed?

21  A.   From February 2003 through August of 2021 for about 18 1/2

22  years I was employed by the Federal Government.  17 of those

23  years were with the FBI, primarily focused on digital evidence;

24  and about a year and a half I was employed with the Naval

25  Criminal Investigative Service, NCIS, also focused on digital

1    evidence.

2    Q.    Okay.  And the jury's heard a bit, but just generally what

3    kinds of things with digital evidence were you doing with

4    those --

5    A.    The identification, collection and analysis of computers,

6    thumb drives, cell phones, CCTV, video-surveillance systems,

7    email servers, web servers, all those things that we use across

8    the Internet.

9    Q.    At NCIS what position did you hold?

10   A.    I was an investigative computer specialist doing the same

11   type of work that I did for the FBI, focused on digital

12   evidence and electronic surveillance systems.

13   Q.    Okay.  And what positions did you hold at the FBI?

14   A.    I served as a computer forensic examiner for the bulk of

15   my time, and then towards the end I was what we call a

16   "computer scientist" at the FBI, which is like a forensic

17   examiner, except that I'm to solve more complex problems; so if

18   there's not a solution that's already in the toolbox of tools

19   that the FBI has, is to come up with a solution to that

20   problem.

21   Q.    And, just briefly, the jury has heard this, but in your

22   words what is a forensic examiner?

23   A.    A forensic examiner would be the person who follows a

24   scientific process for the structured review and analysis of a

25   piece of evidence, whether that's a physical item, such as a

1    fingerprint from a coffee cup, or recovering files from a hard
2    drive.
3    Q.   Okay.  How about just in like laymen's terms, on a
4    day-to-day what are you doing with digital evidence?
5    A.   Hooking it up to a computer, making sure not to alter it,
6    and reviewing the file content, making sure we can recover the
7    information that's there.
8    Q.   Okay.  Can you tell the jury a little bit about your
9    educational background.
10   A.   Yes.  I have an undergraduate degree from Florida State
11   University in management information systems, and I have a
12   master's degree from the Boston University in computer
13   information systems with a concentration in security.  I've
14   also attended in excess of 600 hours of structured training
15   through the Federal Government when I worked for them.
16   Q.   Okay.  And is that training required to hold those
17   positions?
18   A.   Yes.  Within the FBI and NCIS there was requirement to
19   attend training in what would have been about 600 hours of
20   classroom training and about 400 hours of on-the-job training
21   in all, including industry-standard certifications from
22   multiple vendors.
23   Q.   Do you have any certifications or anything outside of
24   these trainings?
25   A.   Outside of these trainings I possess certifications that

1    belong to industry organizations such as CompTIA for network

2    security as well as SANS, which is a leading provider of

3    training and certification in cyber security and digital

4    forensics.  I possess the Incident Handler certification with

5    SANS as well as the Forensic Analysis and Forensic Examiner

6    certifications.

7    Q.   Okay.  With respect to your forensic examinations, just an

8    estimate, how many devices have you examined in your career?

9    A.   In 18 1/2 years I would argue it's in excess of 300

10   individual pieces of evidence.

11   Q.   So, we'll turn to your testimony today.  Were you involved

12   in the investigation of Ian Freeman?

13   A.   Yes, I was.

14   Q.   And what was your role in this case?

15   A.   I participated in the search warrant execution that

16   occurred in March of 2021 in Ian Freeman's residence in Keene,

17   New Hampshire.  My role there was to identify and triage any

18   digital evidence that was on the premises, and then I was also

19   asked to do analysis of a laptop that was obtained during that

20   search warrant.

21   Q.   And the jury saw this, but I'll pull up what has already

22   been admitted as Government's 1303.  I just show you this.

23   A.   Yes.

24   Q.   Do you recognize that?

25   A.   Yes.  It was the laptop at the residence.

1    Q.    Okay.  And we don't need to -- we've already talked about

2    that with another witness, but I want to talk a little bit more

3    about examining that computer.  So, following the search did

4    you have further involvement with that computer?

5    A.    Yes.  After the search warrant was executed, several days

6    later I was asked to take a look at conducting analysis of a

7    copy of the computer; so the forensics lab that's in Boston,

8    Massachusetts had made a sound forensic image of that laptop

9    and provided me a copy of it to conduct analysis on.

10   Q.    Okay.  And how did you go about conducting your analysis?

11   A.    Using my digital forensics examination work station, so a

12   completely separate computer from what we use for production

13   day-to-day checking email, I attached a copy of the forensic

14   image, verified that it hadn't been altered, and began to

15   triage that image, think of the image as just a Xerox, perfect

16   Xerox copy of a hard drive, to see what was contained within

17   it.  I found the drive was running Linux-based software and

18   that it was encrypted, and therefore I could not access the

19   bulk of the information in it.

20   Q.    And what is Linux-based software?

21   A.    Linux software is just another type of software.  Where

22   most people have Microsoft Windows on their computer or Apple

23   Macintosh software, Linux is just another type of software.

24   Q.    And you say it was encrypted?

25   A.    Yes, it was.

1    Q.    And what does that mean, to be encrypted?

2    A.    To be encrypted means that it's no longer in plain text

3    and can be clearly viewed without a password or a key.  In this

4    case we did not have the password or the key to view the bulk

5    of the drive.

6    Q.    Okay.  What steps did you take next?

7    A.    I notified the case agent that the drive was encrypted and

8    that we wouldn't be able to access it without either a password

9    or a key, and that we could submit a request to Quantico,

10   Virginia to the Secure Technologies Exploitation Unit, STXU, to

11   have them attempt to do a password crack against the drive, and

12   they would see if they could attempt to recover the password.

13   Q.    Do you know if that request was submitted?

14   A.    It was submitted.  I was contacted by STXU.  They have a

15   field team that contacted me, asked for information from any of

16   the triage that I had performed as far as what could I

17   ascertain about the type of drive, type of file systems, type

18   of encryption that may be there.  They then also contacted the

19   case agent for other information about the case.  Several weeks

20   later I received notification from STXU that they had recovered

21   or identified a password that should work to unlock the drive.

22   Q.    And did they provide that password to you?

23   A.    They provided that password to me.  I then fired up my

24   computer, typed in that password.  I was able to access the

25   drive, see all the files within it.  I received no errors upon

1    accessing the drive.  Standard configuration files were

2    reviewed within that hard drive to see if I could read them.  I

3    could read them.  There were no clear errors or omissions as

4    far as characters that looked out of sorts.  I then continued

5    to triage the drive and conduct an inventory of what's

6    contained in it, looking for user profiles, documents, things

7    like that.

8    Q.   And did you find any user profiles?

9    A.   I found one user profile within the computer, so one user

10   account was for FTL_Ian, so F-T-L, I-a-n.

11   Q.   What did you do then?

12   A.   Upon identifying that, I then conducted a forensic sound

13   copy of all those files that were in that folder and then

14   conducted inventory.  Think of it, again, as a generated table

15   of contents for, like, a book.  So, a listing of all those

16   files, dates and times and sizes that pertained to them, their

17   location and then actually copied all those files out of that

18   encrypted drive out into forensically prepared media, which is

19   a hard drive that we, the Federal Government, would have

20   purchased, and then wiped it so it had a known pattern so that

21   we know that there's no other data left over from previous use

22   or from any other use and then copied all of the information

23   out of the unlocked drive to there.

24   Q.   So, you took all the user files?  Is that what you called

25   them?

1   A.   Yup.  Yeah, all the user-created things.  Think of your

2   Documents folder, your Downloads folder, your Pictures, your

3   Music, all those types of user-created files.

4   Q.   And once you copied that out to this other hard drive,

5   what did you do with those files?

6   A.   Once we did -- once I could perform that I made a second

7   copy of those files onto another piece of media.  So, there's

8   effectively two copies, one that's the first run; the second

9   copy would be the copy that would be provided to the case agent

10   to conduct review so they could go through and see all the

11   files that were there.

12   Q.   And so, was that provided on an actual drive or --

13   A.   It would have been -- so the copy for the case agent would

14   have been provided on a thumb drive or another piece of USB

15   media that would have been labeled as being a working copy with

16   all that information on it.

17   Q.   And what would the case agent have seen?  What would those

18   files have looked like?

19   A.   They literally would have seen a series of folders,

20   Documents folder, Documents, Downloads, Pictures, and inside

21   those folders all the individual files.  So, think of all your

22   bank statements that you download from the Internet, all those

23   PDFs that are in your Downloads folder.  That's what they would

24   have seen.  All your copies of your resume over the past 30

25   years that you were working would be in your Documents folder.

1    Any of the photos that you have that you downloaded from your
2    phone onto your computer would be in your Pictures folder.  And
3    that's what they would have seen.
4    Q.   And I just want to ask, when you were copying those onto
5    this other hard drive, are you able to ensure that you're
6    actually making an accurate copy of those files?
7    A.   Yeah.  So, during the process, at the conclusion of the
8    copy process I then performed a comparison using hash values of
9    what I copied out to what's contained within the drive to make
10   sure the hashes match.  So, a hash is just a fingerprint.
11   Think of it that way.  It's a unique identifier for every
12   single file.
13   Q.   I'm going to show you what has been agreed for admission
14   as Government's 1305.  Do you recognize this?
15   A.   Yes.
16   Q.   And can you just tell the jury what we're looking at here?
17   A.   This is a set of folders from the user directory or the
18   home directory.  So, there's the Desktop folder, the Documents
19   folder, the Downloads folder, the Pictures folder.
20             THE COURT:  Slow down a little bit for the reporter.
21             THE WITNESS:  Sorry.  My bad.
22             And then the last file, that Copy Log Export Home
23   Files, that's a file that I created that literally is the log
24   of everything I copied.  You can see that the date on that is
25   from April of 2021, when I performed my work.  So, that

1    literally is my audit log that tells me all the files that I

2    copied out so that we could go back through there and double

3    check if they're still there.

4    Q.    Okay.  And so each of these folders, if I were to have

5    this hard drive in front of me and clicked into those folders,

6    what would be inside those folders?

7    A.    So, the Pictures folder would be filled with various

8    pictures, various photographs.  The Downloads folder would be

9    any of the things that were downloaded from the Internet.  So,

10   think of when you go to your bank and you pull down a PDF and

11   you view of all your bank statements.  By default, that usually

12   will go into your Downloads folder unless you put it into your

13   Documents folder.  So, the Documents folder is where you tend

14   to organize more of your personal information.  So, maybe you

15   keep a bunch of recipes there or birthday listing of all your

16   family members; that would be in your Documents folder along

17   with your resume.

18          Your Desktop is literally, when you're looking at your

19   computer and that wallpaper that you see, that Desktop, that

20   log-in screen that's right there that has all your icons on it,

21   that is the Desktop folder.  So, in that Desktop folder could

22   be a series of shortcut files pointing to applications but also

23   could be other files that you may have put there.  Some of us

24   like to put our most frequently used files, perhaps a listing

25   of all of our financial institutions or our banks accounts in a

1   spreadsheet right on the desktop.  That would be in the Desktop

2   folder.

3   Q.   So, after you provided that drive to the case agents did

4   you have any further involvement in this case?

5   A.   No.  I was only asked just if there was anything else that

6   stuck out in my mind, were there any errors when I accessed the

7   drive.  I wrote a final report a few weeks later to give the

8   case agent some time to at least conduct their initial review

9   and pose any questions, and then my report was finalized and

10  serialized to the case file.

11  Q.   And you've had no further involvement since then?

12  A.   No, none.

13            MR. KENNEDY:  I have no further questions, your Honor.

14            MR. SISTI:  No questions.

15            THE COURT:  You're excused.  Thank you.

16                 (Witness stepped down)

17            MR. KENNEDY:  The government calls James Rossell.

18  Mr. Rossell is the one who may need the headphones.

19            MR. AFRAME:  They're right up here.

20            MR. KENNEDY:  Perfect.

21                 (Pause)

22            THE CLERK:  Please remain standing and raise your

23  right hand.

24            **JAMES ROSSELL**, having been duly sworn by the Clerk,

25  was examined and testified as follows:

1          THE CLERK:  Please be seated.  And, for the record,

2     please state your name and spell your last name.

3          THE WITNESS:  James Rossell, R-o-s-s-e-l-l.

4                        DIRECT EXAMINATION

5     BY MR. KENNEDY:

6     Q.   Good morning, Mr. Rossell.  How are you?

7     A.   Good.

8     Q.   Just tell the jury where you currently live.

9     A.   I currently live in Rockwood, Tennessee.

10    Q.   How long have you lived in Tennessee?

11    A.   About a year and a half.

12    Q.   And where did you live before that?

13    A.   New Jersey.

14    Q.   And how long were you in New Jersey?

15    A.   Seventy years.

16    Q.   How old are you?

17    A.   Seventy-two.

18    Q.   Are you currently employed?

19    A.   No.  I'm retired.

20    Q.   How long have you been retired?

21    A.   About 15 years.

22    Q.   What did you do before you retired?

23    A.   Paid firefighter and volunteer firefighter.

24    Q.   Was that in New Jersey?

25    A.   Yes.

1    Q.   Did you do anything before that?

2    A.   U.S. Navy.

3    Q.   How long were you in the Navy?

4    A.   Four years.

5    Q.   Are you currently married?

6    A.   No.  I'm widowed.

7    Q.   How long have you been widowed?

8    A.   A little over three years.

9    Q.   How long were you married?

10   A.   I'm sorry?

11   Q.   I'm sorry.  How long were you married?

12   A.   Thirty-nine years.

13   Q.   Do you have any children?

14   A.   Three daughters.

15   Q.   How about any grandchildren?

16   A.   Eight.

17   Q.   You retired 15 years ago.  If I do my math, in your

18   mid-50s.  Is that considered --

19   A.   Fifty-five, yes.

20   Q.   Is that regular retirement for a firefighter?

21   A.   Well, I was a firefighter for the State of New Jersey, and

22   they had an early retirement plan if you had 25 years of

23   service.

24   Q.   Any reason you retired early?

25   A.   Because my wife was very sick and I had to take care of

1    her.

2    Q.    I'm going to turn to ask you some questions about why we

3    brought you here today.

4    A.    Okay.

5    Q.    After your wife passed away, Mr. Rossell, was there a time

6    that you were seeking some companionship?

7    A.    Yes.

8    Q.    And just, I guess briefly, what kind of emotional state

9    were you in at that time?

10    A.    Not real good.  Very lonely.

11    Q.    And, again, it was about three years ago?

12    A.    Yes.

13    Q.    How did you go about seeking companionship?

14    A.    I went on the Internet on a dating site for senior

15    citizens.

16    Q.    What was the name of that?

17    A.    OurTime.

18    Q.    Did you meet somebody on that website?

19    A.    Yes, I did.

20    Q.    What did you know this person as?

21    A.    Mary Romeo.

22    Q.    Did you develop what you believed to be a relationship

23    with Ms. Romeo?

24    A.    I thought so.

25    Q.    We'll talk about it, but did that turn out to be a real

1    relationship?

2    A.    No.

3    Q.    In general, what happened?

4    A.    Well, we talked together over the Internet, and it got to

5    the point where she constantly needed money for this and money

6    for that; and she was originally in Texas and flew to Malaysia

7    because her father had died and she wanted to get her

8    inheritance.

9    Q.    I'll just back up real quick.

10   A.    Sure.

11   Q.    After you made contact with her on OurTime, how would you

12   communicate with her?

13   A.    Just by text message.

14   Q.    Okay.  So, it was, like, outside of the OurTime website,

15   or was it through your phone?

16   A.    No.  We -- she recommended that we move from OurTime to a

17   website that was more private.

18   Q.    Do you remember what that was called?

19   A.    I can't think of it at this moment.

20   Q.    That's okay.  So, basically was it a place that you guys

21   could communicate?

22   A.    Yes.

23   Q.    And did you have to set up an account on there?

24   A.    Yes.

25   Q.    Did you do that?

```
1    A.    No.  She did.

2    Q.    Okay.  How often were you communicating with Mary?

3    A.    Quite often.  Sometimes daily.

4    Q.    What kind of things would you talk about?

5    A.    Mostly about her inheritance and the requirements of her

6    getting her inheritance, which on the will that she showed me

7    it stated that she had to be married to get her inheritance.

8    Q.    Did she ask you to help her with that?

9    A.    Yes.

10   Q.    Did you help her with that?

11   A.    Yes, I did.

12   Q.    Would you tell the jury why.

13   A.    Well, I wanted to help her, and hopefully we would develop

14   a relationship that would last.

15   Q.    So, would you characterize your relationship at this time

16   as romantic or developing into a romantic relationship?

17   A.    Well, we could only talk on the Internet, so there were no

18   romantic portions of it.

19   Q.    But at least from an emotional sense --

20   A.    Yes.

21   Q.    -- how would you characterize it?

22   A.    Well, it made me feel better that I had someone to talk

23   to.

24   Q.    And what were you hoping would happen if you helped her

25   get this inheritance?
```

1    A.    Well, I had hoped that, if she was able to get her

2    inheritance, that she would come back to the United States, and

3    we would be able to get together.

4    Q.    Did you help her with respect to this marriage piece?

5    A.    Yes, I did.

6    Q.    And what did she ask you to do?

7    A.    She asked me to sign some paperwork stating that I was

8    engaged to her and we would get eventually married.

9    Q.    And --

10   A.    I did think of the -- it was Telegram we were conversing

11   on.

12   Q.    And when she mentioned this new site, did you know what

13   Telegram was at the time?

14   A.    No.

15   Q.    And so, after you signed the paperwork saying that you

16   were engaged, what did she ask from you then?

17   A.    Well, according to the laws in Malaysia, to receive an

18   inheritance you had to pay the taxes on the inheritance before

19   you received the money, so she was asking me for money to help

20   her do that.

21   Q.    Did you provide her with money?

22   A.    Yes, I did.

23   Q.    We'll talk about some specifics, but just, in total, how

24   much money did you send to Mary?

25   A.    Approximately 103,000.

1    Q.   Was that your own money?

2    A.   Yes.

3    Q.   What did that money consist of?  Where did that come from?

4    A.   Well, it was in a retirement account, and primarily it was

5    from my wife's life insurance.

6    Q.   So, when Mary asked you to send her money how did she have

7    you accomplish that?

8    A.   Well, she set up an account for me on Bitcoin, which I had

9    no idea what Bitcoin was, but that's how I would -- I would put

10   the money in and send it to her, and it went into Bitcoin

11   somehow, I don't know how it even works, and that's how she

12   received the money.

13   Q.   Okay.  So, was your money in a bank account?

14   A.   It was in a retirement account, and, in order to send any,

15   I would have to transfer from the retirement account to my bank

16   account.

17   Q.   And then how would you sort of physically send that money?

18   A.   To her?

19   Q.   Yeah.  Did you send it sort of to Mary Romeo or --

20   A.   She would send me account numbers, and I would have it

21   wire transferred.

22   Q.   And while she was asking you to send her all this money,

23   are you in communication with her on that Telegram app?

24   A.   Yes.

25   Q.   Was she providing you information about where to send the

1    money?

2    A.    Yes.

3    Q.    Did Mary ask you to take any photographs to send her?

4    A.    Yes.  I had to take photographs of myself with my driver's

5    license and with notes about the bitcoin showing myself and the

6    note in the photograph.

7    Q.    Okay.  Did she tell you why she needed you to take those

8    photos?

9    A.    No.

10    Q.    I'm going to show you what has been agreed to as

11    Government's Exhibit 2101.  Do you recognize that person?

12    A.    That's me.

13    Q.    A little shorter beard?

14    A.    A little bit.

15    Q.    Is that your license?

16    A.    Yes, it is.

17    Q.    And did you take that photograph?

18    A.    Yes, I did.

19    Q.    And, again, who asked you to take that photograph?

20    A.    Mary.

21    Q.    And what did you do with that photograph after you took

22    it?

23    A.    Sent it to her.

24    Q.    I'm going to show you what has been agreed for admission

25    as Government's Exhibit 2102.

1    A.    That's me again.

2    Q.    Is that you?

3    A.    Yes.

4    Q.    It looks like you're holding a sign.  Is that your

5    handwriting?

6    A.    Yes, it is.

7    Q.    And if I read the words, it says, "I certify that I am

8    buying bitcoin via wire transfer from the Church of the

9    Invisible Hand and Ian Freeman via localbitcoins.com

10   3/16/2020."  There's a signature and a phone number.

11         Did I read that correctly?

12   A.    Yes.

13   Q.    Is that your signature?

14   A.    Yes, it is.

15   Q.    Is that your phone number?

16   A.    Yes.

17   Q.    And did you come up with those words?

18   A.    No.  That's what she told me to write.

19   Q.    Did you take this photograph?

20   A.    No.  I believe I had my granddaughter take some of these

21   photographs.

22   Q.    What did you do with the photograph after you took it?

23   A.    Texted it to Mary.

24   Q.    I'm going to show you what has been agreed as a full

25   exhibit, Government's 2103.  Can you read that, or do you need

1   us to blow that up?

2   A.   No.  I can read it.

3   Q.   Okay.  Do you recognize this?

4   A.   Yes.

5   Q.   And is this a wire receipt that you sent?

6   A.   Yes.

7   Q.   Okay.  Up in the top left, what is WSFS Bank?

8   A.   It's Wilmington Savings Fund Society.

9   Q.   Is that your bank?

10  A.   Yes.

11  Q.   And, again, just tell me what's the amount of this wire?

12  A.   67,000.

13  Q.   We're just going to go down to that "Credit To" section.

14  Who is this wire going to?

15  A.   The Church of the Invisible Hand.

16  Q.   Did you know what Church of the Invisible Hand was?

17  A.   No.

18  Q.   How did you know where to send it?

19  A.   Mary told me where to send it.

20  Q.   Okay.  And is that your handwriting on the side?

21  A.   Yes, it is.

22  Q.   If we can just pull back out.  I'm just going to read it.

23  It says:  "I, James Rossell, authorized and completed a wire

24  transfer in the amount of 67,000 USD for the purchase of

25  bitcoin from FTL_Ian on localbitcoins.com.  I understand that

1    this transaction is non-refundable.   Username jrossell1313."

2    And then there's a reference number.

3            Did I read that correctly?

4    A.   Yes.

5    Q.   Did Mary give you those words?

6    A.   Yes.

7    Q.   Did you know what jrossell1313 is at the time you wrote

8    this?

9    A.   No.

10   Q.   And at the bottom what's the date on this?

11   A.   3/16/20.

12   Q.   Did you take that picture?

13   A.   This picture?

14   Q.   Yeah.

15   A.   No.

16   Q.   What's that?

17   A.   I took that one, yes.

18   Q.   Yeah.  Sorry.  That was zoomed in.  I apologize.  What did

19   you do after you took that picture?

20   A.   Sent it to Mary.

21   Q.   And those words that are written there, did you write

22   those before or after you did the wire?

23   A.   After.

24   Q.   So, did you tell the bank, WSFS Bank, that you were

25   transferring money for the purpose of bitcoin?

1   A.   No.

2   Q.   I show you what has been marked as Government's Exhibit

3   2104, agreed to as a full exhibit.  Do you recognize this?

4   A.   Yes.

5   Q.   Is that you holding the wire that we just looked at?

6   A.   Yes.

7   Q.   And this photo, did either you or a family member take

8   this?

9   A.   Family member, yes.

10  Q.   And what did you do with it after you took it?

11  A.   Sent it to Mary.

12  Q.   So, do you recall sending the $67,000 wire?

13  A.   Yes.

14  Q.   Okay.  Were there any issues with that wire?

15  A.   The bank had an issue with it and canceled it before the

16  money arrived.

17  Q.   Were you able to learn why it was canceled?

18  A.   They thought it was too large of an amount to go to a

19  charity.

20  Q.   Okay.  And what do you mean, "too large of an amount"?

21  A.   Well, they didn't think it was legitimate.

22  Q.   Okay.  At the time was that $67,000, did that represent

23  most of the money in your account?

24  A.   Yes.

25  Q.   Were you contacted by anyone after the wire was reversed?

1    A.    Yes.  I received a call from Ian Flemming (sic) and wanted

2    to know why the money did not arrive.

3    Q.    And did you know who that person was?

4    A.    No.

5    Q.    And anything else other than just why it didn't arrive?

6    A.    No.  That was it.

7    Q.    Were you communicating with Mary at the same time?

8    A.    Yes.

9    Q.    And what were you hearing from Mary?

10   A.    I told her that the wire had been reversed and the money

11   didn't go, and she recommended that I send a personal check.

12   Q.    And did you end up sending a personal check?

13   A.    Yes.

14   Q.    I'm going to show you what has been marked as a full

15   exhibit Government's 2105.  Can you read that, or do you want

16   me to blow it up?

17   A.    No, I can read it.

18   Q.    Is that your check?

19   A.    Yes, it is.

20   Q.    Is that your handwriting?

21   A.    Yup.

22   Q.    And can you just tell me who it's paid to the order of?

23   A.    Ian Freeman.  I'm sorry.  I said a wrong name the first

24   time.

25   Q.    Oh, that's okay.  And what's the amount of this check?

1   A.   60,000.

2   Q.   Is that your signature?

3   A.   Yes, it is.

4   Q.   Did you write anything on the memo line?

5   A.   No.

6   Q.   What did you do with that check when you wrote it?

7   A.   Mailed it to the address that I was given.

8   Q.   And who gave that you address?

9   A.   Mary.

10  Q.   I notice this check is for $60,000.  We were just looking

11  at a wire for $67,000.  Is there a reason for the discrepancy?

12  A.   Yes.  By the time I was ready to mail this check I didn't

13  have enough cash to cover the full amount, so I sent 60,000,

14  and then, once I got enough money in the account, I sent the

15  other 7.

16  Q.   And how did you get more money in the account?

17  A.   Transferred it from my retirement account.

18  Q.   Okay.  And did you send a second check?

19  A.   Yes.

20  Q.   And how much was that second check?

21  A.   7,000.

22  Q.   Did you ever receive any bitcoin yourself in exchange for

23  these?

24  A.   No.

25  Q.   Mr. Rossell, did you ever arrange with other people to

1   send their money to Mr. Freeman to buy bitcoin?

2   A.   No.

3   Q.   I'm going to show you what has been marked and agreed as

4   full exhibit Government's 2106.  Do you know who this person

5   is, Mr. Rossell?

6   A.   No.

7        MR. KENNEDY:  If we can just zoom in on the sign,

8   Caryn, if you don't mind.

9   Q.   This sign says, that they're holding, "I certify that I am

10  buying bitcoin from FTL_Ian on localbitcoins.com.  I am using

11  my trusted agent, James Rossell, Jr., to receive the bitcoin on

12  my behalf on this day, 5/7/20," and then a signature and a

13  phone number.

14       Did you arrange with anybody in May of 2020 to receive

15  bitcoin on their behalf?

16  A.   No.

17  Q.   Did you ever speak to this gentleman?

18  A.   No.

19  Q.   Did you get any phone calls in May of 2020 asking if you

20  knew this gentleman?

21  A.   No.

22  Q.   Did you receive any bitcoin on behalf of this gentleman?

23  A.   No.

24  Q.   I'm just going to show you Government's 2107.  Looks like

25  the same gentleman appears to be holding a receipt for $2,000,

1   and, just to confirm, did you receive $2,000 in bitcoin?

2   A.   No.

3   Q.   I'm going to show you Government's Exhibit 2108.  Do you

4   recognize this gentleman?

5   A.   No.

6   Q.   If I read the sign, it says, "I certify that I am buying

7   bitcoin from FTL_Ian on localbitcoins.com.  I am using my

8   trusted agent, James Rossell, Jr., to receive the bitcoin on my

9   behalf.  5/15/2020."  It looks like "Steven Williams" and a

10  cell phone number.

11          Do you know a Steven Williams?

12  A.   No.

13  Q.   Did you arrange with anybody May 15th to buy bitcoin?

14  A.   No.

15  Q.   I show you Government's 2109.  It's a wire receipt.  I'm

16  just going to direct you to the written language.

17  A.   Yeah, now I can see it.

18  Q.   "I, Steven Williams, authorized and completed a wire

19  transfer in the amount of 2700 USD for the purchase of bitcoin

20  from FTL_Ian on localbitcoins.com.  I authorize delivery of the

21  bitcoin to my trusted agent, James Rossell.  I understand that

22  this transaction is non-refundable."

23          Did you receive $2,700 in bitcoin on behalf of Steven

24  Williams?

25  A.   No.

1    Q.   We talked earlier about you had written the words

2    "jrossell1313" on LocalBitcoins.  Did you have an account on

3    LocalBitcoins that you used?

4    A.   Not that I used, no.

5    Q.   Okay.  I'm going to just bring out what's already been

6    admitted as Government's 1215A, and the jury has seen this.

7    It's a chat from LocalBitcoins, and if we just look at the

8    bottom there, is that one of the photographs of you we've

9    already looked at?

10   A.   Yes.

11   Q.   And that jrossell1313, did you send that through this

12   LocalBitcoins application?

13   A.   No.

14   Q.   Finally, I'm just going to show you Government's 1215F.

15   I'm going to direct you to that fourth line down on 5/15/2020.

16   It says:  "Hi, Ian.  How many percent do you charge for payment

17   through wire transfer?"  Did you write that?

18   A.   No.

19   Q.   Is that how you talk?

20   A.   No.

21   Q.   How would you say that?

22   A.   I would ask what the rates were.

23   Q.   Just down a little bit, at 5/15/2020, jrossell1313.  It

24   says, "Because I have made nothing from this transaction."  Did

25   you write that?

1    A.    No.

2    Q.    Did you make anything from these transactions?

3    A.    No.

4    Q.    How did things end with Mary?

5    A.    I finally caught onto what was going on, and I just ended

6    it.

7    Q.    Did you ever get any of your money back?

8    A.    No.

9    Q.    How has this whole ordeal affected you?

10   A.    Well, it's taught me to be very careful what I do on the

11   Internet and who I talk to and have any dealings with.

12   Q.    Thank you, Mr. Rossell.  I have no further questions right

13   now.

14          THE COURT:  Cross-examination.

15          MR. SISTI:  Thank you, Judge.

16                      CROSS-EXAMINATION

17   BY MR. SISTI:

18   Q.    Good morning, Mr. Rossell.

19   A.    Good morning.

20   Q.    My name's Mark Sisti, and I represent the guy over there

21   at that table.  His name is Ian Freeman.

22   A.    Okay.

23   Q.    I'm sure this is the first time you've met me, right?

24   A.    Yes.

25   Q.    Okay.  And I'm sure it's the first time that you've met

1   Mr. Freeman, right?

2   A.   That's correct.

3   Q.   You don't know Mr. Freeman?

4   A.   No.

5   Q.   Did you ever speak with Ian Freeman or somebody that said

6   he was Ian Freeman?

7   A.   One time on the phone.

8   Q.   Okay.  Why don't you tell the jury what that conversation

9   was.

10  A.   He called me when the wire transfer didn't go through to

11  find out what happened with the money.

12  Q.   Okay.

13  A.   And I explained it to him, and I told him I would mail him

14  a personal check.

15  Q.   Now, he didn't ask for the personal check, right?

16  A.   Well, he wanted the money any way he could get it, I

17  believe.

18  Q.   You were instructed by somebody to send a personal check,

19  right?

20  A.   Yes.

21  Q.   And it wasn't Ian Freeman, right?

22  A.   No.

23  Q.   And I want to make this clear, and I know that you know

24  this right now, but you were scammed.  You understand that?

25  A.   Yes.

1   Q.   Okay.  And I think you told the jury the total of your

2   loss was around $103,000?

3   A.   That's correct.

4   Q.   Of the $103,000, any transactions allegedly made for Mary,

5   all right, to Freeman would have totalled 67,000, right?

6   A.   Correct.

7   Q.   That leaves us with 36,000, right?

8   A.   Yes.

9   Q.   Can you tell the jury how you lost the other 36,000?

10  A.   Some was sent to Mary, some was to buy other bitcoin that

11  went to Mary.  She set up the account, and I didn't have any

12  idea what she was doing.

13  Q.   All right.  So, this Mary -- and this is -- I know it's

14  got to be a fake name, right, like Mary Romeo or something like

15  that?

16  A.   Yeah.

17  Q.   Okay.  This Mary Romeo and you had this connection for how

18  long, if you recall?

19  A.   Probably six months.

20  Q.   And she was taking essentially money from you in bits and

21  pieces?

22  A.   Yes.

23  Q.   And it would go to her in all different ways?

24  A.   Mostly bitcoin.

25  Q.   Okay.  So, there was somebody else other than this Ian

1    Freeman account that some of this stuff was going through.  Do

2    you recall what the other situation was?

3    A.   No.  I didn't have any dealings with bitcoin at all.  She

4    handled everything.

5    Q.   Right.  Or whoever -- you don't know if it's a she,

6    anyway, right?

7    A.   Right, right.

8    Q.   You have no idea who this person in the middle is?

9    A.   No.

10   Q.   Or they call it a man-in-the-middle scam, is really what

11   it comes down to.  You understand that?

12   A.   Yes.

13   Q.   Okay.  So, let's move on a little bit here.  The scammer

14   had you on the hook for quite a while?

15   A.   Yes.

16   Q.   Checks were sent to people that were other than Ian

17   Freeman?

18   A.   I don't think I sent any other personal checks.

19   Q.   Okay.  Accounts or so-called bitcoin purchases were made

20   at the behest of this Mary Romeo?

21   A.   Right.

22   Q.   Not at the behest of Ian Freeman, right?

23   A.   No.

24   Q.   And if you had a conversation with Ian Freeman, the

25   conversation only would have had to do with that person telling

1    you that a wire transfer didn't go through?

2    A.    Yes.

3    Q.    And because the wire transfer didn't go through, then

4    bitcoin could not be purchased, right?

5    A.    No.

6    Q.    Right.

7    A.    Well, yes.  I sent the check to him to pay for the

8    bitcoin.

9    Q.    I understand eventually, okay?

10   A.    Yes.

11   Q.    But, because you were informed that the wire transfer

12   didn't go through, then you received information purportedly

13   from Ian Freeman that bitcoin couldn't be purchased.  If the

14   money wasn't there, it couldn't be purchased, right?

15   A.    Right.

16   Q.    Okay.  And then the instruction from Mary was to send a

17   check, right?

18   A.    Yes.

19   Q.    And did Mary supply you with the address and the

20   information to get that check off?

21   A.    Yes.

22   Q.    It wasn't Ian Freeman that supplied you with that

23   information, correct?

24   A.    No.  It was Mary.

25   Q.    When you went to the bank, or when you spoke with the

1    folks at the bank, I guess they -- I don't know, okay?  It

2    sounds like they tried to straighten you out and say that

3    there's something wrong with this transaction, right?

4    A.   Yes.

5    Q.   Even though they warned you -- I guess they warned you

6    that you were being scammed.

7    A.   No, they didn't say anything about a scam.  They just said

8    it was too much money to send to a charity and they didn't

9    think it was on the up and up.

10   Q.   Okay.  So, they told -- they actually told you they didn't

11   think it was on the up and up, right?

12   A.   Yes.

13   Q.   Okay.  But then this Mary person convinced you to go

14   further, right?

15   A.   Yes.

16   Q.   Even though a bank told you not to do it, right?

17   A.   They advised me not to, yes.

18   Q.   Is it the same bank that you were sending the wire from

19   that you cut the check from?

20   A.   Yes.

21   Q.   So, the same bank that told you they wouldn't do a wire

22   cut the check, well, two checks that resulted in the same

23   $67,000 loss, right?

24   A.   Yes.

25   Q.   So, that bank, even after they announced to you that there

1  was trouble or it wasn't on the up and up, still sent the

2  money, nonetheless --

3  A.   Correct.

4  Q.   -- to the same purported charity, correct?

5  A.   When I sent the personal check it was made out to Ian -- I

6  can't --

7  Q.   Freeman.

8  A.   Freeman.  That's it.

9  Q.   Okay.

10  A.   Yes.

11  Q.   All right.  But it was in the same amount that they had

12  rejected on the wire transfer?

13  A.   Yes.

14  Q.   And it was shortly after that rejection on the wire

15  transfer that your same bank sent out the same amount?

16  A.   Correct.

17  Q.   Ian Freeman never pressured you to send a check, right?

18  A.   No.

19  Q.   He never threatened you in any way, shape or form?

20  A.   No.

21  Q.   He never promised anything in any way, shape or form,

22  right?

23  A.   No.

24  Q.   It was this Mary, this scammer that was pushing you toward

25  this particular transaction, correct?

```
1    A.   That's correct, because she was the one who was going to

2    end up with the money.

3    Q.   Right.

4              MR. SISTI:  If I could just have a moment, Judge?

5              THE COURT:  You may.

6                            (Pause)

7              MR. SISTI:  Thank you.  Thank you very much, and sorry

8    that happened to you, sir.  Thank you.

9              THE WITNESS:  Okay.

10             MR. KENNEDY:  I'm all set, your Honor.

11             THE COURT:  You're excused, sir.

12             THE WITNESS:  Thank you.

13                       (Witness stepped down)

14             MR. KENNEDY:  The government calls Patrick Brown.

15             THE CLERK:  Please remain standing and raise your

16   right hand.

17             THE WITNESS:  Yes.

18             **PATRICK BROWN**, having been duly sworn by the Clerk,

19   was examined and testified as follows:

20             THE CLERK:  Please be seated.  And, for the record,

21   please state your name and spell your last name.

22             THE WITNESS:  Patrick Alan Brown, B-r-o-w-n.

23             MR. SISTI:  Your Honor, there's a witness on the

24   stand.  He can remove --

25             THE COURT:  Oh, you can remove your mask, sir.
```

1            THE WITNESS:  Oh, okay.

2            MR. KENNEDY:  You can take it all the way off, if you

3     want.

4            THE WITNESS:  Is that better?

5            MR. KENNEDY:  It just helps people see our mouths and

6     understand us.

7                        DIRECT EXAMINATION

8     BY MR. KENNEDY:

9     Q.   Good morning, Mr. Brown.  How are you?

10    A.   I'm great.  How are you?

11    Q.   I'm good.  Let me start.  Can you just tell the jury where

12    you currently live.

13    A.   I live in Spicewood, Texas.

14    Q.   And how long have you lived in Spicewood?

15    A.   Almost 18 months.  Two years.

16    Q.   Where did you live prior to that?

17    A.   I lived in San Jose, California.

18    Q.   How long were you there?

19    A.   I was there for approximately eight years.

20    Q.   Did you live in several other places?

21    A.   I lived in Oklahoma, yes.  I've been in Texas three times

22    because of the company that I was working for.

23    Q.   Where did you grow up?

24    A.   Oklahoma.

25    Q.   How old are you, Mr. Brown?

1    A.   I am 68.

2    Q.   Are you currently employed?

3    A.   Yes, I am.

4    Q.   Where are you employed?

5    A.   I have a job at Lowe's in Tools and Hardware.

6    Q.   How long have you been doing that?

7    A.   Probably two years.  18 months, two years.

8    Q.   Were you working immediately prior to that?

9    A.   No, I wasn't.

10   Q.   Were you unemployed, or were you retired?

11   A.   I was retired.

12   Q.   Okay.  How about prior to your retirement; what did you do

13   for a living?

14   A.   I worked for property management for 33 years for the

15   Krupp Company and -- they're out of Boston.  I would move

16   around the country.  It was apartments.  I would manage the

17   apartments and the staffing, everything else.  Once I -- they

18   would send me the ones that were the most distressed and they

19   would make me make it better.

20   Q.   So, then you retired, correct?

21   A.   Did what?

22   Q.   Then you retired, you told us, right?

23   A.   Yes, and then I retired after that.

24   Q.   And then, now you work at Lowe's.  Is there a reason you

25   came out of retirement to work at Lowe's?

1    A.    Yeah.  I was scammed, and I lost $1.2 million.

2    Q.    Do you have any family, Mr. Brown?

3    A.    I do.  I have three kids.  I have two girls and a boy, and

4    I have six grandkids, four girls and two boys.

5    Q.    All right.  So, I'm going to start talking to you about

6    why you're here, okay, Mr. Brown?

7    A.    Yes.

8    Q.    All right.  So, let's orient -- if we orient ourselves to

9    the spring of 2020, is that okay?

10   A.    Yeah.

11   Q.    At that time are you retired?

12   A.    Yes.

13   Q.    Had you planned for retirement?

14   A.    Yes.

15   Q.    And you saved for retirement?

16   A.    Yeah.

17   Q.    And I know you just said it, but was that all your

18   retirement that you had saved, the 1.2 million?

19   A.    Yeah, it was, but -- yeah, it was, 1.2 million.

20   Q.    And at that time where was your money located?

21   A.    My money was located at Fidelity.

22   Q.    So, now I want to focus us on the fall of 2020, okay?

23   A.    Yeah.

24   Q.    In the fall of 2020 did you receive an email that changed

25   the course of your life?

1    A.    I did.  I got an email stating that my Social Security

2    number was hacked and that I should cooperate with Bruce

3    Williams, who was the agent in charge.

4    Q.    And do you recall who the email was from, who they were

5    purporting to be?

6    A.    No.  It just came through, and I was just supposed to

7    follow his lead.

8    Q.    And you said Mr. Bruce Williams was an agent.  Was he --

9    was this a federal agency or state agency?

10   A.    It didn't really say.  It said the "agent in charge" on

11   the email.

12   Q.    And it said your Social Security number was hacked?

13   A.    Yes.

14   Q.    Okay.  And were you in contact with Mr. Bruce Williams?

15   A.    He contacted me later.

16   Q.    And what did you learn talking to him?

17   A.    After talking with him and everything else, he thought it

18   best that I move my money around to different accounts.

19   Q.    And why did he suggest that you move your money to

20   different accounts?

21   A.    He said it would be safer for me to do that.

22   Q.    And is that related to the Social Security number?

23   A.    Mm-hmm.

24   Q.    How did Mr. Williams propose that you go about moving your

25   money?

1    A.   We would open separate accounts at banks.  I've only had

2    one bank, who was Fidelity, and now I'm with Charles Schwab,

3    but he said it best that we open up accounts in different other

4    banks, ones such as Ally, Chase, Bank of America, et cetera,

5    and we would put funds in those different accounts.

6    Q.   So, did you, in fact, open accounts at these other banks?

7    A.   Yes, and the accounts were in my name.

8    Q.   And once you opened these accounts, what did Mr. Williams

9    ask you to do?

10   A.   Once I opened them and everything else, we would put

11   money, different money in there.  Of the money that I had, we

12   would take and allow funds to go to each one of the accounts.

13   Q.   Okay.  So, you moved the money from your Fidelity account;

14   is that right --

15   A.   Yes.

16   Q.   -- into these new accounts that you opened?

17   A.   Yes.  There was probably, I don't know, maybe half a

18   dozen, something like that.

19   Q.   And, again, those accounts that you created, those were in

20   your name?

21   A.   They were in my name.

22   Q.   Once the money was in these new accounts that were in your

23   name what did Mr. Williams suggest that you do?

24   A.   He suggested that I wire, transfer monies to different

25   accounts, and so he sent me -- I would have to wire it, go to

1 | there and wire it, and he would tell me how much to wire to
2 | somewhere else.
3 | Q.   Okay.  And when you're wiring from these new accounts to
4 | places that Mr. Williams is telling you, are those being wired
5 | to accounts in your name?
6 | A.   No.
7 | Q.   Okay.  Did you know the names of the people they were
8 | being wired to?
9 | A.   I don't.  I know that Bruce Williams did.
10 | Q.   And, just to be clear, is it true that you moved this
11 | money at his behest?
12 | A.   I'm sorry?
13 | Q.   I'm sorry.  That was a terrible question.
14 | A.   Yeah.
15 | Q.   Did you, in fact, move money when Mr. Williams asked you
16 | to?
17 | A.   Yes.
18 | Q.   Okay.
19 | A.   I would move money, and during the process of moving the
20 | money I would give him verifications that the money was moved.
21 | Q.   Okay.  Did you believe Bruce Williams that your Social
22 | Security account had been hacked?  Taking you back to the time,
23 | right?  I'm not asking you if you believe it now.
24 | A.   Yeah.  Now I wouldn't, but I did at the time.
25 | Q.   How were you communicating with Mr. Williams?

1    A.    Phone calls and stuff like that.

2    Q.    Were you communicating pretty regularly or sporadic?

3    A.    Sporadically.

4    Q.    Again, what was the goal of moving all of this money,

5    according to Mr. Williams?

6    A.    To make it safer.

7    Q.    So, you testified about a minute ago that he transferred

8    from these new accounts into accounts that were not in your

9    name, correct?

10   A.    Well, they had -- they were in my name, but I had never

11   done business with these banks before.  Yeah.

12   Q.    Sorry.  I just want to clarify.  So, I think we talked

13   about two steps of moving money?

14   A.    Uh-huh.

15   Q.    So, am I correct that you testified that you moved money

16   from your Fidelity account into these new accounts, correct?

17   A.    Uh-huh.

18   Q.    And then you moved it from these new accounts one more

19   time, right?

20   A.    Yes.

21   Q.    And where did it go when it moved from the accounts that

22   were in your name?

23   A.    As far as the ones -- oh, the new ones?

24   Q.    Yes.  So, I just want to make sure I'm understanding.  It

25   went from Fidelity to accounts that you opened in your name,

1    and then it moved --

2    A.    Yeah.  It went to, like, Ally, and it went to Bank of

3    America, Chase and stuff like that; and then, once I would go

4    there, then he would instruct me down the road to go to Chase

5    and make a wire transfer of this much money.

6    Q.    Okay.  And when you wired it out of Ally or Chase were

7    those two accounts that were not in your name?

8    A.    Ally and Chase were never in my name, but they were in my

9    name --

10   Q.    The wires.  Where were you sending the wires to, accounts

11   that were in your name or not in your name?

12   A.    They were not in my name.

13   Q.    I just want to make sure I understand.

14   A.    Yes.

15   Q.    Okay.  Do you recall if one of the places that you wired

16   money to was something called the New Hampshire Peace Church?

17   A.    Yes.

18   Q.    And did you know what the New Hampshire Peace Church was?

19   A.    I had no clue.

20   Q.    And why did you wire it there?

21   A.    Bruce Williams told me to.

22   Q.    And I think you testified that he had you take some

23   verification; is that right?

24   A.    Yes, yes.

25   Q.    What did that consist of?

1    A.    I would take a photo of myself, that way I had it, and

2    then he would give me something to write on saying that I had

3    sent this amount of money to this particular person, and I

4    would take a photo of that and I would send it to him.

5    Q.    I'm going to show you now what we have agreed as a full

6    exhibit is Government's 2001.

7    A.    Yeah, that's me.

8    Q.    Is that you?

9    A.    Yeah.

10   Q.    Is that your driver's license?

11   A.    Yes, it is.

12   Q.    Did you take that photo?

13   A.    Yes.

14   Q.    And why did you take that photo?

15   A.    Bruce told me to.

16   Q.    And what did you do after you took that photo?

17   A.    I sent him a copy of it.

18   Q.    So, you sent that to Bruce?

19   A.    Yes.

20   Q.    I'm going to show you Government's 2002, which has also

21   been agreed to as a full exhibit.

22   A.    Yeah.

23   Q.    Is that your passport?

24   A.    Yes, it is.

25   Q.    Did you take this photograph?

1   A.   Yes, I did.

2   Q.   And, again, why did you take this photograph?

3   A.   Because Bruce Williams told me to.

4   Q.   And after you took this what did you do with it?

5   A.   I sent it to him.

6   Q.   I'm going to show you what has been marked as a full

7   exhibit Government's 2003.

8   A.   Yeah, that's me.

9   Q.   All right.  Mr. Brown, I'm going to move so I can see.  My

10  eyesight is not as great as it used to be.  Okay.

11  A.   That's why I have glasses on.

12  Q.   Yeah.  I have some, and I should be wearing them.

13       So, is this you?

14  A.   Yes, it is, sir.

15  Q.   Okay.  And if I -- is that your handwriting in the sign

16  you're holding?

17  A.   Yes.

18  Q.   And if I read that it says, "I certify that I am buying

19  bitcoin from Bitcoinbombshell on localbitcoins.com," dated

20  "November 2nd, 2020," and then is that a signature?  Is that

21  your signature?

22  A.   Yes.

23  Q.   And is that your phone number?

24  A.   Used to be; but, yes, at that time it was.

25  Q.   And did I read those words correctly?

1    A.    Yes, you did, sir.

2    Q.    And why did you write those words?  I'm sorry.  Why did

3    you write those words?  Did you come up with those words?

4    A.    No.  I was told to write them.

5    Q.    Did you take this picture?

6    A.    Yes.

7    Q.    Did Bruce tell you to take this picture?

8    A.    Yes.

9    Q.    And what did you do after you took this picture?

10   A.    I sent it to him.

11   Q.    Do you know what Bitcoinbombshell is?

12   A.    I have no idea.

13   Q.    Do you know what localbitcoins.com was?

14   A.    No.

15   Q.    I'm going to show you Government's 2004.  Is this you

16   again?

17   A.    That's me.

18   Q.    Is that your handwriting again?

19   A.    Yes.

20   Q.    I'm just going to read this one.  It looks like a slightly

21   different note.

22         "I, Patrick Alan brown, patrickbrown007 on LBC,

23   authorized and completed a wire transfer in the amount of

24   50,000 USD for the purchase of bitcoin (BTC) from

25   Bitcoinbombshell and New Hampshire Peace Church on

1   localbitcoins.com.  I understand that this transaction is

2   non-refundable," a signature and "11/2/2020."

3          Did I read that correctly?

4   A.   Yes.

5   Q.   Did you write those words?

6   A.   Yes.

7   Q.   Who told you to write those words?

8   A.   Bruce Williams.

9   Q.   Skipping 2005, I'm going to -- we're going to pull up

10  Government's 2006, which has been agreed as a full exhibit.

11  A.   Yes.

12  Q.   Do you recognize this?

13  A.   Yes.

14  Q.   Is this a wire transfer receipt?

15  A.   Yes.

16  Q.   In the top right it looks like it says Wells Fargo; is

17  that right?

18  A.   Yes, sir.

19  Q.   Is that one of the banks that Mr. Williams had you open an

20  account at?

21  A.   Yes.

22  Q.   And if we look at the originator information in the middle

23  there, is that you, Patrick A. Brown?

24  A.   Yes.

25  Q.   And was that your address at the time?

1    A.   Yes.

2    Q.   And just at the bottom of that clip there, sorry, the wire

3    amount, can you see what that is?

4    A.   Yes.

5    Q.   And how much is that?

6    A.   Yes.

7    Q.   Sorry.  How much is that?

8    A.   $50,000.

9    Q.   And who is the beneficiary on that?

10   A.   New Hampshire Peace Church.

11   Q.   Okay.  And over in the name line, address, where is that

12   located?

13   A.   Keene, New Hampshire, United States.

14   Q.   Thank you.  I'm just going to -- is that your handwriting

15   again at the bottom?

16   A.   Yes, sir.

17   Q.   Okay.  And I think it says:  "I, Patrick Alan Brown,

18   (patrickbrown007 on LBC) authorized and completed a wire

19   transfer in the amount of 50,000 USD for the purchase of

20   bitcoin (BTC) from Bitcoinbombshell and NH Peace Church on

21   localbitcoins.com.  I understand that this transaction is

22   non-refundable."  And then signed and the date.

23        Is that right?

24   A.   Yes, sir.

25   Q.   These words that you wrote on this wire receipt, did you

1    write these before or after you did the wire at the bank?

2    A.   I certainly didn't do it before, because I had already

3    sent it, so it was after.

4    Q.   What did you do after you took this photograph?

5    A.   I sent it to Bruce Williams.

6    Q.   I'm just going to show you Government's Exhibit 2007,

7    which has been agreed to as a full exhibit.

8    A.   That's me.

9    Q.   Is that the same wire we just looked at?

10   A.   Yup.

11   Q.   Same date, same words?

12   A.   Same date, everything.

13   Q.   And, again, what did you do with this photograph after you

14   took it?

15   A.   I sent it to Bruce Williams.

16   Q.   Do you recall sending additional wires to the New

17   Hampshire Peace Church?

18   A.   I do, but I think it was -- yeah, I do.

19   Q.   Okay.  I'm going to show you what has been marked and

20   agreed to as Government's Exhibit 2008, and this is a bank

21   statement.  I'll just have you look in the top left.  You can

22   tell us who --

23   A.   New Hampshire Peace Church, 661 Marlboro Street, Keene,

24   New Hampshire, 03431.

25   Q.   Okay.  And in the top right can you tell us what the

1    statement period is for?

2    A.    10/02/20 to 11/2/20.

3    Q.    And we were just looking at wires from 11/2/20; is that

4    correct?

5    A.    Yes.

6    Q.    So, if we could just scroll down to an entry for 11/2 at

7    the bottom there, if we can highlight there, can you see that

8    entry from 11/2?

9    A.    Yes, I can.  A wire for $50,000.

10   Q.    Okay.  And what's the account number that that's wiring in

11   from?

12   A.    6047.

13   Q.    And is that you, Patrick A. Brown?

14   A.    No.

15   Q.    That's not your name?

16   A.    Well, it's my name, but that's -- yeah, that's my name.

17   Q.    Just to orient you, we just looked at some wire receipts

18   from 11/2 from you to the New Hampshire Peace Church for

19   $50,000, right?

20   A.    Yes, we did.

21   Q.    And so I'm just -- I'm asking you is this the entry in the

22   bank receipts that matches up with that?

23   A.    Yeah.

24   Q.    And after -- oh, sorry.

25          MR. KENNEDY:  Keep zoomed in for one second.  Okay.

1    Q.   After your name it says "REF Donation"?

2    A.   Yes.

3    Q.   On this wire did you write that it was a donation?

4    A.   No.  It wasn't a donation from me.

5         MR. KENNEDY:  Okay.  I'm just going to scroll down,

6    Caryn.  I think we're going to get to the next month of

7    activity.  Okay.  If we can just look at the statement period

8    on this one.

9    A.   There you go.  11/3/20 to 12/2/20.

10   Q.   Okay.  And when we come down about halfway it says:

11   "Business checking," in that big bold stripe.  Can you just

12   read what's right below that, right below --

13   A.   Oh, yeah.  "Ian B. Freeman d/b/a New Hampshire Peace

14   Church."

15        MR. KENNEDY:  Okay.  Back out, Caryn.  If we can just

16   look at the first line on this statement on 11/3.

17   A.   Yes.

18   Q.   So, we looked at one from 11/2 for $50,000, right?

19   A.   Yes.

20   Q.   And this is 11/3, and how much is this one for?

21   A.   $97,000.

22   Q.   And what's the account number this one is coming from?

23   A.   6047.

24   Q.   I think that's the same one we just looked at; is that

25   right?

```
1    A.   I believe so.

2    Q.   Come back out, Caryn.

3    A.   Okay.

4    Q.   We're going to look at 11/6.

5    A.   Yup.

6    Q.   So, we've got 11/2, 11/3.  Now we're at 11/6?

7    A.   Yes.

8    Q.   Is this you again?

9    A.   Yes, it is.

10   Q.   And what's the account number on this one?

11   A.   3454.

12   Q.   Is that a different account than 6047?

13   A.   Yes, it is.

14   Q.   And how much is this wire for?

15   A.   $98,900.

16   Q.   And just go down to 11/9.

17   A.   Okay.

18   Q.   Do you see 11/9 your name again?

19   A.   Patrick A. Brown.

20   Q.   Yeah.  And what account is this wire coming in from?

21   A.   7518 for 36,000.

22   Q.   Is that a third, different account?

23   A.   Yeah, it's a different account.

24   Q.   So, if I have this right, on 11/2 you had $50,000, on 11/3

25   you had $97,000, on 11/6 you had 98,900, and on 11/9 you had
```

1   36,000.  Does that sound right?

2   A.   Yes.

3   Q.   So, that's about, if I do my math right, a little over

4   $280,000 in about seven days?

5   A.   Yes.

6   Q.   Did you receive any phone calls after sending these wires

7   asking you why you were making so many wires?

8   A.   No.

9   Q.   Anybody call you and ask you if you knew anything about

10  bitcoin?

11  A.   No.

12  Q.   Did you know anything about bitcoin at this time?

13  A.   No.

14  Q.   We talked about patrickbrown007 on LBC.  I'm going to show

15  you -- you wrote that in a prior wire.  I can show you if you

16  want.

17  A.   No.  I don't know why it said 007.  They maybe thought I

18  was James Bond or something.  I don't know.

19  Q.   The jury has already seen this, but I'm going to show you

20  Government's Exhibit 1225.  And these are chats that the jury

21  has seen from --

22  A.   Oh, yeah.

23  Q.   -- LocalBitcoins.  And that first username, can you just

24  tell me what that user name is?

25  A.   Bitcoinbombshell.

1    Q.   And do you recall writing that on the wires we looked at?

2    A.   Yeah.

3    Q.   And if we come to this first white box, what's the

4    username there, on that first big white box on 11/2/2020?

5    A.   11/2.  Whoops.

6    Q.   What's the username that's highlighted?

7    A.   Bitcoinbombshell.

8    Q.   No.  Sorry.

9    A.   That's okay.

10   Q.   All right.  So, we see that first one, right, on 11/2 at

11   16:25:39 that says Bitcoinbombshell, right?

12   A.   Yes.

13   Q.   The one below that that's not shaded and it's in white,

14   and it's at 16:30:14, do you see that?

15   A.   Yes, I do.

16   Q.   And there's a highlighted name.  Can you tell me what name

17   that is?

18   A.   patrickabrown007 (sic).

19   Q.   I think just patrickbrown007?

20   A.   patrickbrown007, yeah.

21   Q.   And, if I read that to you, it says, "Hello.  Sure.

22   Providing you the necessary documentation for verification will

23   not at all be a problem.  Kindly let me know if I can buy for

24   45k, and can you also reduce the price a little for me?  I will

25   be making a wire transfer from my Wells Fargo Banks."

1          Do you recall writing that?

2     A.   I didn't write that.

3     Q.   Okay.  I'm going to show you the one at the bottom,

4     16:37:23.  Do you read that?  Can you see where I'm looking at

5     the very bottom?

6     A.   Yeah, where it says patrickbrown007.

7     Q.   Yes.  And then it says, "Friend, I am comparatively fresh

8     on LBC, but I have traded good.  Yeah, I read it.  That's how

9     your release time is so less.  I completely understand that.  I

10    can trade offline with you.  I have been trading offline since

11    long using Coinbase Pro, but they have some technical issue

12    going on, as they mentioned on my account, my BTC are help in

13    there.  If you want I can trade offline for say maybe around 12

14    BTC."

15         Did I read that right?

16    A.   Yes, you did.

17    Q.   Did you write that?

18    A.   No.

19    Q.   Do you talk like that?

20    A.   No.  I'm from Oklahoma.

21    Q.   How would you characterize the English of the person who

22    wrote that?

23    A.   They need to go back to school.

24         MR. KENNEDY:  No further questions, your Honor.

25         THE COURT:  Cross.

1          MR. SISTI:  Do you want to break at this point, Judge?

2          THE COURT:  Let's take the morning break, just only

3    because, remember, we're only going to go till noon today, so

4    it will be 15 minutes, then 45 till lunch, then you're on a

5    break.

6          THE CLERK:  All rise.

7               (The jury exited the courtroom)

8          THE COURT:  All right.  Anything for the Court?

9          MR. SISTI:  All set here, Judge.

10         THE COURT:  Okay.

11         (Recess taken from 11:00 a.m. to 11:18 a.m.)

12         MR. AFRAME:  Just so you know, the next two witnesses

13   we were going to call have tested positive, so I will just --

14   we will just have to --

15         MR. SISTI:  Could we have a chambers conference?

16         THE COURT:  Yeah.

17              (Chambers conference held off the record)

18         THE COURT:  Okay.  You may begin your

19   cross-examination.

20         MR. SISTI:  Thank you, Judge.

21                        CROSS-EXAMINATION

22   BY MR. SISTI:

23   Q.   Good morning, Mr. Brown.

24   A.   Good morning.

25   Q.   Where exactly is the town that you're living in?

1    A.    The what now?

2    Q.    Where exactly is the town you're living in in Texas?

3    A.    Spicewood?

4    Q.    Yeah.  Where is that?

5    A.    It's in Hill Country.

6    Q.    Okay.

7    A.    Just outside of Austin.

8    Q.    Okay.  All right.  And is your Fidelity account located in

9    that town, or was it located someplace else that we're talking

10   about?

11   A.    Boston.

12   Q.    It was in Boston.  And when you would take money out of

13   that account what was the mechanism?  What would you have to go

14   through?

15   A.    All I have to do is just take it out, and I would just

16   ask -- I would request to move the money and stuff like that.

17   Q.    Yeah.

18   A.    But, to begin with, when I took it out of Fidelity, it was

19   in bits and pieces.

20   Q.    Right.  Let's say you're taking $50,000 out of Fidelity.

21   Did you speak with a human being?

22   A.    When I was taking 50,000 out of Fidelity?

23   Q.    Yeah.

24   A.    They would look at it, and I had the money, yes.

25   Q.    Again, I want to be clear, okay?  Did you talk to an

1    actual representative?

2    A.    From Fidelity?

3    Q.    Yes.

4    A.    If it was a high amount or something I would, but if it

5    was a small amount I would not.

6    Q.    Okay.  Let's say 50,000.

7    A.    Uh-huh.

8    Q.    Would you speak to somebody?

9    A.    Okay.  I would.

10   Q.    Okay.  And can you tell this jury what kind of questions

11   and answers?  What was going on there?

12   A.    They weren't questioning and answering it; they would just

13   approve it.

14   Q.    So, they never asked you why you needed 50,000 bucks, for

15   instance?

16   A.    Why I needed it?

17   Q.    Yeah.

18   A.    No.

19   Q.    Your total amount in this scam, and I'm sorry that you got

20   caught up in this, but it is a lot of money.  It's like 1.2

21   million?

22   A.    Yes.  I'm sorry I got into it, too.

23   Q.    Yeah, really.

24   A.    I am.

25   Q.    Yes.  And this was all out of the Fidelity account?

1    A.    Yeah.  The majority of it was.  What I did was I had it

2    there for a while.  Then I transferred my accounts to Charles

3    Schwab.

4    Q.    All right.  So, you went Fidelity to Charles Schwab?

5    A.    Uh-huh.

6    Q.    How much business -- how much of the scam came through the

7    Fidelity account, if you can recall?  I mean, I'm not holding

8    you to it.

9    A.    I don't recall anything coming from them.

10   Q.    Well, you would ask them for checks so you could transfer

11   it to somebody else, right?

12   A.    Uh-huh.

13   Q.    I want to be clear here, okay?  How much total money did

14   you withdraw of the 1.2 from Fidelity?

15   A.    Well, the Fidelity account was completely extinguished,

16   and then it went to my one in Charles Schwab.

17   Q.    And what's in Charles Schwab?  How much was there?

18   A.    I opened a new account with them.

19   Q.    How much?

20   A.    It was -- I can't remember back.  It was quite a bit of

21   money.

22   Q.    Yeah.  And then you were still cutting checks, or you're

23   still being scammed through Charles Schwab?

24   A.    No.

25   Q.    So, that money is okay?

```
1    A.    Yes.

2    Q.    And that's a good bit of money, right?

3    A.    Oh, yeah.  What I lost?

4    Q.    No.

5    A.    Or what I have there now?

6    Q.    What you've got there now.

7    A.    Yes.

8    Q.    So, you're okay there.  The scammed money, though, would

9    have been the Fidelity account?

10   A.    Yeah, I would say so.

11   Q.    Okay.  Now, the math I've got is that the transactions

12   that this Bruce Williams guy, whoever this is, was insisting be

13   sent to the church or Ian Freeman came to about $281,000?

14   A.    That's correct.

15   Q.    Okay.  And the rest of the 1.2 went someplace else?

16   A.    Yeah.

17   Q.    Okay.  Just so the jury is understanding, how long did

18   this scam thing go on?

19   A.    I can't be exact, but it was probably a four- or

20   five-month period.

21   Q.    And from my notes and from what we saw in the exhibits,

22   there were only I think four transactions that would have gone

23   to this church in Keene or Ian Freeman, right?

24   A.    Correct.

25   Q.    And those four transactions would have spanned about seven
```

1    days, November 2nd through and including November 9th, right?

2    A.    Yes.

3    Q.    And all the other stuff happened before and after that,

4    right?

5    A.    Yeah.  It was -- yes.

6    Q.    Okay.

7    A.    Like I said, I got it hacked, and the agent was Bruce

8    Williams, and he would tell me what to do with the money, put

9    in the Ally banks and the different banks.

10   Q.    So, this Bruce Williams character, he's probably fake,

11   right?  I mean, it's probably not his real name, right?

12   A.    Oh, I'm assuming it's not.  I don't know.  I don't know

13   Bruce.

14   Q.    You don't know Bruce?

15   A.    No.

16   Q.    But you spoke with a human being?

17   A.    Yes, I did speak with a human being.

18   Q.    All right.  And this guy, he must have been pretty good.

19   He was telling the story, right?

20   A.    I guess he was.

21   Q.    He scared you pretty much, right?

22   A.    Well, you know, I don't think it's -- if I could embellish

23   on back of what I did --

24   Q.    Yeah.

25   A.    I wouldn't do it again.

1    Q.    Of course.

2    A.    But I was going by that direction at the time.

3    Q.    You thought he was an agent for the Social Security

4    people, right?

5    A.    Yeah.

6    Q.    And you never checked with Social Security, of course,

7    right?

8    A.    No.

9    Q.    And the thing started with an email purportedly from the

10   Federal Government, right?

11   A.    Yeah.

12   Q.    No official mailing, nothing like that?

13   A.    No.

14   Q.    And then all of a sudden you're speaking to some guy who's

15   holding himself out to be an agent?

16   A.    Mm-hmm.

17   Q.    Right?  You've got to say yes.

18   A.    Yeah.

19   Q.    That doesn't cut it here.

20   A.    I know.  That's fine.

21   Q.    He never said he was working with anybody by the name of

22   Ian Freeman, right?

23   A.    No.  That name never did come up.

24   Q.    Right.  I mean, this Bruce Williams didn't say that he's

25   working in conjunction with some church in Keene, New Hampshire

1    or something like that?

2    A.    I don't know.

3    Q.    Well, you never heard of such a thing, right?

4    A.    No.

5    Q.    Okay.  And out of the total of five or six months the

6    subject of the checks that would have gone to that church, at

7    least from what we know from the government's exhibits, would

8    have been four transactions over one week?

9    A.    Yeah.  That's correct.

10   Q.    Can you tell the jury just what other transactions were

11   taking place?  I mean, what was the form of those?

12   A.    Well, you know, I can only say that the reason I sent them

13   to the New Hampshire Peace Church is because Bruce Williams

14   told me to send them there.

15   Q.    Right.  You've made that pretty clear.

16   A.    Okay.

17   Q.    It wasn't because Ian Freeman told you to send them there?

18   A.    I just told you what I said.

19   Q.    Right.  I get it.  Now, other than those transactions over

20   that one-week period can you tell the jury what other kind of

21   scam thing was going on?

22   A.    I can't -- well, I can only tell you that the checks and

23   the stuff that I wrote at the time, it took -- I know that I

24   sent those out, but they were all sent out at different times.

25   Q.    Yeah.  But what kind of places were those going, do you

1   know?

2   A.   Like I said, they were going to different banks, and then

3   he would tell me to send them to someplace else, and he would

4   just give me the wire and where to go.

5   Q.   And you just don't know what happened to it, right?

6   A.   Correct.

7   Q.   It just disappeared into the ether?

8   A.   I don't know where it went.

9   Q.   You never got bank statements for five or six months from

10  these other banks, did you?

11  A.   No, they did have my address, and they would send me some

12  sort of bank statements but not that many.

13  Q.   Not that many?

14  A.   No.

15  Q.   Did you ever have a conversation with anybody that

16  purported to be Ian Freeman?

17  A.   Do what now?

18  Q.   Did you ever have a conversation with anybody that

19  purported to be Ian Freeman?

20  A.   No.

21  Q.   Or a representative of the Peace Church in New Hampshire?

22  A.   No.

23  Q.   So, would it be fair to say that there was no duress or

24  pressure placed upon you by Ian Freeman?  Correct?

25  A.   No.

1    Q.    Or the Peace Church?

2    A.    That's correct.

3    Q.    And that the scoundrel involved here is somebody

4    purporting to be Bruce Williams?

5    A.    Right.

6    Q.    Are you involved in any other prosecutions other than this

7    one?

8    A.    No.

9    Q.    So, the other approximately $1,000,000 that has nothing to

10   do with this case, have you been cooperating with investigators

11   on that as well?

12   A.    You can ask my attorneys, but I've just been cooperating

13   with them.

14   Q.    Oh, no, I understand that, but any of the other entities

15   other than this subject matter here in this court?

16   A.    No.

17   Q.    Any other states, any other federal districts?

18   A.    No.

19   Q.    Do you know if they've looked into Fidelity, your

20   investment company that cut lose $1.2 million?

21   A.    I didn't do it all at once, but -- yeah.

22   Q.    Did you ever ask Fidelity why they did that?

23   A.    No, because I'd been with them for a long time.

24   Q.    All right.  You were a trusted customer of theirs for

25   years, right?

```
1    A.    Yes.

2    Q.    And even though you were a trusted customer with Fidelity

3    for years they didn't question you with regard to dumping

4    $1.2 million over a five-month period?

5    A.    The 1.2 million wasn't dumped over a five-month period

6    from Fidelity.

7    Q.    All right.

8    A.    The money was already moved out, and my question to you is

9    why did --

10            THE COURT:  Time out, time out.

11   Q.    I'm just asking, sir.

12            THE COURT:  You don't get to ask questions; only he

13   does.

14            THE WITNESS:  Okay.

15   Q.    I'm just asking if you ever had contact with Fidelity as

16   to why they were allowing those transfers taking place.

17   A.    No.

18   Q.    Okay.  Thank you very much.

19   A.    Uh-huh.

20            THE COURT:  Any redirect?

21            MR. KENNEDY:  Just very briefly, your Honor.

22                    REDIRECT EXAMINATION

23   BY MR. KENNEDY:

24   Q.    I just want to make sure, Mr. Brown, I understand how this

25   works.  You had $1.2 million in Fidelity; is that correct?
```

1    A.    Yeah, it was close to that.  A little bit more.

2    Q.    I think, if I recall your testimony, was that Mr. Williams

3    asked you to do some stuff with that?

4    A.    The money that after I transferred, yes.

5    Q.    And he wanted you to transfer the money out of the

6    Fidelity account; is that right?

7    A.    Yeah.

8    Q.    And you had testified that you moved it to some other

9    banks; is that right?

10   A.    Correct.

11   Q.    Ally Bank?  You had said that?

12   A.    Yes.

13   Q.    What was Ally Bank?

14   A.    Ally?

15   Q.    Yeah.  What was that?  You said you opened some Ally

16   accounts.

17   A.    I opened up an Ally account, and the monies that we put

18   there were just different sorts of money.  We opened up

19   accounts at I think it was like four or five other banks.

20   Q.    Okay.  I think we looked at a wire from Wells Fargo; is

21   that right?

22   A.    Yes, you did.

23   Q.    And those were accounts that you opened up; is that right?

24   A.    Yes, I opened them up.

25   Q.    Okay.  And the wire we looked at from Wells Fargo was in

1    the name Patrick Brown, right?

2    A.    Yes.

3    Q.    Okay.  And so, I want to make sure I understand.  Your

4    money was in Fidelity, correct?

5    A.    Mm-hmm.

6    Q.    And then Mr. Williams had you move it to these other

7    accounts?

8    A.    Yes.

9    Q.    Like the Wells Fargo account?

10   A.    Yes.

11   Q.    It was in the name of Patrick Brown?

12   A.    Yes.  So was the Ally, and I think there was Chase, and I

13   think there was one or two others.

14   Q.    Okay.  So, when you went to Fidelity were you asking them

15   to transfer money from your Fidelity account to your Wells

16   Fargo that was also in your name?

17   A.    I had transferred all the money previously before that, so

18   it didn't -- that money didn't come from Fidelity.

19   Q.    I'm not asking -- sorry.  It might be a misunderstanding

20   on my part.  I'm not asking about the wire out of Wells Fargo.

21   A.    Oh.

22   Q.    I'm asking about how the money got into Wells Fargo.

23   A.    It was -- I transferred it, a wire transfer.

24   Q.    Was that from your Fidelity account?

25   A.    I think it was from my Fidelity account.

1    Q.    Okay.  So, it went from Patrick Brown's Fidelity account

2    to Patrick Brown's Wells Fargo account?

3    A.    Yeah.

4          MR. KENNEDY:  I don't have anything else.

5          THE COURT:  Recross?

6          MR. SISTI:  Thank you, Judge.

7                        RECROSS-EXAMINATION

8    BY MR. SISTI:

9    Q.    It seems like it got to a point that you would do anything

10   this Bruce Williams wanted you to do.  I mean, he tells you to

11   send money to Wells Fargo, you do it, right?

12   A.    Okay.  Yes.

13   Q.    I'm not accusing you of anything.

14   A.    I know you're not.

15   Q.    Okay.  He convinces you to send money to Chase, you send

16   money to Chase, right?

17   A.    Right.

18   Q.    He convinces you to send money to Ally, you send money to

19   Ally, right?

20   A.    Yes.

21   Q.    Does he instruct you on what to say if a representative

22   from Chase calls you up?  Does he tell you?

23   A.    No.

24   Q.    Does he ever instruct you that, If anybody asks you why

25   we're doing this, it's for your own protection?

1    A.    No.

2    Q.    Does he ever ask you or tell you that this is for

3    investment purposes or anything like that?

4    A.    No.

5    Q.    He's just having you move money periodically to different

6    banking institutions?

7    A.    Yes.

8              MR. SISTI:  Okay.  I have nothing further.  Thank you.

9              THE COURT:  Sir, you're excused.  Thank you.

10             THE WITNESS:  Okay.

11                  (Witness stepped down)

12             MR. AFRAME:  The United States calls Harold Jones.

13             THE CLERK:  Please remain standing and raise your

14   right hand.

15             **HAROLD JONES,** having been duly sworn by the Clerk, was

16   examined and testified as follows:

17             THE CLERK:  Please be seated, and, for the record,

18   please state your name and spell your last name.

19             THE WITNESS:  My name is Harold Jones, J-o-n-e-s.

20                       DIRECT EXAMINATION

21   BY MR. AFRAME:

22   Q.    Good morning, Mr. Jones.

23   A.    Good morning.

24   Q.    Could you tell the jury how old you are?

25   A.    I'll be 75 in January.

1    Q.    And where do you live presently?

2    A.    Kansas City.

3    Q.    Is that Missouri or Kansas?

4    A.    Missouri.

5    Q.    And how long have you lived in Kansas City, Missouri?

6    A.    I lived officially I think from 2003, but I worked there

7    10 years prior to that.

8    Q.    And before you came -- so that would be the early '90s?

9    A.    Yes.

10   Q.    And so, before you came to Kansas City where were you

11   from?

12   A.    Wisconsin and Tennessee.

13   Q.    Okay.  And let me ask you a bit about your family.  Are

14   you married?

15   A.    I am.

16   Q.    And how long have you been married?

17   A.    Well, 54 years now, I guess.

18   Q.    And what is the present status of that marriage?

19   A.    We're separated for two years.

20   Q.    And do you have children?

21   A.    I have.

22   Q.    How many?

23   A.    Two.

24   Q.    And how old are they?

25   A.    One is 44, and the other one is 32.

1    Q.   And do you have grandchildren?

2    A.   I do.

3    Q.   How many?

4    A.   Four.

5    Q.   Let me ask you a little bit about your professional life.

6    What kind of business have you been in?

7    A.   I've been a developer of real estate as a builder and

8    investor, and I've done a few other things.

9    Q.   Okay.  And would you describe your career as successful?

10   A.   I guess I would.

11   Q.   And what was the most significant real estate transaction

12   you've done?

13   A.   I built a telecommunication hotel that was quite possibly

14   the biggest in the Midwest --

15   Q.   And where was that?

16   A.   -- privately owned.  In Kansas City.

17   Q.   And did you do that alone or with partners?

18   A.   I had a partner.

19   Q.   And, roughly, how much money did you make from that

20   transaction?

21   A.   I personally made around 10 million.

22   Q.   And how would you describe your sort of risk tolerance

23   when it comes to sort of financial stuff?

24   A.   I have pretty good risk tolerance, quite high.

25   Q.   And have you invested in all sorts of different things

1   throughout the years?

2   A.    I have.

3   Q.    And have some been successful?

4   A.    Some.  Some, yes.

5   Q.    And others?

6   A.    Yes, I've had some disappointments.

7   Q.    Okay.  Let me now turn to ask you about a little bit about

8   your life in the spring of 2020.  Can you tell the jury a

9   little about what was going on with you sort of personally at

10  that time?

11  A.    I separated from my wife, which was very difficult, and

12  then the pandemic came and the lockdown that we all experienced

13  put me in a very high state of anxiety.

14  Q.    Okay.  And were you living at that time -- after the

15  separation were you living alone or with other people?

16  A.    Alone.

17  Q.    And were you in your house or out of your house?

18  A.    Out of the house.

19  Q.    And did you get online as a way to sort of pass the time

20  in the lockdown?

21  A.    I did.

22  Q.    And did you meet someone online?

23  A.    I did.

24  Q.    And what was her name?

25  A.    She went by the name of Natasha.

1    Q.   And at this point do you believe Natasha is real?

2    A.   No.

3    Q.   Did you believe Natasha was real then?

4    A.   I did.

5    Q.   And how long were you chatting with Natasha online?

6    A.   A few months.  Several months.

7    Q.   And what did you learn about Natasha's situation?

8    A.   I was told that she had an inheritance that was due her in

9    Sweden, relatively speaking over $100 million, and that she

10   needed help with taxes and legal aspects of it, getting the

11   money cleared.

12   Q.   And did she ask you for help?

13   A.   She did.

14   Q.   And what did she need you to do?

15   A.   Provide funds to pay attorney fees and to cover taxes.

16   Q.   And did she promise you anything in return for that

17   assistance?

18   A.   I was of the understanding I would have 5 percent of

19   whatever was recovered.

20   Q.   Of the inheritance?

21   A.   Yes.

22   Q.   And did she advise you that she had counsel?

23   A.   She did.

24   Q.   And did that person have a name?  Did you learn that that

25   person had a name?

1    A.    Yes, I did.

2    Q.    And what name did you understand that person to have?

3    A.    Raymond Miller.

4    Q.    And did you ever see Raymond Miller in person?

5    A.    No, I did not.

6    Q.    How did you communicate with Mr. Miller?

7    A.    Through an Internet, like, a texting or Telegram.

8    Q.    Okay.  And how long did you communicate with Mr. Miller?

9    A.    I think it lasted about six months.

10   Q.    And who handled helping you sort of doing the financial

11   transactions?

12   A.    Raymond Miller.

13   Q.    And did you end up sending a large series of wires related

14   to this endeavor to help Natasha get her inheritance?

15   A.    I did.

16   Q.    And how did you get the instructions on where to send the

17   wires?

18   A.    From Raymond Miller.

19   Q.    And did you follow Raymond Miller's instructions?

20   A.    I did.

21   Q.    And do you know roughly how many wires you sent over that

22   period of time?

23   A.    I'm thinking about 30 to 40.

24   Q.    Okay.  And do you have some sense of the amount of money

25   that you ended up in total giving to Natasha related to the

1    inheritance?

2    A.    I had a vague idea, a reasonable idea, but it turned out

3    more than I thought.

4    Q.    Okay.  What I'm going to do is show you some, some of the

5    wires but not all of them, because that would take too long,

6    but I think it will give the jury a sense.  Before we do that,

7    what banks were you dealing with?  You were in Kansas City this

8    whole time, right?

9    A.    That is correct.

10   Q.    What banks are you dealing with?

11   A.    Bank of Weston and Bank of America.

12   Q.    And as you were doing this did you get any sort of --

13   first of all, do you have a lot of money in these banks?

14   A.    I did.

15   Q.    Did you at some point get some, I'll call it feedback from

16   Bank of Weston?

17   A.    I did.

18   Q.    And what did they say?

19   A.    They thought I was being defrauded and wouldn't send any

20   more wires.

21   Q.    And did you then change to a different bank?

22   A.    I went to Bank of America.

23   Q.    And ultimately did you get some feedback from Bank of

24   America?

25   A.    Ultimately Bank of America closed my accounts and said I

1   was being defrauded.

2   Q.   And did you ultimately at some point stop sending wires at

3   the behest of this Mr. Miller?

4   A.   At the point Bank of America stopped -- closed my accounts

5   I quit.

6   Q.   Okay.  All right.  So, let me show you a series of photos.

7                         (Pause)

8        MR. SISTI:  Your Honor, we just took a look at the

9   proposed exhibit list.  I have no objection to any of those

10  going in.

11       THE COURT:  All right.  Why don't you read them off

12  for Kellie.

13       MR. AFRAME:  I will.  So, they are 2701 to 2711,

14  inclusive.

15       THE COURT:  All admitted.  Thank you.

16  (Government's Exhibit Nos. 2701 thru 2711 admitted into

17  evidence)

18       MR. AFRAME:  Thank you, your Honor.

19  Q.   Let me show you first 2701, Mr. Jones.  Do you recognize

20  that?

21  A.   I do.

22  Q.   And do you remember taking this selfie?

23  A.   I do.

24  Q.   And who instructed you to take it?

25  A.   Raymond Miller.

1    Q.    And once you would take it, where would you send the

2    selfie?

3    A.    Well, to Raymond Miller.

4    Q.    Okay.  And let me show you now 2702.  So, this is a wire

5    slip, correct?

6    A.    Yeah, correct.

7          MR. AFRAME:  And let's blow up the top.

8    A.    Yes.

9    Q.    That's you, right?

10   A.    Yes.

11   Q.    And this looks like -- do you see the date was April 7th,

12   2020?

13   A.    Correct.

14   Q.    And that was an $8,000 wire, and you sent it to JP Morgan

15   Chase?

16   A.    Yes.

17   Q.    And the beneficiary is Church of the Invisible Hand.  Do

18   you see that?

19   A.    I do.

20   Q.    And that's at 73 Leverett Street in Keene, New Hampshire.

21   So, where did you get all this banking information?

22   A.    That was from Raymond Miller.

23   Q.    And it says the originator here above what I think is your

24   signature, it says Pleasant Valley Oaks, LLC-Harold Jones?

25   A.    Correct.

1    Q.   Can you tell the jury what's Pleasant Valley Oaks?

2    A.   That was a company that we sold our assets, and I was sole

3    owner of it.

4    Q.   That's your company?

5    A.   Yes.

6    Q.   And at the bottom it says:  "I, Harold Jones, authorized

7    and completed a wire in the amount of 8,000 USD for the

8    purchase of bitcoin FTL_...on Telegram on behalf of Raymond

9    Miller."  And then it says, "I understand that this," and then

10   it cuts off.  Did you write those words?

11   A.   Yes, I did.

12   Q.   And who told you to write those words?

13   A.   Raymond Miller.

14   Q.   And did you write those words before or after you did the

15   wire transaction with Bank of Weston?

16   A.   After the wire was made.

17   Q.   Okay.  And I can see you took this photo, given the

18   peculiar angle?

19   A.   Yes.

20   Q.   What did you do with it after that?

21   A.   Sent it to Raymond Miller.

22   Q.   Okay.  Thank you.  And that was on April 7th of '20?

23   A.   Yes.  I think that's what the date is on there.

24   Q.   Let's just keep a little chart.  So, on April 7th you said

25   8,000, right?

1    A.    Correct.

2    Q.    Okay.

3          THE COURT:  Counsel, you want to put that, if you can,

4    where both the Court and the jury can see that?

5          MR. AFRAME:  Sure.  More of an angle towards you?

6          THE COURT:  Sometimes it's even best to put it at the

7    far end so everybody can see it, but I'll let you choose.  Now

8    it's not for the jury there.  Sometimes the best move is back.

9    Yeah.  There you go.

10         MR. AFRAME:  Can you see it?

11         THE COURT:  Well, Counsel -- yeah, you can move,

12   Counsel.

13         MR. SISTI:  Okay.  Thank you.

14         THE COURT:  Yeah.

15         MR. AFRAME:  I wasn't going to write anything special,

16   just dates and numbers.  All right.  Maybe if we move the

17   podium.

18   Q.    And that was, just so we know, that was the Church of the

19   Invisible Hand?

20   A.    Correct.

21   Q.    We'll look at the next one, which is 2703, and this one,

22   how much is -- what's the date of this one?

23   A.    I can't quite make out the month, but I think it says the

24   5th, 5th month, 4th date.

25   Q.    Do you see now?

1   A.   Yes.

2   Q.   And what does it say?

3   A.   It looks like -- I can't make out the month.  It says

4   either 3 or 5.

5   Q.   Okay.  And how much is it for?  There it is at the bottom.

6   Do you see it at the bottom?

7   A.   I'm only getting part of the screen here.

8   Q.   Do you see it at the bottom, Mr. Jones, the date?

9   A.   5/4.

10  Q.   Yeah.  And what's the amount?

11  A.   19,000.

12  Q.   And who is that wire made out to?

13  A.   Ian Freeman.

14  Q.   And there's an address.  Where is the address?

15  A.   63 Emerald Street in New Hampshire.

16  Q.   And, again, this is from your company, Pleasant Valley

17  Oaks?

18  A.   Yes.

19  Q.   And you this time, instead of handwriting it, you typed it

20  out?

21  A.   That's correct.

22  Q.   And where did the words that you typed out come from?

23  A.   Where did the what?

24  Q.   Where did you get the language that you typed in the --

25  A.   That came from Raymond Miller.

1    Q.   Okay.  Thank you.

2         MR. AFRAME:  And we'll look at 2703.  2704.  And if we

3    zoom in on this -- can we go down to the bottom?

4    Q.   Do you see the date?  Because it gets blurry.  Do you see

5    the date of that one?

6    A.   5/22.

7    Q.   And who was that one to?

8    A.   I can't read it.  Church of the Invisible Hand.

9    Q.   How much is that?

10   A.   37,000.

11   Q.   And this says, do you see -- so I see the part -- do you

12   see the part that you typed out and put on?

13   A.   I do.

14   Q.   And did you put that on before or after you did the wire?

15   A.   That was done after the wire was completed.

16   Q.   And there's optional text, do you see that, where it says

17   Church donation?

18   A.   Yes, I do.

19   Q.   Who gave you that?

20   A.   That was Raymond Miller.

21   Q.   Were you trying to actually make a donation to the Church

22   of the Invisible Hand?

23   A.   No.  That was told by Raymond Miller, to put that on

24   there.

25   Q.   And what's the name of the company?

1   A.   Pleasant Valley Oaks.

2        MR. AFRAME:  Okay.  And if you would back out.

3   Q.   And you took this picture?

4   A.   Yes, I did.

5   Q.   And, once you took it, who did you send it to?

6   A.   Raymond Miller.

7   Q.   2705.  So, the prior four that we looked at were Bank of

8   America -- I'm sorry -- were Bank of Weston, right?

9   A.   That's correct.

10  Q.   And here is there a change?

11  A.   It is Bank of America.

12  Q.   Okay.  And if we move in on this a little bit, the name

13  here is different.  This one says CAMELOT/BRITTANY Limited

14  Partnership?

15  A.   That's correct.

16  Q.   And what's that?

17  A.   That's another one of my companies that I personally own.

18  Q.   Okay.  And was that the account you had at Bank of America

19  in that name?

20  A.   Yes.

21  Q.   Okay.  And how much did you write this wire for?

22  A.   20,000.

23  Q.   And where did you send this one?

24  A.   The Reformed Satanic Church of Keene.

25  Q.   And where did you get that information from?

1    A.    Raymond Miller.

2    Q.    And let's go down, if we can.  Do you see the date over

3    here where you signed it?

4    A.    Yes.  6/17.

5    Q.    Okay.  So, this one was 6/17?

6    A.    Correct.

7    Q.    And you sent this one to the Reformed Satanic Church?

8    A.    Correct.

9    Q.    And how much was that one?

10   A.    20,000.

11   Q.    And then 2706.  Again, is that you?

12   A.    Yeah, it is me.

13   Q.    And can you see -- first, what bank is this?

14   A.    Bank of America.

15   Q.    And can you see, if you look over on the right, the wire

16   amount?  Funny angle.

17   A.    It looks like 20,000.  It's a little foggy.

18   Q.    Yeah.  And what bank did you send it to this time?

19   A.    I can't read that one.

20   Q.    Okay.  If you go over to the left, to the recipient name,

21   can you see where you were sending it?

22   A.    Yeah, it's cloudy.  I can't read it.

23        MR. AFRAME:  If you blow up the middle part.

24   A.    Reformed -- looks like Reformed Church.

25   Q.    Yeah.  And what was the date of this?

1    A.   I'm having difficulty reading because it's so blurry.

2    7/20.

3    Q.   Yeah.  Okay.  So, 7/20 Reformed Satanic 20,000?

4    A.   I think, yes.  I think that was it.

5    Q.   And 2707.  Can you see that?  Actually --

6    A.   7/20.

7    Q.   So, this is the one we were just looking at, 7/20.  This

8    is the very bottom.  This is the part you typed up, right?

9    A.   Yes.

10   Q.   And I'm going to read this:  "I, Harold Jones, authorized

11   and completed a wire transfer to James Baker/Aria DiMezzo in

12   the amount of $20,000 USD on 7-20-2020 in order to purchase

13   bitcoin via Telegram.  I authorized the bitcoin to be delivered

14   to my trusted agent, Raymond Miller.  I understand this cannot

15   be refunded or reversed."

16   A.   Correct.

17   Q.   And do you see -- where did you get the name James

18   Baker/Aria DiMezzo?

19   A.   It would be Raymond Miller.

20   Q.   And if we go to 2708.  I just did 07, so 2707.  Do you see

21   this?

22   A.   Yes.

23   Q.   And, again, is this Bank of America?

24   A.   It is Bank of America.

25   Q.   And how much?

1    A.    20,000.

2    Q.    And what was the date?

3    A.    8/11.

4    Q.    And where was it going?

5    A.    To the Reformed Satanic Church.

6    Q.    And if you read the bottom part that you typed up, what's

7    the name of the person you were buying the bitcoin from?

8    A.    Aria D --

9    Q.    Sorry.  The part that --

10   A.    Aria DiMezzo.

11   Q.    Yeah.  That was August 11th?

12   A.    Yes.

13   Q.    And how much was that?

14   A.    That was 20,000.

15   Q.    And 2708.  And that was how much?

16   A.    $20,000.

17   Q.    And who did you send that to?

18   A.    Reformed Satanic Church.

19   Q.    And it looks like you wrote a different number down below.

20   Do you see the part you typed up?

21   A.    Yeah, I see it.  I did make a mistake on that.

22   Q.    And what was the name of the person?

23   A.    Aria DiMezzo.

24   Q.    And what was the date of this one?

25   A.    8/12.

1    Q.    So, is that just the day after the last one?

2    A.    Yes.

3    Q.    And did you ever talk to anyone from the Reformed Satanic

4    Church?

5    A.    No, I did not.

6    Q.    Did you ever talk to anyone from the Church of the

7    Invisible Hand?

8    A.    No.

9    Q.    Did you ever talk to Freeman?

10   A.    No.

11   Q.    2709.  And how much for this one?

12   A.    20,000 again.

13   Q.    And who did it go to?

14   A.    Aria DiMezzo.

15   Q.    And what was the recipient name?

16   A.    Oh.  Reformed Satanic Church was the recipient.  I'm

17   sorry.

18   Q.    And the person that you were sending it to was?

19   A.    Aria DiMezzo.

20   Q.    And that was what date?

21   A.    8/13.

22   Q.    So, we've got 8/11, 8/12, 8/13.  And then we have 2710,

23   and this was how much?

24   A.    20,000.

25   Q.    And to where?

1    A.    To Reformed Satanic Church.

2    Q.    And let's just go down and see the date.

3    A.    8/14.

4    Q.    8/14.  And then just one more, 2711.  And this one, do you

5    see the date on this one?

6    A.    8/27.

7    Q.    Yup.  And how much?

8    A.    3,000, it looks like.

9    Q.    Yeah.

10         MR. AFRAME:  And can we just show to where it went.

11   A.    I'm sorry?

12   Q.    I'm asking to just blow up the part.  Where did this one

13   go?

14   A.    Reformed Satanic church.

15   Q.    Is that signed by you?

16   A.    Yes.

17   Q.    And was this all of the wires, or is it just some of them?

18   A.    That's just some of them, some of them.

19   Q.    And did you ever get any bitcoin?

20   A.    No, I did not.

21   Q.    Did you ever get any inheritance?

22   A.    No, I did not.

23   Q.    What did you get?

24   A.    Nothing.

25   Q.    And what happened to Raymond Miller?

1    A.    I have no idea.

2    Q.    And what happened to Natasha?

3    A.    I don't have any idea.

4    Q.    Okay.  And did you ever talk to any of these people that

5    we talked about here?

6    A.    No.

7              MR. AFRAME:  No further questions.

8              THE COURT:  All right.  We need to take the lunch

9    break.  I'm going to ask you to come back at 1:15 today.  Thank

10   you.

11             THE CLERK:  All rise.

12                  (The jury exited the courtroom)

13                  (Lunch recess taken at 12:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, Brenda K. Hancock, RMR, CRR and Official Court
Reporter of the United States District Court, do hereby certify
that the foregoing transcript constitutes, to the best of my
knowledge, skill, ability and belief, a true and accurate
transcription of the within proceedings.




Date: ___3/10/23_____          /s/ *Brenda K. Hancock*
                                 Brenda K. Hancock, RMR, CRR
                                 Official Court Reporter