1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     *  No. 1:21-cr-00041-JL-01
                 v.                   *  December 13, 2022
6                                     *  3:10 p.m.
                                      *
7     IAN FREEMAN,                    *
                                      *
8                     Defendant.      *
                                      *
9     * * * * * * * * * * * * * * * * *

10

          TRANSCRIPT OF DAY SIX OF JURY TRIAL - AFTERNOON SESSION
11
              BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13    APPEARANCES:

14

      For the Government:       Seth R. Aframe, AUSA
15                              Georgiana MacDonald, AUSA
                                John J. Kennedy, AUSA
16                              United States Attorney's Office

17

      For the Defendant:        Mark L. Sisti, Esq.
18                              Sisti Law Offices

19


20

      Court Reporter:           Brenda K. Hancock, RMR, CRR
21                              Official Court Reporter
                                United States District Court
22                              55 Pleasant Street
                                Concord, NH 03301
23                              (603) 225-1454

24


25

I  N  D  E  X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

DANNELA VAREL
By Mr. Kennedy          4
By Mr. Sisti                         20


KENDALL MCBREARTY
(Resumed)
By Mr. Aframe          27(Cont'd)


E  X  H  I  B  I  T  S

Govt's          For ID.     In Evd.

2401 thru 2406                    10

|   |   |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (At 3:10 p.m.) |
| 3 | THE CLERK:  All rise for the jury. |
| 4 | (The jury entered the courtroom) |
| 5 | THE CLERK:  All rise. |
| 6 | THE COURT:  Please be seated.  We're going to call a |
| 7 | different witness now, because this witness has travel plans, |
| 8 | and if we don't hear from the witness now, the witness is going |
| 9 | to miss a flight. |
| 10 | So, please call your witness. |
| 11 | MR. KENNEDY:  The government calls Dannela Varel. |
| 12 | THE CLERK:  Please remain standing and raise your |
| 13 | right hand. |
| 14 | **DANNELA VAREL**, having been duly sworn by the Clerk, |
| 15 | was examined and testified as follows: |
| 16 | THE CLERK:  Please be seated.  And, for the record, |
| 17 | would you please state your name and spell your last name. |
| 18 | THE WITNESS:  Yes.  And I'm going to spell my whole |
| 19 | name, because it's a new one. |
| 20 | THE COURT:  Excuse me a minute.  I forgot my mask. |
| 21 | Give me a second. |
| 22 | (Pause) |
| 23 | THE COURT:  All right.  Please go ahead with your |
| 24 | name. |
| 25 | THE WITNESS:  My first name is Dannela, D-a-n-n-e-l-a. |

1    My last name is Varel, V, as in Victor, a-r-e-l.

2                        DIRECT EXAMINATION

3    BY MR. KENNEDY:

4    Q.   Good afternoon, Ms. Varel.  How are you?

5    A.   Good afternoon, sir.  I'm fine.  Thank you.

6    Q.   Can you tell the jury where you currently live?

7    A.   In beautiful, sunny Punta Gorda, Florida.

8    Q.   Is it warmer there than it is here?

9    A.   By 60 degrees.

10   Q.   And how long have you lived in Punta Gorda?

11   A.   Thirty years.

12   Q.   And can you tell the jury how old are you?

13   A.   Seventy-six.

14   Q.   Are you currently employed?

15   A.   I'm retired.

16   Q.   How long have you been retired for?

17   A.   Since 2012.

18   Q.   What did you do before you retired?

19   A.   I was a Certified Financial Planner.

20   Q.   Do you have any family?

21   A.   No, sir.  I'm a widow, and I have no children.

22   Q.   Okay.  And when -- how long have you been widowed?

23   A.   Since 2018.

24   Q.   And how long were you married?

25   A.   Twenty years.

1    Q.   I'm going to get right into the questions of why we

2    brought you here, if that's okay.

3    A.   Excuse me?

4    Q.   I said I'm going to start asking the questions for why I

5    called you here, if that's okay.

6    A.   Oh, sure.

7    Q.   So, if I can just orient you to December of 2019.

8    A.   Yes, sir.

9    Q.   Were you on a dating website at that time?

10   A.   Yes, sir.  match.com.

11   Q.   And did you meet anybody on match.com?

12   A.   I did.

13   Q.   And how did you come to know this person, by what name?

14   A.   Jerry Harmon, H-a-r-m-o-n.

15   Q.   And did you reach out to Mr. Harmon, or did he reach out

16   to you on match.com?

17   A.   He reached out to me.

18   Q.   Okay.  What did Mr. Harmon tell you about himself?

19   A.   That he was working on an oil rig in the Gulf of Mexico

20   for Shell.

21   Q.   Did he say what he was doing for Shell?

22   A.   He was supervising a group of drillers and harvesting the

23   oil.

24   Q.   Okay.  And was Mr. Harmon living in the United States?

25   A.   In Raleigh, North Carolina.

1    Q.    Okay.  How did you communicate with Mr. Harmon?  Was it

2    through the Match site, or was there some other way?

3    A.    Skype, text and email.

4    Q.    And could you just describe or explain to the jury what

5    Skype is?  I don't think they've heard that one yet.

6    A.    Oh, it was a video site in the beginning, and then after

7    that telephone calls via Skype.

8    Q.    Okay.  Did you do any video calls with Mr. Harmon?

9    A.    One.  Yes, sir, I did.  That was the first time, and he

10   insisted on going off of the managed site and onto Skype.

11   Q.    And was there an actual person on the Skype talking to

12   you?

13   A.    There certainly was.

14   Q.    And then I think you said you also did voice calls; is

15   that right?

16   A.    Yes, sir, quite a few.

17   Q.    And so, there was an actual voice on the other end when

18   you did those?

19   A.    Yes, the same voice as was in the video.

20   Q.    Okay.  How often were you communicating with Mr. Harmon?

21   A.    Several times a day.

22   Q.    What kind of things were you talking about?

23   A.    What he was doing, his children, what he liked to do in

24   his time off.  He liked to boat and sent me pictures of him

25   while he was boating and sent me pictures ostensibly of his

1    family and told me about his family.

2    Q.    Did you ever speak to anybody who purported to be family

3    members of Mr. Harmon?

4    A.    Yes.  Virginia Harmon.

5    Q.    Could you tell the jury who that is and what that was

6    about?

7    A.    She claimed to be his sister, and she befriended me and

8    welcomed me to the family and so forth and so on.

9    Q.    Okay.  At some point did Mr. Harmon make arrangements to

10   come see you or for you to see him?

11   A.    I went to see him.  I flew out of Fort Myers, Florida up

12   to Charlotte, where I was supposed to change planes and meet

13   him in Raleigh.  When I arrived in Charlotte I received a text

14   message that I was to go to Alexandria, Virginia, because he

15   had been delayed and was unable to meet me, and then travel to

16   Raleigh.

17   Q.    Okay.  And did you ever end up meeting with him during

18   that trip?

19   A.    I never saw him in the flesh.  I spoke only with him via

20   the messages that I mentioned before.

21   Q.    Okay.  Did he send you gifts?

22   A.    A dozen roses --

23   Q.    Okay.

24   A.    -- in early January, and when I thanked him he didn't know

25   about them.  He didn't recognize that he had sent them, so

1    someone else must have done it.

2    Q.   At the time that you were talking to Mr. Harmon how would

3    you categorize the relationship?  Was it romantic?

4    A.   It quickly advanced into a romantic situation, yes.

5    Q.   Okay.  And what were you looking -- what were you hoping

6    was going to happen in this relationship?

7    A.   Something permanent.

8    Q.   Did Mr. Harmon send you photographs of himself?

9    A.   Many.

10   Q.   Did Mr. Harmon eventually tell you that something happened

11   to him that sort of put him in some financial trouble?

12   A.   Yes, he did.  He told me that part of the oil rig had

13   broken and that he needed money to buy parts to repair it.

14   Q.   Okay.  And did he have any money on the oil rig where he

15   was?

16   A.   Apparently not, because he asked me for it.

17   Q.   Okay.  And I'll just ask, I guess, one, did you send him

18   the money.

19   A.   I'm sorry.

20   Q.   Did you send him the money?

21   A.   Yes, sir, I did.

22   Q.   And I guess if you just tell the jury why you decided to

23   send him the money?

24   A.   Because I truly believed that he needed it.

25   Q.   Did he promise to pay you back at some point?

1   A.   Oh, yes, absolutely.  Don't worry, I'll pay you back.

2   Just take a leap of faith, he said to me.

3   Q.   Did Mr. Harmon -- how did he have you send this money?  I

4   mean, did you send him cash?

5   A.   I sent a wire from my bank.

6   Q.   Okay.  And how did you know where to send the wire to?

7   A.   I was given detailed instructions via text as to exactly

8   how the money was to be sent, to what account it was to be

9   sent, who the recipient was, at which bank, the location of the

10   bank, and the verbiage that I was to put onto the paperwork

11   that facilitated the wire.

12   Q.   And who sent you those instructions?

13   A.   Jerry gave them to me, and they were dictated to me as

14   required by Mr. Freeman.

15   Q.   Is that what Mr. Harmon told you?

16   A.   Yes, sir.

17   Q.   As part of this wiring process and these detailed

18   instructions did Mr. Harmon ask you to take some photographs?

19   A.   Yes, sir, he did.

20   Q.   And just, in general, what kind of photographs were these?

21   A.   Photographs of me by myself with my driver license,

22   photographs of me with the wires, and I think that's it.

23   Q.   Okay.  And what did he want you to do with these

24   photographs?

25   A.   Send them to him via text message.

1      MR. KENNEDY:  Okay.  Mark, I realize I didn't -- just

2  one second, your Honor.

3      MR. SISTI:  Your Honor, I'm not going to have any

4  objection to the 2400 series.

5      THE COURT:  All right, then.

6      THE COURT REPORTER:  Did you say 2400?

7      MR. SISTI:  Yes, 2400.

8      MR. KENNEDY:  Let me, just for the record, so it's

9  going to be 2401, 2402, 2403, 2404, 2405 and 2406.

10  (Government's Exhibit Nos. 2401 through 2406 admitted into

11  evidence)

12  Q.   Thanks for your patience, Ms. Varel.  So, I'm going to

13  show you hopefully on your screen right there what we have

14  agreed as a full exhibit is Government's 2401, and I'll just

15  ask if you recognize this photograph.

16  A.   Yes.  It's a photograph of me with my driver's license.

17  You can see it was taken in my car.  I was sitting at the bank

18  prior to sending -- no -- after sending the wire but before

19  sending the text messages.

20  Q.   And did you take this photograph?

21  A.   I did.

22  Q.   And after you took the photograph what did you do with it?

23  A.   Sent it to Mr. Harmon.

24  Q.   Okay.  I'm going to show you Government's 2402.

25  A.   That's a picture of me with the paperwork that initiated

1    the wire.

2          MR. KENNEDY:  And we'll see if we can blow up sort of

3    those top two boxes.  Let's start at the top box, yeah.

4    A.   Yes.  The top says:  "I certify that I am buying bitcoins

5    via wire transfer from FTL_Ian on Telegram on behalf of Rebecca

6    Viar.  Dannella Varel, January 15th, 2020."

7    Q.   And is that your handwriting?

8    A.   It certainly is.

9    Q.   And can you just tell the jury what's the account name, if

10   you can read that?

11   A.   Oh, I'm sorry.  Dannela Therese Varel Revocable Trust,

12   Dannela T. Varel, Trustee.

13   Q.   And are you able to read that handwriting at the bottom

14   there?

15   A.   Yes.  "I, Dannela Varel, authorized and completed a wire

16   transfer in the amount of 240,000 U.S. dollars for the purchase

17   of bitcoin from Ian Freeman.  I understand that this

18   transaction is non-refundable."

19   Q.   And did you take this photograph?

20   A.   I did.

21   Q.   And did you send this to Mr. Harmon?

22   A.   I did.

23   Q.   So, I'm going to show you 2403, Government's, which is the

24   same wire, but we might be able to read the middle section a

25   little better.

1    MR. KENNEDY:  If we can do that wire transfer

2    information section.

3    A.   Which part would you like me to read?

4    Q.   If you could -- sorry.  I should have had my glasses.  Can

5    you just tell the jury the date of that wire?

6    A.   January 15th, 2020.

7    Q.   And what's the amount of the wire?

8    A.   $240,000.

9    MR. KENNEDY:  And, Caryn, if we can zoom in on the

10   recipient account information.

11   A.   The recipient is --

12   Q.   I'm sorry.  I'll ask the questions just to make a record,

13   so they know what I'm asking.

14        So, could you just let the jury know on this wire who

15   the account name that it's sending to is?

16   A.   Ian B. Freeman.

17   Q.   Okay.  And then that area that's text to the recipient,

18   what does that say?

19   A.   "Drilling equipment, purchase of virtual goods."

20   Q.   Okay.  And who told you to write all this information?

21   Where did you get the words to write?

22   A.   In the written part or the typed part?

23   Q.   Let's start with the typed part.

24   A.   Okay.  The typed part I put in "Drilling equipment," and

25   "Purchase of virtual goods" was supplied to me by Jerry.

1  Q.   Okay.  And how about the account name and account number?

2  Who gave you that information?

3  A.   It was supplied to me by Jerry.

4  Q.   Okay.  And just to remind the jury, why were you sending

5  this $240,000?

6  A.   For the purchase of equipment to replace that which was

7  broken on the rig.

8  Q.   Do you recall if you sent additional wires to Mr. Harmon?

9  A.   Two additional wires.

10  Q.   So, that one was on 1/15/2020, I think; is that right?

11  A.   Correct.

12  Q.   So, I am going to show you what has been marked as a full

13  exhibit as Government's 2404.  Is that you?

14  A.   That is me with a picture of the wire initiating the

15  additional transfer.

16  Q.   Okay.  And are you able to, we'll go to the next one

17  because I think it will be the same, but are you able to at

18  least see the date that you signed on this?

19  A.   Yes.  January 21, 2020.

20  Q.   And can you see the date of the wire, I think probably

21  right underneath wire transfer information?

22  A.   Yes, I see.  Recipient date is 1/21/2020.

23  Q.   Okay.

24  A.   At 10:47 a.m.

25  Q.   Okay.  So, what I'm going to do now is show you 2405.

1  A.   All right.

2  Q.   Does that look like the same piece of paper we were just

3  looking at?

4  A.   Yes, sir.

5  Q.   Okay.  And, again, it looks like there's some handwriting

6  there?

7  A.   Yes, sir.

8  Q.   Could I have you read that?  I guess we'll do the bottom

9  part.  We read the top.  I won't make you read both parts, but

10  if you wouldn't mind reading that bottom part.

11  A.   "I, Dannela Varel, authorized and completed a wire

12  transfer in the amount of 210,000 U.S. dollars for the purchase

13  of bitcoin from FTL_Ian on Telegram on behalf of Rebecca Viar.

14  I understand that this transaction is non-refundable.  Dannela

15  T. Varel, January 21, 2020."

16  Q.   And let me ask you, the last wire we looked at on the 15th

17  also said "on behalf of Rebecca Viar"?

18  A.   Yes.

19  Q.   Did you know who Rebecca Viar was?

20  A.   No, sir.

21  Q.   Did Mr. Harmon tell you why you needed to write Rebecca

22  Viar?

23  A.   No, sir.

24  Q.   In both wires you wrote that you were buying bitcoins?

25  A.   Yes.

1  Q.   In January 2020 did you know what bitcoins were?

2  A.   I knew what they were.

3  Q.   Did you own any?

4  A.   Never.

5  Q.   Did you know a lot about them?

6  A.   No.

7  Q.   And is this from the Chase Bank as well?

8  A.   Yes.

9  Q.   Okay.  And if we can just look in that wire transfer

10  information, if you could just tell us, I know you wrote some

11  words, but just officially on the wire what the wire amount is.

12  A.   $210,000.

13  Q.   And if we can look under Recipient Account Information.

14  Are you able to see?

15  A.   Ian B. Freeman.

16  Q.   And did you take these two photographs, the one we looked

17  at of you holding this and the next one?

18  A.   I did.

19  Q.   And what did you do after you took those photographs?

20  A.   Sent them via text.

21  Q.   While you were sending these wires, were you in

22  communication with Mr. Harmon?

23  A.   Yes.

24  Q.   Was he providing you with instructions?

25  A.   He dictated to me the exact verbiage I was to use.

1   Q.   I'm going to show you Government's 2406, and does this

2   look like a wire receipt from TD Ameritrade?

3   A.   Yes, sir.  That's correct.

4   Q.   Did you have an account at TD Ameritrade?

5   A.   Yes, sir.

6   Q.   It looks like this is a letter to you dated 1/21/20.  Does

7   that look right?

8   A.   Yes.

9   Q.   It says:  "Dear Dannela Varel.  Thank you for your

10  inquiry.  Our records indicate that on January 21st, 2020 there

11  was a wire withdrawal in the amount of $305,000 from your

12  TD Ameritrade account ending in 4930, the tracking number going

13  to Bank Service Credit Union for the benefit of Ian B.

14  Freeman."

15        Did I read that right?

16  A.   Correct.

17  Q.   And can you read that bottom section of your handwriting?

18  Is that your handwriting?  Sorry.

19  A.   It is my handwriting.

20  Q.   Would you mind reading that to the jury?

21  A.   "I, Dannela Varel, authorized and completed a wire

22  transfer in the amount of $305,000 U.S. dollars for the

23  purchase of bitcoins from FTL_Ian on Telegram on behalf of

24  Rebecca Viar.  I understand that this transaction is

25  non-refundable.  Dannela T. Varel, 1/21/20."

1   Q.   Okay.  So, I know we just looked at a Chase wire for

2   $210,000 and then this on January 21st, right?

3   A.   Yes.

4   Q.   And this looks like a $305,000 wire on January 21st from

5   TD Ameritrade, so $515,000.  Is there a reason why you sent two

6   wires from two banks?

7   A.   To avoid red flags.

8   Q.   And who was trying to have you avoid red flags?

9   A.   Jerry.  They were afraid to alert the authorities that

10  might have a suspicion about the sending of the money, if it

11  were a larger amount.

12  Q.   In all three receipts we saw there the beneficiary account

13  I think you said was Ian B. Freeman.  At some point did you

14  speak to Mr. Freeman?

15  A.   I did.

16  Q.   And could you just tell the jury about that?  Did you

17  receive -- was it a phone call, a text message, an email?

18  A.   It was a phone call.

19  Q.   Okay.  And did you call Mr. Freeman, or did he call you?

20  A.   He called me.

21  Q.   Do you recall how many times he called you?

22  A.   Once or twice.

23  Q.   From your recollection, how long were these phone calls?

24  A.   Extremely short.

25  Q.   And what did he ask you on these phone calls?

1   A.   If I wanted to send this money.

2   Q.   What did you say?

3   A.   Yes.

4   Q.   Did he ask you who Rebecca Viar was?

5   A.   No.

6   Q.   Did he ask why you were sending such large amounts of

7   money to Rebecca Viar?

8   A.   No.

9   Q.   That first wire receipt we saw that the message to the

10  recipient said for drilling equipment; is that right?

11  A.   Yes.

12  Q.   Did Mr. Freeman ask you anything about why you were buying

13  drilling equipment?

14  A.   No.

15  Q.   Did he ask you if you knew anything about bitcoin?

16  A.   No.

17  Q.   Did he ask where the money was coming from that you were

18  sending?

19  A.   No.

20  Q.   How did your relationship with Mr. Harmon come to an end?

21  Did something happen?

22  A.   When I flew to Charlotte and subsequently the following

23  day to Alexandria, Louisiana, when I got to the airport he was

24  not there to greet me.  I subsequently received a phone call

25  stating that he had been delayed at the port because he didn't

1   have enough money to pay the tax on the product and they would

2   not release him or the product until it was paid and would I

3   send more money.  I declined and told him that I was returning

4   to Punta Gorda; I was not going to wait for him to get off

5   of -- out of the port.  I rented a car and drove myself home.

6   Q.   Did Mr. Harmon ever make any attempts to send money back

7   to you?

8   A.   Yes.

9   Q.   Could you tell the jury about that?

10  A.   I received a call from Wells Fargo Fraud Department.  The

11  woman told me that they suspected that the wire was fraudulent

12  and that if I accepted the deposit of the wire into my account

13  I would be responsible for the entire amount if it was

14  fraudulent.  I declined to accept the wire, and she explained

15  to me what an incredible financial position I was going to be

16  put in, that I would be responsible for $1,250,000.  I would

17  have had to sell my ranch, everything I owned.  I would have

18  had nothing left.  So, I declined the wire.

19  Q.   We looked at three wires here, I think one on the 15th of

20  January and two on the 21st of January, and I think the total

21  was about $755,000.  Does that sound right?

22  A.   Yes, sir.

23  Q.   Where did that money come from?

24  A.   Part of it was money that I had earned in my job; part of

25  it was an inheritance from my husband; and part of it was an

1    inheritance from my mother; part of it was from the sale of my

2    plane.

3    Q.   Did you ever get any of your money back?

4    A.   No, sir.

5    Q.   Can you tell the jury how this whole ordeal has affected

6    you?

7    A.   It's changed the entire way I live.

8    Q.   Thank you, Ms. Varel.  I have no further questions.

9    A.   Thank you.

10                       CROSS-EXAMINATION

11   BY MR. SISTI:

12   Q.   Good afternoon.

13   A.   Good afternoon.

14   Q.   We never met.  My name's Mark Sisti, Ms. Varel.

15   A.   How do you do?

16   Q.   I'm okay.  I was touched by what you just said, by the

17   way.  It was terrible what happened to you.

18        Okay.  This Harmon guy, I guess you've come to the

19   realization now that that was a fabrication.  This Harmon guy

20   doesn't exist, right?

21   A.   I expect that's so.

22   Q.   Yeah.  I mean, you invested a lot in this guy?

23   A.   I did.

24   Q.   Right.  Not just money.  I mean, I understand what's going

25   on here, okay?  It's quite a set-up, actually.  It's very

1   sophisticated.  A videoconferencing coming out of a legitimate

2   Match kind of a situation is generally how these start.  You

3   understand that?

4   A.   It was the first experience and last that I have ever had,

5   so, no, I'm not familiar with how it usually happens.

6   Q.   Stay away from it, I guess is the best thing I can say.

7        But after that one videoconference with this

8   individual did you preserve any of that video for any reason,

9   or is there any way that that could be recaptured?

10  A.   I have no idea.

11  Q.   All right.  Do you know if the government's tried to

12  recapture that video or gone to any sites for it or anything

13  like that?

14  A.   No.

15  Q.   And then you had a lot of voice calls.  Were you able to

16  capture phone numbers from the voice calls?

17  A.   Yes.

18  Q.   Okay.  Were those sent over to the FBI?

19  A.   Yes.

20  Q.   And then you flew to Charlotte, and that, obviously, seems

21  like that was a set-up job.  I mean, you got there and nothing

22  happened, right, other than you having to go to -- was it

23  Alexandria, Virginia?

24  A.   Yes.

25  Q.   And you actually traveled there?

1    A.    I did.

2    Q.    And was there a specific spot in Alexandria?  Was it the

3    airport area, or was there an address?

4    A.    I'm sorry.  The last part I didn't understand.

5    Q.    Yeah.  Why Alexandria?  I know it's right next to the

6    Reagan Airport.

7    A.    He purportedly was working for Shell out of Alexandria,

8    and they would fly him to the rig via helicopter from

9    Alexandria.  At least that's what I was told.

10   Q.    Right.  He had a pretty extensive story, obviously.  So,

11   you get to Alexandria.  Do you go to a specific address when

12   you get there?

13   A.    I did not.  I remained at the airport.  I wouldn't go

14   anywhere.

15   Q.    And then, while you were at the airport, that's when you

16   got the -- was it a text or a phone call?

17   A.    Phone call.

18   Q.    All right.  This thing about the sending of the flowers,

19   and then you had a communication with him and he says he never

20   even sent them?

21   A.    He did not say that.

22   Q.    What did he say?

23   A.    He obviously, from his tone, did not recognize that I had

24   received flowers.

25   Q.    Okay.

1   A.   But I thanked him for them.

2   Q.   All right.  But it seemed to you as though he was unaware

3   that flowers came to your home?

4   A.   Correct.

5   Q.   Okay.

6   A.   But they were sent in his name.

7   Q.   I got it.  Yeah.  Even though you were a certified

8   financial planner, you never got involved with this stuff,

9   right?  You were never involved with cryptocurrency, bitcoin

10  transactions, anything like that?

11  A.   That's accurate.  My expertise was in financial planning,

12  trading stocks and options.

13  Q.   Right.  Okay.  Now, when you -- you had those two very

14  large Chase Bank transactions, one for 240,000 and one for

15  210,000, and they were about six days apart, from what I could

16  tell.

17  A.   Correct.

18  Q.   Did your Chase Bank people advise you that this may be a

19  problem, or did they give you a heads-up on what was going on?

20  A.   They did not.

21  Q.   They did not.  And how long had you been doing -- this was

22  one of the trust accounts, wasn't it?

23  A.   It was one of them.  They are both my trust accounts.

24  Q.   Right.  I mean, they've been doing business and managing

25  your money for quite a while?

1   A.   No.

2   Q.   No?

3   A.   No one managed my money but me.  I was a certified

4   financial planner.  Why would I hire someone else to do what I

5   did better?

6   Q.   I get it.  Okay.  But they were in a fiduciary kind of

7   position with the money; I mean, it's in their bank, right?

8   A.   It's in their bank, but they never acted on my behalf

9   other than to house it.

10  Q.   Okay.  And they certainly didn't question you when you

11  took out 240 on one day and 210 on another?

12  A.   Correct.

13  Q.   Then you got some -- then there was another transaction

14  that was actually on the 21st of January, but it was through

15  another banking institution.  That would have been TD?

16  A.   TD Ameritrade.

17  Q.   All right.  And, again you said that the reason you did

18  that was because this Jerry Harmon told you to do that?

19  A.   To avoid alerting authorities to the transfer of a larger

20  sum in one bit.

21  Q.   So, it was Jerry Harmon that you actually had a direct

22  voice communication with?

23  A.   Correct.

24  Q.   All right.  And this would have been on the same day that

25  you drew 210,000 out?

1    A.    Yes.

2    Q.    And then another 305 coming out of TD, right?

3    A.    Correct.

4    Q.    And during these transactions, again, you never asked

5    about this Rebecca Viar?

6    A.    Viar.

7    Q.    Viar.  And he never told you about her, right?

8    A.    That's correct.

9    Q.    Then you had two short, maybe two short phone calls with

10   Ian Freeman.

11   A.    Correct.

12   Q.    And the essence of the phone call, or at least one of

13   them, was asking you whether you really wanted to send the

14   money, right?

15   A.    Correct.

16   Q.    And, apparently, he sounded concerned about you sending

17   that money?

18   A.    Yes.

19   Q.    But you convinced him that, in fact, you did want to send

20   it, right?

21   A.    I didn't convince him.  I just said, yes, to send it.

22   Q.    I mean, you didn't get into this long conversation about

23   Jerry Harmon or anything like that, right?

24   A.    He knew who Mr. Harmon was, because he mentioned his name.

25   Q.    Well, let me ask you this:  Did he know who Jerry Harmon

1   was, or did he know that somebody was representing themself as

2   a Jerry Harmon?

3   A.   I have no idea what he knew.

4   Q.   Right.  And Jerry Harmon certainly didn't say he knew Ian

5   Freeman, right?

6   A.   Yes, he did.

7   Q.   And did he tell you how he would have known Ian Freeman?

8   A.   He did not.

9   Q.   Do you know if, in fact, this person holding himself out

10  as Jerry Harmon actually knew Ian Freeman?

11  A.   He represented himself to know him.  That's all I know.

12  Q.   Well, he represented himself as a lot of things during

13  this whole episode, right?

14  A.   Yes.

15  Q.   And we know that he represented himself as a lot of things

16  that were absolutely fabricated, right?

17  A.   Correct.

18  Q.   Thank you.

19  A.   You're welcome.

20          MR. KENNEDY:  Nothing further, your Honor.

21          THE COURT:  Ma'am, you're excused.

22          THE WITNESS:  Thank you, sir, your Honor.

23          THE COURT:  Thank you.

24              (Witness stepped down)

25          THE COURT:  We'll get back with the agent.

1     MR. AFRAME:  Yes.  We'll recall -- The United States

2     recalls Kendall McBrearty.

3          **KENDALL MCBREARTY**, having been previously duly sworn,

4     was further examined and testified as follows:

5                    CONTINUING DIRECT EXAMINATION

6     BY MR. AFRAME:

7     Q.   Special Agent, before you -- before we interrupted your

8     testimony to take a different witness, we were discussing a

9     phone call involving a Bank of America account in the name of

10    the Church of the Invisible Hand, correct?

11    A.   Yes.

12    Q.   And do you recall, as you listened to that, how much money

13    was being discussed?

14    A.    I think there were two different amounts, one that was

15    like total in the account about $350,000, and then the dispute

16    I think was 40,000, around there.

17    Q.   Okay.  Hold on one second.  When you -- are there

18    documents in a folder taken from the search called the Church

19    of the Invisible Hand?

20    A.   Yes.

21         MR. AFRAME:  And can you pull up 1535C.

22    Q.   And that's the Church of the Invisible Hand folder?

23    A.   Yes.

24    Q.   And if we just go past that, past that for a second.  So,

25    this is Church of the Invisible Hand Bank of America account?

1    A.    Yes.

2    Q.    If we go to the next page, this is -- actually if we go

3    back.  I'm sorry.  This says June 5th, 2020 Church of the

4    Invisible Hand, account ending in 9633.  We've closed the above

5    account?

6    A.    Yes.

7    Q.    In the audio we were listening to before was there

8    discussion about the account being closed?

9    A.    Yes.

10   Q.    And if we go to the next page, 350,051.07.  Do you see

11   that?

12   A.    Yes.

13   Q.    Was that roughly one of the amounts being talked about?

14   A.    Yes.

15   Q.    And these documents were found in Mr. Freeman's radio

16   studio?

17   A.    Yes.

18   Q.    And before I play the next audio, which will be 1581, I

19   want to show you the prior -- two documents prior.  I think it

20   will set the context for the audio, just within the same --

21   just this document.  Can you just read that to me, just up to

22   the signature?

23   A.    July 27th, 2020.  "I, James Baker, acting on my own

24   volition, transferred via wire $125,000 to the Church of the

25   Invisible Hand on or around May 4th.  It was from my business

1    account, the Reformed Satanic Church."

2    Q.    Okay.  And these documents, the bank record for that

3    Church of the Invisible Hand account and this document you just

4    read to me, those were together in that folder?

5    A.    Yes.

6    Q.    Okay.  So, with that background, let's play the audio.  I

7    believe it's 1581.

8                         (Audio recording played)

9    Q.    Have you -- who was representing to be the speaker there?

10   A.    The speaker was represented as Nobody.

11   Q.    Have you spoken to Nobody in your life?

12   A.    Yes.

13   Q.    Was that Nobody?

14   A.    No.

15   Q.    Do you know who that was?

16   A.    Yes.

17   Q.    Who was that?

18   A.    Ian Freeman.

19   Q.    So, I want to move now from documents seized at Mr.

20   Freeman's house to a few emails.  As part of the investigation

21   were there search warrants for emails?

22   A.    Yes.

23   Q.    And I'll show you now what's been marked as 1538.  Were

24   there multiple accounts for which you received returns based on

25   the search warrants?

1   A.   Yes.

2   Q.   And this email at the top, May 26, 2016, who is that from?

3   A.   Ian Freeman.

4   Q.   And can you read to me the second paragraph of that email?

5   A.   "We do not check customer ID, as the bitcoin vending

6   machine is a community service of the Shire Free Church, and we

7   respect your privacy."

8   Q.   And who signed that email?

9   A.   Ian Freeman.

10  Q.   And turning to 1539, again, is this an email from Ian

11  Freeman?

12  A.   Yes.

13  Q.   And what's the date?

14  A.   August 19th, 2016.

15  Q.   Okay.  And if we turn to the second page, do you see an

16  email from a Tarra Ringland at Service Credit Union?

17  A.   Yeah.

18  Q.   Service Credit Union?

19  A.   Yes.

20  Q.   And does it say in the fourth sentence that people at the

21  bank would like to know where the funds are coming from?  Do

22  you see that?  Sorry.  No.  Down in the larger email, the from

23  Tarra, the fourth sentence.

24  A.   Yes.

25  Q.   It says they would like to know where the funds are coming

1   from?

2   A.   Yes.

3   Q.   And did Mr. Freeman respond to that?

4   A.   Yes.

5   Q.   If you just pull back out, we'll show the response.  Can

6   you just read the first sentence of the above email?

7   A.   Yes.  "We have received contributions from people in

8   various parts of the United States.  Is that a problem?"

9   Q.   And if we go to the top of the email, so in response it

10   says from Tarra, "No, that is not a problem."  And then the

11   third sentence says, "There were some larger funds going out of

12   the account, and if you could name a few of what those funds

13   went to.  Thank you."  Did I read that right?

14   A.   Yes.

15   Q.   And can you read Mr. Freeman's response?

16   A.   "Are you referring to the check I wrote?  That should be

17   the only amount to have come out thus far.  It was sent to our

18   Bank of America account for our ongoing outreach mission."

19   Q.   In any of that email that I just read to you was there any

20   discussion of bitcoin?

21   A.   No.

22   Q.   1540.  If you go down to the middle of that page, this

23   email is from April 6, 2017, correct?

24   A.   Yes.

25   Q.   And do you see it says, Ian Freeman, ian@freetalklive.com?

1    A.    Yes.

2    Q.    And can you read just the second and third paragraphs?

3    A.    "Since our BVM is a vending machine and operated as a

4    church, non-profit outreach project, your privacy is protected.

5    You only need to provide your wallet address to the machine and

6    insert cash to complete the transaction.  Easy."

7    Q.    And 1541.  Is that an email from Mr. Freeman?

8    A.    Yes.

9    Q.    And it says in the first sentence:  "I see from the

10   Portsmouth machine that you have posted rules, and I would like

11   to have our rules posted on the entries for Keene and

12   Manchester, please."

13          And, then, what is Rule Number 1?

14   A.    "Do not tell our staff why you want the coins."

15   Q.    And let's look next at 1543.  This email -- what is the

16   email address from which this email is sent?

17   A.    Keene Crypto.

18   Q.    And at the bottom the salutation to this email says,

19   "Congratulations."  And who is it signed by?

20   A.    Ian.

21   Q.    And what does he sign it as?

22   A.    "Monadnock Decentralized Currency Network."

23   Q.    And if you went up to four paragraphs from the bottom

24   where it says, "If you want to require more Dash in bold --"

25   A.    Yes.

1   Q.   -- can you read that paragraph?

2   A.   "If you want to acquire more Dash, you can get more at the

3   cryptocurrency vending machines at Route 101 Local Goods at 661

4   Marlboro Street in Keene (across from Cheshire Oil) or at

5   Thirsty Owl at 141 Winchester Street (across from Keene State

6   College).  You can also ask in the groups linked below if

7   anyone wants to sell them to you personally, or you can get

8   crypto online in various ways.  The cheaper methods require you

9   to give up personal identifying information like your bank

10  account, while the vending machines at Route 101 Local Goods

11  and the Thirsty Owl are basically anonymous, but you'll pay

12  more for the convenience."

13  Q.   Thank you.  1544.  So, does this appear to be a forwarded

14  message?

15  A.   Yes.

16  Q.   And who is it forwarded from?

17  A.   Michael Gordon.

18  Q.   And who is it forwarded to?

19  A.   ian@freetalklive.com.

20  Q.   And are you familiar with the letter that is in the

21  forwarded email?

22  A.   Yes.

23  Q.   What is that?

24  A.   That is the letter from FinCEN regarding the money

25  transmitter language with the vending machines.

1  Q.   And we've seen this earlier in the trial, correct?

2  A.   Yes.

3  Q.   And when was this sent to ian@freetalklive.com?

4  A.   July 14th, 2018.

5  Q.   And it was sent, again, just to remind the jury, it was

6  sent to a whole bunch of different emails, right?

7  A.   Correct.

8  Q.   And they can see all of them there.  One was

9  keenecrypto@gmail.com, right?

10  A.   Correct.

11  Q.   And then there were others?

12  A.   Yes.

13  Q.   So, this was forwarded on July 14th, 2018.  When was it

14  sent by FinCEN to that whole string of emails?

15  A.   July 13th, 2018.

16  Q.   So, this would have been forwarded the next day?

17  A.   Yes.

18  Q.   And 1545, did this come in the search warrant return for

19  keenecrypto@gmail.com?

20  A.   Yes.

21  Q.   And it says:  "Google subscriber information."  What does

22  it say next to "Name"?

23  A.   "Keene Crypto."

24  Q.   What does it say next to "Email"?

25  A.   "keenecrypto@gmail.com."

1    Q.   And what recovery email was provided for this

2    keenecrypto@gmail.com account?

3    A.   ian@freetalklive.com.

4    Q.   And 1547, this is from that same keenecrypto email,

5    correct?

6    A.   Yes.

7    Q.   And who signed the email?

8    A.   Ian.

9    Q.   And does it say, "Our machine is a crypto vending machine

10   that sells from a hot wallet, which is a private sale, which

11   means no KYC"?

12   A.   Yes.

13   Q.   And, again, KYC means?

14   A.   Know Your Customer.

15   Q.   Limits are 3,000 per transaction, but you can do as many

16   transactions in a row that you need until you fill up the

17   machine, at least.  Did I read that right?

18   A.   Yes.

19   Q.   1548.  Is this an October 30th, 2019 email?

20   A.   Yes.

21   Q.   And who wrote the email at the top?

22   A.   Ian Freeman.

23   Q.   And who is it being written to?

24   A.   Mark Levey.

25   Q.   And based on the bottom or based on the email address can

1   you see where he works?

2   A.    Silvergate Bank.

3   Q.    "Mark, thanks.  It's no fun having to skulk around the

4   banking world, continuing to lose accounts randomly once banks

5   decide they don't like sending wires to bitcoin exchanges.

6   I've done it for a half decade successfully, but it sure would

7   be nice to have somewhere to bank that's not scared or

8   hostile."

9          Did I read that correctly?

10  A.    Yes.

11  Q.    1550.  Who is this email from?

12  A.    Ian Freeman.

13  Q.    And is it sent to an address at metropolitanbankny.com?

14  A.    Yes.

15  Q.    "I do a lot of wire transfers to cryptocurrency exchanges

16  and have had banks close me down just because of this.  It's

17  very frustrating.  I have noticed Metropolitan Commercial Bank

18  as the banking partner for various cryptocurrency-fueled debit

19  cards, so it makes me think your bank might be a safe place for

20  someone like me.  Sadly, if I mention cryptocurrency like

21  bitcoin up front, no bank or credit union will open an account

22  for me, so I have had to keep quiet and hope they leave me

23  alone.  Eventually they notice the large wires, look at the

24  destination, see a cryptocurrency exchange, and then close my

25  account.  I've had it happen to business accounts for my

1    church, of which I am a minister, and also to my personal

2    accounts.  I prefer to wire from my personal accounts as I am a

3    Tier 4 - the top tier - at the Kraken Exchange.  This month I

4    have sent over 1.8 million U.S. dollars in wires, and my

5    current credit union is shutting me down, so I am looking for a

6    new home."

7         Did I read that correctly?

8    A.   Yes.

9    Q.   I want to move now from emails to a video that depicts

10   Mr. Freeman that relates to the bitcoin vending machine.  So,

11   I'd like to play now Government's Exhibit 1551.

12                  (Video recording played)

13   Q.   And where did you get that from?  What was that part of?

14   A.   It was a video that was posted on a website that was

15   publicly available.

16   Q.   And I want to turn now away from Mr. Freeman's devices to

17   someone else's.  Did you, in addition to searching the results

18   of the image of Mr. Freeman's computer, did you search the

19   image of anyone's phone?

20   A.   Yes.

21   Q.   And whose phone did you search?

22   A.   Three of them:  Renee Spinella, Andrew Spinella and Aria

23   DiMezzo.

24   Q.   I'm going to now focus on Aria DiMezzo's phone.

25   A.   Okay.

1    Q.   Are you familiar with the contents of that?

2    A.   Yes.

3         MR. AFRAME:  So, I want to start by looking at 1555,

4    and if we could just blow it up.

5    Q.   Based on your searching of the DiMezzo phone, do you know

6    where this came from?

7    A.   Yes.

8    Q.   Where?

9    A.   Telegram.

10   Q.   And from what device did you get it off of?

11   A.   Aria's phone.

12   Q.   And what's the date?

13   A.   8/27/2020.

14   Q.   And who are the participants?

15   A.   Thomas Easterday and Aria DiMezzo.

16   Q.   Okay.  And what does the body say?

17   A.   "I rarely have an issue," sad face.

18   Q.   And 1555A, did this as well come from DiMezzo's phone?

19   A.   Yes.

20   Q.   And is that a photograph --

21   A.   Yes.

22   Q.   -- of a man?  Were you able to -- could you see from the

23   wire the name on it?

24   A.   I don't think so.

25   Q.   Okay.  How about 1555B?  Did this come from DiMezzo's

1   phone?

2   A.    No.

3   Q.    Where did this come from?

4   A.    This came from Mr. Freeman's computer.

5   Q.    And which folder?

6   A.    The KYC in the Telegram folder.

7   Q.    And do you know what folder it was in, what the name was

8   in which this photo appeared?

9   A.    Thomas Easterday.

10  Q.    And is that the same person that appeared in the photo on

11  Ms. DiMezzo's phone?

12  A.    Yes.

13  Q.    And is it the same name on the little communication at the

14  front?

15  A.    Yes.

16  Q.    Let's look at 1556.  Again, what phone, what device did

17  this come from?

18  A.    Ms. DiMezzo's.

19  Q.    And who is the communication between?

20  A.    Luann Collins and Aria DiMezzo.

21  Q.    And if we looked at 1556A is there a photo there of a

22  woman?

23  A.    Yes.

24  Q.    Do you know who that is?

25  A.    Yes.

1    Q.    Who is that?

2    A.    Luann Collins.

3    Q.    And where was this photo?

4    A.    In Ms. DiMezzo's phone.

5    Q.    And 1556B, what's this?

6    A.    It's a screen shot of a communication.

7    Q.    And at the top what's the name?

8    A.    Luann Collins, 12 percent.

9    Q.    And which phone did you get this off of?

10   A.    Ms. DiMezzo's.

11   Q.    And could you tell who is speaking in white and who is

12   speaking in pink?

13   A.    Yes.

14   Q.    Who is in the pink?

15   A.    Aria DiMezzo.

16   Q.    And in the white?

17   A.    Luann Collins.

18   Q.    So, the first is a little -- I can see -- I'll be the

19   pink.  The last at least few words say:  "Just to cover my

20   bases."

21         Can you be the white?

22   A.    "Here's Todd phone number, 615-485-3075."

23   Q.    Go ahead.

24   A.    "I told him Aria will call.  He's at work, but you can

25   call."

1    Q.    "Thank you.  Who is William Hlad?"

2    A.    "He's my partner, William."

3    Q.    "Why would you give me his number?  He isn't the one I

4    wish to speak to."

5    A.    "Please check the number.  That's Todd's phone number."

6    Q.    "It is not.  It's William's phone number.  But that's

7    okay.  I have Todd's number now."

8           And then, if you go to the next, 1556C, again, is that

9    -- what does it say at the top?

10    A.    Luann Collins.

11    Q.    And is there a photo of a person there?

12    A.    Yes.

13    Q.    And does that look like a Luann Collins?

14    A.    No.

15    Q.    Do you know who that is?

16    A.    Yes.

17    Q.    Who is that?

18    A.    The name is escaping me right now.

19    Q.    Okay.  And what does it say in white?

20    A.    "Thank you."

21    Q.    "Let me know.  I'd also like an explanation of what in the

22    hell happened."

23    A.    "I'll talk to you once I have a new development."

24    Q.    "Okay."

25    A.    Do you mind if I give you the name?

1    Q.    Do you remember the name?

2    A.    Yes.

3    Q.    Go ahead.

4    A.    Israel Garcia.

5    Q.    Okay.  And so, in this little chat between an account in

6    the name of Luann Collins we've had a reference to a Todd,

7    right?

8    A.    Yes.

9    Q.    A William Hlad?

10    A.    Yes.

11    Q.    And a picture of a guy named Israel Garcia?

12    A.    Yes.

13    Q.    And if we go to 1556D, who is that a picture of?

14    A.    Ms. Collins.

15    Q.    And where did that come from?

16    A.    Ian Freeman's computer.

17    Q.    And where in the computer?

18    A.    In the KYC folder in Telegram.

19    Q.    Was it in Luann Collins' folder in the Telegram folder?

20    A.    Yes.

21    Q.    1557.  Where did this document come from?

22    A.    Aria DiMezzo's phone.

23    Q.    And what's the name under Participant?

24    A.    Rebecca Viar.

25    Q.    And 1557A.  Who signed this piece of paper?

1    A.    Rebecca Viar.

2    Q.    And where was this photo found?

3    A.    On Mr. Freeman's computer.

4    Q.    And was that in the Telegram folder?

5    A.    Yes.

6    Q.    And 1558.  Who are listed as the participants?

7    A.    Donnise Allen, Aria DiMezzo.

8    Q.    And what's the date of this?

9    A.    10/6/2020.

10   Q.    What does the body say?

11   A.    $5,000 right now.

12   Q.    And 1558A.  Who is that?

13   A.    It's Donnise Alan.

14   Q.    And where did that picture come from?

15   A.    Mr. Freeman's computer.

16   Q.    And 1559.  Where did this document come from?

17   A.    Aria DiMezzo's phone.

18   Q.    And who are the participants?

19   A.    Dale Alan and Aria DiMezzo.

20   Q.    And the date is?

21   A.    1/8/2021.

22   Q.    And then 1559A there's a photo.  Do you recognize that

23   person?

24   A.    Yes, I do.

25   Q.    Who is that?

1    A.    Dale Alan.

2    Q.    And where did you get this photo?

3    A.    This came from Ian Freeman's computer in the Telegram

4    folder.

5    Q.    And 1560.  Where did you find this Telegram chat?

6    A.    This was in Aria DiMezzo's phone.

7    Q.    And who is the participant?

8    A.    Susan Giordano.

9    Q.    And when was this?

10   A.    7/8/2020.

11   Q.    And if we turn to 1560A, it says:  "I, Susan Giordano, am

12   purchasing $1,000 worth of bitcoin via Zelle."

13         Besides Susan Giordano, do you know where you found

14   this?

15   A.    Yes.

16   Q.    Where?

17   A.    Aria DiMezzo's phone.

18   Q.    And if we turn to 1560B, is that the same person?

19   A.    Yes.

20   Q.    And where did you find this picture?

21   A.    This was on Mr. Freeman's computer in the Telegram folder.

22   Q.    1561.  Where was this document found?

23   A.    On Aria DiMezzo's phone.

24   Q.    And what's the date?

25   A.    8/3/2020.

1    Q.    And if we look at 1561A, do you recognize this photograph?

2    A.    Yes.

3    Q.    And who is it of?

4    A.    Mr. Eldridge.

5    Q.    And where did you find that photograph?

6    A.    This was on Mr. Freeman's computer.

7    Q.    1562.  And where did this document come from?

8    A.    This came from Aria DiMezzo's phone.

9    Q.    And what's the name of the participant?

10   A.    David Dailey.

11   Q.    And what's the date?

12   A.    6/16/2020.

13   Q.    And does it say:  "I will trade when I have my cashapp all

14   set up and when I have moved to another bank that I can use

15   Zelle as well."  Did I read that right?

16   A.    Yes.

17   Q.    And 1562A.  Where was that photo found?

18   A.    This was found on Aria DiMezzo's phone.

19   Q.    And 1562B.  Where was this -- was this a photograph of the

20   same man we just saw in 1562A?

21   A.    Yes.

22   Q.    And who is that man?

23   A.    That's Mr. Dailey.

24   Q.    And where was this photograph found?

25   A.    That was found on Ian Freeman's computer.

1   Q.   1563.  What's the date of this?

2   A.   7/22/2020.

3   Q.   And who is the participant?

4   A.   Donald Huffman.

5   Q.   And what does the body say?

6   A.   "Okay, Aria."

7   Q.   And if we go to 1563A is that identification, uniformed

8   services identification, for Mr. Huffman?

9   A.   Yes.

10  Q.   And where did you find that?

11  A.   In Aria DiMezzo's phone.

12  Q.   And 1563B.  Do you know who that man is?

13  A.   Yes.

14  Q.   Who is that?

15  A.   That's Mr. Huffman.

16  Q.   And does it say:  "I, Donald Huffman, authorized and

17  completed a wire transfer to James Baker/Aria DiMezzo in the

18  amount of 1,400 USD on 13 July 2020 in order to purchase

19  bitcoin via Telegram.  I understand this cannot be refunded or

20  reversed.  Signed Donald Huffman"?

21  A.   Yes.

22  Q.   And where did you find that?

23  A.   On Aria DiMezzo's phone.

24  Q.   And 1563C.  Who is that a photograph of?

25  A.   Mr. Huffman.

1   Q.   And where was that photograph found?

2   A.   This was found on Mr. Freeman's computer.

3   Q.   1564.  Who is this from, or who is the participant?

4   A.   Karla Cino.

5   Q.   And where was this found?

6   A.   Aria DiMezzo's phone.

7   Q.   And on what date?

8   A.   1/7/2021.

9   Q.   And 1564A.  Who is that?

10  A.   Ms. Cino.

11  Q.   And if you look at the beneficiary information, what does

12  it say under name?

13  A.   "James Baker."

14  Q.   And if you look at the part that she signed it says, "I

15  am, Karla K. Cino, buying bitcoin" from who?

16  A.   Buying bitcoin from Aria DiMezzo via Telegram.

17  Q.   And where did you find this picture?

18  A.   On Aria DiMezzo's phone.

19  Q.   And 1564B.  Who is that?

20  A.   Karla Cino.

21  Q.   And where did you find that photo?

22  A.   That was on Mr. Freeman's computer in the Telegram folder.

23  Q.   And page -- document Exhibit 1565, there's a whole series

24  of communications here.  The content is not that important.

25  Who are the participants?

1    A.   Connie Creach and Aria DiMezzo.

2    Q.   And when -- what is the date of the transaction -- of the

3    communication?

4    A.   3/15/2021 is the top one.

5    Q.   Do you know when the search warrant in this case was

6    executed?

7    A.   3/16/2021.

8    Q.   And 1565A.  Do you know what that is?

9    A.   Yes.

10   Q.   What is that?

11   A.   It's a screen shot of the file path to get to the folder

12   labeled Creach in the Telegram folder within the KYC folder on

13   Mr. Freeman's computer.

14   Q.   Okay.  And 1566.  What is this document?

15   A.   It's a screen shot of a communication.

16   Q.   And at the top whose account does the communication start

17   from?

18   A.   Bonita Knight.

19   Q.   And so, is Bonita Knight's text in the white or the pink?

20   A.   The white.

21   Q.   All right.  I will -- and who is the pink?

22   A.   Aria DiMezzo.

23   Q.   So, I'll read the Aria DiMezzo part, and you can read the

24   Bonita Knight part.

25              "Transfer to James Baker/Aria DiMezzo in the amount

1    of," blank, "USD on date in order to purchase bitcoin via

2    Telegram.  I understand this cannot be refunded or reversed.

3    It should also be signed and dated."

4    A.   "Okay.  So, what is your percent rate?"

5    Q.   "10 percent?"

6    A.   "So, this is a bit more.  Is there any way you can go to 6

7    percent?"

8    Q.   "It's the same rate Ian used."

9    A.   "But I thought I can do business with you at a smaller

10   rate and give you a lot of business."

11   Q.   "Sorry.  My rate is 10 percent."

12   A.   "Okay.  Thank you.  I will be in touch."

13   Q.   Okay.  And 1566A.  Where did this photograph come from?

14   A.   That came from Mr. Freeman's computer.

15   Q.   And who is it a photograph of?

16   A.   Bonita Knight.

17   Q.   And 1567.  Who is that a driver's license for?

18   A.   Diane Aucott-Ward.

19   Q.   And where did you obtain this picture?

20   A.   That was from Aria DiMezzo's phone.

21   Q.   And if we go to 1567A, is that the same person?

22   A.   Yes.

23   Q.   And where did you get that photograph from?

24   A.   Mr. Freeman's computer.

25   Q.   And 1568, that says:  "I, Gail Buffamondi, am buying

1     bitcoin from Aria DiMezzo via Telegram using a wire transfer in

2     the amount of" an amount I can't see.  It says, "I understand

3     this amount cannot be refunded or reversed."  Then it says:

4     "The note needs to be signed and dated."  And then:  "Gail

5     Buffamondi, July 10th, 2020."  Did I read that right?

6     A.    Yes.

7     Q.    Where did you find that?

8     A.    On Aria DiMezzo's phone.

9     Q.    And 1568A.  Is that the same woman?

10    A.    Yes.

11    Q.    And where did you find that?

12    A.    On Mr. Freeman's computer.

13    Q.    And 1569.  Do you know who that is?

14    A.    Yes.

15    Q.    Who is that?

16    A.    Loreen Garcia.

17    Q.    And where did you find that image?

18    A.    That was on Aria DiMezzo's phone.

19    Q.    And 1569A.  Is that the same woman?

20    A.    Yes.

21    Q.    And next to the dogs did she sign her name?

22    A.    Yes.

23    Q.    And where did you find this photo?

24    A.    That was on Mr. Freeman's computer.

25    Q.    And 1570.  Do you know who that is?

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   Who is that? |
| 3 | A.   Jared Stogner. |
| 4 | Q.   And where was this photograph found? |
| 5 | A.   That was on Aria DiMezzo's phone. |
| 6 | Q.   And 1570A.  Is that the same person? |
| 7 | A.   Yes. |
| 8 | Q.   And where did you find that photograph? |
| 9 | A.   It was on Mr. Freeman's computer. |
| 10 | Q.   Okay.  And 1571.  What's the name on this account? |
| 11 | A.   "Raymond Miller resell" something. |
| 12 | Q.   And do you see a series of documents at the top? |
| 13 | A.   Yes, and a picture. |
| 14 | Q.   Can you see the signatures? |
| 15 | A.   Yes. |
| 16 | Q.   Based on your investigation of the case, do you know those |
| 17 | signatures? |
| 18 | A.   I do. |
| 19 | Q.   And whose signatures are those? |
| 20 | A.   Harold Jones. |
| 21 | Q.   And he testified yesterday, correct? |
| 22 | A.   Yes. |
| 23 | Q.   And just to remind us, were these the transactions that we |
| 24 | discussed with Mr. Jones? |
| 25 | A.   Yes. |

1   Q.   And there's one for the Invisible Hand, right?

2   A.   Yes.

3   Q.   Or two to the Invisible Hand?

4   A.   Yes.

5   Q.   One to Mr. Freeman?

6   A.   Yes.

7   Q.   And how about the bottom series?  Where did those all go?

8   A.   Reformed Satanic Church.

9   Q.   Okay.  And this exchange came off of Ms. DiMezzo's phone?

10  A.   Yes.

11  Q.   So, again I will read -- is the pink Ms. DiMezzo?

12  A.   Yes.

13  Q.   So, I will read Ms. DiMezzo.  You read Mr. Miller.

14  A.   Okay.

15  Q.   "I also need the first note and selfie."

16  A.   "I just sent it.  Read it."

17  Q.   "That's the second note.  Come on, man.  We've been over

18  this repeatedly.  You know by now that I require two different

19  notes.  Plus, that note is for $20,000, not 7,830.  Don't try

20  to fuck me, man.  Fix this bullshit or we're done doing

21  business."

22          If we go to the next page, which is 1571A, the top is

23  reprinted, right, so we don't need to read that again?

24  A.   Correct.

25  Q.   But at 12:51 it's new information, right?

1    A.    Yes.

2    Q.    So, please start there.

3    A.    "Aria, please be patient.  It's not my fault.  Despite how

4    I keep instructing this guy, he keeps acting like a retard."

5    Q.    "Well, then, I'll need to be -- well, then I'll need you

6    to be more diligent, especially with amounts like this."

7              And if we go up to the very top there's the document

8    there.  Can you see the signature?

9    A.    Yes.

10   Q.    And whose signature is that?

11   A.    Harold Jones.

12   Q.    And it continues on at 1571B?

13   A.    Yes.

14   Q.    "When I get home."

15   A.    "When will that be?"

16   Q.    "Your behavior here is 100 percent unacceptable.  For all

17   you know, I had a wedding today, or a funeral, or a full day

18   involving two flights.  It's not my fault that your guy sent me

19   a wire with no contact with you and with no contact with me.

20   Now Ian is messaging me about it, and I am not in the least

21   amused.  Worse, you've already seen me lose one bank account.

22   For all you know, your guy sent money to a frozen account.  If

23   you're going to send me money out of the blue, it will be on my

24   terms, and I will deal with it when I can.  At the moment I'm

25   waiting on an exchange to process a withdrawal.  Did I tell you

1    this?  No.  I also didn't tell you to wire me money.  That's on

2    you and your guy, not me.  If you send any additional wires to

3    me without contact will be considered donations."

4            Did I read that correctly?

5    A.   Yes.

6    Q.   And 1571C.  Where did this photograph come from?

7    A.   Mr. Freeman's computer -- well, it's a screen shot of the

8    file path to the Miller, Raymond file on Mr. Freeman's

9    computer.

10   Q.   Thank you.  And 1572.  What is this?

11   A.   It's another screen shot of a communication with Cindy

12   Frank.

13   Q.   And where did you get the community communication from?

14   A.   This was on Ms. DiMezzo's phone.

15   Q.   And does it make a reference to Ian?

16   A.   Yes.

17   Q.   And does the communication here appear to be with Ian?

18   A.   Yes.

19   Q.   Did this appear like the other Telegram messages we saw on

20   the phone, or did it appear different?

21   A.   Different.

22   Q.   How so?

23   A.   The background is different, the color profile.

24   Q.   Okay.  But this was on Ms. DiMezzo's phone?

25   A.   Correct.

1    Q.    If we go to 1572A, do you recognize that photo?

2    A.    Yes.

3    Q.    And where did that come from?

4    A.    That came from Mr. Freeman's computer.

5    Q.    And if we go to 1573, this is a -- where did you obtain

6    this Telegram exchange?

7    A.    Where?  Ms. DiMezzo's phone.

8    Q.    And who is it from?

9    A.    Ian Freeman.

10   Q.    And would he be in the white?

11   A.    Yes.

12   Q.    So, I'll read the pink.  "5K."

13   A.    "He tends to be in the 20K to 60K range.  Okay.  Probably

14   starting small with you."

15   Q.    "Yeah."  And what's the date right below that?

16   A.    June 17th.

17   Q.    And just if we could go back a second to 1537A and just go

18   to the first.  We looked at this already, but this was an

19   updated agreement for Shire Bitcoin's assistant contractor

20   position?

21   A.    Yes.

22   Q.    And if we go to the end, what's the date this was signed?

23   A.    June 10th, 2020.

24   Q.    And it's signed between DiMezzo and Freeman?

25   A.    Yes.

1    Q.   And the communications you saw involving DiMezzo that we

2    just went through, were those mostly before or after this date?

3    If you don't know, you don't know.

4    A.   Yeah.

5    Q.   Okay.  The last thing I want to do is to play a few

6    audios.  Where did you -- so 1574 is an audio.  Do you know

7    where you obtained it from?

8    A.   Yes.

9    Q.   Where?

10   A.   Aria DiMezzo's phone.

11   Q.   Let's play 1574.

12                       (Audio recording played)

13   Q.   And whose voice is that?

14   A.   Mr. Freeman.

15   Q.   And, again, you got it from where?

16   A.   Aria DiMezzo's phone.

17   Q.   And 1575.

18                       (Audio recording played)

19   Q.   Do you know that voice?

20   A.   Yes.

21   Q.   Who is that?

22   A.   Ms. DiMezzo.

23   Q.   And did you hear a reference in there to a selfie and to

24   wires?

25   A.   Yes.

1    Q.   And 1576.

2                    (Audio recording played)

3    Q.   And whose voice is that?

4    A.   Mr. Freeman.

5    Q.   Did he say he was checking the register of her Citizens

6    Bank account?

7    A.   Yes.

8    Q.   And the last one is 1577.

9                    (Audio recording played)

10   Q.   And whose voice was that?

11   A.   Mr. Freeman.

12   Q.   And where did you obtain that voice memo from?

13   A.   Aria DiMezzo's phone.

14          MR. AFRAME:  Thank you.  No further questions.

15          MR. SISTI:  Can we approach, Judge?

16          THE COURT:  Yes.  The day's over here anyway.  We're

17   only going to go till 4:45, so that will be 90 minutes anyway.

18   (SIDEBAR CONFERENCE AS FOLLOWS):

19          MR. SISTI:  That's what I was going to suggest.

20          THE COURT:  Why don't you --

21          MR. SISTI:  Yes, that's what I was going to suggest.

22   I don't want to start with five minutes and then break.

23          MR. AFRAME:  That's fine.

24          THE COURT:  Anything else you guys needed to --

25          MR. SISTI:  No.

1          MR. AFRAME:  No.

2          THE COURT:  9:00 tomorrow.

3     (END OF SIDEBAR CONFERENCE)

4          THE COURT:  All right.  We're going to send you home

5     for the day.  The agent will return.

6          You can step down.  The agent will return tomorrow for

7     cross-examination.  In the meantime, remember my usual

8     admonition:  No conversations with each other or anybody else

9     regarding the trial during the recess, and no outside

10    information, no investigation, no inquiry, any sort of

11    information about the trial during the recess.  I'll see you in

12    the morning.  Good job today.

13         THE CLERK:  All rise.

14              (The jury exited the courtroom)

15         THE COURT:  All right.  Counsel already informed me

16    that they have nothing for me to take care of, so I'll see you

17    in the morning at 9:00 a.m.  Have a good evening.  We're in

18    recess.

19         MR. SISTI:  Thank you.

20         MR. AFRAME:  Thank you.

21         MS. MACDONALD:  Thank you, your Honor.

22       (WHEREUPON, the proceedings adjourned at 4:40 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    knowledge, skill, ability and belief, a true and accurate

8    transcription of the within proceedings.

9

10

11

12

13   Date:   3/10/23            /s/ Brenda K. Hancock
                                Brenda K. Hancock, RMR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25