**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:21-cr-41-JL |
| ) | |
| IAN FREEMAN ) | |
| ) | |

## MOTION FOR ORDER OF FORFEITURE

The United States of America, pursuant to Federal Rule of Criminal Procedure 32.2(b), moves the Court to enter an order of forfeiture as to defendant IAN FREEMAN (hereinafter "defendant"). In support of this motion, the government states as follows:

**I.     Procedural Background**

Following a jury trial, on December 22, 2022, the defendant was convicted of conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. §§ 371, 1960(a) and (b)(1)(B) (Count 1); operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) and (b)(1)(B) and (C) (Count 2); money laundering in violation of 18 U.S.C. § 1956(a)(3)(B) (Count 21); conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 28); and tax evasion in violation of 28 U.S.C. § 7201 (Counts 29-32). The superseding indictment contained a forfeiture allegation notifying the defendant that upon conviction of Counts 2, 21, and 28, he "shall forfeit to the United States all property, real or personal, involved in the offense, and all property traceable to such property." ECF No. 139. The indictment also included a notice provision related to substitute assets.

## II.   ARGUMENT

### A.  Forfeiture is Mandatory

The Court's authority to order criminal forfeiture in this case is founded upon 18 U.S.C. § 982(a)(1). That statute says, in pertinent part, that "in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 . . . , [the court] shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." The clear language of the statute reflects the mandatory nature of forfeiture once the factual predicates have been met. *See, e.g., Alexander v. United States*, 509 U.S. 544, 562 (1993) ("A RICO conviction subjects the violator not only to traditional, though stringent, criminal fines and prison terms, but also mandatory forfeiture under [section] 1963."); *United States v. Monsanto*, 491 U.S. 600, 606 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied . . ."); *United States v. Newman*, 659 F.3d 1235, 1240 (9th Cir. 2011) ("Criminal forfeiture is separate from the discretionary sentencing considerations under 18 U.S.C. § 3551. Unlike a fine, which the district court retains discretion to reduce or eliminate, the district court has no discretion to reduce or eliminate mandatory criminal forfeiture."), *abrogated on other grounds*, *Honeycutt v. United States*, 581 U.S. 443, 448 (2017); *United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000) (forfeiture is a mandatory aspect of the sentence; district court erred in refusing to order forfeiture of "sufficiently quantifiable" proceeds of a RICO offense); *United States v. Gilbert*, 244 F.3d 888, 909 (11th Cir. 2001) ("order of forfeiture is a required element of sentencing"); *United States v. Rafael*, 282 F.Supp.3d 407, 410 (D. Mass. 2017) (court must order forfeiture to the extent permitted by the Constitution).

Fed. R. Crim P. Rule 32.2(b)(1)(A) acknowledges that the government may obtain a

money judgment: "If the government seeks a personal money judgment, the Court must determine the amount of money that the defendant will be ordered to pay." The Court may order an in personam money judgment against the defendant for the amount of money involved in or directly traceable to the unlicensed money transmitting offenses and the money laundering offenses. *See United States v. Misla-Aldarondo*, 478 F.3d 52, 73-74 (1st Cir. 2007) ("If the Government has proven that there was at one point an amount of cash that was directly traceable to the offenses, and that thus would be forfeitable under 18 U.S.C. § 982(a), that is sufficient for a court to issue a money judgment, for which the defendant will be fully liable whether or not he still has the original corpus of tainted funds—indeed, whether or not he has any funds at all;" following *Hall*); *United States v. Elfgeeh*, 515 F.3d 100, 138-39 (2d Cir. 2008) (funds "transferred in the unlicensed operation" of the money transmitting business were "involved in" it, making them forfeitable under 18 U.S.C. § 982(a)(1)); *see also United States v. Iacaboni*, 363 F.3d 1, 3 (1st Cir. 2004) (court entered money judgment equal to sum of amounts involved in all money laundering transactions making up the conspiracy to launder gambling proceeds, including salaries paid to co-defendants, overhead expenses, and payouts to winning bettors, even though defendant did not retain the money for himself).

As explained below, the government is seeking a monetary judgment in the total amount of money involved in the operation of the unlicensed money transmitting business. The money "involved in" the operation of the unlicensed money transmitting business will necessarily include the money "involved in" the money laundering offenses, given the nature of the defendant's business and the facts adduced at trial. And while the United States is entitled to forfeiture under multiple theories in the same case, *United States v. Schlesinger*, 261 Fed. App'x. 355, 361 (2d Cir. 2008), to avoid any arguments about double counting, the government is

3

seeking a money judgment only for the total sum of money involved in the defendant's operation of an unlicensed money transmitting business, as charged in Count 2.

### B. Amount of Money Judgment

Forfeiture may take the form of a judgment against the defendant for a sum of money equal to the property involved in the defendant's offenses, even if that property is no longer available at the time of sentencing. This is consistent with the mandatory nature of criminal forfeiture and the provision in section 853(o) directing courts to liberally construe its provisions to effectuate its remedial purpose. *See United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006) ("A money judgment permits the government to collect on the forfeiture order in the same way that a successful plaintiff collects a money judgment from a civil defendant. Thus, even if a defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order."); *see also Misla-Aldarondo*, 478 F.3d at 73-74.

"[T]he term 'property involved' is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. McGauley*, 279 F.3d 62, 76 n.14 (1st Cir. 2002) (quoting 134 Cong. Rec. S17365 (daily ed. Nov. 10, 1988)).

The government must prove the amount of the forfeiture money judgment by a preponderance of the evidence. *United States v. Cox*, 851 F.3d 113, 129 (1st Cir. 2017) (a forfeiture award is a part of the sentence rather than the substantive offense and thus the preponderance of the evidence standard applies). Fed. R. Crim P. 32.2(b)(1)(A) states that "[i]f the government seeks a personal money judgment, the Court must determine the amount of money that the defendant will be ordered to pay." *See, e.g., United States v. Zorilla-Echevarria*,

671 F.3d 1, 5-6 (1st Cir. 2011) ("For a money judgment forfeiture, the court 'must determine the amount of money that the defendant will be ordered to pay . . . .'"). The rule also provides that the "court's determination may be based on evidence already in the record, . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Rule 32.2(b)(1)(B); *see also United States v. Capoccia*, 503 F.3d 103, 109 (2nd Cir. 2007) (the court may rely on evidence from the guilt phase of the trial, even if the forfeiture is contested; it is not necessary for the government to reintroduce that evidence in the forfeiture hearing). Because forfeiture is part of the sentencing process, traditional rules of evidence do not apply – such that hearsay is admissible as long as it is sufficiently reliable. *Libretti v. United States*, 516 U.S. 29, 38-39 (1995) ("Forfeiture is an element of the sentence imposed following conviction . . . ."); *United States v. Rondón-García*, 886 F.3d 14, 21 (1st Cir. 2018) (sentencing court has "broad discretion to accept hearsay evidence at sentencing so long as the court supportably concludes that the information has sufficient indicia of trustworthiness"); *see also United States v. Gaskin*, No. 00-CR-6148, 2002 WL 459005, *9 (W.D.N.Y. Jan. 8, 2002) (in the forfeiture phase of the trial, the parties may offer evidence not already in the record; because forfeiture is part of sentencing, such evidence may include reliable hearsay), *aff'd*, 364 F.3d 438 (2d Cir. 2004); *United States v. Ivanchukov*, 405 F. Supp. 2d 708, 709 n.1 (E.D. Va. 2005) (because forfeiture is part of sentencing, reliable hearsay is admissible to establish the forfeitability of the property).

"If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." Fed. R. Crim. P. 32.2(b)(2)(B). Because the defendant has objected to the government's requested amount for the forfeiture money judgment, the Court must conduct a hearing on this issue if the defendant requests one; but the Court can conduct that

5

hearing as part of the sentencing scheduled for August 17, 2023.  *See United States v. Tardon*, 56 F.Supp.3d 1309, 1314-15 (S.D. Fla. 2014) (soonest practical time for the Court to determine the amount of a forfeiture money judgment in money laundering case was at the sentencing hearing because the amount of the forfeiture money judgment sought was the amount of money laundered by the defendant).  As in *Tardon*, the forfeiture money judgment sought by the government is directly related to the amount of money involved in the defendant's illegal operation of his unlicensed money transmitting business, in violation of Count 2.  As such, it makes practical sense to have the forfeiture hearing conducted as part of the sentencing hearing scheduled on August 17, 2023.

      The trial evidence established Ian Freeman operated an unlicensed money services business (MSB) which sold, at least, $21,000,000 in virtual currency, and catered itself largely to the online fraud community.  Freeman sold bitcoin without abiding by any FinCEN or Bank Secrecy Act regulations, which require MSBs to, among other things, register with FinCEN, collect know-your-customer information, have an anti-money laundering program, and file suspicious activity reports.  In exchange for the anonymity he afforded his customers by operating an unlicensed MSB, Freeman charged typically 10% but as high as 21% commission for converting cash into bitcoin.  Evidence at trial established that Freeman himself was buying bitcoin from exchanges such as Kraken for as low as 0.2% commission.  The people willing to pay these exorbitant fees, of course, were fraudsters looking to move their victims' money into difficult to trace bitcoin.  The jury found that Freeman knew or was willfully blind to the fact that the money he was converting from cash to bitcoin was the proceeds of wire fraud and convicted him of conspiracy to commit money laundering.  In one instance, Freeman knowingly accepted money that he believed to be the proceeds of drug trafficking, and the jury convicted

him of a substantive money laundering count. The jury also found that the Freeman was operating an unlicensed money transmitting business to convert his victim's cash to crypto. Thus, Freeman profited handsomely from operating his unlicensed MSB in violation of Section 1960 and as charged in Count 2.

At trial, the government presented testimony from a sample of Freeman's victims. These witnesses testified about the photographs that they sent to Freeman, the conversations that they did or did not have with him, the large sums of money they sent him, and that they had been victims of fraud. The government also presented testimony and exhibits regarding numerous financial accounts used by Freeman to operate his business. For example, Government Exhibit 2501 provided a summary of 50 bank accounts opened by Freeman and/or his co-conspirators. The approximate amount of money that went through the accounts in aggregate was nearly $50 million. Several individual account summaries were also introduced to the jury to illustrate the flow of money into the accounts and out to other accounts controlled by Freeman or to cryptocurrency exchanges.

    i.    <u>Operating an Unlicensed Money Transmitting Business (Count 2)</u>

Freeman was convicted of, among other crimes, operating an unlicensed money transmitting business. As previously noted, the government entitled to forfeit all the funds that were transmitted as part of both Freeman's unlicensed money transmitting business. *See Elfgeeh*, 515 F.3d at 138-39 (funds "transferred in the unlicensed operation" of the money transmitting business were "involved in" it, making them forfeitable under 18 U.S.C. § 982(a)(1)); *United States v. Sterlingov*, No. 21-399, 2023 WL 2387759, *6 (D. D.C. March 6, 2023) (legal precedent on forfeiture related to operation of an unlicensed money transmitting business suggests that all money transmitted through such a business is subject to forfeiture). The government has taken a conservative approach in calculating the amount of funds that were

involved in Freeman's unlicensed money transmitting business. Of the more than 50 accounts identified, the government has identified 30 bank accounts controlled by either Freeman or his co-conspirators that were used to receive fiat money from "customers" to exchange it for bitcoin. These accounts are identified in the PSR at Paragraph 34. Although the accounts include deposits from various sources, for purposes of calculating the money judgment, the government has considered only deposits in cash, which include shared branch deposits from around the country, and wire transfers from bitcoin "clients" specifically identified in the customer folders on Freeman's computer or in his LocalBitcoin.com records. In many instances, this conservative approach likely undercounts the true total that Freeman transmitted as part of his unlawful business. The money that the government calculates was "involved in" his money transmitting business is as follows:[1]

| Account | Deposits |
|---|---|
| First Tech (ending 8014) (Gov't Exh. 1) | $3,407,388.02 |
| First Tech (ending 7012) (Gov't Exh. 2) | $688,800.00 |
| Radius Bank (ending 0642) (Gov't Exh. 3) | $299,176.00 |
| Service Credit Union (ending 4962) (Gov't Exh. 4) | $3,725,218.03 |
| Bank of America (ending 8465) (Gov't Exh. 5) | $1,706,875.65 |
| Santander (ending 9819) (Gov't Exh. 6) | $477,939.00 |
| Triangle Credit Union (ending 7610-2) (Gov't Exh. 7) | $209,936.79 |
| AgFed (ending 9908) (Gov't Exh. 8) | $67,356.00 |
| Wells Fargo (ending 7792) (Gov't Exh. 9) | $1,017,684.65 |
| Service Credit Union (ending 6792) (Gov't Exh. 10) | $350,650.86 |
| DFCU (ending 5127) (Gov't Exh. 11) | $725,374.92 |
| Santander (ending 2523) (Gov't Exh. 12) | $433,450.00 |
| CIT Bank (ending 4049) (Gov't Exh. 13) | $100,258.00 |
| DFCU (ending 4760) – Fordham (Gov't Exh. 14) | $407,512.00 |
| GFA Federal Credit Union (ending 7902) – Fordham (Gov't Exh. 15) | $53,537.85 |
| Service Credit Union (ending 19) - Fordham (Gov't Exh. 16) | $28,577.00 |
| TD Bank (ending 2980) – Fordham (Gov't Exh. 17) | $1,956,858.27 |

---

[1] Bank summaries prepared by Darlene Cacace, the forensic accountant who testified at trial, along with a breakdown of which funds the government included in its calculations, are attached as Exhibits 1 through 30—each exhibit corresponding to a different account.

| | |
|---|---|
| TD Bank (ending 1932) - Rt 101 Goods/Reitmann) (Gov't Exh. 18) | $123.316.96 |
| TD Bank (ending 8273) - Rt 101 Goods/Reitmann (Gov't Exh. 19) | $689,858.98 |
| TD Bank (ending 4372) - Rt 101 Goods/Reitmann (Gov't Exh. 20) | $146,953.50 |
| TD Bank (ending 4848) - Rt 101 Goods/Reitmann (Gov't Exh. 21) | $491,791.09 |
| Bank of America (ending 8122) - Rt 101 Goods/Reitmann (Gov't Exh. 22) | $814,967.97 |
| JP Morgan (ending 9038) – Nobody (Gov't Exh. 23) | $887,458.48 |
| Bank of America (ending 9633) – Nobody (Gov't Exh. 24) | $1,060,051.87 |
| Wells Fargo (ending 8055) - Andrew Spinella (Gov't Exh. 25) | $121,839.29 |
| Wells Fargo (ending 3193) - Renee Leblanc (Gov't Exh. 26) | $378,102.34 |
| Service Credit Union (ending 9598) - Crypto Church (Gov't Exh. 27) | $26,752.25 |
| Digital Federal Credit Union (ending 0897) - Renee Spinella (Gov't Exh. 28) | $280,204.00 |
| Citizen's Bank (ending 4521) - Aria DiMezzo (Gov't Exh. 29) | $196,080.00* |
| Wells Fargo (ending 5556) – DiMezzo (Gov't Exh. 30) | $551,290.00* |
| **Total** | **$21,301,942.81** |

With respect to the two accounts belonging to DiMezzo, the government is not including the full amount of funds transmitted through those accounts. Although entitled to a money judgment for this amount, the Government is only seeking to include the percentage of the DiMezzo business that were paid to Freeman. Here, the evidence at trial established that Freeman controlled the accounts of all his co-conspirators except for those opened by DiMezzo. The accounts opened by other co-conspirators were used solely to support Freeman's business, and evidence at trial indicated that these conspirators passed full control of their accounts over to Freeman. DiMezzo, by contrast, conspired with Freeman to operate her own business, for which she paid Freeman a percentage of her net profit. The Government has taken a conservative approach to the DiMezzo accounts and attributes to Freeman's money judgment only that percentage which he received.

DiMezzo signed two contracts with Freeman in which she agreed to provide Freeman a percentage of her daily net in exchange for a working capital loan. The first agreement obligated DiMezzo to pay Freeman 25% of her daily profit, while the agreement signed in June 2020,

9

obligated her to pay 33%. Evidence at trial established that in the summer of 2020, consistent with the time of the second agreement, Freeman transitioned his "customers" to DiMezzo, and many of the same victims that were on Freeman's computer began contacting DiMezzo.

Evidence at trial showed that DiMezzo would include the commission percentage next to the contact name in her phone. These were as low as 10% and has high as 15%. *See e.g.,* Gov't Trial Ex. 1555, 1556, 1561, 1563, 1572. Using a conservative estimate of 10% profit for DiMezzo, and splitting the difference between the two commission percentages owed Freeman (25% and 33%), resulting in an estimate of a 29% average commission percentage, the government conservatively calculates that Freeman's cut of DiMezzo's business was $21,673.73.[2]

The funds involved in the operation of Freeman's unlawful business through the other 28 accounts identified amounts to $20,554,572.81. Together with the commissions he collected from DiMezzo, the operation of Freeman's unlicensed money transmitting business involved, conservatively, **$20,576,246.54**.

  ii. <u>Money Laundering – 18 U.S.C. § 1956(a)(3)(B) (Count 21)</u>

The jury convicted the defendant of concealment money laundering for accepting $19,900 from an undercover agent, believing that money to be the proceeds of drug distribution, in exchange for bitcoin. The receipts for these transactions were introduced as Government's Exhibit 611 at trial. The government is entitled to a forfeiture money judgment in the amount of the funds laundered, here $19,900. As noted, however, the laundered funds are included in the

---

[2] This estimate takes into account only the wire transfers received by DiMezzo for individuals whose names were on Freeman's computer, or that Freeman and DiMezzo spoke about. This does not include any of DiMezzo's cash business. Thus, this likely understates the money that Freeman received from DiMezzo.

amount of the money judgment calculated for the unlicensed money transmitting offense charged in Count Two, so, while entitled to this amount, to avoid any arguments about double counting the government is not seeking an additional forfeiture amount for these funds.

      iii.      <u>Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h) (Count 28)</u>

Much of the government's case at trial focused on Freeman's use of his business to serve online scammers and fraudsters enabling them to launder their fraud proceeds into untraceable bitcoin. Extensive evidence was presented to show that Freeman was either aware of, or willfully blind to, the nature of the fraudulent funds and the fact that the elderly "customers" sending him money were in fact victims of fraud.

As previously noted, the government is entitled to a money judgment for the total amount of money that Freeman laundered through his business. *See United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005) ("The corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder."); *United States v. Bermudez*, 413 F.3d 304, 306 (2d Cir. 2005) ("In [the defendant's] case, this means he must forfeit substitute assets up to the amount laundered, even if he merely handled the laundered property—*i.e.*, even if he never retained those funds and consequently never obtained proceeds from them."); *United States v. Reiner*, 397 F. Supp. 2d 101, 112 n.26 (D. Me. 2005) (collecting cases holding that forfeiture in a money laundering case includes the subject matter of the offense, commissions, and facilitating property); *aff'd* 500 F.3d 10 (1st Cir. 2007).

The scope of forfeiture under § 982(a)(1)'s "involved in" language is broad and can include commingled funds. *United States v. Aguasvivas-Castillo*, 668 F.3d 7, 17 (1st Cir. 2012) ("[E]ven legitimate funds that are commingled with illegitimate funds can be forfeited if the legitimate funds were somehow involved in the offense, such as by helping to conceal the illegal

funds.").

Again, while the government is entitled to forfeit the same funds for the money laundering and the unlicensed money transmitting counts, the government has chosen to simplify the forfeiture determination and is only seeking a money judgment for the amounts involved in the money transmitting business.

As outlined in Paragraph 35 of the PSR, the government believes that, very conservatively, there are an additional $5 million that could be forfeited for the money laundering conspiracy count.

### III.    CONCLUSION

For all the reasons set forth, pursuant to Rule 32.2(b)(2), the United States respectfully requests that this Court enter a money judgment order of forfeiture against the defendant in the amount of **$20,576,246.54**, representing all of the funds involved in his operation of an unlicensed money transmitting business, as charged in Count Two.  Counsel for the defendant does not assent to the relief sought in this Motion, and as such, the Court should hold a hearing on this matter as part of the sentencing hearing scheduled on August 17, 2023.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Dated: July 17, 2023         By:    /s/ John J. Kennedy
Assistant U.S. Attorney
NH Bar #19557
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
john.kennedy2@usdoj.gov