UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

     v.                        Criminal No. 21-cr-41-JL

                                   Opinion No. 2023 DNH 106P

<u>Ian Freeman</u>

## **<u>MEMORANDUM ORDER</u>**

The defendant in this case, Ian Freeman, was tried on charges of operating an unlicensed money transmitting business (Count 1), conspiracy to operate an unlicensed money transmitting business (Count 2), money laundering (Count 3), conspiracy to commit money laundering (Count 4), and four counts of attempt to evade or defeat taxes for each year from 2016 to 2019 (Count 5-8).  Prior to trial, Freeman joined co-defendant Aria DiMezzo's[1] motion to dismiss Counts 1 and 2.  After argument, the court denied the motion by oral order.[2]  Following the court's ruling, DiMezzo plead guilty, and Freeman went to trial.  After a 10-day trial, the jury returned guilty verdicts on all eight counts. Freeman orally moved under Rule 29 for judgment of acquittal as to each count at the end of the prosecution's case-in-chief, and he renewed the motion at the end of the defense case.  The court took the oral motion under advisement and allowed Freeman's written motion after trial.

---

[1] <u>See</u> Freeman Motion for Joinder (doc. no. 177); DiMezzo Motion to Dismiss (doc. no. 176).

[2] <u>See</u> Transcript of Motion Hearing (doc. no. 268).

In his motion for acquittal, Freeman incorporates the arguments for dismissal of Counts 1 and 2, which were first raised in DiMezzo's motion to dismiss.[3]  Freeman also argues that the trial evidence was insufficient to show that he knowingly engaged in the business of money transmitting, willfully joined a conspiracy to do so, or that any money "transmission" actually occurred.  As for Counts 3 and 4, Freeman contends that the evidence was insufficient to support the conclusion that he knowingly conducted a money laundering transaction or willfully joined a conspiracy to do so.  And finally, Freeman argues that the prosecution failed to prove beyond a reasonable doubt that he owed and evaded federal income tax, as alleged in Counts 5-8.

The court grants Freeman's motion for judgment of acquittal as to the money laundering count, upon finding that the evidence adduced at trial was insufficient to prove that Freeman knew that the prohibited transaction alleged in the indictment occurred.  For the reasons articulated in its oral order on the motion to dismiss, and those further explained below, the court denies Freeman's motion for acquittal as to the remaining counts.  This order also memorializes the court's oral order denying the motion to dismiss.  See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 n.1 (D.N.H. 2014), aff'd, 778 F.3d 247 (1st Cir. 2015) (noting a district court's authority to later reduce its

---

[3] See Freeman Rule 29 Motion (doc. no. 265) at 2.

prior oral findings and rulings to writing (citing In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007))).[4]

## I.      Applicable legal standards

*Motion to dismiss*.  A criminal defendant may move to dismiss an indictment on the ground that it fails to state an offense based on a pure legal issue.  See Fed. R. Crim. P. 12(b)(3)(B)(v).  A motion to dismiss an indictment, however, is not a way to test the sufficiency of the evidence behind an indictment's allegations.  United States v. Guerrier, 669 F.3d 1, 4 (1st Cir. 2011).

*Motion for judgment of acquittal*.  "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Fifth Amendment's due process clause "prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 309 (1979).  Accordingly, "[a]fter the prosecution closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The court assesses "whether 'a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'"  United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006) (quoting United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)).  If the "verdict 'finds support in a plausible

---

[4] To the extent there is any inconsistency between the factual and legal findings in the court's oral orders and its written order, this order controls.

rendition of the record,'" the conviction must stand.  United States v. Oliver, 19 F.4th 512, 516 (1st Cir. 2021) (quoting United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993)).

When reviewing the evidence, the court "take[s] all inferences in the light most favorable to the verdict . . . give[s] equal weight to both direct and circumstantial evidence, and . . . neither weigh[s] witness credibility nor require[s] the prosecution to 'eliminat[e] every possible theory consistent with the defendant's innocence[.]" Id. (quoting United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir. 2001)).  It "evaluate[s] the sum of all the evidence and inferences drawn therefrom, and determine[s] whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation."  United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015).  In conducting a sufficiency review, however, "some degree of intellectual rigor is required" and the court must "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative."  United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)).

## II.  **Background**

Consistent with the Rule 29 standard, the court draws on the evidence that the prosecution presented at trial when reciting the facts.  This case concerns a business that

Freeman and his colleagues[5] operated, in which they charged their customers a fee for

exchanging fiat currency for virtual currency—specifically, bitcoin.

Freeman conducted the business, in part, on a website, localbitcoins.com.

Freeman also interacted with customers on Telegram, an application that allowed for

encrypted communications.  He gave similar instructions to each of his customers as to

the method for conducting a transaction, and directed them to wire fiat currency to

particular bank accounts, some of which were held by his colleagues and others by

entities such as a "church" that he founded.  Freeman then calculated the equivalent value

of bitcoin, less the transaction fee, and transferred that bitcoin to a "digital wallet."  A

digital wallet is a program or device that stores virtual currency.  Recipients of bitcoin

enjoy a level of anonymity, since the owner of a digital wallet is harder to identify than

---

[5] The court provisionally admitted certain out-of-court, co-conspirator statements at trial under
Fed. R. Evid. 801(d)(2)(E), against the defendant's objection.  See Trial Tr. Day 5 Afternoon
(doc. no. 271) at 57:9-19 (orally finding the objected-to co-conspirator statements "admissible
subject to review on request by the defendant at the end of evidence if necessary . . . .").  The
First Circuit Court of Appeals has held that the court must make certain findings regarding the
admissibility of such evidence.  See, e.g., United States v. Diaz, 670 F.3d 332, 348 (1st Cir.
2012) ("A district court faced with a challenge to the admission of a co-conspirator's statement
must provisionally admit the statement and then wait until the end of the trial to consider
whether, in light of all the evidence, the following four conditions are satisfied by a
preponderance of the evidence: (1) a conspiracy existed; (2) the defendant was a member of the
conspiracy; (3) the declarant was also a member of the conspiracy; and (4) the declarant's
statement was made in furtherance of the conspiracy." (internal citations omitted)); United States
v. Merritt, 945 F.3d 578, 586 (1st Cir. 2019) ("To admit evidence of out-of-court statements
made by a defendant's co-conspirator, 'the district court must determine by a preponderance of
the evidence that the declarant and the defendant were members of the same conspiracy and that
the statement was made in furtherance of the conspiracy.'" (quoting United States v. Paz-
Alvarez, 799 F.3d 12, 29 (1st Cir. 2015))).  Freeman did not renew his objection or request
findings supporting the admission of the co-conspirator statements at the close of evidence.
Nevertheless, the court finds that the requisite findings are fully supported by the evidence
presented at trial, and the statements were properly admitted.

the owner of a bank account, for instance.  Over the course of the trial, several of Freeman's customers testified that they were the victims of romance (or other online) scams, and they purchased bitcoin from Freeman as part of those scams.  Specifically, under the scammer's instruction, the victim deposited fiat currency into one of Freeman's accounts in order to purchase bitcoin that ultimately entered a digital wallet associated with the scammer.

The money laundering charge centers on a bitcoin purchase completed by an undercover agent at one of Freeman's bitcoin exchange machines located in New Hampshire on August 25, 2020.  The agent—Special Agent Pavel Prilotsky with the Internal Revenue Service Criminal Investigation Unit—initiated contact with Freeman on localbitcoins.com in or around September 2019.  The agent asked to purchase bitcoin from Freeman, and Freeman provided him with instructions on the information he required and the account to which the agent should wire money for his purchase.  They continued to interact and complete transactions on the website for a few months.  The agent later asked if he could purchase bitcoin from Freeman through other means than localbitcoins.com.  Freeman instructed the agent to contact him directly on Telegram.[6] The agent communicated with Freeman several times on Telegram to complete additional bitcoin purchases through bank wire transfers.  At one point, Freeman left a voice message for the agent on Telegram, explaining that, if the agent sought to mail money, he

---

[6] Id.

should use the United States Postal Service, since a warrant is "supposedly" required to open packages sent through the U.S. mail.[7]

After some time passed, Freeman told the agent about his bitcoin exchange machines in New Hampshire, where customers could complete bitcoin purchases in person.  The agent asked whether the machines utilized facial recognition technology, and Freeman assured him that the machines' identifying capabilities had been turned off. The agent continued to communicate with Freeman while completing an $11,000 transaction at a machine located at Thirsty Owl, an establishment in Keene, New Hampshire.  Freeman discounted his standard 14% transaction fee to 10% for this purchase.[8]

The agent eventually told Freeman that the money he was exchanging for bitcoin was the product of drug sales.  In a subsequent Telegram conversation on July 30, 2020, Freeman wrote, "unfortunately I can't sell you bitcoin because you told me too much about what you do."[9]  The agent expressed disappointment, writing, "can't even use your ATM [bitcoin exchange machines]?  I told a few of my buddies. They all got excited. Now don't even know what to respond to them."[10]  Freeman replied, "[m]y answer to the

---

[7] Prosecution Trial Ex. 606 (audio).

[8] See Trial Tr. Day 4 Morning (doc. no. 270) at 116:11-16, 117:18-20.

[9] Id. at 128:4-5.

[10] See id. at 128:9-15.

question is, I can't KNOWINGLY assist you with financial matters."[11]  The word

"knowingly" appeared in all capital letters.

> The agent inquired further into Freeman's position, and Freeman explained:
> You told me you sell drugs.  Therefore, to assist you with buying bitcoin would be
> considered money laundering.  Money laundering requires knowledge of the
> illegal activity.  I don't think you are an undercover agent, but you got a little too
> loose lipped.  So while I am not opposed to the sale of drugs, I do need to be
> careful.  Sadly that means I cannot KNOWINGLY sell bitcoin to you.[12]

Again, the word "knowingly" appeared in all capital letters in the message.

On August 25, 2020, the agent halted Freeman outdoors as he was walking and

asked him if there was still a bitcoin exchange machine located at Thirsty Owl.[13]

Freeman recognized the agent, as they had met in person before.  Freeman confirmed that

the machine was still there.  The agent then asked whether he could use it, and Freeman

replied, "I can't tell you that you can use that."[14]  The agent responded, "okay, thanks."[15]

Later that day, the agent purchased about $20,000 in bitcoin from the Thirsty Owl

machine.  Freeman's standard 14% transaction fee, and not a discounted fee, applied to

this purchase.[16]

---

[11] Id. at 128:16-17.

[12]  Id. at 129:17-23.

[13] The agent and Freeman were approximately 30 miles from Keene and Thirsty Owl during this conversation.

[14] Prosecution Trial Ex. 610A (video).

[15] Id.

[16] See Trial Tr. Day 4 Afternoon (doc. no. 279) at 19:10-17.

Freeman and the agent did not discuss the purchase after this point, and Freeman did not make an admission or otherwise indicate that he knew that the transaction took place.  Law enforcement agents seized records from Freeman's home and home office, but the prosecution did not introduce any such records that memorialized or referred to the August 25 purchase.  Further, while the prosecution presented evidence reflecting that Freeman monitored at least some of his bitcoin exchange machines at times, it did not elicit or introduce evidence that the August 25 transaction was specifically monitored, or that Freeman had actual contemporaneous or subsequent knowledge of the transaction.

### III.   <u>Analysis</u>

As noted above, Freeman first joined DiMezzo's motion to dismiss the unlicensed money transmitting business counts (Counts 1 and 2) and later incorporated the arguments from the motion to dismiss into his motion for acquittal on those counts.[17] The court first addresses Freeman's arguments for dismissal or acquittal as to Counts 1 and 2, and then turns to the remaining arguments in his motion for acquittal.

#### A.   **Operation of and conspiracy to operate an unlicensed money transmitting business (Counts 1 and 2)**

Freeman premises his motion to dismiss on the assumption that the United States Attorney, in deciding to charge Freeman with operating and conspiring to operate an unlicensed money transmitting business, relied on (or needed to rely on) official guidance from FinCEN applying the Bank Secrecy Act's implementing regulations to persons

---

[17] <u>See</u> doc. no. 265 at 2 ("Additionally, the Church was not engaged in 'money transmitting'. The transactions involved church-owned Bitcoin.  The Defendant incorporates all arguments and the pretrial Motion to Dismiss with regard to this aspect of our current Rule 29 motion.").

exchanging virtual currencies.  Specifically, in 2013, FinCEN issued guidance opining that an "exchanger" of virtual currency (as defined in FinCEN's regulations) that "(1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason is a money transmitter under FinCEN's regulations," and must register under 31 U.S.C. § 5330.  Under this guidance, an "exchanger is a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency."[18]

Freeman argues that FinCEN acted without authority from Congress in issuing this guidance and taking the position that the money transmitting business registration requirements apply to individuals or entities that exchange virtual currencies, like bitcoin. Absent such Congressional authority, Freeman avers, the agency guidance and regulatory interpretation are invalid under the major questions doctrine,[19] and Freeman's prosecution for operating an unlicensed money transmitting business cannot stand.

The prosecution responds that its charging decision (and ultimately, its proof at trial) depends on the statute itself, not the implementing regulations or FinCEN's associated interpretive guidance.  Under the plain meaning of the statute, Freeman knowingly conducted, controlled, managed, supervised, directed, or owned "all or part of an unlicensed money transmitting business," 18 U.S.C. § 1960(a), because that business involved the transfer of "funds" and "fail[ed]" to comply with the money transmitting

---

[18] 2013 FinCEN Guidance, FIN-2013-G0012013, at 2.

[19] W. Virginia v. Env't Prot. Agency, 142 S. Ct. 2587, 2610 (2022) ("Under our precedents, this is a major questions case.").

business registration requirements under section 5330 of title 31, United States Code, or

regulations prescribed under such section."  § 1960(b)(1)(B) & (b)(2) (emphasis added).

The prosecution further argues that even if its proof depended on FinCEN's interpretation

of the regulations, and that interpretation constituted a "major question," FinCEN's

actions would not exceed the authority given to it by Congress.  For the reasons detailed

below, the court agrees with the prosecution on all points.

### 1.    Statutory interpretation

The court begins by determining whether the plain and ordinary meaning of

"funds" as used in 18 U.S.C. § 1960 includes bitcoin – the virtual currency at issue here.

See Babb v. Wilkie, 140 S. Ct. 1168, 1177 (2020) (noting that where the court determines

the plain meaning of a statute based on its unambiguous words, the "judicial inquiry is

complete") (quoting Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003)).  Courts have

near unanimously found that bitcoin may constitute "funds" under § 1960 and the money

laundering statute, 18 U.S.C. § 1956.  See, e.g., United States v. Iossifov, 45 F.4th 899,

913 (6th Cir. 2022), cert. denied, No. 22-6343, 2023 WL 2123960 (U.S. Feb. 21, 2023);

United States v. Harmon, 474 F. Supp. 3d 76, 80, 90 (D.D.C. 2020); United States v.

Ologeanu, No. 5:18-CR-81-REW-MAS, 2020 WL 1676802, at *11 (E.D. Ky. Apr. 4,

2020); United States v. Stetkiw, No. 18-20579, 2019 WL 417404, at *2 (E.D. Mich. Feb.

1, 2019); United States v. Mansy, 2:15-CR-198-GZS, 2017 WL 9672554, at *1 (D. Me.

May 11, 2017) (Signal, J.); United States v. Murgio, 209 F. Supp. 3d 698, 707 (S.D.N.Y.

2016); United States v. Budovsky, No. 13CR368 DLC, 2015 WL 5602853, at *14

(S.D.N.Y. Sept. 23, 2015); United States v. Faiella, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014).[20]

Freeman agrees and concedes that if the court interprets the statute consistent with these cases, his motion fails.[21]  He instead asks the court to forego statutory interpretation entirely and raises an apparently novel challenge to FinCEN's actions under the major questions doctrine.  The court addresses and rejects that argument below, see infra. § III, A, 2.  But first, it construes the operative statute.

Under 18 U.S.C. § 1960, a person commits an offense when he "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business."  In relevant part, the statute defines the term "unlicensed money transmitting business" as "a money transmitting business which affects interstate or foreign commerce in any manner or degree" and "fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330] or regulations prescribed under such section."  18 U.S.C. § 1960(b)(1)(B).  The version of 31 U.S.C. § 5330(d) in effect at the time of the offense conduct also defined "money transmitting

---

[20] The only contrary authority, United States v. Petix, is a report and recommendation from a Magistrate Judge in the Western District of New York that was not adopted by the district court. See 15-CR-227A, 2016 WL 7017919, at *5 (W.D.N.Y. Dec. 1, 2016).  No other court, including other judges within the Western District of New York, has adopted the Petix court's reasoning, as "[v]irtually every federal court to consider this issue has determined that the ordinary meaning of 'funds' in the federal money laundering statutes encompasses Bitcoin."  United States v. Phillips, No. 22-CR-6058CJS, 2022 WL 16990050, at *3 (W.D.N.Y. Nov. 17, 2022), report and recommendation adopted, No. 22-CR-6058, 2023 WL 2775610 (W.D.N.Y. Apr. 4, 2023).

[21] See doc. no. 176 at 19.  At oral argument, DiMezzo's counsel (who prepared and filed the motion that Freeman later joined) admitted that "if the normal rules of statutory interpretation apply, we lose . . . I grant that."  Doc. no. 268 at 9:22-23.

business" as "any other person who engages as a business in the transmission of funds,

including any person who engages as a business in an informal money transfer system[.]"

Pub. L. No. 107-56, 115 Stat. 272, 328 (2001).  In 2021, Congress amended § 5330(d) to

include in the definition of money transmitting business "any other person who engages

as a business in the transmission of <u>currency</u>, funds, or <u>value that substitutes for currency</u>,

including any person who engages as a business in an informal money transfer system[.]"

31 U.S.C. § 5330(d)(1)(A) (emphasis added).  This amended version of § 5330(d) does

not apply to Freeman's conduct.

     In the Superseding Indictment, the Grand Jury charged Freeman with operating,

and conspiring to operate, "an unlicensed money transmitting business, in violation of

Title 18, United States Code, Section 1960."[22]  Specifically, the indictment charged

Freeman and others with operating a business that "failed to comply with the money

transmitting business registration requirements set forth in Title 31, United States Code,

Section 5330, and the regulations prescribed thereunder."[23]

     While the indictment referenced purported unspecified violations of the

"regulations," the prosecution clarified at oral argument that it could prove its case by

showing that Freeman violated either the statute or the regulations.  <u>See</u> United States v.

Bader, 698 F.2d 553, 555 (1st Cir. 1983) ("The complaint does not use the statute's

---

[22] Superseding Indictment (doc. no. 139) at ¶ 12.

[23] Id. at ¶ 13; <u>see also</u> id. at ¶ 3 (alleging that defendants knowingly operated a business that
failed to "meet registration and reporting requirements set forth in Title 18, United States Code,
Section 1960, and in regulations promulgated by the United States Department of the Treasury"),
¶ 17, ¶ 20.

disjunctive 'or,' for the simple reason that, when a statute is phrased in the disjunctive, it is well-established that a criminal complaint based on that statute must be phrased in the conjunctive. . . .   It is equally well-established that the government need prove only one of the conjunctively connected offenses to warrant conviction.").[24]   It further represented that it planned to present evidence demonstrating violations of the statute, without reference to the regulations or FinCEN's guidance about the regulations.[25]   The prosecution also proposed jury instructions on the unlicensed money transmitting business counts that referenced only the statute and case law applying the statute, rather than the regulations.[26]   The court adopted a slightly modified version of these instructions – without referencing the regulations – and instructed the jury accordingly.   The court thus focuses on the statute.

---

[24] The prosecution is correct that a person may violate § 1960 by failing to comply with the registration requirements of 31 U.S.C. § 5330, but not necessarily the regulations prescribed thereunder.  For example, § 5330(a)(1) provides that "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury" within 180 days from the "date on which the business is established." (emphasis added).  The statute alone requires registration, regardless of what the regulations say.  The statute also details the required contents of the registration, see § 5330(b), and "[s]ubject to [those] requirements," provides that the Secretary of the Treasury "shall prescribe, by regulation, the form and manner for registering a money transmitting business."  § 5330(a)(2).  Freeman was not charged with failing to follow the required "form and manner" of registration under the regulations; rather, he was charged with failing to register all together.  The regulations – and FinCEN's interpretation of them – therefore have no bearing on whether he violated § 1960.

[25] In its oral order, the court clarified that it was not ruling that "removing the reg[ulations] from the criminal trial" was "legally necessary."  Doc. no. 268 at 56:3-6.  The parties were free to inject the regulations into the trial as they wished.

[26] See Freeman Proposed Jury Instructions (doc. no. 243); Prosecution Proposed Jury Instructions (doc. no. 250).  Freeman did not object to the fact that the prosecution's proposed jury instructions on the money transmitting claim did not reference the regulations.

Freeman argues in his Rule 29 motion for acquittal that the trial evidence was insufficient to prove that he was engaged in "money transmitting" under § 1960 because the transactions involved bitcoin.[27]  Under § 1960, however, "the term 'money transmitting' includes transferring <u>funds</u> on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2) (emphasis added).  The statute does not define "funds," but "[w]hen a term goes undefined in a statute," courts determine "its ordinary meaning."  Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012).  As several courts have recognized, the "ordinary meaning of 'funds[ ]' . . . is 'available pecuniary resources,' which essentially means, 'something generally accepted as a medium of exchange, a measure of value, or a means of payment.'"  Iossifov, 45 F.4th at 913 (quoting Stetkiw, 2019 WL 417404, at *2); see also Murgio, 209 F. Supp. 3d at 707 (adopting identical ordinary meaning of "funds," but adding that "[p]ecuniary is defined as taking the form of or consisting of money" (quoting Webster's Third New International Dictionary 921 (2002))).

"[I]t is clear that bitcoins are funds within the plain meaning of that term."  Murgio, 209 F. Supp. 3d at 707.  "Bitcoins can be accepted 'as a payment for goods and services' or bought 'directly from an exchange with [a] bank account.'"  Id. (quoting <u>Getting started with Bitcoin</u>, bitcoin, https://bitcoin.org/en/getting-started (last visited

---

[27] <u>See</u> doc. no. 265 at 2.

Sept. 16, 2016)).  Indeed, as the trial evidence here showed,[28] "[i]n today's society,
Bitcoin is often used [to] pay for things, and it may sometimes be used as a medium of
exchange that is subsequently converted to currency to pay for things."  Iossifov, 45 F.4th
at 914; see also Faiella, 39 F. Supp. 3d at 545 (finding that bitcoins "clearly qualif[y] as
'money' or 'funds'" under § 1960 because they "can be easily purchased in exchange for
ordinary currency, act[ ] as a denominator of value, and [are] used to conduct financial
transactions").[29]

Moreover, while the plain and ordinary meaning of the statutory text
unambiguously includes bitcoin, and thus, the court is not inclined to look to the history
and purpose of § 1960, courts have held that that history and purpose nevertheless
"support[ ] the conclusion that bitcoins fall within the statute's purview."  Murgio, 209 F.
Supp. 3d at 708.  Congress enacted § 1960 to "address the fact that 'money launderers

---

[28] For example, Freeman presented testimony from business owners who accept bitcoin as
payment for goods or services, such as pizza.  See Trial Tr. Day 9 Morning (doc. no. 273) at 25-
26.

[29] The key term "funds" appears in multiple statutes that work together to form the basis of
Freeman's unlicensed money transmitting business charges.  For example, § 1960 defines
"money transmitting" as "transferring funds on behalf of the public by any and all means . . . ."
Section 5330 similarly defines a "money transmitting business" as a business that "engages in
the transmission of funds" and is required to file reports under 31 U.S.C. § 5313.  And the §
5313 reporting requirement applies to "financial institutions," which include businesses that
"engage[ ] in the transmission of funds."  31 U.S.C. § 5312(a)(2)(R); see also Harmon, 474 F.
Supp. 3d at 101 ("[C]ourts have held that 'there is virtually no substantive difference, nor did
Congress intend there to be a substantive difference, between the terms 'money transmitting' in
Section 1960 and 'money transmitting business' in Section 5330.'" (quoting United States v. E-
Gold, Ltd., 550 F. Supp. 2d 82, 92 n. 10 (D.D.C. 2008)).  This "record of statutory usage
demonstrates convincingly" that the plain and ordinary meaning of "funds" includes bitcoin.  W.
Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 88 (1991).

with illicit profits ha[d] found new avenues of entry into the financial system.'"  Id.

(quoting S. Rep. No. 101-460 (1990)).  Thus, "[f]rom its inception," the statute "sought to

prevent innovative ways of transmitting money illicitly," and interpreting "funds" to

include bitcoin aligns with that purpose.  Id.; see also Faiella, 39 F. Supp. 3d at 546

(observing that "Congress designed the statute to keep pace with such evolving threats,

which is precisely why it drafted the statute to [broadly] apply to any business involved

in transferring 'funds . . . by any and all means'") (quoting 18 U.S.C. § 1960(b)(2)).

Freeman contends that because bitcoin and other virtual currency did not exist in

2001, Congress could not have anticipated the word "funds" applying to such new

financial instruments.  While Freeman is correct that bitcoin did not exist when Congress

amended the statute in 2001, this does not change the result.  "[T]he fact that a statute can

be applied in situations not expressly anticipated by Congress does not demonstrate

ambiguity[;] it demonstrates breadth."  Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212

(1998); see also Barr v. United States, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a

choice of language that fairly brings a given situation within a statute, it is unimportant

that the particular application may not have been contemplated by the legislators.");

Budovsky, 2015 WL 5602853, at *14 (finding that Congress may "address a general

problem with many variations" through broadly worded statutes like § 1960 and § 5330).

It is also well-settled that a "statute can be unambiguous without addressing every

interpretive theory offered by a party. It need only be 'plain to anyone reading the Act'

that the statute encompasses the conduct at issue." Salinas v. United States, 522 U.S. 52, 60 (1997) (quoting Gregory v. Ashcroft, 501 U.S. 452, 467 (1991)).[30]

In sum, the statute's plain language and structure unambiguously include bitcoin. And, to the extent that legislative intent and statutory purpose are legitimate and permissible interpretive tools, they point to the same conclusion. See Mansy, 2017 WL 9672554, at *2. For these reasons, the Superseding Indictment does not fail to state a criminal offense against Freeman for operating an unlicensed money transmitting business, or conspiring to operate such a business, and the motion to dismiss is denied. Freeman's Rule 29 argument that the trial evidence was insufficient to support the jury's conclusion that he was engaged in "money transmitting" because the transactions involved bitcoin is unavailing for the same reasons.

### 2.      Major questions doctrine

Contending that the straightforward statutory interpretation principles outlined above "miss the point," Freeman asserts that the Supreme Court's recent decision in West Virginia v. EPA changed the legal landscape in such a way that FinCEN's 2013 interpretive guidance of its regulations must be invalidated. 142 S. Ct. 2587 (2022). Consequently, says Freeman, the indictment fails to state a criminal offense for violating § 1960. Freeman's argument overlooks the fact that the indictment neither depends on

---

[30] The allegedly unintended or "undesirable policy consequences" of following the statute's plain and ordinary meaning likewise do not control the interpretative analysis. Bostock v. Clayton Cnty., Georgia, 140 S. Ct. 1731, 1753 (2020) ("The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.").

nor references the FinCEN guidance, and the only agency arguably "interpreting" § 1960 for purposes of this prosecution is the Department of Justice, not FinCEN.  Indeed, the FinCEN guidance itself clarifies that it "explains only how FinCEN characterizes certain activities involving virtual currencies under the Bank Secrecy Act [31 U.S.C. § 5330] and FinCEN regulations" and "should not be interpreted as a statement by FinCEN about the extent to which those activities comport with other federal or state statutes, rules, regulations, or orders."[31]  Importantly, "the FinCEN Guidance does not even mention § 1960, much less purport to interpret the statute's use of the word 'funds.'"  Murgio, 209 F. Supp. 3d at 709.

Even if the FinCEN guidance mattered to this prosecution, however, the court is not persuaded by Freeman's arguments for at least three reasons.  First, FinCEN's regulatory interpretation is not a "major question."  Second, even if this were an extraordinary case of "deep economic and political significance," where, as here, the statutory language at issue is unambiguous, the court simply enforces the statute according to its terms and does not need to look to, let alone defer to, the agency's interpretation.  King v. Burwell, 576 U.S. 473, 486 (2015).  And third, FinCEN's interpretation is consistent with the clear statement of regulatory authority Congress granted it and thus does not run afoul of the major questions doctrine, to the extent that the doctrine applies.

---

[31] 2013 FinCEN Guidance at n.1.

### a)  Applicability

The major questions doctrine operates as something of an exception to Chevron deference.  "Deference under Chevron to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps."  Brown & Williamson, 529 U.S. at 159 (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)).  "In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation."  Id.  Those extraordinary cases – "in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion" – call for a "different approach."  West Virginia, 142 S. Ct. at 2608.  "[S]omething more than a merely plausible textual basis for the agency action is necessary.  The agency instead must point to 'clear congressional authorization' for the power it claims."  Id. at 2609 (quoting Utility Air Regulatory Group v. EPA, 573 U.S. 302, 324 (2014)); but see Yeskey, 524 U.S. at 212 (noting that "in the context of an unambiguous statutory text," arguments concerning whether Congress has made its intention clear are "irrelevant").

The West Virginia majority simply concluded that it was "a major questions case" under "[its] precedents."  Id. at 2610.  In a concurrence joined by Justice Alito and relied on by Freeman,[32] however, Justice Gorsuch summarized, based on existing case law,

---

[32] See doc. no. 176 at 15.

certain factors for courts to consider when determining whether a case implicates a

"major question." Id. at 2620 (Gorsuch, J., concurring) ("[O]ur cases supply a good deal

of guidance about when an agency action involves a major question for which clear

congressional authority is required.").  These factors counsel against applying the

doctrine here.

First, "the doctrine applies when an agency claims the power to resolve a matter of

great 'political significance' or end an 'earnest and profound debate across the country.'"

Id. (quoting Gonzalez v. Oregon, 546 U.S. 243, 267-268 (2006)).  Whether one sub-

agency out of thousands within the executive branch believes that businesses which

transmit bitcoin for fiat currency must register with FinCEN can hardly be described as a

matter of "great political significance."[33]  Nor does it purport to end an earnest and

profound national debate about regulating virtual currencies.  That debate is just as

vibrant now as it was prior to FinCEN issuing its guidance in 2013.  Importantly,

Congress has not "considered and rejected bills authorizing something akin to the

agency's proposed course of action," which is often a "sign than an agency is attempting

to work [a]round the legislative process to resolve for itself a question of great political

significance." Id. at 2621 (cleaned up).

Second, major questions arise when an agency "seeks to regulate a significant

portion of the American economy or require billions of dollars in spending by private

---

[33] Nor is this court in the best position to decide what constitutes a matter of great political significance.

persons or entities." Id. (cleaned up).  Freeman contends that FinCEN seeks to regulate a significant portion of the economy through its interpretive guidance because as of November 2021, non-state-issued digital assets had a combined market capitalization of $3 trillion.  See doc. no. 176, at 10.  While undoubtedly a large figure, the argument misses the mark.  FinCEN's exercise of regulatory authority does not target the entire $3 trillion virtual currency market.  Rather, it is directed at a fraction of market participants who are in the business of transmitting virtual currencies and not already registered with FinCEN.  Freeman does not attempt to quantify the portion of the virtual currency market that FinCEN's interpretative guidance would actually affect.

Moreover, Freeman has presented no evidence that FinCEN's guidance would require billions of dollars in spending by private persons or entities.  By contrast, in West Virginia, EPA's exercise of authority would "force [dozens of] coal and gas-fired power plants to cease [operating] altogether," "eliminate thousands of jobs by 2025," and "cause consumers' electricity costs to rise by over $200 billion."  Id. at 2621-22.  Freeman has offered no evidence of similar downstream consequences here.

Third and finally, the "major questions doctrine may apply when an agency seeks to intrud[e] into an area that is the particular domain of state law."  Id. at 2621 (cleaned up).  Freeman does not meaningfully argue, or present evidence, that regulation of financial services entities and money transmitting businesses is an "area[ ] traditionally regulated by the States."  Id. (quoting Gregory, 501 U.S. at 459-460).  While Freeman is correct that New Hampshire has chosen not to require similar businesses to register with the State, that alone does not indicate that FinCEN is stepping into a particular domain of

state law.  The Federal Government and the States often regulate similar industries,

entities, or people, but sometimes regulate them differently.  Thus, unlike EPA's actions

in West Virginia, FinCEN's interpretive guidance does not create federalism concerns.

Id. at 2622 (finding that the "CPP unquestionably has an impact on federalism, as 'the

regulation of utilities is one of the most important of the functions traditionally associated

with the police power of the States.'") (quoting Arkansas Elec. Cooperative Corp. v.

Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 377 (1983)).  For all of these reasons, the

major questions doctrine does not apply to FinCEN's interpretive guidance.

<strong>b)</strong>      <strong>Unambiguous statutory language, not agency guidance, controls</strong>

The Supreme Court has recognized that even in "extraordinary cases" involving

questions of "deep economic and political significance," it is the court's "task to

determine the correct reading" of the statute at issue.  King, 576 U.S. at 486 (quoting

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000)).  "If the

statutory language is plain, [the court] must enforce it according to its terms."  Id.

(emphasis added); see also Biden v. Nebraska, 143 S. Ct. 2355, 2376 (2023) (Barrett, J.,

concurring) ("In this case, the Court applies the ordinary tools of statutory interpretation

to conclude that the HEROES Act does not authorize the Secretary's plan.  The major

questions doctrine reinforces that conclusion but is not necessary to it.") (emphasis

added).

Therefore, even assuming, without deciding, that this is such an extraordinary

case, as discussed above, see supra, § III, A, 1, the language of § 1960 and § 5330 is plain

and unambiguous, and the court enforces those statutes according to their terms.  The

23

statutes cover Freeman's conduct, and the prosecution could meet its burden of proving a violation of § 1960 by relying on the statutes alone.  There is accordingly no need to look to, or rely upon, FinCEN's interpretive guidance on the related regulations.  See Massachusetts v. E.P.A., 549 U.S. 497, 528-29 (2007) (rejecting EPA's reading of a statute based entirely on the unambiguous statutory text).

> ### c) FinCEN acted within its clear Congressional delegation of authority

Freeman contends that Congress did not provide a clear statement to the Treasury Department authorizing FinCEN's purportedly new regulatory authority until it amended § 5330(d) in 2021.  But assuming, without deciding, that FinCEN's interpretive guidance[34] is a question of major economic and political significance, the agency had "clear congressional authorization" to regulate in such a manner prior to 2021.  West Virginia, 142 S. Ct. at 2609 (quoting Utility Air, 573 U.S. at 324).

"Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' [ ] subtle device[s]," or "ambiguous statutory text."  West Virginia, 142 S. Ct. at 2609 (quoting Whitman v. American Trucking Association, 531 U.S. 457, 468 (2001)).  No such modesty, subtlety, or ambiguity exists here.  "Section

---

[34] It is not clear that the major questions doctrine applies to an agency's interpretative guidance on a regulation (as opposed to its construction of a statute or creation of a new regulation), which do not have the force of law.  See Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1204 (2015).  Interpretive guidance does not "create new law, right[s] or duties," but "merely clarif[ies] an existing statute or regulation."  United States v. Lott, 750 F.3d 214, 217 (2d Cir. 2014) (citation omitted).  Because the 2013 FinCEN guidance is arguably an act of regulatory authority, however, the court assumes, without deciding, that it could be subject to challenge under the major questions doctrine.

5330 governs the registration of money transmitting businesses with [FinCEN], E-Gold, 550 F. Supp. 2d at 96, and expressly does so by authorizing the Secretary of the Treasury to "prescribe, by regulation, the form and manner for registering a money transmitting business." 31 U.S.C. § 5330(a)(2).  As discussed above, the statute in effect at the time of Freeman's conduct broadly defined "money transmitting businesses" as "any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system." 31 U.S.C § 5330(d), Pub. L. No. 107-56, 115 Stat. 272, 328 (2001).  Therefore, the "regulations clarify the scope of Section 5330," which by its plain text covers a broad swath of activities, persons, and entities. E-Gold, 550 F. Supp. 2d at 96.

Freeman does not argue that this statutory language is vague or ambiguous, nor does he develop his argument beyond simply concluding that the language is "cryptic." Indeed, he does not offer an alternative construction, and even if he had, "genuine ambiguity requires more than a possible alternative construction." United States v. Jimenez, 507 F.3d 13, 21 (1st Cir. 2001).  He instead contends that because bitcoin did not exist in 2001, Congress could not have intended to confer on FinCEN the authority to regulate money transmitting businesses that use virtual currency.  See doc. no. 176, at 19-21.  But the court has already rejected that argument.  See supra, § III, A, 1 (quoting Yeskey, 524 U.S. at 212); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985) ("[T]he fact that RICO has been applied in situations not expressly anticipated by

Congress does not demonstrate ambiguity.  It demonstrates breadth."); United States v. Southwestern Cable Co., 392 U.S. 157, 172 (1968) (noting that while Congress could not have foreseen the development of new communications technologies when it passed the Communications Act in 1934, it gave the FCC broad authority to regulate such a "new and dynamic" field through the administrative process).  There is thus more than a "colorable textual basis" in § 5330 authorizing FinCEN to issue the interpretive guidance challenged here.  West Virginia, 142 S. Ct. at 2609.

With clear authorization from Congress to regulate (and require registration of) money transmitting businesses, FinCEN acted well within its long-established regulatory authority by issuing the 2013 Guidance.  That stands in stark contrast to EPA's actions in West Virginia, other recent major questions cases, and the purpose of the doctrine altogether.

The major questions doctrine purports to address a "particular and recurring problem:  agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  West Virginia, 142 S. Ct. at 2609.  For example, in West Virginia, the majority found that EPA was attempting to "discover in a long-extant statute an unheralded power" to "restructure the American energy market," which was a "transformative expansion of [its] regulatory authority."  Id. at 2610 (quoting Utility Air, 573 U.S. at 324).  EPA, through its rule, was effectively mandating energy generation by natural gas, wind, solar, or other non-coal-fired sources.  In that way, the EPA was not simply regulating pollutants or pollution emissions.  It was getting into the business of making policy judgments as to the makeup of the country's energy

production industry and effectively ordering the eventual shuttering of a major segment of the nation's existing power generation sources. EPA sought this "newfound power" in an ancillary provision of the Clean Air Act that "had rarely been used in the preceding decades." Id. And the agency's exercise of authority "allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." Id.

None of these factors is present here. FinCEN's guidance does not represent an expansion of regulatory authority into some unforeseen area of the economy or an area beyond the agency's normal expertise and subject matter. By regulating money transmitting businesses that use bitcoin, FinCEN is simply applying its existing regulatory authority to a different type of funds. Regulating money transmitting businesses that exchange bitcoin for fiat currency therefore fits squarely within FinCEN's "congressionally assigned mission and expertise." West Virginia, 142 S. Ct. at 2623 (Gorsuch, J., concurring).

Nor is FinCEN "attempt[ing] to deploy an old statute focused on one problem to solve a new and different problem," which "may be a warning sign that it is acting without clear congressional authority." Id. The "problem" here is neither new nor different and the statute has been used to solve these exact problems since its inception. The same could not be said in other recent major questions cases. For example, the CDC (a public health agency) did not have statutory authority to regulate the housing market through an eviction moratorium. See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs., 141 S. Ct. 2485, 2488-89 (2021). And OSHA (an agency charged with regulating workplace safety) did not have the authority to set the "broad public health

measure" of a COVID vaccine mandate.  See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin., 142 S. Ct. 661, 665 (2022).

Moreover, while Congress recently amended § 5330(d) to explicitly encompass businesses that transmit virtual currencies, it has not "considered and rejected" such bills in the past.  If it had, that would suggest that FinCEN was attempting a regulatory work around these prior legislative failures.  Congress instead amended the statute in 2021 to allow FinCEN "to continue" its regulatory objectives of "safeguard[ing] the financial system from illicit activity, counter[ing] money laundering and the financing of terrorism, and promot[ing] national security" and address the fact that criminals are "increasingly rely[ing] on [virtual currencies] . . . to move illicit funds." Pub. L. No. 116-283, 134 Stat. 3388, 4552 (2021) (emphasis added).  The amendment therefore reinforced and clarified FinCEN's existing regulatory authority; it did not create new, previously unrecognized authority.  As a result, to the extent the major questions doctrine applies to FinCEN's actions, the agency did not violate the doctrine's core principles.  Freeman's motion to dismiss and Rule 29 motion for judgment of acquittal on the unlicensed money transmitting business counts are therefore denied for these additional reasons.

**B.     Remainder of Freeman's motion for judgment of acquittal**

Freeman also moves for judgment of acquittal as to the remaining counts in the Superseding Indictment (Counts 3-8).  The court grants the motion with respect to the

money laundering count (Count 3) as detailed below, and otherwise denies the motion for the reasons stated on the record and in the prosecution's briefs and oral argument.[35]

The money laundering charge is brought under 18 U.S.C. § 1956(a)(3)(B), which makes it a federal crime for an individual:

> with the intent . . . to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . .  [,] [to] conduct[ ] or attempt[ ] to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity . . . .

As previously discussed, the prosecution charges Freeman with money laundering based on an undercover agent's August 25, 2020 transaction at one of Freeman's bitcoin exchange machines, located at Thirsty Owl in Keene, New Hampshire.  Freeman argues that the money laundering conviction cannot stand, as the prosecution did not provide sufficient evidence that Freeman knew that the August 25 transaction took place.

This argument hinges on the mens rea requirement that attaches to the criminal actus reus of "conduct[ing] a financial transaction."  On its face, the statute is silent as to whether conviction requires that the defendant have knowledge that a money laundering transaction occurred.  In construing criminal statutes, however, courts do not treat such silence as dispositive, given the "longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'"

---

[35] See Prosecution Objection to the Rule 29 Motion (doc. no. 266); Prosecution Response to the Rule 29 Motion (doc. no. 254); Trial Tr. Day 8 Morning (doc. no. 282) at 48:1-81:9 (oral argument on the Rule 29 motion).

Rehaif v. United States, 139 S. Ct. 2191, 2195 (2019) (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 72 (1994)).  Accordingly, where criminal statutes are "silent on the required mental state[,]" courts "read into [the] criminal statute[ ] . . . that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct."  Ruan v. United States, 142 S. Ct. 2370, 2377 (2022) (quoting Elonis v. United States, 575 U.S. 723, 736 (2015)).  Specifically, "the mens rea [courts] have read into such statutes is often that of knowledge or intent."  Id. (citing cases).  Applying this principle here, Freeman cannot be convicted of money laundering unless he knowingly conducted a prohibited financial transaction, which includes possessing knowledge that the August 25 transaction occurred.  Significantly, the prosecution agrees with this reading of the statute.  Indeed, the Superseding Indictment alleged that Freeman "knowingly conducted"[36] the August 25 transaction, and the jury instructions repeated the same language without objection from the prosecution.[37]

 Having established the culpable mental state required under the statute, the court turns to the evidence and the parties' arguments regarding its sufficiency.  The parties submitted briefs on the Rule 29 motion for acquittal following Freeman's conviction.  With respect to the money laundering count, the prosecution essentially argued that

---

[36] Doc. no. 139 at ¶ 31 (emphasis added).

[37] See Final Jury Instructions (doc. no. 256) at 31 ("Count 3 of the Indictment charges Mr. Freeman with the crime of money laundering.  The Indictment charges that, on or about August 25, 2020, . . . the defendant knowingly conducted a financial transaction involving property represented by an authorized agent of the United States government to be proceeds of unlawful activity . . . .").

Freeman participated in the August 25 transaction by giving the undercover agent permission to use the Thirsty Owl machine, with knowledge that the agent's purpose in purchasing bitcoin was to hide the source of illegal funds.[38]   The prosecution's initial briefing did not focus, however, on whether Freeman knew that the August 25 transaction actually took place, as opposed to whether it was intended to conceal or disguise.  Given that this is a close call, the court permitted the parties to submit supplemental briefing on this specific issue.

In its supplemental brief, the prosecution recognized that it must prove that Freeman "knowingly participated in a financial transaction" under the statute.[39] Tellingly, in reciting supporting evidence adduced at trial, the prosecution continued to focus on Freeman's grant of permission to the agent to use the machine and the intent to conceal illegal funds—not on Freeman's knowledge that the transaction in fact occurred.

For example, the prosecution pointed out, and the evidence shows, that Freeman told the agent about his bitcoin exchange machines and assured him that he could purchase large values of bitcoin through the machines anonymously.  Freeman also expressed that he had "general knowledge that his machines were used to launder funds and facilitate frauds."[40]  Further, after learning of the illegal source of the agent's funds,

---

[38] This "intent . . . to conceal or disguise the nature, location, source, ownership, or control of" the subject funds involves a second, specific mens rea under the money laundering statute.  18 U.S.C. § 1956(a)(3)(B).  Freeman does not argue that the evidence was insufficient to prove that element, and it is thus not the subject of this motion.

[39] Prosecution Supp. Br. (doc. no. 316) at 1.

[40] Id. at 5.

Freeman spoke cryptically about continuing to sell bitcoin to the agent.  Freeman asserted that he could not knowingly permit further transactions, and he placed emphasis on the word "knowingly," but he did not clearly and directly refuse to sell to the agent.  Viewing "the communications in their entirety," the prosecution argued that "it was a rational construction of the evidence for the jury to conclude that the defendant provided the officer with a wink-and-nod to use the machine when he said, 'I can't tell you that you can use [that].'"[41]

True enough.  But noticeably absent in the evidence presented at trial and highlighted by the prosecution is proof that Freeman knew that the August 25 transaction occurred.  Indeed, Freeman did not witness the August 25 transaction personally, as he was some miles away from where it took place.  Nor is there evidence showing, or creating the inference that, someone else (including the undercover agent himself) witnessed the transaction and informed Freeman of it.  Further, at trial, the prosecution presented financial records and documents seized from Freeman's home and home office.  If these records were in Freeman's possession and confirmed that the August 25 transaction occurred, the jury arguably could have inferred that Freeman possessed the requisite knowledge regarding the transaction.  But none of the records or documents confirmed this key fact, a required element of proof.

Further, the prosecution has not argued, and it would be a mistake to argue, that the evidence going to Freeman's knowledge of the concealment of the source of the

---

[41] Id.

subject funds implicitly proves knowledge of the transaction's occurrence.  Indeed, a person can have full knowledge of an individual's intent to conceal aspects of an upcoming transaction without ever knowing that the transaction took place.

In analyzing this deficiency in the evidence, the court bears in mind that the prosecution brought this charge based on an undercover operation.  In this context, the prosecution and the agent had ample opportunity to avoid this gap in their evidence by having the agent communicate with Freeman after the transaction took place, to confirm its occurrence.  By all accounts, such a conversation did not occur.  If it did occur, the prosecution presented no evidence of it.

In the face of this failure of proof, the prosecution attempts to salvage the money laundering charge through evidence of two occasions in January and February 2021, in which Freeman alerted his "confederates" over Telegram that large transactions were completed at bitcoin machines that were not the Thirsty Owl machine.[42]  The prosecution argues that "[t]he jury could infer [from these communications] that the defendant monitored the transactions into his machines and knew that a large transaction occurred on August 25, 2020."[43]  This evidence is not sufficient to support the conviction, and instead arguably cuts against the prosecution's position.  The absence of comparable evidence of Freeman's communications regarding the sizable August 25 transaction

---

[42] Doc. no. 316 at 6 n.2 (citing Trial Exs. 862, 863).

[43] Id.

weighs against the inference that he was either: (1) monitoring the machine that day, or (2) uncovered evidence that the transaction occurred.

As a final note, the court's analysis and conclusion are not disturbed or affected by the language in 18 U.S.C. § 1956(a)(3)(B) that makes it a crime to "attempt[ ] to conduct" a money laundering transaction.  The prosecution confirmed at trial that it did not charge Freeman with an attempted money laundering offense.[44]  And the Superseding Indictment did not track the statutory language by alleging that Freeman attempted to conduct a transaction under the statute.  Instead, it alleged that he knowingly conducted such a transaction.  Consistent with this, the prosecution does not argue that the evidence is sufficient to convict Freeman of an attempted offense, which would have required proof of Freeman's "intent to commit the substantive offense[,]" along with a "substantial step towards its commission."  United States v. Turner, 501 F.3d 59, 68 (1st Cir. 2007) (internal quotation omitted).

In sum, based on the above construction of the subject statute, with which the prosecution agrees, the money laundering count required proof beyond a reasonable doubt that Freeman had knowledge that the August 25 transaction took place.  The jury was ultimately left without sufficient evidence of Freeman's mental state on this matter. The court accordingly grants the motion for judgment of acquittal as to Count 3.

---

[44] Doc. no. 282 at 53:8-12.

IV.   **Conclusion**

For the reasons stated above, Freeman's oral and written[45] motions for judgment

of acquittal are GRANTED-IN-PART as to Count 3 and DENIED-IN-PART as to the

remaining counts.  Freeman's motion to dismiss[46] is DENIED.


   **SO ORDERED.**


   _____
   Joseph N. Laplante
   United States District Judge

Dated:   August 22, 2023

cc:   Georgiana MacDonald, AUSA
   Seth R. Aframe, AUSA
   John J. Kennedy, AUSA
   Michael T. McCormack, AUSA
   Mark L. Sisti, Esq.
   Richard Guerriero, Esq.

---

[45] Doc. no. 265.

[46] Doc. no. 176.