*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 8, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
UNITED STATES OF AMERICA                \*
                                        \*   1:21-cr-41-JL
              v.                        \*   December 20, 2022
                                        \*   1:38 p.m.
IAN FREEMAN                             \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF JURY TRIAL
DAY 9 - AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Government:            Georgiana L. MacDonald, AUSA
                               Seth R. Aframe, AUSA
                               John J. Kennedy, AUSA
                               United States Attorney's Office



For the Defendant:             Mark L. Sisti, Esq.
                               Sisti Law Offices



Court Reporter:                Liza W. Dubois, RMR, CRR
                               Official Court Reporter
                               United States District Court
                               55 Pleasant Street
                               Concord, New Hampshire 03301
                               (603)225-1442

```
1                        I  N  D  E  X

2

3   WITNESS:                 Direct   Cross   Redirect   Recross

4
    IAN FREEMAN              (Cont.)
5
      By Mr. Sisti              3                 103
6     By Ms. MacDonald                  39

7

8
    EXHIBITS:                        FOR ID            IN EVD.
9
    Defendant's Exhibit D-1                              27
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          THE COURT:  Ladies and gentlemen of the jury, did

3    you have any conversation with each other or anyone else during

4    the recess regarding the trial?

5          Were any of you exposed to any information regarding

6    the trial inadvertently or on purpose regarding the trial

7    during the recess?

8          Let's proceed, Mr. Sisti.

9          MR. SISTI:  Thank you, Judge.

10         THE COURT:  Mr. Freeman, you're still under oath.

11                    <u>CONTINUED DIRECT EXAMINATION</u>

12   <u>BY MR. SISTI:</u>

13      Q.   Ian, let me circle back a little bit.

14           We dealt with that so-called heroin dealer.  Just

15   generally, on any of these money laundering charges, did you

16   agree with anybody or any human being at all to launder money,

17   to take illegal steps in laundering money?

18      A.   I would never do that and I didn't do that.

19      Q.   Now, let me go back a little bit to the church

20   itself.

21           You were discussing some of the things you folks did

22   outreachwise --

23      A.   Yeah.

24      Q.   -- in the Keene and Cheshire County area.  Did you

25   also reach out to the Muslim community in that area?

1      A.    They reached out to us in the form of a gentleman

2  who was moving to the Keene area or was interested in moving to

3  the Keene area who I happened to know personally from the

4  festival that was mentioned earlier, the PorcFest, Porcupine

5  Freedom Festival.  His name was Will, and he's an imam, and he

6  approached me and was asking whether or not there would be a

7  space available for a Muslim group to gather in Keene.

8            There are Muslims in Keene and they have a space,

9  but it's very, very small.  And so he was aware of their

10  situation and was asking if the Shire Free Church could help

11  with that.  And we did.  The building next door to -- you heard

12  about the thrift store which became Route 101 Goods and then

13  now is a convenience store, the -- the Bitcoin Embassy is now

14  located next to the convenience store, but there is another

15  building next to it which is a home, but we converted the

16  living room of that home into a mosque and the imam and his

17  family moved into that home.  And then we also set aside a room

18  of that building for what we call the interfaith area.  So it

19  was both a mosque and an interfaith area.

20      Q.    So earlier in the trial there was some discussion as

21  shrines or meeting places with regard to the church.  Is that

22  one of the meeting places that you folks actually utilized?

23      A.    Yeah, it definitely was.  The questions that were

24  being asked earlier were regards to the parsonages, which don't

25  really have meetings going on, but this area was certainly

1    that.  It was an actual mosque.

2        Q.    And did you also gather at the -- the Embassy?

3        A.    Yes.  The Embassy was open and was able to host

4    multiple classes.  We performed Bitcoin 101 and, of course, the

5    Shire Free Church, being the property owner, also was the

6    co-founder of the Bitcoin Embassy.  And the whole point of that

7    was to help, again, continue with that outreach, spread the

8    word about bitcoin and how it can help bring peace.

9             And so, you know, it's easy to go online and look up

10   various information about bitcoin, but it's not so easy to find

11   someone who's willing to stand in front of a classroom

12   environment and actually teach you.  And that's what Chris

13   Reitmann did, who you all met earlier.  He would regularly host

14   Bitcoin 101 classes whenever anyone in the region wanted to

15   have one.  Free of charge.

16       Q.    Now, there's a number of different churches that

17   were mentioned during the course of the trial so far.  Let me

18   go through the list and tell me what your involvement is in

19   each one of these things.

20       A.    Sure.

21       Q.    New Hampshire Peace Church, what is that?

22       A.    New Hampshire Peace Church is just a trade name.

23   That means that it's just an alternative name for what I was

24   doing with the Shire Free Church.  And one of the reasons for

25   that was because it was difficult to open bank accounts under

1    the name Shire Free Church, we presume because they would do a

2    Google search on it and find that it was associated with

3    bitcoin vending machines and then immediately refuse to open

4    the accounts.

5           So that was the -- the New Hampshire Peace Church

6    was just another name for the Shire Free Church.

7      Q.    All right.  So let me -- let me make this clear.

8           Was the intent on opening up New Hampshire Peace

9    Church to be involved in any criminal activity whatsoever?

10     A.    No, of course not.

11     Q.    What was it -- what was the reason for that, quote,

12   trade name, period?

13     A.    For banking purposes.

14     Q.    And would that also hold true for the Church of the

15   Invisible Hand?

16     A.    No.  The Church of the Invisible Hand is a church

17   founded by my friend and cohost on Free Talk Live, Nobody, and

18   it has its own separate set of beliefs that he has spent a lot

19   of time working on.

20     Q.    All right.  So your involvement with the Church of

21   the Invisible Hand is what?

22     A.    Nobody and I also had an agreement regarding working

23   on LocalBitcoin so he could benefit his church and the Shire

24   Free Church could benefit our church operations as well.

25          However, Nobody is not a member of the Shire Free

1   Church and he's not a minister there because he doesn't adhere
2   to the same level of advocacy of peace for me to consider him
3   to be a minister there.  However, we will still work together
4   on the things and the issues that we agree on.
5       Q.   Reformed Satanic Church, what's that?
6       A.   That is a church founded by Aria DiMezzo, another
7   one of our cohosts.  She is a Satanist, which doesn't mean she
8   believes in the devil.  It's more of a humanist belief system
9   and if she were here she would be better at explaining it to
10  you.  But that's -- that's her church.  She had some severe
11  disagreements with the actual -- the original Satanic church,
12  so she founded the Reformed Satanic Church of Keene.
13      Q.   Okay.  I mean, is she involved with you in any way,
14  shape, or form?  What's the situation?
15      A.   We're on the air together on Free Talk Live three
16  nights a week and we work closely together.  And we also have
17  an agreement in regards to LocalBitcoins where the Shire Free
18  Church, similar to my friend Nobody, provided some funds for
19  her to work on that site for her church.
20      Q.   Did you refer people to her as well?
21      A.   I did refer some people to her.  At some point I got
22  to the point where I was not really wanting to spend much time
23  on doing LocalBitcoins things anymore.  I still had some of the
24  larger clients that I was servicing, but I would send most of
25  the smaller LocalBitcoins clients over to her at that point.

1    Q.   And --

2    A.   This is probably in 2020.

3    Q.   How about the Crypto Church of New Hampshire?

4    A.   Crypto Church of New Hampshire is yet another

5   program of the Shire Free Church in that case.  And in that

6   case, it's a little different from a trade name because we

7   actually did file for a nonprofit with the Crypto Church.  And

8   Renee and Chris were the two key ministers involved there and I

9   did make sure to have a conversation with both of them that I

10  didn't want them to open up this church, corporation, if --

11  this nonprofit if they didn't believe in God.  And so I did

12  have those conversations with them prior to that.

13       But I think it's important to differentiate

14  something here, and that is the difference between a church and

15  a corporation.  So the church is an idea that people create in

16  order to facilitate the worship of God and the understanding of

17  the nature of the universe.  You don't have to ask permission

18  to create a church.  And when you get a corporation, like a

19  New Hampshire nonprofit or an LLC, you are asking for

20  permission to do something in sort of this, for lack of a

21  better term, this legal land that the government operates in.

22       So when you see a corporation, you're not looking at

23  a church.  You're looking at a filed folder that's sitting in

24  the Secretary of State's office.  Those aren't churches.

25  Churches like Shire Free Church have corporations and the

1    reason we have corporations is to be able to do things in this

2    legal land where you have to have certain corporate structure

3    in order to buy a house, which we have; and you have to have a

4    corporation in order to, you know, open a bank account.

5           In fact, when you go to the IRS website and you

6    apply for an employee identification number or a tax ID number

7    there, there's a special category for church.  And when you

8    click on that category, there's an option that you only want

9    this number for banking purposes.  You can inform them of this.

10   Because they understand at the IRS that they don't regulate

11   churches and that we're not employees -- you know, we don't

12   employ people at our church.  So we don't -- we're not an

13   employer, but we have to have that number or we'll never be

14   able to open a bank account.  So --

15   Q.    Did you actually get that number?

16   A.    Uh-huh, yes, for the Shire Free Church as well as

17   Shire Free Church Monadnock, which is the nonprofit that we

18   have registered with the state of New Hampshire and have since

19   2013.

20   Q.    And that number would have been what again, so the

21   jury understands that?

22   A.    That's the employee identification number or tax ID

23   number or whatever terminology they are using.

24          As you may know from 2001, I think it was, when the

25   Patriot Act was passed, banks have required social security

1    numbers in order to open an account.  In the good old days, you

2    didn't have to do that but now you do.  So in order to open an

3    account under the name of the church, it has to have one of

4    these numbers.  So --

5         Q.   Okay.

6         A.   -- that's the only reason we applied for that.

7         Q.   So you applied for the number, the IRS has the

8    number, and it's the same IRS that never contacted you?

9         A.   The very same.

10             They did send one letter.

11        Q.   And what was that?

12        A.   This was in 2014, so long before the bitcoin thing.

13             They sent a letter in Spanish to four, I think,

14    different addresses that I had used over the years.  And I had

15    to translate it.  The Spanish letter was requesting that I

16    provide my updated address information to them.

17        Q.   And was it -- was it updated?

18        A.   I saw no reason to communicate with them.  It was

19    simply a request that said please.

20        Q.   And was it in Spanish, you said?

21        A.   The letter was in Spanish, yes.

22        Q.   Okay.  All right.  After -- after the 2014 Spanish

23    letter, were there any further communications from the IRS?

24        A.   No.  I had never heard from them.

25        Q.   And did you apply for these numbers that you needed

1   to get bank accounts between 2014 and 2021?

2       A.   That's correct.  I think we might have applied for

3   one in 2013 when we first formed the nonprofit.  Maybe.

4       Q.   Okay.

5       A.   But it's certainly when we wanted to open the first

6   bank account because we -- we had to.

7       Q.   All right.  So that was on record?

8       A.   It must be.  I mean, it's an instant system.  As

9   long as you do it during business hours, they kick the number

10  out to you immediately.

11      Q.   All right.  Let me get into some of the ins and outs

12  of the bitcoin vending machine.

13      A.   Sure.

14      Q.   The ones that the church operated, what was your

15  interpretation of your obligation concerning FinCEN and whether

16  or not it was money transmission?

17      A.   Zero obligation.  We did an extensive amount of

18  research about this, including hiring an attorney, Attorney

19  Seth Hipple, who did the research on this question and looked

20  into both -- looked into both state and federal regulations

21  regards to money so-called services businesses, which -- of

22  which money transmission is a subcategory to see if we not only

23  met the qualifications as a money transmitter, but also any of

24  the other money services business categories.  And he

25  determined that we did not and so, therefore, we didn't need to

1      do any of the requirements for those things.

2          Q.    Do you consider what you're doing with your bitcoin

3      machines transmitting?

4          A.    No, not at all.  And not to go too far into the

5      technical weeds with bitcoin, but when you actually start

6      learning about sort of the guts of how it operates, you would

7      learn that there's no transmission at any point.

8              Now, when you look at the -- sort of the terminology

9      that they would use if you had a bitcoin wallet, you would see

10     things like send and receive, but those are just words to help

11     communicate to the user sort of what's kind of happening.  But

12     it's not what's actually happening on the back end, which is

13     called the blockchain.  The blockchain is the public ledger

14     that is available for anyone to look at.

15             And on this blockchain is essentially -- it's also

16     a distributed ledger, meaning that it exists in thousands of

17     locations all at the same time.  And the brilliance of the --

18     one of the brilliances of the blockchain by Satoshi Nakamoto is

19     that you cannot cook the books with bitcoin.  There is no way

20     to falsify these bitcoin blockchain entries and that's because

21     they're constantly checking one other.  Each copy of the

22     blockchain is constantly checking against the other.

23             And so what happens when a bitcoin transaction

24     occurs is there's something called a UTXO, which stands for

25     unspent transaction output, and all of the bitcoin is

1    represented by these UTXOs which are associated with these

2    bitcoin addresses.  When a transaction is, quote, unquote,

3    sent, it doesn't actually move at all.  It stays on the ledger

4    and it doesn't even move on the ledger.  The UTXOs that are

5    relating to the coins that are being spent are simply destroyed

6    and re-created and associated with a different wallet address.

7         Q.    All right.  So there isn't actually any transmission

8    or transfer?

9         A.    At no point is bitcoin ever transmitted.  It stays

10   in the same place.

11        Q.    All right.  And, again -- and, in fact, the bitcoin

12   in your machines was actually owned by the church?

13        A.    That's correct.  It was donated to us and given to

14   us by various different people over the years.

15        Q.    All right.  So that -- those particular bitcoin

16   machines, in essence, were not owned by a business then, were

17   they?

18        A.    No.  The bitcoin machines were owned by the Shire

19   Free Church which is a religion.  It's a church.  It's not a

20   business.

21        Q.    Now, we did mention briefly and the Government's

22   mentioned on a number of occasions this FinCEN email from 2018.

23   Do you recall that?

24        A.    I do recall it.

25        Q.    And did you actually see such a thing back in 2018?

```
1         A.    Yeah, I did see it.  It came in to sort of one of
2    these catchall email addresses.  If you were to go to the
3    website coinatmradar.com back in those years, you would see
4    the -- sort of a map of where bitcoin vending machine locations
5    are all around the planet.  And, of course, in New Hampshire as
6    well.  And then if you were to look at each of those machines,
7    it would tell you who the ostensible operator of those machines
8    was.
9         And so what it seemed like had happened with the
10   FinCEN letter, it seemed like somebody in FinCEN in DC went to
11   this website, pulled off all of the contact emails for every
12   bitcoin vending machine operator that they couldn't find a file
13   on, sent them all into the same email and shot out a mass email
14   to all of those people.  They didn't know who they were sending
15   it to.
16        Q.    And what was your impression when you received such
17   a thing?
18        A.    I was immediately suspicious.  I had never received
19   an official government email communication like that before.
20   Normally when -- you know, my experience, when a government
21   agency, whether it be a federal or state or local government
22   agency, wants to communicate with you, they send you mail.  And
23   if they really want to communicate with you, they make sure
24   they send registered mail so you have to sign for it somewhere
25   so they know that it didn't get lost or whatever.  The idea
```

1   that somebody would send a communication through email seemed

2   suspicious.

3          I actually thought there was a chance it may have

4   been a scam artist that was sending that email, but presuming

5   it was actually FinCEN, I discarded it simply because I knew

6   that we weren't required to register with them.

7      Q.   And then there's been some discussion during the

8   last couple of weeks about the ages of your -- I guess

9   individuals that you transacted some of these bitcoin purchases

10  and so forth?

11     A.   Sure.

12     Q.   What -- what is the age group that you deal with?  I

13  mean, do you -- do you have any idea?

14     A.   I have been involved with bitcoin purchases from all

15  age ranges and especially so on LocalBitcoins.com.  That's

16  probably the reason why they didn't go through that folder,

17  because there's a bunch of people in there that are of all

18  different ages.

19     Q.   Yeah, what was the folder that they went through and

20  did the median age on?

21     A.   They did the Telegram folder, which was a subset of

22  people who I had met on LocalBitcoins.com that wanted to trade

23  off of LocalBitcoins.com because we had had trades together and

24  they knew that I was reliable and they wanted to trade off the

25  site because LocalBitcoins takes a fee.  And so I was able to

1    lower my fee to them on Telegram to give them a better rate for

2    direct trades.

3         Q.    So you were actually giving them a better deal going

4    to Telegram?

5         A.    That's correct.

6         Q.    Your fee was being reduced by going to Telegram?

7         A.    That's right, yes.

8         Q.    And the median age that was represented by the

9    government, does that have any basis in reality at all?

10        A.    As far as all of my bitcoin buyers, no, not at all.

11   But, ultimately, people who are older tend to have more money

12   to spend and they want to get into different things just like

13   anybody of any age.

14        Q.    Okay.  When you were dealing with the banks, did you

15   ever have conversations with some of these bank presidents

16   about bitcoin and whether or not you had any obligations

17   whatsoever to even tell them the kind of business you're in?

18        A.    I actually had a really interesting discussion with

19   one bank president.  Because as I mentioned before, whenever a

20   bank would break up with us, it would always be a -- especially

21   if it was a corporate bank, it would always be like a terse

22   letter of, you know, such and such bank, we're going to

23   terminate our relationship with you based on our terms of

24   service, goodbye.  And if you tried calling the service line

25   and asking them, well, why, they wouldn't say.

1          And TD Bank, they have what's called the demarketing

2     department.  So you've probably heard of a marketing

3     department, but the demarketing department is the department

4     designed to break up with you.  And they weren't very helpful.

5     They were very robotic.

6          So I received some number of these breakups over

7     time and then we had a bank account at Savings Bank of Walpole,

8     which is a more local bank in the Keene area.  And in this case

9     when I got the breakup letter, it was actually signed by the

10    bank president.  And it had his phone number, his office phone

11    number, was at the bottom; if I had any questions, I could

12    call.  I had questions.  Because at this point I had had very

13    little interaction with any banker willing to tell me anything

14    about why they were ever closing my accounts.

15         So I called him up, left a message, and I scheduled

16    an appointment.  And Chris Reitmann and I, you know, we put on

17    suits and we went into the bank and sat down with this bank

18    president for more than an hour and had a really interesting

19    conversation with him where he revealed that he's quite

20    intimidated by the federal government and all their

21    requirements.  And even though he's not against --

22              MS. MACDONALD:  Objection, your Honor.

23              THE COURT:  Yeah, sustained.

24    Q.   You don't have to go through the ins and outs of the

25    conversation, but what was the result of that meeting?

1      A.    Well, what I learned was that even though bitcoin

2  wasn't illegal, right, like he understood that, I learned that

3  he didn't feel comfortable --

4            MS. MACDONALD:  Objection, your Honor.

5            THE COURT:  Yeah.  It's hearsay.

6            MR. SISTI:  All right.

7            THE COURT:  Unless there's a different purpose for

8  which you're offering it.

9      Q.    Ian, after the conversation with bank presidents,

10 were you able to go to banks and say, hey, I want to open an

11 account, I want to do it for bitcoin?

12     A.    Oh, no.  Banks have -- most banks have no interest

13 whatsoever in dealing with bitcoin.  At one point I actually

14 called all of the banks and credit unions in the Manchester

15 area.  I used, you know, Google Maps and looked at all of them.

16 And I called every single one of them and I asked them, I said,

17 I'm interested in opening an account.  And I didn't tell them

18 exactly what I was going to do, but I just said it would be in

19 regards to bitcoin.  I just brought up bitcoin and told them

20 that the account would have to do with, you know, something in

21 regards to bitcoin.  And every single one of them told me no.

22     Q.    Okay.  So let me ask you something.

23           On -- on the -- on some of the receipts and some of

24 the writing that was on some of the transactions, there would

25 be quotes like for investment purposes.

1      A.    Uh-huh.

2      Q.    Okay?  Would that be an accurate representation?

3      A.    I think a lot of people believe that bitcoin is a

4 good investment.  The last decade, bitcoin has been the best

5 investment of all potential investments that you could possibly

6 have made in the last decade.

7      Q.    How about writing that says rare coins?  What was

8 that all about?

9      A.    Yup, that's absolutely true with bitcoin.  So in

10 bitcoin, there's a maximum.  There's -- Satoshi decided there

11 should be no more than 21 million bitcoins ever issued.  Right

12 now I think we're getting close to 19 million that have come

13 out, so every ten minutes, roughly, the bitcoin miners will

14 mine what's called new block onto the blockchain and that block

15 contains roughly the last ten minutes' worth of transactions.

16 And then once it's mined onto the blockchain, it's there

17 permanently.  It cannot be removed.  It's a permanent record.

18         But with each block that is mined into existence,

19 there's what they called a block reward that comes out.  And

20 this is how the miners are awarded for their efforts, which is

21 a very expensive effort.  They have to have very specific

22 computer hardware that has to work very hard at solving very

23 complex math problems.  And only one miner can receive the

24 block reward.  It's the one that sort of finds the block or

25 mines that block into existence.  And that -- that reward

 1    reduces over time.

 2         Q.   Okay.

 3         A.   So when bitcoin first started in 2009, it was 50

 4    bitcoins per block which, of course, in the beginning was worth

 5    zero and then basically I think every three to four years, the

 6    bitcoin block reward cuts in half.  So it went down to 25 and

 7    then 12 and a half and it is currently at 6.25 bitcoin per

 8    block.  And then next year I think sometime it's going to cut

 9    in half again.

10         So those coins are -- I forget what the original

11    question was.

12         Q.   Yeah.  Were they -- are they rare coins?

13         A.   Yeah.  Okay.  Thank you.

14         So the total number is 21 million and so slowly,

15    over time, the number of bitcoins that is coming out every ten

16    minutes is going down over the years to where we probably will

17    get to 21 million sometime in 2140 or, you know, roughly a

18    hundred years from today.

19         And so if you look at the rarity of the number 21

20    million -- a friend of mine gave me an example years ago.  He

21    said that somebody somewhere calculated that in the world

22    there's only like roughly 40 million millionaires in the world.

23    So there's not even enough bitcoin to give every millionaire a

24    whole bitcoin.  So it is quite rare.

25         Q.   Okay.  How about --

1        A.    And everyone calls them coins.

2        Q.    How about when people would write "donation" on that

3    receipt?  What would that be all about?

4        A.    Well, everything that we were doing was for the

5    benefit of the Shire Free Church and its mission.  And I don't

6    know if you all noticed, but when they put the trade -- the

7    trade terms for LocalBitcoins up that I had on my account under

8    the About Me section, it talked about that this is a church

9    project, that everything that is earned from this is going

10   right back into the church, its outreach programs and such, and

11   in order to open a trade on LocalBitcoins, the rule is you have

12   to read the terms of the trade.  So they must have known if

13   they were opening a trade that this was for church reasons.

14       Q.    Okay.

15       A.    Oh, and also it was mentioned on the bitcoin vending

16   machines in the terms and service as well.

17       Q.    So that was open and out there for the public?

18       A.    Absolutely.

19       Q.    And that would have been known or should have been

20   known by everybody that engaged in that transaction with you?

21       A.    It should have been, yes.

22       Q.    I want to go to the beginning of this case.

23             Well, let me stay on one thing because -- I want to

24   stay on one subject.

25             I'm going to refer you to -- it's just marked for ID

1   now, but Defendant's C-2 through C-4.

2           And if I told you that it had to do with feedback

3   for FTL_Ian, would you be familiar with something like that?

4       A.   Yes, I'm quite familiar with my user feedback on

5   LocalBitcoins.

6       Q.   And why would you be familiar with it and why would

7   it be important to you?

8       A.   Well, as a top-rated seller on LocalBitcoins, I

9   achieved what they call the pro level simply because of the

10  volume of trades that I had done.  I am certainly concerned

11  with what people think of how I've performed.  I mean, did I do

12  a good job?  I'd like to know.  And so I would regularly review

13  the feedback that was left.

14      Q.   All right.  And how much feedback did you get?  I

15  mean, do you even have any estimate?

16      A.   I know because I reviewed it before the trial.  Over

17  1,400 positive ratings and a handful of negatives and what they

18  call neutral ratings as well.

19      Q.   Let me show you what's been marked as Defendant's

20  C-2, C-3, and C-4, and ask you if you can identify these for

21  the jury.

22      A.   Okay.  C-2 is, I believe, 70-something pages of

23  positive feedback from my LocalBitcoins account.

24           C-3 is a whole one page of neutral feedback that I

25  received.  And this is in the four years, five years, that I

1    had the account.

2              And then a less than half a page of negative

3    feedback is C-4 on this exhibit.

4              MR. SISTI:  Your Honor, I'd ask that these be marked

5    as full exhibits at this time.

6              MS. MACDONALD:  Objection, your Honor.  These

7    contain statements of the customers that are not offered for a

8    purpose other than hearsay.  He can certainly testify about

9    this generally and the amount of reviews he received, but to

10   introduce the statements of the customers would be hearsay.

11             MR. SISTI:  It's the number of reviews -- it's the

12   number of positive reviews versus the number of negative

13   reviews over a four-year period that is critical during the

14   course of this case that is claiming --

15             THE COURT:  Well, I need to see it.

16             MR. SISTI:  Okay.  I can bring it up.

17             THE COURT:  Sure.  Or you can pass it -- however you

18   want to do it.  Do I have a copy?  Because I have government

19   exhibits.  I don't think I have a copy of --

20             MR. SISTI:  You may not.

21             THE COURT:  Okay.

22             MS. MACDONALD:  Your Honor, to be clear, he just

23   testified to all the things Mr. Sisti said he would be using it

24   for, so I --

25             THE COURT:  That's true.

1          MS. MACDONALD:  -- would have an objection to that.

2          THE COURT:  Thank you.

3          Oh, I see.

4          Is D-1 part of the -- oh, sorry.

5          So this is Internet feedback regarding the business.

6          MR. SISTI:  Uh-huh.  And it's used -- I mean, I

7  don't want to continue with the --

8          THE COURT:  I'm just -- I'm trying to understand --

9  I mean, he has testified about it, but the -- the problem is

10  this is a lot of statements by looks like maybe hundreds of

11  people and I certainly can't admit it for its truth.

12          MR. SISTI:  Doesn't have to be.

13          THE COURT:  So what do you -- so what are you

14  offering it for?

15          MR. SISTI:  It doesn't have to be admitted for the

16  truth of the matter.  It's asserted in the anonymous names that

17  are there.

18          THE COURT:  Yup.

19          MR. SISTI:  But as the business record that he

20  actually keeps in order to sustain his business and fine-tune

21  his business and make sure that he's on the up-and-up with his

22  client base, that's what he does regularly.  I can get that

23  out.  I can -- that's part of his business, what he does.

24          THE COURT:  Yeah.

25          MR. SISTI:  It's part of the church business and

1     that's how he --

2          THE COURT:  I'm going to allow it as records he

3     maintains for running his business.  They appear -- they

4     definitely appear to be business records.

5          Do you have any authentication objection?

6          MS. MACDONALD:  Well, I don't think that the

7     defendant --

8          THE COURT:  Yeah, he hasn't laid a foundation for

9     their authenticity yet, but that's not -- your objection was

10    hearsay.  And I'm not going to allow it for its truth, but they

11    are records of the business that a business would normally

12    maintain to, you know, assess customer opinions.  And it can be

13    admitted for that purpose.  And I can give a limiting

14    instruction, but before we get to that, I need to know if you

15    have any other objection.

16         MS. MACDONALD:  Yes, your Honor.  That business

17    would be localbitcoins.com, not the defendant's business.

18         MR. SISTI:  It's his business with --

19         THE COURT:  Wait a minute.  Don't --

20         MR. SISTI:  Sorry.

21         THE COURT:  Yeah.  That business --

22         MS. MACDONALD:  Localbitcoins.com would have to

23    authenticate these records.  That's where these come from.

24         THE COURT:  Right.  Isn't that Mr. Freeman?

25         MS. MACDONALD:  Localbitcoins.com is a Finnish

1    company that keeps those records.  That -- he took them off a

2    website, but that's not sufficient to authenticate those

3    records.

4              THE COURT:  That's true.

5              MR. SISTI:  They're directed to his business.

6              THE COURT:  Directed to, though.

7              I'm not going to admit these yet.  We're going to

8    have to take it up at the break and we'll have the argument

9    then.

10             But for now -- you can continue with your

11   examination but I'm not admitting that yet.

12             MR. SISTI:  Thank you.

13        Q.   And let me show you another defendant's exhibit,

14   D-1.  Let me ask you if you know what that is.

15        A.   Yes, I do.  This is the church website from the

16   Shire society site, church.shiresociety.com.

17        Q.   Okay.  And just what is it?  Not what is in it, but

18   what is it?

19        A.   This is a statement of -- all about the church, the

20   church's mission, the church's declaration, its virtues,

21   various different statements about how to become ordained and

22   that sort of thing.

23        Q.   And that's out there for the public so they can

24   educate themselves on your church?

25        A.   It is.

1          MR. SISTI:  And I'd like to strike the ID on D-1 at

2     this time, your Honor.

3          THE COURT:  D-1?

4          MR. SISTI:  D-1.

5          MS. MACDONALD:  That's fine, your Honor.

6          THE WITNESS:  Can I say something to clarify on

7     that?

8          THE COURT:  Admitted.

9          MR. SISTI:  Thank you.

10             (Defendant's Exhibit D-1 admitted.)

11          MR. SISTI:  Can we call that up on the screen,

12     please?

13     Q.    Okay.  D-1.  Now, you testified a little bit earlier

14     today about, you know, your declaration, your mission, and that

15     sort of thing.  I want to make it clear as to what it is.

16             Is this D-1 full exhibit, the declaration, mission,

17     unification in diversity, maxim, virtues, is that what is

18     intact now and is that what has been intact for years?

19     A.    Yeah, I believe this was printed within the last few

20     weeks and it has been relatively similar for some time.  It may

21     have been expanded slightly over the years.

22     Q.    All right.  And can you -- can you tell the jury,

23     can you -- can you read the declaration of your church?

24     A.    Certainly.  The Shire Free Church offers a sanctuary

25     for those seeking an escape from state churches.  The Shire

1   Free Church is an interfaith diverse group of people who may

2   not share identical theological beliefs.

3           As a member in or minister of the Shire Free Church,

4   you are a sovereign individual and may be the faith of your

5   choice whether it be Christian, Muslim, Hindu, Buddhist,

6   Daoist, Jewish, Quaker, et cetera, or following your inner

7   light.  Monotheists, polytheists, pantheists, panentheists, and

8   atheists are all welcome as long as you are peaceful.

9           The Shire Free Church was organized in Keene in the

10  year --

11          THE COURT:  You've got to really slow down when

12  you're reading.

13          THE WITNESS:  The Shire Free Church was organized in

14  Keene in the year 2013 and serves all of the shire.

15      Q.   And does your church have a mission, and what would

16  that be?

17      A.   We don't claim to have all of the answers.  We are

18  open to all peaceful people.  We want to learn from each other.

19  It is our mission inspired by God, Allah, the universe, and the

20  inner light, to foster peace.

21          We understand that in order to have peace in the

22  world, one must have it inside oneself first, the purification

23  of the soul, as our Muslim friends call it.

24      Q.   And is there a statement of beliefs as well?

25      A.   There is, the unification and diversity.

1          What unifies the Shire Free Church and its diverse

2   members is peace, love, and liberty.  There are many paths to

3   God, one for every individual.

4          The Shire Free Church does not define a specific

5   path beyond those parameters that must be your foundation,

6   peace as your way, love as your guide, and liberty as your

7   light.

8          Q.   And a maxim?

9          A.   Be the best you can be and harm no other in his

10   person or property.

11          Q.   Okay.  Now, has this been the common theme since the

12   beginning of the church, since the inception?

13          A.   It has.

14          Q.   And then does it give, on the second page,

15   instructions on how to visit and join the Shire Free Church?

16          A.   It does.

17          Q.   All right.  And is that -- it's laying out any and

18   all requirements there may be and how to get in touch?

19          A.   Correct.

20          Q.   And it lays out for the public how to contact a

21   minister, an ordination of ministers, and church locations,

22   correct?

23          A.   Yes, it does all of those things.

24          Q.   Okay.  And, again, when was that first put before

25   the public, if you recall?

1       A.    Many years ago, probably shortly after the church

2   was formed in 2013.

3       Q.    So it's been in existence since 2013?

4       A.    That is correct.  The church has.

5       Q.    Yes.

6       A.    I can't say if the website was 2014 or exactly when

7   that happened.

8       Q.    We were showing the Court and offering Exhibits C-2,

9   C-3, and C-4.

10      A.    Uh-huh.

11      Q.    Were those documents that you kept or reviewed in

12  your day-to-day business?

13      A.    I did review them.  I wouldn't use the term business

14  for what we were doing, but I think it's important to point out

15  I did not keep those records.  Those records are kept by

16  LocalBitcoins.  I do not have any ability to edit those

17  records.  Those are -- much in the same way that you might see

18  an eBay rating for someone, those are completely done without

19  my involvement.  At the termination of a trade on

20  LocalBitcoins, the person who did the trade has the option to

21  leave feedback.

22            I can also leave feedback for the buyer, which I

23  did, but those are the feedbacks that were left for me by those

24  people.  I cannot go in and delete, I have no editing ability

25  over those, and if we need to verify it, we can pull up the

1  website live here.

2      Q.   Why do you review these --

3          THE COURT:  Listen, listen.  I'll decide what we do

4  here.

5          THE WITNESS:  All right.  Just a suggestion.

6          THE COURT:  I don't need any suggestions.  Just

7  answer his question.

8      Q.   Why do we -- why do we look at these?  Why do you

9  review these?

10     A.   As somebody who wants to provide good service, I

11  want to make sure that the people who are buying are happy and

12  I want to know if I've made any mistakes or if there's anything

13  I can do to make something right that hasn't been brought to my

14  attention.

15     Q.   And, again, how many positive feedbacks?

16     A.   I believe it was over 1,400 or 1,379, somewhere in

17  that ballpark.

18     Q.   And negative feedbacks?

19     A.   Negative was around five and then there was neutral

20  which I think was 14.

21     Q.   And these would have been entered into this

22  particular collection of data without your influence

23  whatsoever, correct?

24     A.   That is correct, beyond the influence of being good

25  at what I do.

1      Q.    Now, part of that peace -- or part of the mission

2  of the church has to do with being peaceful, nonviolent,

3  understanding.  Is that kind of it in a nutshell?

4      A.    Absolutely.

5      Q.    All right.  So that would have been --

6      A.    Love, peace, forgiveness.  Sorry.

7      Q.    If anybody wanted to know about your church, they

8  could have pulled that right up, Googled that, and taken a look

9  at it, right?

10     A.    They certainly could.  They could also call my radio

11 show and talk about it.

12     Q.    And if anybody wanted to know about you or the

13 people involved in your church, including the people in your

14 house, they could have checked that out as well?

15     A.    Yeah.  It's not hard to learn who lived in my home.

16     Q.    All right.  Was anybody living there secretly?

17     A.    Certainly not that I'm aware of.

18     Q.    Was anybody living in your home with a violent

19 record of any kind?

20     A.    Definitely not.  They mentioned early --

21     Q.    On March 16th, 2021, you were awakened in the early

22 morning hours and I want to bring you back to that for a

23 second.  Okay?

24           Do you remember that?

25     A.    Oh, I remember it quite clearly.

1      Q.    There was testimony from an agent that claims that

2  the normal course of business when a search is supposed to take

3  place is that there's supposed to be an announcement, a

4  call-out, I believe is what the statement actually was.

5           Do you recall any call-out in the early morning

6  hours of March 16th, 2021?

7      A.    I was asleep at the time of roughly 5:00 a.m., 5:13,

8  when they arrived.  I don't recall hearing any such thing

9  happen and my friend Nobody, who was awake at the time, never

10  reported that to me.

11      Q.    What was the first thing you recall that morning?

12      A.    I was awoken by the sound of smashing glass, coming

13  from the first floor, what sounded, of my home.  I was sleeping

14  on the second floor with my then girlfriend Bonnie at the time.

15  And we were obviously quite shocked to be awakened by that.

16           My first thought was maybe someone had thrown a

17  brick through the front window.  Every now and then we would

18  have teenagers that would steal the peace flag that was hanging

19  on the porch.  You might have seen that in one of the video

20  clips.  And that flag had been stolen on a number of occasions.

21           And we had security cameras on the house.  In

22  reviewing the footage, we'd seen teenagers steal that flag over

23  the, you know, the last several years on a number of occasions.

24  So I just -- I figured, you know, that was what happened,

25  somebody chucked a brick through the front window.

1    And I continued to hear noise from downstairs, got

2  up, put a robe on, and as soon as I opened the door to the

3  stairwell, I noticed that there was a very loud noise coming

4  from downstairs.  And it turned out it was a drone that was

5  flying inside of my home, just hovering inside of my home, and

6  that was when I was shouted out -- shouted at by what appeared

7  to be men with guns outside of the -- what was a window and was

8  now a gaping hole on the side of my home by the front door

9  where they had torn out the window after smashing it.

10    Q.    I mean, were there any bars on your windows or --

11    A.    No, this is Keene, New Hampshire.  I don't know if

12  anyone has bars on their windows.

13    Q.    All right.  Did anybody in your home resist anything

14  from what you recall?

15    A.    No.  You know, we came downstairs with our hands up

16  as instructed.  And my girlfriend was completely naked at the

17  time, so I did request that she be able to go back upstairs and

18  put her robe on, which she was allowed to do.

19    Then we continued down the stairs and halted because

20  there was broken glass everywhere and they wanted us to walk

21  outside.

22    So -- and we also had Cocoanut, our dog, which I had

23  in my arms at that point.  They allowed me to pick him up so he

24  didn't have to walk across the glass.  We were able to dump the

25  glass out from our -- inside of our shoes, because it was right

1    in the entryway where all the shoes are, and put the shoes on

2    and then exit the home.

3        Q.   Okay.  There were four of you, total, in the home at

4    the time?

5        A.   On our side it would have been me and Bonnie and

6    then Matt Roach and our dog Cocoanut.

7        Q.   On that side there would have been three and a dog.

8             Matt Roach, any violent history that you're aware

9    of?

10       A.   No, I've never heard of such a thing.  In fact, I

11   happen to know that Matt is a registered gun owner with the

12   federal government.  He's gotten all kinds of permits for the

13   various different things that he owns.  So they certainly knew

14   that he had no criminal history.

15       Q.   All right.  And who lived on the other side of the

16   house?

17       A.   My good friend Nobody and his roommate Calvin.

18       Q.   All right.  So all of you were -- were all of you

19   taken into custody that night?

20       A.   Everyone was detained until they could clear the

21   building and make sure there was, you know, not somebody hiding

22   out or something in there.

23       Q.   And was -- was there any reason that you could

24   ascertain as to why they were destroying your surveillance

25   equipment?

1      A.     Well, I mean, I -- I could speculate as to their

2   reasons, but it doesn't seem like they wanted to be seen doing

3   what they were doing.

4      Q.     Is there any off-site, you know, monitoring of your

5   house?  I mean, do you have some special militia group keeping

6   an eye on you or something like that?

7      A.     Certainly not.  The cameras were hooked up to

8   recording devices, DVRs, that were located in the basement of

9   the other side of the house, so on Nobody's side of the house,

10  was where the recording decks were and they took those decks.

11  And, thankfully, they did return those.  A year later.

12     Q.     Did you -- was there -- was there anybody that gave

13  you any reason for smashing out windows and doors and throwing

14  a flash bang grenade onto your porch?

15     A.     The flash bang wasn't thrown on the porch.  It was

16  thrown on the back end of the house over by the garage, at

17  least according to the video, which was nearby where I was

18  asleep on the -- the upstairs room.  And it seemed -- based on

19  the time codes of the video, it seemed that all those things

20  happened at one.

21          So if you watch carefully, you'll see that the flash

22  bang is thrown and basically right when that happens is when

23  they smashed in the windows on both my side and on Nobody's

24  side.

25          On his side they used a BearCat with a battering ram

```
 1    to smash his window in and I'm not sure what they used on my
 2    side.
 3         Q.   But there was no call-out?
 4         A.   Oh, not that I could hear and I certainly -- you
 5    know, if there was, they didn't give us more than ten seconds.
 6         Q.   Okay.
 7         A.   And you can look at the video.  It doesn't seem like
 8    anyone has a megaphone in their hands.  The guys on the front
 9    porch had like a claw hammer that I think that they used to
10    smash in the front windows.  I had two of my windows smashed,
11    including the front window to the studio and the window on the
12    side of the house.
13              They were carrying a lot of guns, but no megaphone.
14         Q.   All right.  Let me jump ahead.
15              One of the counts is the tax evasion count.  We've
16    gone over this a little bit.
17         A.   Uh-huh.
18         Q.   And you've already discussed with the jury that you
19    received no letters or no notification of any arrearages or
20    owed taxes or anything like that?
21         A.   No communications in that way at all.
22         Q.   I mean, did anybody in person call you or anything
23    like that?
24         A.   I've never heard anything directly from any IRS
25    agent.
```

1       Q.    Did you file any documents with the IRS, any false

2    documents or anything like that?

3       A.    No.  I did not believe I had any obligation to file

4    documents as churches under the IRS rules don't pay taxes.

5       Q.    So was that one of the reasons you weren't filing

6    returns?

7       A.    That's correct.

8       Q.    Okay.

9       A.    Based on my research of the IRS codes and their

10   publications, they do not require churches to file anything.

11      Q.    And did you have a source of income other than the

12   support you were receiving from the church?

13      A.    I don't have income because I live at the support of

14   the church.  It sustains me.

15      Q.    At any point in time over the past nine years or so,

16   were you attempting to do anything illegal?

17      A.    Not to my knowledge.

18      Q.    And to your knowledge, did you in any way, shape, or

19   form conspire with others for any illegal act?

20      A.    I think I may have smoked some cannabis at some

21   point over the past nine years.

22      Q.    And that's about it?

23      A.    That's about it.

24            MR. SISTI:  I have nothing further.  Thank you, Ian.

25            Your witness.

```
1              THE COURT:  Cross-examination.

2              MS. MACDONALD:  Thank you.

3                        CROSS-EXAMINATION

4   BY MS. MACDONALD:

5       Q.   Good afternoon, Mr. Freeman.

6       A.   Hello.

7       Q.   So, Mr. Freeman, we have established that you call

8   yourself a minister, right?

9       A.   Yes, that's right.

10      Q.   Of the Shire Free Church; is that right?

11      A.   That's correct.

12      Q.   Okay.  And Mr. Sisti just recently showed us your

13  church website, right, a printout of your church website?

14      A.   That's what that was.

15      Q.   Okay.  And did you write that?

16      A.   I did with a -- with some others.

17      Q.   Okay.  And you heard Hope Cherry testify that banks

18  will research the businesses that open accounts with them,

19  right?

20      A.   Yeah, that's their job.

21      Q.   Okay.  That would include things like Google

22  searches of businesses?

23      A.   It would seem that would be step one for them, I

24  would think.

25      Q.   Okay.  And you have a nightly radio show, Free Talk
```

1    Live, right?

2         A.    Yes, seven nights a week.

3         Q.    And that -- you get calls in to that radio show from

4    various listeners, right?

5         A.    Of course.  It's an open phone show.  Anyone can

6    call in.

7         Q.    Okay.  And because it's an open phone show, people

8    can call in to talk about whatever they want, right?

9         A.    Absolutely, including undercover agents.

10        Q.    Okay.  And you -- you don't prepare for it, because

11   you don't know what the topics are going to be, right?

12        A.    That's part of the fun, yeah.

13        Q.    Right.  And so you're -- you're good at that; you're

14   a good talker, right?

15        A.    Precisely.  I'm quite practiced at talking on the

16   radio.  I've been doing it since I was 17.

17        Q.    And on your show you often talk about current

18   events, right?

19        A.    Yup, that's right.  It's an open phones talk show

20   and so current events are usually the issue of the day.  But

21   sometimes we talk about theology and various other topics.

22        Q.    Okay.  And, for example, on Friday night of this

23   week, the topics on your radio show included car companies

24   adding ridiculous subscription fees, right?

25        A.    Yup, that sounds like something we talked about

1    recently.

2         Q.    And Trump's superhero NFT, right?

3         A.    Yeah.  That was a very silly story, but, yeah, we

4    covered that, too.

5         Q.    And the Griner trade for Bout, right?

6         A.    Yes, the gunrunner from Russia, yeah.  That's right.

7         Q.    And another thing from the description of the show

8    was 25 Oregon counties reprohibit mushrooms, right?

9         A.    They did, sadly.

10        Q.    And you talked about online bullying?

11        A.    Yup, that sounds right.

12        Q.    And then something called Edgington Post Serbian

13   Prince Philip, correct?

14        A.    That wasn't actually on the radio show.  The

15   Edgington Post is something that comes in only on our podcast.

16   So radio listeners didn't hear that segment.

17        Q.    Okay.  But those are generally the -- an example of

18   some topics that you talk about on the radio show, correct?

19        A.    That is one night's worth of topics, yes.

20              THE COURT:  Let's make sure we let each other

21   finish, mostly to give the reporter a little beat to catch up.

22              THE WITNESS:  Sure.

23        Q.    Mr. Freeman, you call this radio show your outreach

24   ministry, right?

25        A.    That's correct.

1      Q.   And you've testified today that your parsonage is

2  at -- is at 73 Leverett Street, correct?

3      A.   That's correct.

4      Q.   That's where you live?

5      A.   That's right.

6      Q.   And it's also where you broadcast the radio show

7  from, right?

8      A.   Yes.

9      Q.   And you purchased that property and you donated it

10 to the church, correct?

11     A.   Yes.  I purchased it in 2006 before I moved to

12 New Hampshire.

13     Q.   And you tried to get the city of Keene to exempt you

14 from paying property taxes on that building, right?

15     A.   We did put in one of those requests on a few

16 different years in a row, yes.  Ultimately they rejected it,

17 unfortunately, which would mean we would have had to have sued

18 them in civil court and at the time we didn't have the funds

19 and the willingness to go about that process.

20     Q.   Okay.  And so you asked for the exemption based on

21 it being a religion -- a religious location, a parsonage or the

22 location of the church, correct?

23     A.   Correct.  The church owns those building -- that

24 building.

25     Q.   Okay.

1    A.    And that is the reason for the exempt request.

2          However, as you may understand, being a newer

3    religion is not exactly an easy thing to do.  Had we been a

4    Muslim religion or a Christian religion, sort of of the

5    standard variety, they would have probably had a more difficult

6    time rejecting that request.  This is one of those things that

7    newer religions sort of have to get over that hump and there's

8    definitely some difficulties.

9    Q.    Okay.  Mr. Freeman, you testified that the church

10   sustains you, right?

11   A.    That's right.

12   Q.    And that includes paying for your car?

13   A.    It is not my car.  The church owns that car.  I am

14   one of the drivers of it.

15   Q.    Okay.  And does the church pay for the gas that you

16   put in the car when you drive places in it?

17   A.    Of course it does.

18   Q.    And does the church pay for the food that you eat?

19   A.    Yes, it does.

20   Q.    And the clothes that you wear?

21   A.    It certainly does.

22   Q.    And you've traveled internationally at various times

23   since being the minister of the Shire Free Church, correct?

24   A.    Just a few times.  We've gone to Mexico on a radio

25   remote, as we call it, where we went to a convention that was

44

 1   run down in Acapulco three years in a row, kind of a

 2   Libertarian convention that happened there, and they had paid

 3   for us to -- you know, they bought our tickets and they paid

 4   for the hotel room for us to come down and broadcast.  And we

 5   did broadcast there free of charge because we believed in what

 6   that particular organization was doing.

 7            So, yes, we did go there, and I also went to Japan

 8   once to visit with Roger Ver, who was our number one supporter

 9   over all of the years.

10        Q.   And did the church pay for those travel expenses?

11        A.   Of course it did.

12        Q.   Of course it did.

13            In other words, the church is how you make money,

14   right?

15        A.   No.

16        Q.   It's how you get money that you use to pay things,

17   right -- pay for things, right?

18        A.   No, we get donations.

19        Q.   Donations from your bitcoin customers?

20        A.   From various different people --

21        Q.   Okay.

22        A.   -- various supporters.

23        Q.   Okay.  But it's those donations that allow you to

24   buy food, correct?

25        A.   Well, yeah.

```
 1          Q.    Okay.

 2          A.    That's right.

 3          Q.    Okay.  And we've talked about a lot of different

 4    religious organizations, so I'd like to go through some of the

 5    ones that Mr. Sisti discussed with you.

 6                Let's start with the Crypto Church of New Hampshire.

 7    Okay?

 8          A.    Yeah.

 9                MS. MACDONALD:  And could you bring up 1505, please,

10    Caryn.

11          Q.    And this is a screenshot of the Crypto Church folder

12    on your computer, right, Mr. Freeman?

13          A.    That looks like it.

14          Q.    And you testified -- I believe you called this

15    another program of the Shire Free Church just a few minutes

16    ago?

17          A.    That's correct.

18          Q.    Okay.  But Ms. Spinella is the minister of that

19    church?

20          A.    One of two.

21          Q.    I'm sorry?

22          A.    She's one of two ministers.

23          Q.    Okay.  And who's the other minister?

24          A.    Christopher Reitmann.

25          Q.    Christopher Reitmann.  Okay.
```

1      And you were here for his testimony, correct?

2      A.   Yes, I was.

3      Q.   Okay.  So the Crypto Church of New Hampshire was

4  formed in November of '17; isn't that right?

5      A.   Sounds possible.  I mean, I see a certificate of

6  existence from that time, so that may be right.

7      Q.   Okay.  Well, I can bring up something that might be

8  helpful then.

9           I think I'm looking for 1510, please, Caryn.

10          Apologies, your Honor.  I think I have it on my

11  desk.

12          THE COURT:  That's okay.

13          MS. MACDONALD:  Okay.  I am looking at 1536A.

14     Q.   And this states the Crypto Church of New Hampshire

15  is a nonprofit -- New Hampshire nonprofit corporation

16  registered to transact business in New Hampshire on

17  November 17th of 2017.

18          Did I read that right?

19     A.   Looks correct.

20     Q.   Okay.  And if we go on to page 3, this lists Renee

21  LeBlanc as the chairman of the board of directors and the chief

22  executive officer, correct?

23     A.   Yup, that looks correct.

24     Q.   Okay.  And over on page 4, you are listed as the

25  payer for this document.  I would think it's at the top of the

1   page.

2        A.   Yes, that's right.

3        Q.   Okay.  And in January of 2018, Ms. Spinella opened

4   an account in the name of that church at the Service Credit

5   Union, correct?

6        A.   Sounds like something that happened.

7        Q.   Okay.  And then you and Ms. Spinella directed

8   LocalBitcoins customers to deposit into that account?

9        A.   Seems likely.

10        MS. MACDONALD:  Okay.  Let's bring up 1511.

11        Q.   And this is another folder on your computer,

12   correct?

13        A.   That is correct.

14        Q.   And remind us what COTIH stands for, please.

15        A.   That's Church of the Invisible Hand.  That is

16   Nobody's church.

17        Q.   Okay.  And you told him he had some different views

18   and so you -- that's why you have separate churches, correct?

19        A.   No.  It's one reason why I would not want to

20   acknowledge him as a minister of the Shire Free Church.

21        Q.   Okay.

22        A.   But he has his own church because he wanted his own

23   church.  That's his own mission and his reasons.

24        Q.   And you told Bank of America that you were the

25   treasurer for that church?

1          A.    On a phone call with him, yes.  I was assisting him.

2          Q.    Are you the treasurer for that church?

3          A.    At that moment, I was.

4          Q.    Okay.  And this church was formed in December of

5     2019, correct?  I can pull up a document if you don't remember.

6          A.    I --

7                MS. MACDONALD:  1512, please.

8          Q.    And so this is a registered trade name on 12/16 of

9     2019, correct?

10         A.    That's true, Nobody registered a trade name under

11    the name Church of the Invisible Hand.

12         Q.    Okay.  And Nobody lived at 75 Leverett Street,

13    right?

14         A.    He certainly did.

15         Q.    But this says 73 Leverett Street on it?

16         A.    He frequently received mail on my side of the home

17    as well.

18         Q.    Okay.  And in January of 2020, just a month later,

19    Nobody opened a bank account at JPMorgan Chase in the name of

20    that church, correct?

21         A.    Sounds plausible.

22         Q.    Okay.  And you directed localbitcoins.com customers

23    to deposit money into that account?

24         A.    Yes, per our agreement with one another.

25         Q.    Okay.  And in the end of May of 2020, Mr. Freeman,

1  you had a lot of bank accounts get closed; isn't that right?

2       A.   I had bank accounts getting closed all the time.

3       Q.   Okay.  But you told the undercover at the end of May

4  in 2020 that you couldn't sell him bitcoin at that time because

5  you had a lot of accounts closed; is that right?

6       A.   There were no more accounts closed at that time than

7  any other time.  What I was telling him was that at that time I

8  did not have any active accounts that I could use.

9            MS. MACDONALD:  Okay.  And let's just pull up 4023,

10  please.

11           Mr. Sisti, this is just a screenshot from the chat

12  with the undercover officer that we've already introduced.  Is

13  that okay to display?

14           MR. SISTI:  Put it right up.

15           MS. MACDONALD:  Thank you.

16       Q.   And so, Mr. Freeman, this is May 29th of 2020.

17  The -- near the bottom of the page, the undercover officer

18  Pavel tells you, I'm planning to make a good deal that weekend

19  and wouldn't mind stopping by.  And you respond to him, I, am

20  sadly, not selling at this time due to losing two bank

21  accounts.

22           Is that what we've been talking about?

23       A.   Sounds like it.

24           MS. MACDONALD:  Okay.  Let's pull up another

25  screenshot, 4027, please.

1          THE CLERK:  Excuse me, Counsel.  Are these all

2    admitted?

3          MS. MACDONALD:  They have not yet been admitted, but

4    Mr. Sisti did not object because they're screenshots from

5    something that has already been admitted.

6          THE CLERK:  Okay.

7     Q.   Okay.  And this says -- June 10th of 2020, you say:

8    Hi Pavel, my partner Aria is now able to accept wires and money

9    orders.  If you'd like to trade with her, please let me know

10   and I will introduce you.

11          Is that right?

12    A.   Yup, looks like I said that.

13    Q.   Okay.  And is it a time you still had bank accounts

14   closed?

15    A.   I can't say for sure --

16    Q.   Okay.  Let's --

17    A.   -- possibly.

18          MS. MACDONALD:  Let's pull up 4028.

19    Q.   Okay.  So the last one is June 10th and this one is

20   June 19th.  And the -- and Pavel asks you:  Hey Ian, I was

21   wondering if you'd be able to meet before your radio program

22   starts.  I was hoping to convert cash to BTC, explore Keene,

23   and catch up with you after the show.

24          And your response is:  I'm on hold with Chase.

25          And Chase is a bank, right?

1        A.    It is.

2        Q.    And so you weren't able to use that bank account at

3   that time?

4        A.    Perhaps.  Like I said, we lost and gained various

5   different accounts at various different times.

6        Q.    Okay.

7        A.    You could extrapolate that from it, but I can't say

8   100 percent sure.

9        Q.    Okay.  But you did then tell him that he could go to

10   the vending machine, right?

11        A.    Absolutely.

12        Q.    And you tell him that the last couple of weeks

13   you've had banking/exchange issues, correct?

14        A.    We always have banking exchange issues.

15        Q.    Okay.  And do you recall when Nancy Triestram

16   testified in this court?

17        A.    I do.

18        Q.    And she testified that her scammer told her that in

19   June of 2020 you were having trouble with bank accounts and so

20   she would need to start sending to Aria DiMezzo instead, right?

21        A.    Okay.

22        Q.    Okay.  Do you remember that?

23        A.    Vaguely.  That sounds like something that happened.

24        Q.    Okay.  And showing that -- I'm going to take a look

25   at this chart that Mr. Aframe wrote up.

1           And this was created with the witness Harold Jones

2    on the stand, correct?

3        A.    I think that was, yeah.

4        Q.    Okay.  And you'll notice he sent wires to the Church

5    of the Invisible Hand, to you, the Church of the Invisible Hand

6    all the way through May and then starting in June he began

7    sending to the Reformed Satanic Church, correct?

8        A.    Looks like it.

9        Q.    Okay.

10        A.    I think that was because, as I explained earlier, I

11    had been wanting to get away from a lot of the day-to-day with

12    bitcoin transactions.  So once Aria had taken that customer on,

13    I think she just stuck with him.

14        Q.    And it's also the same time that you had a lot of

15    bank accounts closed, right?

16        A.    I wouldn't say it was a lot of bank accounts.  It

17    was maybe one or two.  But I usually never had more than one or

18    two.  But then I did get one later, if not shortly thereafter.

19    I don't remember the time frame or how long it was between --

20        Q.    Okay.

21        A.    -- but I pretty much had a bank account the whole

22    while.

23        Q.    Okay.  Well, a month later, in July of 2020, that's

24    when you registered the trade name for the New Hampshire Peace

25    Church, right?

1      A.    Possibly.

2      Q.    Okay.  We can show you 1515 if you have some doubt

3 about that.  And we'll go to the second page to look for a

4 date, July 23rd of 2020.  So does that -- do you agree that was

5 in July of 2020, that's when you registered the New Hampshire

6 Peace Church?

7      A.    It looks like that might have been it, but I don't

8 see it on this page.

9      Q.    Perhaps you can go to the next page.

10      A.    There it is.  Yup.  That's correct.  That was the

11 trade name that I registered with the Secretary of State.

12      Q.    And you did that, you testified, because you wanted

13 to open more bank accounts in the name of that church, correct?

14      A.    Absolutely.

15      Q.    Okay.

16      A.    So we could continue the mission.

17      Q.    Okay.

18      A.    Just to clarify, the New Hampshire Peace Church is

19 just a trade name for the Shire Free Church.

20      Q.    Another name for the Shire Free Church, right?

21      A.    Correct.

22      Q.    Okay.  Are there any other names?

23      A.    No, there are no other trade names.  Shire Free

24 Church does have another trade name for Free Talk Live as well.

25      Q.    Okay.  Mr. Freeman, you've testified that the Shire

54

1    Free Church gave a lot of money to charity, correct?

2         A.    We gave some money to charity for sure.

3         Q.    Okay.

4         A.    I don't know what you consider a lot.

5         Q.    Well, did you give a lot of money, a substantial

6    amount of money, to charity?

7         A.    Thousands of dollars --

8         Q.    Okay.

9         A.    -- for sure.

10        Q.    Okay.  And compared to the amount of money coming

11   into the Shire Free Church, was that a lot of money?

12        A.    Well, it depends on what you mean by coming in.  The

13   majority of the super majority of the money that was coming

14   into the church went right back out, as you guys showed, to

15   bitcoin exchanges where more bitcoin was purchased, usually

16   more so than we originally had in the first place.

17             Of what was remaining, we spent various different

18   funds on everything from local charities to supporting other

19   religions like the local Muslims and other folks that needed

20   assistance in addition to our ongoing outreach projects of

21   which we poured tens of thousands into those, the Shire Free

22   Church's Bitcoin Embassy and on and on.  We had a variety of

23   different programs that were going on, plus the radio show.

24        Q.    Okay.  And I'd like to go through those, actually,

25   one by one, but first I will ask you, just to make sure that we

1    have talked about all of the religious entities involved in

2    your bitcoin business.

3              We talked about the Crypto Church of New Hampshire,

4    correct?

5        A.    That's correct.  That is a registered nonprofit with

6    the Secretary of State.

7        Q.    The New Hampshire Peace Church, correct?

8        A.    That's a trade name.

9        Q.    The Church of the Invisible Hand, correct?

10       A.    That is not related to the Shire Free Church.

11       Q.    But it -- you did have a contract whereby you and

12   that church sold bitcoin together, correct?

13       A.    We worked together, yes.

14       Q.    Okay.  And the Reformed Satanic Church had a similar

15   contract, right?

16       A.    That's correct.

17       Q.    Okay.  Were there any other religious entities that

18   were involved in selling bitcoin with you?

19       A.    There was a gentleman with the Islamic group as

20   well.

21       Q.    And that is the -- the mosque that you were just

22   testifying about?

23       A.    That's correct, yes.

24       Q.    Okay.  And so that was also involved in your bitcoin

25   sales, correct?

1    A.    Well, he did his own thing, but I provided support

2    for him.

3    Q.    And by provided support for him, you lent him money

4    or bitcoin and he sold it and gave you a percentage of the

5    profits?

6    A.    Possibly.  It's been quite a long time.

7    Q.    Okay.  Mr. Freeman, Mr. Coley was the imam of that

8    entity, correct?

9    A.    That's right.  His name is Will Coley.

10    Q.    And what was that called, that mosque?

11    A.    His mosque had a bit of a long name.  It was the

12    masjid.  That's the other name for mosque.  I don't recall the

13    full name of his masjid.

14    Q.    Is -- was it referred to as the MALIC Center?

15    A.    Yes, and MALIC stood for something lengthy, which I

16    don't recall offhand.

17    Q.    Okay.  And, Mr. Freeman, did Mr. Coley operate a

18    MALIC Center localbitcoins.com business?

19    A.    Again, you're using the term business.  He ran a

20    mosque and he did have an account on LocalBitcoins.

21    Q.    And did he sell bitcoin for profit on

22    localbitcoins.com?

23    A.    You keep using the term profit, and that is a term

24    that has to do with making money for a business.

25    So, no, I wouldn't say he sold it for profit, but

1   there was some revenue to his masjid.

2       Q.   Okay.  So he received -- he sold it for a lower

3   price and received a higher price, correct?

4       A.   You mean he bought it for a lower price?

5       Q.   Thank you.  He bought it for a lower price and sold

6   it for a higher price, correct?

7       A.   Yeah.  Since you brought that up, I think it's

8   important to point out that when you're selling on

9   LocalBitcoins, you're in a marketplace.  And so you are

10  competing with other sellers who are also trying to sell

11  bitcoin in that same marketplace.

12           So there's a natural tendency to compete for

13  the lowest potential price.  So one of the things that we

14  definitely wanted to do was price our bitcoins lower than much

15  of the competition there.

16      Q.   Okay.  Mr. Freeman, if you don't mind just listening

17  to my question and answering my question and if I have a

18  follow-up I will ask that right after, if that's okay.

19      A.   I think I should be able to explain my answers.

20           MS. MACDONALD:  Your Honor, could you instruct

21  Mr. Freeman to limit his answers to the question that I ask.

22           MR. SISTI:  I think he can explain his answers,

23  though.

24           THE COURT:  Right.

25           MR. SISTI:  Thank you.

1          THE COURT:  Here's the -- here's the deal.

2          Most questions on cross-examination have a yes or no

3    answer.  Not all, but most.  Answer the question directly.  If

4    you feel you need to explain, you can do that, but make the

5    effort first to answer the question directly.

6          THE WITNESS:  Okay.

7          MS. MACDONALD:  Thank you.

8     Q.    Okay.  And so Mr. Coley's MALIC Center bitcoins.com

9    business was operated by him?

10    A.    Again, you used the term --

11    Q.    I'm sorry, business.  Localbitcoins.com sales were

12   operated by him --

13    A.    Yes, he was doing that --

14    Q.    -- is that correct?

15    A.    -- himself.

16    Q.    Okay.  And so it would -- and was he an

17   administrator of the Shire BTC?

18    A.    To my knowledge, he was not.

19    Q.    And so it would surprise you to know that his

20   advisement on localbitcoins.com stated, I'm an administrator of

21   Shire BTC, the Shire Free Church's outreach project dedicated

22   to spreading bitcoin?

23    A.    Ah, yes.  That's probably because he copied that

24   from me.

25    Q.    Oh, okay.  And so he was using it, but it used all

1  of your language from your advertisement?

2       A.    Right.  I had sort of set the standard, so it would

3  make sense for somebody who wanted to do a good job to use me

4  as an example.

5       Q.    Okay.  And did Mr. Coley --

6       A.    By the way, just if I can answer further?

7             Shire BTC didn't have any sort of legal existence as

8  far as like a board of directors.  So, you know, if he wanted

9  to claim that, it wasn't necessarily false.

10      Q.    Okay.

11      A.    Yeah.

12      Q.    And, Mr. Freeman, did Mr. Coley write large -- write

13  checks from his bank account in the name of the MALIC Center in

14  the amounts of, for example, $21,000, $17,000, $34,000,

15  $16,000, and $61,000, to you?

16      A.    Sounds like something that could have happened,

17  likely in return for bitcoin.

18      Q.    Okay.  And Will Coley has been a friend of yours for

19  some time, right, Mr. Freeman?

20      A.    For several years I've known Will.  Unfortunately,

21  his parents got very ill and he had to leave Keene a couple of

22  years ago.

23      Q.    Okay.  And you, while he was living in Keene,

24  donated or allowed him to live at a residence owned by the

25  Shire Free Church, correct?

1    A.    In addition to him and his family and his children

2    living there, there was also a mosque that was built, a very

3    nice mosque, built in that home.

4    Q.    Okay.  And I'm going to show you Government's

5    Exhibit, this has been admitted, 1701.

6          And this is the location of that mosque, correct?

7    A.    That's correct.  The mosque is inside at the middle

8    window on the first floor.

9    Q.    Okay.  And in 2021, Aria DiMezzo was living there,

10   correct?

11   A.    That's correct.

12   Q.    Okay.

13   A.    And prior to that.

14   Q.    Okay.  And so is this also the location of the

15   Reformed Satanic Church?

16   A.    It is now, yes.

17   Q.    Okay.  And while Mr. Coley was living in that

18   residence, he attempted to -- he got into an argument with the

19   city of Keene, correct?

20   A.    What do you mean?

21   Q.    Did he get into an argument with some people in the

22   city of Keene about permitting related to that residence?

23   A.    I vaguely recall some news about that.  I think that

24   he didn't need a permit to open a church, so he just opened his

25   church.

1           MS. MACDONALD:  Okay.  Your Honor, I would like to

2    play a video.  It is Government's Exhibit -- it's 4026, Ms.

3    Shedd.

4           Can we have sidebar, your Honor?

5           THE COURT:  You can.

6           THE COURT:  Take a stretch if you'd like.  No

7    problem.

8                          AT SIDEBAR

9           THE COURT:  Okay.

10          MS. MACDONALD:  Your Honor, I'd like to play a video

11   that's filmed by Mr. Freeman.

12          THE COURT:  What's the -- what's the exhibit number?

13          MS. MACDONALD:  I believe it's 4026.  We haven't --

14   we haven't provided it, as I didn't know it would be relevant

15   unless this testimony came up.  So Mr. Sisti hasn't seen it

16   yet.  If we want to break just to have him view it before we

17   discuss the relevance.

18          MR. SISTI:  Well, I haven't seen it, but from the

19   offer I got, it's irrelevant.  I don't even know what it's

20   being offered for.  Something about an argument with regard to

21   permitting with the city of Keene that has --

22          MS. MACDONALD:  I'm happy to explain it, your Honor.

23          THE COURT:  Yeah, I'll give you a chance to explain

24   it.  Just -- it's a statement of the defendant?

25          MS. MACDONALD:  Yes.

1          THE COURT:  Why haven't you provided it yet?

2          MS. MACDONALD:  Well, your Honor, it's a statement

3   of the defendant that is relevant only because of his testimony

4   today about his affiliations with this MALIC Center mosque.

5          THE COURT:  I didn't hear what you said what.

6   Because of what?

7          MS. MACDONALD:  It's something that -- that the

8   defendant posted on the Internet that we found only thinking

9   about his testimony of when he talked about the mosque.  So

10  it's a video of him and Mr. Coley going to the town assessor's

11  office and arguing, saying that because there is -- the

12  building is a religious organization, it shouldn't have to, you

13  know, abide by whatever permitting rules.

14         And then Mr. Freeman walks out and says, that's why

15  you shouldn't ask -- something along the lines of that's why

16  you shouldn't ask for permission, because then you have to

17  follow their rules.

18         MR. SISTI:  Yeah, it's a wonderful statement.  I

19  wish I could have seen it.  I would have filed the appropriate

20  motion in limine at that point in time.  But, I mean, if I

21  don't see stuff, I'm not going to get, you know, like, trapped

22  during the course of the trial with new stuff.  I mean --

23         THE COURT:  Yeah.

24         MR. SISTI:  -- it's ridiculous, especially --

25         THE COURT:  I'm -- I guess I'm not following what he

1    said that makes it relevant.  I'm not seeing -- but it is

2    highly unusual not to provide a statement that you're going to

3    play at trial to the defendant.  I mean, you know, it's just

4    not -- I'm not familiar with the idea that you hold statements

5    of the defendant until they become relevant based on his

6    testimony, but I'm not ruling it out.

7               How long have we been going?

8               THE CLERK:  I have 3:10 --

9               THE COURT:  3:10?  Yeah, probably take the break

10   early so I can take a look at this.

11              MR. SISTI:  I'd like to look at it, too.

12              THE COURT:  Yeah.  Okay.  So I'm going to give them

13   a break.  Then we can actually talk in the courtroom about --

14   you can articulate it for me.  Okay?

15              MS. MACDONALD:  Thank you.

16              THE COURT:  So we'll take a break.

17                      CONCLUSION OF SIDEBAR

18              THE COURT:  We're going to take the afternoon break

19   now.

20              THE CLERK:  All rise for the jury.

21                      (Jury excused.)

22              THE COURT:  Please be seated.

23              You can remove masks.

24              MR. SISTI:  Can I generally speak with Ian just for

25   a second because I don't even know what it's about.  He might

1    have some knowledge of who it is.

2              THE COURT:  Regarding the -- I don't think so.

3              MR. SISTI:  Well, I mean --

4              THE COURT:  Not yet anyway.  I'm not ruling it out,

5    but not yet.

6              MR. SISTI:  Okay.

7              THE COURT:  It might not become necessary.  Because

8    we are in the middle of his testimony.

9              MR. SISTI:  Understood.  But this is a new item

10   that --

11             THE COURT:  Yeah.  Give me a moment.

12             Okay.  Okay.  So I'm looking at Rule 16.  Rule

13   16(a)(1)(B) says that the -- that -- that upon defendant's

14   request -- and I think the local rule makes it not dependent on

15   a defendant's request, I think it's just required -- the

16   government must disclose to the defendant and make available

17   for inspection, copying, or photographing all of the following:

18             One, any relevant written or recorded statement by

19   the defendant if the statement is within the government's

20   possession, custody, and control and the attorney for the

21   government knows or through the due diligence could know that

22   the statement exists.

23             I'm trying to understand why you would not think you

24   had an obligation to produce it, at least once you -- it sounds

25   to me like what you said at sidebar is that you didn't get this

1    until sort of relatively recently, maybe, but, you know,

2    regardless, at the point you knew it existed, why didn't you

3    have an obligation to provide it to the defense?

4              MS. MACDONALD:  Your Honor, this defendant is a

5    media personality and there are countless statements of his on

6    the Internet.  This is something that we found --

7              THE COURT:  It's in your possession.  It's in your

8    possession.  You obviously have this in your possession.

9    You're about to introduce it as an exhibit.

10             So let me ask you again.  Why did you think you

11   didn't have an obligation to produce it in discovery?

12             MS. MACDONALD:  Your Honor, because it only became

13   relevant when he testified about this at the trial.  It is not

14   relevant to the rest of our case.

15             THE COURT:  Okay.  And it does say it has to be a

16   relevant written or recorded statement by the defendant if it's

17   within your possession and control and -- and you knew or

18   should have known that it exists.

19             So your view is that it only became relevant based

20   on his testimony.  So break that down for me.

21             MS. MACDONALD:  So my understanding -- I don't have

22   it in front of me right now, but it occurs prior to the charged

23   conduct in this case.

24             THE COURT:  Okay.

25             MS. MACDONALD:  So depending on what his testimony

1   was going to be, whether he talked about helping this mosque is

2   the only way that it would have come in as relevant.  It

3   doesn't have to do with our case in chief and is relevant to --

4              THE COURT:  Okay.

5              MS. MACDONALD:  -- cross-examine him on his

6   statements.

7              THE COURT:  So break it down for me.

8              What did he say on -- what did he say on direct and

9   what does this statement say so I can understand why it became

10  relevant.

11             MS. MACDONALD:  Mr. Freeman talked about how the

12  Shire Free Church helped a mosque get set up in Keene.

13             THE COURT:  Yeah.

14             MS. MACDONALD:  That was discussed for the first

15  time on his testimony.

16             Then we brought up the fact that he also worked with

17  the person who set up the mosque to sell bitcoin.  That was not

18  something that was part of our case prior, but that --

19             THE COURT:  Sure.

20             MS. MACDONALD:  -- is information they did have.

21             THE COURT:  Yup.

22             MS. MACDONALD:  And he talked about that the

23  legitimacy of this mosque and what he did to help them and so

24  the video that we -- and I asked him about whether Mr. Coley

25  got into an argument with the city of Keene about trying to get

1   exemptions from rules because he's a church and that has become

2   relevant to this case where Mr. Freeman is talking about how,

3   you know, he helped this mosque and this mosque is a real thing

4   and the churches are a real thing --

5           THE COURT:  Yeah.

6           MS. MACDONALD:  -- and so that video has become

7   relevant to show --

8           THE COURT:  Well, it depends what's on the video.  I

9   mean, so you're saying that by describing his assistance to the

10  mosque in Keene to get set up or whatever, and I guess get

11  compliant with whatever city law -- city ordinances exist, he

12  testified about that on direct.

13          So okay.  What does this video show that adds to --

14  that -- what does this video -- what are you offering it to

15  show?

16          MS. MACDONALD:  To show that Mr. Freeman's friend's

17  mosque is just like the other churches and it helps him get out

18  of government requirements.  He tried to use the fact that he

19  was a religious organization to not comply with the state

20  licensing requirements and he's there with Mr. Coley and he's

21  saying, yeah, you know, I agree, that's why you shouldn't ask

22  this -- the government for permission to do things.

23          And so that's why it has become relevant.

24          THE COURT:  All right.  I guess I need to -- and you

25  haven't seen it yet, Mr. Sisti, right?

1          MR. SISTI:  Yeah, I haven't seen it and I agree with

2    your Rule 16 and the local rules.  I agree that, you know, I go

3    as far back as, you know, the Jencks material, but I've got

4    nothing here.

5          And, you know, I opened, by the way, a week -- over

6    a week ago with a reference to a mosque.

7          THE COURT:  Did you?  Oh, what did you say a week

8    ago?

9          MR. SISTI:  I opened --

10         THE COURT:  Yeah.  But what did you say in your

11   opening?

12         MR. SISTI:  I -- I referred to a mosque.  I referred

13   to him helping.

14         THE COURT:  Okay.  Referred to a mosque -- you

15   referred to him helping.

16         MR. SISTI:  I referred to him being involved.  All

17   right?

18         THE COURT:  Yeah.

19         MR. SISTI:  And in various charities, including the

20   Muslim community.  All right?  I just -- I mean, this is not,

21   like, a shocker.

22         THE COURT:  No.

23         MR. SISTI:  All right?  And I didn't get anything.

24         So, I mean, if they're going to use this thing, let

25   me know.  I -- I don't like getting, you know, clipped here

```
 1    during this thing.  What else is out there?
 2               THE COURT:  I know you don't like getting clipped,
 3    but that's not really -- the analysis is -- the -- the analysis
 4    is whether you were entitled to production of it and when.
 5               MR. SISTI:  Yeah.
 6               THE COURT:  And certainly to me -- I'm not crazy
 7    about this practice at all, frankly -- but I'm trying to
 8    evaluate whether the duty to disclose it only was triggered
 9    when it became relevant, because that's the argument.  Right?
10    That's your position.
11               MS. MACDONALD:  That's correct, your Honor.  And I
12    would mention that we have also two clips from the defendant's
13    radio show over the last -- over the last couple of days where
14    he's been commenting on things that have happened in court --
15               THE COURT:  Hmm.
16               MR. SISTI:  (Shakes head.)
17               MS. MACDONALD:  -- that we'd like to play as well.
18    And we can give Mr. Sisti all of those to review now, if you'd
19    like.
20               MR. SISTI:  That's really nice of them, Judge.  And
21    they -- and, you know, but --
22               THE COURT:  I think you had to expect his radio
23    statements to come in.
24               MR. SISTI:  I'm not --
25               THE COURT:  But you should also expect to see them.
```

1              MR. SISTI:  Yes.

2              THE COURT:  Yeah.

3              MR. SISTI:  I mean, I don't mind -- I don't mind any

4    of that stuff if I can have him back on the stand and start

5    direct again.

6              THE COURT:  I hear you.

7              Is it your position that the radio statements also

8    only became relevant after direct?

9              MS. MACDONALD:  Yes.  He said that he thought that

10   the stories of the victims were very sad and so I'm going to

11   put those -- those clips on to show that that wasn't a truthful

12   statement and that that's not what he was saying on his radio

13   show.

14             THE COURT:  I -- see, I think any statements he made

15   about the victims on the radio show became relevant as soon as

16   you got the statements because the victims testified.

17             MR. SISTI:  Yeah.

18             THE COURT:  That's definitely potentially relevant

19   and you had an obligation at that point to turn them over.

20   This is a little different, though, the mosque testimony.

21             Look, he's talking -- he's making statements about

22   the victims and you're presenting victims into criminal trial.

23   There are definitely potentially relevant statements and you

24   had possession of them.  You had to turn them over.

25             MS. MACDONALD:  I mean, we -- by that logic, we

1   would have to make -- download and turn over his radio show

2   every single night.  Is that -- I mean --

3             THE COURT:  No, only the ones that you have

4   possession of and intend to introduce at trial, by that logic.

5   Yeah, I stand by it.  It's not -- that's not hard.  Come on.

6   If you took the trouble -- you did download it, you have it,

7   right?

8             MS. MACDONALD:  That's correct, your Honor.  We

9   weren't sure we were going to use it --

10            THE COURT:  It doesn't --

11            MS. MACDONALD:  -- until he testified.

12            THE COURT:  The rule doesn't say you turn it over

13   when you're sure you're going to use it.  The rule says if it's

14   relevant -- and I'm only going -- I'm only using the relevance

15   benchmark because you've introduced it.  Because the rule says

16   if you have possession of it and -- or you know it exists, you

17   have to turn it over.

18            Now, if you monitored the radio show -- if I was

19   trying the case, I'd be monitoring that radio show.  I'd have

20   somebody doing it.  And everything -- I wouldn't say everything

21   I heard had to be turned over, of course.  It's his show.

22            But when you -- when you do download it and make an

23   exhibit out of it, at that point, when it's about victims in

24   this trial, it was relevant.

25            So those -- I don't -- I can't imagine how I can

1  allow you to do that now.  You needed to turn that over when

2  you took possession of them because those were already

3  relevant.  They concerned victims in the case that were

4  presented in your case.

5          This question about the mosque is a little bit

6  closer and I'm trying to evaluate it, but I think I need to

7  watch it, too.  I need to at least know what's on it.

8          So can we do that?

9          MS. MACDONALD:  Yes.

10          THE COURT:  I mean, I think in fairness, though --

11  how long is the video?

12          MS. MACDONALD:  Two minutes.

13          THE COURT:  I -- before we just play it in open

14  court, I'd like Mr. Sisti to have a chance to look at it first.

15  That's all.

16          MR. SISTI:  Thank you.

17          THE COURT:  I'll get off the bench for a minute.

18  You can show it to him and then let me know when you're ready

19  to proceed.

20          MS. MACDONALD:  Okay.  Thank you, your Honor.

21          THE CLERK:  All rise.

22        (Recess taken from 3:05 p.m. until 3:25 p.m.)

23          THE COURT:  Sustained.  You may proceed.

24          MR. SISTI:  Thank you.

25      Q.    Mr. Freeman, you testified that your church donated

1    to an orphanage in Uganda, correct?

2         A.   Our church did, as well as many of our supporters.

3         Q.   Okay.  And your church donated about $35,000,

4    correct?

5         A.   Sounds about right.  Mark, my cohost and cofounder,

6    was the one who handled most of that.

7              MS. MACDONALD:  Okay.  I'm going to pull up

8    Exhibit 2406, please.

9         Q.   And, Mr. Freeman, you recall this was one of the

10   wire receipts from Danella Varel, correct?

11        A.   Looks like it.

12        Q.   And she sent you $305,000, correct?

13        A.   I think she did.

14        Q.   And so your -- if your commission on that was 10

15   percent, that would be about the amount that you donated to the

16   orphanage in Uganda, right?

17        A.   Looks like it.

18             MS. MACDONALD:  Okay.  Ms. Shedd, could we please

19   pull up --

20        Q.   Actually, before we do that, Mr. Freeman, you

21   testified that you would ask your LocalBitcoins customers

22   invasive questions, I believe, right?

23        A.   Eventually, after I learned of some of the scams

24   that were going on out there, I increased my security

25   requirements and asked a number of questions.

1          MS. MACDONALD:  Okay.  And let's pull up 1206,

2     please.  This has been admitted.

3          Q.    And, Mr. Freeman, this is a LocalBitcoins chat with

4     loveshotz01, correct?

5          A.    That's correct.

6          Q.    And this is from December of 2019?

7          A.    It is.

8          Q.    Okay.  And, here, loveshotz tells you on this first

9     page:  I am currently offshore and I have asked my in-law to

10    make the deposit, is it okay.

11              Correct?

12         A.    He said that.

13              MS. MACDONALD:  Okay.  And let's turn to page 2,

14    please.

15         Q.    And this is the Nigerian passport of Mr. Chiedu

16    Okafor, correct?

17         A.    It is.

18         Q.    Okay.  And his supposed in-law is Mary Hurd,

19    correct?

20         A.    That's what he said.

21              MS. MACDONALD:  Okay.  And here -- on the next page,

22    please, Ms. Shedd.

23         Q.    This is the -- the shirtless man here is Mr. Okafor,

24    correct?

25         A.    It looks like him.

1        Q.    Okay.  And this is the note that you had him send,

2   right?

3        A.    Yes.

4        Q.    Okay.  And let's just read through a couple -- a

5   little bit of the conversation.

6              You recall there was a bit of a disagreement with

7   Mr. Okafor, correct?

8        A.    I do recall that vaguely, yup.

9        Q.    Okay.  So let's go down to, let's see, one, two,

10  three, four -- five, the fifth page.  In the middle of this,

11  loveshotz complains:  Bro, your terms is fucking complicated.

12             Correct?

13       A.    He said that.

14       Q.    And going on to the next page, this is a picture of

15  Mary Hurd, correct?

16       A.    That's her.

17       Q.    And below, loveshotz says:  Here is your receipt

18  writing with the words.  Please release my bitcoin now.

19             Correct?

20       A.    He says that.

21       Q.    And he says:  Are you expletive kidding me.

22             Correct?

23       A.    That's right.

24       Q.    And then he says:  I said release my bitcoin before

25  I lunch (sic) a police report on your bank account.  Right now.

1              Correct?

2      A.    He said that.

3      Q.    Okay.  And, Mr. Freeman, you testified that when

4  people say -- they yell at you to release their bitcoin, that's

5  a red -- I think you said a red alert, right?

6      A.    It can be.

7      Q.    Okay.

8      A.    In his case, if I recall correctly -- I mean, we

9  don't have the whole conversation that you -- you know, we

10 haven't reviewed it.  But if I recall correctly, he wanted

11 to -- me to release it, but I needed him to open another trade

12 or something like that in order for that to happen --

13     Q.    Okay.

14     A.    -- if I recall this correctly.

15     Q.    But he's -- he's saying, you know, are you expletive

16 kidding me, release my bitcoin now.  Correct?

17     A.    That -- usually in the case of -- one of my

18 requirements was that if you -- so to explain LocalBitcoins a

19 little more, once the buyer clicked complete on the trade, it

20 starts a clock and the clock is timing how quickly I am able to

21 release the bitcoins from escrow once the customer has clicked

22 complete.

23            However, not everyone follows the terms of the trade

24 correctly and sometimes they would click the complete button

25 prior to finishing the requirements.

1          So for instance, if he had not yet uploaded the

2   required photographs but then clicked the complete button, I

3   would then require him to open a new trade in order to get

4   things right.  So on the new trade he would have to do things

5   in the correct order, then hit the complete button.

6          That way my score for how quickly I could release

7   the coins was not impacted.  Otherwise, I -- otherwise, if he

8   clicked complete but he hadn't actually finished, then it's

9   timing me for all the time that it would take him to finish the

10  trade.

11          So if I recall correctly, that's what had gone on

12  here.  And he didn't understand, I don't think, that the trade

13  had been marked complete before he had finished the trade.  And

14  because of that, I required him to open another trade and

15  that's what he was upset about.

16      Q.   Okay.  But he was quite upset with you here.  Let's

17  turn on to page -- the next page, 2019/12/9.  I think it might

18  just be one more.  That's page -- that's great.

19          I'm just going to continue on in the conversation.

20  He calls you a liar and says:  Hold the bitcoin.  Don't release

21  and see happen.  You will be charged for fraud.

22          And then he says, I am going -- and you give an

23  explanation about your release time.  And then he says:  I'm

24  going to the police now.

25          Correct?

1      A.    Yes.  And as I can see from my explanation here,

2   this was, as I recalled, he simply just did things out of order

3   and I needed him to correct the -- the right order before I

4   could release the coins to him.

5      Q.    And nothing about this trade then raised a red alert

6   for you?

7      A.    No.  Sometimes people get frustrated because they

8   haven't fully read or understood the trade terms, which they're

9   supposed to prior to opening the trade.  But he accidentally or

10  for whatever reason just clicked that complete button, so I

11  needed to rectify that situation.

12     Q.    Okay.

13     A.    Mary Hurd was a multiple-time buyer.

14     Q.    She was, wasn't she?

15     A.    That's right.

16     Q.    And Barbara K. Freeman also bought on behalf of

17  Mr. Chiedu, or at least attempted to, right?

18     A.    I think so.

19     Q.    Okay.  And there's been evidence in this case,

20  Mr. Freeman, that you never once called up Mary Hurd to

21  question her about this trade, correct?

22     A.    I don't think there was any such evidence.

23     Q.    Your Honor -- there wasn't a stipulation by the

24  Court that you have never -- don't recall ever speaking to

25  Ms. Hurd?

1      A.   I don't recall, but I don't recall any evidence

2  about that.

3      Q.   Okay.

4           Mr. Freeman, I would like to talk a little bit about

5  the FinCEN letter.

6      A.   Okay.

7      Q.   You testified that you did receive the letter via

8  email in one email address that you monitored, correct?

9      A.   Well, by definition, receiving an email is not the

10 same as receiving a letter, but it did come into an email box.

11     Q.   Okay.  But my question was you received an email.

12     A.   That's right.

13     Q.   Okay.  Thank you.

14     A.   It wasn't addressed to me.

15     Q.   You read the email?

16     A.   I read the email, but it wasn't addressed to me.

17     Q.   Okay.  And it was addressed to Shire Cryptocoin,

18 correct?

19     A.   Correct.  And I wasn't sure who that was.

20     Q.   Okay.  But you did have a folder on your computer

21 labeled Shire Crypto, right?

22     A.   That is not the same thing, but I did have a

23 computer -- a file on my folder.  Shire Cryptocoin was

24 associated with the vending machine located at Area 23, if I

25 recall correctly, which I had nothing to do with.

1      Q.   Okay.  And would it surprise you that there is a

2 Twitter account that lists -- in the name of Shire Cryptocoin

3 that lists your vending machines on it?

4      A.   I have no idea who's behind that account and I did

5 not know about it.

6      Q.   Okay.  Nevertheless, you told Ms. Spinella that the

7 FinCEN letter hit your box, right?

8      A.   Yeah, that's right.

9      Q.   Okay.  And previous to receiving that letter, you

10 got a letter from your lawyer, correct?

11      A.   I had my lawyer write an opinion piece for the itBit

12 exchange to explain to them why it is the Shire Free Church is

13 not a money transmitter or a money services business under both

14 state and federal law.  So yes.

15      Q.   Okay.  And itBit received that letter and then

16 closed your account, right?

17      A.   Somewhere in that range.  They may have closed my

18 account before they received the letter.  Either way --

19      Q.   Okay.

20      A.   -- they did receive the letter.

21      Q.   Well, the FinCEN letter came about nine months after

22 your lawyer's letter, right?

23      A.   Possibly.

24      Q.   Okay.  Do you agree that the FinCEN letter was dated

25 July 14th of 2018?

1      A.    I mean, I could take your word for it.  It sounds
2    plausible.
3          Q.    Okay.  Well, I'm happy to pull it up.
4                You know what, let me -- 15 -- I apologize.  You
5    know what, let's do this instead.
6                This is a -- I'm going to play a voicemail.  This is
7    Exhibit 845B.  This is on July 17th of 2018 between you and
8    Ms. Spinella.  So let's play that and that might clarify the
9    dates.
10         A.    Okay.
11                    (Audio recording played.)
12               MS. MACDONALD:  Okay.  And let's pull up 1544,
13    please.
14         Q.    I've now found it and just confirm this is dated
15    July 13th of 2018.
16         A.    There it is, yes.
17         Q.    And in that memo you said you ignored it but, in
18    fact, you did send it to a friend of yours, Vin Armani, right?
19         A.    At some point I may have done that.
20         Q.    Okay.  And on -- in fact, July 24th of 2018, did
21    Vin Armani respond to you with his opinion about the letter?
22         A.    Possibly.  I do recall having a conversation with
23    Vin.
24         Q.    Okay.  And didn't he tell you that his lawyer put
25    together a little package at his request to help him understand

1  what is going on with the MSB laws after you shared your

2  letter?

3      A.   He did.  Are you going to read the rest of it?

4      Q.   I would like to read the rest of it, yes,

5  Mr. Freeman.  Thank you.

6      A.   Okay.  Good.

7      Q.   Mr. Armani then wrote that he has attached two

8  documents that his lawyer prepared; one is FinCEN's guidance

9  that explains how they enforce MSB laws when it comes to

10 virtual currencies, what they consider crypto to be.  Is that

11 right?

12     A.   Sounds believable.

13     Q.   Okay.  Is that what -- did you receive this email

14 from him?

15     A.   It sounds familiar.  I believe there are more emails

16 in the chain.

17     Q.   Okay.  And correct that Mr. Armani pasted in the

18 definition of a money transmitter into that email, correct?

19     A.   He may have.  I'm very familiar with that

20 definition.

21     Q.   Okay.  And I'll read that.  It says:  A money

22 transmitter in general, a person that provides money

23 transmission services.  The term, money transmission services,

24 means the acceptance of currency, funds, or other value that

25 substitutes for currency from one person and the transmission

1    of currency, funds, or other value that substitutes for

2    currency to.

3              And then, a theme in this trial, Mr. Armani put

4    another location in all caps or person by any means.  Any means

5    includes but is not limited to through a financial agency or

6    institution, a Federal Reserve Bank or other facility of one or

7    more Federal Reserve banks, the board of governors of the

8    Federal Reserve system or both electronics funds transfer

9    network or an informal value transfer system?

10             And Mr. Armani then writes:  I capitalized, quote,

11   another location there.  The acceptance of currency from

12   someone and then the transmission of value by any means to

13   another location is defined in the statute as money

14   transmission.

15             And he says:  It's an absolutely bullshit broad

16   definition, but broadcasting a transaction to the blockchain

17   is, by definition, transmission of value to another location?

18             And he wrote that to you, correct?

19   A.    That's his opinion.  And there's more.

20   Q.    Okay.  And the more includes the attachment which is

21   the 2013 FinCEN guidance, correct?

22   A.    That's also their opinion.

23   Q.    FinCEN's opinion?

24   A.    That's right.

25   Q.    Okay.  And, in fact, Mr. Armani's lawyer highlighted

1    the parts in the FinCEN opinion that were relevant, correct?

2         A.   I don't know what his lawyer did.

3         Q.   Okay.  Well, did you receive this attachment with

4    highlighted parts of the FinCEN guidance?

5         A.   I don't recall reading it.

6         Q.   Okay.  But you recall receiving the first letter

7    from Mr. Armani?

8         A.   That's right.

9         Q.   Okay.  You heard testimony, Mr. Freeman, from Ted

10   Vlahakis from FinCEN, correct?

11        A.   We did, but you didn't finish the email thread.

12             THE COURT:  You can continue.

13             MS. MACDONALD:  Thank you.

14             THE COURT:  You conduct the examination.

15             MS. MACDONALD:  Thank you, your Honor.

16             THE WITNESS:  Okay.

17        Q.   And, Mr. Freeman, my question was that you heard

18   Mr. Vlahakis's testimony, correct?

19        A.   I did, yes.

20        Q.   And he talked about this guidance being available at

21   FinCEN since 2013, correct?

22        A.   I'm familiar with the FinCEN guidance, yes.

23        Q.   Okay.  And he testified about how FinCEN operates a

24   hotline, correct?

25        A.   Sure.

1    Q.    Okay.  And, sorry, just to back up, you're familiar

2    with the FinCEN guidance.  Have you ever read the FinCEN

3    guidance?

4    A.    I've looked at it --

5    Q.    Okay.

6    A.    -- yes, and a couple of their other papers.

7    Q.    Okay.  And, Mr. Freeman, when you received that

8    email in the summer of 2018, you forwarded it to Vin Armani,

9    correct?

10   A.    According to you, yes.

11   Q.    Okay.  Well, according to the email that I read that

12   you said you received, right?

13   A.    Sounds right.  I don't have it in front of me, so I

14   can't say 100 percent --

15   Q.    Okay.

16   A.    -- but I'll take your word for it.

17   Q.    Okay.  And -- but you never contacted FinCEN?

18   A.    No.  I see no obligation to contact FinCEN.  I mean,

19   just because they have issued a legal opinion doesn't mean that

20   they're correct.

21   Q.    Okay.  About their own guidance?

22   A.    That's right.  My understanding is the lawmakers

23   make the -- they write the statutes and then these

24   organizations like FinCEN interpret them.  And they interpret

25   them usually in the way that increases their power and their

1    scope, even though they are going beyond the scope of the

2    original intentions of the law.

3            And when I looked at their guidance from 2013, and I

4    think there was another one from 2014 as well, it was, in my

5    opinion, written very carefully to make it sound like that they

6    were regulating all forms of bitcoin transactions and bitcoin

7    vending or bitcoin ATM situations, but the reality is that they

8    weren't.

9        Q.    Okay.  And, Mr. Freeman, you also testified that

10   banks closed your accounts without giving you any reason why.

11   Correct?

12       A.    All the time, with the exception of the conversation

13   with the bank president that you wouldn't let me talk about.

14       Q.    Well, frequently, actually, banks did tell you the

15   reason they were closing your accounts, didn't they?

16       A.    Not that I have much recollection of.  There was

17   another credit union that I was able to sit down with their

18   Bank Secrecy Act officer and have a lengthy conversation with

19   that particular credit union, but most of the time on the bank

20   breakup letters they gave absolutely no reason except that they

21   have it in their terms of service that they can break up with

22   you anytime they want without explaining why and then follow-up

23   phone calls, they would not reveal anything.

24            MS. MACDONALD:  Okay.  Let's look at Exhibit 1523,

25   please.

1          Q.    Mr. Freeman, this is a letter from the GFA Federal

2     Credit Union, correct?

3          A.    Yes, that's right.

4          Q.    And this was to Colleen Fordham about an account

5     that you asked her to open, correct?

6          A.    Colleen and I agreed that she should open an

7     account, yes.  However, as I said, credit unions have been a

8     little more forthcoming than most banks.  You were asking me

9     about banks.

10         Q.    Okay.  Thank you for the clarification.

11         A.    Yes.

12         Q.    This lets -- so would you agree that credit unions

13    told you the reasons that they were closing your accounts?

14         A.    Sometimes.

15         Q.    Okay.  And that was frequently because you were

16    operating an unlicensed money transmitting business?

17         A.    No, I definitely wasn't operating an unlicensed

18    money transmitting business, as we explained to GFA.  We were

19    not, according to our attorney, subject to their regulations at

20    all and we provided the attorney's opinion to these credit

21    unions in these circumstances to explain to them why that was.

22              It was their opinion that we may have been operating

23    as a money transmitter, but their opinion was wrong because

24    they didn't understand the facts of the circumstances.

25         Q.    Okay.  And after receiving that opinion, did any

88

1   bank or credit union change their mind and reopen your account?

2        A.    Unfortunately not, because they are deathly afraid

3   of the federal government.

4             MS. MACDONALD:  Okay.  Ms. Shedd, I'm just going to

5   go back to 1206 briefly.

6        Q.    Mr. Freeman, you talked a lot about the positive

7   feedback that you received on localbitcoins.com, right?

8        A.    Yes.

9        Q.    Okay.  If we can go -- this, again, I know we've

10  looked at this a number of times and I apologize to bring it up

11  again -- one, two, three, four, five, six, seven, eight, nine,

12  ten -- if we could go to page 11, please.

13            THE COURT:  Don't -- don't -- don't count to

14  yourself and stuff out loud.  We've got to make a record.

15            MS. MACDONALD:  Thank you, your Honor.  I apologize.

16            THE COURT:  That's okay.

17            MS. MACDONALD:  Page 11, please.

18       Q.    Now, this is after the conversation, after loveshotz

19  was arguing with you, correct?

20       A.    Looks like it.

21       Q.    And you respond:  All set.  I'm leaving you positive

22  feedback.  I would appreciate you doing the same for me.  Thank

23  you.  Please spread the word of peace and freedom that bitcoin

24  can bring the world.

25            Correct?

1      A.     I did, yes.  I said that usually after every trade.

2             MS. MACDONALD:  Okay.  And let's bring up 1526,

3      please.

4      Q.     And, Mr. Freeman, does this have sort of a script of

5      the sorts of things that you would say frequently on

6      localbitcoins.com?

7      A.     Yes.  This was a set of notes that I had a more

8      updated version on Google Docs and I would drop into that

9      anytime I needed to to copy and paste things so I didn't have

10     to retype them every time.

11     Q.     Okay.  And let's just look at page 2 quickly.

12            This is after the sale.  I'll direct you to after

13     the sale, please.

14            Does this have that same language:  All set.  I'm

15     leaving you positive feedback.  I would appreciate you doing

16     the same for me?

17     A.     Yes, that's right.

18     Q.     Okay.  And on the first page of this --

19            THE COURT:  Please, when you're reading, slow down

20     just a little bit.

21     Q.     Back on the first page of this, I'll direct you to

22     the bottom of the page where it says verification for agent.

23            And this is when one person is buying -- sending you

24     money and sending the bitcoin to another person, correct?

25     A.     This is when it was represented that an individual

1    was depositing on behalf of another person.  They could have

2    been using the other person's money.  I didn't know exactly

3    what their arrangement was.

4         Q.   Okay.  But one person is putting the money into your

5    account, whether it's their money or someone else's money, and

6    you're sending the bitcoin to the agent?

7         A.   No.  The agent is the person doing the depositing --

8         Q.   Okay.  But you're sending the bitcoin --

9         A.   -- on behalf of the buyer.

10        Q.   -- to someone else, correct?

11        A.   That's correct.

12        Q.   Okay.  The buyer.

13             And this is on your list of sort of frequent things

14   to say on localbitcoins.com, right?

15        A.   Yeah.  I had previously written things so I wouldn't

16   have to retype them.

17        Q.   Great.

18        A.   I wouldn't say they were frequent, but they did

19   happen.

20        Q.   Okay.

21        A.   A minority of the time.

22        Q.   Okay.  You testified that you did some research into

23   whether churches pay taxes, correct?

24        A.   I sure did.  I read some of the IRS code and some of

25   their publications.

1       Q.    And so that research would have led you to the

2  conclusion that ministers still do have to pay taxes, right?

3       A.    I didn't see anything about that unless the minister

4  was making some sort of an income at something.

5            MS. MACDONALD:  Okay.  And let's bring up 1504,

6  please.

7       Q.    Is this a document that you created?

8       A.    No, I found this on the Internet.

9       Q.    Okay.  Is it something that you reviewed?

10      A.    I did review this, yes.

11      Q.    Okay.

12      A.    Many years ago.

13            MS. MACDONALD:  And I'd like to go to the second

14  page, the section beginning with excerpts, please.

15      Q.    And I'm just going to read this.

16            Churches and religious organizations, like many

17  other charitable organizations, qualify for exemption from

18  federal income tax under IRC Section 501(c)(3) and are

19  generally eligible to receive tax-deductible contributions.  To

20  qualify for tax exempt status, such an organization must meet

21  the following requirements.

22            And then there are some bullets.

23            First, the organization must be organized and

24  operated exclusively for religious, educational, scientific, or

25  other charitable purposes; second, net earnings may not inure

1   to the benefit of any private individual or shareholder; third,

2   no substantial part of its activity may be attempting to

3   influence legislation; fourth, the organization may not

4   intervene in political campaigns; and fifth, the organization's

5   purposes and activities may not be illegal or violate

6   fundamental public policy.

7           Did I read that correctly?

8       A.   You did.  However, that does not apply here.

9   This -- what you were reading is a list of requirements for

10  501(c)(3) organizations and you do not have to be a 501(c)(3)

11  organization to be a church.

12      Q.   Okay.

13      A.   Would you like me to explain more about that?

14      Q.   No, thank you.

15          THE COURT:  She asked -- sidebar.

16                       AT SIDEBAR

17          THE COURT:  Listen, the last thing I'm ever going

18  to do in a trial is jump all over your client while he's

19  testifying.  But, you know, you're letting him go crazy here,

20  all right, and I can't listen very much longer to this guy

21  making speeches.

22          So I don't know what to do here exactly, but I'm --

23  I'm --

24          MR. SISTI:  Do you want me to talk to him for a

25  second?  I won't do it without your permission.

1           THE COURT:  I understand.  Yeah.

2           MR. SISTI:  But, I mean, I don't want him to get to

3  the other end.

4           THE COURT:  Of course.  I know you don't and I don't

5  want to overstep.

6           But I'm going to ask you to assert yourself a little

7  bit here.  All right?

8           MS. MACDONALD:  Okay, your Honor.

9           THE COURT:  Yeah.  I mean, ask your questions.  I'll

10  support you on it.  I'm not going to cut him off, but tell him

11  the usual thing that he can explain himself.  But he needs to

12  answer the questions.  Mark will do a redirect and he'll get

13  all this out.

14           MR. SISTI:  I don't mind you actually talking to him

15  right now and saying between you and me, just answer the

16  questions, you know.

17           THE COURT:  Okay.

18           MR. SISTI:  You know, we'll get to -- we'll get to

19  what you want to say afterwards.

20           THE COURT:  Exactly.

21           MR. SISTI:  Something like that.  Okay.

22                      CONCLUSION OF SIDEBAR

23           THE COURT:  Please proceed.

24           MS. MACDONALD:  Can we please pull up the next page,

25  and I'll have you zoom in on parsonage or housing allowances.

1        Q.    Mr. Freeman, I'll ask you just to listen to my

2    question and answer just the question that I ask you.  Okay?

3        A.    Okay.

4        Q.    Thank you.

5              I'm just going to read this.

6              A minister who has furnished a parsonage may exclude

7    from income the fair rental value of the parsonages, including

8    utilities.

9              Did I read that correctly?

10       A.    Yes, you did.

11       Q.    Okay.  And that presumes that some ministers get

12   income, correct?

13       A.    Looks like it.

14       Q.    Okay.  Thank you.

15             Mr. Freeman, I'd like to talk now about your golden

16   rule.

17             Let's pull up 1541, please.

18             Bullet point number 1 here, Mr. Freeman, do not tell

19   our staff why you want the coins.

20             Did I read that correctly?

21       A.    You did.

22       Q.    Okay.  And you are sending this to coinatmradar,

23   correct?

24       A.    That's right.

25             MS. MACDONALD:  Okay.  Let's pull up 302, please.

1      Q.   And this was posted on one of your crypto kiosks,

2  correct?

3      A.   That was -- I believe it might have been Thirsty Owl

4  but, yes, we had those rules posted at all the vending

5  machines.

6      Q.   Okay.  And number 4 reads do not tell our staff why

7  you want to buy cryptocurrency; is that correct?

8      A.   That's right.

9           MS. MACDONALD:  Okay.  And let's pull up 1201,

10  please, Ms. Shedd.

11          And I'll have you choose any of these

12  advertisements, any one of them, Ms. Shedd.

13          And a little bit lower.

14      Q.   Once again, Mr. Freeman, under this disclaimer, do

15  the first two lines read, what you do with your bitcoin is your

16  business, don't tell me what your plans are; is that correct?

17      A.   Yes, it does.

18      Q.   Thank you.

19          I'd like to talk now, Mr. Freeman, about some of

20  your customers.

21          Let's look at 1224, please.  And if you could scroll

22  down a little bit.

23          This is a localbitcoins.com chat, correct?

24      A.   It appears to be.

25      Q.   Okay.  And here you're talking to somebody named

1    sweetcuteBarbie, correct?

2        A.   Yes.

3        Q.   And that person says:  I'm too old to take a selfie;

4    my hands are trembling.

5             Right?

6        A.   That's what they said.

7        Q.   Okay.  And you told them that they might use a

8    mirror, because you need to get that selfie, correct?

9        A.   It's very important, yes.

10       Q.   And let's go on to the end of the page.

11            SweetcuteBarbie says:  I can't hold something in one

12   hand and take a photo with my phone in the other hand.

13            Right?

14       A.   They said that.

15       Q.   And to page 2, they continue:  My hands tremble too

16   much.

17            Right?

18       A.   That's right.

19       Q.   And your response, Mr. Freeman, was some people hold

20   the paper with their mouth.

21       A.   Some people do.

22            MS. MACDONALD:  Okay.  And, Mr. Kennedy, if we could

23   pull up the Telegram folder.

24       Q.   Mr. Freeman, on direct you told Mr. Sisti about a

25   time that you believe you identified a scam because you noticed

1   that the receipt was scanned, correct?

2          A.    That's correct.

3          Q.    Okay.  And you testified that you look very

4   carefully at those photos that you get, right?

5          A.    I do.  Best I can.

6          Q.    Yup.  And you -- in that case, you zoomed in on it

7   and looked very closely?

8          A.    Yes.  It appeared to be that it was a scan, so --

9          Q.    Okay.

10         A.    -- I took a close look.

11         Q.    And that's how you figured that out?

12         A.    That's right.

13               MS. MACDONALD:  Okay.  Mr. Kennedy, could you open

14   Cindy Frank, please, and could you please open up that third

15   photo.

16         Q.    And, Mr. Freeman, you looked very carefully at this

17   photo?

18         A.    As I recall.

19         Q.    Okay.  And it's your testimony you thought this

20   person was a legitimate bitcoin customer, right?

21         A.    I did.

22               MS. MACDONALD:  Okay.  Let's pull up Donald

23   Huffman's folder, please, and the fourth photo in.

24         Q.    This one, Mr. Freeman, you looked closely at this

25   photo?

1          A.    Yes, I did.

2          Q.    And it's your testimony you thought this person was

3     legitimately investing in bitcoin?

4          A.    Yes.  Donald was a repeat buyer.

5                MS. MACDONALD:  Okay.  And how about, Mr. Kennedy,

6     Laureen Garcia.  That photo, thank you.

7          Q.    Again, Mr. Freeman, you looked very carefully at

8     this photo?

9          A.    Yes, and the other photo she provided.

10         Q.    And you believed that she was a legitimate bitcoin

11    customer?

12         A.    I had no reason to disbelieve that.

13               MS. MACDONALD:  Okay.  Danella Varel.  And I think

14    that's the one I'm looking for.

15         Q.    And you looked closely at this one as well?

16         A.    I certainly did.

17         Q.    Okay.  And could you zoom in on the -- and this one

18    says, drilling equipment, purchase of virtual goods, doesn't

19    it?

20         A.    Yes, I think I can see that.

21               MS. MACDONALD:  Okay.  Susan Giordano.

22         Q.    Mr. Freeman, I'm sorry.  I'm going to back up and

23    ask you one more question about Danella Varel.

24               Is it true, Mr. Freeman, that you have been

25    reporting on this trial on your nightly radio show?

1          A.    Yes, of course.

2          Q.    And you talked about Ms. Varel's testimony on your

3     radio show?

4          A.    Likely, yes.

5          Q.    Okay.  And you talked about how ridiculous it was

6     that she would believe that her boyfriend needed her to help

7     pay for the drilling equipment, correct?

8          A.    I didn't know anything at the time about drilling

9     equipment beyond what was on that form.

10         Q.    But you commented on your radio show that you

11    thought that was a ridiculous story.

12         A.    Yes.  Had I known that that was the case, I would

13    have told her that.

14         Q.    Okay.  And you were on your radio show with your

15    cohost Aria DiMezzo, correct?

16         A.    I think so.

17         Q.    And she called Ms. Varel a moron?

18         A.    Well, I wouldn't say the same thing.  I mean, people

19    can be fooled.

20         Q.    Sir, my question is did Ms. DiMezzo call Danella

21    Varel a moron --

22         A.    I don't recall.

23         Q.    -- on your radio show?

24               You don't recall her saying that Ms. Varel was

25    stupid?

1        A.    I wouldn't say the same things about that, if that's

2    what she said.  I don't recall.

3        Q.    You don't recall.  And you don't recall that on your

4    radio show just a few days ago you didn't disagree with her?

5        A.    I apologize if I didn't, but I don't recall that.

6              MS. MACDONALD:  Okay.  If you could pull up one of

7    these, please.

8        Q.    Again, Mr. Freeman, another photo that you reviewed

9    closely?

10       A.    That's correct.

11       Q.    Okay.  And you thought this was also a legitimate

12   bitcoin customer?

13       A.    Indeed.  She followed the instructions.

14             MS. MACDONALD:  Nancy Triestram.

15       Q.    Again, something you reviewed closely, Mr. Freeman?

16       A.    That's right.

17       Q.    Okay.  Another legitimate bitcoin customer?

18       A.    Absolutely.  Multiple-time.

19             MS. MACDONALD:  And Larry Bowman.

20       Q.    How about this one?  Did you look at this one

21   closely?

22       A.    I did, yes.

23       Q.    Okay.  And he was, in your mind, a legitimate

24   investor in bitcoin?

25       A.    At the time I had no reason to believe otherwise.

1          MS. MACDONALD:  Okay.  I think we've done enough.

2          If I could just have one moment, your Honor.

3          THE COURT:  Sure.

4          MS. MACDONALD:  No further questions.  Thank you.

5          THE COURT:  Redirect.

6          MR. SISTI:  Thank you, Judge.

7          I'd ask now to strike the IDs on C-2, C-3, and C-4,

8    based on the cross-examination referencing the feedback aspect,

9    and the reintroduction of 1206 and 1526 regarding feedback that

10   was questioned by the government's attorney.

11         THE COURT:  Okay.  Is it C-1 through C-3?

12         MR. SISTI:  It's C -- let me go through them.  C-2,

13   C-3, C-4.

14         THE COURT:  I see.  And that's the feedback, right?

15         MR. SISTI:  Those would be the positive, neutral,

16   and negative feedback aspects that I already asked the Court to

17   accept.

18         THE COURT:  Okay.  My ruling on those is I don't

19   view them as business records, but I also don't view them as

20   hearsay.  I think they can come in for the limited purpose that

21   I can instruct the jury on.

22         Do you have any other objections, though, besides

23   the hearsay?

24         MS. MACDONALD:  Other than the authentication

25   objection?

1          THE COURT:  Yeah, I don't think they're

2    authenticated, Counsel.  I think she's right about that.

3    Because to be -- as LocalBitcoins records, which Mr. Freeman

4    testified that they are, they're not -- they're not church

5    records or Freeman records, so he can't really authenticate

6    them.  So I don't think they're authenticated as LocalBitcoins

7    records and his testimony establishes that that's what they

8    are --

9          MR. SISTI:  Well --

10          THE COURT:  -- so I can't allow them in.  I can't

11    allow them in as not authenticated.  I didn't have any other

12    substantive problem with it, but they're not authenticated.

13          MR. SISTI:  These are the same LocalBitcoins records

14    or at least references to LocalBitcoins records that the

15    government has been introducing during the course of trial.

16          THE COURT:  Without objection, though.  Without

17    objection.

18          MR. SISTI:  Well, again, I mean, there doesn't seem

19    to be a problem with this other than -- other than with

20    Mr. Freeman.

21          THE COURT:  Yeah.

22          MR. SISTI:  And, again, they were referred to in the

23    cross-examination.  There was a specific reference as to

24    feedback, how feedback was important --

25          THE COURT:  Yeah.

1          MR. SISTI:  -- and that is exactly what Mr. Freeman

2     testified to and why he -- why he utilizes those records.  And

3     he utilizes those records for his day-to-day business or

4     day-to-day church transactions.

5          So I'm just saying if he wants to get -- if they

6     want to dive back into the water, so do I, Judge.

7          THE COURT:  I do.

8          MS. MACDONALD:  Your Honor, the localbitcoins.com

9     records that we introduced were introduced with a business

10    certification from localbitcoins.com.  Those records did not

11    come from what we received from localbitcoins.com.

12          THE COURT:  The testimony about the feedback is all

13    admissible and proper for the jury to hear, but the records

14    themselves are unauthenticated and I'm not going to admit them.

15          Now, 1206 and 1526, I guess I need to see them

16    before I can rule.  I will --

17          MR. SISTI:  Those are in.

18          THE COURT:  Those are in?

19          MR. SISTI:  Those are in.

20          THE COURT:  Oh, okay.  Then --

21          MR. SISTI:  We're good with that.

22          THE COURT:  No problem.

23          MR. SISTI:  Right.  Thank you.

24                    REDIRECT EXAMINATION

25    BY MR. SISTI:

1        Q.   So you understand that, Ian.  I mean, as far as the

2   feedback aspects, you can testify to them.  It's just that the

3   documents can't come in.  Do you understand that?

4        A.   Sure, although I will say that I downloaded them.

5        Q.   I understand.  It's fine.  You downloaded them but,

6   again, you heard the judge's ruling.

7        A.   I heard it.

8        Q.   We'll abide by that.

9        A.   Sure.

10        Q.   Okay.  Now, with regard to the positive feedbacks

11   that you said were important, they are important?

12        A.   They're very important.

13        Q.   All right.  And does that aid you in going forth and

14   actually seeking out and selling bitcoin?

15        A.   Well, in that case, the positive feedbacks would be

16   looked at by potential buyers who are presented with an entire

17   website full of potential sellers and they have to determine

18   which seller they want to choose.  And the fact that I had what

19   LocalBitcoins called a 100 percent positive feedback rating,

20   despite the fact that there were five negatives and 14

21   neutrals, because I had like 14 -- almost 1,400 positives, it

22   was still enough to call it 100 percent positive.

23        So when someone looked at my profile, they would see

24   the tremendous amount of trade volume over the years and the

25   positive feedback.  It would be a no-brainer.

1      Q.   Okay.  So, actually, this is part of the, actually,

2  transaction kind of advertising, getting good feedback?

3      A.   Yeah, absolutely.  You want to have a good

4  reputation or no one's going to be interested in you.

5      Q.   And the reputation that you had from LocalBitcoins

6  was the highest?

7      A.   I mean, it was 100 percent.  There probably were

8  some other sellers who'd been on the site longer and had more

9  positive feedback than me, but I was what they called a pro

10  level seller.

11      Q.   Okay.  I want to clear up a few things.

12           You just got a rapid fire look at a bunch of elderly

13  individuals that were shown to the jury again.

14      A.   Yes.

15      Q.   We've seen these individuals before in this trial,

16  correct?

17      A.   Some of them appeared.

18      Q.   Yeah.  And with regard to their purchasing, do you

19  just like automatically say it's -- I'm not going to sell to

20  you, you're too old?

21      A.   No, I don't discriminate.

22      Q.   Okay.  Do you say, I'm not going to sell to you

23  because you're too young?

24      A.   No.

25      Q.   Okay.  And with regard to those photos that you

1    were -- that you were shown, you were shown individuals that

2    some of them had done multiple purchases from you, haven't

3    they?

4         A.   A lot of them had, yes.

5         Q.   Right.  And did they directly complain to you about

6    anything?

7         A.   No, they didn't.  Had they given me some idea that

8    there was something untoward going on, I would have done

9    everything I could to help them in that circumstance.

10        Q.   And was there any negative feedback from any of

11   those folks?

12        A.   Not that I'm aware of.

13        Q.   All right.

14        A.   The only negative feedback I received was from

15   scam artists who were upset, I presume, because some people

16   complained that he requires too many pictures.  If you were to

17   look at it, you'd see that.

18        Q.   All right.  And when we went through a number of

19   these individuals, the name Varel came up again.  You remember

20   her?

21        A.   Yes.  She was the certified financial planner, since

22   retired.

23        Q.   Right.  You -- you didn't call her stupid, right?

24        A.   Absolutely not.

25        Q.   You didn't call her a moron, did you?

1      A.    No, and I wouldn't.  And I am sorry that those

2  things happened to those folks.

3      Q.    And, in fact, with Ms. Varel, if we could just

4  remember that situation, were you the individual that was the

5  one that asked her if she really wanted to invest that kind of

6  money?

7      A.    Yes.  I did call Ms. Varel.  And even though she

8  only recalled that one question, it would have been a series of

9  questions that I asked her.

10      Q.    Do you recall if any of the banks that dealt with

11  Ms. Varel stopped her from cutting loose hundreds of thousands

12  of dollars?

13      A.    None of the banks stopped any of the buyers because

14  they all were allowed to send wire transfers.

15      Q.    And these would have all been the elderly

16  individuals that were just depicted?

17      A.    People of all ages but, yes, those included.

18      Q.    Okay.  The FinCEN letter again.  What did you think

19  that was when you got it?

20      A.    It could have been a scam, but if it was really from

21  FinCEN, then I thought their opinion was incorrect.

22      Q.    All right.  And from the date that you got this

23  email that wasn't even addressed to you, was there any

24  follow-up from them at all?

25      A.    At no point have I ever been contacted directly by

1   anyone from FinCEN --

2        Q.    Okay.

3        A.    -- meaning using my name.

4        Q.    Okay.  With regard to any of the banks that we've

5   heard about that accounts were closed or they had issues with

6   bitcoin, did any of those banks even lose one cent to you?

7        A.    At no point did the banks lose anything at all to

8   me.  In fact, they gained through the various different fees

9   that they charged the accounts.

10       Q.    With your good faith investigation into the IRS

11  code, what did you determine your status to be vis-a-vis

12  501(3)(c) and church definition?

13       A.    Yeah, thank you for asking.

14             This was something that we did a lot of research on

15  before forming the Shire Free Church.  And so what we

16  researched was what's called the Free Church Movement.  And

17  this is a group of churches, many of which already exist, who

18  have decided that they -- by becoming a 501(c)(3) organization

19  or filing for that with the IRS that they had ended up

20  restricting themselves without realizing what they were getting

21  into.

22             A 501(c)(3) is not required to be a church.  As I

23  explained earlier, a church is something that's outside of the

24  government.  It's a creation of man for the purpose of bringing

25  people together to worship God and to learn and understand the

1    nature and the purpose of the universe.

2            Churches do things like incorporate in order to

3    interact in the sort of the legal world and so many churches

4    are given advice, which in my opinion is bad advice, by many

5    attorneys who would love to hold their hand through a 501(c)(3)

6    application which, as I understand it, is very complicated.

7    And, of course, the attorneys get paid thousands of dollars to

8    do this and then at the end of it, if they get the 501(c)(3),

9    it comes along with a lot of the restrictions that the attorney

10   read during the cross-examination.  But those restrictions do

11   not apply if you're not 501(c)(3).

12           And so the Free Church Movement is the idea of any

13   church that has felt restricted by 501(c)(3) and all of its

14   rules can undo that.  They can release those shackles to cancel

15   the 501(c)(3) and return to a free church status.

16           And an important thing that we learned when we were

17   looking at the IRS code is that one of the big concerns, one of

18   the reasons why lawyers recommend churches get 501(c)(3) is

19   because that means -- they say that means donations to those

20   churches are tax-deductible, which is true, but it's also true

21   that donations to any church are tax-deductible, according to

22   the IRS code.

23           So the big lie about 501(c)(3) is that you need it

24   to receive tax-deductible contributions and that is not true.

25   The truth is any church can receive tax-deductible

1   contributions.  So a lot of churches in the Free Church

2   Movement has -- have undone the 501(c)(3).  In our case, we

3   never did the 501(c)(3).  We formed Shire Free Church as a free

4   church and we don't have to ask permission for that.

5               So what they were showing on cross-examination was a

6   list of restrictions that apply specifically to people that

7   want 501(c)(3) status, which we do not.

8        Q.    Okay.  And, again, you don't receive any income?

9        A.    That's correct.

10       Q.    All right.  And as far as your golden rules or your

11  rule one, although they don't seem to be rule one all the

12  time --

13       A.    Yeah.

14       Q.    -- why is it that you would stay -- or why would

15  there be a sign up in like a bar, restaurant, convenience

16  store, that says, do not tell our staff why -- I mean, first of

17  all, do you have any staff?

18       A.    Well, I don't have staff.  The Shire Free Church

19  has no employees.  But the bar certainly has staff or the

20  convenience store certainly has staff.  And what we didn't want

21  to have happen was for a store employee to be put in the

22  awkward circumstance of, say, having someone come into the

23  store to purchase some bitcoin and tell the store employee,

24  either before or after purchasing the bitcoin, I'm going to buy

25  some marijuana with this bitcoin, right?

1          That would put that store employee in a very

2    difficult circumstance of having to.  If they hadn't purchased

3    the bitcoin yet, if the person hadn't purchased the bitcoin,

4    would they then have to, you know, somehow stand in front of

5    that person and physically block them from using the machine?

6    Would they need to, you know, call the police?  It would be a

7    very difficult situation to deal with because that person would

8    have admitted that they were intending to do something that

9    would have been illegal in a lot of places with that bitcoin.

10         So it would be better to not put a store employee in

11   a situation like that, where they wouldn't necessarily know how

12   to deal with that, where if Pavel showed up and tried that with

13   one of the store employees, they may have been arrested for a

14   money laundering charge.

15         So the -- the point of putting that there was to

16   give the store employees at the very least the ability to say,

17   hey, look, you broke the rules and we don't want to deal with

18   you, you know, you have to leave or something like that.  But,

19   you know, better to leave those things unsaid in that case.  It

20   was for their protection.

21        Q.   All right.  It was for their protection?

22        A.   Yes, and ours, and the customers' as well.  Because

23   privacy matters.

24             MR. SISTI:  Thank you, Ian.  No further questions.

25             MS. MACDONALD:  Nothing further, your Honor.

1          THE COURT:  Please resume your seat at counsel

2     table.

3               (Witness excused.)

4          MR. SISTI:  Can we just approach, Judge --

5          THE COURT:  You may.

6          MR. SISTI:  -- about scheduling?

7          THE COURT:  Sure.

8          THE CLERK:  Would the jurors take their headphones

9     off, please?

10                    AT SIDEBAR

11         THE COURT:  We don't need a record for this.

12             (Off-the-record discussion.)

13         THE COURT:  Ladies and gentlemen of the jury, I'm

14    going to discharge you for the day.  Tomorrow you will

15    certainly, possibly among other things but certainly, hear

16    jury instructions and closing arguments and begin your

17    deliberations.  That will happen tomorrow.

18             Under any set of circumstances, right, Counsel?

19             MR. SISTI:  That is correct.

20         THE COURT:  Yeah.  So I'm going to discharge you for

21    the day.  I'll see you at 9:00 a.m. tomorrow.  Remember my

22    usual admonition, though, right?  No conversations about the

23    trial with anybody.  No access about the trial from any source.

24             Have a good night.

25             THE CLERK:  All rise.

1                          (Jury excused.)

2              THE COURT:  Please be seated.  Anything else on the

3    record for the Court?

4              MR. SISTI:  Nothing.

5              THE COURT:  Okay.  Why don't we convene in the jury

6    deliberation room right here and we'll talk about the charge.

7              (Proceedings adjourned at 4:27 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 3/10/23          */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR