**IN THE UNITED STATES DISTRICT COURTFOR**
**THE DISTRICT OF NEW HAMPSHIRE**

THE UNITED STATES OF AMERICA

v.                                                        No. 1:21-cr-41-JL-1

IAN FREEMAN

SUPPLEMENT TO OBJECTION
TO MOTION FOR ORDER OF FORFEITURE

The defense supplements its objection to the Government's Motion for Order of

Forfeiture, Doc. 321, as follows.[1]

In a superseding indictment, Doc. 139, the Government charged Ian Freeman with

thirty-two counts of criminal conduct.  Thereafter, the Government elected to not proceed on

charges of Conspiracy to Commit Wire Fraud and Bank Fraud (one count), Wire Fraud (sixteen

counts), Money Laundering (six counts), and Continuing Financial Criminal Enterprise (one

count). With twenty-four of the thirty-two counts dropped, the Government and Freeman went

to trial on eight counts.

The jury convicted Mr. Freeman on all counts. The convictions are for: Operating an

Unlicensed Money Transmitting Business, Conspiracy to Operate an Unlicensed Money

Transmitting Business, Money Laundering, Conspiracy to Commit Money Laundering, and four

counts of Tax Evasion.

The Government does not base its forfeiture motion on the Tax Evasion convictions.

Also, the Court has granted the defense's Rule 29 motion as to the Money Laundering count, so

that conviction is also unavailable as a basis for forfeiture.

---

[1] Defense counsel confirmed with the Government that it does not object to the filing of a supplemental
memorandum. Similarly, the defense does not object to a further memorandum and/or reply from the Government.

That leaves only the convictions for Operating an Unlicensed Money Transmitting Business, Conspiracy to commit that same offense, and Conspiracy to Commit Money Laundering, as the bases for any forfeiture order. The Government says that it relies entirely on the Unlicensed Money Transmitting Business count because money involved in that conviction necessarily includes the money involved in the Money Laundering offenses. Doc. 321, p. 3-4. However, that seems to have been written before, but likely in anticipation of, the Court's order granting the Rule 29 motion regarding the Money Laundering count. In any event and in the end, the Government bases its motion for forfeiture solely on Freeman's conviction for Operating an Unlicensed Money Transmitting Business. *Id.*

The Government's motion seeks a forfeiture order of more than $20 million because that is the amount of money that passed through bank accounts controlled by Freeman. The $20 million proposed forfeiture is not based on convictions for completed crimes involving fraud or theft. It is not even based on proven knowledge of the illegality of the funds passing through Mr. Freeman's business. In addition, the requested forfeiture is not limited to profits Mr. Freeman made in operating the business. Nor is it based on losses resulting from the offense conduct. The Government seeks a forfeiture order equal to the millions that passed through Mr. Freeman's accounts even though he used the cash that passed through these accounts to buy Bitcoin that he in turn supplied to customers, with the result that the customers received precisely what they intended to purchase. In short, the Government seeks a huge forfeiture order on the basis of a regulatory offense with a minimally culpable mental state and which did not result in any gain or loss to anyone.

To reach its goal, the Government asks the Court for an expansive interpretation of 18 U.S.C. § 982(a)(1)'s "involved in" standard—an interpretation developed in the context of

money laundering—and applies it in the new context of operating an unlicensed money transmitting business. The First Circuit's understanding of this standard, as well as the understanding of other courts, does not countenance such an expansive reading of the statute. The Government's proposal would allow the forfeiture of an entire business when no customer lost any money, the defendant did not make any unlawful profit, and there was no deceit or fraud proven.  It therefore exceeds the First Circuit's understanding of § 982(a)(1) and runs headlong into the Eighth Amendment's prohibition on grossly disproportionate forfeitures. "Involved in" cannot reasonably be read to encompass every penny that in any way related to the defendant or his businesses. The mere failure to have a license from FinCEN does not render every cent from every account subject to forfeiture when customers received exactly what they paid for. To the contrary, the Government has not shown how any forfeiture is justifiable in this case.

THE GOVERNMENT WRONGLY SEEKS AN EXPANSIVE READING OF THE "INVOLVED IN" STANDARD FOR FORFEITURE UNDER 18 U.S.C. § 982(a)(1) AS IT APPLIES TO 18 U.S.C. § 1960.

The First Circuit has not opined on the interplay of criminal forfeiture under 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 1960. Here, the Government is seeking to apply an understanding of "involved in" that was developed in the context of §§ 1956 and 1957 in the new context of § 1960 to seek the forfeiture of millions of dollars neither laundered nor retained as profit, but simply used to purchase Bitcoin sold to customers. This interpretation goes beyond what the First Circuit held in *United States v. McGauley*, 279 F.3d 62 (1st Cir. 2002) and in the other circuit decisions upon which the First Circuit relied. The Government's aggressive interpretation of the interplay between § 982(a)(1) and § 1960 elides the limiting principles the

circuit courts recognized and opens the door to nearly boundless forfeitures of money transacting businesses.

In *McGauley*, the First Circuit concluded that 18 U.S.C. § 982(a)(1) "authorizes the forfeiture of legitimate funds that have been commingled with the proceeds of unlawful activity for the purpose of concealing those proceeds." *McGauley*, 279 F.3d at 65. McGauley's criminal forfeiture under § 982(a)(1) resulted from her conviction for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i). *Id.* at 75. Therefore, in interpreting what counted as "involved in," the district court looked at the language of § 1956(a)(1)(B)(i), specifically, "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." As the First Circuit summarized, "the commingling of tainted funds (mail fraud proceeds) with legitimate funds is enough to expose the legitimate funds to forfeiture, if the commingling was done for the purpose of concealing the nature or source of the tainted funds (that is, if the commingling was done to facilitate money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i))." *McGauley*, 279 F.3d at 76. Here, by contrast, the Government has not established that any alleged commingling was done to facilitate the unlicensed money transmitting business, and so the crucial connection between the forfeiture statute and the underlying criminal conviction is absent.

The other appellate decisions the *McGauley* court looked to illustrate the crucial interplay between the criminal forfeiture and the underlying substantive offense. So, for instance, in *United States v. Bornfield*, 145 F.3d 1123 (10th Cir. 1998), the Government sought forfeiture under § 982 tied to a conviction for money laundering under § 1957. *Id.* at 1136. The court held that "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture" but that

"forfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of, his scheme." *Id.* at 1135 (citing *United States v. Tencer*, No. 95-31135, 1997 U.S. App. LEXIS 12778 (5th Cir. Mar. 10, 1997)). The Tenth Circuit concluded that while the defendant's personal account was forfeitable because it was utilized in his money laundering transaction and thus "involved in" the money laundering offense, the business account, which had no connection to the money laundering offense, was not a forfeitable asset. *Id.* at 1138. Applying those principles here, Mr. Freeman's pooling of cash in various accounts to purchase and sell Bitcoin did nothing to "disguise the nature and source of his scheme." Mr. Freeman would not have kept such detailed records of his sales (upon which the Government relied heavily at trial) if he was seeking to disguise it.

Similarly, *United States v. Tencer*, No. 95-31135, 1997 U.S. App. LEXIS 12778 (5th Cir. Mar. 10, 1997), which both the *McGauley* and *Bornfield* courts cited heavily, indicates that a broad interpretation of "involved in" stems from its particular relation to money laundering. The Fifth Circuit was persuaded that "forfeiture of legitimate and illegitimate funds commingled in accounts was proper as long as the government demonstrated that the defendant had pooled the funds to disguise the nature and source of his scheme." *Id.* at 39 (*citing United States v. Contents of Account Nos.*, 847 F. Supp. 329, 335 (S.D.N.Y. 1994)). The court explained that "merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture." *Id.* at 38. But it was the particular facts of the case that subjected the entire account to forfeiture under the "involved in" standard: "the money laundering counts arose from six transfers of funds by wire and check from various accounts throughout the country into one account in [the defendant's] name at California Federal" and

"[a]ll of the funds—both legitimate and illegitimate—were quickly moved into the account within a few days in order to conceal the nature and source of the mail fraud proceeds." *Id.* at 40-41.

Here, the Government has failed to show how Mr. Freeman's sale of virtual currencies facilitated, or made his prohibited conduct, "less difficult or more or less free from obstruction or hindrance." *Tencer*, 107 F.3d at 36-36 (quoting *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990) (defining term in context of a drug forfeiture statute that expressly used the "facilitating" language)).

The final appellate decision the *McGauley* court looked to was *United States v. Baker*, 227 F.3d 955 (7th Cir. 2000). The defendant in *Baker* was convicted of fifteen counts of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), six counts of engaging in monetary transactions in criminally-derived property under 18 U.S.C. § 1957, and one count of conspiracy to launder money under 18 U.S.C. § 1956(a)(1)(A)(i) & (h) related to a massage parlor and prostitution business. *Baker*, 227 F.3d at 958-59. The Seventh Circuit concluded that all the funds were forfeitable because "all of the funds from Baker's prostitution business over the years—both the proceeds from credit card and ATM transactions and other proceeds—were illegal, and as a result Baker *laundered all of them*" and "[a]ll of these funds were thus 'involved in' the money laundering conspiracy, not just the specific credit card transactions the government proved were for prostitution services and not just the specific monies the government proved were laundered." *Id.* at 969 (italics in original). Here, by contrast, as Government witnesses admitted at trial, nothing about the sale of underlying sale of Bitcoin was illegal.

The two cases the Government offers for the application of § 982 to the operation of an unlicensed money transmitting business under § 1960 are clearly distinguishable from the facts

at hand. The Government offers *United States v. Elfgeeh*, 515 F.3d 100 (2d Cir. 2008) and

*United States v. Sterlingov*, No. 21-399 (RDM), 2023 U.S. Dist. LEXIS 37271 (D.D.C. Mar. 6,

2023) for the proposition that "the government [is] entitled to forfeit all the funds that were

transmitted as part of both [sic] Freeman's unlicensed money transmitting business." Gov't

Mot. For Forfeiture, Doc. 321 at 7. They do not. The Second Circuit's decision in *Elfgeeh*,

rendered under a plain-error standard, concerned a *hawala* operation where the disputed monies

to be forfeited were found by the jury to have violated both structuring laws under 31 U.S.C. §

5324(a)(3) and transferring requirements under 18 U.S.C. § 1960(a). *Elfgeeh*, 515 F.3d at 138.

The Second Circuit concluded that because the monies "plainly were 'involved in' *those*

offenses," they were appropriately included in the forfeiture total. *Id* (emphasis added). By

contrast, the Government has not shown that all of the $20,576,246.54 it seeks forfeited in this

case derived from unlawful conduct, such as structuring crimes or fraud crimes. The alleged

illegality of the great bulk of the money passing through Freeman's accounts is simply that his

business was not licensed, nothing more. The *Elfgeeh* court itself acknowledged the possibility

that the funds in controversy might not have been forfeitable if the defendant had presented

evidence and provided the jury a "basis for returning a verdict in an amount less than that

sought by the government." *Id.* at 139. In short, *Elfgeeh* does not stand for the proposition that

all money that passes through an unlicensed money transmitting business is subject to

forfeiture.

The facts of *Sterlingov* bear a closer resemblance to the facts here, but the Government's

contention that it provides "legal precedent on forfeiture related to operation of an unlicensed

money transmitting business suggests that all money transmitted through such a business is

subject to forfeiture" goes too far. As the D.C. District Court noted, "[w]here forfeiture is based

on allegations of money laundering or operating an unlicensed money transmitting business, this means that a defendant may challenge whether the seized property was 'involved in' these offenses or is traceable to property that was." *Sterlingov*, No. 21-399 (RDM), 2023 U.S. Dist. LEXIS 37271, at *11 (*citing E-Gold*, 521 F.3d at 419 and 18 U.S.C. § 982(a)(1)). But as the court noted, the "key facts bearing on the traceability inquiry [were] less contested than one might expect" because "Sterlingov admit[ted] that most if not all of the seized funds arrived in his [] accounts by way of Bitcoin Fog" ["a bitcoin mixer (or tumbler) that offers enhanced anonymity to those engaged in bitcoin transactions"]. *Sterlingov*, No. 21-399 (RDM), 2023 U.S. Dist. LEXIS 37271, at *14, *3. Because "*all* funds deposited with Bitcoin Fog were intermingled (or tumbled) with other funds, [] thus *all* of the funds were 'involved in' the alleged operation of an unlicensed money transmitting business." *Id.* at *19-20. These "two essential facts," that "Sterlingov admit[ted] that he mixed most, if not all, of the seized funds using Bitcoin Fog before the funds reached his personal accounts" and that "the very essence of Bitcoin Fog's service was commingling—that is, mixing—funds" led the court to conclude that all the funds "contributed to its efficacy and facilitated its activities—both lawful and unlawful. *Id.* at *22. The crucial difference, therefore, is that by design, Sterlingov's operation of an unlicensed MTB required the mixing of all funds (the Bitcoin tumbler could not operate without legitimate Bitcoin to mask the illegitimate ones), whereas Mr. Freeman's did not. Each of Mr. Freeman's sales of virtual currency was independent and did not touch other transactions.

When applying the "involved in" standard to the operation of an unlicensed money transmitting business, the Court should also recognize the important differences between the regulatory offense of not having a license and other crimes, such as wire fraud or money

laundering, which require a more culpable mental state. Money laundering requires a more culpable mental state regarding the source of the funds than operating an unlicensed money transmitting business. For instance, the First Circuit's pattern jury instructions for money laundering require the defendant's knowledge that the funds "were the proceeds of some kind of crime that amounts to a state or federal felony" (instructions for 18 U.S.C. § 1956(a)(1)(B)(i)) or "were the proceeds of unlawful activity" (instructions for 18 U.S.C. § 1956(a)(1)(B)(ii)). First Circuit Pattern Criminal Jury Instructions Drafting Committee, *Pattern Criminal Jury Instructions for the District Courts of the First Circuit* (2023). *See also United States v. Isabel, 945 F.2d 1193, 1201 n.13 (1st Cir. 1991)* ("'The defendant need not know exactly what crime generated the funds involved in a transaction, only that the funds are the proceeds of some kind of crime that is a felony under Federal or State law.' (quoting S. Rep. No. 433, 99th Cong., 2d Sess. 12 (1986)) (alteration in original)"); *McGauley*, 279 F.3d at 69 ("the government must show that [the defendant] conducted financial transactions involving the proceeds of unlawful activity, knowing that the transactions involved the proceeds of unlawful activity, and that the transactions were designed 'to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'") (quoting 18 U.S.C. § 1956(a)(1)(B)(i)); *United States v. Martinez-Medina*, 279 F.3d 105, 115 (1st Cir. 2002) ("Where the defendant is someone other than the source of the illegal proceeds...the statute is concerned with his knowledge of the source's intent in the transaction.).

While there are no First Circuit pattern instructions for operating an unlicensed money transmitting business, this Court's jury instructions, and case law elsewhere, indicate a less culpable mental state is required for conviction under § 1960. This Court instructed the jury that "[k]nowingly means that the defendant was aware of the facts that establish the existence of a

money transmitting business, in other words, the defendant knew he was participating in an enterprise carried on for financial gain that involved more than a single isolated act of transferring funds." Trial Tr. Day 10 Afternoon (doc. no. 283) at 20:19-24. The Court specifically noted that "the government does not need to prove that the funds were derived from or intended to promote any specific criminal offense." *Id.* at 22:13-15. Thus, the jury was not required to find that Mr. Freeman knew the money transferred stemmed from fraudulent activity. *See also United States v. Keleta*, 441 F. Supp. 2d 1, 2 (D.D.C. 2006) ("18 U.S.C. § 1960(b)(1)(B) on its face does not contain a knowledge or willfulness requirement, nor does 31 U.S.C. § 5330 to which it refers"); *United States v. Barre*, 324 F. Supp. 2d 1173, 1177 (D. Colo. 2004); *United States v. Dimitrov*, 546 F.3d 409, 414 (7th Cir. 2008) ("the statute no longer contains any requirement that a money transmitting operator know that what he is doing is prohibited by state law"); *United States v. Elfgeeh*, 515 F.3d 100, 132-33 (2d Cir. 2008). Because the jury was not required to find the more culpable mental state associated with money laundering charges when it convicted Mr. Freeman for operating an unlicensed money transmitting business, forfeiture guided by principles derived from money laundering cases is not appropriate. The conviction for Operating an Unlicensed Money Transmitting Business did not require, and the jury did not find, that Mr. Freeman knew his business involved proceeds from unlawful activities.

Finally with regard to application of the statute, the Government's broad interpretation of "involved in" leads to absurd results. It would mean that were a large financial institution to violate 18 U.S.C. § 1960, the Government could seek forfeiture of the entire business. There is no limiting principle that would prevent, for example, the Government seeking the forfeiture of an entire multi-billion dollar financial institution merely because the institution failed to follow

a registration requirement. Cabining the scope of "involved in" follows from the Supreme

Court's decision in *Honeycutt v. United States*, 581 U.S. 443 (2017). While the Court's

*Honeycutt* decision concerned the scope of 21 U.S.C. § 853(a)(1) and not 18 U.S.C. § 982, the

logic is similar. In *Honeycutt*, because the defendant "had no ownership interest in his brother's

store and did not personally benefit" and "never obtained tainted property as a result of the

crime," forfeiture was unwarranted. *Honeycutt*, 581 U.S. at 453. Similarly, Mr. Freeman did not

retain an ownership interest in any of the virtual currency sold nor obtained tainted property as a

result of his crime. To set a forfeiture amount based on a total of funds passing through his

business when the funds did not belong to him would contradict the principles recognized by

the Supreme Court in *Honeycutt*.

THE GOVERNMENT'S PROPOSED FORFEITURE IS GROSSLY DISPROPORTIONAL
TO THE CONVICTIONS.

Even if the Government's requested forfeiture is consistent with the statute, it is

nonetheless unconstitutional. The Government's proposed forfeiture of $20,576,246.54 is

grossly disproportional under the Eighth Amendment, the Supreme Court's decision in *United

States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028 (1998), and First Circuit precedent. The

Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines

imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Bajakajian*,

the Supreme Court interpreted the Excessive Fines Clause to cover criminal forfeitures and held

that forfeiture under § 982(a)(1) constitutes punishment covered by the Eighth Amendment.

*Bajakajian*, 524 U.S. at 328. The Supreme Court stated that the "touchstone of the

constitutional inquiry under the Excessive Fines Clause is the principal of proportionality: The

amount of forfeiture must bear some relationship to the gravity of the offense that it is designed

to punish." *Id.* at 334 (citing *Austin* v. *United States*, 509 U.S. 602, 622-623 (1993). The Court

pointed to two "particularly relevant" considerations: "that judgments about the appropriate punishment for an offense belong in the first instance to the legislature" and "that any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise" so "the standard of gross disproportionality" comparing "the amount of forfeiture to the gravity of the defendant's offense" was the appropriate standard. *Bajakajian*, 524 U.S. at 336-37. As to the facts of the case, the Court held that the forfeiture of $357,144 in currency that the defendant failed to report upon leaving the United States in violation of federal law was "grossly disproportional to the gravity of his offense." *Bajakajian*, 524 U.S. at 324. Because defendant's crime was "solely a reporting offense," the defendant did not "fit into the class of persons for whom the statute was principally designed," the statutory penalties nowhere reached the proposed forfeiture, and the "harm the [defendant] caused was minimal," the "forfeiture would be grossly disproportional to the gravity of the offense." *Id.* at 337-40. Many of the same reasons are applicable here.

The First Circuit has developed a three-part inquiry to determine whether a forfeiture is grossly disproportional under *Bajakajian*. As it explained in *United States v. Jose*, 499 F.3d 105 (1st Cir. 2007), for "Eighth Amendment excessive fine purposes, pertinent factors include: (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *Id.* at 111 (cleaned up). In addition, "[g]iven the history behind the Excessive Fines Clause, it is appropriate to consider whether forfeiture would deprive [the defendant] of his livelihood." *Id.* at 113; *see also United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008). The defense recognizes that the final de facto fourth factor regarding livelihood, has no practical application here. However, application of the three-

factor test indicates that the Government's proposed forfeiture of $20,576,246.54 is grossly disproportional and offends the Eighth Amendment's prohibition on excessive fines.

First, Mr. Freeman is not within the class of persons at whom the criminal statute (specifically, 18 U.S.C. § 1960) was principally directed. The purpose of the registration requirement in this law is to allow law enforcement to "effectively enforce the criminal, tax, and regulatory laws and prevent such money transmitting businesses from engaging in illegal activities." *See* Riegle Community Development and Regulatory Improvement Act of 1994, P.L. 103-325, 103rd Cong., § 408 (1994), Findings and Purposes. Thus, the measurable harm the statute seeks to prevent is the furtherance of *other* illegal activities, beyond the mere regulatory offense of failing to register. To the extent there is a violation of this regulatory statute without additional related criminal conduct, the violation does not harm anyone the statute was intended to protect.

In addition, as the defense explained in its Motion to Dismiss, virtual currency did not even exist at the time Congress passed the statute. at the time of the events charged, FinCEN, without authority from Congress, unilaterally classified virtual currencies as within its regulatory authority and subject to § 1960. Such unbridled discretion to an administrative agency falls afoul of the major questions doctrine where Congress must "speak clearly if it wishes to assign agencies decisions of vast 'economic and political significance.*" Utility Air Regulatory Group v. E.P.A.*, 573 U. S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)); *see also West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2609 (2022) ("Agencies have only those powers given to them by Congress") and *Biden v. Nebraska*, 600 U.S. ___ (2023) (slip op., at 19-21). It was not until the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116- 283,

134 Stat. 3388, 4552 (2021) that Congress added language to include money transmitting businesses which dealt in virtual currency. Because criminal liability is governed by the substantive criminal law in effect during the operative timeframe for the indictment, the class of persons for whom the statute was principally designed does not include Mr. Freeman or others engaged in the sale of virtual currencies. *See Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388-89 (1798); *United States v. Molina*, 407 F.3d 511, 525 (1st Cir. 2005). Thus, while the defense must recognize that the Court denied the Motion to Dismiss, it is nonetheless clear that Mr. Freeman, at the time of the offenses, was not and could not have been within the class of persons at whom the statute was principally directed.

As to the second factor, the other penalties authorized by the legislature indicate the grossly disproportional nature of the Government's proposed forfeiture. As recognized by the Office Probation, there is no restitution due for Mr. Freeman's convictions. Presentence Investigation Report, at §120, p, 30 (hereinafter "PSIR"). The Probation Office notes that "[r]estitution is not applicable with respect to Counts 1s, 2s, and 28s" and "restitution in the total amount of $281,588.69 may be ordered with respect to Counts 29s through 32s," the tax evasion counts. *Id.*; see also §§38-39. The Government's proposed forfeiture is an order of magnitude greater than the restitution and would require Mr. Freeman to forfeit $20,000,000 more than in restitution. Although there is some disagreement as to whether the maximum financial penalties provided for under the Sentencing Guidelines or the statutory maximum fine are the appropriate benchmark for determining gross disproportionality, the Government's proposed forfeiture far exceeds both. *See United States v. Beras*, 183 F.3d 22, 29 n.5 (1st Cir. 1999) and *Jose*, 499 F.3d at 112. The PSIR notes the statutory and guidelines maximum is approximately $11.5 million. The Government seeks roughly ten million dollars more, all the

14

while acknowledging that Mr. Freeman's profits were roughly one million dollars. *Ian Freeman Convicted On All Counts Relating To Bitcoin Money Laundering Scheme*, U.S. Attorney's Office, District of New Hampshire (Dec. 22, 2022), https://www.justice.gov/usao-nh/pr/ian-freeman-convicted-all-counts-relating-bitcoin-money-laundering-scheme ("Freeman made in excess of a million dollars"). This belies the Government's claim of a "conservative approach" and instead illustrates that it seeks a grossly disproportionate criminal forfeiture.

Third, as to the harm caused by Mr. Freeman's conduct, the PSIR notes that Mr. Freeman's "actions of converting criminally derived proceeds to cryptocurrency, enabling the [scam] perpetrators of those crimes to conceal the source of those proceeds, are distinct and separate from the underlying fraud, for which there is no evidence that the defendant conspired, caused or contributed." PSIR, Addendum 1, p. 3. But rather than the $20 million plus described in the Government's motion, the PSIR notes that the government has identified only approximately "$5 million that was the result of Freeman's customers [not Freeman] defrauding victims." PSIR §35. Moreover, "it is not clear that the scam victims were 'directly or proximately' harmed by the defendant's offense because there is no evidence that he conspired, caused or contributed to the underlying offense/offenses from which the funds were derived." *Id*. Thus, the Government cannot attribute $5 million in harm, let alone $20 million, to Mr. Freeman. In seeking more than $20 million in criminal forfeiture, the Government is attempting to have Mr. Freeman pay for the crimes of others.

CONCLUSION

For all of the foregoing reasons, the Court should deny the Government's Motion for Order of Forfeiture. The proposed criminal forfeiture is based only on the regulatory offense of not Operating an Unlicensed Money Transmitting Business. That offense does not involve fraud, theft, or even knowledge that funds passing through the Money Transmitting Business are illegal. The Government has not established that forfeiture is warranted under 18 U.S.C. §982(a)(1). Moreover, the proposed forfeiture of $20 million is unconstitutionally grossly disproportional to the offense of conviction.

WHEREFORE the defense requests that the Court deny the Government's motion.

Date: August 28, 2023.                    Respectfully submitted by counsel for Ian Freeman

                                          */s/ Richard Guerriero*
                                          Richard Guerriero, Esq.
                                          N.H. Bar ID. 10530
                                          Law Clerk: Oliver Bloom
                                          Lothstein Guerriero, PLLC
                                          Chamberlain Block Building
                                          39 Central Square, Suite 202
                                          Keene, NH 03431
                                          Telephone: (603) 352-5000
                                          richard@nhdefender.com

                                          Mark L. Sisti, Esq.
                                          N.H. Bar ID 2357
                                          Sisti Law Offices
                                          387 Dover Road
                                          Chichester, N.H. 03258
                                          Telephone: (603) 224-4220
                                          info@sistilawoffices.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

*/s/ Richard Guerriero*
Richard Guerriero, Esq.