UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| United States of America ) | |
| ) | |
| v. ) | Court No. 1:21-cr-00041-JL |
| ) | |
| Ian Freeman, ) | |
| Defendant ) | |
| ) | |

UNITED STATES' SENTENCING MEMORANDUM

I.   INTRODUCTION.

After a jury trial, Ian Freeman was convicted of conspiracy to money launder, conspiracy to operate an unlicensed money transmission business, operating an unlicensed money transmission business, and tax evasion.[1] Freeman operated a concealment money-laundering business with knowledge that a vast number of his clients were elderly victims of romance scams and other types of frauds. Without hesitation, Freeman took these victims' money, converted it to anonymous bitcoin, and sent it to virtual wallets controlled by fraudsters. With full knowledge of what he was doing, Freeman completed the fleecing of victims' life savings and made sure that they would never again see that money once they realized they had been defrauded.  And he required the fraudsters to pay him a handsome commission for doing this dirty work on which he never paid a penny of tax.

This is the worst kind of crime. Freeman knowingly used his cryptocurrency savvy to help facilitate the on-line scam industry which wreaks havoc on some of the most vulnerable in society.  Elderly people literally had to come out of retirement because Freeman facilitated the

---

[1] This Court granted Freeman's Fed. R. Crim. P. 29 motion on the stand-alone money laundering count involving an undercover officer on the ground that there was insufficient evidence that Freeman was aware of the undercover's financial transactions at one of Freeman's bitcoin kiosks.

1

stealing of their savings. And he did it for no purpose other than to enrich himself. Freeman's outrageous conduct warrants the long sentence contemplated by the sentencing guidelines.

II.     FACTS.

Ian Freeman has never held a real job. Since the age of 22, he has run a nightly radio show that earned him, according to the Presentence Investigation Report, no more than $1,200 a month. PSR ¶ 99. This was far more hobby than it was work. In 2013, he deemed himself minister of a church and began collecting "donations." Since at least 2015, the majority of those so-called "donations" have come in the form of the astronomical fees he collected through his unlicensed money transmitting business, a business through which he laundered millions of dollars, mostly from elderly fraud victims. From this, he earned commissions in the seven figures.

Freeman operated his money-transmitting business through Localbitcoins.com, Telegram, and bitcoin kiosks that he installed throughout New Hampshire. Freeman bought bitcoin at cryptocurrency exchanges where he paid a commission of less than one percent. He then turned around and sold that same bitcoin at between a 10 and 21% commission. Given that markup, why would anyone want to buy bitcoin from Freeman when they could buy the same bitcoin from an exchange at a fraction of the price? The answer is simple: Freeman was willing to conduct transactions where he knew the proceeds derived from fraud, while reputable cryptocurrency exchanges would identify and decline such transactions.

Freeman was savvy. He knew how to signal to fraudsters that he was open for business to help them launder their ill-gotten gains. He told people who wanted to deal on Localbitcoins.com, "What you do with your bitcoin is your business. Don't tell me what your plans are." (Trial Ex. 1201). And similarly on his kiosks, he posted signs stating, "Don't tell our

staff why you want to buy the cryptocurrency" (Trial Ex. 302) or "Don't tell our staff why you want the coins" (Trial Ex. 1541). These messages sent the clear signal that, unlike a reputable exchange, Freeman would deal with anyone no matter the reason for the transaction or their objective in turning cash to bitcoin.

And Freeman knew exactly what kind of transactions, he was encouraging through these messages. Here's what he said about the purpose of his kiosks:

> [T]hey've been warned of the potential scams that are out there. And if they fall in love with a guy from Africa, I can't talk you out of it. You know? Uh so it is what it is . . . The vending machine is a way for them to take . . . the money that they have and send it to the person that they've fallen in love with. I'm guessing right? Like I don't know. I don't know what their reasons are. Maybe they are there on their own volition and they're taking their own retirement savings . . . I don't know, none of my business.

(Trial Ex. 609B). Freeman also described his familiarity with how the elderly are the targets of these scams on his radio show. (Trial Ex. 1534). And he bragged to the undercover agent about how "old ladies" put $40,000 into his kiosks. (Trial Ex. 605). Freeman knew that these elderly people were most likely scam victims and he proceeded to launder their funds anyway under the guise that it was "none of [his] business."

There were other ways that Freeman knew he was laundering fraud proceeds. He accepted large amounts of money in cash. (Trial Ex. 1102). Sending boxes of cash through the mail is not indicative of legitimate business, but Freeman did not care. He gladly accepted those boxes and turned the cash to bitcoin. And the language used in the Localbitcoins chats indicated that many of these transactions were scams. There were several examples where the picture of the person supposedly conducting the transaction was an elderly person from the United States. Yet, the language used in the chat was not consistent with that profile. That was a repeated red flag that Freeman consistently ignored. And Freeman is not naïve. As he recognized when

3

talking about one such chat that Renee Spinella brought to his attention, "how many brendas say 'bro'?" (Trial Ex. 819).

Freeman also permitted third-party trades, which was another red flag for fraud. People would send Freeman money with instructions to send the bitcoin to a third person. Freeman knew that these trades were prohibited by Localbitcoins.com's terms but he did them anyway. Freeman did nothing to assure the legitimacy of these transactions because he knew they were not legitimate. There is no good reason that an elderly person would want to convert thousands of dollars of cash into bitcoin and then ship that bitcoin off, in an irreversible transaction, to some third party, often in another country. Freeman even stated on his radio show that he knows that this type of transaction is often connected to fraud. (Trial Ex. 1533). And yet he did them repeatedly when he thought no one was watching.

Freeman's money-laundering offense was sophisticated. He knew once he found an effective scammer that it was best to move them off the public facing Localbitcoins.com to the private Telegram app where the communications are encrypted and can be easily discarded. The evidence in the Telegram folder was devastating. Senior citizen after senior citizen is depicted sending Freeman tens and sometimes hundreds of thousands of dollars. Freeman admitted he knew that this was the target audience for romance scams and yet he did not ask these "clients" a single question to determine their motive for the transaction. That's because Freeman knew that these were fraudulent transactions and if he asked questions, he'd lose the handsome commission.

Freeman engaged in this business month-after-month, year-after-year, and made substantial profits doing it. His only problem was keeping bank accounts open to run his dirty business. The nature of his banking activity looked suspicious --- millions of dollars coming and

4

going with no legitimate explanation. To hide his activity from banks, he lied at every turn, describing his business as selling "rare coins like gold and silver," (Trial Ex. 705), "day trading . . . they will presume that means stocks or commodities" (Trial Ex 807), a "financial dominatrix business" (Trial Ex. 815), "online sales" or "personal investments" (Trial Ex. 824) and of course most commonly, "church donations" (Trial Ex. 835).

His most common tactic was to hide his activity under the guise of fake churches and ensnare his friends into his shenanigans by having them open accounts, and more fake churches, for him. Though even in his objection to the PSR he continues to maintain the legitimacy of his churches, the evidence at trial showed that they were simply an elaborate scam he used to benefit and enrich himself. No trial witness questioned about it was aware of any church services, parishioners, or activities. According to Freeman's former radio co-host, friend, and tenant of the house Freeman claims to be the church's parsonage, Freeman only discussed the church "[w]hen he needed it as a legal entity for some legal reason." Trial Tr. Dec. 12, 2022, PM Session, p. 29, 24-25.

One of those reasons was to open bank accounts to manage his money-laundering business. Freeman specifically admitted that he registered the NH Peace Church just as a "trade name" because it was "difficult to open bank accounts under the name Shire Free Church" and that he registered it solely for "banking purposes." Trial Tr. Dec 20, 2022, PM Session, pp. 5-6. When Renee Spinella's bank accounts were shut down, Freeman suggested, "maybe we need to get you a church." (Trial Ex. 857). Spinella did in fact register her own "Crypto Church" but had no qualms about admitting, when talking about taking money from the church bank account to pay for her wedding, that "Crypto church = moi." (Trial Ex. 827). Just like the Crypto Church = Renee, the Shire Free Church = Freeman.

5

Freeman used the church excuse only when convenient. For example, when opening a personal bank account in an international tax haven, Nevis, he drafted a document claiming to personally own over $2.5 million in assets. When confronted with the fact that he failed to disclose these assets under oath to this Court in his bail hearing, he claimed that he did not disclose them because they were "church assets." Of course, this was also his excuse for not paying taxes. In his trial testimony, he claimed that he does not own anything and that "the church sustains [him]." Trial Tr. Dec. 20, 2022, AM Session, p. 92, 20. He later admitted he is sustained through receiving gas money, clothes, food, and international travel. Whan asked by his lawyer about what he does as minister, he answered "I do whatever it is that God calls me to do." Trial Tr. Dec. 20, 2022, p. 94, 7-8. Freeman conveniently dubbed himself "minister" of a church for which he does whatever he wants. Because he called his bitcoin fees "donations," he decided he could operate his illegal business with impunity and avoid paying taxes.[2] The jury saw through this charade and the Court should too.  Freeman maintained these churches to confuse banks so he could get needed accounts to run his money-laundering business – nothing more.

Opening bank accounts in the names of these various churches allowed him to operate for years, until the summer of 2020, when he went through a period without any accounts. And then, he turned his business over to Aria DiMezzo for one summer so she could open accounts under the Reformed Satanic Church and run the business on Freeman's behalf.  Freeman gave DiMezzo the seed money and coached her on what to do so that he could keep his money-laundering activities rolling while he was out of accounts. That DiMezzo's sentence is only a

---

[2] Even during his own direct testimony, he couldn't keep his story straight. When asked generally about his radio show, he said, "we do, like, a general interest talk show." When later trying to justify the existence of his "church" the radio show was suddenly a "church ministry." Trial Tr. Dec. 20, 2022, p. 94, 13-14.

fraction of the sentence recommended for Freeman is appropriate because DiMezzo was nothing more than Freeman's momentary shill in his larger money-laundering enterprise.

In sum, Freeman was a classic money-launderer. He knowingly worked with numerous scammers to make sure that those scammers gained control over their victims' money and that the money trail was sufficiently hidden such that neither the victims nor law enforcement could find the funds. While Freeman concealed the money trail, he left a trail of tears for his victims. He knowingly laundered the retirement funds of elderly people in the aid of romance scammers using the internet to pray on the lonely and vulnerable. There is hardly anything worse.

III.     GUIDELINE OBJECTIONS.

    A.     Freeman Is Responsible For Restitution.

The Presentence Report concludes that "restitution is not applicable with respect to Count[] 28," -- conspiracy to commit money laundering. The probation officer acknowledges that restitution would be owed by the fraudsters who committed the underlying romance scams. But, according to the probation officer, Freeman's subsequent money laundering did not harm the victims because "the defendant's actions of converting criminally derived proceeds to cryptocurrency, enabling the perpetrators of those crimes to conceal the source of those proceeds" occurred after the victim had already been defrauded. In other words, the probation officer perceives that a fraud victim is victimized once and only once by the perpetrator of the fraud. But the officer overlooks the additional harm caused to the victim by the money launderer, i.e., making the fraud proceeds harder to find when the victim realizes that he or she has been scammed. That harm is compensable too under the Mandatory Victim Restitution Act (MVRA). See Goodwin, Catharine, Federal Criminal Restitution, § 4:12 (stating that "money laundering for a financial offense that has a victim is more likely to meet the "victim

requirement" under the MVRA, and therefore "most courts look to the underlying offense to determine the eligibility for restitution for money laundering cases").

Freeman's conduct in operating a conspiracy to engage in concealment money laundering by converting fraud proceeds into bitcoin directly and proximately harmed the victims by making the victims' property more difficult to find. Freeman's conduct decreased the likelihood that the government would be able to recover the fraud proceeds and return those proceeds to the victim once the victim realized he or she had been defrauded. United States v. Green, 225 F.3d 955, 959 (8th Cir. 2000) (stating that concealment money laundering prohibits measures used to conceal or disguise illegal proceeds from detection).  That harm is compensable under the MVRA. The perpetrator of the underlying fraud, of course, would be responsible too.  But that is why the MVRA permits joint and several liability or allows a court to apportion liability based on culpability and/or capacity to pay.  United States v. Ochoa, 58 F.4th 556, 561 (1st Cir. 2023).

Even assuming (erroneously) that only those engaged in the underlying fraud are responsible for restitution, that would not help Freeman. Freeman's conduct also was the final step in permanently separating the victims from their money. It was Freeman, with knowledge that he was dealing in fraud proceeds, who sent the victims' money to the fraudster by converting the victim's money into bitcoin and transferring the bitcoin to a virtual wallet identified for Freeman by the fraudster. Thus, Freeman served as the last link in the chain allowing the fraudster to complete his crime by gaining control over the victims' money. Contrary to the probation officer's position, Freeman's conduct was not "distinct and separate from the underlying fraud."  Rather, Freeman, through his conduct, participated in the underlying

fraud by allowing the fraudster to obtain possession of the ill-gotten gains, i.e., Freeman executed the last part of the fraud scheme.

The Mandatory Victim Restitution Act (MVRA) mandates that a defendant convicted of certain federal crimes, including those committed by fraud or deceit, make restitution to victims commensurate with actual losses. United States v. Flete-Garcia, 925 F.3d 17, 36-37 (1st Cir. 2019). A court should award restitution when the defendant was the but for and proximate cause of the victim's injury. United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002).

Concealment money laundering is a crime for which restitution may be awarded under the MVRA. United States v. Paradis, 219 F.3d 22, 25 (1st Cir. 2000). In this regard, the First Circuit has expressly rejected the notion that society is always the only victim in a concealment money-laundering case.[3] Id. That is so because concealment money-laundering, where the underlying offense was fraud, works to hide the location of the fraud proceeds which reduces the victims' chance to recover their losses. Id. Such concealment is a direct and proximate harm suffered by the victim at the hands of the concealment money launderer for which there should be restitution. United States v. Cunningham, 210 F. Appx. 938, 940 (11th Cir. 2006).

Paradis demonstrates that concealing funds by money laundering is, by itself, a sufficient harm such that the money launderer should be required to pay restitution. In that case, the defendant, who was not the perpetrator of a bankruptcy fraud, was convicted of concealment money laundering because he hid the proceeds of the fraud in his personal bank accounts. Paradis, 219 F.3d 23. The upshot of the defendant's conduct was to conceal from the bankruptcy

---

[3] Sometimes concealment money laundering is a victimless crime such as when the underlying offense is a drug crime. In that case, only society is victimized by the money-laundering offense because the money-laundering helped the drug-trafficker retain his ill-gotten gains which did not belong to an innocent person. Federal Criminal Restitution, § 4:12. But that is not the case when the underlying offense is a financial crime during which a person was defrauded. It that situation, the money laundering not only helps the fraudster retain his fraud proceeds; it also prevents the victim from getting their money back.

court $3 million that could have been used to satisfy creditors. Id. at 25. The First Circuit concluded that, if there had been unpaid creditors, the money launderer would have been responsible for restitution to those creditors because his actions prevented the bankruptcy trustee from locating the fraud proceeds which could have been used to pay creditor claims. Id. It so happens that there was no evidence of actual unpaid creditors in Paradis and so there were no identified victims entitled to restitution. Id. Nevertheless, Paradis holds that concealment money laundering can serve as the predicate for a restitution order so long as there are identifiable victims who could not get their money because of the concealment. Id. at 25.

The Eleventh Circuit reached a similar conclusion in Cunningham. There, the defendant concealed the proceeds of a Ponzi scheme victimizing churches by allowing the proceeds to be deposited into his account and then withdrawing those proceeds by making various wire transfers. 210 F. Appx. at 39. The Court held that this concealment activity caused harm to the churches "because the transfers decreased the amount of money the government could seize to return to the churches." Id. at 40. Based on that harm, the Court affirmed an order requiring the money launderer to pay restitution to the church victims.

The circumstances presented in Paradis and Cunningham are analogous to the circumstances here. Freeman knowingly helped romance scammers obscure the location of fraud proceeds. He did so by establishing a business that was designed to knowingly accept the proceeds of scams and then conceal the location of those proceeds. Mostly elderly people, at the scammers' behest, sent Freeman large amounts of fiat currency. Freeman then converted those funds into bitcoin, a form of virtual currency that is notoriously difficult for law enforcement to trace. United States v. Le, 902 F.3d 104, 108 n.3 (2d Cir. 2018). He then sent that bitcoin (minus his fee) to the scammer's virtual wallet. Freeman's conduct substantially "decreased the amount

10

of money [law enforcement] could seize to return to the" victims who the underlying fraudster had instructed to send Freeman money so that he could launder it. Cunningham, 210 F. Appx. at 940. That conduct is enough to make Freeman responsible for restitution under the MVRA.

The probation officer cites no case supporting the proposition that imposing restitution against a money launderer is improper unless the money launderer was also involved in the underlying crime. The officer attempts to rely on United States v. Meade, 677 F. Appx. 959 (6th Cir. 2017), but he misreads the case. The underlying crime in Meade was the transportation of stolen goods in interstate commerce based on the theft of several motorcycles. The defendant was not involved in that crime. Rather, he laundered the motorcycles after they were stolen by helping create fake titles and selling them through his motor shop. The defendant was only charged with concealment money laundering based on his post-theft conduct in helping to hide the stolen origin of the motorcycles and sell them to convert the bikes into money. Nevertheless, the Sixth Circuit affirmed the restitution order against the defendant. Thus, the probation officer is wrong when he says that Meade is distinguishable because "the defendant was culpable for the underlying activity itself, from which the laundered funds were derived." The defendant was not involved in the interstate transportation of stolen motorcycles. Rather, the defendant was involved in conduct after-the-fact in helping the fraudster conceal the proceeds earned during the underlying crime by disguising the stolen origin of the bikes.

But, even if the probation officer's flawed understanding of the law was accurate such that restitution can only be awarded in a money-laundering case where the defendant participated in the underlying fraud, Freeman was involved in the underlying fraud. A fraudster's object in a romance scam is to obtain control of the victim's money. United States v. Leahy, 82 F.3d 624, 634 (5th Cir. 1996) ("Intent to defraud for the purpose of personal gain will satisfy the 'harm'

11

requirement of the wire fraud statute."). Having the victim release funds to a third-party does not complete the fraudster's mission; the fraudster wins only once the fraudster obtains his or her personal gain by getting control over the victim's funds.

In determining whether a defendant owes restitution, "the restitution analysis focuses on the causal relationship between the conduct and the loss, not between the nature of the statutory offense and the loss." United States v. Chin, 965 F.3d 41, 59 (1st Cir. 2020) (emphasis in original). The analysis focuses on whether the victim was harmed by "the defendant's criminal conduct in the course of a scheme, conspiracy or pattern of criminal activity." Id. (emphasis in original). Thus, the focus is not on the elements of the crime charged but on what the defendant actually did. Id.

Based on the trial evidence, Freeman was involved in more than just after-the-fact, concealment money laundering. Freeman served the crucial role of helping the fraudster complete his or her fraud offense. The jury's guilty verdict necessarily means that Freeman knew he was receiving fraud proceeds from elderly victims. He also knew that he was converting the funds into bitcoin and sending the bitcoin to a virtual wallet identified by the fraudster. Thus, Freeman's criminal conduct served two purposes. First, as already described, it concealed the location of the fraud funds making them more difficult to find. Second, it was essential to completing the primary fraud. The fraudster has not won merely by getting an elderly person to send money to Freeman. The fraudster wins only when Freeman forwards the victim's money to a wallet that the fraudster controls. Thus, Freeman's conduct was the final step in the underlying fraud. That conduct makes him responsible for restitution, even accepting the dubious assumption that after-the fact, concealment money laundering conduct does not support a restitution order where the launderer was not part of the underlying fraud.

In sum, the probation officer's analysis of restitution is wrong twice over. First, Freeman's concealment money laundering harmed the victims because it concealed the location of the funds which rendered it more difficult for the victims to recover their losses. That injury is sufficient to warrant restitution. Second, Freeman did not merely commit after-the-fact, concealment money laundering. His conduct was part of the underlying fraud because he performed the final step of transferring the fraud proceeds to the fraudster. Freeman's role in the underlying scheme (even though he was not charged with wire fraud) also makes him responsible for restitution. Accordingly, this Court should impose restitution in the amount of $3,415,997.65., apportioned to the victims as set forth in Exhibits 1 and 2 to this memorandum.

B. The Vulnerable-Victim Enhancement Should Apply.

The probation officer also incorrectly denied the government's request that Freeman receive a four-level, vulnerable-victim adjustment under U.S.S.G. § 3A1.1(b). The officer's rationale flows directly from his restitution analysis. Just as he says that, because the elderly people who sent money to Freeman were not Freeman's victims for restitution purposes based on the money-laundering charge, they were also not victims for purposes of the vulnerable-victim enhancement. Once again, the probation officer is wrong.

In Chin, the First Circuit rejected the line of reasoning employed by the probation officer. It concluded that the vulnerable-victim enhancement can apply even if the victim was not the direct target of the count of conviction so long as the defendant's relevant conduct harmed the victim. Chin, 965 F.3d at 53. Thus, the analysis does not focus on the elements of money laundering but rather on the effect that the defendant's conduct had on the alleged victims. Id.

Here, as already discussed, Freeman harmed his victims in two ways. First, he completed the fraud scheme by sending the victim's money to the fraudster. Second, he made the victims'

money difficult to find by turning that money into difficult-to-trace bitcoin such that neither the victim nor the government could recover the money once the victim realized that he or she had been defrauded. There is also no question that Freeman knew his victims were vulnerable based on age. The Telegram folder on Freeman's computer, which included information about the date of birth for the victims, showed that he was aware of their age. Freeman also made recorded comments showing he understood the nature of romance scams and the vulnerability of older people to these scams. The Telegram folder alone contained more than 80 customers virtually all of whom were older and thus susceptible to online scams. Not a single interview of any of these people demonstrated a legitimate bitcoin transaction. There was also evidence of numerous additional elderly victims through Freeman's transactions on Localbitcoins.com. These facts make the four-level adjustment under U.S.S.G. § 3A1.1(b)(1)-(2) appropriate. United States v. Kaufman, 546 F.3d 1242, 1269-69 (8th Cir. 2008) (more than 10 victims constitutes a large number for purposes of U.S.S.G. 3A1.1.(b)(2); see United States v. Mazkouri, 945 F.3d 293, 306 (5th Cir. 2019).

IV. A GUIDELINE SENTENCE IS THE APPROPRIATE DISPOSITION.

    The pre-sentence report recommends several enhancements that result in the serious sentence recommended by the United States Sentencing Guidelines. Each of these enhancements is warranted in this case and demonstrates why Freeman's offense was so aggravated. Because each enhancement under the guideline identifies a different aggravating feature of the crime and the government is unaware of any substantially mitigating information, the government supports a guideline sentence.

    A.     U.S.S.G § 2B1.1 -- Freeman received an 18-level enhancement based on the size of his money-laundering enterprise. That is appropriate because it reflects the true scope of

Freeman's activities. This was not a crime about a few isolated transactions. Freeman worked for years engaging in this laundering activity and, as the popularity of bitcoin increased in the scamming community as a preferred method for hiding the money trail, Freeman expanded his activities even further. The $5.7 million dollars in laundered funds is a conservative estimate, but it shows that this was big business that caused major harms and from which Freeman earned substantial profits.

      B.      U.S.S.G. § 2S1.1(a)(2) – Freeman received a two-level enhancement because he was engaged in the business of money laundering, i.e., he regularly engaged in money laundering over an extended period. This was not a situation where Freeman committed a few large transactions. He set up a business in which he employed his then 19-year-old girlfriend Renee Spinella, Aria DiMezzo, Colleen Fordham, Chris Rietmann, Nobody, Andrew Spinella, and others to do some of the work for him. In fact in Renee Spinella's employment contract, Freeman specified, "[t]he Shire Bitcoin Assistant position is a profession, not a hobby." (Trial Ex 802). His employees signed detailed employment contracts (Trial Ex. 503, 701, 802, 803) and he even offered what he described as a "severance package" (Trial Ex. 505). He set up teams of people to operate his kiosks and to empty the cash when they were full. He also used sophisticated tactics such as moving people from various platforms when he thought it was in his interest to do so. He further engaged in repeated dishonesty with banks and cryptocurrency exchanges to keep his business going. Freeman worked his money-laundering scheme day and night. It was planned and coordinated. And Freeman adapted it to changing conditions. It was a corrupt business from which Freeman earned significant profits.

      C.      U.S.S.G. § 3B1.1--- Freeman also employed and managed various people as part of this business. By recruiting his friends, including his teenage girlfriend, to help him,

he caused them to face criminal charges for following his lead.  Freeman knew that he was engaged in sordid business because banks told him so when they repeatedly shut him down due to his many questionable transactions. Yet, Freeman refused to take the hint and cease his criminal conduct.  Instead, he continued his crime by expanding it to include his friends. He set them up with fake churches and bank accounts so that he would have the banking bandwidth to expand his money-laundering capacity.  Evidence introduced at trial showed that Freeman filed the registration documents for the Church of the Invisible Hand, in Nobody's name, and the Crypto Church of NH in Renee Spinella's name. (Trial Exs. 1518, 1511, 1535A, 1536A). Freeman micromanaged the activities of these co-conspirators. In an almost-comical exchange between Freeman and Renee Spinella he insisted that she create some Crypto Church letterhead. When Renee Spinella asked Freeman to make it instead, he said, "I wanted you to put a feminine touch on the letterhead . . . I don't want it to look too much like my church." (Trial Ex. 829, 830, 833, 834, 846). Investigators found a document entitled "letterhead" for the Crypto Church on Freeman's computer. Also on Freeman's computer was a similar word document entitled "letterhead" for Nobody's Church of the Invisible Hand.

 He kept folders labeled "Legal ID" with copies of the IDs and personal information of his "employees" so that he could conduct banking activities on their behalf. (Trial Exs. 1519, 1518, 1535C). For example, he called banks pretending to be the "treasurer" of the Church of the Invisible Hand, and on some occasions, he pretended to be Nobody himself. Freeman kept control over these people by having them sign detailed employment contracts in which they promised to cede control over the accounts to him and to make sure he received his commission. (Trial Ex. 1537A). Freeman was the mastermind and the boss. He told Renee Spinella, "I'm your

supervisor" (Trial Ex. 813) and she testified at trial that he was the boss.  Trial Tr. Dec. 9, 2022, PM Session, p. 53, 23-25. That too is aggravating.

        D.      U.S.S.G. § 3A1.1 ---The final enhancement (not found by probation by that should be applied by the Court)) is for vulnerable victims which in many ways is the most serious aggravator. Money laundering is a significant crime when the proceeds come from drug trafficking.  It is worse when the money launderer knows that the laundered proceeds derive from fraud.  And the crime is worst of all where, as here, the money launderer knows that he is laundering funds that come from frauds perpetrated on some of the most vulnerable members of society.  Ian Freeman knew that most of his clients were elderly and that they were victims of romance scams.  He said as much to the undercover and had the audacity to brag about an "old lady" placing $40,000 in one of the kiosks.  The Telegram folder is littered with elderly people smiling for their selfies, or taping bank receipts to their faces as they sent their nest eggs away to Freeman so that he could send those savings away in anonymous bitcoin never to be seen again. Freeman knew what he was doing, he knew who it hurt, and he knew it's how he could make a fast buck, supporting himself enough never to have to work a day in his life. Despicable is insufficient to describe the depravity of Freeman's criminal conduct.

    In short, Ian Freeman ran a large-scale money laundering business in which he ensnared his friends as accomplices so that he could help romance scammers complete frauds against lonely, elderly people.  He did all of that to make some easy cash and then refused to pay a penny of tax on his corrupt windfall. Freeman has not taken a scintilla of responsibility for his actions. He is an unrepentant criminal and the government is not aware of any mitigating factors that take this case out of the heartland established by the Sentencing Guidelines.  For these

reasons, the United States recommends that the Court impose a sentence within the advisory guideline range.

V.     THE COURT SHOULD NOT GRANT BAIL PENDING APPEAL.

This Court should not grant the defendant bail pending appeal. To obtain bail pending appeal, the defendant must show (1) by clear and convincing evidence that he is not a flight risk and does not pose a danger to the community or any person therein; (2) the appeal is not for the purpose of delay and (3) the appeal raises a substantial question of law that may lead to a reversal, new trial, no imprisonment, or a period of imprisonment less than the total time expected for the appeal process. 18 U.S.C. § 3143; United States v. Correia, 597 F. Supp. 3d 476, 480 (D. Mass. 2022).

The United States has argued previously that the defendant is a flight risk. The pre-sentence report calculates that the defendant has over $3 million in net worth. He failed to report his international bank account to the Court. With that kind of wealth, the defendant could certainly leave for another country in which extradition would be difficult or impossible. While the defendant has not made that choice to date, the defendant will now know that he is facing a long time in prison. He is essentially out of options. So if he is going to run, now would be the time.

In any event, the government is not aware of any appellate issues that meet the requirements of § 3143. The main issue raised in this case was the motion to dismiss the unlicensed-money-transmission counts based on the major-questions doctrine. Even assuming arguendo that the motion raises a substantial question (which, in the government's view, it does not), it is not going to result in any meaningful relief for the defendant.

Conspiracy to commit money laundering is the charge that should drive the defendant's sentence. Under the grouping rules, the money-transmission counts added nothing to the advisory guideline range. Whether the defendant needed to register his business is almost beside the point at this juncture. The jury found that the defendant knowingly laundered vulnerable people's money as part of large-scale, money-laundering business. That's why he should be headed to jail for a long time. Even if the money-transmission charges were eliminated, it should have little to no effect on the sentence which certainly should be longer than the expected appeal period. The government is not aware of any other substantial issues that the defendant intends to raise. Accordingly, the defendant cannot meet the requirements for bail pending appeal.

VI.     <u>CONCLUSION</u>.

For the reasons stated, the Court should impose a guideline sentence which the defendant begins serving when imposed and the Court should order that the defendant pay restitution in the amount of $3,415,997.65.

Date: September 1, 2023                                        Respectfully submitted,

                                                               JANE E. YOUNG
                                                               UNITED STATES ATTORNEY

                                       By:     */s/ Seth R. Aframe*
                                               Seth R. Aframe
                                               Assistant United States Attorney
                                               MA Bar # 643288
                                               United States Attorney's Office
                                               53 Pleasant Street, 4th Floor
                                               Concord, New Hampshire 03301
                                               (603) 225-1552
                                               Seth.Aframe@usdoj.gov


                                               */s/ Georgiana L. MacDonald*
                                               Georgiana L. MacDonald
                                               Assistant United States Attorney

MA Bar # 685375
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
Georgiana.MacDonald@usdoj.gov


*/s/ John J. Kennedy*
John J. Kennedy
Assistant United States Attorney
NH Bar #19557
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
John.Kennedy2@usdoj.gov