**IN THE UNITED STATES DISTRICT COURTFOR**
**THE DISTRICT OF NEW HAMPSHIRE**

THE UNITED STATES OF AMERICA

v.                                                        No. 1:21-cr-41-JL-1

IAN FREEMAN

<u>MOTION TO RECONSIDER</u>
<u>ORDER DENYING MOTION TO DISMISS</u>

The defense respectfully asks the Court to reconsider its order of August 22, 2023, in which the Court denied the defense Motion to Dismiss the counts charging Operation of an Unlicensed Money Transmitting Business and Conspiracy to Commit that same offense. The defense asks the Court to reconsider and then grant the defense motion for the following two reasons.

I. THE PLAIN AND ORDINARY MEANING OF THE LANGUAGE IN § 5330 AT THE TIME OF THE ACTIVITIES CHARGED DID NOT COVER VIRTUAL CURRENCY AND THAT IS WHY FINCEN INSTEAD RELIED ON ITS OWN TERM, "VALUE THAT SUBSTITUTES FOR CURRENCY."

The Court's order focused on "whether the plain and ordinary meaning of 'funds' as used in 18 U.S.C. § 1960 includes bitcoin." Mem. Order (doc. no. 332) at 11. The Court, like other courts, stated that the ordinary meaning of "funds" encompasses bitcoin. Doc. no. 332 at 11-12, 15. The only reference to "funds" in § 1960 is in 1960(b)(2): "the term 'money transmitting' includes transferring funds…." 18 U.S.C. § 1960(b)(2). The defense's argument in its motion to dismiss, however, was not about § 1960(b)(2) and what counts as "money transmitting." Rather the defense argument focused on the version of 31 U.S.C. § 5330(d)(1)(A) that existed between 2001 and 2021 and the fact that "the use of the word 'funds' in 2001 could not have been intended to authorize federal agencies to regulate the entire universe of virtual currency

transactions, a part of the U.S. and global economy which did not exist when Congress wrote the 2001 law." Mot. to Dismiss (doc. no. 176) at 7.

To the defense's point, Government regulators, including those from FinCEN, recognized that "funds" did not adequately capture virtual currencies. For that reason, FinCEN unilaterally, and without authorization from Congress, drafted a rule to add language, specifically "value that substitutes for currency," to its implementing regulations in order to reach virtual currency. As the defense argued in its motion to dismiss, "FinCEN said it was going to regulate something that is not 'funds' — 'value that is equivalent to or can substitute for currency,' such as virtual currency." Doc. no. 176 at 13. The defense motion to dismiss traced FinCEN's use, and Congress's later adoption, of the phrase "value that substitutes for currency." *Id.* at 6-7. And it was that phrase, not "funds," that FinCEN used to regulate virtual currencies and what Government witnesses and prosecutors used at trial to convict Mr. Freeman. Because Congress did not adopt that language until 2021, FinCEN acted without authority when it brought virtual currencies within its regulatory ambit, and thus, it was an "agency claim[ing] to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 at 159 (2000)).

The defense recognizes that, as virtual currencies have grown in popularity and use, many courts now consider them to be "funds." *See* doc. no. 332 at 11-12 (collecting cases). But the appropriate test for the plain and ordinary meaning of a statute's terms is "to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (quoting *Perrin* v. *United States*, 444 U. S. 37 at 42 (1979). And in 2001, when Congress amended 18 U.S.C. § 5330(d)(1)(A), no

one, not legislators, not regulators, and not the ordinary public, had any inkling of virtual currency or how it would evolve.

Applying contemporary understandings of virtual currency to a law that pre-dates its invention by roughly a decade leads to ambiguity. If bitcoin was funds because it could "be accepted as payment for goods and services or bought directly from an exchange with a bank account," then it was not funds when it was invented but only became funds when a Florida man chose to exchange 10,000 bitcoins for two pizzas from Papa Johns. Doc. no. 332 at 15 (cleaned up); Benjamin Wallace, *The Rise and Fall of Bitcoin*, Wired, Nov. 23, 2011, available at https://www.wired.com/2011/11/mf-bitcoin/. Under this theory, many other things, like art or commodities, would become "funds" when they were accepted as payment or bought from an exchange. But as the Supreme Court has counseled, Congress, "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

History bears out the idea that virtual currencies were not funds when Congress amended 31 U.S.C. § 5330 in 2001. Government agencies have for years struggled as to the appropriate classification for virtual currencies. Doc. no. 176 at 11-12. And the history of FinCEN's efforts to regulate virtual currencies indicates that FinCEN itself did not consider virtual currency to be "funds," but instead created a new category, "value that substitutes for currency," for its regulatory authority, and used that new definition to regulate cryptocurrencies under the money transmitting framework. This history, not to mention the repeated statements of FinCEN's own leadership, undermines the idea that virtual currencies were captured under the plain and ordinary meaning of "funds."

FinCEN's testimony before Congress explains the journey. In the wake of its 2013 guidance, FinCEN acknowledged the necessity of its expanded regulatory definition to capture

virtual currencies. Jennifer Shasky Calvery, then-director of FinCEN, testified before a

Congressional joint hearing on FinCEN's efforts to tackle money laundering and virtual

currencies. She said:

> The updated definitions reflect FinCEN's earlier guidance and rulings, as well as current business operations in the industry. As such, they have been able to accommodate the development of new payment systems, including virtual currency. *Specifically, the new rule on money services businesses added the phrase "other value that substitutes for currency" to the definition of "money transmission services." And since a convertible virtual currency either has an equivalent value in real currency, or acts a substitute for real currency, it qualifies as "other value that substitutes for currency" under the definition of "money transmission services."* A person that provides money transmission services is a "money transmitter," a type of money services business already covered by the AML/CFT protections in the BSA.

*The Present and Future Impact of Virtual Currency: Joint Hearing before the Subcomm. on Nat'l*

*Security and International Trade and Finance and the Subcomm. on Banking, Housing, and*

*Urban Affairs*, 113th Cong. 210 (2013) at 36 (emphasis added). The director of FinCEN could

not have been clearer: "value that substitutes for currency" was the agency's way of reaching

virtual currencies and requiring them to register as money transmitting businesses.

In 2018 testimony before the House Subcommittee on Terrorism and Illicit Finance,

Thomas Ott, associate director of the Enforcement Division of FinCEN, explained,

> In 2011, FinCEN issued a regulation that defined money transmissions services as the acceptance and transmission of currency, funds, and other value that substitutes for currency by any means. The 2011 rule serves as the foundation of our regulation of certain virtual currency activity. In March 2013, FinCEN issued guidance to clarify that virtual currency exchangers and administrators generally qualify as money transmitters under the Bank Secrecy Act.

*Illicit Use of Virtual Currency and the Law Enforcement Response: Hearing before the House*

*Subcomm. on Terrorism and Illicit Finance of the Committee on Financial Services*, 115th Cong.

102 (2018) at 9. The 2011 rule was "the foundation of [FinCEN's] regulation" not because it

used the word "funds," but because it added the words "value that substitutes for currency."

When Representative Budd asked Director Ott, "how should we classify virtual currencies," he responded, "[s]o our concern is the transmission of either currency, finds [sic], or what we say is a subset—of other value that substitutes for currency. And we have said that in our guidance and in our legislation that the current virtual currency is also included in that definition of other value, that substitutes for currency." *Id.* at 25. That "other value," value that substitutes for currency, was not the result of any action by Congress, but the unilateral assertion of regulatory authority by FinCEN.

Nor were these isolated instances where FinCEN admitted that it used the phrase "value that substitutes for currency" to capture virtual currency and regulate it. In 2018, in testimony before the Senate Committee on Banking, Housing, and Urban Affairs, Kenneth Blanco, then-Director of FinCEN, explained,

> One of the reasons the United States is recognized as a leader in the regulation, supervision, and enforcement of virtual currency money transmitters is because FinCEN regulations are technology-neutral and, as such, already cover *the transmission of value that substitutes for currency, including convertible virtual currencies like bitcoin and ethereum.*

*Combating Money Laundering and Other Forms of Illicit Finance: Regulator and Law Enforcement Perspectives on Reform: Hearing before the Senate Committee on Banking, Housing, and Urban Affairs*, 115th Cong. 454 (2018) at 66 (emphasis added). He continued,

> FinCEN's regulations governing money transmission encompass emerging technologies that transfer value, including virtual currency. Specifically, FinCEN regulates "the acceptance and transmission of currency, funds, or any other value that substitutes for currency, from one person to another person or location by any means as money transmission." Convertible virtual currency is a type of value that substitutes for currency, and therefore money transmission denominated in convertible virtual currency is subject to the same registration, reporting, recordkeeping, and monitoring obligations as that denominated in currency of legal tender. *See generally,* 31 U.S.C. § 5312 (2); 31 CFR § 1010.100(ff)(5).

*Id.* And FinCEN recognized the precariousness of its authority such that it repeatedly told Congress that it would "not object to Congress considering codifying elements of money transmission to involve the transmission of currency, as well as value that substitutes for currency." *Id.* at 59, 62. It even pointed to legislation, "[c]urrently under consideration by this Committee…the 'FinCEN Improvement Act of 2019,' that will make this clarification in 31 U.S.C. § 310." *Id.* at 59.

Congress, however, had other ideas. It "considered and rejected bills authorizing something akin to the agency's proposed course of action." *West Virginia v. EPA*, 142 S. Ct. 2587 at 2621 (2022) (Gorsuch, J., concurring) (cleaned up). So, for instance, in September 2018, the House passed H.R. 6411, the "FinCEN Improvement Act of 2018," adding the language at issue to FinCEN's authority, but the Senate failed to pass the legislation. FinCEN Improvement Act of 2018, H.R. 6411, 115th Cong. (2018). In 2019, they tried again. The House passed H.R. 1414, the "FinCEN Improvement Act of 2019," but again, it died in the Senate. FinCEN Improvement Act of 2019, H.R. 1414, 116th Cong. (2019). The Senate tried its own version, S. 1883, the Combating Money Laundering, Terrorist Financing, and Counterfeiting Act of 2019, and although it made it out of committee, it went no further. Combating Money Laundering, Terrorist Financing, and Counterfeiting Act of 2019, S. 1883, 116th Cong. (2019). Another attempt, S. 2563, the Improving Laundering Laws and Increasing Comprehensive Information Tracking of Criminal Activity in Shell Holdings Act, fared even worse, failing to even make it out of committee. Improving Laundering Laws and Increasing Comprehensive Information Tracking of Criminal Activity in Shell Holdings Act, S. 2563, 116th Cong. (2019). Only in late 2020, overriding President Trump's veto, did Congress finally add "value that substitutes for currency" to the law. William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year

2021, Pub. L. No. 116-283, 134 Stat. 3388, 4552 (2021). This is not an even exhaustive list of
legislation Congress considered related to the regulation of cryptocurrencies, but an illustration
that for years, Congress considered, and repeatedly rejected, adding the term "value that
substitutes for currency" to federal law.

One need only look to FinCEN former Director Blanco's own words:

FinCEN was the first financial regulator to address virtual currency and the first to assign
obligations to related businesses to guard against financial crime.…The money
transmitter definition we published in 2011 and the guidance we issued in 2013 clarifying
how that definition applies to transactions involving virtual currency have proven to be
exceptionally durable.…Simply stated, those who accept and transfer value, by any
means, must comply with our regulations and the criminal misuse of any methodology
remains our fundamental concern.

*New FinCEN Guidance Affirms Its Longstanding Regulatory Framework for Virtual Currencies
and a New FinCEN Advisory Warns of Threats Posed by Virtual Currency Misuse*, FinCEN, May
9, 2019, available at https://www.fincen.gov/news/news-releases/new-fincen-guidance-affirms-
its-longstanding-regulatory-framework-virtual.

And more recently, the acting director of FinCEN, Him Das, has acknowledged how the
2021 updates were necessary to update the 2001 framework for contemporary challenges:

Until recently, the overarching legal foundation of our regime was an artifact of the
moment it was most recently updated – in the wake of 9/11 – and like most 21-year-old
things, it has not entirely kept up with the times. Just as earlier incarnations of the Bank
Secrecy Act were laser-focused on countering drug-related financial flows, the updates in
the USA PATRIOT Act really emphasized disrupting the money flows of groups like al
Qaida. *It never anticipated the challenges of the 2020s*: *digital assets*…

Him Das, *Prepared Remarks of FinCEN Acting Director Him Das, Delivered Virtually at the
American Bankers Association/American Bar Association Financial Crimes Enforcement
Conference*, FinCen (Jan. 13, 2022), https://www.fincen.gov/news/speeches/prepared-remarks-
fincen-acting-director-him-das-delivered-virtually-american-bankers (emphasis added). *See also*,
*id.* ("[a]s the digital world increasingly becomes the financial world – and *vice versa* – we need a

regulatory regime to match, <u>one that accounts for crypto and other digital assets</u>….") (Italics in original, underline added).

The "value that substitutes for currency" definition is not confined to FinCEN's guidance. Its own employee, Theodore Vlahakis, a senior compliance officer at FinCEN, testified to the standard at the trial in this case, even though, as the Court acknowledges, "[t]his amended version of § 5330(d) does not apply to Freeman's conduct." Doc. 332 at 13. Specifically, Mr. Vlahakis testified that:

> The term money transmission services means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.

Trial Tr. Day 2 Afternoon (doc. no. 269) at 89:17-23. And he admitted that the 2013 guidance "clarifie[d] the scope of the FinCEN's regulations with regard to certain virtual currency business models." *Id.* at 91:2-4. The prosecution used this definition in its cross-examination of Mr. Freeman. *See* Trial Tr. Day 9 Afternoon (doc. no. "doc") at 82-83:23-2.

A common rule of statutory construction confirms that it is the "value that substitutes for currency" clause that captures cryptocurrency. The rule against surplusage instructs that courts "must give independent meaning to each word in a statute and treat none as unnecessary." *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 73 (1st Cir. 2017). If virtual currencies were already capture by "funds," FinCEN would have had no reason to draft regulations in 2011 adding language about "value that substitutes for currency." And if FinCEN already had the authority to regulate "value that substitutes for currency," Congress would have had no reason to add the language in 2021. Instead, what happened was FinCEN unilaterally usurped for itself the power

to regulate virtual currencies and roughly a decade later, Congress ratified that power. But that is not how our laws work. Federal agencies do not make law. Congress does.

## II. TO SAY THAT REGISTRATION AS A MONEY TRANSMITTING BUSINESS REFERS ONLY TO THE STATUTE IGNORES THE PLAIN LANGUAGE OF THE STATUTE AS WELL AS PRACTICAL REALITY.

The Court writes that the "prosecution is correct that a person may violate § 1960 by failing to comply with the registration requirements of 31 U.S.C. § 5330, but not necessarily the regulations prescribed thereunder." Mem. Op. (doc. no. 332) at 14 n.24. The Court notes that section 5330(a)(1) mandates that an operator of a money transmitting business "shall register" with the Secretary of the Treasury and therefore the "statute alone requires registration, regardless of what the regulations say." *Id.* The defense agrees that § 5330(a)(1) mandates registration but maintains that the Court erred in not recognizing that registration as required by the statute is impossible without reference to the Treasury secretary's discretionary regulations.

As the Court acknowledges, § 5330(b) "details the required contents of the registration." Mem. Op. (doc. no. 332) at 14 n.24. Four provisions of § 5330—the statutory (as opposed to the regulatory) registration requirement—hinge on the Treasury Secretary's regulations. So, for instance, § 5330(a)(2) requires that the "Secretary of the Treasury shall prescribe, by regulation, the form and manner for registering a money transmitting business pursuant to paragraph (1)." 18 U.S.C. § 5330(a)(2). Mr. Freeman could therefore not satisfy § 5330(a)(1)'s requirement that he "shall register" without adhering to the Secretary of the Treasury's prescribed regulations for the form and manner of the registration under § 5330(a)(2). Section 5330(b) lists the required "[c]ontents for registration" to include "[s]uch information as the Secretary of the Treasury may require." 18 U.S.C. § 5330(b)(5). In addition, § 5330(c)(1) requires money transmitting businesses to maintain lists of agents, "[p]ursuant to regulations which the Secretary of Treasury

shall prescribe…". 18 U.S.C. § 5330(c)(1). And finally, § 5330(c)(2) notes that the "Secretary of the Treasury shall prescribe regulations establishing, on the basis of such criteria as the Secretary determines to be appropriate, a threshold point for treating an agent of the money transmitting business as a money transmitting business for purposes of this section." 18 U.S.C. § 5330(c)(2). Thus, without the Secretary's regulations, a money transmitting business would be trying to register without knowing the "form and manner" for registering, without knowing what other information to include in the contents of registration, and without knowing what agents to include in their required lists.

The Court posits that "Freeman was not charged with failing to follow the required 'form and manner' of registration under the regulations; rather, he was charged with failing to register all together." Mem. Op. (doc. no. 332) at 14 n.24. However, respectfully, it is impossible to do the latter without doing the former. Could Mr. Freeman have submitted a registration that merely announced he was a money transmitting business while providing no other details? If not, and he was required to include information detailed in § 5330(b), then he also had to include the subsidiary requirements of §§ 5330(b)(1)-(5), including "[s]uch other information as the Secretary of the Treasury may require." 18 U.S.C. § 5330(b)(5). In short, Mr. Freeman could not satisfy the statutory registration requirements without simultaneously satisfying the regulatory registration requirements.

Considering the essential interplay between the registration requirements of § 5330 and the Secretary of the Treasury's regulations, the more natural and correct reading of 18 U.S.C. § 1960(b)(1)(B) is that a money transmitting business must "comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code" *and* the "regulations prescribed under such section." This would not be the first time a court has read

"or" to mean "and." *See, e.g., De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956) ("the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity"); *Swearingen v. United States*, 161 U.S. 446, 450 (1896) ("We, however, prefer to regard the words 'obscene, lewd or lascivious,' used in the statute, as describing one and the same offence."); *United States v. Fisk*, 70 U.S. (3 Wall.) 445, 447 (1865) ("courts are often compelled to construe *'or'* as meaning *'and,'* and again *'and'* as meaning *'or.'"*) (italics in original); *Chemehuevi Tribe of Indians v. Fed. Power Com.*, 420 U.S. 395, 417-18 (1975); *Union Ins. Co. v. United States*, 73 U.S. (6 Wall.) 759, 764 (1868) ("the word 'or' must be taken conjunctively); *United States v. Moore*, 613 F.2d 1029, 1040 (1979) ("Normally, of course, 'or' is to be accepted for its disjunctive connotation, and not as a word interchangeable with 'and.' But this canon is not inexorable, for sometimes a strict grammatical construction will frustrate legislative intent. That, we are convinced, is precisely what will occur here unless 'or' is read as 'and.'"); *Ass'n of Bituminous Contractors v. Andrus*, 581 F.2d 853, 862 (D.C. Cir. 1978) ("this is an instance where 'or' means 'and.'"); *In re Rice*, 165 F.2d 617, 619 n.3 (D.C. Cir. 1947); *George Hyman Constr. Co. v. OSHRC*, 582 F.2d 834, 840, n.10 (4th Cir. 1978); *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958) ("Courts are often compelled to construe 'or' as meaning 'and,' and again 'and' as meaning 'or.'"); *United States v. Mullendore*, 30 F. Supp. 13, 15 (N.D. Okla. 1939) ("the Courts have many times held that 'and' in a statute may be read to mean 'or'").

This reading of § 5330 would comport with its legislative intent. When Congress enacted the registration requirements for money transmitting business, it explained that "[i]t is the purpose of this section to establish a registration requirement for businesses engaged in providing check cashing, currency exchange, or money transmitting or remittance services, or

issuing or redeeming money orders, travelers' checks, and other similar instruments to assist the Secretary of the Treasury, the Attorney General, and other supervisory and law enforcement agencies to effectively enforce the criminal, tax, and regulatory laws and prevent such money transmitting businesses from engaging in illegal activities." Riegle Community Development and Regulatory Improvement Act of 1994, P. L. 103-325, 103rd Cong. § 408(a)(2) (1994) (underline added). Congress thought it was creating one registration requirement, not multiple.

Eighteen U.S.C. § 5330(a)(2) says that "[s]ubject to the requirements of subsection (b), the Secretary of the Treasury, shall prescribe, by regulation, the form and manner for registering a money transmitting business pursuant to paragraph (1)." This language is consistent with other Congressional delegations of authority to administrative agencies. *See, e.g., Stryker v. SEC*, 780 F.3d 163, 167 (2d Cir. 2015) ("Congress delegated to the SEC rulemaking authority to implement the whistleblower award program and specific authority to determine the 'form and manner' in which information had to be submitted…"); *Bo v. Wilkie*, 31 Vet. App. 321, 348 (U.S. 2019) ("Congress delegated to VA the authority to determine the form and manner of these elections, essentially establishing a largely regulatory election process…"); *15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 587 n.12 (2016) ("By authorizing the Secretary to specify the form and manner of donee reporting, the statute addresses 'how' questions. But it also delegates the Secretary authority to address difficult policy questions, the resolution of which may affect (and did affect) his decision as to whether donee reporting should be implemented at all."). *See also* 7 U.S.C. § 2133 (The Animal Welfare Act delegates that the "Secretary shall issue licenses to dealers and exhibitors upon application therefor in such form and manner as he may prescribe…").

The Court also writes that, because "the language of § 1960 and § 5330 is plain and unambiguous, and the Court enforces those statutes according to their terms," there "is accordingly no need to look to, or rely upon, FinCEN's interpretive guidance on the related regulations." Mem. Order. (doc. 332) at 23-24. But the extensive testimony the Government presented at trial regarding the FinCEN guidance, and the Government's own closing, illustrates just such reliance on the regulations. The Government elicited extensive testimony from Theodore Vlahakis, a senior compliance officer at FinCEN, regarding the registration requirements. He testified that those who exchange virtual currencies for fiat currency are money transmitters "[b]ecause FinCEN has guidance that explicitly states that if you are exchanging virtual currency for real currency, or what we call fiat currency, you are a virtual currency exchanger which is a money transmitter which is a money service business." Trial Tr. Day 2 Afternoon (doc. no. 269) at 66:17-21. The same testimony indicates that registration required compliance with more than § 5330(a)(1): "[b]ecause FinCEN is concerned with the activity or conduct of money transmission…[] once that activity occurs, that triggers the requirement to register *and report and have an anti-money laundering program and all the other requirements under the Bank Secrecy Act that are associated with financial institutions*." *Id.* at 70:15-20 (emphasis added).

Mr. Vlahakis also testified specifically about the registration requirements for money service businesses. He stated that:

> …all money services businesses, including money transmitters, must register with FinCEN within 180 days after their business is established by completing what's called an RMSB, a registration of money services businesses. It's also called FinCEN Form 107. That form basically just has fields corresponding to information relating to the type of business, the types of services it offers, you know, locations, address, identifying information, bank account information, location of supporting documentation, and that's, in a nutshell, what the registration form is asking about.

*Id.* at 71-72:22-6. The required fields in Form 107, summarized by Mr. Vlahakis, require more information than is listed in 31 U.S.C. § 5330(b) [Contents of Registration], indicating that adequate registration requires more than mere compliance with § 5330(b), but also with the Secretary of the Treasury's discretionary regulations. *See also*, doc. no. 269 at 73:11-12 ("FinCEN is – you can think of that as the federal registration requirement"); at 74:3-6 ("And for companies or entities that do register with FinCEN, are there additional requirements under the Bank Secrecy Act?" "Yes."); at 76:18-20 (same).

Moreover, Mr. Vlahakis's testimony also showed that the regulations stemmed from the precise authority that the defense challenges. When asked "does FinCEN sort of have the power from Congress to write regulations to require people to register," he responded "Yes." Doc. no. 269 at 90:5-7. As to "what statute that power comes from," he explained, "[i]t's 31 United States Code 5330" and confirmed that § 5330 "gives the power to create the types of regulations that are cited here." *Id.* at 90:12-14.

The letter FinCEN sent to Shire CryptoCoin, about which much was made at trial, also shows that registration required adherence to the discretionary regulations. As Mr. Vlahakis testified regarding the contents of the letter, "FinCEN[] believes that your business is a money service business, MSB, as defined by the Bank Secrecy Act, BSA. As a result, you are *required* to register with FinCEN as an MSB *and comply with applicable anti-money laundering, AML, program, recordkeeping, and reporting requirements*." *Id.* at 88:4-9 (emphasis added).

The Government's opening and closing also tied registration to the specific requirements promulgated by the Secretary of the Treasury. The Government's opening explicitly linked registration with FinCEN's requirements: "Ian Freeman is charged with operating an unlicensed money transmitting business, meaning that he didn't register that business with FinCEN. And

FinCEN's records will show it. And you'll also hear Freeman's own words that he chose not to register. But you'll learn that he also didn't do the other things that are required of those businesses. He did not file currency transaction reports, he did not file suspicious activity reports." Trial Tr. Day 1 Afternoon (doc. no. 277) at 30:3-11.  Also, counsel for the Government admitted that registration entails more: "[h]e chooses not to register as a money transmitter and therefore do any of the things that federal law would require of a money transmitter." Trial Tr. Day 2 Morning (doc. no. 286) at 78:10-12. *See also id.* at 78:16-17 ("why he is not registering as a money transmitter and doing any of those things…"). So, for instance, counsel said that "You learned from FinCEN representative Mr. Valahakis that money transmitters present a particular danger of money laundering, and for that reason money transmitters must register with the Government. They must follow certain rules under the Bank Secrecy Act. Why? To stop money laundering they have to have real procedures for identifying suspicious transactions and then filing Suspicious Activity Reports if they encounter any of the red flags, and you know Freeman didn't file any of those." Trial. Tr. Day 10 Afternoon (doc. no. 290) at 45:12-20. *See also id.* at 46:6-8 ("That makes him a money transmitter. He needs to register, and he needs to follow basic rules about something – he needs to follow basic rules to stop money laundering"). Counsel further said regarding the registration requirement, "[t]here are two ways that the business that's relevant to this case can be unlicensed. The most obvious is the business didn't register with FinCEN. The FinCEN witness told you that all money transmitters, businesses, no matter their size, must register *and follow the Bank Secrecy Act*." *Id.* at 57:2-7. The Government sought to have it both ways: that Mr. Freeman was guilty by failing to register, but that evidence of his failure to register could be inferred from his failure to comply with the prescribed registration requirements that went well beyond what is listed in 31 U.S.C. § 5330.

CONCLUSION: THESE TWO PRIMARY ERRORS REQUIRE THE COURT TO CHANGE
ITS DECISION.

The defense respectfully asks the Court to reconsider its order. While the defense stands

by all of its arguments in the Motion to Dismiss, the two errors in the order stand out. First, the

Court erred in its interpretation of §5330 and the determination that virtual currency fell within

the scope of the version of the statute in effect at the relevant time. Second, the Court erred in

concluding that a business could comply with the statute without also complying with the

implementing regulations mandated by the statute.

WHEREFORE the defense respectfully requests that the Court reconsider its August 22,

2023, order and grant the defense Motion to Dismiss the Counts of Operating an Unlicensed

Money Transmitting Business and Conspiracy to commit that same offense.

Date: September 5, 2023.                    Respectfully submitted by counsel for Ian Freeman

*/s/ Richard Guerriero*
Richard Guerriero, Esq.
N.H. Bar ID. 10530
Law Clerk: Oliver Bloom
Lothstein Guerriero, PLLC
Chamberlain Block Building
39 Central Square, Suite 202
Keene, NH 03431
Telephone: (603) 352-5000
richard@nhdefender.com

Mark L. Sisti, Esq.
N.H. Bar ID 2357
Sisti Law Offices
387 Dover Road
Chichester, N.H. 03258
Telephone: (603) 224-4220
info@sistilawoffices.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

*/s/ Richard Guerriero*
Richard Guerriero, Esq.