IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

THE UNITED STATES OF AMERICA

v.                                                                                      No. 1:21-cr-41-JL-1

IAN FREEMAN

OBJECTION TO MOTION FOR ORDER OF RESTITUTION

The defense objects to the Government's motion for an order of restitution, as set forth in the Government's sentencing memorandum, doc. no. 336, for the reasons set forth below.

In a Money Laundering Conspiracy case like this one, the defendant owes restitution when a person suffers harm directly and proximately as a result of the defendant's conduct in the commission of the offense. However, in this case, the Government has not shown any such direct and proximate harm. In contrast to some other cases, the Government's evidence here does not show a direct connection between Ian Freeman and any person who defrauded those who the Government names as victims. Thus, while some of those people were apparently victims of scams, they were not victimized by Ian Freeman.

Probation and the Defense Say Restitution Is Not Due; The Government Says It Is.

Probation concluded that the facts of this case do not support restitution for the Money Laundering Conspiracy conviction because "the defendant did not cause or contribute to the transactions from which the illegal proceeds were derived but is guilty of conduct that enabled the perpetrators of those crimes to conceal the source of those proceeds." Presentence Investigation Report, doc. no. 327 ("PSIR"), ¶ 38; *see also* ¶ 120. As explained by Probation, although the Government showed that Freeman was generally aware that the funds were derived from unlawful activity, it did now show that "the scam victims were 'directly and proximately'

1

harmed by the defendant's offense because there is no evidence that he conspired, caused, or contributed to the underlying offense/offenses from which the funds were derived." PSIR attachment 1, doc. no. 327-1, p. 4.

The Government nonetheless urges that restitution is due because, "Freeman knowingly helped romance scammers obscure the location of fraud proceeds. He did so by establishing a business that was designed to knowingly accept the proceeds of scams and then conceal the location of those proceeds." Doc. no. 336, p. 10. Moreover, says the Government, Freeman's "conduct was part of the underlying fraud because he performed the final step of transferring the fraud proceeds to the fraudster. Freeman's role in the underlying scheme (even though he was not charged with wire fraud) also makes him responsible for restitution." *Id.* at 13.

As set forth below, although everyone is generally in agreement about the law, Probation is right and the Government is wrong about whether the facts of this case establish that restitution is owed.

<u>The MVRA Limits Restitution to Harms "Directly and Proximately" Resulting from the Defendant's Conduct When Committing the Offense.</u>

Restitution here is governed by the Mandatory Victim Restitution Act ("MVRA") which requires that, "when sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense…" 18 U.S.C. § 3663A(a)(1). Thus, the initial questions are whether the offense of conviction is a qualifying offense under subsection (c), and whether there is any person who qualifies as a "victim" of that offense under the statute.

Subsection (c) of the statute says that restitution is due "in all sentencing proceedings for convictions of…an offense against property under this title…including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). There is no dispute that a Money

2

Laundering Conspiracy is a crime against property. *United States v. Paradis*, 219 F.3d 22, 24 (1st Cir. 2000); *United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014); Catharine Goodwin, *Federal Criminal Restitution* §4:12 (August 2023).

Thus, the real question in this case is whether any person qualifies as a "victim" of Mr. Freeman's conduct in the commission of the offense of conviction under the MVRA. Under subsection (a)(2), a victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Notably, the statute does not make a defendant convicted of conspiracy liable for restitution for harm caused by others involved in the scheme, but rather only for "those directly harmed by the defendant's criminal conduct" in the course of the conspiracy. Thus, the question here is whether the Government has established that there are victims of the offense who were "directly and proximately" harmed by Mr. Freeman's own "conduct in the course" of the Money Laundering Conspiracy.

Restitution Is Only Owed When the Specific Facts of the Case Establish a Direct and Proximate Connection Between the Defendant and the Conduct Which Caused the Harm.

The Supreme Court's decision in *Robers v. United States*, 572 U.S. 639 (2014) explained that the MVRA, 18 U.S.C.S. § 3663A(b)(1), has a "proximate cause requirement" and "[t]he basic question…is 'whether the harm alleged has a sufficiently close connection to the conduct' at issue." *Id.* at 645 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).

The First Circuit expounded on the application of the MVRA to conspiracies in *United States v. Chin*, 965 F.3d 41 (1st Cir. 2020). The Court explained that the "MVRA defines

3

'victim' as 'a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered'" and that, when "an offense 'involves as an element a scheme, conspiracy, or pattern of criminal activity'…'any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern' is a victim." *Chin*, 965 F.3d at 59-60 (internal citations omitted). See also United States v. Collins, 209 F.3d 1, 3 (1st Cir. 1999) ("each conspirator may be ordered to pay restitution for all the reasonably foreseeable losses caused by any conspirator in the course of the conspiracy"). Furthermore, the court explained how the "restitution analysis focuses on the causal relationship between the <u>conduct</u> and the loss, not between the nature of the statutory offense and the loss." *Chin*, 965 F.3d at 60 (internal citations and quotations omitted, emphasis in original). The First Circuit believed this "approach to the victim analysis tracks the language of the statute, as it focuses on whether the victim was harmed as a result of the <u>commission</u> of an offense or by the defendant's criminal <u>conduct</u> in the course of a scheme, conspiracy, or pattern of criminal activity." *Id.* (cleaned up, quotations omitted, emphasis in original).

As to proximate cause, the First Circuit has explained that in "practical terms, the inquiry…asks whether the loss has a sufficiently close connection to the conduct at issue" or "[p]ut another way, the question is whether the loss is within the reasonably foreseeable risks of harm created by the defendant's conduct." United States v. Cardozo, 68 F.4th 725, 735-36 (1st Cir. 2023) (internal citations and quotations omitted). See also United States v. Soto, 799 F.3d 68, 98 (1st Cir. 2015). And there "is no requirement that there only be one proximate cause." *Id.*

Elsewhere, the Court has said that it has "no quarrel with the abstract proposition that unforeseeable consequential damages are beyond the scope of the MVRA…the question is really whether the damages…were 'reasonably foreseeable.'" United States v. Corey, 77 F. App'x 7, 10

4

(1st Cir. 2003) (quoting *Collins*, 209 F.3d at 3-4). It adopted the same standard as used in the Victim and Witness Protection Act (VWPA): "a 'but for' standard of causation for restitution that requires the government to show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)" where the "watchword is reasonableness" and where a "sentencing court should undertake an individualized inquiry; *what constitutes sufficient causation can only be determined case by case, in a fact-specific probe*." *Corey,* 77 F. App'x at 10 (quotation and citation omitted, emphasis in original).

The First Circuit has emphasized that restitution is limited to conduct which was part of the commission of the offense of which the defendant was convicted. In United States v. Paradis, 219 F.3d 22 (1st Cir. 2000), the defendant had helped conceal his employer's investment income during her bankruptcy proceedings. The defendant pleaded guilty to one count of money laundering. He was sentenced to prison and ordered to pay $3 million in restitution to the bankruptcy trustee. *Id.* at 23. The First Circuit vacated the restitution order because the charge against Paradis was not bankruptcy fraud, but rather "laundering the proceeds of the fraud." *Id.* at 23, 25. There was "no evidence that the trustee was harmed as a result of this offense," as "[i]ts effect was to conceal the proceeds of the fraud and to divert those funds from the estate where they could have been available to pay creditors who had filed claims" and "there [was] no evidence of harm to creditors." *Id.* at 25. Thus, there was "no evidence of identifiable victims who suffered harm as a result of Paradis's money laundering," the conduct which was part of the commission of the offense of which Paradis was convicted. *Id.*

Likewise, in United States v. Cutter, 313 F.3d 1 (1st Cir. 2002), the First Circuit emphasized the two "bedrock principles" regarding restitution orders: "[f]irst, restitution should

not be ordered if the loss would have occurred regardless of the defendant's misconduct underlying the offense of conviction," and "[s]econd, restitution is inappropriate if the conduct underlying the offense is too far removed, either factually or temporally, from the loss." *Cutter*, 313 F.3d at 7. Cutter had been convicted of concealing assets and making a false oath in bankruptcy and appealed, among other issues, the restitution award to his niece, to whom he had transferred his home at a discounted price. *Id.* at 2-4. The First Circuit found "no basis for awarding restitution" because while "it may well be that [the niece], who was youthful and inexperienced, was pushed into an inappropriate financial transaction by her uncle, Cutter," and "even assuming [she] was in some sense led down a primrose path by Cutter, her loss was not due to the particular crimes of which Cutter was convicted—the false bankruptcy oath and concealment of assets." *Id.* at 8-9. As the Court concluded, "Section 3663A provides only for restitution for the benefit of the victims of the specific crimes of which a defendant is convicted, not for restitution on broad equitable principles for other misleading or even fraudulent conduct." *Id.* at 9.

<u>Probation Correctly Recognized that the Government Has Not Proved Freeman's Conduct in Commission of the Money Laundering Conspiracy "Directly and Proximately" Harmed Any Person.</u>

The Government seeks restitution for thirty-six claimed victims in a total amount of $3,415,997.65. Doc. no. 336, p. 13 and exhibits. The Government says this restitution is due because:

> Based on the trial evidence, Freeman was involved in more than just after-the-fact, concealment money laundering. Freeman served the crucial role of helping the fraudster complete his or her fraud offense. The jury's guilty verdict necessarily means that Freeman knew he was receiving fraud proceeds from elderly victims. He also knew that he was converting the funds into bitcoin and sending the bitcoin to a virtual wallet identified by the fraudster.

6

*Id.* at p. 12. Thus, the Government says, "Freeman's conduct was the final step in the underlying fraud." *Id.*

The Government's evidence does not support these claims. The most the Government can show is that the jury found the funds were the proceeds of unlawful activity. Trial Tr. Day 10 Afternoon (doc. no. 283) at 31:19-20 (court's instructions). The Government has not shown any direct connection of Freeman to any underlying fraud, despite the statements in its memorandum. A review of the transactions on which the Government bases its restitution claims shows that it cannot establish Freeman's participation in any of the alleged "scams."

First, the Government is not able to show that Freeman provided bitcoin purchased by an alleged victim to any "scammer." The Government's evidence shows that the alleged victims purchased bitcoin from Freeman, but the evidence stops there. In most instances, the Government's evidence does not show where the bitcoin was sent. The LocalBitcoins.com trade history, for instance, that the Government uses as evidence of restitution for eight individuals: T.A., L.C.B., J.C., B.D., M.F., M.E.G., C.J., and C.W., indicates the time when Mr. Freeman sold bitcoin to the users and the account to which it was sent, but not who controls the recipient account. Exhibit 2, doc. no. 336-2; 18R82_LBC-03797 [Mr. Freeman's LBC Trade History]. In another twenty-three instances, the Government's exhibits showed bank account records of deposits sent by the alleged victims to accounts controlled by Mr. Freeman, but no evidence of where the bitcoin went. Exhibit 1, doc. no. 336-1 (M.A., D.A., R.A., D.B., L.D.B., B.B., P.B., J.B., D.D., G.G., S.J., S.K., S.L., K.M., C.M., T.R., J.R., J.S., J.T., R.V., D.W., S.W., and D.Z.), Exhibit 2, doc. no. 336-2 (same). In each of these instances, there is simply no evidence of the other half of the alleged transaction. The Government claims that Freeman was a link between the victims' purchase of bitcoin and alleged scammers, but the Government has offered no

7

evidence to prove that claim. How can the Government seek restitution based on the claim that "Freeman's conduct was the final step in the underlying fraud" when the Government has not proved any "final steps" in the form of bitcoin being provided to the scammers?

Similarly, the Government can hardly claim a direct and proximate connection between Freeman and any scammer when the Government fails to identify any of the so-called scammers. In the instance of H.J., for example, the Government seeks restitution of $811,624 for losses caused by a scammer, but the Government does not establish the real identity of the scammer. Exhibit 1, Doc. no. 336-1, p. 3; Trial Tr. Day 5 Morning (doc. no. 288) at 89:25 and 91:3 (identifying "Natasha" and "Raymond Miller" which are the false names of the purported scammers); *see also*, Exhibit 1, Doc. no. 336-1, p. 4; Trial Tr. Day 6 Afternoon (doc. no. 289) at 5:14 (D.V. identifying "Jerry Harmon" as the scammer of $755,000). Here again, how can the Government prove a direct connection to the person who harmed the alleged victim through an act of fraud, when the Government does not even identify that person beyond a likely fake name?

What the Government really intends then is that Freeman should be liable for restitution to the victims of others because, in a general sense, without reference to any particular scammer or scam, Freeman's business of selling bitcoin was useful to others who were committing crimes. That analysis not only falls short of the requirement of a direct and proximate connection, but it is also contrary to common sense. If that argument is correct, then every seller of a fungible product is liable when the product is used to commit another offense even when the Government cannot establish any direct connection between the seller and the person committing the underlying offense. Consider, for example, the case of M.E.G., for whom the Government seeks restitution of $23,259.60. Exhibit 1, Doc. no. 336-1, p. 3. There, the Government's own exhibits

8

indicate that the alleged victim was an employee of a financial company hit by an Eastern European ransomware attack. Government Exhibit MEG 1. The alleged victim "decided to pay the ransom of $23,000 and needed Bitcoin to do so," so he "contacted Ian Freeman through the application and ended up purchasing the Bitcoin needed" whereafter "the Bitcoin was released and the ransom was paid." *Id.* There is no evidence that Mr. Freeman knew anything regarding the Eastern European hackers or even what M.E.G.'s purchase of bitcoin was for. Nor is this an instance where scammers may have been representing themselves to be the purchasers of the bitcoin: the buyer's username and the FBI's interview with M.E.G. indicate that it was M.E.G. who purchased and received the bitcoin. *Id.*, Government Exhibit MEG 2.

In addition, the Government writes as if the various transactions it describes all fit one common pattern, but that is hardly the case. For example, in a number of instances, the statements of the alleged victims and the FBI agents confirm that the claimed victims were not buying bitcoin with their own money. *See, e.g.,* Government Exhibit DAW 3 ("Wilson [the scammer] sent money to [D.A.] and had her wire the money to Freeman to buy Bitcoin"); USAO-00002200-01 (B.B. was drawing checks from a JPMorgan Chase account of S.C., withdrawing the cash, and then purchasing bitcoin); Government Exhibit PAB 4, 18R82_REP-03293.03, Doc. no. 288 at 77:3-9, 81:6-18 (P.B. was receiving large cash deposits and moving money before his bitcoin purchases); Government Exhibit BD 1 (B.D. "stated he received four wire transfers to his personal bank account…[he] stated he was instructed to withdrawal [sic] the funds and purchase Bitcoin"); Government Exhibit RMV 3 ("She stated Wilson [the scammer] would send money to her account and she would wire the money out at the direction of Wilson"); Government Exhibit CLW 3 (C.W. "stated money is deposited into her company account at Bank of America, she withdrawal's [sic] the funds and purchases Bitcoin with the

9

money"); 18R82_REP-03437.02 ("It was explained that this account receives wire transfers from unknown sources. [D.Z.] then receives direction from Green [the scammer], via text, to send a specified amount, via check or cash, to Ian Freeman"); and, Doc. no. 327-5 (K.M. was traveling "to a certain location in Florida that had a Bit Coin [sic] machine" where she "[p]ut money in and [gave] him [the scammer] the wallet address" including with the money of others).

In one particularly glaring example, the Government seeks $14,000 in restitution for T.R.. Exhibit 1, Doc. no. 336-1, p. 4. Yet, T.R. says she only lost "a few hundred dollars of her own and this was the only occasion she sent money." Government Exhibit TAR 3. As the FBI interview report explains, "Hoodman [the scammer] had the money deposited into [T.R.'s] bank account by his company and she [T.R.] used this money for the wire transfer." *Id.*

These examples from the Government's case show two things. First, they show that the Government has not established any direct connection between Freeman and any "scam." Second, these examples show that the Government inaccurately generalizes when it implies that all alleged victims fell prey to a similar romance scam. That assumption is contrary to the evidence. When one follows the First Circuit's instruction to conduct a "fact specific probe" of the evidence, the inadequacy of the Government's evidence is apparent.

<u>The Government's Abandonment of *Adebara* as a Case Supporting Its Position Highlights the Lack of Evidence Supporting the Government's Claims.</u>

In its letter to Probation, the Government pointed to <u>*United States v. Adebara*, No. 19-CR-00208-GKF-1, 2021 U.S. Dist. LEXIS 154464 (N.D. Okla. Aug. 17, 2021)</u> as an example where "a court recently granted restitution in a case prosecuting money launderers of underlying romance scams." PSIR, Addendum 1, doc. no. 327-1, p. 2. However, the Government left that case out of its analysis in its Sentencing Memorandum. There are good reasons for the Government to have abandoned *Adebara*. As pointed out by Probation, *Adebara* is a case in

10

which the Government actually did provide the facts necessary to establish a direct and proximate relationship between the victims of romance scams and the defendant convicted of money laundering.

*Adebara* involved a defendant who pleaded guilty to conspiracy to commit money laundering in relation to a scheme involving nine other named and unnamed defendants who conducted "financial transactions involving the proceeds of an unlawful 'romance scam,' which amounted to mail and wire fraud." *Adebara*, at *1-2. In applying the MVRA, the Court looked to whether the defendant's conduct was the but-for and proximate cause for the harm. *Id.* at *7. It then compared the elements of conspiracy to commit money laundering. *Id.* at *7-8. Even though the "government characterize[d] the romance scam as part of Adebara and co-defendants' overall 'scheme,'" the Court rejected the government's contention that "the MVRA requires restitution to any one directly harmed in the course of the scheme, conspiracy or pattern, regardless of Adebara's counts of conviction." *Id.* at *8-9. It found that Adebara "may be liable for the loss from the specific financial transactions of his co-defendants—that is, financial transactions not actually conducted by him—but which [were] part of the broader conspiracy to commit money laundering alleged in the Indictment" but not "liability against Adebara for the entirety of the romance scam, including crimes which [were] not charged against any of the co-defendants or of which no co-defendants have been convicted." *Id.* at *10.

Turning to the offense of conviction and whether Adebara's conspiracy to commit money laundering was the but-for and proximate cause of the harm, the Court concluded that "[f]unds transferred to uncharged co-conspirators, some of [whom] are located in Nigeria, that did not pass through any of the bank accounts set forth in the Indictment are too attenuated from the offense of conviction" and "the harm would have occurred regardless of defendants' conduct,

11

such that the offense of conviction cannot constitute the 'but for' cause of the harm. *Id.* at *10-11. As the Court summarized, "defendants, including Adebara, did not directly injure victims who transferred monies to uncharged co-conspirators in unalleged accounts." *Id.* at *11. Furthermore, because the elements of money laundering require "only that *the amounts laundered* to be derived" from the specified unlawful activity, the "court is again limited to the amounts actually laundered." *Id.* at *12 (emphasis in original). Therefore, "restitution [was] limited to funds for which there is evidence of a financial transaction in the identified bank accounts involving the charged defendants." *Id.*

Relying on this decision, the Government originally "propose[d] the same approach" and "identified as MVRA victims those individuals who were victims of an underlying romance scam where Freeman actually laundered the victims' money as part of that scam." PSIR, Addendum 1, doc. no. 327-1, p. 2. Probation disagreed. It looked at the Indictment in *Adebara* and concluded that the "Indictment alleged that the conspirators were responsible for the money laundering conduct *as well as the underlying fraudulent conduct* from which they derived the proceeds." PSIR, Addendum 1, doc. no. 327-1, p. 4 (emphasis in original). Probation noted how the *Adebara* Indictment detailed how the conspirators themselves used online dating platforms to defraud victims, induced the victims to send money to co-conspirators, and fraudulently induced the victims to facilitate financial transactions. *Id.* By comparison, "while Freeman knew the proceeds were derived from an unlawful activity…there is no evidence that he was responsible for the underlying offense from which the proceeds were derived." *Id.*

In short, it is not that the principles cited by the Government could never establish that a person convicted of Money Laundering Conspiracy should pay restitution to the victims of

12

romance scams. Rather, the point of the defense and Probation is that the Government has not established such a direct and proximate connection in this case.

<u>Since the Government Has Not Shown that there Are Any Victims, the "Vulnerable Victim" Enhancement Does Not Apply.</u>

In addition to seeking over $3,000,000 in restitution, the Government also argues for a four-level sentencing guidelines enhancement under U.S.S.G §3A1.1(b). Probation rejected this proposal on the grounds, discussed above, that there were no identified victims of the Money Laundering Conspiracy. In short, Probation concluded that there cannot be a "vulnerable" victim if there no victims at all. Objecting to Probation's conclusion, the Government cites *Chin*, 965 F.3d at 54, as authority for the idea that even if there is no victim under 18 U.S.C. §3663A, there may still be victims under U.S.S.G §3A1.1(b).

On this issue, the defense differs somewhat from Probation. The Court should reject the vulnerable victim finding because, as explained above, the Government wrongly treats each transaction in evidence as involving the same kinds of persons and the same pattern of activity. The Government called some alleged victims to testify at trial and now it generalizes from their testimony to characterize the entire group of alleged victims for whom it seeks restitution. The Government applies a default description of all victims as the elderly, unsophisticated victims of romance scams. This is an incorrect characterization.

First, the evidence shows that some of the "older" alleged victims were in fact fairly sophisticated. H.J., for example, was a hugely successful "developer of real estate as a builder and investor" with a "quite high" risk tolerance, who "did not miss the money he lost" and "advised this was a business dealing or an investment for him and there was not a romantic reason for helping" the scammer. Doc. no. 288 at 88:7-23; USAO-00007748. D.V. was a

Certified Financial Planner. Doc. no. 289 at 4:19. These examples show that the idea that "older" people are especially vulnerable is, in this case, simply a mildly insulting generalization.

Second, as discussed above, some of the alleged victims did not claim to have been harmed by a romance scam. M.E.G.'s company was hit by a ransomware attack. Government Exhibit MEG 1. D.B. was scammed in 2014 or 2015, hired an Israeli "attorney" over the internet to help recover his losses, and then around 2017, was contacted by "Cypress Security Exchange Commission" to cover taxes and attorney's fees on his purported recovery. Government Exhibit DEB 1. Scammers pretending to be working for the Department of Justice contacted L.B. and obtained access to her computer and financial accounts. Government Exhibit LDB 3. Scammers purporting to be Social Security agents ensnared P.B. 18R82_REP-10794; Government Exhibit PAB 4. Purported businesspeople researching "US market alternative payment systems" roped in B.D. Government Exhibit BD 1. M.G. did not buy bitcoin online at all: scammers posing as Social Security agents reached out to her by phone and directed her to withdraw all her cash and exchange it for bitcoin at a nearby ATM. Government Exhibit MG 1. J.S. simply wanted to buy bitcoin and followed advice he found on a "Bitcoin investing forum." Government Exhibit JCS 2.

Third, some the victims were not "older" at all. T.A. is approximately 54. Government Exhibit TA 1. L.C.B. is approximately 48. Government Exhibit LCB 1. B.D. is approximately 33. Government Exhibit BD 1. M.E.G. is approximately 48. Government Exhibit MEG 1. C.J. is approximately 52. Government Exhibit CJ 1. S.L. is approximately 54. Government Exhibit SLL 2. And J.S. is approximately 35. Government Exhibit JCS 2.

Finally, the Government's writes as if its characterization of is an accurate description of the entire the universe of Mr. Freeman's bitcoin sales. That is simply not correct. Freeman's

14

LocalBitcoins.com trade history has nearly four thousand transactions involving more than two thousand unique buyer usernames. 18R82_LBC-03797. The Government simply ignores those transactions because they do not fit the Government's narrative.

In summary, the defense agrees that, if the Government had shown that a large group unsophisticated elderly people were directly victimized by Freeman's conduct, then the enhancement might apply. However, the Government has not shown that anyone was a victim of Freeman, nor has it provided evidence which actually supports the claim that there is a group of alleged victims who fit the Government's generalized "victim" description. For these reasons, the Court should reject the Government's argument for an enhancement under U.S.S.G §3A1.1(b).

Conclusion

For all of the foregoing reasons, the Court should reject the Government's arguments that Mr. Freeman owes restitution and should reject that Government's argument that the vulnerable victim enhancement applies in the guidelines calculation.

WHEREFORE the defense respectfully requests that the Court deny the Government's request for restitution and for an enhancement in the guidelines calculation pursuant to U.S.S.G §3A1.1(b).

Date: September 25, 2023.                    Respectfully submitted by counsel for Ian Freeman

*/s/ Richard Guerriero*
Richard Guerriero, Esq.
N.H. Bar ID. 10530
Law Clerk: Oliver Bloom
Lothstein Guerriero, PLLC
Chamberlain Block Building
39 Central Square, Suite 202
Keene, NH 03431
Telephone: (603) 352-5000
richard@nhdefender.com

>Mark L. Sisti, Esq.
>N.H. Bar ID 2357
>Sisti Law Offices
>387 Dover Road
>Chichester, N.H. 03258
>Telephone: (603) 224-4220
>info@sistilawoffices.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

>*/s/ Richard Guerriero*
>Richard Guerriero, Esq.