UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | Court No. 1:21-cr-00041-JL |
| | ) | |
| Ian Freeman, | ) | |
| Defendant | ) | |
| | ) | |

UNITED STATES' REPLY REGARDING RESTITUTION

Freeman argues that "the Government is not able to show that Freeman provided bitcoin purchased by an alleged victim to any 'scammer,'" in part because "[i]n most instances, the Government's evidence does not show where the bitcoin was sent" or the identity of the scammers. Neither of these showings is required for the Court to award restitution. Nonetheless, the government can show, in most instances, where the bitcoin was sent. And while Freeman is right that the government cannot prove the true identity of the scammers, because Freeman specifically designed his money laundering business to provide anonymity to those scammers, he makes no claim as to why the law would require that. The fact that Freeman was a successful money launderer whose bitcoin business helped scammers remain anonymous cannot possibly exempt him from being required to pay restitution.

The government presented substantial evidence that Freeman knowingly took money from scam victims and sent bitcoin to their scammers. Freeman was convicted of money laundering, the jury thereby finding he had knowledge of the criminal nature of the funds. Whether or not he knew the exact identity of the scammer has no bearing on whether he should be liable for restitution.

I.      **Freeman is Responsible for Restitution.**

The defendant's brief does not address the government's first argument that Freeman's business of converting fraud proceeds into bitcoin directly and proximately harmed the victims by making the victims' property more difficult to find. That harm is compensable under the MVRA. United States v. Paradis, 219 F.3d 22, 25 (1st Cir. 2000); United States v. Cunningham, 210 F. Appx. 938, 940 (11th Cir. 2006). Freeman knowingly helped romance scammers obscure the location of fraud proceeds. He did so by establishing a business that was designed to knowingly accept the proceeds of scams without asking any questions and then conceal the location of those proceeds by converting them to bitcoin. He then sent that bitcoin (minus his fee) to the scammer's virtual wallet. Freeman's conduct substantially "decreased the amount of money [law enforcement] could seize to return to the" victims who the underlying fraudster had instructed to send Freeman money so that he could launder it. Cunningham, 210 F. Appx. at 940. This alone is a sufficient basis to provide restitution under the MVRA.

The defendant's brief focuses only on the government's secondary argument that through his conduct, Freeman participated in the underlying fraud by allowing the fraudster to obtain possession of the ill-gotten gains, i.e., Freeman executed the last part of the fraud scheme. Freeman makes two arguments: first, that the government is not able to show that Freeman provided bitcoin purchased by any alleged victim to any scammer; and second, that the government did not prove the identity of the scammers. The first argument is particularly perplexing as there was substantial evidence in the trial record (including Freeman's own testimony) and it was never meaningfully disputed, that he provided the bitcoin when he received funds from the scam victims he claimed were his customers. His second argument is that the government did not present evidence of the real identity of the scammers, only the names

provided to the victims like "Jerry Harmon." But of course, this kind of proof is not necessary. Whether or not the government proved the true identity of "Jerry Harmon" has no bearing on the restitution inquiry. The jury's guilty verdict necessarily means that Freeman knew he was receiving fraud proceeds from elderly victims and that he knowingly sent bitcoin to the address that the scammer provided him. The fraudster's scam is not complete when the victim sends money to Freeman, but only when Freeman sends the fraudster the bitcoin. That makes Freeman the but for and proximate cause of the victim's injury. United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002). Freeman served the crucial role of helping the fraudster complete his or her fraud offense. That conduct makes him responsible for restitution, even accepting the dubious assumption, which is contrary to First Circuit precedent, that after-the-fact, concealment money laundering conduct does not support a restitution order where the launderer was not part of the underlying fraud.

a.  *United States v. Adebara*

The defendant spends significant time insisting that the Government's lack of citation to *United States v. Adebara*, No. 19-CR-00208-GFK-1, 2021 WL 3633475 (N.D. Okla. Aug. 17, 2021), in its sentencing memorandum indicates that it has abandoned any argument that the case supports restitution and "highlights the lack of evidence supporting the Government's claims." The defendant, like Probation, misreads *Adebara*.  Despite the defendant's attempts to distinguish it, *Adebara* is quite similar to the factual posture of this case.  Adebara and six other named conspirators as well as three unnamed conspirators were charged in a one count indictment for conspiracy to commit money laundering by conducting financial transactions involving the proceeds of an unlawful romance scam which amounted to mail and wire fraud. *Adebara*, at *1-2.

The defendant attempts to distinguish *Adebara* by claiming that the 10 named and unnamed conspirators "themselves used online dating platforms to defraud victims, induce the victims to send money to co-conspirators, and fraudulently induced the victims to facilitate the financial transactions." But a closer reading of *Adebara* makes clear that the charged conspirators were the money launderers, while the unnamed, uncharged, "others known and unknown to the Grand Jury," were the ones who committed the frauds in Nigeria. Testimony at Adebara's sentencing hearing established that the role of Adebara and his charged conspirators was to "receive[] these funds through mail or wire transfers from the victims," and use "fake passports . . . to open bank accounts in which he could take that money and essentially launder it to avoid detection." *Adebara*, Docket No. 4:19-cr-00208-GKF, ECF No. 346 at 7-8. That is, their role was limited to laundering of the fraud proceeds.

The crux of the disagreement between Adebara and the Government was whether or not losses sustained by victims involving money **not** laundered by the charged defendants could be included as restitution against those defendants. The defendants in that case did not even dispute whether restitution would be ordered for money that was laundered by the defendants. The Government in *Adebara* sought to include as restitution all losses suffered by the victims in the case, even if those victims sent some of their money to other money launderers who were not part of the charged conspiracy. That would be similar, in this case, to the Government seeking restitution for Patrick Brown in the full amount of his loss, $1.2 million, rather than just the $281,900 that Brown sent to Freeman. Adebara argued that it was improper to hold him responsible for restitution for the entirety of the underlying fraud because he was not charged with committing the fraud, but rather solely with conspiring to launder the proceeds from the fraud. *See Adebara*, 4:19-cr-208-GKF, ECF No. 301 at 4. The government does not attempt to

do so in this case. Requiring restitution for funds laundered by Freeman is entirely consistent with the Court's decision in *Adebara.*

## II.        There is Overwhelming Evidence that Freeman Provided Bitcoin to Scammers.

Freeman's claim that the government has not presented evidence that he completed the fraudulent transactions by providing bitcoin purchased by victims to the scammers is not only contrary to the jury's verdict in the case and but was in fact not disputed by Freeman at trial. Freeman testified that he regularly sold bitcoin and described how that business worked. Trial Trans. 12/20/23 AM, p. 102. ("They would put the money into the account, I would verify the funds were there, and then I would release the bitcoin.") In fact, when the government showed Freeman photographs of scam victims from Freeman's Telegram folder, Freeman adamantly claimed that he believed they were legitimate bitcoin customers. Trial Trans. 12/20/23 PM, pp. 97-100.  Freeman boasted about the positive reviews his business received from his customers, underscoring the fact that he actually sent the bitcoin they "purchased."  The government presented evidence of undercover purchases, confirming that when the undercover sent cash to Freeman, he provided bitcoin in return. There can be no meaningful dispute about whether Freeman actually sent the bitcoin purchased by "customers."

The government also presented substantial evidence that various of Freeman's "customers" were scam victims and that when they sent him money, they never received bitcoin in return. Scam victims also testified that they sent funds to Freeman, at the best of their scammers, on more than one occasion. Of course, if Freeman had not provided the bitcoin to the scammers after each victim deposit, why would the scammers continue to instruct their victims

to send him funds on multiple occasions?[1] Although the government does not know the true identity of the scammers, the jury found that Freeman knew he was taking money from victims and providing bitcoin to scammers. Below is a sample of the evidence that the government is prepared to present to the Court at the sentencing/restitution hearing.

  a.  *Patrick Brown*

  Patrick Brown, 70 years old, from Oklahoma, testified at trial that he was the victim of a government impersonator scam and that his scammer told him to wire funds to Freeman's bank accounts. Freeman chatted on LocalBitcoins.com with a person using the name "patrickbrown007" which Brown confirmed was not him. *See* Exhibit to Government's Sentencing Memorandum, PAB 3. Chats introduced at trial included one of the <u>many</u> examples of "red flags" for fraud that Freeman ignored, indicating that it was not, in fact a person in his late 60s from Oklahoma operating the patrickbrown007 account. *See e.g.*, Trial Ex 1225 ("Friend, I am comparatively fresh on LBC, but I have traded good.").[2] The conversation between Freeman and the scammer confirm that Brown sent the funds and Freeman told the scammer that he released the bitcoin. The scammer responded "thank you for quick release"

---

[1] Although this evidence is sufficient to conclude that the transactions that are the subject of each individual restitution request occurred, further corroboration is available on the public blockchain. Although the government contends that this evidence is not necessary, it is nevertheless prepared to show that Freeman's bitcoin wallet in fact sent bitcoin corresponding to victim payments.

[2] The numerous localbitcoins.com chats presented at trial were also full of red flags for scams. *See e.g.* Trial Ex 1221, 1221A (conversation in which a supposed female from South Carolina writes, "My partners received the it but I'll deposit it on his ba half and do whatever you want me to do we have trade before but my username is Kgreg89 but my account was hack so am using my partner" and "we use to talk on Telegram but no more"); Trial Ex 1224 (conversation in which username "sweetcutebarbie" writes "I'm too old to take a selfie, my hands are trembling" and sends an identification card of a man in his 70s from Arizona named  Stephen); Trial Ex. 1206 (in which Nigerian man tells Freeman that his American in-law Mary Hurd and "company accountant" Barbara Kae Freeman were making deposits on his behalf). Of course, Freeman knew this as he remarked to Renee Spinella in response to one, "heh, how many brendas say 'bro'"? Trial Ex 819.

confirming his receipt and then discussed future trades. Records from localbitcoins.com confirm that after receiving funds sent from Brown, Freeman sent bitcoin to patrickbrown007. *See* Trial Ex 1225C.  More to the point, Brown sent wires to Freeman on November 2, 3, 6 and 9, totaling $281,900.  Trial Ex. 2525.  It strains credulity to insist that there is no evidence whatsoever that Brown's scammer received his bitcoin from Freeman, where the scammer had Brown continue sending money to Freeman over the course of the week for bigger and bigger trades.

   b.  *James Rossell*

   James Rossell, age 72, a retired firefighter from New Jersey was a victim of a romance scam. At the behest of a scammer, who was speaking to Freeman on localbitcoins.com, Rossell sent a $67,000 wire to Freeman's account. Localbitcoins.com records and the localbitcoins.com chat with Freeman's scammer confirm that Freeman then sent the corresponding amount of bitcoin to the scammer. Trial Ex 1215A.  Rossell testified that he never received any bitcoin. Trial Trans. 12/12/2023 AM, p. 40.  After the bitcoin was sent by Freeman, Rossell's bank marked his wire transfer as fraudulent and clawed it back from Freeman's account. Paying zero attention that red flag, Freeman then requested that Rossell send a personal check to him. Rossell, however, who was sending his life savings, no longer had enough funds in his account to cover the full $67,000 and told Freeman he had to wait for his retirement check to come in. Freeman paid no attention to this red flag either. After receiving two personal checks from Rossell, Freeman had no concerns when Rossell then told him he would be "making bitcoin investment for my friends and they want me to help them handle it, how do we go about because I can't use my bank. Can they make the payment directly to you so that you can send coin to me." Trial Ex. 1215B. Freeman then suggested that they communicate on Telegram instead of localbitcoins.com. Freeman then sold bitcoin to two other septuagenarian scam victims,

supposed "clients" of Rossell. Various parts of that conversation indicate that the person

pretending to be James Rossell was not a native English speaker. Trial Exs. 1215-1215F.

   c.   *Danella Varel*

       Danella Varel, age 76, testified that she was a retired widow who had been married for 20

years when she joined match.com.  She met Jerry Harmon, who claimed to be working on an oil

rig in the Gulf of Mexico.  Their relationship quickly became romantic, and Harmon soon

claimed to run into financial trouble on the oil rig.  Believing that Harmon was truly in need,

Varel agreed to send him money for the drilling equipment.  Varel was directed to wire money to

Freeman.  On January 15, 2020, she wired $240,000 to Freeman and put in the wire memo,

"drilling equipment. Purchase of virtual goods."  Trial Ex. 2403.  As with so many other

"clients" presented throughout the trial, Freeman required photographs of the wire receipts along

with handwritten notes.  This note indicated that Varel was buying bitcoins "on behalf of

Rebecca Viar."  The Court heard Viar's victim impact statement at the sentencing hearing held

on September 11, 2023.  Despite testifying that he knows bitcoin transactions are irreversible,

Trial Trans. 12/20/2023 AM, p. 98, and that sending money for drilling equipment "was a

ridiculous story," *id.* at 99, Freeman accepted the wire transfer and sent along the bitcoin.[3]

"Jerry Harmon," was apparently so pleased with Freeman's services that he again engaged those

services a week later on January 21, 2020, when he had Varel send Freeman two wires, to two

different banks, in the amounts of $210,000 and $305,000.  Varel testified that she spoke with

Freeman on one occasion for a very short period of time, and Freeman never asked her who

---

[3] As noted, there is more than enough evidence to establish by a preponderance of the evidence that Freeman in fact
sent the bitcoin to the scammers, but to the extent that the Court believes that more is required, the Government is
prepared to show specific transactions on the blockchain from Freeman's wallet representing the equivalent bitcoin
being sent for each of the Varel wires.

Rebecca Viar was, why she was buying drilling equipment, or where the money was coming from that she was sending.  Varel testified that she never got any of her money back.

   *d.  Rebecca Ault*

   Rebecca Ault, age 59, testified that she divorced after 38 years of marriage due to physical and mental abuse by her husband.  Following her divorce, she joined Match.com and began communicating with a man named Gary Flowers.  Flowers claimed to be a civil engineer from Alabama, and Ault developed romantic feelings for Flowers. Eventually Flowers claimed that he was sick in the hospital and needed money for the doctors and medicine.  He needed Ault to get him bitcoin and told her to send money to Freeman.  Ault testified that she took various photographs of wire receipts and handwritten notes that Flowers asked her to take.  Ault sent wires on three different occasions to accounts controlled by Freeman—October 28, November 9, and December 12, 2020, for $20,000, $5,000 and $20,000 respectively.  Trial Ex. 2524.  Ault testified that she spoke with Freeman on one occasion for a matter of seconds.  She testified that he never asked if she knew anything about bitcoin, why she was buying bitcoin, or where her money was coming from.  On one of the wires, Ault wrote in the memo line that the wire was for "Artwork."  She testified Freeman never asked her about artwork. Ault testified that she never got any of her money back, and in addition to the money sent to Freeman, she lost nearly $200,000 of her retirement money.

   The government is prepared to present evidence about these victims and others, should the Court require it, at the sentencing hearing on October 2.  However, the parties agree that the merits of each individual victim restitution request should be litigated at a bifurcated hearing, after the sentencing pursuant to 18 U.S.C. § 3664(d)(5). At the October 2 hearing, the Court need only determine whether restitution applies generally. Of course, the scams for which Freeman

laundered funds differ from each other. This is because Freeman's business did not discriminate between types of scams. The government proved at trial that Freeman charged astronomical fees in exchange for anonymity, and he invited scammers of all shapes and sizes to use his business with his promises of, "what you do with you bitcoin is your business. Don't tell me what your plans are." Trial Ex. 1201.

### III.     The Vulnerable Victim Enhancement Should Apply.

At trial, the government presented evidence of three aspects of Freeman's business, his kiosk business, his localbitcoins.com business, and his Telegram business. Telegram was the encrypted messaging application that Freeman used to communicate with bitcoin customers "offline," meaning off the website localbitcoins.com which kept records of conversations and trades. And it was no coincidence that Freeman directed the "customers" who were most obviously scam victims to this more anonymous location. The crux of the government's case with respect to money laundering focused on this subset of customers and the trades, the only records of which were kept on Freeman's encrypted computer. The government opened each of the 80 folders in Freeman's "Telegram folder" during the trial. The median age of the "customers" in this Telegram folder was 59.  FBI SA Kendall McBrearty testified that every person that she was able to contact in that folder confirmed they were a scam victim.  The government will be prepared to present the photographs from the scam folder at the hearing on October 2, 2023, to allow the Court to evaluate the evidence Freeman viewed, and which made abundantly clear that many of his victims were vulnerable.

United States Sentencing Guideline §3A1.1(b)(1) provides that "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase [total offense level] by **2** levels."  §3A1.1(b)(2) increases an additional 2 levels if "the offense involved a large

number of vulnerable victims." United States v. Kaufman, 546 F.3d 1242, 1269-69 (8th Cir.

2008) (more than 10 victims constitutes a large number for purposes of U.S.S.G. 3A1.1.(b)(2);

see United States v. Mazkouri, 945 F.3d 293, 306 (5th Cir. 2019). The Guidelines define

"vulnerable victim" as a person "who is a victim of the offense of conviction and any conduct for

which the defendant is accountable under §1B1.3 (Relevant Conduct); and who is unusually

vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible

to the criminal conduct." Application Note 2 to U.S.S.G. §3A1.1.

     "The government need only establish that a single victim was vulnerable in order for the

enhancement to apply." *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003) (referring to

U.S.S.G. §3A1.1(b)(1)). The government has clearly established that many of Freeman's victims

were vulnerable. The Government spent significant time at trial going through the Telegram

folder found on Freeman's computer. This was the folder where Freeman kept the selfies that he

made all of the "customers" send with their transactions. Victim after victim was shown to be

elderly, often sending large payments over and over again. Many looked confused while taking

photographs, some had several prescription medications in the background, and many could not

figure out how to take the "selfie," taping the notes to their face. And of course these

transactions all involved bitcoin, a technology that continues to confuse even the most tech-

savvy individuals, and often the sending of these large sums to "third-party agents."

     These flags alone, make clear that these victims were unusually vulnerable, but Freeman

himself has recognized as much. As detailed at trial and in the Government's Sentencing Memo,

Freeman was aware of common romance scams and knew that his operation catered to these

scammers. *See* Trial Ex. 609B ("The vending machine is a way for them to take their, the money

that they have and send it to the person that they've fallen they've fallen in love with. I'm

guessing, right? Like I don't know. I don't know what their reasons are. Maybe they are there on their own volition and they're taking their own retirement savings—Bitcoin and giving it to their kids. I don't know, none of my business."); Trial Ex. 605 (telling undercover agent that he has seen "old ladies" put $40,000 into his kiosks).  He spoke on his radio show about knowing that romance scammers in Africa were targeting elderly victims.  Trial Ex. 1534.

As the Seventh Circuit has recognized, "[e]lderly victims satisfy the requirements of §3A1.1(b)(1), especially when their financial investments and financial security are at issue.  The elderly are frequent targets of scammers and frequently qualify as vulnerable victims."  United States v. Iriri, 825 F.3d 351, 352 (7th Cir. 2016) (citations omitted); *see also* United States v. Pol-Flores, 644 F.3d 1, 4 (1st Cir. 2011) (district court property applied vulnerable victim enhancement to elderly widow who had desire to invest money to establish an income).

For these reasons, the Court should impose the vulnerable victim enhancement set forth in §3A1.1(b).

**IV.    Conclusion.**

For the reasons stated, the Court should order restitution, to be calculated at a future hearing.


Date: September 29, 2023                             Respectfully submitted,

                                                     JANE E. YOUNG
                                                     UNITED STATES ATTORNEY

                                           By:    */s/ Seth R. Aframe*
                                                     Seth R. Aframe
                                                     Assistant United States Attorney
                                                     MA Bar # 643288
                                                     United States Attorney's Office
                                                     53 Pleasant Street, 4th Floor
                                                     Concord, New Hampshire 03301
                                                     (603) 225-1552

Seth.Aframe@usdoj.gov


*/s/ Georgiana L. MacDonald*
Georgiana L. MacDonald
Assistant United States Attorney
MA Bar # 685375
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
Georgiana.MacDonald@usdoj.gov


*/s/ John J. Kennedy*
John J. Kennedy
Assistant United States Attorney
NH Bar #19557
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
John.Kennedy2@usdoj.gov