*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO FEBRUARY 13, 2024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
UNITED STATES OF AMERICA            *
                                    *   1:21-cr-41-JL
            v.                      *   September 11, 2023
                                    *   10:38 a.m.
IAN FREEMAN                         *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF SENTENCING HEARING
DAY 1
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

For the Government:          Georgiana L. MacDonald, AUSA
                             Seth R. Aframe, AUSA
                             John J. Kennedy, AUSA
                             United States Attorney's Office


For the Defendant:           Mark L. Sisti, Esq.
                             Sisti Law Offices

                             Richard Guerriero
                             Lothstein Guerriero PLLC


Probation Officer:           Sean Buckley


Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

I N D E X

                                                        PAGE

Statement by Karen Miller                                30

Statement by Dannela Varel                               33

Statement by Rebecca Viar                                36

<pre>
                  P R O C E E D I N G S
</pre>

1                                P R O C E E D I N G S

2        THE CLERK:  Court is now in session, has before it

3  for consideration sentencing hearing in criminal case

4  21-cr-41-01-JL, United States vs. Ian Freeman.

5        THE COURT:  All right.  We're here for Mr. Freeman's

6  sentencing hearing after a jury trial.

7        Mr. Freeman is here represented by his counsel and

8  there are three federal prosecutors also present in the

9  building -- I mean in the courtroom.

10        And we have a couple of motions that were filed

11  very recently by the defendant that we should take up as a

12  preliminary matter.  They were caused by the -- the Court

13  dismissed one of the counts under Rule 29 of the Federal Rules

14  of Criminal Procedure finding that -- in a very close call, but

15  finding that the evidence to support the substantive money

16  laundering count was insufficient to support the conviction, so

17  the Court vacated that guilty verdict and dismissed the count.

18        That led to a motion for a new trial based on

19  spillover prejudice by the defense and the -- and the defense

20  also filed a motion to reconsider the Court's denial of its

21  motion to dismiss the counts involving running a money

22  transmitting business under the theory that the Bitcoin

23  involved in the case did not constitute funds under the

24  applicable federal statutes.

25        So let's -- let's address those motions first

1    because, of course, if I reconsidered that, it would be a

2    different sentencing and if I granted the motion for a new

3    trial, there would be no sentencing at all.  So we should -- we

4    should address these first.

5              MR. GUERRIERO:  Okay, your Honor.  Thank you.

6    Richard Guerriero for Mr. Freeman.

7              We're going to submit the merits of those motions on

8    the pleadings on -- we've made our record.  We think our

9    arguments are quite clear.

10             THE COURT:  Yup.

11             MR. GUERRIERO:  I did want to address the issue of

12   timeliness which the government raised on each motion and

13   that's not addressed in our pleadings.

14             On the motion for a new trial, the Court had a

15   status conference in which your Honor said that you were going

16   to be granting the -- the Rule 29 motion in part as to the

17   money laundering charge.

18             At that time, Attorney Sisti said, well, then, I'm

19   likely going to be moving for a new trial.  And my recollection

20   is that -- it was before I was counsel on the case, but I did

21   attend that status hearing online.  My recollection is that the

22   Court said, what's your argument, and Attorney Sisti responded,

23   I have to see the order.

24             So I think everyone, the Court and the government,

25   was on notice at that point that we would file a motion for a

1  new trial, but we needed to see the written order.

2          The written order came out.  It's Document 332.  It

3  came out on August 22nd and we filed a motion for new trial

4  within 14 days after that.  I think under the applicable Rules

5  of Criminal Procedure and the local rules, 14 days was timely.

6          With regard to the motion to reconsider, the

7  government also raised a timeliness issue and you described the

8  memorandum order earlier as addressing the motion for new

9  trial, but it also contained the written order denying the

10  motion to dismiss the unlawful money transmitting counts.

11          Your Honor had given reasons on the record back a

12  long time ago by all accounts, a year ago, when I had filed the

13  motion in a different proceeding, and you gave oral reasons on

14  the record, but then you addressed that motion in writing and

15  you said you would write an order later to address that motion

16  in writing.

17          So in order to make sure we preserved our arguments

18  regarding the motion to dismiss, we also filed within 14 days a

19  motion to reconsider that order on the motion to dismiss the

20  unlicensed money transmitting business counts.  That, likewise,

21  we believe, was timely.  It was filed within 14 days of the

22  Court's written order.

23          The fact that the Court may have given people a --

24  you know, the courtesy of a notice that the order was coming,

25  that's not the same as the analysis.  Our motion to reconsider

1    is quite detailed.  It addresses the analysis in the Court's

2    written order which, you know, we had the Court's reasons at

3    the time of the oral order, but we didn't have the full-scale,

4    broken-down legal analysis in the written order, so that's why

5    we filed a motion to reconsider.

6              THE COURT:  Thank you.

7              MR. GUERRIERO:  Thank you.

8              THE COURT:  Timeliness?

9              MR. AFRAME:  On timeliness, as to the spillover

10   argument, Rule 33 says any motion for a new trial grounded on

11   any reason other than newly discovered evidence, which this was

12   not, must be filed within 14 days after verdict or finding of

13   guilty.

14             If you go down to the 2005 commentary note

15   amendment, it describes a procedure where the defendant must

16   file within that 14 days but can then seek extension of time to

17   actually file and the Court can rule well beyond that period.

18             THE COURT:  Yeah.

19             MR. AFRAME:  So there's a technical matter and it's

20   in the footnote in the government's pleading --

21             THE COURT:  Yeah.

22             MR. AFRAME:  -- but it definitely says the Court can

23   do what it wants if the defendant establishes excusable

24   neglect.

25             But since Mr. Guerriero talked about it, I think the

 1     right procedure is the Rule 29 is filed and you file a -- a

 2     Rule 33 motion and say if the Court grants a Rule 29, then I

 3     want 14 days from after that to actually write my spillover

 4     brief.

 5               But something needs to happen within 14 days of the

 6     entry of the verdict or finding of guilty.  Nothing happened

 7     within that time.  I acknowledge that the commentary note says

 8     the Court can excuse that failure, but I do think it was a

 9     failure.

10               THE COURT:  All right.  And that's with respect to

11     the motion for -- I'm a little bit confused.

12               MR. AFRAME:  Sorry.

13               THE COURT:  I understand the argument vis-a-vis the

14     new trial motion.

15               MR. AFRAME:  That was that.

16               THE COURT:  What about the motion to reconsider?

17               MR. AFRAME:  So there is no -- first of all, there

18     is no rule of criminal procedure that allows reconsideration.

19     So the First Circuit has said that there's sort of an inherent

20     power in the Court to do that.

21               So I would say it's -- this is more in sort of a

22     laches kind of argument, that the -- the Court set forth in

23     November what the rationale was.  I didn't see any material

24     difference in the written order from what the Court said in

25     November.  I don't think there was an expectation in November

1   there would be a written order and there was no motion to

2   reconsider.  And then on the eve of trial, I'm sorry, of

3   sentencing, a motion to reconsider is filed.

4           My point was just sort of as a matter of sort of

5   sitting on your rights, and this is an extraordinary leave to

6   begin with, that that was -- that was too late.  But there --

7   I cannot point you to a rule because there is no rule that

8   even --

9           THE COURT:  We have a local rule on motion to

10  reconsider, though.

11          MR. AFRAME:  I don't think it applies to criminal.

12          THE COURT:  It doesn't apply to criminal?

13          MR. AFRAME:  Not to criminal, I don't think.

14          THE COURT:  There's that list of rules that also --

15  can I have that?  Does he have a copy?

16          There's that list of rules that also apply to

17  criminal --

18          MR. KENNEDY:  We can cross-reference --

19          THE COURT:  Is it covered?

20          MR. KENNEDY:  I think the criminal does cross --

21  like it mentions the civil rule, but I think with a list of a

22  bunch of rules.

23          MR. GUERRIERO:  It's 7.2(d), your Honor.

24          THE COURT:  Okay.  Okay.  Motions for

25  reconsideration.  Okay.  Yeah, that's the motion for

1    reconsideration.

2                I was looking for the rule about which -- which

3    rules apply to criminal cases and whether 7.2 was covered.

4                Kellie, are you familiar with that rule?  It's like

5    a laundry list of rules.

6                THE CLERK:  Is there -- I'll look it up.  I know

7    they have the --

8                THE COURT:  It never -- it doesn't usually become an

9    issue, but --

10               THE CLERK:  Right.

11               THE COURT:  -- that's why nobody's really ...

12               MR. GUERRIERO:  I believe your Honor may be

13   referring to 1.1(d), your Honor.

14               THE COURT:  Could be.

15               MR. GUERRIERO:  And I have to say this specifically

16   excludes Civil Rule 7.2(d).

17               THE COURT:  So it doesn't apply.

18               All right.  Look.  Okay.  Anything else you want to

19   say?

20               MR. AFRAME:  On timeliness, no.

21               THE COURT:  What about merits?

22               MR. AFRAME:  So on the merits, when it comes to

23   spillover, the standard that the defendant would need to

24   establish is a high one.

25               The First Circuit has articulated that there must

1    be -- that the joinder of offenses must compromise a specific

2    trial right or prevent the jury from making a reliable judgment

3    about guilt or innocence such that a miscarriage of justice

4    looms.

5            Our point is we're not close to that.  The evidence

6    regarding -- first of all, the judge -- the Court's ruling on

7    the Rule 29 was on the narrow question of whether there was

8    sufficient evidence that Mr. Freeman knew of the transaction.

9    But all of the evidence otherwise, other than the sort of

10   last-day, was there a transaction, were statements by

11   Mr. Freeman made to the undercover during the time period

12   covered by the conspiracy that go to all the questions of how

13   he ran his business, what he knew, what he understood, what he

14   used his kiosks for, that he understood elderly people were

15   using them to send money.

16           All of this was evidence that, yes, it related to

17   the substantive money laundering count, but it was equally

18   admissible to the conspiracy count and it was certainly

19   admissible as nonhearsay under 8-0 -- 801(d)(2)(A), and so I

20   don't see how Mr. Freeman was prejudiced from the -- in any way

21   from the admission of that evidence because I think it would

22   have been admissible anyway.

23           THE COURT:  Right.  What about on the motion for

24   reconsideration?

25           MR. AFRAME:  I just don't --

1          THE COURT:  If you want to address the merits.

2          MR. AFRAME:  Yeah.  So the merits, I mean, I would

3   just say, I mean, it's a -- as I sort of said, it's sort of a

4   good appellate brief in the sense that it makes some arguments,

5   but the standard is -- for a motion to reconsider is a very,

6   very high one.  It would need a showing of newly discovered

7   evidence, an intervening change in the law where the original

8   decision was based on a mere -- a manifest error law was

9   clearly unjust.

10          There's just none of that here.  The -- there are

11   arguments.  There are always arguments.  But reconsideration

12   isn't the place to rehash the arguments that we already made

13   and resolved.  There is a place to make those arguments and

14   that will come, but this isn't -- based on what this read like,

15   it wasn't a motion to reconsideration because the -- there was

16   no -- even if those arguments end up being right at the end of

17   the day, they were not a manifest error of law or clearly

18   unjust.  So I do not think reconsideration is the appropriate

19   vehicle for bringing them forward.

20          THE COURT:  Yeah.  Is it fair to say -- I mean, I --

21   the motion for reconsideration seems more like just a motion

22   to, I don't know, preserve arguments for appeal.  I mean, you

23   don't really argue that the Court made a manifest error of fact

24   or law, do you?

25          MR. GUERRIERO:  We don't argue that the Court made

1   an error of facts in the sense of like a witness testified --

2   there were no witnesses on this.  It's really a legal --

3                THE COURT:  Yeah.

4                MR. GUERRIERO:  It's really a legal issue.

5                There are some facts of which the Court -- I guess

6   we asked the Court to take general notice.  For example, the

7   size of the Bitcoin industry in the world economy --

8                THE COURT:  Yeah.

9                MR. GUERRIERO:  -- that's more of a matter of

10  opinion.  There's plenty of authority cited by both sides and

11  your Honor, you know, made a finding on that.  But other than

12  that, there aren't factual issues.  It's a question of a legal

13  issue.

14               The reason it was necessary for us to file that

15  motion is that when we read the written order on August 22nd,

16  we saw that there were arguments that we wanted to make sure

17  that, as you say, we preserved and put on the record exactly

18  what our legal arguments were.

19               It did appear that, respectfully, in disagreeing

20  with us, the Court may have misunderstood our legal arguments.

21  Maybe it simply disagreed for good reasons.  We'll find out on

22  appeal.  But in order to make the record clear, we needed to

23  put those on the record.

24               THE COURT:  All right.  I think both -- I think

25  both -- I think both motions are untimely, but the -- the

1   motion for reconsideration is -- there's an argument -- the

2   argument for the untimeliness of the motion for reconsideration

3   is much better than it is for the motion for new trial.  The --

4   there was an order on the motion to dismiss and although it was

5   memorialized -- memorialized in that same order that came out

6   in August of this year, the order had been issued long, long

7   ago and there's really no reason a motion for reconsideration

8   should be filed, you know, so many months later.  So that's --

9   the motion for reconsideration is clearly untimely.

10          It also -- but in addition to the untimeliness, it

11   also fails on the merits.  It rehashes some old arguments and

12   it introduces -- and it makes some new ones.  And introducing

13   new arguments is impermissible in a motion for reconsideration.

14   I'll address -- I'll address those on the merits as well, but

15   they're not properly advanced in a motion for reconsideration.

16          The basic argument, of course, the basic thrust of

17   the argument, was that Mr. Freeman argued that since virtual

18   currency did not exist in 2001 when the applicable statute was

19   enacted, Congress could not have intended to authorize the

20   regulation of virtual currency like Bitcoin when it passed

21   Section 5330 in 2001.  It's sort of a plain meaning of funds

22   argument that the defense has advanced here.

23          And this case that -- the case that the defendant's

24   relying on, *Wisconsin Central Ltd. vs. United States*, I think

25   it -- I think it actually supports the Court's interpretation

1    of the word funds in the statute.

2           In *Wisconsin Central* -- by the way, the citation for

3    that, 138 S. Ct. 267, I'm sorry, 2067, 138 Supreme Court 2067.

4    That's a 2018 case.  But in that *Wisconsin Central* case, the

5    Supreme Court interpreted the meaning of money in the Railroad

6    Retirement Tax Act of 1937.  The majority held, the Court

7    ruled, that, quote:  While every statute's meaning is fixed at

8    the time of enactment, new applications may arise in light of

9    changes in the world.  So money, as used in that statute, must

10   always mean a medium of exchange and what qualifies as a medium

11   of exchange may depend on the facts of the day.

12          In other words, that can change over time.

13          Another -- another sort of very well known example

14   of this idea is the very famous *Bostock* case where the parties

15   acknowledged that in Title VII of the Civil Rights Act

16   pertaining to employment, it was not Congress's intent to

17   subject the workplace or to prohibit discrimination based on

18   sexual orientation or sexual identity and the Supreme Court

19   ruled that despite that that wasn't intended in the early 1960s

20   when the act was enacted, the meaning of the world sex

21   nonetheless includes sexual orientation, sexual identity.

22          And that's another sort of very clear example that

23   at least from this Court's perspective, legislative intent

24   doesn't really control these issues; the meaning of words

25   control these issues.  And that can change over time.  So the

1    Court continues to reject that on the merits.

2            There's a couple of new arguments that were advanced

3    in this motion for reconsideration.  They're based on the --

4    some of them are based on the premise that the phrase, quote,

5    valued as substitute for currency in reference to virtual

6    currency -- that's in Section 5330 -- that Congress, therefore,

7    did not support the expansion of FinCEN's -- FinCEN is

8    F-i-n-C-E-N -- FinCEN's regulatory authority for -- for the

9    period.  And this language is included in several bills in 2018

10   and 2019, which were considered and rejected.

11           Now, the defendant doesn't elaborate on the reasons

12   that these bills were rejected and whether the fate of the

13   bills was in any way connected with the phrase at issue here,

14   again, value that substitutes for currency.

15           The defendant also invokes the canon against

16   surplusage to argue that if funds included virtual currency,

17   there wouldn't have been any need for the amendment, the added

18   phrase, quote, value that substitutes for currency, in Section

19   5330.

20           The First Circuit's case, *City of Providence vs.*

21   *Barr*, 954 F.3d. 23, it's a 2020 case, First Circuit, quote:

22   Although we aspire to give statutory language more than

23   illustrative function when the plain meaning of the text

24   admits, we recognize that sometimes Congress may consider a

25   specific point important or uncertain enough to justify a

1    modicum of redundancy.

2            Quoting the *Mass Association of HMOs* case, that's at

3    194 F.3d. 176, a circuit case from 1999.  Continuing, the Court

4    said:  The canon against surplusage is not a straitjacket.  It

5    should not, therefore, be employed inflexibly to rule out

6    even -- to rule out every interpretation of a statute that

7    treats certain language as illustrative or clarifying.

8            The other point is, look, these arguments could have

9    been raised in the original motion and they were not raised and

10   a motion for reconsideration is not the proper vehicle for

11   presenting new theories in favor of dispositive motion

12   practice.

13           A party has the duty to incorporate all relevant

14   arguments in the papers that directly address the pending

15   motion.  That's the *Hudson* case, *Hudson vs. Town of Weare*,

16   quoting circuit authority, *Rocafort vs. IBM Corp.,* 334 F.3d

17   115, a 2003 case.

18           Now, the defendant also argues in the motion to

19   dismiss that Counts One and Two should have been dismissed

20   because they rely on FinCEN's 2013 interpretive guidance as

21   opposed to the statute, which Mr. Freeman argues is invalid

22   under the major questions doctrine.

23           I addressed how I read the major questions doctrine

24   in the written order.  I held that the regulations promulgated

25   under Section 5330 and FinCEN's interpretations of them were --

1  "have no bearing on whether the defendant violated section

2  1960," the money laundering statute, in Counts One and Two.

3  That's document number 332, page 14, note 24.

4          And what I tried to explain in that order was that

5  Mr. Freeman was charged with failing to register the money

6  transmitting business, a requirement in Section 5330, and he

7  was not charged with violating the regulations.  By example,

8  you know, "failing to follow the required form and manner of

9  registration under the regs."

10          That's in the same order.

11          I also ordered, "The indictment neither depends on

12  nor references the FinCEN guidance and the only agency arguably

13  interpreting Section 1960 for purposes of this prosecution is

14  the Department of Justice, not FinCEN."

15          The language of those statutes is ambiguous, but

16  they covered Mr. Freeman's conduct and the prosecution could --

17  could have met its burden of proof for a violation of Section

18  1960 by relying on the statutes alone.  So there's no need to

19  look to the FinCEN guidance, the interpretive guidance, on

20  those regs.

21          I also -- I -- I should note here, correct me if I'm

22  wrong, I don't remember an instruction for the -- to seek jury

23  unanimity on a violation of the statute as opposed to the

24  guidance.  And so there's no reason whatsoever, no record of

25  any reason, why the jury shouldn't be assumed to have

1    unanimously found a violation of the statute.

2           Now, Mr. Freeman's argued in response, though, that

3    he couldn't have satisfied Section 5330's registration

4    requirements without complying with the regulation's

5    prescribing form and manner as well as the contents of the

6    registration.

7           He points out some of Mr. Vlahakis -- is it

8    Vlahakis -- Mr. Vlahakis's testimony, that's V-l-a-h-a-k-i-s,

9    regarding registration requirements at the trial and he also

10   argues, Mr. Freeman argues, that at various points during the

11   trial the prosecution referred to his failure to file as well

12   as his failure to complete the other tasks required of a money

13   transmitter, as if the two are linked, implying, I guess, that

14   the latter, form and manner, proves the former, failure to

15   register.  And the bottom line is that Mr. -- what

16   Mr. Freeman's arguing is here is that registration required

17   adherence to the regs.

18          But it doesn't persuade the Court.  The Court

19   thought about it, but the Court's holding was that the

20   prosecution proved that the defendant failed to register a

21   money transmitting business and that by doing so, he violated

22   Section 5330, the registration requirement.  So even if it

23   follows that he also failed to comply with the related regs, it

24   doesn't affect the Court's conclusion that the prosecution

25   could have and did prove its case by relying on the statutes

1    alone.

2              In terms of these other statements purportedly made

3    by the prosecution linking the failure to file with the form

4    and manner of registration, I don't think those were argued in

5    the Rule 29 motion at all.  They don't -- they didn't seem to

6    be important at the time of that filing or focused on during

7    the trial at all and, like I said, there was no request for a

8    jury finding one way or the other so it could have -- so

9    diminution could be shown as to one or the other or both.

10             Nothing in the motion to reconsider challenges or

11   disturbs this Court's analysis and conclusions with regard to

12   the major questions doctrine.  I don't think this is a major

13   questions doctrine issue, but if I'm wrong about that, the

14   circuit court will tell us.

15             Finally, this argument advanced on the motion for

16   reconsideration, it's just basically a disagreement with the

17   Court's holding in footnote 24.  And it -- this argument

18   focuses on Section 1950(b)(1)(B) and doesn't relate or affect

19   the other theories of conviction in the case, especially

20   1960(b)(1)(C), and it doesn't relate to or affect the other

21   theories of -- like I said, it doesn't -- it doesn't relate to

22   the (C) -- (b)(1)(C), focuses only on (b)(1)(B).  And that's

23   what makes it a crime to operate the money transmitting

24   business that includes the transmission of funds that the

25   defendant knew to be derived from a criminal offense.

1          Let's all -- look, there's also just the point that

2    there's just no -- there's no support for this argument.  I

3    mean, as the Court pointed out in its order, there's near

4    unanimity.  The only -- I think the only case we could find in

5    our research that adopted this theory about the statutory

6    definition not covering Bitcoin, getting back to the general

7    argument, was a U.S. magistrate judge opinion that hadn't even

8    been adopted by the district court.  There's just no authority

9    for this argument that's being advanced.  It doesn't mean there

10   couldn't be authority at some point, I recognize that, but I'm

11   bound by circuit authority and when I'm not -- when I don't

12   have circuit authority, I rely on persuasive authority from

13   other courts.  And all the authority favors the prosecution's

14   position and argument with respect to this issue, so the motion

15   for reconsideration is denied.

16          Now, the motion for new trial based on spillover

17   prejudice, I also think that it's untimely, but the argument

18   for timeliness is better here than it is for the motion for

19   reconsideration.  The problem -- the problem with this argument

20   is this.  It ignores the fact that the defendant was convicted

21   of conspiracy to commit money laundering or money -- I should

22   call it money laundering conspiracy, which is the proper name,

23   proper reference to it, right?

24          The -- the simple fact is -- and I don't see an

25   argument to the contrary anywhere in the defendant's papers.

1  The evidence that allegedly created the spillover prejudice

2  that -- you know, Mr. Freeman dealing with the undercover, that

3  would have been admissible evidence for the money laundering

4  conspiracy and was admissible for that and there was no request

5  during the trial for a limiting instruction that should be

6  considered as to one -- like the substantive money laundering

7  count and no other counts or anything like that, including

8  money laundering conspiracy.  This evidence was admissible.

9         So there's no prejudice.  There's no prejudice

10  because even with -- even had that count, money laundering,

11  been dismissed pretrial, the evidence still would have been

12  part of the trial.  There's no -- there's no spillover under

13  the applicable authority because the source of the spillover

14  would still have been part of the trial.

15         There's also the point that -- it's important to

16  remember why the Court -- why the Court dismissed the money

17  laundering count.  It was that there was a failure -- a very

18  close failure, by the way, it was a very close call -- that

19  the -- that the government hadn't proven the required mens rea

20  or culpable mental state.  But it wasn't the prejudicial -- the

21  so-called prejudicial aspect of that culpable mental state.

22         There were two culpable mental states involved in

23  this case.  There was the general, sort of routine, requirement

24  to prove knowledge that a knowing transaction had occurred,

25  knowingly conducted a money laundering transaction.  And

1   because there was no proof of actual knowledge that the

2   undercover transaction had been effectuated that was proven

3   with respect to Mr. Freeman, the Court vacated the jury verdict

4   and dismissed the count.

5           But there was plenty of evidence on the so-called

6   special mens rea, the knowledge of intent to conceal source of

7   funds.  That was -- there was plenty of proof of knowledge of

8   that, if not -- if not willful blindness to that actual

9   knowledge.

10          And so that's the prejudicial aspect of it,

11  according to the motion for new trial, and there was no failure

12  of proof there and that evidence was coming in anyway.

13          So it's important not to -- not to confuse or

14  conflate the two types of culpable mental state that were

15  required to be proven for the money laundering count.  The

16  failure was as to routine, general mens rea, not as to specific

17  mens rea regarding knowledge of intent to conceal source of the

18  funds.  And that's an important consideration from the Court's

19  perspective.

20          Okay.  So those motions are both denied.

21          Yes, sir.

22          0MR. GUERRIERO:  Yes, your Honor.  Thank you.  Just

23  a couple of points.

24          I want to address the two things that -- the two

25  issues the Court said were not preserved --

```
 1                    THE COURT:  Yeah.
 2                    MR. GUERRIERO:  -- that you -- that the Court
 3      described as new issues raised in the motion to reconsider.
 4                    With respect to the first one, I believe the Court
 5      referred to the argument that FinCEN had adopted this language,
 6      value substituting --
 7                    THE COURT:  Yeah.
 8                    MR. GUERRIERO:  -- that -- that was addressed on
 9      page 12 of the original motion to dismiss.  I just want to say
10      that for the record.  I will sort it out on appeal, I'm sure.
11                    THE COURT:  Yup.
12                    MR. GUERRIERO:  And then our argument regarding
13      the -- whether or not it was possible to register without
14      following a regulation, that was not in the original motion to
15      dismiss, you're right, but it came up at the argument on the
16      motion to dismiss and my recollection is that I argued in
17      response to that that it was not possible to comply with the
18      statute without also following regulations.
19                    So I believe that should be in the transcript of
20      that hearing is my recollection.  If I'm wrong --
21                    THE COURT:  Well, you -- yeah, but you argued that
22      for DiMezzo.
23                    MR. GUERRIERO:  I did.
24                    THE COURT:  All right.
25                    MR. GUERRIERO:  And Mr. Freeman joined DiMezzo's
```

1     motion.

2                THE COURT:  Is that how we ran that?

3                MR. SISTI:  That's exactly what happened.

4                THE COURT:  Okay.  Understood.

5                MR. GUERRIERO:  Thank you.

6                THE COURT:  Anything you want to say about that?

7                MR. AFRAME:  No, your Honor.

8                THE COURT:  All right.  Let's move to the

9     sentencing.

10               Mr. Freeman, in any criminal sentencing, the first

11    thing the Court has to do is determine what the U.S. Sentencing

12    Guidelines recommend for your sentence.  And even if the

13    Court -- the Court's not bound by that recommendation.  The

14    Court can give a sentence that is more lenient or more severe

15    than what the guidelines recommend.  But as a rule in our

16    circuit, this district court of the country, the -- the trial

17    Court's required to figure out and find what the guidelines

18    recommend.

19               So there's two -- there's two parts of that effort.

20    One is just researching the guidelines, applying it to your

21    case, which I've been doing.  The other one is reading this

22    report, this -- this presentence report.  In your case, it is

23    32 pages long.  It's written by Officer -- Probation Officer

24    Buckley, seated over there to your left, and he -- he wrote

25    that.  And then in response to correspondence with your lawyer

1    and the lawyers for the government, Officer Buckley issued an

2    addendum.

3              Have you read both of those?

4              THE DEFENDANT:  I have.

5              THE COURT:  All right.  Did you go over them both

6    with counsel?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you feel like you understand them?

9              THE DEFENDANT:  Yup.  I read them and I get it.

10             THE COURT:  Okay.  Any questions you want to ask me

11   about them?

12             THE DEFENDANT:  No.

13             THE COURT:  All right.  Now, what generally

14   happens -- now, let me explain what's happened here.

15             Generally what happens is the parties file

16   objections with the probation officer where they disagree with

17   what's in the report, the first draft.  And that's what the

18   addendum is; it addresses all those disagreements, objections,

19   and then the report's finalized and the parties file motions

20   with the Court where they disagree with the report.

21             In this case, your counsel didn't have any

22   objections to the report as -- well, had objections, just not

23   guideline-impacting objections, right?  There were some --

24   there were definitely some objections to certain wording of the

25   report that they disagreed with, but their disagreements and

1    objections did not address your guideline score, the guideline

2    offense -- the guideline offense level.

3           The prosecution, though, did.  They had objections

4    to, specifically, an adjustment under the guidelines for what's

5    called a vulnerable victim adjustment and the idea is that

6    the -- the offense level should be increased if victims of the

7    crime were particularly vulnerable.  The prosecution says that

8    should apply in this case.

9           That's related to another issue in the case about

10   whether you should be ordered to pay restitution to victims.

11   Your lawyers didn't file anything about that because they

12   didn't object to the report.  The report found -- the report

13   found that -- not that there were no victims, but that in the

14   way -- in the way that this case was charged and proven, the

15   Restitution Act didn't permit ordering restitution to victims.

16   The prosecution disagreed.  They objected to the report and

17   they have filed papers with me to persuade.

18          I met with the lawyers before the hearing because my

19   view is that on this issue, the presentence report is incorrect

20   and the prosecution has the correct argument that, yes, you can

21   be ordered to pay restitution to victims, but there's still

22   proof that needs to be made to me to make that happen, which

23   victims, and how much.  So there's that issue.

24          There's also -- so there's that issue and there's

25   also the issue of if the Restitution Act does permit or require

1   the payment of restitution to victims, does it trigger the

2   application of this guideline adjustment, additional levels for

3   vulnerable victimhood.  Okay?

4            The prosecution has briefed that.  Your lawyers

5   haven't.  And your lawyers told me in chambers that given that

6   I'm inclined to agree with the prosecution on this issue,

7   they'd like an opportunity to brief that, file papers with me,

8   and of course I'm going to allow them to do that.

9            There's an argument that they should have done it

10  already, but the truth is you have conscientious lawyers, they

11  interpreted the procedure differently, obviously, because they

12  didn't file papers to that effect, and I want to give them that

13  opportunity.  I don't want to sentence you on -- on that issue

14  without you getting the full stroke of the pump and me hearing

15  their legal arguments about, A, whether the victims here are

16  entitled to restitution and whether you can be ordered to pay

17  it and, if so, to whom and how much; and, B, whether that

18  triggers an adjustment upward in your guideline offense level.

19           Do you follow me?

20           THE DEFENDANT:  Yup.

21           THE COURT:  Okay.  So that part of it won't happen

22  today, but we're going to conduct as much of the hearing as we

23  can because there's evidence that -- there's evidence that the

24  parties are prepared to present today that the Court will

25  consider as part of that and there's really no prejudice to

1   either side allowing the parties to present that evidence

2   today.

3            Do you follow me?

4            THE DEFENDANT:  Okay.

5            THE COURT:  All right.  So tell me what you propose

6   to present today.

7            MR. AFRAME:  So all we would -- I would like to

8   reserve making the actual argument on the sentence until we

9   know what the guideline range is.

10           THE COURT:  Yes.

11           MR. AFRAME:  So all I would like to do today is we

12  have two people present who, we believe, constitute victims in

13  the case that flew here from out of state and wish to read

14  letters to the Court; and we have one person similarly situated

15  who's available by Zoom and would also like to read her letter

16  to the Court.  I propose that we do that today and then anyone

17  from -- these people could watch the actual sentencing by Zoom

18  at the later date that we hold it.

19           THE COURT:  Or they could return.

20           MR. AFRAME:  Or they could return.  That's totally

21  up to them.

22           THE COURT:  Yeah.  So it's two live, one on Zoom.

23           MR. AFRAME:  Correct.

24           THE COURT:  Okay.  Mr. Sisti, you're on your feet.

25           MR. SISTI:  Thank you.

1          Just for preservation purposes, we don't consider

2    these individuals as victims and I want to make that clear

3    right now.

4          THE COURT:  Understood.

5          MR. SISTI:  Okay.  Because we will be addressing

6    this whole issue within two weeks.

7          THE COURT:  Yes.

8          MR. SISTI:  Thank you.

9          THE COURT:  And so your -- so you will file your

10   brief on the restitution issue and the vulnerable victim

11   adjustment by what date do you think that -- was it the 25th?

12         MR. GUERRIERO:  (Nods head.)

13         THE COURT:  25th.  Okay.

14         You may proceed.

15         MR. AFRAME:  So I would invite Karen Miller to come

16   forward and read an impact statement to the Court.

17         THE COURT:  Please.

18         So let me just be clear on this.  You're presenting

19   this as a victim impact statement, not as -- not as restitution

20   evidence.

21         MR. AFRAME:  Correct.

22         THE COURT:  All right.

23         So you don't need to be sworn.  I'm happy to listen.

24   Thank you.

25         MS. MILLER:  Okay.  In 2017, my husband and I

1   started remodeling a home in Florida that my daughter owns.  We

2   were retiring and would be moving to Florida from Pennsylvania

3   when the house was ready.

4          Unfortunately, my husband died of a sudden heart

5   attack in 2018.  We had been married 43 years.  I decided to

6   continue the remodel and move to Florida to be near my daughter

7   and grandson.

8          I moved in June of 2019.  Shortly after moving, I

9   realized I was going to -- wasn't going to see them very much.

10  They lived 40 miles away and my daughter worked full time.  I

11  became very lonely.

12         In the fall of 2019, I joined a dating app online.

13  I registered as a widow.  Soon after I joined, I was contacted

14  by a person calling himself Jerry Harmon of Raleigh,

15  North Carolina.  From the picture I saw online, he looked very

16  handsome.

17         Shortly after communicating with him, he asked if I

18  would do a FaceTime.  Of course I agreed.  We only spoke for a

19  short period, but it was definitely the same person.  We spoke

20  some days all through the night and some days all day long.  He

21  was very romantic.  I found myself falling in love with him.

22         He told me he was on an oil rig in the Gulf of

23  Mexico.  He was the boss of his crew and was going to be

24  earning 20 million when the job was complete.

25         Soon he called me crying, he was actually crying,

1 saying he was done with the job but was going to be arrested

2 because he owed 9 percent tax on that 20 million.  They would

3 not let him pay it out of his earnings.

4          I didn't hear from him for a few days, but when I

5 did, he was very sad, saying he was in jail.  He asked if I

6 could send him some money to help.  I ended up eventually

7 sending him all my money at that time, which was approximately

8 $300,000.

9          He gave me a phone number and contact information

10 for Ian Freeman to send the money to.  We would buy Bitcoin

11 from Ian Freeman and he would send it to a wallet that Jerry

12 Harmon designated.

13          At that time, I had no idea what he was talking

14 about.  He explained to me to go to a certain location in

15 Florida that had a Bitcoin machine, put my money in, and give

16 him the wallet address.  I did this not only with my own money,

17 but with others'.  He said he was getting his employees' wives

18 and girlfriends to send money to help.  He had them send it to

19 me and instructed me to send it to Ian Freeman.  I had to send

20 Ian Freeman information that the money was coming.

21          This went on for about a year and a half.  I ended

22 up not only giving him all my available cash, but went into

23 credit card debt of approximately $20,000.  Every time I

24 thought this was a scam, I remembered the FaceTime call and

25 told myself it must be real; it was him on FaceTime.

1          Eventually I received a call from Peggy Daley from

2     California.  She started telling me, don't send Jerry any more

3     money as this is a huge scam.  At the time I had -- I had been

4     starting to have doubts about it anyway, the whole

5     relationship.  I finally believed her.

6          I now work part time.  I was working at LegoLand.  I

7     now am a cashier at Publix part time.

8          THE COURT:  Where were you working originally?

9          MS. MILLER:  LegoLand in Florida.

10         THE COURT:  Yup.

11         MS. MILLER:  Just to help day-to-day.

12         I'm paying $475 a month to a debt consolidator to

13    pay off my credit cards.  This is not the way I expected

14    retirement life to be.

15         There is one good thing that came from all of this.

16    I met Peggy Daley, Barbara Conniff, and Pam Hamilton, who have

17    all become very good friends.  They are also victims.  They

18    were also victim of Jerry Harmon and Ian Freeman.

19         Pam paid me to fly to Colorado to meet everyone.  I

20    spent one week with all of them at Barbara's house.  We were

21    there for each other.  It really helped.  We now call ourselves

22    the Goldless Girls.

23         We would like to go public and let everyone know how

24    easy it is to get scammed.  I hope Ian Freeman can't do this to

25    anyone ever again.

1          Thank you.

2          THE COURT:  Thank you, ma'am.

3          MR. AFRAME:  I'd like to invite next Dannela Varel.

4    Ms. Varel was one of the witnesses at the trial.

5          THE COURT:  I remember.

6          MS. VAREL:  Good morning, your Honor.

7          THE COURT:  Good morning.

8          MS. VAREL:  How do you share with others the effect

9    this crime has had on you?  How do you explain that your

10   fingers tremble on this keyboard just thinking of how you

11   believed you were being offered a lifetime of happiness when,

12   in fact, you were being lied to and duped into the theft of the

13   inheritance you received from your parents and your spouse.

14         How do you get past the guilt you have, the guilt

15   you feel for having lost all of the money they worked for their

16   whole lives?  How do you explain that now you worry about how

17   much money it takes to feed your livestock and whether you will

18   have enough so that they can eat this month.

19         When I saw the ad for Valentine roses, my mind went

20   immediately to the last time I received roses.  I felt loved

21   and appreciated, but in reality it was a ploy to gain my

22   confidence in a false relationship.

23         Now, whenever I see roses, I am reminded of what a

24   fool I was to believe that anyone as handsome and loving as I

25   believed Jerry Harmon to be could be interested in me when, in

1  fact, he was only interested in what I had and how he could

2  cause me to give it to him.  To the end, he was only interested

3  in money and was angry on our final phone call when I wouldn't

4  give him more.

5          Why didn't I see the true motivation in his efforts,

6  the phone calls, the sweet talk, loving instant messages and

7  pleas to just take a leap of faith, Danni.

8          How do you regain the self-respect you once had?

9  How do you convey the fear as you drove home from Alexandria,

10  realizing that as long as -- at long last that you had been

11  scammed and that there was no one there to protect your home

12  from invasion by people who caused you to be absent?  How do

13  you share the fear that you were scared someone was going to

14  shoot you if you went outside to check the animals when they

15  were in need?

16          I knew I had a moral obligation to testify, but at

17  what risk?

18          How do you begin to trust any decision you make or

19  relearn how to let someone genuinely valuable into your life so

20  that you could once again attempt the pursuit of a lasting

21  relationship?

22          I still can't tell my family how I've lost whatever

23  inheritance they might expect from me as I was so ashamed.

24  Rebuilding from Hurricane Ian would have been possible given

25  the funds I used to have available, but now I have to rely

1    totally on whatever the insurance company deems they will give

2    me.  Will I have enough to replace the broken window in my

3    living room?  How much will I get for the scrap metal that I've

4    collected from the ruins of the two barns destroyed by the

5    tornado?  Will I have enough to repaint my tractor?

6              Every day this crime affects me, my animals, and

7    those I love who have no idea how deeply this crime has invaded

8    my life.

9              I really have no idea how the Court determines what

10   penalty is imposed, but I genuinely appreciate the fact that so

11   much effort was put forth to terminate this scam so that no

12   others will be affected as I was.

13             How do you fairly sentence one person for the havoc

14   that he has unleashed on so very many individual lives?  He has

15   only one life, but all of us will pay for the rest of our

16   lives.

17             Thank you, your Honor.

18             THE COURT:  Thank you.

19             MR. AFRAME:  And the last letter today will be read

20   by Rebecca Viar.  Ms. Viar was on our witness list, but --

21   actually came to New Hampshire but contracted COVID and,

22   therefore, she was unable to testify but would like to read a

23   letter now.

24             THE COURT:  You mean at the trial?

25             MR. AFRAME:  At the trial, yes.

1                Good morning, Ms. Viar.

2                MS. VIAR:  Good morning.

3                MR. AFRAME:  Go ahead.  So you can read the letter

4     to the judge.  He can see you on the screen.

5                MS. VIAR:  Okay.  Thank you.

6                Mr. Ian Freeman of Keene, New Hampshire, performed a

7     really good con job on myself and numerous other elderly

8     people.  Our monies were taken illegally by Mr. Freeman and the

9     other individuals who aided him in this scheme of crimes.

10               As a result of Ian Freeman and his associates' theft

11    of our monies, my life and countless other lives have been

12    ruined both emotionally and financially.

13               I do not trust anyone anymore.  I also have frequent

14    emotional breakdowns and crying spells.  I have sought support

15    from my friends and church members as well as my doctor.  I do

16    not interact freely with people I meet anymore.

17               Because of the emotional damage inflicted on me and

18    the other victims of Mr. Freeman's crimes, my ability to trust

19    others and also the other victims' abilities to trust has been

20    forever damaged.  The pain I suffer emotionally will never go

21    away.  It will be with me until I die.

22               When I was first approached by an individual on

23    Match.com, I was undergoing a really rough spot in my life.  My

24    husband of 43 years had passed away on August the 1st, 2018.  I

25    was lonely and vulnerable and I imagine that most of the other

victims were lonely, elderly people as well.  I was led to
believe that the individual who contacted me was interested in
a romantic relationship with me.  No one who cares anything
about people would have played on my emotions like that.

The last couple of years have been very difficult
for me.  I could not believe that I was a victim of such a
scheme.  I was also threatened by the person or persons that
were scamming all of us elderly people.  The scammers told me
they knew where I was at all times and were tracking me in some
way.

I was and still am very frightened of these people.
I still wake up at night having nightmares and thinking someone
is chasing me and will find and kill me.  I do not sleep well
at all and have not done so since this scheme all began.

Anyone like Mr. Ian Freeman who would do something
so emotionally damaging to every -- to elderly people is a
terrible, horrible person.  I feel destroyed and ruined as a
person.  How could another human being be so money hungry that
they would emotionally and financially destroy the lives of so
many vulnerable elderly people?

Mr. Ian Freeman was the planner and instigator of
this entire scam.  Mr. Ian Freeman is an ugly-hearted person
and obviously has an ugly soul.  His actions against all his
victims show that he is a horrible person who deserves to
suffer immensely for his actions.

1          I would like to request from the Court that you

2     sentence him to the maximum sentence possible for his crimes

3     against unsuspecting, vulnerable, and innocent people that he

4     chose to make the victims of his scams.  I suffer every day

5     because of his actions and I'm certain that all the other

6     elderly people he scammed suffer daily as well.

7          How could Ian Freeman be so callous as to treat all

8     of these elderly people like garbage and claim to be religious?

9     Please, please, please, I beg you to allow him to suffer the

10    consequences of his scams against so many vulnerable elderly

11    people.

12         Like the other victims, I ended up giving all the

13    available cash and money that I had to these people.  Insurance

14    money, three loans that they got me to take out, ended up

15    selling my husband's truck and sent them the money from that.

16    In other words, I really lost my life.  As I knew it once, it

17    is no longer.

18         Thank you very much.

19         MR. AFRAME:  Thank you, Ms. Viar.

20         THE COURT:  All right.

21         MR. AFRAME:  Your Honor, we do not have any

22    additional statements to read today.

23         THE COURT:  I have a couple of questions for you,

24    though.  Just give me some context.

25         Kellie, can you grab the white binder that's on the

```
 1   table in the room out back?

 2             THE CLERK:  Yes.

 3             THE COURT:  The first two women we heard from who

 4   were -- today in the courtroom --

 5             MR. AFRAME:  Yes.

 6             THE COURT:  -- they were both involved with

 7   Mr. Harmon?

 8             MR. AFRAME:  Correct.

 9             THE COURT:  Was the last -- was the last -- I want

10   to say witness -- I guess the last one we heard from, was that

11   also a Harmon situation?

12             MS. VAREL:  Yes.

13             MR. AFRAME:  No, his name was -- there was a

14   different -- I think the names -- I mean, these aren't real

15   names, so when I say that, it doesn't mean anything.

16             THE COURT:  Yeah.

17             MR. AFRAME:  But that was not the name.

18             The name of the person who offered her the romantic

19   relationship was not Harmon.

20             THE COURT:  Not reported to be Harmon.

21             MR. AFRAME:  Right.

22             MS. VAREL:  Seth, it was.

23             MR. AFRAME:  For her?  I thought it was Mr. Flowers.

24             THE COURT:  I know it was purportedly Harmon for the

25   two who testified here today or who spoke today, but --
```

1          MR. AFRAME:  No.  So for the -- for Ms. Varel and

2     Ms. Miller --

3          THE COURT:  Yeah.

4          MR. AFRAME:  -- it was Mr. Harmon.

5          Rebecca Viar, the name she provided us was a -- was

6     a name of a Michael Glen Wilson.

7          THE COURT:  Rebecca Biar (sic), that's not Rebecca

8     Ault?

9          MR. AFRAME:  That's a different person.

10          THE COURT:  All right.  So where's --

11          MR. AFRAME:  Rebecca Viar is at --

12          MS. MACDONALD:  Under Viar.

13          MR. AFRAME:  Viar.

14          THE COURT:  Oh, Viar.

15          MR. AFRAME:  They're alphabetical.

16          THE COURT:  I thought it was a B.  I've got it now.

17          MR. AFRAME:  I'm sorry.  V.

18          THE COURT:  Okay.  I just want to take a quick look.

19          MS. MACDONALD:  Page 2 of the FBI, 302.  RMV --

20          THE COURT:  RMV -- yeah.

21          MS. MACDONALD:  3.  RMV3 on the second page says her

22     name.

23          THE COURT:  RMV3.

24          MS. MACDONALD:  Yup.  Page 2, the first full

25     paragraph.

```
 1                THE COURT:  Okay.  So there is a connection with
 2    Ms. -- with Ms. Varel here.
 3                MR. AFRAME:  Yes.  So that would be that -- so,
 4    again, like we -- we're not behind the underlying scams, but
 5    what did happen --
 6                THE COURT:  We're not what?
 7                MR. AFRAME:  We don't know exactly -- these people
 8    using these names, we can't tell you for certain who they are.
 9                What we do know is at one point, Varel was asked to
10    send money to Viar to send to Freeman and there was evidence of
11    this at the trial.  We called them third-party --
12                THE COURT:  Yup.
13                MR. AFRAME:  It's money muling.
14                So is there -- could there be a connection between
15    so-called Wilson and so-called Harmon?  Absolutely.
16                THE COURT:  Well, it would seem to me that, you
17    know, commonality of wallets, for lack of a better way of
18    putting it, would be important consideration in understanding
19    all this from a restitution perspective.
20                Okay.  Thank you.
21                All right.  Look.  So does either party want to be
22    heard on anything else before we do -- before we move to this
23    briefing on restitution and the vulnerable victim adjustment?
24                MR. SISTI:  No, your Honor.
25                MR. AFRAME:  No, I don't -- I don't think so,
```

```
1    because I think what happens next depends on what the guideline

2    calculation --

3              THE COURT:  Yeah, me too.  Me too.  All right.

4              Well, let -- we accomplished less than we wanted to

5    today and I guess what I want to do is I want to acknowledge

6    the Court's role in this delay.  Because I think it would be

7    better if we had had briefing from both sides on this issue and

8    it didn't really occur to me until the last few days that the

9    defendants had basically chosen not to engage on this

10   particular issue because they concurred with the presentence

11   report and probably didn't feel a need to.

12             But had I realized that earlier, I probably would

13   have ordered briefing so we could have finished the job today

14   that we meant to start and I just want to acknowledge the

15   Court's role in that because I'm not happy about it, with my

16   own performance on that particular issue.

17             Okay.  Then what we have then is a schedule.  We're

18   going to -- by two weeks from today, we're going to have the

19   defendant's briefing on the Restitution Act issue and the

20   vulnerable victim adjustment.

21             Then we're going to have a couple of weeks from that

22   an addendum likely -- if I find the -- the -- if I find that

23   restitution is warranted under the law, then we're going to

24   have an amendment to the presentence report analyzing this

25   alleged victim by alleged victim, vis-a-vis entitlement to
```

 1    restitution and amount, which the parties are going to have a

 2    chance to react to.

 3            So we can't set the next date yet and I'm not sure

 4    what else we can accomplish today.

 5            Did you want to say something?

 6            MR. AFRAME:  No.  So -- just so I make sure I

 7    understand.

 8            So there will be briefing in two weeks by the

 9    defense --

10            THE COURT:  Yup.

11            MR. AFRAME:  -- we'll have a sentencing hearing that

12    will happen on October 2nd; and then following that, probation

13    will issue --

14            THE COURT:  Yeah.

15            MR. AFRAME:  -- if the Court orders restitution --

16            THE COURT:  Yeah.

17            MR. AFRAME:  -- as a legal matter, probation will

18    file a report with its -- with its view of who should get

19    restitution and we will litigate that at a date to be decided.

20            THE COURT:  Yeah.

21            Now, look, to the extent it helps any briefing, let

22    me be -- let me explain my inclination here.

23            There's an argument -- the presentence report took

24    the -- took the position that the Restitution Act does not

25    allow for restitution to these individuals and the prosecution

1      briefed -- briefed based on its position that it does.

2              This is not a situation -- this -- and this is based

3      on the money laundering aspect of this.

4              This is not a situation that involves what is much

5      more frequently seen in laundering cases where the perpetrator

6      of a crime -- in this case it would be whoever would be

7      purporting to be, you know, Jerry Harmon or someone like him --

8      accepts funds and then delivers the funds to someone through a

9      transaction by which the funds are washed, laundered, whatever.

10             This isn't like taking drug money or even fraud

11     money and -- that's been procured from a victim and then

12     handing it to a defendant like Mr. Freeman to conduct

13     transactions that washes the money.  If that were the case, it

14     would be a much more difficult analysis, I think, to determine

15     whether restitution is allowed.

16             But in this case, Mr. -- the -- the Bitcoin

17     purchases that were made from Mr. Freeman and the proceeds of

18     which were transmitted to Bitcoin wallets is a little

19     different.  Those transactions conveyed the purported victims'

20     money from the victims to the perpetrator.

21             So they were -- they were laundering transactions

22     that were very much part and parcel of the actual defrauding

23     conduct, the -- the obtaining of money from victims and

24     transmitting it to perpetrators.  And there was a commission

25     involved, of course.

1           But that, to me, makes it a much easier analysis

2   and really requires a finding that restitution here is -- or

3   because the causation element of the two-part test is

4   satisfied.

5           That said, I've drawn that preliminary conclusion --

6   I haven't reached the conclusion, it's a preliminary conclusion

7   without having -- I've read the probation officer's position

8   and I've read the prosecution's position, but the defendant

9   didn't brief it because the defendant agreed with the

10  presentence report.  And why wouldn't he?  It would have meant

11  a more lenient sentence.  But I don't think that -- I don't

12  think that conclusion is likely supported by the law.

13          So I -- in order to make sure the defendant's been

14  heard on this fully, he has two weeks to brief the issue and

15  then the -- the related corollary issue about the applicability

16  of the vulnerable victim requirement.

17          It's the Court's position that based on what I have

18  read that probably applies as well and that results in a higher

19  guideline total offense level and, therefore, a higher

20  guideline sentencing range.  So it's important information.

21          Okay then.  So you've got the schedule.  We will --

22  yes, sir.

23          MR. GUERRIERO:  Yes, your Honor.

24          Just to mention it in the context of this

25  discussion, the way I understand it is that the Court will

1    decide on October 2nd whether restitution is due and also

2    whether there will be a forfeiture and then we'll have a later

3    hearing on those amounts.  You didn't mention the forfeiture

4    and the restitution effects of the forfeiture, so I wanted to

5    make sure I was clear on the schedule.

6              THE COURT:  I guess to the extent -- yeah, whether

7    there will be a forfeiture, I guess we can decide it that day,

8    sure.

9              MR. GUERRIERO:  Okay.

10             THE COURT:  Yeah.

11             MR. GUERRIERO:  All right.  I just wanted to --

12             THE COURT:  You're right, it's related to

13   restitution or restitution is a factor in that analysis.  And

14   the -- the -- the knowledge of whether that factor will apply

15   is important information.  I would assume there will be some

16   forfeiture in this case.

17             MR. GUERRIERO:  Okay.

18             THE COURT:  Okay?

19             We are adjourned for now.

20             THE CLERK:  All rise.

21             (Proceedings adjourned at 11:44 a.m.)

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 11/15/23          */s/  Liza W. Dubois*
                             LIZA W. DUBOIS, RMR, CRR