1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE
2

3      * * * * * * * * * * * * * * * * *
                                       *
4      UNITED STATES OF AMERICA        *
                                       *
5                                      *  No. 1:21-cr-00041-JL-01
               v.                      *  October 2, 2023
6                                      *  10:08 a.m.
                                       *
7      IAN FREEMAN,                    *
                                       *
8                      Defendant.      *
                                       *
9      * * * * * * * * * * * * * * * * *

10

             TRANSCRIPT OF SENTENCING HEARING - DAY TWO
11
             BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13     APPEARANCES:

14

       For the Government:      Seth R. Aframe, AUSA
15                              Georgiana MacDonald, AUSA
                                John J. Kennedy, AUSA
16                              United States Attorney's Office

17

       For the Defendant:      Mark L. Sisti, Esq.
18                              Sisti Law Offices

19                              Richard Guerriero, Esq.
                                Lothstein Guerriero
20

       U.S. Probation:         Sean Buckley
21

22     Court Reporter:         Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
23                             United States District Court
                               55 Pleasant Street
24                             Concord, NH 03301
                               (603) 225-1454

25

1                    P R O C E E D I N G S

2            THE CLERK:  All rise for the Honorable Court.  Court

3    is now in session and has before it for consideration the

4    continuation of the sentencing hearing in criminal case

5    21-cr-41-01-JL, The United States versus Ian Freeman.

6            THE COURT:  All right.  We're here for the

7    continuation of Mr. Freeman's sentencing hearing.  It was

8    suspended after we resolved a couple of motions in the first

9    day of the hearing, because the defendant didn't have a chance

10   to really fully brief the question of restitution, which is

11   important in his sentencing, not only because it might entail

12   an order on the defendant to pay restitution to victims, but

13   also because it affects the guideline sentencing range that

14   could affect the level of incarceration; because whether the

15   defendant is entitled to -- whether the defendant can be

16   ordered to pay restitution also informs the question of whether

17   the U.S. Sentencing Guideline adjustment for a vulnerable

18   victim applies.  So, the Court -- defendant really hadn't

19   briefed that issue, because they agreed with the probation

20   officer's Presentence Report, and the prosecution had briefed

21   it fully, so I gave the defendant an opportunity, which they

22   took advantage of, and then the U.S. Attorney responded to that

23   on Friday.

24            I've read everything, read all the cases, and I'm

25   ready to proceed, and we will proceed with the rest of the

1    sentencing.

2         There are some guideline impact -- but I don't think I

3    have to spell it out yet, we'll figure that out after the Court

4    makes its decision on restitution and how it affects the

5    guidelines, but basically my understanding is that what it

6    amounts to, aside from the payment of restitution, is either a

7    two-point bump or a four-point bump in the Total Offense Level,

8    because it's a two-point bump for vulnerable victim if the

9    prosecution has established at least one vulnerable victim, and

10   then there's another potential two-point bump for a, quote,

11   unquote, large number.  That's what the guideline says.

12   There's not a lot of guidance in the comments after, but if

13   there's a large number of vulnerable victims it's another two

14   points.

15        Okay.  We had some discussions about other,

16   more-circuitous routes around the guideline and

17   cross-references, but we had reached a consensus last time that

18   this is the way we would approach it; it would amount to either

19   two or four points on the Total Offense Level.

20        So, I've read your papers.  This is a situation where

21   the prosecution differs, disagrees with the Presentence Report,

22   so I'll let you go first.  I have read your submissions, and

23   I'm ready to listen.

24        MR. AFRAME:  Thank you, your Honor.  So, Probation

25   took the position that essentially in the money-laundering case

1    restitution is not appropriate essentially because the victim

2    in such a case is the society for the concealment of the money

3    and not the individuals whose money was concealed, and so our

4    initial briefing took issue with that legal conclusion.

5         In our view, based on First Circuit case law,

6    restitution is appropriate in some money-laundering cases.  So,

7    to be clear, it's true that sometimes society is the victim in

8    a money-laundering case, and I think the classic example of

9    that might be a drug conspiracy case, if you're trying to

10   conceal what happened to the drug funds:  those didn't come

11   from a victim, they came from somebody who was buying

12   contraband, and so it's hard to say that that person was

13   victimized by that kind of money laundering.

14        But when the money laundering is a fraud case, an

15   underlying fraud case, in our view the situation is different,

16   and in our view there are two bases on which restitution should

17   be imposed in a money-laundering case.

18        And I first point the Court to the First Circuit's

19   decision in Paradis, which held -- which took on this question

20   of is society always the victim in a money laundering for

21   restitution purposes and said, No; and that was a bankruptcy

22   fraud case, and the underlying person was convicted of the

23   bankruptcy fraud, and then the person before the court was

24   convicted of money laundering, and the court said that there

25   can be restitution in that case because the concealment

1   activity could prevent the bankruptcy trustee from finding the

2   money to pay back creditors.  Now, in fact the government

3   didn't have any unpaid creditors in that case, so in fact no

4   restitution was ordered.

5          But the important point from our position is money

6   laundering, concealment money laundering serves to hide the

7   origin of the fraud proceeds, and that harms the victim because

8   the victim -- it is more difficult for the victim or impossible

9   for the victim to recover those proceeds when they've been

10  determined that they've been defrauded or when law enforcement

11  goes to find those proceeds.  And so, that is a harm to the

12  victim worked by the money laundering that is separate and

13  apart from the crime of the underlying person who committed the

14  fraud.

15         And I would note that the Guidelines -- I'm sorry --

16  the statute itself does contemplate this idea that I'm talking

17  about right now, which is there might be more than one person

18  who contributed to the victim's loss, and when that happens

19  3664 says that in that circumstance the Court may make each

20  defendant liable for the full amount of restitution or

21  apportion liability based on the Court's determination of the

22  particular defendant's contribution to the victim's losses.

23         So, that's our first argument.

24         Our second argument is that in the particular facts of

25  this case Mr. Freeman was not only involved in the restitution

1    -- I'm sorry -- the money laundering, he was also involved in

2    the underlying fraud, because what we proved at trial is that

3    Mr. Freeman ran a business in which he knew that he was taking

4    in fraud proceeds and distributing them back to the person

5    committing the underlying fraud.

6              And, of course, the purpose of the fraud from the

7    person who is perpetuating the underlying scheme is to get the

8    money.  It's not to have the victim give the money to

9    Mr. Freeman.  That doesn't help the fraudster at the end of the

10   day.  The fraudster is helped when they actually get the money,

11   and Mr. Freeman is the one who is taking that step to get that

12   money that has now left the victim, is in Mr. Freeman's hands,

13   and he's the one who is getting it to the fraudster.  So,

14   that's actually the last part of the fraud schemes that were

15   the sort of underpinning of this entire case.

16             So, those are different theories, but I think they

17   both point to restitution.

18             The defendant talks about one case that we talked

19   about in our letters to Probation but not here, and I just want

20   to touch on that for a minute, Adebara.

21             THE COURT:  Yes.

22             MR. AFRAME:  What the government said there, which did

23   not succeed, is that the person in Mr. Freeman's position

24   should be responsible for restitution for transactions, even

25   those of which he had no part, if other conspirators had a

1      part, and the court said that's too broad, that the person

2      shouldn't be responsible for restitution, even if they're part

3      of a conspiracy, if they had no part in the underlying

4      transactions.  We agree with that, but the difference here is

5      we are only asking for restitution for transactions in which

6      Mr. Freeman had a part by concealing the origin of the money

7      and by helping the fraudster ultimately gain control of the

8      money, which, of course, is the last step of the wire fraud.

9            So, in our view, Probation is wrong; restitution is

10     appropriate.

11           The point was made by the defense in their pleadings

12     that we have an obligation to, at least as I understood their

13     pleadings, two things, I guess:  one, to show the money was

14     sent, which I believe we could do at a later hearing.  The

15     second thing is we should have to identify the actual

16     underlying fraudster in some way, and, of course, we can't do

17     that, we won't be able to do that, because it's a bitcoin

18     transaction in which the money is sent anonymously.

19           The whole point of this scheme, the whole point of

20     this money-laundering scheme and the whole point of the

21     fraudster's *modus operandi*, which Mr. Freeman, I would say, was

22     part of, was to make the identity of that fraudster unknown to

23     the victim, the government and to Mr. Freeman.  He doesn't know

24     the identity of that person other than the general idea that, I

25     am aware that this is a romance scheme, and I'm going to send

1    it to wherever I am told, which I think that's sufficient

2    evidence to say that's the fraudster, even though I can't tell

3    you what country he's in, or her, what their name is.  But I

4    don't think that's what the government would need to show to

5    have there be restitution, because, if it was, in any Bitcoin

6    fraud scheme, money-laundering scheme, there would never be

7    restitution, because that's what makes this case important and

8    unique, was using bitcoin as a money-laundering tool.

9         THE COURT:  Okay.  I have one question about this, but

10   I want to hear from defense first, and then I'll come back.

11        Mr. Guerriero.

12        MR. GUERRIERO:  Yes, your Honor.  Let me start by

13   saying that, and I don't mean that they did this deliberately,

14   but the prosecution's first part of his presentation

15   mischaracterizes what our argument is.  We don't argue that

16   society is the only victim of money laundering.  We

17   acknowledge --

18        THE COURT:  That was the Paradis case, and that's not

19   really your argument, no.

20        MR. GUERRIERO:  Okay.  Well, and we don't argue that

21   there could never be restitution due from money laundering; we

22   agree that it could be.  Our point is that the harm has to be

23   the direct and proximate cause of the defendant's conduct in

24   the commission of the offense, to use the words of the statute.

25   Nor do we argue that there can only be one proximate cause.  We

1   agree that there could be cases, like in <u>Adebara</u>, where more

2   than one defendant's conduct was a proximate cause of the harm.

3          So, to the extent that that is what the government

4   argues, or that is what the government posits as our argument,

5   that's not our argument.  What we are saying quite directly is

6   that the government has not proved and cannot prove in this

7   case that the harm of the alleged victims was directly and

8   proximately caused by Mr. Freeman.

9          And I really think it boils down to this:  In some

10  ways it's an undisputed factual point, which, credit to

11  Mr. Aframe for recognizing this, they agree that they can't

12  prove what we characterize as the final step that would link

13  these things together and would make someone in

14  Mr. Freeman's position responsible; that is, they can't prove

15  that he knew any specifics of any particular fraud, they can't

16  prove he knew the identity, they can't even prove that --

17          THE COURT:  The jury found, the jury found --

18          MR. GUERRIERO:  They found that he, that Mr. Freeman

19  --

20          THE COURT:  -- laundered the proceeds of wire fraud.

21          MR. GUERRIERO:  Right, but --

22          THE COURT:  There was no Rule 29 motion on wire fraud

23  and an underlying -- there was no objection to the jury

24  instruction.  It was in the indictment, the jury instructions.

25  That's the problem.

1          MR. GUERRIERO:  Right.  No.  I looked at the Court's

2    instructions carefully about that.  The problem is that it's

3    not any particular wire fraud, okay?  It just says "wire

4    fraud."  It's document 283, is the transcript, and your

5    instruction starts on page 31, and it's just an instruction,

6    You have to find wire fraud, you have to find that there was a

7    conspiracy to commit an underlying crime, and the crime

8    specified here, unlike in the direct money-laundering charge,

9    was wire fraud.

10         THE COURT:  No, you got that wrong.  It's a conspiracy

11   to commit money laundering of the proceeds of wire fraud.

12         MR. GUERRIERO:  Right.

13         THE COURT:  Okay.  Not a conspiracy -- although they

14   probably could have shown that as well.  I'm not sure why they

15   didn't notice it up, but whatever, they didn't, and they did it

16   the way they did.

17         I'm trying to understand the argument here, that --

18   what authority do you have for the proposition -- because your

19   argument, when you filed that -- you had me thinking when you

20   made that filing last week, but the government responds I think

21   correctly.  What is the authority for the proposition that they

22   have to prove the identity of the fraudster?  I think they did

23   prove the transactions took place, and I think the defendant

24   testified he knowingly transmitted money to the bitcoin wallets

25   of the person -- the recipient of the purported victims'

1    payments, right?  He passed it on.  Now, he said, That's what I

2    do, but they didn't identify any of these recipients.  That's

3    true, too.

4              MR. GUERRIERO:  That's right.

5              THE COURT:  So, what's the authority for the

6    proposition that they have to?

7              MR. GUERRIERO:  In order for it to be -- well, I guess

8    it's going to depend on how your Honor defines "direct and

9    proximate cause," okay, and that's really, as you pointed out

10   earlier, there's not a case exactly on point with these facts,

11   and so we try to characterize it.

12             THE COURT:  Yeah.

13             MR. GUERRIERO:  That's why we compared this case to

14   Adebara, where it was clear that the person convicted of the

15   money-laundering conspiracy was involved in the underlying

16   fraud.  I mean, his conduct was charged in the indictment, and

17   so, when there was a conviction on that indictment, there was a

18   finding that he was engaged in that conduct.

19             Here you have a general finding regarding wire fraud,

20   as you say, the underlying crime, the object of -- the source

21   of the illegality of the funds laundered, but you don't have a

22   link to any specific scam, and what I tried to show in what we

23   filed is that, in fact, to characterize each of these

24   transactions as being the same is wrong.  Some of them, the

25   amount of funds transferred had nothing to do with any

1    particular loss by the victim.  Some of these people were

2    providing funds to their -- the person who was actually

3    scamming them in other contexts.

4         I mean, so for example, one of the alleged victims,

5    I'll just call him RS, and it's in the government's exhibit --

6         THE COURT:  Yeah.

7         MR. GUERRIERO:  -- that person was also buying gift

8    cards at either Target or Walmart, I forget which one, a lot,

9    like thousands of dollars of gift cards.  And so to say -- and

10   nobody is saying, well, that store that sold those gift cards,

11   even though in this case they had questioned, Why are you

12   buying so many?, nobody is saying, Well, that makes you

13   responsible for somehow facilitating the fraud in this case.

14   And as to any business that was dealing in a fungible product,

15   I mean, according to the government's theory, they would be

16   potentially liable.

17        THE COURT:  I don't know how you make this argument

18   now, though, without having made it earlier with respect to the

19   money laundering, and the fact is you didn't.  The jury was

20   instructed that they had to find that he -- I understand your

21   argument is that he didn't knowingly do it.  That's different.

22   But it sounds to me like you're saying they didn't prove a wire

23   fraud took place, and the jury found that they did, and there

24   was no motion to dismiss based on insufficiency of the evidence

25   of that element, so I don't know how you can say that now.

1          MR. GUERRIERO:  Well, because they're claiming

2     restitution to 36 different victims.

3          THE COURT:  Yeah.

4          MR. GUERRIERO:  And I think under the statute the

5     phrase in the statute is the harm has to result from the

6     defendant's conduct in the commission of the crime, okay?

7          THE COURT:  Yeah.

8          MR. GUERRIERO:  So, we have to look at each victim,

9     and that's why we broke it down in our motion.  Some of them

10    clearly they're claiming there's losses listed that were not a

11    result of this conduct, and each of these transactions is a

12    little bit different, and some of them are wildly different, so

13    in some circumstances the person who is purchasing the bitcoin

14    is actually, you know, to use maybe an unfairly pejorative

15    phrase, a money mule; like, the person scamming them is giving

16    them funds to use to buy bitcoin, and so the person claimed to

17    be a victim is not actually even the source of the funds.  And

18    so, in other instances the person is -- it's not a romance

19    scam.  And so, each of these is different.

20         THE COURT:  That's true.

21         MR. GUERRIERO:  And our point is that to just have

22    a -- to say, Okay, you were convicted of money-laundering

23    conspiracy where the illegality that makes the funds illegal

24    was wire fraud, that's not enough to prove restitution is owed

25    to 36 different victims, each with specific circumstances.  I

1    mean, we've demonstrated in their own evidence that there's

2    some of them that are clearly not --

3          THE COURT:  And I'm not prepared to make that finding

4    today.  The question today is whether as a generic matter under

5    the law can restitution be ordered in this case on these

6    convictions?  The identities of the purported victims involved

7    and the amounts, you're right, and I think there's almost no

8    chance I'm going to order the full economic loss figures as

9    restitution in this case.  It's one of the -- I don't think

10   that's probably demonstrable by the prosecution in this case at

11   that hearing.  I also think it's one of the reasons that the

12   Offense Level is cranked so unbelievably high in this case, I

13   think artificially severely high, because, when you do the

14   economic-loss analysis as opposed to what restitution

15   Mr. Freeman could be ordered to pay to what victims, they're

16   wildly divergent figures.  I recognize that.

17         MR. GUERRIERO:  Okay.

18         THE COURT:  So, all I have to decide today is whether

19   the law provides for restitution on this conviction to at least

20   one victim, I guess --

21         MR. GUERRIERO:  Right.

22         THE COURT:  -- and I think they had made that showing.

23   You disagree.

24         MR. GUERRIERO:  I do disagree, your Honor, because,

25   again, I would point back to the Adebara case, which I think

1   Probation was exactly right to look at in the way that

2   Probation responded to the government's initial position and

3   why I think the government dropped it as a case for supporting

4   it.  In that case the government did what they needed to do to

5   establish the link, basically to close the circle and show,

6   okay, this person was involved in the underlying fraud of these

7   victims.

8        And, as Probation pointed out, and as we pointed our

9   in our memo, the defense couldn't deny that in that case.

10  Those were the facts, that was the substance of the case;

11  whereas, here, there are no details as to any particular victim

12  regarding the wire fraud.  I mean, the government could say,

13  Well, we had particular victims testify that they were

14  defrauded, but we don't know what the jury found as to any

15  particular victim.

16       THE COURT:  The thing about Adebara, I think, you

17  know, it might be an example of the parties talking past each

18  other, but that was the court reacting to an overreach by the

19  government to order restitution based, again, on economic

20  losses that were separate and apart from the laundering

21  involved in that case.  That's not what the government is

22  saying here.  At least, that's not what I'm going to order

23  here.  I don't think it's what they're saying here.

24       MR. GUERRIERO:  What you're saying is true.  That's

25  right, that is what the court said in that case, but what

1    <u>Adebara</u> is, is an example of the government doing what they

2    need to do to close the link to get the restitution they did

3    get, because, when you look at the indictment in that case,

4    which is what Probation first pointed to and what we point to,

5    it details out exactly the connection between <u>Adebara</u> and the

6    underlying fraud and then gives the details of it.

7         THE COURT:  I think that link is here, though, I do,

8    and I'll explain that.  I think that link is here.  Again,

9    we've been through this at the last hearing, and I'll explain

10   that, but I do understand your argument.  I do.

11        MR. GUERRIERO:  Okay.

12        THE COURT:  But I don't want to cut you off.  Is there

13   more you want to say?

14        MR. GUERRIERO:  No, no.  I think the issue is framed

15   for the Court.  I think you understand our argument.

16        THE COURT:  Okay.  Let me ask this question of the

17   prosecution, then, because you said -- there was one thing you

18   said during your presentation that put me back on my heels a

19   little bit, because I think one could argue that you have

20   closed the loop based on the jury's verdict that the

21   money-laundering conspiracy laundered the funds, laundered the

22   proceeds of wire fraud.

23        There is this question, though, about -- because I

24   don't think the evidence at trial focused on, other than some

25   testimony by the defendant himself and some points you've made

1  in your most recent memorandum, which was an excellent

2  memorandum, this last one we got last -- the end of the week,

3  but you said on Page 6, Footnote 1:  "Although this evidence is

4  sufficient to conclude that the transactions that are the

5  subject of each individual restitution request occurred," which

6  is what I just alluded to, "further corroboration is available

7  on the public blockchain.  Although the government contends

8  that this evidence is not necessary, it is nevertheless

9  prepared to show that Freeman's bitcoin wallet in fact sent

10 bitcoin corresponding to victim payments."

11       And I kind of thought you were going to do that today,

12 and you said during your presentation, We're prepared to do

13 that in another hearing.  So, are you not prepared to do that

14 today?

15       MS. MACDONALD:  Your Honor, we are prepared to do that

16 today.  We have Agent Montgomery prepared to testify by Zoom,

17 and we've confirmed with the defense that they are willing to

18 allow that to happen.

19       THE COURT:  You don't object to that?

20       MS. MACDONALD:  But we had also spoken before the

21 hearing that neither of us thought that that was necessarily

22 what we were planning to prove at this hearing; if the Court

23 rules that restitution applies in general, that that's

24 something that we would do victim by victim at the next

25 hearing.  We're happy to present that general testimony.

1          MR. GUERRIERO:  If we did that today we're going to be

2    going through 36 individual victims.  I have a 12-page --

3          THE COURT:  I wouldn't need it for 36 victims today.

4    All I'd need is -- I would just want to take you up on the

5    offer of Footnote 1 with respect to a couple of transactions.

6    I wouldn't need it for everybody.  We'll do that at the

7    restitution hearing, when we're counting dollars and victims.

8    We'll do that then, if I order restitution.

9          But I do want to make sure we have a good record

10   today.  Look, I've put the government through a lot of

11   briefing, and the briefing here was a little bit unorthodox.

12   I'll give you a chance to confer.  Do you want to talk?

13          MR. SISTI:  Yeah.  One second, Judge.

14          THE COURT:  Please.

15                         (Pause)

16          MR. AFRAME:  We certainly could put on that testimony.

17          THE COURT:  Yeah, I hear you.

18          MR. AFRAME:  I still don't understand that that was

19   the disputed point.  I can understand it's disputed we don't

20   know who the fraudster is, but I thought his testimony at trial

21   was, Yes, of course I sent the bitcoin; that was my business.

22          THE COURT:  Yeah, but you acknowledged that they've

23   got two points.  One is, they haven't identified recipients,

24   and you can't, and I don't think you need to, but the first one

25   is that they haven't shown -- and you spent a lot of time

1      showing me that you did prove, I think, that he didn't transfer

2      the money to the fraudsters, and you put in Footnote 1, I can

3      show you he did that based on blockchain, but --

4                  MR. AFRAME:  Sure.

5                  THE COURT:  And I'm saying I'm not 100 percent sure

6      that's necessary either, but we're here in court, and what I

7      don't want to do is get into a situation where my agreement

8      with you that the wire fraud predicate for the money-laundering

9      conspiracy is enough.  I think it probably is, but I'd rather

10     hear the evidence and find it than find out later that, no,

11     that was insufficient, if you know what I mean.

12                 MR. AFRAME:  Okay.

13                 THE COURT:  What do you want to say?

14                 MR. GUERRIERO:  Well, your Honor, I actually think

15     that this is a point where we're not in disagreement on what

16     the facts are in terms of what's there and what's not there.

17                 THE COURT:  Okay.  Maybe Attorney Aframe is right.

18                 MR. GUERRIERO:  You know, Mr. Freeman acknowledges

19     that he received funds and that he then made bitcoin accessible

20     in certain amounts on certain dates, and that's what the

21     government would prove by the documents that they showed me.

22     And my point would be you can't -- that proof stops there.  It

23     doesn't show who had access to that bitcoin wallet; it doesn't

24     show any contact with any particular scammer, and I think they

25     agree with that.

1          MR. AFRAME:  Mm-hmm.

2          MR. GUERRIERO:  And so, we're in agreement on those

3    facts.

4          THE COURT:  Then, I don't need to have you put this

5    proof on, because I think -- okay.  I've heard what I need to

6    hear.  Because your point is that, yeah, your point is that

7    they need it to identify recipients, scammers and means of

8    access by recipient scammers to the proceeds, basically, right?

9          MR. GUERRIERO:  Right.

10          THE COURT:  Okay.  What else did you want to say?

11          MR. GUERRIERO:  Just one other thing, your Honor, and

12    we were talking here for a second.  I do think that your

13    determination of the -- if you say restitution is going to be

14    due to at least somebody, one person, the determination of the

15    number of people would have an impact on the 3A1.1 calculation

16    because of, you know, the extra two points --

17          THE COURT:  Is it two points instead of four.

18          MR. GUERRIERO:  That's right.

19          THE COURT:  I think I'm with you on that.

20          MR. GUERRIERO:  Okay.

21          THE COURT:  Okay.  Thank you.  All right.  This is a

22    good issue.  Okay.

23          MR. AFRAME:  Can I facilitate something for you?

24          THE COURT:  You certainly can.

25          MR. AFRAME:  We are willing to abandon the four-point

1     vulnerable victim and pursue the two.

2                THE COURT:  That's a good concession.

3                MR. AFRAME:  I don't think it will matter in the end.

4                THE COURT:  I was about to say, look, I'm prepared --

5     I'm prepared to apply the adjustment for vulnerable victim.

6     I'm prepared to find the restitution is -- that ordering

7     restitution is permissible and required here under MVRA, and

8     therefore that the vulnerable victim adjustment applies, but I

9     wasn't prepared to find a large number of vulnerable victims

10    and order four points.  I am prepared to order two points.

11    It's not that I don't think it's possible; it's just that on

12    this record I don't think I can.

13                And the prosecution has gone to a lot of trouble

14    giving me a big binder full of FBI interview reports and

15    evidence that suggest there's a lot of vulnerable victims here,

16    but there's an amazing dearth of law on this guideline and what

17    "a large number" means.  There's a case that says ten's enough

18    that you've given me.  There's not a lot more out there, and

19    I'm just not prepared to find it on this record.

20                So, here's what I'm thinking about this, though:

21    First of all, I appreciate this briefing.  It's a weird sort of

22    ping-pong of briefing in this case, and I kept giving people

23    more chances, but I think what it's done is created a good

24    legal record on the applicable law in a way that will allow the

25    Court to make a decision.  But I appreciate the sort of, like,

1   short-term compliance with very fast-moving orders on this.

2   It's not unnoticed or unappreciated.

3         The government advances two arguments in opposition to

4   the Presentence Report and the defendant's arguments.  One,

5   they call it the first argument based on Paradis and Cunningham

6   that restitution is recoverable under MVRA because the

7   defendant's conduct made it more difficult for the fraud funds

8   to be traced and recovered; and the second argument is the one

9   that's on pages 12 and 13 of their original Sentencing

10  Memorandum, which is that the defendant basically participated

11  in the fraud, participated in the fraud, and therefore that the

12  causation aspect of the required showing is proven.

13        A couple of cases I rely on to find -- to, first of

14  all, develop the standard.  One is the Newell case, the Newell

15  case, 658 F.3d 1.  It's a First Circuit case, 2011.  It also

16  quotes the Vaknin case, 112 F.3d 579.  It's a 1997 First

17  Circuit case.  "A modified but for standard of causation is

18  appropriate for restitution..." meaning "...that the government

19  must show not only that a particular loss would not have

20  occurred but for the conduct underlying the offense of

21  conviction, but also that the causal nexus between the conduct

22  and the loss is not too attenuated (either factually or

23  temporally)."

24        The Chin case also, and this is a case cited by the

25  prosecution.  It's a 2020 First Circuit case:  "The restitution

1   analysis focuses on the causal relationship 'between the

2   conduct,'" your point, Mr. Guerriero, "'and the loss,' not

3   between the nature of the statutory offense and the loss."  And

4   to me -- oh, by the way, Chin is 965 F.3d 41, First Circuit,

5   2020.

6            This is not what I would consider the standard

7   money-laundering situation where Mr. Freeman was accused of or

8   proved to have accepted funds from a fraud perpetrator and then

9   laundered them in a way to make them difficult to trace.

10  That's not this case.  This is a case where Mr. Freeman's

11  conduct literally transmitted, and I think it's been proven and

12  found by the jury, but literally transferred fraud proceeds

13  from purported victims to fraud perpetrators by accepting cash

14  and depositing, after taking a commission, the bitcoin proceeds

15  of that cash into a bitcoin wallet, and one of the points the

16  prosecution makes is it was done repeatedly by some of the

17  unidentified, one, in particular, of the four examples of the

18  unidentified scammers, showing that the scammer had a

19  motivation to continue the relationship, and I think that's

20  important.

21           So, to the extent that causation and foreseeability

22  are key concepts in the availability of restitution under MVRA,

23  I look at this argument, what the prosecution calls its second

24  argument, as the primary argument.  I think that's the reason,

25  the clearest reason, not the only reason, but the clearest

1    reason that restitution applies here and that it's orderable

2    here, because it certainly caused the loss, the harm to the

3    victim.

4           Mr. Freeman's conduct was the conduit, was the means

5    of transmittal of defrauded funds from victims to perpetrators

6    of wire fraud.  The jury found that.  The jury found that he

7    conspired to launder the proceeds of wire fraud in the way I've

8    described it, not in the way of accepting funds from a

9    fraudster or a scammer and then conducting transactions that

10   would, quote, unquote, launder the funds, and I think that's

11   set forth very clearly on pages 12 and 13 of the original

12   prosecution's Sentencing Memorandum, document number 336.

13          I wondered why I was blocking on the first prosecution

14   argument, and I just don't think it's as close -- I don't think

15   it's as close and as integrated into the harm-causing conduct

16   as the second argument.  They're still both good arguments, by

17   the way; they're both reasons MVRA requires restitution here,

18   and, because of that, the reason the vulnerable victim

19   adjustment applies.

20          Now, I just want to put a few other -- I do think

21   there's an abundance of record evidence that the defendant

22   transferred wire fraud victims' fraudulently obtained money to

23   wire fraudsters, and I just want to run through a little bit of

24   it so we have a good record.

25          First of all, there was the defendant's own testimony

1    confirming that he didn't keep the money sent to him by the

2    purported victims -- the victims in this case.  I shouldn't

3    call them "purported," because I've found they're victims.  He

4    transferred it to bitcoin wallets controlled by third parties.

5         Second was the repeat transactions that I already

6    referred to that are listed in the prosecution's most recent

7    filing, document 351.  The fraudsters would elicit repeated

8    transmissions through the defendant, and obviously the

9    fraudsters received the fraud funds, incentivizing repeat

10   business for Mr. Freeman in this way.

11        I want to refer everyone to the testimony in exhibits

12   involving Patrick Brown.  Those are Exhibits 1225, 1225C and

13   2525.

14        I refer to -- I had some difficulty with the James

15   Rossell evidence and understanding all of it, to be honest, but

16   some exhibits do provide confirmation of transmittal of

17   defrauded and laundered funds, Exhibit 1215A, Exhibit 1215B and

18   Exhibits 1215 through 1215F on Rossell; with respect to Danella

19   Veral, Exhibit 2403, and Mr. Freeman's testimony about that

20   particular situation; regarding Rebecca Ault, A-u-l-t, Exhibit

21   2524 and Exhibit 1201.

22        There was also the defendant's use of Telegram, the

23   Telegram-encrypted messaging app, for most of the most obvious

24   scam situations, situations by which the jury could easily draw

25   permissible inferences of proof beyond a reasonable doubt that

1   they involved wire fraud; there's exhibit -- the vending

2   machine, a couple of the vending machine exhibits, 609B, 605,

3   the defendant's testimony about it, again confirm transmittal,

4   in the Court's view, beyond a reasonable doubt to wire

5   fraudsters; and then, finally, Exhibit 1534, the defendant's

6   comments on his radio broadcast.

7            So, the Court does apply, it does apply the vulnerable

8   victim -- that means two things.  First of all, it means we're

9   going to have another hearing to determine what restitution is

10  owed and to who; second, it means the vulnerable victim

11  adjustment at 3A1.1 applies, for a two-point increase in the

12  Total Offense Level, but the Court declines -- and I'm not

13  going to get into this -- the prosecution has withdrawn that it

14  is seeking another upward adjustment for a large number of

15  victims.  The Court wasn't prepared to find it on this record.

16  It was a close call.  It's just that I think in vague

17  situations, where the law is not very clear, it's my practice

18  usually to call those in favor of the defendant, because it's

19  his liberty at stake, and no one should ever be incarcerated

20  for longer than the law requires.

21            Okay.  So, what that means -- let's get back to

22  normal -- not normal but more conventional conversation

23  about --

24            MR. GUERRIERO:  Your Honor, if I may, just so we don't

25  have to come back to it later, just note for the record that we

1   object to your ruling on --

2           THE COURT:  I'm about to say it.  Yeah, go ahead.

3           MR. GUERRIERO:  Okay.  We object to your ruling on the

4   issue of restitution both under the MVRA and under 3A1.1.

5           THE COURT:  Let's revisit that last part.  I thought

6   we agreed last time we were here that if, that if MVRA

7   restitution was warranted, that 3A1.1, vulnerable victim

8   applied, because all they have to show is one vulnerable

9   victim, and it's very difficult to make an argument that they

10  didn't do that.

11          MR. GUERRIERO:  I agree with your legal point that

12  they only have to show one vulnerable victim.  That's clearly

13  the law.  But we would object to the finding -- because we say

14  there were no victims of Mr. Freeman, we object to your finding

15  of even one victim.

16          THE COURT:  Understood.

17          Okay.  So, then, let me do this:  I've got to do just

18  a very quick guideline calculation.  That would mean -- so the

19  Court adopts the Presentence Investigation Report in full, with

20  one exception.  It would add an addition to adjusted Offense

21  Level and then Total Offense Level of two points, based on the

22  guideline Section 3A1.1, vulnerable victim.

23          MS. MACDONALD:  And, your Honor, we are also prepared

24  to agree that, based on the amendments to the *Sentencing*

25  *Guidelines* that are forthcoming that will be retroactive --

1          THE COURT:  Okay.

2          MS. MACDONALD:  -- that he should be a Criminal

3     History Category II instead of III, and that the two levels

4     that are applied for him being on a criminal justice sentence

5     should not apply.

6          THE COURT:  That's more of a variance argument,

7     though, isn't it?  How do you characterize that?  Do I say the

8     PSR is incorrect?  Because I can't really say that.  It's

9     correct.

10          MR. SISTI:  Maybe a stip on the criminal history

11     level.

12          THE COURT:  I don't want to make an issue of

13     something --

14          MR. AFRAME:  Yeah.  I just think, as you described, it

15     would be helpful to describe the right numbers, but I agree

16     with you that technically it still applies today, but, with it

17     being retroactive, we don't want to -- we want to be clear.

18          THE COURT:  Okay.  I'm going to say that, then.  I'm

19     going to apply Category II.  Everybody good with that?

20          MR. SISTI:  Yes.

21          THE COURT:  Okay.  Officer Buckley, we can figure out

22     later how you want to address that in your report, if you do at

23     all.

24          So, he's a Total Offense Level 36 and a Criminal

25     History Category II instead of III.  Without waiving any of

1    your objections, Mr. Guerriero, and, Mr. Sisti, regarding the

2    ones you just put on the record, if that's the case, the

3    Court's calculation is that the guideline sentencing range is

4    210 months' to 262 months' imprisonment, supervised release of

5    one to three years each count.  The fine is -- I would say it's

6    40,000 to $11,535,575.

7               MR. AFRAME:  Right.

8               THE COURT:  All right.  And then restitution to be

9    determined at a subsequent hearing.  Special Assessment of $100

10   per count of conviction.

11              MR. AFRAME:  I also want to keep forfeiture on the

12   radar.  There is a forfeiture aspect to the case involving 1960

13   and 1956.

14              THE COURT:  Understood.  And my proposal would be to

15   address that at the same time we're doing restitution.  Any

16   objection?

17              MR. AFRAME:  So, the law on that will require the

18   Court to find that forfeiture exists, that the defendant is

19   responsible for forfeiting the funds involved in the offense,

20   but that ultimately you would need a further hearing to

21   determine the exact amount, but it will have to be said in the

22   judgment today that forfeiture is ordered.

23              THE COURT:  Right.  It will be said.  I'm just talking

24   now about the guideline sentencing range --

25              MR. AFRAME:  Yeah.  I want to make sure that we --

1          THE COURT:  -- which is not an issue, right?  Okay.
2     So, what I just described --
3          MR. AFRAME:  Yeah.
4          THE COURT:  -- do you have any objection to the
5     guideline sentencing range?
6          MR. AFRAME:  No.
7          THE COURT:  Without waiving your objections you've
8     already raised, are there any other objections to the guideline
9     sentencing range?
10         MR. GUERRIERO:  No, your Honor.
11         THE COURT:  Okay.  Okay, Mr. Freeman -- oh, you were
12    talking?
13         MR. SISTI:  No.  All set, Judge.
14         THE COURT:  So, here's what we know:  Now we know that
15    the guideline sentencing range is 210 to 262 months'
16    imprisonment.  Generally what happens now is lawyers make
17    arguments for what are called "departures" and "variances."
18         "Departures" are arguments that I should sentence you
19    either more severely or more leniently based on provisions of
20    these guidelines (indicating).  It's called a "departure" under
21    the guidelines.
22         A "variance" is an argument that I should set the
23    guidelines aside and just not apply them and sentence you on
24    some more traditional sentencing factors that are in the
25    statutes and in the sort of common law of sentencing, and your

1    lawyer has asked for that, and your lawyer has filed a

2    memorandum requesting what's called a "variance."

3            There's no departure requests in this case, but there

4    is a request for a variance, and I'm prepared to listen to it.

5    I am prepared to say already I'm not going to sentence you to

6    anything close to 210 months in prison, but the question is

7    what's the appropriate level of a variance, and both sides have

8    arguments about that that I'm prepared to listen to, so that's

9    what's going to happen now.  Understand?

10           THE DEFENDANT:  Yes.

11           THE COURT:  Okay.  So, your burden on the variance.

12   I'll let you make your argument, Mr. Sisti.

13           MR. SISTI:  Thank you, your Honor.  And I do have a

14   few witnesses as well that I'd like to have the Court listen

15   to.

16           THE COURT:  Sure.

17           MR. SISTI:  We can do that toward the conclusion of

18   this.

19           THE COURT:  Yeah.  Let me say this about that:  Yes,

20   that's fine.  I have read every single letter that was

21   submitted, every single character reference.  A couple of them

22   were actually submitted this morning that I read, and -- yeah,

23   from Brian Bugenhagen and Tina Spiers (ph) or Spies.

24           MR. SISTI:  Spies.

25           THE COURT:  Spies.  I'm sorry about that.  I didn't

1    mean to butcher her name.  But, yeah, I've read everything, so

2    I'm happy to listen to testimony.

3          Let me ask the prosection, do you have any witnesses

4    you want to present today?

5          MS. MACDONALD:  No, your Honor.

6          THE COURT:  All right.  Go ahead, Mr. Sisti.

7          MR. SISTI:  Thank you.  And I'm happy, your Honor,

8    that I think we recognize and I think you've actually

9    articulated that in this particular case the Offense Level is

10   unreasonably high.  It's unreasonably high because of the money

11   computations.  We understand that.

12         But going to the more traditional aspects of

13   sentencing, I think this is a perfect example as to why this

14   particular Offense Level and this where we work out a Criminal

15   History II and it works into over 200 months of incarceration

16   should be set aside, and we should be dealing with the profile

17   of the individual in front of you today.

18         You recognized the multiple letters that were there.

19   There's 80 to 100 letters that are included, all of them fairly

20   well written from people all over the place, culturally.  Their

21   backgrounds vary from law enforcement personnel, decorated

22   military veterans, the people in his community that would back

23   him up, folks that have known him all his life, relatives,

24   including parents, wife, et cetera.  It's a wide range that you

25   could dip into, pull out and read.  Most of them agree to a few

1     of the things that I think I want to stress.

2              I've been doing this a while, we've all been doing

3     this a while in this court, and when I started out several

4     decades ago it was explained to me that we lock up other human

5     beings in cages when they are a threat to themselves or others

6     in the community.

7              Let me kind of back up a little bit and make sure

8     we're all on the same page there.  The individual, the person

9     that you will be sentencing today has no violent past

10    whatsoever, none, zero.  And, as far as his forays into the

11    criminal justice system, we've come down to a Criminal History

12    II, but you can look at the convictions in his past:  minor

13    offenses, for the most part, misdemeanor in nature, and, quite

14    frankly, nobody got hurt.

15             This particular case really, really focuses like a

16    laser beam on a regulatory situation more than anything else,

17    and that's what really bumps up the guideline range in this

18    case.  What we're asking the Court to do in this case is

19    consider the fact that this individual has been living in the

20    community, at least the New Hampshire community, now for

21    decades, has avoided any kind of, any kind of violent or

22    substantial criminal involvement in the jurisdiction; that he

23    has been out on bail conditions in the community for over two

24    years; that any aspects of him not following along with regard

25    to bail did not result in any bail violation; that he has been

1    in the community monitored, electronically and otherwise, all

2    the way through trial and up until trial.

3           This is somebody that, you know, maybe you had the

4    book on him early as somebody that might be somewhat

5    disrespectful or somewhat antagonistic with regard to this

6    process, but I think you observed over this long, long period

7    of time that this guy actually, he's behaving himself, he's

8    doing what he can do, and he's showing up every day.

9           And he knows what's going on here.  It's not like

10   Richard and I haven't explained to him the seriousness of

11   what's going on and what the guideline range was and what he's

12   facing, and he's faced it for a long time.  I mean, if he

13   wanted to take off, he would have taken off a long, long time

14   ago, Judge.  He's facing up to it.

15          The other thing I want to make sure that we're going

16   to land on here is that this guy's not a fake.  This guy

17   actually believes a thousand percent in what he's doing.  For a

18   lot of folks maybe that's silly, maybe they think it's some

19   kind of a ruse, but for him that's the very core of how he

20   operates, and he'll address that with regard to who he is and

21   what his moral character is with the Court.

22          The other thing I want to emphasize here, too, is that

23   I don't think anybody in the entire process that we've been

24   through would state that Ian tried to take advantage of old

25   people or that Ian tried to scam people out of money.  I mean,

1    that wasn't even the government's position.  The government's

2    position is not that he's a scammer.  I think we're all on the

3    same page with where that theory is, and the Court has

4    articulated it this morning.

5          But, you know, I hate to say it, I hate to be so

6    blunt, and I hate to be so real, but the folks that were

7    scammed were going to be scammed anyway.  It seemed to me, it

8    seemed to me that Ian Freeman was not the pivot in whether or

9    not they were going to support some mythological guy on an oil

10   rig.  That money was going to get there one way or the other.

11   Was it going to be with gift cards from Walmart?  Was it going

12   to be with some kind of a cash transaction that took place?

13   Was it going to be flying money back and forth from different

14   airports and meeting mythological people?  It could all have

15   happened and probably would have happened.  And, in fact, some

16   of these victims have articulated that it wasn't just Ian; that

17   they had lost hundreds of thousands of dollars without Ian

18   Freeman even being in the picture.  So, I want to make sure

19   that that's on the table, too.

20          THE COURT:  Let me ask you a question about that,

21   though.

22          MR. SISTI:  Sure.

23          THE COURT:  It's not that I necessarily disagree with

24   you, but if I accept this idea that it was going to happen

25   anyway, that they were going to be victimized based on their

1    circumstances and the fact that there were people, there were

2    predators out there preying on them, right --

3              MR. SISTI:  Mm-hmm.

4              THE COURT:  -- isn't that really what the

5    prosecution -- that the point they've been making about this

6    whole victim restitution issue and the money-laundering

7    dimension of it is that his conduct made it -- it facilitated

8    that scam by making the money virtually impossible to recover

9    from the scammers?  Like -- no?  Why not?

10             MR. SISTI:  No.  Cash is king, you know.  I mean, you

11   can make a cash transaction any day of the week, and you can't

12   trace it.  Gift cards.  I mean, this scam's -- that game has

13   been going on for years and years and years.  I mean,

14   transfers, emergency transfers.  I mean, this thing has been

15   going on forever.  People in the middle.  It goes on forever.

16   It's going on today.

17             You know, and the things is, the other thing is that

18   we started this case over two years ago, two years ago, and,

19   you know, Ian's been out of circulation for two years.  This

20   isn't some kind of a situation that's plaguing the District of

21   New Hampshire.  I don't know of another case right now active

22   in the District of New Hampshire that even comports in any

23   relation to what we're dealing with here today.

24             And the other thing is that Ian knew that he was under

25   the focus and the microscope of the FBI in 2017, '18, '19.  I

1    mean, I guess they could have sat back and let the numbers fly

2    for another five years and have many, many more vulnerable

3    people victimized, but they pulled the trigger in 2020.  Why

4    didn't they pull it in 2017?  He hasn't been hiding from

5    anybody.  Those machines have been around for a long, long

6    time.  He's open, he's out there.  He's on his radio show

7    saying what he does every day.

8           I was in this courtroom once years ago with Judge

9    McAuliffe, and I argued a sentencing entrapment case.  Now, I'm

10   not saying that this is sentencing entrapment, okay?  I'm just

11   not going to go that far.

12          THE COURT:  You're just saying it went a lot longer

13   than it needed to.

14          MR. SISTI:  It went way longer than it needed to.

15   They had everything they needed back in 2017.  They knew where

16   he lived, they knew what he was doing.  He had the machines

17   going, up and running.  I mean, they let it string out, and

18   then they popped him when they popped him, and when they did

19   that they smashed through his windows and his doors with

20   battering rams, but they didn't have to do that.

21          In a lot of ways, Judge, and I'm not saying this is a

22   minor case, but what I'm saying is, I guess, exactly what you

23   were saying, that the Offense Level is unreasonably high for

24   what we're dealing with in this situation, that I think we have

25   to back down and take a look at just who Freeman is and whether

1    or not he can be controlled in the future.  Quite frankly, I

2    believe he's learned what's going on here.

3            I can tell the Court he understands that jail time, of

4    course, is a reality.  He came here today knowing that.  I

5    mean, we're not messing around with this guy.  He's authorized

6    me, in fact, to ask for 38 months of incarceration.  He's got

7    about two months in from his pretrial, and he's asking that

8    that be imposed.  He's never had a sentence like that imposed

9    upon him, certainly not in the federal system.  Certainly, that

10   would be a high-impact sentence for Ian Freeman.  It would

11   separate him from his wife, his community, and it would be for

12   a substantial period of time, and it would satisfy, frankly,

13   everything that one looks at when one is being sentenced.  The

14   punishment would be clear.  Obviously, deterrence is there;

15   it's been there for the last couple of years.  He gets the

16   message.  He's not dealing with machines anymore.  He's not

17   dealing with LocalBitcoins.  He's been monitored by U.S.

18   Probation.

19           And I think the folks are here, and the community and

20   the culture with regard to the bitcoin situation and with

21   regard to what Ian was convicted of doing get the message, too.

22   It's pretty clear.  You can't just get one of these machines up

23   and running without registering.  We understand that.  He

24   understands that.  That's clear.  And you don't get yourself in

25   situations that he got himself into.

1          But if you look at all the conventional outlines and

2     conventional dictates when you're dealing with sentencing, Ian

3     hits every one of them, and this Court can certainly, can

4     certainly impact him and impact the community with a

5     reasonable, proper sentence, and I would say that what Ian has

6     asked me to ask the Court to impose is a reasonable sentence.

7     It's not him coming in here, saying, Oh, give me time served,

8     and, you know, I'll be a good boy and put me on probation.  I

9     mean, he gets it, okay?  And I think he's somebody that's been

10    getting it for the last couple of years.

11         So, with that in mind, I don't know if you want to

12    hear from the government before I put on a few witnesses,

13    but --

14              THE COURT:  No.  I'll hear your evidence.

15              MR. SISTI:  Okay.  Thank you.

16              THE COURT:  Let me say something, by the way, just so

17    no one gets the wrong idea.  Sometimes I have a bad habit;

18    sometimes I sort of complete other people's sentences.  Like, I

19    just did that with Mr. Sisti.  I said, Well, you know, you're

20    saying it went on too long.  I'm not necessarily endorsing

21    that.

22              MR. SISTI:  No, no.  I know.

23              THE COURT:  I'm just saying I understand your

24    argument.

25              MR. SISTI:  Right.

1          THE COURT:  Sometimes these federal investigations,

2    especially in areas like this that are not -- with not a lot of

3    clear law, they take a long time.  The problem is, as you point

4    out, it's kind of like a drug investigation.  The more time

5    that goes on the more the criminal activity -- and I know you

6    disagree that there's criminal activity; I understand that --

7    but the longer the criminal activity and the victimization and

8    everything else continues.  So, point taken.

9          MR. SISTI:  Thank you.

10         THE COURT:  All right.

11         MR. SISTI:  First, I'd like to ask Bonnie Freeman to

12   come on up and address the Court.  If she could do it from the

13   podium, Judge?

14         THE COURT:  Sure.

15         I'll just ask the prosecution, do you want any of

16   these people sworn?

17         MS. MACDONALD:  No, your Honor.  That's fine.

18         THE COURT:  Okay.

19         MS. FREEMAN:  Hello.  Thank you for giving me the

20   opportunity to talk to you.  I'm writing to -- it says, To

21   Honorable Judge Laplante:  I am writing to testify to the

22   character of my husband, Ian Freeman.  I have known him since

23   October 2020, and I was a daily listener of his radio show for

24   a few months before I met him; and, in fact, before I met him

25   and when I was just a listener I wondered if he was fake

1    sometimes, if all of his message about peace and freedom and

2    everything, if that was just an act for a show, and I was

3    really afraid if I met him that he would say it wasn't.

4         Sorry.  That's not in the letter.  I just said that,

5    because it's something Sisti said, and it reminded me of that.

6         THE COURT:  Since you're reading your letter, what I

7    want you to do is -- you probably remember this from the trial.

8    When you're reading you have to read a little slower.

9         MS. FREEMAN:  Oh, okay.  Yeah.

10        THE COURT:  So, I would ask you to just moderate the

11   pace.

12        MS. FREEMAN:  Okay.  I was inspired to get a job and

13   move to New Hampshire after hearing about his beliefs on his

14   show.  I wanted to meet him, but I didn't imagine we would

15   actually fall in love like we did.  We have so many things in

16   common that I never thought I would find in a partner.  We

17   believe in making the world a better place, we believe in

18   living nonviolently, and we believe we serve a higher power.

19        Ian helped heal me of so many negative personality

20   traits that were harming myself and others, and he never did it

21   by pushing me to act a certain way.  He helps others when they

22   ask for it, but the most important thing he does to positively

23   influence others is just living the way he does and being a

24   positive role model.

25        Because of his influence, I am a lot less

materialistic.  Ian doesn't care about the way someone looks or
what they have.  He cares about what people are doing to make
the world a better place, and that's why he's a peace activist.

Ian already had made a lot of money in his life by his
early 30s by being an extremely productive member of society
and then gave it all to his church.  I think this was a really
wise thing to do, because I've seen how having a lot of money
can ruin even people with good hearts.  Instead of using his
money for leisure and fancy clothes and women, Ian stayed in
our humble home in New Hampshire and did what he felt called by
God to do.

One thing that he felt he could positively change the
world with was bitcoin.  Bitcoin and other cryptocurrencies are
sacred to us, the interfaith members of the Shire Free Church.
We believe that God gave us to humanity to help us progress.
Though the prosecution tried to make the Shire Free Church seem
not valid because we didn't have a shrine in the studio --

THE COURT:  Okay.

MS. FREEMAN:  Oh, slow down more?  Sorry.

THE COURT:  Please.

MS. FREEMAN:  Though the prosecution tried to make the
Shire Free Church seem not valid because we didn't have a
shrine in the studio, that is actually a very shallow way of
viewing another's religious practice.  Ian talks about the
Shire Free Church openly on his show all of the time.  On the

internet feed that plays our show as well there is a
reoccurring commercial -- sorry -- recurring commercial about
the Shire Free Church that gives the website for more
information.

Ian, Mark Edgington and I, three of the many
co-ministers of the Shire Free Church in Keene, are not pushy
about our religious beliefs.  We consider that to be a problem
with other religions that we don't want to incorporate into
ours.  We just offer what we believe on our radio show every
single night.  A lot of people agree with us, and some don't.

I have tried out (indicating) many different churches
and religions in my life, looking for one that fit with me the
best.  Being in the Shire Free Church gives me such a feeling
of freedom, because it just means that I believe in living
peacefully and doing what I feel God calls me to do.

Mark is a Quaker but also a part of the Shire Free
Church, and that's exactly how it works.  One friend who is a
host of *Free Talk Live* as well has recently become a Christian
and is still a member of the Shire Free Church.  Being an
interfaith church, we all get together, and whether on our show
ministering to the public or off the show just in fellowship,
our conversations almost always go to the topics of morality,
spirituality, and love.

For Ian and I love is our God.  Being a panentheist,
Ian believes that everything good is ultimately God, which is

1   the same as saying love is God.

2          Our radio show gets to the topics of love and morality

3   every single episode.  The idea is it is a current events show,

4   and then we speak on the current events from the viewpoints we

5   have as Shire Free Church members and lovers of peace, freedom,

6   and charity for our neighbors.  All of those aspects come from

7   God.

8          The prosecution boiling it down to just being the same

9   kind of show as something like Rush Limbaugh's type of

10  political show is a gross misrepresentation.  We don't care

11  about politics the way that other talk show hosts do.  To us,

12  it isn't about politics; it's about educating humanity on how

13  we got into the situations we're in and how peaceful solutions

14  are the way out.

15         If Ian is sent to prison and not on the air, there

16  will be one person fewer on the radio every single night

17  preaching the ideas of non-violence.  We are living in an

18  increasingly dangerous country that's on the brink of splitting

19  up.  Ian's message is incredibly important, as he reminds

20  people to stay peaceful and nonviolent.

21         I know Ian more than anyone else, and I can say that

22  he has a soul that is more sensitive to people who have been

23  wronged than most.  He would not be able to have on his

24  conscience aiding people to harm other people for money.  He

25  wouldn't do that ever, and his defense even showed instances

1    where he helped stopped scams from happening.

2          Putting Ian in jail won't stop anyone else from

3    getting scammed.  Those who scammed the people who wrote in

4    letters to the Court are still out there.  Punishing Ian

5    harshly wouldn't do anything to help the men and women who got

6    scammed or anyone else who could be scammed in the future.

7    Scam victims will continue buying Walmart gift cards, wiring

8    money and using Venmo or other apps, and there's also plenty of

9    bitcoin sellers out there on the internet still who don't have

10   Ian's moral values.

11         The FBI could have helped stop scams if from the

12   beginning they alerted Ian to the fact that these people he was

13   dealing with were getting scammed and worked with Ian to catch

14   scammers.  Instead, the prosecution is going after someone who

15   was used by the scammers and who at times was scammed himself.

16         A long sentence is not justice for anyone who was

17   wronged.  A long sentence merely harms Ian and everyone who

18   loves him and wants him to be around, especially me.

19         Ian and I have never knowingly harmed anyone in our

20   lives, and lots of people testified at trial and in letters to

21   the Court how positive his influence has been in their lives.

22         Ian was just doing what he believed God wanted him to

23   do, which was to sell bitcoin, which was never illegal to do.

24   He did everything in his power to keep it from harming anyone.

25   I'm not sure what he was supposed to do about other people's

1    scam victims lying to him in order to get him to do things he

2    didn't want to do that ended with them sending their money

3    away.  I witnessed, personally, many times that he was asking

4    people on the phone if they really wanted to buy bitcoin, if

5    they knew the person they were purchasing for, or if they ever

6    met their husband who they said they were buying bitcoin for.

7    I witnessed one woman, at least, convince him over the phone

8    that she knew her husband and told him she was offended that he

9    would even ask.

10         I am asking you to use your discretion and give a

11   lenient sentence to my husband, Ian.  Thank you for your time

12   and consideration.

13         THE COURT:  Thank you.

14         MS. FREEMAN:  Thank you.

15         MR. SISTI:  Your Honor, we'd call David Hathaway at

16   this time.

17         MR. HATHAWAY:  Your Honor, thank you for the

18   opportunity to address the Court today.  My name is David

19   Hathaway.  I'll start out with a little bit about my

20   background.  I am currently the elected Sheriff for Santa Cruz

21   County, Arizona.  I have worked in law enforcement for 31

22   years.  Most of those years were as a Special Agent with the

23   U.S. Department of Justice, the Drug Enforcement

24   Administration.  I started out that career at the FBI/DEA

25   Academy in Quantico, Virginia.  At that time, in the 1980s, the

1     training was collocated and shared instructors between the two

2     agencies.

3            I did eight transfers during my career, eight

4     multiyear assignments.  The last four of those assignments were

5     as the Agent in Charge of different offices domestically and

6     internationally for DEA.

7            I'm going to just refer a little bit to the letter I

8     sent the Court --

9            THE COURT:  Yup.

10           MR. HATHAWAY:  -- summarize this.  As an elected

11    Sheriff and a former Supervisory Special Agent with the DEA, I

12    would like to talk about Ian Freeman, an individual who is

13    undergoing sentencing proceedings in your court.  As we

14    approach the sentencing phase regarding Mr. Freeman, I would

15    like to tell you how he has impacted my life positively as an

16    advocate for freedom and the American dream.  Mr. Freeman is a

17    nonviolent individual who has dedicated his life to helping his

18    fellow man by promoting free trade, capitalism and individual

19    liberty.  He embodies the founding spirit of this country.

20           My life experiences and my professional career have

21    made me abundantly aware of the importance of individual

22    liberty and voluntary relationships between individuals.

23    Mr. Freeman is an advocate of peaceful, free-market solutions

24    to the challenges we face in daily lives.

25           THE COURT:  You've got to slow down a little bit, sir.

1    You must remember from your court days you can't speak that

2    fast with a court reporter.

3              MR. HATHAWAY:  Okay.  Sorry.

4              THE COURT:  That's all right.

5              MR. HATHAWAY:  Mr. Freeman respects all people and is

6    not a risk to society.  Please consider sentencing Mr. Freeman

7    to a reasonable sentence in this case.  He has an encouraging

8    voice on the airwaves for those of us who also strive for free,

9    friendly relations with our fellow man.

10             You know, I have testified many times in Federal

11   Court, many times in federal sentencing hearings, many times in

12   motions hearings, many times in federal trials, many times to

13   federal grand juries, but this is the first time I have

14   testified on behalf of a defendant in Federal Court.

15             And I would also urge the Court to use caution in this

16   case that Bitcoin has not been addressed by Congress.  I know

17   the Court is hesitant, as the entire Judicial Branch, to

18   legislate from the bench.  Congress has not addressed Bitcoin,

19   has not addressed blockchain.  They have not addressed is it

20   money, is it a commodity, is it a security, is it something

21   benign, or is it something nefarious?

22             And, you know, however this case is charged, it's

23   going to be reported in the media and looked at by the

24   Judiciary as a Bitcoin case, as a case speaking to blockchain.

25   So, if there is a very punitive, Draconian sentence in this

1    case, that will wind up setting precedent not only in the First

2    Circuit but in other Circuits across the U.S. in other Federal

3    Districts.

4          If I can contrast that to my experience, which is

5    primarily Title 28 of the United States Code, as a DEA agent,

6    that is an area where Congress, for better or worse, has

7    legislated extensively with minimum mandatory sentencing

8    thresholds for different types of drugs, different quantities

9    of drugs, sentencing enhancements for use of a firearm, use of

10   a minor in the commission of a drug offense, and also the

11   regulatory agencies have spoken extensively on federal drug

12   issues, like the DEA has regulated concerning the Drug

13   Schedule, Schedule I, II, III and IV.  So, that is an example

14   of an area where Congress has spoken, has legislated.

15         Just another point:  Mr. Freeman and others have tried

16   to assess what is the government's stance on bitcoin?

17   Mr. Freeman and others who sell bitcoin have received legal

18   opinions before embarking on the path of selling bitcoin to see

19   what are the federal and state requirements for bitcoin.

20         Mr. Freeman was advised by an attorney that there were

21   no requirements that he needed to comply with.  This has

22   happened with other individuals as well.

23         With all respect to the U.S. Attorney's Office and

24   federal law enforcement agencies, I think we should proceed

25   with caution and not merely allow an aggressive U.S. Attorney's

1    Office or an aggressive federal law enforcement agency to

2    charge something, maybe, say, to charge something creatively

3    that pertains to new technology to something that the

4    Legislative Branch has not addressed.  That's why we have the

5    separation of powers, the Legislative Branch, the Executive

6    Branch and the Judicial Branch, so that Congress can make the

7    laws, and then the court, as you know, can apply the laws.

8         Yes, the jury did issue a guilty verdict in this case,

9    so the jury was the trier of fact, and now it has been kicked

10   into, you know, your court, your authority, to do the

11   sentencing phase.  But jurors, as are probably many people in

12   this courtroom, are ignorant about blockchain technology,

13   about --

14        THE COURT:  I instructed this jury on the law.

15        MR. HATHAWAY:  Yeah.

16        THE COURT:  Move on.

17        MR. HATHAWAY:  Very good, your Honor.

18        To wind up, I'd like to say Mr. Freeman -- I'd like to

19   do a schoolyard analogy.  Let's say there's a bully on a school

20   ground and he goes to another kid and says, Do you have your

21   lunch money?  Yes, I do.  Okay.  Take your lunch money, go buy

22   a candy bar from that guy and bring it to me.  Mr. Freeman is

23   the guy who sold the candy bar.  And I know there are

24   provisions, like my career with DEA, where there are provisions

25   to excise, to remove innocent third parties who maybe

1    unwittingly facilitated a crime.

2         THE COURT:  Would it make a difference to you if

3    Mr. Freeman handed the candy bar to the bully on the

4    schoolyard?

5         MR. HATHAWAY:  Well, if he didn't know, if it was

6    anonymous, if he was told, Put it in that locker over there,

7    and he didn't know whose locker it was, and he thought it was

8    the locker of the kid whose lunch money was being extracted by

9    the bully, if you could identify --

10        THE COURT:  What would you think of that kid in the

11   schoolyard?  I'm curious.  With all your experience in

12   enforcing the federal law, what do you think of that kid in the

13   schoolyard that delivers --

14        MR. HATHAWAY:  That was bullied?

15        THE COURT:  No, no, the one delivering the candy bars

16   to the anonymous lockers.  I'm not sure what school has

17   anonymous lockers, but I'm curious, based on your analogy.

18        MR. HATHAWAY:  I don't know.  If you said, like, Hey,

19   I'd like to buy a candy bar, put it in my car over there, and

20   then he doesn't investigate the -- you know, he doesn't see

21   force or he doesn't see a scam being perpetuated, he just sells

22   candy bars.

23        THE COURT:  Okay.

24        MR. HATHAWAY:  Thank you so much, your Honor, for this

25   opportunity, and that's all I have, unless there's any

1   questions.

2          THE COURT:  I appreciate your words.

3          MR. HATHAWAY:  Thank you, sir.

4          THE COURT:  It's not time for that yet, Mr. Freeman.

5          THE DEFENDANT:  What's that?

6          THE COURT:  It's not time for that yet.

7          THE DEFENDANT:  Oh, I'm sorry.

8          THE COURT:  I promise, though, you're going to get an

9   opportunity.

10         MR. SISTI:  That's what we have right now, Judge.

11         THE COURT:  Thank you.

12         MS. MACDONALD:  Thank you, your Honor.  Before you

13  today, your Honor, is a man who has failed to take

14  responsibility for his crimes, using this prosecution as a

15  platform to gain celebrity in his community through lies and

16  spin, posting just two days ago on Twitter about his sentencing

17  for his victimless crime of selling bitcoin without permission.

18  No matter how many times Mr. Freeman says that this is a crime

19  about failing to get the right paperwork, that's not what it's

20  about.  This is a crime about Mr. Freeman creating an elaborate

21  scheme and weaving an elaborate web of lies to enrich himself

22  and about the devastation on the victims that you heard from

23  last week and who submitted victim impact statements to the

24  Court.

25         I'd like to tell the Court, especially in response to

1    what Mr. Sisti said, a little bit about the background of our

2    investigation, because it helps explain why Mr. Freeman's

3    scheme was so sophisticated.

4         The investigation began, as an FBI agent testified at

5    trial, with numerous Suspicious Activity Reports being filed by

6    financial institutions about scam victims sending funds to

7    Mr. Freeman or churches in Keene, New Hampshire.  The Special

8    Agent who was in charge of the case at the time interviewed

9    many of these scam victims in almost all of the 50 states, and,

10   while this was all really suspicious, at that time all she knew

11   was that a lot of scam victims were sending their funds and

12   buying bitcoin from a seller in New Hampshire.

13        Now, Mr. Freeman operated, as you know, very openly

14   his bitcoin ATMs throughout the state, but, of course, selling

15   bitcoin through kiosks isn't necessarily illegal, and, even

16   though we knew, okay, he's operating these kiosks without a

17   license, this wasn't what this case was about.  We wanted to

18   know why the scam victims from all over the country were

19   choosing Mr. Freeman in Keene to buy their bitcoin, and the

20   answer, it turns out, is a part of the case that Mr. Freeman

21   hid from public view, but what we learned over the years is

22   that Mr. Freeman, who is very knowledgeable about the law and

23   followed very closely the prosecutions of bitcoin money

24   launderers, carefully tailored his business to cater to

25   scammers and to not get caught, and it wasn't really until we

searched his encrypted computer that we saw the part of his
business that he kept hidden, that his customers, his big
customers, were victims of scams, and he knew it.

Now, let me be clear.  Mr. Freeman surely had
legitimate bitcoin customers.  There were definitely people who
saw his ATMs and walked in and bought bitcoin as a novelty or
people who heard him on the radio and bought from him because
of that, absolutely; but his big customers, his regular
customers, his customers all over the country buying hundreds
of thousands at time, those were criminals.

And ask yourself why anyone who legitimately was
buying bitcoin would pay Ian's 15 to 20 percent, when they
could spend five minutes downloading an app like Coinbase or
Paxos on their phone, well-known exchanges, with Super Bowl
ads, and they could pay a fraction of a percent to buy their
bitcoin.  Because they valued privacy?  Okay.  Maybe a few.
But even Mr. Freeman, who would tell you that he values privacy
more than anyone, bought his bitcoin at the exchanges like
Coinbase and Paxos, because, of course, that's where you buy it
when you don't want to pay exorbitant fees.

The only people who chose to pay his outrageous fees
on substantial sums were the people who couldn't make accounts
at exchanges like Coinbase, because they couldn't give the KYC
information, and they couldn't pass the security protocols, and
they couldn't have little old ladies deposit funds into those

1     accounts and then send the bitcoin to someone else.

2          And Mr. Freeman, your Honor, is a very bright man.

3     He's a man who studied all of this, and he spent his days

4     thinking about it, and he knew exactly how to attract these

5     people.  Unlike Coinbase, he said, I won't ask any questions

6     about why you want your bitcoin.

7          If we could pull up some of the exhibits.

8          He would say, Want someone to buy on your behalf?

9     Sure.  Like Exhibit 1532, the man from Nigeria on the right

10    wants these three women from across the country to send funds

11    to him and for Freeman to send him bitcoin.  No problem.  Just

12    don't tell me why you want the bitcoin.

13         Exhibit 605.  As Mr. Freeman told the undercover

14    officer, he was very familiar with the laws here.  Because the

15    undercover told him that he sold drugs, in order for Freeman to

16    sell to him it would be considered money laundering.

17    Mr. Freeman was very careful.  He said because he got a

18    little -- the undercover got a little too loose-lipped, That

19    means I cannot KNOWINGLY, in all caps, sell bitcoin to you.

20    Nearly every bitcoin seller the Feds have taken down have sold

21    to an undercover stating they did something illegal to get the

22    money.

23         Mr. Freeman was smart enough to know he couldn't

24    expose himself that obviously, and so therefore it was just on

25    the encrypted computer in that Telegram folder that made really

1    clear what he did know, and these are some from 1532.

2    Legitimate bitcoin customer.

3           Go to the next one.  Keep going.

4           We showed all of these photos at the trial, your

5    Honor, and they make clear that Mr. Freeman saw all of these

6    people, and he knew why they were sending money to him, taking

7    a 15 to 20 percent haircut, and that was not for a legitimate

8    investment of their life savings.

9           And he even said in his own words that he knew what

10   this was all about.

11                     (Audio recording played)

12           MS. MACDONALD:  He knew, your Honor.  He is not naive.

13   When he looked at those photos that people were sending him in

14   that Telegram folder he knew they were scam victims.

15           Let's look at 609B.

16           What Freeman also knew, while we're waiting to pull

17   that up, is he specifically on localbitcoins.com created an

18   advertisement where he sold bitcoin for Nigerian naira, not

19   British pounds or pesos from other countries, maybe like

20   El Salvador, where bitcoin is very popular, but Nigerian naira.

21           And you'll see, we'll also look at a conversation

22   where he and Renee Spinella laughed about the fact that after

23   he opened that account they were going to get money from the

24   Nigerian prince, referring to the Nigerian prince scam.  He

25   knew what he was doing, and he targeted these scammers.

1        And here's 609B, when he didn't realize he was being

2    recorded:  They've been warned of the potential scams that are

3    out there, and if you fall in love with a guy from Africa I

4    can't talk you out of it, you know?  The vending machine is a

5    way for them to take their -- the money that they have and send

6    it to the person that they've fallen in love with.  I'm

7    guessing, right?  Like, I don't know.  I don't know what their

8    reasons are.  Maybe they're there on their own volition and

9    they're taking their own retirement savings, bitcoin, and

10   giving it to their kids.  I don't know.  None of their (sic)

11   business.

12        THE COURT:  None of my business.

13        MS. MACDONALD:  None of my business.  Thank you.

14        And 852, this is the conversation when he talks about

15   setting up ads on localbitcoins.com for Nigerian naira.  Renee

16   Spinella responds:  I almost asked if they were the Nigerian

17   prince, but I thought better of it.  And later:  Let me be the

18   first to receive a payment from the OG Nigerian prince via

19   bitcoin.

20        Mr. Freeman also knew how to stay under the radar.

21   Exhibit 1205.  He told his customers:  Be careful with

22   depositing $9,000, because if you split deposits to avoid the

23   10-K reporting requirement, the bank will likely fill out a

24   Suspicious Activity Report on you and me, and that can lead to

25   criminal charges of structuring.

1          And let's not forget how he told the undercover to

2   send his cash via the Postal Service, because the Postal

3   Service needs a search warrant to open it.  That's the words of

4   a sophisticated criminal trying to avoid getting caught.

5          And Mr. Freeman kept this up for so long without

6   getting caught, and that's because he's an excellent liar and

7   manipulator.  He lied to the banks over and over again:  rare

8   coins, virtual goods, financial dominatrix, artwork.  And his

9   church donation lie was the best of all, because who is going

10  to question someone's religion?

11         It wasn't until we saw the chats between he and Renee

12  Spinella that you really realize how seriously he took these

13  churches.  When her accounts were shut down, Hey, let's get you

14  a church.  When her church was started, he coached her on how

15  to get feminine-looking letterhead so it looked different

16  enough from his church.

17         One of his former radio show hosts testified at trial

18  that he only talked about the churches when he needed them to

19  his advantage.  Someone else testified at trial, who was

20  supposedly one of the church directors on the paperwork, that

21  he had no idea what that church was even about.

22         And his lies were so successful that the banks

23  believed him over and over.  His lies were that good.  And, of

24  course, the church is a convenient lie again and again.  When

25  he didn't report his assets to Probation initially, Oh, well

1     that's because they're church funds.  When he testified he was

2     very clear:  It's not a business, it's a church.  But, of

3     course, it's a business.  He had employment contracts.  He

4     offered severance, when he ended those contracts, to his

5     employees.  He told his employees that he was the boss, and

6     they frequently talked about maximizing profits.

7             He said in his testimony, I don't make any money, my

8     church sustains me; but his church pays for his food, his

9     clothes, his travel, his lifestyle, where he never had to

10    otherwise work.

11            And, of course, even in the last few weeks the ball

12    keeps moving.  His radio show, according to the PSR, brought in

13    $1,200 a month at most, but in response to the government's

14    contention that he therefore usually clearly used the proceeds

15    of his crime to sustain himself, he then writes, Oh, no.  The

16    radio show brought in 10,000 a month in his sentencing memo.

17    The ball moves based on what lies are convenient for him.

18            And I talk about these lies, because it speaks to two

19    important things.  It speaks, one, to the sophistication of his

20    crime and, two, that he is an expert conman who has a spin for

21    everything, and that he operated a very clever scheme, a scheme

22    that really hurt people.  "Nobody got hurt" is preposterous.

23    You saw some of the people who are very hurt by what

24    Mr. Freeman did, and he's here saying, I'm not a scammer.  But

25    your Honor knows the scammers use fake email addresses and

1    phone numbers and VPNs, and they're overseas.  So, first of

2    all, cash isn't king, they need some other way to get the cash

3    overseas, and there's almost no way to identify them based on

4    the fake phone numbers and the fake email addresses and the

5    VPNs, and the only way we can sometimes get them is by

6    following the money.  Freeman, who sent them bitcoin, shut off

7    that avenue of investigation, and so because of him --

8              THE COURT:  Time out, time out.

9          Ma'am, I'm trying to listen here.  You've got to keep

10   it down.  I'm just trying to listen, okay?  You, staring at me

11   right there, yeah you, you were just talking -- yeah.  Not you,

12   the lady sitting next to you to your left.  You were talking,

13   and I couldn't hear the prosecutor talking.  I need you to keep

14   it down.  Thanks.

15         Go ahead.

16         MS. MACDONALD:  Mr. Freeman's bitcoin business shut

17   off the best avenue for investigating these scammers, which is

18   to follow the money.  And, sure, one scammer may have targeted

19   one, two, a certain amount of folks, but Mr. Freeman served

20   many scammers, and he's facilitated many different types of

21   scams, and he was here in the U.S. and he was doing that, and

22   he profited mightily, and in many ways, your Honor, because of

23   that, he had much broader reach than any one scammer.

24         Congress has recognized the particular importance of

25   deterrence for white-collar criminals.  In drafting the

1    sentencing statute, Congress wrote, The second purpose of

2    sentencing is to deter others from committing the offense.

3    This is particularly important in the area of white-collar

4    crime.  Major white-collar criminals are often sentenced to

5    small fines and little or no imprisonment.  Unfortunately, this

6    creates the impression that certain offenses are punishable

7    only by a small fine that can be written off as a cost of doing

8    business.

9           This is particularly important in the area of virtual

10   currency, which is a new, novel technology with a lot of

11   promise but also a risk of abuse and danger.  A message needs

12   to be sent that using this for danger will not be tolerated and

13   that the law applies to bitcoin, just like it does to other

14   types of currency.

15          Mr. Freeman is not someone with a disadvantaged

16   background who sold drugs to support his family.  He's smart,

17   he's resourceful, he's garnered a following, and he's had every

18   advantage, and he uses his attributes to profit from these

19   crimes undetected, hiding the most nefarious part of that

20   business on his computer.

21          He's a great manipulator, and he's talked his way out

22   of a lot of things, and his continued focus on this as just a

23   regulatory crime is more spin and manipulation, because without

24   that he'd have to face what he really did and what the

25   guidelines really recognize, which is that the guidelines are

1    appropriate here.  The guidelines don't account for the entire

2    amount of money that went through his business.  That's upwards

3    of 20 million.  The guidelines only consider the funds

4    laundered through his business.

5         The guideline enhancements also really reflect what he

6    did.  They reflect that he hired his confederates to work for

7    him.  They reflect the size, the complexity of his business,

8    the fact that he had vulnerable victims.  Those are

9    significantly aggravating factors that the guidelines

10   appropriately apply here.

11        He stands before the Court today a man whose actions

12   directly harmed many, many people, and he's here without

13   showing any public remorse.

14        This, Judge, is exactly the type of complicated,

15   sophisticated white-collar crime that causes substantial harm,

16   that Congress was focused on, and that the guidelines are built

17   for, and that this Court should take seriously.  Thank you.

18        THE COURT:  Thank you.  I'm only going to make the

19   comment that we don't know if he's going to show remorse, he

20   hasn't spoken yet, and that's going to be up to him.

21        We've been going for 90 minutes.  I need to give the

22   court reporter a break, so we're going to adjourn for the usual

23   15-minute break.

24        Let me say this:  The courtroom is fuller than usual,

25   which is great.  It's good that people are here observing this

1    proceeding, but when we're all together in a group this big we

2    make a lot of noise, so I'm going to ask you to please do your

3    best, because I don't know what's going on in the other three

4    courtrooms on this floor right now, but let's please do our

5    best not to be disruptive with a lot of hallway noise.  I'm

6    just saying keep it reasonable.  All right?  And we'll

7    reconvene in 15 minutes.

8                 THE CLERK:  All rise.

9                 (Recess taken from 11:40 a.m. to 11:58 a.m.)

10                THE CLERK:  All rise for the Honorable Court.  Court

11    is back in session.

12                THE COURT:  Okay.  Did you want to respond?

13                MR. SISTI:  Yes, your Honor, if we could.  It will be

14    brief.

15                THE COURT:  You take what time you need.  This is

16    important.

17                MR. SISTI:  Thank you.  Just a quick, just a very,

18    very quick reference so that we keep this thing basically in

19    the reality mode.  If you'll take a look at the Presentence

20    Investigation, paragraph 35 --

21                THE COURT:  Let me pull that up, the report up.

22                MR. SISTI:  Thank you.

23                THE COURT:  Paragraph 35?

24                MR. SISTI:  Yeah.  And you can reference 34 as well.

25    But if you look at the total numbers, even -- and I have to say

1    we'll reiterate this in every avenue and every time we can.  We

2    don't believe that the fraud victims, of course, were at all

3    cultivated by Freeman.  But if you look at the total numbers,

4    even through Probation's investigation, 20 million in virtual

5    currency, it's actually more than 20 million, sold through the

6    MSB, and then the government identifies about 5 million that

7    was a result of Freeman's customers, what you really end up

8    with, Judge, and mathematics is one of those things that

9    doesn't really lie, 73 percent of the transactions, even with

10   their submission, even with the government's submission and the

11   report, 73 percent would indicate a totally legit transaction.

12   Now, we know it was unlicensed, that was the charge, but this

13   is not the backbone of what Freeman was doing.  73 percent is a

14   significant number.

15           And, second, there was a partial clip that was played

16   by the government during their presentation just now, and we've

17   geared up the full clip for the Court to hear, because we think

18   that the totality of the clip is something that the Court

19   should take into consideration before Ian addresses the Court.

20           So, if we could play that for the Court now.  Thank

21   you.

22           MR. GUERRIERO:  And just, Judge, just for your

23   reference, it's two minutes long, so it's not very long.

24           THE COURT:  That's okay.

25                       (Audio recording played)

1          MR. SISTI:  Thank you, Judge.

2          THE COURT:  Thank you.  Hold on a minute.

3          Anything you want to say about it?

4          MR. AFRAME:  I just want to say that, to say that 73

5    percent of the money was legitimate, that's just not -- that's

6    not a fair way to look at what the data is.  These are the

7    people in paragraph 35, that we have identified individually

8    who they are, that we have interviewed, but if you go through

9    the KY -- the Telegram folder, there are lots of people who

10   quite clearly appear to be elderly people holding up signs with

11   hundreds of thousands of dollars that at least look to be

12   romance-scam victims, and if you thumb through all of that

13   LocalBitcoins evidence there were many, many people that the

14   conversations look quite suspicious, tons of red flags, but we

15   just didn't meet them and interview them.

16         But you cannot say that that's all -- those are all

17   legitimate transactions.  I mean, some of them we pointed out

18   during the trial as having red flags all over them, but we just

19   did not -- we were not able to locate or interview the person.

20         So, I don't want paragraph 35 to be taken as, well,

21   that's all of it, and everything else is great.  That's not the

22   case.

23         THE COURT:  Understood.

24         MR. SISTI:  And I don't think we're here to speculate

25   either, Judge, and why they didn't pursue interviews with those

1    individuals, where they were holding IDs in front of their face

2    and identifying themselves, is beyond me, if they really wanted

3    to get to the heart of the scamming.

4            So, with that, that would be the conclusion of our

5    evidence, other than the allocution, Judge.

6            THE COURT:  So, Mr. Freeman, let me say this to you:

7    You're about to do your allocution.  You don't have to speak

8    today, but you have the right to speak, and I'm certainly here

9    to listen.

10           I want to suggest something to you.  There's no risk

11   at all, in other words, I would never add a day of

12   incarceration to your sentence based on something you've said

13   that I didn't like or disagreed with, or even if you were

14   disrespectful.  None of those things are going to add to your

15   sentence.  There's no risk of that whatsoever.

16           But I am going to ask you to the extent -- what you

17   should talk to me about, in other words, to serve your best

18   interests, is your conduct in this case, what it meant to you,

19   how you feel about it, okay?  Resist the temptation, if you're

20   experiencing it, to perform or to get into any kind of effort

21   to play to your supporters.  Why?  Not because I'll hold it

22   against you, because I won't.  This is your opportunity to

23   speak, and I wouldn't stand in the way.  You can't make it

24   worse by speaking, in terms of your sentence, but sometimes you

25   can make it better, depending on how you approach it.  And if

1    you, instead of talking to me about this crime -- and I know

2    you maintain your innocence, by the way -- but if, instead of

3    talking to me about this, you talk to me about other things

4    that aren't meant to appeal to me but are meant to appeal to

5    somebody else either in the media or in the courtroom or

6    anywhere else, you won't be penalized for it, but you will have

7    missed an opportunity.  That's the only risk, is you'll have

8    missed an opportunity to improve your situation.  Do you follow

9    me?

10              THE DEFENDANT:  Okay.

11              THE COURT:  That's all.  So, please, I'm listening.

12              THE DEFENDANT:  All right.  I wrote this definitely

13   intending for you to hear it, for sure.

14              THE COURT:  Understood.

15              THE DEFENDANT:  I appreciate the opportunity to speak

16   here today, and I hope you can appreciate that I'm in a bit of

17   an awkward position.  Normally, apologies and acceptance of

18   responsibility are expected from a defendant at a sentencing

19   hearing.  I've been convicted on all, well, at the time, eight

20   counts I faced in trial by a jury of 12 other human beings, and

21   since that time this Court has, thankfully, overturned the one

22   wrongful conviction on the money-laundering count.  We are, of

23   course, going to be appealing the remaining seven convictions

24   on the basis that the prosecution never proved a single one of

25   them.  So, I can't apologize for those things, as I do not

1    believe I broke the law.

2          Regardless, the jury found me guilty, despite whatever

3    defects in the case, so there is something in their opinion to

4    be acknowledged, and I don't know if they didn't like me or if

5    they didn't believe me, but they thought I deserved to be found

6    guilty, and I have to accept there was some reason they did

7    that, whether I like it or not.

8          There is something I do want to apologize for,

9    however, and that is that I failed to detect and prevent

10   100 percent of the scam victims from using my services, and for

11   that I am sorry.  To the extent that my screening and Know Your

12   Customer procedures failed to alert me and the victims to what

13   was happening to them, I take full responsibility for my

14   failure and would like to request that the Court direct any

15   fine towards those victims instead of the government.

16         In their recent Sentencing Memorandum the prosecution

17   accused me of never having a real job.  The truth is I've

18   worked several years at Kmart and several more at multiple

19   radio stations, including several working for Clear Channel

20   Communications, now known as iHeartRadio, and that's where I

21   began my now nationally syndicated talk radio program in 2002,

22   and that's what they insultingly called a hobby, simply because

23   its revenue is down from its previous heights.  They act as

24   though I could be heard on over 170 radio stations nationwide

25   without any history in the industry or ever having lifted a

1   finger.  They obviously don't know entrepreneurship or the

2   countless hours that I've invested in building and maintaining

3   our studio, calling radio stations to get them to carry our

4   show, running our website, an online presence, and then

5   actually performing the show three hours a night several days a

6   week, which I've done for two decades of my life.  My show is

7   my life's work, and it's completely unnecessary to belittle it,

8   completely unnecessary to their case to belittle it.

9          We've been honored by *TALKERS Magazine*, the top

10  industry publication, with inclusion in their Heavy Hundred for

11  over a decade.  It's a list of the most influential talk show

12  hosts in America, and this year we ranked at number 25.

13         *TALKERS* also awarded me with their coveted Freedom of

14  Speech Award in 2022.  It's an annual award that has gone to

15  approximately 30 talk show hosts in the last few decades,

16  including Rush Limbaugh.

17         They've also insulted my religion and my church simply

18  because they don't understand it or pretend not to.  And, while

19  we don't utilize a traditional religious meeting space, we did

20  provide one free of charge to the local Muslim community, as

21  our witness, Mohammad Ali, testified.  This is because the

22  Shire Free Church, like the Unitarian Universalists, is an

23  interfaith church.  Our ministers in Keene conduct their

24  ministry via broadcast media, as many television and radio

25  churches have done for decades.

1          Our church has donated to multiple charities,

2    including the Hundred Nights homeless shelter, Liberty in North

3    Korea, and we were instrumental in building an orphanage in

4    Uganda.

5          Multiple local business owners testified under oath

6    and via written letter that I provided my cryptocurrency

7    consulting services to them free of charge, as this was part of

8    my church mission.

9          Despite the prosecutor's claims that I'm the only

10   minister, we actually have multiple, and they've presided over

11   multiple weddings, including the very witness that they had

12   falsely testify that the church isn't real.  Despite their

13   claim that the church only existed to confuse banks, the Shire

14   Free Church was founded a year prior to my inspiration to

15   launch our first vending machine in Keene and three years

16   before my first LocalBitcoins sale.

17          However, the most insulting part about the case

18   against me is the idea that I was conspiring with fraudsters to

19   assist them in their evil deeds.  The prosecutors' case

20   attempted to have it both ways.  On one hand, they said

21   advertising that I respected privacy was an invitation to

22   criminals, but then they showed some of the detailed

23   requirements that I put buyers through to verify their

24   identities and alert them to what they were buying and how.

25          What they did not show the jury was the list of

questions that I had developed to ask people prior to selling

them bitcoin, and you just heard a reference to it in the

undercover audio that we played.  The questions specifically

identified different types of scams and required the buyer to

confirm that they were not being victimized.

It's worth pointing out that my procedure was more in

depth than any of the banks who also sent away the scam

victims' life savings, yet the bank tellers and managers were

not arrested.

Unfortunately, it took me some time to develop these

procedures as I learned slowly of the different types of scams.

There was no how-to manual to read when I started this, and

initially I was the direct target of the scammers, who used my

bank information to pay their credit card bills or their car

payments.  Since the banks never told me why they were closing

my accounts, it kept me in the dark much longer about what was

happening to a small percentage of my buyers.

The prosecution suggested during trial the only reason

I had identification procedures in place at all was to protect

my bank accounts.  Well, that is one reason.  It's not the only

one.  The other reason is because I don't want people to be

taken advantage of.

As a libertarian voluntaryist, I'm firmly against

fraud, and I would never want to be part of it.  Indeed, my

perfect seller ratings on LocalBitcoins were proof of my

1     reputation for honesty.  Eventually, my mission expanded beyond

2     spreading bitcoin, to include never letting a scammer get

3     through my screening.  Sadly, no matter how strict I became, no

4     matter how many hoops I put in place for buyers to jump, I

5     could not catch them all.

6              And as I learned in the case with Patrick Brown, who

7     testified at trial, Mr. Brown said under oath that I'd only

8     asked him one question when we talked on the phone prior to

9     selling him bitcoin.  However, by that time I had developed the

10    series of questions that I mentioned, which included asking him

11    if there was a third party putting him up to it and if he was

12    under duress.  He assured me he was buying the bitcoins for

13    investment purposes on his own volition, so I sold it to him,

14    and then he came back for a few more purchases, and I thought

15    he was a satisfied repeat customer until his bank tried to pull

16    back one of his wires from my account.

17             I reached out to Patrick, whose number I still have in

18    my phone, to try to find out what happened, and eventually I

19    heard from Detective Alan Snoddy from the Travis County

20    Sheriff's.  I spent a half an hour on the phone with him and

21    provided any information I could to help with the

22    investigation.  Detective Snoddy explained to me what had

23    happened to Mr. Brown, and that's when I learned that he was

24    under duress, as the scammers were threatening him and

25    pretending to be federal government agents.  It was in my

1      conversation with Detective Snoddy that I finally learned that

2      Patrick Brown lied to me to get me to sell him that bitcoin.

3             The other witnesses in this case I had no idea were

4      victims of scams, and I didn't find out that they had been

5      victimized until I saw their names and stories in the discovery

6      in this case.  Karla Cino had purchased many times from me

7      over -- longer than a year.  She represented herself to be a

8      successful real estate agent who was buying for herself and

9      eventually selling to others.  I didn't know until the trial

10     that she'd been working with a scammer for half a decade and

11     was, herself, acting as a money transmitter for that scammer.

12     She kept those details from me.

13            And the same was true for Nancy Triestram.  She

14     revealed at trial she was working with her scammer and moved

15     money at his behest while keeping me in the dark.

16            Danella Varel was a sophisticated financial adviser by

17     trade, but even she was fooled by a scammer

18            What I learned was the scammers are so persuasive they

19     will get their victims to lie and do anything necessary to get

20     through my requirements.  It didn't matter how strict I was or

21     how many questions I asked.  I was also the victim of the

22     scammers who had their victims lie to get through my security,

23     putting me unknowingly in the position of taking the fall for

24     their crimes.

25            One more example of the dishonesty of the victims in

1    this case came to light since the previous sentencing hearing,

2    where Karen Miller read her letter to the Court.  In it she

3    admitted having bought bitcoin from me with other people's

4    money that the scammer had his victims send to Karen.  Karen

5    never told me this.  Like Patrick Brown, I still have her cell

6    phone number in my phone, as I had spoken to her more than once

7    to make sure that she was a consenting buyer, as she purchased

8    from me multiple times.  She appeared to be a wealthy

9    businesswoman buying bitcoin for investment and business

10   purposes.  I met Karen through Rebecca Viar, who I also

11   considered to be a good customer.  Karen assured me in my first

12   phone call with her that she knew Rebecca Viar personally, and

13   this turned out to be a lie.

14          Thanks to the most recent letter filed by the

15   prosecution from Pam Hamilton Campbell, we know that Karen

16   Miller was willing to tell lies to get what she and the scammer

17   wanted from me and others.  In her letter Pam Campbell stated

18   Karen Miller, quote, posed on the phone to me as the scammer's

19   sister.  She and I spoke on the phone several times.  She

20   assured me that, as his sister, she was also sending him money

21   to help him out of his situation.  I would never have sent him

22   money, $753,251, out of the kindness of my heart had she not

23   compelled me using the unconscionable methods via emotional

24   blackmail perpetrated to commit this crime, unquote.

25          I want to be clear.  I don't think Karen Miller was

1   knowingly part of the scam; however, she was under this man's

2   spell, and she was willing to lie to help him.  She lied to Pam

3   Campbell to get her to send Karen money, and then she lied to

4   me to get me to accept it.  However, she never told me she was

5   using other people's money, and this is yet another example of

6   how I was tricked by the scam victims.  Now these poor people

7   think their scammer has been caught and is facing punishment,

8   when, in reality, whoever Jerry Harmon is, is still out there,

9   probably running the same scam and using one of the thousands

10  of other bitcoin sellers on the peer-to-peer sites.

11          I'm sorry that those people were taken advantage of

12  and that I couldn't stop them all.  I did stop plenty of them,

13  however.  While the prosecutors focused on a few dozen scam

14  victims who bought bitcoin through me, they objected to me

15  showing my user feedback on LocalBitcoins.  This is because the

16  only negative feedback that I had received was from likely

17  scammers who were upset because my requirements were too

18  onerous.  Between my account, Renee and Nobody's accounts we

19  had thousands of buyers and 100 percent positive feedback.

20          In addition to stopping scam victims from buying from

21  me in the first place, my procedures were able to stop multiple

22  scams in progress, including an elderly doctor from Alabama,

23  who we worked with the police to get his $4,000 back to him, a

24  young stockbroker from New York City, who lost nearly $5,000,

25  and Paul Niwa's elderly mother, Yoshino, who I saved from

1    losing $11,000 and went through many hoops to get her money

2    back after the bank closed our account.  The idea that I was

3    somehow in support of scammers or tolerant of them is negated

4    by the fact that I worked to get people their money back and

5    worked with law enforcement on multiple occasions.  Were I part

6    of the scam, there would be no reason to return Ms. Niwa's

7    money, as it was already in our bank account.

8          Further, the church already had plenty of bitcoin

9    years prior to selling them, so the idea that this was all

10   about making money from scammers is absurd.  This was all about

11   getting people to adopt Bitcoin, which is why, despite the

12   prosecution's claims of high rates, our vending machines were

13   priced lower than any other in the region.  The prosecution

14   would have you believe that charging 10 percent on

15   LocalBitcoins is outrageous compared to the less than 1 percent

16   that the exchanges would charge, and therefore only scammers

17   would apply.  They say this while ignoring the testimony of

18   their own witness, Chris Rietmann, who said my prices were in

19   line with the markets where we were in, and ignoring the

20   thousands of satisfied customers we have on that site over the

21   years.

22         Even prosecution's own numbers admit only a small

23   portion of our buyers were victims of scams, and clearly

24   there's a demand for the personal service that we provided.

25         Further, the centralized exchanges can't stop the

1    scammers either.  Their onboarding procedure is completely

2    automated.  There's no phone interview.  It involves a customer

3    simply handing over their Social Security Number and their ID.

4    Scammers can easily have their victims, who we know are willing

5    to lie to buy bitcoin, jump through the exchange hoops;

6    however, the exchanges have their government paperwork, so

7    they're not facing criminal charges, just like the banks aren't

8    facing charges for wiring away the victims' life savings.

9         Despite the prosecution's assertions, simply

10   advertising that one respects privacy is not an invitation to

11   scammers, especially when paired with the ID and security

12   requirements I had.  Privacy is a right established or

13   enshrined in the *New Hampshire Constitution's Bill of Rights*,

14   and it was placed there by a supermajority of the voters in

15   2018.  So, clearly privacy is popular, and it's not a criminal

16   act or an unspoken conspiracy.

17        Their case for conspiracy to money launder was

18   innuendo, suggesting I should have known that scams were

19   happening simply because a portion of my buyers were of

20   retirement age.  The prosecutors claim that cash is a red flag,

21   but people who appreciate privacy also appreciate cash.  The

22   desire for privacy is not a crime nor evidence for suspicion.

23        Further, poor grammar on the internet is common.  Many

24   people of all ages who might speak fine in real life are

25   constantly cutting corners in their internet communications.

1          Though third-party trades are riskier, I required ID

2     from all parties involved and even made a phone call to ask

3     probing questions of the buyers' agents, though the government

4     witnesses didn't recall the extent of those questions.

5     Assisting scams would have meant major frustration for me, as

6     unhappy buyers always led to a bank account being closed.  A

7     customer pulling back a wire also meant I would become the

8     scammer's victim, as I would have already sent the bitcoin, and

9     there's no way to reverse a bitcoin transaction like one could

10    a bank transfer.  There's simply no reason that I would have

11    wanted these difficulties to happen more often, and working

12    with scammers or trying to attract them would have ensured that

13    it happened more often than it did.

14          In order to prove the count of money laundering

15    conspiracy with scammers, they would have had to have proven

16    willful blindness, as no other evidence was presented.  To

17    prove willful blindness, they had to prove I consciously and

18    deliberately avoided learning facts in question.  Given I had a

19    rigorous set of Know Your Customer requirements in place, it

20    was clear I was trying to catch and prevent scammers; further,

21    I had assisted law enforcement with their investigations of

22    those scammers; and, additionally, when I was able to detect a

23    scam in progress I was able to stop the transaction and worked

24    to get the funds back to the victim, as was testified to by

25    Paul Niwa.

1          I was able to interdict multiple scams and make

2    victims whole, and this is the opposite of willful blindness.

3    This is willfully trying to stop scammers and protect my

4    buyers.

5          As a long-time advocate for jury nullification, I'm

6    well aware that juries also have the power to do what might be

7    called "reverse jury nullification" and convict someone who

8    wasn't proven guilty by the evidence.  Perhaps that's what

9    happened in this case.

10          However, before you render your sentence, there are

11    some important factors to consider.

12          The real shocking revelation from the testimony in

13    this case was the complete lack of interest on the part of the

14    FBI in catching or even investigating the actual scammers.

15          As you probably recall, on cross-examination Patrick

16    Brown admitted the FBI never asked a single question about what

17    happened to the roughly $900,000 that he sent to other people

18    or places at the behest of the scammer, $900,000 that didn't go

19    into any of my accounts.  Mr. Brown stated they never inquired

20    about the scammer at all and had no interest in what happened

21    to the bulk of his life savings.

22          Karla Cino similarly said she would be happy to talk

23    to the FBI about her scammer, who she admitted she was still in

24    touch with as of the week before appearing at trial.  She also

25    said the FBI had never asked her to help provide any

1    information about him or put them in touch with him.

2         I hope you'll consider this very carefully in your

3    sentence.  The fact that the FBI had zero interest in catching

4    or even investigating the scammers themselves reveals the truth

5    behind this case.  It was brought in bad faith.

6         Another example of this is when the FBI first

7    approached my ex-girlfriend, Renee, and her fiance, Andy, in

8    2018 to question them about working with me selling bitcoin.

9    They already could have brought charges of money transmission

10   and perhaps some others, but they didn't.  In fact, since they

11   didn't charge Andy or Renee or me at the time, we figured that

12   was more proof that we weren't doing anything illegal and they

13   were on a fishing expedition, hoping to find something.

14        If you'll recall, I was operating on my attorney Seth

15   Hipple's guidance letter, explaining why what we were doing

16   didn't require a money transmitter license at either the state

17   or the federal level.

18        Throughout the case they have acted as though this

19   prosecution was about saving elderly victims from scammers,

20   but, if that were true, why not arrest me in 2018?  Why did

21   they wait three more years?  They kept spending taxpayer

22   dollars on investigating me with 24-hour-a-day surveillance and

23   letting me continue to sell bitcoin to many hundreds more

24   people.  If this was about enforcing the law, they would have

25   arrested me in 2018.

1          They also don't actually care about the scam victims.

2     That's why they never asked Patrick Brown or Karla Cino

3     anything about their scammers.  They wanted to arrest a

4     high-visibility bitcoin advocate and seller and use the maximum

5     amount of force and intensity to take me down to show everyone

6     what happens when you don't ask their permission to sell

7     bitcoin.

8          However, the idea that a government license matters in

9     regards to stopping scammers is disingenuous.  We learned

10    through the witness testimony that every single one of these

11    scam victims first went to their bank and authorized the bank

12    tellers to send out hundreds of thousands of dollars via wire

13    transfer in order to buy bitcoin for their scammers.  It didn't

14    matter that the banks are registered money transmitters.  They

15    sent away these people's life savings.

16         My Know Your Customer procedures were even more in

17    depth than the bankers,' but the scam victims lied to me, like

18    they lied to the bankers.  What did it matter if the banks

19    filled out an SAR or a CTR on the transfer?  They still sent

20    the wires, because in the end you do what the customer wants

21    after you've done your best to alert them to the possible

22    scams.

23         It wasn't SARs or CTRs that alerted the FBI to the

24    victims who testified in this case.  It was my own Know Your

25    Customer files from my laptop, and, based on what I saw in

1    discovery, the FBI had zero awareness of most of the scam

2    victims until they started contacting people they found in

3    those files.

4           The government estimates the scam victims lost

5    several-million dollars to their scam victims -- to their

6    scammers by buying bitcoin from me.  However, that number is

7    the total that they lost to the scammer.  An average of about

8    10 to 15 percent went to me and my friends, and the rest of it

9    is in the scammers' possession.

10          Though the prosecution likes to bring up the 21

11   percent number, that was only for first-time buyers, because

12   they were the highest risk, and I subjected them to in-depth

13   Know Your Customer requirements.  Most of the regular buyers

14   that turned out to be victims were at a 10 percent commission,

15   because to me they were good, satisfied, regular buyers.

16          As we learned at trial, Karla Cino lost $100,000 of

17   her own money early on in her several-year-long relationship

18   with her scammer, and then she began assisting him by receiving

19   funds from his other victims years before opening her first

20   trades with me.  So, in some of the victims' cases they weren't

21   even sending their own money, making it hard to know what their

22   own personal loss via trades with me was, if any at all.

23          Though they're now saying again I'm a flight risk, the

24   prosecution previously went from saying I was a threat to the

25   community to have me wrongfully denied bail for 69 days all the

1    way to consenting to dropping location monitoring and computer

2    monitoring prior to trial.  It's clear I'm not a threat to

3    anyone, and I can obey various restrictions without being a

4    burden on the Probation Department.  I've already lived under

5    pre- and post-trial restrictions for over two years in addition

6    to the 69 days I spent behind bars.

7            If I have to go back to a cell as part of a sentence,

8    my radio show and our over 170 AM and FM radio stations will be

9    unnecessarily harmed.  My co-hosts will do their best to keep

10   things going in my absence, but no one knows the studio

11   equipment like I do.  A prison sentence for me may be the death

12   sentence for my 20-year-old radio program.

13           I also have a wife, Bonnie, who I love very much, and

14   my absence would harm her greatly.

15           While I have my criticisms of the justice system in

16   this country, I know it is made of individuals, and throughout

17   this process you've shown yourself to be thoughtful, fair, and

18   willing to change your mind.  Thank you for that.

19           THE COURT:  Thank you, sir.

20           Is there anybody else who has anything they want to

21   say?

22           Prosecution?

23           MS. MACDONALD:  No, your Honor.

24           MR. SISTI:  Submitted.  Thank you, Judge.

25           THE COURT:  All right.

1                        (Pause)

2          THE COURT:  The Court is going to grant the

3    defendant's motion for a variance.  I'm going to sentence the

4    defendant below, significantly below, the guideline sentencing

5    range but probably not low enough to satisfy.

6          It's not going to be the thirty -- is it 38 months you

7    requested, Mr. Sisti?

8          MR. SISTI:  Yes, your Honor.

9          THE COURT:  Yeah.  It's a substantial variance, and

10   I'm just considering that allocution there for a moment.

11         What I've attempted to do here is fashion a sentence

12   that is sufficient but not more severe than necessary to meet

13   the following purposes:  first, to reflect the seriousness of

14   the offense, promoting respect for the law and providing just

15   punishment; second, to afford adequate deterrence to criminal

16   conduct; third, to protect the public; and, fourth, to provide

17   the defendant with any needed educational, vocational, medical

18   or other correctional treatment in the most effective manner.

19         The Court has considered the defendant's arguments and

20   the probation officer's comments pertaining to his advocacy for

21   cryptocurrency, his purported lack of concealment of his

22   activities, his claims to have been targeted for persecution

23   and prosecution by authorities and law enforcement, his peace

24   advocacy, his assertion that he is not a scammer, which has

25   some truth in the sense that his conduct was not identical to

that of the individuals whose crimes he facilitated and whose
criminal proceeds he conspired to launder, his claim that he
poses no danger to the community, his lack of a violent
history, his many supporters, many of whom submitted letters to
the Court vouching for him and his character, his efforts to
aid law enforcement in Texas and California, his efforts to aid
individuals in avoiding scams and recovering defrauded
proceeds, his claims to a subjective belief in the lawfulness
of his actions, his offered point that, quote, no bank ever
lost money due to his conduct, the purportedly benign nature of
his crimes compared to other federal crimes, the sentences
imposed on his codefendants, his lack of prior significant
incarceration, the punishments he has already sustained, and
the excessive severity of the *U.S. Sentencing Guidelines* as
applied to this offense.

These factors, whether viewed separately or
collectively, viewed in the context of the offense conduct, the
defendant's history, the need for deterrence, respect for the
law and public protection make a variance below the guideline
sentencing range appropriate in this case.

The primary reasons for the variance include the
severity of the economic loss calculation as applied to this
offense, the lack of prosecution of the fraudsters who received
the bulk of the fraud proceeds -- I don't say that as
criticism, I say that as a comparative analysis, that it's a

1    factor the Court considers in how it would sentence those

2    individuals vis-a-vis how it would sentence Mr. Freeman, who

3    conspired to launder the proceeds of their wire fraud -- the

4    defendant's subjective belief in the lawfulness of his conduct,

5    or I should say more accurately not his subjective belief in

6    the lawfulness of his conduct, because that's not clear to me.

7    What he has a subjective belief in is that his conduct was not

8    provably unlawful, and there's a difference.  And the role of

9    his political ideology in his crimes.

10          I do take the defendant as sincerely holding his

11   political ideology.  It's one of libertarianism, or at least a

12   strain of it, and it's a legitimate political value system and

13   belief.

14          I looked over all of his -- I looked over his criminal

15   record, which is a Category III, although we're sentencing him

16   as a Category II, based on how the guidelines are going to

17   change in the future, and it does seem, though, a lot of his

18   criminal background, which is not substantial, but it exists,

19   but a lot of it's involved in activism and things that were

20   motivated by his ideology.  And I don't say that -- the

21   ideology doesn't justify the conduct here.  The defendant did

22   find a way to profit from his ideology.  We can say that the

23   church profited, really, but, from the Court's perspective, the

24   defendant personally profited from that substantially.

25          It's not that the ideology caused this crime.  It's

1    just that my view is that the intensity with which the

2    defendant held that ideology sincerely I think made him lose

3    some perspective on what could reasonably be construed as

4    lawful conduct and the likelihood of conducting his affairs

5    this way in a way that complied with federal law, and it did

6    not.

7         I've considered the following statutory factors set

8    forth at Section 3553(a) of Title 18 in imposing this sentence:

9         First, the nature and circumstances of the offense;

10   second, the history and characteristics of this defendant;

11   third, the kinds of sentences statutorily available; fourth,

12   both the kinds of sentences and the advisory sentencing range

13   established by the *U.S. Sentencing Guidelines*; fifth, the

14   policy statements issued by the U.S. Sentencing Commission

15   under the applicable guidelines, which I have reviewed and

16   considered very carefully in this case.

17        I spent a lot of time with the guidelines and the

18   conduct they are meant to target in analyzing the defendant's

19   conduct in light of that, in light of the policy articulations

20   that are embedded in and follow the guidelines and their

21   commentary.

22        Sixth, the need to avoid unwarranted sentencing

23   disparity in situations involving similar conduct and similar

24   criminal records.

25        And the Court notes that the defendant received an

1   upward adjustment for manager or leader, and it was appropriate

2   and wasn't objected to.  So, sentencing disparity is not that

3   weighty of a factor in this particular case.

4          And, seven, the need to provide restitution, which the

5   Court is going to order, although to whom and how much is yet

6   to be determined.

7          The fact that this sentence involved the calculation

8   of and then a variance from the applicable guideline sentencing

9   range ensures that the consideration of each factor, which I

10  have undertaken independently as well, is reflected by the

11  sentence.

12         The Court wants to note here that its sentence would

13  have been the same whether or not it applied the vulnerable

14  victim adjustment; or whether it applied both subsections of

15  the vulnerable victim adjustment, one subsection or neither,

16  the sentence would have been the same.

17         We learned something about the victims in this case

18  but not enough at least for me to seriously focus on that

19  vis-a-vis the sentence in this case.  I do believe some of them

20  are vulnerable people, by the way, either by age or by their

21  life circumstances, like recent events in their lives, but I

22  just try to impose sentences based on the deepest, broadest,

23  most accurate understanding I have of the evidence, and that's

24  evidence that's a little hazy to me, a little bit.

25         A sentence below the guideline sentencing range is

1    sufficient but not more severe than necessary to facilitate and

2    serve the statutory and traditional functions of sentencing.

3            That's the reason for the variance.  Give me a moment.

4            I'm not trying to keep people in suspense here.  What

5    I'm going to sentence the defendant to is 96 months.  It's a

6    very serious sentence; I'm not trying to suggest it's not.

7    It's less than half of the low end of the guideline sentencing

8    range, though.  It's a substantial variance and a substantial

9    sentence for what is, you know, referred to commonly as a

10   white-collar offense.

11           Are there any questions about the variance before I

12   impose sentence?

13           MR. AFRAME:  No, your Honor.

14           MR. SISTI:  Not on the variance, Judge.

15           THE COURT:  Thanks.

16           Pursuant to the Sentencing Reform Act of 1984, and

17   having considered the sentencing factors enumerated at

18   Section 3553(a) of Title 18, it is the judgment of the Court

19   that the defendant, Ian Freeman, is hereby committed to the

20   custody of the Bureau of Prisons, to be imprisoned for a term

21   of 96 months.  The term consists of 60 months on Counts 1, 2,

22   29 through 32 and a term of 96 months on Count 28s -- I should

23   say that differently.  This term consists of a term of 60

24   months on Counts 1s, 2s and 29s through 32s and a term of 96

25   months on Count 28s, to be served concurrently.

1          The Court notes, for what it's worth, this is

2     precisely the same sentence recommended by the probation

3     officer in this case, and I thought it was a very sound

4     analysis by the probation officer.  And, interestingly, the

5     probation officer didn't think that the vulnerable victim

6     adjustment applied, and it just sort of goes to show what the

7     Court was saying, just the vulnerability of victims in this

8     case is definitely a real thing, and they certainly were

9     victims, but the factors set forth in that guideline adjustment

10    were just not as clear to the Court as they needed to be for me

11    to increase the sentence.

12         The Court recommends the defendant participate in

13    substance abuse treatment while in BOP custody.

14         Upon release from imprisonment, Mr. Freeman shall be

15    placed on supervised release for a term of two years.  This

16    term consists of two years on Counts 1s, 2s and 28s through

17    32s, such terms to run concurrently.  Within 72 hours of

18    release from the Bureau of Prisons the defendant shall report

19    in person to the District to which he's released.

20         Mr. Freeman, I have this -- I'm going to stop imposing

21    sentence here for a minute to ask the defendant a question.  I

22    have this document here (indicating) called "Acknowledgment."

23    It looks like you signed it.  Did you sign this?

24              THE DEFENDANT:  Was that the last time I was here?

25              MR. SISTI:  Yeah.

1          THE COURT:  Yeah.

2          THE DEFENDANT:  Yes, I recall signing it.

3          THE COURT:  All right.  Here's what it tells me:  It

4     tells me that Mr. Buckley recommended conditions for your

5     supervision, basically the rules you have to live under for two

6     years.  This tells me that you read them and you understand

7     them.  Is that true?

8          THE DEFENDANT:  That's true.

9          THE COURT:  All right.  Mr. Sisti, or, Mr. Guerriero,

10    any objection to any condition of supervised release?

11         MR. SISTI:  No.  There wasn't then; there isn't now.

12         THE COURT:  All right.  While under supervision,

13    Mr. Freeman must comply with the standard conditions that have

14    been adopted by this Court and must comply with the mandatory

15    and proposed special conditions attached to the Presentence

16    Report and attached to the defendant's signed Acknowledgment,

17    which we just discussed.  It's docketed at number 353 of this

18    docket.

19         The defendant shall pay to the United States a Special

20    Assessment of $700.  It shall be due in full immediately.

21         The Court is going to impose a fine of $40,000, which

22    is at the low end of the guideline sentencing range.  The

23    reason for the low-end fine is -- and I'm not going to impose

24    any interest on the fine -- to allow for the greatest

25    availability of funds to pay restitution, when that is ordered

1    eventually.  No interest on the fine.  Payment of the fine

2    shall be in a lump-sum payment, which is due within 60 days of

3    sentencing.

4           The Court does make a final order that forfeiture -- a

5    forfeiture will be ordered in this case, it is ordered;

6    however, the Court wants to defer the details of the forfeiture

7    so it can consider it along with restitution, which to the

8    Court is a priority.

9           Mr. Freeman said, Please don't order me to pay a fine;

10   order it for restitution instead.  I understand, but I've got

11   to account for the law on each level, and I am going to try to

12   maximize the restitution to the extent that I can.

13          All right.  Those are the terms of the sentence.  I

14   know there is a Motion for Release Pending Appeal, so I just

15   want to nail those terms down.  Any questions about the terms

16   of the sentence?

17          MR. AFRAME:  No, your Honor.

18          MR. SISTI:  Terms, no, but there should be noted 69

19   days, he was incarcerated for 69 days.

20          THE COURT:  Any objection to noting that?  The Bureau

21   of Prisons will determine what pretrial credit he gets, but

22   normally he would get credit for that, 69 days.  All right.

23          MR. GUERRIERO:  Your Honor, we do need to state on the

24   record our objection to the sentence, when that's time, now, if

25   you like.

1           THE COURT:  Sure.

2           MR. GUERRIERO:  So, we object to the -- I realize

3   there is going to be a later hearing both on restitution and

4   forfeiture, but, because you've found both are due, I think I

5   have to object to both of those as procedurally unreasonable,

6   and I would just say it's for the reasons stated on the record

7   and, in particular, document 335 regarding forfeiture and

8   document 349 regarding the restitution.

9           And then regarding the 96-month sentence, we would

10   object to that as substantively unreasonable to the extent that

11   it exceeds the 38 months that we requested.  It's unreasonable

12   considering the factors under 18 U.S.C. 3553.  Thank you.

13           THE COURT:  Thank you.  Anything you want to say about

14   that?

15           MR. AFRAME:  No, your Honor.

16           THE COURT:  All right.  There is a Motion for Release

17   Pending Appeal.  There certainly will be an appeal in this

18   case.  That's document number 341.  I have read it.  What's

19   your position on the motion?

20           MR. AFRAME:  We oppose that motion, your Honor.

21           THE COURT:  All right.  Let me let them make the

22   motion first or at least elaborate.

23           MR. SISTI:  Yeah, your Honor.  I mean, the motion has

24   been made, and the basis for the motion I think can be

25   sustained almost beyond a reasonable doubt.  I mean, he's been

1     supervised without any major disruption.  He's not had his bail

2     revoked.  He's straightened up.  There was one blip, I think it

3     was back in December of 2021, and that all straightened out.

4     And he was monitored successfully.  He adhered to any and all

5     court orders, including his requests to go and participate in a

6     certain festival up north.  He understood the Court's order on

7     that, complied with the Court's order.  He's been living in the

8     same house, he's been easily monitored, and he's had actually

9     no contact with law enforcement of any significance over the

10    last two years.

11          He is somebody that will show up at any and all court

12    proceedings.  He's obviously looking forward to it, I suppose,

13    in many ways, and would be able to live by any restrictions

14    that are reasonable by the Court.  He's not a threat to the

15    society, he's not violent, and, again, he's not a

16    failure-to-appear risk.  He's got nothing like that on his

17    record.  So, I think with those facts, they're uncontroverted

18    facts before the Court.

19          And the Court has seen his behavior.  The Court

20    recognizes that, you know, whether there's a disagreement with

21    the Court and the verdict, he still respects this Court, and he

22    still respects this Court's orders.

23          So, with that, we're asking that he be released on the

24    same bail terms as he's on now.  They've been successful.

25    There was a substantial cash amount that was put up at the

1    beginning to expedite his release.  That's still ongoing, and

2    we would ask that that be ongoing and any monitoring that the

3    Court deems necessary.  He's already -- I believe he's already

4    given up his passport, and his travel restrictions are already

5    intact.

6              THE COURT:  Thanks.

7              MR. SISTI:  Thank you.

8              MR. AFRAME:  The law, when it comes to release or

9    detention, changes as the case proceeds.  So, at the beginning,

10   before the trial, the burden is on us to prove risk of flight,

11   danger to the community.  After the conviction --

12             THE COURT:  3143(b), right?

13             MR. AFRAME:  Right.  So, the burden is on the

14   defendant.  Now, that's not the only question.  Really the

15   question is you have to prove not only he doesn't pose a danger

16   or risk to flee but also that the appeal will likely result in

17   reversal, a new trial, a sentence that does not include

18   imprisonment, or a reduced sentence less than the total time

19   expected for the appeal.  None of that is at play here.

20             I'm not aware -- there's an argument that has been

21   pursued through this case about the major questions doctrine.

22   As I understand it, that applies to the 1960 count only.  The

23   96-month count sentence was on the 1956(h) count.  So, I don't

24   see that as being a potential risk to this conviction.

25             Everything else I'm aware of is sort of the humdrum of

1    an appeal, substantive reasonableness.  Those are unlikely to

2    prevail.  And so, the law is clear that at this stage of the

3    proceedings it's not only about the things Mr. Sisti's talking

4    about, it's about how that appeal is likely to come out, and

5    it's likely to come out with no change in what the Court's

6    doing today, and so the law says at this point the sentence

7    should begin.

8              THE COURT:  Understood.  Well, I don't think the

9    defendant is a flight risk.  Whether he's a danger, it's a

10   little harder to say.  He's certainly not violent, he's a

11   peaceful person, so he's not dangerous in the sense that, you

12   know, that he's going to endanger anybody in this community to

13   violence.  I don't mean that at all.  But there was real harm

14   caused by his conduct, and that's dangerous.  But I'm going to

15   assume he's not dangerous in the sort of traditional sense.

16             The thing is, the prosecutor is right.  I have to

17   find, and the burden is on the defendant to establish, not only

18   that he's not a danger and not a flight risk, which I find, but

19   that the appeal is not for the purpose of delay -- I'll give

20   you that; I don't look at it as dilatory; I think you have a

21   good-faith appeal -- but also that it raises a substantial

22   question of law or fact likely to result in reversal, an order

23   for a new trial, a non-prison sentence, or a reduced sentence

24   to a term of imprisonment less than the total of time already

25   served -- was it 67 or 69 days -- plus the expected time of an

1    appeal.  I can't see that here.

2           I don't think the Motion to Dismiss on the funds

3    question, whether bitcoin is funds under the statute -- I

4    listened carefully to the Sheriff from out of state, and I

5    understand he has some understanding of the law, but whether

6    you look at it through major questions or just nondelegation or

7    just statutory construction, I don't see our Court of Appeals

8    reversing that decision.  I guess it's possible the

9    U.S. Supreme Court might, because the major questions doctrine

10   and questions of Congressional authority and statutory

11   construction are very actively debated on our Supreme Court,

12   but I don't think the odds are good.  That's really the only --

13   I can't imagine any appeal issue in this case reducing the

14   situation -- you know, reducing the counts or applicable law or

15   sentences to a situation that would result in a sentence of

16   less time than it's going to take for the appeal.

17          So, I can't grant bail pending appeal here.  The

18   statute doesn't permit it, at least the way I understand it.

19          I've never had to apply the statute like down to (iv),

20   (B)(iv), like I have in this case; it never gets that far.  But

21   generally in white-collar cases that don't involve a violent

22   offender, like Mr. Freeman, I generally grant bail pending

23   appeal, but that's because I really fear that the sentence

24   could be served, the whole sentence, before the appeal is over,

25   and that would be a shame, for someone to serve an entire

1    sentence and then have the conviction reversed.  Even if this

2    conviction is reversed, any aspect of it, I can't imagine it's

3    going to result in a subsequent prosecution or subsequent

4    sentencing for less time than it's going to take.  I just can't

5    see it.

6          Now, look.  You're going to appeal right away, and

7    maybe the Court of Appeals will disagree, and you can file a

8    motion for release pending appeal there.  If I'm wrong, I take

9    no offense, but I can't grant bail pending appeal in this

10   particular case now.  I don't think the defendant has made the

11   required showing under 18 U.S.C. Section 3143(b)(B), (b)(A) or

12   (b)(B).

13         So, the defendant will be taken into custody by the

14   United States Marshal pending any further order by the Court of

15   Appeals or this Court.

16         We're adjourned.

17        (WHEREUPON, the proceedings adjourned at 12:55 p.m.)

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    knowledge, skill, ability and belief, a true and accurate

8    transcription of the within proceedings.

9

10

11

12

13   Date:  ___11/17/23_____        /s/ *Brenda K. Hancock*
                                     Brenda K. Hancock, RMR, CRR
14                                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25